UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DR. JAMES J. TIESIGNA *ex rel.*
UNITED STATES GOVERNMENT,
and DR. JAMES J. TIESINGA

    Plaintiffs,

-against-

DIANON SYSTEMS, INC. and
ETHEL JANEGA

    Defendants.

**COMPLAINT**

JURY DEMAND

302CV1573

On behalf of the United States Government, the Plaintiff, Dr. James J. Tiesinga, by his attorneys, Maya & Associates, P.C., hereby complains and alleges that Defendant DIANON Systems, Inc. violated rights secured to the Unites States Government under the False Claims Act. On behalf of himself, Dr. Tiesinga hereby complains and alleges that Defendant DIANON Systems, Inc. and Defendant Ethel Janega violated rights secured to him under federal and state statutory law, as well as state decisional law.

### PARTIES

1. The Plaintiff is Dr. James J. Tiesigna ("Tiesinga"), who resided at 9312 Avalon Gates, Trumbull, Connecticut 06611. At all material times, Tiesinga was a gay man diagnosed with a positive HIV status.

2. The Defendant is DIANON Systems, Inc. ("DIANON" or the "Company"), a corporation organized under the laws of the State of Delaware. With corporate headquarters at 200 Watson Boulevard, Stratford, Connecticut 06615, the Company provides pathology services to physicians. At all material times, DIANON

employed at least twenty (20) employees and is therefore an "employer" for purposes of federal and state employment discrimination statutes.

3.  Ms. Ethel Janega is also a Defendant. Upon information and belief, Janega resides at 22 Partridge Drive, Seymour, Connecticut 06483. At all material times, Janega was an employee of DIANON.

## JURISDICTION

4.  The Court has subject matter jurisdiction over the Counts brought under the False Claims Act and Rehabilitation Act by way of 28 U.S.C. § 1332, with supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

5.  On August 30, 2002, the Connecticut Commission on Human Rights and Opportunities issued a "Release of Jurisdiction" relative to Tiesinga's claims under the Connecticut Fair Employment Practices Act ("CFEPA"). The Release is attached hereto as Exhibit A.

## VENUE

6.  The District of Connecticut is the proper venue for this dispute under 29 U.S.C. § 1391(b), since a substantial part of the events and omissions giving rise to the claims occurred in this judicial district.

## FACTS

7.  In July 2001, DIANON hired Tiesinga as a Staff Pathologist specializing in Hematopathology. In this role, Tiesinga examined bone marrow and lymph node biopsies for the purpose of identifying hematologic disorders. While Tiesinga reported directly to the Co-Directors of Hematopathology, he also reported to Dr. James "Jay"

Amberson ("Amberson"), a co-founder of DIANON, who managed all parts of the Company's pathology operation as the "Director of Laboratories."

8. From his first day on the job, Tiesinga performed his job duties in exemplary fashion, as he surpassed the Company's other Hematopathologists in cases completed and hours logged. As a result, on or about March 18, 2002, DIANON offered Tiesinga the position of "Director of Hematopathology" for a facility the Company had acquired recently in Oklahoma City. Under the terms of the offer, Tiesinga's start date would be on or around June 30, 2002 at an annual salary of $230,000.00. Tiesinga accepted the Company's offer, and shortly thereafter, recruited a team of doctors and laboratory personnel for the new facility.

9. During the month of April 2002, Tiesinga devoted additional time to his "Director" duties, but not at the expense of his pathologist responsibilities, which required hourly attention. Thus, in this latter respect, Tiesinga continued to render diagnoses on scores of cases each day, later providing his findings to the Company's Transcription Department, where a report would be typed up for submission to the primary care physician who submitted the biopsy, i.e., DIANON's client. Given the every day need for reports, Tiesinga became acquainted with the Transcription Department's "Group Leader," Ms. Ethel Janega ("Janega"). Janega was among the group of DIANON employees who had knowledge of Tiesinga being transported to the hospital on April 28, 2002 as a result of an allergic reaction.

