62. Tiesinga repeats and realleges paragraphs 1 through 61, above, as if fully set forth herein.

63. By receiving Medicare funds, DIANON is a recipient of federal financial assistance within the meaning of § 504 of the Rehabilitation Act.

64. At all material times, Tiesinga was qualified to perform the essential functions of his job, despite being a person with a handicap within the meaning of the Rehabilitation Act.

65. As detailed in Count 1, above, Janega created a hostile working environment based upon her pervasive and severe abuse of Tiesinga, to the point where the conditions of his employment were irreparably altered.

66. Despite his repeated complaints, DIANON failed to remedy the past harassment and to prevent future harassment of Tiesinga by Janega.

67. Tiesinga was offended by Janega's conduct, which would be equally offensive to a reasonable person.

68. Based upon the foregoing, DIANON violated § 504 of the Rehabilitation Act of 1973 by subjecting Tiesinga to a hostile work environment on the basis of his handicap.

69. Given that Tiesinga's resignation was based on the violation alleged in paragraph 68, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

70. As a result of the violation alleged in paragraph 68, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

71.     The violation alleged in paragraph 68, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 6
## VIOLATION OF THE FALSE CLAIMS ACT

72.     Tiesinga repeats and realleges paragraphs 1 through 71, above, as if fully set forth herein.

73.     During the period of Tiesinga's employment with DIANON, i.e., July 2001 to June 5, 2002, the Company prepared and submitted to the United States Government claims which requested and / or demanded money paid from the federal treasury on account of flow cytometry analyses performed by DIANON. Upon information and belief, DIANON prepared and submitted similar claims in the years prior to Tiesinga commencing his employment with the Company. Upon further information and belief, DIANON received substantial monies from the federal treasury on account of the flow cytometry cases it performed.

74.     Upon information and belief, each flow cytometry claim submitted by DIANON, both before and during Tiesinga's employment with the Company, expressly certified, as a precondition to payment, that the analysis, which used a full panel of antibodies, was reasonable and necessary for the diagnosis of illness or injury. In fact, in the majority of cases, a full panel of antibodies was *not* reasonable and necessary for such diagnosis. Accordingly, in these cases, DIANON's claims were false.

75. In the alternative, regardless of the express language, each flow cytometry claim submitted by DIANON, both before and during Tiesinga's employment, implicitly certified, as a precondition to payment, that the analysis, which used a full panel of antibodies, was reasonable and necessary for the diagnosis of illness or injury. In fact, in the majority of cases, a full panel of antibodies was *not* reasonable and necessary for such diagnosis. Accordingly, in these cases, DIANON's claims were false.

76. From May 14, 2002 through today, DIANON has had actual knowledge that, in a majority of flow cytometry cases, a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury. Accordingly, with respect to this time frame, and in relation to these cases, DIANON's claims were fraudulent.

77. Upon information and belief, prior to May 14, 2002, the Company had actual knowledge that, in a majority of flow cytometry cases, a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury. Accordingly, with respect to this earlier time frame, and in relation to these previous cases, DIANON's claims were similarly fraudulent. In the alternative, with respect to this same time frame, and in relation to these same cases, the Company acted either in deliberate ignorance or reckless disregard of the fact that a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury.

78. Based upon the foregoing, DIANON violated § 3729(a)(1) and § 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2002) and is therefore subject to all penalties as provided for therein.

79. In compliance with 31 U.S.C. § 3730(b)(2), upon the *in camera* filing of

this Complaint, Tiesinga served a copy of this Complaint, together with a written statement of the evidence and information he possesses relative to this Sixth Count, on the United States Government, in accordance with the service of process rules set forth by Rule 4(d)(4) of the Federal Rules of Civil Procedure.

### COUNT 7
### NEGLIGENT SUPERVISION

80. Tiesinga repeats and realleges paragraphs 1 through 79, above, as if fully set forth herein.

81. For the duration of Tiesinga's employment with DIANON, the Company had the duty to supervise Janega insofar as she was an employee of the Company during that time period. Alternatively, the Company acquired the obligation on May 15, 2002, as Tiesinga complained to DIANON management that day about Janega's abuse of him.

82. For the duration of Tiesinga's employment with DIANON, the Company failed to supervise Janega reasonably, and thereby enabled her to abuse Tiesinga. Alternatively, DIANON failed to supervise Janega reasonably during the period May 15, 2002 to June 5, 2002, and thereby enabled her to abuse Tiesinga.

83. Given that Tiesinga's resignation was based on the negligent supervision alleged in paragraph 82, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

84. As the direct and proximate result of DIANON's failure to supervise Janega reasonably, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

85. The negligent supervision alleged in paragraph 82, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 8
## NEGLIGENT RETENTION

86. Tiesinga repeats and realleges paragraphs 1 through 85, above, as if fully set forth herein.

87. Assuming *arguendo* that DIANON instructed Janega to cease her harassment of Tiesigna, the Company had the obligation to discharge her once her harassment of Tiesinga continued.

