UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
_____

|  |  |  |
|---|---|---|
| DR. JAMES J. TIESIGNA *ex rel.* UNITED STATES GOVERNMENT, and DR. JAMES J. TIESINGA | : : : : | Case No. 302 CV 1573 (MRK) |
| Plaintiffs, | : : | **AMENDED COMPLAINT** |
| -against- | : : | |
| DIANON SYSTEMS, INC. and ETHEL JANEGA | : : : | JURY DEMAND |
| Defendants. | : : | |

_____ :

On behalf of the United States Government, the Plaintiff, Dr. James J. Tiesinga, by his attorneys, Maya & Associates, P.C., hereby complains and alleges that Defendant DIANON Systems, Inc. violated rights secured to the Unites States Government under the False Claims Act. On behalf of himself, Dr. Tiesinga hereby complains and alleges that Defendant DIANON Systems, Inc. and Defendant Ethel Janega violated rights secured to him under federal and state statutory law, as well as state decisional law.

## **PARTIES**

1.     The Plaintiff is Dr. James J. Tiesigna ("Tiesinga"), who resides at 8026 Inwood Road, Dallas, Texas 75209. At all material times, Tiesinga was a gay man diagnosed with a positive HIV status.

2.     The Defendant is DIANON Systems, Inc. ("DIANON" or the "Company"), a corporation organized under the laws of the State of Delaware. With corporate headquarters at 200 Watson Boulevard, Stratford, Connecticut 06615, the

Company provides pathology services to physicians.  At all material times, DIANON employed at least twenty (20) employees and is therefore an "employer" for purposes of federal and state employment discrimination statutes.

3.      Ms. Ethel Janega is also a Defendant.  Upon information and belief, Janega resides at 22 Partridge Drive, Seymour, Connecticut 06483.  At all material times, Janega was an employee of DIANON.

## JURISDICTION

4.      The Court has subject matter jurisdiction over the Counts brought under the False Claims Act, the Americans With Disabilities Act of 1990 and Rehabilitation Act by way of  28 U.S.C. § 1332, with supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

5.      On August 30, 2002, the Connecticut Commission on Human Rights and Opportunities issued a "Release of Jurisdiction" relative to Tiesinga's claims under the Connecticut Fair Employment Practices Act ("CFEPA").  The Release is attached hereto as Exhibit A.

6.      On February 12, 2003, the Equal Employment Opportunity Commission issued a "Dismissal and Notice of Rights" relative to Tiesinga's claim under the Americans With Disabilities Act of 1990.  The document is attached hereto as Exhibit B. Tiesinga first received the Dismissal and Notice of Rights on November 5, 2004.

## VENUE

7.      The District of Connecticut is the proper venue for this dispute under 29 U.S.C. § 1391(b), since a substantial part of the events and omissions giving rise to the claims occurred in this judicial district.

## FACTS

8.      In July 2001, DIANON hired Tiesinga as a Staff Pathologist specializing in Hematopathology.  In this role, Tiesinga examined bone marrow and lymph node biopsies for the purpose of identifying hematologic disorders. While Tiesinga reported directly to the Co-Directors of Hematopathology, he also reported to Dr. James "Jay" Amberson ("Amberson"), a co-founder of DIANON, who managed all parts of the Company's pathology operation as the "Director of Laboratories."

9.      From his first day on the job, Tiesinga performed his job duties in exemplary fashion, as he surpassed the Company's other Hematopathologists in cases completed and hours logged.  As a result, on or about March 18, 2002, DIANON offered Tiesinga the position of "Director of Hematopathology" for a facility the Company had acquired recently in Oklahoma City.  Under the terms of the offer, Tiesinga's start date would be on or around June 30, 2002 at an annual salary of $230,000.00.  Tiesinga accepted the Company's offer, and shortly thereafter, recruited a team of doctors and laboratory personnel for the new facility.

10.     During the month of April 2002, Tiesinga devoted additional time to his "Director" duties, but not at the expense of his pathologist responsibilities, which required hourly attention.  Thus, in this latter respect, Tiesinga continued to render diagnoses on scores of cases each day, later providing his findings to the Company's Transcription Department, where a report would be typed up for submission to the primary care physician who submitted the biopsy, i.e., DIANON's client.  Given the every day need for reports, Tiesinga became acquainted with the Transcription Department's "Group Leader," Ms. Ethel Janega ("Janega").  Janega was among the

group of DIANON employees who had knowledge of Tiesinga being transported to the hospital on April 28, 2002 as a result of an allergic reaction.

11.    On Friday, May 3, 2002, Tiesinga disclosed to Janega that his allergic reaction was in response to a medication prescribed for his positive HIV status. Immediately thereafter, and indeed for the remainder of his employment, Janega systematically discriminated against Tiesinga on account of his HIV status, to the point where she interfered with his ability to perform his job duties and subjected him to pervasive abuse.  Janega also advised at least two other DIANON employees of Tiesinga's HIV status.

