UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA,<br><br>    Plaintiffs,<br><br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:02CV1573(MRK)<br><br>June 8, 2005 |

**UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT UNDER FED. R. CIV. P. 9(b)**

The United States respectfully submits this memorandum of law in opposition to defendant's motion to dismiss the complaint under Fed R. Civ. P. 9(b). As we show below, the United States' complaint in this case is quite detailed and provides Dianon with fair notice of the allegations against it. The particular information that Dianon requests in its motion–such as specific patient names, dates of service, etc.– is not required by Rule 9(b) and will be provided during discovery. Thus, Dianon's motion should be denied.

BACKGROUND

On March 18, 2005, the United States intervened in this qui tam suit by filing its complaint against defendant, Dianon Systems, Inc. ("Dianon") to recover damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and at common law. The FCA allows private citizens (known as "relators") to bring actions to redress fraud against the United States and to receive a share of any recovery made on behalf of the United States.

**ORAL ARGUMENT IS NOT REQUESTED**

The relator in this case, Dr. James J. Tiesinga, is a hematopathologist who was formerly employed by Dianon at its laboratory in Stratford, Connecticut. United States' Complaint ("U.S. Compl.") ¶¶ 10-11.

The FCA is the Government's primary tool to recover losses due to fraud against the United States. United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 745 (9th Cir. 1993). The FCA applies whenever any person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or engages in other related misconduct.[1]

The United States' complaint alleges that, starting in 1996 and up to the present time, Dianon billed Federal healthcare programs for hematopathology flow cytometry tests that included antibodies that were medically unnecessary and, therefore, not reimbursable. U.S. Compl. ¶¶ 2, 28-36. Flow cytometry is performed on cells in liquid suspension (i.e. blood, bone marrow, body fluids or tissue cell suspensions) that have been incubated with fluorescently tagged antibodies directed against specific cell surface proteins. U.S. Compl. ¶ 26. A number of different antibody panels are used, depending on the clinical question to be answered. Id. The information obtained from the flow cytometry test can be used to evaluate particular types of cancer. Id. Particular antibodies are used depending upon what type of cancer is suspected or already diagnosed, because not all antibodies are useful in evaluating all types of cancer. Id.

At all relevant times, Dianon was reimbursed separately for each antibody used in the flow cytometry tests. U.S. Compl. ¶ 25. In 1995, Dianon's "standard" flow cytometry panel

---

[1] Under the FCA, knowledge includes: 1) actual knowledge; 2) deliberate ignorance of the truth or falsity of the information; or 3) reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).

consisted of eight antibodies. U.S. Compl. ¶ 27. In late 1996, Medicare reduced the amount it would reimburse for each flow cytometry test from $94.00 per antibody to $28 per antibody. U.S. Compl. ¶ 29. Soon thereafter, Dianon significantly increased the number of antibodies in its flow cytometry panel to twenty-six antibodies. U.S. Compl. ¶ 28. By increasing the number of antibodies on its panel to twenty-six, Dianon was able to ensure that pre-1996 reimbursement per panel (8 antibodies x $94=$752) did not drop significantly in post-1996 reimbursement (26 antibodies x $28 = $728). U.S. Compl. ¶ 29.

On May 21, 1997, an internal Dianon memo prepared by Dianon pathologists purported to justify the company's standard panel of twenty-six antibodies it used when conducting flow cytometry tests. U.S. Compl. ¶ 30. However, less than one month later, on June 17, 1997, another internal Dianon memo prepared by Dianon pathologists indicated that only eighteen antibodies were "essential for the accurate and complete initial work up of flow cytometry specimens" and that "their routine usage can be justified to insurance carriers." U.S. Compl. ¶ 31. Thereafter, from 1998 to 2000, Dianon tested using twenty-six antibodies, but only billed Medicare for eighteen antibodies, because the company knew that it could only justify a maximum of eighteen antibodies as medically necessary. U.S. Compl. ¶ 32.

