UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:02CV1573(MRK) |
| ex rel. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | July 14, 2005 |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' AMENDED COMPLAINT

Plaintiff United States of America brings this action against defendant Dianon Systems, Inc. ("Dianon") to recover monies that defendant wrongfully obtained from Federal healthcare programs through false or fraudulent claims for payment. For its causes of action, the United States alleges as follows:

## NATURE OF ACTION

1.    The United States brings this action to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733. The United States also brings this action to recover all available damages and other monetary relief under the common law or equitable theories of unjust enrichment and payment by mistake of fact.

2.    The United States alleges that Dianon submitted false or fraudulent claims for payment to Federal healthcare programs for flow cytometry tests containing antibodies that were not reasonable and medically necessary.

3.    Under the False Claims Act, a private person may, under certain circumstances,

bring an action in federal district court for himself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That private person is known as a relator, and the action that the relator brings is called a *qui tam* action.

4.    This complaint is part of a *qui tam* action brought by relator James Tiesinga, M.D. ("Relator") on behalf of the United States. In or about September 2002, Relator filed a complaint for violations of 31 U.S.C. §§ 3729 et seq., on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1). The Relator also asserted personal, employment discrimination claims under 31 U.S.C. § 3730(h) and various common law and statutory claims.

5.    On or about November 5, 2004, the United States notified the Court of its election to intervene in and assume primary responsibility for prosecuting this *qui tam* action, pursuant to 31 U.S.C. § 3730(b)(4), with the exception of the Relator's personal employment discrimination claims.

## JURISDICTION

6.    This Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court possesses supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

7.    The Court has personal jurisdiction over defendant pursuant to 31 U.S.C. § 3732(a), because defendant is transacting and has transacted business in this District, and because defendant committed acts within this District that violated 31 U.S.C. § 3729.

## VENUE

8.     Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. §1391(b)

and (c) because defendant resides and/or transacts business in this District, and

because defendant committed acts within this District that violated 31 U.S.C. §

3729.

## PARTIES

9.     The United States brings this action on behalf of the Department of Health and

Human Services (HHS) and the Centers for Medicare and Medicaid Services

(CMS), formerly known as the Health Care Financing Administration (HCFA), on

behalf of the Medicare program, and the Department of Defense, on behalf of the

Civilian Health and Medical Program of the Uniformed Services (CHAMPUS),

now known as TRICARE.

10.     Defendant Dianon is a clinical laboratory with its principal place of business in

Stratford, CT. Dianon is a wholly owned subsidiary of Laboratory Corporation of

America, Inc.

11.     Relator was employed by Defendant Dianon as a hematopathologist from July

2001 until June 5, 2002 and was a resident of Connecticut during that time period.

## THE FALSE CLAIMS ACT

12.     The False Claims Act provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be
presented, to an officer or employee of the United States
Government or a member of the Armed Forces of the United States
a false or fraudulent claim for payment or approval; (2) knowingly
makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the Government,

* * *

is liable to the United States Government . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729.

### FEDERAL HEALTHCARE PROGRAMS

13.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg (1999), establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. The Secretary of HHS administers the Medicare program through CMS, a component of HHS.

14.     The Medicare program is comprised of four parts. Medicare Part A, C and D are not directly at issue in this case. Medicare Part B provides federal government funds to help pay for, among other things, laboratory procedures performed for Medicare beneficiaries.

15.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals who are age 65 or older, or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. However, payments under the Medicare Program are often made directly to service providers, such as laboratories, rather than to the patient (the "beneficiary"). This occurs when the

provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

16. The United States provides reimbursement for Medicare claims through CMS. CMS, in turn, contracts with private insurance carriers to administer, process and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the Part B Trust Fund). In this capacity, the carriers act on behalf of CMS. Dianon submitted claims to the Part B Carrier in Connecticut, First Coast Services Options, formerly United Healthcare (from 1997-2000) and Metrahealth Insurance Company (from 1995-96).

17. The Medicare Program, through the Part B Carrier, pays a significant portion of every claim. The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-pay." Beneficiaries also pay deductibles.

