

EXHIBIT B

December 4, 1997

Arif A. A. Toor, MD
United Health Care
Medical Director, Medicare Part B
538 Preston Avenue
Meriden, CT 06450

Dear Dr. Toor:

Since April, 1996 DIANON has been denied payment for flow cytometric immunophenotyping when the requesting physician used certain ICD 9 codes. You and I have had several meetings on this matter. You agreed that denial of payment for certain ICD 9 codes, 789.2 - splenomegaly, 238.4 - polycythemia vera, and 288.0 - agranulocytosis, to name a few, was inappropriate. You also requested that I assist you in drafting an appropriate policy governing coverage of this service. In doing so, I have based my recommendations on the policy published in the *Medicare News* of March, 1993 and on a detailed review of the 1275 reports issued by our laboratory between April 1996 and August 1997 and for which we were denied payment. I am assuming that the policy to which I am referring is the most current written policy. A copy of the relevant page is attached. Please let me know if this is not correct.

Your published policy states that immunophenotyping (CPT code 88180) is a covered service in the following circumstances:

1. Diagnosed or possible leukemia of any type. May repeat for evaluation of status with consideration of change of treatment.

2. Diagnosed or possible non-Hodgkin's lymphoma. May repeat for evaluation of status with consideration of change of treatment.

3. Possible Hodgkin's disease, will be denied for previously diagnosed Hodgkin's disease unless there is a possibility of #1 or #2 being considered (acute leukemia or non-Hodgkin's lymphoma post Hodgkin's therapy).

S00100

The policy also mentions coverage for HIV+ patients and in cases of bone marrow transplantation. This is a rational policy with a firm basis in the established utility of immunophenotyping, primarily as a tool for:

1. Diagnosing a suspected malignancy by demonstrating monoclonality, enumerating populations of blasts, or characterizing aberrant phenotypes with a strong association with malignancy.

2. Staging patients with known malignancy.

3. Monitoring disease status in response to treatment.

While the policy reflects a clear understanding of the utility of immunophenotyping, the same cannot be said for the method currently employed in practice. In conversations with me you have indicated that in processing claims, the computer at your facility has been programmed to reject all claims that do not have an ICD 9 code referring to a preexisting diagnosis of either leukemia or non-Hodgkin's lymphoma. This change is inconsistent with your written policy, since possible leukemia, possible non-Hodgkin's lymphoma, and possible Hodgkin's disease, all of which are covered conditions in the policy, are excluded by the computer. (I should also note that the computer is even rejecting some claims with ICD 9 codes corresponding to diagnoses of leukemia or lymphoma - see Attachments, TABLE 5.)

In an attempt to assist you in determining what additional codes should be covered, I undertook a review of 1275 cases denied between April, 1996 and August, 1997, the data from which is presented in Tables 1 - 5 located in the Attachments. Our laboratory diagnosed 57% of these cases as non-neoplastic and 43% as neoplastic (TABLE 1). The category of neoplastic includes only hematologic malignancies. The breakdown into the various types of hematologic malignancies is also presented. I have included myelodysplastic syndromes and myeloproliferative disorders in this category since they are regarded as either neoplastic or preneoplastic by hematologists and hematopathologists. What are most instructive are the tables demonstrating the findings in cases coded by the ordering physician as Non-hematologic Neoplasms (TABLE 2), Non-neoplastic Hematologic Conditions (TABLE 3), and Non-neoplastic Non-hematologic Conditions (TABLE 4). The frequency of hematologic neoplasia is virtually identical in all 3 groups: 41%, 38%, and 42%, respectively. The frequencies of the various types of hematologic malignancy are also remarkably similar. Hematologic malignancy rates in the range of 40% are extremely high when compared with a rate of 0.04% in the general population. This 1000 fold increase indicates a preselected patient population. In this case the selection criteria must have been a strong clinical suspicion of leukemia or lymphoma. There is no other plausible explanation for such high frequencies of disease. Our data suggest, therefore, that clinicians are using immunophenotyping in an

appropriate fashion. If the situation were otherwise, one would expect a much lower rate of malignant diagnoses more in line with the findings in the general population. In fact, the incidence of significant disease in our immunophentyping cases is higher than that found in the prostate biopsies which we are asked to interpret. We diagnose carcinoma on 33% of the 40 to 50,000 prostate biopsies we see each year at DIANON. The incidence of newly diagnosed prostate cancer in males in the United States is 0.3%. Thus DIANON's experience with prostate biopsies reflects a selection of patients with a 100 fold increased risk of malignancy as compared with a 1000 fold increase in cases sent for immunophenotyping.

You and I have already agreed that coverage determination based only on ICD 9 codes referring to an established diagnosis of leukemia or lymphoma is inadequate. Coverage needs to be expanded to encompass patients with possible leukemia or lymphoma for whom immunophenotyping could well offer the means to a diagnosis permitting appropriate medical care. One approach would be to add those codes with a high likelihood of positive findings and to continue to exclude those where there is little likelihood of finding neoplasia. In the Non-neoplastic Hematologic Conditions (TABLE 3) neoplasia was found in 22 to 100% of the cases depending on the ICD 9 code provided by the clinician. These frequencies are high enough to warrant coverage. There are 4 codes in the Non-hematologic Neoplasm group (TABLE 2) in which the incidence of neoplasia is 0%, but each of these codes has only 1 or 2 cases. All the others have frequencies above 25%. A similar situation obtains in the Non-neoplastic Non-hematologic Conditions (TABLE 4): only codes with 4 or fewer cases show no neoplasia. The codes with 10 or more cases all have frequencies of neoplasia of 33% or higher. Thus there is no empirical evidence in these numbers upon which one could select codes for denial of coverage.

