## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    )
<u>ex</u> <u>rel</u>. DR. JAMES J. TIESINGA,    )
    )
    Plaintiffs,    )
    )
v.    )    No. 3:02CV1573(MRK)
    )
DIANON SYSTEMS, INC.,    )
    )
    Defendant.    )

## MOTION TO QUASH OR MODIFY SUBPOENA
## FOR THIRD PARTY RECORDS

Dianon Systems, Inc. ("Dianon"), by and through its undersigned counsel, submits its

motion to quash or modify the United States subpoena for third party records served upon

Richert Goyette, M.D. pursuant to Federal Rule of Civil Procedure 45. Dianon asserts that the

subpoena should be quashed or, in the alternative, modified so it does not demand production of

attorney-client communications or attorney work product and in support thereof states as

follows:

    1.    The main thrust of the Government's contention in this case is that Dianon's flow

cytometry antibody panel used for characterizing a patients' blood system health and diagnosing

leukemia and lymphoma had too many markers. A marker is a specific antibody which, when

used in combination with other antibodies, allows a hematopathologist to distinguish healthy

cells from atypical or cancerous cells by the marker's adherence or expression on different blood

cells. Since Medicare reimbursed flow cytometry testing on a per marker basis, the Government

contends that Dianon knew it billed medically unnecessary markers in its flow cytometry testing

which constitutes a false claim for each of 13,000 tests performed from 1996 to 2004. Dianon

asserts its testing was a well-designed panel of medically appropriate markers and the Government's position in this case amounts to an after-the-fact attempt to dictate medical practice outside the regulatory process.

2.      On February 28, 2006, Plaintiff deposed Dr. Goyette with regard to his involvement in the design, implementation and application of flow cytometry antibody panels and role as Director of Hematopathology for Dianon during the period 1995 to June 2000.

3.      It is upon information and belief that on or about March 30, 2006, Plaintiff served a Subpoena Duces Tecum on Richert Goyette, M.D.  A copy of the subpoena served on Dr. Goyette is attached as Exhibit 1.

4.      Plaintiff failed to serve the subpoena on Dianon pursuant to Fed. R. Civ. Pro. 45(b)(1).  As Plaintiff failed to serve Dianon, the *ex parte* subpoena should be quashed in its entirety.

5.      On April 4, 2006, Dr. Goyette forwarded the Plaintiff's subpoena to undersigned counsel for review.

6.      The subpoena attached as Exhibit 1 demands that Dr. Goyette produce the following documents to Plaintiff no later than April 13, 2006 (ten business days from the date of service):

(a)      All correspondence or communications relating to this litigation;

(b)      All contracts or agreements between Dr. Goyette and Dianon relating to work to be performed regarding this litigation;

(c)      All time records of Dr. Goyette relating to the litigation and any invoices for payment for time spent related to the litigation; and

(d)    Any drafts or the affidavit signed by Dr. Goyette and submitted to the United States and any related notes. See Exhibit 1 at 3.

7.    As Plaintiff failed to serve Dianon or its attorneys with the third-party subpoena, Dianon requested an extension to respond to the subpoena until April 18, 2006 -- ten days from the date upon which Dianon received notice of the subpoena. See attached Exhibit 2, Letter to Patricia Davis, Rick Molot, counsel for Plaintiff.

8.    During Dr. Goyette's deposition, Plaintiffs' counsel questioned Dr. Goyette regarding his relationship with Dianon after he left Dianon's employment. According to Dr. Goyette, in 2004 in-house counsel for Dianon, Thomas Kossl, contacted him and requested his help with regard to the United States allegations in this matter. See Exhibit 3 at 322-24. During the initial conversation with Mr. Kossl, Dr. Goyette and Mr. Kossl came to an agreement that Dianon would pay Dr. Goyette for his time and efforts as a consultant in order to help Dianon rebut the government's allegations and prepare for this litigation. *Id.*

9.    Dr. Goyette testified that Thomas Kossl requested Dr. Goyette to assist, *inter alia*, in preparing an affidavit to produce to the Government regarding this matter prior to the Government's decision to intervene. Dr. Goyette testified that, based upon a long conversation with Mr. Kossl, Mr. Kossl prepared a draft affidavit for Dr. Goyette's review and revision. See Exhibit 3 at 81-83, 189-90.

10.    Dr. Goyette testified that he received a draft affidavit from Mr. Kossl and rewrote it. *Id.* at 82. See Exhibit 4, Declaration of Richert E. Goyette, M.D. The signed affidavit was provided to the Government.

11.    The Government's subpoena requests communications between Mr. Kossl and Dr. Goyette as well as the draft affidavit prepared by Mr. Kossl. These documents contain

-3-

attorney-client privileged communications and attorney work product. As a former employee who was involved in the underlying transaction(s) giving rise to this litigation, the Government's request for communications between Dr. Goyette and Dianon's counsel as well as any drafts or documents prepared by Dianon's counsel invade both the attorney-client privilege and the work product doctrine. *U.S. v. Housing Authority of the Town of Milford*, 179 F.R.D. 69, 72-73 (D. Conn. 1997).

12.     As this Court noted in *Milford*, Plaintiff is entitled to neither attorney-client communications with a former employee hired as a consultant nor the corporation's counsel's work product:

> "Some former employees continue to personify the organization even after they have terminated their employment relationship. ***An example would be a managerial level employee involved in the underlying transaction, who is also conferring with the organization's lawyer in marshalling the evidence on its behalf.*** ... This kind of former employee is undoubtedly privy to privileged information, including work product, and an opposing lawyer is not entitled to reap a harvest of such information without a valid waiver by the organization ... ." (emphasis supplied).

