## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA <br> <u>ex</u> <u>rel</u>. DR. JAMES J. TIESINGA, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )    No. 3:02 CV 1573(MRK) |
| DIANON SYSTEMS, INC., | ) <br> ) <br> )    April 25, 2006 |
| Defendant. | ) <br> ) |

## MEMORANDUM IN SUPPORT OF
## UNITED STATES' MOTION FOR ADDITIONAL DEPOSITIONS

Plaintiff, the United States of America, submits this memorandum in support of its

motion requesting that the Court permit the plaintiff to take depositions beyond the limit of ten

depositions set forth in Federal Rule of Civil Procedure 30(a)(2)(A).

### Background

On March 18, 2005, the United States filed its Complaint against defendant Dianon

Systems, Inc. (Dianon) to recover damages and civil penalties under the False Claims Act and at

common law for billing federal health care programs for medically unnecessary tests. On July

14, 2005, the United States filed its Amended Complaint. Dianon filed its Answer to the

Amended Complaint on August 5, 2005. The parties are now conducting discovery. Discovery

closes on July 31, 2006.

To date, the Government has taken five fact witness depositions, including one 30(b)(6)

deposition. Dianon has submitted reports for five expert witnesses. If expert depositions count

toward the ten depositions provided for in F. R. Civ. P. 30, then deposing those experts will

exhaust the United States' available depositions. On April 11, 2006, counsel for the United

States asked if counsel for Dianon would agree that expert depositions not count against the ten-deposition limit contained in Rule 30. Counsel for the United States also asked if Dianon would agree to additional fact depositions beyond the ten-deposition limit. Counsel for Dianon did not agree. (*Declaration of Government Counsel, at ¶ 2*). Thereafter, on April 20, 2006, prior to filing the instant motion, counsel for the United States provided Dianon with a list of the eight additional fact depositions the government wanted to take and asked if Dianon would reconsider its position opposing any additional depositions. On April 24, 2006, counsel for Dianon informed the government that it would stipulate to three additional depositions, for a total of 13 depositions, if the United States would stipulate that Dianon could take an equivalent number of depositions. The United States agreed to this request, but also informed Dianon that to properly complete discovery, the five other fact depositions were still necessary and for that reason the United States would be filing a motion for leave to take the additional depositions. *(Id. at ¶ 3-4).*

## Facts

The allegations in this case span a time period from 1995 through the end of 2004. Essentially, the United States asserts in its complaint that Dianon charged Medicare and other federal healthcare programs for medically unnecessary tests. The particular test at issue is immunophenotyping by flow cytometry (hereinafter "flow cytometry").

Dianon performs the test on blood and tissue samples sent to it from referring physicians. The specimens are shipped by overnight carrier to Dianon. The samples are processed in the lab to prepare them for the various tests ordered by the referring physician. Laboratory technicians then run various tests, including flow cytometry, on portions of the specimens. The test results and slides prepared are then given to the pathologist, in this case a hematopathologist, who

2

makes the diagnosis of a particular disease or the stage of the disease, if a diagnosis has previously been made.

To perform a flow cytometry test, portions of the specimen are placed in a series of test tubes along with various antibodies which react when in the presence of certain types of cancer cells. The tubes are then sent through the flow cytometer which records the presence or absence of a reaction by the various antibodies. The results are used by the hematopathologist, in conjunction with a morphology test (examination of a specimen under a microscope), and any other information available, to make a diagnosis or to stage a disease. The pathologist's report, and the test results, are then sent to the referring physician. Dianon then bills Medicare or a private insurance company for the tests performed. During the relevant time period, flow cytometry tests (CPT 88180) were billed per antibody used, *i.e.* for each of the antibodies used in the test tubes which were put through the flow cytometer, Dianon billed one unit of CPT code 88180. So if Dianon used 26 antibodies, it billed 26 units of 88180.

