EXHIBITS

Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------x
UNITED STATES OF AMERICA,     :
ex rel., JAMES J. TIESINGA,   :
                              :
          Plaintiffs,         :
                              :
          v.                  : No. 3:02CV1573(MRK)
                              :
                              :
DIANON SYSTEMS, INC.,         :
                              :
          Defendant.          :
------------------------------x

                              Washington, D.C.

                    Tuesday, February 28, 2006

Deposition of

                    RICHERT E. GOYETTE

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 9:00 a.m., at

the offices of United States Department of Justice,

601 D Street, NW., Washington, D.C., before Lohna

Esteb of Beta Court Reporting, notary public in and

for the District of Columbia, when were present on

behalf of the respective parties:

102

1  here, represented the fact that this, in
2  fact, was designed by me in, probably, July
3  because of the amount of work we were doing
4  trying to simply it for myself, whereas this
5  came out in November.
6      So it was an evolving process.
7  Antibodies were added or taken off, I assume.
8  I don't remember specifically.
9      But as new hematopathologists would
10  join the staff, based on their practiced and
11  their experience, they would say, "You know
12  what, we really need this."
13      And we'd discuss it. I mean, you
14  are not going to tell a physician don't use
15  your stethoscope or don't use this tool. So,
16  I mean, if they really believed it was
17  important to make the diagnosis, we would go
18  ahead and add it.
19      So — what was your question?
20   Q  The question, I've forgotten. The
21  question was how did you — when you and Dr.
22  Connor —

103

1   A  Oh, okay. I'm sorry.
2   Q  — sat down and put together the
3  panel that you chose, how did you decide
4  which antibodies to put on it?
5   A  Okay. Well, at the time, I had a
6  lot of book knowledge shown by what I believe
7  to be shown in my book. But Dr. Connor
8  actually had been practicing — had recently
9  trained and been practicing hematopathology.
10  So she basically suggested most of these
11  antibodies. And based on my knowledge, I
12  concurred.
13      So the initial panel represented
14  her professional opinion, with my
15  concurrence.
16   Q  Okay. And there are roughly
17  somewhere in the low 20s in terms of
18  antibodies.
19   A  Okay.
20   Q  Did you consider having more —
21  smaller, more focused panels based on what
22  the supposed or suspected diagnosis was?

104

1   A  I'm sure that that was considered;
2  but, our situation was very unique, and that
3  would have been — we believed that would
4  have, actually, potentially harmed patients.
5   Q  Why was that?
6   A  That's because you — sometimes you
7  can do kind of a step-wise panel: Do a few,
8  do a few more.
9      If you're in a hospital, a specimen
10  has just been taken out in the operating
11  room, the doctor is there for immediate
12  consultation, can add, subtract. You can do
13  a lot things that you can't do in a reference
14  laboratory.
15      And so since these specimens start
16  dying — the minute you take them out of the
17  body they start dying — by doing — start
18  doing kind of a sequential approach, you have
19  cells dropping out.
20      And it's interesting that the cells
21  don't just die at an even rate. Some
22  populations die faster than others.

105

1      For example, neoplastic cells or
2  tumor cells can die faster than normal cells.
3  And so the longer you wait, the less likely
4  it is that you're going to be able to examine
5  a spe — or cells that are representative of
6  the patient's condition.
7      So we elected at the time to try to
8  apply our professional experience based upon
9  which antibodies we thought were appropriate
10  for the specimens, which comprise this panel.
11   Q  Okay. And that panel was applied
12  for all the specimens that came in?
13   A  I wouldn't say all. There were
14  times that a specimen would come in and
15  somebody in the lab would call the
16  hematopathologist and say, "This is a strange
17  request."
18      And if it appeared to be a strange
19  request, the hematopathologist might call the
20  physician or, in fact, he'd say, "Well, based
21  on the IDC9 code and the diagnosis here, I
22  think we should add an antibody or two."

314

1  affidavit?
2     A  Sure.
3     Q  That's Exhibit 3.
4     A  All right.
5     Q  On Page 3, it's in Paragraph 5 of
6  the affidavit, about halfway down the
7  paragraph.
8     A  Yes.
9     Q  The middle of that paragraph you
10  say:  I had no knowledge or interest
11  regarding the reimbursement -- the impact of
12  that decision.  Indeed, during this time
13  period, I actually believed that the
14  reimbursement was the same regardless of the
15  number of antibodies performed.
16        And go back earlier in the
17  paragraph, it seems to be relating to the
18  1995 time period, is that right?
19     A  I'm sorry.  What did you say?  Is
20  this comment related to --
21     Q  The 1995 time period.
22     A  I believe so.

315

1     Q  Okay.  So this statement isn't
2  during the time -- that time -- during this
3  time period; in other words, the '95 time
4  period, you had no understanding of how the
5  reimbursement was made for these antibodies?
6     A  No, to the best of my knowledge, I
7  didn't have any.
8     Q  Okay.  Did you have any -- did you
9  -- I think I sort of asked this question
10  earlier, but did you get any training at
11  Dianon regarding how Medicare reimbursed for
12  these tests?
13     A  No.  We were thrown in the lion's
14  pit and said, "Practice medicine."
15     Q  Okay.  So there was no training
16  about Medicare?
17     A  No, there wasn't.
18     Q  Their billing, what they paid for?
19     A  No, none.  You won't find any
20  records of that to the best of my knowledge.
21     Q  Okay.  Now, did there come a time
22  at which you did become aware of how the

316

1  antibodies were being reimbursed?
2        Well, let me be a little more
3  specific.
4     A  Okay.
5     Q  Well, at the point in time when
6  you're doing -- you're having the discussions
7  with Dr. Amberson about 18 versus 26, at
8  that point in time did you understand that
9  the antibodies were being billed per antibody
10  rather than per panel?
11     A  You know, I honestly don't think
12  so.  It was kind of my attitude that we are
13  practicing medicine, and that whether they
14  were billing it in total or individual
15  antibodies was Dr. Amberson's problem.
16        And so had he mentioned something
17  about it, I wouldn't have been interested
18  because I felt that was their problem, not
19  mine.
20        MS. DAVIS:  Let's go off the record
21  for two minutes.  This may be all I have.
22        THE VIDEOGRAPHER:  Going off the

317

1  record 4:33 p.m.  Tape 5.
2        (Recess)
3        THE VIDEOGRAPHER:  Going back on
4  the record at 4:41 p.m.  Tape 5.
5        BY MS. DAVIS:
6     Q  I just have a couple sort of
7  clean-up type questions.
8     A  Certainly.
9     Q  I don't think I asked you this
10  earlier.  You left Dianon in 2000, mid-2000?
11     A  Yes, end of June or -- end of May
12  or beginning of June.
13     Q  Okay.  Why did you leave?
14     A  Because I was making more money
15  writing on the weekends and consulting than I
16  was making at Dianon, plus the work I felt --
17  I was getting older and it was hard to keep
18  up the same level of professional practice at
19  the intensity that it was at Dianon.
20     Q  Okay.  Have you ever been
21  disciplined at any job?
22     A  I can't remember being spanked.

**Exhibit 2**

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2
     -----------------------X
 3   UNITED STATES OF AMERICA|
     ex rel. DR. JAMES J.     |   CIVIL ACTION NO.
 4   TIESINGA,               |   3:02 CV 1573(MRK)
               Plaintiff,    |
 5
              vs.            |
 6                           |
     DIANON SYSTEMS, INC.,    |   March 24, 2006
 7            Defendant.      |
     -----------------------X
 8
 9      ATTACHED EXHIBITS CONTAIN CONFIDENTIAL HEALTH
         INFORMATION SUBJECT TO PROTECTIVE ORDER
10
11        DEPOSITION of GLENN H. SEGAL, D.O.
12
13
14      Taken before Elzbieta A. Sirois, RPR,
        LSR 350, a Court Reporter and Notary
15      Public within and for the State of
        Connecticut, pursuant to Notice and the
16      Federal Rules of Civil Procedure, at the
        offices of Office of the United States
17      Attorney for the District of Connecticut,
        157 Church Street, New Haven, Connecticut on
18      March 24, 2006, commencing at 9:25 a.m.
19
20
21
22
23           FALZARANO COURT REPORTERS
                117 North Saddle Ridge
24              West Simsbury, CT 06092
                   860-651-0258
25
```

**Page 2**

```
 1
     APPEARANCES:
 2
 3     For the Plaintiff:
 4
        UNITED STATES DEPARTMENT OF JUSTICE
 5      157 Church Street
        New Haven, Connecticut 06510
 6      203.821.3792
              By:  RICHARD M. MOLOT, ESQ.
 7
 8
 9     For the Defendants:
10      AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
        1333 New Hampshire Avenue, N.W.
11      Washington, D.C. 20036-1564
        202.887.4000
12      202.887.4288 Fax
              By:  ROBERT S. SALCIDO, ESQ.
13
14
15
16
;  --
20
21
22
23
24
25
```

**Page 3**

```
 1
 2                S T I P U L A T I O N S
 3
 4
 5      It is stipulated by counsel for the parties that
 6   all objections are reserved until the time of trial,
 7   except those objections as are directed to the form of
 8   the question.
 9      It is stipulated and agreed between counsel for
10   the parties that the proof of the authority of the
11   Notary Public before whom this deposition is taken is
12   waived.
13      It is further stipulated that any defects in the
14   Notice are waived.
15      It is further stipulated that the deposition may
16   be signed before any Notary Public.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            (Government's Exhibit No. 1:
 2             Marked for Identification.)
 3
 4       (Deposition commenced:  9:25 a.m.)
 5
 6       GLENN H. SEGAL, D.O., Deponent, of
 7     46 Sullivan Road, New Milford, Connecticut,
 8     being first duly sworn by the Notary Public,
 9     was examined and testified, on his oath, as
10     follows:
11
12             DIRECT EXAMINATION
13
14   BY MR. MOLOT:
15      Q   Good morning.  My name's Rick Molot, and I'm
16   from the U.S. Attorney's Office, and I represent the
17   Government in the lawsuit that's been filed against
18   Dianon Systems, Inc.; you understand that?
19      A   Yes.
20      Q   I'm going to be taking your deposition this
21   morning; you understand that?
22      A   Yes.
23      Q   And in the deposition you've got to verbalize
24   your answers because the Court Reporter is taking
25   everything down.  So, a nod of the head won't work.
```

BY MR. MOLOT:

Q   So you said Dr. Goyette ran the flow cytometry lab during that time period?

A   Well, he was director of hematopathology, so he had responsibility over that area.

Q   Was there someone who managed the flow cytometry lab during that time period?

A   I believe, the laboratories, I guess, I don't know the exact term, laboratory supervisor or manager, I don't know the exact term.  I believe Steve Brown was the first one I remember.

I don't know if he was doing that exactly when I came there, but he was the main person I remember early on.

Q   Right.

A   Then he had left, and Cindy Dawkins, who was a tech, took over then.  She was promoted.

Q   I see.  During that time period, before you left for Impath, about how many other doctors interpreted flow cytometry tests?

A   During that time period it would be, I would say between four and six.

Q   Between four and six.  Could you tell me who they were besides yourself?

A   Dr. Goyette, Dr. Mishalani -- beside myself,

---

18

right?

Q   Correct.

A   Dr. Connor, she was there before I was as well.

Q   Is that AnnMarie Connor?

A   AnnMarie Connor, and Dr. Maiese came on board.  I helped in recruiting him.  I knew him from Florida.

Q   What's his first name?

A   Russell, Russ.  I don't know, I think '97, but I don't know for certain.

Q   You think he started --

A   In '97 or '98 or '97, I don't remember exactly.  And then there's also a person that works on weekends and some evenings if there's cases we can't complete during the day, for example, and his name is Dr. Bower.

Q   What's his first name?

A   Frank Bower.

Q   During that time period, that two and a half year time period, did you have any responsibility for billing?

A   No.

Q   Which people, during that time period to your knowledge, had any responsibility for billing?

A   What type of people?

---

1   Q   I'm saying employees of Dianon who might have
2   had some responsibilities for billing insurance
3   carriers.
4   A   I wouldn't know.  I didn't know who did that.
5   Q   No idea?
6   A   I assumed there's people that do it, but I
7   don't know who they are.  I think they were even in a
8   separate building or they are in a separate building,
9   so we don't have much, really any interaction with
10  them.
11  Q   During that time period, the '96 to '99 time
12  period, did you have any knowledge of how flow
13  cytometry tests were billed to Medicare?
14  A   No, I wasn't aware of how they billed.
15  Q   Did you come -- did there come a time when you
16  learned how flow cytometry tests were billed by Dianon
17  to Medicare?
18  A   Some of the discussions after the Qui tam was
19  filed, I'm still not sure exactly, but I know some of
20  the -- I guess some of the documents had things on
21  there that suggested, you know, there were -- I wasn't
22  sure how it was done, but I just know I've seen there
23  was, you know, again, I don't know how specifically how
24  it's done, but I really can't answer exactly, but I
25  know there's -- I could see from some of the documents,

---

20

1   I had seen from some of the documents that they were
2   billed certain ways.
3   Q   But just so I understand your testimony, it's
4   fair to say that from the time you started in 1996 at
5   Dianon until this lawsuit was filed, you didn't have
6   knowledge of how flow cytometry tests were billed to
7   Medicare?
8   A   Right.
9   Q   So, you didn't know that if Dianon used more
10  antibodies they got paid more, you didn't know that?
11  A   What was the question?
12  Q   You didn't know that if Dianon used more
13  antibodies in its flow cytometry panel it got paid more
14  by Medicare?
15  A   I was not clear on that, no.
16  Q   You didn't know that?
17  A   No.
18  Q   Did you have -- withdrawn.
19      Did you think during that time period that
20  flow cytometry was billed to Medicare on a, you know,
21  per panel basis like one charge per test?
22  A   I did have that thought, yes.
23  Q   You had that impression?
24  A   Yeah.
25  Q   That it was one price per test?

1    A    That was an impression I had. I wasn't
2    certain of it.
3    Q    What was the basis for that impression?
4    A    I don't recall, but that's the impression I
     had.
6    Q    During that two and a half year period when
7    you first worked at Dianon, did you ever receive any
8    training on Medicare rules and regulations?
9    A    Not to my recollection, no.
10   Q    During that time period, did you ever discuss
11   the concept of medical necessity as defined by Medicare
12   with anyone?
13   A    Not that I recall, no.
14   Q    Do you know of any internal policies in place
15   at that time to ensure that Dianon only performed
16   medically necessary tests?
17   A    Not that I was aware of, no.
18   Q    I'm sorry?
19   A    Not that I was aware of, no.
20   Q    Did you know at that time that Medicare would
21   only pay for medically necessary tests?
22            MR. SALCIDO:  Objection.
23   BY MR. MOLOT:
24   Q    You can answer.
     A    It really wasn't a focus of my, you know, work

22

1    there.  I didn't really think of that detail.
2    Q    In July of 1999 you left Dianon and went to
3    join Impath?
4    A    Yes.
5    Q    Impath is another reference laboratory?
6    A    Another laboratory, yes.
7    Q    Where was that located?
8    A    New York City.
9    Q    Why did you leave Dianon?
10   A    My wife was working down there, and there was
11   a position for a director down there, and I wanted to
12   see if it would work out, but it was a very difficult
13   commute from where I was living, and my wife became
14   pregnant, and we just -- she didn't go back to work
15   thereafter, she had a back problem and didn't go back,
16   and so it was just me commuting alone.  It just wasn't
17   working, the commute.
18   Q    Long commute.
19   A    Luckily they accepted me back, brought me
     back.
     Q    What was your title at Impath?
22   A    I think it's a director of cytometry and
23   hematopathology services in the New York division.
24   Q    Your CV says director and senior consultant.
25   A    Okay.  That was the title I had.

1    Q    What were your responsibilities at Impath?
2    A    It was basically signing cases, very similar,
3    it's what I did at Dianon.
4    Q    Signing out cases and doing flows?
5    A    That's what I mainly did, yes.
6    Q    Doing flow cytometry interpretations?
7    A    Flow cytometry and morphology interpretations,
8    yes.
9    Q    Did you have any responsibility for billing
10   while you were at Impath?
11   A    No.
12   Q    Did you get any Medicare training while you
13   were at Impath?
14   A    Not that I recall, no.
15   Q    In April of 2000 you returned to Dianon,
16   correct?
17   A    Yes, I believe so, April.
18   Q    It's not a memory test.  I'm just, that's what
19   I have.  And what was your -- what were your
20   responsibilities when you returned to Dianon in April
21   of 2000?
22   A    I went back to the position I had, senior
23   hematopathologist because Dr. Goyette was director.
24   Q    Dr. Goyette was still there at that time?
25   A    Yes.

24

1    Q    And then in June of 2000 your CV indicates you
2    became codirector hematopathology services, correct?
3    A    Yes.
4    Q    Tell me how it was that you became codirector?
5    A    Dr. Goyette had resigned and Dr. Mishalani and
6    I approached, I don't know exactly who was there at
7    that point as far as, it could have been Jay or someone
8    else, but to be -- you know, since we were remaining
9    that we need to have someone in that position to do,
10   you know, just a general director-type role thing,
11   proficiency tests and, you know, to sign off on those
12   and make sure those are accurate, and to do just
13   general things, QA type of things for the lab.
14        If there's problems that arise, general
15   problems with clients, you know, that is what the
16   codirector would deal with, other than a specific case,
17   so those kind of things.
18   Q    Why did Dr. Goyette leave, to your knowledge?
19   A    I'm not really sure.
20   Q    Do you know whether he was asked to leave or
21   left voluntarily?
22   A    Oh, he left voluntarily.
23   Q    During the time -- from the time you became
24   codirector in June of 2000 up until the -- there was an
25   acquisition by LabCorp in early 2003, correct?

**Exhibit 3**

1

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
        --------------------------X
        UNITED STATES OF AMERICA|
        ex rel. DR. JAMES J.       CIVIL ACTION NO.
        TIESINGA,                  3:02 CV 1573(MRK)
                  Plaintiff,
        --------------------------
              vs.

        DIANON SYSTEMS, INC.,      February 22, 2006
                  Defendant.
        --------------------------X


                  VIDEO DEPOSITION of VALERIE PALMIERI


                  Taken before Elzbieta A. Sirois, RPR,
              LSR 350, a Court Reporter and Notary
              Public within and for the State of
              Connecticut, pursuant to Notice and the
              Federal Rules of Civil Procedure, at the
              offices of Office of the United States
              Attorney for the District of Connecticut,
              157 Church Street, New Haven, Connecticut on
              February 22, 2006, commencing at 9:07 a.m.








                      PALISANO COURT REPORTERS
                      117 North Saddle Ridge
                      West Simsbury, CT 06092
                          860-651-0258
```

