**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ex rel. DR. JAMES J. TIESINGA, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:02 CV 1573(MRK) |
| ) | |
| DIANON SYSTEMS, INC. ) | May 2, 2006 |
| ) | |
| ) | |
| Defendants. ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO QUASH**

The United States respectfully submits this Memorandum containing its responses to the arguments made in Defendant, Dianon Systems Inc.'s ("Dianon") Motion to Quash or Modify Subpoena for Third Party Records.

**BACKGROUND**

On February 28, 2006, the United States took the deposition of Dr. Richert Goyette ("Goyette"). Dr. Goyette was the director of the hematopathology at Dianon from July 1995-May 2000. As Dr. Goyette testified during his deposition, his position was not management or supervisory, but was a "working position" in which he would examine medical specimens received as consultations from physicians throughout the United States. ( See, Exhibit A, Excerpts from Deposition of Dr. Richert Goyette, February 28, 2006, Pages 15-17)

During the deposition, Dr. Goyette testified that, in 2004, he was contacted by Dianon's in-house attorney and, during a long telephone conversation, discussed the facts surrounding this case. Ex. A, pgs. 79-83. According to Dr. Goyette, based on that conversation, Dianon's attorney drafted an affidavit and then forwarded it to Dr. Goyette for his review. Id. Dr. Goyette

further testified that, once he received the draft from the Dianon attorney, he "extensively revised it" and, after revision, it "no longer look[ed] like [the original] document." Ex. A, pgs. 189-190. This affidavit was subsequently supplied to counsel for the United States.

Although Dr. Goyette testified that he was able to engage in long conversations about the facts of the case with Dianon lawyers and extensively rewrite the draft affidavit, he had a very difficult time during the deposition recalling the facts and circumstances behind the assertions made in the affidavit, often times referring to the affidavit and his testimony as "reconstructed memory." For example, the attorney representing the United States asked Dr. Goyette about a memorandum that he authored that stated that eighteen antibodies were essential for the "initial workup of specimen." Dr. Goyette's affidavit states that the reason he wrote this memorandum and why Dianon decided to bill for only 18, rather than 26, antibodies, was to avoid harassment by insurance companies. In his testimony, Dr. Goyette states that this part of the affidavit was based on "reconstructed memory":

> Q That last part that I read, it says, "This was simply an attempt to avoid what we perceived to be harassment by payors," what are you talking about there?
> A Well, I think part of this is – may be a little bit of reconstructed memory, but there must have been -- you know, I can only explain it from the context of this, and this memo. Id. at 160-161.

In fact at several points during his deposition, when asked about statements in his affidavit, Dr. Goyette referred to the statements in the affidavit as "reconstructed memory." As another example, the attorney for the United States focused on the verbatim wording of the affidavit and asked Dr. Goyette whether or not a dispute with an insurance carrier was responsible for the change in billing. Ex. A., pgs. 161-163. The following exchange took place:

2

> Q   Okay. Let me focus on some of the wording of this.
> A   Okay.
> Q   It says, again it's Page 7, it says that: "...while 26 antibodies should be performed and will continue to be performed that it was considering billing for fewer antibodies to avoid any possible dispute with the carrier." Was there some dispute with the carrier about the number of antibodies?
> A   No. I'm -- at reconstructed memory again, I focused, when I talked with Mr. Kossl[1], and not revealing client attorney privilege information, there was such a focus during the discussion about eight antibodies, 18 antibodies, 26 --
> COURT REPORTER: I'm sorry.
> THE WITNESS: Eight antibodies, 16 -- or 26 antibodies, nine antibodies, that in the course of preparing this I focused on the number of antibodies when, in fact, I hadn't counted the antibodies until last week when I actually counted them. Id. at 162-163

As one final example, Dr. Goyette was asked, once again, for the reason why the number of antibodies billed was changed to eighteen as specifically referenced in his affidavit. The following exchange took place:

> Q   Okay. Let me go back to your affidavit --
> A   Okay.
> Q   -- once again. It says that we were considering billing for fewer antibodies to avoid any possible dispute with the carrier. The question was: Was there a dispute with the carrier at this point in time about the number of antibodies?
> A   Sure. Not that I'm aware of.
> Q   Okay.
> A   Not that I'm aware of.
> Q   Then why did you put that in your affidavit?
> A   Because I was reconstructing memory. And it turns out I apparently do that on a fairly regular bases in my personal life. And because I take documents --
> COURT REPORTER: I take documents?
> THE WITNESS: I take documents -- I take documents and I lay them out and I interpret what must have occurred between

---

[1] Mr. Kossl is an attorney who works for Dianon.

