**Page 14**

1  for the pharmaceutical industry advisory
2  boards.
3    Q   Do you work with any particular
4  company, any particular pharmaceutical
5  company or --
6    A   I've -- during the -- from 2000 --
7  actually, from 1997 until 2006, I have been
8  employed predominantly indirectly through
9  medical communications companies for most of
10 the major pharmaceutical manufacturers in the
11 United States.
12   Q   Okay. So you work for all of them,
13 basically?
14   A   Pretty much.
15   Q   Okay. And you do mostly
16 publications, journals, CME?
17   A   Yes, and consultations.
18   Q   Okay. And then you said -- I think
19 you said that before we started that when you
20 left Dianon, you stopped practicing medicine,
21 is that right?
22   A   Other than occasionally treating my

**Page 15**

1  wife and children.
2    Q   You're not supposed to do that.
3    A   I know that.
4    Q   Okay. And you left Dianon in 2000?
5    A   Yeah, I believe it was late May of
6  2000.
7    Q   Okay. Let's talk a little bit
8  about what you did at Dianon.
9        You have two entries here on the --
10 you were director of hematopathology and then
11 associate laboratory director, director of
12 immmunohistochemistry?
13   A   That's correct.
14   Q   Okay. Can you tell me a little
15 about what you did in each of those
16 positions?
17   A   Associate laboratory director was a
18 position created by Dianon to receive the
19 input of the pathology staff in relationship
20 to performance evaluations and professional
21 direction of the laboratory.
22       And the position was created in

**Page 16**

1  '96, and it was abolished in '98. And there
2  were two other physicians that were also
3  associate laboratory directors.
4    Q   And who were they?
5    A   They were -- Vido Santoseiri (?)
6  Mary Lachman.
7        COURT REPORTER: Can you spell the
8  first one?
9        THE WITNESS: The last name, no.
10       BY MS. DAVIS:
11   Q   And I'm sorry, the second one is
12 Mary?
13   A   Lachman. I can do that:
14 L-A-C-H-M-A-N.
15   Q   And did you -- I take it these were
16 sort of supervisory kinds of positions?
17   A   No, because they were not
18 management at all. They were really
19 consultative. They asked -- Jay Amberson was
20 the only one who ever asked our opinion, and
21 we would give our opinion. And unfortunately
22 oftentimes they would not follow our opinion,

**Page 17**

1  but they'd do what they wanted to do.
2    Q   And then you said before that you
3  were -- from '95 to 2000 you were also
4  director of hematopathology?
5    A   That's correct.
6    Q   What did you do in that job?
7    A   Well, the director of
8  hematopathology ostensibly was in charge of
9  the hematopathology laboratory.
10       However, it was a working position.
11 And the primary responsibilities were to a
12 function as a physician examining medical
13 specimens received as consultations from
14 physicians throughout the United States.
15       But it also involved consultation
16 with laboratory staff and the medical
17 director.
18   Q   Okay. And how many -- let's start
19 in 1995. How many hematopathologists were
20 there in that group?
21   A   When I arrived at Dianon, there
22 were two hematopathologist -- two people

**Page 78**

1. would get diverted to the cytogenetics lab.
2. But there were numerous occasions
3. in which the hematopathologist asked for
4. cytogenetics to be done, or other laboratory
5. studies to be done.
6. Q  If a test was not ordered by the
7. referring physician, for example, they asked
8. for flow cytometry and morphology but didn't
9. ask for cytogenetics, and the pathologist
10. thought it was necessary, how would you go
11. about getting -- would you go call the doctor
12. and ask for his approval to do that?
13. A  Calling the doctor was very
14. problematic. And that's because these are --
15. the specimens have to be alive to do
16. cytogenetics. And the cells die very rapidly
17. over a period of time.
18. And so whereas sometimes we would
19. try to make an effort to get the okay,
20. because of the fact that these tissues were
21. obtained, and oftentimes you couldn't obtain
22. them again without subjecting the patient to

