**4**

# YALE UNIVERSITY
## SCHOOL OF MEDICINE

**STUART D. FLYNN, M.D.**
*Professor of Pathology and Surgery*
*Director of Medical Studies*
*Director of Residency Program*

**TEL:**  203.785.6424
**FAX:**  203.737.2922
**EMAIL:** stuart.flynn@yale.edu



**OVERNIGHT MAIL:**
Yale University School of Medicine
Pathology/EP2-608
200 South Frontage Road
New Haven, Connecticut 06510

**U.S. MAIL:**
Yale University School of Medicine
Department of Pathology
P.O. Box 208070
New Haven, Connecticut 06520-8070

February 10, 2006

Attorney Richard Molot
US District Attorneys Office
United States Attorney
District of Connecticut
157 Church Street
23rd Floor
New Haven, CT 06510

Attorney Patricia Davis
US Department of Justice
Civil Division
601 D Street, Room 9026
Washington, DC 20530

**Re:  United States of America v Dianon Systems, Inc. #3:02CV1573 (MRK)**

Dear Attorneys Molot and Davis,

This document represents my report regarding the above captioned case.

The following items have been reviewed and/or used in my generating this report:

1. The amended complaint.
2. Patients' charts/medical records obtained from Dianon.
3. Various Dianon company documents relating to flow cytometry.
4. Affidavits from Dianon employees
5. Local medical review policies related to flow cytometry.
6. Documents from the National Institutes of Health and Veterans Administration Hospital System regarding flow cytometry.
7. Compiled list of CPT codes
8. Regulations outlining medical necessity from HHS.
9. OIG compliance information
10. Medical literature and books relating to flow cytometry

SF0001

As outlined in the complaint, the United States alleges that Dianon submitted false or fraudulent claims for payment to Federal Health Programs for Flow Cytometry tests containing antibodies that were not reasonable and medically necessary. A standard panel of antibodies was used for every case, regardless of clinical information provided. In addition, for repeat tests, the utilization of information gleaned from the previous tests performed by Dianon was not incorporated into determining which antibodies were medically necessary. Also, clinical/laboratory information which would have been valuable in the design of a panel of antibodies that were deemed medically necessary and would have been available from the referring physician's office, was not obtained (although some charts do make reference to either having called the physician's office for such information or that a call should be made).

To perform my assessment, I reviewed all supplied charts. Materials within each chart included an order requisition form which, in addition to pertinent patient and laboratory demographics, included an ICD-9 code and/or a written history, the source of the specimen submitted, and the test requested. Some variation was noted in regards to the completeness of such information. In addition, some charts included copies of relevant laboratory information as well as possible relevant past medical history. For those patients who had more than one test performed by Dianon, some had reference to such previous studies, whereas others did not. After having reviewed all of these documents for each case, I proceeded to review the antibodies used from Dianon's records and concluded from all such information which antibodies were medically necessary versus those which were not. Following designation of each antibody in either of these two categories, I reviewed the laboratory results and conclusions when included in the chart.

As discerned from the charts reviewed, Dianon used a standard panel of 22 antibodies in 1996 which subsequently evolved to a standard panel typically composed of 25, 26, or 27 antibodies. Major categories within which subsets of antibodies reside within these panels include B cell antibodies (including anti-kappa and lambda light chains), T cell antibodies, myeloid antibodies, and a subset of "miscellaneous" antibodies. However, some of the antibodies within a given category may offer additional information outside of their designated category proper. Representative examples would include the role of anti-CD7, a T cell antibody, which may also be immunoreactive with myelogenous leukemias, and anti-CD56, an antibody identified on natural killer cells and activated T cells, but which may also be expressed on the plasma cells of multiple myeloma, a B cell neoplasm. A major role for some antibodies is their "absence" of staining in specific diseases, examples including the absence of CD10 and CD23 on mantle cell lymphomas and the absence of CD5 in follicular center cell lymphomas. Some antibodies in the panel allow for "gating" during the performance of the assay, including anti-CD45 which should stain the vast majority of hematopoietic cells, and anti-CD16/56 which assist in identifying natural killer cells from the larger set of lymphocytes identified in the assay. Other antibodies assume significance for their specificity when immunoreactive, including the ratio of kappa versus lambda positive cells in B cell proliferations, and antibodies that are valuable in identifying hairy cell leukemia cells, namely anti-CD25, CD103, and CD11c. However, it should be emphasized that the value of specific antibodies in these tests is maximized (medically

2

necessary) when used within a panel devised to address the disease(s) in question and when correlated with other relevant parameters, which include peripheral blood laboratory results, bone marrow biopsy/aspirate results, and histopathologic information from other organs biopsied, including lymph nodes. Such information is typically known by the referring physician. In many cases, there was sufficient clinical information to design a targeted panel of antibodies as opposed to using a large "standard panel" in each case. However, even in those cases in which the clinical information supplied was vague, such information could be garnered from the patient's chart in the referring physician's office. This does not necessitate having to talk directly with the physician. In my opinion, making such inquiries would have been very valuable in assuring that the flow cytometry tests used medically necessary antibodies to address the referring physician's diagnostic questions.

The disease categories which represented the vast majority of the cases submitted (as reflected in the ICD-9 code or history), for either diagnosis or staging, included lymphoproliferative processes, acute or chronic leukemia, monoclonal gammopathy/multiple myeloma, and anemia/myelodysplastic syndrome. Also included were infrequent examples of myeloproliferative disorders, thrombocytopenia, Hodgkin lymphoma, among others. There were also cases submitted with no or confusing history. As noted above, clinical information obtained from the physician's office would have been valuable in knowing what disease(s) was in the patient's differential diagnosis, would have assisted in deciding which antibodies were medically necessary and those which were medically unnecessary, and would have assisted in correlating the flow cytometry immunophenotyping studies with this clinical information.

The following represent comments regarding flow cytometry immunophenotyping studies in the workup of these various categories:

1.    **Malignant lymphoma/lymphoproliferative disorders**
       Immunophenotying studies by flow cytometry play a valuable role in this category. However, the results of the flow cytometry immunophenotyping studies require correlation with biopsy findings, peripheral blood findings, and the overall clinical picture. Recognizing that specimens may be sent to Dianon without all of this information submitted, as mentioned above, request for such information from the referring physician's office would be clinically valuable and appropriate. In my evaluation of those patients in which the history or ICD-9 code suggested the possibility of a malignant lymphoma/lymphoproliferative process, I believe a panel including anti-kappa and lambda, T cell antibodies anti-CD3, CD4, CD8, and CD5, B cell antibodies anti-CD19, CD20, CD23, and CD10 was appropriate. I believe that the T cell antibodies anti-CD2 and CD7 and the B cell antibody anti-CD22 are not of sufficient diagnostic value to include in this panel and, therefore, were not medically necessary. Additionally, the myeloid antibodies anti-CD13 and CD33, HLA-DR, CD57, and CD34 were also felt to not have significant diagnostic merit and, therefore, were not medically necessary. Anti-CD45, CD16, and CD56 were included as discussed above. The role of anti-CD11c, CD25, CD103, and CD38 was determined based on the history/ICD-9 code submitted.

3

SF0003

B cell neoplasms may be shown to be clonal using kappa and lambda antibodies and the presence and/or absence of specific antibodies is also valuable. For B cell lymphomas, in addition to anti-kappa and lambda, anti-CD19, CD20, CD10, CD5, and CD23 are very valuable in correlation with the histologic features and peripheral blood findings in subclassifying the vast majority of B cell lymphomas, inclusive of follicular center cell lymphoma, mantle cell lymphoma, marginal cell lymphoma, and small lymphocytic lymphoma/chronic lymphocytic leukemia.

