UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA Ex rel. DR. JAMES J. TIESINGA, | ) ) ) | CASE NO. 3:02-CV-1573 (MRK) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DIANON SYSTEMS, INC., | ) ) | |
| Defendant. | ) ) ) | August 23, 2006 |

**NON-PARTY YALE-NEW HAVEN HOSPITAL'S
MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO COMPEL**

Pursuant to Federal Rule of Civil Procedure 45 and Local Civil Rule 7(a)(1), non-party

Yale-New Haven Hospital (the "Hospital") respectfully submits this memorandum of law in

opposition to Dianon Systems, Inc.'s ("Dianon") motion to compel, dated August 2, 2006, and

requests that the Court quash Dianon's subpoena, dated June 21, 2006.

This lawsuit involves claims by the United States against Dianon, a clinical laboratory,

under the False Claims Act, 31 U.S.C. §§ 3729-3733. The United States alleges that Dianon

fraudulently billed federal healthcare programs for antibodies that it used in flow cytometry tests,

but which were not medically necessary. In its defense to the United States' claims, Dianon

contends that its indiscriminate use of a standard panel of antibodies comported with the

applicable standard of care.

The Hospital is not a party to this lawsuit, and has no factual knowledge pertaining to

Dianon's choice of antibodies for its flow cytometry testing or to its billing practices.

**ORAL ARGUMENT REQUESTED**

Nonetheless, Dianon has subpoenaed the Hospital in a misguided attempt to conscript the

Hospital into service in its battle against the government's sole expert on the standard of care.

The Court should deny Dianon's motion to compel, and quash the subpoena, for two reasons.

First, Dianon's subpoena subjects the Hospital to an undue burden. *See* Fed. R. Civ. P.

45(c)(3)(A)(iv). Second, Dianon's subpoena is a back-door attempt to obtain expert information

from an unretained nonparty who does not wish to be involved in this lawsuit. *See* Fed. R. Civ.

P. 45(c)(3)(B)(ii).

## I. BACKGROUND

This action was filed by the United States against Dianon under the False Claims Act, 31

U.S.C. §§ 3729-3733. Dianon is a clinical laboratory that performs flow cytometry testing. *See*

Amended Compl. ¶¶ 10, 25. Flow cytometry is a laboratory test performed on cells in liquid

suspension (i.e., blood, bone marrow, body fluids, or tissue cell suspensions) that have been

incubated with fluorescently tagged antibodies directed against specific cell surface proteins.

*See id.* ¶ 26. The relative fluorescence intensity of the cells that results from such testing is used

to evaluate particular types of cancer. *See id.* ¶ 26.

The United States alleges that, beginning in 1996, Dianon indiscriminately used a

standard panel of 26 antibodies in conducting flow cytometry tests, and billed federal healthcare

programs for all antibodies used, even though some of the antibodies were not medically

necessary in many cases. *See id.* ¶¶ 28-36. In the government's view, Dianon should have used

patient-specific information accompanying each tissue sample it tested and its own medical

judgment to select panels aimed at identifying the particular type of cancer suspected by the

referring physician. *See id.* ¶ 37. The government claims that, by using standard panels without

regard to the patient's particular circumstances and then billing federal healthcare programs for

each antibody used, Dianon submitted false or fraudulent claims in violation of the False Claims Act. *See id.* ¶ 37.

Dianon's defense is that "its antibody panel for flow cytometry testing was well within the prevailing medical standards, [its] methodology was consistent with peer reviewed medical literature, and [its] antibody panel design provided excellent patient care." Mot. to Compel ¶ 4 (Aug. 2, 2006).

The Hospital is not a party to this lawsuit. It does not have a relationship with Dianon, and it does not have any knowledge of a factual nature in its possession, custody, or control pertaining to Dianon's panels. *See* Exhibit 1 ¶ 7. Nonetheless, on June 21, 2006, Dianon served the Hospital with a subpoena requiring it to produce a multitude of documents, spanning a ten year period of time, pertaining to the practices and procedures of the Hospital's Flow Cytometry Laboratory (the "Hospital lab"). After the Hospital lab objected to that subpoena, Dianon moved to compel. The Hospital opposes that motion, and respectfully requests that the Court quash Dianon's subpoena, for the following reasons.

## II. ARGUMENT

### A.     The Hospital did not waive its objections.

Rule 45 provides that "a person commanded to produce . . . may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection." Fed. R. Civ. P. 45(c)(2)(B). Without citing a single case construing that provision, Dianon asserts that this Court reflexively should conclude that the Hospital waived its objections by serving them more than 14 days after the subpoena issued. *See* Mot. to Compel ¶ 1. That assertion ignores well-established precedent and misconstrues the record in this case.

