UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA,<br><br>Plaintiffs,<br><br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) No. 3:02CV1573(MRK)<br>)<br>)<br>)<br>)<br>) |

## DIANON SYSTEMS, INC.'S REPLY TO YALE NEW HAVEN HOSPITAL'S OPPOSITION TO MOTION TO COMPEL

I.  **Motion to Compel and Yale New Haven Hospital's Opposition**

In its Motion to Compel, Dianon has requested the production of documents pursuant to its June 21, 2006 subpoena detailing how Yale New Haven Hospital ("YNHH") conducted flow cytometry from 1996 to 2006. The Court should grant Dianon's Motion because: (1) the documents requested are vital to Dianon's defense of this case to test the opinions and methodology of the government's medical expert, Stuart Flynn, M.D.; (2) the documents Dianon seeks are unique and no other party will have comparable documents; and (3) Dianon is willing to compromise the scope of its request and assist in the document review.

YNHH asserts two grounds for this Court to deny Dianon's Motion to Compel: (1) "Dianon's subpoena subjects YNHH to an undue burden pursuant to Fed. R. Civ. P. 45(c)(3)(A)(iv);" and (2) "Dianon's subpoena is backdoor attempt to obtain expert information from an unretained non-party who does not wish to be involved in this lawsuit pursuant to Fed. R. Civ. P. 45(c)(3)(B)(ii)." Opposition at 2. YNHH's objections have no merit.

II. **Dianon's request and need for documents does not place an undue burden on Yale New Haven Hospital.**

YNHH asserts Dianon's request is unduly burdensome because: (1) YNHH's flow cytometry lab "tailors each panel to . . . each patient" and therefore, would have to review and redact tens of thousands of patient records (Opp. at 6); (2) producing ten years of YNHH policies, procedures, manuals or forms constitutes an "overwhelming" amount of material and cannot be produced without "enormous burden with respect to time and cost" (Id. at 6-7); (3) Dianon's proposed narrow request would still "exact a heavy toll and time, effort and expense," *inter alia*, comparing the "thousands of pages" in its current manual with past versions (Id. at 7); and (4) weighing these alleged burdens against the benefits of production, the "only value" of the requested information "pertains to the standard of care." (Id. at 8).

YNHH has failed to produce facts sufficient to show Dianon's request is unduly burdensome. The facts YNHH have produced and the conclusions drawn from them are either inapposite or just wrong. Finally, Dianon is willing, and expressed this willingness to YNHH counsel, to ameliorate <u>any</u> alleged burden on YNHH. In sum, YNHH's claim of "undue burden" is a thinly veiled attempt to avoid making <u>any effort</u>, no matter how slight, to comply with Dianon's subpoena.

    A. **Even though YNHH's flow cytometry lab "tailors" each test to an individual patient, it does not follow that YNHH's policies, procedures, and manuals will not show how YNHH tailors each test to each patient.**

YNHH incorrectly concludes that in order to comply with Dianon's request concerning how YNHH conducts flow cytometry, it must review "tens of thousands of patient" tests and redact confidential information. Rest assured, Dianon does not seek

any patient files – only the procedures, policies, manuals, and training information provided to flow cytometry technicians, residents, and fellows regarding how YNHH tailors flow cytometry antibody panels to a particular patient.

Sound laboratory practice requires that flow cytometry procedures, policies, and manuals are in place so that all personnel in the flow cytometry laboratory are familiar with how to run a flow cytometry test. Put simply, a laboratory cannot run a diagnostic test on a patient for the first time without validating the accuracy of the particular test. *See* 42 C.F.R. §§ 493.1251 (a laboratory must have written procedure manuals for all tests or assays with "step by step performance of the procedure, including test calculations and interpretations of results"), 493.1281 (if laboratory performs the same test using different methodologies, it must have biannual evaluations of relationship between test results using different methodologies). *See also Exhibit 1, College of American Pathology Commission on Laboratory Accreditation, Laboratory General Checklist* (April 6, 2006) at 58 ("Sound laboratory practice requires full characterization of an assay before its use for patient testing, . . . the laboratory must have data on each test's accuracy, precision, analytic sensitivity, interferences and reportable range.").

