UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DR. JAMES J. TIESINGA, <br><br> Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) )   No. 3:02CV1573(MRK) |

**MOTION TO COMPEL PRODUCTION OF MARYALICE STETLER-STEVENSON, M.D. FOR CONTINUED DEPOSITION**

Dianon Systems, Inc. ("Dianon") hereby moves to Compel the Production of Maryalice Stetler-Stevenson, M.D. for Continued Deposition. Dr. Stetler Stevenson's deposition should be continued because: (1) there is no legal basis to instruct a designee witness not to answer questions within her knowledge; (2) Dianon is entitled to learn the extent to which Dr. Stetler-Stevenson's testimony has been influenced by her review of expert reports the government furnished to her immediately prior to her testimony; and (3) the unanswered questions are within the scope of the 30(b)(6) deposition notice. Accordingly, Dianon requests that it be allowed to reconvene the deposition of Dr. Stetler-Stevenson.

**I.   OVERVIEW**

The United States alleges that from 1996 to 2004 Dianon submitted over 12,000 fraudulent claims for flow cytometry testing and thus seeks a recovery of more than $100 million from Dianon. *See* Gov't Damage Disclosure.[1] The United States alleges that

---

[1] The government has sued Dianon under the False Claims Act, 31 U.S.C. §§ 3729-3733, which provides for treble damages and a civil penalty of $5,000 to $10,000 for each fraudulent claim tendered to the

Dianon used medically unnecessary markers or antibodies in flow cytometry tests designed to detect leukemia and lymphoma (hereinafter "flow cytometry testing").

The Centers for Medicare & Medicaid Services ("CMS") has not defined what constitutes "medically indicated" and "necessary" items or services furnished to Medicare patients. *See United States v. R.D. Prabhu, M.D.*, 2006 U.S. Dist. LEXIS 49690 at *66 (D. Nev. July 20, 2006) (describing requirement in context of FCA case).[2] CMS, however, has instructed its Medicare carriers that "medical necessity" should be determined based upon accepted standards of medical practice which is determined, in part, by the opinions of recognized authorities or experts in the medical field. *See, e.g., Exhibit 1,* CMS Program Integrity Manual, § 13.7.1.

Accordingly, in May 2006, Dianon issued a Fed. R. Civ. P. 30(b)(6) deposition notice for a National Institute of Health ("NIH") designee from the government's preeminent flow cytometry laboratory to discuss NIH flow cytometry testing, general medical standards of designing and performing flow cytometry testing, and NIH's advancement or incorporation of medical knowledge in this field. *See Exhibit 2,* Deposition of Maryalice Stetler-Stevenson, M.D. at 128:9-130:13 (NIH flow cytometry laboratory is preeminent government laboratory for flow cytometry testing).[3]

---

government. For violations committed on or after Sept. 29, 1999, the defendant is liable for treble damages plus penalties ranging from $5,500 to $11,000 per claim. *See* Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099, 47,103–47,104 (Aug. 30, 1999) (to be codified at 28 C.F.R. pt. 85).

[2] *See, e.g.*, Medicare Program; Criteria and Procedures for Making Medical Services Coverage Decisions That Relate to Health Care Technology, 54 Fed. Reg. 4302, 4304, 4308, 4312 (1989) ("current regulations are general and we have not defined the terms 'reasonable' and 'necessary,' nor have we described in regulations a process for how these terms must be applied").

[3] The Notice of Deposition called for the NIH designee to testify as to:

The government designated Maryalice Stetler-Stevenson, M.D. as its sole designee to address the six topics in Dianon's deposition notice. Dr. Stetler-Stevenson has been the Chief or Director of the flow cytometry laboratory for the National Cancer Institute (NCI), a sub-division of the NIH, since approximately 1989. *Exhibit 2* at 7:15–8:10. Dr. Stetler-Stevenson has published numerous articles concerning the use of flow cytometry testing, attended numerous conferences addressing this subject, and regularly communicated with the flow cytometry community as the Director of the NCI flow cytometry laboratory. *Id.* at 51:9 - 55:4, 60:1 - 64: 21, 104:1 - 105:1, 139:7 - 141:18, *Exhibit 4*, (e-mail communications), *Exhibits 5 and 6*, (Dr. Stetler Stevenson articles certified as U.S. government works).

