Page 1

1             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
2

3   UNITED STATES OF AMERICA,
    ex rel. Dr. James J.
4   Tiesinga,

5            Plaintiffs,
                              No.3:02CV157(MRK)
6       vs.

7   DIANON SYSTEMS, INC.,

8            Defendant.
    _____/
9

10             The deposition of MARY ALICE

11   STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12   2006, commencing at 9:30 a.m. at the Law Offices of

13   Venable, L.L.P., 575 7th Street, N.W., Washington,

14   D.C., before Steven Poulakos, Notary Public in and for

15   the District of Columbia.

16

17

18

19

20

21   REPORTED BY:  Steven Poulakos

ORIGINAL

Page 2

```
 1    APPEARANCES:

 2              PATRICIA R. DAVIS, ESQUIRE

 3                   On behalf of Plaintiffs

 4                   United States Department of Justice

 5                   601 D Street, N.W.

 6                   Room 9154

 7                   Washington, D.C. 20004

 8

 9              BRUCE R. PARKER, ESQUIRE

10              WILLIAM F. PIERMATTI, ESQUIRE

11                   On behalf of Defendant

12                   Venable, L.L.P.

13                   Two Hopkins Plaza

14                   Suite 1800

15                   Baltimore, Maryland 21201

16

17    ALSO PRESENT:  Mike Huff, Videographer

18

19

20

21
```

    1   National Cancer Institute, I think you said in

    2   approximately 1990 thereabouts?

    3          A     Yes.

    4          Q     Take me through your work history from that

    5   point up to the present point, if you would, please?

    6          A     I was a staff clinician.  The title changed

    7   just -- I believe it was a medical officer was the term

    8   applied initially and then I became a staff clinician

    9   as they redefined the category and gave it a new title.

   10          Q     At the National Cancer Institute?

   11          A     At the National Cancer Institute.  The same

   12   place.

   13          Q     How long did you stay in that position?

   14          A     Up to today.

   15          Q     My understanding from what I can determine

   16   on the Internet is that you're the director of the flow

   17   cytometry lab; is that correct?

   18          A     Yes.  The title is chief of the flow

   19   cytometry unit.  Government names are different.

   20          Q     When did you become the chief?

   21          A     I'm not sure when that title was developed.

Page 8
1    I assumed control of the flow cytometry laboratory

2    immediately after my fellowship.  Actually, during my

3    fellowship, there was the person who left and I started

4    to take on the activities of director of laboratory.

5        Q    So around 199 --

6        A    Approximately 1989.

7        Q    So for the better part of 16 to 17 years

8    you've served as the head or chief of the flow

9    cytometry lab for the National Cancer Institute?

10       A    Correct.

11       Q    Thank you.

12            As the chief of the flow lab, what are your

13   responsibilities?

14       A    My responsibilities as chief of the flow

15   cytometry laboratory include the diagnose -- diagnostic

16   interpretation of all flow cytometric data coming from

17   the laboratory.

18            I also run the laboratory which involves

19   overseeing the technicians, monitoring quality control

20   procedures, dictating policy for the laboratory, making

21   sure we're in compliance with CLEA and College of

1    work in outside labs.

2          A      I would have to imagine, but I believe

3    everywhere in life in every job people have to consider

4    the cost of everything.

5          Q      Just a few other background details.

6    Doctor, before appearing today for today's deposition,

7    did you do anything specific to prepare for today's

8    deposition other than talking to counsel, which I'm

9    sure you did?

10         A      I'm not sure I understand what you mean.

11         Q      Okay.  Did you read any of the depositions

12   of any of the witnesses expert or lay witnesses that

13   have been taken in this case?

14         A      Yes.

15         Q      Whose depositions did you read?

16               MS. DAVIS:  Depositions.

17               THE WITNESS:  No, I have not read any

18   depositions.  No.

19               BY MR. PARKER:

20         Q      Have you read any statements that were

21   prepared by any of the witnesses in this case,

 1    statements or reports?

 2          A     Statements or reports, yes.

 3          Q     And whose --

 4          A     And I'm aware of the opinion of

 5    Dr. Jeannine Holden.

 6          Q     When you say opinion, you mean her report

 7    that she submitted in this case?

 8          A     I'm not sure if it's a report.  I'm not

 9    sure what.  She's written a letter.

10          Q     She wrote a multi-page what I would call a

11    letter report expressing her opinions in the case.

12    I'll show it to you later on.

13          A     Show me it, yes.

14          Q     What other reports or letters do you recall

15    having reviewed?

