EXHIBIT D

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
 2

 3    UNITED STATES OF AMERICA,
      ex rel. Dr. James J.
 4    Tiesinga,

 5              Plaintiffs,
                                       No.3:02CV157(MRK)
 6       vs.

 7    DIANON SYSTEMS, INC.,

 8              Defendant.
      _____/
 9

10         The deposition of MARY ALICE

11    STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12    2006, commencing at 9:30 a.m. at the Law Offices of

13    Venable, L.L.P., 575 7th Street, N.W., Washington,

14    D.C., before Steven Poulakos, Notary Public in and for

15    the District of Columbia.

16

17

18

19

20

21    REPORTED BY:  Steven Poulakos
```

Page 18

1  performed outside are suggestive but not sufficient to
2  confirm the studies, diagnosis.
3      Q    What do you -- help me better understand
4  what you mean by protocol? Are you talking about a
5  research program?
6      A    Research protocol, yes. So an example
7  would have a protocol call to treat patients with hairy
8  cell leukemia. Patients with the diagnosis of hairy
9  cell leukemia who are refractory to current accepted
10 therapy will contact the head contact person, a nurse,
11 for this protocol.
12          Their diagnostic evaluation will be sent to
13 NIH and everything that they've had done, and if they
14 appear to indeed have hairy cell leukemia and meet
15 other requirements such as which would be H status, et
16 cetera, their blood would be sent to me to confirm that
17 they have hairy cell leukemia and to determine -- and
18 if they do have hairy cell leukemia they would then be
19 brought to NIH for further evaluation for the protocol.
20          Protocol lists absolute requirements to
21 maintain homogenous patient population so that they

Page 19

1  have appropriate patients to study. If the patient
2  meets all of these requirements and they're visit to
3  NIH they're entered on the protocol they'll receive
4  experimental therapy. They'll be followed by me and by
5  other hematopathologists to record their response to
6  therapy, et cetera.
7      Q    If I'm understanding correctly, if I were
8  to develop a cancer of the blood or bone marrow and my
9  particular cancer is not one for which there is a
10 protocol in place, a study going on at NIH, then I
11 would not be permitted to submit my specimen to your
12 lab for evaluation; is that correct?
13     A    That is correct.
14     Q    And is the protocol process you just
15 described the same at NCI and at NIH?
16     A    NCI is part of NIH.
17     Q    Okay. Thank you.
18     A    All patients are treated on protocols. We
19 do not have an emergency room. We do not have
20 unexpected submissions for patients. They're treated
21 on a protocol.

Page 20

1      Q    No calls in the middle of the night that
2  you have to run down to?
3      A    Yes, I do, but they're on protocol.
4      Q    Okay.
5           I know you told me and I've forgotten. The
6  lab is under the auspice of the NIH or the NCI?
7      A    Well, it's under the auspices of NCI which
8  is under NI.
9      Q    But to be technically correct, the flow lab
10 is operated by NCI?
11     A    Correct.
12     Q    I'm not intending to be fictitious by this,
13 but you use reagents in your flow like everyone else,
14 correct?
15     A    Correct.
16     Q    And they cost money to use?
17     A    Correct.
18     Q    You don't get them for free in your lab?
19     A    Correct.
20     Q    Is it your professional judgment as to --
21 well, let me rephrase the question.

Page 21

1           As part of your professional judgment in
2  constructing your various panels for use in flow, do
3  you have to consider, because you operate with within a
4  budget, the financial implications of your decisions?
5      A    Yes.
6      Q    So you are in, I would say, would you agree
7  with me, somewhat the same situation as an outside
8  nongovernmental lab in which you have to weigh the
9  incremental benefits of how you construct your panel
10 versus the incremental cost?
11          MS. DAVIS: Objection.
12          BY MR. PARKER:
13     Q    You can answer the question.
14     A    Okay. Could you repeat the question?
15     Q    Yes, ma'am.
16          There has been testimony in this case by
17 the government's expert that I can't look to how you
18 run your lab because you're just a government and you
19 don't have to pay for your lab, I mean pay for your
20 studies?
21          MS. DAVIS: Objection.

6 (Pages 18 to 21)

Page 30

1    it.
2    Q    Dr. Stetler-Stevenson, have you reviewed
3    the deposition testimony of any of the individuals that
4    we just discussed, Borowitz, Braylan, Holden, or Flynn?
5    A    No.
6         (Whereupon, a document was marked as
7    Deposition Exhibit Number 7.)
8         BY MR. PARKER:
9    Q    I'm going to hand you Exhibit Number 7
10   which is an extract from the deposition given by Dr.
11   Holden in this case.
12        MS. DAVIS:  I'm going to have to object to
13   this again because it's beyond the scope of the 30(b)6
14   and you're asking her personal questions now as opposed
15   to questions in her capacity as the NIH.
