EXHIBIT E

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
 2

 3   UNITED STATES OF AMERICA,
     ex rel. Dr. James J.
 4   Tiesinga,

 5              Plaintiffs,
                                       No.3:02CV157(MRK)
 6      vs.

 7   DIANON SYSTEMS, INC.,

 8              Defendant.
                                    /
 9

10          The deposition of MARY ALICE

11   STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12   2006, commencing at 9:30 a.m. at the Law Offices of

13   Venable, L.L.P., 575 7th Street, N.W., Washington,

14   D.C., before Steven Poulakos, Notary Public in and for

15   the District of Columbia.

16

17

18

19

20

21   REPORTED BY:  Steven Poulakos
```

Page 150

1 selection of antibodies that Dianon made in 1998 for
2 its flow panel when compared to the flow panel that you
3 discussed with me, Exhibit Number 12, that you were
4 using four blood and bone marrow?
5     MS. DAVIS: Objection.
6     THE WITNESS: I have more antibodies.
7     BY MR. PARKER:
8  Q  You have more?
9  A  Yes, additional.
10 Q  Alright, you can put that aside.
11    Doctor, if you would, please, pull up
12 Exhibit Number 4 which is, I believe if my notes are
13 correct, Dr. Braylan's report -- I'm sorry, Dr.
14 Borowitz, Exhibit Number 3.
15    MS. DAVIS: I'm going to object to this and
16 I'm going to instruct her not to answer any questions
17 about the expert reports in this case. It's outside
18 the scope of the 30(b)6 deposition.
19    MR. PARKER: I don't believe our rules
20 entitle any lawyer to instruct the witness not to
21 answer a question that is not invoking a privilege, and

Page 151

1 none of my questions have invoked a privilege.
2     I think you take all testimony subject to
3 determinations and relevance. I will also say that
4 this witness has already testified that part of her
5 preparation for this deposition was, in fact, review of
6 some of these reports; but I want to make my record so
7 I'll go forward and ask the questions and you can
8 instruct this witness, your government's witness, not
9 to answer my questions.
10    BY MR. PARKER:
11 Q  Doctor, before coming here today -- strike
12 that. Let me go right into this.
13    Doctor, please turn to Dr. Borowitz's
14 report, page 3.
15 A  Yes.
16 Q  Doctor, so I don't prolong this record, I
17 will ask you and then I will simply ask you a question
18 and your counsel will either tell you you're allowed to
19 answer it or in her judgment you're not; but look,
20 Doctor, please at the paragraph that begins, the reason
21 I say this?

Page 152

1  A  Yes.
2  Q  And you've reviewed this as least one time
3 before, right, Doctor?
4  A  Correct.
5  Q  To refresh your memory of Dr. Borowitz's
6 opinions in this case, would you please read to
7 yourself the sentence that begins, the reason I say
8 this, and stopping down at the end of the sentence that
9 ends -- that begins, the reason this is a critical
10 distinction, and tell me when you're done and I'll ask
11 you a question.
12 A  Yes.
13 Q  You've read it to yourself. Doctor, is
14 there anything in that segment of Dr. Borowitz's report
15 with which you disagree?
16    MS. DAVIS: Objection.
17    I'm going to instruct you not to answer.
18    BY MR. PARKER:
19 Q  Let's go on to Dr. Braylan's report,
20 Exhibit Number 4. If you would please turn to page 8
21 of Dr. Braylan's report, down towards the end of the

Page 153

1 first paragraph.
2     Do you see his sentence beginning,
3 focusing?
4  A  Yes.
5  Q  Dr. Braylan wrote, focusing the analysis to
6 a particular cell population and ignoring the remaining
7 cells because of a presumable clinical or pathologic
8 diagnosis is like limiting the examination of a
9 microscopic slide to only a portion of a tissue biopsy
10 and ignoring the rest or restricting the observation of
11 a radiographic study based on patient's symptoms.
12    I read that correctly, right?
13    MS. DAVIS: Objection.
14    THE WITNESS: Yes.
15    BY MR. PARKER:
16 Q  Do you agree with that?
17    MS. DAVIS: Objection, and I'm instructing
18 her not to answer.
19    BY MR. PARKER:
20 Q  Further down the next paragraph Dr. Braylan
21 wrote, furthermore -- let me let you catch up with me.

Page 154

1  Are you with me?
2    A    Yes.
3    Q    Furthermore, the inefficiencies of a
4  process that necessitates the design in each case of a
5  particular antibody or a chrome combination and their
6  frequent uncertainty created by unlimited data
7  convinced us that a global initial approach to the
8  analysis is the appropriate tactic in the majority of
