# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:02CV1573(MRK) |
| | ) | |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE
## THE OPINIONS OF STUART FLYNN, M.D.

### I. OVERVIEW

The United States alleges that Dianon failed to use its "medical judgment to craft

(flow cytometry) panels aimed at identifying the particular type of cancer suspected by

the referring physician" and therefore fraudulently over-billed Medicare for medically

unnecessary testing. Complaint at ¶37. In other words, Dianon's testing was medically

unnecessary because it was designed to detect additional types of leukemia and

lymphoma the clinician did not indicate on the test requisition, i.e. it was too thorough.

To prove this claim, the government retained Stuart Flynn, M.D. Dr. Flynn reviewed 637

Dianon flow cytometry tests and indicated which of the 26 antibodies Dianon typically

used were medically unnecessary for a given patient's suspected disease.[1] In making

these determinations on a case-by-case basis, Dr. Flynn either did not utilize a

---

[1] Based upon Dr. Flynn's review, the government used a statistician to compute the average number of medically necessary antibodies (between 12 and 16) and then extrapolated those results to the entire population of 12,545 claims Medicare reimbursed to compute its damages. See Government Damage Disclosures at 1-2. As an initial matter, the government's claim for damages is inconsistent with its theory of liability. On the one hand it asserts that each patient must be individually examined to ensure medically necessary testing is performed, yet do not analyze every patient claim when asserting Medicare fraud.

discernable, medically-recognized methodology or, when he could articulate a methodology, did not follow it.

Dr. Flynn alleges that based upon a suspected diagnosis, a laboratory has "sufficient clinical information to design a targeted panel of antibodies as opposed to using a large standard panel in each case." *Exhibit* 1, Dr. Flynn's Report at 3. However, Dr. Flynn did not create a targeted panel to address a particular disease process such as lymphoma, acute leukemia, or anemia. Instead, Dr. Flynn selected varying antibodies for each suspected disease – an approach he did not follow in medical practice. The reason he did not follow this approach in medical practice was because he could not. The antibody combinations that comprise a flow cytometry test or "panel" must be validated before being used on patients and cannot be "dreamed up on the spot." *Exhibit 2,* Deposition of Maryalice Stetler-Stevenson at 117:8-9. *See also, Exhibit 3[2]* at SF0770 (laboratories must "construct and validate" antibody combinations), *Exhibit 4,* College of American Pathologist Laboratory Accreditation Program at 58 ("Sound laboratory practice requires full characterization of an assay before its use for patient testing…"). In essence, the government utilizes a standard for medical necessity that could not be applied in actual practice.

Dr. Flynn's approach to flow cytometry is not generally accepted in the medical community nor was it acceptable in Dr. Flynn's practice. Dr. Flynn's expressed opinions are nothing more than *ad hoc* determinations that do not conform to a scientific methodology that can be tested, have never been peer reviewed, and, at times, he cannot explain. Dr. Flynn did not "design" flow cytometry tests that would be medically

---

[2] Stelzer, G, et al., *U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia by Flow Cytometry: Standardization and Validation of Laboratory Procedures.* Cytometry 30:214-230 (1997).

appropriate for a given patient, i.e. provide antibody combinations a laboratory would use. Rather, Dr. Flynn selected "unnecessary" antibodies on a case-by-case basis without thought as to how a laboratory could actually implement his opinions.

To the extent this Court believes Dr. Flynn demonstrated and properly applied a legitimate scientific methodology, his opinions do not "fit" the Plaintiff's case. In order for the Government's case to succeed, they must prove, among other elements, that flow cytometry medical standards <u>required</u> (through publication of a clear rule, regulation or standard) that the flow cytometry community adopt Dr. Flynn's approach and Dianon purposely failed to adhere to this approach. There is no scientific evidence, publication, opinion, government rule or regulation that supports the Plaintiff's contention that the standard of care <u>requires</u> a laboratory to design its flow cytometry testing based upon a clinician's initial suspicion of a patient's disease. In fact, the medical literature criticizes the government's theory and warns the medical community that it could be hazardous to patients.

Conversely, Dianon used a medically recognized "comprehensive" approach to its flow cytometry testing. The government's designee from the National Institute of Health (NIH), Maryalice Stetler-Stevenson, M.D., testified that the government's premier flow cytometry laboratory utilized the same approach as Dianon (and numerous other labs).

## II.     FACTUAL BACKGROUND

Dianon Systems, Inc. ("Dianon") is a small reference laboratory located in Stratford, Connecticut. Dianon provides, among other tests, flow cytometry testing for the diagnosis of blood and lymph system diseases, such as leukemia and lymphoma. *See, Exhibit 5*, World Health Organization Classification of Neoplastic Diseases of the

Hematopoietic and Lymphoid Tissues for a listing of the various blood and lymph disease classifications and sub-classifications.

