# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
2

3   UNITED STATES OF AMERICA,
    ex rel. Dr. James J.
4   Tiesinga,

5           Plaintiffs,
                                      No.3:02CV157(MRK)
6       vs.

7   DIANON SYSTEMS, INC.,

8           Defendant.
    _____/
9

10         The deposition of MARY ALICE

11   STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12   2006, commencing at 9:30 a.m. at the Law Offices of

13   Venable, L.L.P., 575 7th Street, N.W., Washington,

14   D.C., before Steven Poulakos, Notary Public in and for

15   the District of Columbia.

16

17

18

19

20

21   REPORTED BY:   Steven Poulakos
                  DISCREPORT@COMCAST.NET

Page 102

1  use CD2, CD5, CD7, CD22, CD -- excuse me, and kappa,
2  lambda, and HLADR?
3      A   If there was a clinical patient had -- was
4  not doing well and there was a question of is the
5  patient -- so this panel would be performed, including
6  those antibodies, if there's a question of the patient
7  having -- developing a blast crisis or simply not doing
8  well, and there's a question is something going on.
9      Q   And your reference to blast is referring to
10 the evolution of a chronic process into an acute
11 process?
12     A   Correct.
13     Q   You can put that aside.
14         Doctor, can you hand back, since I didn't
15 have a copy of Exhibit 13. I may have a question about
16 that.
17         MS. DAVIS:  Here.
18         MR. PARKER:  Yes.
19         If you don't mind, Pat, let me use this for
20 a second. Actually, I can hand that back to you.
21         BY MR. PARKER:

Page 103

1      Q   Doctor, Exhibit 13 is your panel that is
2  used in patients who are suspected of having lymphoma
3  and which you have not previously diagnosed?
4      A   Correct.
5      Q   Doctor, in your panel you utilize CD
6  markers, among others, 2, 7, 11C, 13, 22, 33, 34, 57,
7  and 103?
8      A   Correct.
9          MS. DAVIS:  Objection.
10         BY MR. PARKER:
11     Q   Am I correct, Doctor, that in your medical
12 judgment all of those antibodies are medically
13 necessary to use to render a correct diagnosis in a
14 patient suspected of having lymphoma?
15         MS. DAVIS:  Objection.
16         THE WITNESS:  Yes.
17         BY MR. PARKER:
18     Q   You can put those aside for a moment.
19         (Whereupon, a document was marked as
20 Deposition Exhibit Number 18.)
21         BY MR. PARKER:

Page 104

1      Q   I'm handing you, Doctor, Exhibit Number 18,
2  and could you identify this exhibit for the record?
3      A   This is a case report in communications and
4  clinical cytometry that I authored with a fellow.
5      Q   Tell me, Doctor, why do physicians and
6  scientists like yourself publish case reports?
7      A   Primarily because they're unusual or they
8  have something instructive in general to the medical
9  community.
10     Q   In other words, you felt that your
11 experience diagnosing this patient that you describe in
12 this exhibit was instructive and helpful to other
13 physicians doing flow cytometry?
14         MS. DAVIS:  Objection.
15         THE WITNESS:  Yes.
16         BY MR. PARKER:
17     Q   And am I correct, Doctor, that you held
18 that belief regardless whether the pathologist was a
19 government pathologist or a nongovernment reference
20 laboratory or an academic institution?
21         MS. DAVIS:  Objection.

Page 105

1          THE WITNESS:  Yes.
2          BY MR. PARKER:
3      Q   Tell me, Doctor, in a way that our jury can
4  understand, what this patient presented with and what
5  you ultimately diagnosed this patient with?
6      A   The patient -- actually, I have two here.
7      Q   Okay.
8      A   The patient presented with fever, dyspnoea
9  on exertion and a lot platelet count, low hemoglobin,
10 and he had a mass and interstitial changes demonstrated
11 on chest X-ray. He was rather sick. A specimen was
12 submitted to cytopathology for diagnosis. The
13 clinician suspected infection.
14         The cytopathologist examined the specimen
15 and felt there was a lymphoma present, or a chronic
16 lymphoproliferative process and sent the specimen to
17 flow cytometry.
18     Q   Can I stop you there?
19     A   Yes.
20     Q   The cytopathologist is not someone doing
21 flow cytometry?

