# EXHIBIT 13

## Page 1

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
- - - - - - - - - X
UNITED STATES OF AMERICA,,        |
ex rel. Dr. James J. Tiesinga,    |
          Plaintiffs,             | No. 3:02CV1573(MRK)
                                  |
    v.                            |
                                  |
DIANON SYSTEMS, INC.,             |
          Defendant.              | July 25, 2006
- - - - - - - - - X


        VIDEOTAPE DEPOSITION OF FRANK DELLI CARPINI, M.D.

                    30(b)(6) Testimony


       Taken before Kristine A. Paradis, LSR 338, a
       Court Reporter and Notary Public within and for
       the State of Connecticut, pursuant to Notice
       and the Federal Rules of Civil Procedure, at
       the offices of First Coast Service Options,
       Inc., 321 Research Parkway, Meriden,
       Connecticut, on July 25, 2006, commencing at
       11:23 a.m.






              FALZARANO COURT REPORTERS
                 117 North Saddle Ridge
             West Simsbury, Connecticut 06092
                       860.651.0258
```

## Page 2

**APPEARANCES:**

For the Plaintiffs:

    OFFICE OF THE UNITED STATES ATTORNEY
    157 Church Street
    New Haven, Connecticut 06510
    203.821.3700
      BY: RICHARD M. MOLOT, ESQ.
        Assistant United States Attorney

For the Defendant:

    AKIN, GUMP, STRAUSS, HAUER, & FELD, LLP
    Robert S. Strauss Building
    1333 New Hampshire Avenue, N.W.
    Washington, DC 20036-1564
    202.887.4000
      BY: ROBERT S. SALCIDO, ESQ.

Videographer:

    Hamilton Communications
    1442 Essex Road
    Westbrook, Connecticut 06498
      Joe Castelot
      860.399.4999

## Page 3

### STIPULATIONS

It is stipulated and agreed by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public, before whom this deposition is taken, is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

## Page 4

(Deposition commenced: 11:23 a.m.)

THE VIDEOGRAPHER: We're now on record. This is the deposition of Dr. Frank Delli Carpini taken on behalf of the Defendant in the case of the United States of America, et al. v. Dianon Systems, Inc., case number 3:02CV1573(MRK) filed in the United States District Court for the District of Connecticut. Today's date -- today's date is July 25, 2006. The time on video record is 11:24 a.m. This deposition is being held at First Coast Services Options, 321 Research Parkway, Meriden, Connecticut.

My name is Joe Castelot representing Hamilton Commun -- Communications of 1442 Essex Road, Westbrook, Connecticut. Would counsel please introduce yourselves for the record.

MR. MOLOT: Richard Molot from the U.S. Attorney's Office on behalf of the Government.

MR. SALCIDO: Robert Salcido on behalf of Defendant, Dianon Systems.

THE VIDEOGRAPHER: Swear him in.

## Page 37

1  is the reason for this document being used in the
2  LMRP. It could have been used for a multitude of
3  reasons. It could have been -- anything in here
4  could have been the purpose of referencing it in
5  here. It does not mean that in formation of the
6  LMRP that we looked at Section 2.6 in here for that
7  purpose. It could have been for another -- another
8  purpose for looking at this could have been to
9  collaborate with another piece of literature; it
10 could have been for a different purpose altogether.
11             MR. SALCIDO:  Move to strike as
12         nonresponsive.
13 BY MR. SALCIDO:
14      Q   My question wasn't whether you used this
15 literature, or more specifically Section 2.6 when
16 you decided to cite it as a basis for your decision
17 in LMRP, that was not my question.
18             My question instead was: Do you know
19 whether the authors of this text use a comprehensive
20 approach or a step -- what they define as a stepwise
21 approach?
22             MR. MOLOT:  Object to the form.
23      A   I'm not understanding the question. If
24 the -- if the authors of this text that's in front
25 of us uses the stepwise or the comprehensive

## Page 38

1  approach in what scenario?
2  BY MR. SALCIDO:
3       Q  Well, maybe it's easier -- I can direct
4  you to page 22, Section 2.7.
5       A  I'm sorry, what section?
6       Q  Section 2.7, page 22.
7       A  Okay.
8       Q  Can you read that paragraph?
9       A  Sure. "In the authors' laboratory, the
10 antibody panels have been designed based on a
11 comprehensive approach to the FCM analysis. The
12 rationale is to optimize the detection and
13 characterization of the critical cells for
14 determining the lineage of the cells of interest
15 (example myeloid, B-cell or T-cell), their maturity
16 status, the clonality, where appropriate, the
17 specific subtype of hematopoietic malignancy, the
18 status of the normal elements present. The use of
19 large comprehensive panels also facilitates the
20 detection of two or more unrelated neoplastic
21 processes present in the same specimen. Appropriate
22 isotype controls are included in the panels. The
23 evaluation of the FCM data also relies on internal
24 controls, however. Example T-cells serve as
25 internal control for B-cells and vice versa,

## Page 39

1  Figure 2.6."
2       Q  Now, is there any indication in the LMRP
