# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
ex rel. DR. JAMES J. )
TIESINGA, )
              )
        Plaintiff, )
              )
vs.           ) CIVIL ACTION FILE
              ) NO. 3:02CV1573(MRK)
DIANON SYSTEMS, INC., )
              )
        Defendant. )

---

DEPOSITION OF JEANNINE T. HOLDEN, M.D.

JUNE 7, 2006

9:00 A.M.

---

Page 26

1  say lytic bone lesion or M protein or monochromic
2  hemopathy, that would cue the techs to go ahead and
3  add up front additional tubes looking specifically
4  for chromoplastid cells.
5       If the case were a child and there were
6  anything at all about it that suggested that it might
7  be a new acute leukemia, they might say new acute
8  leukemia; they might say leukemia, cytopenia, some
9  cytopenia, just a new patient, growing pain, any of
10 those would prompt the techs to go ahead and add
11 additional tubes for TDT, that's terminal
12 deoxynucleotidyltransferase and myeloperoxidase.
13 Those are tests that the -- they are treatment
14 protocols require that we do them.
15      So there are a few add-ons we might have
16 occasion to do up front, but short of that, they
17 pretty much get the standard panel. If we have
18 previously diagnosed a patient with --
19   Q   Let me stop you right there.
20   A   I'm sorry.
21   Q   What is the standard panel?
22   A   The standard panel is 14 tubes. They are
23 four-color tubes. It's a total of 30 antibodies
24 tested. So obviously 14 times four is more than 30, so
25 there's a fair amount of redundancy in the panel as

Page 27

1  cross checks.
2       The most redundancies with a reagent
3  called CD45 which is in every tube so that I can find
4  small populations and cross reference them between
5  the tubes.
6    Q   Okay. Go ahead.
7    A   Where was I?
8    Q   You were about to tell me the --
9    A   I know where I was.
10   Q   Okay.
11   A   So assuming that there's no problem with
12 the sample, they will go ahead and take it forward and
13 stain it.
14      I was going to point out, if it's a
15 patient with amyloid process and there's been no
16 integral change to suggest development of a lymphoma,
17 we will drop the tubes that specifically look at --
18 look for lighting restrictions, either kappa or
19 lambda, within the B-cell compartment.
20      Now, there's also a possibility that the
21 patient may have developed an intercurrent, a B-cell
22 lymphoma, but the remainder of the panel is done in
23 such a way that we would detect that and then we
24 would have to go back and add that on.
25   Q   Okay.

Page 28

1    A   So we don't discount that possibility but
2  don't look for it in those cases if we've previously
3  documented a -- documented a myeloic process.
4    Q   Okay. When you say previously documented
5  does that mean intake form will contains the
6  information.
7    A   No. That means that we have personally
8  run a sample and diagnosed that entity. Even if it had
9  been -- the intake form is notoriously unreliable.
10   Q   Okay. What information comes in addition
11 with the intake form? Let me ask the question again.
12 What information is contained on the intake form?
13   A   There is -- there is the patient's name
14 and identifying information, their contact information
15 from the hospital or doctor's office that sent it, what
16 physician ordered it. If they want to be called with
17 the results immediately, you know, a contact number,
18 fax number, things like that.
19      They'll have indicated the type of
20 specimen it is. Occasionally they won't have done
21 that, and then the techs have to call them and try to
22 identify them before we process.
23      They -- and then, of course, the type of
24 testing they are interested in. Do they only want
25 flow cytometry? Do they also want morphology? Do

Page 29

1  they also want cytogenetics? All of that comes on
2  that form.
3       And then finally clinical history and/or
4  an ICD9 number. And that is has to be very, very
5  complete. And, of course, many of these patients are
6  patients that we've seen previously, and so we pull
7  the -- we pull that patient's folder, previous
8  results, including the report, the previous history
9  of bands or dot plots and any morphology that we may
10 have done on it as well. And we have that available
11 to us.
12   Q   Okay. Let me -- let me -- this is going
13 to be a two-part question. The information that comes
14 in the clinical history and the ICD9, do you consider
15 any of that information in deciding what antibodies to
16 use?
17   A   No.
18   Q   Why not?
19   A   It is frequently -- not frequently, pretty
20 frequently not complete. It can be very misleading.
21 We actually find that, especially in a practice
22 setting, it's much more efficient and better for
23 patient care to simply essentially look for everything.
24 The goal is to identify every cell in the sample.
25   Q   Okay. So if the doctor puts on the form

