# EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

NO. 3:02 CV 1573(MRK)

UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

    Plaintiff(s),

- vs -

DIANON SYSTEMS, INC.,

    Defendant(s).

V I D E O  E X A M I N A T I O N

OF

RAUL C. BRAYLAN, M.D.

| | |
|---|---|
| TAKEN ON BEHALF OF: | The Plaintiff |
| DATE: | June 15, 2006 |
| TIME: | Scheduled start: 9:00 a.m.<br>Actual Start: 9:07 a.m.<br>Conclusion: 12:32 p.m. |
| PLACE: | Unites States Attorney's Office<br>300 West University Avenue<br>Suite 310<br>Gainesville, Florida 32601 |
| REPORTER: | Anne C. Noble, RPR, FPR, CSR-GA, WA<br>Notary Public: Florida and South Carolina |

Page 34

1  don't think there's going to be an end to that.
2      But at the moment, most laboratories use
3  four-color.
4      Q. Okay. Now, the samples that come from within
5  the hospital and the clinics, how do you bill for
6  those?
7      A. How do I bill?
8      Q. Uh-huh; how to charge somebody.
9      A. I don't bill.
10     Q. You don't bill for those?
11     A. No. No, no. I mean, I'm not involved with
12 the billing.
13     Q. Okay.
14     A. I only decide on the medical necessity of
15 using a particular procedure or something on samples
16 of all kinds.
17     Q. Do you know --
18     A. I don't bill. There's an office that does
19 that.
20     Q. Do you know how the various antibodies are
21 billed for?
22     A. How the antibodies are billed?
23     Q. Uh-huh.
24     A. According to the -- I guess the rules of the
25 time (phonetic) is according to the rules that are in

Page 35

1  place. In our institution, we have -- we have
2  technical and the professional component, and they are
3  billed differently, as far as I know.
4      The technical component is billed as per the
5  CMS mandate. I think it's billed -- the first
6  antibody is billed, and the subsequent antibodies are
7  billed with a different code. That is the technical.
8      The professional component is billed
9  according to the number of reagents, three different
10 tiers.
11     Q. And that's the present system?
12     A. That's the present.
13     Q. Okay.
14     A. In the past, I believe it was billed on a
15 per-reagent basis.
16     Q. Okay. And are you familiar with -- let me
17 ask you a question -- strike that.
18     Do you bill Medicare for any of your testing?
19     A. I believe they do, yes.
20     Q. Okay. Are you familiar with the Medicare
21 rules on medical necessity?
22     A. I think I am. They determined that Medicare
23 should be billed for medically-necessary tests.
24     Q. Okay.
25     A. Is that --

Page 36

1      Q. What do you think medically necessary means?
2      A. Medically necessary is a procedure or
3  medication that is necessary to restore the health of
4  a patient.
5      Q. Of a particular patient?
6      A. Of a particular patient?
7      Q. Uh-huh.
8      A. I'm not understanding.
9      Q. Well, is it medically necessary for that
10 patient?
11     A. Instead of --
12     Q. Well, instead of just a general test that
13 would apply to anybody.
14     A. Let me think about it. For that particular
15 patient? If the patient is sick and needs to be
16 healthy, there is a set of procedures, diagnostic and
17 therapeutic, that are applicable to that patient that
18 are medically necessary and for which, I think,
19 Medicare is charged -- billed.
20     Q. Okay. And if you --
21     A. I mean, I --
22     Q. Let me ask the question a different way. If
23 you -- if you do a panel of antibodies and certain of
24 the antibodies don't play any role in the diagnosis or
25 treatment of the patient, should Medicare be billed

Page 37

1  for them?
2      MR. PARKER: Objection.
3      A. The problem with that is that we don't know,
4  until the antibodies are used, that -- we don't know
5  if those antibodies are going to be useful or not
6  until we're finished with the analysis.
7      It's like an x-ray. How do I know, before I
8  take an x-ray, if it's going to be necessary or not?
9  If I take an x-ray and find nothing -- I mean, it's
10 the same thing.
11 BY MS. DAVIS:
12     Q. Well, if you -- I take it that when you --
13 when a specimen comes into your lab, you don't take
14 into account any of the clinical information that
15 you --
16     A. We do --
17     MR. PARKER: Doctor, let her finish her
18 questions.
19     THE WITNESS: Okay.
20 BY MS. DAVIS:
21     Q. Let me do it again.
22     A. I'm sorry. I'm sorry. I'm very sorry.
23     Q. Okay. I take it when the specimen comes into
24 the lab, you don't take into account any of the
25 clinical information that comes with the specimen or