10. On Friday, May 3, 2002, Tiesinga disclosed to Janega that his allergic reaction was in response to a medication prescribed for his positive HIV status. Immediately thereafter, and indeed for the remainder of his employment, Janega

3

systematically discriminated against Tiesinga on account of his HIV status, to the point where she interfered with his ability to perform his job duties and subjected him to pervasive abuse. Janega also advised at least two other DIANON employees of Tiesinga's HIV status.

11.  On Monday, May 6, 2002, Tiesinga entered the Transcription Room to drop his findings in an "in-box" mounted to the wall, just as he had done for each day of the preceding nine (9) months of his employ. Nonetheless, upon his entrance, Janega stated to Tiesinga, "you are not to step foot in this room for any reason." Janega gave Tiesinga a similar "instruction" the following day, and indeed for each day, of that week ending Friday, May 10, 2002. Furthermore, Tiesinga was advised that Janega had threatened to discipline the employees of the Transcription Department if they communicated with Tiesinga in any way.

12.  On Monday, May 13, 2002 and Tuesday, May 14, 2002, Janega's abuse of Tiesinga continued unabated. Aside from her familiar orders for Tiesinga to "stay out" of the Transcription Room, Janega began to hold his papers by the edges, using only her fingertips, as if the papers were transfer agents for his HIV infection. Furthermore, Tiesinga discovered that Janega was deliberately delaying the typing and finalization of his reports.

13.  During Janega's abuse in the midst of May 2002, Tiesinga became aware of a policy on the part of DIANON to charge Medicare for services not requested by the doctors who made up DIANON's client base. In particular, Tiesinga learned that DIANON would use an unnecessary *number* of antibodies in conducting so-called flow cytometry analysis, which was a service offered by DIANON for the purpose of

diagnosing blood diseases. Whereas, in the majority of cases, DIANON would need no more than fifteen (15) antibodies to respond to the physician's request, e.g., "test for lymphoma," the Company would virtually always use twenty-five (25) antibodies, as Medicare would reimburse DIANON for these added, but unnecessary, antibody tests.

    14.    On May 14, 2002, Tiesinga attended a meeting with several members of DIANON's senior management, including Amberson and Valerie Palmeri ("Palmeri"), who, upon information and belief, serves as DIANON's Chief Operations Officer. During this meeting, Tiesinga stated his opposition to DIANON's policy of charging Medicare for unnecessary antibodies during flow cytometry analysis. In response, Amberson recognized that the use of twenty-five antibodies in each case was "not appropriate," but advised Tiesinga that DIANON would continue to use all antibodies for which Medicare reimbursement could be received, as any divergence from the policy would require costly changes to DIANON's computerized billing and reporting system. Palmeri, for her part, agreed, noting that flow cytometry was a "major source of revenue for the [C]ompany, and will not be changed."

    15.    The next day, i.e., May 15, 2002, Tiesinga met with Amberson to advise him of Janega's abuse. Tiesinga informed Amberson that Janega had excluded him from the Transcription Room and otherwise subjected him to "hostile" behavior. Tiesinga further complained that Janega was "singling him out" as though he was a "leper." Tiesigna also informed Amberson that Janega was deliberately delaying the preparation of his reports, while threatening the Transcription Department employees with discipline if they dare communicate with him in any way. In response, Amberson promised that he would discuss Tiesinga's complaints with Palmeri.

16. Despite his complaints, on Friday, May 17, 2002, Tiesinga was advised that Janega had intensified her earlier threats to the Transcription Department employees, going so far as to threaten them with *termination* in the event they engaged in any dialogue with him. Also on Friday, May 17, 2002, Tiesinga noticed that Janega removed so-called "divvy sheets" from the wall behind her desk in the Transcription Room. Previously, Janega used the divvy sheets as a tool for advising that findings for a particular case had been typed up and a report was ready for delivery to the client.