88. DIANON had actual knowledge of Janega's continued harassment of Tiesinga. In the alternative, DIANON had constructive knowledge of the continued harassment.

89. DIANON negligently retained Janega during the course of her ongoing harassment of Tiesinga.

90. Given that Tiesinga's resignation was based on the negligent retention alleged in paragraph 89, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

91. As the direct and proximate result of DIANON's negligent retention of Janega, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

92.     The negligent retention alleged in paragraph 89, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 9
## FALSE IMPRISONMENT

93.     Tiesinga repeats and realleges paragraphs 1 through 92, above, as if fully set forth herein.

94.     On May 22, 2002, the Company stationed security guards outside of Tiesinga's office and instructed them to remove Tiesinga from the building in the event he left his office. Accordingly, DIANON restrained Tiesinga's physical liberty by confining him to his office.

95.     Tiesinga learned about the presence of the security guards and their instructions to remove him from the building in the event he left his office. Tiesinga was therefore conscious of his confinement.

96.     Tiesinga did not consent to his confinement and the confinement was not otherwise privileged.

97.     As the direct and proximate result of DIANON's false imprisonment of Tiesinga, he suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

98.     The false imprisonment alleged in this Ninth Count is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on

notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 10
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99. Tiesinga repeats and realleges paragraphs 1 through 98, above, as if fully set forth herein.

100. By May 15, 2002, DIANON had knowledge that Janega was harassing Tiesinga. Yet, the Company chose not to respond to Tiesinga's complaints and thereby enabled Janega to continue her harassment of Tiesinga. In fact, DIANON actually supported Janega's harassment of Tiesinga.

101. On May 22, 2002, DIANON stationed security guards outside of Tiesinga's office and instructed them to remove Tiesinga from the building in the event he left his office.

102. That same day, the Company made false accusations against Tiesinga, threatened to discharge him, and repudiated the Company's promise to name him Director.

103. On May 23, 2002, DIANON advised Tiesinga that he would be penalized for sharing his concern that Bailey was "homophobic." Later, Tiesinga was advised that he would be suspended for ten (10) days.

104. During his suspension, DIANON failed to provide Tiesinga with materials relating to the Company's counseling services, despite Tiesinga indicating that he would benefit from such services.

105. The conduct alleged above is extreme and outrageous, to the point where the local community would regard such behavior as totally intolerable.

106. As a result of the conduct alleged above, Tiesigna suffered severe emotional distress, which he continues to suffer today.

107. DIANON engaged in the conduct alleged above with the intent to cause Tiesinga emotional distress. Alternatively, the Company knew or should have known that by engaging in the conduct alleged above it would likely cause Tiesinga emotional distress.

108. Based upon the foregoing, DIANON is liable for intentional infliction of emotional distress.

109. The conduct alleged in this Tenth Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 11
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

110. Tiesinga repeats and realleges paragraphs 1 through 109, above, as if fully set forth herein.

111. Assuming *arguendo* that DIANON instructed Janega to cease her abuse of Tiesinga, the Company failed to procure an actual cessation of Janega's harassment of Tiesinga.

112. DIANON should have realized that by failing to procure an actual cessation of Janega's harassment, the Company was posing an unreasonable risk to Tiesinga that he would suffer from emotional distress which might lead to illness or bodily harm.

23

113. As a result of DIANON's failure, Tiesinga suffered severe emotional distress, which continues to endure today.

114. Based upon the foregoing, DIANON is liable for negligent infliction of emotional distress.

115. The conduct alleged in this Eleventh Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 12
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

116. Tiesinga repeats and realleges paragraphs 1 through 115, above, as if fully set forth herein.

117. On May 23, 2002, Tiesinga advised DIANON that he might become depressed during the course of his suspension and requested that the Company provide him with resource materials relating to DIANON's counseling services.

118. DIANON failed to provide these requested, and promised, materials and failed to contact Tiesinga to share the Company's inability / unwillingness to provide the materials.

119. DIANON should have realized that by failing to provide the counseling resource materials, the Company was posing an unreasonable risk to Tiesinga of suffering severe emotional distress which might lead to illness or bodily harm.

120. As a result of DIANON's failure, Tiesinga suffered severe emotional distress, which he continues to endure today.

24

121. Based upon the foregoing, DIANON is liable for negligent infliction of emotional distress.

122. The conduct alleged in this Twelfth Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

### COUNT 13
### CONSTRUCTIVE DISCHARGE

123. Tiesinga repeats and realleges paragraphs 1 through 122, above, as if fully set forth herein.

124. Based upon the conduct and omissions alleged in this Complaint, the Company intentionally subjected Tiesinga to an intolerable environment at DIANON.

125. The intolerable working environment alleged in paragraph 124, above, resulted in Tiesinga's constructive discharge. Said discharge reflects DIANON's violation of public policies, including the policy of having employers provide a safe working environment for its employees, as provided by C.G.S. § 31-49.