12.    On Monday, May 6, 2002, Tiesinga entered the Transcription Room to drop his findings in an "in-box" mounted to the wall, just as he had done for each day of the preceding nine (9) months of his employ.  Nonetheless, upon his entrance, Janega stated to Tiesinga, "you are not to step foot in this room for any reason."  Janega gave Tiesinga a similar "instruction" the following day, and indeed for each day, of that week ending Friday, May 10, 2002.  Furthermore, Tiesinga was advised that Janega had threatened to discipline the employees of the Transcription Department if they communicated with Tiesinga in any way.

13.    On Monday, May 13, 2002 and Tuesday, May 14, 2002, Janega's abuse of

Tiesinga continued unabated.  Aside from her familiar orders for Tiesinga to "stay out" of the Transcription Room, Janega began to hold his papers by the edges, using only her fingertips, as if the papers were transfer agents for his HIV infection.  Furthermore,

Tiesinga discovered that Janega was deliberately delaying the typing and finalization of his reports.

14.     During Janega's abuse in the midst of May 2002, Tiesinga became aware of a policy on the part of DIANON to charge Medicare for services not requested by the doctors who made up DIANON's client base.  In particular, Tiesinga learned that DIANON would use an unnecessary *number* of antibodies in conducting so-called flow cytometry analysis, which was a service offered by DIANON for the purpose of diagnosing blood diseases.  Whereas, in the majority of cases, DIANON would need no more than fifteen (15) antibodies to respond to the physician's request, e.g., "test for lymphoma," the Company would virtually always use twenty-five (25) antibodies, as Medicare would reimburse DIANON for these added, but unnecessary, antibody tests.

15.     On May 14, 2002, Tiesinga attended a meeting with several members of DIANON's senior management, including Amberson and Valerie Palmeri ("Palmeri"), who, upon information and belief, serves as DIANON's Chief Operations Officer.  During this meeting, Tiesinga stated his opposition to DIANON's policy of charging Medicare for unnecessary antibodies during flow cytometry analysis.  In response, Amberson recognized that the use of twenty-five antibodies in each case was "not appropriate," but advised Tiesinga that DIANON would continue to use all antibodies for which Medicare reimbursement could be received, as any divergence from the policy would require costly changes to DIANON's computerized billing and reporting system.  Palmeri, for her part, agreed, noting that flow cytometry was a "major source of revenue for the [C]ompany, and will not be changed."

16.    The next day, i.e., May 15, 2002, Tiesinga met with Amberson to advise him of Janega's abuse.  Tiesinga informed Amberson that Janega had excluded him from the Transcription Room and otherwise subjected him to "hostile" behavior.  Tiesinga further complained that Janega was "singling him out" as though he was a "leper." Tiesigna also informed Amberson that Janega was deliberately delaying the preparation of his reports, while threatening the Transcription Department employees with discipline if they dare communicate with him in any way.  In response, Amberson promised that he would discuss Tiesinga's complaints with Palmeri.

17.    Despite his complaints, on Friday, May 17, 2002, Tiesinga was advised that Janega had intensified her earlier threats to the Transcription Department employees, going so far as to threaten them with *termination* in the event they engaged in any dialogue with him.  Also on Friday, May 17, 2002, Tiesinga noticed that Janega  removed so-called "divvy sheets" from the wall behind her desk in the Transcription Room. Previously, Janega used the divvy sheets as a tool for advising that findings for a particular case had been typed up and a report was ready for delivery to the client.

18.    The following Monday, May 20, 2002, Tiesinga questioned Janega on her reasons for removing the divvy sheets.  In an angered tone, Janega stated to Tiesinga, "you don't need to come *near* my area looking for them, you have your own."  While Tiesinga's computer did contain some relevant information, Janega appeared to ignore the fact that Tiesinga utilized the divvy sheet notice system since his first day on the job, without any objection on Janega's part.  Shortly after Janega made her comments, Tiesinga complained to Amberson for a second time, advising him that Janega altered the conditions of his employment further, by removing the divvy sheets so as to keep

Tiesinga away from her.  Tiesinga expressly complained that Janega's behavior was "discriminatory" and demanded a resolution.  In response, Amberson advised Tiesinga that he already discussed his complaints with Palmeri, but would do so again.

19.    Upon information and belief, on Tuesday, May 21, 2002, Palmeri had a discussion with Janega whereby Palmeri condoned her past abuse of Tiesinga and failed to instruct Janega to avoid future abuse of Tiesinga.   That same day, Tiesinga questioned Janega on whether other doctors had complained about the divvy sheets being removed. In a raised voice, Janega told Tiesinga that he was "forbidden to come in here [i.e., the Transcription Room]" and ordered him to leave, which he did so as to avoid a confrontation.  Later, Tiesinga received a voice-mail from Janega, advising him that she had created a new "in-box" for his findings only, with the other doctors placing their findings in the common in-box.  Tiesinga then peered into the Transcription Room where he observed a separate in-box for himself, which was mounted just inside the threshold of the Transcription Room.  In her message, Janega explained that her placement of the "in-box" was strategic, designed to avoid Tiesinga's need to enter the Transcription Room physically.

20.    Shortly after observing his special "in-box," Tiesinga went to Palmeri's office to complain, but was advised by her secretary, Irene, that Palmeri was not available.  Tiesinga then expressed his concerns to Irene that Janega might disclose, if she had not already disclosed, "information about people's medical condition."  Tiesinga explained that his concern was particularly acute given that DIANON had scheduled Janega to fly to Oklahoma City and train the facility's Transcription Department.  Upon information and belief, Irene relayed Tiesinga's complaints to Palmeri that same day.