Beginning in 2001, however, Dianon changed its billing pattern and began to bill Federal healthcare programs for all twenty-six antibodies in its standard panel, instead of the eighteen antibodies it had previously found were "essential." U.S. Compl. ¶ 33. In other words, Dianon began to bill Federal healthcare programs for the eight antibodies that its own pathologists had found were not "essential" in its June 17, 1997 memo. Id. From 2001 to the first quarter of 2004, Dianon billed Federal healthcare programs for twenty-six antibodies in most cases,

regardless of the medical necessity of each of the individual antibodies. U.S. Compl. ¶ 34.[2]

The information received by Dianon with the patient sample allowed pathologists at Dianon to use their medical judgment to craft panels aimed at identifying the particular type of cancer suspected by the referring physician, to determine whether cancer had recurred, or to stage a particular type of cancer. U.S. Compl. ¶ 37. By utilizing a standard panel of twenty-six antibodies in each and every case, regardless of the patient's history, diagnosis or other information supplied by the requesting physician, Dianon did not exercise medical judgment as to whether each of the individual antibodies was medically necessary. Id. For example, where the requisition form submitted to Dianon, or results of previous tests conducted by Dianon on the same patient indicated the existence of a particular type of cancer, a complete panel of twenty-six antibodies would not be needed to evaluate that cancer. Id. Dianon's pathologists should have used their medical judgment to limit the panel size to those antibodies medically necessary to the already diagnosed, or suspected, type of cancer. Id. By limiting the ordering choice to a panel of twenty-six antibodies, Dianon ensured that in many cases medically unnecessary antibodies would be used and billed to Federal healthcare programs. U.S. Compl. ¶ 42.

Between January 1, 1996 and March 31, 2004, Dianon was reimbursed by Medicare for thousands of claims for flow cytometry services billed under CPT code 88180, and was paid approximately $15 million by the Government. U.S. Compl. ¶ 44.

In its motion to dismiss, Dianon argues that the complaint does not provide sufficient notice of the claims against it because the complaint "never specifies the date or content of any

---

[2] Dianon apparently changed its billing pattern again after the first quarter of 2004 and began to bill for only twenty-two antibodies.

particular false or fraudulent claim, identifies the specific patients that received the services, lists the antibodies that were allegedly unnecessary, or identifies the amounts wrongfully charged on individual claims." Def. motion to dismiss at 2. Acknowledging that it "may be impractical for the plaintiff to specify the alleged fraud on a patient-by-patient basis," Dianon argues, in the alternative, that the United States should provide a list of the patients who received unnecessary services, specifically identifying which services were unnecessary, and containing an appraisal of the amount allegedly gained. Def. motion to dismiss at 5. Finally, Dianon argues that the United States' common law claims should also be dismissed on similar 9(b) grounds.

## ARGUMENT

As we show below, the Government's complaint clearly provides Dianon with "fair notice" of the United States' claims against it. See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1058 (2d Cir. 1993); see also Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985) ("There can be no doubt that the Complaint gives each defendant notice of precisely what he is charged with. No more is required by Rule 9(b)."). However, if the Court determines that Rule 9(b) requires more specificity, the Court should allow the United States leave to amend, rather than dismiss the complaint.

In ruling on this Rule 9(b) motion, the Court should apply the general rule that the pleadings are to be construed in the light most favorable to the pleader. See United States ex rel. Capella v. Norden Sys., Inc., 3:94cv2063, 2000 WL 1336487, at *5 (D. Conn. Aug. 24, 2000) (citing Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990)); see also Herrmann, 9 F.3d at 1058 (in ruling on a 9(b) motion, Court should accept as true the factual allegations in the complaint and draw all inferences in favor of the pleader).

I.  **The United States' complaint satisfies the particularity requirement of Rule 9(b).**

Fed. R. Civ. P. 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." While the complaint must allege the circumstances of the fraud, it need not plead all of the evidence or facts supporting it. See 5A Wright & Miller, *Federal Practice & Procedure: Civil 3d* §1298, at 192 (2004). The rule has three purposes: (1) giving defendants "notice of plaintiff's claims," thus enabling them to prepare a defense, (2) protecting defendants from spurious charges of fraud, and (3) minimizing the number of strike suits. See Ross, 904 F.2d at 823. Of these three reasons, the "primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." Id.; see also United States ex rel. Capella, 2000 WL 1336487 at *5 ("The purpose of the specificity requirement is to ensure that the complaint provides defendant with fair notice of a plaintiff's claim and adequate information to frame a response."). As such, Rule 9(b) must be read in harmony with Fed. R. Civ. P. 8, which requires that complaints be "simple, concise, and direct."