18. In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called CMS 1500. When the CMS 1500 is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

19. On a CMS 1500, the provider also must state, among other things, the procedure(s) for which it is billing Medicare. Providers use the Current Procedural Terminology (CPT) numeric codes to describe on the CMS 1500 the procedures or services they rendered.

20. All healthcare providers, including laboratories, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

   a. Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); and

   b. Providing economical medical services, and then, only when, and to the extent, medically necessary. 42 U.S.C. § 1320c-5(a)(1).

21. The federal Medicare regulation excludes from payment services that are not reasonable and necessary. 42 C.F.R. § 411.15(k)(1).

22. Medicare also does not pay for "screening" tests, except in certain circumstances specifically set forth in the regulations. 42 C.F.R. § 411.15. Screening tests are tests performed in the absence of signs, symptoms, complaints, personal history of disease or injury.

23. Tricare Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. Tricare contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Dianon under the Tricare program.

## THE FRAUDULENT CONDUCT

24.     Defendant acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations and guidance applicable to Federal healthcare programs when submitting claims for various flow cytometry procedures billed under CPT code 88180.

25.     Specifically, in performing hematopathology flow cytometry tests, starting in 1996 and up to the present time, Dianon significantly increased the number of antibodies it used to test patient specimens. At all relevant times, Dianon was reimbursed separately by Medicare for each antibody used in the flow cytometry test. However, not all of the antibodies for which Dianon billed Federal healthcare programs were medically necessary.

26.     Flow cytometry is performed on cells in liquid suspension (i.e. blood, bone marrow, body fluids or tissue cell suspensions) that have been incubated with fluorescently tagged antibodies directed against specific cell surface proteins. A number of different antibody panels are used, depending on the clinical question to be answered. Using the flow cytometer, cells are counted with each antibody combination, and the percentage of positive cells is calculated. The relative fluorescence intensity of the positive cells indicates the amount of antibody bound to specific binding sites on the antibodies. The information obtained from the flow cytometry test can then be used to evaluate particular types of cancer. Particular antibodies are used depending upon what type of cancer is suspected or already diagnosed, because not all antibodies are useful in evaluating all types of

cancer.

27.   In or about 1995, Dianon's "standard" flow cytometry panel consisted of 8 antibodies.

28.   Beginning in or about 1996, Dianon significantly increased the number of antibodies in its flow cytometry panel. On information and belief, Dianon's standard panel was increased to 26 antibodies.

29.   In or about 1996, Medicare reduced the maximum allowable amount for flow cytometry tests from approximately $94.00 per antibody to approximately $28 per antibody. By increasing the number of antibodies on its panel to 26, Dianon was able to ensure that the pre-1996 allowable amount per panel (8 antibodies x $94=$752) did not drop significantly as compared with the post-1996 allowable amount (26 antibodies x $28 = $728).

30.   On or about May 21, 1997, an internal Dianon memo prepared by Dianon pathologists purported to justify the company's standard panel of 26 antibodies it used when conducting flow cytometry tests.

31.   However, less than one month later, on or about June 17, 1997, another internal Dianon memo prepared by Dianon pathologists indicated that only 18 antibodies were "essential for the accurate and complete initial workup of flow cytometry specimens" and that "their routine usage can be justified to insurance carriers."

32.   Thereafter, from in or about 1998 to in or about 2000, on information and belief, Dianon tested using 26 antibodies, but only billed Medicare for 18 antibodies, because the company knew that only 18 antibodies were medically necessary.

33.  However, beginning in or about 2001, Dianon changed its billing pattern and began to bill Federal healthcare programs for all 26 antibodies in its standard panel, instead of the 18 antibodies it had previously found were "essential." In other words, Dianon began to bill Federal healthcare programs for the 8 antibodies that its own pathologists had found were not "essential" in the June 17, 1997 memo.

34.  From in or about 2001 to in or about the first quarter of 2004, Dianon billed Federal healthcare programs for 26 antibodies in most cases, regardless of the medical necessity of each of the individual antibodies.

35.  Not all of the 26 antibodies in Dianon's standard panel are necessary, or appropriately used, to evaluate all types of cancer.

36.   From in or about 1996 to the present, when Dianon billed for flow cytometry tests, a significant portion of the antibodies billed to Federal healthcare programs were not medically necessary.