If one excludes those with codes for Hematologic Neoplasms (TABLE 5), the majority of cases in this series are those with Non-neoplastic Hematologic Conditions (TABLE 3), as one would expect in patients being worked up for a possible hematologic malignancy. That is how leukemias, lymphomas, and myelomas present: with anemias, various cytopenias, monoclonal gammopathies, and all the other hematologic conditions through which these malignancies first manifest themselves. Even codes like 280.9 (iron deficiency anemia) are understandable from this perspective. Patients can present with an anemia, presumed to be iron deficient based on initial work-up, but fail to respond as expected to iron replacement therapy. A more serious condition becomes more likely and must be ruled out. Our data set does beg an important question, however. Why were 179 cases with codes for Non-neoplastic Non-hematologic Conditions (TABLE 4) and 112 for Non-hematologic Neoplasms (TABLE 2) sent for immunophenotyping? There are two reasons. First, some of the codes in these categories are for conditions that in fact are manifestations of leukemia or lymphoma. Splenomegaly and enlarged lymph nodes are obvious examples. Another example is that of intertrochanteric fracture.

300102

Immunophenotyping is not standard of care for broken bones, but what about in the case of a suspected pathologic fracture? One of these 4 cases turned out to have a lymphoma. .The clinician could have coded the case as a pathologic fracture of the hip, 733.14, but that diagnosis remained to be established.

Poor coding is undoubtedly the second explanation for codes seemingly unrelated to leukemia or lymphoma. Judging from the high rates of malignancy in these patients, we must assume that there were strong clinical suspicions. These suspicions must also have been based on signs or symptoms that, in most cases, could have been coded. For example, a patient with a history of prostate cancer (ICD 9 - 185) who turned out to have chronic lymphocytic leukemia might have presented with lymphocytosis (ICD 9 - 288.8). Another common example of less than optimal coding is the use of 742.59, unspecified anomalies of the spinal cord. If one looks up the term myelodysplasia in the index of some ICD 9 CM coding manuals, the reader is referred to 742.59 under which is listed myelodysplasia, albeit a different disorder than myelodysplastic syndrome, for which the correct code is 238.7. I'm sure that in many of these examples the coding is done by non-physician or even non-professional staff in very busy physician offices. If a code is already in the chart, they pick that one. If not, they do their best.

These data, which are based upon actual clinical practice, should compel us to reconsider the utility of using ICD 9 codes as a means for determining coverage for this diagnostic test. There is no correlation between the ICD 9 codes used and the frequency of hematologic malignancy in those cases when immunophenotyping is requested in patients undergoing a diagnostic work-up. The fact that we find more disease in patients with known malignancy is neither surprising nor relevant. The issue in question, in the words of your published policy, is whether or not this testing is being performed when there truly is a justified clinical concern of "possible leukemia" or "possible lymphoma". The high frequency of positive findings answers the question in the affirmative. There is no evidence of unnecessary testing.

DIANON Systems has been denied payment on 1275 claims for immunophenotyping performed between April 1996 and August 1997. Most of those, 1131, were for cases sent to us because of a concern for possible leukemia or possible lymphoma. The remainder were cases with known malignancy. You have expressed your willingness to pay DIANON for those claims that would be covered under mutually agreed upon modifications of your current policy. You have told me that your responsibility as Medical Director of Medicare Part B is to determine proper coverage based upon medical necessity and to prevent expenditure of tax payer funds on inappropriate testing. Analysis of these claims and the laboratory reports generated by DIANON shows no evidence of unnecessary testing. The likelihood of finding significant disease, namely neoplasia, is extremely high and compares favorably with other types of diagnostic testing such as prostate biopsy. Coverage for immunophenotyping

based on ICD 9 coding cannot be justified on the grounds that it will eliminate unnecessary testing. All that it accomplishes is to arbitrarily exclude some patients who have just as high a likelihood of disease as those with coverage. It does save money, but by using a method that is at best capricious and at worst unethical. I know that you would never knowingly countenance such draconian methods unless forced to do so by statute or directives from HCFA. If that is the unfortunate situation, then the number of covered ICD 9 codes will need to be expanded dramatically. I have included a proposed list of covered codes in the Attachments. Of necessity it includes hundreds of codes. Dealing with this number of codes will be an enormous burden for your staff and mine. I hope that we are able to simply abandon the use of ICD 9 codes for this purpose. If that is the case your policy can stand as written.

Please let me know as soon as possible your response to this letter. The analysis presented here has taken months of effort on the part of numerous individuals. Retrieving all this data had to be done manually. If you would like to see the reports themselves, I invite you down to look at them. It would literally take a truck to transport them to your office. Could you also please let me know how the claims should be resubmitted once the criteria for coverage are determined? I look forward to your timely response.

Sincerely,

James B. Amberson MD
Chief Medical Officer

S00104