*Id.* at 72, quoting G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct*, 436-436.1 (1988 Supp.) cited in *Dubois v. Gradco*, 136 FRD 341, 346 (D. Conn. 1991).

13.     In *Milford*, the United States recognized the above-quoted exception to *ex parte* interviews with former employees who become litigation consultants. *Id.* at 73. Despite actual knowledge of Dr. Goyette's status as a paid consultant with previous managerial level responsibility, the United States failed to recognize this exception in its *ex parte* subpoena served on Dr. Goyette.

14.     The United States violated F.R.C.P. 45 by failing to serve Dianon with a copy of the subpoena and failed to abide by this Court's decision in *Milford*. Therefore the subpoena should be

quashed in its entirety as a sanction for its *ex parte* subpoena. Alternatively, Plaintiff should not be allowed to compel the production of attorney-client communications or work product documents. In its subpoena, the government demands attorney-client communications and protected work product in categories A and D. See Exhibit 1 at page 3. Attached is a log of the documents Dr. Goyette has provided to undersigned counsel in response to this subpoena[1]. Exhibit 5, Dianon Privilege Log.

15.     Items 7-9 on the Privilege Log are protected by the attorney-client privilege and/or work product doctrine. The draft affidavit was prepared by Dianon's counsel after discussions with Dr. Goyette, Dianon's consultant. Plaintiff should not have access to communications between Dianon's counsel and its consultant retained to assist with this litigation. *See U.S. v. Housing Authority of the Town of Milford*, 179 F.R.D. at 72-73, *MMR/Wallace Power & Industrial, Inc. v. Thames Associates*, 764 F.Supp. 712, 723-726 (D.Conn. 1991) (party not allowed to obtain privileged information from ex-employee retained as litigation consultant and doing so is grounds for disqualifying party's counsel).

16.     Similarly, Plaintiff should not have access to documents selected by Dianon's counsel to review with Dr. Goyette as those documents represent Dianon's counsel's work product. Plaintiff should not be able to "reap a harvest of such information (work product)" and discover which documents Dianon's counsel had questions or thought important or relevant. *Id*.

17.     Finally, Plaintiff should not have access to any communications between Dianon's counsel and its litigation consultant. *Id*.

---

[1] In its original subpoena for the February 28, 2006 deposition, the government requested documents relating to Dr. Goyette's employment at Dianon. Dr. Goyette did not produce any documents and testified that he did not have any documents responsive to the subpoena. Upon receiving the subpoena subject to this motion, Dr. Goyette and his wife conducted a second search for documents and found additional electronic documents saved on an old computer hard drive (documents 8 and 9 on the attached privilege log).

WHEREFORE Dianon Systems, Inc. requests this Court to quash the *ex parte* subpoena served upon Richert Goyette, M.D. In the alternative, Dianon requests that the subpoena be modified to ensure that the production of attorney-client communications and attorney work product are not compelled pursuant to the subpoena.

Respectfully submitted,

Robert Salcido
Fed. Bar No. 447951
(admitted *pro hac vice)*
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4095

Bruce R. Parker, admitted pro hac vice
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, MD 21201
(410) 244-7400

Attorneys for Defendant Dianon Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of April, 2006, a copy of the foregoing

Motion to Quash or Modify Subpoena for Third Party Records was sent via electronic mail:

> Patricia R. Davis
> Civil Division
> Commercial Litigation Branch
> P.O. Box 261
> Ben Franklin Station
> Washington, DC 20044

# EXHIBIT  1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

UNITED STATES ex rel. Dr. JAMES J. TIESINGA,

Plaintiff,

V.

DIANON SYSTEMS, INC.,

Defendant.

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: 3:02CV1673(MRK)

TO:   Richard E. Goyette
      1706 Alcott Manor Lane
      Knoxville, TN 37922

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attachment A of this subpoena. Documents will be produced to the Department of Justice 10 business days after the date of service of this subpoena.

| PLACE | DATE AND TIME |
|---|---|
| U.S. Department of Justice, Civil Division, 601 D Street, NW, Room 9154, Washington, DC 20004 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) PATRICIA DAVIS, Attorney for Plaintiff | DATE 3/22/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
PATRICIA DAVIS, 601 D Street, NW, ROOM 9154, WASHINGTON, DC 20004 (202) 307-0238

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | MANNER OF SERVICE |
|---|---|
| SERVED ON (PRINT NAME) | |
| Richert E. Goyette | |

| | TITLE |
|---|---|
| SERVED BY (PRINT NAME) | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, The court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Attachment A

All documents in your possession or control relating to this litigation including,

a.  All correspondence or communications relating to this litigation, including electronic communications;

b.  All contracts, Statements of Work or other agreements between Dr. Goyette and Dianon Systems, Inc. or its counsel relating to the work to be performed relating to this litigation;

c.  All records of time spent by Dr. Goyette relating to this litigation, any invoices for payment and any records of payment; and

d.  Any drafts of the affidavit signed by Dr. Goyette and submitted to the United States and any related notes.