The Medicare statute states that Medicare will only pay for "medically necessary" tests, and Medicare regulations state that Medicare will not pay for "any services that are not reasonable and necessary for one of the following purposes: (1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. . ." 42 C.F.R. § 411.15(k)(1). In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called CMS 1500. When the CMS 1500 is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

In this case, the United States alleges that Dianon charged Medicare, and other federal healthcare programs, for more flow cytometry antibodies (CPT 88180) than were medically

3

necessary. The United States alleges that, rather than exercising medical judgment about what
was needed to diagnose or stage a particular patient, Dianon simply performed a standard panel
of 26 antibodies on all of the specimens that were referred to the lab. Dianon then billed
Medicare for all 26 antibodies regardless of whether they played any role in the diagnosis or
staging of the disease in that patient.[1] During the nine-year time period at issue in this case,
Dianon billed Medicare for CPT 88180 for approximately 40,000 claims for 32,000 patients and
was paid approximately $16.6 million.

## ARGUMENT

The Court should allow the United States to take the additional fact depositions set forth
below (in addition to the depositions of Dianon's five expert witnesses).

## Need for the Depositions

The instant case involves complex medical necessity issues, and covers a period of nine
years. Over that nine-year time period, there was a significant amount of turnover in Dianon
personnel. Also, during those nine years, Dianon changed its procedures for conducting flow
cytometry tests several times. For example, prior to 1996, Dianon apparently performed the test
with a varying number of antibodies, but billed for eight or nine of those antibodies. In 1996,
Dianon performed 22 antibodies but billed for 26. Sometime in early 1997, Dianon changed to a
standard panel of 26 antibodies and began billing for 26 antibodies. However, within 3 months
of implementing the new panel of antibodies, Dianon began billing for only 18 of the 26
performed, after conducting a review to determine which of the antibodies "was essential to the

---

[1]     For a period of three years, 1998-2000, Dianon performed its standard panel of 26
antibodies but only billed insurance plans and Medicare for 18 units of CPT 88180. This change
was made after the Dianon's Medical Director asked the pathologists to determine which of the
26 antibodies were essential for an initial workup of a specimen.

initial work up" of a specimen. In 2001, Dianon again began billing for all 26 antibodies. In 2003, Dianon was purchased by Lab Corp and the pathologists at the two companies had discussions about what type of panel was appropriate - Dianon's comprehensive panel of 26 antibodies or Lab Corp's two, more limited, panels of antibodies.

It is important to the Government's medical necessity case to discover how Dianon decided which antibodies to perform, what to bill for, and why, in each of these time periods. Unfortunately, because of the turnover of personnel at the company, there is no one person who can testify about the entire time period. Further, because Dianon is somewhat compartmentalized, the knowledge of each witness is limited. Witnesses in the lab generally cannot testify about what was billed for or how prices were set. Each of the medical personnel deposed thus far, with one exception, have testified that they did not know anything about billing. *(Exhibit 1, Goyette deposition, p. 315 line 9 to p. 316 line 7; Exhibit 2, Segal deposition, p. 19 lines 1-14 and p. 20 lines 3-8)*. Dr. Glenn Segal for example testified that he had little interaction with the billing people and that they were housed in a building other than the building where the lab was located. *(Exhibit 2, p. 19 lines 1-14)*. Billing and management employees stated that they could not testify about what the lab personnel did. *(Exhibit 3, Palmieri deposition, p. 80 lines 19-25)*. Even within the various departments, witnesses were reluctant to discuss anything they did not personally do. For example, Dr. James Amberson, the Medical Director for Dianon and a pathologist himself, was reluctant to discuss the various antibodies used by the hematopathologists or the lab procedures for flow cytometry. *(Exhibit 4, Amberson deposition, p. 80 lines 2-10, p. 201 lines 11-20 and p. 202 lines 4-8)*.

The United States attempted to avoid having to request additional depositions by noticing a Rule 30(b)(6) deposition requesting that the company produce a witness who could testify as to

5

the company's knowledge about various subjects, including the various panels of antibodies, the

decisions about what to bill for and the identity of various crucial documents. *(Exhibit 5,*

*Deposition Notice).* Unfortunately, these witnesses did not conduct a complete investigation of

the issues as required by Rule 30(b)(6). In fact, one of the two 30(b)(6) witnesses produced by

Dianon could testify to nothing other than her own personal knowledge. (*Exhibit 3, Palmieri*

*deposition, p. 12 line 9 to p. 13 line 21*). She did nothing to prepare as a 30(b)(6) witness.