3

2    S T I P U L A T I O N S

5    It is stipulated by counsel for the parties that

6    all objections are reserved until the time of trial,

7    except those objections as are directed to the form of

8    the question.

9        It is stipulated and agreed between counsel for

10   the parties that the proof of the authority of the

11   Notary Public before whom this deposition is taken is

12   waived.

13       It is further stipulated that any defects in the

14   Notice are waived.

15       It is further stipulated that the deposition may

16   be signed before any Notary Public.

2

APPEARANCES:

For the Plaintiff:

    UNITED STATES DEPARTMENT OF JUSTICE
    601 D Street N.W.
    Room 9154
    Washington, D.C. 20004
    202.307.0238
    202.305.4117 Fax
        By:  PATRICIA R. DAVIS, ESQ.

    UNITED STATES DEPARTMENT OF JUSTICE
    157 Church Street
    New Haven, Connecticut 06510
    203.821.3792
        By:  RICHARD M. MOLOT, ESQ.


For the Defendants:

    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
    1333 New Hampshire Avenue, N.W.
    Washington, D.C. 20036-1564
    202.887.4000
    202.887.4288 Fax
        By:  ROBERT S. SALCIDO, ESQ.

ALSO PRESENT:

    Thomas Kossl, Dianon Systems

VIDEOGRAPHER:

    Hamilton Communication
    60 Pine Lake Road
    Westbrook, Connecticut
        Jason Hamilton
        860.399.4999

4

1        THE VIDEOGRAPHER:  We are now on the

2    record.  This is the deposition of Valerie

3    Palmieri, taken on behalf of the Plaintiff in

4    the case of the United States of America vs.

5    Dianon Systems Incorporated.  Case number

6    3:02CV1573 (MRK) filed in the United States

7    District Court for the District of

8    Connecticut.

9        Today's date is February 22, 2006.  Time

10   on videotape record is 9:07 a.m.  This

11   deposition is being held at 157 Church Street

12   in New Haven, Connecticut.  My name is Jason

13   Hamilton representing Hamilton Communications

14   of 60 Pine Lake Road, Westbrook, Connecticut.

15       Would counsel please introduce yourselves

16   for the record.

17       MS. DAVIS:  My name is Pat Davis.  I'm

18   representing the United States.

19       MR. MOLOT:  Richard Molot for the United

20   States.

21       MR. SALCIDO:  I'm Robert Salcido here on

22   behalf of Dianon Systems.

23       MR. KOSSL:  Tom Kossl, Dianon Systems.

24       THE VIDEOGRAPHER:  The witness may now be

25   sworn.

9

1  under the microscope at the --

2      A     No, they're chemical assays using radioactive

3  isotopes, enzymatic reactions, fluorescent reactions in

   a test tube.

5      Q     I see.  How long did you hold that position?

6      A     For two years.

7      Q     What was your next position?

8      A     Laboratory supervisor in 1989.

9      Q     What did that entail?

10     A     Supervising day and evening shift operations

11  of the laboratory.

12     Q     When you say "operations" what does that mean?

13     A     The analytical portion, the testing of the

14  specimens, the quality assurance.

15     Q     How long did you hold that job?

16     A     For four years.

17     Q     What was your next job?

18     A     Laboratory manager.

19     Q     What does a laboratory manager do?

20     A     I managed multiple functions, the chemistry

21  laboratory which I supervised, histology laboratory,

22  psychology laboratory, so it's a multidepartment

23  position.

24     Q     Did you receive, when you were the manager,

   did you have people reporting to you?

10

1      A     Yes.

2      Q     Did the technologists?

3      A     No, supervisors reported to me.

4      Q     Supervisors, I see, okay.

5            How long did you hold that job?

6      A     I held that job until 1998.

7      Q     What was your next job?

8      A     I became director of clinical pathology and

9  pretty much service operations.

10     Q     What did you do in that job?

11     A     I managed the laboratory plus all the customer

12  service, laboratory processing, all the preanalytic

13  steps.

14     Q     The intake?

15     A     Yes, and the output.

16     Q     Okay?

17     A     Logistics, materials management.

18     Q     How long were you in that position?

19     A     I was in that position for one year, and then

   I became the vice-president of laboratory operations.

       Q     What were your duties in that job?

22     A     Managing the clinical as well as the anatomic

23  portion of the laboratory, as well as the preanalytic,

24  analytic, postanalytic, the entire gamut.

25     Q     So all the logistics --

11

1      A     Everything.

2      Q     -- all the materials?  Okay.  How long were

3  you in that position?

4      A     I was in that position until 2001, and then I

5  became senior vice president of laboratory operations.

6      Q     How did what you did differ from what you had

7  done previously?

8      A     I managed multiple locations.

9      Q     I see.  What were those locations?

10     A     New York, Florida and Connecticut, two

11  locations in New York.

12     Q     Then how long were you in that position?

13     A     Until we were acquired by LabCorp.

14     Q     Then what was your title?

15     A     Vice-president of operations.

16     Q     Vice-president of operations or vice-president

17  of lab operations?

18     A     Same thing.

19     Q     Same thing?

20     A     Yeah, same thing pretty much.  Then my

21  position was just limited to Connecticut and New York.

22     Q     And no more responsibility for Florida?

23     A     Florida or Oklahoma.  Actually in 2001 too we

24  purchased UroCor so I took on Oklahoma in 2001.

25     Q     When was Dianon acquired by LabCorp?

12

1      A     January of 2003.

2      Q     And have you held that position since then?

3      A     Yes.

4      Q     Do you have stock in the company?

5      A     Yes.

6      Q     As the vice-president, you're an officer of

7  the corporation?

8      A     Yes.

9      Q     Tell me, generally, what did you do to prepare

10  for this deposition?

11     A     I reviewed the documents relating to the

12  subject matter.

13     Q     And you're talking about the documents

14  relating to C, D and E of the deposition notice?

15     A     Correct, yes.

16     Q     Did you talk to anyone?

17     A     No.

18     Q     You didn't ask anybody information about any

19  of this?

20            MR. SALCIDO:  Anyone other than me and

21            Tom.

22     A     Did I talk to anyone?  Well, in pulling

23  together information like cost information and things

24  like that I talked to my managers and things like that.

25  I talked to my husband, told him where I was going to

13

1   be today, but that's about it.
2   BY MS. DAVIS:
3       Q    When you say you talked to your managers, who
4   would that be?
5       A    Matt Plamkoodan.
6       Q    Anyone else?
7       A    Tami Sessa and Sue Cowan.
8       Q    You didn't talk to any of the other managers
9   or the other officers?
10      A    No.
11      Q    You didn't talk to any of the billing folks?
12      A    No.
13      Q    Any of the pathologists?
14      A    The only other person I talked to is Jay
15  Amberson.
16      Q    What did you talk to him about?
17      A    Basically that I, you know, he was telling me
18  he was going to also come here, and I said I was coming
19  today.  That was it.
20      Q    He didn't talk anything about substance?
21      A    No, not at all.
22      Q    Okay.  Take a look at the deposition notice.
23      A    Sure.
24      Q    First thing you're being offered for is C,
25  your -- that's Dianon's decision in or about 2000 to

14

1   bill for 26 antibodies for most flow cytometry
2   services?
3       A    Yes.
4       Q    Including the reason for your re-examination
5   of the numbers of antibodies to bill for?
6       A    Yes.
7       Q    At the time Dianon was billing for 18
8   antibodies; is that right?
9       A    Correct.
10      Q    What prompted, what prompted the decision to
11  look at the number of antibodies that you were billing
12  for?
13      A    It's customary for us to look at our
14  competitors and see, you know, look at their offerings,
15  see how they are billing.  And we did a review of our
16  competition, and we found out that we were actually
17  severely underbilling for the antibodies that we were
18  performing.
19      Q    What competitors did you look at?
20      A    Various competitors.  At the time, Impath is a
21  competitor, at that time.  I think that's the only one
22  I can recall.
23      Q    Did you look at a number of different
24  competitors?
25      A    No, I don't remember any other names being

15

1   brought up.  It was a very informal conversation, you
2   know, where this was brought up.  It wasn't anything
3   formal in terms of a market survey or anything like
4   that.
5       Q    The only one you can remember talking about is
6   Impath?
7       A    Yes.
8       Q    When was the, you talk about discussions, who
9   was involved in the discussions?
10      A    It was originally raised at our senior
11  management team meeting.
12      Q    Who is the senior management team?
13      A    It would include the finance, operations,
14  sales, marketing, medical director and the president.
15      Q    Who were those -- at the time, who were in
16  those positions?
17      A    Kevin Johnson.
18      Q    Was president?
19      A    President.  Finance was Dave Schreiber.  The
20  medical director at the time, I believe, was Jack
21  Snyder.
22      Q    Operations?
23      A    Myself.  Sales was Marty Stefanelli, and
24  marketing was Grant Carlson.
25      Q    What prompted the discussion?

16

1       A    It was customary for us at the end of the
2   year, end of a fiscal year we would look at our
3   pricing, we would look at competition's offering, we'd
4   compare ourselves, and it was a nonformal process where
5   we would review our offering and upon review of that,
6   it was determined that we were, you know, possibly
7   underbilling for what we were performing.  We are
8   performing 26 and only billing for 18.
9       Q    Who raised the issue?
10      A    It was not raised specifically.  It was like a
11  generic review of our offering at the end of the year.
12  We said okay, what's our offering, how does it compare
13  to the competition, and it was obvious that we were
14  only billing for 18 and our competition was billing for
15  more.
16      Q    You said at the end of the year it was
17  customary to review your offering, does that mean you
18  reviewed all the tests that you do?
19      A    Yes, that's correct.
20      Q    You went through and looked at each of the
21  tests you do --
22      A    Yes.
23      Q    -- and compared yourself to the competitors?
24      A    Competitors, compared it to, you know, how
25  they were billing, you know, and what CPT codes were

17

1  they using, things like that.  So we looked at

2  everything.  This was not an isolated look at flow.

3     Q   When you say you compared yourself to your

   competitors, was Impath the only competitor you

   compared yourself to?

6     A   That's the only one that I can remember, you

7  know, and again, I don't even know how many they were

8  doing, but that's the only one that I can recall.

9     Q   The senior team, management team meetings,

10 were notes kept of those, minutes?

11    A   No.

12    Q   No minutes were kept?

13    A   No, it was very informal.

14    Q   Did anybody customarily take notes?

15    A   The only notes I can think of is if someone

16 had an action item, they would take a note, mental note

17 to themselves and take that away from the meeting.

18    Q   But nobody -- you're going through a lot of

19 tests.  I mean, you guys have a lot of tests to

20 perform, right?

21    A   Right.

22    Q   So nobody was sitting there taking notes on

23 what you were going to do about the various tests?

24    A   No, the subject was brought up and then people

25 were sent back to do the analysis.  So the analysis

18

1  wasn't performed during the meeting.  The subject was

2  brought up, we need to do our review of all our

3  offerings, you know, the billing, the pricing, and then

4  they would go back and do the analysis.  So we didn't

5  go one for one through everything at that meeting.

6     Q   Then who would do the analysis?

7     A   Marketing.

8     Q   That would be Grant Carlson?

9     A   Correct.

10    Q   Then Mr. Carlson would report to the senior

11 management team about the results?

12    A   Correct.

13    Q   When did he do that?

14    A   Around that same time period he noted, you

15 know, upon review that we were underbilling, basically

16 that we were, you know, we were only billing for the 18

17 and what the competitive landscape was showing was that

18 other competitors were billing for a lot more.

19    Q   Did he mention anybody other than Impath?

      A   I can't think of anyone else.

      Q   Did he produce a report of any sort?

22    A   No, not that I'm aware of.

23    Q   So, when did you -- I mean, did you go

24 through, at some point go through all of the tests and

25 decide what you were going to do about each of them?

19

1     A   He brought observations back that said that,

2  you know, we were going to do price increases on other

3  tests, some of them were across the board, you know, in

4  terms of just our prices had gone up so we were going

5  to be increasing our prices, let's say 5 percent, and

6  then he brought up isolated -- I recall him bringing up

7  this as a special case that, you know, this required

8  special handling in the sense that we were underbilling

9  quite a bit.

10    Q   Did he mention any other tests?

11    A   Not that I can recall.

12    Q   Was there any discussion with the pathologists

13 or the lab about what to bill for or what antibodies to

14 use?

15    A   I mean the medical director was at this

16 meeting, but as far as the HemePaths are you asking,

17 were there any discussions, I'm not aware of any

18 discussions with the HemePaths.

19    Q   Is a change in pricing, does that require some

20 sort of approval by the board?

21    A   No, it does not.

22        MS. DAVIS:  Mark that as Exhibit 2,

23        please.

24

25

20

1        (Government Exhibit No. 2:

2         Marked for identification.)

3

4  BY MS. DAVIS:

5     Q   Take a look at that document.

6     A   Sure.

7     Q   Do you recognize that?

8     A   Yes, I do.

9     Q   What is that?

10    A   This is a test code creation form.

11    Q   What does that mean?

12    A   This is a form that is generated when we make

13 a change to a test code.