3

there, which is, in a legal setting, not appropriate. Ex. A, pgs. 164-165.[2] Later in the deposition, Dr. Goyette was asked by government counsel whether he was being compensated by Dianon. Ex. A, pgs. 321-324. Dianon's counsel interjected that Dr. Goyette had been retained as a consultant for the litigation and was compensated on that basis. Id. In response to the government's question, Dr. Goyette testified that he was compensated for the time spent preparing for the deposition, and "advising [Dianon] of what happened." Id. When asked if he had been hired as a consulting expert, Dr. Goyette testified that he "did not believe so." Id.

### The Rule 45 Subpoena

Based on Dr. Goyette's testimony at his deposition, the United States issued a third-party subpoena under Federal Rule 45, seeking (1) correspondence or communications relating to the litigation; (2) a copy of any signed consultant agreement; (3) all records of time spent working on the litigation and any invoices for payment or records of payment; and (4) any drafts of the affidavit signed by Dr. Goyette and submitted to the United States and any related notes. See, Exhibit B, Rule 45 Subpoena issued to Dr. Goyette on March 22, 2006.

The United States inadvertently failed to serve Dianon's counsel with the subpoena, as required by Rule 45. On April 11, 2006, Dianon's counsel notified the United States of its non-compliance with Rule 45 and asked that the United States treat April 4, 2006, as the service date in computing the time to respond to the subpoena. The United States agreed to accept April 18, 2006, as the return date.

On April 18, 2006, Dianon filed a Motion to Quash the third party subpoena issued to Dr.

---

[2] Additional examples of Dr. Goyette's "reconstructed memory" can be found at page 166 and page 167 of the deposition attached as Exhibit A.

4

Goyette arguing that the subpoena was not properly served on opposing counsel in accordance with Federal Rule of Civil Procedure 45 and that all requested materials were protected by the attorney-client privilege and work product doctrine because Dr. Goyette is a paid consultant for the defense.

Based on conversations between counsel for Dianon and the United States, Dianon agreed to disclose Dr. Goyette's six invoices submitted for payment dated July 15, 2004, and March 17, 2006. Additionally, based on representations by counsel for Dianon, the United States agreed to withdraw its request for the e-mail exchanges listed in the privilege log and dated March 31-April 5, 2006. However, the parties could not reach an agreement on the draft of the affidavit listed on the privilege log.

The United States is requesting any existing drafts of the affidavit so that the trier of fact can know what portion of Dr. Goyette's signed affidavit and what portion of his testimony in his deposition are, as he terms it, "reconstructed memory." As discussed below, it is important to know what portion of Dr. Goyette's "reconstructed memory" was his own and how much was suggested by counsel for Dianon. This information is clearly relevant and bears directly on his credibility.

**ARGUMENT**

Dr. Goyette is an integral fact witness who will be called to testify at trial. Dianon's position that it can protect as privileged documents and communications with Dr. Goyette because he is a paid trial consultant is very simply wrong. Dr. Goyette does not meet the criteria to be a "litigation consultant." He is nothing more than a third-party witness and as such any communications with him are not privileged. Further, payments to a fact witness are suspect,

5

bear on the witness' credibility, and should not be protected as privileged. Finally, the draft affidavits bear strongly on Dr. Goyette's credibility. Considering his difficulty in testifying about the facts contained in his affidavit and his references to "reconstructed memory" it is important to assessing his credibility whether he is the source of this reconstructed memory or whether the source is Dianon's counsel.

> A.  **The United States inadvertent failure to serve Dianon with the subpoena has been cured without any prejudice to Dianon.**

Dianon asks the Court to quash the subpoena in its entirety as a sanction for its *ex parte* subpoena. Although the United States' agent failed to serve Dianon with the third party subpoena, after notice of this failure was received, the United States cured any resulting prejudice by permitting Dianon additional time to review the production of the documents requested and/or to consider a challenge to the subpoena. Because Dianon has not suffered any prejudice and was afforded the same amount of time for challenge as it would have been had it been properly served, granting the Motion to Quash is not an appropriate sanction in this case.

> B.  **Dianon has failed to meet its burden of showing that the exchanged documents in question are entitled protection for privilege.**

Dianon argues that the drafts of Dr. Goyette's affidavit should be protected from disclosure as an attorney-client communication and as work product.[3] As the proponent of the

---

[3] Federal courts continue to utilize the definition of the attorney-client privilege enunciated in United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358-59 (D.Mass. 1950), as cited by, Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,160 F.R.D. 437, 441 (S.D.N.Y.1995):
> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting

6

privilege, Dianon has the burden of establishing the elements of the privilege. Dianon utterly fails to meet that burden.