**Page 79**

1. an operation or painful procedure, we'd go
2. ahead and submit it, knowing that if we
3. didn't and we waited until we'd finally get
4. ahold of the doctor, we would -- the specimen
5. would be dead and of no value.
6. Q  What about if you're going to add
7. on tests for the flow cytometry?
8. A  Flow cytometry. In most instances,
9. I believe we looked at that as an exercise of
10. our professional judgment as to which were
11. appropriate.
12. Q  So you wouldn't call the doctor to
13. get approval for that?
14. A  I can only speak for myself. And
15. then generally, no.
16. Q  Okay. So you considered the
17. selection of the particular antibodies to be
18. your medical judgment?
19. A  Certainly.
20. Q  Okay. Let's see. Do you recall
21. providing an affidavit to Dianon in -- let's
22. see when this was signed -- within the past

**Page 80**

1. year or year and a half?
2. A  You know, actually, I'd to see that
3. because I didn't know I provided it to
4. Dianon. Is that who it's addressed to? Or
5. is it addressed to the court?
6. Q  It's not addressed to anybody.
7. A  Oh, really? Well, let me look at
8. it.
9. Q  All right. Let me -- I'll have to
10. make a copy of it. I'm sorry. Can we go off
11. the record for a minute?
12. THE VIDEOGRAPHER:  Going off record
13. at 10:18 a.m. Tape 1.
14. (Recess)
15. (Deposition Exhibit No. 3 was
16. marked for identification.)
17. THE VIDEOGRAPHER:  Going back on
18. the record at 10:20 a.m. Tape 2.
19. BY MS. DAVIS:
20. Q  Okay. Before we broke we were
21. talking about your affidavit.
22. A  Yes. Thanks.

**Page 81**

1. Q  And here you go.
2. A  Sorry. I just looked -- looked
3. like a court document, but -- all right.
4. Yes, I'm familiar with this document.
5. Q  Okay. Who asked you to prepare
6. this?
7. A  I believe it was one of the
8. attorneys from Dianon Systems.
9. Q  From inside Dianon?
10. A  I honestly don't know what his role
11. is. I do know his name.
12. Q  What's that?
13. A  Tom Kossl. Can't spell it.
14. Q  K-O-S-S-L. And did he say why he
15. was asking for this?
16. A  This was -- this document was
17. produced following a series of conversations
18. so I can't remember his saying specifically
19. anything other than he'd like my statement of
20. what I believed to be true written down.
21. Q  Now, did you write this or did
22. someone write this?

**82**

1  A   Actually, no. Tom wrote it, and
2  based on a long conversation we had. And
3  then I essentially rewrote it once I received
4  his draft.
5    Q   Okay. If you take a look at
6  Paragraph 4 of the affidavit, it starts,
7  "Beginning in 1995"...
8    A   Yes.
9    Q   It says: "...Based upon our
10 expertise and experience, Dr. Connor and I
11 began to refine Dianon's immunophenotyping
12 panels. Previously, because Dianon did not
13 have any physician that was board certified
14 in hematopathology, it lacked in-depth
15 expertise and knowledge of which antibodies
16 to perform. Dr. Connor and I extensively
17 studied the subject. The antibody panel was
18 incomplete at that time and did not represent
19 the state of the art in the specialty.
20 Furthermore, there were antibodies on the
21 panel that did not appear to contribute
22 significantly to patient care."

**83**

1       Do you recall what antibodies were
2  on the panel back then?
3    A   No. This -- this paragraph here is
4  based on my recall of the events in mid-'95.
5  And, actually, it's also based on the fact I
6  saw several of Dr. DeSilva's flow cytometry
7  reports that -- and then based on a
8  government exhibit I thought that there were
9  approximately nine antibodies that were being
10 done.
11      Ask me that question again. Sorry.
12   Q   Yeah. I had just asked you whether
13 you remember which antibodies they were.
14   A   Oh, no, no, I don't.
15      (Deposition Exhibit No. 4 was
16      marked for identification.)
17 BY MS. DAVIS:
18   Q   Take a look at what's been marked
19 as Exhibit 4.
20   A   Okay.
21   Q   Actually, I would like to have you
22 take a look at just the first section there