T cell lymphomas make up a small, but distinct minority of lymphomas encountered in the United States. Flow cytometry immunophenotyping studies are of value in T cell lymphomas once a histologic diagnosis has been made. Thus, immunophenotyping studies may be of value in distinguishing the T cell nature of a lymphoproliferative processes (recognizing that entities such as T cell rich B cell lymphoma may be misinterpreted as a T cell neoplasm if the diagnosis is based primarily on the immunophenotype obtained by flow cytometry studies). Unlike B cell lymphomas where a marked discordance between the percentage of kappa and lambda positive cells is very valuable in distinguishing lymphoid neoplasms from non-neoplastic processes, no such discordance exists for the identification of T cell lymphomas. So-called aberrant loss of antigen expression on T cells has been noted to sometimes occur in T cell lymphoproliferative processes, but this is not diagnostic, but rather supportive information in a pathologically diagnosed lymphoproliferative disorder. Rather, both genotyping studies and immunophenotyping studies performed on a pathology specimens (tissue immunohistochemistry) are of greater diagnostic value in supporting both the diagnosis and immunophenotype of such lymphoproliferative processes. Two examples of a T cell lymphoproliferative disorder in this patient cohort are B69, and the multiple specimen case A102-106. The interpretations of the results from the A102-106 set of cases note an increase in NK-associated marker expression on T lymphocytes. This is noted to be of uncertain significance, possibly representing reactive versus a T cell lymphoproliferative disorder of granular lymphocytes. Immunophenotyping studies were done initially on both the bone marrow and the peripheral blood. Highlighting the above stated role of ancillary studies other than flow cytometry for possible T cell lymphoproliferative disorders, Dianon was recommended that PCR genotyping studies be performed and this was done on several specimens over periods of several week intervals.

2. **Chronic Leukemias**

**A. Chronic Lymphocytic Leukemia**

Flow cytometry immunophenotyping studies are of significant value in the diagnosis and definitive classification of chronic lymphocytic leukemia. This is a usually a B cell neoplasm and presents with circulating neoplastic cells, marrow involvement and may also involve lymph nodes, engendering malignant lymphoma in the differential diagnosis. Diagnostic specimens submitted for flow cytometry immunophenotyping studies may include peripheral blood, bone marrow, or a lymph node. In relative terms, this is a common leukemia in middle aged and elderly adults. Thus, it is the most common

4

diagnosis of lymphoproliferative processes in the peripheral blood. However, the differential diagnosis does include other lymphoproliferative disorders such as mantle cell lymphoma and hairy cell leukemia, among others. Additional information about the patient and information about any histopathology would be very helpful in suggesting the likelihood of the latter entities. However, where such information was not available for the patients in this analysis, but could have been obtained from the referring physician's office, I gave the "benefit of the doubt" for those antibodies considered medically necessary to address other potential entities in the differential diagnosis of chronic lymphocytic leukemia.

### B. Chronic Myelogenous Leukemia

The role of flow cytometry immunophenotyping studies is not the primary diagnostic study in the diagnosis of chronic myelogenous leukemia (CML). CML is typically considered to be in the general category of a myeloproliferative disease, all of which represent clonal proliferations of the hematopoietic stem cell. These patients typically present with an elevated white count (WBC) which has a distinctive WBC differential of a predominance of cells in the myeloid lineage and a "left shift", including the presence of infrequent promyelocytes and myeloblasts. Techniques addressing the presence of a "Philadelphia chromosome", a translocation of chromosomes 9 and 22, represent the definitive standard for the diagnosis of this entity. There is no role for flow cytometry immunophenotyping studies in the intitial work up of a patient suspected of having CML. However, if in the natural evolution of CML a patient is suspected of undergoing "blast crisis", flow cytometry would be of value in subclassifying the phenotype of the blasts. The panel I proposed in the CML cases is designed to address this particular question, but information about the patient obtained from the physician's office should have been very valuable in addressing if this was a diagnostic consideration and, therefore, if flow cytometry immunophenotyping studies were necessary. At the time of intital diagnosis, the non-flow cytometry immunophenotyping tests mentioned above would have been the appropriate tests to use for diagnosis. Such tests were recommended and performed in some of the cases reviewed.

### 3. Acute Leukemia

Acute leukemias typically demonstrate either lymphoid or myeloid differentiation, but evidence of differentiation in both categories (bilineage) is not uncommon. Typically peripheral blood and bone marrow represent sites in which the neoplastic cells are found and, therefore, either site represents an appropriate specimen for flow cytometry immunophenotyping studies. The role of flow cytometry immunophenotyping studies is valuable in subcategorizing acute leukemias and, therefore, some antibodies addressing lymphoid lineage, T and B, and myeloid lineage, as well as CD34, a hematopoietic progenitor cell antigen, are of value. Other antibodies, such as those used for the diagnosis of hairy cell leukemia, kappa and lambda, CD57, CD38 and CD23 do not play substantive roles in this interpretation and in virtually all cases, are not medically necessary.

5

SF0005

4.    **Anemia/myelodysplastic process**

The clinical diagnosis of "anemia" is very broad and includes some entities in which flow cytometry immunophenotyping studies may play a role whereas flow cytometry studies in many other categories would serve no diagnostic value. Thus, clinical and laboratory information would be very valuable in helping to assess not only the role of flow cytometry, but the specific antibodies one would utilize. Specifically, an anemia with an associated lymphocytosis would warrant assessment for the possibility of a lymphoproliferative process, namely CLL. Also, consideration of hairy cell leukemia might be warranted. Additionally, anemia may be a presenting feature for a myelodysplastic process and in this regard, the myeloid antibodies are of value assessing their distribution in the maturation of cells in the myeloid series. However, in many of the reviewed cases, I gave Dianon the benefit of the doubt for the antibodies allowed in my panel, but believe that information obtained from the referring physician's office would have been helpful in designing a much more targeted panel of medically necessary antibodies or even determining if there was merit in doing this study at all.

5.    **Monoclonal gammopathy/multiple myeloma**

Once again, the role of flow cytometry immunophenoytyping studies in the assessment of a patient with a monoclonal gammopathy and possible multiple myeloma must be evaluated in the context of additional laboratory and clinical findings, including serum and urine characteristics of the monoclonal protein, bone marrow biopsy findings, serum calcium, bone radiographs, etc. The entities included in this category are clonal B cell proliferations, the majority composed of a clonal plasma cell proliferation. In this regard, some of the B cell lymphoid antibodies, including kappa and lambda, are of value as is the evidence of expression of anti-CD56 and CD38 on the plasma cells. T cell and myeloid antibodies as well as antibodies for hairy cell leukemia, CD57, CD34 and HLA-DR serve no diagnostic value in this assessment and, therefore, are not medically necessary.

6.    **Miscellaneous**

There were infrequent examples of cases in which there was difficulty in discerning the role of flow cytometry immunophenotyping studies and, hence, which antibodies to use in the panel. Once again, I gave Dianon the benefit of the doubt, but flow cytometry immunophenotyping studies in these categories were probably unnecessary or could have used targeted antibodies based on information gleaned from the referring physician's office.

Those patients with repeat samples analyzed at Dianon afford the opportunity to design refined antibody panels for subsequent tests. The initial sample submitted in such cases is similar to those patients who only had one sample evaluated at Dianon. However, the information gleaned from the initial sample in repeat sample cases not only may offer insights into the immunophenotype of the cells in question for a given patient's disease, but also offers insights as to the absence of antigen expression on such cells. Therefore, it is my opinion that many patients evaluated in repeat tests could have had well-designed and refined panels based on

6

SF0006

the data available to Dianon. One disease process for which several patients were evaluated with serial tests over a several week/month period was Acute Myelogenous Leukemia (AML). The immunophenotype for AML is helpful in the initial subclassification of the leukemia, but also allows for a very targeted panel of antibodies to assess subsequent specimens for possible recurrent disease. One illustrative case of AML demonstrating the ability to target antibodies is represented by the patient A158-161. The initial history accompanying a bone marrow biopsy stated leukopenia; evaluate for AML. 26 antibodies were used by Dianon, 18 of which I thought were medically necessary. The interpretation of this assay was "CD34 postive myeloid blast population with is also CD13, 33, 117, 11c, HLA-DR, 38, and 7 positive." Two weeks later, another bone marrow biopsy was submitted and again a panel of 26 antibodies was used by Dianon. Given the information gleaned from the first test, I believe only 11 antibodies were medically necessary to address the diagnostic question of ongoing marrow involvement by AML versus remission. Twelve days later, another bone marrow was analyzed with 26 antibodies used, again with only 11 being medically necessary. Less than 3 months later, another bone marrow was submitted with a panel of 26 antibodies used by Dianon, whereas only 11 were medically necessary.