As widely recognized, the strict interpretation of Rule 45 urged by Dianon "'would discourage informal dispute resolution among parties who cause issuance of subpoenas duces tecum and those to whom the subpoenas are issued,' a result that 'certainly would work against the efficient administration of justice.'" *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 52 (S.D.N.Y. 1996) (quoting *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 1991 WL 172930, at *1 (N.D. Ohio June 21, 1991)). District courts thus routinely exercise discretion to consider objections served beyond the 14-day time period of Rule 45 when (1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; (2) the subpoenaed witness is a nonparty acting in good faith; or (3) counsel for the witness was in contact with counsel for the party issuing the subpoena prior to filing its formal objection. *See, e.g., Yousuf v. Samantar*, 451 F.3d 248, 252 (D.C. Cir. 2006) (failure to object within 14 days properly excused where the subpoenaed party "is a nonparty acting in good faith; the subpoena is broad enough at least to raise a question of overbreadth; and counsel for the [subpoenaed party] acted promptly to contact counsel for the [party issuing the subpoena] and to file his objections"); *Semtek Int'l, Inc. v. Merkuriy Ltd.*, 1996 WL 238538, at *2 (N.D.N.Y. May 1, 1996) (same); *Concord Boat*, 169 F.R.D. at  52 (same); *see also* 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 45.41[1][c] (3d ed. 2006).

Here, counsel for the Hospital and Dianon promptly engaged in conversations after the subpoena issued in an informal effort to resolve issues surrounding the subpoena.[1] It was counsel's understanding from those conversations that a conference call would be held with the Court on July 31, 2006 to address the dispute over the subpoena and to avoid formal motions practice. In a subsequent email informing counsel for the Hospital that the July 31

---

[1] The breadth of the subpoena is explained thoroughly in the next section.

teleconference had been canceled and that this dispute had been referred to a Magistrate Judge,

counsel for Dianon stated that Dianon would move to compel. *See* Mot. to Compel, Ex. 3.

Dianon has been aware of the Hospital's objections to the subpoena from the beginning, and, in

light of both parties' voluntary efforts to resolve this dispute informally, Dianon cannot claim

any prejudice resulting from the timing of service of the Hospital's written objections.

Accordingly, this Court should decline Dianon's invitation to apply a strict interpretation of Rule

45's 14-day time period in this case.

**B.    The Subpoena Should be Quashed Pursuant to Rule 45(c)(3)(A)(iv).**

Dianon's subpoena imposes an "undue burden" on the Hospital and, therefore, should be

quashed. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). An evaluation of undue burden "requires the court

to weigh the burden to the subpoenaed party against the value of the information to the serving

party." *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005). In

that regard, courts give "special weight" to the burden on non-parties of providing information to

parties involved in litigation. *Id.*

Here, Dianon's subpoena seeks to compel the Hospital, a non-party, to produce the

following documents "regarding the use of flow cytometry . . . during the period 1996 to the

present":

> 1.    All protocols, procedures or manuals that relate to how the [Hospital lab]
> handles and processes bone marrow, peripheral blood and tissue specimens.
> Please include those policies, procedures and protocols for processing a specimen
> from its receipt at the [Hospital lab] through the testing of the specimen in the
> flow cytometer.

> 2.    All templates, forms, worksheets or other standard procedures for: (a)
> selecting antibodies used in bone marrow, peripheral blood and tissue sample
> flow cytometry testing; (b) requesting flow cytometry testing (requisition forms);
> (c) analyzing flow cytometry test results; and (d) reporting results.

3.    All policies, procedures, manuals or forms reflecting the antibody or reagent combinations used in flow cytometry testing of bone marrow, peripheral blood and tissue samples.

4.    All policies, procedures, manuals or forms used to train or educate hematopathology residents, fellows or laboratory technicians in the (a) selection of antibodies used in flow cytometry testing; (b) antibody or reagent combinations used in each test tube for flow cytometry testing; and (c) reporting of results form flow cytometry testing.

5.    Any and all list(s) [of] antibody or reagent test tube combinations the [Hospital lab] uses in the diagnosis of (a) lymphoma; (b) leukemia; (c) chronic lymphocytic leukemia (CLL); and (d) myeloid disease processes using flow cytometry testing during the years 2002, 2003, 2004, 2005 and 2006.