The antibody combinations YNHH's flow cytometry laboratory used must be tested and validated. In addition, technicians, residents, and fellows must be trained on how to select certain antibody combinations under certain circumstances to insure quality patient care and minimize errors. *See, e.g., Exhibit 2*, Johns Hopkins University summary of how it tailors its panels to particular clinical symptoms. Undoubtedly, YNHH does not follow an oral tradition in training its technicians, residents and fellows to run flow cytometry tests in their laboratory. As the "main teaching hospital for Yale

BA2DOCS1\300535.01

School of Medicine" and the "primary training location" for its fellows, YNHH must have some documentation regarding how its flow cytometry laboratory is run and what antibody combinations are utilized for patient care. *Exhibit* 3, Yale University School of Medicine Department of Laboratory Medicine Hematopathology Fellowship description at 4. The assertion that patient files are the only place that antibody combinations are written down on any document is just wrong.

> **B.     YNHH did not and cannot produce evidence to show that producing ten years worth of flow cytometry testing policies, procedures, manuals and forms ("flow cytometry materials") is unduly burdensome.**

YNHH asserts that producing ten years of flow cytometry materials would be "overwhelming," but provides this Court no basis to quash Dianon's subpoena. Regardless of the amount of material YNHH possesses, requesting the material from an off-site storage facility can in no way be considered unduly burdensome. If the material represents thousands of pages, Dianon is willing to go to YNHH's facility and review those documents. Assembling documents in a room for review cannot be considered unduly burdensome under any circumstance. Furthermore, Dianon is willing to accept less than all ten years worth of training materials depending upon how "overwhelming," the document production would be.

YNHH also alleges that Dianon's "narrowed request" would "exact a heavy toll of time, effort and expense" if it had to review the historic materials and compare them to the current manual to determine what changes have been made. Opposition at 7. Given Dianon's willingness to work with YNHH and shoulder the alleged burden of reviewing the flow cytometry materials, YNHH's assertions have no merit.

BA2DOCS1\300535.01

### C.   YNHH incorrectly asserts that the "only value" of the requested information "pertains to the standard of care."

To be sure, YNHH's flow cytometry materials are relevant to the standard of care regarding the practice of flow cytometry. However, these documents do not pertain <u>only</u> to the standard of care. The requested documents are also relevant to cross-examine the government's expert, Dr. Stuart Flynn, and test his methodology and the application of his methodology in this case. Motion to Compel at ¶¶ 2, 10-12, 16, 20. These considerations are not addressed in YNHH's Opposition. If Dr. Flynn utilized a different methodology in this case as compared to the methodology he utilized when he consulted with YNHH, those differences are important for this Court's consideration regarding a *Daubert* challenge to the admissibility of Dr. Flynn's opinions. *See, Perkins v. Origin Med Systems, Inc.*, 299 F.Supp.2nd 45, 53-54 (D.Conn. 2004) (Court considers whether experts methodology has been put to nonjudicial use and whether the expert employs the same level of intellectual rigor in the courtroom as practiced in the field).

YNHH also incorrectly asserts that the issue of the standard of care is "reserved for experts." Opposition at 8. The opinions of experts are but one means to establish the standard of care. Another way to establish the standard of care for medical testing is to produce facts regarding the medical test. Dianon has retained experts to provide opinions concerning the use of flow cytometry in diagnosing blood and lymph system disorders. Dianon is also attempting to obtain <u>facts</u> concerning how the other major flow cytometry provider in Connecticut, YNHH, utilized the same test.

Put simply, Dr. Flynn testified that he regularly consulted with YNHH's flow cytometry laboratory (part of the Yale Medical School's Department of Laboratory Medicine) in providing diagnoses for patients with suspected blood disorders. *See*

*Exhibit 4*, Deposition of Stuart Flynn M.D. at 33-34, 55-57. If his opinions in this matter do not conform with the practices of YNHH's flow cytometry laboratory, the differences between his opinions for litigation and his practice in the field are important considerations for both this Court (as to whether his opinion should be admissible) as well as a jury (to consider regarding the weight of those opinions). Therefore, YNHH's Opposition is incorrect on two points: (1) the "only value" of the information requested "pertains to the standard of care and the practice of flow cytometry;" and (2) the standard of care in the practice of flow cytometry is an issue solely reserved for expert testimony. Opposition at 8.