---

a. Antibody panel design and implementation for flow cytometry testing for leukemia and lymphoma or the diagnosis and staging of hematopoietic disease from January 1, 1996 through January 1, 2004;

b. The use of antibodies for research purposes and diagnostic purposes at NIH for flow cytometry testing used in the diagnosis and staging of hematopoietic disease from January 1, 1996 through January 1, 2004;

c. Determinations by the NIH for medically appropriate antibodies used in flow cytometry testing for leukemia and lymphoma and the reasoning that led to those determinations;

d. Any advice, discussions or communications made to Medicare regarding the appropriate number of antibodies to be used in a flow cytometry antibody panel for leukemia and lymphoma testing;

e. Any publications, guidance, or advisory opinions provided to the medical community as to the appropriate number of antibodies or utility of antibodies to be used in a flow cytometry antibody panel for leukemia and lymphoma testing and the reasons for providing such information; and

f. Internal NIH policies, directives, or guidance as to medically appropriate indications for flow cytometry antibody panel testing for leukemia and lymphoma, ICD-9 codes that would support medically appropriate application of flow cytometry antibody panel testing for leukemia and lymphoma, and antibody panel design and usage for leukemia and lymphoma testing from January 1, 1996 to the present.

See *Exhibit 3*, Notice of Deposition, ¶3(a)-(f).

In preparation for her role as the NIH designee, the United States provided Dr. Stetler-Stevenson with the expert reports of Dr. Stuart Flynn, expert on behalf of the United States, and Drs. Raul Braylan, Michael Borowitz, and Jeannine Holden, experts on behalf of Dianon. *See Exhibit 2* at 23:20-26:4. During the course of the deposition, counsel for the United States instructed Dr. Stetler-Stevenson not to answer numerous questions concerning those reports and this case, allegedly because they were beyond the scope of the 30(b)(6) notice. *Id.* at 28:2 - 29:2, 50:17 - 51:7, 150:11 - 158:1, 162:21 - 163:5, and 166:1-8.

The government's instructions were improper. First, there is no legal authority that allows a party to unilaterally limit answers questions that do not seek privileged information. Second, the government cannot furnish reports to Dr. Stetler-Stevenson to help her prepare for her deposition and then instruct her not to answer questions concerning those reports. Third, the questions go to the heart of this case and are within the scope of the 30(b)(6) notice – are Dianon's practices and its expert opinions consistent with the prevailing standards of the medical community and NIH practices?

## II.   ARGUMENT

### A. There is no legal support for the government's instructions not to answer relevant questions within the knowledge of the designee deponent.

Federal Rule of Civil Procedure 30(b)(6) allows a party to notice a government designee deposition and requires the party to "describe with reasonable particularity the matters on which examination is requested." The responding government agency must then designate one or more witnesses to address the matters in the deposition notice. The only witness the United States produced from the NIH pursuant to Dianon's deposition notice was Dr. Stetler-Stevenson.

A party may instruct a witness not to answer questions <u>only</u> to preserve a privilege, enforce a limitation directed by the court, or to present a motion to the court *during the course of the deposition* when "the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent or party." Fed. R. Civ. Pro. 30(d)(1) and (4).

Several courts have held that instructing a 30(b)(6) deponent not to answer questions because they exceeded the scope of the deposition notice was improper and no court has held otherwise. See *Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 366-368 (N.D. Cal. 2000) (government designee "shall answer" questions to the best of the deponent's ability and improper for counsel to instruct witness not to answer); *Overseas Private Investment Corp. v. Mandelbaum*, 185 F.R.D. 67, 68-69 (D.D.C. 1999); *King v. Pratt and Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995) (Rule 30(b)(6) does not limit what questions can be asked of a designated witness at deposition); *Paparelli v. Prudential Insurance Company of America*, 108 F.R.D. 727, 730-731 (D. Mass. 1985).