16          A     Let's see, Dr. Raul Braylan, Dr. Michael

17    Borowitz.  They were letters, and I think Dr. Stuart

18    Flynn.

19          Q     Just to make sure we're all on the same

20    page.

21                (Whereupon, a document was marked as

1    Deposition Exhibit Number 3.)

2              BY MR. PARKER:

3         Q    I'm handing what's Exhibit 3 what I will

4    describe as a report from Dr. Borowitz.  Is that the

5    report or letter that you reviewed before coming today?

6         A    Yes.

7              (Whereupon, a document was marked as

8    Deposition Exhibit Number 4.)

9              BY MR. PARKER:

10        Q    We'll come back to that in a moment so you

11   can just put that aside, and moving on to Exhibit 4

12   which is a report prepared by Dr. Braylan.

13             Can you tell me whether you were shown this

14   report before coming today?

15        A    Yes.

16             (Whereupon, a document was marked as

17   Deposition Exhibit Number 5.)

18             BY MR. PARKER:

19        Q    Thank you.

20             Next I'm handing you Exhibit Number 5 which

21   is a report prepared by Dr. Holden.

Page 26

1                Have you seen this exhibit before?

2        A    I don't think so, but I'm not sure.

3                (Whereupon, a document was marked as

4    Deposition Exhibit Number 6.)

5                BY MR. PARKER:

6        Q    Can you -- I'm sorry, why don't you finish

7    your review.

8        A    I'm not sure.

9        Q    Do you remember reviewing anything else

10   that Dr. Holden may have prepared in connection with

11   this case?

12       A    I reviewed something, but it was smaller,

13   it looked different, and it's been a while so that's

14   why I'm not sure.

15       Q    Moving on to Exhibit Number 6.  I'm handing

16   you a report prepared by the government's expert,

17   Dr. Flynn.

18                Dr. Stetler-Stevenson, have you seen this

19   report previously?

20       A    Yes.

21       Q    You regard Dr. Borowitz as an expert, a

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

```
 1   leader in the field of flow cytometry?

 2              MS. DAVIS:  Objection.  This is beyond the

 3   scope of the notice of deposition.

 4              MR. PARKER:  The doctor's also been noticed

 5   on her individual capacity as well, Pat.

 6              MS. DAVIS:  No, she hasn't.  She's been

 7   designated as a 30(b)6 witness.

 8              MR. PARKER:  And also the deposition notice

 9   is on Rule 26.

10              MS. DAVIS:  No.  You can't send me a

11   deposition notice the day before the deposition and

12   change the ground rules.

13              MR. PARKER:  It hasn't been the day before.

14   Talk to Richard, but you make your objection, if it's

15   not admissible on the 30(b)6.

16              MS. DAVIS:  No.  I'm going to object to any

17   questions that are beyond the 30(b)6.

18              MR. PARKER:  Instruct the witness not

19   answer, if that's what you plan to do.

20              MS. DAVIS:  I'm going to instruct her not

21   to answer.
```

Page 28

1                   BY MR. PARKER:

2          Q    Doctor, do you recall Dr. Braylan as an

3     expert and authority on flow cytometry?

4                   MS. DAVIS:  Objection.

5                   Don't answer.

6                   MR. PARKER:  You're instructing the witness

7     not to answer, correct?

8                   MS. DAVIS:  I'm instructing her not to

9     answer.

10                  BY MR. PARKER:

11         Q    Dr. Stetler-Stevenson, do you regard Dr.

12    Holden as a expert in the field of flow cytometry?

13                  MS. DAVIS:  Objection.

14                  MR. PARKER:  You're instructing her not to

15    answer?

16                  MS. DAVIS:  I'm instructing her not to

17    answer.

18                  MR. PARKER:  Please indicate for the record

19    so we can go on.

20                  BY MR. PARKER:

21         Q    Do you even know Dr. Flynn?

```
 1              MS. DAVIS:  Objection.

 2              Don't answer it.

 3              BY MR. PARKER:

 4       Q      Okay.  Dr. Stetler-Stevenson, did you ask

 5   for the reports that you just testified that you

 6   reviewed before coming to the deposition or were they

 7   sent to you by counsel unsolicited?

 8       A      I don't remember.

 9       Q      Dr. Stetler-Stevenson, have you discussed

10   with Dr. Borowitz, Dr. Braylan, or Dr. Holden this

11   lawsuit?

12       A      No.

13       Q      You have no memory of a specific

14   conversation with Dr. Holden about this in Greece, this

15   litigation?

16       A      No, although I've talked with Jeannine

17   frequently, and when I believed there was point in

18   which she started to talk about some litigation

19   involving the government and I told her that I really

20   shouldn't be involved in this as a government employee.

21   So I have instructed people not to speak to me about
```