16        MR. PARKER:  We can agree to disagree, but
17   I'll ask me questions and you can instruct her not to
18   answer and we'll take it up with the judge.
19        BY MR. PARKER:
20   Q    Doctor, please turn to page 200 of this
21   transcript.  And you can certainly take your time to

Page 31

1    read the entire answer, but my question will focus --
2    actually, why don't I ask you to read Dr. Holden's
3    testimony beginning on line 7 on page 200 through line
4    13 on page 201 before I ask my question and tell me
5    when you're done and I'll ask you my question.
6    A    So page 201?
7    Q    Yes, ma'am.  Beginning on page 201, line 7,
8    and the answer continues and completes on line 13 on
9    page 201.  I'll ask you a question when you --
10   A    I've read it.
11   Q    Dr. Stetler-Stevenson, in this answer Dr.
12   Holden testifies that you initiated the discussion with
13   her in Greece regarding your concern about this lawsuit
14   and your particular concern with the implications if
15   the government were successful in this lawsuit as it
16   related to flow cytometry.
17        MS. DAVIS:  Objection.
18        BY MR. PARKER:
19   Q    Do you agree with her recitation of that
20   conversation?
21   A    No.  I don't believe I knew about this

Page 32

1    particular lawsuit at that time.  I may -- she may have
2    said something about a lawsuit and I would have said,
3    oh, really.  That sounds terrible.  What's going on or
4    whatever, but I don't recall -- I did not know the name
5    of the Plaintiff at that time.
6    Q    Did you ever initiate a conversation with
7    Dr. Holden regarding your understanding of this
8    lawsuit?
9         MS. DAVIS:  Objection.
10        THE WITNESS:  This lawsuit, no.
11        BY MR. PARKER:
12   Q    Did you ever initiate a discussion with Dr.
13   Holden regarding some knowledge of a lawsuit, the
14   particulars of which were unknown to you, and your
15   concern how it may affect flow cytometry?
16        MS. DAVIS:  Objection.
17        THE WITNESS:  Let me think about this.  I
18   don't have a clear memory of a interest in a lawsuit at
19   that time.
20        BY MR. PARKER:
21   Q    I said any time.

Page 33

1    A    At any time.  Any lawsuit any time?
2    Q    Have you ever discussed -- my question is
3    just -- we'll start again.
4    A    Okay.
5    Q    Have you ever discussed with Dr. Holden
6    your concern about a lawsuit about which you heard
7    something and your concern about if the government were
8    successful that it would have an adverse impact on how
9    flow cytometry was performed?
10        MS. DAVIS:  Objection.
11        THE WITNESS:  I wouldn't say I said that to
12   her.
13        BY MR. PARKER:
14   Q    What did you say?
15   A    If --
16        MS. DAVIS:  Objection.
17        THE WITNESS:  If she were talking about a
18   lawsuit I would probably say, oh, that sounds terrible
19   or what's happening or is it you or, you know, whatever
20   and murmured conversational, oh, that's interesting, oh
21   yes, whatever.

Page 34

1    I don't believe I brought up to her, oh, I
2  hear that there is a lawsuit against Dianon which I did
3  not know was involved until rather recently. I did not
4  know the name and so, therefore, I could not have
5  commented on that specific case.
6    BY MR. PARKER:
7    Q    But that wasn't my question, Doctor. And
8  you answered in terms of I might have or -- my question
9  to you is specifically: Sitting here today, have you
10 ever had a conversation with Dr. Holden in which you've
11 discussed the impact of a lawsuit as it might relate --
12 as it would relate, in your opinion, to flow cytometry?
13    MS. DAVIS: Objection.
14    THE WITNESS: When people started to talk
15 about a lawsuit against -- involving the U.S.
16 government, my answer was, I'm a U.S. government
17 employee and you probably shouldn't talk to me about
18 this.
19    BY MR. PARKER:
20    Q    So there was a conversation?
21    A    I believe that -- I believe that I've heard

Page 35

1  rumors of a lawsuit with the U.S. government against
2  some laboratory and I always remove myself from the
3  conversation. I don't want -- you don't want to talk
4  about this in front of me.
5    Q    Who conveyed to you what you described as
6  rumors of such a lawsuit?
7    MS. DAVIS: Objection.
8    THE WITNESS: I don't -- I don't know. It
9  could have been Dr. Holden.
10    BY MR. PARKER:
11    Q    Do you have any memory that you can testify
12 to under oath right now as to who has discussed with
13 you, to use your word, the rumor of a lawsuit as it
14 relates to flow cytometry?
15    MS. DAVIS: Objection.
16    THE WITNESS: Discussed with me directly?
17    BY MR. PARKER:
18    Q    Well, you said that someone raised a rumor.
19 I want to find out who that person is.
20    MS. DAVIS: Objection.
21    THE WITNESS: Someone discussed with me

Page 36

1  directly? I believe that possibly -- I'm not sure. I
2  have heard other people talking, but discussed with me,
3  I'm not sure if Dr. Holden started to speak to me about
4  it in the company of others; but I think she may have
5  started to and when she mentioned the U.S. government