9  the cases rather than the limited approach recommended
10 by the government expert.
11        Do you agree with that statement?
12        MS. DAVIS:  Objection, and I instruct you
13 not to answer.
14        BY MR. PARKER:
15   Q    Not allowed to answer that one either.
16 Okay.  Let's go on to Dr. Holden's report, which is
17 Exhibit Number 5.
18        Please, turn, Dr. Stetler-Stevenson, to the
19 second page of Dr. Holden's report.
20        Do you see her paragraph beginning Dianon's
21 use?

Page 155

1    A    Yes.
2    Q    And we just reviewed a document Exhibit
3  Number 24 that showed you in 1998 what antibody were
4  being used by Dianon in its panel, correct?
5    A    Correct.
6    Q    With that in mind Dr. Holden wrote,
7  Dianon's use of a broad panel of antibodies reflects
8  accepted medical practice at that time and since,
9  particularly in the setting of a big volume reference
10 laboratory.
11        Do you agree with that statement?
12        MS. DAVIS:  Objection and I instruct you
13 not to answer.
14        BY MR. PARKER:
15   Q    Let's go to the next page.  You'll see the
16 second to the bottom paragraph beginning in order?
17   A    Yes.
18   Q    Dr. Holden wrote, in order to deal with
19 these challenges reference laboratories take a
20 standardized approach to testing, one that yields the
21 most information for the most patients in the shortest

Page 156

1  period of time with the fewest possible errors.
2        Do you agree with that statement?
3        MS. DAVIS:  Objection, and I'm instructing
4  you not to answer.
5        BY MR. PARKER:
6    Q    Let's go to the next paragraph.  Dr. Holden
7  wrote, consistency in the immuno -- my copy is
8  blurred -- immunophenotypic approach is of paramount
9  importance in the evaluation of repeat samples where
10 the clinicians may be concerned about relapse of the
11 original disease, minimal disease remaining after
12 therapy, evolution of disease -- she puts in
13 parentheticals, (transmission of low-grade lymphoma to
14 high-grade lymphoma or emergence of a previously and
15 apparent Leukemic) -- she continues -- or development
16 of a second malignancy possibly related to therapy from
17 the first.
18        Do you agree with that statement?
19        MS. DAVIS:  Objection, and I direct you not
20 to answer.
21        BY MR. PARKER:

Page 157

1    Q    She further writes, one -- excuse me.
2        She further writes, more than one of these
3  processes may be present in a repeat sample and a
4  standardized approach such as that used by Dianon and
5  other high volume laboratories will reliable detect
6  them.
7        Do you agree with that?
8        MS. DAVIS:  Objection, and I direct you not
9  to answer.
10        BY MR. PARKER:
11   Q    You did read and study these in preparation
12 for the deposition today, right?
13   A    Yes.
14   Q    Going on.  Dr. Holden wrote, restricted
15 panels, particularly those using nonstandard
16 combinations to detect patient specific disease, run
17 the risk of overlooking significant findings and are
18 particularly inappropriate in the reference laboratory
19 setting.
20        Do you agree with that?
21        MS. DAVIS:  Objection.

Page 158

1  I direct you not to answer.
2  BY MR. PARKER:
3  Q  Doctor, let's move on to the government's
4  expert report, Exhibit Number 6.
5  Dr. Stetler-Stevenson, please refer to or
6  please look at page number 3 of this report, the
7  paragraph that's labeled malignant lymphoma
8  lymphoproliferative disorders.
9  Are you with me?
10  A  Yes.
11  Q  And to correlate this would at least
12  include Exhibit Number 12, your blood bone marrow
13  panel?
14  A  Yes.
15  Q  So your Exhibit Number 12 would be the
16  panel that you would use, perhaps others as well, to
17  look at malignant lymphomas and lymphoproliferative
18  disorders?
19  A  Correct.
20  Q  Now, Dr. Flynn, the government's expert,
21  says midway down that paragraph, I believe that the

Page 159

1  T-cell antibodies anti-CD2 and CD7 and the B-cell
2  antibody anti-CD22 are not of sufficient diagnostic
3  value to include in this panel and, therefore, not
4  medically necessary.
5  Do I take it from what you've told me,
6  Doctor, that you disagree with the proposition that
7  CD2, 7 and CD22 are not helpful or necessary when
8  attempting to correctly diagnose these conditions?
9  MS. DAVIS: Objection.
10  THE WITNESS: Could you repeat the
11  question?
12  BY MR. PARKER:
13  Q  Yes.
14  Doctor, you disagree, based on your earlier
15  testimony in the panel construction, Exhibit Number 12,