Once Dianon receives a patient's specimen from a clinician, the living cells are mixed in test tubes with different, validated antibody combinations and sent through the flow cytometer. In Dianon's practice, each test tube has three specific antibodies combined because Dianon utilized a three color flow cytometer. *See, Exhibit 6* at 4, Dianon's standard antibody combinations. The different antibodies bind with certain cell types such as t-cell lymphocytes, b-cell lymphocytes, myeloid cells, and "natural killer" cells. *Id.* at 1. The pattern or expression of antibodies on cells allows the hematopathologist to separate normal cells from abnormal cells and then, depending on which antibodies are affixed to the different cells, identify and classify a disease process or rule out disease processes.

Selecting antibodies, and the combinations used in each test tube, for a flow cytometry "panel" is a crucial decision in flow cytometry testing. Only certain antibodies can recognize or identify specific diseases. Dianon utilizes a "comprehensive" approach to flow cytometry testing whereby its trained hematopathologists selected 26 antibodies to include in its standard panel from approximately 40 antibodies recognized as useful in detecting leukemia and lymphoma.[3] *Exhibit 7,* Deposition of Stuart Flynn, M.D. at *145:13-146:4. See also, e.g., Exhibit 6* at 1, 4.

---

[3] *Exhibit 8, Consensus protocol for the flow cytometric immunophenotyping of hematopoietic malignancies,* Leukemia 10:877 (1996) at 882, Table 2, *Exhibit 9, U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia by Flow Cytometry: Selection of Antibody Combinations,* Cytometry 30:231 (1997) at 232 Table 1, *Exhibit 10, Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting,* Cytometry 46:23 (2001) at SF0757.

Medicare has not defined medically reasonable and necessary medical practices for selecting antibodies for use in flow cytometry testing. Therefore, published scientific studies, "consensus of expert medical opinion," and "recognized authorities in the field" determine reasonable and necessary medical practices. *Exhibit 11*, Medicare Program Integrity Manual at §13.7.1, *Exhibit 12*, Deposition of Arif Toor, M.D. at 26:19-22, *Exhibit 13*, Deposition of Frank Delli Carpini, M.D. at 39:12-19, 81:23 – 82:15, 86:2-13.[4]

### III.     Dr. Flynn's Qualifications And Opinions

Dr. Flynn is not a recognized authority in the field of flow cytometry – he has co-authored one article on the use of flow cytometry to detect leukemia and lymphoma and has not performed flow cytometry testing since 2000. His opinions contradict the published medical literature in the field - *including the testing outlined in his sole published article on the subject.* Dr. Flynn's analysis and opinions in this matter, at best, only provide his *ad hoc* conclusions regarding flow cytometry testing without any discernible, reliable methodology governing his review or how flow cytometry should allegedly be performed.

Dr. Flynn is a former Professor of Pathology at Yale University. Dr. Flynn is not a board certified hematopathologist -- a pathologist who specializes in diagnosing blood disorders. During the approximate period 1998 to 2000, Dr. Flynn directed a flow cytometry laboratory at Yale Medical School. *Exhibit 7* at 32:15-19, 49:16-18. During this time period, Dr. Flynn regularly analyzed tissue specimens for suspected lymphoma or lymphocytosis, but not leukemia. *Id.* at 53:4-19, 67:10 – 68:1. Dr. Flynn did not normally analyze "wet specimens" (bone marrow and blood specimens). *Id.* However,

---

[4] Drs. Toor and Delli Carpini were the Medical Directors for Medicare's Connecticut carrier which created the rules for flow cytometry reimbursement applicable to Dianon.

"wet specimens" comprised 97.7% of the tests Dr. Flynn analyzed in this case.[5] These specimens were sent to a different laboratory for analysis. *Id.* at 53:4 – 54:12.

Dr. Flynn retrospectively reviewed 637 Dianon flow cytometry tests to determine which of the antibodies Dianon used were medically unnecessary. In preparing his opinions regarding these test reviews, Dr. Flynn spent less than two hours reviewing medical articles provided by government counsel. *Exhibit 7* at 21:4-13. Dr. Flynn did not confer with or contact other hematopathologists or colleagues concerning flow cytometry testing. *Id.* at 21:14-18. Dr. Flynn selected those antibodies that he believed, at the time, would be relevant to assess the suspected disease and then determined all other antibodies medically unnecessary. *Exhibit 7* at 81:2-18, 236:5 – 237:12 (Dr. Flynn had a "different perspective" after his initial 2003 review and subsequently allowed 2 additional antibodies).