Page 106

1 A Correct.
2 Q I'm sorry, continue.
3 A And we evaluated the specimen.
4 Q What did you determine the patient's
5 condition was?
6 A We determined that the patient had an acute
7 myeloid leukemia that was unexpected, and in addition
8 had a incidentally a process consistent with an early
9 chronic lymphocytic Leukemia.
10 Q What you diagnosed was not what was
11 suspected?
12 A Correct.
13 Q And one of the conditions you diagnosed, an
14 acute myeloid cancer?
15 A Yes.
16 Q Is a potentially fatal cancer?
17 A Correct.
18 Q Such that if one is not treated rather
19 quickly and promptly you will die?
20 A Correct.
21 Q So the is it fair to say, Doctor, that you

Page 107

1 and your colleagues who perform flow cytometry are
2 called upon to make life and death decisions?
3         MS. DAVIS: Objection.
4         THE WITNESS: Yes.
5         BY MR. PARKER:
6 Q So it's important to be correct in what you
7 do?
8 A Yes.
9 Q Doctor, you wrote in the first paragraph,
10 and I'm going to paraphrase, but I think I'll get the
11 gist of it, that you wrote, in an effort to cut costs
12 or to reduce costs laboratories constantly try to
13 reduce antibody panels performing flow cytometry,
14 correct?
15 A Correct.
16 Q And that pressure on cost, as we discussed,
17 is also something you experience as part of your
18 budgetary process?
19 A Right.
20 Q In fact, Doctor, as you explain it to me,
21 unlike what some people might think you don't have

Page 108

1 unlimited resources in terms of performing flow
2 cytometry, do you?
3 A No.
4 Q In fact, you have to make decisions on to
5 which patient you do flow on as to whether it fits
6 within your protocol?
7 A Correct.
8 Q Something which an outside laboratory
9 doesn't have to do?
10 A Correct.
11 Q You comment, and you put in quotes, disease
12 directed panels.
13         Do you see that, Doctor?
14 A Yes.
15 Q What do you mean by that?
16 A People who receive a true unknown and
17 suspected of a lymphoma and do a panel that will only
18 detect lymphoma, that would be a disease specific
19 panel, would be unable to detect an acute myeloid
20 leukemia, for example.
21 Q Does your -- today in the course of this

Page 109

1 morning's discussion we've looked at number of panels,
2 some of which have a number of diseases, some of which
3 have fewer. I don't recall seeing anyone that just had
4 one.
5         Is your approach disease specific or is it
6 something different?
7 A Our approach is not disease specific,
8 although our approach is based on the fact that
9 patients present already with a diagnosis.
10         In all panels we include antibodies that
11 will detect another process. It may not fully
12 characterize it, but will detect it, as in this case
13 where we had to request a second blood sample to fully
14 characterize the acute myeloid leukemia, however, we
15 detected its presence with our limited panel.
16 Q Doctor, I didn't ask you this before. In
17 your laboratory when you're performing flow on a
18 patient who's within an NCI protocol study, does your
19 lab require that morphologic examination of the
20 specimens be conducted before you do your flow study?
21 A No.