3  that some other approach was advocated rather than a
4  comprehensive approach?
5             MR. MOLOT:  Objection.
6       A  No. I do not recall the LMRP referencing
7  which approach should be used. It was basically
8  left at the discretion of the provider to provide
9  medically necessary and pertinent services to the
10 carrier.
11 BY MR. SALCIDO:
12      Q  Do you know whether physicians can rely on
13 peer-reviewed medical journals when making decisions
14 regarding medical necessity?
15            MR. MOLOT:  Objection.
16      A  If -- if -- if a physician is referencing
17 peer-reviewed literature and incorporates it into
18 their practice of medicine, then I would assume that
19 they could incorporate that.
20 BY MR. SALCIDO:
21      Q  Would it be your view that a physician
22 could read this text which was cited in your LMRP
23 under Basis of Decision and then rely on this
24 comprehensive approach in terms of designing an
25 antibody panel?

## Page 40

1             MR. MOLOT:  Object to the form of the
2         question.
3       A  If the situation was exactly the same,
4  yes.
5  BY MR. SALCIDO:
6       Q  If you could, Doctor, could you go to the
7  next page.
8       A  Uh-hum.
9       Q  Now, in terms of the first sentence on
10 that page, "The clinical impression or the
11 morphologic features of the specimen should not
12 dictate the design and selection of an antibody
13 panel"?
14            MR. MOLOT:  I'm sorry, where are you
15         reading, Robert?
16            MR. SALCIDO:  First sentence, page 17.
17            THE WITNESS:  Oh, you said 23.
18            MR. MOLOT:  You said the next page. We
19        were on 22, you went to 23.
20            MR. SALCIDO:  Oh, I apologize.
21            MR. MOLOT:  We were both page 23.
22            MR. SALCIDO:  I'm sorry. I skipped back
23        to 16.
24            THE WITNESS:  So, we're on 17?
25            MR. SALCIDO:  Yeah. Yeah. I must have

81

1  Q   Yeah. And just -- it will be quicker to
2  read it into the record and just ask questions.
3       Contractor LCDs shall be based on the
4  strongest evidence available. The extent and
5  quality of supporting evidence is key to defending
6  challenges to LCDs. The initial action in gathering
7  evidence in support of LCDs should always be a
8  search of published scientific literature for any
9  available evidence pertaining to item or service in
10 question. In order of preference, LCD should be
11 based on, first bullet, published authoritative
12 evidence derived from definitive randomized clinical
13 trials or other definitive studies. And second
14 bullet, General acceptance by the medical community
15 (standard of practice), as supported by sound
16 medical evidence based on scientific data or
17 research studies published in peer-reviewed medical
18 journals; consensus of expert medical opinion, that
19 is, recognized authorities in the field; or third
20 bullet, medical opinion derived from consultations
21 with medical associations or other health care
22 experts.
23      Now, in determining whether a service is
24 medically necessary and indicated, would it be
25 reasonable for a physician to rely on standards set

82

1  forth in published peer-reviewed medical journals?
2       MR. MOLOT:   Objection.
3       THE WITNESS:   Should a physician --
4       MR. SALCIDO:   You're changing the
5  question.
6       THE WITNESS:   I'm sorry, I don't
7  understand the question.
8  BY MR. SALCIDO:
9  Q   Would it be reasonable -- not should.
10 A   Okay.
11 Q   Would it be reasonable for a physician to
12 rely upon peer-reviewed medical journals?
13      MR. MOLOT:   Objection.
14 A   Yes, a physician can certainly rely on
15 peer-reviewed medical journals.
16 BY MR. SALCIDO:
17 Q   Could a physician also reasonably rely on
18 consensus of expert medical opinion in determining
19 whether a service is medically necessary and
20 indicated?
21 A   In relation to submitting a claim to
22 Medicare?
23 Q   Yes.
24 A   Yes. And -- and for the record, this
25 particular section of the manual talks to the CAC

83

1  process and that we did get a consensus of expert
2  medical opinion by that process, by putting this
3  through the CAC process. The pathologists of
4  Connecticut and the hematopathologists and our
5  representation to the CAC process were -- were --
6  were alerted to the policy and to the comment
7  period. So, we did include that whole paradigm of
8  clinical people to help us with this policy in the
9  comment period.
10 BY MR. SALCIDO:
11 Q   But you understand that wasn't my
12 question.
13 A   But I answered your question.
14 Q   Yes. But that second part was -- I mean,
15 it's fine, but just so the record is clear, that
16 that's unrelated what my question was.
17 A   Yeah, but I wanted to make sure that the
18 record was clear that -- what we were referencing in
19 these bullets.
20 Q   Okay. Fair enough.
21      Is it also reasonable for physicians to
22 rely upon medical opinions derived from consultation
23 with medical association and other health care
24 experts?
25      MR. MOLOT:   Objection.

84