**Page 46**

1  "medical necessity" on documents from Medicare. I
2  guess on the Medicare website is where I usually am
3  most likely to see that, specifically in the context of
4  what used to be called LMRPs, local medical review
5  policies, but are now called LCDs, local code
6  determinations.
7      Q    Do you bill Medicare?
8      A    Yes. I know that some of my patients are
9  Medicare patients, so I'm assuming that's done, yes.
10     Q    Do you -- what's your understanding of
11 what medical necessity is?
12     A    Equivalent to standard of care, what's
13 medically appropriate.
14     Q    Medically appropriate for who? For what?
15     A    For any patient, for a patient, you know.
16 The -- as far as I'm concerned, the -- for me, medical
17 necessity is not a term that necessarily relates
18 specifically to the government or Medicare. That's
19 what you do for patients. Good practice, standard of
20 care.
21     Q    Good practice for who? For a particular
22 patient?
23     A    For -- yeah, for all patients and for a
24 particular patient, yes.
25     Q    So in determining whether something is

**Page 47**

1  medically necessary for a particular patient, do you
2  have to take into account the information that you know
3  about that patient in deciding which antibodies to use?
4      A    Not in deciding which antibodies to use
5  because I'm going to use the same antibodies for
6  essentially all the patients.
7      Q    Regardless of what information you had
8  about --
9      A    Oh, yes. Yes.
10     Q    And you think that that -- that -- that
11 using all -- however many there were, 30?
12     A    Uh-huh.
13     Q    Thirty antibodies, each one of those
14 antibodies is medically necessary in each case?
15     A    Yes, I do.
16     Q    And why is that?
17     A    Because it's the idea that -- that each of
18 the antibodies is a separate test is a false premise.
19 That dates to a time when it was actually technically
20 and cumbersome and expensive to run the lab -- to test
21 for these antibodies, and at that time they were tested
22 singularly or in pairs, if you really wanted to be sort
23 of fancy about it at that time, and that was pretty
24 much the mid 1980s.
25          We no longer do it that way. We now

**Page 48**

1  take a panel approach. And so that anybody even asks
2  about antibodies is essentially -- the best word
3  would be an artifact of the billing structure in the
4  CPT codes.
5           I went on record actually back in the
6  late '90s saying that I thought the entire billing
7  structure was flawed and that it should not never --
8  should never have been per marker; it should have
9  been per panel, essentially effective from the time
10 we started doing more than one color at a time or one
11 antibody at a time.
12          I have been happy to see that that has
13 changed recently in terms of the professional billing
14 for -- for flow cytometry interpretation. I would
15 actually like to see the technical side follow
16 this -- follow the same principle. That I bill per
17 marker is purely because I have to and not because
18 I'd like to.
19     Q    I'm sorry. Run that one by me again. You
20 bill for markers solely because you have to, not
21 because you want to?
22     A    The CPT codes are tied to a number of
23 markers. There's no way for me to untie them.
24     Q    So you felt no responsibility to -- to --
25 given the fact that you were charging, and we'll just

**Page 49**

1  stick with Medicare for now, policies. I don't care
2  about private insurers. I mean, I do, but not for this
3  purpose.
4      A    Not for this, yeah.
5      Q    So you felt no obligation to look at the
6  individual markers you were using and find out whether
7  they were medically necessary for that patient at that
8  time when you were billing for every marker?
9      A    They were all medically necessary.
10     Q    And they were all medically necessary why
11 again?
12     A    I think I've explained this.
13     Q    Well, tell me again.
14     A    Okay. When you're looking at a sample,
15 you have to identify all the cells in the sample. Any
16 population that you haven't identified is a candidate
17 of malignant population.
18          As that patient's physician, I can't
19 not -- I can't ignore -- I -- I can't look at that
20 sample and not have identified every cell in the
21 sample.
22     Q    So your approach is essentially --
23     A    I'll give you -- I'll give you a good
24 example of this. Let's say a biopsy is done for -- a
25 skin biopsy is done, and they send it to me, and the