Page 38

1  any other information you might have in determining
2  which antibodies to use?
3      A.  Right.  If you read my report, I think I
4  clearly stated that that is a mistake.  In our hands,
5  and I think is the understanding of most people now,
6  that that is a mistake.
7          There is a forthcoming consensus next month
8  that is going to address this, and the majority of the
9  opinions is that we should not utilize that
10 information to direct our construction of panels.
11         There's a variety of reasons for that, and I
12 can list them for you.  Those who -- and, again, this
13 is an evolving situation.  It's not firm yet, although
14 the guidelines will be submitted for publication later
15 this year.
16         There are two schools of thought.  One school
17 says you need to look at every piece of information
18 that comes with the sample, and you need to look at
19 the microscopy to see what the cells look like or the
20 tissues look like.  And on the basis of those pieces
21 of information, you need then to design a panel that
22 will focus exclusively on what the potential problem
23 would be on the basis of that information that you
24 received.
25         Time and time again has proven that that

Page 39

1  approach is faulty, and I do not support it, and I'll
2  tell you why.  First of all, the information, that
3  counts is extremely -- the clinical that comes with
4  the sample may or may not be informative enough, it
5  may not be accurate enough, it may not be thorough
6  enough.  Why?  Most of the times, unfortunately,
7  the histology laboratories don't have access to
8  computers in the offices of the doctors who pull the
9  samples or the hospitals where the samples are
10 obtained.  Therefore, we have to rely on a handwritten
11 request for a test from the referring institution or
12 person.  That handwritten request, there is a lot from
13 place to place.  Usually, as I stated in my report,
14 and it is unfortunate, the amount of information that
15 we get, there is a lot, but it's usually scanty.  It
16 tells us -- okay.  "Patient, 46 year-old male with
17 anemia."  We don't know anything about if the anemia
18 was worked up, for how long, all the tests that are
19 needed.  All of that we do not get, we do not obtain
20 in most cases.  The same thing with surgeons.  They're
21 busy.  They're asked to deal with a patient that has a
22 lump.  They go ahead.  They cut the lump out, send the
23 lump to us and "study this," but minimal information.
24 I'm not even sure they know all the specifics of that
25 particular patient.

Page 40

1          So one serious issue is that the amount of
2  information, particularly in a referring situation --
3  in a referral situation, the amount of information is
4  extremely variable and often scanty.  Some errors also
5  do occur.  In a busy, busy practice, oncologists
6  usually delegate to nurses or physician assistants or
7  even secretaries to fill out the forms, and whatever
8  comes to their mind -- or sometimes they hear
9  something, or they do this -- they may say M-A-L, or
10 they may say C-L-L or whatever.  Unfortunately, that
11 is the case, and there are many examples of that.
12         So we decided -- now, that is in contrast to
13 a local hospital, where I have full access to the
14 complete history.  I open the computer in my own
15 hospital, and I see exactly what's going on with that
16 patient; many visits, many laboratory testing, what
17 they did for the patient, treatment with the patient
18 which we never get information on.  Treatment
19 affects -- many treatments affect the bone marrow and
20 affect the blood and affect the tissues.  If we don't
21 know about those treatments, we may not focus on the
22 right diagnostic approach.
23         In a local situation, when you are in an
24 institution -- usually, academic institutions tend to
25 be better.  They're more informative.  You get a

Page 41

1  complete view of that patient.  And in that situation,
2  then, you rely more on that piece of information if
3  you need to, particularly, when you have very, very
4  small samples.
5          But, frankly, even with all that
6  information -- that's one part of the argument that --
7  "Okay.  You can rely on that information to then
8  proceed and construct a panel for each patient."
9          The other argument that is being put forth --
10     Q.  Let me ask you a question.
11     A.  Uh-huh.
12     Q.  When you have that option, when you have a
13 sample that's from inside the hospital system, and you
14 can get onto the computer and look up the complete
15 medical record for this patient --
16     A.  Inside the hospital?
17     Q.  -- inside the hospital system or wherever --
18 what you just described, you can get on the computer,
19 you can pull up the medical record and look up the
20 entire history for this patient --
21     A.  Uh-huh.
22     Q.  -- do you still do the complete panel that
23 you just described?
24     A.  Yes, the complete panel is done routinely.
25 The information that we use is to interpret the