17. The following Monday, May 20, 2002, Tiesinga questioned Janega on her reasons for removing the divvy sheets. In an angered tone, Janega stated to Tiesinga, "you don't need to come *near* my area looking for them, you have your own." While Tiesinga's computer did contain some relevant information, Janega appeared to ignore the fact that Tiesinga utilized the divvy sheet notice system since his first day on the job, without any objection on Janega's part. Shortly after Janega made her comments, Tiesinga complained to Amberson for a second time, advising him that Janega altered the conditions of his employment further, by removing the divvy sheets so as to keep Tiesinga away from her. Tiesinga expressly complained that Janega's behavior was "discriminatory" and demanded a resolution. In response, Amberson advised Tiesinga that he already discussed his complaints with Palmeri, but would do so again.

18. Upon information and belief, on Tuesday, May 21, 2002, Palmeri had a discussion with Janega whereby Palmeri condoned her past abuse of Tiesinga and failed to instruct Janega to avoid future abuse of Tiesinga. That same day, Tiesinga questioned Janega on whether other doctors had complained about the divvy sheets being removed. In a raised voice, Janega told Tiesinga that he was "forbidden to come in here [i.e., the

6

Transcription Room]" and ordered him to leave, which he did so as to avoid a confrontation. Later, Tiesinga received a voice-mail from Janega, advising him that she had created a new "in-box" for his findings only, with the other doctors placing their findings in the common in-box. Tiesinga then peered into the Transcription Room where he observed a separate in-box for himself, which was mounted just inside the threshold of the Transcription Room. In her message, Janega explained that her placement of the "in-box" was strategic, designed to avoid Tiesinga's need to enter the Transcription Room physically.

19.     Shortly after observing his special "in-box," Tiesinga went to Palmeri's office to complain, but was advised by her secretary, Irene, that Palmeri was not available. Tiesinga then expressed his concerns to Irene that Janega might disclose, if she had not already disclosed, "information about people's medical condition." Tiesinga explained that his concern was particularly acute given that DIANON had scheduled Janega to fly to Oklahoma City and train the facility's Transcription Department. Upon information and belief, Irene relayed Tiesinga's complaints to Palmeri that same day.

20.     Since Palmeri was not available, Tiesinga met with Amberson and complained to him for a *third* time, going so far as to show Amberson the separate "in-box." Tiesinga again informed Amberson that he found Janega's conduct to be "discriminatory," as well as "humiliating." By this time, Tiesinga had been reduced to tears. In response, Amberson stated that he would discuss Tiesinga's complaints with Palmeri. That night, Tiesinga also left a voice-mail message for Janega's direct supervisor, who, of course, ultimately reported to Palmeri.

21.     The following day, Wednesday, May 22, 2002, Tiesinga entered the

7

Transcription Room and, in exercise of his rights, placed his findings in the common "inbox." Upon seeing this, Janega exclaimed "what are you doing; your reports belong in this separate bin, and that's all per Valerie [Palmeri]'s orders." To avoid a confrontation, Tiesinga returned to his office and closed the door. Moments later, Tiesinga heard several loud thumps on his door, which he opened only to find a red-faced Janega with her arm raised and "pointer" finger aimed at his face. As Janega began to berate him, Tiesinga closed his door and endeavored to return to his duties. Roughly thirty minutes later, Amberson advised Tiesinga that Janega had just accused him of slamming a door in her face. Tiesinga disputed Janega's accusation and reminded Amberson of the series of complaints that he had lodged against her, with no response from DIANON. Tiesinga then pleaded for Amberson to respond to his complaints, as Janega was "pushing some very emotional buttons" in the course of "discriminating" against him to the point where he was being "torn apart." Predictably, Amberson advised Tiesinga that he would discuss his complaints once again with Palmeri.

22.   Following this meeting with Amberson, Tiesinga returned to his office. Tiesinga then learned from an anonymous caller that security officers had been assigned to his area and were instructed to remove him from the building in the event he exited his office. Accordingly, for the ensuing seven (7) hours, Tiesinga was a captive in his own office. Fearing for his safety if he left his office, Tiesinga urinated in jars. At the end of the day, Tiesinga was escorted by Amberson to his office where Human Resources' official Leon Bailey ("Bailey") was lying in wait. Bailey accused Tiesinga of slamming his door in Janega's face and advised him that he was "precariously close" to being removed from the building and having his employment with DIANON terminated.