126. As a result of the constructive discharge alleged in paragraph 125, above, Tiesinga incurred economic loss, including, but not limited to, lost salary and benefits.

127. As a result of the constructive discharge alleged in paragraph 125, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

128. The constructive discharge alleged in paragraph 125, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 14
## VIOLATION OF FALSE CLAIMS ACT

129. Tiesinga repeats and realleges paragraphs 1 through 128, above, as if fully set forth herein.

130. On May 14, 2002, Tiesinga opposed DIANON's policy of charging Medicare for unnecessary antibody use during flow cytometry analyses. Tiesinga's opposition was a lawful act done in furtherance of this Fourteenth Count, which is brought under § 3730 of the False Claims Act.

131. As a result of Tiesinga's opposition, DIANON condoned Janega's abuse of him. The Company also repudiated the promise to name Tiesinga as the Director of Hematopathology, threatened him with discharge, put him on a 10 day suspension and otherwise discriminated against him in the course of creating the intolerable conditions that led to his constructive discharge.

132. Based upon the foregoing, DIANON violated § 3730(h) of the False Claims Act.

133. Given that Tiesinga's resignation was based on the violation alleged in paragraph 132, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

134. As a result of the violation alleged in paragraph 132, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

135. The violation alleged in paragraph 132, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on

notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 15
## INVASION OF PRIVACY

136. Tiesinga repeats and realleges paragraphs 1 through 135, above, as if fully set forth herein.

137. Janega publicized to at least two people Tiesinga's HIV status, which was a condition relating to his private life and disclosed to Janega in the strictest of confidences.

138. Janega's disclosure of Tiesinga's HIV status would be highly offensive to a reasonable person and is of no legitimate concern to the public.

139. By reason of the foregoing, Janega invaded Tiesinga's privacy by publicizing private facts concerning Tiesinga.

140. As a result of the invasion of privacy alleged in paragraph 139, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

141. The invasion of privacy alleged in paragraph 139, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 16
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

142. Tiesinga repeats and realleges paragraphs 1 through 141, above, as if fully set forth herein.

143. Janega's conduct as alleged above, including the conduct alleged in Count One, above, is extreme and outrageous, to the point where the local community would regard such behavior as totally intolerable.

144. As a result of Janega's conduct, Tiesigna suffered severe emotional distress, which he continues to endure today.

145. Janega engaged in the conduct alleged above with the intent to cause Tiesinga emotional distress. Alternatively, Janega knew or should have known that by engaging in the conduct alleged above it would likely cause Tiesinga emotional distress.

146. Based upon the foregoing, Janega is liable for the intentional infliction of emotional distress.

147. The conduct alleged in this Sixteenth Count was so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 17
### RETALIATION UNDER CFEPA

148. Tiesinga repeats and realleges paragraphs 1 through 147, above, as if fully set forth herein.

149. On May 22, 2002, Tiesinga opposed Janega's discriminatory employment practices by placing his findings in the common in-box and then closing his office door as Janega stood outside the threshold and berated him.

150. Janega later retaliated against Tiesinga by lodging false allegations against him with the Company.

28

151. Based upon the foregoing, Janega violated § 46a-60(a)(4) of the CFEPA by retaliating against Tiesinga for opposing her discriminatory employment practices against him.

152. Given that Tiesinga's resignation was based on the violation alleged in paragraph 151, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

153. As a result of the violation alleged in paragraph 151, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

154. The violation alleged in paragraph 151, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 18
## COERCION OF DISCRIMINATORY PRACTICE UNDER CFEPA

155. Tiesinga repeats and realleges paragraphs 1 through 154, above, as if fully set forth herein.

156. On several occasions, Janega coerced employees of the Transcription Department to cease engaging in any conversations with Tiesinga because of his disability.

157. Based on the foregoing, Janega violated § 46a-60(a)(5) of the CFEPA by coercing the doing of an act that is a discriminatory employment practice.

158. Given that Tiesinga's resignation was based on the violation alleged in paragraph 157, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

29

159. As a result of the violation alleged in paragraph 157, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

160. The violation alleged in paragraph 157, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 19
## DEFAMATION

161. Tiesinga repeats and realleges paragraphs 1 through 160, above, as if fully set forth herein.

162. On May 22, 2002, Janega stated to Amberson and / or Bailey that Tiesinga had "slammed his door in her face."

163. Janega's statement was false and made by Janega with knowledge of its falsity.

164. Janega's statement was made for the purpose of injuring Tiesinga and she was therefore acting out of malice.

165. Janega's statement would cause Tiesinga to be hated, ridiculed and held up to scorn and contempt by reasonable and respectable members of the community.

166. Based on the foregoing, Janega defamed Tiesinga.

167. Given that Tiesinga's resignation was based on the defamation alleged in paragraph 166, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.