21.    Since Palmeri was not available, Tiesinga met with Amberson and complained to him for a *third* time, going so far as to show Amberson the separate "in-box."  Tiesinga again informed Amberson that he found Janega's conduct to be "discriminatory," as well as "humiliating."  By this time, Tiesinga had been reduced to tears.  In response, Amberson stated that he would discuss Tiesinga's complaints with Palmeri.  That night, Tiesinga also left a voice-mail message for Janega's direct supervisor, who, of course, ultimately reported to Palmeri.

22.    The following day, Wednesday, May 22, 2002, Tiesinga entered the Transcription Room and, in exercise of his rights, placed his findings in the common "in-box."  Upon seeing this, Janega exclaimed "what are you doing; your reports belong in this separate bin, and that's all per Valerie [Palmeri]'s orders."  To avoid a confrontation, Tiesinga returned to his office and closed the door.  Moments later, Tiesinga heard several loud thumps on his door, which he opened only to find a red-faced Janega with her arm raised and "pointer" finger aimed at his face.  As Janega began to berate him, Tiesinga closed his door and endeavored to return to his duties.  Roughly thirty minutes later, Amberson advised Tiesinga that Janega had just accused him of slamming a door in her face.  Tiesinga disputed Janega's accusation and reminded Amberson of the series of complaints that he had lodged against her, with no response from DIANON.  Tiesinga then pleaded for Amberson to respond to his complaints, as Janega was "pushing some very emotional buttons" in the course of "discriminating" against him to the point where he was being "torn apart."  Predictably, Amberson advised Tiesinga that he would discuss his complaints once again with Palmeri.

23.    Following this meeting with Amberson, Tiesinga returned to his office.

Tiesinga then learned from an anonymous caller that security officers had been assigned to his area and were instructed to remove him from the building in the event he exited his office. Accordingly, for the ensuing seven (7) hours, Tiesinga was a captive in his own office. Fearing for his safety if he left his office, Tiesinga urinated in jars. At the end of the day, Tiesinga was escorted by Amberson to his office where Human Resources' official Leon Bailey ("Bailey") was lying in wait. Bailey accused Tiesinga of slamming his door in Janega's face and advised him that he was "precariously close" to being removed from the building and having his employment with DIANON terminated. Tiesinga rejected the notion that he slammed his door, and suggested that the real focus should be the abuse that *he* had long endured at the hands of Janega. In response, Bailey offered the following comment: "[you] guys are so full of drama." Amberson then advised Tiesinga that Palmeri had been advised of his complaints and fully supported Janega's behavior and the alterations she caused in the conditions of his employment. Amberson also advised Tiesinga that the Company no longer considered him to be "Director material." Bailey then concluded the meeting by advising Tiesinga that he would meet with him again tomorrow to discuss the discipline that DIANON would impose upon *him* as a result of the alleged door slam and other alleged violations of Company policy.

24. The following day, Thursday, May 23, 2002, Tiesinga met with Bailey and Amberson in Amberson's office. Tiesinga advised Bailey that he was uncomfortable with his involvement insofar as other DIANON employees had advised him that Bailey was "homophobic." In response, Bailey advised Tiesinga that his statement was "just one more thing that [would] count against him." Tiesinga then advised Bailey and

Amberson that he was HIV positive and stated that Janega's abuse of him was the result of his disclosing his HIV status to Janega on May 3, 2002. Immediately after this disclosure, Bailey informed Tiesinga that he would be placed on paid suspension from Saturday, May 25, 2002 to Monday, June 3, 2002 while DIANON contemplated further disciplinary action against him. At that point, Tiesinga advised both Bailey and Amberson that he was concerned that a suspension might cause him emotional problems, including depression. Although Bailey promised to supply Tiesinga with materials relative to DIANON's counseling services, Tiesinga never received any such materials and Bailey never contacted Tiesinga to advise that DIANON would be unable to provide the materials.

25.     On Friday, May 24, 2002, Tiesinga reported to DIANON to attend to various matters in preparation for his suspension. In the early afternoon, Bailey stopped by Tiesinga's office and told him that he "must be off the premises by 5 p.m. and [he] [did] not want to see [his] face [at] [DIANON] until June 3rd." Tiesinga complied with Bailey's orders, and left DIANON at 5 p.m. that day, with most employees believing erroneously, albeit innocently, that *Tiesinga* was guilty of wrongdoing.

26.     On Saturday, May 25, 2002, Tiesinga began his suspension and was soon besieged by suicidal feelings that ultimately required his hospitalization at Yale University Psychiatric Hospital. Since that time, Tiesinga has been prescribed anti-depressant medication, and regularly sees a psychiatrist for support.

27.     In light of the intolerable conditions underlying his employment, and the understanding that he would not be given the promised "Director" position, Tiesinga resigned his employment with DIANON on June 5, 2002.