    A.    **Rule 9(b) is a flexible standard that does not require the complaint to set forth patient names and dates of service for each individual claim.**

In the context of FCA claims, courts recognize that Rule 9(b) does not require that the facts of each individual false claim be set forth in the complaint, particularly where the false claims are numerous and the scheme extended over the course of several years. Such a requirement would be unworkable and inconsistent with the principal that pleadings should be simple and concise. See Unites States ex rel. Semtner v. Medical Consultants, Inc., 170 F.R.D. 490, 498 (W.D. Okla. 1997) ("The Court agrees with the government . . . that a fraudulent scheme that has occurred over a long period of time with perhaps thousands of billing documents

need not be pled with reference to the exact nature of each allegedly fraudulent document. The government has more than throughly identified how the scheme operated and even the specific billing codes that were employed [by defendants]."); see also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of America, Inc., 238 F.Supp.2d 258, 268 (D.D.C. 2002) ("where a complaint covers a multi-year period, Rule 9(b) may not require a detailed allegation of all facts supporting each and every instance of submission of a false claim); United States ex rel. Franklin v. Parke-Davis, 147 F.Supp.2d 39, 49 (D. Mass. 2001) ("where the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible"); General Accident Ins. Co. v. Fidelity & Deposit Co., 598 F. Supp. 1223, 1232 (E.D. Pa. 1984) ("if the fraud allegedly involved a course of conduct over an extended period of time or a series of transactions, it is not necessary to recite, in detail, the facts of each transaction of the fraudulent scheme").[3]

A number of courts have approved complaints that did not include the type of claim-specific information that Dianon contends is missing from the United States' complaint in this case. For example, in United States ex rel. Pogue v. American Healthcorp, Inc., 977 F. Supp. 1329 (M.D. Tenn. 1997), a FCA qui tam case alleging Medicare and Medicaid fraud spanning a 12-year period, defendant argued that "it must be given specific information regarding the fraudulent transactions to which it is alleged to have been a party." Id. at 1332. The Court rejected this argument, reasoning that "[t]he overarching purpose of Rule 9(b) is to provide a defendant with fair notice of the claims against him, in order that he may prepare an adequate

---

[3] Courts do not necessarily require facts to be proven with respect to each individual claim even at trial. See, e.g., United States v. Cabrera-Diaz, 106 F.Supp.2d 234 (D.P.R. 2000) (awarding damages in FCA case based on a sample of claims).

responsive pleading." Id. The Court found that the complaint met Rule 9(b)'s pleading requirements, holding as follows:

> Keeping in mind that the primary purpose of the pleading standard is to ensure that Defendants receive notice of the charges against them, the Court finds that the complaint adequately describes Defendants' allegedly fraudulent scheme to defraud the United States of Medicare and Medicaid monies. Although no specific dates or [Defendant] West Paces employees are identified, the complaint alleges that the hospital participated in a systematic, fraudulent scheme, spanning the course of twelve years; thus, reference to a time frame and to "West Paces" generally is sufficient. As this Court noted in its denial of [co-Defendant's] Atlantic Physicians' similarly-couched motion to dismiss the Second Amended Complaint, "[r]equiring Plaintiff to refer to the specific instances underlying each Medicare and Medicaid claim submission that he claims was fraudulent in his [complaint] would undermine Rule 8's admonishment to keep pleadings simplistic."

Id. at 1333. Other courts are in accord. See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F.Supp.2d 1017, 1049 (S.D. Tex. 1998) (Where complaint described fraudulent scheme with specificity, "[p]laintiffs are entitled to discovery before being required to list every false claim, its dates, the individuals responsible, and why each patient was not eligible for Medicare."); United States ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 207 (E.D. Tex. 1998) (Where complaint alleged that defendants submitted false monthly reports over a ten-year period, "[t]he defendants' pleas of the need for specific dates and invoice numbers for each transaction are not persuasive."); United States v. Warning, No. 93-4541, 1994 WL 396432, at *3 (E.D. Pa. July 26, 1994) (in Medicare/Medicaid fraud action brought by the United States, Court approved complaint that did not "provide specific date, time and place descriptions for each fraudulent act at issue"); United States v. Kensington Hosp., 760 F. Supp. 1120, 1126 (E.D. Pa. 1991) (Court found Government sufficiently identified Medicare/Medicaid fraud schemes and that any missing details would be revealed through discovery).