37.  The information received by Dianon with the patient sample provided information which would have allowed pathologists at Dianon to use their medical judgment to craft panels aimed at identifying the particular type of cancer suspected by the referring physician, to determine whether cancer had recurred or to stage a particular type of cancer.  By utilizing a standard panel of 26 antibodies in each and every case, regardless of the patient's history, diagnosis or other information supplied by the requesting physician, Dianon did not exercise medical judgment as to whether each of the individual antibodies was medically necessary.  For

example, where the requisition form submitted to Dianon, or results of previous tests conducted by Dianon on the same patient, indicated the existence of a particular type of cancer, a complete panel of 26 antibodies would not be needed to evaluate that cancer;  Dianon's pathologists should have used their medical judgment to limit the panel size to those antibodies medically necessary to the already diagnosed, or suspected, type of cancer.

38.    In fact, for a significant portion of the patients for whom Dianon conducted flow cytometry tests during the relevant time period, Dianon performed multiple tests, over time, on the same patient, each time using a full panel of 26 antibodies. Thus, Dianon had information readily available to its pathologists which would have enabled them to exercise their medical judgment and limit the number of antibodies for which they tested to only those medically necessary to that particular case.  For example, where a prior Dianon flow cytometry test had already been used to evaluate a particular type of cancer, and the pathologist knew of the results of the prior test, or should have known by reviewing Dianon's own records, it was not medically necessary to test for those antibodies which were not useful to evaluate the type of cancer in question.  Instead, Dianon knowingly failed to properly exercise its medical judgment and charged Federal healthcare programs for medically unnecessary antibodies.

39.    Physicians who refer patient samples to Dianon for testing rely on the medical judgment of the Dianon pathologist as to the number and type of antibodies to use in performing the flow cytometry tests.

40.     The requisition forms used by referring physicians to request flow cytometry

services from Dianon reflect the company's knowledge and understanding of the

Medicare regulations, particularly the requirement that the tests ordered be

medically necessary and the fact that Medicare does not consider screening tests

to be medically necessary.  On the requisition form in use in April of 1998, for

example, a footnote to the requisition form states, " Medicare and Medicaid do not

consider screening tests to be medically necessary;  please order only tests that are

medically necessary for diagnosis or treatment for billings to these payors."

Despite this recognition, a notation on the form next to Dianon's two primary flow

cytometry panels, XL3 and XL4, indicates that those panels contained "18-26

markers."  By limiting the ordering choice to panels of 18-26 antibodies, Dianon

ensured that in many cases medically unnecessary antibodies would be used and

billed to Federal healthcare programs.  Requisition forms are not submitted to

Federal healthcare agencies when healthcare providers such as Dianon submit

requests for payment.

41.     On the requisition form in use by Dianon in June of 1999, the same statement

about ordering only medically necessary tests appears, but next to the XL3 and

XL4 panels a new statement appears:  "The number of antibodies used will be

based on the professional opinion of the hematopathologist."  Dianon clearly

recognized that its pathologists should be making a medical judgment about the

necessity of individual antibodies to be used in the test.  However, in practice,

Dianon continued to use a standard panel of 26 antibodies in most of its flow

cytometry tests, and, as a result, billed Federal healthcare programs for medically unnecessary antibodies.

42.     The requisition form in use by Dianon in November of 2000 does not contain the statement about choosing only medically necessary tests for Medicare and Medicaid patients, and the notation under the flow cytometry panels XL3 and XL4 states, "Standard Panel of 26 Antibodies." By limiting the ordering choice to a panel of 26 antibodies, Dianon ensured that in many cases medically unnecessary antibodies would be used and billed to Federal healthcare programs.

43.     Dianon knowingly billed Federal healthcare programs for medically unnecessary antibodies. As a result of Dianon's actions, the United States paid for antibodies billed under CPT Code 88180 that were not medically necessary and that the United States would not have paid for had it known that they were not medically necessary.

44.     Prior to filing this complaint, the Government created a statistical sample to assist it in determining whether or not to intervene in this case. The purpose of the statistical sample was to determine whether Dianon routinely billed Federal healthcare programs for medically unnecessary antibodies under CPT Code 88180. The Government reserves the right to supplement or revise this sample prior to trial in this matter.