# EXHIBIT 2

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

▬▬▬▬▬▬▬ Attorneys at Law

**ROBERT SALCIDO**
202.887.4095/fax: 202.887.4288
rsalcido@akingump.com

April 11, 2006

**VIA ELECTRONIC MAIL**

Richard M. Molot, Esq.
Assistant United States Attorney
Office of U.S. Attorney, District of Connecticut
Connecticut Financial Center
U.S. Department of Justice
157 Church Street
New Haven, Connecticut  06510

Patricia R. Davis, Esq.
Civil Division
Commercial Litigation Branch
U.S. Department of Justice
601 D Street, N.W.
Washington, D.C.  20004

                    Re:     **U.S. v. Dianon Dr. Goyette Subpoena**

Dear Rick and Pat:

        I am writing regarding your recent subpoena duces tecum served on Richert
Goyette, M.D.  Dr. Goyette forwarded the subpoena to us on April 4, 2006.  Prior to
April 4th we had not seen the subpoena as you failed to serve it on Dianon pursuant to
Fed. R. Civ. P. 45.  In the future, please serve third-party subpoenas pursuant to Rule 45
to provide Dianon an opportunity to object if warranted.

        Since we were unable to review the subpoena until April 4th, I ask that you treat
April 4th as the date of service in computing the time to respond -- giving Dianon and Dr.
Goyette until April 18, 2006 to respond to the subpoena.  The additional time is necessary
because, on its face, the subpoena requests documents protected by the attorney-client
privilege.  See *U.S. v. Housing Authority of the Town of Milford*, 179 F.R.D. 69, 72-73
(D. Conn. 1997).

**AKIN GUMP**
**STRAUSS HAUER & FELD**LLP
━━━━━━━━━ Attorneys at Law

Richard M. Molot, Esq.
Patricia R. Davis, Esq.
April 11, 2006
Page 2


        Please let me know whether the requested extension to respond to the subpoena is
acceptable or whether you object to the extension.  Thank you for your attention to this
matter.