*(Exhibit 3, p. 21 lines 12-21, p. 29 line 9 to p. 31 line 7, p. 35 lines 1-20, p. 36 lines 16-22, p. 37*

*line 13 to p. 39 line 20, and p. 41 line 4 to p. 44 line. 9).* She did not talk to other Dianon

employees, either present or former, who had been present at discussions of relevant issues.

(*Exhibit 3, p. 71 lines 6-13, p. 78 line 19 to p. 79 line 8, p. 93 line 25 to p. 94 line 18*). For

example, this 30(b)(6) witnesses testified as follows:

Q Tell me, generally, what did you do to prepare
for this deposition?
A I reviewed the documents relating to the subject matter.
Q And you're talking about the documents relating to C, D and E of the deposition notice?
A Correct, yes.
Q Did you talk to anyone?
A No.
Q You didn't ask anybody information about any of this?
MR. SALCIDO: Anyone other than me and Tom.
A Did I talk to anyone? Well, in pulling together information like cost information and things like that I talked to my managers and things like that. I talked to my husband, told him where I was going to be today, but that's about it.
BY MS. DAVIS:
Q When you say you talked to your managers, who would that be?
A Matt Plamkoodan.
Q Anyone else?
A Tami Sessa and Sue Cowan.
Q You didn't talk to any of the other managers or the other officers?
A No.
Q You didn't talk to any of the billing folks?
A No.
Q Any of the pathologists?
A The only other person I talked to is Jay Amberson.

Q   What did you talk to him about?

A   Basically that I, you know, he was telling me he was going to also come here, and I said I was coming today. That was it.

Q   He didn't talk anything about substance?

A   No, not at all.

*(Exhibit 3, Palmieri deposition, p. 12 line 9 to p. 13 line 21).*

The other Rule 30(b)(6) witness was only marginally better prepared. While he did ask present Dianon employees about the identity and content of certain documents, he did not attempt to talk to former employees. *(Exhibit 6, Amberson 30(b)(6) deposition, p. 9 line 6 to p. 11 line 4).* In fact, he did not even attempt to interview a former employee who was at the center of some of the crucial decisions about billing and who called him to find out what was going on in the case. The Rule 30(b)(6) witness talked to this former employee a mere eight days before his scheduled deposition and apparently did not think to ask him about memoranda the former employee had either prepared or been the recipient of. *(Exhibit 6, p. 57 line 8 to p. 58 line 19 and p.70 line 22 to p. 72 line 4).* As a result, this witness was unable to testify about the role of the former employee in certain decisions and was unable to identify certain documents attached to the 30(b)(6) deposition notice for which the Government had asked the identity of, the author, and the purpose for which it was written. *(Exhibit 6, p. 54 line 8 to p. 60 line 22 and p. 68 line 5 to p. 74 line 22).*

In order to have adequate discovery in this case, the United States will now have to depose a number of additional witnesses. The additional deponents at issue here, and the information the Government seeks to obtain from them, are as follows:

**1. Mark Florio** - Mr. Florio has been identified as the likely author of a series of internal Dianon memoranda prepared in late 1995 through early 1996 regarding the number of antibodies and the fee per antibody Dianon would charge. The 30(b)(6) witness could not testify

7

about the purpose of the memo or anything other than the likely author and made no attempt to contact Mr. Florio. (*Exhibit 6, p. 68 line 5 to p. 72 line 19*). Mr. Florio, as the former hematopathology product manager for Dianon, has also been identified as the person who dealt with lab personnel, management personnel, billing personnel and sales and marketing personnel. He should, therefore, as the overall manager for the hematopathology business, have complete information regarding the issues.

**2. Kim Hade** - Ms. Hade was the hematopathology product manager at the time Dianon made its decision to resume billing for 26 antibodies in 2000-2001, and as such, she should have comprehensive knowledge about discussions among the various Dianon departments relating to this decision. She was identified as the likely author of several memoranda about which the 30(b)(6) witness could not testify; he also made no attempt to contact her. (*Exhibit 6, p. 54 line 8 to p. 56 line 3, and p. 61 line 20 to p. 62 line 10*).

**3. Dr. Jack Snyder** - Dr. Snyder was the Dianon Medical Director at the time of the decision to resume billing for 26 antibodies in 2001. The 30(b)(6) witness did not contact him to discover what he might remember about the decision. (*Exhibit 3, p. 29 line 19 to p. 30 line 4*). He will likely be able to testify to any discussions regarding medical necessity of the various antibodies in the panel of 26 and on whether there was any discussion of medical necessity at this point in time.