14    Q   Is that done in all cases?

15    A   Yes.

16    Q   Who has to approve the change?

17    A   First there is the initial approval is the

18 lab, billing, IS and marketing, and then there are

19 vice-president or senior management approval, by the

20 chief medical officer, the vice-president, the

21 corporate controller and the VP of marketing.

22    Q   Those are all people whose names are down at

23 the bottom of the sheet?

24    A   That's correct.

25    Q   Do you get any input from -- I take it there's

21

1  over on the right-hand side at the bottom there's a --
2  are there initials from the lab, billing, information
3  systems, and marketing?
4        A     Correct.
5        Q     Who's the -- do you know whose signature that
6  is from the lab?
7        A     We were trying to decipher that.  I'm not
8  sure.
9        Q     Who would it normally be?
10       A     It would be someone who works in the
11  laboratory processing area, the manager of laboratory
12  processing.  So, there's two individuals that I can
13  think of that this would look like their handwriting,
14  but it's hard to decipher.
15       Q     Who are those two people?
16       A     Either Tami Sessa or Bill Tilton.
17       Q     When you were preparing for this deposition,
18  did you talk to any of the other folks on the senior
19  management team about what they recalled about this
20  issue?
21       A     No, I did not.
22       Q     You said you reviewed documents relating to
23  this, what did you review?
24       A     Subject matter documents.  I don't, you know,
     I don't, I'd have to see, you know, I don't know

22

1  specifically.  I mean, I can't remember each document
2  in my head.
3        Q     Did you recall -- did you review this
4  document?
5        A     Yes, I did.
6              MS. DAVIS:  Could we go off the record for
7        a minute.  I'm having trouble locating
8        something.  I don't want to waste time.
9              THE VIDEOGRAPHER:  Sure.  Going off the
10       record at 9:29 a.m.
11
12             (Off-the-record discussion.)
13
14             THE VIDEOGRAPHER:  Back on the record at
15       9:32 a.m.
16             MS. DAVIS:  Okay.  I apologize for that.
17       Can you mark that, please.
18
19             (Government's Exhibit No. 3:
               Marked for identification.)
20
21
22  BY MS. DAVIS:
23       Q     Have you had a chance to review that document?
24       A     Yes.
25       Q     Do you recognize it?

23

1        A     No.
2        Q     Never saw it before?
3        A     Never saw it before.
4        Q     This isn't one of the documents you reviewed
5  to prepare for this deposition?
6        A     No.
7        Q     Approximately how many meetings did you have
8  to discuss the changes to the billing -- number of
9  antibodies to be billed for for flow cytometry?
10       A     I don't remember exactly.  I mean, you know,
11  the problem was initially brought up, they were sent
12  back to review the data, they came back with the data.
13  So, I want to say two meetings.
14       Q     Were the same people present at each meeting?
15       A     Yes.
16       Q     The senior management team?
17       A     That's correct.
18       Q     Just so, it's clear --
19       A     Stop nodding, I know.
20       Q     It's okay to nod as long as you give a vocal
21  answer, but we're talking over each other.
22       A     Okay.
23       Q     So if you could wait until I finish the
24  question.
25       A     Sure.

24

1        Q     It will be much easier on her.
2              Now, one of the parts of the deposition notice
3  is if you look at C6, the identity and content of all
4  documents relating to the decision.
5        A     Is there a question or?
6        Q     What did you do to make sure that you could
7  answer that part of the deposition?
8        A     The identity and content of all documents
9  relating to the decision, this is one of the documents
10  right here.
11       Q     But the deposition ask that you be prepared to
12  answer what exactly -- what documents and the content
13  of documents relating to the decision and the identity
14  of.  Did you identify documents relating to this
15  decision?
16             MR. SALCIDO:  We did, Pat, we have them
17        here with us.
18             MS. DAVIS:  Okay.  Could you produce them
19        to us?
20             MR. SALCIDO:  Yes.
21             MS. DAVIS:  Could we have those?
22             MR. SALCIDO:  I have one copy.
23             MS. DAVIS:  We can go off the record and
24        make copies.  Why don't we go off the record.
25             THE VIDEOGRAPHER:  Going off the record at

29

```
1   competitive pressures?
2       A    Well, we looked at the competition and we
3   determined that we were severely underbilling and that
4   that could, from a compliance perspective, be viewed as
5   inducement.
6       Q    What does that mean?
7       A    Basically that we could be giving things away
8   and inducing the customer to utilize us.
9       Q    So, your decision was based on some sort of
10  fear that by performing 26 tests and only billing for
11  18, that it was some sort of kickback?
12      A    That we were giving things away, correct.
13      Q    Was there any discussion of that with the
14  compliance committee?
15      A    I am not aware of that.
16      Q    Isn't that something that you would normally
17  discuss with the compliance committee?
18      A    Yes.
19      Q    Take a look at exhibit -- actually, it's the
20  top document, Exhibit 4, the Bates number is 600000.
21  Under the approvals, you've got Jack W. Snyder, is he
22  still with the company?
23      A    No, he is not.
24      Q    Did you make any effort to talk to him about
    what his recollections about this decision were?
```

30

```
1       A    No, I did not.
2       Q    Did you ask him if he had any documents
3   relating to this decision?
4       A    No, I did not.
5       Q    What about the controller, whose name I can't
6   read, can you tell me who that is?
7       A    Christopher Rausch.
8       Q    Is he still with the company?
9       A    No, he is not.
10      Q    Did you make any effort to contact him to
11  discuss this issue?
12      A    No, I did not.
13      Q    Did you contact him to find out if he had any
14  documents relating to the issue?
15      A    No, I did not.
16      Q    What about Grant Carlson, did you talk to him
17  before this meeting, before this deposition?
18      A    No, I did not.
19      Q    Did you contact him to find out what his
    recollections were?
21      A    No, I did not.
22      Q    Did you ask him if he had any documents
23  relevant to this decision?
24      A    No, I did not.
25      Q    What about -- I don't know whose signature
```

31

```
1   is -- it says billing data.  What about the person in
2   the lab, did you talk to the lab folks about this
3   decision?
4       A    No, I did not.
5       Q    Did you ask them if they had any documents
6   relevant to this?
7       A    No.
8       Q    Take a look at the next, very next page which
9   is 600001, what does this particular page represent?
10      A    It's a fee schedule.
11      Q    It's got, says there patient fee?
12      A    Patient fee, yes.
13      Q    It's got $75 per antibody?
14      A    Correct.
15      Q    Then it's got a list of, I'm not going to
16  count them, I'm assuming there are 26 antibodies there?
17      A    Correct.
18      Q    Then underneath the XL3 patient bill.  It says
19  need to bill for all 26 antibodies, what does that
20  mean?
21      A    That we need to bill for all 26.
22      Q    Why do you need to bill for all 26?
23      A    Because we are performing all 26.
24      Q    The antibodies that are listed there, who
25  decided what antibodies to put in the panel?
```

32

```
1       A    The hematopathology medical directors.
2       Q    Who were they?
3       A    At that time -- I don't recall exactly.
4       Q    Can you take a look at page 600003.  This is a
5   similar document to the document we were looking at,
6   600000, the first page of this exhibit; is that right?
7       A    Correct.
8       Q    This is for a different test?
9       A    Correct.
10      Q    What test is this?
11      A    XL4.
12      Q    A part of the test is the flow cytometry,
13  which is CPT code 88180; is that right?
14      A    Correct.
15      Q    The same panel was used for this test?
16      A    That's correct.
17      Q    Let's take a look at page 600102, what is that
18  document?
19      A    This is a summary of the test code committee's
20  test that they were working on at the time.
21      Q    It says "weekly test code meeting" was there a
22  weekly meeting dealing with test codes?
23      A    That's correct.
24      Q    What was the purpose of the meeting?
25      A    It was a cross-functional team that would look
```

33

1  at all the different variables that were required to
2  set up a new test code or change a test code.
3       Q   So the test codes were under constant review?
4       A   They could be under a constant review if there
5  were changes in CPT codes, you know, any change we
6  wanted to put in place was reviewed by a
7  cross-functional team.
8       Q   What would prompt the weekly test code meeting
9  group to review a particular test code?
10      A   Any change to CPT, any change in the process
11  by which the test was performed, any methodology
12  changes that we were -- that we put in place.
13      Q   Let me ask you who the folks are who are
14  listed here.  Who is Bob McNamee?
15      A   He's our quality assurance director.
16      Q   For the lab?
17      A   For the entire operation.
18      Q   Then it says present M. Strazza, who's that?
19      A   Maria Strazza, she's information systems.
20      Q   So she'd be in charge of entering this into
21  the system?
22      A   Correct.
23      Q   The next one?
24      A   Bob Tucciarone.
25      Q   What is his --

34

1       A   Billing.
2       Q   He's in billing.  Grant Carlson that's the
3  medical director -- no, marketing, I'm sorry.  He's
4  head of marketing at the time?
5       A   That's correct.
6       Q   B. Tilton?
7       A   Lab processing manager.
8       Q   Niedmann?
9       A   GI marketing manager.
10      Q   I take it that's Jack Snyder?
11      A   Correct.
12      Q   Then that's McNamee again.  And then absent,
13  F. Ferrara?
14      A   IS.
15      Q   Next one, Hade?
16      A   HemePath marketing manager.
17      Q   And Hanak?
18      A   Urology marketing manager.
19      Q   Were you a member of this group?
20      A   No, I was not.
21      Q   Take a look at page 600104.  If you go down
22  the page about two-thirds of the way, it says XL3 final
23  approval.  What does final approval under status mean?
24      A   That the final approval was in process.  It
25  was not completed yet.

35

1       Q   What would -- what would be necessary to
2  complete the final approval process?
3       A   Under comments it states here that the test
4  code fees needed to be updated, the description and
5  quantity of cell surface markers to the billed.
6       Q   Let me go back to the first page of this
7  particular document, 600102.  Are any of the people who
8  are listed on either the from, the present or absent
9  categories, are any of those still with the company?
10      A   Yes.
11      Q   Which ones?
12      A   Maria.
13      Q   Strazza?
14      A   Strazza, Bob Tucciarone.  Bill Tilton's with a
15  sister laboratory, EsoTerix, not with Dianon.  Bob
16  McNamee and Fred Ferrara.
17      Q   Did you make any effort to contact them to ask
18  them what they remembered about changing the number of
19  antibodies for CPT code 88180?
20      A   No, I did not.
21           MR. SALCIDO:  Well, you spoke to Bob
22           McNamee.
23           THE WITNESS:  I did not discuss the
24           background in terms of why we changed it.
25           MR. SALCIDO:  Oh, I'm sorry.  I thought

36

1           she was asking what generally did you discuss
2           about this with respect to anyone.
3  BY MS. DAVIS:
4       Q   What did you discuss with Mr. McNamee?
5       A   Yesterday he reviewed this fee schedule sheet
6  with me.  I had never seen this sheet before.
7       Q   What did he tell you?
8       A   The origin of it, how it was created, who
9  created.
10      Q   What was the origin?  How was it created?
11      A   The origin of this is our billing department
12  changes the fees in our computer system.  This is a
13  computer generated sheet and post -- they'll print the
14  current fees and then the updated fees, and basically
15  have this document for records.
16      Q   Did you make any effort to contact any of the
17  folks on this list who are no longer with the company
18  to find out what their recollection of this issue was?
19      A   No, I did not.
20      Q   Did you ask any of the people on the list
21  whether they had documents relative to this?
22      A   No, I did not.
23           MS. DAVIS:  Let's take a break.
24           THE VIDEOGRAPHER:  Going off the record at
25           9:58 a.m.

37

1
2          (Off-the-record discussion.)
3
4          THE VIDEOGRAPHER:  Back on the record at
5          10 a.m.
6          MS. DAVIS:  Okay.  If you could mark this
7          as Exhibit 5.
8
9          (Government's Exhibit No. 5:
10          Marked for Identification.)
11
12 BY MS. DAVIS:
13     Q    If you'd take a look at this, this is a
14 document your counsel handed to me when we were
15 discussing what documents were available relating to
16 this issue.  Did you review this document in
17 preparation for this deposition?
18     A    Yes, I did.
19     Q    Did you talk to anybody about it?
20     A    Counsel.
21     Q    Did you -- do you know who prepared it?
22     A    I do not know.
23     Q    Did you ask anybody?
24     A    No.
25     Q    Do you know who, for example, it seems to be

38

1 signed by --
2          MR. SALCIDO:  Did you ask anyone other
3          than counsel?
4          THE WITNESS:  No.
5 BY MS. DAVIS:
6     Q    Did you talk to any of the people whose names
7 are written down at the bottom?
8     A    No.
9     Q    So all you did was review the document?
10     A    Correct.
11     Q    So you have no idea what it is or who wrote on
12 it?
13          MR. SALCIDO:  Objection to form.
14 BY MS. DAVIS:
15     Q    Do you have any idea who prepared the
16 document?
17     A    Well, I know these signatures at the bottom.
18     Q    But do you know who prepared the document?
19     A    No, I don't.  I don't know the handwriting.
     Q    Do you know why it was prepared?
     A    In review of the test offerings.
22     Q    Do you know that or is that a guess?
23     A    That's an assumption.
24     Q    Do you recognize any of the signatures at the
25 bottom of the page?

39

1     A    Yes.
2     Q    Whose are they?
3     A    Perry Chan.
4     Q    Who's Mr. Chan?
5     A    He is the Ph.D. who is in charge of the
6 molecular lab.
7     Q    That's the cytogenetic?
8     A    No, the molecular.
9     Q    Molecular, okay.  And Grant Carlson?
10     A    Yes.
11     Q    And I can't read that one.
12     A    It's Steve Gersen.
13     Q    Who's Mr. Gersen?
14     A    He was the vice-president of cytogenetics and
15 molecular.
16     Q    Over on the side of the document it looks like
17 severely underbilling, do you know who wrote that?
18     A    No, I do not.
19     Q    Did you try to find out?
20     A    No, I did not.
21          MS. DAVIS:  Let's go off the record for a
22          minute.
23          THE VIDEOGRAPHER:  Going off the record at
24          10:02 a.m.
25

40

1          (Off-the-record discussion.)
2
3          THE VIDEOGRAPHER:  Back on the record at
4          10:05 a.m.
5 BY MS. DAVIS:
6     Q    Okay.  I'm going to go back over some of the
7 things you said earlier.  I asked you several times
8 what the basis for the decision to move from billing
9 for 18 to 26 was and at one point you said that it was
10 -- you looked at the competition and compared what you
11 were doing to the competition, and then later you said
12 that the reason was because you were concerned that
13 there was a compliance issue; that you were giving some
14 sort of inducement to the doctors by not billing for
15 everything you were doing.  Which one of those was it?
16     A    Well, it was really, initially we looked at
17 the competition and, you know, when we looked at the
18 competition we noticed that we were basically running
19 the 26, billing for the 18 and the competition was
20 running more than us and billing for more.
21          Upon looking at that and observing that and
22 comparing ourselves, we also noted that we were, you
23 know, there could be grounds here for a compliance
24 issue.
25     Q    Let me make sure I understand.  The

41

```
1   competition you compared yourself to was Impath as far
2   as you recall?
3      A   That's the only one, only name I can remember.
4      Q   You didn't, you didn't discuss this with
5   Mr. Carlson who was the person who did the review?
6      A   No.
7      Q   Then as far as the compliance issue is
8   concerned, when did that first come up?
9      A   The -- when we noticed that we were, you know,
10  under -- basically we were only charging for the 18.
11     Q   So that would be the first meeting you had?
12     A   Yes.
13     Q   So, both the competition issue and the
14  compliance issue came up in the first meeting?
15     A   That's correct.
16     Q   You said that you didn't present this to the
17  compliance committee to find out what they thought
18  about it?
19     A   I did not.  I don't know who did.
20     Q   Did somebody do that?
21     A   I can only assume they did that.  I mean, we
22  had an active compliance structure and a formal
23  compliance team.
24     Q   Who was on the compliance committee?
25     A   I don't recall.  We had some senior management
```