  The case law is clear that, with regard to current corporate employees, statements made to counsel at the direction of corporate superiors for the purpose of securing legal advice are protected by the attorney-client privilege. However, for former employees, the question becomes whether the communications "relate to the former employee's conduct and knowledge, or communication with defendant's counsel, during his or her employment?" See Peralta v. Cendant Corporation, 190 F.R.D. 38, 41 (D. Conn. 1999). This type of communication is entitled to protection. Alternatively, "communications between defendant's counsel and a former employee whom counsel does not represent, which bear on or otherwise potentially affect the witness's testimony, consciously or unconsciously, no attorney-client privilege applies." Id. at 41-42. As an example, if a former employee is informed of facts that developed during litigation, and the employee did not have prior and independent personal knowledge of the facts, such communications would not be entitled to the privilege particularly given their potential to influence the witness to conform or adjust his testimony to the information. See, id. at 41.

  Dianon, as the proponent of the privilege, has the burden of establishing the elements of the privilege and to identify specific information to which a former employee was privy during the course of his employment. See, Dubois v. Gradco Systems, Inc., 136 F.R.D. 341, 346 (D.

---

    as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Conn. 1991); see also, von Bulow by Auersperg v. Von Bulow, 811 F. 2d 136, 144 (2d Cir. 1987).

To the extent it is relevant to the determination, there has been no showing that Dr. Goyette was ever a "control-group" or managerial employee, as defined in Upjohn Co. v. United States, 449 U.S. 383 (1981); see, also, Peralta, 190 F.R.D. at 40-41 (rejecting the wholesale application of the Upjohn principals to former employees as if they were no different than current employees.) On the contrary, Dr. Goyette himself testified that he was not part of management and certainly did not "personify" the organization:

> Q   Okay. Can you tell me a little about what you did in each of those positions?
> A   Associate laboratory director was a position created by Dianon to receive the input of the pathology staff in relationship to performance evaluations and professional direction of the laboratory. And the position was created in '96, and it was abolished in '98. And there were two other physicians that were also associate laboratory directors.
>
> \* \* \* \* \*
>
> Q   And did you -- I take it these were sort of supervisory kinds of positions?
> A   No, because they were not management at all. They were really consultative. They asked -- Jay Amberson was the only one who ever asked our opinion, and we would give our opinion. And unfortunately oftentimes they would not follow our opinion, but they'd do what they wanted to do.
> Q   And then you said before that you were -- from '95 to 2000 you were also director of hematopathology?
> A   That's correct.
> Q   What did you do in that job?
> A   Well, the director of hematopathology ostensibly was in charge of the hematopathology laboratory. However, it was a working position. And the primary responsibilities

8

> were to a function as a physician examining medical
> specimens received as consultations from physicians
> throughout the United States. But it also involved consultation
> with laboratory staff and the medical director.
> See, Ex. A, pgs. 15-17.

Thus, in order for the attorney-client privilege to apply to communications between Dr. Goyette and Dianon counsel, the communication would have to be about some privileged information imparted to Dr. Goyette while he was still an employee of Dianon. To the extent that the communications involve the underlying factual issues, that information is not privileged. Further, to the extent that the communications involve information that the witness has no independent knowledge or recollection of, those communications would not be privileged.

Denying privileged status to communications which may bear on the credibility of the witness is particularly important. In this case, there is a real question about how much of Dr. Goyette's "reconstructed memory" was his own recollection and how much was suggested to him by Dianon. Given the fact that Dr. Goyette testified to extensive handwritten changes to the draft affidavit provided to him by Dianon's counsel, yet such a draft does not appear on the privilege log, there is a real question about what information in his deposition and affidavit were based on "prior and independent personal knowledge of the facts" and which Dianon influenced "to conform or adjust his testimony" to Dianon's theory of the case. See, e.g., Peralta v. Cendant Corporation, 190 F.R.D. at 41.

Alternatively, the Court should review the draft affidavit(s), *in camera*, to make an independent assessment as to whether the draft submitted to Dr. Goyette may be entitled to the attorney-client privilege. For, if the draft affidavit is identical or substantially similar to the final

affidavit submitted to the United States, the privilege has been waived.

      **C.**      **Dianon has failed to meet its burden of demonstrating that Dr. Goyette is a "litigation consultant" and, therefore, as a testifying third-party fact witness, he must produce any drafts of the affidavit that might bear on his credibility.**

Dianon fares no better by simply stating that Dr. Goyette is entitled to the attorney client privilege as a result of his transformation from former employee to "consultant." Mere conclusory assertions that privilege exists do not satisfy Dianon's burden. In re Grand Jury Subpoena Dated January 4, 1984, 750 F.2d 223, 224-25. (2d Cir. 1984).