**84**

1  where it says EX-3 Immunophenotyping. And
2  then it has eight cell surface markers.
3    A   Okay.
4    Q   Does that help refresh your
5  recollection about what the markers were?
6    A   You know, honestly, I've never seen
7  this before. I do know who Mark Florio is.
8  I don't know Debra Klembara or Pat Torre for
9  sure.
10      But this doesn't match my memory as
11 to what antibodies were being performed at
12 that time.
13   Q   Okay.
14   A   You know, the lab types would say,
15 "Oh, let's get an EL-3 or an EL-4," or, "We
16 got one."
17      I never knew what they were. I
18 just knew which -- they had appropriate
19 antibodies.
20      MS. DAVIS: Take a look at that.
21 That's exhibit 5.
22      (Deposition Exhibit No. 5 was

**85**

1       marked for identification.)
2       THE WITNESS: Okay. I reviewed it.
3  BY MS. DAVIS:
4    Q   Okay. Does that help refresh your
5  recollection about what they were doing?
6    A   This, to me, is an incomplete flow
7  cytometric examination. And would certainly
8  -- certainly supports my contention that,
9  number one, they were not examined by a board
10 certified hematopathologist because James B.
11 Amberson was not.
12      But, also, this is -- truly is an
13 incomplete examination.
14   Q   Okay. But is this what Dianon was
15 doing when you first got there?
16   A   I saw things like this.
17   Q   Okay.
18   A   Okay. I mean, I can't speak
19 because I didn't review all the records, but
20 I did see reports like this.
21   Q   Okay. And they were doing
22 approximately nine, you said?

158

1  AFTERNOON SESSION
2  THE VIDEOGRAPHER: Going back on
3  the record at 12:59 p.m. Tape 3.
4  Whereupon,
5  RICHERT E. GOYETTE
6  was recalled as a witness and having been
7  previously duly sworn was examined and testified
8  further as follows:
9  EXAMINATION BY COUNSEL FOR PLAINTIFFS
10  CONTINUED
11  BY MS. DAVIS:
12  Q  Welcome back.
13  A  Thank you.
14  Q  Did you have a nice lunch?
15  A  We had a pleasant -- because I
16  didn't eat because I want to be awake. Yeah,
17  right, right.
18  Q  Didn't have a couple of drinks?
19  A  No, no.
20  Q  Okay. I want to go back -- I'd
21  gotten away from this a little bit --
22  A  Okay.

159

1  Q  -- but I want to go back. Take a
2  look at Exhibit 13 again.
3  A  Uh-huh.
4  Q  That's this one.
5  A  Okay.
6  Q  And it might help to have this one
7  as well.
8  A  That's Exhibit 11, is that right?
9  Q  Yes. I think so. And then also
10  your affidavit, which is Exhibit 3.
11  A  All right.
12  Q  Okay. In your affidavit, this is
13  on Page 8 --
14  A  All right.
15  Q  -- Exhibit 3. Actually, it starts
16  at the beginning -- at bottom of Page 7.
17  Okay. We were talking about this earlier, it
18  says:
19  "Hence, I was asked to identify
20  those antibodies that any responsible payer
21  with knowledge and the complexities of modern
22  hematopathology would agree were essential

160

1  and for which they could never question
2  medical necessity. After consulting with the
3  hematopathology staff, I identified those
4  antibodies in a June 17, 1997 memo, which
5  happened to number 18. I understand that it
6  is the government's position that this memo
7  constitutes Dianon's admission that only 18
8  antibodies are 'essential' and that, by
9  implication, the additional eight antibodies
10  are 'nonessential.' This viewpoint is
11  absolutely false. I simply identified those
12  antibodies that no hematopathologist with the
13  training and experience that would were
14  linked with the number of specimens that we
15  examined could question. This was simply an
16  attempt to avoid what we perceived to be
17  harassment by payors regarding our medical
18  judgment concerning what constituted
19  appropriate medical care."
20  That last part that I read, it
21  says, "This was simply an attempt to avoid
22  what we perceived to be harassment by

161

1  payors," what are you talking about there?
2  A  Well, I think part of this is --
3  may be a little bit of reconstructed memory,
4  but there must have been -- you know, I can
5  only explain it from the context of this, and
6  this memo.
7  Q  I'm sorry, which?
8  A  I'm sorry, my statement, my
9  statement here on Page 8 -- 7 and 8, as you
10  mentioned, that I do remember coming up with
11  Exhibit 12, which is this one here --
12  Q  The justification?
13  A  -- justification for 26, followed
14  by Exhibit 13, in which I focused on the
15  initial workup of flow cytometry specimens.
16  And that at no time did any of the
17  hematopathology staff at Dianon believe that
18  by doing 18, we'd be practicing a level of
19  medicine that was -- actually couldn't cause
20  us to get sued for malpractice.
21  So I really didn't care what Dianon
22  billed, quite honestly. I did care about the