Another example of repeat tests in which a standard panel of 26 antibodies was used on all specimens and some of the repeat studies were very close in time to one another is composite case A53-63. Specifically, blood was sent in for analysis with the only clinical information being the ICD-9 code 202. With this limited information, I gave Dianon the benefit of the doubt and found 23 antibodies were medically necessary. The test was negative. Approximately six weeks later, another blood specimen was submitted for which I thought 14 antibodies were medically necessary. Two weeks later, another blood specimen was submitted, and again I thought 14 antibodies were medically necessary. Approximately eleven weeks later, peripheral blood was submitted followed one week later by a bone marrow specimen, both of which I felt 14 antibodies were medically necessary. Peripheral blood was submitted again approximately eight weeks later with five more peripheral blood samples submitted over an approximate thirty two month period with 14 antibodies medically necessary for each. In all cases, there was no evidence of a B or T cell lymphoproliferative disorder or other abnormalities noted. I also did not see any amplification in any of these charts as to what the referring physician knew about the patient (i.e. pathology, lab results, clinical information) or what medical "question(s)" Dianon was trying to answer with the results of the assays.

After having reviewed more than 400 flow cytometry services by Dianon, it is my opinion as set forth above that Dianon used medically unnecessary antibodies on a routine basis. This is because Dianon used a standard panel, typically 26 antibodies, in almost every case. So, in almost all such cases, they did not exercise medical judgment based on clinical, laboratory, or pathology information submitted by the referring physician. In many cases, there was sufficient clinical information that would have allowed Dianon to run panels with fewer antibodies than those used, without compromising Dianon's role in patient care and diagnosis. For those patients who had repeat flow cytometry tests performed, not only did Dianon have the initial clinical information submitted by the referring physician to design a targeted panel of antibodies, but for subsequent tests, they then had data from their own previous flow cytometry tests. Although this

7

SF0007

information allows the design of a very focused, considerably smaller panel of antibodies to address the patient's disease in question, Dianon did not use such information, but rather used their standard panel, typically of 26 antibodies, for every date of service for such patients. Recognizing that Dianon is a reference laboratory that does a significant number of flow cytometry testing, it would be reasonable for Dianon to craft a series of smaller, targeted antibody panels, depending on the diagnostic question(s) being asked by the referring physician. The pathologist is responsible for choosing the number of antibodies used for a given panel, and with the incorporation of the clinical information supplied by the referring physician, assumes the responsibility to use medically necessary antibodies.

The opinions and conclusions in this report are based on the information I have reviewed to date. I reserve the right to supplement or amend my opinions and conclusions if additional information is supplied.

Very truly yours,

Stuart D. Flynn, M.D.
Professor of Pathology and Surgery

SDF/jhr

8

SF0008

**5**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
 2

 3     - - - - - - - - - - - - - - )
                                    )
 4   UNITED STATES OF AMERICA,      )
     ex rel. Dr. James J. Tiesinga  )NO.: 3:02CV1573(MRK)
 5            PLAINTIFFS            )
                                    )
 6   VS.                            )
                                    )
 7   DIANON SYSTEMS, INC.           )
               DEFENDANT           )
 8     - - - - - - - - - - - - - - )