Mot. to Compel, Ex. 1 Document Schedule. Put simply, Dianon's subpoena would compel the Hospital to produce ten years' worth of protocols, procedures, policies, manuals, templates, forms, worksheets, requisition forms, reports, analyses, and training materials related to the Hospital's flow cytometry work on its own patients who have no connection to Dianon or this lawsuit. The subpoena is unduly burdensome.

First and foremost, unlike Dianon, the Hospital lab does not use a standard panel of antibodies in its flow cytometry tests. *See* Exhibit 1 ¶ 8. Instead, it tailors each panel to the individual circumstances of each patient. *Id.* Therefore, to respond to Dianon's request for documents, the Hospital lab would have to obtain and review each patient's individual record, of which there are tens of thousands. *Id.* The resulting burden of reviewing and redacting many, if not most, of those records to eliminate patient-specific information, as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), would be daunting, and the time and expense required to perform that task would be exorbitant. *See* Exhibit 1 ¶ 9.

Second, even producing materials that do not contain patient-specific information would be overly burdensome due to the breadth of the requests. For example, in Request 4 alone, Dianon seeks, for a ten-year period of time, "[a]ll policies, procedures, manuals or forms used to

train or educate hematopathology residents, fellows or laboratory technicians" with respect to the selection of antibodies and the reporting of testing results. That request embodies an overwhelming amount of written material, some likely archived and stored off-site, that cannot be produced without imposing an enormous burden with respect to time and cost on the Hospital lab. *See* Exhibit 1 ¶ 9.

Dianon has offered to narrow the scope of the subpoena by requesting: (1) "documents that outline the various antibody combinations the [Hospital lab] used" from 1996 to the present; and (2) "one or more laboratory manuals describing how [the Hospital lab] process[es] flow cytometry specimens," unless the methodology has changed in the last ten years, in which case, "additional documents that track those changes would be necessary." Mot. to Compel ¶ 17.

However, Dianon's first revised request would impose an undue burden on the Hospital because, again, the Hospital lab has chosen antibodies on a patient-specific basis, and thus would have to unearth ten years' worth of records regarding tens of thousands of patients—patients who have no connection to Dianon or this lawsuit—and would then have to redact patient-specific information from those records. *See* Exhibit 1 ¶ 9. Dianon's second request is no less burdensome because it would require the Hospital lab to compare and contrast its current manual with those from the last ten years, many of which likely have been archived and stored off-site, to determine what changes have been made and what "additional documents . . . track those changes." *See* Exhibit 1 ¶ 10. The current manual alone is comprised of multiple binders spanning thousands of pages, and a comparison of that manual against prior manuals used over the last ten years would exact a heavy toll in time, effort, and expense. *See id.*

Those burdens that Dianon so eagerly wishes to impose on the Hospital lab must be balanced against the benefit to Dianon in obtaining the requested information. *See Travelers*

*Indem.*, 228 F.R.D. at 113.  As explained more thoroughly in the next section, the only value that Dianon can obtain from the information requested of the Hospital pertains to the standard of care in the practice of flow cytometry—an issue reserved for experts.  Dianon thus is using the subpoena power to conscript the Hospital into serving as an expert, which, as discussed below, is an abuse of that power.

Therefore, the balance plainly favors the Hospital, and the subpoena should be quashed pursuant to Rule 45(c)(3)(A)(iv).

**C.    The Subpoena Should be Quashed Pursuant to Rule 45(c)(3)(B)(ii).**

Dianon subpoenaed the Hospital after it deposed the government's sole expert, Stuart Flynn, M.D., on the prevailing medical standards for flow cytometry.  *See* Mot. to Compel ¶ 6 & Exs. 1, 5.  Dianon requested information from the Hospital in order to establish "the standard of care or prevailing medical standards regarding flow cytometry antibody panel design" and, in that regard, to undermine Dr. Flynn's expert testimony.  *Id.* ¶¶ 11-13.  However, establishing the standard of care is a job reserved for experts.  In effect, therefore, Dianon is attempting to force the Hospital to serve as an expert on the prevailing standard of care.  Dianon cannot do so under Rule 45(c)(3)(B)(ii).

Rule 45 affords protection to unretained experts, such as the Hospital, by authorizing courts to quash subpoenas that seek to compel their "opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party."  Fed. R. Civ. P. 45(c)(3)(B)(ii).  That provision was added to Rule 45 in 1991 specifically to combat the "growing problem" of "the use of subpoenas to compel the giving of evidence and information by unretained experts" and to provide "protection for the intellectual property of the non-party witness."  Fed. R. Civ. P. 45 advisory committee's note.