III. **Dianon's Subpoena does not request expert opinions pursuant to F.R.C.P. 45(c)(3)(B)(ii) as it seeks documents that describe specific historic events or occurrences in dispute.**

YNHH asserts that "in effect . . . Dianon is attempting to force the hospital to serve as an expert on the prevailing standard of care." Opposition at 8. The protection afforded by F.R.C.P. 45(c)(3)(B)(ii) is only available if the subpoena "requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party." Since the information sought by Dianon describes specific events or occurrences (how YNHH practiced flow cytometry), the provision is inapplicable.

However, even if the Court believes this section is applicable, the Second Circuit has specifically drawn a distinction between providing "facts relevant to the case" as opposed "opinion testimony." *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2nd Cir. 1976) quoted in F.R.C.P. 45, 1991 Advisory Committee Notes. Dianon is not asking anyone from the Hospital to provide opinion testimony. *Kaufman* provided the following factors

-6-

to determine whether a party "may be excused from testifying" in a case "despite the lack of any general privilege":

> (1) the degree to which the expert is being called because of his knowledge of facts relevant to the case rather than in order to give opinion testimony; (2) the difference between testifying to a previously formed or expressed opinion and forming a new one; (3) the possibility that, for other reasons, the witness is a unique expert; (4) the extent to which the calling party is able to show the unlikelihood that any comparable witness is willing to testify; (5) the degree to which the witness is able to show that he has been oppressed by having to continually testify.

*Kaufman v. Edelstein*, 539 F.2d at 822 (numbers added).

First, Dianon has not requested that any witness testify. Rather, Dianon has requested the production of documents that depict relevant, historical facts – YNHH's use of flow cytometry testing from 1996 to 2006. No witness has been asked to explain *why* YNHH performed its flow cytometry testing in a certain fashion, whether different laboratory practices are acceptable under the standard of care, or the basis for utilizing flow cytometry in a particular manner – all opinions. Instead Dianon seeks what in fact YNHH did in structuring its flow cytometry testing for the reasons stated in its Motion to Compel. Second, the *Kaufman* Court distinguished between "testifying to a previously formed or expressed opinion and forming a new one." *Id.* Dianon is not requesting YNHH generate new information, facts, or opinions. Dianon only seeks historical documents regarding relevant facts to this case.

Third, YNHH is a unique party. The only party that has information regarding YNHH's use of flow cytometry is YNHH. Furthermore, as stated in the Motion to Compel, relevant documents reflecting how Dr. Flynn ran his flow cytometry laboratory, which closed in 2000, are non-existent. *See Exhibit 5*, Affidavit of Yale Medical School Flow Cytometry Laboratory at ¶6, Motion to Compel at ¶14. Fourth, there is no other

party, comparable or otherwise, that has YNHH's documents. Finally, YNHH has not and cannot show that it "has been oppressed by having continually to testify (or produce documents concerning flow cytometry)." *Id.* YNHH has not asserted that it is continually oppressed by similar document requests.

In sum, <u>none</u> of the *Kaufman* considerations weigh in favor of non-disclosure and all weigh in favor of requiring YNHH to produce the requested documents. YNHH cites to these same considerations and concludes the exact opposite – that it does not possess facts relevant to the parties' dispute. Opposition at 11-12. This position has no merit as Dianon asserted three independent grounds establishing the relevance of the documents sought. Motion to Compel at ¶2. YNHH's assertion that it is not a "unique expert" on flow cytometry testing is wholly irrelevant as Dianon has not asked (and does not care) what YNHH's opinions are regarding the appropriate practice of flow cytometry. Dianon only seeks documents to establish YNHH's practices, not YNHH's commentary on those practices. Finally, YNHH alleges it is oppressed because of "the undue burden placed on it (to produce documents) outweighs any conceivable benefit to Dianon." Opposition at 11-12. YNHH can only come to this conclusion because it selectively cited and applied the *Kaufman* factors to only one of several important, relevant reasons Dianon subpoenaed these documents.