Three of the four cases cited also held that *questioning a deponent beyond the scope of the 30(b)(6) notice is proper* and the "scope of the deposition is determined solely by relevance under Rule 26, that is that the evidence sought may lead to the discovery of admissible evidence." *Detoy v. City and County of San Francisco*, 196 F.R.D. at 367, citing *Overseas Private Investment Corp. v. Mandelbaum*, 185 F.R.D. at 68; see also, *King v. Pratt and Whitney*, 161 F.R.D. at 476. These three courts specifically rejected the conclusion in *Paparelli* that the deposition questions must be restricted to the matters set forth with "reasonable particularity" in the 30(b)(6) deposition notice. See *Paparelli v. Prudential Insurance Company of America*, 108

F.R.D. at 729. The courts rejected the *Paparelli* approach because: (1) there is no specific limitation of what can be asked at deposition and therefore general deposition standards should govern; (2) Rule 30(b)(6) was not created to provide greater protections to corporate or government designees, but rather to "have the right person present at the deposition;" and (3) such a reading of the rule would frustrate the purpose of discovery depositions and "substitute hyper-technical pleading and gamesmanship for the true purposes of discovery." See *Detoy v. City and County of San Francisco*, 196 F.R.D. at 367; *Overseas Private Investment Corp. v. Mandelbaum*, 185 F.R.D. at 68-69, *King v. Pratt and Whitney*, 161 F.R.D. at 476.

Even the *Paparelli* Court held that unilaterally limiting deposition responses is improper. *Paparelli v. Prudential Insurance Company of America*, 108 F.R.D. at 731. If the government believed the deposition is taken in bad faith or to harass, annoy or embarrass the witness or party, it *must immediately seek a protective order from the Court during the deposition. Id.* quoting Fed. R. Civ. Pro. 30(d) ("Only the Court, not counsel, can order that a deposition be limited or that certain questions not be answered."). The government did not move for a protective order during the deposition because it had no basis to do so. It only seeks a protective order now because Dianon has pressed its right to continue the deposition.

**B. The government's instruction not to answer any question regarding reports it provided to the witness to help prepare for the deposition was improper.**

For its tactical advantage, the government chose to provide Dr. Stetler-Stevenson with expert reports in order to prepare her for the deposition. If the reports were not relevant to Dr. Stetler Stevenson's role as a government designee, no purpose was served by providing them to her. Once the government learned that Dr. Stetler-Stevenson was

critical of the government's expert and supported Dianon's defense, it improperly attempted to silence its Rule 30(b)(6) designee. Quite simply, if Dr. Stetler-Stevenson endorses Dianon's approach to flow cytometry testing, the government's $100 million dollar fraud case is effectively over.

A basic procedural right enjoyed by a litigant when deposing a witness is to question the witness about the details of what they reviewed and relied upon in preparing for the deposition, even if the material would otherwise be privileged. *See Redvanly v. NYNEX Corp.*, 152 F.R.D. 460, 471 (S.D.N.Y. 1993)(party hampered in testing accuracy of testimony without questioning witnesses concerning documents reviewed prior to testifying), *Eckert v. Fitzgerald*, 119 F.R.D. 297, 299 (D.D.C. 1988) (same). Here, the government showed its witness Dianon's expert reports presumably hoping that Dr. Stetler-Stevenson would support its theory and testify against Dianon. When the witness did not testify as expected, the government instructed its witness not to answer.[4] A litigant does not enjoy the right to prepare its witnesses by having the witness review documents and then cut off all questions on those documents.

### C. The unanswered questions are within the scope of Dianon's 30(b)(6) deposition notice.

Dianon requested an NIH representative who could testify as to: (1) the practices and procedures of NIH flow cytometry testing; (2) general medical standards for flow cytometry testing; and (3) information incorporated by NIH in designing its tests as well as information broadcast to the medical community. *See, Exhibit 3* at ¶3a, b, c, e and f. The NIH designee deposition notice is broadly worded to include information or

---

[4] Dr. Stetler-Stevenson supported Dianon's primary defense, i.e. the use of 26 antibodies or markers in flow cytometry testing is medically appropriate and indicated. *See, e.g., Exhibit 2* at 149:21 – 150:6 (NIH uses <u>more</u> antibodies than Dianon in its flow cytometry testing).

knowledge of flow cytometry testing in the medical community, NIH influence on this body of knowledge, and how this medical knowledge influenced NIH flow cytometry testing.