Page 50

```
 1   efforts to go after or to sue Dianon in this case?

 2              MS. DAVIS:  Objection.

 3              THE WITNESS:  Repeat the question?

 4              BY MR. PARKER:

 5         Q    Yes, ma'am.

 6              We talked first about electronic or written

 7   transmission.  My question is the same except it's

 8   verbal.

 9              Have you spoken to anyone within the

10   government who is not an attorney, like Mr. Davis or

11   Mr. Molot or others in the Department of Justice or the

12   U.S. attorney's office regarding your thoughts on this

13   litigation?

14              MS. DAVIS:  Objection.

15              THE WITNESS:  I don't believe so.

16              BY MR. PARKER:

17         Q    Doctor, what is your understanding of the

18   government's theory against Dianon in this case?

19              MS. DAVIS:  Objection.  I'm going to direct

20   her not to answer.  It's beyond the scope of the

21   30(b)6.
```

1                    BY MR. PARKER:

2        Q    I forgot to ask whether you're going to be

3    allowed to answer this question or not.

4             Do you know Dr. Flynn?  Have you met him

5    before?

6             MS. DAVIS:  Objection.  I direct her not to

7    answer.

8             BY MR. PARKER:

9        Q    Okay.  Doctor, in the course of your duties

10   as the director of flow cytometry for NCI, do you use

11   your e-mail to converse with your colleagues both

12   inside the government and outside regarding issues

13   involving flow cytometry?

14       A    Yes.

15       Q    And let me be more specific now for my next

16   question.  Do you use your government e-mail computer

17   to discuss within the government direct or indirect

18   communications with colleagues regarding flow

19   cytometry?

20       A    Regarding flow cytometry in general, yes.

21       Q    And I want to make sure that my question is

1    clear.  The government has produced to us a number of

2    e-mails that you posted on an internet site which

3    people talk about flow cytometry.  My questions don't

4    forth that sort of activity.

5              My questions pertain to your use of your

6    computer sending e-mails to other governmental

7    employees or other colleagues outside of the government

8    involving e-mail, regarding flow excuse me.

9              Was that clear?

10     A    Yes.

11     Q    Let me start over again.

12              Have you used and do you use regularly your

13   government computer with e-mail transmission to discuss

14   not on the internet but in direct e-mail-to-e-mail

15   transmission your colleagues in the pathology arena

16   regarding flow?

17     A    In pathology?

18     Q    Yes, ma'am.

19     A    Not on a regular basis.

20     Q    But --

21     A    It's possible I may have.

1       Q       Over the course of whenever e-mail became

2    readily available, colleagues surely have sent e-mails

3    to you directly and said MaryAlice, Dr.

4    Stetler-Stevenson, I've got a difficult case, what do

5    you think about this, those sort of communications

6    occur?

7       A       Could you clarify?  Are you talking about

8    within the government or in general?

9       Q       Within the government or outside,

10   physicians outside the government.

11      A       Physicians outside the government, yes,

12   definitely.

13      Q       And, Doctor, at any time before today have

14   you ever been instructed by counsel to save those

15   e-mail transmissions?

16      A       No.

17      Q       What is the government's destruction policy

18   of e-mails from your computer?

19      A       I believe that NIH saves e-mails for seven

20   days.

21      Q       So after seven days anything that you may

Page 54

1    have discussed with a colleague regarding the design of

2    the panels, large, small, or in between are destroyed

3    by the government within seven days?

4         A    Unless I were to save them, yes.

5         Q    At no point before coming here today were

6    ever instructed and your department was ever instructed

7    by counsel representing the government to save all of

8    those type of e-mail transmissions; is that correct?

9         A    I don't remember any instruction to save

10   any e-mails pertaining to flow cytometry, or should I

11   say, all e-mails pertaining to flow cytometry.

12        Q    Have you ever been instructed to save any

13   particular type of e-mail that you have engaged --

14   e-mail traffic in which you have engaged regarding flow

15   cytometry?

16        A    I don't remember receiving instruction.

17        Q    Dr. Stetler-Stevenson, did you recently

18   participate in a consensus conference involving flow

19   cytometry?

20        A    Yes.

21             MS. DAVIS:  Objection.

1              BY MR. PARKER:

2      Q    Was your participation in that conference

3  as a government employee representing the NCI flow lab?

4      A    Yes.

5      Q    And what was the goal or purpose of that

6  conference?

7              MS. DAVIS:  Objection.

8              THE WITNESS:  There were multiple goals of

9  the conference.  They were to update guidelines that

10  had previously been developed in lieu of advances in

11  the field.