6  my answer is, you shouldn't talk to me about this.
7    BY MR. PARKER:
8    Q    Is there anyone else that you can recall
9  discussing with you or discussing in your presence a
10 lawsuit that involved flow cytometry?
11    MS. DAVIS: Objection.
12    THE WITNESS: I believe that Dr. Borowitz
13 and Dr. Holden started to discuss a case involving the
14 government in front of me and I said, you should not
15 talk about this in front of me.
16    BY MR. PARKER:
17    Q    When was that, Doctor?
18    MS. DAVIS: Objection.
19    THE WITNESS: October.
20    BY MR. PARKER:
21    Q    Of what year?

Page 37

1    A    2005.
2    Q    Thank you.
3         Alright, let's go back to what we were
4  talking about before.
5         I started to ask you about what you had
6  done to prepare for today's deposition. We got into a
7  discussion about having reviewed some of the reports
8  that had been put in front of you.
9         Did you do anything else to prepare for
10 today's deposition?
11    A    Besides I informed my supervisor. I
12 informed the clinical staff of the laboratory of
13 pathology that I would be absent today.
14         My staff had to collect documents for this,
15 and I did not give specifics, but said it's the U.S.
16 attorney's office is requesting this and this. And for
17 today I told them I would be unavailable unless it's an
18 extreme emergency.
19    Q    Did you review the documents that were
20 collected by your staff?
21    A    Not all of them, no. I mean, they were my

10 (Pages 34 to 37)

Towson Reporting Company         GORE BROTHERS         Whitman Reporting-Rockville
410-828-4148                     410-837-3027          301-279-7599

Page 142

1  Braylan on the left-hand side, in general -- I'll let
2  you catch up with me. Right about right here.
3      A   Okay.
4      Q   You wrote in general, do you see that?
5      A   Yes.
6      Q   Flow cytometry is more sensitive than
7  morphologic analysis and is particularly valuable in
8  staging for detection of bone marrow and peripheral
9  blood involvement, right?
10         MS. DAVIS: Objection.
11         THE WITNESS: Correct.
12         BY MR. PARKER:
13     Q   I agree and assume since you're one of the
14 authors you agree with that statement?
15         MS. DAVIS: Objection.
16         THE WITNESS: Yes.
17         BY MR. PARKER:
18     Q   And so the jury understands, when you say
19 sensitive, you're really saying it's more accurate?
20         MS. DAVIS: Objection.
21         BY MR. PARKER:

Page 143

1      Q   In the context that's how you're using that
2  word; isn't that right?
3      A   Accuracy has many different definitions.
4  What I mean by it's more sensitive is that you could
5  evaluate by morphology looking at a slide a specimen
6  and detect no cancer yet be able to detect it by flow
7  cytometry.
8      Q   And my layman sense that's more accurate
9  because I want to know whether I got cancer?
10     A   Right.
11     Q   Now, Doctor, morphologic again is looking
12 through the microscope with the human eye?
13     A   Correct.
14     Q   And flow cytometry is the use of machines
15 that detect antibodies or small proteins that bind to
16 other cellular components in the specimen you're
17 looking at?
18     A   Correct.
19     Q   I think we've covered the other areas in
20 this paper. Let's put that aside.
21         (Whereupon, a document was marked as

Page 144

1  Deposition Exhibit Number 23.)
2          BY MR. PARKER:
3      Q   Let me hand you an excerpt Exhibit 3, and
4  Exhibit 3 is an excerpt of --
5          MS. DAVIS: 23?
6          MR. PARKER: 23, I'm sorry.
7          BY MR. PARKER:
8      Q   Is an excerpt of from a context written by,
9  among others, Dr. Braylan, which also for the record
10 is --
11         MS. DAVIS: Once again, I'm going to object
12 to this as being outside of the scope of the 30(b)6
13 deposition.
14         MR. PARKER: Okay.
15         BY MR. PARKER:
16     Q   -- referenced in the materials by the
17 Connecticut LMRP.
18         Doctor, I'd like you to turn please to page
19 17 of this document.
20     A   Yes.
21     Q   I'm going to read the first two sentences

Page 145

1  and ask whether you agree with these authors. The
2  clinical impression or the morphologic features of the
3  specimens should not dictate the design and selection
4  of an antibody panel. Despite efforts to improve the
5  communication between the clinical and laboratory
6  services, the clinical information on the FCM request
7  forms is often scanty, vague, and potentially
8  misleading.
9          Do you agree with that statement?
10         MS. DAVIS: Objection.
11         THE WITNESS: Yes.
12         BY MR. PARKER:
13     Q   They further write, furthermore to have an
14 antibody panel for each specific group of hemotologic
15 neoplasms -- I'll skip the parenthetical -- would be
16 inappropriate and defeat the purpose of FCM
17 immunophenotype.
18         Do you agree with that?
19         MS. DAVIS: Objection.
20         THE WITNESS: Yes.
21         BY MR. PARKER:

Towson Reporting Company    GORE BROTHERS    Whitman Reporting-Rockville
410-828-4148                410-837-3027     301-279-7599