16  with Dr. Flynn's statement that using CD2, 7, and 22
17  are not of sufficient diagnostic value to include in
18  the panel?
19  MS. DAVIS: Objection.
20  THE WITNESS: Yes.
21  BY MR. PARKER:

Page 160

1  Q  Yes, you disagree?
2  A  Yes, I disagree.
3  Q  He goes on to say, additionally myeloid
4  antibodies CD13, 3, HLADR, CD57 and 34 are also
5  lacking -- I'm paraphrasing now -- significant
6  diagnostic merit.
7  Do you also disagree with that statement?
8  MS. DAVIS: Objection.
9  THE WITNESS: Yes.
10  BY MR. PARKER:
11  Q  You can put his report aside for the
12  moment. Doctor, I'm sorry, I may have asked you this
13  and if I did, I apologize.
14  Did you actually read Dr. Flynn's
15  deposition?
16  A  Yes. No. Deposition, no. I read this.
17  Q  Let's take a short break and let me step
18  outside with my associate and let make sure I've asked
19  you everything that I need to ask you today.
20  (A short break was taken.)
21  BY MR. PARKER:

Page 161

1  Q  Dr. Stetler-Stevenson, when did you first
2  learn about this lawsuit in particular?
3  A  I'm not sure when, but it was in 2006 I
4  would say. I'd have to guess that it was in the spring
5  of 2006.
6  Q  Of this year?
7  A  Yes, I believe that is when I was contacted
8  specifically, but I'm not sure. I'm not sure when I
9  was contacted concerning this.
10  Q  Okay. And were you told about the fact
11  that this lawsuit existed from a colleague or by a
12  government lawyer?
13  MS. DAVIS: Objection.
14  THE WITNESS: About this specific lawsuit
15  with mentioning of the Dianon's name, I was told by
16  government lawyers.
17  Q  And I'm not going back into the discussion
18  we had earlier about some recollection possibly -- I
19  don't want to mischaracterize your testimony -- about a
20  conversation with Dr. Holden about a lawsuit; but had
21  you been told about the fact that the government was

41 (Pages 158 to 161)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 162

1  suing a laboratory performing flow cytometry without
2  regard to the particular name before the government
3  told you about it?
4     A    Yes, I had heard that.
5     Q    Heard it through the government attorney
6  sources or through colleagues?
7     A    No, through colleagues.
8     Q    And would that have been back in 2005 or
9  earlier?
10    A    It would have been in 2005.
11    Q    I take it, Doctor, that you had never been
12 consulted by government lawyers with regard to the
13 allegation in this lawsuit before they decided to file
14 the lawsuit or to join the lawsuit?
15       MS. DAVIS: Objection.
16       THE WITNESS: I have to admit, I'm not sure
17 when the lawsuit was actually filed.
18       BY MR. PARKER:
19    Q    It was filed before 2006.
20    A    So then, no, I was not contacted.
21    Q    Doctor, have you ever, in your capacity as

Page 163

1  chief of the flow lab for the NCI, ever been asked by
2  government lawyers for your opinion regarding the
3  merits of this case?
4        MS. DAVIS: Objection, and I'm going to
5  direct you not to answer.
6        BY MR. PARKER:
7     Q    Doctor, in the course of your running the
8  NCI flow lab over the past 15 plus years, have you
9  either in person or through some written or
10 electronically written presentation, presented
11 information to Medicare or carriers implementing the
12 Medicare program for the reimbursements for flow?
13    A    No.
14    Q    Have you ever, without being asked to do
15 so, submitted such an expression of your opinions
16 regarding what the reimbursement schedules ought to be
17 and what they ought to reimburse for?
18    A    To Medicare?
19    Q    To Medicare.
20    A    No.
21    Q    Is that because of the restrictions that

Page 164

1  are placed on you by the government that you can't do
2  that?
3     A    Could you repeat?
4     Q    I'd like to put it in more concrete terms.
5  Let's assume, for example, that Dr. Borowitz contacted
6  you and said the carrier who's implementing Medicare in
7  Maryland will not reimburse us for diagnosing AML.
8  This is outrageous. Will you help us explain to them
9  why this is wrong.
10       If that were the situation, would you be
11 permitted by the government to weigh in, give your
12 professional opinion?
13    A    Most likely not. I'm not sure. However, I
14 would have to put a written request and go through
15 normal chains of approval at NCI and NIH.
16    Q    So you'd have to request as a director of
17 the flow lab permission to speak as a professional
18 about your opinions involving medical practice?