At the outset, this approach makes no sense because, if true, it eliminates the need for flow cytometry. If a hematopathologist's job is to do nothing more than confirm or refute a clinician's suspicions, then more focused medical tests, such as RT-PCR analysis, are available.[6] Doctors utilize flow cytometry because it can detect a wide array of diseases, even trace amounts of unsuspected or co-morbid diseased cells, for clinical confirmation. *See, e.g., Exhibit 15,* Deposition of Jeannine Holden, M.D. at 76:8 – 77:22,

---

[5] In the 437 cases Dr. Flynn reviewed in 2005-06 (he reviewed 200 cases in 2003 without indicating specimen type), Dr. Flynn identified a specimen type in 391 tests - 382 of the reviewed tests were performed on blood or bone marrow (97.7%) and only 9 were on tissue (2.3%). Dianon incorporates by reference documents produced by the government Bates stamped SF0027 through SF0466. A copy of Dr. Flynn's notes on the tests he reviewed is available at the Court's request. Excerpts from these test reviews will be discussed *supra.*

[6] *See, e.g. Exhibit 14,* Flynn, S, et al. *Real-time Quantitative RT-PCR of Cyclin D1 mRNA in Mantle Cell Lymphoma: Comparison with FISH and Immunochemistry,* Leukemia and Lymphoma 44:1385-1394 (2003) at 1393 (RT-PCR analysis is a diagnostic alternative to flow cytometry in detecting mantle cell lymphoma).

*Exhibit 16,* Deposition of Raul Braylan, M.D. at 43:18 – 45:24, *Exhibit 17,* Deposition of

Michael Borowitz, M.D. at 96:20 – 97:22, 143:17 – 144:17.

Dr. Flynn alleges that he does not believe a "one size fits all" panel represents a

medically necessary approach. *Exhibit 7* at 132:5-15.  However, in his practice he

utilized a standard, one-size fits-all antibody panel in his flow cytometry laboratory when

he tested specimens for suspected lymphoma. *Id.* at 64:4-12; 88:7 – 89:15.  Dr. Flynn's

opinions in this case, as reflected by the dozens of different antibody panel designs,

contradict his medical practice. *See, e.g. Exhibit 18*, Dr. Flynn asserts 12 to 25 antibodies

medically necessary for lymphoma cases. Furthermore, Dr. Flynn does not indicate how a

laboratory could possibly implement his dozens of different antibody selections.  Though

Dr. Flynn purports to perform a scientific analysis of 637 tests to determine which

antibodies are medically unnecessary, a review of his work shows that his "methodology"

is inconsistent with his medical practice, contradictory, and applied in an inexplicable

manner.

IV.     **ARGUMENT**

A.     **Legal Standard.**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786,

125 L.ed. 2d 469 (1993), the Supreme Court held that the trial courts should act as

"gatekeepers" in order to "ensure that any and all scientific testimony or evidence is not

only relevant but reliable." *Id.* at 589.  In its role as gatekeeper, the District Court

evaluates expert evidence pursuant to Fed. R. of Evid. 702 which provides:  "If scientific,

technical, or other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

skill, experience, training or education, may testify thereto in the form of an opinion or

otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The proponent of expert testimony has the burden of demonstrating, by a

preponderance of the evidence, that the testimony is competent, relevant, and reliable.

*Perkins v. Origin Medsystems, Inc.*, 299 F.Supp. 2d 45, 52 (D. Conn. 2004). In *Daubert*,

the Supreme Court listed several non-exclusive factors the trial court may consider in

determining whether an expert's reasoning or methodology is reliable:

>      if the theory has been tested

>      if the theory has been subject to peer review

>      the known or potential error rate of the theory

>      the existence of standards controlling the theory's application

>      if the theory has been generally accepted by the scientific community.

*Id.* at 53, citing *Daubert*, 509 U.S. at 593-94. In addition, this Court noted other factors

to consider "such as whether the theory or method offered by the expert has been put to

any non-judicial use … whether (the experts) have developed their opinions expressly for

the purpose of testifying," or whether the expert "employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Id.* at 53-54 (citations omitted), *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152,

119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Dr. Flynn's opinions in this matter fail the

*Daubert* factors as well as the additional factors set forth by this Court.

Dr. Flynn's selection of antibodies as medically unnecessary cannot be "challenged in some objective sense," rather it is simply a "subjective, conclusory approach that cannot reasonably be assessed for reliability." See *Perkins v. Origin Medsystems, Inc.*, 299 F.Supp. 2d at 53, n. 17. His opinions are "connected to the existing data only by the *ipse dixit* of the expert." *General Electric v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997).