28 (Pages 106 to 109)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Page 114

1  Dr. Flynn responding to my question of whether he
2  agreed with that statement?
3     A   Yes.
4     Q   And you'll see beginning on line 3
5  beginning on page 161 Dr. Flynn says in part I would
6  venture to bet that they cannot defend that they detect
7  all abnormal hematopoietic populations so it is a
8  sentence that out of context with what they're trying
9  to defend in this case as far as I'm concerned?
10        MS. DAVIS: Objection.
11        BY MR. PARKER:
12    Q   Do you see that?
13    A   Yes, I see that.
14    Q   I take it you disagree with his
15 characterization?
16        MS. DAVIS: Objection.
17        THE WITNESS: I would agree to the extent
18 that I can with sufficient number of cells design my
19 panel to detect all abnormal hematopoietic populations
20 that I'm aware of.
21        BY MR. PARKER:

Page 115

1     Q   Thank you. Let's go back to your case
2  report. If you would please turn to page 115?
3     A   Yes.
4     Q   Doctor, you show us, the readers, in tables
5  1 and 2 antibody cocktails that were used in this
6  patient; is that correct?
7     A   Yes.
8     Q   Doctor, it wasn't clear to me, and I'm sure
9  it's just my ignorance of this area of medicine, when
10 you first received the specimen was the cocktail
11 recipe, if you will, shown in Table 1 used or 1 and 2?
12    A   Table 1 was the initial specimen which was
13 submitted with a diagnosis of probable lymphoma.
14    Q   Let me make sure I understand.
15        You're saying the specimen was received by
16 your lab, your lab performed flow using the cocktail
17 recipe shown in Table 1 initially?
18    A   Yes.
19    Q   Based upon what you learned when did you
20 that study then went and did the second test shown in
21 Table 2?

Page 116

1     A   We requested additional blood.
2     Q   And?
3     A   A second specimen was received and Table 2
4  was done.
5     Q   Okay. I didn't mean to interrupt I'm
6  sorry. So what happened here was that you received a
7  specimen. That specimen was tested with your standard
8  panel approach shown in Table 1 at the point of this
9  paper, right?
10    A   Right.
11    Q   And then you wanted based on what you
12 learned then you didn't retest that specimen but rather
13 you went back and got a second specimen?
14    A   Yes.
15    Q   And you tested that second specimen with
16 the cocktail shown in Exhibit 2?
17    A   Correct.
18    Q   I mean Table 2?
19    A   Yes. It was not a capillary pull back
20 specimen however. It was a peripheral blood specimen
21 which is collected from a peripheral site. It's not as

Page 117

1  dangerous to the patient.
2     Q   Okay. Doctor, I don't want to spend the
3  time. It's there for to us look at, but can you tell
4  me whether or not if you can do this without examining
5  this. Was the cocktail in Table 2 a customized recipe,
6  if you will, or was that one of your standard panels to
7  which you added on a few antibodies?
8     A   This was not -- the cocktails were not just
9  dreamed up on the spot. They had been validated. This
10 was not a standard panel because we had already done a
11 panel on a specimen and it identified a immature
12 myeloid population, an acute myeloid leukemia; but we
13 could not further classify it based on the limited
14 panel that we did based on the number of cells, et
15 cetera.
16        So we figured the patient has an acute
17 myeloid leukemia. It is most likely in the peripheral
18 blood. And so we requested a second specimen which is
19 a simple venus puncture of the anti-cubital faucet and
20 did just those cocktails necessary to further
21 characterize the acute myeloid leukemia that we had

Page 118

1 already detected.
2   Q   So the one of the diseases, the potentially
3 fatal disease, is referred to as AML?
4   A   Yes.
5   Q   And AML itself has a number of different
6 types of AML, some six or seven or so different types
7 of AML, correct?
8   A   Correct.
9   Q   And physicians will adjust their treatment
10 based upon which of those subclassifications in some
11 cases you may find, right?
12   A   Correct.
13   Q   So it's not even enough to tell a physician
14 your patient's got AML to really help that patient
15 live, you've got to tell the patient what type of AML
16 the patient has?
17   A   Correct.
18   Q   And that's what you were attempting to do
19 in Table 2 by using a cocktail in Table 2?
20   A   Correct.
21   Q   Please turn to page 117. If you would,