1  A   In answering these -- this series of
2  questions, is your question -- is the tense of your
3  question during the reference in the manual that
4  you're reading from or are you speaking to the
5  submission of a claim to Medicare after this process
6  is over? Because that's where I'm getting confused.
7  BY MR. SALCIDO:
8  Q   No, what I'm asking more precisely is when
9  a physician determines whether a service is
10 medically necessary and indicated, can the physician
11 reasonably rely, for example, on consensus of
12 medical expert opinion that, in fact, a service is
13 medically necessary and indicated?
14      MR. MOLOT:   Objection.
15 A   For their particular claim?
16 BY MR. SALCIDO:
17 Q   Right.
18 A   No, they would have to rely on the LCD
19 because the LCD of the particular -- the LCD of the
20 particular service that they're billing is what
21 mandates the medical necessity in the Medicare
22 program.
23 Q   Yeah. Again, here, this context is a
24 little different, because of course if you have an
25 LCD, then an LCD governs. I'm talking about, let's

85

1  say an LCD doesn't have a frequency limit.
2      A    Okay.
3      Q    Are you with me? Now, when a physician
4  deciding what the frequency of the service should
5  be, can a physician reasonably rely upon, again, in
6  the silence of no provision in an LCD, expert
7  consensus medical opinion in the community?
8      A    I would like to state that you changed the
9  question, because your first question was can the
10 physician rely on those references for medical
11 necessity. And then when you restated it just now
12 you said the frequency. So, they're two different
13 things.
14     Q    Well, because when you answered it you
15 answered it by reference to an LCD. So, I wanted to
16 take an LCD out of the question.
17     A    Okay. So, are we talking about medical
18 necessity or are we talking about frequency?
19     Q    Well, frequency, which must, by
20 definition, be medically necessary and indicated.
21     A    Right.
22     Q    You understand that?
23     A    Absolutely.
24     Q    Okay. No, I'm just asking so we can move
25 on from there.

86

1      A    Right.
2      Q    No, that the service itself, in
3  determining whether the frequency of the service is
4  medically necessary and indicated, would it be
5  reasonable for a physician to rely on consensus,
6  expert opinion of physicians who supply the same
7  service that's encompassed in his claim?
8      A    Yes. If -- if a physician is billing for
9  a service, for example 88180, and they would like to
10 have an expert say that on that specimen that
11 they're billing that 88180 for, they can certainly
12 rely on an expert to say your frequency was correct
13 or not correct.
14     Q    Okay. And I -- just one last question.
15 And the same answer would be true that they can
16 reasonably rely as well on peer-reviewed medical
17 journals?
18     A    They can reference the literature, but the
19 specific specimen that is being billed for is a
20 different entity.
21     Q    No, no, no. Well, I'm talking about their
22 provision of the service is consistent with the
23 service provided or identified in the medical
24 literature.
25     A    A blanket provision saying that in certain

87

1  circumstance an expert would say that blanketly they
2  can bill the frequency that is being asked?
3             MR. SALCIDO: No, I'm sorry. We'll have
4         to change the tape. I tried to wrap it up
5         before the last tape. I'm sorry.
6             THE VIDEOGRAPHER: Going off record --
7             MR. SALCIDO: It got butchered.
8             THE VIDEOGRAPHER: Going off record.
9         Time is 1:21.
10
11        (Recess taken: 1:21 to 1:22 p.m.)
12
13            THE VIDEOGRAPHER: Back on record. Time
14        is 1:22.
15 BY MR. SALCIDO:
16     Q    Okay. Let me try it this way. Let's say
17 peer-reviewed medical journals containing
18 international consensus conferences, so recognized
19 medical experts, determine that a certain frequency,
20 a service is needed in order to diagnose the
21 patients. Can a physician reasonably rely on the
22 expert opinions embodied in that peer-reviewed
23 medical journal to determine whether a service is
24 medically necessary or indicated?
25            MR. MOLOT: Object to the form.

88

1      A    In clinically evidence-based research, if
2  the particular piece of literature references the
3  specific specimen that they're using to gain
4  knowledge from, I would assume that they could, if
5  everything being the same.
6             MR. SALCIDO: Okay. I think I'm done,
7         Rick, but give me five minutes --
8             MR. MOLOT: Sure.
9             MR. SALCIDO: -- to look over my notes.
10            THE VIDEOGRAPHER: Going off record.
11        Time is 1:24.
12
13        (Recess taken: 1:24 to 1:28 p.m.)
14
15            THE VIDEOGRAPHER: Back on record. Time
16        is 1:28.
17            MR. SALCIDO: I've concluded my exam.
18            MR. MOLOT: I have no questions.
19            THE VIDEOGRAPHER: Going off record.
20        Time is 1:28.
21
22        (Deposition concluded: 1:28 p.m.)
23
24
25