Page 70

1  Let me think. At the time -- right. I just want to
2  make sure. At the time I prepared the expert opinion,
3  I don't think I'd seen the deposition. What was the
4  date of the deposition?
5      Q   Which deposition?
6      A   Dr. Flynn's deposition.
7          MR. PARKER: After the report.
8          THE WITNESS: It was after. Okay. So
9  when I prepared my opinion, that's right, I had
10 seen his expert opinion. So in preparation for
11 this deposition, I saw Dr. Flynn's deposition.
12 I saw Dr. Mishilani's deposition.
13         I specifically looked at those cases
14 that were discussed during the deposition.
15 Those were exhibits. I looked at those
16 briefly.
17         The -- looked at -- although I was
18 already familiar with the papers that had been
19 introduced as exhibits during that deposition.
20 Essentially the documents related to his
21 deposition.
22 BY MS. DAVIS:
23     Q   Dr. Flynn's deposition?
24     A   Yes.
25         MR. PARKER: You also had the worksheets,

Page 71

1  so the record is clear.
2          THE WITNESS: Yes. Some of which were
3  discussed at -- essentially any -- anything that
4  had been labeled in that deposition, I think I
5  had, numbers 1 through 30 odd, 35 at least.
6          MS. DAVIS: Just to make clear, she didn't
7  have all 400 or however many?
8          MR. PARKER: I think she did.
9          THE WITNESS: You know, I think I have two
10 binders of cases that I have not looked at in
11 detail. They've been provided to me, but I've
12 not looked at them, very simply I've not looked
13 at them because it's not necessary.
14         As I said, the correct approach in doing
15 this work is not on a patient-per-patient
16 basis, especially in the reference lab
17 setting. I just saw no point in billing
18 Dianon for services that were not necessary.
19 BY MS. DAVIS:
20     Q   Okay. So you didn't look in detail at any
21 of the cases that Dr. Flynn looked at.
22         MR. PARKER: Objection, other than the
23 amended complaint.
24 BY MS. DAVIS:
25     Q   Other than the amended complaint?

Page 72

1      A   Other than what was discussed in detail in
2  the deposition.
3      Q   All right. So if you didn't look at Dr.
4  Flynn's, I take it you didn't look at the results, his
5  handwritten notes.
6      A   Not in enough detail.
7      Q   Okay.
8      A   Or not in -- not in detail. I know
9  there's some -- I think there's some in the binders,
10 just didn't even bother. Not necessary.
11     Q   And why isn't it necessary?
12     A   Because that's not how one correctly
13 approaches these cases. What I'm addressing here is
14 not the details of these cases. What I'm addressing is
15 the practice of flow cytometry.
16         To the extent that Dr. Flynn discusses
17 details of those cases is very illustrative of his
18 approach with which I cannot agree.
19     Q   So if someone takes the approach
20 Dr. Flynn's takes, which is to look at the information
21 that's available, clinical information available about
22 the patient, might look at morphology or the cytospin
23 or whatever, to take that information into account to
24 derive a panel of antibodies that is directed at
25 whatever the suspected diagnosis is for that patient,

Page 73

1  what is your opinion about that approach?
2          MR. PARKER: Objection. Misstates the
3  testimony.
4          THE WITNESS: I'm sorry?
5          MR. PARKER: Just objection for the
6  record.
7          THE WITNESS: That's his job. Can you
8  repeat that?
9          MS. DAVIS: No. It took me long enough to
10 get it. All right. Let me try it again. Can
11 you read it back.
12         (Whereupon, the record was read by the court
13 reporter as designated.)
14         THE WITNESS: My opinion is that that
15 approach is likely to result in misdiagnoses.
16 BY MS. DAVIS:
17     Q   So do you view that approach would be
18 malpractice?
19     A   Potentially.
20     Q   Okay. So because you didn't review
21 Dr. Flynn's results in any of the medical records, you
22 don't know what information was available to Dr. Flynn
23 when he made his decision to have a smaller panel?
24     A   In those -- those cases that were
25 discussed at the deposition, I did look at that

19 (Pages 70 to 73)