Page 42

1  results rather than select on the -- select on the --
2       (Whereupon, deponent's pages sounds.)
3       MS. DAVIS: Let's go off the record.
4       (Whereupon, there was a pause in the
5   proceedings.)
6    A. Excuse me. The information is mostly to
7  interpret the results and convey to the clinician the
8  appropriate information or to go back and look for
9  something that we did not look at because we didn't
10 have that piece of information. It is not to restrict
11 our panel, unless the number of cells in that sample
12 is insufficient, in which case, we have to determine,
13 in that case, what to do, what is the best panel to
14 use.
15      But the vast majority, if we have enough
16 cells, we just complete -- we do the whole panel for a
17 variety of reasons.
18 BY MS. DAVIS:
19   Q. And those reasons are?
20   A. What?
21   Q. And what reasons are those?
22   A. The other argument that is being proposed is
23 that we need to look at the microscopy, the
24 microscopic findings --
25      MR. PARKER: Didn't she ask you what your reasons

Page 43

1  were for --
2    A. Oh, I'm sorry. I couldn't hear that. My
3  reasons for --
4  BY MS. DAVIS:
5    Q. Reasons for -- in the situation where you
6  have the complete medical background for the patient,
7  and you still do the entire panel.
8    A. Well, it varies with the case. It depends on
9  the situation. But, in general --
10   Q. No; but you just said that it didn't. You
11 just -- even when you open the computer, and you can
12 look at --
13   A. I thought you said the reason for me to --
14 not to --
15   Q. No. You described a situation where you are
16 opening up the records for this type of patient.
17   A. Uh-huh.
18   Q. You have the complete medical history of the
19 patient, all of the tests that have been performed on
20 the patient, what medications have been given to the
21 patient, and despite all that information, you still
22 do the entire panel of antibodies. And you said you
23 had reasons for that. What reasons are those?
24   A. The reasons for using a complete panel -- I
25 consider a complete panel a single test; that each

Page 44

1  individual reagent provides information on a cell
2  type, on a cell stage of maturity, and on the function
3  of the cells and so on. So it gives us a complete
4  panoramic view of the marrow in that particular
5  situation.
6       Then if we have a concern for what we see,
7  then we would add more reagents or maybe we can call
8  the doctor and say, "Look, we're seeing something here
9  that we shouldn't be seeing."
10      So the approach of having a full panel as a
11 single test is something that we have instituted after
12 even trying several times to cut it down in pieces.
13 We found ourselves too often going back to the sample
14 and redoing more of the testing with a consequent
15 waste of time, waste of sample. Particularly after
16 hours, the sample deteriorates. It was more work and
17 more labor and more headaches. We could never
18 determine for sure if something that we are seeing on
19 this particular reagent was right or wrong. We have
20 to have more.
21      So this was several years ago. We decided
22 that that's not the way to go.
23      Now, when we have a full panel, first of all,
24 the diagnosis is complete. Second, the assessment of
25 all the cells in that particular sample -- and, again,

Page 45

1  I repeat this; are very precious samples and cannot be
2  recovered again. These are very difficult diseases
3  that require either very toxic drugs, very difficult
4  drugs for the patient or even transplantation
5  procedures, which are extremely, extremely risky for
6  the patients. We could not afford to miss something.
7  We could not afford to ignore something. We decided
8  that since we have that very precious sample, that is
9  very complex, in a patient with life-threatening
10 diseases, that we need to do our best to simply look
11 at every single aspect of that marrow because marrows
12 can change with treatment, secondary diseases can
13 occur, changes that we did not expect, an infection
14 can occur. Think all kinds of things. So our
15 approach is to simply get as much information as we
16 can once we have that sample in our hands.
17      And this is not going to end here. It's
18 going to continue on because we're getting more and
19 more very informative reagents from genetic studies,
20 from biological studies. So it's not going to be just
21 thirty or forty reagents in the future. It's going to
22 be more. We're just going to have to devise
23 techniques to assemble them and analyze them in a very
24 efficient manner.
25   Q. Now, you said one of the reasons you do the