Tiesinga rejected the notion that he slammed his door, and suggested that the real focus should be the abuse that *he* had long endured at the hands of Janega. In response, Bailey offered the following comment: "[you] guys are so full of drama." Amberson then advised Tiesinga that Palmeri had been advised of his complaints and fully supported Janega's behavior and the alterations she caused in the conditions of his employment. Amberson also advised Tiesinga that the Company no longer considered him to be "Director material." Bailey then concluded the meeting by advising Tiesinga that he would meet with him again tomorrow to discuss the discipline that DIANON would impose upon *him* as a result of the alleged door slam and other alleged violations of Company policy.

23.   The following day, Thursday, May 23, 2002, Tiesinga met with Bailey and Amberson in Amberson's office. Tiesinga advised Bailey that he was uncomfortable with his involvement insofar as other DIANON employees had advised him that Bailey was "homophobic." In response, Bailey advised Tiesinga that his statement was "just one more thing that [would] count against him." Tiesinga then advised Bailey and Amberson that he was HIV positive and stated that Janega's abuse of him was the result of his disclosing his HIV status to Janega on May 3, 2002. Immediately after this disclosure, Bailey informed Tiesinga that he would be placed on paid suspension from Saturday, May 25, 2002 to Monday, June 3, 2002 while DIANON contemplated further disciplinary action against him. At that point, Tiesinga advised both Bailey and Amberson that he was concerned that a suspension might cause him emotional problems, including depression. Although Bailey promised to supply Tiesinga with materials relative to DIANON's counseling services, Tiesinga never received any such materials

9

and Bailey never contacted Tiesinga to advise that DIANON would be unable to provide the materials.

24. On Friday, May 24, 2002, Tiesinga reported to DIANON to attend to various matters in preparation for his suspension. In the early afternoon, Bailey stopped by Tiesinga's office and told him that he "must be off the premises by 5 p.m. and [he] [did] not want to see [his] face [at] [DIANON] until June 3rd." Tiesinga complied with Bailey's orders, and left DIANON at 5 p.m. that day, with most employees believing erroneously, albeit innocently, that *Tiesinga* was guilty of wrongdoing.

25. On Saturday, May 25, 2002, Tiesinga began his suspension and was soon besieged by suicidal feelings that ultimately required his hospitalization at Yale University Psychiatric Hospital. Since that time, Tiesinga has been prescribed anti-depressant medication, and regularly sees a psychiatrist for support.

26. In light of the intolerable conditions underlying his employment, and the understanding that he would not be given the promised "Director" position, Tiesinga resigned his employment with DIANON on June 5, 2002.

## COUNT 1
## HOSTILE WORK ENVIRONMENT UNDER THE CFEPA

27. Tiesinga repeats and realleges paragraphs 1 through 26, above, as if fully set forth herein.

28. At all material times, by reason of his positive HIV status, Tiesinga had a "disability" within the meaning of the Connecticut Fair Employment Practices Act.

29. As detailed above, Janega subjected Tiesinga to regular abuse during his employment with DIANON. Through her *pervasive* abuse, which was motivated by

Tiesinga's HIV status, Janega created a hostile working environment that altered the conditions of Tiesinga's employment.

30. Aside from the frequency of the abuse, Janega's conduct was sufficiently *severe* to alter the conditions of Tiesinga's employment and create a hostile working environment.

31. Despite Tiesinga's repeated complaints, DIANON failed to remedy the past harassment and to prevent future harassment of Tiesinga by Janega.

32. Tiesinga was offended by Janega's conduct, which would be equally offensive to a reasonable person.

33. Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(1) by subjecting Tiesinga to a hostile work environment on the basis of his disability.