10

## COUNT 1
## HOSTILE WORK ENVIRONMENT UNDER THE CFEPA

28.     Tiesinga repeats and realleges paragraphs 1 through 27, above, as if fully set forth herein.

29.     At all material times, by reason of his positive HIV status, Tiesinga had a "disability" within the meaning of the Connecticut Fair Employment Practices Act.

30.     As detailed above, Janega subjected Tiesinga to regular abuse during his employment with DIANON.     Through her *pervasive* abuse, which was motivated by Tiesinga's HIV status, Janega created a hostile working environment that altered the conditions of Tiesinga's employment.

31.     Aside from the frequency of the abuse, Janega's conduct was sufficiently *severe* to alter the conditions of Tiesinga's employment and create a hostile working environment.

32.     Despite Tiesinga's repeated complaints, DIANON failed to remedy the past harassment and to prevent future harassment of Tiesinga by Janega.

33.     Tiesinga was offended by Janega's conduct, which would be equally offensive to a reasonable person.

34.     Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(1) by subjecting Tiesinga to a hostile work environment on the basis of his disability.

35.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 34, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

36.     As a result of the violation alleged in paragraph 34, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

37.     The violation alleged in paragraph 34, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 2
## RETALIATION UNDER THE CFEPA

38.     Tiesinga repeats and realleges paragraphs 1 through 37, above, as if fully set forth herein.

39.     By his repeated complaints to DIANON, Tiesinga opposed the hostile environment created by Janega's pervasive and severe abuse of him.  Tiesinga also opposed Janega's unlawful abuse by closing his office door on May 21, 2002 to prevent Janega from further berating him for placing his findings in a common "in-box."

40.     As a result of Tiesinga's opposition, DIANON repudiated the Company's promise to name Tiesinga as the Director of Hematopathology, threatened him with termination, put him on a 10 day suspension and was otherwise responsible for the intolerable conditions that led to his constructive discharge.

41.     Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(4) by subjecting Tiesinga to adverse employment actions as a result of his opposition to Janega's abuse.

42.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 41, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

43.     As a result of the violation alleged in paragraph 41, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

44.     The violation alleged in paragraph 41, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 3
## HOSTILE WORK ENVIRONMENT UNDER THE ADA

45.     Tiesinga repeats and realleges paragraphs 1 through 44, above, as if fully set forth herein.

46.     At all material times, by reason of his positive HIV status, Tiesinga had a "disability" within the meaning of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA").

47.     As detailed above, Janega subjected Tiesinga to regular abuse during his employment with DIANON.   Through her *pervasive* abuse, which was motivated by Tiesinga's HIV status, Janega created a hostile working environment that altered the conditions of Tiesinga's employment.

48.     Aside from the frequency of the abuse, Janega's conduct was sufficiently *severe* to alter the conditions of Tiesinga's employment and create a hostile working environment.

49.     Despite Tiesinga's repeated complaints, DIANON failed to remedy the past harassment and to prevent future harassment of Tiesinga by Janega.

50.     Tiesinga was offended by Janega's conduct, which would be equally offensive to a reasonable person.

51.     Based upon the foregoing, DIANON violated the ADA by subjecting Tiesinga to a hostile work environment on the basis of his disability.

52.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 51, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

53.     As a result of the violation alleged in paragraph 51, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

54.     The violation alleged in paragraph 51, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 4
## RETALIATION UNDER THE ADA

55.     Tiesinga repeats and realleges paragraphs 1 through 54, above, as if fully set forth herein.

56.     By his repeated complaints to DIANON, Tiesinga opposed the hostile environment created by Janega's pervasive and severe abuse of him.  Tiesinga also opposed Janega's unlawful abuse by closing his office door on May 21, 2002 to prevent Janega from further berating him for placing his findings in a common "in-box."

57.    As a result of Tiesinga's opposition, DIANON repudiated the Company's promise to name Tiesinga as the Director of Hematopathology, threatened him with termination, put him on a 10 day suspension and was otherwise responsible for the intolerable conditions that led to his constructive discharge.

58.    Based upon the foregoing, DIANON violated the ADA by subjecting Tiesinga to adverse employment actions as a result of his opposition to Janega's abuse.

59.    Given that Tiesinga's resignation was based on the violation alleged in paragraph 58, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

60.    As a result of the violation alleged in paragraph 58, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

61.    The violation alleged in paragraph 58, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 5
## HOSTILE WORK ENVIRONMENT UNDER CFEPA

62.    Tiesinga repeats and realleges paragraphs 1 through 61, above, as if fully set forth herein.

63.    At all material times, Leon Bailey either perceived Tiesinga as being gay or had actual knowledge that Tiesinga was gay.

64.    As a result of his bias towards Tiesinga, Bailey either recommended or made the decision to repudiate the Company's promise to name Tiesinga as the Director

of Hematopathology and placed him on a 10 day suspension.  In addition, Bailey

stationed security guards outside of Tiesinga's office and threatened him with termination

because of his opposition to Janega's abuse.  Bailey also insulted Tiesinga in the course

of uttering a discriminatory comment, falsely accused him of violations of DIANON

policy, threatened him with discipline for exposing Bailey's bias, failed to provide

Tiesinga with materials relating to DIANON's counseling services, and told Tiesinga that

he "did not want to see [his] face" at DIANON until his suspension was completed.