These cases demonstrate that Rule 9(b) is satisfied as long as a complaint is pleaded in a manner that gives defendant sufficient notice of the claims made against it and guards against unsubstantiated charges of fraud. Like the cases cited above, the United States has provided clear notice to Dianon of the time, place and content of the fraud. Herman, 9 F.3d at 1057. The complaint sets forth the time period at issue, U.S. Compl. ¶¶ 25, 28-36, and that the conduct took place in Dianon's clinical laboratory in Stratford, Connecticut. U.S. Compl. ¶10. The complaint also alleges the content of the fraud: that Dianon billed Medicare for a pre-set number of antibodies without regard to medical necessity or an individualized assessment of the patient's condition. See U.S. Compl. ¶¶ 27-35 (specifically referencing supporting internal Dianon documentation). Although the complaint does not list the names of each patient or the specific dates that each of the thousands of false claims were submitted, it does discuss the specific test at issue, flow cytometry, and provides the particular CPT code under which the test was billed. U.S. Compl. ¶ 24-26. Finally, ¶ 44 of the complaint specifically lists the Medicare fee schedule for each antibody used in flow cytometry tests.

It is not necessary to list every detail of every specific claim at the pleading stage of the litigation. There is no doubt that the United States' complaint in this case provides Dianon with notice of precisely what it is charged with under the FCA. "No more is required by Rule 9(b)." Goldman, 754 F.2d at 1070.

**B.   Dianon relies on cases involving complaints filed by relators which failed to supply basic factual information to support the relators' allegations.**

Dianon's brief cites a number of cases in which complaints were held to be too vague to satisfy Rule 9(b). Def. motion to dismiss at 3-4 and footnote 3. In those cases, however, unlike in our case, the complaints failed to set forth essential elements of a FCA allegation, such as

whether claims had even been submitted to the Government. Moreover, the cases cited by Dianon in which a court dismissed a qui tam complaint on 9(b) grounds were cases where the United States had declined to intervene in the litigation brought by the relator and, therefore, had no control over the drafting or filing of the complaint.

Dianon cites, for example, to United States ex rel. Clausen v. Laboratory Corp. of America, 290 F.3d 1301 (11th Cir. 2002), a declined qui tam in which the relator brought an action under the FCA alleging Medicare and Medicaid fraud against a competitor. Def. motion to dismiss, at 4. The Eleventh Circuit affirmed the District Court's dismissal of the realtor's first and second amended complaints, noting that the relator described the defendant's alleged schemes to increase its testing and testing revenues but failed to "provide any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes. . . ." Clausen, 290 F.3d at 1312 (emphasis added). The decision in Clausen was premised on the Court's concern that the relator failed to show in his complaint that false claims for payment had in fact been submitted to the Government. Id. at 1311-12. The Court expressly stated that it was not requiring that any particular piece of information was needed to satisfy Rule 9(b), or that detailed information had to be provided about every claim:

> To the contrary, this discussion merely lists some of the types of information that might have helped Clausen state an essential element of his claim with particularity but does not mandate all of this information for any of the alleged claims. Although Clausen has provided none of these items of information here, some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).

Id. at 1312, n. 21.

Here, unlike Clausen, there is no dispute that Dianon actually submitted thousands of claims for flow cytometry tests to the Government, and that it was paid millions of dollars by the

Government for those claims. U.S. Compl. at ¶ 44. Similarly, the other cases cited by Dianon, unlike our case, involved complaints filed by relators that failed to provide basic factual support for key elements of the allegations. See Def. motion to dismiss at 3-4, citing U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital, 360 F.3d 220, 232 (1st Cir. 2004) (Court focused on the fact that the relator's complaint did not indicate that any false claims had actually been presented to the Government.); United States ex rel. Bledsoe v. Community Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003) (Court found relator's vague complaint "often states that 'Defendants' engaged in certain practices, without ever specifying the defendants to which it was referring"); United States ex rel. Schwartz v. Coastal Healthcare Group, Inc., No. 99-3105, 2000 U.S. App. LEXIS 26914, at * 14 (10th Cir. Oct. 26, 2000) (relator's fourth amended complaint found deficient because it failed to identify any hospital or physician who signed the agreements in question or "identify any time when a false or fraudulent claim was presented"); United States ex rel. Barrett v. Columbia/HCA Healthcare, 251 F.Supp.2d 28, 35 (D.D.C. 2003) (relator's complaint did not even allege "that claims for payment were made to the federal government"). These cases do not establish a principle that particular facts, such as the date of each false claim and the name of each Medicare patient, must be included in a FCA complaint. Rather, each of these cases involved a factual determination by the Court that the complaint was too vague to accomplish the basic purposes of Rule 9(b), namely giving the defendant enough information about the claims at issue to be able to prepare a meaningful defense and ensuring that the plaintiff had at least some factual basis for its allegations. Those concerns are not present here.

Finally, as we show in the following section, Dianon already has in its possession much of the information it seeks, and the remaining information will be provided during fact and expert

discovery.