45.     The sample encompassed Dianon's flow cytometry services paid by the Government under CPT Code 88180 during the time period 1998 through 2002.

46.     The sample consisted of randomly selected dates of service for 200 patients.

47.    On or about May 5, 2003, the Government served a request for information on Dianon. This request for information included an attachment which listed the 200 patients and dates of service included in the sample. The attachment contained the sample number, the patient's name, the patient's Health Insurance Claim number, and the date of service in question. To protect the privacy of the patients, the examples set forth in this complaint will refer only to the patient's sample number.

48.    After Dianon produced the records for the 200 patients, the records were reviewed by an expert pathologist from the Yale University School of Medicine.

49.    First, the expert found that even during the time period 1998-2000, when Dianon only billed the Government for 18 of the 26 antibodies used in its standard panel, Dianon still billed the Government for medically unnecessary antibodies on numerous occasions.

50.    For example, Patient #36 received flow cytometry testing from Dianon on or about December 7, 2000. Patient #36 was an 80 year old female with a history of "lymphadenopathy." The referring physician indicated that the patient's clinical diagnosis was "lymphoma" and the indication for the study was "staging lymphoma." The referring physician also provided blood test results for the patient. In choosing which antibodies to use, Dianon did not make an independent medical judgment based on the patient's condition. Instead, it simply performed its standard panel of 26 antibodies. The Government's expert reviewed the records for Patient #36 and found that there was sufficient information

provided by the referring physician, such as the clinical diagnosis, and the history of malignancy ("lymphadenopathy"), that it was not medically necessary to run a full panel of 26 antibodies. The expert found that only 13 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD 22, CD103, CD11C, CD13, CD33, CD 38, CD56, CD57, CD25, CD34, and HLA-DR. Thus, for Patient #36, Dianon billed the Government for 18 antibodies, when only 13 antibodies were medically necessary. As the maximum allowable amount per antibody in 2000 was $41.16, Dianon was paid an extra $164.64 by the Government for the 5 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 5 medically unnecessary antibodies).

51.     As another example, Patient #25 received flow cytometry testing services from Dianon on or about September 24, 1999. Patient #25 was a 72 year old male. The indication for the study, provided by the referring physician, was "monoclonal gammopathy" and the clinical diagnosis was "sensory neuropathy." As with most samples sent to Dianon for flow cytometry testing, the referring physician also provided blood test results for the patient. The Government's expert found that Dianon again did not attempt to exercise medical judgement in deciding what antibodies to use, but instead performed its standard panel of 26 antibodies. The Government's expert reviewed the records for patient #25 and found that there was sufficient information supplied by the referring physician, such as the clinical diagnosis and indication for the study, such that it was not medically necessary to

run a full panel of 26 antibodies.  The expert found that only 14 antibodies were medically necessary.  The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, and HLA-DR.  Thus, for patient #25, Dianon billed the Government for 18 antibodies, when only 14 were medically necessary.  As the maximum allowable amount  per antibody in 1999 was $28.05, Dianon was paid an extra $89.76 by the Government for the 4 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 4 medically unnecessary antibodies).

52.    As another example, Patient # 65 received flow cytometry testing services from Dianon on or about August 24, 2000.  Patient # 65 was a 74 year old male.  The clinical diagnosis and indications for the study, provided by the referring physician, were "low grade lymphoma" and "staging lymphoma."  Again, Dianon performed its standard panel of 26 antibodies, instead of tailoring the panel to the patient's medical condition.  The Government's expert reviewed the records for Patient #65 and found that there was sufficient clinical information set forth by the referring physician, such that it was medically unnecessary to use a panel of 26 antibodies.  The expert found that only 13 antibodies were medically necessary.  The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38.  Thus, for patient #65, Dianon billed the Government for 18 antibodies, when only 13 were medically necessary.  As the maximum allowable amount per antibody in 2000

-15-

was $41.16, Dianon was paid an extra $164.64 by the Government for the 5 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 5 medically unnecessary antibodies).