                            Sincerely,

                            *Robert Salcido*

                            Robert Salcido


cc:    Thomas Kossl
       Bruce R. Parker

# EXHIBIT  3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
---------------------------x
UNITED STATES OF AMERICA,    :
ex rel., JAMES J. TIESINGA,  :
                             :
          Plaintiffs,        :
                             :
     v.                      : No. 3:02CV1573(MRK)
                             :
                             :
DIANON SYSTEMS, INC.,        :
                             :
          Defendant.         :
---------------------------x
```

Washington, D.C.

Tuesday, February 28, 2006

Deposition of

RICHERT E. GOYETTE

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 9:00 a.m., at

the offices of United States Department of Justice,

601 D Street, NW., Washington, D.C., before Lohna

Esteb of Beta Court Reporting, notary public in and

for the District of Columbia, when were present on

behalf of the respective parties:

78

1    would get diverted to the cytogenetics lab.
2        But there were numerous occasions
3    in which the hematopathologist asked for
4    cytogenetics to be done, or other laboratory
5    studies to be done.
6    Q   If a test was not ordered by the
7    referring physician, for example, they asked
8    for flow cytometry and morphology but didn't
9    ask for cytogenetics, and the pathologist
10   thought it was necessary, how would you go
11   about getting -- would you go call the doctor
12   and ask for his approval to do that?
13   A   Calling the doctor was very
14   problematic. And that's because these are --
15   the specimens have to be alive to do
16   cytogenetics. And the cells die very rapidly
17   over a period of time.
18       And so whereas sometimes we would
19   try to make an effort to get the okay,
20   because of the fact that these tissues were
21   obtained, and oftentimes you couldn't obtain
22   them again without subjecting the patient to

79

1    an operation or painful procedure, we'd go
2    ahead and submit it, knowing that if we
3    didn't and we waited until we'd finally get
4    ahold of the doctor, we would -- the specimen
5    would be dead and of no value.
6    Q   What about if you're going to add
7    on tests for the flow cytometry?
8    A   Flow cytometry. In most instances,
9    I believe we looked at that as an exercise of
10   our professional judgment as to which were
11   appropriate.
12   Q   So you wouldn't call the doctor to
13   get approval for that?
14   A   I can only speak for myself. And
15   then generally, no.
16   Q   Okay. So you considered the
17   selection of the particular antibodies to be
18   your medical judgment?
19   A   Certainly.
20   Q   Okay. Let's see. Do you recall
21   providing an affidavit to Dianon in -- let's
22   see when this was signed -- within the past

80

1    year or year and a half?
2    A   You know, actually, I'd to see that
3    because I didn't know I provided it to
4    Dianon. Is that who it's addressed to? Or
5    is it addressed to the court?
6    Q   It's not addressed to anybody.
7    A   Oh, really? Well, let me look at
8    it.
9    Q   All right. Let me -- I'll have to
10   make a copy of it. I'm sorry. Can we go off
11   the record for a minute?
12       THE VIDEOGRAPHER: Going off record
13   at 10:18 a.m. Tape 1.
14       (Recess)
15       (Deposition Exhibit No. 3 was
16       marked for identification.)
17       THE VIDEOGRAPHER: Going back on
18   the record at 10:20 a.m. Tape 2.
19       BY MS. DAVIS:
20   Q   Okay. Before we broke we were
21   talking about your affidavit.
22   A   Yes. Thanks.

81

1    Q   And here you go.
2    A   Sorry. I just looked -- looked
3    like a court document, but -- all right.
4    Yes, I'm familiar with this document.
5    Q   Okay. Who asked you to prepare
6    this?
7    A   I believe it was one of the
8    attorneys from Dianon Systems.
9    Q   From inside Dianon?
10   A   I honestly don't know what his role
11   is. I do know his name.
12   Q   What's that?
13   A   Tom Kossl. Can't spell it.
14   Q   K-O-S-S-L. And did he say why he
15   was asking for this?
16   A   This was -- this document was
17   produced following a series of conversations
18   so I can't remember his saying specifically
19   anything other than he'd like my statement of
20   what I believed to be true written down.
21   Q   Now, did you write this or did
22   someone write this?

82

1     A   Actually, no. Tom wrote it, and
2   based on a long conversation we had. And
3   then I essentially rewrote it once I received
4   his draft.
5     Q   Okay. If you take a look at
6   Paragraph 4 of the affidavit, it starts,
7   "Beginning in 1995"...
8     A   Yes.
9     Q   It says: "...Based upon our
10  expertise and experience, Dr. Connor and I
11  began to refine Dianon's immunophenotyping
12  panels. Previously, because Dianon did not
13  have any physician that was board certified
14  in hematopathology, it lacked in-depth
15  expertise and knowledge of which antibodies
16  to perform. Dr. Connor and I extensively
17  studied the subject. The antibody panel was
18  incomplete at that time and did not represent
19  the state of the art in the specialty.
20  Furthermore, there were antibodies on the
21  panel that did not appear to contribute
22  significantly to patient care."

83

1         Do you recall what antibodies were
2   on the panel back then?
3     A   No. This -- this paragraph here is
4   based on my recall of the events in mid-'95.
5   And, actually, it's also based on the fact I
6   saw several of Dr. DeSilva's flow cytometry
7   reports that -- and then based on a
8   government exhibit I thought that there were
9   approximately nine antibodies that were being
10  done.
11        Ask me that question again. Sorry.
12    Q   Yeah. I had just asked you whether
13  you remember which antibodies they were.
14    A   Oh, no, no, I don't.
15        (Deposition Exhibit No. 4 was
16        marked for identification.)
17        BY MS. DAVIS:
18    Q   Take a look at what's been marked
19  as Exhibit 4.
20    A   Okay.
21    Q   Actually, I would like to have you
22  take a look at just the first section there

84

1   where it says EX-3 Immunophenotyping. And
2   then it has eight cell surface markers.
3     A   Okay.
4     Q   Does that help refresh your
5   recollection about what the markers were?
6     A   You know, honestly, I've never seen
7   this before. I do know who Mark Florio is.
8   I don't know Debra Klembara or Pat Torre for
9   sure.
10        But this doesn't match my memory as
11  to what antibodies were being performed at
12  that time.
13    Q   Okay.
14    A   You know, the lab types would say,
15  "Oh, let's get an EL-3 or an EL-4," or, "We
16  got one."
17        I never knew what they were. I