**4. Dr. Margaret Johnson** - Dr. Johnson is a pathologist at Dianon's parent corporation, Lab Corp who handled Lab Corp's Hematopathology program. She can testify about Lab Corp's practice of using smaller, more focused panels as opposed to the larger, single comprehensive panel used by Dianon, and why Lab Corp felt that these smaller panels were sufficient for the

8

initial workup of specimens. She can also testify about efforts to standardize the panels of Lab Corp and Dianon after Lab Corp acquired Dianon.

**5. Lab Corp 30(b)(6) Witness** - The United States would also seek to depose someone at Lab Corp who could testify about Lab Corp's billing for flow cytometry, including Lab Corps' "back-end billing" procedure which apparently involved only billing for antibodies which played a role in diagnosis, in contrast to Dianon's billing system which bills for all antibodies whether they are used in the diagnosis or not.

## Effects on Schedule

There need be no effect on the ultimate discovery schedule in this case by the granting of the Government's request. Currently, there are gaps in the deposition schedule during which these depositions could be scheduled. There are presently no depositions scheduled for most of May, none are scheduled in June or July. However, because discovery ends at the end of July, the United States is seeking expedited consideration for this motion to ensure that the schedule is not affected by the additional requested depositions.

## DISCUSSION

Rule 30(a)(2)(A) provides that a party must obtain a stipulation from other parties or leave of court to take more than 10 depositions. *F. R. Civ. P. 30(a)(2)(A)*.[2] Whether to allow additional depositions is within the discretion of the court. *Commodity Futures Trading*

---

[2] "It is not at all clear whether expert depositions under Rule 26(b)(4) are governed by Rule 30(a)(2)(A), which specifically pertains to depositions under Rules 30 and 31. Expert depositions are governed by Rule 26(b)(4), but could also be included in Rule 30's broad application to 'any person.' Fed.R.Civ.P. 30(a)(1). Neither the cases, nor the commentary shed any light on this issue." *Express One Intern., Inc. v. Sochata,* No. 3-97 CV3121-M, 2001 WL 363073 at * 3 (N.D.Tex. Mar. 2, 2001). Some cases, however, appear to assume that expert depositions are included in the ten in Rule 30. *See, e.g., Andamiro U.S.A. v. Konami Amusement of America, Inc.,* No. CV00-8561, 2001 WL 535667 at * 2 (C.D.Cal. Apr. 26, 2001).

*Commission v. Commodity Investment Group, Inc.*, No. 05 civ. 5741, 2005 WL 3030816 at * 1
(S.D.N.Y. Nov. 10, 2005) (allowing government to take sixteen depositions, with the right to ask
for additional depositions if necessary). In considering a motion for additional depositions, the
court must consider the principles set forth in Rule 26(b)(2), which requires that discovery not be
"unreasonably cumulative or duplicative." *Id.*

In this instance, the Government has demonstrated good cause for the additional
depositions. The Government has identified a limited number of deponents and outlined the
need for the depositions and the relevance to the case. Because of the significant turnover in
Dianon employees over the years and because of the compartmentalization within Dianon, the
Government attempted to limit the need for many depositions by noticing a Rule 30(b)(6)
deposition. However, the 30(b)(6) witnesses were not properly prepared by Dianon to speak on
behalf of the company. Indeed, one of the witnesses, Ms. Palmieri, did not even consult with
knowledgeable personnel still employed by Dianon, and made no attempt to contact former
employees. As a result, Ms. Palmieri simply testified to her own personal knowledge of the
matters for which she was designated.

Under Rule 30(b)(6), the corporation being deposed must designate persons having
knowledge of the subject matter and prepare those persons so that they can testify fully as to
matters "known or reasonably available to" the corporation. *F.R. Civ. P. 30(b)(6)*; *Sony
Electronics, Inc. v. Soundview Technologies, Inc.*, 217 F.R.D. 104, 112 (D.Conn. 2002).
Properly preparing a 30(b)(6) witness "goes beyond matters personally known to that designee
or to matters in which the designee was personally involved." *Calzatirficio S.C.A.R.P.A. S.P.A.
v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36 (D. Mass. 2001), *citing Buycks-Roberson v.
Citibank Fed. Savings Bank*, 162 F.R.D. 338, 343 (N.D.Ill. 1995). A 30(b)(6) witness must

prepare to the extent matters are reasonably available "whether from documents, past employees, or other sources." *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997). Such preparation is necessary because the individuals designated are to testify as to the knowledge of the corporation, not the individual. *Sony,* 217 F.R.D. at 112.