42

```
1   people, some of the senior management team.
2      Q   Who would normally bring something like that
3   before the compliance committee?
4      A   Whoever observed it.  In this case it would
5   have been Grant.
6      Q   So it would have been Grant's responsibility
7   to bring it to the attention of the compliance
8   committee?
9      A   Correct.
10     Q   Do you know if he did that?
11     A   I do not know.
12     Q   Do you -- did you talk to him to ask him about
13  it?
14     A   No, I did not.
15     Q   Did you talk to anybody on the compliance
16  committee to find out whether they discussed it?
17     A   No, I did not.
18     Q   Did you look for any documents to see whether
19  the compliance committee had looked at the issue?
20     A   No, I did not.
21     Q   How was the decision, whoever made it, that
22  there was some sort of compliance issue here, how was
23  that conveyed to the management?
24     A   After the analysis he came back to the senior
25  management team and said, you know, there was two
```

43

```
1   issues, one from a competitive standpoint and one from
2   a -- there could be a potential compliance problem
3   here, and the senior management team then decided to
4   move forward with charging for the 26.
5      Q   Did, other than consult with the compliance
6   committee that you assume somebody did but you don't
7   have any information about that, did anybody consult
8   with counsel?
9      A   Compliance committee -- legal counsel is on
10  the compliance committee.
11     Q   There was -- was there any written
12  documentation of any sort of advice about an
13  inducement?
14     A   I am not aware of any.
15     Q   Did you ask anybody about that?
16     A   No, I did not.
17     Q   Did you talk to the members of the compliance
18  committee?
19     A   No, I did not.
20     Q   Did you talk to corporate counsel about this?
21     A   No, I did not.
22         MR. SALCIDO:  Corporate counsel during
23     what time frame?
24         MS. DAVIS:  During the time frame that
25     this was happening.
```

44

```
1   BY MS. DAVIS:
2      Q   Did you talk to any outside counsel about the,
3   about this compliance issue?
4      A   No, I did not.
5      Q   Do you know whether anybody at the company
6   did?
7      A   I'm not sure.
8      Q   Did you ask anybody?
9      A   No, I did not.
10         MS. DAVIS:  Just for the record, Robert,
11     it doesn't appear to me that she's done what
12     she's supposed to do under rule 30(b)(6) to
13     prepare for this deposition.
14         Apparently she's testifying based only on
15     her own personal knowledge.  She didn't ask
16     anybody who was at any of these meetings.  She
17     didn't look at any -- ask anybody for any
18     documents and that's not what a 30(b)(6)
19     witness is supposed to do.
20         A 30(b)(6) witness is supposed to gather
21     up all the information at the company,
22     available to the company, and speak on behalf
23     of the company, and that's not what she's
24     doing.  She's testifying based on her own
25     personal knowledge, and that's it.
```

69

```
1    1996?
2    A    Yes.
3    Q    What was your position then?
     A    1996, lab manager.
          MS. DAVIS:  If you could take a look at
5         the deposition notice again.  Let me make
6         sure, before we move on, you're going to look
7         for documents that would have information
8         about costs per accession or cost per
9         antibodies for previous years and would
10        produce those to us?
11             MR. SALCIDO:  Yes.
12   BY MS. DAVIS:
13   Q    You've also been offered to testify on
14   section E; is that right?
15   A    That is right.
16   Q    And that's Dianon's decision in not to open --
17   I think there's a typo there.  The decision not to open
18   a hematopathology laboratory at Dianon's facility in
19   Oklahoma City; is that right?
20   A    Yes.
21   Q    When did Dianon first consider opening up a
22   hematopathology lab in Oklahoma City?
23   A    Early 2002.
24   Q    Who raised, who first raised the idea?
```

70

```
1    A    I believe Steve Gersen and Todd Homan.
2    Q    Why did they want to open up a lab in Oklahoma
3    City?
4    A    Number one is we had space out there.  We just
5    acquired UroCor.  Number two is we wanted a West Coast
6    or Midwest presence for our HemePath offering.
7    Q    What did -- were there any meetings to discuss
8    this?
9    A    Yes.
10   Q    Who was present at the meetings?
11   A    I don't recall every meeting because I did not
12   attend every meeting, but the meetings that I was at
13   Todd Homan, Steve Gersen, Jim Tiesinga, Marty
14   Stefanelli, Jay Amberson.
15   Q    What was Todd's position?
16   A    I believe VP of marketing.
17   Q    So he's replaced by Mr. Carlson?
18   A    Correct.
19   Q    Mr. Gersen?
     A    VP of genetics services.
     Q    Jim Tiesinga?
22   A    Staff hematopathologist.
23   Q    Mr. Stefanelli?
24   A    VP of sales and marketing, senior VP.
25   Q    Is he Todd's boss?
```

71

```
1    A    That's correct.
2    Q    Jay Amberson?
3    A    Medical director.
4    Q    And what was your position at this point?
5    A    VP of operations.
6    Q    About how many meetings were held on this
7    subject?
8    A    I can recall two.
9    Q    Two that you were at?
10   A    Yeah, two that I was at.
11   Q    Did you talk to any of the other folks about
12   whether there were meetings that you did not attend?
13   A    No, I did not.
14   Q    When were these two meetings?
15   A    Initially I want to say Q1 2002 when the idea
16   was raised.
17   Q    Was that again Gersen and Homan --
18   A    Yes.
19   Q    -- raised the issue?
20   A    Yes.
21   Q    Wait until I finish the question.
22   A    Okay.
23   Q    I know I'm slow, but I'll get there.  Okay.
24        Were the people you just named at this first
25   meeting?
```

72

```
1    A    They could be.  I don't remember exactly.
2    Q    Did you talk to any of them to find out
3    whether they were at the meeting or what their
4    recollection of the meeting were?
5    A    No, I did not.
6    Q    Did you review any documents relating to the
7    first meeting?
8    A    No, I did not.
9    Q    Did you -- did anybody take any notes at the
10   meeting?
11   A    Not that I have reviewed.
12   Q    Do you know whether anybody took notes?
13   A    I don't, you know, I don't recall seeing notes
14   or meeting minutes.
15   Q    Did you ask anybody if they took notes?
16   A    No, I did not.
17   Q    What was the -- why were each of these folks
18   at the meeting:  Mr. Homan, Gersen, Tiesinga,
19   Stefanelli and Amberson and yourself, what was your
20   role?
21   A    Each one was representing a specific area,
22   specific department.  Todd was representing marketing
23   and the need to, you know, strategically locate
24   ourselves within a certain area of the country for
25   HemePath's offering.  Steve Gersen was --
```

77

1    Q    You don't remember whether Mr. Stefanelli or
2  Amberson were there?
3    A    I don not recall.
   Q    Where did the meeting take place?
   A    In Steve Gersen's office.
6    Q    Was there any, was there anything put in
7  writing?
8    A    I don't recall.
9    Q    Did you, when you -- when you said you were
10  game planning or outlining what you were going to tell
11  the carrier, the Oklahoma carrier about your need for
12  26 antibodies, had somebody put together an outline of
13  the issues?
14    A    I believe Todd did put together some outline.
15  I mean, I know people were taking notes, but I did not
16  get a copy of those notes.
17    Q    So Todd put together an outline.  What was on
18  the outline?
19    A    Really understanding, you know, the
20  differences between their IC9 codes, our IC9 codes, the
21  differences in their reimbursement and making them
22  understand why we felt it was medically necessary for
23  us to keep the 26.
24    Q    Was there any -- this outline was done by
   Mr. Homan who was marketing?

78

1    A    Marketing.
2    Q    Was there any input into this from any of the
3  medical personnel?
4    A    Yes.  Jim Tiesinga was also involved at that
5  point, and he spoke to them on the phone.
6    Q    Spoke to whom on the phone?
7    A    The Medicare carrier.
8    Q    Who did he speak to?
9    A    I do not know.
10    Q    Other than speaking to the Medicare carrier on
11  the phone, did he have any other import into the
12  outline?
13    A    He reviewed it and, you know, agreed with what
14  they came up with in terms of the summary to present
15  and they scheduled a meeting with the carrier.
16    Q    Was any sort of PowerPoint presentation put
17  together?
18    A    No, I do not believe that.
19    Q    Any sort of outline for the medical director
20  at the carrier?
21    A    I assume there was.  I did not see it.
22    Q    Did you ask any of the other people at the
23  meeting whether such a presentation was put together?
24    A    Did I ask them at the time?
25    Q    No, in preparation for this deposition, did

79

1  you ask them?
2    A    No, I did not.
3    Q    So, you didn't ask Mr. Homan whether he put
4  together some sort of formal presentation for the
5  medical director in Oklahoma City?
6    A    No, I did not.
7    Q    Did you talk to Mr. Gersen?
8    A    No, I did not.
9    Q    Are either of them still at the company?
10    A    No, they are not.
11    Q    Okay.  So, you said that the outline prepared
12  by Mr. Homan talked about the ICD9 codes.  I take it
13  there was some sort of difference between which codes
14  were reimbursed by Oklahoma as opposed to Connecticut;
15  is that right?
16    A    That's correct.
17    Q    Was the plan to convince the medical director
18  of the carrier in Oklahoma that he should add ICD9
19  codes to their local medical review policy?
20    A    I don't believe so.  I believe the Oklahoma or
21  Arkansas policy was more extensive than ours.
22    Q    So it covered more ICD9 codes?
23    A    That's correct.
24    Q    What about the number of antibodies, was there
25  something put together to convince the medical director

80

1  in Oklahoma that the number of antibodies reimbursed
2  should increase?
3    A    I believe so.
4    Q    What was the basis for that?
5    A    Based on what we felt was medically necessary
6  and we were currently performing.
7    Q    What was the basis for your presentation to
8  the medical director in Oklahoma City about why 26 were
9  medically necessary?
10    A    That is based on our hematopathologists
11  directors they created these panels and felt very
12  strong and passionate about why we needed all these
13  antibodies, and for us to provide HemePath services in
14  Oklahoma we needed to offer this panel.
15    Q    So, let me ask it differently.  Who were the
16  medical directors in hemopathology?
17    A    At that time Sueha Michelleanni[phonetic] and
18  Glen Segal.
19    Q    What was the basis for why they thought all 26
20  were medically necessary?
21    A    I'm not aware of their medical basis.  I'm not
22  a medical doctor.
23    Q    Did you talk to them in preparation for this
24  deposition?
25    A    No, I did not.

93

1  perspective to open the site up.
2      Q   I'm sorry. I didn't understand that answer.
3      A   The -- from a strategic perspective, we needed
   a site in the Midwest or the West part of the country,
   because these are very labile specimens, so the
6  reimbursement factor did not cause us to delay this or,
7  you know, push us off.
8      Q   You said that a group of folks from Dianon
9  went out to try to convince the Connecticut carrier
10 that, I'm sorry, the Oklahoma City carrier that they
11 should expand the number of antibodies that they would
12 be reimbursed for. Did you get a decision from the
13 carrier about what they would do?
14     A   I don't believe. I don't believe there was a
15 final decision. It's just that they were open to
16 listening to our case studies, and that they were
17 approachable.
18     Q   But did they ever say to you --
19     A   I do not believe there was a final decision,
20 no.
21     Q   What's the basis for that belief?
22     A   No one ever told me there was.
23     Q   But so, did you ask anybody?
24     A   No, I did not.
25     Q   In preparation for this deposition, did you

94

1  ask anybody if there had been a final decision by the
2  carrier?
3      A   No, I did not.
4      Q   Or some sort of indication from the carrier
5  that it wasn't going to change?
6      A   No, I did not.
7      Q   Did you, for example, talk to Mr. Gersen about
8  whether the carrier had indicated whether they would
9  change their reimbursement policy or not?
10     A   No, I did not.
11     Q   Did you talk to anybody else who was involved
12 in this process? Let me give you names, Mr. -- let's
13 see, Mr. Amberson?
14     A   No.
15     Q   Mr. Stefanelli?
16     A   No.
17     Q   Mr. Homan?
18     A   No.
19
                 (Government's Exhibit No. 11:
                 Marked for Identification.)
22
23 BY MS. DAVIS:
24     Q   Have you seen that document before?
25     A   Yesterday.

95

1      Q   That was the first time you ever saw it?
2      A   Yes.
3      Q   Do you know who wrote it?
4      A   I'm not sure.
5      Q   Did you do anything to find out who wrote it?
6      A   I asked the question if this was Steve Gersen.
7  So I think it is Steve Gersen's.
8      Q   You think Steve Gersen wrote this?
9      A   I think so.
10     Q   But you don't know?
11     A   I don't know.
12     Q   You don't recognize his handwriting?
13     A   No.
14     Q   You didn't talk to him?
15     A   No, I did not.
16     Q   Who made the decision to put the Oklahoma City
17 facility on hold?
18     A   I do not believe there was a formal decision.
19 I think it was a series of events with Jim resigning,
20 the difficulties with hiring, and a number of us were
21 busy preparing for, you know, putting the company up
22 for sale.
23     Q   During your discussions of opening up the
24 Oklahoma City facility, was there any discussion of the
25 viability of the specimens?

96

1      A   In terms of what?
2      Q   In terms of why there would be a need to do 26
3  antibodies?
4      A   I don't understand how the viability has to do
5  with the 26 antibodies.
6      Q   Well, was there any discussion about the need
7  to do the 26 antibodies because there were questions
8  about how long the specimen would be viable to be
9  tested?
10     A   I'm not aware of any discussions.
11     Q   Let me make sure I understand. You believe
12 that there were two meetings to discuss this, two
13 formal meetings; one before the trip to Oklahoma City
14 and then -- no, two before, one just before to outline
15 what the game plan is, and then one prior to that to
16 talk about all the issues involved --
17     A   That's correct.
18     Q   -- in moving to Oklahoma City?
19     A   That's correct.
20     Q   And then after the meeting in Oklahoma there
21 was only an informal discussion in Mr. Gersen's
22 office --
23     A   That's correct.
24     Q   -- and in the hallway with Mr. Tiesinga?
25     A   That's correct.

97

1    Q    Did anyone do an analysis of assuming the
2    carrier in Oklahoma would not agree to expand the
3    number of antibodies that they reimbursed for?  Did
4    anybody do an analysis of how much that would affect
5    reimbursement to Dianon?
6    A    I did not see an analysis, but I am sure that
7    as part of marketing's duties they would -- I would
8    assume they would have done an analysis.
9    Q    Did you ask anybody?
10   A    I did not ask anybody.
11   Q    Did you review any documents that indicated
12   such an analysis had been done?
13   A    No, I did not.
14   Q    Do you know how much reimbursement would have
15   been affected by the difference between the Connecticut
16   carrier and the Oklahoma carrier?
17   A    I am not sure of the difference.  One note, I
18   know that on the flip side, the ICD9 codes in Arkansas
19   were much more comprehensive.  So, I do know, I can
20   recall a conversation where although we had less
21   antibodies there was more ICD9 codes available so they
22   could wash each other out.
23   Q    Did anybody do an analysis of that?
24   A    I did not see an analysis, but I would assume
     there was one done.

98

1    Q    Did you review any documents that would -- in
2    preparation for this deposition, that would constitute
3    such an analysis?
4    A    No.
5    Q    Did you talk about it with any of the other
6    participants in the meetings on this issue about
7    whether they had done an analysis?
8    A    No, I did not.
9    Q    Did you ask them if they had any such
10   analysis?
11   A    No, I did not.
12   Q    Was there any discussion in these meetings
13   about whether in fact it was necessary to do 26
14   antibodies in all cases?
15   A    It was never a question.
16   Q    So there was no discussion of, for example,
17   coming up with a more targeted panel based on the
18   potential diagnosis?
19   A    No.
     Q    Did you ever consider having, just having two
     separate systems?  In other words, the lab in
22   Connecticut billing the carrier based on 26 and the
23   Oklahoma City lab billing the Oklahoma carrier based on
24   whatever the cap was that they had?
25   A    No.