One of the most routinely cited cases on the issue of compensating fact witnesses is Hamilton v. General Motors Corp. 490 F.2d 223 (7th Cir. 1973), which held that public policy would be offended by any contract with a testifying witness that reimbursed the witness for anything other than reasonable cost of travel, subsistence incurred, and the reasonable value of time lost in attendance. Hamilton, 490 F. 2d at 229. Compensation is limited for good reason. Compensating witnesses beyond that permitted in Hamilton, creates an appearance of impropriety and arouses public suspicion of the process. See, Norton v. Tallahassee Memorial Hospital, 689 F.2d 938, 941 (11th Cir. 1982) (adopting a two-prong test for disqualification for the appearance of impropriety). Since Dianon has not yet produced the invoices submitted by Dr. Goyette, the Government is unable to comment on the reasonableness of his compensation.

However, counsel for the United States is aware of no cases which hold that the attorney-client privilege or work product doctrine exists as a result of this type of compensation and arrangement with an integral testifying fact witness. Dianon argues that Dr. Goyette's status as a paid "consultant" affords the protection of the work product doctrine to the communications

10

between Dianon and Dr. Goyette, but Dianon has failed to meet its burden of demonstrating that Dr. Goyette actually is a "consultant".

The first case cited by Dianon, MMR/Wallace Power & Industrial, Inc. v. Thames Associates, 764 F. Supp. 712 (D. Conn. 1991), concerned a subcontractor's motion to disqualify opposing counsel in a complex contract case where counsel had improperly retained a former member of the subcontractor's litigation team as his own litigation consultant. In that case, the former employee was an office manager who was specifically retained to close out project-related activities and to prepare for litigation after a construction contract was terminated. MMR, 764 F. Supp. at 714. This office manager, turned litigation consultant, was specifically employed for eight months, until the company went bankrupt. Id. at 715. During this time period, the consultant was directly responsible for the following tasks: setting up plaintiff's document control system, to organize thousands of documents; reviewing, indexing, and digesting all of the various discovery materials; helping counsel decide which documents to copy at two separate locations; preparing a number of reports and analyses at the request of attorneys; participated in a number of confidential meetings with counsel to discuss litigation tactics and strategies; assisted counsel in answering interrogatories; consulted with counsel regarding people that were going to be deposed and possible topics to discuss with them; and served as on-site observer at counsel's request. Id. at 714-715.

After the bankruptcy, the plaintiff's surety recognized the consultant's value and made the consultant an offer to continue his work in the same capacity. Id. at 715. When the consultant did not get a firm response to his counter-offer, he contacted the opposing counsel in the litigation, who retained him despite the consultant's obvious exposure to information protected by the attorney-client privilege and work product doctrine. Id. at 715-716. Not

11

surprisingly, the Court disqualified opposing counsel from the matter because it was presumed that confidential information was obtained by the employee and shared with the opposing attorney. Id. at 726-728.

The lengthy recitation of the unique circumstances in MMR is essential because Dianon has argued in its motion that Dr. Goyette's role is somehow comparable to the litigation consultant in that case. See Dianon's Motion to Quash, pg. 5. This is plainly not so.

In this case, Dr. Goyette was a former employee who was contacted and compensated for his time spent preparing the affidavit, preparing for deposition testimony, and giving deposition testimony-- not for any services as a "litigation consultant." As referenced above, Dr. Goyette, by his own admission, performed no other function other than preparing for the deposition and advising Dianon of "what had happened." Ex. A, pg 323-324. Most strikingly, there is no written consultant contract or agreement between Dianon and Dr. Goyette. Also, unlike the consultant in MMR, Dr. Goyette was not specifically and exclusively employed for the purposes of the litigation. Finally, there has been no showing, as there was in MMR, that Dr. Goyette was exposed to any confidential information on a regular basis.

Dianon also relies heavily on United States v. Housing Authority of the Town of Milford, 179 F.R.D. 69, (D. Conn. 1997); however, that case does not actually support Dianon's position. In that case, while considering whether or not an *ex parte* interview of a former managerial employee by opposing counsel was barred by the attorney-client privilege, the court ruled that the former employee's services of "marshaling evidence to aid in the defense" did not satisfy the burden of showing that the witness in that case was a "trial consultant", and the court ruled that the privilege would not bar contact with the former employee. Id. At 73-75.