162

1  antibodies that we used.
2      And even at the time of this memo,
3  Exhibit 13, where it's 18 antibodies, we
4  specifically told -- I specifically told J.
5  Amberson I was going to continue to use all
6  26 antibodies and whatever he wanted to do
7  with the billing was his problem.
8      Q  Okay. Let me focus on some of the
9  wording of this.
10     A  Okay.
11     Q  It says, again it's Page 7, it says
12  that: "...while 26 antibodies should be
13  performed and will continue to be performed
14  that it was considering billing for fewer
15  antibodies to avoid any possible dispute with
16  the carrier."
17     Was there some dispute with the
18  carrier about the number of antibodies?
19     A  No. I'm -- at reconstructed memory
20  again, I focused, when I talked with Mr.
21  Kossl, and not revealing client attorney
22  privilege information, there was such a focus

163

1  during the discussion about eight antibodies,
2  18 antibodies, 26 --
3      COURT REPORTER: I'm sorry.
4      THE WITNESS: Eight antibodies, 16
5  -- or 26 antibodies, nine antibodies, that in
6  the course of preparing this I focused on the
7  number of antibodies when, in fact, I hadn't
8  counted the antibodies until last week when I
9  actually counted them.
10     So never had any conversations
11  specifically about the number of antibodies.
12  You know, should we do 17, 26?
13     And, in fact, the times that I
14  counted the antibodies that I can remember is
15  when I put these down, and then went down and
16  counted the numbers. And when I put these
17  down, I actually went back -- did I say 26?
18  Yeah, I went back and counted.
19     Q  You're referring to exhibits --
20     A  I'm sorry. I'm referring to
21  Exhibits 12 and 13.
22     Q  Okay.

164

1      A  So the counting was something that
2  was done in the evaluation of the case and
3  not -- the number of antibodies never
4  concerned me.
5      Q  Okay. Let me go back to your
6  affidavit --
7      A  Okay.
8      Q  -- once again. It says that we
9  were considering billing for fewer antibodies
10 to avoid any possible dispute with the
11 carrier.
12     The question was: Was there a
13 dispute with the carrier at this point in
14 time about the number of antibodies?
15     A  Sure. Not that I'm aware of.
16     Q  Okay.
17     A  Not that I'm aware of.
18     Q  Then why did you put that in your
19 affidavit?
20     A  Because I was reconstructing
21 memory. And it turns out I apparently do
22 that on a fairly regular bases in my personal

165

1  life. And because I take documents --
2      COURT REPORTER: I take documents?
3      THE WITNESS: I take documents -- I
4  take documents and I lay them out and I
5  interpret what must have occurred between
6  there, which is, in a legal setting, not
7  appropriate.
8      My wife would love to -- me to
9  admit that to her.
10     BY MS. DAVIS:
11     Q  So to your knowledge, there was no
12 dispute with the carrier in 1997 --
13     A  No.
14     Q  -- about the number of antibodies?
15     A  About the number of antibodies, no,
16 ma'am.
17     Q  Then on Page 8 you said:
18 "...simply an attempt to avoid what we
19 perceived to be harassment by payers
20 regarding our medical judgment concerning
21 what constituted appropriate medical care."
22     What do you mean by harassment by

Page 166

1  payers?
2    A  Well, if we look at Exhibit 13,
3  there's a mention of justified to insurance
4  carriers.
5      And I just -- I don't remember, but
6  -- I -- I don't remember because, quite
7  honestly, it wasn't -- the number of
8  antibodies was never mentioned, you know. It
9  was, like, we are doing -- maybe we are doing
10 a lot of antibodies or something, but nobody
11 ever counted numbers.
12   Q  All right. So the statement in
13 your affidavit, to avoid what we perceived to
14 be harassment by payers, what is that based
15 on?
16   A  Reconstructed memory.
17   Q  Do you have any specific memory
18 that a particular carrier was harassing you?
19   A  No, no. Nope.
20   Q  And so what is the
21 harassment-by-payers language based on?
22   A  Well, it's -- you know what, it's