 9

10

11          DEPOSITION OF: STUART FLYNN, M.D.

12          DATE TAKEN: MAY 10, 2006

13          LOCATION: UNITED STATES DEPARTMENT OF

14                    JUSTICE

15                    157 CHURCH STREET

16                    NEW HAVEN, CONNECTICUT

17

18

19

20

21    REPORTED BY:  IRENE J. PARRISH, RMR, LSR #085
```

Stuart Flynn, M.D. - 5/10/06

Page 18

1 Standardization and Validation of Laboratory
2 Procedures." The first author is Stelzer,
3 S-T-E-L-Z-E-R, again, a 1997 publication.
4         MR. MOLOT:  Do you have a copy for me,
5     please?
6         MR. PARKER:  I just needed to read it.
7 BY MR. PARKER:
8    Q   Dr. Flynn, did you read and review this paper
9 before preparing your report in this case?
10    A   Yes.
11    Q   And was this paper also given to you by
12 counsel?
13    A   Yes.
14    Q   Do you remember, sir, whether you had read
15 this paper in your normal professional practice
16 before it being brought to your attention by the
17 government?
18    A   Don't remember.
19    Q   And this exhibit appears not to have any
20 underlines or markings also; is that correct?
21    A   Correct.

Page 19

1    Q   And do you know, sir, whether or not you made
2 such underlines or markings on another draft of this
3 paper?
4    A   No, I did not.
5    Q   We'll come back to those later in the
6 deposition. Dr. Flynn, you performed an analysis of
7 selected files in 2003 and another analysis of
8 additional files in 2005 that were taken from
9 Dianon's files; is that correct?
10    A   Correct.
11    Q   Can you give me a guess estimate of the
12 amount of time it took you to review each case in
13 2003?
14         MR. MOLOT:  Objection.
15    A   It depends on what kind of range you'd like
16 me to give you, but maybe 30 minutes, 15 to 30
17 minutes per case, but I'm not sure I can be more
18 accurate than that.
19 BY MR. PARKER:
20    Q   Okay. If I was to take your billing
21 statements that reflect the amount of time you spent

Page 20

1 on this case on a per-day basis and I was to look at
2 each of the cases that you did on that day which is
3 reflected in your worksheets and were to divide the
4 number of cases by the number of hours billed, would
5 that give me a reasonably accurate estimate of the
6 number of minutes per case that you spent?
7         MR. MOLOT:  Objection.
8    A   It wouldn't because there was also time I
9 spent in counsel. There was time I spent in travel
10 so there's amorphous time in there that would be an
11 unfair depiction of the amount of time spent per
12 case.
13 BY MR. PARKER:
14    Q   So the amount of time would be even less than
15 the average if I were to divide the total amount
16 of -- say, hypothetically speaking, you billed two
17 hours on June 1st, and you did 10 cases on June 1st.
18 You're saying that the amount of time you actually
19 spent on those 10 cases would be less actually
20 because there was other time spent perhaps doing
21 other things other than just reviewing the cases?

Page 21

1         MR. MOLOT:  Objection.
2    A   Correct.
3 BY MR. PARKER:
4    Q   Can you give me, sir, because I did not see
5 this level of detail in your statements -- can you
6 give me an estimate of the amount of time you spent
7 reviewing the literature on flow cytometry before you
8 prepared your report?
9    A   Total time?
10    Q   Yes, sir.
11    A   I would say under two hours.
12    Q   Under two hours?
13    A   Yes.
14    Q   Okay. Did you at any point in your efforts
15 for the government confer with colleagues in the
16 hematopathologic community regarding the issues in
17 this case?
18    A   No.
19    Q   So if I'm understanding correctly, the extent
20 of your investigation leading up to the preparation
21 of your report consisted of reading under two hours

Stuart Flynn, M.D. - 5/10/06

Page 22

1  of published literature and then reviewing the
2  individual cases?
3          MR. MOLOT: Objection.
4    A   And the other issues of talking with counsel
5  and so on, yes.
6  BY MR. PARKER:
7    Q   Okay. Approximately how long, Dr. Flynn, did
8  it take you to prepare -- to actually write the
9  report?
10   A   I'm not sure I'm going to be able to give you
11 a real accurate number.
12          MR. MOLOT: I'd just caution the
13      witness not to guess. If you have a
14      recollection, give your recollection.
15   A   Yeah. I don't recall which is unfortunate --
16 BY MR. PARKER:
17   Q   Well --
18   A   -- or embarrassing.
19   Q   -- it's not reflected in your billing
20 statements either, is it?
21   A   I haven't billed for that time.

Page 23

1    Q   You haven't billed for that time?
2    A   Correct.
3    Q   When you bill for that time, will you itemize
4  the time actually spent preparing the report?
5    A   I will.
6    Q   So eventually I'll get a copy of that
7  statement, and I'll see how much time you spent
8  preparing that report?
9    A   You will, correct.
10   Q   I take it then, Doctor, you keep time sheets
11 in some manner or some record of the time that you
12 spent doing discrete tasks in this case?
13          MR. MOLOT: Objection. Slow down.
14   A   Go ahead.
15          MR. MOLOT: Objection.
16   A   I keep dates, and I keep the time attached to
17 the dates.
18 BY MR. PARKER:
19   Q   I mentioned earlier, Dr. Flynn, that you have
20 given depositions before, and I'd like to explore for
21 a moment your experience in the litigation arena. If

Page 24

1  I'm not mistaken, you provided us with a list of
2  cases. I don't have extra copies of this so I'm not
3  going to mark it as an exhibit, but I'll hand this to
4  you. I believe this came from your report. It's
5  described as medical legal cases, deposition and/or
6  trial, 2002 to the present, Stuart Flynn. Is that a
7  document that you prepared?
8    A   Yes.
9    Q   Doctor, this exhibit which was --
10          MR. MOLOT: I'm sorry, Bruce. Could
11      you give the Bates numbers so we could have a
12      record?
13          MR. PARKER: Sure. It's Bates stamped
14      SF, as in San Francisco, 0024.
15 BY MR. PARKER:
16   Q   Doctor, this document lists seven cases in
17 which you've given either deposition or trial
18 testimony between a period of September 2003 and
19 December 2005, correct?
20   A   Oh, the dates -- I see. My inclusive date
21 was January 1st, 2002, but, yes.

Page 25

1    Q   And are you sure, Doctor, that this chart
2  contains all of the cases in which you've given trial
3  or deposition testimony in the referenced period of
4  time?
5    A   To the best of my recollection, yes.
6          MR. MOLOT: Bruce, since you're taking
7      so much time, I'll make a quick copy, and
8      we'll mark it.
9          MR. PARKER: Sure.
10          MR. MOLOT: Just give me two seconds.
11          MR. PARKER: Okay.
12          (A short break was taken.)
13          (Defendant's Exhibit No. 6,
14          Medical Legal Cases, Deposition
15          and/or Trial, 1/1/02 to
16          present, marked for
17          identification.)
18 BY MR. PARKER:
19   Q   We've gone ahead and marked as Exhibit No. 6
20 the document that you and I have been discussing over
21 the past couple minutes that was originally appended

7 (Pages 22 to 25)

Stuart Flynn, M.D. - 5/10/06

Page 30

1 generated over the last three years in connection
2 with your work for lawyers?
3    A   I don't know so it's going to be the issue of
4 guessing so I guess I'll ask for advice.
5    Q   Well, do you have records?  I mean, certainly
6 you file tax returns.
7    A   Right, but I don't have that put to memory.
8    Q   So you have the financial records from which
9 you could determine how much money you derived for
10 consulting with lawyers?
11    A   Correct.
12    Q   And you could do that over the last three
13 years?
14    A   Correct.
15    Q   Do you have a reasonable guess estimate of
16 the amount that you earned in 2005, last year?
17         MR. MOLOT:  Objection.
18    A   A reasonable guess estimate would be maybe
19 $10,000.
20 BY MR. PARKER:
21    Q   Annually -- in calendar year 2005?

Page 31

1    A   Right, but that is a guess.
2    Q   I understand, and that would include this
3 case as well?
4    A   Correct.
5    Q   Okay.  Doctor, the money that you earn
6 testifying in legal matters, does it go to you
7 personally or does it go to Yale?
8    A   It goes to me.
9    Q   Do you operate a consulting business for your
10 legal professional activities?
11         MR. MOLOT:  Objection.
12    A   I don't.
13              (Defendant's Exhibit No. 7,
14              curriculum vitae, marked for
15              identification.)
16 BY MR. PARKER:
17    Q   Dr. Flynn, let me hand you Exhibit No. 7
18 which is a copy of your CV that was provided to us,
19 and could you take a quick look at it, sir, and tell
20 me whether this document is current.
21    A   It's current within reason.  The only thing

Page 32

1 that has changed is the director of flow cytometry
2 because we have -- my department has -- I guess, for
3 lack of a better word, that lab has been closed.
4    Q   The flow lab has been closed?
5    A   The flow lab has been closed.
6    Q   When was that done, sir?
7    A   I would say within the last year.
8    Q   In calendar year 2006 or 2005?
9    A   2005.
10    Q   And the reason?
11    A   The reason is we were doing DNA flow
12 cytometry, and the utility of that was not -- the
13 volume was such that we decided it wasn't cost
14 beneficial to keep it open.
15    Q   How long had Yale operated a flow cytometry
16 lab?
17    A   Well, in my department, I was -- a colleague
18 of mine and I started it, and I will say -- and this