Recognizing that "compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services," the rule "establishes the right of such persons to withhold their expertise." *Id.*

That protection applies here because the parties to the underlying lawsuit dispute whether Dianon fraudulently billed federal healthcare programs for antibodies that were not medically necessary, and the Hospital lab is not in possession of facts pertaining to that issue. *See* Exhibit 1 ¶ 7. Accordingly, it is plain that the Hospital cannot provide information "describing specific events or occurrences in dispute" between the parties. Fed. R. Civ. P. 45(c)(3)(B)(ii).

Dianon erroneously contends that Dr. Flynn's expert opinion regarding the standard of care is based on the flow cytometry practices of the Hospital lab, and that the Hospital lab consequently should be compelled to provide information undermining his testimony. *See* Mot. to Compel ¶¶ 2, 7, 9-12, 14, 16. Dr. Flynn formerly worked in a pathology laboratory associated with Yale University (the "University lab")—not the Hospital lab. *See* Mot. to Compel ¶ 9 & Ex. 5 at 33-34; Exhibit 1 ¶ 6. As even Dianon acknowledges, the Hospital lab and the University lab are distinct entities. Mot. to Compel ¶ 9; Exhibit 1 ¶ 6. Dr. Flynn's testimony cannot be based on the practices and policies of a laboratory in which he did not work, and Dianon's argument to the contrary is supported with only the flimsiest patchwork of bits and pieces of Dr. Flynn's deposition testimony. *See* Mot. to Compel ¶¶ 2, 7, 9-12, 14, 16.[2]

As Dianon points out, Dr. Flynn did testify that individual cases sometimes involved participation of, and consultation between, employees of both laboratories. *See* Mot. to Compel, Ex. 5 at 53-57. He further testified that, at times, he personally read, and incorporated the results

---

[2] To the extent that Dr. Flynn's testimony can be construed purportedly to be based on the practices of a laboratory in which he did not work, there may be a basis to preclude his testimony, but it cannot supply a basis to force an unwilling nonparty to participate in this lawsuit.

of, flow cytometry tests performed by the Hospital lab into his own reports for the University lab. *See id.* at 56-58. However, Dr. Flynn made clear that, in order to obtain such reports, Dianon "would have to issue the subpoena to [the University lab]," and not the Hospital lab. *Id.* at 58. Moreover, when asked generally about the Hospital flow cytometry practices, and specifically whether the Hospital used medically unnecessary antibodies, Dr. Flynn disclaimed any knowledge, testifying that Dr. Brian Smith, the Director of the Hospital lab, would have to answer such questions. *Id.* at 301-02.

Dianon also emphasizes that, at his deposition, "Dr. Flynn testified how the [Hospital lab] would handle suspected leukemia cases," but expresses dismay that Dr. Flynn "could not state which antibodies the [Hospital lab] used in flow cytometry testing." Mot. to Compel ¶ 12 (citing Ex. 5 at 48-49, 61, 299-302, and 323). It should come as no surprise that Dr. Flynn was unable to testify about what antibodies the Hospital used in its flow cytometry testing—he did not work there. And Dr. Flynn's supposed "testimony" about how the Hospital lab would handle suspected leukemia cases was nothing more than speculative responses to hypothetical questions. *See, e.g., id.*, Ex. 5 at 299 ("Q.  And, once again, Doctor, . . . engaging in the *assumption* that the [Hospital lab] in doing their flow studies in August of 2003 were using the antibodies that are described in [a document entitled 'YNHH Laboratory Manual, Flow Cytometry Consultation'], would you agree with me that they were using, with that assumption in mind, several of the antibodies you found to be medically unnecessary in this case? . . . A.  No.  I *think* that would be kind of a superficial depiction of the comparison so the way *I would make* the comparison is, first of all . . . .") (emphases added); *id.* at 323 ("Q.  So you're saying *if* I went down to the folks that work at the [Hospital lab] and I say, '*If* a patient presents with AML, do you think it's the standard of care to exclude those antibodies for hairy cell leukemia, for example,' they would tell

me, 'Absolutely, you exclude those antibodies'? . . . A.  They would tell you, yes.") (emphasis

added).  Plainly, as Dianon itself concedes, Dr. Flynn's testimony establishes that he had no

personal knowledge of what antibodies the Hospital lab used in flow cytometry testing.  Mot. to

Compel ¶ 12.  Consequently, the Hospital lab practices and policies could not have served as a

basis for his expert opinion.