The remaining cases YNHH cites are equally unavailing. In *Statutory Comm. Of Unsecured Creditors v. Motorola*, 218 F.R.D. 325 (D.D.C. 2003) the Court had to determine whether compelled production of commissioned reports valued at $600,000 and deposition of the author were permissible. *Motorola* 218 F.R.D. at 326. The reports were the expert's "prediction of the market for mobile satellite telecommunication

services" – an opinion, not historical fact. *Id.* at 327. The only reason for requesting the report and deposition was because one of the litigants "may have relied upon" one or more of the requested studies. *Id. at* 326. In this case, Dr. Flynn relied upon, interpreted and used YNHH flow cytometry studies. *Exhibit 4* at 55-57. Finally, unlike this case, the requesting party had an alternative – it could have commissioned a similar report. *Id. at 327.*

Both *Biotechnology General Corp. v. Novo Nordisk,* 2003 Lexis 7911 (D.Del. May 7, 2003) and *Schering Corp v. Amgen Inc.*, 1998 Lexis 13452 (D.Del. August 4, 1998) addressed whether unretained expert witnesses could be compelled to testify. In both cases, the unretained experts were not "unique experts" and did not possess any "unique facts" relevant to the case. *Biotechnology General Corp.,* 2003 Lexis 7911, 9, *Schering Corp.,* 1998 Lexis 13452, 8. In this case, Dr. Flynn consulted with YNHH and interpreted YNHH's flow cytometry reports and used this information to diagnose patients. *Exhibit 4* at 55-57. The only surviving records of how Dr. Flynn utilized flow cytometry testing in his clinical practice are with YNHH.

## IV.  CONCLUSION

The distinction between demanding that a doctor take a day from his busy practice to testify (the concerns addressed in the authority cited by YNHH) and asking an institution to produce institutional records is substantial. Records can be produced by non-experts, opinions cannot. YNHH is not an expert, but as a non-party, regularly retrieves records to comply with document requests. The request at issue in this case is only different because it is larger than usual. If the documents are as expansive as YNHH asserts, Dianon is willing to assist in reviewing the documents to select the

handful that are needed. Dianon is willing to pay YNHH's customary rates for document retrieval and copying. In this case, Johns Hopkins Medical Center, Emory University and the University of Florida laboratories produced between 52 and 521 pages to satisfy nearly identical requests in a timely fashion. *See, Exhibit* 6. Though YNHH has not made <u>any effort</u> to comply with a duly authorized subpoena, they have the resources to pay two attorneys to draft a 12 page brief arguing that compliance efforts would be too costly.

YNHH alleges that Dianon's subpoena is unduly burdensome, but cannot support such an allegation. YNHH's representation that Dr. Flynn did not work "in" its flow cytometry lab or that Yale New Haven Hospital and Yale Medical School are different legal entities is also unavailing. Opposition at 9. The distinction between what legal entity actually employed Dr. Flynn is irrelevant. Dr. Flynn testified he consulted with and rendered diagnoses for patients referred to YNHH's flow cytometry laboratory and therefore worked for the YNHH lab. Motion to Compel at ¶7. YNHH does not refute or deny this relationship. This relationship is the reason for Dianon's request and only YNHH has the records Dianon seeks. Therefore this Court should grant Dianon's Motion to Compel and, based upon YNHH's representation of the "overwhelming" amount of material, require YNHH to produce responsive documents at a mutually convenient time and place for Dianon to review them and copy those documents it needs.

WHEREFORE, Dianon requests this Court to require Yale New Haven Hospital to produce manuals, policies, protocols, forms, and training materials regarding the use of flow cytometry immunophenotyping to diagnose blood and lymph system disorders from 1996 to 2006, or a lesser time period as agreed by the parties, for inspection and copying no later than September 21, 2006.

Respectfully submitted,

*/s/ Bruce R. Parker*
Bruce R. Parker, admitted pro hac vice
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

Robert Salcido, admitted pro hac vice
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for Dianon Systems, Inc.

-12-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of August, 2006, a copy of the foregoing Reply to Yale New Haven Hospital's Opposition to Motion to Compel was sent via, electronic mail to Bonnie Patten, bpatten@wiggin.com, Richard M. Molot, Richard.Molot2@usdoj.gov, and Bryan T. Carmody, bcarmody@mayalaw.com, and mailed, postage prepaid to:

Penny Seaman, Esq.
Bonnie Patten, Esq.
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT 06508-1832

Richard M. Molot, AUSA
Patricia Davis, AUSA
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven CT 06510

Bryan T. Carmody
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880

                                                    _____
                                                    Bruce R. Parker

BA2DOCS1\300535.01