As Director of NCI's flow cytometry laboratory, Dr. Stetler-Stevenson contributed to this body of knowledge and regularly interacted with the flow cytometry community, including Dianon's experts. 51:9 - 55:4, 60:1 - 64: 21, 104:1 - 105:1, 139:7 - 141:18, *Exhibit 4 through 6*, (Dr. Stetler-Stevenson interactions with and efforts to educate the flow cytometry community through published articles, conferences, and electronic mail consultations). Whether the expert reports in this case are consistent with the general body of medical knowledge and Dr. Stetler-Stevenson's efforts to educate the flow cytometry community are well within the scope of the deposition notice. *See, Exhibit 3* at ¶3(e), *Exhibit 2* at 166:1-8. Conversely, Dianon needs to establish whether the government's theory is consistent with general medical knowledge or government efforts to educate the medical community through the publications, conferences, or electronic mail advisory opinions of its designee, Dr. Stetler-Stevenson. That is why Dianon insisted on taking Dr. Stetler-Stevenson's deposition, regardless of her capacity.[5]

The United States' position that the 30(b)(6) notice only "refers to the NIH giving official advice" has no merit for two reasons. *See, Exhibit 2* at 140:19 – 141:5. First, the deposition notice is not limited only to "official advice" from the NIH, whatever that may mean. Dianon's deposition notice asks for a deponent who can discuss the body of knowledge in the medical community and NIH's role in that community. Second, Dr. Stetler-Stevenson published articles, attended conferences, and corresponded with

---

[5] Once the government designated Dr. Stetler-Stevenson subject to its right to amend, Dianon notified the government that it wanted to depose Dr. Stetler-Stevenson in her individual capacity if she was not designated as NIH's representative. See *Exhibit 7*, June 23, 2006 electronic mail.

doctors as the Director of the NCI flow cytometry laboratory, not as a private citizen. Her role in educating the flow cytometry community was performed as a representative of the United States Government. *See, e.g., Exhibits 5 and 6*, Dr. Stetler-Stevenson articles certified as "U.S. Government Works." Even accepting the United States self-serving, limited interpretation of Dianon's 30(b)(6) deposition notice, questions concerning whether the medical theories put forth by each party in this case are consistent with accepted medical standards or the government's efforts to educate the flow cytometry community are within both the scope of the deposition notice and the knowledge of the witness.

### III.   CONCLUSION

The United States efforts to obstruct Dianon's discovery have no basis in fact or law. The questions that remain unanswered are within the scope of the deposition notice, go to the crux of this case, and no legal authority has upheld the ability of a party to restrict questioning of its witness under these circumstances. Finally, Dianon should be able to explore Dr. Stetler Stevenson's review of medical opinions in preparation for the deposition, whether they are consistent with good medical practice generally and NIH's flow cytometry practices and publications specifically. All of these questions are within the knowledge of the deponent, relevant to this case, and proper subjects of discovery.

WHEREFORE, Dianon requests that the deposition of Dr. Stetler Stevenson resume at a mutually agreeable time within 21 days of this Court's order pursuant to Dianon's 30(b)(6) notice of deposition.

                          Respectfully submitted,

                          */s/ Bruce R. Parker*
                          Bruce R. Parker, admitted pro hac vice
                          Venable LLP
                          1800 Mercantile Bank & Trust Bldg.
                          2 Hopkins Plaza
                          Baltimore, Maryland 21201
                          (410) 244-7400

                          Robert Salcido, admitted pro hac vice
                          Akin Gump Strauss Hauer & Feld, LLP
                          1333 New Hampshire Avenue, NW
                          Washington, DC 20036

                          Attorneys for Dianon Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of September, 2006, a copy of the foregoing Motion to Compel Production of Maryalice Stetler-Stevenson for Continued Deposition was sent via U.S. mail, postage prepaid, to:

Richard M. Molot, AUSA
Patricia Davis, AUSA
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven CT 06510

Bryan T. Carmody
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880


                                                                                           Bruce R. Parker