12              And there were -- so there are many

13  multiple goals, not just one specific.  It was to

14  update the guidelines.

15              BY MR. PARKER:

16      Q    Guideline for doing what, Doctor?

17              MS. DAVIS:  Objection.

18              THE WITNESS:  Performing flow cytometric

19  evaluation of leukemia and lymphoma.

20              BY MR. PARKER:

21      Q    And what guidelines exist that you were

Page 60

1          Q      Dr. Stetler-Stevenson, I'm going to hand

2     you a exhibit produced by the government to us in

3     response for documents pertinent to this deposition.

4     And, Doctor, this is a copy of an e-mail dated

5     May 20th, 1997.

6               Did you generate this e-mail?

7          A      Probably.

8          Q      And so we understand, Doctor, this would

9     have been an e-mail sent to the internet site as

10    supposed to the direct e-mail communication I discussed

11    earlier?

12         A      It looks like it's from the produce

13    cytometry list?

14         Q      Yes, ma'am.  So others understand what

15    we're referring to, that is an internet web site

16    location where physicians having questions or thoughts

17    regarding flow cytometry go to and can have dialogue

18    with other people, correct?

19         A      Correct.

20         Q      And you certainly utilize that resource

21    from time to time?

1        A      Correct.

2        Q      This documents states, the second

3    sentence -- read along with me, Doctor.   When I

4    started -- this is addressed to Dear Adrian and

5    MaryAlice, MaryAlice Stetler-Stevenson.   That would be

6    yourself?

7        A      Correct.

8        Q      The second sentence says, when I started

9    analyzing bone marrows for leukemia and low-level

10   lymphoma I had the benefit of learning in (at flow

11   courses) from two great clinical flow cytometrists,

12   Raul Braylan and Mike Borowitz.

13             Now, other than perhaps mispronouncing Dr.

14   Borowitz's first name, I read that correctly?

15       A      Correct.

16       Q      And those doctors, Braylan and Borowitz,

17   would be the two of the gentlemen who prepared reports

18   in this case for Dianon?

19             MS. DAVIS:   Objection.

20             THE WITNESS:   Correct.

21             BY MR. PARKER:

Page 62

1        Q        Thank you.

2                 (Whereupon, a document was marked as

3     Deposition Exhibit Number 9.)

4                 BY MR. PARKER:

5        Q        Let's move on to Exhibit Number 9.

6     Exhibit 9 is another copy of an e-mail.  This one dated

7     May 11th, 2001?

8        A        Yes.

9        Q        Appears to be from yourself to again this

10    Purdue web site; is that correct?

11       A        Correct.

12       Q        And, Doctor, is it fair to describe this as

13    an open e-mail to anyone going on this web site and

14    reading it about an upcoming program?

15                MS. DAVIS:  Objection.

16                THE WITNESS:  As I understand, one can

17    search the archives, but this is a e-mail distribution

18    list that you subscribe to and you receive all e-mails

19    that pass the administrator sent to you automatically.

20                Although some people may -- once it's in

21    the archives you can go on to the web site and see it.

```
 1    Initially it's sent out in a broadcast e-mail.

 2         Q     But that was something you generated and

 3    sent out to anyone who might be interested in

 4    reading --

 5         A     Yes.

 6         Q     -- on the Purdue web site for flow

 7    cytometry?

 8         A     Correct.

 9         Q     And about midway down through this

10    paragraph you're describing a program that will be

11    conducted in Montpellier, France in May of 2001?

12               MS. DAVIS:  Objection.

13               THE WITNESS:  Correct.

14               BY MR. PARKER:

15         Q     And you state as follows:  Do you see the

16    line that begins the faculty?

17         A     Yes.

18         Q     The faculty consists of the international

19    leaders in these fields.  I presume that means fields?

20         A     Yes.

21         Q     And include doctors, and then you go on to
```

Page 64

1    list a number of doctors.  I'll skip over all of them

2    except for three.  You list Dr. Michael Borowitz at

3    Johns Hopkins, Dr. Braylan at the University of

4    Florida, and Dr. Jeannine Holden at Emory, correct?

5              MS. DAVIS:  Objection.

6              THE WITNESS:  Correct.

7              BY MR. PARKER:

8        Q    And those again are three of the experts

9    who have prepared reports for Dianon in this case?

10       A    Correct.

11       Q    I do not see, correct me if I've missed it,

12   any reference to a Dr. Stuart Flynn in this list?