19       You have to get permission to speak from
20 the United States government; is that right?
21       MS. DAVIS: Objection.

Page 165

1        THE WITNESS: I have to get permission to
2  speak whenever I am representing the flow cytometry
3  laboratory at NCI.
4        BY MR. PARKER:
5     Q    What happens if it's just
6  Dr. Stetler-Stevenson, I'm a pathologist, I have an
7  opinion?
8     A    Out in the general community without
9  identifying where I come from.
10    Q    Can you do that?
11    A    I am prohibited from lobbying a government
12 organization concerning policy.
13    Q    We can agree that flow cytometry today at
14 least is not national security?
15       MS. DAVIS: Objection.
16       THE WITNESS: Yes.
17       BY MR. PARKER:
18    Q    Doctor, I know you're not allowed to talk
19 about the opinions that you read in preparation for
20 today's deposition, but you've read those reports of
21 Drs. Braylan, Borowitz, and Holden.

42 (Pages 162 to 165)

Page 166

1  Can you tell me, Doctor, whether the
2  opinions expressed by those doctors are any different
3  materially from the educational effort that you've
4  tried to make to your colleagues in the flow community
5  regarding the way to approach flow cytometry?
6      MS. DAVIS: Objection.
7      And I'm going to instruct you not to
8  answer.
9      BY MR. PARKER:
10  Q  Okay. Well, I guess I can't talk to you
11  about anything else. Those are the end of my
12  questions. We'll come back for another day I'm quite
13  sure.
14      Oh, I'm sorry. We have the matter of
15  identifying a few more of your panels now that I have
16  all copies. They will take no time at all.
17      (Whereupon, a document was marked as
18  Deposition Exhibit Number 25.)
19      BY MR. PARKER:
20  Q  Exhibit 25 is a list of the antibodies
21  currently being used for T-cell repeat cases; is that

Page 167

1  correct?
2  A  This is for two specific -- actually it can
3  be applied to three protocols. It references Morris
4  and Bates who are the principal investigators on the
5  protocols for which this is appropriate and they answer
6  research questions.
7  Q  So this is not being used for diagnostic
8  purpose, this is being used to answer specific protocol
9  question?
10  A  Correct.
11  Q  Thank you.
12      (Whereupon, a document was marked as
13  Deposition Exhibit Number 26.)
14      BY MR. PARKER:
15  Q  Moving on to Exhibit Number 26. Rather
16  than me misstating the exhibit, why don't you tell me
17  what this is depicting, Doctor?
18  A  This is a panel for a protocol, research
19  protocol, that was treating patients with LGL
20  leukemias.
21  Q  Again, not something you would use to

Page 168

1  diagnose disease?
2  A  No.
3  Q  Correct?
4  A  That's correct.
5      (Whereupon, a document was marked as
6  Deposition Exhibit Number 27.)
7      BY MR. PARKER:
8  Q  Now we're on Exhibit Number 27. Would you
9  please tell me that this exhibit depicts?
10  A  This is a panel for patients with a
11  specific diagnosis of ALPS in which there these
12  patients have a tendency to develop lymphoproliferative
13  processes and are periodically when they have an
14  enlarged lymph node or some changes of bone marrow
15  aspartate may be performed, and in patients with this
16  rare disease of ALPS we will do this panel because
17  there are research specific questions being asked as
18  well as checking for a specific lymphoma that they are
19  likely to develop or have an increased risk of.
20  Q  So this is a diagnostic panel for a very
21  rare disease used very infrequently?

Page 169

1  A  Yes.
2  Q  What is ALPS?
3  A  It's an autoimmune lymphoproliferative
4  syndrome. It's patients who have a deficiency in a
5  specific gene that allows regulation of their immune
6  system.
7  Q  I think that's all I need to know.
8      (Whereupon, a document was marked as
9  Deposition Exhibit Number 28.)
10      BY MR. PARKER:
11  Q  I'm going to hand you now Exhibit Number 28
12  and can you tell me what this document depicts?
13  A  This is a document of a repeat panel for
14  patients on a specific protocol. It is not for
15  diagnosis. It can answer several questions that may be
16  checked such as a blast count only after diagnosis has
17  been determined or protocol or research specific
18  questions concerning levels of expression of various
19  antigens.
20  Q  But it's not for diagnostic use?
21  A  No.

Towson Reporting Company    GORE BROTHERS    Whitman Reporting-Rockville
410-828-4148                410-837-3027     301-279-7599