Dr. Flynn's alleged approach is not generally accepted in the medically community, but akin to an approach (the "targeted" approach) criticized as potentially hazardous to patient care. Dr. Flynn has never published nor subjected his opinions that certain antibodies are medically unnecessary to peer review -- in fact, the one article Dr. Flynn published on flow cytometry contradicts his opinions in this case. There are no standards controlling Dr. Flynn's technique of selecting medically unnecessary antibodies or known error rate for his methodology – though based on the analysis below, it appears to be very high. Dr. Flynn's methodology for determining medically unnecessary antibodies has not been used in any other context but this case. *Perkins v. Origin Med Systems, Inc.*, 299 F.Supp. 2d at 53, n. 17. Instead, Dr. Flynn's methodology for determining medically unnecessary antibodies was developed "expressly for the purpose of testifying" in this matter. *Id.*

**B.    Dr. Flynn's methodology is not generally accepted within the scientific community.**

Three international flow cytometry consensus conferences published their findings in 1996, 1997, and 2001 to educate doctors practicing flow cytometry. *Exhibits 8-10.* The consensus conferences did not establish any "consensus" in the selection and design of antibody panels or combinations that can recognize various

diseases. Differences in practice setting, methods of flow cytometry testing, and the utility of various antibody combinations to identify abnormal cell populations and disease led to disagreement on a standard design for flow cytometry tests. *Exhibit 2*, at 136:14 – 137:3.

The 1997 consensus statement identified three approaches to flow cytometry: (1) comprehensive; (2) screening or step; and (3) targeted. *Exhibit 9* at SF0760-61. The 1997 consensus specifically warned that the "targeted" approach in which antibodies are selected "to confirm or classify a disease already suspected or diagnosed ... is impractical at laboratories lacking the support of additional information and may be <u>hazardous</u> in cases in which the information is incorrect." *Id.* at SF0761 (emphasis supplied). The 1997 consensus statement noted that "the ability to recognize and define cellular abnormalities is directly proportional to the number of antibodies used." *Id.* at SF0764. Put simply, the more antibodies used, the more sensitive and accurate the test will be.

A third consensus conference held in 2000 addressed the design of flow cytometry tests. *Exhibit 10*. The consensus statement surveyed 13 hematopathologists, including Dr. Stetler-Stevenson and Dianon expert Drs. Braylan, Borowitz, and Holden (but not Dr. Flynn), to obtain their opinions regarding which antibodies were "essential" or "useful" in detecting and diagnosing leukemia and lymphoma. *Id.* at SF0757. The consensus statement concluded that leukemia and lymphoma are "complex disorders that require a rather large array of antibodies for their complete characterization ... (and) alternative approaches that utilize reduced panels could significantly jeopardize our ability to diagnose, accurately sub-classify, or adequately monitor and treat these serious

diseases." *Id.* at SF0758.  Dr. Flynn's opinions in this case stand in stark contrast to the experts surveyed in the 2000 consensus meeting.

For example, Dr. Flynn alleges that antibodies CD2, CD7, CD13, CD22, CD33, CD34, CD57, and HLA-DR are not medically necessary to diagnose lymphoma. *Exhibit 1,* Dr. Flynn Report at 3.  At the outset, Dr. Flynn's methodology is flawed because it assumes the provisional diagnosis is correct and complete, i.e. the lymphoma patient does not have a different disease or an additional, co-morbid disease.  *See, Exhibit 15* at 29:12 – 29:24, *Exhibit 16* at 37:23 – 40:11 (clinical information is often incorrect or incomplete).  For example, Dr. Flynn's methodology excludes three antibodies (CD13, CD33, and CD34) that all 13 doctors believed "essential" to diagnose acute leukemia – a potentially fatal condition.  *Exhibit 10* at SF0757.  Even assuming a patient will only have lymphoma, nearly all of the doctors found CD2, CD7, CD22, CD57, HLA-DR at least "useful" in analyzing suspected lymphoma.  *Id.  See also Exhibit 2* at 103:1-16 (Dr. Stetler Stevenson utilizes the antibodies Dr. Flynn excludes in analyzing patient specimen with suspected diagnosis of lymphoma because those antibodies are medically necessary to properly diagnose the patient).

Maryalice Stetler-Stevenson, M.D., the government's designee on behalf of the National Institute of Health (NIH), participated in the 1997 and 2000 consensus conferences.  She also published a case study criticizing the "targeted" flow cytometry method the government supports.  *Exhibit 19, Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometry Immunophenotyping,* Cytometry 42: 114-117 (2000).  Dr. Stetler-Stevenson co-authored this article to educate the medical community

11

about "the perils" of designing antibody panels based on the initial, suspected diagnosis because it can be misleading and place a patient's life in danger. *Exhibit 2* at 118:21 – 122:14, *Exhibit 19* at 117.