Page 119

1 Doctor, please look on the right-hand column. Do you
2 see the sentence beginning because up at the top about
3 the fourth line down?
4   A   117?
5   Q   117, right-hand column, fourth line down
6 the sentence begins because?
7   A   Yes.
8   Q   You wrote because adequate clinical history
9 was not provided and because granulation was not
10 apparent a diagnosis of AML was not made based on
11 morphology.
12       First, have I read it right?
13   A   Correct.
14   Q   What I think you're saying, and tell me if
15 I'm wrong, is that someone looking at the microscope,
16 the smears if you will, could not make a diagnosis of
17 AML in this case because rather ultimately flow was
18 needed to make that diagnosis?
19   A   Correct.
20   Q   And in this case also when it came to you
21 there was an inadequate clinical history such that you

Page 120

1 could not have suspected this patient might have AML?
2   A   Correct.
3   Q   And does that refer back to our earlier
4 discussion that often times you see outside diagnoses
5 being wrong?
6   A   Correct.
7   Q   So the point here, I think you're telling
8 the community, tell me if I'm getting it wrong, is that
9 if you simply just assume as a flow cyrtometrist that
10 the diagnosis is right and that's all you look at you
11 can put patients at risk of death?
12       MS. DAVIS: Objection.
13       THE WITNESS: Yes.
14       BY MR. PARKER:
15   Q   Further down in this paragraph do you see
16 the paragraph, the last paragraph begins concomitant?
17 If you go up to the preceding two sentences up that
18 begins if a restricted?
19   A   Yes.
20   Q   Are you with me?
21   A   Yes.

Page 121

1   Q   You wrote to the medical community, if a
2 restricted lymphoma panel had been used only the
3 diagnosis of CLL could have been made, because AML was
4 a disease causing clinical deterioration patient care
5 would have been severely compromised.
6       Have I read it correctly?
7   A   Yes.
8   Q   In all likelihood a patient with AML who
9 goes untreated is going to die within a couple of
10 months?
11   A   Correct.
12   Q   The last paragraph you wrote, picking up
13 mid sentence, do you see where it says, we demonstrate?
14 In this report your wrote --
15   A   We demonstrate.
16   Q   In this report, we demonstrate the
17 importance of employing a panel of antibodies capable
18 of identifying abnormal hematopoietic cells instead of
19 simply using a disease specific panel?
20       MS. DAVIS: Objection.
21       BY MR. PARKER:

Towson Reporting Company   GORE BROTHERS   Whitman Reporting-Rockville
410-828-4148   410-837-3027   301-279-7599

Page 122

1   Q   This reinforces the U.S.-Canadian consensus
2   recommendations and indicates the danger of restricting
3   reimbursement to disease specific antibody panels.
4       Have I read that correctly?
5   A   Yes.
6   Q   When you referred to reimbursement you're
7   speaking not as a government flow cyrtometrist but to
8   those out there, your colleagues out there, who are
9   doing flow cytometry whether in academic centers or in
10  reference laboratories and are getting compensated for
11  that either by patients or third-party insurers or the
12  U.S. government through Medicare?
13      MS. DAVIS:  Objection.
14      THE WITNESS:  Yes.
15      BY MR. PARKER:
16  Q   Thank you.  No other questions on this
17  paper.
18      MR. PARKER:  Let's go off the record.
19      (A discussion was held off the record.)
20      BY MR. PARKER:
21  Q   Mr. Stetler-Stevenson, putting modesty

Page 123

1   aside, is the NCI flow lab, in your judgment, the
2   premiere flow cytometry lab operated by the United
3   States government?
4   A   There are laboratories that are research
5   laboratories that have different missions and to mix
6   them all together would be -- it's not a type of
7   question I could answer.
8   Q   Fair enough.  Let me rephrase my question.
9       Is the NCI flow lab, your lab, in your
10  judgment, the premiere government operated laboratory
11  for purposes of running diagnostic services through the
12  use of flow cytometry?
13  A   I'd have to restrict it further.  I only
14  study leukemia and lymphoma.
15  Q   Restricting it further, as you've
16  suggested, is it?
17  A   I believe so.
18      (Whereupon, a document was marked as
19  Deposition Exhibit Number 20.)
20      BY MR. PARKER:
21  Q   I'm going to hand you a paper, Exhibit