Page 74

1  material.
2      Q   But otherwise you didn't?
3      A   No.
4      Q   And --
5      A   I would not. And, again, as I said
6  before, would not find it necessary.
7      Q   So you don't know whether there were
8  laboratory results in those -- in those packages other
9  than the -- questions, let's just baseline, other than
10 the ones you looked at, you don't know whether there
11 were laboratory results in there?
12     A   I don't know what information was
13 available to Dr. Flynn at the time he would have looked
14 at those. I will point out that it does not appear
15 that he is designing panels that are individualized.
16         Given that all of the patients he was
17 seeing either were known to have lymphomas or were
18 suspected of having lymphomas, I gather it is a
19 fairly standard panel, standard approach, to those
20 cases.
21     Q   In what way? I'm sorry. You mean because
22 he was -- he was basing his analysis on what in
23 Dianon's panel was appropriate or not?
24     MR. PARKER: Objection.
25     THE WITNESS: No, he actually lists --

Page 75

1  list things that he would actually -- he
2  actually did list at certain points what he
3  would do on certain cases.
4          And then and the specifics -- we can go
5  through this if you want to. There are
6  specific differential diagnosis in a number of
7  those cases I would consider even flawed.
8          Even though he was using his past
9  experience to decide what he thought were the
10 most likely diagnosis in some of those
11 patients, some of those would be incorrect.
12 BY MS. DAVIS:
13     Q   So in the panel, the sample targets panel
14 that he derived, would those -- did those contain
15 sufficient antibodies to uncover other -- other things
16 that might be present other than --
17     A   No.
18     Q   In what way?
19     A   They were targeted looking to answer --
20 answer only a question that either a clinician had
21 posed or that he had gathered might be -- might be the
22 question, might have been going on.
23         Say, if he didn't have sufficient
24 information if he looked at the CBC or, say, percent
25 lymphocytes on the differential count, say, oh, this

Page 76

1  patient has a lymphocytosis, I'm going to evaluate it
2  as a lymphocytosis. In some instances -- well, I'll
3  just leave it at that.
4      Q   Okay. So you don't know whether in a
5  particular case the patient had already been diagnosed
6  buy Dianon with a particular disease?
7      A   In some instances they had.
8      Q   And in Dr. -- why is Dr. Flynn's approach
9  inadequate in those cases?
10     A   He would miss intercurrent co-morbid
11 conditions, which do occur, which not infrequently
12 occur, especially as a result of therapy. He didn't
13 specifically have instances of this, but it's also
14 possible to overcall intercurrent co-morbid conditions
15 that are a result of therapy.
16         For instance, patients who have been
17 given colony stimulating factors after chemotherapy.
18 You have to be careful to not overcall those as
19 atypical myeloblast situation.
20     Q   What percent of cases is there a co-morbid
21 disease?
22     A   Well, in all cases there's a potential for
23 co-morbid disease.
24     Q   And what percentage of time does it
25 happen?

Page 77

1      A   Co-morbid finding that we would consider
2  worthy in some of the work we investigate, I'm going to
3  guess 5 percent over the course of the patients.
4  Obviously there's certain patients that are at high
5  risk for developing co-morbid disease that I'd be
6  interested in.
7      Q   So you could -- you could -- knowing what
8  risk factors there were about a particular patient, you
9  could adjust what you did depending on those risk
10 factors, take that into account, in other words, when
11 you put together the panel?
12     A   I don't need to. My panel is sufficient
13 as it is.
14     Q   No. I understood your panel. But if you
15 could do that, you could take into account various risk
16 factors in developing a panel?
17     A   By the time you had done that, you would
18 actually have the same panel that I do or the same --
19 essentially as sufficiently detailed. Whether it would
20 have exactly the same number of markers or the same
21 antibodies, which wouldn't necessarily, but would have
22 to be as detailed.
23     Q   Okay. You mentioned in your report
24 that -- let me see -- you're basing your expertise in
25 part on your extensive experience and high volume