Page 58

1   A. Right. So he uses that approach of selecting
2   a group of reagents prepared according to the clinical
3   and/or morphological or microscopic information that
4   he receives.
5        And for the reasons that I mentioned to you,
6   I don't think that is the appropriate approach.
7   That's one thing I have to criticize him for.
8        The other criticism I have for him is that
9   what he is stating here is not what he apparently does
10  in his own laboratory or at least accepts being done
11  in a neighboring laboratory at Yale. From his
12  deposition, I learned that he uses a panel approach as
13  well. It may be a different panel, but he does use a
14  panel approach.
15       I think, to a certain extent, his remarks are
16  based on general ideas that he has, but I think he
17  lacks the experience of somebody who does this on a
18  day-in and day-out basis. He hasn't done flow
19  cytometry of bone marrows, particularly, ever, as far
20  as I know; of bone marrow aspirates, at least. He's
21  done only tissues. So I think some of his remarks
22  reflect that type of -- lack of exposure to that.
23       At Yale, the two laboratories that do flow
24  cytometry, or at least did flow cytometry, as far as I
25  know, were separated into two different units, which

Page 59

1   is an artificial separation. I fought for this
2   twenty, thirty years ago. I think it has to be
3   integrated. But if they don't have it integrated,
4   it's their problem. I don't know.
5        The laboratory that does tissues is separate
6   from the laboratory that does bone marrow aspirates.
7   And so the bone marrow aspirates and the bone marrow
8   requires different skills. It requires different
9   situations and so on. I think he uses his theoretical
10  understanding to make some of his remarks but not what
11  he's in practice in the other laboratory. I think
12  it's reflected in some of his inconsistencies when he
13  talks and when he describes the cases or criticizes
14  the cases; the fact that, at one time, he accepts one
15  thing, and then the next time he doesn't, or the other
16  way around; the fact that what he's published -- and I
17  believe he only published one paper, as a co-author,
18  with regards to, peripherally, immunophenotyping or
19  flow cytometry in lymphomas -- and what is in that
20  paper is not what he says is supposed to be.
21       So because of that, I get the feeling that he
22  is missing something or his report is not completely
23  acceptable, as far as I'm concerned, if I read, you
24  know, in an abstract form.
25       I don't know him personally. He's not part

Page 60

1   of our, you know, family, if you wish, of people who
2   do this every day. He stopped doing this. So what he
3   discusses is something that he read perhaps or he
4   talked about, but it's not his own experience. And
5   that's my major concern. Because this is a very
6   complex technology, very complex decisionmaking
7   process, if you don't do it on a daily basis or at
8   least supervise it on a daily basis, you would be
9   prone to make mistakes or make judgments or make
10  statements that are not correct.
11  BY MR. DAVIS:
12       Q. So am I understanding, from what you've just
13  been saying --
14       A. It's a lot. Sorry.
15       Q. -- that's all right -- that if a lab uses an
16  approach, where they look at the morphology first,
17  they look at it under the microscope, and then they
18  make a determination, based on what they see under the
19  microscope, either not to do flow cytometry or to do a
20  panel addressing what they see under the microscope,
21  do you think that's bad medicine?
22       A. As far as I'm concerned, this is incorrect.
23  Okay? There will be some individuals who would say
24  the opposite. But as I mentioned to you -- and this
25  would be clarified once this consensus ends in a

Page 61

1   publication -- that approach is dangerous. It's not
2   necessarily totally incorrect because, obviously, you
3   do something, but it's dangerous because it doesn't --
4   it may miss something. It may not provide all the
5   information that you could extract from a sample. And
6   it always or very often leaves some uncertainties that
7   people might or may ignore with a restricted panel.
8        So I would not support it. I think the group
9   of people involved in this consensus, again, is going
10  to recommend -- and, again, I don't know the number of
11  reagents they're going to recommend, but it's going to
12  be a full, I would say, panoramic set of reagents that
13  will encompass pretty much every cell in the bone
14  marrow to make sure that that bone marrow does or does
15  not have a problem. If it does have a problem, then
16  additional reagents very likely will be -- will be
17  used, will be appropriate to use.
18       So, yes, in answer to your question, I am
19  against that approach. It's something that we do not
20  agree completely, but the majority will agree.
21       Q. So if a lab is performing the way I just
22  described -- they look at the morphology, and they
23  decide, based on what they see under the microscope,
24  either not to do the test or to -- or not to do the
25  flow cytometry or to do a limited panel -- you think