34. Given that Tiesinga's resignation was based on the violation alleged in paragraph 33, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

35. As a result of the violation alleged in paragraph 33, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

36. The violation alleged in paragraph 33, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 2
## RETALIATION UNDER THE CFEPA

37. Tiesinga repeats and realleges paragraphs 1 through 36, above, as if fully set forth herein.

38. By his repeated complaints to DIANON, Tiesinga opposed the hostile environment created by Janega's pervasive and severe abuse of him. Tiesinga also opposed Janega's unlawful abuse by closing his office door on May 21, 2002 to prevent Janega from further berating him for placing his findings in a common "in-box."

39. As a result of Tiesinga's opposition, DIANON repudiated the Company's promise to name Tiesinga as the Director of Hematopathology, threatened him with termination, put him on a 10 day suspension and was otherwise responsible for the intolerable conditions that led to his constructive discharge.

40. Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(4) by subjecting Tiesinga to adverse employment actions as a result of his opposition to Janega's abuse.

41. Given that Tiesinga's resignation was based on the violation alleged in paragraph 40, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

42. As a result of the violation alleged in paragraph 40, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

43. The violation alleged in paragraph 40, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 3
## HOSTILE WORK ENVIRONMENT UNDER CFEPA

44. Tiesinga repeats and realleges paragraphs 1 through 43, above, as if fully set forth herein.

45. At all material times, Leon Bailey either perceived Tiesinga as being gay or had actual knowledge that Tiesinga was gay.

46. As a result of his bias towards Tiesinga, Bailey either recommended or made the decision to repudiate the Company's promise to name Tiesinga as the Director of Hematopathology and placed him on a 10 day suspension. In addition, Bailey stationed security guards outside of Tiesinga's office and threatened him with termination because of his opposition to Janega's abuse. Bailey also insulted Tiesinga in the course of uttering a discriminatory comment, falsely accused him of violations of DIANON policy, threatened him with discipline for exposing Bailey's bias, failed to provide Tiesinga with materials relating to DIANON's counseling services, and told Tiesinga that he "did not want to see [his] face" at DIANON until his suspension was completed.

47. As just detailed, Bailey subjected Tiesinga to regular abuse during his employment with DIANON. Through his *pervasive* abuse, which was motivated by his bias against Tiesinga as a homosexual, Bailey created a hostile working environment that altered the conditions of Tiesinga's employment.

48. Aside from the frequency of the abuse, Bailey's conduct was sufficiently *severe* to alter the conditions of Tiesinga's employment and create a hostile working environment.

49. At all materials times, DIANON had knowledge of Bailey's harassment of Tiesinga but failed to remedy the past harassment and to prevent future harassment of Tiesinga by Bailey.

50. Tiesinga was offended by Bailey's conduct, which would be equally offensive to a reasonable person.

51. Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(1) by subjecting Tiesinga to a hostile work environment on the basis of his sexual orientation.

52. Given that Tiesinga's resignation was based on the violation alleged in paragraph 51, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

53. As a result of the violation alleged in paragraph 51, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

54. The violation alleged in paragraph 51, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 4
## RETALIATION UNDER CFEPA

55. Tiesinga repeats and realleges paragraphs 1 through 54, above, as if fully set forth herein.

56. Tiesinga opposed Bailey's involvement in the May 23, 2002 meeting because of his belief that Bailey held a bias against homosexuals, as demonstrated the day before by Bailey's discriminatory comment.

57. As alleged above, in response to Tiesinga's opposition, Bailey advised him that it was "just one more thing that [would] count against him." Bailey then put Tiesinga on a 10 day suspension. The following day, Bailey advised Tiesinga that he did "not want to see [Tiesinga's] face" at DIANON until his suspension was completed, and later failed to supply Tiesinga with the counseling materials that he requested and that Bailey promised to provide during the May 23, 2002 meeting.

58. Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(4) by subjecting Tiesinga to adverse employment actions as a result of his opposition to Janega's abuse.

59. Given that Tiesinga's resignation was based on the violation alleged in paragraph 58, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

60. As a result of the violation alleged in paragraph 58, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

61. The violation alleged in paragraph 58, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 5
## VIOLATION OF THE REHABILITATION ACT