65.     As just detailed, Bailey subjected Tiesinga to regular abuse during his

employment with DIANON.  Through his *pervasive* abuse, which was motivated by his

bias against Tiesinga as a homosexual, Bailey created a hostile working environment that

altered the conditions of Tiesinga's employment.

66.     Aside from the frequency of the abuse, Bailey's conduct was sufficiently

*severe* to alter the conditions of Tiesinga's employment and create a hostile working

environment.

67.     At all materials times, DIANON had knowledge of Bailey's harassment of

Tiesinga but failed to remedy the past harassment and to prevent future harassment of

Tiesinga by Bailey.

68.     Tiesinga was offended by Bailey's conduct, which would be equally

offensive to a reasonable person.

69.     Based upon the foregoing, DIANON violated Conn. General Stat. §46a-

60(a)(1) by subjecting Tiesinga to a hostile work environment on the basis of his sexual

orientation.

70.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 69, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

71.     As a result of the violation alleged in paragraph 69, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

72.     The violation alleged in paragraph 69, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 6
## RETALIATION UNDER CFEPA

73.     Tiesinga repeats and realleges paragraphs 1 through 72, above, as if fully set forth herein.

74.     Tiesinga opposed Bailey's involvement in the May 23, 2002 meeting because of his belief that Bailey held a bias against homosexuals, as demonstrated the day before by Bailey's discriminatory comment.

75.     As alleged above, in response to Tiesinga's opposition, Bailey advised him that it was "just one more thing that [would] count against him." Bailey then put Tiesinga on a 10 day suspension.  The following day, Bailey advised Tiesinga that he did "not want to see [Tiesinga's] face" at DIANON until his suspension was completed, and later failed to supply Tiesinga with the counseling materials that he requested and that Bailey promised to provide during the May 23, 2002 meeting.

76.     Based upon the foregoing, DIANON violated Conn. General Stat. §46a-60(a)(4) by subjecting Tiesinga to adverse employment actions as a result of his opposition to Janega's abuse.

77.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 76, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

78.     As a result of the violation alleged in paragraph 76, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

79.     The violation alleged in paragraph 76, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 7
## VIOLATION OF THE REHABILITATION ACT

80.     Tiesinga repeats and realleges paragraphs 1 through 79, above, as if fully set forth herein.

81.     By receiving Medicare funds, DIANON is a recipient of federal financial assistance within the meaning of § 504 of the Rehabilitation Act.

82.     At all material times, Tiesinga was qualified to perform the essential functions of his job, despite being a person with a handicap within the meaning of the Rehabilitation Act.

83.     As detailed in Count 1, above, Janega created a hostile working environment based upon her pervasive and severe abuse of Tiesinga, to the point where the conditions of his employment were irreparably altered.

84.     Despite his repeated complaints, DIANON failed to remedy the past harassment and to prevent future harassment of Tiesinga by Janega.

85.     Tiesinga was offended by Janega's conduct, which would be equally offensive to a reasonable person.

86.     Based upon the foregoing, DIANON violated § 504 of the Rehabilitation Act of 1973 by subjecting Tiesinga to a hostile work environment on the basis of his handicap.

87.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 86, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

88.     As a result of the violation alleged in paragraph 86, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

89.     The violation alleged in paragraph 86, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 8
## VIOLATION OF THE FALSE CLAIMS ACT

90.     Tiesinga repeats and realleges paragraphs 1 through 89, above, as if fully set forth herein.

91.    During the period of Tiesinga's employment with DIANON, i.e., July 2001 to June 5, 2002, the Company prepared and submitted to the United States Government claims which requested and / or demanded money paid from the federal treasury on account of flow cytometry analyses performed by DIANON.  Upon information and belief, DIANON prepared and submitted similar claims in the years prior to Tiesinga commencing his employment with the Company.  Upon further information and belief, DIANON received substantial monies from the federal treasury on account of the flow cytometry cases it performed.

92.    Upon information and belief, each flow cytometry claim submitted by DIANON, both before and during Tiesinga's employment with the Company, expressly certified, as a precondition to payment, that the analysis, which used a full panel of antibodies, was reasonable and necessary for the diagnosis of illness or injury.  In fact, in the majority of cases, a full panel of antibodies was *not* reasonable and necessary for such diagnosis.  Accordingly, in these cases, DIANON's claims were false.

93.    In the alternative, regardless of the express language, each flow cytometry claim submitted by DIANON, both before and during Tiesinga's employment, implicitly certified, as a precondition to payment, that the analysis, which used a full panel of antibodies, was reasonable and necessary for the diagnosis of illness or injury.  In fact, in the majority of cases, a full panel of antibodies was *not* reasonable and necessary for such diagnosis.  Accordingly, in these cases, DIANON's claims were false.

94.    From May 14, 2002 through today, DIANON has had actual knowledge

that, in a majority of flow cytometry cases, a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury.  Accordingly, with respect to this time frame, and in relation to these cases, DIANON's claims were fraudulent.