C. **During its pre-complaint investigation, the United States provided Dianon with patient-specific information, and additional information will be produced during discovery.**

It is well established that a complaint which sets forth the fraudulent scheme with specificity is sufficient for Rule 9(b) purposes, and the particular details of each false claim can await discovery. See Warning, 1994 WL 396432, at * 3 ("Although the allegations do not provide specific date, time and place descriptions for each fraudulent act at issue, they describe the fraudulent schemes conducted by the defendants with sufficient particularity to provide the defendants with adequate means for substantiating the charges. . . . Any remaining uncertainty can be remedied by means of discovery."); see also Diabetes Treatment Ctrs., 238 F.Supp.2d at 270 (complaint that set forth scheme was specific enough to allow defendant to prepare its defense; "[t]he complaint is sufficient to go forward with discovery"); Thompson, 20 F.Supp.2d at 1049 ("Plaintiffs are entitled to discovery before being required to list every false claim, its date, the individuals responsible, and why each patient was not eligible for Medicare."); Kensington Hospital, 760 F. Supp. at 1126 ("In the present situation, the government has sufficiently identified the schemes of fraudulent behavior in which defendants allegedly engaged . . . . [F]ull particulars will have to be revealed during discovery, and a pretrial order should clarify any remaining uncertainty.").

Moreover, during its pre-complaint investigation of this matter, the Government provided Dianon with two lists of patients containing the type of information Dianon now seeks in its motion. As part of its investigation of Dianon's flow cytometry billing practices, the Government created a statistically valid random sample consisting of 200 patients. On or about

May 5, 2003, the Government requested the records of those 200 patient from Dianon. The list of patients the Government served on Dianon contained each patient's name, the date of service, and patient's specific health insurance claim number. The 200 patient records were produced by Dianon to the Government.

The Government also learned during its investigation that Dianon was billing for a substantial number of repeat services (i.e. the same patient received two or more flow cytometry tests, and each time Dianon utilized a "full panel" of twenty-six antibodies). On or about September 15, 2004, the Government served Dianon with an Inspector General subpoena for approximately 1,500 additional patient records related to these repeat services. Dianon did not produce the records called for by the subpoena. Dianon later informed the Government that because it believed that the Government would intervene in the action in the near future, Dianon felt that it did not have to produce the 1,500 patient records, but would do so in the context of the Federal Rules of Civil Procedure.[4]

---

[4] The purpose of the original sample of 200 patient records requested by the Government was to assist the Government in deciding whether or not to intervene in this action. After having the patient records reviewed by a medical expert, and taking other investigatory steps, the Government determined that it was appropriate to intervene. Because the Government has now intervened in this action, and will undertake to prove its case at trial, the Government will likely expand its review beyond the sample conducted during its pre-complaint investigation and will have additional patient charts reviewed by its medical expert prior to issuing his expert report. Utilizing a statistically valid random sample is an accepted method of proving damages when a case involves thousands of claims submitted to Medicare or Medicaid. See, e.g., United States v. Freitag, 230 F.3d 1019, 1025 (7th Cir. 2000) (in criminal case where defendant was convicted of submitting false claims to Medicare for medically unnecessary ambulance services, Court approved a sample of 200 claims in calculating the amount of the fraud loss, noting that "the large number of fraudulent claims (over 8,000) and the extensive period over which the claims were submitted (seven years)" made it "impractical" to calculate the loss with greater precision); United States v. Cabrera-Diaz, 106 F.Supp.2d 234, 240 (D.P.R. 2000) (awarding damages in a FCA case based on a statistical sample and holding that '[n]umerous cases involving Medicaid and Medicare overpayments have endorsed proof of damages through the use of statistical

Dianon explicitly acknowledges in its motion that it would be impractical to specify the fraud on a patient-by-patient basis, and requests that the Government produce lists of the patients at issue. See Def. motion to dismiss at 5. However, Dianon now has in its possession the list of the original 200 patients included in the Government's sample, as well as the list of the 1,500 patients whose records it failed to produce. Because these are Dianon's own patients derived from its own billing data, Dianon obviously has in its possession the amount billed and paid for each of those patients, as well as the particular antibodies used in each of the tests. Dianon also knows how much it was paid by Medicare and Tricare for each antibody.[5]

During discovery in this case, Dianon will certainly request and receive the flow cytometry claims data that the Government has received from the Medicare and Tricare programs. In addition, as noted above, during discovery the Government will request that Dianon produce additional patient charts and will, among other things, have those charts reviewed by its medical expert. Pursuant to discovery and the requirements of the Federal Rules of Civil Procedure, the Government will produce an expert report setting forth the expert's findings in detail. After that, again pursuant to the Federal Rules of Civil Procedure, Dianon will have the opportunity to depose the Government's expert and to ask the expert questions about his

---

sampling"); see also Youngstown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 89-90 (2d Cir. 1991) (approving the use of statistical sample to prove Medicaid overcharges by medical laboratory); Illinois Physicians Union v. Miller, 675 F.2d 151, 155 (7th Cir. 1982) ("the use of statistical samples has been recognized as a valid basis for findings of fact in the context of Medicaid reimbursement").