53.     In or about 2001, without explanation, Dianon started to bill the Government for all 26 antibodies in its standard panel (even after billing the Government for only 18 antibodies during the prior three years, because Dianon's own pathologists had found that only 18 antibodies were "essential"). A review by the Government's expert of claims submitted in 2001 and 2002 found that Dianon billed for an even greater number of medically unnecessary antibodies during this time period.

54.     For example, Patient #125 received flow cytometry testing services from Dianon on or about March 7, 2002. Patient #125 was an 84 year old female. The indications for the study, provided by the referring physician, were "lymphocytosis, Thrombocytopenia, ?CLL" (i.e. rule out chronic lymphocytic leukemia). Instead of performing a more targeted panel based on the patient's medical condition, Dianon performed a panel of 27 antibodies (although it only billed for 26 antibodies). The Government's expert reviewed the records for Patient #125 and found that there was sufficient clinical information set forth by the referring physician, which included the indications for the study set forth above, that it was not medically necessary to use a panel of 27 antibodies. The expert found that only 14 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c,

CD56, CD57, CD25, CD34, HLA-DR, and CD38.  Thus, for patient #125, Dianon billed the Government for 26 antibodies when only 14 were medically necessary.  As the maximum allowable amount per antibody in 2002 was $39.84, Dianon was paid an extra $382.46 by the Government for the 12 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 12 medically unnecessary antibodies).

55.     As another example, Patient #129 received flow cytometry testing services from Dianon on or about Nov. 11, 2002.  Patient #129 was an 71 year old male.  The indication for the study, provided by the referring physician, was "monoclonal gammopathy" and  "multiple myeloma."  Dianon again performed its standard panel of 26 antibodies.  The Government's expert reviewed the records for patient #129 and found that there was sufficient clinical information set forth by the referring physician such that it was medically unnecessary to use a panel of 26 antibodies.  The expert found that only 15 antibodies were medically necessary.  The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD57, CD25, CD34, and HLA-DR.  Thus, for patient #129, Dianon billed the Government for 26 antibodies when only 15 were medically necessary.  As the maximum allowable amount per antibody in 2002 was $39.84, Dianon was paid an extra $350.59 by the Government for the 11 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 11 medically unnecessary antibodies).

56.     As another example, Patient #136 received flow cytometry testing services from

Dianon on or about April 12, 2001. Patient #136 was a 70 year old female. The referring physician indicated that the clinical diagnosis was "lymphocytosis" and that the indication for the study was "chronic leukemia." Dianon performed a panel of 27 antibodies (although it only billed for 26). The Government's expert reviewed the records for patient #136 and found that there was sufficient clinical information set forth by the referring physician, which included the clinical diagnosis and the indications for the study, that it was medically unnecessary to use a panel of 27 antibodies. The expert found that only 14 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #136, Dianon billed the Government for 26 antibodies when only 14 were medically necessary. As the maximum allowable amount per antibody in 2001 was $41.43, Dianon was paid an extra $397.72 by the Government for the 12 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 12 medically unnecessary antibodies).

57.     As another example, patient #139 received flow cytometry testing services from Dianon on or about May 25, 2001. Patient #139 was an 79 year old female. The referring physician indicated that the clinical diagnosis was "possible extranodal marginal zone lymphoma" and the indication for the study was "staging lymphoma." Dianon once again performed its standard panel of 26 antibodies. The Government's expert reviewed the records for patient #139 and found that

there was sufficient clinical information set forth by the referring physician, such that it was medically unnecessary to use a panel of 26 antibodies. The expert found that only 13 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #139, Dianon billed the Government for 26 antibodies when only 13 were medically necessary. As the maximum allowable amount per antibody in 2001 was $41.43, Dianon was paid an extra $430.87 by the Government for the 13 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 13 medically unnecessary antibodies).

58. As another example, patient #137 received flow cytometry testing services from Dianon on or about February 9, 2001. Patient #137 was an 72 year old male. The referring physician indicated that the clinical diagnosis was "?Hodgkin's vs. LCAL" and that there was a history of "lymphadenopathy." Dianon again performed a panel of 26 antibodies. The Government's expert reviewed the records for patient #137 and found that there was sufficient clinical information set forth by the referring physician, which included the diagnosis and the history set forth above, that it was medically unnecessary to use a panel of 26 antibodies. The expert found that only 14 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #137, Dianon billed the Government for 26 antibodies when only 14 were medically necessary.