18  just knew which -- they had appropriate
19  antibodies.
20        MS. DAVIS:  Take a look at that.
21  That's exhibit 5.
22        (Deposition Exhibit No. 5 was

85

1         marked for identification.)
2         THE WITNESS: Okay. I reviewed it.
3         BY MS. DAVIS:
4     Q   Okay. Does that help refresh your
5   recollection about what they were doing?
6     A   This, to me, is an incomplete flow
7   cytometric examination. And would certainly
8   -- certainly supports my contention that,
9   number one, they were not examined by a board
10  certified hematopathologist because James B.
11  Amberson was not.
12        But, also, this is -- truly is an
13  incomplete examination.
14    Q   Okay. But is this what Dianon was
15  doing when you first got there?
16    A   I saw things like this.
17    Q   Okay.
18    A   Okay. I mean, I can't speak
19  because I didn't review all the records, but
20  I did see reports like this.
21    Q   Okay. And they were doing
22  approximately nine, you said?

**186**

1  apologize.
2      THE WITNESS: I'll calm down.
3      BY MS. DAVIS:
4   Q  What about CD23?
5   A  CD 23 is absolutely essential to
6  differentiate between chronic lymphocytic
7  leukemia and mantel cell lymphoma.
8   Q  Okay. And CD25?
9   A  Twenty-five, key antibody for the
10  diagnosis of hairy cell leukemia.
11   Q  Sixteen, we already talked about.
12  That was, which?
13   A  I think it's an NK cell marker.
14   Q  All right. Thirty-eight?
15   A  Thirty-eight, I believe, is an
16  activation marker and it -- it can be very
17  valuable in cases of multiple myeloma. And
18  we received a number of cases in which either
19  myeloma was asked for, or it turned out to be
20  the diagnosis that we felt it was important
21  to include.
22   Q  HLABR?

**187**

1   A  It's an activation antigen. It's
2  present on a variety of cells. It can be
3  present on leukemic blasts, as an additional
4  marker for leukemic blast.
5   Q  All right. So does -- those eight
6  antibodies that we just talked about that are
7  not on your list on Exhibit 13, are those
8  antibodies that if you did the initial 18,
9  and for some reason suspected there might be
10  hairy cell anemia, (sic) you could go back
11  and do those tests as a second round?
12   A  No, because I think -- we had
13  established we were going to do all 26,
14  irrespective of this memo.
15      I think that pathologists or
16  hematologists that do the 18 memos -- I mean,
17  excuse me, the 18 antibodies listed on this
18  memo are not practicing a standard of care
19  because as, I document in my deposition -- or
20  not deposition, what is this thing -- my
21  declaration, Exhibit 3, I had my eyes opened
22  to the diagnosis of a number of different

**188**

1  disorders that would not have been diagnosed
2  with the additional use of these antibodies
3  on a routine basis, such as hairy cell
4  leukemia.
5   Q  Hairy cell -- isn't hairy cell
6  leukemia a sort of subset of one of the
7  leukemias?
8   A  Not really. It's a very distinct
9  pathologic entity. It's got very distinct
10  clinical presentation. And it's one of those
11  fortunate diseases that the cells have
12  something we can relate to. And there are
13  little hairs all over them.
14   Q  So you can look at the slide and
15  see --
16   A  You can look at the slide and you
17  can say "Gee, whiz, this might be hairy cell
18  leukemia."
19   Q  And so after you looked at the
20  slide, you could then go back and try -- and
21  do the hairy cell --
22   A  No, because some of them don't have

**189**

1  hairs, unfortunately. And the other thing is
2  sometimes the hairs are only seen on phase
3  microscopy, which requires live -- specimens
4  still alive. And at Dianon, they were dying
5  as we talked.
6   Q  Okay. I asked you earlier, the
7  affidavit we've been looking at, Exhibit 3,
8  you said that Tom Kossl wrote the initial
9  draft of it, is that right?
10   A  After -- after a long conversations
11  with me.
12   Q  Okay. And then you said you had
13  some changes to it?
14   A  No. I extensively revised it. This
15  no longer looks like Tom Kossl's document;
16  although, I can't tell you for sure that
17  there aren't elements of his still in here.
18   Q  Okay. How many drafts did you go
19  through?
20   A  One.
21   Q  One draft?
22   A  Yeah.

190

1    Q    He gave you a draft.
2    A    He gave me a draft. I completely
3  rewrote it. I think -- in fact, I think I
4  might have done it by hand and sent it back
5  to him --
6    Q    Okay.
7    A    -- because there were so many
8  changes.
9    Q    Did you keep any of the drafts?
10   A    No. In fact, I threw the stuff --
11  I intentionally threw it away because I was
12  cleaning out my office about six months or a
13  year ago, because they were cluttering my
14  office.
15       It wasn't a draft that I threw
16  away. It was the same thing here. I just --
17  I had a copy of it and I thought, you know,
18  these guys keep records of everything so I
19  didn't have to worry about keeping it.
20   Q    Are you suggesting that lawyers are
21  anal?
22   A    Yeah, maybe even more than doctors.

191

1    Q    Did you ever do any training to
2  help -- to help train the sales reps on the
3  hematopathology?
4    A    You know, I'm very -- my father, as
5  I mentioned earlier, was a college professor.
6  And I'm very committed to education. And so
7  during my time at Dianon, I actually gave
8  talks.
9       And I gave talks to sales reps and
10  to the other pathologists about things that I
11  thought were relevant to hematopathology.
12  So, yes, I did talk to sales reps among -- is
13  a subgroup.
14   Q    Okay. And did you prepare any
15  documents for them to help them understand
16  what hematopathology was about, the disease
17  and that sort of thing?
18   A    You know, I might have but I don't
19  remember; however, I did a video.
20   Q    I've seen a transcript of the
21  video. I haven't seen the video.
22   A    Oh, really? Yeah, that was my only

192

1  chance to get -- go to Hollywood and nobody
2  took -- nobody bought.
3    Q    Who do you want to play you in the
4  movie?
5    A    Yeah, right. Probably some -- be
6  some fat, dumpy guy.
7    Q    I'm holding out for Sissy Spacik.
8    A    Good for you. We haven't heard
9  much of her recently.
10       MS. DAVIS: I would like to have
11  you take a look at what's been marked Exhibit
12  17.
13       (Deposition Exhibit No. 17 was
14       marked for identification.)
15       THE WITNESS: Okay. This is
16  perfect example of why you shouldn't
17  reconstruct your memory. This first thing,
18  "Hematopathology Services Study Sheet," I
19  don't remember ever seeing this.
20       BY MS. DAVIS:
21   Q    Okay. So that's the Pages PP10600
22  --

193

1    A    To 11.
2    Q    Okay. That's the -- last page is