Ms. Palmieri could only testify as to her own personal knowledge, and that was incomplete. As a result, the United States must now depose other Dianon employees involved in the 2000-2001 decision to bill for 26 antibodies rather than the 18 for which Dianon had been billing. Two of the depositions requested are necessary to provide information Ms. Palmieri did not know: (1) Kim Hade - the former Hematopathology product manager who should be able to discuss billing issues; and (2) Dr. Jack Snyder - the former Medical Director and the person most likely to have been cognizant of any discussions of medical necessity.[3]

Similarly, Dr. Amberson the other 30(b)(6) witness, while somewhat better prepared than Ms. Palmieri, made no attempt to interview cognizant former employees, even when one of them called him to ask about the case. Further, he was unable to explain, except by speculating, about the source and purpose of various documents the Government asked Dianon to identify. As a result, the United States is forced to depose an additional witnesses in order to obtain complete discovery: Mark Florio - the former hematopathology product manager and likely author of a series of memoranda the 30(b)(6) witness could not identify.[4]

---

[3] Because Ms. Palmieri did not talk to Grant Carlson, the government will also have to take his deposition. However, Dainon has agreed to Mr. Carlson's deposition.

[4] Because Mr. Amberson was not properly prepared, the government will also have to depose William McDowell, the former hematopathology product manager who authored, requested or received several of the documents the Government asked Dianon to identify during the 30(b)(6) deposition and who was intimately involved in the decision to "move to 18" antibodies for billing purposes. Dianon has, however, stipulated to Mr. McDowell's deposition.

In addition to the above witnesses necessary to complete the discovery not provided by Dianon's 30(b)(6) witnesses, the United States needs to depose two additional witnesses from Dianon's parent corporation, Lab Corp. As part of its defense, Dianon has indicated that one reason it had a comprehensive panel of 26 antibodies was because of the delicate nature of the specimens on which Dianon performed its tests and the need to do the tests while the specimens were still viable. Yet, Lab Corp, Dianon's parent corporation and also a national reference lab, did flow cytometry tests with two smaller, focused panels of antibodies.[5] It is important to understand why Lab Corp, Dianon's parent corporation, does not feel 26 antibodies are medically necessary for the initial workup of a specimen. Further, for some period of time, Lab Corp apparently had a system of back-end billing, where it performed the test first and them made a billing decision after determining which antibodies had played a role in the diagnosis. It is important to depose Lab Corp to understand whether Dianon could have implemented such a billing procedure, as well.

---

[5]     Depending on the time period involved, Lab Corp's flow cytometry panels contained 14 and 16 antibodies or 16 and 20 antibodies.

## CONCLUSION

For the reasons discussed above, the Government requires additional depositions. The Government has shown why these depositions are necessary, and the Government has attempted to limit the number of persons to be deposed. That has been very difficult because the time period covered by the case spans nine years and during that time, Dianon experienced significant employee turnover. The Government is requesting only a small, extremely selective and important, set of individuals for additional depositions, is pursuing these additional depositions in a timely manner and is not seeking to abuse the discovery process. The Government has sought to precisely explain the nature of the information sought, and how it bears on critical issues of material fact. Moreover, the information sought through these depositions is obtainable only through deposition testimony. Finally, this request can be accommodated without disrupting the remainder of the schedule.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

RICHARD MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700
Richard.Molot2@usdoj.gov

_____/s/_____
MICHAEL F. HERTZ
JOYCE R. BRANDA

13

PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0240
Facsimile:  (202) 305-7797

Attorneys for the United States

## CERTIFICATION OF SERVICE

I hereby certify that on this 25th day of April 2006, a true and correct copy of the United States' Memorandum in Support of United States' Motion for Additional Depositions was served by first-class mail and electronic mail on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880
bcarmody@mayalaw.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

Bruce R. Parker
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Md. 21201
brparker@venable.com

Richard M. Molot
Assistant U.S. Attorney