99

1    Q    You didn't discuss that at all?
2    A    The panels would not change, that was the only
3    thing that was discussed.
4    Q    Did -- you said, I asked you before who made
5    the final decision about not opening the lab, and you
6    said that it just sort of...
7    A    I don't think there was a formal final
8    decision.  It was a series of events that were
9    occurring at the same time.
10   Q    Was any report made to the board of directors
11   about what was going on with the lab in Oklahoma City?
12   A    Not that I'm aware of.
13   Q    Did you ask anybody if there were?
14   A    No, I did not.
15   Q    Did you review any board minutes to see
16   whether there in fact had been such a report.
17   A    No, I did not.
18   Q    At the time that you were considering opening
19   up the lab in Oklahoma City, was there an issue with
20   the Connecticut carrier about reimbursement for certain
21   diagnosis codes?
22   A    I believe there was.  Anemia was specified.  I
23   believe there was a question on that.
24   Q    What was the question?
25   A    That we were, that we were questioning

100

1    Connecticut why they would not reimburse us for that
2    diagnosis code.
3    Q    Was there any other diagnosis codes that were
4    at issue?
5    A    That's the only one that I can recall.
6         MS. DAVIS:  Let's take a short break.
7         THE VIDEOGRAPHER:  Going off the record at
8    11:43 a.m.
9
10        (Recess taken:  11:43-11:53 a.m.)
11
12        THE VIDEOGRAPHER:  Back on the record at
13   11:53 a.m.
14   BY MS. DAVIS:
15   Q    Okay.  I want to go back over a couple of
16   issues just to make sure I've got the record correct.
17   On the issue we talked about earlier where you said
18   that the decision to move from charging, billing for 18
19   to billing for 26, that you had some sort of compliance
20   issue concern about that, remember that testimony?
21        Are you aware of any documents that reflect
22   that this was an issue at the time?
23   A    The only documents I'm aware of is what was
24   presented here.
25   Q    So you're not aware of any documents, any sort

101

1  of advice of counsel or any sort of compliance
2  committee meetings minutes?
3      A    I reviewed all documents for this case in a
   binder that was provided by counsel and that was not
   included.
6            MS. DAVIS:  Robert, if there are any such
7            documents, we haven't seen them, could you
8            take a look again and produce whatever you
9            might have that you haven't produced already?
10           MR. SALCIDO:  Will do.
11           MS. DAVIS:  And I've looked at the
12           privilege log again, and there's nothing on
13           the privilege log.  So, if there's something
14           on the privilege log that's relevant, if you
15           could point that out to us also.  All right?
16           MR. SALCIDO:  Okay.
17  BY MS. DAVIS:
18      Q    Is Dianon still doing 26 antibodies today?
19      A    Yes, they are.
20      Q    How many are you billing for?
21      A    How many are we billing for, I believe 26.
22      Q    Billing for 26?
23      A    Yes.
24      Q    Did there come a time in I believe it was
25  2001 -- 2004 that Dianon continued to perform 26 but

102

1  only billed for 22?
2      A    I believe there was some coding changes, but
3  I'm not aware of the specifics.
4      Q    But do you know whether in fact they, Dianon
5  performed 26 but only billed 22?
6      A    I'm not aware that the billing of 22 is
7  happening today.
8      Q    What about in 2004?
9      A    I haven't confirmed that.
10     Q    You don't know?
11     A    I don't know.
12     Q    Do you know of any other tests that Dianon
13  performs where they do more units of the test than they
14  bill for?
15           MR. SALCIDO:  Are you looking for a time
16           period on that, Pat?
17           MS. DAVIS:  At any time.
18     A    At any time, I believe there was an issue a
19  few years back with jars where we had, let's say a
20  prostate biopsy had 12 jars but we were only billing
21  for six jars.  I don't know if that's the actual
22  number, but I know there was a jar issue as my memory
23  recalls.
24  BY MS. DAVIS:
25     Q    How was that issue resolved?

103

1      A    That we billed according to what we performed.
2      Q    You billed 12 as opposed to six?
3      A    Right.
4      Q    What was the basis for that decision?
5      A    Again, that we should bill for what we
6  performed.
7      Q    Was there a compliance issue raised in that
8  discussion?
9      A    I believe so.
10     Q    When was that decision made?
11     A    I mean, I'm just trying to pick my brain right
12  now.  I want to say late '90s time frame.
13     Q    Would there be any documentation associated
14  with that?
15     A    There might be.  I have not seen it.
16     Q    Now, the -- let's go back to the decision on
17  the Oklahoma City lab.  You said that Mr. Homan did an
18  outline; is that right?
19     A    I'm sure there was some type of analysis
20  performed.
21     Q    I'm sorry, but you said --
22     A    Outline, what do you mean?
23     Q    Let me finish the question.  As I recall what
24  you said earlier, you said that Mr. Homan prepared an
25  outline and you were gaming how you were going to go

104

1  and talk to the carrier in Oklahoma and that he had
2  prepared an outline of issues to discuss; is that
3  right?
4      A    That's correct.
5      Q    You saw the outline?
6      A    I did not see the outline, no.
7      Q    So how do you know he had an outline?
8      A    He was, during the meeting as the marketing
9  leader preparing a case in a sense of what we were
10  going to discuss with the Medicare carrier.
11     Q    Any -- did he prepare an outline at the
12  meeting?
13     A    I know he was taking notes, but I did not see
14  anything.
15     Q    So he was writing down as you were discussing
16  what positions you were going to take with the carrier
17  in Oklahoma?
18     A    That is correct.
19     Q    Did you ask Mr. Homan whether he still had
20  those notes?
21     A    I did not ask him, no.
22     Q    Did you review anything that might have been
23  his notes?
24     A    I reviewed all subject matter and those notes
25  were not included.

105

1    Q    I asked you a couple times earlier about who

2    made the decision to basically give up on the Oklahoma

3    City lab, and you gave me a series of reasons, things

4    that were happening, but somebody must have said, let's

5    just give up on Oklahoma City, let's not work on it

6    anymore.  Who was that person?

7    A    I mean that person would probably be the

8    president of the company, you know, he probably would

9    say, you know --

10   Q    Do you know?

11   A    I don't know for sure.

12   Q    Did you ask anybody?

13   A    No, I did not ask anybody.

14   Q    Do you know when, approximately, that that

15   decision was made?

16   A    I want to say the summer of 2002, some time

17   around there.  I don't know the actual month or

18   anything.

19   Q    Did you ask anybody?

20   A    No, I did not ask anybody.

21   Q    We talked earlier about people who were at

22   meetings.  Was Mr. Kossl at any of the meetings on the

23   issue about, let me see, the issue about, the issue --

24   let me just tie it to the deposition notice.

         Was Mr. Kossl at any of the meetings that you

106

1    discussed the decision that's outlined in section C of

2    the deposition notice?

3    A    I do not believe so.

4    Q    Was he involved in any of the discussions?

5    A    I do not believe so.

6    Q    Did he provide any advice on the issue?

7    A    I don't recall.

8    Q    What about section E, was he involved in any

9    of the meetings?

10   A    I don't believe so.

11   Q    Was he involved in any of the discussions?

12   A    I believe Tom was a contractor at the time,

13   and where we would have gotten legal advice, it would

14   have been through Tom, but I was not privy to any of

15   those discussions.

16   Q    So he wasn't corporate counsel?  He was a

17   contractor?

18   A    Right.

19   Q    Did he provide any advice on this?

20   A    I'm not aware of the advice.

21   Q    Did you ask anybody?

22   A    No, I did not.

23   Q    Did you review any documents that indicates he

24   did?

25   A    They were not included in any of the documents

107

1    I reviewed.

2        MS. DAVIS:  Once again, to the extent

3        there are any documents, if you could point us

4        to where they are in the privilege log or if

5        you could find them, that would be great or

6        tell us if they don't exist.

7        MR. SALCIDO:  Okay.

8    BY MS. DAVIS:

9    Q    Let's see, let me go through some of the

10   people whose names we've mentioned, and if you could

11   just tell me whether they're with the company or not.

12   A    Sure.

13   Q    Dave Scheiber?

14   A    No.

15   Q    Do you know where he is?

16   A    No, I do not.

17   Q    Marty Stefanelli?

18   A    No.

19   Q    He's not with the company?

20   A    No.

21   Q    Do you know where he is?

22   A    No, I do not.

23   Q    Jack Snyder?

24   A    No.

25   Q    He's not with the company?

108

1    A    No.

2    Q    Do you know where he is?

3    A    No.

4    Q    Kevin Johnson?

5    A    No.

6    Q    He's not with the company anymore?

7    A    He is not.

8    Q    Do you know where he is?

9    A    No, I do not.

10   Q    What about Grant Carlson?

11   A    No.

12   Q    Not with the company?

13   A    No.

14   Q    Do you know where he is?

15   A    No.

16   Q    Steve Gersen?

17   A    No.

18   Q    Not with the company?

19   A    No.

20   Q    And you don't know where he is?

21   A    I do not.

22   Q    Todd Homan?

23   A    Actually, no, let me go back to Steve.  Steve

24   is with a competitor.

25   Q    Do you know which one?

113

1   Q   -- to that?

2   A   No.

    Q   You're doing the same thing you did with Pat.

    A   I'm sorry.  No, they were not.

    Q   Thank you.

6       Now, with respect to the identity and content

7   of documents related to Dianon's decision and not to

8   open a hemopathology laboratory, were there any

9   documents within all the documents that you reviewed

10  that addressed that topic matter?

11  A   Just the summaries from John Hazard which

12  stated that the lab was put on hold.

13  Q   Were there any other documents that you

14  reviewed related to that?

15  A   No, there were not.

16  Q   And is your answer consistent with E as it was

17  with C and D that to the extent to which individuals

18  within Dianon's Systems had information related to that

19  item that you lacked that you reached out to such

20  individuals?

21  A   That is correct.

22      MR. SALCIDO:  That's all I have.

23      MS. DAVIS:  Maybe just one follow-up

24      question.

114

1              REDIRECT EXAMINATION

2

3   BY MS. DAVIS:

4   Q   Just to make sure I'm clear.  The people you

5   consulted were only those who are still at Dianon?

6   A   Yes.

7   Q   You made no attempt to contact anyone who is

8   no longer a Dianon employee?

9   A   No, I did not.

10      MS. DAVIS:  I have nothing further.

11  BY MS. DAVIS:

12  Q   And for item C, did you consult anyone other

13  than Bob McNamee?

14  A   No, just Bob McNamee.

15      MS. DAVIS:  Thank you.  Nothing further.

16      THE VIDEOGRAPHER:  Going off the record at

17      12:22 p.m.

18

19      (Deposition concluded:  12:22 p.m.)

22

23

24

25

115

1                    INDEX

2

WITNESS                                          PAGE

Valerie Palmieri

    Direct Examination by Ms. Davis           5
    Cross Examination by Mr. Salcido          111
    ReDirect Examination by Ms. Davis         114


              GOVERNMENTS' EXHIBITS
              (For Identification)

EXHIBIT                                          PAGE

1   Notice of Deposition                         6

2   Test code creation form                      20

3   Documents Bates Stamped 500175-500177        22

4   Test code creation form documents Bates      25
    Stamped 600000-600006 and 600102-600106

5   One page document Bates stamped 900208       37

6   Document titled Question D-Exhibit A          50
    Numbered VP-1 through VP-14

7   One page entitled Standard Costs by          68
    Product Line

8   Two pages of Handwritten notes               87

9   Memorandum dated May 10, 2002                88

10  Memorandum dated June 20, 2002               91

11  One page handwritten document                94

116

1              STATE OF CONNECTICUT

2       I, ELZBIETA A. SIROIS, RPR, LSR #350, a Notary

3   Public, duly commissioned and licensed in and for the

4   State of Connecticut, do hereby certify that pursuant

5   to Notice there came before me on the 22nd day of

6   February, 2006, the following named person, to wit:

7   VALERIE PALMIERI, who was by me duly sworn to testify

8   to the truth and nothing but the truth; that she was

9   thereupon carefully examined upon her oath and her

10  examination reduced to writing under my supervision;

11  that this deposition is a true record of the testimony

12  given by the witness.

13      I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of the

15  parties to the action in which this deposition is

16  taken, and further, that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties hereto, or financially interested in this

19  action.

        IN WITNESS THEREOF, I have hereunto set my hand

20  this _____ day of _____, 2006.

21

22        Elzbieta A. Sirois, RPR, LSR #350
                Notary Public

23

My Commission Expires:

24  October 31, 2007

25

Exhibit 4

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------x
UNITED STATES OF AMERICA       :
ex rel. JAMES J. TIESINGA,     :
                               :
           Plaintiff,          :
                               :
    v.                         : No. 3:02CV1573(MRK)
                               :
                               :
DIANON SYSTEMS, INC.,          :
                               :
           Defendant.          :
-----------------------------x

Washington, D.C.

Tuesday, March 28, 2006

Deposition of

JAMES AMBERSON

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 10:46 a.m.,

at the offices of the United States Department of

Justice, 601 D Street, NW., Washington, D.C.,

before Denise Dobner Vickery of Beta Court

Reporting, notary public in and for the District

of Columbia, when were present on behalf of the

respective parties:

78

1  that back to you. But at any rate, which
2  list, you know, that fee file tells how many
3  markers were in fact being billed at the
4  time. Again -- well, it was in the material
5  that I was supposed to prepare for this.
6      Q   I'm sorry. Of the --
7      A   Yes.
8      Q   One of the attachments to the --
9      A   Yes.
10     Q   -- deposition notice?
11     A   The screens with the fee file.
12 Yeah, around this time we were billing like
13 eight or nine markers.
14         MS. DAVIS: Okay. That's been
15 marked as Exhibit 10.
16         (Deposition Exhibit No. 10 was
17         marked for identification.)
18     BY MS. DAVIS:
19     Q   Can you tell me what that is?
20     A   It's a flow cytometry report.
21     Q   Okay. And if you look on the
22 second page of the document, it's got two

79

1  signatures?
2      A   Yes.
3      Q   One of them is Dr. DeSilva's?
4      A   That's correct.
5      Q   And he was the person performing
6  the hematopathology repeat?
7      A   That's right.
8      Q   And then your signature is next to
9  it?
10     A   Yes.
11     Q   And why are you signing on this?
12     A   I believe there had been some
13 complications with Dr. DeSilva getting a
14 Connecticut license. He came from Kansas and
15 until he could get a Connecticut license, I
16 was countersigning his reports.
17     Q   Okay. And on the front of the
18 report, the antibodies that are listed there,
19 are those the ones that are reported, are
20 those the ones that were actually done?
21     A   Those are the antibodies --
22     Q   That were actually performed?