While Dr. Goyette may have voluntarily assisted Dianon with the factual development of the case, this situation is much more like <u>Milford</u> than <u>MMR</u> and should be treated as such. Dr. Goyette's intermittent contacts with Dianon fall short of the extensive contact with counsel, substantial disclosure of attorney work product, and ongoing access to litigation materials and strategy that signify one's status as a trial consultant.

Although the case is not cited by Dianon, at least one court has squarely considered the propriety of retaining an important fact witness as a "litigation consultant" and weighed the applicability of the work product doctrine as it relates to this type of arrangement. In <u>State of New York v. Solvent Chemical Company, Inc.</u>, 166 F.R.D. 284, 288-289 (W.D.N.Y. 1996), which involved a complex environmental suit brought against a chemical company and the United States as a third-party defendant, the chemical company retained a former employee and important fact witness as a "litigation consultant."

There, the Court found that the work product rule did not protect from disclosure the consulting agreement and any related documents that might reveal facts and circumstances surrounding defendant's retention of the former employee as a litigation consultant. <u>Solvent Chemical Co.</u>, 166 F.R.D. at 289. Additionally, the Court ordered the defendant to produce all documents shown or provided to the former employee in preparation for his deposition. <u>Id.</u> at 291-292. Finally, the Court ordered the defendant to produce a copy of all documents reviewed by the former employee under the consulting agreement, documents, notes or other writings prepared by him under the agreement, and notes of any conversations or other written communications. <u>Id.</u> at 292.

Of particular importance to the Courts decision, was the finding that this kind of arrangement, whereby "a party engages in a hasty courtship with a potentially hostile witness

13

which culminates with his being engaged as a 'consultant'... threatened to undermine the integrity of the adversary process in this case." Id. at 289.

Two of the distinguishing characteristics of the present case, when compared to Solvent Chemical Co., are that Dianon did not bother with a written consulting agreement and Dianon has not shown that Dr. Goyette was actually exposed to confidential or otherwise protected information. Much like the former employee in Solvent Chemical Co., however, the United States learned of the consultant arrangement only after Dr. Goyette was asked by government counsel during his deposition whether he was being compensated. Additionally, like Solvent Chemical Co., the identification of Dr. Goyette as both a fact witness and a retained member of the trial team creates the appearance of impropriety and raises strong concerns as to whether he will be able to testify fully and impartially on key facts in the case. See, id. at 291.

Because the United States does not seek to exclude Dr. Goyette as a witness, Dianon should, at minimum, be forced to disclose the documents for which it claims work product protection, so that Dr. Goyette's credibility can be fully assessed by the trier of fact.

## CONCLUSION

Dianon's attempt protect Dr. Goyette's affidavit and communications with him as attorney-client privilege and/or the work product doctrine should be denied. Dianon has failed to demonstrate that the documents in Dr. Goyette's possession are entitled to privilege or otherwise protected by the work product doctrine. Even if Dianon could meet its burden of showing that Dr. Goyette is Dianon's consultant, without the disclosure of the documents in his possession, the United States will be severely limited in its ability to challenge Dr. Goyette's credibility

14

during trial.

                      Respectfully submitted,

                      PETER D. KEISLER
                      Assistant Attorney General

                      KEVIN J. O'CONNOR
                      United States Attorney

                      _____
                      RICHARD M. MOLOT
                      Assistant United States Attorney
                      Federal Bar No. CT21676
                      157 Church Street
                      New Haven, Connecticut 06510
                      (203) 821-3700

                           /s/
                      _____
                      MICHAEL F. HERTZ
                      JOYCE R. BRANDA
                      PATRICIA R. DAVIS
                      RYAN FAYHEE
                      Attorneys, Civil Division
                      Commercial Litigation Branch
                      Post Office Box 261, Ben Franklin Station
                      Washington, D.C. 20044
                      Telephone: (202) 307-0240
                      Facsimile: (202) 305-7797
                      Attorneys for the United States

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the United States' Opposition to Defendant's Motion to Quash was served by mail and electronic mail this 2nd day of May 2006 on:

>Bryan T. Carmody, Esq.
>Maya & Associates, P.C.
>266 Post Road East
>Westport, CT 06880
>bcarmody@mayalaw.com
>
>Robert Salcido, Esq.
>Akin Gump Strauss Hauer & Feld, LLP
>Robert Strauss Building
>1333 New Hampshire Ave, NW
>Washington, D.C. 20036
>rsalcido@akingump.com
>
>Bruce R. Parker
>Venable LLP
>1800 Mercantile Bank & Trust Bldg.
>2 Hopkins Plaza
>Baltimore, Md. 21201
>brparker@venable.com

_____
RICHARD M. MOLOT
Assistant United States Attorney