Page 167

1  probably that, ergo, I don't think this is
2  reconstructed memory. I think this is real,
3  okay.
4      When I was in Missouri and
5  practicing pathology, we were in a situation
6  in which we billed patients who were in the
7  hospital in a private lab for the
8  professional component of laboratory
9  services.
10     And duration that time Blue Cross
11 BlueShield, as well as all other insurance
12 companies, and including the government,
13 didn't want to pay pathologists.
14     I mean, if they could get away --
15 they, for example, would propose that
16 everything a pathologist did was in the --
17 covered by the technical component.
18     And so BlueCross and BlueShield did
19 what I believe what I would call harassment
20 in that they would tell patients, "Oh, you
21 don't have to pay that bill." Or, "What did
22 the pathologist do for you?"

Page 168

1  And so in concert with Bynum &
2  Associates, (?) a group of pathologists in
3  Columbia, Missouri, and the College of
4  American Pathologists, our group actually
5  sued BlueCross and BlueShield for this
6  practice. And -- because we considered it
7  simply harassment.
8      It was not -- not that it wasn't
9  medically appropriate what we were doing,
10 they just didn't want to pay. And they
11 pretty much freely admitted that outside of a
12 deposition setting.
13     And so I perceive any attempt to
14 interfere with the practice of medicine by
15 dictating what we should or should not do as
16 harassment, either by administrative types,
17 accountants, or insurance companies.
18     And I'm sure that cloud hovered
19 over this memo.
20   Q  And so 1997, when this affidavit is
21 directed at that time period, was a payer or
22 payers, were they harassing Dianon about the

Page 169

1  number of antibodies that they were charging
2  for?
3    A  No, not that I know of. But,
4  remember, I had gone to the Connecticut
5  carrier's office about a flow cytometry
6  related issue so I kind of extrapolated that
7  there must be some issue.
8    Q  Do you know of any issue relating
9  to the number of antibodies?
10   A  No, never.
11   Q  Okay. Take a look at No. 13 and --
12 is that 16? This one.
13   A  Yeah, that's 11.
14   Q  Eleven. Okay. Take a look at 11
15 and 13.
16   A  Okay.
17   Q  Can you tell me -- let's see, if I
18 go through and compare --
19   A  Okay. I think we did that, didn't
20 we?
21   Q  Well, not these two particular
22 documents.

### Page 186

1 apologize.
2     THE WITNESS: I'll calm down.
3     BY MS. DAVIS:
4     Q   What about CD23?
5     A   CD 23 is absolutely essential to
6 differentiate between chronic lymphocytic
7 leukemia and mantel cell lymphoma.
8     Q   Okay. And CD25?
9     A   Twenty-five, key antibody for the
10 diagnosis of hairy cell leukemia.
11    Q   Sixteen, we already talked about.
12 That was, which?
13    A   I think it's an NK cell marker.
14    Q   All right. Thirty-eight?
15    A   Thirty-eight, I believe, is an
16 activation marker and it -- it can be very
17 valuable in cases of multiple myeloma. And
18 we received a number of cases in which either
19 myeloma was asked for, or it turned out to be
20 the diagnosis that we felt it was important
21 to include.
22    Q   HLABR?

### Page 187

1     A   It's an activation antigen. It's
2 present on a variety of cells. It can be
3 present on leukemic blasts, as an additional
4 marker for leukemic blast.
5     Q   All right. So does -- those eight
6 antibodies that we just talked about that are
7 not on your list on Exhibit 13, are those
8 antibodies that if you did the initial 18,
9 and for some reason suspected there might be
10 hairy cell anemia, (sic) you could go back
11 and do those tests as a second round?
12    A   No, because I think -- we had
13 established we were going to do all 26,
14 irrespective of this memo.
15        I think that pathologists or
16 hematologists that do the 18 memos -- I mean,
17 excuse me, the 18 antibodies listed on this
18 memo are not practicing a standard of care
19 because as, I document in my deposition -- or
20 not deposition, what is this thing -- my
21 declaration, Exhibit 3, I had my eyes opened
22 to the diagnosis of a number of different