19 is within a couple-year deviation -- 1998.
20    Q   Your colleague that you referenced, is that
21 Dr. Smith?

Page 33

1    A   No.
2    Q   And who was the colleague?
3    A   Dr. Buckley.
4    Q   Just to be sure, is there any other flow
5 cytometry lab supporting the medical hospital at Yale
6 Medical School?
7         MR. MOLOT:  Objection.
8    A   There are at least two, and there are
9 probably more than two.
10 BY MR. PARKER:
11    Q   Okay.  Let me make sure I understand.  The
12 lab to which you just referenced closing, what
13 division was that in?
14    A   Pathology.
15    Q   And was that the lab for which you reference
16 on your CV that you were the co-director of?
17    A   Correct.
18    Q   And was that lab in which Dr. Smith was also
19 co-director?
20    A   No, separate lab.
21    Q   All right.  Is the lab that Dr. Brian Smith

9 (Pages 30 to 33)

Stuart Flynn, M.D. - 5/10/06

Page 34

1  is a director of still in business?
2      A    Yes.
3      Q    Okay.  And what division is that lab placed
4  in?
5      A    The Department of Laboratory Medicine.
6      Q    And do you know how long that flow lab has
7  been in operation?
8      A    I don't.
9      Q    Are there any other flow labs within the Yale
10  medical system that are currently in operation?
11          MR. MOLOT:  Objection.
12          Go ahead.
13      A    As I said, there's at least one other, and
14  that's in the cancer center.
15  BY MR. PARKER:
16      Q    And who directs that, sir?
17      A    Do not know.
18      Q    Does the flow lab that is within the
19  Department of Laboratory Medicine provide services
20  for physicians outside of the Yale medical system?
21      A    Yes.

Page 35

1      Q    So hypothetically speaking, they may get a
2  case, let's say, from a physician in California who
3  may want to have his or her patient's specimen
4  analyzed by Yale?
5      A    They get their -- the bulk of their
6  specimens -- I can't comment on specific geographies,
7  but the radius is basically Connecticut, probably
8  hits upstate or hits New York.  I'm not familiar with
9  New York's geography, but it's more geographically
10  confined to that for the most part with outliers.
11      Q    So it's accurate to state, Doctor, that for
12  the most part the flow lab at Yale's -- that is
13  within Yale's Department of Laboratory Medicine
14  largely supports the physicians who have privileges
15  at the Yale Medical Center?
16      A    No, I don't think they necessarily have --
17  again, that's an administrative nuance which I don't
18  want to misrepresent.
19      Q    Um-hum.
20      A    But they're not individuals, for instance,
21  that necessarily admit patients to Yale.  So it's

Page 36

1  these tentacles which I don't pretend to understand.
2      Q    Fair enough.  Doctor, do you know the
3  approximate number of flow cytometry studies that are
4  currently being done on a monthly basis or weekly if
5  that's easier for you by the Department of Laboratory
6  Medicine?
7      A    I think probably the number that's reasonable
8  is daily, and it averages around 10 cases a day.
9      Q    When the flow lab within the pathology
10  department was in operation, what was your volume of
11  cases for flow?
12      A    It averaged, I would say, four to five cases
13  a day.
14          MR. MOLOT:  Did you ask for him
15      personally or --
16          MR. PARKER:  No, the lab within the
17      pathology department.
18          MR. MOLOT:  Okay.  Sorry.  Go ahead.
19  BY MR. PARKER:
20      Q    Doctor, did you sign out cases interpreting
21  flow studies?

Page 37

1      A    Yes.
2          MR. MOLOT:  Object to the form.
3  BY MR. PARKER:
4      Q    Are you board certified in hematopathology?
5      A    No.
6      Q    Was there a board certified hematopathologist
7  signing out cases in the flow lab within the
8  pathology department?
9      A    No.
10      Q    There are, however, board certified
11  hematopathologists working in the flow lab at the
12  Department of Laboratory Medicine, correct?
13      A    Correct.
14      Q    Dr. Smith is a board certified
15  hematopathologist?
16      A    I don't know that.
17      Q    Okay.  But you do know that they do have
18  board certified hematopathologists?
19      A    Actually, I shouldn't say I know.  I'm
20  assuming they do.
21      Q    Have you had discussions with the

10 (Pages 34 to 37)

Stuart Flynn, M.D. - 5/10/06

Page 46

1    A    Dr. Tallini, yes.
2    Q    Okay.  Are Drs. Buckley and Tallini still on
3    the Yale facility -- faculty?
4    A    No.
5    Q    Do you know where Dr. Buckley is presently?
6    A    I believe he's at Duke.
7    Q    And Dr. Tallini?
8    A    Dr. Tallini is at the Cancer Institute in
9    Italy.
10        MR. PARKER:  Get your plane ticket,
11       Rick.
12   BY MR. PARKER:
13   Q    All right.
14        MR. MOLOT:  Are you finished with the
15       CV for now?
16        MR. PARKER:  Yeah.
17        (Defendant's Exhibit No. 8,
18        YNHH Laboratory Manual, Flow
19        Cytometry Consultation, marked
20        for identification.)
21   BY MR. PARKER:

Page 47

1    Q    Okay.  I've handed you Exhibit No. 8 which is
2    a document entitled, "YNHH Laboratory Manual, Flow
3    Cytometry Consultation."  Dr. Flynn, have you seen
4    this document before?
5    A    No.
6    Q    Take a look at it for a moment.  I have one
7    or two questions for you.
8        MR. MOLOT:  You want him to read it?
9    BY MR. PARKER:
10   Q    I'll tell you what.  Go to the last page.
11   The last page should be entitled the table of
12   contents.  I hope your copy is like mine.  Do you
13   have that, Doctor?
14   A    "Reference Documents"?
15   Q    Yes.
16   A    Yes.
17   Q    At the bottom, it makes reference to the
18   Department of Laboratory Medicine, Yale Medical
19   School.  Do you see that?
20   A    Yes.
21   Q    Is that the same group that we have been

Page 48

1    discussing which currently, to the best of your
2    knowledge, operates a flow lab?
3    A    It's one of the flow labs at Yale.
4    Q    All right.  Doctor, take a look, if you
5    would, at the paragraph entitled, "Acute Leukemia."
6        MR. MOLOT:  Why don't you also take a
7        look at the document, make sure you
8        understand what it is.
9        THE DEPONENT:  Um-hum.
10   BY MR. PARKER:
11   Q    When you've had a chance to look at that
12   paragraph, let me know, and I'll ask you my question.
13   A    Okay.
14   Q    All right.  Doctor, did the pathology flow
15   lab design its panels for acute leukemia consistent
16   with the description in this paragraph within
17   Exhibit No. 8?
18        MR. MOLOT:  Objection.  Are you
19        talking about the Department of Pathology
20        flow lab that's closed?
21        MR. PARKER:  Yes.

Page 49

1    A    No.  All of these antibodies weren't
2    available or their merit was not understood at that
3    point.
4    BY MR. PARKER:
5    Q    At what point, sir?
6    A    When the lab was initially designed and
7    activated.
8    Q    Okay.  But as of -- let's approach it this
9    way.  This document we can -- so it's stated in the
10   last page is current through 2005.  Let me ask the
11   question this way:  In 2004, your flow lab was still
12   in operation as best you now recall, right?
13   A    You're referring to the pathology flow lab?
14   Q    When I say "your lab," I will refer to, yes,
15   the flow lab within the pathology department.
16   A    No.  I think it was for DNA flow cytometry,
17   correct.  I think I told you about the year 2000 we
18   quit doing immunophenotyping studies.
19   Q    I don't know -- if you said that, I didn't
20   understand it.
21   A    I may not have.  I knew what I was trying to

13 (Pages 46 to 49)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 50

1 say.
2 Q Let me go back and first understand that
3 aspect of the history of the Yale flow lab. The flow
4 lab within your department ceased doing
5 immunophenotyping in 2000?
6 A And that is a guess.
7 Q I understand.
8 A But a few years ago, correct.
9 Q And that would have been corresponding to the
10 last time you signed out a flow lab for
11 immunophenotyping?
12 A Correct.
13 Q In 2000, the last year in which your lab
14 was -- I understand 2000 may be off by a year or
15 months, but the last year in which your lab was
16 operational, did it construct its panel for acute
17 leukemia consistent with document No. or
18 Exhibit No. 8?
19 A And by "consistent" you mean?
20 Q The same.
21 A I would doubt that it was the same.

Page 52

1 A I'd have to look at some of that -- some of
2 their -- the evolution of some of these. CD117, I
3 would have to see when that actually made commercial
4 viability for lack of a better word. CD64 would be
5 another.
6 Q Are there any documents to your knowledge,
7 sir, that still exist that reflect the panels that
8 were being used by the pathology department flow lab
9 in 2000 or the last year in which it was operational?
10 A Don't know.
11 Q Did the flow lab operate -- that operated
12 within the pathology department have an online
13 description of its services and its panel
14 construction back in 2000?
15 A I don't know.
16 Q Did you receive cases in the -- we talked
17 earlier about the flow lab at the Department of
18 Laboratory Medicine. Did the flow lab within your
19 department, the pathology department, receive cases
20 outside of the Connecticut/New York area?
21 A Infrequently, but, yes.

Page 51

1 Q Could you tell me how it is different?