Moreover, because Dianon is attempting to force the Hospital lab to provide expert

material, it is Dianon's burden to overcome the protection of Rule 45(c)(3)(B)(ii) by

(1) "show[ing] a substantial need for the . . . material that cannot be otherwise met without undue

hardship," and (2) "assur[ing] that the person to whom the subpoena is addressed will be

reasonably compensated."  Fed. R. Civ. P. 45(c)(3)(B); *see also id.* advisory committee's note

("The rule establishes the right of such persons to withhold their expertise, at least unless the

party seeking it makes the kind of showing required for a conditional denial of a motion to quash

as provided in the final sentence of subparagraph (c)(3)(B)."); *Schering Corp. v. Amgen Inc.*,

1998 WL 552944, at *2-3 (D. Del. Aug. 4, 1998) (placing burden on serving party to establish

requirements of subparagraph (c)(3)(B)); *Statutory Comm. of Unsecured Creditors v. Motorola,*

*Inc.*, 218 F.R.D. 325, 327 (D.D.C. 2003) (same).

In balancing the competing interests in that regard, courts consider the following factors:

(1) "the degree to which the expert is being [subpoenaed] because of his knowledge of facts

relevant to the case rather than in order to give [an] opinion"; (2) "the difference between

testifying to a previously formed or expressed opinion and forming a new one"; (3) "the

possibility that, for other reasons, the witness is a unique expert"; (4) "the extent to which the

[issuing] party is able to show the unlikelihood that any comparable witness will willingly

[provide information]"; and (5) "the degree to which the witness is able to show that he has been

oppressed." Fed. R. Civ. P. 45 advisory committee's note (quoting *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976)). Dianon has made no showing with respect to those factors, and each weighs heavily in favor of quashing Dianon's subpoena.

The first two factors plainly support quashing the subpoena because, as discussed above, the Hospital does not possess facts pertinent to the parties' dispute over Dianon's panels and billing practices. *See* Exhibit 1 ¶ 7. The third and fourth factors favor quashing the subpoena because the Hospital is not a unique expert in flow cytometry testing. As there are over 400 laboratories in the country that perform flow cytometry testing, there can be no serious question that Dianon easily can retain whatever expert it deems appropriate to support its side of this dispute—it has already retained experts to do exactly that. *See* Exhibit 1 ¶ 12; Mot. to Compel ¶ 14. Finally, the Hospital is oppressed by the subpoena, as the undue burden placed on it outweighs any conceivable benefit to Dianon of compelling the Hospital to produce the requested documents. Courts have not hesitated to quash subpoenas under similar circumstances. *See, e.g.*, *Schering Corp.*, 1998 WL 552944, at *2 & n.3 (quashing subpoena and rejecting as "disingenuous" the serving party's argument that it was "only seeking to discover fact testimony" from the nonparty experts where those experts' prior opinions did not describe specific events or occurrences in dispute in the controversy); *Bio-Tech. Gen. Corp. v. Novo Nordisk A/S*, 2003 WL 21057238, at *3 (D. Del. May 7, 2003) (quashing subpoena where expert did "not possess any unique facts relevant to the case or subject matter that plaintiff [could not] obtain from other retained experts"); *Motorola*, 218 F.R.D. at 326-27 & n.1 (quashing subpoena where expert's studies had not been commissioned by any party to the lawsuit, expert had "absolutely no information about any facts pertaining to the issues in the lawsuit," and her "only value" was in her market prediction, which, "by its very nature, [was] an opinion based on the

application of one's expertise to the facts one has gathered," and distinguishing case from others where "the witnesses had *direct knowledge* of the *fundamental facts* of the case") (emphasis added).

### III.  CONCLUSION

Non-party Yale-New Haven Hospital has no factual information pertinent to Dianon's flow cytometry testing panels or billing practices.  The Hospital has information about its own flow cytometry practices, but it has not been, and is not willing to be, retained as an expert. Dianon cannot show a substantial need to forceng the Hospital to provide its intellectual expertise against its will.  To the contrary, compelling the Hospital to produce such information would impose an undue burden.  Therefore, the Hospital respectfully requests that the Court deny Dianon's motion to compel and quash the subpoena pursuant to Federal Rules of Civil Procedure 45(c)(3)(A)(iv) and 45(c)(3)(B)(ii).