13             MS. DAVIS:  Objection.

14             BY MR. PARKER:

15       Q    Is that correct?

16       A    That is correct.

17       Q    Have you ever attended a flow cytometry

18   meeting at which, to your knowledge, Dr. Flynn

19   attended?

20             MS. DAVIS:  Objection.

21             THE WITNESS:  To my knowledge, no.

Page 104

1          Q      I'm handing you, Doctor, Exhibit Number 18,

2     and could you identify this exhibit for the record?

3          A      This is a case report in communications and

4     clinical cytometry that I authored with a fellow.

5          Q      Tell me, Doctor, why do physicians and

6     scientists like yourself publish case reports?

7          A      Primarily because they're unusual or they

8     have something instructive in general to the medical

9     community.

10         Q      In other words, you felt that your

11    experience diagnosing this patient that you describe in

12    this exhibit was instructive and helpful to other

13    physicians doing flow cytometry?

14                MS. DAVIS:   Objection.

15                THE WITNESS:   Yes.

16                BY MR. PARKER:

17         Q      And am I correct, Doctor, that you held

18    that belief regardless whether the pathologist was a

19    government pathologist or a nongovernment reference

20    laboratory or an academic institution?

21                MS. DAVIS:   Objection.

1           THE WITNESS:  Yes.

2           BY MR. PARKER:

3      Q    Tell me, Doctor, in a way that our jury can

4  understand, what this patient presented with and what

5  you ultimately diagnosed this patient with?

6      A    The patient -- actually, I have two here.

7      Q    Okay.

8      A    The patient presented with fever, dyspnoea

9  on exertion and a lot platelet count, low hemoglobin,

10  and he had a mass and interstitial changes demonstrated

11  on chest X-ray.  He was rather sick.  A specimen was

12  submitted to cytopathology for diagnosis.  The

13  clinician suspected infection.

14           The cytopathologist examined the specimen

15  and felt there was a lymphoma present, or a chronic

16  lymphoproliferative process and sent the specimen to

17  flow cytometry.

18      Q    Can I stop you there?

19      A    Yes.

20      Q    The cytopathologist is not someone doing

21  flow cytometry?

Page 128

```
 1    described in the paragraph beginning alternatively?

 2              MS. DAVIS:  Objection.

 3              THE WITNESS:  Correct.

 4              BY MR. PARKER:

 5         Q    Thank you, Doctor.

 6              (Whereupon, a document was marked as

 7    Deposition Exhibit Number 21.)

 8              BY MR. PARKER:

 9         Q    Moving on now to Exhibit Number 21.  This

10    is a paper published in 1997.  This is the

11    U.S.-Canadian consensus recommendations.

12              Dr. Stetler-Stevenson, these are the

13    recommendations or guidelines to which you earlier

14    referred in this deposition?

15         A    Yes.

16         Q    Did you participate in this consensus

17    conference?

18              MS. DAVIS:  Objection.

19              THE WITNESS:  Yes.

20              BY MR. PARKER:

21         Q    Did you file any written objections that
```

1   you disagreed with the draft of this paper as it was

2   published?

3              MS. DAVIS:   Objection.

4              THE WITNESS:   No.

5              BY MR. PARKER:

6        Q    If you look on the first page under

7   recommendations.

8              Do you see that?

9        A    Yes.

10       Q    Number one -- well, let me preface it by

11  saying, beginning in paragraph number one and going

12  through three paragraphs is a description of three

13  different ways in which different laboratories perform

14  flow cytometry, correct?

15       A    Correct.

16             MS. DAVIS:   Objection.

17             BY MR. PARKER:

18       Q    Approach number one is, they wrote the

19  application of a general comprehensive panel of

20  antibody combinations that usually answers most

21  relevant questions.   This procedure saves time and

 1    additional staining is only rarely required.

 2              That describes what you were doing in 1997

 3    in your lab?

 4         A    Correct.

 5         Q    If we turn now, Doctor, to the second page

 6    of this journal article, table number 1.  Am I correct,

 7    Doctor, without putting them side-by-side that what is

 8    subscribed here is useful antigenic targets, although

 9    CD markers.  The vast majority of those were being used

10    by you in 1997 when you did your unknown PB or BM

11    samples?

12              MS. DAVIS:  Objection.

13              THE WITNESS:  Yes.

14              BY MR. PARKER:

15         Q    Doctor, thank you.  Incidentally, could we

16    turn back just for a moment to Exhibit Number 12 which

17    is the panel that I just referenced, the unknown PB or

18    BM samples.

19              I failed to ask you earlier, Doctor, in

20    1996 I appreciate the fact that with the

21    state-of-the-art developing panel reagents cocktails

1       Q       And you still do?

2               MS. DAVIS:  Objection.

3               THE WITNESS:  Yes.

4               (Whereupon, a document was marked as

5       Deposition Exhibit Number 22.)

6               BY MR. PARKER:

7       Q       I'm going to hand you next a paper that we

8       will mark as Exhibit 22.  This is a paper published in

9       April of 2001; is that right?

10      A       Yes.

11              MS. DAVIS:  I object again.  This going

12      outside of the scope of 30(b)6 deposition.