Consistent with Dr. Stetler-Stevenson's educational efforts, Connecticut's Medicare carrier listed several medical sources in its Connecticut flow cytometry Local Medical Review Policy (LMRP), including D. Nguyen, R. Braylan, *Flow Cytometry in Hematopathology: A Visual Approach to Data Analysis and Interpretation* (Humana Press, 2003) (Hereinafter *Flow Cytometry in Hematopathology*). *Exhibit 20,* excerpts. The government's designee testified that Dianon could rely upon the reference material cited in the Connecticut LMRP to ensure their medical practices are appropriate and medically indicated. *Exhibit 13* at 39:21 – 40:4.

In *Flow Cytometry in Hematopathology*, the authors warn that "the clinical impression or the morphologic features of the specimen should not dictate the design and selection of an antibody panel." *Exhibit 20* at 17 (emphasis supplied). The authors warn against the government's "targeted" approach because clinical information provided "is often scanty, vague, and potentially misleading." *Id*. Therefore, a source the Medicare carrier cited and expected healthcare providers to rely upon specifically warns against using the very methodology touted by the government in this case.

Dr. Flynn utilized a "targeted" approach to flow cytometry in his medical practice where he designed standard antibody combinations for his standard panel to diagnose lymphoma, regardless of the clinical nuances each patient presented. *Exhibit 7* at 88:7 - 89:15, 146:5-9. In this case, Dr. Flynn's approach is not "targeted" to a specific disease. Rather, Dr. Flynn selected numerous, different antibodies for patients with the same

presenting disease without any explanation or discernable methodology that could be tested.

**C.     Dr. Flynn's theories have not been tested and do not have a known or potential error rate.  His methodology and opinions were created solely for this litigation and contradict his own medical practice.**

Dr. Flynn's rationale for determining which antibodies are medically unnecessary, and therefore fraudulent, is either inconsistent, inexplicable, or both.  When Dr. Flynn performed flow cytometry (1998 to 2000) or consulted with a flow cytometry laboratory (after 2000), he did not utilize the proposed antibody panel designs he suggests in this case.  Furthermore, his opinions are not peer reviewed and do not have a known error rate.  To the extent his methodology has been peer reviewed in this litigation by leading experts in the field, it has failed the review.

Dr. Flynn's methodology is inconsistent with the way he and his colleagues practiced flow cytometry outside the context of this litigation.  Dr. Flynn co-authored one article regarding flow cytometry, a retrospective study of 39 lymphoma cases.  *Exhibit 14* at 1386.  In the article, Dr. Flynn notes that Yale flow cytometry laboratories utilized antibodies CD2, CD7, and CD22 *in all 39 cases of suspected lymphoma.  Id.*  In this case, Dr. Flynn specifically alleges CD2 and CD7 and CD22 do not have "sufficient diagnostic value" to diagnose lymphoma and therefore are not medically necessary.  *Exhibit 1* at 3. Dr. Flynn reviewed 159 Dianon tests with a suspected diagnosis of lymphoma. Dr. Flynn found CD2 to be medically <u>unnecessary</u> in 153 of 159 cases, CD7 in 149 of 159 cases, and CD22 in 152 of 159 cases,[7] *Exhibit 7* at 232:2 – 233:8.  According to Dr. Flynn, he

---

[7] The tabulation of lymphoma cases was created from all of the patient files and page summaries that Dr. Flynn provided in this matter.  Documents SF0025 through SF0466 and Flyn0001 through Flyn0200 are incorporated herein by reference.  Should the court need a copy of Dr. Flynn's entire review of all patient cases, a copy can be provided upon request.

and his colleagues can use these antibodies, but Dianon committed fraud when it used the same antibodies for the same reasons.

Dr. Flynn's laboratory did not perform acute leukemia analysis. *Exhibit 7* at 67:10 - 68:1. Dr. Flynn testified that, after his flow cytometry laboratory was closed in 2000, he consulted with Yale New Haven's flow cytometry laboratory which performed acute leukemia testing. *Id.* at 55:13 – 57:21. Dr. Flynn's opinions expressed in his testimony and report differ from Yale New Haven's acute leukemia panel. Dr. Flynn excluded CD 2, CD7, CD16, Kappa and Lambda as medically unnecessary to diagnose acute leukemia, though Yale New Haven's laboratory utilized all of these antibodies. *Id.* at 110:3-18, *Exhibit 21*, Yale New Haven Hospital acute leukemia panel, *Exhibit 1* at 5. Once again, Dr. Flynn's opinions in this case contradict his practice in the field.