Page 124

1   Number 20, that was published in 1996 which is the
2   first year of damages sought by the government against
3   my client.
4       Doctor, are you familiar with this paper?
5   A   Yes.  It's been a long time since I've
6   looked at it, but I am familiar with it.
7   Q   I have I think just one question.  If you
8   could turn to the second page of this study.  Now,
9   before I ask you my questions let me put this into
10  context.
11      In 1996, the year this paper was published,
12  you had been the chief of the flow lab for six or seven
13  years?
14  A   Correct.
15  Q   And, Doctor, at that time, 1996, if you had
16  to describe your approach to performing diagnostic flow
17  cytometry would you say you used a restricted approach
18  or a comprehensive panel approach?
19  A   A comprehensive panel approach.
20  Q   And is it fair to say -- strike that.
21      Is it accurate to state that that has been

Page 125

1   your approach throughout your criteria as the chief of
2   the flow cytometry laboratory?
3   A   I believe that initially when I assumed the
4   position as chief of the flow cytometry unit things
5   were done quite differently and I evolved as a
6   clinician through study, and it would take a year or
7   two to get up to the comprehensive panel approach.
8   Q   Then is it more accurate to state that
9   early on in your tenure as the chief of the flow
10  cytometry lab for NCI you developed a comprehensive
11  panel approach?
12  A   Correct.
13  Q   Now, let's go to this paper, Exhibit
14  Number 20, on the second page of this journal article
15  on the right-hand column section 2.3.  The paragraph
16  beginning, alternatively?
17  A   Yes.
18  Q   Do you see that?
19  A   Yes.
20  Q   And in 1996 -- these are largely, by the
21  way, international European pathologists?

Page 134

1  Q    In fact, your case report that we just
2  discussed is a perfect example of exactly this
3  situation, isn't it, Doctor?
4       MS. DAVIS:  Objection.
5       THE WITNESS:  Yes.
6       BY MR. PARKER:
7  Q    On page 3 under general considerations, the
8  paragraph begins on page 2 and carries over to page 3.
9  Do you see the sentence in the left-hand column
10 beginning, Doctor, in general?  I'm on page 3.  I'm
11 sorry, that was confusing.  The section begins on page
12 2 --
13 A    Yes.
14      MS. DAVIS:  What's the page number?
15      MR. PARKER:  I'm sorry, Pat, it's 233.
16      MS. DAVIS:  Okay.
17      THE WITNESS:  Yes.
18      BY MR. PARKER:
19 Q    The authors wrote, in general the larger
20 the number of reagents the higher the sensitivity of
21 abnormal cell detection and the better the ability of

Page 135

1  delineating phenotypes that must be useful in disease
2  monitoring.
3       You agreed with that statement in 1997?
4  A    Yes.
5       MS. DAVIS:  Objection.
6       THE WITNESS:  Correction.  Delineating
7  phenotypes that may be useful in disease monitoring.
8       BY MR. PARKER:
9  Q    I accept your correction.  As you corrected
10 me, that is a statement to which you agreed in 19967?
11      MS. DAVIS:  Objection.
12      THE WITNESS:  Yes.
13      BY MR. PARKER:
14 Q    Let's turn now to the last page, page 235.
15 Up at the top these authors wrote that despite the best
16 efforts -- I'm paraphrasing here.
17      They wrote, recommending a universal
18 strategy for the selection of antibodies applicable to
19 the analysis of hemotologic neoplasia is unrealistic
20 and that a consensus in this regard will be extremely
21 difficult to reach.