Case 3:02-cv-01573-MRK   Document 186-14   Filed 09/29/2006   Page 7 of 8

Page 146

1  in these patients to see whether or not they may have
2  developed Richter's transformation. They won't
3  necessarily have developed the Richter's
4  transformation. The lymph nodes may be getting larger
5  for some other reason.
6       Sometimes the lymph nodes in which you
7  see the greatest increase are not immediately
8  accessible to surgery. So you have a 75-year-old
9  patient, lymph nodes retroperitoneal, actually may go
10 for another lymph node in hopes that they will be
11 able to document the Richter's transformation as that
12 will change therapy. They may or may not be able to.
13 Sometimes they have to go back and define the
14 aspirate of the node in question.
15    Q  And the morphology would be different for
16 CLL.
17    A  Yes, it would.
18    Q  And how -- how soon would a transformation
19 like this occur after first diagnosis?
20    A  Oh, that can vary enormously. I mean,
21 well, for instance, a patient with CLL may not be all
22 that symptomatic. You can actually have CLL, can be an
23 indolent disease, you can actually have it for years
24 and not be diagnosed. We tend to diagnose it. If it
25 occurs in older patients, we tend to diagnose it in

Page 147

1  older patients because they go to see the doctor more
2  frequently, but patients who don't go to see the doctor
3  as frequently, they may have had it for several years
4  before it was developed, before it was recognized.
5       And so if, let's say that patient had
6  the disease for ten years before anybody recognized
7  it. On his second doctor's visit, he could have
8  develop a Richter's transformation. On the other
9  hand, if we catch the patient in the first couple of
10 years of the disease, it could be ten years. Not all
11 patients develop it. It's not as inevitable as blast
12 crisis is in CLL.
13    Q  But if it did show up on the doctor's --
14 second visit to the doctor, it would -- the morphology
15 would be different and there would be some lymph node
16 involvement.
17    A  Tissue involvement of some sort usually.
18    Q  Okay. What about -- is there anything
19 else that CLL might change into?
20    A  In the literature, at least, we talk
21 about -- I'm trying to think of the term they use for
22 it. Historically it's been recognized that when you
23 see patients, when patients have increased numbers of
24 cells that -- what do they call them -- prolymphs,
25 prolymphocytes. They have what -- they are called

Page 148

1  prolymphocytes with larger nuclei and more abundant
2  cytoplasm and that may be an indication that that
3  patient is not doing as well, and we spend a lot less
4  time talking about that now than we used to. That's
5  something that's --
6     Q  Would there be any different clinical
7  indications that would indicate that?
8     A  That that was actually occurring?
9     Q  Uh-huh.
10    A  There might be and there might not be.
11    Q  Would they have, for example, a very high
12 white blood count?
13    A  If the patient was actually developing
14 what we call prolymphocytic leukemia, which may well
15 not be associated with a prior history of CLL, those
16 patients tend to have a very high white count in
17 splenomegaly, but historically people thought that that
18 disease, prolymphocytic leukemia, developed out of CLL
19 and it's now clear that a number of those do not that
20 they present a willing and much more aggressive
21 disease.
22      It's also clear that some -- many of
23 those cases in the literature called prolymphocytic
24 leukemia in fact are not prolymphocytic leukemia but
25 are another entity called mantel cell lymphoma, and

Page 149

1  that's just an aggressive form of mantel cell
2  lymphoma. It's an area that really constantly is in
3  flux.
4     Q  Okay. You also mentioned in your report
5  that you thought that Dianon's panel would pick up
6  certain diseases that were -- that Dr. Flynn's approach
7  would not pick up; is that right?
8     A  Oh, yeah.
9     Q  And what kinds of things would that be?
10    A  Well, assuming a limited lymphoid panel
11 would not -- depending on how he was doing it, I would
12 have to say there's crucial aspects of his analysis
13 that I can only guess about.
14    Q  Because you didn't look at his underlying
15 analysis?
16    A  No, because I've never seen any work that
17 he has actually personally done, and given that he's no
18 longer actually doing this type of testing and from his
19 deposition hasn't since 2000, that would be difficult
20 to do.
21      But at least in terms of the antibody
22 selection, he would -- concerns that he would miss
23 some myeloid and T-cell processes as well as fully
24 characterize B-cell processes.
25    Q  Okay. But is there something that you

38 (Pages 146 to 149)