Page 62

1  that's bad medicine?
2    A. I think it's not appropriate knowing what we
3  know right now. If I'm the chief of a division of the
4  hematopathology division, and I think I share this
5  with everybody right now, I would not support that
6  approach. It's not completely -- I mean, if you do
7  find something, it's useful, but it's incomplete --
8  let's put it that way -- and leaves room for
9  equivocation (phonetic), for error, which, in these
10 patients, you can't afford to have.
11   Q. All right. Let's go back to Exhibit 2 for a
12 minute. There's an invoice, which is the very top
13 page. That says that you charged for five hours of
14 personal consultations with the two lawyers
15 representing Dianon and a review of records; is that
16 right?
17   A. Correct.
18   Q. And it's as of February 8th, 2006. Have you
19 done any other work since then?
20   A. Yeah, we've been doing some work. I haven't
21 billed for the work -- or I have? But I haven't
22 collected for the work.
23   Q. They're late paying, huh?
24   A. Ah -- maybe.
25      MR. PARKER: If we got paid for our flow, we

Page 63

1  could pay his bills.
2    A. I think I submitted more, but I don't know
3  for sure.
4  BY MS. DAVIS:
5    Q. Okay. Do you know roughly how many hours
6  you've done?
7    A. I was thinking yesterday how many hours I've
8  spent. I think it would be approximately, by now,
9  twelve hours.
10   Q. Okay.
11   A. Yeah.
12   Q. Okay. So the five hours that you billed for
13 here, what were those for?
14   A. Well, Bill Piermattei came to me and spoke a
15 few times, and then I spent time with Mr. Parker
16 discussing the case.
17      But most of, I think -- well, not most of it,
18 but a significant amount of time is reviewing the
19 records, the paperwork, yeah.
20   Q. Okay. And that's -- let me just make sure I
21 understand. That's this package of documents they
22 gave you, plus the thirteen records (indicating) --
23   A. Plus the thirteen. But I don't know when
24 this -- this was generated February 8th. I should
25 have had the thirteen cases by then; right?

Page 64

1      MR. PARKER: Pat, I'll check. I don't know off
2  the top of my head whether we have received another
3  statement since this February 8th statement, but my
4  guess is that Dr. Braylan -- because this precedes the
5  preparation --
6      MS. DAVIS: Of his report?
7      MR. PARKER: -- of his report, I think. He
8  probably has spent more than twelve hours. I was
9  thinking about in general. But if we have any other
10 statements, I'll certainly forward them to your office.
11     MS. DAVIS: Okay.
12     MR. PARKER: I don't know whether we do.
13     MS. DAVIS: Okay.
14   A. I need to start looking at my -- I'm not
15 pretty good at that. I need to go back and look at my
16 notes, yeah.
17 BY MS. DAVIS:
18   Q. Okay. All right. So when you met with
19 Mr. Piermattei and Mr. Parker, what did you talk
20 about?
21   A. Do you mean initially?
22   Q. Yes.
23   A. Well, the nature of the case. The nature of
24 the situation, this was a government-initiated, I
25 guess, legal case against Dianon for charging for

Page 65

1  medically-unnecessary tests.
2    Q. Okay. Did you discuss whether you were going
3  to be an expert or not?
4    A. Way back when. I think it was last year that
5  I think -- yes, we did, yes.
6    Q. Okay.
7    A. I think it was April/May last year that Bill
8  approached me.
9    Q. Okay.
10   A. Yeah.
11   Q. When you prepared your report, how did that
12 work? How did you prepare it?
13   A. Again, Mr. Piermattei asked me to prepare a
14 report and asked me to include the elements that I did
15 include; my background, my CV, what I do and my
16 philosophy and my approach to things like this. I
17 just simply typed this myself, and then we had a
18 meeting with Mr. Parker about the contents of my
19 report, and we modified that essentially just to --
20 for style mostly, not for content.
21   Q. Okay. So are there any drafts of the report?
22   A. Drafts? No. I typed on my computer.
23   Q. Okay. And so you said you made changes to
24 it?
25   A. On the computer. He was in my office.