95.    Upon information and belief, prior to May 14, 2002, the Company had actual knowledge that, in a majority of flow cytometry cases, a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury.  Accordingly, with respect to this earlier time frame, and in relation to these previous cases, DIANON's claims were similarly fraudulent.  In the alternative, with respect to this same time frame, and in relation to these same cases, the Company acted either in deliberate ignorance or reckless disregard of the fact that a full panel of antibodies was not reasonable and necessary for the diagnosis of illness or injury.

96.    Based upon the foregoing, DIANON violated § 3729(a)(1) and § 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2002) and is therefore subject to all penalties as provided for therein.

97.    In compliance with 31 U.S.C. § 3730(b)(2), upon the *in camera* filing of this Complaint, Tiesinga served a copy of this Complaint, together with a written statement of the evidence and information he possesses relative to this Eighth Count, on the United States Government, in accordance with the service of process rules set forth by Rule 4(d)(4) of the Federal Rules of Civil Procedure.

## COUNT 9
## NEGLIGENT SUPERVISION

98.    Tiesinga repeats and realleges paragraphs 1 through 97, above, as if fully set forth herein.

99.    For the duration of Tiesinga's employment with DIANON, the Company had the duty to supervise Janega insofar as she was an employee of the Company during that time period.  Alternatively, the Company acquired the obligation on May 15, 2002, as Tiesinga complained to DIANON management that day about Janega's abuse of him.

100.    For the duration of Tiesinga's employment with DIANON, the Company failed to supervise Janega reasonably, and thereby enabled her to abuse Tiesinga. Alternatively, DIANON failed to supervise Janega reasonably during the period May 15, 2002 to June 5, 2002, and thereby enabled her to abuse Tiesinga.

101.    Given that Tiesinga's resignation was based on the negligent supervision alleged in paragraph 100, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

102.    As the direct and proximate result of DIANON's failure to supervise Janega reasonably, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

103.    The negligent supervision alleged in paragraph 100, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 10
## NEGLIGENT RETENTION

104.    Tiesinga repeats and realleges paragraphs 1 through 103, above, as if fully set forth herein.

105.    Assuming *arguendo* that DIANON instructed Janega to cease her harassment of Tiesigna, the Company had the obligation to discharge her once her harassment of Tiesinga continued.

106.    DIANON had actual knowledge of Janega's continued harassment of Tiesinga.  In the alternative, DIANON had constructive knowledge of the continued harassment.

107.    DIANON negligently retained Janega during the course of her ongoing harassment of Tiesinga.

108.    Given that Tiesinga's resignation was based on the negligent retention alleged in paragraph 107, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

109.    As the direct and proximate result of DIANON's negligent retention of Janega, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

110.    The negligent retention alleged in paragraph 107, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 11
## FALSE IMPRISONMENT

111.    Tiesinga repeats and realleges paragraphs 1 through 110, above, as if fully set forth herein.

112.    On May 22, 2002, the Company stationed security guards outside of Tiesinga's office and instructed them to remove Tiesinga from the building in the event

he left his office.  Accordingly, DIANON restrained Tiesinga's physical liberty by confining him to his office.

113.    Tiesinga learned about the presence of the security guards and their instructions to remove him from the building in the event he left his office.  Tiesinga was therefore conscious of his confinement.

114.    Tiesinga did not consent to his confinement and the confinement was not otherwise privileged.

115.    As the direct and proximate result of DIANON's false imprisonment of Tiesinga, he suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

116.    The false imprisonment alleged in this Eleventh Count is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 12
## INTENTIONAL INFLICTION  OF EMOTIONAL DISTRESS

117.    Tiesinga repeats and realleges paragraphs 1 through 116, above, as if fully set forth herein.

118.    By May 15, 2002, DIANON had knowledge that Janega was harassing Tiesinga.  Yet, the Company chose not to respond to Tiesinga's complaints and thereby enabled Janega to continue her harassment of Tiesinga.  In fact, DIANON actually supported Janega's harassment of Tiesinga.

119.    On May 22, 2002, DIANON stationed security guards outside of Tiesinga's office and instructed them to remove Tiesinga from the building in the event he left his office.

120.    That same day, the Company made false accusations against Tiesinga, threatened to discharge him, and repudiated the Company's promise to name him Director.

121.    On May 23, 2002, DIANON advised Tiesinga that he would be penalized for sharing his concern that Bailey was "homophobic."  Later, Tiesinga was advised that he would be suspended for ten (10) days.

122.    During his suspension, DIANON failed to provide Tiesinga with materials relating to the Company's counseling services, despite Tiesinga indicating that he would benefit from such services.

123.    The conduct alleged above is extreme and outrageous, to the point where the local community would regard such behavior as totally intolerable.

124.    As a result of the conduct alleged above, Tiesigna suffered severe emotional distress, which he continues to suffer today.

125.    DIANON engaged in the conduct alleged above with the intent to cause Tiesinga emotional distress.  Alternatively, the Company knew or should have known that by engaging in the conduct alleged above it would likely cause Tiesinga emotional distress.

126.    Based upon the foregoing, DIANON is liable for intentional infliction of emotional distress.

127.     The conduct alleged in this Twelfth Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 13
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

128.     Tiesinga repeats and realleges paragraphs 1 through 127, above, as if fully set forth herein.

129.     Assuming *arguendo* that DIANON instructed Janega to cease her abuse of Tiesinga, the Company failed to procure an actual cessation of Janega's harassment of Tiesinga.