[5] Accordingly, Dianon already has the type of patient specific information mentioned in In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318 (D. Conn. 2004) and United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F.Supp.2d 35 (D. Mass. 2000). Although the information provided does not list each antibody that is fraudulent, that analysis will be provided in an expert report, after review by the expert of additional patient records.

report and about any other relevant topic.

Finally, it is disingenuous for Dianon to act as if it is completely unaware of which antibodies were medically unnecessary. As referenced in the complaint, an internal memorandum prepared by a Dianon pathologist stated that only eighteen antibodies were "essential" and could be "justified" to insurance carriers. Thus, even Dianon's own pathologist questioned whether the other eight antibodies were medically necessary. See U.S. Compl. ¶¶ 31-33. Dianon certainly should be able to identify, at minimum, those eight antibodies.

Thus, this Court should conclude, as did the court in Gelco Corp. v Major Chevrolet, Inc., No. 01-C-9719, 2002 WL 31427027, at *9, (N.D. Ill. Oct. 30, 2002) that:

> this complaint permits an inference that plaintiffs have investigated defendant's conduct to sufficiently be able to lay out the schemes on which they base their complaint so as to dispel concern that they are fishing to uncover unknown wrongs, merely seeking to injure defendant by making charges of serious wrongdoing, or leaving defendant in the dark about what it is accused of doing.

Dianon's argument that the complaint is insufficient under Rule 9(b) should be rejected in its entirety.[6]

## II.    In the alternative, the United States should be granted leave to file an amended complaint.

The United States' complaint in this matter is pleaded with sufficient particularity to satisfy the requirement of Rule 9(b). However, should the Court determine that the Complaint does not meet the requirements of Rule 9(b), the appropriate remedy is to allow the United States to amend the complaint to plead with the necessary specificity, rather than to dismiss the case completely. 5A Wright & Miller, *Federal Practice and Procedure: Civil 3d* § 1300, at 265

---

[6] For the same reasons as set forth above, the Government's common law claims are also pleaded with sufficient particularity for the purposes of Rule 9(b).

(2004). The Second Circuit has recognized that "complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (internal quotation marks and citation omitted). In general, leave to amend has been denied only where the plaintiff already had one opportunity to plead fraud with greater specificity or where the defective allegation was made after full discovery in a related case. Id. at 56.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny defendant's motion to dismiss pursuant to Rule 9(b) in its entirety. If the Court concludes that the Government's complaint is insufficiently detailed, the Government respectfully requests leave to amend its complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

RICHARD M. MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700 (phone)
(203) 773-5373 (fax)
Richard.Molot2@usdoj.gov

MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch

Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0240
Facsimile: (202) 305-7797

Attorneys for the United States

CERTIFICATE OF SERVICE

    This is to certify that a true and correct copy of the United States' Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint Under Fed. R. Civ. P. 9(b), was served by mail, this 8th day of June 2005 on:

    Bryan T. Carmody, Esq.
    Maya & Associates, P.C.
    183 Sherman Street
    Fairfield, CT 06430

    Kerry M. Parker, Esq.
    Michael D. Thompson, Esq.
    Epstein, Becker & Green, P.C.
    Two Gateway Center, 12th Floor
    Newark, NJ 07102

    Mary A. Gambardella, Esq.
    Epstein, Becker & Green, P.C.
    One Landmark Square, Ste. 1800
    Stamford, CT 06901

    Robert Salcido, Esq.
    Akin Gump Strauss Hauer & Field, LLP
    Robert Strauss Building
    1333 New Hampshire Ave, NW
    Washington, D.C. 20036

    Pat Davis, Esq.
    Civil Division
    U.S. Department of Justice
    Patrick Henry Building, Room 9022
    601 D. Street, N.W.
    Washington, D.C. 20004

                                                      RICHARD M. MOLOT
                                                    ASSISTANT U.S. ATTORNEY