As the maximum allowable amount per antibody in 2001 was $41.43, Dianon was paid an extra $397.73 by the Government for the 12 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 12 medically unnecessary antibodies).

59.     As another example, Patient #162 received flow cytometry testing services from Dianon on or about July 9, 2002. Patient #162 was a 75 year old male. The referring physician indicated that the clinical diagnosis was "staging lymphoma." Dianon performed its standard panel of 26 antibodies. The Government's expert reviewed the records for Patient #162 and found that there was sufficient clinical information set forth by the referring physician, that it was medically unnecessary to use a panel of 26 antibodies. The expert found that only 13 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #162, Dianon billed the Government for 26 antibodies when only 13 were medically necessary. As the maximum allowable amount per antibody in 2002 was $39.84, Dianon was paid an extra $414.34 by the Government for the 13 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 13 medically unnecessary antibodies).

60.     In addition, the Government's expert found during his review that Dianon was utilizing a full panel of 26 antibodies even when conducting repeat tests (i.e. a second, third, fourth, etc. test on the same patient, each time with a full panel of

26 antibodies). The Government's expert indicated that when doing a repeat test on the same patient it is not medically necessary to do a full panel of 26 antibodies. For a repeat test, a panel of significantly fewer antibodies can usually be utilized, because the lab conducing the test should review the prior test results, as well as the patient's clinical information, and chose a more targeted panel. The expert was not able to do an analysis of these repeat tests, however, because the Government's original sample was designed to review single claims on particular dates of service, not multiple repeat tests on the same patient. In an attempt to review the repeat tests in more detail, the Government served an additional subpoena on Dianon requesting patient records relating only to the repeat tests. However, Dianon refused to produce the requested records. Thus, the Government's expert has not yet been able to do a comprehensive review of the repeat tests.

61. Although the Government has not yet been able to do a full analysis of the repeat tests, the following are some examples of the repeat tests billed by Dianon to the Government.

62. Billing data indicates that Patient #161 received multiple repeat flow cytometry tests from Dianon between 1999 and 2004. One of those tests, which occurred on or about May 1, 2002, was included in the Government's sample. At that time, Patient #161, a male, was a 70 years of age. The indication for the study for that test was "CML" (chronic myeloid leukemia). Dianon performed its standard panel of 26 antibodies. Dianon's test report did not indicate that Patient #161 had

previously had 5 prior flow cytometry tests from Dianon. The Government's expert reviewed the records for Patient #161 and found that there was sufficient clinical information set forth by the referring physician, which included the indication for the study set forth above, that it was medically unnecessary to use a panel of 26 antibodies. The expert found that only 16 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD22, CD103, CD11c, CD56, CD57, CD25, HLA-DR, and CD38. Thus, for the test performed on May 1, 2002 for Patient #161, Dianon billed the Government for 26 antibodies when only 16 were medically necessary. As the maximum allowable amount per antibody in 2001 was $41.43, Dianon was paid an extra $331.44 by the Government for the 10 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 10 medically unnecessary antibodies).

63. However, the analysis set forth above for Patient #161 was only for one test, viewed in isolation. Patient #161 had 17 flow cytometry tests by Dianon, each one, on information and belief, using a full panel of 26 antibodies. Set forth below are the dates of service and number of antibodies paid for by the Government for Patient #161:

| Date of Service | Number of antibodies paid |
| --- | --- |
| 4/22/99 | 18 |
| 7/28/99 | 18 |
| 12/16/99 | 18 |
| 4/19/00 | 18 |
| 8/15/00 | 18 |

-22-

| | |
|---|---|
| 5/1/01 | 26 |
| 8/15/01 | 26 |
| 10/28/01 | 26 |
| 3/13/02 | 26 |
| 9/4/02 | 26 |
| 12/18/02 | 26 |
| 1/16/03 | 26 |
| 3/27/03 | 26 |
| 5/8/03 | 26 |
| 10/1/03 | 26 |
| 1/6/04 | 26 |
| 3/4/04 | 26 |

64.    Thus, Dianon billed the Government for medically unnecessary antibodies for

Patient #161 on multiple dates of service, as set forth above, by using a full panel

of antibodies on each occasion.