3  10611?
4    A    Right, correct.
5    Q    Okay.
6    A    Pages 10612 to 10633, don't
7  specifically remember doing, but the writing
8  looks very much like mine.
9    Q    You mean the style?
10   A    The style.
11   Q    Okay.
12   A    The style. And, in fact, even the
13  font used.
14   Q    Okay.
15   A    And the -- the logic going through
16  here. So, I mean, I'll say reasonably this
17  is probably mine.
18   Q    All right. Let me do this, then.
19  Let me mark that first section as one
20  exhibit, and then mark this as a separate
21  exhibit.
22   A    Okay. All right.

322

1      THE WITNESS: I'm sorry, you know,
2   this is what's happening. I'm decompensating
3   here.
4      MR. PARKER: I'm highly offended.
5      THE WITNESS: I'm sorry.
6      BY MS. DAVIS:
7    Q   You met with Dianon lawyers on
8   three separate occasions?
9    A   I think that's what I just said.
10   Q   Okay. What about, did you talk to
11  anyone else at Dianon?
12   A   No.
13   Q   Any former employees?
14   A   I've had no -- virtually no contact
15  with Dianon since I left, with employees or
16  anything else.
17   Q   Okay. Are you being compensated in
18  any way for --
19   A   Yes, I am.
20   Q   -- your testimony?
21   A   This experience represents a
22  significant compromise to my professional

323

1   activities. So when Mr. Kossl originally
2   talked to me, it was not about money, and I
3   volunteered to help.
4      But then I said "Well, how much
5   time is this going to take?"
6      And he said, "Oh, don't worry.
7   We'll compensate you." And that was the
8   extent --
9      MR. PARKER: I want to put an
10  objection because your question was
11  compensated for his testimony.
12     MS. DAVIS: No --
13     MR. PARKER: He has been retained
14  to serve as consulting services in connection
15  with the litigation. It's not paid to
16  testify.
17     BY MS. DAVIS:
18   Q   Okay. So let me make sure I
19  understand what it is you're being
20  compensated for. Can you tell me what it is?
21   A   I guess it's the time I've spend
22  involved in preparing for the deposition.

324

1    Q   Okay. Are you --
2    A   And advising them --
3    Q   Okay. Are you -- are you --
4    A   -- of what happened.
5    Q   We are talking over each other
6   again. Go ahead.
7    A   I'm through.
8    Q   Okay. Are you being compensated --
9   are you -- have you been hired as a
10  consulting expert or --
11   A   No, I don't believe so.
12     MS. DAVIS: Okay. I think that's
13  all the questions I have.
14     Just to put on the record, though,
15  because we've got medical records and we need
16  to protect those, can we have the --
17  everything marked confidential?
18     And there's -- at the bottom,
19  there's a statement about confidential health
20  information, put that on the tape and on the
21  transcript. And keep the transcript and the
22  exhibits confidential. Okay. That's all I

325

1   have.
2      EXAMINATION BY COUNSEL FOR DEFENDANT
3      BY MR. PARKER:
4    Q   Dr. Goyette, I want to go back and
5   talk about a few issues that were discussed
6   six hours or so ago.
7    A   Okay.
8    Q   Dr. Goyette, in the period of time
9   in which you were at --
10   A   Didn't want to forget your name.
11   Q   In the period of time in which you
12  were at Dianon, from 1995 to 2000?
13   A   Yes.
14   Q   Was it the hematopathologists who
15  decided what antibodies ought to be in the
16  panel, or did the business people decide
17  that?
18   A   No. The hematopathologists decided
19  solely.
20   Q   In the five years you were at
21  Dianon, was there ever an instance in which
22  anyone outside of the hemopathologists

# EXHIBIT   4

IN RE: DIANON SYSTEMS          )
                               )
                               )

## DECLARATION OF RICHERT E. GOYETTE, M.D.

I, Richert E. Goyette, M.D., hereby declare the following to be accurate and true to the best of my knowledge:

1.      From July 1995 to May 2000, I was employed by Dianon Systems, Stratford, Connecticut. From 1995 to 2000, I served as Dianon's Director of Hematopathology. From 1996 to 2000, I also served as the Director of Immunohistochemistry. Finally, from 1996 to 1998, I was one of three Associate Laboratory Directors at the company.

2.      I am board certified in anatomic and clinical pathology and hematology (American Board of Pathology). I graduated *magna cum laude* from Baylor College of Medicine in Houston, Texas, where I was awarded the Stuart A. Wallace Award as the Outstanding Student in Pathology. I received training in Internal Medicine at the University of Washington, Seattle, WA. I was trained in anatomic pathology, clinical pathology and also received training in hematopathology at Brooke Army Medical Center and the University of Southern California. Immediately prior to joining Dianon in 1995, I served as Chief of the Department of Pathology at Phelps County Regional Medical Center, Rolla, Missouri. I have authored numerous medical journal articles, monographs, educational slide kits and textbooks, including HEMATOLOGY – A COMPREHENSIVE GUIDE TO THE DIAGNOSIS AND TREATMENT OF BLOOD DISORDERS. Attached as Exhibit 1 is a copy of my *Curriculum Vitae*.

1

3.      When I began interviewing with Dianon in early 1995, the company did not
employ a board certified hematopathologist.  However, Dianon had strategically determined that
it would become a leader in anatomic and clinical pathology in general as well as subspecialty
pathology to include hematopathology, dermatopathology, gastrointestinal pathology and
cytology.  As a first step in that direction, it determined to hire board certified sub-specialty
pathologists in all relevant specialty areas including hematopathology.  Hence, the company
hired, in early 1995, shortly before I was hired, Ann Marie Connor, who was, like me, board
certified in hematopathology.

4.      Beginning in 1995, based upon our expertise and experience, Dr. Connor and I
began to refine Dianon's immunophenotyping panels.  Previously, because Dianon did not have
any physician that was board certified in hematopathology, it lacked in-depth expertise and
knowledge of which antibodies to perform.  Dr. Connor and I extensively studied the subject.
The antibody panel was incomplete at that time and did not represent the state of the art in the
specialty.  Furthermore, there were antibodies on the panel that did not appear to contribute
significantly to patient care.  Dr. Connor and I were especially well versed in the subject matter:
She had recently completed her training in hematopathology under Richard Brunning a world-
renowned expert on the subject and I had just finished a well-received draft of my textbook.  Dr.
Connor and I determined that the medically indicated and necessary basic panel should include a