80

1      A   -- that were performed, yes.
2      Q   Okay. And -- okay. So, in
3  November of '94, DIANON was doing this panel
4  of antibodies that's listed on this report?
5      A   I don't know whether what we were
6  doing on a regular basis. All I can say is
7  this is what was being -- that was done on
8  this particular report.
9      Q   Oh, I see. Okay.
10     A   I don't know what we did on a
11 routine basis.
12     Q   Okay. So you don't know whether
13 this -- this particular report is
14 representative of what you did?
15     A   No.
16     Q   Okay. Who would choose -- at that
17 point in time, who would choose the
18 antibodies that were performed?
19     A   At this time, Dr. DeSilva would,
20 but I believe at this time I think that we
21 had Dr. Connor, had already interviewed her
22 and while she couldn't join us in the spring,

81

1  my recollection is that she had felt that the
2  panels that when she first saw them that we
3  were using were totally inadequate and that
4  we needed to add more antibodies, and I think
5  she had worked with Dr. DeSilva to do that.
6      Q   Okay. Before she came onboard?
7      A   Yeah.
8      Q   Okay. And what time period was
9  that?
10     A   I believe '94-'95.
11     Q   Okay. So let me make sure I
12 understand. Do you think this particular
13 report that we just looked at has the
14 antibodies that Dr. Connor thought were
15 essential?
16     A   You know, I don't know
17 specifically.
18     Q   Okay.
19     A   I do know that she was involved,
20 you know, talking to us about the panel and
21 upgrading it.
22     Q   Okay. And when did she come

21 (Pages 78 to 81)

198

1   Flynn?
2       A   He's -- he's the author of the
3   government's expert? Yes, I met him once a
4   long time ago.
5       Q   Okay.
6       A   I haven't talked to him since.
7       Q   Okay. Let me see. Go back. Do
8   you own stock in DIANON?
9       A   There is no DIANON stock now.
10      Q   I'm sorry. Did you own stock in
11  DIANON before the buy-out?
12      A   Yes, I had options and stock.
13      Q   Okay. Do you own stock in LabCorp?
14      A   Yeah, I have -- I don't own any
15  stock. I have some stock options, which are
16  -- which haven't been exercised and they're
17  not all vested.
18      Q   Okay. Let me make sure I
19  understand that. When LabCorp acquired
20  DIANON, they acquired the stock?
21      A   Yes.
22      Q   And so they acquired your stock

199

1   options?
2       A   Yes.
3       Q   Okay.
4       A   And then they were essentially
5   cashed out.
6       Q   Okay. I take it over the time
7   period that we've been talking about, roughly
8   '96 through until DIANON was purchased by
9   LabCorp, I take it did DIANON have an
10  internal computer system e-mail system?
11      A   Yes.
12      Q   And were there exchanges of e-mails
13  among the various employees?
14      A   Yes.
15      Q   When -- when you were -- let me ask
16  you the question a different way. In
17  responding to our document production
18  request, were you asked to produce any
19  e-mails?
20      A   I believe so. I don't -- I didn't
21  have any e-mails, but I believe I was asked
22  to produce any records I had, computer or

200

1   otherwise.
2       Q   Okay. Do you know if anybody -- if
3   any of the other employees produced e-mails?
4       A   I don't know.
5       Q   Okay. Do you have the same e-mail
6   system that you've had over this entire time
7   period or has that changed?
8       A   That's changed.
9       Q   What was the system originally?
10      A   Originally I think it was based on
11  Microsoft Outlook and now it's a Novell
12  GroupWise, which is what LabCorp uses.
13      Q   Okay. Novell?
14      A   Novell. Excuse me.
15      Q   I'm just going to go back and I'm
16  asking random questions that I forget --
17  missed the first time around. So this is
18  going to hop around a little bit, okay?
19      A   Okay.
20      Q   When you talked to Drs. Toor and
21  Delli Carpini -- I'll start with Dr. Toor
22  first, did you put together any sort of

201

1   PowerPoint presentations for him?
2       A   Not that I remember.
3       Q   Okay. These were just discussions
4   with him?
5       A   Discussions and then I sent him
6   those letters.
7       Q   Okay. So, any communications you
8   had with him that were in writing were the
9   letters?
10      A   Yes.
11      Q   Okay. Did DIANON ever consider
12  doing your hematopathology process in a
13  different way, looking at the morphology
14  results slide first and then deciding what --
15  what biomarkers to choose for flow cytometry?
16      A   I don't recall. I think the
17  hematopathologists, principally Dr. Connor
18  and Dr. Goyette, set up the approach that we
19  would follow in terms of working up the
20  specimens.
21      Q   Okay. So --
22      A   I do believe they looked at samples

51 (Pages 198 to 201)

202

1   just to make sure there was, you know,
2   adequate numbers of cells and things like
3   that.
4       Q   But as I understand it, the flow
5   cytometry was done before the pathologist
6   ever looked at the slide; is that right?
7       A   I -- the question would be probably
8   better put to the hematopathologist.
9       MS. DAVIS: Okay. Let's go off the
10  record for a minute.
11      THE VIDEOGRAPHER: Off the record
12  at 3:39 p.m. tape 3.
13      (Recess)
14      THE VIDEOGRAPHER: Back on the
15  record at 3:40 p.m. tape 3.
16      BY MS. DAVIS:
17      MS. DAVIS: Take a look at what's
18  been marked as Exhibit 40.
19      (Deposition Exhibit No. 40 was
20      marked for identification.)
21      BY MS. DAVIS:
22      Q   We talked a little this morning

204

1   opposed to the 30(b)6 deposition that we
2   talked about this morning, what did you do to
3   prepare specifically for this deposition?
4       A   I went over some documents with
5   counsel.
6       Q   And that's all?
7       A   Yes.
8       Q   You didn't talk to anybody?
9       A   For -- no. I talked to people
10  about the documents that were -- that you --
11  that were provided that I should be prepared
12  to talk about but none others.
13      Q   Okay. Those are the 30(b)6
14  documents?
15      A   Okay.
16      Q   Okay. How many times did you meet
17  with counsel to prepare for this deposition?
18      A   I met with Mr. Parker on one
19  afternoon and a portion of one morning.
20      Q   Okay. Did you meet with any other
21  counsel?
22      A   When I talked to people at DIANON

203

1   about -- this 30(b)6 deposition about the
2   different kind of pricing. The patient bill,
3   client bill, account bill and special
4   pricing. But I don't think I asked you about
5   what threshold pricing was. Do you know what
6   threshold pricing is?
7       A   No.
8       Q   You never heard that before?
9       A   I don't remember that particular
10  term.
11      MS. DAVIS: Okay. Let's go off the
12  record for one last time, and I'll just make
13  sure I covered everything.
14      THE VIDEOGRAPHER: Off the record
15  3:43 p.m. tape 3.
16      (Recess)
17      THE VIDEOGRAPHER: Back on the
18  record at 3:43 p.m. tape 3.
19      MS. DAVIS: Okay. You'll be happy
20  to know I'm running out of questions for you.
21      BY MS. DAVIS:
22      Q   Just a couple questions. As

205

1   about the documents, Tom Cassel was with me
2   when I talked to some people, but not
3   everybody.
4       Q   Okay. Mr. Parker and Mr. Salcido
5   weren't there?
6       A   I'm sorry? No.
7       MS. DAVIS: I think I have no more
8   questions.
9       MR. PARKER: Okay. I have no
10  questions. We'll you get to read and sign
11  another one.
12      THE WITNESS: I look forward to it.
13      THE VIDEOGRAPHER: This concludes
14  the deposition of James Amberson in the case
15  of USA v. DIANON Systems on March 28, 2006,
16  Off the record at 3:36 p.m.
17      (Whereupon, at 3:36 p.m., the
18      deposition of JAMES AMBERSON was
19      adjourned.)
20      * * * * *
21
22

52.(Pages 202 to 205)

Exhibit 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA,      )<br>     )<br>     )<br>Plaintiffs,      )<br>     )<br>v.      )<br>     )<br>DIANON SYSTEMS, INC.,      )<br>     )<br>     )<br>Defendant.      ) | No. 3:02 CV 1573(MRK)<br><br>January 20, 2006 |

TO:    DIANON SYSTEMS, INC.

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiff United States of America will take the deposition upon oral examination of Dianon. The deposition will begin at 9:00 a.m. on February 7, 2006, at the Office of the United States Attorney for the District of Connecticut, 157 Church Street, New Haven, Connecticut or at another location to be designated later. The matters on which examination is requested are identified on the attached Exhibit A. The oral examination will continue from day to day until completed, and it will be videotaped.

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

_____/s/_____

RICHARD MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0240
Attorneys for the United States

2

Exhibit A

DEFINITION

You or your means Dianon Systems, Inc., your past and present representatives, agents, parent corporation(s), subsidiaries, divisions, departments, affiliates, and all persons acting or purporting to act on your behalf.

MATTERS TO BE EXAMINED

A.    As to the attached documents, you should produce a witness able to testify as to the following:

1.    The identity of the author of and recipients of each document;

2.    The date each document was created;

3.    The substance of the document; and,

4.    The purpose for which the document was created.

B    Your decision in or about 1997 to reduce the number of antibodies to be billed for most flow cytometry services to approximately 18, including
        1. the reason for your re-examination of the number of antibodies to bill for flow cytometry services,
        2. how you chose the individual antibodies to bill for,
        3. any discussions of, or consideration of, the medical necessity of any of the individual antibodies,
        4. the identity and role of all persons involved in the discussions/deliberations relating to the decision,
        5. the identity of the person(s) who made the decision to change the number of antibodies to be billed, and
        6. the identity and content of all documents relating to the decision.

C.    Your decision in or about 2000 to bill for 26 antibodies for most flow cytometry services, including
        1. the reason for your re-examination of the number of antibodies to bill for,

3

2.  how you chose the individual antibodies to bill for,

3.  any discussions of or consideration of the medical necessity of any of the individual antibodies,

4.  the identity and role of all persons involved in the discussions/deliberations relating to the decision to bill for 26 antibodies in most cases,

5.  the identity of the person(s) who made the decision to bill for 26 antibodies in most cases, and

6.  the identity and content of all documents relating to the decision.


D.    The material and labor costs, direct and indirect, of performing a flow cytometry test per unit billed, and any documents which evidence such costs, including,

1.  labor costs by job category per unit billed,

2.  the cost of antibodies used per unit billed,

3.  the cost of any reagents used per unit billed,

4.  equipment costs per unit billed, and

5.  any overhead/G&A costs per unit billed.


E.    Dianon's decision in not to open a hematopathology laboratory at Dianon's facility in Oklahoma City, including

1.  the reasons for the decision,

2.  the identity of all persons involved in making the decision and each person's role in the decision making process, and

3.  the identity and content of any documents relating to the decision.

4

## CERTIFICATION OF SERVICE

I hereby certify that on this 20th day of January 2006, a true and correct copy of the Notice of Deposition, was served by first-class mail on:

> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 183 Sherman Street
> Fairfield, CT 06430

> Mr. Robert Salcido
> Akin, Gump, Strauss, Hauer & Feld, LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, D.C. 20036

Patricia R. Davis
Trial Attorney
U.S. Department of Justice

5

Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------x
UNITED STATES OF AMERICA        :
ex rel. JAMES J. TIESINGA,      :
                                :
          Plaintiff,            :
                                :
     v.                         :  No. 3:02CV1573(MRK)
                                :
                                :
DIANON SYSTEMS, INC.,           :
                                :
          Defendant.            :
------------------------------x


                         Washington, D.C.

                    Tuesday, March 28, 2006

30(b)6 Deposition of

                    JAMES AMBERSON

a corporate designee, called for examination by

counsel for Plaintiff, pursuant to notice and

agreement of counsel, beginning at approximately

9:08 a.m., at the offices of the United States

Department of Justice, 601 D Street, NW.,

Washington, D.C., before Denise Dobner Vickery of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

Page 6

1    Q    Do you understand what a 30(b)6
2    deposition is?
3    A    I know one I am the corporate
4    representative. In the other I'm a fact
5    witness.
6    Q    Right. Okay. And we're doing the
7    corporate representative one first, okay?
8         Can you just give us a little
9    background information about yourself, your
10   schooling, prior work experience?
11   A    I'm a physician. I went to college
12   at Wesleyan University. I went to medical
13   school at Johns Hopkins University in
14   Baltimore. I was trained in pathology at
15   Cornell Medical College in New York City.
16   Following my training there, I joined the
17   faculty. I also completed a fellowship in
18   cytopathology and then joined DIANON Systems
19   in 1989.
20   Q    Okay. And when you first joined
21   DIANON, what was your -- what was your
22   position?

Page 7

1    A    I joined DIANON to set up a program
2    in urine cytology and image cytometry, and I
3    believe my title at the time was director
4    flow or director cytometry business unit.
5    Although, I'm not certain.
6    Q    Okay. And that was in 1989?
7    A    Yes.
8    Q    And how long were you in that
9    position?
10   A    I don't remember. My title changed
11   over the years, but I've been at DIANON
12   since.
13   Q    Okay. And what's your position
14   now?
15   A    Now I'm divisional medical director
16   for DIANON.
17   Q    And when you say divisional medical
18   director, what does that mean?
19   A    It means our medical laboratory in
20   Stratford, the physicians there report to me.
21   I'm also the laboratory director for that
22   laboratory, and it means that with regards to

Page 8

1    our laboratory in Long Island, the laboratory
2    director there also reports to me.
3    Q    And do any of the other lab
4    facilities report to you?
5    A    No, just those two.
6         MS. DAVIS: This has been marked as
7    Exhibit 1.
8         (Deposition Exhibit No. 1 was
9         marked for identification.)
10        BY MS. DAVIS:
11   Q    And this is the notice of
12   deposition for this 30(b)6 deposition. And
13   as I understand it, if you could turn to
14   Exhibit A, which is page 3. Two page 3s.
15   The second page 3. As I understand it,
16   you've been offered for section B. The
17   decision in or about 1997 to reduce the
18   number of antibodies billed for most of the
19   cytometry service to approximately 18; is
20   that right?
21   A    That's correct.
22   Q    And also for A, which is the

Page 9

1    identity of some documents that are attached?
2    A    That's correct.
3    Q    Okay. And you're not being offered
4    for any of the other sections?
5    A    No.
6    Q    Okay. Okay. Let me ask you some
7    questions. What did you do to gather
8    information so that you could be the company
9    representative in this deposition?
10   A    I was given some copies of
11   documents, which are -- I believe are in what
12   you just handed me. I reviewed those, went
13   over them with counsel, and also talked to a
14   number of people at DIANON to see if they
15   remembered what they were, who the authors
16   were, and why they were composed.
17   Q    Okay. And who was -- who did you
18   talk to at DIANON?
19   A    Let's see. I talked to, in
20   addition to counsel, Tom Cassel and Mr.
21   Parker, I spoke with Ms. Palmieri, a Robert
22   McNamee, Fred Ferrera, Debra Klembara, Pat

3 (Pages 6 to 9)

1   Torre, Maria Conte, Erlvin Young.
2      Q   I'm sorry. What was that?
3      A   Erlvin Young.
4      Q   Okay.
5      A   I think those were all the people I
6   talked to. I may have forgotten one or two
7   but...
8      Q   Okay. And all these people are
9   still at DIANON?
10     A   Yes.
11     Q   Did you talk to anybody who's not
12  with DIANON any more?
13     A   Not in preparing for these. Before
14  I received these documents, one person who's
15  not at DIANON called me about this.
16     Q   And who was that?
17     A   That was a Mr. William McDowell.
18     Q   Okay.
19     A   And he called me actually to ask me
20  if he should be worried about this and then
21  he also volunteered. He says, "You know, I
22  can remember virtually nothing about this 10

1   years ago."
2      Q   Okay. But you didn't call any --
3   any of the other former employees at DIANON?
4      A   No.
5      Q   In preparing for this deposition,
6   did you review any documents that aren't the
7   ones attached to the deposition notice?
8      A   Yes. Counsel and I went over some
9   other documents.
10     Q   Okay. Do you remember what those
11  were?
12     A   There's quite a few. I don't
13  remember them all. Just some reports and
14  standard operating procedures, various other
15  documents.
16     MS. DAVIS: Okay. I'm sorry. We
17  have to go off the record for a minute. I
18  was supposed to dial in Rick and I totally
19  forgot it.
20     MR. PARKER: Oh, sure.
21     THE VIDEOGRAPHER: Going off the
22  record at 9:15 a.m. tape 1.