### Page 188

1 disorders that would not have been diagnosed
2 with the additional use of these antibodies
3 on a routine basis, such as hairy cell
4 leukemia.
5     Q   Hairy cell -- isn't hairy cell
6 leukemia a sort of subset of one of the
7 leukemias?
8     A   Not really. It's a very distinct
9 pathologic entity. It's got very distinct
10 clinical presentation. And it's one of those
11 fortunate diseases that the cells have
12 something we can relate to. And there are
13 little hairs all over them.
14    Q   So you can look at the slide and
15 see --
16    A   You can look at the slide and you
17 can say "Gee, whiz, this might be hairy cell
18 leukemia."
19    Q   And so after you looked at the
20 slide, you could then go back and try -- and
21 do the hairy cell --
22    A   No, because some of them don't have

### Page 189

1 hairs, unfortunately. And the other thing is
2 sometimes the hairs are only seen on phase
3 microscopy, which requires live -- specimens
4 still alive. And at Dianon, they were dying
5 as we talked.
6     Q   Okay. I asked you earlier, the
7 affidavit we've been looking at, Exhibit 3,
8 you said that Tom Kossl wrote the initial
9 draft of it, is that right?
10    A   After -- after a long conversations
11 with me.
12    Q   Okay. And then you said you had
13 some changes to it?
14    A   No. I extensively revised it. This
15 no longer looks like Tom Kossl's document;
16 although, I can't tell you for sure that
17 there aren't elements of his still in here.
18    Q   Okay. How many drafts did you go
19 through?
20    A   One.
21    Q   One draft?
22    A   Yeah.

## Page 190

1  Q  He gave you a draft.
2  A  He gave me a draft. I completely
3  rewrote it. I think -- in fact, I think I
4  might have done it by hand and sent it back
5  to him --
6  Q  Okay.
7  A  -- because there were so many
8  changes.
9  Q  Did you keep any of the drafts?
10  A  No. In fact, I threw the stuff --
11  I intentionally threw it away because I was
12  cleaning out my office about six months or a
13  year ago, because they were cluttering my
14  office.
15      It wasn't a draft that I threw
16  away. It was the same thing here. I just --
17  I had a copy of it and I thought, you know,
18  these guys keep records of everything so I
19  didn't have to worry about keeping it.
20  Q  Are you suggesting that lawyers are
21  anal?
22  A  Yeah, maybe even more than doctors.

## Page 191

1  Q  Did you ever do any training to
2  help -- to help train the sales reps on the
3  hematopathology?
4  A  You know, I'm very -- my father, as
5  I mentioned earlier, was a college professor.
6  And I'm very committed to education. And so
7  during my time at Dianon, I actually gave
8  talks.
9      And I gave talks to sales reps and
10  to the other pathologists about things that I
11  thought were relevant to hematopathology.
12  So, yes, I did talk to sales reps among -- as
13  a subgroup.
14  Q  Okay. And did you prepare any
15  documents for them to help them understand
16  what hematopathology was about, the disease
17  and that sort of thing?
18  A  You know, I might have but I don't
19  remember; however, I did a video.
20  Q  I've seen a transcript of the
21  video. I haven't seen the video.
22  A  Oh, really? Yeah, that was my only

## Page 192

1  chance to get -- go to Hollywood and nobody
2  took -- nobody bought.
3  Q  Who do you want to play you in the
4  movie?
5  A  Yeah, right. Probably some -- be
6  some fat, dumpy guy.
7  Q  I'm holding out for Sissy Spacik.
8  A  Good for you. We haven't heard
9  much of her recently.
10      MS. DAVIS: I would like to have
11  you take a look at what's been marked Exhibit
12  17.
13      (Deposition Exhibit No. 17 was
14      marked for identification.)
15      THE WITNESS: Okay. This is
16  perfect example of why you shouldn't
17  reconstruct your memory. This first thing,
18  "Hematopathology Services Study Sheet," I
19  don't remember ever seeing this.
20      BY MS. DAVIS:
21  Q  Okay. So that's the Pages PP10600
22  --

## Page 193

1  A  To 11.
2  Q  Okay. That's the -- last page is
3  10611?
4  A  Right, correct.
5  Q  Okay.
6  A  Pages 10612 to 10633, don't
7  specifically remember doing, but the writing
8  looks very much like mine.
9  Q  You mean the style?
10  A  The style.
11  Q  Okay.
12  A  The style. And, in fact, even the
13  font used.
14  Q  Okay.
15  A  And the -- the logic going through
16  here. So, I mean, I'll say reasonably this
17  is probably mine.
18  Q  All right. Let me do this, then.
19  Let me mark that first section as one
20  exhibit, and then mark this as a separate
21  exhibit.
22  A  Okay. All right.