2 A No, I can't. My memory doesn't go back that
3 far, but I would venture to think that either some of
4 these antibodies either weren't available or their
5 utility was not understood. Many of these antibodies
6 were used, however.
7 Q Can you give me one example of any of these
8 antibodies in the paragraph for acute leukemia whose
9 utility was not understood in your judgment in the
10 year 2000?
11 A CD38 was probably just entering the arena of
12 our appreciating what roles it might play.
13 Q And what role is that, Dr. Flynn?
14 A It plays a role in acute leukemias. It plays
15 a role in the interpretation of multiple myeloma.
16 Q Are there any others?
17 MR. MOLOT: Are there any others what?
18 BY MR. PARKER:
19 Q Are there any others in this paragraph that
20 you're prepared to say were not well appreciated or
21 understood in the year 2000?

Page 53

1 Q But it's accurate to state that the great
2 majority of your cases came within the local
3 community -- local medical community?
4 A Within the state of Connecticut, correct, and
5 I should just add for clarification our lab did solid
6 tumor analysis, and the lab in laboratory medicine
7 did the wet heme analysis which would include blood
8 and bone marrow so there was a natural kind of
9 dichotomy in both the -- in what specimens were seen
10 and, therefore, the design of the panels.
11 Q Let me make sure I understand. So from 1986
12 approximately when you came to Yale we're going to
13 use 2000 as the approximate date when it closed, the
14 flow lab within the pathology department with respect
15 to immunophenotyping only did that service on tissue
16 samples?
17 A Well, they're all tissue samples. It did it
18 on solid tissue with some exceptions, and the lab in
19 laboratory medicine did it on the fluid specimens.
20 Q So if a physician sent you a vial of blood
21 and asked you to do an immunophenotypic study, would

14 (Pages 50 to 53)

Stuart Flynn, M.D. - 5/10/06

Page 54

1  the practice have been back when your lab was
2  operational to send that over to the Department of
3  Laboratory Medicine for analysis?
4      A   It would depend what the question being asked
5  was.  If it was a question of chronic lymphocytic
6  leukemia and it was a bone marrow and we got the
7  core, we would analyze that.  If the question was
8  acute leukemia, we would take advantage of laboratory
9  medicine's panel because that's what they did and
10  send that upstairs.
11      Q   Can you tell me, sir, today whether you've
12  ever signed out a flow study involving blood or bone
13  marrow for purposes of immunophenotyping?
14      A   I have.
15      Q   But it would be accurate to state that that
16  would be the small minority of cases that you
17  actually signed out?
18          MR. MOLOT:  Objection.
19      A   It would be.  I want to clarify in fairness
20  to myself and the process that although I'm not the
21  one signing them out I'm intimately associated with

Page 55

1  not only their interpretation but with their role
2  because --
3  BY MR. PARKER:
4      Q   What does that mean?
5      A   That means I'm a hematopathologist.  So even
6  though a case may be looked at and formally signed
7  out in laboratory medicine, it's a very fluid and
8  collegial relationship so they call me and ask what
9  I'm seeing.  I talk with them.  We have conferences
10  together.  We walk to each other's department so I
11  don't want to make it appear stark because it's not
12  stark.
13      Q   Well, if currently -- and since 2000 at the
14  point when your lab closed for immunophenotyping,
15  when the Department of Laboratory Medicine gets a
16  request to do immunophenotyping, are you called in
17  for consults?
18      A   I actually often get part of the specimen so
19  I'm not a consultant.  I'm actually a diagnostician.
20      Q   You get a part of the specimen for
21  morphologic examination?

Page 56

1      A   Correct.
2      Q   Okay.  For purposes of interpreting
3  immunophenotyping, are you called in as a consult?
4          MR. MOLOT:  Objection.
5      A   I'm called in to integrate what I'm seeing
6  with what they're seeing.
7  BY MR. PARKER:
8      Q   That's not what I'm asking.
9      A   Well, then clarify your question.
10      Q   Okay.  There are components in doing a flow
11  that may involve looking at the morphology, looking
12  at the cells under a microscope and describing what
13  one sees, correct?
14      A   Correct.
15      Q   Another component is looking at the reactions
16  or lack thereof that one gets by using monoclonal
17  antibodies in a flow cytometry study?
18      A   Correct.
19      Q   My question, sir, pertains to interpreting
20  the reactions or lack of reactions to the monoclonal
21  antibodies that are used in a flow cytometry study.

Page 57

1  Have you been called in to give a second opinion on
2  that aspect of a flow study?
3      A   Which aspect so I understand?
4      Q   Interpreting whether or not -- well,
5  interpreting what diagnostic conclusions one can
6  reach from the reactions to the monoclonal
7  antibodies.
8      A   Oh, absolutely.
9      Q   And you've been called in by the folks in the
10  Department of Laboratory Medicine?
11      A   Correct.
12      Q   Now, when you're called in to do a consult,
13  do you write a report?
14      A   Actually, I write a report because I have a
15  specimen in my department.
16      Q   I'm not talking about your evaluation of the
17  morphologic evaluation.  I'm talking about whatever
18  feedback you give to them on your interpretation of
19  the monoclonal antibodies that are used.
20      A   Well, it is incorporated into my report so
21  the answer is yes.

15 (Pages 54 to 57)

Stuart Flynn, M.D. - 5/10/06

Page 58

1    Q    So if I were to issue a subpoena to the
2   Department of Laboratory Medicine and ask them for
3   copies of, let's say, all reports in the last three
4   years in which they've done flow studies, I would see
5   reports from you?
6    A    I think you misinterpreted my answer.  If you
7   subpoenaed my reports, you would see my integration
8   of the flow cytometry results in correlation with the
9   morphology.
10    Q    Okay.  So I would have to issue the subpoena
11   to your department?
12    A    You would.
13    Q    Okay.  Thank you.  Doctor, let's go back to
14   Exhibit No. 8, and let's look at the section
15   entitled, "Lymphoma/Lymphocytosis."  Take a look at
16   that, please, and tell me whether in 2000 your
17   department was using the antibodies described in this
18   paragraph.
19         MR. MOLOT:  Objection.
20    A    I don't have all of them put to memory, but
21   we were certainly using the majority.

Page 59

1   BY MR. PARKER:
2    Q    Are there any that you can tell me now you
3   definitely were not using?
4    A    Again, I would go back to CD38, and I'm not
5   sure that that was a mainstream antibody at that
6   point.
7    Q    Are there any others?
8    A    No, not that I can recall.
9    Q    Let's go over to the next page.  The
10   paragraph labeled, "Myeloma/Lymphoma," can you tell
11   me whether the antibodies described in this paragraph
12   that are utilized by the Yale Department of
13   Laboratory Medicine were also being utilized by your
14   department's flow lab as of 2000?
15         MR. MOLOT:  Object to the form of the
16         question.
17    A    They all were except again CD38, and I just
18   don't recall.
19   BY MR. PARKER:
20    Q    And you just don't recall what, sir?
21    A    Whether or not we were using CD38 at that

Page 60

1   point in time.
2    Q    Doctor, do you have an understanding or an
3   impression from your review of the Dianon records as
4   to how many flow cytometry studies they performed on
5   a daily basis between 1996 and 2004?
6         MR. MOLOT:  Objection.
7    A    Do not.
8   BY MR. PARKER:
9    Q    Would you be willing to state that it was
10   considerably more than what your department was
11   doing?
12    A    I don't know.
13    Q    You don't know?
14    A    No.
15         MR. MOLOT:  Are you finished with this
16         document?
17         MR. PARKER:  For the moment.
18   BY MR. PARKER:
19    Q    When a -- let me approach it this way.  Do
20   you know whether the current practice -- let me try
21   it one more time.

Page 61

1         Do you know whether the practice in 2000,
2   the year in which your lab -- your flow lab was last
3   doing immunophenotyping -- did it operate
4   fundamentally the same or different than the
5   Department of Laboratory Medicine with respect to
6   design of the panels?
7         MR. MOLOT:  Objection.
8    A    Fundamentally similar.
9   BY MR. PARKER:
10    Q    Okay.  When a specimen came into your lab in
11   2000, walk me through the process, sir, as to how
12   that specimen would be handled from the time it was
13   received to the time the technologist or technicians,
14   excuse me, put the specimens in the machines that
15   read the monoclonal antibodies.
16    A    Okay.  So I want to clarify again just so we
17   understand the distinction this was a solid tumor
18   based flow cytometry immunophenotyping laboratory so
19   what that meant in the vast majority of the cases was
20   lymphoma.  So a specimen would come out of the
21   operating room, come to pathology.  We would decide

Stuart Flynn, M.D. - 5/10/06

Page 62

1   if there was another tissue to put through for flow
2   cytometry, and if there was, then the specimen would
3   be sent to the flow cytometry lab at which point the
4   cells would be disassociated. We would have already