NON-PARTY,
YALE-NEW HAVEN HOSPITAL


By:
Penny Q. Seaman ct05813
Bonnie L. Patten ct12931
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT  06508-1832
(203) 498-4400
Fax: (203) 782-2889
pseaman@wiggin.com
bpatten@wiggin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served this 23rd day of August,

2006, via facsimile and first class mail, postage prepaid, to the following counsel of record:

Patricia R. Davis, Esq.
U.S. Department of Justice
601 D Street NW
Washington, DC  20004
Fax: (202) 305-7868

Ryan Fayhee, Esq.
U.S. Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
Fax: (202) 305-7797

John B. Hughes, Esq.
Richard M. Molot, Esq.
U.S. Attorney's Office
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT  06510
Fax: (203) 773-5373

Bryan T. Carmody, Esq.
266 Post Road East
Westport, CT  06880
Fax: (203) 221-3199

Dean R. Singewald II, Esq.
Mary A. Gambardella, Esq.
Epstein, Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT  06901-2165
Fax: (203) 324-9291

Kerry M. Parker, Esq.
Michael D. Thompson, Esq.
Epstein, Becker & Green, P.C.
Two Gateway Center, 12th Floor
Newark, NJ  07201-5003
Fax: (973) 642-0099

Robert Salcido, Esq.
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W., Suite 400
Washington, DC  20036
Fax: (202) 887-4288

Bruce R. Parker, Esq.
Venable LLP
2 Hopkins Plaza
Baltimore, MD  21201
Fax: (410) 244-7742


Bonnie L. Patten

\14364\2084\608242.5

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    )
Ex rel. DR. JAMES J. TIESINGA,              )          CASE NO. 3:02-CV-1573 (MRK)
                                            )
              Plaintiff,                    )
                                            )
         v.                                 )
                                            )
DIANON SYSTEMS, INC.,                       )
                                            )          August 23, 2006
              Defendant.                    )
                                            )

STATE OF CONNECTICUT          )
                              )  ss:
COUNTY OF NEW HAVEN           )

### AFFIDAVIT OF BRIAN SMITH, M.D.

BRIAN SMITH, M.D., being duly sworn, deposes and says:

1.      I am over the age of 18 and understand the meaning and obligation of an oath.

2.      I submit this affidavit in support of Yale-New Haven Hospital's ("the Hospital")

memorandum in opposition to Dianon System, Inc.'s ("Dianon") motion to compel compliance with

its subpoena duces tecum.

3.      I make this declaration based on personal knowledge of the facts contained

herein.

4.      I am the Director of the Flow Cytometry Laboratory owned and operated by the

Hospital (the "Hospital lab").

5.      The Hospital lab is separate and distinct from the Yale University pathology

laboratory (the "University lab").

6.     Stuart Flynn, M.D. is the former director of the YU lab.  At no time did he work in the Hospital lab.

7.     The Hospital lab does not have a relationship with Dianon, and it does not possess any facts regarding the composition of Dianon's flow cytometry panels or Dianon's billing practices over the last ten years.

8.     The Hospital lab has not used a standard panel of antibodies in its flow cytometry testing.  Instead, it tailors each panel to the individual circumstances of each patient.  Over the last ten years, the Hospital lab has performed flow cytometry testing for tens of thousands of patients.

9.     Producing the ten years' worth of documents requested in Dianon's subpoena would impose an undue burden, in terms of time, cost, and effort, on the Hospital lab.  Many of those documents, particularly those pertaining to the use of antibodies used in Hospital's flow cytometry testing, call for patient records containing protected health information that would have to be redacted in order to comply with state and federal privacy laws.  Also, many of the requested documents, such as training materials, represent an overwhelming amount of written material, older versions of which likely are archived and stored off-site.

10.    The 2006 Hospital lab policy and procedures manual consists of multiple binders spanning thousands of pages.  Determining whether the methodology described in that manual has changed in the last ten years would require a substantial amount of time and effort, at a significant cost, because archived materials would have to be located, obtained from off-site storage, and compared against the current manual in order to determine what changes have been made during the relevant time period.

11.    The Hospital lab has not been retained as an expert in the above-captioned lawsuit, and it is not willing to be retained as an expert.

2

12.     There are over 400 laboratories throughout the United States performing flow cytometry testing.

The foregoing is true and correct to the best of my knowledge and belief.

_Brian Smith, MD_
Brian Smith, M.D.

Subscribed and sworn to before me this
23rd day of August, 2006

Notary Public

my Commission expires 3/31/09

I:\436\12084\608733.1

3