13              BY MR. PARKER:

14      Q       Well, Doctor, we would agree that this is a

15      publication, right?

16      A       Yes.

17      Q       And in this publication you offer

18      scientific opinions to the medical community?

19      A       Yes.

20      Q       And that a scientific opinion is focused on

21      performance and interpretation of flow cytometry?

Page 140

1         A      Yes.

2         Q      And, Doctor, would you say that this paper

3    is a publication containing advisory opinions provided

4    to the medical community regarding the number of

5    antibodies or the use of antibodies used in flow

6    cytometry?

7                MS. DAVIS:   Objection.

8                BY MR. PARKER:

9         Q      Would you say that that's a fair

10   characterization of this paper?

11        A      Could you repeat that?

12        Q      Yes.

13               Would you say -- let me back up a second.

14               You wrote this paper with Dr. Braylan?

15        A      Correct.

16        Q      And he's one of the physicians who wrote a

17   report for Dianon in this case, right?

18        A      Correct.

19        Q      Would you say that your effort with Dr.

20   Braylan in publishing this paper was a publication in

21   which you offered opinions providing to the medical

1    community regarding either the number of antibodies or

2    the use of those antibodies in flow cytometry?

3            MS. DAVIS:  Objection.

4            This refers to the -- 30(b)6 notice refers

5    to the NIH giving official advice.

6            BY MR. PARKER:

7        Q    Doctor?

8        A    The primary -- it's not a restricted to

9    antibody panel.  It's a general educational document on

10   flow cytometry analysis of lymphomas and

11   lymphoproliferative disorders.

12       Q    Doctor, nowhere that I could see in this

13   paper, and correct me if I'm wrong, is there a

14   disclosure that says the government has nothing to do

15   with this?  In fact it says, this is U.S. government

16   work, doesn't it?

17           MS. DAVIS:  Objection.

18           THE WITNESS:  Correct.

19           BY MR. PARKER:

20       Q    Okay.  Now on page 2 of this U.S.

21   government work you wrote with your colleague Dr.

1          Q       If you go to the second page, I believe

2      it's on the second page, Doctor, there's a listing of

3      the antibodies being used by Dianon in 1998.

4                  Do I have the right page?

5          A       Yes.

6          Q       Doctor, is there --

7                  MS. DAVIS:  Object.

8                  BY MR. PARKER:

9          Q       Is there any significant difference in the

10     antibodies composition -- let me rephrase the question.

11                 In 1998, the date of this document 24, was

12     there any material difference in the selection of

13     antibodies that Dianon was using in its flow panels

14     compared to the panel that you were using as shown in

15     Exhibit Number 12 for your blood and bone marrow --

16                 MS. DAVIS:  Objection.

17                 BY MR. PARKER:

18         Q       -- testing?

19         A       Would you repeat the question?

20         Q       Yes, Doctor.

21                 Is there any significant difference in the

```
 1    selection of antibodies that Dianon made in 1998 for

 2    its flow panel when compared to the flow panel that you

 3    discussed with me, Exhibit Number 12, that you were

 4    using four blood and bone marrow?

 5              MS. DAVIS:  Objection.

 6              THE WITNESS:  I have more antibodies.

 7              BY MR. PARKER:

 8         Q    You have more?

 9         A    Yes, additional.

10         Q    Alright, you can put that aside.

11              Doctor, if you would, please, pull up

12    Exhibit Number 4 which is, I believe if my notes are

13    correct, Dr. Braylan's report -- I'm sorry, Dr.

14    Borowitz, Exhibit Number 3.

15              MS. DAVIS:  I'm going to object to this and

16    I'm going to instruct her not to answer any questions

17    about the expert reports in this case.  It's outside

18    the scope of the 30(b)6 deposition.

19              MR. PARKER:  I don't believe our rules

20    entitle any lawyer to instruct the witness not to

21    answer a question that is not invoking a privilege, and
```

 1   none of my questions have invoked a privilege.

 2           I think you take all testimony subject to

 3   determinations and relevance.  I will also say that

 4   this witness has already testified that part of her

 5   preparation for this deposition was, in fact, review of

 6   some of these reports; but I want to make my record so

 7   I'll go forward and ask the questions and you can

 8   instruct this witness, your government's witness, not

 9   to answer my questions.