Dr. Flynn's report and testimony are also inconsistent regarding his antibody selections. In his deposition, Dr. Flynn testified that CD23, kappa, lambda and CD38 were medically appropriate to use in acute leukemia cases. *Exhibit 7* at 110:3-18. However, in his report, Dr. Flynn states these same antibodies "do not play substantive roles in this interpretation (for acute leukemia) and in virtually all cases, are not medically necessary." *Exhibit 1* at 5.

A review of 6 cases with a presenting clinical indication or suspicion of Acute Lymphocytic Leukemia (ALL) show Dr. Flynn either has no discernable methodology or has not applied it consistently. Dr. Flynn testified that HLA-DR is a medically appropriate antibody to include in an acute leukemia analysis. *Exhibit 7* at 110:3-18. However, Dr. Flynn excludes HLADR as medically unnecessary in 5 of 6 ALL cases he reviewed. *Exhibit 22*, ALL patient cases. In 3 of the 6 ALL cases kappa and lambda are

14

considered medically unnecessary – perhaps reflecting Dr. Flynn's inconsistent views that kappa and lambda are medically necessary (deposition) or unnecessary (report). In 4 of 6 cases, Dr. Flynn finds CD2 medically unnecessary despite the fact that Yale's flow laboratory used it. *See Exhibit 21.* In 3 of 6 cases, Dr. Flynn excludes CD4, CD8, CD5, HLA-DR, kappa and lambda as medically unnecessary even though Yale's flow cytometry laboratory utilized these markers in analyzing acute leukemia cases and Dr. Flynn testified that these antibodies were appropriate to use for acute leukemia analysis. *Exhibit 7* at 110:3-18, *Exhibits 21, 22.*

Dr. Flynn could not articulate a reasoned methodology for assessing whether cases should receive antibodies CD11c, CD25, and CD103. *Exhibit 1* at 3. In determining whether these markers, utilized for detecting hairy cell leukemia, were medically necessary, Dr. Flynn testified that:

> (I)t <u>might</u> be the setting of a florid lymphocytosis which would be a most unusual presentation, so, in other words, a lymphocyte count of 20,000. It <u>might</u> be a patient with a much smaller lymphocyte count, potentially associated with splenomegaly, for instance. …<u>It's a complex disease process so there would be a litany of possibilities</u>. …Opportunistic infections, for instance, is another presentation of that entity.

*Exhibit 7* at 104:6-20 (emphasis supplied). Such a vague methodology is not subject to testing to see if Dr. Flynn consistently applied it to individual patient cases. Rather, whether to include these markers devolves to Dr. Flynn's subjective beliefs which he cannot articulate or apply consistently. To the extent the methodology can be tested, it fails. For example, one of the conditions Dr. Flynn associated with hairy-cell leukemia was splenomegaly. *Id.* Dr. Flynn reviewed 6 tests presenting with splenomegaly and found one or more of the hairy cell leukemia markers (CD11c, CD25, CD103) medically unnecessary in three of the six cases. *Exhibit 23,* splenomegaly cases. In other cases,

15

Dr. Flynn could not explain why he found some of the hairy cell leukemia antibodies medically necessary and excluded others in the same patient. See *Exhibit 7* at 330:4-16, 364:18 – 365:18.

**D.      There are no standards controlling the application of Dr. Flynn's methodology to the Dianon tests he reviewed.**

There are no definite standards controlling Dr. Flynn's selection of medically unnecessary antibodies in any particular case. For example, though Dr. Flynn professes to construct "the panel" of antibodies that would address patient cases with a suspected diagnosis of chronic mylegeous leukemia (CML), the results of his review contradict this assertion. *Exhibit 1* at 5. In cases with an initial presentation of CML, Dr. Flynn allowed between 11 and 18 antibodies as medically necessary and appropriate. *Exhibit 24*, CML cases. Apparently there are unidentified, varying medical concerns with a CML patient, hence the need for different antibodies. Alternatively, Dr. Flynn does not have a set panel or methodology for CML patients and his selection of antibodies are the result of his subjective thoughts on a particular day. Either way, his varied approach to the same medical diagnosis reflects his unscientific analysis in this case. *See, e.g. Exhibit 25,* Acute Myelogenous Leukemia (AML) patients, Dr. Flynn found between 10 and 22 antibodies medically necessary.

In patient cases presenting with anemia, Dr. Flynn could not reproduce his own findings. During his deposition, he reviewed patient number 93 and selected 12 antibodies that would be medically appropriate. *Exhibit 7* at 204:3 – 205:3, 208:12 – 209:20. However, in his report, he found 21 antibodies medically appropriate. *Exhibit 26,* Patient 93 report. For patient 79, Dr. Flynn reported that 14 antibodies were medically necessary, but selected 16 medically necessary antibodies during his

deposition. *Exhibit 27*, patient 79, *Exhibit 7* at 211:16-18, 214:8 – 216:2, 220:13-221:2.