Page 136

1  You agreed with that in 1997?
2       MS. DAVIS:  Objection.
3       THE WITNESS:  Where is this?
4       BY MR. PARKER:
5  Q    I'm sorry, top of 235 on the left-hand
6  side, the first lane in mid part of that line picks up
7  with recommending and universal?
8  A    Okay, yes.
9       BY MR. PARKER:
10 Q    You agreed with that statement in 1997?
11      MS. DAVIS:  Objection.
12      THE WITNESS:  Yes.
13      BY MR. PARKER:
14 Q    In other words, Doctor, what you and your
15 colleagues recognized in 1997 is that given the
16 situations that different labs face, some reference
17 labs, some academic labs, some government labs, given
18 the different training that different flow cytometrists
19 cyrtometrist have gone through in their practice, that
20 it simply was not going to be possible then and it
21 hasn't happened today that there is a universal

Page 137

1  strategy for doing flow cytometry, correct?
2       MS. DAVIS:  Objection.
3       THE WITNESS:  Yes.
4       BY MR. PARKER:
5  Q    Further down in the paragraph the authors
6  wrote, a restricted panel of antibodies may limit our
7  ability to recognize neoplastic cells or to determine
8  their correct types.
9       You agreed with that statement in 1997,
10 right?
11      MS. DAVIS:  Objection.
12      THE WITNESS:  Yes.
13      BY MR. PARKER:
14 Q    And you still subscribe to that?
15      MS. DAVIS:  Objection.
16      THE WITNESS:  Yes.
17      BY MR. PARKER:
18 Q    And neoplasia again is cancer?
19 A    Yes.
20 Q    Lastly the authors wrote, the average
21 number -- do you see where I'm referring to at the

Page 146

1  Q   Now, FCM is flow cytometry. What does the
2  M stand for?
3  A   Cytom.
4  Q   But we can agree that FCM is flow
5  cytometry?
6  A   Yes, that is -- I believe they define their
7  abbreviation earlier in the chapter. They must have.
8  At some point in the book they would define it as an
9  abbreviation they were using for flow cytometric.
10 Q   And if you just to skip over here. Let's
11 go down to the bottom where it says, a certain degree
12 of redundancy. These authors wrote, a certain degree
13 of redundancy of some critical antibodies -- and cite
14 34 and 20 -- between different tubes is necessary to
15 optimize the sensitivity of FCM analysis and thereby
16 permit the detection of aberrant intragenic expression
17 on neoplastic cells.
18     Do you agree with that?
19     MS. DAVIS: Objection.
20     THE WITNESS: Yes.
21     BY MR. PARKER:

Page 147

1  Q   Now, we haven't used the word aberrant
2  before. What does that mean in the context of flow
3  cytometry?
4  A   Abnormal.
5  Q   So flow can help you determine whether
6  there are cancer cells present? They can also tell you
7  whether normal cells are expressing surface receptors
8  that they should not be expressing?
9      MS. DAVIS: Objection.
10     THE WITNESS: Yes.
11     BY MR. PARKER:
12 Q   And when normal cells express surface
13 receptors that they ordinarily do not, in some cases
14 that's important for prognosis? In some cases it's
15 important for treatment?
16     MS. DAVIS: Objection.
17     THE WITNESS: Yes.
18     BY MR. PARKER:
19 Q   So your goal, among others, as a flow
20 cytometrist, is not only to find the abnormal cells or
21 the cancer cells, but also to properly understand the

Page 148

1  normal cells that may be acting aberrantly?
2  A   I would replace normal by noncancerous.
3  Q   I'll accept that, but otherwise you agree
4  with that statement?
5  A   Yes.
6  Q   We can put that aside.
7      (Whereupon, a document was marked as
8  Deposition Exhibit Number 24.)
9      BY MR. PARKER:
10 Q   I think we're up to number 24. Doctor, I
11 want to show you Exhibit Number 24 which has been
12 previously marked in this litigation as exhibit -- I
13 just gave away my only copy so I'll go by memory --
14 which is dated I believe 1998. It's a Dianon document,
15 correct?
16 A   Correct.
17 Q   Doctor, if you look down I think it's on
18 the second page again --
19     MS. DAVIS: I'll object again as being
20 outside of the scope of 30(b)6 deposition.
21     BY MR. PARKER:

Page 149

1  Q   If you go to the second page, I believe
2  it's on the second page, Doctor, there's a listing of
3  the antibodies being used by Dianon in 1998.
4      Do I have the right page?
5  A   Yes.
6  Q   Doctor, is there --
7      MS. DAVIS: Object.
8      BY MR. PARKER:
9  Q   Is there any significant difference in the
10 antibodies composition -- let me rephrase the question.
11     In 1998, the date of this document 24, was
12 there any material difference in the selection of
13 antibodies that Dianon was using in its flow panels
14 compared to the panel that you were using as shown in
15 Exhibit Number 12 for your blood and bone marrow --
16     MS. DAVIS: Objection.
17     BY MR. PARKER:
18 Q   -- testing?
19 A   Would you repeat the question?
20 Q   Yes, Doctor.
21     Is there any significant difference in the

Page 150

1  selection of antibodies that Dianon made in 1998 for
2  its flow panel when compared to the flow panel that you
3  discussed with me, Exhibit Number 12, that you were
4  using four blood and bone marrow?
5      MS. DAVIS: Objection.
6      THE WITNESS: I have more antibodies.
7      BY MR. PARKER:
8  Q  You have more?
9  A  Yes, additional.
10 Q  Alright, you can put that aside.
11     Doctor, if you would, please, pull up
12 Exhibit Number 4 which is, I believe if my notes are
13 correct, Dr. Braylan's report -- I'm sorry, Dr.
14 Borowitz, Exhibit Number 3.
15     MS. DAVIS: I'm going to object to this and
16 I'm going to instruct her not to answer any questions
17 about the expert reports in this case. It's outside
18 the scope of the 30(b)6 deposition.
19     MR. PARKER: I don't believe our rules
20 entitle any lawyer to instruct the witness not to
21 answer a question that is not invoking a privilege, and

Page 151

1  none of my questions have invoked a privilege.
2      I think you take all testimony subject to
3  determinations and relevance. I will also say that
4  this witness has already testified that part of her
5  preparation for this deposition was, in fact, review of
6  some of these reports; but I want to make my record so
7  I'll go forward and ask the questions and you can
8  instruct this witness, your government's witness, not
9  to answer my questions.
10     BY MR. PARKER:
11 Q  Doctor, before coming here today -- strike
12 that. Let me go right into this.
13     Doctor, please turn to Dr. Borowitz's
14 report, page 3.
15 A  Yes.
16 Q  Doctor, so I don't prolong this record, I
17 will ask you and then I will simply ask you a question
18 and your counsel will either tell you you're allowed to
19 answer it or in her judgment you're not; but look,
20 Doctor, please at the paragraph that begins, the reason
21 I say this?

Page 152

1  A  Yes.
2  Q  And you've reviewed this as least one time
3  before, right, Doctor?
4  A  Correct.
5  Q  To refresh your memory of Dr. Borowitz's
6  opinions in this case, would you please read to
7  yourself the sentence that begins, the reason I say
8  this, and stopping down at the end of the sentence that
9  ends -- that begins, the reason this is a critical
10 distinction, and tell me when you're done and I'll ask
11 you a question.
12 A  Yes.
13 Q  You've read it to yourself. Doctor, is
14 there anything in that segment of Dr. Borowitz's report
15 with which you disagree?
16     MS. DAVIS: Objection.
17     I'm going to instruct you not to answer.
18     BY MR. PARKER:
19 Q  Let's go on to Dr. Braylan's report,
20 Exhibit Number 4. If you would please turn to page 8
21 of Dr. Braylan's report, down towards the end of the

Page 153

1  first paragraph.
2      Do you see his sentence beginning,
3  focusing?
4  A  Yes.
5  Q  Dr. Braylan wrote, focusing the analysis to
6  a particular cell population and ignoring the remaining
7  cells because of a presumable clinical or pathologic
8  diagnosis is like limiting the examination of a
9  microscopic slide to only a portion of a tissue biopsy
10 and ignoring the rest or restricting the observation of
11 a radiographic study based on patient's symptoms.
12     I read that correctly, right?
13     MS. DAVIS: Objection.
14     THE WITNESS: Yes.
15     BY MR. PARKER:
16 Q  Do you agree with that?
17     MS. DAVIS: Objection, and I'm instructing
18 her not to answer.
19     BY MR. PARKER:
20 Q  Further down the next paragraph Dr. Braylan
21 wrote, furthermore -- let me let you catch up with me.