PREMIER REPORTING

45542f79-c893-4804-88f7-3e1f28685ccc

Page 150

1  think he would completely miss?
2    A    I would have to go back and look
3  specifically at cases. One of the cases that was
4  discussed in the deposition was a case with a patient
5  with CLL, a patient who actually diagnosis had been
6  rendered, Dianon had identified that, and for some
7  reason they -- the clinicians sent -- continued to send
8  repeat samples at what seemed to be fairly frequent --
9  what seemed to be fairly frequent intervals, and before
10 I had actually seen the details, my question was, oh,
11 this sounds as if the clinicians are not content with
12 the diagnosis of CLL; they think something else is
13 going on, and they continue to send samples to identify
14 that, and what was eventually identified in that
15 patient was a plasma cell myeloma, but which would not
16 have been identified by Dr. Flynn, and he actually
17 suggested that was a trivial finding, and, in fact,
18 that patient actually had significant disease and was
19 treated for that based on -- that was one of the few
20 charts I looked at in detail.
21   Q    Okay. And if the panel that Dr. Flynn in
22 another panel changed a little bit depending on what
23 information he had, but there was sort of a core panel
24 that things showed up pretty much.
25   A    Yes. Given that he suggests that it's and

Page 151

1  it sounds like you're suggesting that you would
2  actually craft a panel based on that individual
3  patient's findings seems at odds to me.
4    Q    What individual --
5    A    I mean, unless you can say that all of his
6  patients were identical, if he did the identical
7  markers on each of them, that would suggest to me that
8  he was using a panel, albeit a very short one.
9    Q    What about the approach -- I mean -- of
10 crafting a panel based on what you suspect the patient
11 has based on the clinical information you have,
12 morphology, blood count, whatever it is you have, plus
13 the referring physician's suspected diagnosis, and in
14 addition to that including some additional antibodies
15 to account for, you know, what else might be out there?
16   A    So you're saying that if -- if he was
17 actually using identical antibodies for a series of
18 patients, those patients were not substantially
19 different in any way from one another?
20   Q    No, that's not what I'm saying. In
21 crafting -- and I'm not saying this is what Dr. Flynn
22 does -- I don't want to speak for Dr. Flynn -- but is
23 it -- would it be possible to take a look at what the
24 diagnosis -- I'm sorry. It's getting late. What the
25 referring physician said, for example, staging

Page 152

1  lymphoma, whatever it is he said, look at the blood
2  count and the other laboratory reports that come in and
3  craft a panel to answer what you think is the
4  diagnostic question that the referring physician is
5  asking, but in addition to that include some antibodies
6  that aren't -- just answer that diagnostic question so
7  that you're covering other potential --
8    A    Right. Not every marker in the world but
9  enough to cover it, which is essentially what I do and
10 what Dianon does.
11   Q    And -- okay.
12   A    The -- the antibodies that a particular
13 lab or hematopathologist will use will depend on the
14 practice setting. Dr. Flynn's practice was these cases
15 were -- essentially these were prescreened for him and
16 so chances of him running into a problem by using a
17 very short directed lymphoid panel were much less than
18 they would be for somebody in my position.
19        I really can't assume that these cases
20 have been as rigorously prescreened. I have cases
21 coming from everywhere and really have to assume that
22 it's a broader question that I'm answering, and
23 that's just -- I owe it to the patients. I can't
24 compromise the testing I do.
25   Q    And so if someone like Mayo medical school

Page 153

1  or the Mayo Clinic does it differently, then, in other
2  words, takes the clinical information and morphology
3  and crafts a more limited panel, once again, you think
4  that's not appropriate?
5        MR. PARKER: Objection.
6        THE WITNESS: They have different cases
7    than I do.
8  BY MS. DAVIS:
9    Q    And you know that how?
10   A    Well, certainly he described -- Flynn
11 described the -- the types of cases that he was getting
12 and certainly his impression of the types of cases that
13 the other lab had been getting. You're right, I can't
14 actually tell you, I do not know exactly precisely what
15 Mayo's case mix may be.
16        I would not be surprised to find that
17 they don't necessarily adhere to the list of
18 indications and nonindications that was present in
19 that Communique' document, at least at this time.
20 And as I said, if I were to take a position with
21 Mayo, I would be uncomfortable practicing that way.
22        (Marked for identification purposes, Exhibit No.
23   7.)
24 BY MS. DAVIS:
25   Q    I'm going to show you what's been marked