130.     DIANON should have realized that by failing to procure an actual cessation of Janega's harassment, the Company was posing an unreasonable risk to Tiesinga that he would suffer from emotional distress which might lead to illness or bodily harm.

131.     As a result of DIANON's failure, Tiesinga suffered severe emotional distress, which continues to endure today.

132.     Based upon the foregoing, DIANON is liable for negligent infliction of emotional distress.

133.     The conduct alleged in this Thirteenth Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 14
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

26

134.     Tiesinga repeats and realleges paragraphs 1 through 133, above, as if fully set forth herein.

135.     On May 23, 2002, Tiesinga advised DIANON that he might become depressed during the course of his suspension and requested that the Company provide him with resource materials relating to DIANON's counseling services.

136.     DIANON failed to provide these requested, and promised, materials and failed to contact Tiesinga to share the Company's inability / unwillingness to provide the materials.

137.     DIANON should have realized that by failing to provide the counseling resource materials, the Company was posing an unreasonable risk to Tiesinga of suffering severe emotional distress which might lead to illness or bodily harm.

138.     As a result of DIANON's failure, Tiesinga suffered severe emotional distress, which he continues to endure today.

139.     Based upon the foregoing, DIANON is liable for negligent infliction of emotional distress.

140.     The conduct alleged in this Fourteenth Count was so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 15
## <u>CONSTRUCTIVE DISCHARGE</u>

141.     Tiesinga repeats and realleges paragraphs 1 through 140, above, as if fully set forth herein.

142.     Based upon the conduct and omissions alleged in this Complaint, the Company intentionally subjected Tiesinga to an intolerable environment at DIANON.

143.     The intolerable working environment alleged in paragraph 142, above, resulted in Tiesinga's constructive discharge.  Said discharge reflects DIANON's violation of public policies, including the policy of having employers provide a safe working environment for its employees, as provided by C.G.S. § 31-49.

144.     As a result of the constructive discharge alleged in paragraph 143, above, Tiesinga incurred economic loss, including, but not limited to, lost salary and benefits.

145.     As a result of the constructive discharge alleged in paragraph 143, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

146.     The constructive discharge alleged in paragraph 143, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 16
## VIOLATION OF FALSE CLAIMS ACT

147.     Tiesinga repeats and realleges paragraphs 1 through 146, above, as if fully set forth herein.

148.     On May 14, 2002, Tiesinga opposed DIANON's policy of charging Medicare for unnecessary antibody use during flow cytometry analyses.  Tiesinga's opposition was a lawful act done in furtherance of this Sixteenth Count, which is brought under § 3730 of the False Claims Act.

149.    As a result of Tiesinga's opposition, DIANON condoned Janega's abuse of him.  The Company also repudiated the promise to name Tiesinga as the Director of Hematopathology, threatened him with discharge, put him on a 10 day suspension and otherwise discriminated against him in the course of creating the intolerable conditions that led to his constructive discharge.

150.    Based upon the foregoing, DIANON violated § 3730(h) of the False Claims Act.

151.    Given that Tiesinga's resignation was based on the violation alleged in paragraph 150, above, DIANON is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

152.    As a result of the violation alleged in paragraph 150, above, Tiesinga suffered severe emotional injuries, which he continues to suffer from today, and, upon information and belief, will continue to suffer from in the future.

153.    The violation alleged in paragraph 150, above, is so egregious that DIANON is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 17
## INVASION OF PRIVACY

154.    Tiesinga repeats and realleges paragraphs 1 through 153, above, as if fully set forth herein.

155.    Janega publicized to at least two people Tiesinga's HIV status, which was a condition relating to his private life and disclosed to Janega in the strictest of confidences.

156.    Janega's disclosure of Tiesinga's HIV status would be highly offensive to a reasonable person and is of no legitimate concern to the public.

157.    By reason of the foregoing, Janega invaded Tiesinga's privacy by publicizing private facts concerning Tiesinga.

158.    As a result of the invasion of privacy alleged in paragraph 157, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

159.    The invasion of privacy alleged in paragraph 157, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 18
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

160.    Tiesinga repeats and realleges paragraphs 1 through 159, above, as if fully set forth herein.

161.    Janega's conduct as alleged above, including the conduct alleged in Count One, above, is extreme and outrageous, to the point where the local community would regard such behavior as totally intolerable.

162.    As a result of Janega's conduct, Tiesigna suffered severe emotional distress, which he continues to endure today.

163.    Janega engaged in the conduct alleged above with the intent to cause Tiesinga emotional distress.  Alternatively, Janega knew or should have known that by engaging in the conduct alleged above it would likely cause Tiesinga emotional distress.

164.    Based upon the foregoing, Janega is liable for the intentional infliction of emotional distress.

165.    The conduct alleged in this Eighteenth Count was so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

## COUNT 19
## RETALIATION UNDER CFEPA

166.    Tiesinga repeats and realleges paragraphs 1 through 165, above, as if fully set forth herein.

167.    On May 22, 2002, Tiesinga opposed Janega's discriminatory employment practices by placing his findings in the common in-box and then closing his office door as Janega stood outside the threshold and berated him.