65.    As another example, billing data indicates that Patient #159 received multiple

repeat flow cytometry tests from Dianon in 2002 and 2003.  One of those tests,

which occurred on or about Sept. 12, 2002, was included in the Government's

sample.  At that time, Patient #159, a male, was a 65 years of age.  The diagnosis

codes that provided the indication for the study for that test were lymphoma and

cytoperias.  The referring physician also provided blood test results for the patient.

Dianon performed its standard panel of 26 antibodies.  The Government's expert

reviewed the records for Patient #159 and found that there was sufficient clinical

information set forth by the referring physician, which included the diagnosis

codes indicating the reasons for the study, that it was medically unnecessary to use

a full panel of 26 antibodies.  The expert found that only 13 antibodies were

medically necessary.  The medically unnecessary antibodies were: CD2, CD7,

CD13, CD33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #159, Dianon billed the Government for 26 antibodies when only 13 were medically necessary. As the maximum allowable amount per antibody in 2002 was $39.84, Dianon was paid an extra $414.34 by the Government for the 13 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 13 medically unnecessary antibodies).

66.     However, the analysis set forth above for Patient #159, as with Patient #161, was only for one test, viewed in isolation. Patient #159 had 4 flow cytometry tests performed by Dianon, each one, on information and belief, using a full panel of 26 antibodies. Set forth below are the dates of service and number of antibodies paid for by the Government for Patient #159:

| Date of Service | Number of antibodies paid |
| --- | --- |
| 9/12/02 | 26 |
| 11/7/02 | 26 |
| 1/9/03 | 26 |
| 8/7/03 | 26 |

67.     Thus, Dianon billed the Government for medically unnecessary antibodies for patient #159 on multiple dates of service, as set forth above, by using a full panel of antibodies on each occasion.

68.     Finally, billing data indicates that Patient #121 received two flow cytometry tests from Dianon in 2001. One of those tests, which occurred on or about May 30, 2001, was included in the Government's sample. At that time, Patient #121, a

female, was 77 years of age. The clinical history provided by the referring physician was "lymphocytosis." Blood test results for the patient were also provided. Dianon performed a panel of 27 antibodies (although it only billed for 26). The Government's expert reviewed the records for Patient #121 and found that there was sufficient clinical information, such that it was medically unnecessary to use a panel of 27 antibodies. The expert found that only 14 antibodies were medically necessary. The medically unnecessary antibodies were: CD2, CD7, CD 13, CD 33, CD22, CD103, CD11c, CD56, CD57, CD25, CD34, HLA-DR, and CD38. Thus, for patient #121, Dianon billed the Government for 26 antibodies when only 14 were medically necessary. As the maximum allowable amount per antibody in 2001 was $41.43, Dianon was paid an extra $397.72 by the Government for the 12 medically unnecessary antibodies (i.e. Dianon was paid 80% of the maximum allowable amount per antibody, for each of the 12 medically unnecessary antibodies).

69.     However, the analysis set forth above for Patient #121, like the other repeat test examples set forth above, was only for one test, viewed in isolation. Patient #121 had second flow cytometry tests by Dianon, on information and belief, using a full panel of 26 antibodies. Set forth below are the dates of service and number of antibodies paid for by the Government for Patient #121:

| Date of Service | Number of antibodies paid |
| --- | --- |
| 5/30/01 | 26 |
| 6/11/01 | 26 |

70. Thus, Dianon billed the Government for medically unnecessary antibodies for Patient #121 on two dates of service, as set forth above, by using a full panel of antibodies on each occasion.

71. Between January 1, 1996 and March 31, 2004, Dianon was reimbursed by Medicare for in excess of 13,000 claims for flow cytometry services billed under CPT code 88180 where the number of antibodies billed per patient sample was 18 units or greater. Of these claims, in excess of 9,000 claims involved 26 or more antibodies, and in excess of 1,500 claims were for repeat tests.