selection of antibodies that eventually totaled twenty-six.  We determined that the previous
immunophenotyping panel, which included nine antibodies, was inadequate and undermined
patient care.

5.      I have reviewed the government's chart, titled 'Timeline: Fee Schedule and
Standard Billed Panel', which is attached as Exhibit 2.  I understand that the government

2

contends that the determination to expand the number of antibodies performed rose dramatically in response to a drop in reimbursement for the services performed. That viewpoint is mistaken. The hematopathology staff had absolutely no interest in the organization's billing practices and it was only serendipitously that we even learned that our division was making money. Physicians determined what antibodies to perform because it was a medical decision. Specifically, Dr. Connor and I made the decision. I had no knowledge or interest regarding the reimbursement impact of that decision. Indeed, during this time period, I actually believed that the reimbursement was the same regardless of the number of antibodies performed. I thought that the billing was for the panel analogous to that for a multiphasic chemistry analysis. As physicians, the antibody selection and number were made solely based upon patient care considerations, not financial consequences. The total premise underlying the government chart – the number of antibodies performed turned on the dollar amount reimbursed and Dianon intentionally increased the number performed to offset a projected short fall in reimbursement – is absolutely, completely wrong. The compensation of the hematopathologists and the laboratory staff was not based upon the number of antibodies and we believed that billing issues should have no influence on our ability to practice medicine.

6.    The business and corporate personnel at Dianon had absolutely no role in the determination of what or how many antibodies would be performed. At no time would we permit business people to determine what constituted appropriate medical care. On a solitary occasion, a Dianon business manager attempted to cross the boundary between the practice of medicine and the company's financial performance. During the summer of 1995, at approximately 3:00 pm one afternoon, a product manager asked me specifically what I was doing to market the hematopathology services. I was offended by the question and believed that

3

such a query was inconsistent with our intent to practice our specialty. I resigned from the company immediately and left the office. When I arrived at my residence, I called my fiancee in Missouri who was planning to join me in Connecticut and asked her *not* to hand in her letter of resignation because I had no intention to ever work at Dianon again. That evening, Dr. James Amberson, the Medical Director at Dianon, called me and asked me to reconsider my decision. He took me to dinner at the Trumbull Marriot Hotel and told me that the whole situation was inappropriate and that he wished that I would reconsider my decision. He then promised that there would be absolutely no interference by any business person at Dianon regarding the practice of medicine. Accordingly, I returned to Dianon the next morning and resumed my practice of medicine. However, I waited several months before confirming to my fiancee that I would continue working at the company. From that time on, no person at Dianon ever again attempted to insert business considerations into medical decision-making in the hematopathology section.

7.     The diagnosis of hematologic disease is not just based on which antibodies are performed, or how many, but the relationship of the antibodies to each other. These relationships often cannot be observed unless a comprehensive panel is performed. For example, CD19, CD5 and CD23 must be viewed together to differentiate chronic lymphocytic leukemia from mantle cell leukemia. Both of these diseases have antigens that combine with CD19 and CD5. The level of expression in the CD23 differentiates the two. Both look similar under a microscope. Use of the 26-antibody panel substantially advances patient care. For example, shortly after we modified the panel and increased the number of antibodies, I observed that Dianon had begun to diagnose a vastly disproportionate number of cases of hairy cell leukemia and of mantle cell lymphoma than would be anticipated from a review of the literature. The reason that we were

4

able to accurately diagnose these cases is the comprehensive panel we used, the specialty training of the Dianon hematopathologists, and our commitment to the practice of medicine. If all of the antibodies selected by us for the panel were not performed, we knew that diseases would not be fully characterized and we would miss subtleties that were clinically significant based on the interaction of the antibodies and other factors. By performing the 26- antibody panel, we diagnosed a number of conditions on a regular basis that otherwise would have been missed to the detriment of the patient.

      8.      I understand that it is the government's position that in selected cases a shorter panel can be appropriately used, for example, in lymphoma cases or when Dianon had previously diagnosed a patient's condition. In my medical judgment, this viewpoint is wrong for several reasons. First, some lymphomas and leukemias have common characteristics and by failure to test the cells with appropriate antibodies, you may misdiagnose the patient's condition. For example, some specimens sent in as one type of lymphoma turned out to be a leukemia of a different cell type and vice versa. In addition, some patient's develop second malignancies. Second, regarding repeat specimens, patient's conditions evolve – a low-grade malignancy could undergo a large cell transformation: an entity with a totally different clinical course and treatment. Indeed, I received a number of calls from physicians who informed me that we had properly diagnosed conditions that were missed by other commercial labs or hospital pathologists. Another example is that we would receive a bone marrow specimen on a patient with a history of lymphoma. In some instances, patients who had received pelvic radiation would have a relatively acellular bone marrow specimen but the CD34 and myeloid antigens would reveal a discrete population of myeloblasts that indicated the presence of an evolving therapy-related myelodysplasia. We would have missed these conditions as well had we

5

performed fewer antibodies. Third, by using the 26 antibody panel, we were also able to diagnose hematological malignancies earlier. For example, outside of gene rearrangement studies, sometimes the only evidence that a T-cell proliferation is malignant is deletion of an antigen. Only by a comprehensive analysis, were we able to identify the antigens that were present as well as those that were aberrantly missing. The consequences of this early identification and characterization had the potential to allow therapy to be given while the tumor burden was lower and could, in some instances, save the patient's life.