1      (Discussion off the record)
2      THE VIDEOGRAPHER: Back on the
3   record at 9:16 a.m. tape 1.
4      BY MS. DAVIS:
5      Q   Okay. I'm sorry about that. Let's
6   get into the substance of section B of the
7   depo notice, which is the decision in '97 to
8   reduce the number of antibodies to 18 you
9   billed for. Just generally explain to me
10  what it is that your investigation uncovered
11  on that in that respect.
12     MR. PARKER: Objection.
13     BY MS. DAVIS:
14     Q   You can answer. Go ahead.
15     MR. PARKER: Go ahead.
16     THE WITNESS: Where would you like
17  me to start?
18     BY MS. DAVIS:
19     Q   Just -- just give -- tell me. I
20  mean, basically the decision in -- in or
21  about 1997 to reduce the number of antibodies
22  to be billed for most flow cytometry services

1   to approximately 18, including the reason for
2   the reexamination, how you chose the
3   individual antibodies to bill for. Just
4   generally explain what you found out.
5      MR. PARKER: Objection. You can
6   answer.
7      THE WITNESS: At that time, we were
8   performing 26 antibodies, which I believe we
9   had started to do that in March of that year.
10  And in the process of adding the additional
11  antibodies and setting up the fee schedules
12  to do that, it was discovered that the
13  company was already billing for 26
14  antibodies. And as I think you know, the
15  company discovered that it had been
16  overbilling for these 26 antibodies, which
17  believed had been going on since the prior
18  August.
19     At that -- when I learned about
20  this, I was to put it mildly very upset and
21  really because of that, I wanted to be
22  particularly cautious. So, I also knew that

Page 26

1  nor will the fees change. Only the
2  antibodies that we mention in the bills will
3  change."
4        So, is this the kind of document
5  that would be sent to the billing people to
6  implement the change in antibodies?
7     A  To change the fee schedule, yes,
8  and I think Bill at this time clearly still
9  assumed that they had been doing 26 and they
10  were just changing a couple of the
11  antibodies. Because at this time they did
12  change the antibodies that were listed in the
13  fee schedule.
14     Q  Okay. So this memo would prompt
15  the billing people to start listing the
16  antibodies that are listed there on the
17  billing?
18     A  Yeah, to take change them -- to
19  have an updated fee schedule.
20     Q  Okay. So this would essentially
21  implement change?
22     A  It would implement the billing

Page 27

1  change. It would -- has nothing to do with
2  what was actually going on in the laboratory.
3     Q  Right.
4     A  The laboratory -- this is simply
5  Bill communicate -- communicating his
6  understanding of what antibodies were going
7  to be billed under the new panel.
8     Q  Okay. Now, why would marketing
9  have a role in -- in telling billing what
10  would charge for the or what -- what
11  antibodies to list on the bill?
12     A  Our marketing people, sometimes
13  they were called product managers. They
14  really played a role of -- their job was to
15  understand, you know, what the offering was
16  and also to work with billing and setting
17  things such as pricing.
18     Q  Okay. So would the product manager
19  essentially be the person at DIANON who
20  interacted with both the medical people and
21  the billing people?
22     A  Yes.

Page 28

1     Q  And the --
2     A  Yes.
3     Q  -- salespeople?
4     A  Yes.
5     Q  Okay. Sort of a central location
6  for whatever the product was?
7     A  Yes.
8     Q  And the product in this case would
9  be hematopathology?
10     A  Yes.
11     Q  Okay. So would -- I guess the
12  question is, was Bill McDowell the product
13  manager at this point for --
14     A  No, I think the original product
15  manager --
16     Q  I'm sorry. Let me. Let me. You
17  have to let me finish the question because
18  otherwise it's not going to make sense when
19  it's on the transcript, okay? So let me ask
20  the question again.
21        At this point in time, was Bill
22  McDowell the product manager for

Page 29

1  hematopathology?
2     A  No.
3     Q  Who was?
4     A  I believe at this time, I'm not
5  sure there was one. We did have a person and
6  I know he was there in '96, but I'm not -- I
7  think he left at some point in '96, Mark
8  Florio, and I believe he was asked to leave
9  and so I think this task fell on Bill.
10     Q  Okay. Why? Why was he asked to
11  leave?
12     A  I think there was some performance
13  issues.
14     Q  Okay. And then so Bill McDowell
15  basically took over his job when he left?
16     A  Yeah, until they could get a
17  replacement.
18     Q  And who replaced him?
19     A  I believe it was Kim Hade
20  eventually, but I'm not certain.
21     Q  Okay. I show you what's been
22  marked as -- actually, let me make sure

8 (Pages 26 to 29)

1   that's not. Sorry about that. That's my
2   copy. It's got all the highlighting on it.
3       A   Oh.
4           MR. PARKER: Secret codes.
5           MS. DAVIS: Can't give you that
6   one. Give you hints.
7           THE WITNESS: Wouldn't want to give
8   me an advantage.
9           MS. DAVIS: There you go. That's
10  been marked as Exhibit 4.
11          (Deposition Exhibit No. 4 was
12          marked for identification.)
13          BY MS. DAVIS:
14      Q   Okay. This has been marked as
15  Exhibit Number 4, and it's a memorandum on
16  May 21, 1997 from Dr. Goyette to you and its
17  "Subject Flow Cytometry Antibodies"; is that
18  right?
19      A   Yes.
20      Q   It also says, "Attached is the
21  justification for the number and variety of
22  antibodies we use in our flow cytometry

1   panel. While there is no national consensus
2   on the number of antibodies to use, our
3   practice is not uncommon."   And then it has
4   an explanation.
5           What was -- Dr. Goyette basically
6   when he testified a couple days ago said that
7   he prepared this at your request. Why did
8   you ask him to prepare this?
9       A   Again, I think this was in the
10  context of our increasing to this 26 antibody
11  panel, which Dr. Goyette and the other
12  hematopathologists really felt was essential.
13  In particular, one of our newer
14  hematopathologists, Dr. Glenn Segal, who I
15  believe had joined us the previous fall, had
16  extensive experience in flow cytometry and
17  felt that there were -- I don't remember the
18  number -- another four or so antibodies that,
19  again, as I mentioned before, I think they
20  might have had something to do with hairy
21  cell leukemia, but anyway he really felt we
22  needed to add these antibodies or we would

1   miss conditions.
2           So, you know, they put forth this
3   26 antibody panel and I simply asked Dr.
4   Goyette, you know, I'd like to have something
5   in writing that if I'm ever asked why are we
6   using 26 antibodies that I can refer to
7   because I'm not an expert on this, and so he
8   graciously put this -- put this together for
9   me.
10      Q   Okay. Did you -- I mean, this was
11  just something you wanted to have in your
12  file?
13      A   Yeah, I wanted to have a record of
14  it. Again, this is in context of that
15  overbilling problem.
16          MS. DAVIS: Okay. This has been
17  marked as Exhibit 5.
18          (Deposition Exhibit No. 5 was
19          marked for identification.)
20          BY MS. DAVIS:
21      Q   This is that same memo but with
22  some handwriting on it. At the top it says,

1   "Bill, as you requested, Jay"?
2       A   Uh-huh.
3       Q   Is that your handwriting?
4       A   Yes.
5       Q   And that Jay is you?
6       A   Yes.
7       Q   And who is Bill?
8       A   McDowell.
9       Q   That suggests that Mr. McDowell
10  asked for the -- the justification?
11      A   Yes.
12      Q   And why did he ask for that?
13      A   I don't remember.
14      Q   No idea?
15      A   No.
16      Q   Did you -- down at the bottom there
17  are three bullet points or three numbered.
18  One of which of them is "Jay discuss" and
19  then the last one says "More detail on second
20  paragraph."   Did you discuss this with --
21  with Mr. McDowell?
22      A   I don't recall it. We may have. I

Page 38

which would be essential in any complete flow cytometry panel.

Q Okay. And then it says, "We believe that their routine uses can be justified to insurance carriers"?

A Yes.

Q Do you know why he said that?

A I mean, I don't know why he said that. I had said I want antibodies that if people to look at them, these antibodies, everybody would agree, yeah, you've got to have these antibodies in there.

Q Okay. Were insurance companies raising issues about whether the individual antibodies were necessary?

A No. No.

Q Nobody was raising that issue?

A No.

Q Okay. Take a look at the top of the document. It says, "Bill, as per your request, hopefully you already have a copy of this information" and then "Jay." Is that

Page 39

you?

A Yes.

Q That's your handwriting?

A Yes.

Q And is -- is the Bill, Bill McDowell again?

A Yes.

Q And Bill requested the information, Mr. McDowell?

A I assume so. I don't remember writing that, but it would appear to be the case.

Q Okay. So you don't remember whether he asked for it or not?

A No.

Q Okay. Up at the top you see some fax numbers up there and one of them says 10/1997, Christopher F. Metz.

A Yes.

Q Who is Mr. Metz?

A He was -- at the time I think he was in sales.

Page 40

Q Okay. Do you know what position he held in sales?

A Well, he had a lot of different positions. He was involved in sales with managed care, and then he was also just a straightforward sales rep. I'm not sure what he was at the time.

Q Okay. But he dealt with managed care organizations?

A In the latter part of his career at DIANON. I'm not certain he was even doing that at that point. I just don't remember.

Q Okay. And what about Cathleen Pavlowski?

A I have no idea who that is.

Q Okay. And then down at the bottom there's a notation that says "Move to 18." Do you know who -- who wrote that?

A No. I would guess it was Mr. McDowell, but I don't know.

Q Okay. So Mr. McDowell made the decision to -- to bill for 18?

Page 41

A No. I made the decision.

Q You made that decision?

A (Nodding)

MS. DAVIS: Okay. This has been marked as Exhibit 7.

(Deposition Exhibit No. 7 was marked for identification.)

BY MS. DAVIS:

Q Can you tell me what that is?

A Yes. This is a form for either changing fees or CPT codes or test profiles that was in existence at the time.

Q Okay.

A And this is the form where they went -- we changed from billing for 26 antibodies to 18.

Q Okay. And in the very center it says "Current patient fees/CPT codes." Then it says 26 -- I don't know what that says.

A Typings I believe.

Q Typings times $45?

A Yes.

Page 54

1    documents that are attached to the deposition
2    notice which are -- and let's just go through
3    each of them, and I'll refer to the Bates
4    numbers that are down in the corner so you
5    can keep track of what we're talking about.
6    That's these numbers down here.
7        A    Yes.
8        Q    Okay.  The first number -- the
9    first page that I want you to take a look at
10   is 500234.  Okay.  What did you do to
11   discover what this -- the origin of this
12   document?
13       A    I showed it to the people that I
14   mentioned to see if any of them knew what it
15   was.  Nobody did.  I inferred from the fact
16   that Kim Hade's name on it that she prepared
17   it.
18       Q    Okay.  And that you're talking
19   about her name --
20       A    Yes.
21       Q    -- which is right here?
22       A    Yes.

Page 55

1        Q    Okay.  Did you talk to her about
2    it?
3        A    No.
4        Q    Is she still with the company?
5        A    No.
6        Q    Do you know where she is?
7        A    I have no idea.
8        Q    And so you don't know what this
9    document is?
10       A    It appears to be an estimate of
11   growth, you know, by percentage but for
12   various testing services.  Kind of a
13   back-of-the-envelope type of thing that she
14   did.
15       Q    But do you know whether that's what
16   it is or not?
17       A    All I can say is that it just says
18   growth and, you know, the last column is
19   increase of 7 -- in the first row is an
20   increase of 17 percent over the second
21   column, but beyond that I can't tell you what
22   it is.

Page 56

1        Q    Okay.  I mean, you can tell that
2    just by doing the math?
3        A    Exactly.
4        Q    Okay.  The next page 500189.
5        A    Yes.
6        Q    What did you do to figure out what
7    the origin of this document was?
8        A    I recognized the handwriting, which
9    I thought was Kevin Johnson's, the president
10   of the company, and I believe Ms. Palmieri
11   also thought it was his handwriting.  Other
12   people didn't recognize it.
13       Q    Okay.  And did you talk to Mr.
14   Johnson about this document?
15       A    No.
16       Q    Okay.  He's not still with the
17   company?
18       A    No.
19       Q    Do you know where he is?
20       A    I don't know where he is.  I'm not
21   sure what he's doing now.
22       Q    Okay.  He got moved out when

Page 57

1    LabCorp bought DIANON?
2        A    Yeah.  He retired.
3        Q    Okay.  So, do you have -- so, you
4    have no information about what this -- the
5    information on this document means or why it
6    was created?
7        A    No.
8        Q    Okay.  Next page 200058.  Okay.
9    We've sort of talked about this document, but
10   what I'm interested in is the handwriting on
11   the side.
12       A    Yes.
13       Q    Do you know whose handwriting that
14   is?
15       A    I believe that's Mr. McDowell's.
16       Q    Okay.  Did you talk to him about
17   this document?
18       A    No.
19       Q    You think this handwriting is his?
20       A    I think so.  I'm not certain.
21       Q    Okay.  Did you -- when he called,
22   you didn't ask him about it?

15 (Pages 54 to 57)

Page 58

1    A    No. He called me before I saw this
2  document.
3    Q    So, do you have his number?  Could
4  you have called him back?
5    A    I don't have -- I actually -- do I
6  have his number or not?  I may have his
7  number. I'm not certain.
8    Q    But you didn't call him back?
9    A    No, I didn't call him back.
10    Q    Okay. So you don't have any idea
11  what those numbers mean?
12    A    They look to me like he was just
13  modeling things, looking at pricing for flow
14  cytometry, the number of antibodies and the
15  price per antibodies and just, you know,
16  doing some calculations.
17    Q    Okay. That's a guess based on just
18  looking at the numbers?
19    A    Yes.
20    Q    Okay. Page 500191. What did you
21  do to find out what the origin of this
22  document was?

Page 59

1    A    Again, showed it to all the people
2  I mentioned.
3    Q    And -- and what was?
4    A    Nobody knew specifically what it
5  was.
6    Q    Okay. And, once again, did you
7  talk to anybody, any former employees at
8  DIANON?
9    A    No.
10    Q    Okay. And then page 500175 and
11  actually I believe the way this was produced
12  to us, the next two pages are also part of
13  the same document. So 500175 through 177.
14  What did you do to discover the origin of
15  this document?
16    A    Again, showed it to various people
17  at DIANON. Actually, also I think I showed
18  this one in particular to Joe Hurley, who's
19  in finance. He wasn't -- I don't think he
20  was there at the time this would have been
21  produced, and trying to decide whether this
22  was produced by finance or marketing. Best

Page 60

1  guess it might have been produced by finance.
2    Q    Okay. But you don't -- you didn't
3  find anybody --
4    A    I don't know that.
5    Q    -- find anybody who recognized it?
6    A    No.
7    Q    And you didn't call anybody who was
8  no longer with the company?
9    A    No.
10    Q    Who would have been in Mr. Hurley's
11  position when this -- the document was
12  created, which was in approximately I guess
13  late 1999 or early 2000?
14    A    Well, we have both a controller and
15  a CFO. The CFO was Dave Schreiber and the
16  controller was Chris Rausch.
17    Q    So it could have been one of those
18  folks?
19    A    Yes.
20    Q    I'm sorry. Chris?
21    A    Rausch.
22    Q    R-a-u-s-c-h?

Page 61

1    A    Yes, I believe so.
2    Q    All right. If you turn to the page
3  that's Bates numbered 600 -- I can't tell
4  whether that's another 0 or 6. 000.
5    A    Looks like all zeros on this one.
6    Q    Okay. What can you tell me about
7  the origin of this document?
8    A    This is a test code creation form
9  which was -- this is the version was current
10  in 2000. I believe is substantially the same
11  as the form that we use now, and from looking
12  at this, it looks like a form to go up to 26
13  antibodies.
14    Q    Okay. Let me ask. Take a look at
15  Exhibit 7.
16    A    Yes.
17    Q    Is this a replacement for Exhibit
18  7?
19    A    Yes, I believe so.
20    Q    Okay. Now, let's just go through
21  each of the people who's on there. If you
22  look at the -- up at the top, it says,

16 (Pages 58 to 61)

1   "Initiator's name, Kim Hade"?
2       A   Yes.
3       Q   That's -- we've already talked
4   about her, and then it says, "Description.
5   Need to bill for all 26 markers performed and
6   recorded."   Do you know why that's there?
7       A   I don't know specifically, no.
8       Q   Okay.  Did you ask Ms. Hade?
9       A   No.  I don't know where Ms. Hade
10  is.
11      Q   Okay.  And then under billing
12  information, it says cell service marker
13  88180, 26 events, fee per event is $75 and
14  the patient fee is 1950; is that right?
15      A   Yes.
16      Q   Okay.  That would be the fee
17  charged to the patient directly?
18      A   Yes.
19      Q   Or the patient's insurance company?
20      A   Yes.
21      Q   And then the client fee is 1300.
22  What did you say again the client fee was?