### Page 318

1  I've never had my license threatened or
2  suspended or revoked. Is that what you mean,
3  disciplined in any job?
4  Q    Well, let me -- two-part question.
5  Have you ever been disciplined by a medical
6  board?
7  A    Not to the best of my knowledge.
8  Q    Okay. What about any -- just any
9  management at any job that you were at?
10  A    I think you're going to have to be
11  more specific.
12  Q    For example, admonished, or a
13  letter put in your file, you know, something
14  like that, pay docked. I don't know, what do
15  they do in private practice, I don't know --
16  A    I don't know. You mean as a
17  physician, were there letters added to my
18  file?
19  Q    Right.
20  A    Not to the best of my knowledge.
21  Q    Okay. When you were preparing for
22  this deposition, did you -- you said -- you

### Page 319

1  mentioned you talked to Tom Kossl who
2  prepared your affidavit?
3  A    Yes.
4  Q    Did you talk to anyone else?
5  A    Yes, I talked to the Dianon
6  attorneys.
7  Q    Both who are sitting across the
8  table from us?
9  A    Yes, and Tom Kossl, yes.
10  Q    All right. So you talked to Mr.
11  Salcido and -- I'm sorry --
12       MR. PARKER: Parker. It's been a
13  long day.
14       MS. DAVIS: It's been a long day.
15       BY MS. DAVIS:
16  Q    And Mr. Kossl?
17  A    That's correct.
18  Q    Okay. How long did you talk to
19  them for?
20  A    I talked to them for, let's see,
21  I'd say probably -- probably in the last
22  couple of weeks maybe for about 14 hours.

### Page 320

1  Q    Fourteen hours?
2  A    About, yeah.
3  Q    Over a series of days?
4  A    Yes, over a weekend, and yesterday
5  afternoon.
6  Q    Okay. So you came in early, I take
7  it?
8  A    Yes, I came in yesterday afternoon,
9  or --
10  Q    But then you --
11  A    -- yesterday around noon.
12  Q    I'm sorry. We're talking over each
13  other again.
14       But then you talked to them at a
15  different time over a weekend?
16  A    Right. Well, let's -- I mean, I'll
17  be glad to give you the chronology. I mean,
18  I was -- Tom Kossl originally phoned me. We
19  had had talks.
20       THE WITNESS: Then Mr. Sal --
21  Salcido?
22       MR. SALCIDO: Uh-huh.

### Page 321

1       THE WITNESS: Mr. Salcido and Mr.
2  Kossl flew to Knoxville and I had a
3  conversation with them there. I don't
4  remember the duration of that conversation;
5  but, I do know that we got a conference room
6  in a hotel so I'm sure it was -- it might
7  have even -- well, I think I -- I think we
8  had lunch there so it went over the lunch
9  period.
10       Then last -- last weekend or the
11  weekend before, I think I flew to Newark and
12  talked with Mr. Kossl and Mr Salcido and met
13  Mr. Porter, and spent an afternoon with the
14  three them, and then the morning with Mr.
15  Porter.
16       MR. PARKER: Parker.
17       THE WITNESS: Parker. Sorry.
18       MR. PARKER: You are making me feel
19  so bad, Richert.
20       THE WITNESS: I'm sorry.
21       MS. DAVIS: Nobody knows your name.
22  I'm not the only one.