5   made touch preps in pathology so we had some
6   indication of what we were expecting to see
7   morphologically, and then the case would get prepped.
8   We would make tubes of cells, and we would add the
9   aliquots of antibodies that we were using at the
10   time.
11      Q   Who made the decision as to what antibodies
12   were to be placed in which tubes?
13      A   That was designed by Patrick and myself, and
14   then we would adjust that as time went by if it
15   needed adjusting.
16      Q   I'm not sure I understand that. Firstly, you
17   mentioned that you would get tissue from the
18   operatory from someone suspected, I presume, of
19   having a lymphoma?
20      A   Correct.
21      Q   But if I'm not mistaken, you said there were

Page 63

1   some occasions where you would have received some of
2   those similar samples through the mail from a
3   physician not operating in an operating room within
4   the Yale medical facility?
5      A   Correct.
6      Q   Okay. Let's talk about those instances where
7   you received the sample through overnight mail. And
8   there were such occasions?
9      A   Yes.
10      Q   They're initially received by a technician?
11      A   No. They're received in surgical pathology
12   once again so the process is once they're received --
13          MR. MOLOT: Wait for the next
14      question.
15   BY MR. PARKER:
16      Q   Take me through it. So what do you mean they
17   were received by a surgical pathologist?
18      A   So the case is sent to pathology, and once it
19   comes to pathology, it didn't make any difference if
20   it had come from the outside or if it had come from
21   the operating room.

Page 64

1      Q   So you or your colleague would take a look at
2   the sample, correct?
3      A   Correct.
4      Q   And then do I understand that based on the
5   clinical information you had in hand you would then
6   design a customized panel for that patient?
7      A   No. We already had a customized panel
8   because the question was typically lymphoma and
9   issues related to that.
10      Q   So you used the same panel for all the
11   lymphoma cases that were presented to you?
12      A   Correct.
13      Q   And can you tell me now by memory what
14   antibodies were in your lymphoma panel as of 2000 or
15   the last year in which your lab operated?
16      A   I cannot tell you from memory.
17      Q   And further not only did you have
18   predetermined the particular antibodies that you
19   would use, but I presume, and correct me if I'm
20   wrong, that you would also determine the combination
21   of antibodies that you would use together?

Page 65

1      A   Correct.
2      Q   How many colors did you use in your lab in
3   2004 of immunophenotyping?
4      A   Two colors.
5      Q   Was that state of the art in 2000?
6      A   You'd have to define "state of the art."
7      Q   Do you know what that term means?
8      A   I think it means a lot of different things to
9   a lot of different people.
10      Q   Well, in your judgment, did your lab using
11   two colors represent the state of the art?
12          MR. MOLOT: Objection. I think he
13      said he's not sure.
14      A   I'm not sure what you mean by "state of the
15   art." Was it diagnostically viable and valuable, the
16   answer is yes.
17   BY MR. PARKER:
18      Q   So two colors was valuable and provided in
19   your judgment accurate information with regard to
20   interpreting immunophenotyping in lymphoma cases?
21      A   Correct.

17 (Pages 62 to 65)

Page 70

1      MR. MOLOT: Objection to the form.

2      Go ahead.

3    A   We would do that, and we would also ask for

4  information about the patient.

5  BY MR. PARKER:

6    Q   And what are the conditions, Dr. Flynn, under

7  which your lab would do the immunophenotyping study?

8    A   Again, if it was a lymphocytosis question --

9    Q   I'm going to go back to my hypothetical.  If

10  all you get from a doctor is rule out leukemia, is

11  that lymphocytosis?

12      MR. MOLOT: Objection.

13    A   Well, again, you can't -- I'll keep saying

14  this.  It's not done in a vacuum so I have a smear

15  that I can look at, very valuable information, and I

16  also can talk with the physician or the physician's

17  office, very valuable information.

18  BY MR. PARKER:

19    Q   So if you determine that it's a question of

20  lymphocytosis and you elect to go forward with the

21  study, did you have panels already constructed at

Page 71

1  that time?

2    A   Yes.

3    Q   And do you remember what antibodies you were

4  using at that time to assess whether a specimen, in

5  fact, had a lymphocytosis?

6    A   To address what the lymphocytosis was?

7    Q   Yes.

8    A   Yes.  It would have been very similar if not

9  identical to the lymphoma panel because it's the

10  identical question.

11    Q   You say "it would have been."  Are you

12  telling me that, in fact, it was?

13    A   Well, I won't state that categorically, but

14  it would have been very close if not identical.

15    Q   And we've addressed lymphomas.  We've

16  addressed lymphocytosis.  Would you do a study where

17  you thought either by virtue of what you were told by

18  the physician or by what you saw in the blood study

19  the question presented was a likely leukemia?  Would

20  you do that study?

21      MR. MOLOT: Objection.

Page 72

1  BY MR. PARKER:

2    Q   A myelogenous leukemia?

3    A   No.

4    Q   Why not?

5    A   We would send it upstairs.

6    Q   Why wouldn't you do it yourself?

7    A   Because it was a redundancy of effort that

8  they could -- they were more defined and refined to

9  do that.  That was their focus was wet heme.  Our

10  focus was solid heme.

11    Q   More skilled?

12    A   I don't think more skilled, just efforts that

13  were distributed.

14    Q   Well, was there a redundancy between your lab

15  and the Department of Laboratory Medicine's lab with

16  regard to lymphocytosis?

17    A   There would be, but, again, that was within

18  both of our purviews I think is a fair way to put it.

19    Q   So there was redundancy there.  Wasn't there

20  also redundancy in the efforts with regard to

21  lymphomas?

Page 73

1    A   No.  They did not see any of the solid

2  specimens.

3    Q   So any solid specimen that happened to come

4  into that department was sent downstairs to your

5  group?

6    A   Correct.

7    Q   Let's go back to Exhibit No. 8 if you would.

8  In light of your last answer, I'm not sure I

9  understand, and perhaps you can help me why if this

10  lab is not doing lymphoma cases they have a

11  description of their panel for myelomas, slash,

12  lymphomas?

13    A   Because when we closed the immunophenotyping

14  part of our lab, those efforts went to laboratory

15  medicine.

16    Q   So if this document in some form existed in

17  1999, you would expect not to see a paragraph

18  labeled, "Myelomas/Lymphomas"?

19      MR. MOLOT: Objection.

20    A   I can't tell you what you would have seen in

21  1999.

19 (Pages 70 to 73)

Stuart Flynn, M.D. - 5/10/06

Page 298

1  their provisional diagnosis"?
2      A    We know that histories can come in wrong.
3  I've never had that specific -- in other words, what
4  percentage or whatever, but that's an accepted noise
5  in the system.
6      Q    So is it wise as a pathologist being called
7  upon to tell the physician what's actually going on
8  in their patient to assume that the provisional
9  diagnosis is right or to in essence challenge that
10  diagnosis?
11          MR. MOLOT:  Objection.
12     A    What do you mean by the second part of that
13  question?
14  BY MR. PARKER:
15     Q    To challenge the accuracy by looking at other
16  conditions.
17     A    Well, the way I would engage with you in this
18  is to ask the question from the other angle, and that
19  is what are the other entities that the antibodies
20  you're using addressing and then see what the
21  likelihood and the potential is because I think

Page 299

1  that's relevant to this discussion.
2      Q    Let's go back to this case, and let's go back
3  to Exhibit No. 8 which was the Yale presentation of
4  their flow studies, Exhibit No. 8.
5      A    Okay.
6      Q    And, once again, Doctor, directing your
7  attention to the paragraph for AL in Exhibit No. 8
8  and engaging in the assumption that the Department of
9  Laboratory Medicine at Yale in doing their flow
10  studies in August of 2003 were using the antibodies
11  that are described in that document, would you agree
12  with me that they were using, with that assumption in
13  mind, several of the antibodies you found to be
14  medically unnecessary in this case?
15          MR. MOLOT:  Object to the form.
16     A    No.  I think that would be kind of a
17  superficial depiction of the comparison so the way I
18  would make the comparison is, first of all, we have
19  information about this patient.  Secondly, the
20  entities that they're alluding to detecting here
21  basically include ALL and AML, and I would submit

Page 300

1  that the panel that I have proposed for this patient
2  will detect ALL and will detect AML.
3  BY MR. PARKER:
4      Q    Can we agree on this, Doctor, that in the
5  document you're looking at Yale tells the public as
6  of the date of that publication that when they test
7  for AL they use, among others, antibodies 2, 4, 8, 5,
8  22 and HLA?
9      A    Again, I just want to reiterate targeted
10  panels are done so ultimately this may be the