10           BY MR. PARKER:

11       Q    Doctor, before coming here today -- strike

12   that.  Let me go right into this.

13           Doctor, please turn to Dr. Borowitz's

14   report, page 3.

15       A    Yes.

16       Q    Doctor, so I don't prolong this record, I

17   will ask you and then I will simply ask you a question

18   and your counsel will either tell you you're allowed to

19   answer it or in her judgment you're not; but look,

20   Doctor, please at the paragraph that begins, the reason

21   I say this?

Page 152

1        A       Yes.

2        Q       And you've reviewed this as least one time

3    before, right, Doctor?

4        A       Correct.

5        Q       To refresh your memory of Dr. Borowitz's

6    opinions in this case, would you please read to

7    yourself the sentence that begins, the reason I say

8    this, and stopping down at the end of the sentence that

9    ends -- that begins, the reason this is a critical

10   distinction, and tell me when you're done and I'll ask

11   you a question.

12       A       Yes.

13       Q       You've read it to yourself.  Doctor, is

14   there anything in that segment of Dr. Borowitz's report

15   with which you disagree?

16               MS. DAVIS:  Objection.

17               I'm going to instruct you not to answer.

18               BY MR. PARKER:

19       Q       Let's go on to Dr. Braylan's report,

20   Exhibit Number 4.  If you would please turn to page 8

21   of Dr. Braylan's report, down towards the end of the

1    first paragraph.

2              Do you see his sentence beginning,

3    focusing?

4         A    Yes.

5         Q    Dr. Braylan wrote, focusing the analysis to

6    a particular cell population and ignoring the remaining

7    cells because of a presumable clinical or pathologic

8    diagnosis is like limiting the examination of a

9    microscopic slide to only a portion of a tissue biopsy

10   and ignoring the rest or restricting the observation of

11   a radiographic study based on patient's symptoms.

12             I read that correctly, right?

13             MS. DAVIS:  Objection.

14             THE WITNESS:  Yes.

15             BY MR. PARKER:

16        Q    Do you agree with that?

17             MS. DAVIS:  Objection, and I'm instructing

18   her not to answer.

19             BY MR. PARKER:

20        Q    Further down the next paragraph Dr. Braylan

21   wrote, furthermore -- let me let you catch up with me.

Page 154

1    Are you with me?

2         A    Yes.

3         Q    Furthermore, the inefficiencies of a

4    process that necessitates the design in each case of a

5    particular antibody or a chrome combination and their

6    frequent uncertainty created by unlimited data

7    convinced us that a global initial approach to the

8    analysis is the appropriate tactic in the majority of

9    the cases rather than the limited approach recommended

10   by the government expert.

11        Do you agree with that statement?

12        MS. DAVIS:  Objection, and I instruct you

13   not to answer.

14        BY MR. PARKER:

15        Q    Not allowed to answer that one either.

16   Okay.  Let's go on to Dr. Holden's report, which is

17   Exhibit Number 5.

18        Please, turn, Dr. Stetler-Stevenson, to the

19   second page of Dr. Holden's report.

20        Do you see her paragraph beginning Dianon's

21   use?

1      A      Yes.

2      Q      And we just reviewed a document Exhibit

3   Number 24 that showed you in 1998 what antibody were

4   being used by Dianon in its panel, correct?

5      A      Correct.

6      Q      With that in mind Dr. Holden wrote,

7   Dianon's use of a broad panel of antibodies reflects

8   accepted medical practice at that time and since,

9   particularly in the setting of a big volume reference

10  laboratory.

11          Do you agree with that statement?

12          MS. DAVIS:   Objection and I instruct you

13  not to answer.

14          BY MR. PARKER:

15     Q      Let's go to the next page.  You'll see the

16  second to the bottom paragraph beginning in order?

17     A      Yes.

18     Q      Dr. Holden wrote, in order to deal with

19  these challenges reference laboratories take a

20  standardized approach to testing, one that yields the

21  most information for the most patients in the shortest

```
 1    period of time with the fewest possible errors.

 2              Do you agree with that statement?

 3              MS. DAVIS:  Objection, and I'm instructing

 4    you not to answer.

 5              BY MR. PARKER:

 6        Q    Let's go to the next paragraph.  Dr. Holden

 7    wrote, consistency in the immuno -- my copy is

 8    blurred -- immunophenotypic approach is of paramount

 9    importance in the evaluation of repeat samples where

10    the clinicians may be concerned about relapse of the

11    original disease, minimal disease remaining after

12    therapy, evolution of disease -- she puts in

13    parentheticals, (transmission of low-grade lymphoma to

14    high-grade lymphoma or emergence of a previously and

15    apparent Leukemic) -- she continues -- or development

16    of a second malignancy possibly related to therapy from

17    the first.

18              Do you agree with that statement?

19              MS. DAVIS:  Objection, and I direct you not

20    to answer.

21              BY MR. PARKER:
```

1    Q    She further writes, one -- excuse me.

2         She further writes, more than one of these

3    processes may be present in a repeat sample and a

4    standardized approach such as that used by Dianon and

5    other high volume laboratories will reliable detect

6    them.