For patient 6, Dr. Flynn testified that the patient would receive the same panel as patient

79 (16 medically necessary antibodies). *Exhibit 7* at 221:13-223:4. Yet in his report,

Dr. Flynn found that patient 6 required 18 antibodies. *Exhibit 28,* patient 6 review.

Though he treated patients 79 and 6 the same in his deposition, in his review of their

tests, he treated each patiently differently. Compare *Exhibits 27 and 28* (patient 79, 14

antibodies medically necessary vs. 18 medically necessary for patient 6). In sum, when

asked to reproduce his review for three patients, Dr. Flynn could not do it.

     Dr. Flynn reviewed 47 cases that presented with a clinical indication of anemia.

In those 47 cases, Dr. Flynn determined that between 11 and 24 antibodies were

medically necessary. *Exhibit 29,* anemia cases. Dr. Flynn noted that "… anemia may be

a presenting feature for a myelodysplastic process (MDS) and in this regard the myeloid

antibodies are of value assessing their distribution in the maturation of cells in the

myeloid series." *Exhibit 1* at 6. Dr. Flynn found the myeloid markers (CD13 or CD33)

medically unnecessary in 22 of the 47 cases despite their asserted "value." *Exhibit 29*.

With a presentation of anemia, Dr. Flynn felt that "consideration of hairy cell leukemia

might be warranted." *Exhibit 1* at 6. Yet in 31 of 47 cases that presented with anemia,

Dr. Flynn did not allow one or more hairy cell leukemia antibodies (CD11c, CD25,

CD103). *Exhibit 29*. Dr. Flynn could not indicate when these antibodies "might" be

warranted and therefore, by definition, he does not have standards to include or exclude

them.

     Similarly, in cases which presented with a clinical indication of myelodysplasia

syndrome (MDS), Dr. Flynn allowed between 11 and 23 antibodies as medically

necessary. *Exhibit 30*, MDS cases. When asked why two patients presenting with MDS resulted in different antibody panels, Dr. Flynn could not explain this difference. *See Exhibit 7* at 291:6 – 292:8, *Exhibits 31 and 32*. In his deposition, Dr. Flynn explained that he included CD7 due to concerns for acute leukemia. *Exhibit 7* at 278:7 – 279:18. However, in subsequent MDS cases presented to him, he found CD7 medically unnecessary. *Compare Exhibit 31* with *Exhibits 32 and 33*.

In sum, Dr. Flynn does not have a methodology that has identifiable standards. When Dr. Flynn articulated standards governing particular antibody choice, he ignored them. When asked to reproduce results or explain variability between patients, he could not. Dr. Flynn's subjective, case-by-case opinions yielding different conclusions on different days for the same presenting clinical indication or even for the same patient cannot be considered scientific standards. Furthermore, Dr. Flynn did not "design" antibody panels, i.e. antibodies utilized in multiple combinations for each test tube in a panel. *See, e.g. Exhibit 6* at 4. Dr. Flynn has not articulated any "standards" a laboratory could follow to perform medically necessary flow cytometry testing.

### E.     Dr. Flynn's opinions do not "fit" the government's case

To ensure an expert's opinion is relevant, the trial court must assess the "fit" of the expert's testimony to the underlying facts and legal theory of the case. *Daubert*, 509 U.S. at 591, *see also, Equal Employment Opportunity Commission v. Beauty Enterprises, Inc.*, 361 F.Supp. 2d 11, 15 (D. Conn. 2005) (In assessing expert admissibility it is helpful to "keep in mind the essential elements" of proponent's claim). In this case, the Government must show that rules, regulations, or standards mandate that the medical community follow Dr. Flynn's approach to flow cytometry and failing to follow this

18

approach amounts to fraud. *See,* Dianon's Memorandum in Support of Motion for Summary Judgment at 8-10 and cases cited therein (differences of scientific opinion cannot be the basis for False Claims Act liability).

Neither the United States nor Dr. Flynn can point to any study, publication, rule, regulation, or any other criteria that establishes Dr. Flynn's alleged methodology as the medical standard. Therefore, Dr. Flynn's opinions are irrelevant to what the government must prove in this case – the Medicare program mandated that physicians adhere to Dr. Flynn's approach to flow cytometry testing. Dianon could not follow Dr. Flynn's approach because he has not set standards that could be utilized and validated in a laboratory.

Dr. Flynn acknowledges that his opinions proffered in this case concerning which antibodies would be medically unnecessary under specific conditions are only his viewpoints within a spectrum of flow cytometry practices. *Exhibit 7* at 339:11-15. Dr. Flynn agrees that more than one expert, including Drs. Braylan and Borowitz, believe that using comprehensive panels of antibodies to detect blood disorders are within the standard of care or "good medicine." *Id.* at 339:17 – 340:7.