Page 158

1  I direct you not to answer.
2  BY MR. PARKER:
3  Q  Doctor, let's move on to the government's
4  expert report, Exhibit Number 6.
5  Dr. Stetler-Stevenson, please refer to or
6  please look at page number 3 of this report, the
7  paragraph that's labeled malignant lymphoma
8  lymphoproliferative disorders.
9  Are you with me?
10  A  Yes.
11  Q  And to correlate this would at least
12  include Exhibit Number 12, your blood bone marrow
13  panel?
14  A  Yes.
15  Q  So your Exhibit Number 12 would be the
16  panel that you would use, perhaps others as well, to
17  look at malignant lymphomas and lymphoproliferative
18  disorders?
19  A  Correct.
20  Q  Now, Dr. Flynn, the government's expert,
21  says midway down that paragraph, I believe that the

Page 159

1  T-cell antibodies anti-CD2 and CD7 and the B-cell
2  antibody anti-CD22 are not of sufficient diagnostic
3  value to include in this panel and, therefore, not
4  medically necessary.
5  Do I take it from what you've told me,
6  Doctor, that you disagree with the proposition that
7  CD2, 7 and CD22 are not helpful or necessary when
8  attempting to correctly diagnose these conditions?
9  MS. DAVIS:  Objection.
10  THE WITNESS:  Could you repeat the
11  question?
12  BY MR. PARKER:
13  Q  Yes.
14  Doctor, you disagree, based on your earlier
15  testimony in the panel construction, Exhibit Number 12,
16  with Dr. Flynn's statement that using CD2, 7, and 22
17  are not of sufficient diagnostic value to include in
18  the panel?
19  MS. DAVIS:  Objection.
20  THE WITNESS:  Yes.
21  BY MR. PARKER:

Page 160

1  Q  Yes, you disagree?
2  A  Yes, I disagree.
3  Q  He goes on to say, additionally myeloid
4  antibodies CD13, 3, HLADR, CD57 and 34 are also
5  lacking -- I'm paraphrasing now -- significant
6  diagnostic merit.
7  Do you also disagree with that statement?
8  MS. DAVIS:  Objection.
9  THE WITNESS:  Yes.
10  BY MR. PARKER:
11  Q  You can put his report aside for the
12  moment.  Doctor, I'm sorry, I may have asked you this
13  and if I did, I apologize.
14  Did you actually read Dr. Flynn's
15  deposition?
16  A  Yes.  No.  Deposition, no.  I read this.
17  Q  Let's take a short break and let me step
18  outside with my associate and let make sure I've asked
19  you everything that I need to ask you today.
20  (A short break was taken.)
21  BY MR. PARKER:

Page 161

1  Q  Dr. Stetler-Stevenson, when did you first
2  learn about this lawsuit in particular?
3  A  I'm not sure when, but it was in 2006 I
4  would say.  I'd have to guess that it was in the spring
5  of 2006.
6  Q  Of this year?
7  A  Yes, I believe that is when I was contacted
8  specifically, but I'm not sure.  I'm not sure when I
9  was contacted concerning this.
10  Q  Okay.  And were you told about the fact
11  that this lawsuit existed from a colleague or by a
12  government lawyer?
13  MS. DAVIS:  Objection.
14  THE WITNESS:  About this specific lawsuit
15  with mentioning of the Dianon's name, I was told by
16  government lawyers.
17  Q  And I'm not going back into the discussion
18  we had earlier about some recollection possibly -- I
19  don't want to mischaracterize your testimony -- about a
20  conversation with Dr. Holden about a lawsuit; but had
21  you been told about the fact that the government was