168.    Janega later retaliated against Tiesinga by lodging false allegations against him with the Company.

169.    Based upon the foregoing, Janega violated § 46a-60(a)(4) of the CFEPA by retaliating against Tiesinga for opposing her discriminatory employment practices against him.

170.    Given that Tiesinga's resignation was based on the violation alleged in paragraph 151, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

171.    As a result of the violation alleged in paragraph 169, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

172.     The violation alleged in paragraph 169, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

**COUNT 20**
**COERCION OF DISCRIMINATORY PRACTICE UNDER CFEPA**

173.     Tiesinga repeats and realleges paragraphs 1 through 172, above, as if fully set forth herein.

174.     On several occasions, Janega coerced employees of the Transcription Department to cease engaging in any conversations with Tiesinga because of his disability.

175.     Based on the foregoing, Janega violated § 46a-60(a)(5) of the CFEPA by coercing the doing of an act that is a discriminatory employment practice.

176.     Given that Tiesinga's resignation was based on the violation alleged in paragraph 175, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

177.     As a result of the violation alleged in paragraph 175, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

178.     The violation alleged in paragraph 175, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

**COUNT 21**
**DEFAMATION**

179.    Tiesinga repeats and realleges paragraphs 1 through 178, above, as if fully set forth herein.

180.    On May 22, 2002, Janega stated to Amberson and / or Bailey that Tiesinga had "slammed his door in her face."

181.    Janega's statement was false and made by Janega with knowledge of its falsity.

182.    Janega's statement was made for the purpose of injuring Tiesinga and she was therefore acting out of malice.

183.    Janega's statement would cause Tiesinga to be hated, ridiculed and held up to scorn and contempt by reasonable and respectable members of the community.

184.    Based on the foregoing, Janega defamed Tiesinga.

185.    Given that Tiesinga's resignation was based on the defamation alleged in paragraph 184, above, Janega is liable for all economic loss that Tiesinga incurred, including, but not limited to, lost salary and interest.

186.    As a result of the defamation alleged in paragraph 184, above, Tiesinga suffered severe emotional injuries, which he continues to suffer today, and, upon information and belief, will continue to suffer in the future.

187.    The defamation alleged in paragraph 184, above, is so egregious that Janega is subject to punitive damages under applicable law, and is hereby put on notice that Tiesinga requests such damages in this case, as echoed by the Wherefore Clause herein.

**WHEREFORE**, Tiesinga demands judgment as follows:

(A)     on the First Cause of Action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(B)     on the second cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(C)      on the third cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(D)     on the fourth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing

compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(E)    on the fifth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(F)    on the sixth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(G)    on the seventh cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(H)    on the eighth cause of action, judgment against Defendant DIANON in an amount no less than the maximum relief available under the False Claims Act;

(I)    on the ninth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(J)    on the tenth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing

compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(K)     on the eleventh cause of action, judgment against Defendant DIANON in an amount no less than one million dollars ($1,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(L)     on the twelfth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(M)     on the thirteenth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(N)     on the fourteenth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(O)     on the fifteenth cause of action, judgment against Defendant DIANON in an amount no less than five million dollars ($5,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(P)   on the sixteenth cause of action, judgment against Defendant DIANON  in an amount no less than the maximum of applicable relief available under § 3730(h) of the False Claims Act;

(Q)   on the seventeenth cause of action, judgment against Defendant Janega in an amount no less than one million dollars ($1,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(R)   on the eighteenth cause of action, judgment against Defendant Janega in an amount no less than one million dollars ($1,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(S)   on the nineteenth cause of action, judgment against Defendant Janega in an amount no less than two million dollars ($2,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(T)   on the twentieth cause of action, judgment against Defendant Janega in an amount no less than one million dollars ($1,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest;

(U)   on the twenty-first cause of action, judgment against Defendant Janega in an amount no less than one million dollars ($1,000,000.00), representing compensatory and punitive damages, in addition to attorneys' fees, costs, expenses and interest; and

(V)      such other and further relief as the Court may deem just and proper.

Dated: Westport, Connecticut
        February  __, 2005

                        Respectfully submitted,

                        MAYA & ASSOCIATES, P.C.

                        By _____

                        Bryan T. Carmody (CT 2254)
                        183 Sherman Street
                        Fairfield, CT 06430
                        (203) 255-5600
                        (203) 255-5699 (fax)
                        *Attorneys for Plaintiff*
                        *James J. Tiesinga, M.D.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this _____ day of February 2005, I caused a true and

correct copy of the foregoing to be served upon the following counsel of record by

Federal Express:

Michael D. Thompson, Esq.
Epstein Becker & Green, P.C.
*Attorneys for Defendants*
Two Gateway Center, 12th Floor
Newark, NJ 07102
973-639-8259


Richard Molot, Esq.
U.S. Attorney General's Office
*Attorneys for United States*
District of Connecticut
157 Church Street
New Haven, CT 06510


_____

Bryan T. Carmody (ct 22514)
Maya & Associates, P.C.
*Attorneys for Plaintiff*
266 Post Road East
Westport, CT 06880
203-221-3100
203-221-3199 (facsimile)
bcarmody@mayalaw.com