72.  For the years 1995 through 2003, the applicable Medicare fee schedule for each antibody used in a flow cytometry test was as follows:

1995 - $93.77

1996 - $28.21

1997 - $26.08

1998 - $28.16

1999 - $28.05

2000 - $41.16

2001 - $41.43

2002 - $39.84

2003 - $66.00

73. On or about January 17, 2003, Dianon was acquired by Laboratory Corporation of America ("LabCorp"). LabCorp, the parent corporation of Dianon, generally uses two targeted panels of up to only 16 or 20 antibodies when conducting flow

cytometry testing pursuant to CPT code 88180.  Unlike Dianon, the parent

company, LabCorp, does not utilize a single standard panel of 26 antibodies in

each and every case.

74. The United States did not know, and could not reasonably have known, before the

Relator's filing of his *qui tam* complaint in 2002 of the facts material to the causes

of action pled in this Complaint.

75. Defendant's false or fraudulent claims damaged the United States because they

allowed Defendant to obtain monies to which it was not entitled.

## CLAIMS

### FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

76. The United States realleges and reincorporates paragraphs 1 through 75 as if fully

set forth herein.

77. Defendant knowingly presented or caused to be presented false or fraudulent

claims for payment or approval to the United States (*i.e.*, the Form 1500s and

electronic claims).  These false or fraudulent claims were presented to Medicare

for payment of CPT code 88180, Flow Cytometry.

78. By virtue of the false or fraudulent claims made by the Defendant, the United

States suffered damages and therefore is entitled to statutory damages under the

False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False Record or Statement)
### (31 U.S.C. § 3729 (a)(2))

79. The United States realleges and reincorporates paragraphs 1 through 75 as if fully set forth herein.

80. Defendant knowingly made, used, or caused to be made or used, false records or false statements to get false or fraudulent claims paid or approved by the United States.

81. By virtue of the false records or false statements made by the Defendant, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (Claim of the United States)

82. The United States realleges and reincorporates paragraphs 1 through 75 as if fully set forth herein.

83. This is a claim for the recovery of monies by which Defendant has been unjustly enriched.

84. By directly or indirectly obtaining federal funds to which it was not entitled, Defendant was unjustly enriched, and is liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## FOURTH CAUSE OF ACTION
(Payment By Mistake)
(Claim of the United States)

85.     The United States realleges and reincorporates paragraphs 1 through 75 as if fully set forth herein.

86.     This is a claim for the recovery of monies paid by the United States to the Defendant as a result of mistaken understandings of fact.

87.     The false or fraudulent claims which Defendant submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

88.     The United States, acting in reasonable reliance on the accuracy, completeness and truthfulness of the information contained in the claims, paid Defendant certain sums of money to which it was not entitled, and Defendant is thus liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendant as follows:

1.      On the First and Second Causes of Action under the False Claims Act, as amended, for the amount of statutory damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On the Third and Fourth Causes of Action, for unjust enrichment and payment by mistake, for the damages sustained and/or amounts by which the defendant was unjustly enriched or by which defendant retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

_____/s/_____
JOHN B. HUGHES
Assistant U.S. Attorney
Chief, Civil Division
Federal Bar No. CT05289
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700 (phone)
(203) 773-5373 (fax)
John.Hughes2@usdoj.gov

_____/s/_____
RICHARD M. MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700 (phone)
(203) 773-5373 (fax)
Richard.Molot2@usdoj.gov


_____/s/_____
MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0238


Attorneys for the United States

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the United States' Amended Complaint was served by Federal Express, this 14th day of July 2005 on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880

Kerry M. Parker, Esq.
Michael D. Thompson, Esq.
Epstein, Becker & Green, P.C.
Two Gateway Center, 12th Floor
Newark, NJ 07102

Mary A. Gambardella, Esq.
Epstein, Becker & Green, P.C.
One Landmark Square, Ste. 1800
Stamford, CT 06901

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Field, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036

Pat Davis, Esq.
Civil Division
U.S. Department of Justice
Patrick Henry Building, Room 9022
601 D. Street, N.W.
Washington, D.C. 20004

_____/s/_____
RICHARD M. MOLOT
ASSISTANT U.S. ATTORNEY