9.    Further, by performing 26 antibodies, Dianon was not "screening" patients, which I also understand the government contends. We, obviously, were not testing persons walking in off the street. Hematologists and oncologists referred these patients to us to consult and diagnose the patient's condition. These specialists had determined that the patient's condition had sufficient complexity that they needed to avail themselves of our expertise. Indeed, there were many cases where the referring clinician's impression was wrong and hence we could not rely upon his statement of the patient's condition, for example, when lymphoma was the preliminarily diagnosis and the patient had multiple myeloma or another hematologic disorder. Moreover, if we used the step approach, the referring clinician would not have learned that what came in as a lymphoma was really another condition. If we did not use the comprehensive approach, we would not have made an accurate diagnosis in some cases. Therefore, we treated each patient sample as a request for a medical consultation. The specimen reached Dianon because the patient had already been screened by the referring hematologist who had referred the patient sample to us. Almost every specimen arrived with a presumptive diagnosis of concern about a hematologic malignancy; not with a request for screening. On many instances, we called the referring physician with preliminary results of the immunophenotyping and discussed the

diagnosis and treatment with them. This consultation usually clarified the diagnosis, caused the patient to be referred to a tertiary referral center, or necessitated additional testing.

10.    Early in 1997, Dianon determined to review its immunophenotyping panel to verify that its billing was appropriate. I was asked at that time to analyze whether all of the antibodies in the 26 antibody panel were medically indicated and necessary. Accordingly, on May 21, 1997, I authored a memo to Dr. Amberson that provided a justification for the number and variety of antibodies that we used in our flow cytometry panel. *See* Exhibit 3. At that time, I had just completed all work on my hematology textbook and combining that academic expertise with the clinical experience I had obtained at Dianon, along with consultation with the other hematopathologists reinforced my opinion that performing those 26 antibodies was absolutely necessary to provide adequate patient care. I informed the Dianon business representative that I did not care what antibodies they elected to charge or not charge-for, we would not compromise patient care by restricting our ability to fully examine patient specimens. Subsequently, I learned that the management of Dianon concluded that our rationale for the testing was appropriate and had determined that while 26 antibodies should be performed and would continue to be performed that it was considering billing for fewer antibodies to avoid any possible dispute with the carrier. In other words, the representatives of the corporation elected to support optimal patient care rather than economic benefits. Hence, I was asked to identify those antibodies that any responsible payor with knowledge of the complexities of modern hematopathology would agree were essential and for which they could never question medical necessity. After consulting with the hematopathology staff, I identified those antibodies in a June 17, 1997 memo, which happened to number 18. *See* Exhibit 4. I understand that it is the government's position that this memo constitutes Dianon's admission that only 18 antibodies are

7

"essential" and that, by implication, the additional 8 antibodies performed are "non-essential." This viewpoint is absolutely false. I simply identified those antibodies that no hematopathologist with the training and experience that were linked with the number of specimens that we examined could question; this was simply an attempt to avoid what we perceived to be harassment by payers regarding our medical judgment concerning what constituted appropriate medical care. However, although a business decision was made to bill for 18 antibodies, the hematopathology staff continued to perform all 26 antibodies because 26 was indeed medically indicated and necessary. In fact, it was not uncommon to perform more than 26 antibodies in some situations. That is absolute proof we believed that 26 was medically indicated and necessary. Even though Dianon was not compensated for performing those 8 additional antibodies and even though performing these antibodies required the hematopathology staff to work more and review more documents, we were unwilling to compromise patient care for economic benefits. Indeed, in my view, use of a restricted panel of antibodies to diagnose a complex hematologic disorder is analogous to a patient with potential heart disease who goes to a cardiologist who decides to limit the examination by performing only 3- of the 12-leads of an electrocardiogram. Failure to fully examine the patient's hematologic disease is also equivalent to a cardiologist examining a patient with atrial fibrillation prior to cardioversion with only a transthoracic echocardiogram. It is not good enough to be right most of the time. Failure to fully employ all of the diagnostic tools, such as transesophageal echocardiography, to detect a left atrial thrombus in this condition impairs healthcare outcomes and compromises patient care. Forcing the hematopathologists to compromise our practice of medicine would probably have led to wholesale resignations of the Dianon hematopathology staff: a group of physicians who continue to practice the highest standards of hematopathology in a difficult environment.

8

I have reviewed this declaration and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Richert E. Goyette, M.D.

# EXHIBIT  5

## PRIVILEGE LOG

| | |
|---|---|
| 1. July 15, 2004 | Invoice 1073, prepared by Dr. Goyette |
| 2. March 17, 2006 | Invoice 6003, prepared by Dr. Goyette |
| 3. March 17, 2006 | Invoice 6004, prepared by Dr. Goyette |
| 4. March 17, 2006 | Invoice 6005, prepared by Dr. Goyette |
| 5. March 17, 2006 | Invoice 6006, prepared by Dr. Goyette |
| 6. March 17, 2006 | Invoice 6007, prepared by Dr. Goyette |
| 7. March 31-April 5, 2006 | Electronic mail messages between Dr. Goyette and Dianon, counsel for Dianon Systems Inc. |
| 8. June 4, 2004 | Draft Declaration of Richard E. Goyette, M.D. provided to Dr. Goyette by Thomas Kossl, Esq., in-house counsel for Dianon Systems, Inc. and Goyette revisions |
| 9. June 4, 2004 | Documents selected by Thomas Kossl, Esq., in-house counsel for Dianon Systems, Inc. and provided to Dr. Goyette |