1       A   Client fee was when you would bill
2   the physician who submitted the specimen and
3   usually that would be -- most commonly that
4   was the pathology laboratory.
5       Q   Okay.  Then if you go down under
6   Approvals, it says Jack W. Snyder?
7       A   Yes.
8       Q   It says "Chief Medical Officer"?
9       A   Yes.
10      Q   What did Mr. Snyder do?
11      A   He was at that time the chief
12  medical officer and the director of the
13  laboratory.
14      Q   Okay.  And did you report to him?
15      A   Yes.
16      Q   Okay.  And then I guess that is
17  Valerie Palmieri underneath there, vice
18  president?
19      A   Yes.
20      Q   Okay.  We've already talked to her.
21  Is Mr. Snyder still with the company?
22      A   No.

1       Q   Do you know where he is?
2       A   No.
3       Q   And then corporate controller?
4       A   That's Chris Rausch whom I already
5   mentioned.
6       Q   Okay.  And under "Vice President
7   Marketing" would that -- I think that's Grant
8   Carlson?
9       A   Yes.
10      Q   Is he still with the company?
11      A   No.
12      Q   Do you know where he is?
13      A   Last I heard he's somewhere -- I
14  think he might be somewhere in Florida, but
15  I'm not sure.
16      Q   Okay.  And then over on the corner
17  there Department Approvals.  Do you recognize
18  any of those initials?
19      A   I do not recognize them.  Although
20  I asked people and got some help discovering
21  who's they were.
22      Q   Okay.

1       A   The top one, people were uncertain
2   who that is.  Fred Ferrera and our
3   information service thought it might be
4   William Tilton, who at the time worked in the
5   lab.  He doesn't any longer.  Under billing,
6   that's Bob Tucciarone.  Under information
7   systems, that's Maria Conte, and under
8   marketing, that's Kim Hade.
9       Q   Okay.  And we already talked about
10  Kim Hade.  She's not there any more and I'm
11  sorry, who did you say the info system was?
12      A   Maria Conte.
13      Q   Is she still there?
14      A   Yes.
15      Q   And Tucciarone?
16      A   He's still there.
17      Q   He's still there.  And the first
18  one on the list, I'm sorry, Bill?
19      A   Bill Tilton.
20      Q   Is he still there?
21      A   No.
22      Q   Let's turn to actually the next two

17 (Pages 62 to 65)

1 pages, which are 600003 and 4. I think they
2 were -- when they were produced to us, they
3 were produced together. This is essentially
4 the same sort of document as the previous
5 one, except for a different test?
6    A  Yes, it's a larger profile. That
7 also includes some molecular tests used to
8 characterize these kinds of cancers.
9    Q  Okay. And then next couple of
10 pages looks like 900000 through 03. Can you
11 tell what that is?
12    A  Yes. This is a print of the fee
13 file maintenance portion of our information
14 system, and it prints out fee files for a
15 specific test or profile going from the most
16 recent to the oldest.
17    Q  Okay. So, if -- if -- let me ask
18 following question. So this -- this is
19 what's in the computer system essentially for
20 billing purposes?
21    A  Yes, that's the -- that's the fee
22 file. Don't ask me how this all -- the

1 mechanics of this works.
2    Q  Right. Okay.
3    A  That's my understanding.
4    Q  Okay. So if somebody put in that
5 they performed the XL 3, all of this
6 information would be pulled up?  In other
7 words, if you wanted to know what individual
8 antibodies were in the XL 3?
9    A  Well, which individual antibodies
10 would be billed. It --
11    Q  Right.
12    A  -- doesn't correspond to what is
13 necessarily performed. For example, as we've
14 already discussed, in some instances in here,
15 there are only 18 antibodies listed; whereas,
16 26 were performed and earlier there might
17 have been 9 antibodies listed where an exact
18 21 were performed.
19    Q  Okay. And let's go to the next
20 couple of pages. I can't read those numbers
21 at all. It looks like 300004 and 05.
22    A  Yes.

1    Q  We've already talked about those.
2 Those are the --
3    A  That's going from 26 antibodies to
4 18.
5    Q  Right. Okay. And then 2000068?
6    A  Yes.
7    Q  69 and it goes through -- goes on
8 quite some time here.
9    A  Goes through 75.
10    Q  75; okay. What can you tell me
11 about the origin of this document?
12    A  This was I believe produced by Mark
13 Florio, who was the hematopathology product
14 manager at the time. It looks like it was
15 produced in the first week in January or so,
16 and it was to look at some hematopathology
17 fee changes and take a look at the impact of
18 that, and also he kind of alludes to this,
19 although it's not clear to me, that there
20 might have been a change in Medicare
21 reimbursement.
22    Q  Okay. Up at the top, it says, "Ask

1 Pat for Medicare reimbursement table 31
2 January 96." Do you know who wrote that?
3    A  Again, it looks to me like it might
4 be Bill McDowell's handwriting.
5    Q  Okay.
6    A  I think Mark reported to him at the
7 time.
8    Q  And did you -- did you discuss this
9 document with either Mr. McDowell or Mr.
10 Florio?
11    A  No. I don't know where Mr. Florio
12 is.
13    Q  Okay. So what -- why was this
14 document produced?
15    A  Every year really starting around
16 September, but continuing right up until the
17 turn of the year, one of the things that goes
18 on at our laboratory and I think virtually
19 every other laboratory is you start preparing
20 for your budget for next year. That involves
21 a number of things. First of all, doing a
22 sales forecast. It also involves looking at

18 (Pages 66 to 69)

Page 70

1  whatever reimbursement changes there might
2  be.
3          And usually in the fourth quarter,
4  Medicare releases figures for any changes in
5  reimbursement for various CPT codes and so we
6  naturally have to take that into account.
7          This looks like this one was done
8  rather at the very last minute. Typically
9  this kind of analysis would be done much
10 earlier in the fourth quarter, not already
11 into the new year. But it looks to me like
12 that's what this is.
13 Q   Okay. Do you -- do you know what
14 it is?
15 A   No. That's my best guess.
16 Q   Okay. So that's a guess based on
17 -- did you discuss this with anybody who's
18 still at the company?
19 A   I showed it to all the people I
20 mentioned. Nobody knew specifically what it
21 was.
22 Q   Okay. If you look over on the

Page 71

1  left-hand side next to 88180 it says "MOI."
2  Do you know what that means?
3  A   No.
4  Q   And under it says -- what looks to
5  me it says, "Rick believes legal times 2."
6  Do you know what that mean?
7  A   No.
8  Q   Do you know who wrote it?
9  A   I guess Mr. McDowell, but I'm not
10 certain.
11 Q   Okay. Looks like his handwriting?
12 A   Could be.
13 Q   Okay. And you --
14 A   I'm not certain about that.
15 Q   When did Mr. McDowell call you?
16 A   Oh, I believe he called me on -- I
17 could tell you in just a second because I
18 need to look at a calendar here. I think on
19 March 20th. I'm not certain.
20 Q   Okay. And you didn't discuss any
21 of these documents with him at the time?
22 A   No. I didn't have any of these

Page 72

1  documents at the time.
2  Q   All right. When were you
3  designated to be the 30(b)6 witness?
4  A   I don't know when I was formally
5  designated to be the witness.
6  Q   Okay. So can -- let's turn -- turn
7  to the next page, which is 200069. Up at the
8  top where it's talking about the XL 3
9  immunophenotyping. Do you know what those --
10 any of those numbers are?
11 A   Again, it looks he's modeling the
12 fee times the -- as he calls it -- the number
13 of billable events to calculate the price of
14 the profile.
15 Q   Okay. But do you know or are you
16 just guessing based on what you're looking
17 at?
18 A   That's my best interpretation of
19 this, but I don't know for certain.
20 Q   Okay. All right. Let's go to --
21 let's see. Let's just skip that one. This
22 is -- I'm trying to find a number on it. Oh,

Page 73

1  here we are. 600051.
2  A   Where's the number?
3  Q   It's over here. It's hard to see.
4  A   Okay. I see it.
5  Q   Can you tell me what that is? Says
6  up at the top "fee schedule"?
7  A   Yes. This looks like the fee
8  schedule when we were billing 18 and then
9  over on the right is what the new fee
10 schedule will be when they went up to 26.
11 Q   Okay.
12 A   In 2000.
13 Q   Okay. This is dated October 19,
14 2000?
15 A   Yeah. When --
16 Q   When it was printed out?
17 A   Yeah, was when it was printed out.
18 Q   Okay.
19 A   I believe they went -- I don't know
20 when they actually made the change, but this
21 is...
22 Q   Okay. And who did you talk to

19 (Pages 70 to 73)

| | Page 74 | | Page 76 |
|---|---|---|---|
| 1 | about this particular document? | 1 | might have, but I honestly don't know. |
| 2 | A   Again, everybody that I mentioned. | 2 | Q   Okay. And you didn't ask him that |
| 3 | Q   Okay. And did they -- did anybody | 3 | when you talked to him? |
| 4 | know who created it or when it was created or | 4 | A   No. |
| 5 | why it was created? | 5 | Q   And you said that at that time, |
| 6 | A   No. People did the same thing I | 6 | DIANON calculated how much they had been |
| 7 | did. They surmised it was probably Kim Hade. | 7 | overbilling Medicare? |
| 8 | Q   Okay. All right. And then the | 8 | A   Yes. |
| 9 | next two documents, just generically these | 9 | Q   Who did that calculation? |
| 10 | are the fee code changes again? | 10 | A   I don't know. |
| 11 | A   Yes. | 11 | Q   Okay. And you issued a refund to |
| 12 | Q   200042 and 43. And these are for | 12 | the carrier? |
| 13 | the change from 9 markers to 26 markers in | 13 | A   Yes. |
| 14 | 1996? | 14 | Q   Do you know how much that was? |
| 15 | A   Yes. | 15 | A   I think it was around $26,000. |
| 16 | Q   Okay. And who did you talk to | 16 | Q   Okay. And as I understood your |
| 17 | about these? | 17 | testimony earlier, you said that this, this |
| 18 | A   Again, everybody that I mentioned. | 18 | refund, this overbilling prompted you to |
| 19 | Q   Okay. Okay. Let's go off the | 19 | decide to move to 18 antibodies initially? |
| 20 | record for a little bit. Take a break while | 20 | A   The -- several things were going on |
| 21 | we're doing that. | 21 | at the time. We discovered the overbilling |
| 22 | A   Okay. | 22 | and we had increased in fact to 26 |

| | Page 75 | | Page 77 |
|---|---|---|---|
| 1 | THE VIDEOGRAPHER: Going off the | 1 | antibodies. I talked to Rich Goyette and as |
| 2 | record at 10:18 a.m. tape 1. | 2 | I said asked him, look, I want to be |
| 3 | (Recess) | 3 | extremely cautious here and so could you give |
| 4 | THE VIDEOGRAPHER: Back on the | 4 | me this list of antibodies do you think that |
| 5 | record at 10:29 a.m. tape 1. | 5 | everybody would agree should be in any panel. |
| 6 | BY MS. DAVIS: | 6 | He gave me those antibodies. Then I asked |
| 7 | Q   Okay. I'd like to go back to a | 7 | and convinced others that let's just bill for |
| 8 | couple of things we talked about earlier. | 8 | these 18. |
| 9 | You said that in '97 you discovered | 9 | Q   Okay. Who did you talk to about |
| 10 | that DIANON had been overbilling Medicare by | 10 | this decision? |
| 11 | four antibodies; is that right? | 11 | A   I don't remember precisely. I'm |
| 12 | A   Yes. | 12 | sure I talked to Mr. McDowell and I'm sure I |
| 13 | Q   And how did you discover that? | 13 | talked to Mr. Johnson, Kevin Johnson, but |
| 14 | A   I didn't discover it. I don't | 14 | beyond that, I don't know who I would have |
| 15 | remember precisely how it was discovered, but | 15 | talked to. |
| 16 | I believe it was discovered in the context of | 16 | Q   Okay. And let me make sure I |
| 17 | going up to 26 antibodies from 20 -- 22 that | 17 | understand. This was -- this was based |
| 18 | in that process it became apparent that they | 18 | solely on the fact that you had a $26,000 |
| 19 | were already billing for 26. | 19 | error and had to refund the money to |
| 20 | Q   Okay. And so who -- do you know | 20 | Medicare? |
| 21 | who discovered it? | 21 | A   Well, it was that and I didn't -- |
| 22 | A   I don't know. I think Mr. McDowell | 22 | if anybody were to question, were to look, I |

20 (Pages 74 to 77)

Page 78

1 wanted to be able every antibody would be
2 noncontroversial.
3    Q   Okay. Was anybody questioning it
4 at the time?
5    A   I don't remember anybody
6 questioning at the time, no.
7    Q   Okay. Was Medicare questioning the
8 number of antibodies?
9    A   Medicare? I don't remember
10 Medicare ever questioning the number of
11 antibodies. We certainly had issues with
12 Medicare about them denying flow cytometry
13 totally, saying it wasn't that they weren't
14 going to cover it, but the issue was never
15 the number of antibodies.
16    Q   Okay. And -- and what about other
17 insurance companies? Were other insurance
18 companies questioning the number of
19 antibodies?
20    A   Not that I'm aware of.
21    Q   All right. So I guess I'm -- I'm
22 sort of confused because, you know, you have

Page 79

1 $26,000 overbilling. You pay back Medicare,
2 and then you make a decision to give up going
3 forward 8 antibodies which at the time you
4 were charging $70 an antibody?
5    A   Yes.
6    Q   So for every time you tested, you
7 were going to do 26 and only charge for 18?
8    A   That's right.
9    Q   And so you were giving up eight
10 times 70. That's $560 if I did my math,
11 right?
12    A   Yeah, whatever it is.
13    Q   So for every test you were
14 essentially giving up $560 in revenue?
15    A   Yes.
16    Q   And -- and you made that decision?
17    A   Well, I was the one who instigated.
18 Others went along with it.
19    Q   Okay. And this was prompted simply
20 by the fact that there had been this -- this
21 overbilling?
22    A   Well, that was my motivation, yes.

Page 80

1    Q   Okay. And what did you to convince
2 the -- what arguments did you make to Mr.
3 McDowell and Mr. Johnson to give up $560 in
4 revenue in every test?
5    A   I don't -- you know, honestly I
6 don't remember the specific discussions or
7 what arguments I made, other than what I just
8 told you.
9    Q   Which is that you wanted to have a
10 panel that nobody could argue with?
11    A   Yes.
12    Q   Now, when you talked about the
13 refund, you said that you went back to August
14 of '96. And why did you only go back to
15 August of '96?
16    A   I wasn't involved in determining
17 what the refund was. So I don't know
18 actually who calculated it and how they went
19 back to August of '96.
20    Q   Okay. Who would normally determine
21 whether an overpayment -- I mean, an
22 overbilling had taken place?

Page 81

1    A   I don't know if there's one person
2 who would normally do it. I don't know who
3 normally did it back then. Now, if there was
4 any question of an overbilling, Tom Cassel
5 would get involved and would work with people
6 in the billing department. Back then, I'm
7 not sure who was doing it.
8    Q   So, would it be billing or finance
9 or is billing part of finance?
10    A   Billing is part of finance.
11    Q   Okay. So it would be somebody in
12 the finance department who would do it?
13    A   Well, not solely. They would work
14 with people in other departments and if Tom
15 Cassel was associated with the company at
16 that time, then he would have been involved.
17    Q   Okay. Do you know when Mr. Cassel
18 became associated with the company?
19    A   I honestly I don't recall. I
20 believe it was '96-'97. He wasn't full-time
21 employee of the company. He was essentially
22 a consultant or whatever the technical term

21 (Pages 78 to 81)