Page 322

1    THE WITNESS: I'm sorry, you know,
2 this is what's happening. I'm decompensating
3 here.
4    MR. PARKER: I'm highly offended.
5    THE WITNESS: I'm sorry.
6    BY MS. DAVIS:
7    Q   You met with Dianon lawyers on
8 three separate occasions?
9    A   I think that's what I just said.
10   Q   Okay. What about, did you talk to
11 anyone else at Dianon?
12   A   No.
13   Q   Any former employees?
14   A   I've had no -- virtually no contact
15 with Dianon since I left, with employees or
16 anything else.
17   Q   Okay. Are you being compensated in
18 any way for --
19   A   Yes, I am.
20   Q   -- your testimony?
21   A   This experience represents a
22 significant compromise to my professional

Page 323

1 activities. So when Mr. Kossl originally
2 talked to me, it was not about money, and I
3 volunteered to help.
4    But then I said "Well, how much
5 time is this going to take?"
6    And he said, "Oh, don't worry.
7 We'll compensate you." And that was the
8 extent --
9    MR. PARKER: I want to put an
10 objection because your question was
11 compensated for his testimony.
12   MS. DAVIS: No --
13   MR. PARKER: He has been retained
14 to serve as consulting services in connection
15 with the litigation. It's not paid to
16 testify.
17   BY MS. DAVIS:
18   Q   Okay. So let me make sure I
19 understand what it is you're being
20 compensated for. Can you tell me what it is?
21   A   I guess it's the time I've spend
22 involved in preparing for the deposition.

Page 324

1    Q   Okay. Are you --
2    A   And advising them --
3    Q   Okay. Are you -- are you --
4    A   -- of what happened.
5    Q   We are talking over each other
6 again. Go ahead.
7    A   I'm through.
8    Q   Okay. Are you being compensated --
9 are you -- have you been hired as a
10 consulting expert or --
11   A   No, I don't believe so.
12   MS. DAVIS: Okay. I think that's
13 all the questions I have.
14   Just to put on the record, though,
15 because we've got medical records and we need
16 to protect those, can we have the --
17 everything marked confidential?
18   And there's -- at the bottom,
19 there's a statement about confidential health
20 information, put that on the tape and on the
21 transcript. And keep the transcript and the
22 exhibits confidential. Okay. That's all I

Page 325

1 have.
2    EXAMINATION BY COUNSEL FOR DEFENDANT
3    BY MR. PARKER:
4    Q   Dr. Goyette, I want to go back and
5 talk about a few issues that were discussed
6 six hours or so ago.
7    A   Okay.
8    Q   Dr. Goyette, in the period of time
9 in which you were at --
10   A   Didn't want to forget your name.
11   Q   In the period of time in which you
12 were at Dianon, from 1995 to 2000?
13   A   Yes.
14   Q   Was it the hematopathologists who
15 decided what antibodies ought to be in the
16 panel, or did the business people decide
17 that?
18   A   No. The hematopathologists decided
19 solely.
20   Q   In the five years you were at
21 Dianon, was there ever an instance in which
22 anyone outside of the hemopathologists

**EXHIBIT B**

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF **CONNECTICUT**

UNITED STATES ex rel. Dr. JAMES J. TIESINGA,

    Plaintiff,

V.

DIANON SYSTEMS, INC.,

    Defendant.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: 3:02CV1573(MRK)

TO:  Richard E. Goyette
1700 Alcott Manor Lane
Knoxville, TN 37922

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attachment A of this subpoena.  Documents will be produced to the Department of Justice 10 business days after the date of service of this subpoena.

| PLACE | DATE AND TIME |
|---|---|
| U.S. Department of Justice, Civil Division, 601 D Street, NW, Room 9154, Washington, DC 20004 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) PATRICIA DAVIS, Attorney for Plaintiff | DATE 3/22/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
PATRICIA DAVIS, 601 D Street, NW, ROOM 9154, WASHINGTON, DC 20004 (202) 307-0238

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |
| SERVED ON (PRINT NAME) Robert E. Goyette | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clauses (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial. The court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Attachment A

All documents in your possession or control relating to this litigation including,

a. All correspondence or communications relating to this litigation, including electronic communications;
b. All contracts, Statements of Work or other agreements between Dr. Goyette and Dianon Systems, Inc. or its counsel relating to the work to be performed relating to this litigation;
c. All records of time spent by Dr. Goyette relating to this litigation, any invoices for payment and any records of payment; and
d. Any drafts of the affidavit signed by Dr. Goyette and submitted to the United States and any related notes.