11  distillation that you end up doing these antibodies.
12  I would not infer from this that that's necessarily
13  their first cut.
14     Q    Doctor, answer my question if you could,
15  please.  Are those antibodies contained in that
16  document that I just mentioned?
17          MR. MOLOT:  Objection.  That wasn't
18      your question.
19     A    That wasn't the question.
20  BY MR. PARKER:
21     Q    Then I'll make it real clear.  Doctor, does

Page 301

1  Yale state in Exhibit No. 8 that among the antibodies
2  used to detect AL cases include 2, 4, 8, 5, 22 and
3  HLA?
4      A    They do out of the context of any other
5  information.
6      Q    So if the Yale -- your colleagues in doing a
7  flow study on a patient in identical respects -- in
8  all respects to patient No. 123 in August of 2003
9  used 2, 4, 8, 5, 22 and HLA, your testimony would be
10  that your colleagues at Yale were using medically
11  unnecessary antibodies?
12          MR. MOLOT:  Object to form.
13     A    Give me just a couple seconds if you would
14  to -- no.  I apologize.  I wanted to see -- and I do
15  see reference to an old report here, but it
16  doesn't -- it certainly doesn't reference it to the
17  point that I know -- that I knew and, therefore, that
18  the pathologists at Dianon would have known, but,
19  again, maybe I'll ask you to repeat the question.  I
20  apologize.  I got side tracked, but there is
21  reference to Dianon having seen previous material on

76 (Pages 298 to 301)

Stuart Flynn, M.D. - 5/10/06

1    this patient. What I don't see is reference to the
2    ALL which would have certainly allowed additional
3    information which would have been helpful in regards
4    to looking for residual blasts, but I don't see that
5    information here.
6    BY MR. PARKER:
7     Q   Move to strike. I don't think that was
8    responsive to the question.
9         MR. PARKER: Could you please read
10      back the question.
11         (Reporter read the last
12         question.)
13     A   Well, first of all, identical to this
14    patient? Then, the answer would be yes, because I
15    think they would have addressed this differently.
16    BY MR. PARKER:
17     Q   And it would be Dr. Smith who would be the
18    best person to tell me that?
19     A   Yes.
20         (Defendant's Exhibit No. 28,
21         notes, Bates stamped SF0467,

1         marked for identification.)
2    BY MR. PARKER:
3     Q   This is my working copy, but I have to use
4    it. I'm going to hand you, Dr. Flynn, as Exhibit 28
5    what I pulled from your notes. It's Bates No.
6    SF0467, and for the record, it's my highlighting on
7    the entry for A124; is that correct? Yes. And A124
8    would have been the second review in the patient that
9    we've been just discussing; is that correct, sir?
10     A   You said those do correspond, the 124?
11     Q   The patients we just talked about went from
12    123 to 125. There were three repeat studies.
13     A   Yes.
14         MR. MOLOT: Mind if I burn a copy of
15      this?
16         MR. PARKER: Sure. Off the record.
17         (A short break was taken.)
18    BY MR. PARKER:
19     Q   All right. We're back on the record, and,
20    Doctor, Exhibit 28, just so we're clear, is a copy
21    out of your notes; is that right?

1     A   Correct.
2     Q   And the reference to A124, does that
3    correspond to the second report in the exhibit that
4    we just were discussing, Exhibit 28 -- Exhibit 27?
5     A   Correct.
6     Q   So we're clear, when you got to claim 120 --
7    excuse me -- report 124, in your notes, you wrote,
8    "Expanded panel to characterize ALL." Did I read
9    that correctly?
10     A   Yes.
11     Q   Tell me what you meant by "expanded panel."
12     A   I think what I meant is Dianon did additional
13    antibodies after their initial run which I reference
14    in the bottom. So I believe that's a reference to
15    Dianon expanding their panel to characterize the
16    acute leukemia. In other words, they did 79a TDT,
17    CD117 and MPO.
18     Q   So, Doctor, if I understand correctly, you
19    also concluded that none of those additional
20    antibodies were medically necessary?
21     A   Those didn't come up on their initial draft

1    so I didn't address those antibodies. That was
2    reflected to me that they had the ability to make
3    second-tier decisions on a given case. This is an
4    example of such, but I don't know if they billed
5    those. They didn't report them.
6     Q   We're not talking about billing.
7     A   I understand, but they also did not report
8    them on the one form that I looked at as I generated
9    my panel. As you'll see, none of those is declared
10    as being medically unnecessary.
11     Q   Well, I don't know that. All I have is
12    what's medically necessary, and we have 12 out of the
13    26 --
14     A   Well, no. You have the medically
15    unnecessary. That's all of those that are
16    articulated. None of those four antibodies on the
17    bottom are in that list.
18     Q   I understand that, Doctor. Stay with me. 26
19    antibodies are in the standard panel, correct?
20     A   Correct.
21     Q   12 you decided to be necessary?

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Stuart Flynn, M.D. - 5/10/06

Page 322

1    Q    Can you answer the one I asked you?
2          MR. MOLOT:  Objection.
3    A    Can you repeat it?
4  BY MR. PARKER:
5    Q    Yeah.  When you're telling me in your
6  analysis when the doctor is now seven months after
7  the first report believing that his patient may have
8  progressed to or deteriorated to a life-threatening
9  condition, AML, to help diagnose that condition,
10  you're saying Dianon should have cut their panel back
11  by almost 50 percent?
12    A    So after I say yes or no, am I allowed to
13  talk?
14    Q    Sure.
15    A    So the answer is yes, and, secondly, it's not
16  the progression of the disease.  You are given the
17  stated history this patient has received
18  chemotherapy.  So in somebody's eyes, there is no
19  question what is being treated; okay?  So that's the
20  first point.  The second point is we can discuss
21  every one of the antibodies that are medically

Page 323

1  unnecessary; and they are irrelevant to addressing
2  the issue of this patient's acute leukemia.
3    Q    So you're saying if I went down to the folks
4  that work at the Yale medical reference laboratory
5  and I say, "If a patient presents with AML, do you
6  think it's the standard of care to exclude those
7  antibodies for hairy cell leukemia, for example,"
8  they would tell me, "Absolutely, you exclude those
9  antibodies"?
10          MR. MOLOT:  Objection.
11    A    They would tell you, yes.
12  BY MR. PARKER:
13    Q    Okay.  And it's your testimony that a
14  laboratory working up a patient with a suspicion of
15  AML is within the standard of care to use the
16  antibodies you've described here; is that right?
17    A    And very possibly with the phenotype of this
18  patient's AML, but the answer is yes.
19    Q    Okay.
20          MR. MOLOT:  Off the record for 30
21  seconds.

Page 324

1          MR. PARKER:  Absolutely.
2          (A short break was taken.)
3          MR. PARKER:  Okay.  We're now up to
4  Exhibit 30.
5          MR. MOLOT:  31.
6          MR. PARKER:  Exhibit 30 and patient 6.
7          MR. MOLOT:  No.  I think the notes
8  were 30.
9          MR. PARKER:  That's right.  Let me
10  have that back, and we'll make this instead
11  Exhibit 31.  31 then is patient No. 6.
12          (Defendant's Exhibit No. 31,
13          collection of documents, Sample
14          No. 6, marked for
15          identification.)
16  BY MR. PARKER:
17    Q    And you performed this analysis, Doctor, back
18  on December 10th, 2005?
19    A    Correct.
20    Q    And this flow study was done by Dianon when
21  they were using 22 antibodies; is that correct?

Page 325

1    A    Correct.
2    Q    And you determined that all but four were
3  medically necessary?
4    A    Correct.
5    Q    Now, the presenting diagnosis here is anemia;
6  is that right?
7    A    Correct.
8    Q    When a patient presents with anemia, that may
9  be explained by any number of abnormalities in the
10  bone marrow.  Would you agree with that?
11    A    Or outside of the bone marrow, correct.
12    Q    Or outside.  And to accurately and fully
13  characterize disorders of the bone marrow that could
14  produce anemia, is it your testimony that it is
15  unnecessary, medically unnecessary, to use CD2, 22,
16  25 and HLA DR?
17    A    Correct, in this case, correct.
18    Q    What is it about this case that leads you to
19  conclude that in a patient presenting with anemia it
20  was wrong for Dianon to use 2, 22, 25 and HLA DR?
21          MR. MOLOT:  Object to the form.

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| <u>ex</u> <u>rel</u>. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:02CV1573(MRK) |
| | ) | |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
|      Defendant. | ) | |

### <u>PROPOSED ORDER</u>

      Upon consideration of Dianon Systems, Inc.'s Motion to Compel Yale New Haven Hospital to Produce Documents Pursuant to Subpoena and any opposition thereto, it is this ___ day of _____, 2006 hereby ORDERED that said Motion is hereby GRANTED, and it is further ORDERED that Yale New Haven Hospital shall produce documents responsive to categories 1, 3, and 5 of the subpoena document schedule no later than ____ days from the date of this Order.

_____
Judge, United States District Court for the
District of Connecticut