7         Do you agree with that?

8         MS. DAVIS:  Objection, and I direct you not

9    to answer.

10        BY MR. PARKER:

11   Q    You did read and study these in preparation

12   for the deposition today, right?

13.  A    Yes.

14   Q    Going on.  Dr. Holden wrote, restricted

15   panels, particularly those using nonstandard

16   combinations to detect patient specific disease, run

17   the risk of overlooking significant findings and are

18   particularly inappropriate in the reference laboratory

19   setting.

20        Do you agree with that?

21        MS. DAVIS:  Objection.

Page 158

1              I direct you not to answer.

2              BY MR. PARKER:

3        Q    Doctor, let's move on to the government's

4    expert report, Exhibit Number 6.

5              Dr. Stetler-Stevenson, please refer to or

6    please look at page number 3 of this report, the

7    paragraph that's labeled malignant lymphoma

8    lymphoproliferative disorders.

9              Are you with me?

10       A    Yes.

11       Q    And to correlate this would at least

12   include Exhibit Number 12, your blood bone marrow

13   panel?

14       A    Yes.

15       Q    So your Exhibit Number 12 would be the

16   panel that you would use, perhaps others as well, to

17   look at malignant lymphomas and lymphoproliferative

18   disorders?

19       A    Correct.

20       Q    Now, Dr. Flynn, the government's expert,

21   says midway down that paragraph, I believe that the

Page 162

1    suing a laboratory performing flow cytometry without

2    regard to the particular name before the government

3    told you about it?

4        A       Yes, I had heard that.

5        Q       Heard it through the government attorney

6    sources or through colleagues?

7        A       No, through colleagues.

8        Q       And would that have been back in 2005 or

9    earlier?

10       A       It would have been in 2005.

11       Q       I take it, Doctor, that you had never been

12   consulted by government lawyers with regard to the

13   allegation in this lawsuit before they decided to file

14   the lawsuit or to join the lawsuit?

15               MS. DAVIS:  Objection.

16               THE WITNESS:  I have to admit, I'm not sure

17   when the lawsuit was actually filed.

18               BY MR. PARKER:

19       Q       It was filed before 2006.

20       A       So then, no, I was not contacted.

21       Q       Doctor, have you ever, in your capacity as

1   chief of the flow lab for the NCI, ever been asked by

2   government lawyers for your opinion regarding the

3   merits of this case?

4           MS. DAVIS:   Objection, and I'm going to

5   direct you not to answer.

6           BY MR. PARKER:

7       Q       Doctor, in the course of your running the

8   NCI flow lab over the past 15 plus years, have you

9   either in person or through some written or

10  electronically written presentation, presented

11  information to Medicare or carriers implementing the

12  Medicare program for the reimbursements for flow?

13      A       No.

14      Q       Have you ever, without being asked to do

15  so, submitted such an expression of your opinions

16  regarding what the reimbursement schedules ought to be

17  and what they ought to reimburse for?

18      A       To Medicare?

19      Q       To Medicare.

20      A       No.

21      Q       Is that because of the restrictions that

 1                  Can you tell me, Doctor, whether the

 2    opinions expressed by those doctors are any different

 3    materially from the educational effort that you've

 4    tried to make to your colleagues in the flow community

 5    regarding the way to approach flow cytometry?

 6                  MS. DAVIS:   Objection.

 7                  And I'm going to instruct you not to

 8    answer.

 9                  BY MR. PARKER:

10         Q     Okay.   Well, I guess I can't talk to you

11    about anything else.   Those are the end of my

12    questions.   We'll come back for another day I'm quite

13    sure.

14                  Oh, I'm sorry.   We have the matter of

15    identifying a few more of your panels now that I have

16    all copies.   They will take no time at all.

17                  (Whereupon, a document was marked as

18    Deposition Exhibit Number 25.)

19                  BY MR. PARKER:

20         Q     Exhibit 25 is a list of the antibodies

21    currently being used for T-cell repeat cases; is that