The record in this case shows that the government's theory that flow cytometry testing must be crafted to the suspected disease is criticized as potentially hazardous and dangerous to patients, *even by its own NIH designee.* Conversely, Dianon's comprehensive approach is the preferred method utilized by numerous reference laboratories,[8] authors and in the field,[9] the government's premier flow cytometry

---

[8] *See Exhibit 34* at CMS003273, April 15, 2005 letter from American Clinical Laboratories Association (ACLA) noting that 26 antibody panel is the average used by its member laboratories.

19

laboratory,[10] and supported by no less than eight medical doctors in this case

(Drs. Braylan, Borowitz, Holden, Stetler-Stevenson, Goyette, Connor, Mishalani, and

Segal), all with far more experience than Dr. Flynn in performing flow cytometry testing.

## V.     CONCLUSION

Dr. Flynn's "methodology" has not been tested by the medical community.  To

the extent his opinions have been peer reviewed, by Drs. Braylan, Borowitz, Holden, and

Stetler-Stevenson, his opinions have failed this peer review.  *See Exhibit 17* at 96:20 –

97:22, 143:3 – 144:17 (Dr. Borowitz concludes Dr. Flynn is wrong and would miss

clinically important conditions), *Exhibit 16* at 37:3 – 38:10, 60:15 – 62:10 (Dr. Braylan

asserts relying upon clinical information to construct panels is wrong and Dr. Flynn's

approach is dangerous), *Exhibit 15* at 72:19 – 75:11, 149:4 – 150:20 (Dr. Holden, same)

and *Exhibit 2* at 159:14 – 160:9 (Dr. Stetler Stevenson's disagrees with Dr. Flynn's

assessment of medically unnecessary antibodies).

This Court should not accept Dr. Flynn's subjective, haphazard opinions

concerning flow cytometry practice.  The record is replete with Dr. Flynn contradicting

his stated methodology and misapplying it in numerous cases he reviewed.  Moreover,

Dr. Flynn did not even adhere to the same methodology or selection of antibodies he used

in practice when he and his colleagues analyzed specimens for diagnosis.  His method of

selecting medically appropriate antibodies is not even accepted within the laboratory he

consulted or the article he published, let alone "generally accepted" within the entire

medical community.  With all of these problems in mind, the government asserts

---

[9] *See Exhibit 20* at 24, a standard flow cytometry text *cited by Medicare's carrier in Connecticut* recommends a 27 antibody panel. *Exhibit 15* at 47:10-15, Dr. Jeannine Holden at Emory University utilizes approximately 30 antibodies in her panel.

[10] *See Exhibit 2* at 149-150, Dr. Stetler Stevenson uses more antibodies in her flow cytometry testing compared to Dianon's test.

Dr. Flynn's varying methods are appropriate in testing where a patient's life is at stake. *See, e.g. Exhibit 19* at 117 (if lymphoma panel used, acute leukemia would not have been detected); *Exhibit 2* at 106:4-20 (Dr. Stetler-Stevenson testified that if acute leukemia went undiagnosed, the patient would die).

In no way can Dr. Flynn's opinions be accepted by this Court to establish how <u>all</u> laboratories, including Dianon, must practice flow cytometry. In essence, that is the government's claim in this case – all laboratories must select antibodies and make potential life and death choices on a patient by patient basis as Dr. Flynn does or it is not performing flow cytometry appropriately. For the reasons stated above, Dr. Flynn's opinions are not scientifically acceptable or admissible.

WHEREFORE, Dianon request this Court to exclude Dr. Flynn's opinions in their entirety.


DATE: September 29, 2006                    Respectfully submitted,


                                            _____
                                            Mary A. Gambardella
                                            Bar No. ct05386
                                            Epstein, Becker & Green, P.C.
                                            One Landmark Square, Ste. 1800
                                            Stamford, CT 06901-2165
                                            203-348-326-7426
                                            203-324-9291 (fax)
                                            mgambard@ebglaw.com

                                            Bruce R. Parker, admitted pro hac vice
                                            Bar No. PHV01015
                                            Venable LLP
                                            1800 Mercantile Bank & Trust Bldg.
                                            2 Hopkins Plaza
                                            Baltimore, Maryland  21201
                                            (410) 244-7400

Robert Salcido, admitted pro hac vice
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for Dianon Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of September, 2006, a copy of the

foregoing Motion to Exclude the Opinions of Stuart Flynn, M.D., Memorandum in

Support thereof, attached Exhibits, and Order were sent via U.S. mail, postage prepaid,

to:

Richard M. Molot, AUSA
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven CT 06510

Bryan T. Carmody
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880


_____
Mary A. Gambardella