**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. Dr. James J. Tiesinga, | ) | |
| | ) | No. 3:02CV1573(MRK) |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |


**DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT**

## TABLE OF CONTENTS

Page No.

I.     THE GOVERNMENT'S ALLEGATIONS ...................................................................... 1

II.    GOVERNMENT'S MEDICAL NECESSITY STANDARDS ........................................ 2

III.   CMS ELECTS NOT TO  ISSUE AN NCD REGARDING CPT 88180 AND
       MEDICAL SCIENTIFIC LITERATURE GOVERNING THE SERVICE
       OUTLINES THREE APPROACHES (INCLUDING A "COMPREHENSIVE
       APPROACH") TO PERFORM FLOW CYTOMETRY SERVICES ......................... 5

IV.    DIANON DEVELOPS A COMPREHENSIVE FLOW CYTOMETRY
       PANEL .......................................................................................................................... 13

V.     CONNECTICUT'S LMRP DOES NOT TAKE A POSITION ON WHICH OF
       THE THREE APPROACHES TO FLOW CYTOMETRY SHOULD BE USED,
       IMPOSES NO FREQUENCY LIMIT ON FLOW CYTOMETRY SERVICES,
       AND NEVER QUESTIONED THE SIZE OF DIANON'S PANEL ........................... 19

VI.    THE ONLY APPLICABLE LEGAL AUTHORITY FOUND A 26 ANTIBODY
       COMPREHENSIVE PANEL MEDICALLY NECESSARY AND INDICATED ..... 25

VII.   WHEN CMS REVISED CPT 88180 IT RELIED UPON A 26 ANTIBODY
       COMPREHENSIVE PANEL .......................................................................................... 26

VIII.  THE GOVERNMENT AND OTHER REFERENCE LABS USE
       COMPREHENSIVE PANELS ...................................................................................... 27

## I.    THE GOVERNMENT'S ALLEGATIONS

1.    On September 5, 2002, relator James J. Tiesinga filed this action under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729-3733, against Dianon Systems, Inc. ("Dianon"). The government elected to intervene in the relator's action. On March 18, 2005, the government filed its FCA complaint against Dianon, which included related common law claims of unjust enrichment and payment by mistake of fact. Because the government's initial complaint failed to comply with Fed. R. Civ. P. 9(b), the government filed an amended complaint on July 14, 2005.

2.    In its amended complaint, the government alleges that Dianon submitted false or fraudulent claims for payment to Federal healthcare programs for flow cytometry tests under CPT 88180 containing antibodies that were not medically necessary. *See* Am. Compl. ¶ 2.[1] Hematopathologists use flow cytometry for the identification and classification of specific white blood cells (leukocytes) using antibodies in single cell suspensions of either blood, bone marrow, or lymph tissue. *See id.* ¶ 26. After interpreting the results of flow cytometry, often in conjunction with blood and bone marrow morphology and other procedures, hematopathologists provide other specialists, such as oncologists, surgical oncologists, hematologists, and radiation oncologists, with the appropriate diagnosis and classification of leukemias and lymphomas. These specialists then provide specific treatment

---

[1] Regulations require that physicians' services and procedures be entered onto a prescribed governmental form by using procedure codes the American Medical Association ("AMA") publishes, known as Current Procedural Terminology ("CPT"). *See United States v. R.D. Prabhu, M.D.*, 2006 U.S. Dist. LEXIS 49690 at *4, n.2 (D. Nev. July 20, 2006). The AMA annually updates the CPT Manual to reflect the advances in the practice of medicine and the changes in the delivery and definition of the various medical services and supplies. *Id.*

regimens and monitor the patients during treatment to determine remission status or recurrence of disease.

3.     The government asserts that "in or about 1996 to the present, when Dianon billed for flow cytometry tests, a significant portion of the antibodies billed to Federal healthcare programs were not medically necessary." *Id.* ¶ 36. The government asserts that between 1996 and 1998 Dianon billed for 26 antibodies and between 1998 and 2000 it billed for 18 antibodies, although it continued to perform 26 antibodies. *Id.* ¶¶ 28, 32. Further, the government asserts that during the time period covered in the complaint that Dianon submitted 12,545 false claims for patients that received flow cytometry services, and that of these 12,545 claims, 2,706 claims concerned patients that received repeat services (*i.e.,* two or more accessions including flow cytometry services for a particular patient). *See* Gov't Damage Disclosure. If the government were successful in its claims, and received the maximum amount of civil penalties authorized under the FCA, it would receive more than $125 million.[2]

## II.    GOVERNMENT'S MEDICAL NECESSITY STANDARDS

4.     Under the Medicare Act, carriers may provide coverage only for those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).[3] The Centers for Medicare & Medicaid Services ("CMS") "has not delineated what constitutes

---

[2] The FCA provides for statutory penalties of $5,000 to $10,000 per each false claim submitted. 31 U.S.C. § 3729(a). For violations committed on or after Sept. 29, 1999, the defendant is liable for treble damages plus penalties ranging from $5,500 to $11,000 per claim. *See* Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099, 47,103–47,104 (Aug. 30, 1999).

[3] CMS contracts with private companies to handle claims processing responsibilities. Private insurance companies that process the bulk of Medicare Part B claims, which are relevant here, are referred to as carriers or may be referred to as contractors. *See United States v. R.D. Prabhu, M.D.*, 2006 U.S. Dist. LEXIS 49690 at *35, n. 13 (D. Nev. July 20, 2006) (describing program).

'medically indicated' and 'necessary' items or services furnished to Medicare patients and the specific documentation required to support medical necessity in individual cases." *United States v. R.D. Prabhu, M.D.*, 2006 U.S. Dist. LEXIS 49690 at *66 (D. Nev. July 20, 2006).[4]

     5.     To provide guidance regarding whether a particular medical service is medically reasonable and necessary, CMS may promulgate a National Coverage Decision ("NCD") which will grant, limit or exclude Medicare coverage for a specific medical service. *See* 64 Fed. Reg. 22619, 22621 (Apr. 27, 1999). If CMS elects to issue a NCD, the NCD is binding on all Medicare contractors processing Medicare claims. *Id.*

     6.     In the absence of CMS promulgating a NCD, medical necessity decisions are made at the discretion of local Medical contractors.[5] Contractors may also publish local medical review policies ("LMRPs"), or Local Coverage Determinations ("LCDs"), the successor to LMRPs, to provide guidance to the public and the medical community within a specified area and "explain when an item or service will be considered 'reasonable and necessary' and thus eligible for coverage under the Medicare statute." 64 Fed. Reg. at 22,621.

     7.     CMS, in issuing guidance to carriers regarding the criteria they should use in making medical necessity determinations under LCDs, specified that a service shall be considered reasonable and necessary, if, among other things, it falls within accepted standards of medical practice. Specifically, CMS, in its Program Integrity Manual ("PIM"), stated:

     8.     A service may be covered by a contractor if:

---

[4] *See, e.g.*, Medicare Program; Criteria and Procedures for Making Medical Services Coverage Decisions That Relate to Health Care Technology, 54 Fed. Reg. 4302, 4304, 4308, 4312 (1989) ("current regulations are general and we have not defined the terms 'reasonable' and 'necessary,' nor have we described in regulations a process for how these terms must be applied").

[5] *See, e.g.*, Medicare Program; Procedures for Making National Coverage Decisions, 64 Fed. Reg. 22,619, 22,621 (1999); *see also* Dep. of Steve E. Phurrough at 30:4-18 (hereinafter "Phurrough Dep.") (excerpts attached hereto at Ex. 1). Mr. Phurrough is the government's Rule 30(b)(6) designee regarding Medicare's consideration of a NCD regarding CPT 88180. *Id.* at 9:11-17.

3

- It is reasonable and necessary under 1862(a)(1)(A) of
The Act.

Only reasonable and necessary provisions are considered part of
the LCD.

**Reasonable and Necessary**

In order to be covered under Medicare, a service shall be
reasonable and necessary. When appropriate, contractors shall
describe the circumstances under which the proposed LCD for
the service is considered reasonable and necessary under
1862(a)(1)(A). Contractors shall consider a service to be
reasonable and necessary if the contractor determines that the
service is: ...

- Appropriate, including the duration and frequency that is
considered appropriate for the service, in terms of
whether it is:

  o Furnished in accordance with accepted standards
  of medical practice for the diagnosis or treatment
  of the patient's condition or to improve the
  function of a malformed body member;

*See* Internet Only Medicare ("IOM") Program Integrity Manual ("PIM"), 13.5.1.

9. Additionally, in determining the medical necessity of a service, CMS provides

that the carrier should consider, among other things, the standard of practice within the

community and scientific or research data. Specifically, the PIM provides:

Contracting LCDs shall be based on the strongest evidence
available. The extent and quality of supporting evidence is key
to defending challenges to LCDs. The initial action in gathering
evidence to support LCDs shall always be a search of published
scientific literature for any available evidence pertaining to the
item/service in question. In order of preference, LCDs should
be based on:

- Published authoritative evidence derived from definitive
randomized clinical trials or other definitive studies, and

- General acceptance by the medical community (standard
of practice), as supported by sound medical evidence based on:

4

> Scientific data or research studies published in peer-reviewed medical journals;
>
> Consensus of expert medical opinion (i.e., recognized authorities in the field); or
>
> Medical opinion derived from consultations with medical associations or other health care experts.

IOM PIM, 13.7.1 (excerpts attached hereto at Ex. 2).

## III. CMS ELECTS NOT TO ISSUE AN NCD REGARDING CPT 88180 AND MEDICAL SCIENTIFIC LITERATURE GOVERNING THE SERVICE OUTLINES THREE APPROACHES (INCLUDING A "COMPREHENSIVE APPROACH") TO PERFORM FLOW CYTOMETRY SERVICES

10.     In 1998, CMS considered adopting a national policy regarding coverage of flow cytometry, including limitations on the number of antibodies that could be billed without additional justification, but ultimately declined to do so because, it believed, that there was insufficient medical literature addressing the number of antibodies that should be used for a specific indication. *See* Phurrough Dep. at 23:14-24:13; 39:18-41:10.

11.     During this time period, the medical scientific literature described three general approaches to performing flow cytometry. *See* Carleton C. Stewart et al., *U.S. Canadian Consensus Recommendations on the Immunophenotypic Analysis Of Hematologic Neoplasia by Flow Cytometry: Selection of Antibody Combinations*, 30 CYTOMETRY 231 (1997) (attached hereto at Ex. 3). One approach was the use of a "comprehensive panel of antibody combinations that usually answers most relevant questions." *Id.* (hereinafter "comprehensive approach"). A second approach was the "initial use of a minimal 'screening' panel to obtain general information on the sample, followed by a secondary, more thorough, and specific set of reagents chosen according to the results obtained with the initial panel." *Id.* at 231-32. (hereinafter "screening panel"). A third approach was "a 'directed' or targeted approach, which is based on the availability of other data such as morphologic or clinical information."

*Id.* at 232. (hereinafter "directed" or "targeted" approach). Each of these approaches has various advantages and disadvantages. *Id.* at 231-32. The Consensus Conference concluded:

> An adequate characterization of the cellular components in a sample requires at least these many reagents or even larger panels, which unfortunately affect test cost. However such a characterization is often of significant clinical value. In the context of a potentially serious disease, the impact of reagent cost may be negligible.

*Id.* at 235.

12.     Maryalice Stetler-Stevenson, M.D., is the government's Rule 30(b)(6) designee regarding the appropriate number of antibodies or utility of antibodies to be used in a flow cytometry panel for leukemia and lymphoma testing. She heads the flow cytometry laboratory of the National Cancer Institute ("NCI") of the National Institute of Health ("NIH"), which is the premiere governmental operated laboratory for purposes of performing leukemia and lymphoma studies through the use of flow cytometry. *See* Dep. of Maryalice Stetler-Stevenson, M.D., 7:15-8:4, 123:8-17 (hereinafter "Dr. Stetler-Stevenson Dep.") (excerpts attached hereto at Ex. 4). She testified that as to the approaches set forth in the United States and Canadian Consensus Conference, she uses the comprehensive approach. *Id.* at 128:9-130:13. Dr. Stetler-Stevenson believed that a comprehensive approach was superior because the more antibodies that were used the higher the sensitivity of abnormal cell detection and the better the ability to delineate phenotypes that may be useful in disease monitoring. *Id.* at 134:19-135:4. She also believed that it was actually more economical because when total time and material costs are considered it is more cost effective to run more antibodies once than fewer antibodies two or more times. *Id.* at 132:6-20.[6] Dr. Stetler-

---

[6] *See also* Dep. of Raul C. Braylan, M.D., at 43:18-45-16 (hereinafter "Dr. Braylan Dep.") (excerpts attached hereto at Ex. 5):

Stevenson testified that the only difference between her blood and bone marrow panel and the panel that Dianon ran is that hers contained *more* antibodies. *Id.* at 149:9-150:9.[7]

13.     Additionally, Dr. Stetler-Stevenson employed the comprehensive approach because otherwise a patient's serious medical condition could be misdiagnosed.  For example, as to the third approach outlined in the United States and Canadian Consensus Conference – a directed or targeted approach – she stated that such an approach is impractical in laboratories lacking the support of additional information and may be hazardous in cases in which this information is incorrect. *See id.* 133:10-19.  In fact, she authored an article warning the flow cytometry community regarding how reliance on a limited or restricted panel – such as a

---

... So the approach of having a full panel as a single test is something that we have instituted after even trying several times to cut it down in pieces. We found ourselves too often going back to the sample and redoing more of the testing with a consequent waste of time, waste of sample.  Particularly after hours, the sample deteriorates.  It was more work and more labor and more headaches.  We could never determine for sure if something that we are seeing on this particular reagent was right or wrong.  We have to have more.

So this was several years ago.  We decided that that's not the way to go.

Now, when we have a full panel, first of all, the diagnosis is complete. Second, the assessment of all the cells in that particular sample – and, again, I repeat this; are very precious samples and cannot be recovered again. These are very difficult diseases that require either very toxic drugs, very difficult drugs for the patient or even transplantation procedures, which are extremely, extremely risky for the patients.  We could not afford to miss something.  We could not afford to ignore something.  We decided that since we have that very precious sample, that is very complex, in a patient with life-threatening diseases, that we need to do our best to simply look at every single aspect of that marrow because marrows can change with treatment, secondary disease can occur, changes that we did not expect, an infection can occur.... So our approach is to simply get as much information as we can once we have that sample in our hands.

[7] Because of budgetary constraints, Dr. Stetler-Stevenson sought to limit the amount of antibodies used when diagnosing the patient. *See* Dr. Stetler-Stevenson at 20:20-21:5 ("Q. ... As part of your professional judgment in constructing your various panels for use in flow, do you have to consider, because you operate with ... a budget, the financial implications of your decisions?  A.  Yes"); *see also id.* 86:3-13 ("Q.  Am I correct, Doctor, that when you design these panels it was because you felt that this combination of antibodies was what was medically necessary for you to render correct and accurate diagnoses of these suspected medical conditions? A.  Yes"); *id.* at 90:17-21 ("Q.  Isn't it true with all of the panels we've talked about, if you have additional information you may add on to these basic panels?  A.  Yes, although I try to limit it as much as possible").

disease specific panel – could result in patient death if it was used in the place of a panel that was capable of identifying all abnormal hematopoietic cells. *Id.* at 121:1-11; *see also id.* at 119:14-120-13; 133:10-134:5.[8] Moreover, as to repeat cases, if she received another specimen from the physician because the physician was concerned the patient could be developing a co-morbidity, Dr. Stetler-Stevenson employed the same full panel to test the patient. *Id.* at 79:19-80:13; 82:8-17.

---

[8] *See* Yan Xie, X., Filie, A., Jasper, G., Fukushima, P., & Stetler-Stevenson, M., *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, 42 CYTOMETRY 114, 117 (2000) (attached hereto at Ex. 6). Specifically, the authors note the importance of using a comprehensive panel that is capable of identifying all abnormal hematopoietic cells:

> In the interest of cost containment, laboratories are constantly seeking to minimize antibody panels in flow cytometric immunophenotypic analysis of patient materials. The use of "disease-directed panels" such as lymphoma panel or a leukemia panel is one method used to lower antibody consumption. This is often done despite the availability of minimal clinical information to direct panel choice. However, in patients without an established diagnosis, one runs the risk of being unable to identify an unexpected malignant population. We report flow cytometric detection of concomitant chronic lymphocytic leukemia (CLL) and acute myeloid leukemia (AML) in a specimen submitted for evaluation of lymphoma. This case illustrates the need to use multiparametric analysis with antibody panels designed to detect all abnormal hematopoietic populations.

*     *     *

> … Although the number of cells in the specimens determined the panel used, the panel was sufficient to detect all cell populations present as per the US/Canadian consensus recommendations on immunophenotypic analysis of hematologic neoplasia by flow cytometry. Despite the fact that the specimen was submitted for evaluation of lymphoma, the panel utilized allowed detection of myeloid leukemia as well. If a restricted lymphoma panel had been used, only the diagnosis of CLL could have been made. Because AML was the disease causing clinical deterioration, patient care would have been severely compromised.

> Concomitant AML and CLL, although rare, can occur and may be difficult to evaluate morphologically. In this report, we demonstrate the importance of employing a panel of antibodies capable of identifying abnormal hematopoietic cells instead of simply using a disease-specific panel. This reinforces the US/Canadian consensus recommendations and indicates the danger of restricting reimbursement to disease-specific antibody panels.

*Id.* at 114, 117 (endnotes omitted).

14.    In 2000, the International Society for Analytical Cytology convened a meeting

of recognized international experts in the area of flow cytometry, including Dianon's experts,

Drs. Braylan, Borowitz, and Holden, to determine consensus on the optimal use of antibodies

in the diagnosis and subclassification of blood and lymph diseases, such as leukemia and

lymphoma. The international experts participating at the conference concluded that large

panels were needed to diagnose and evaluate the patient's condition. The authors concluded:

> Achieving overall consensus on essential or useful panels is
> predictably difficult. This is because the choice depends
> heavily on the particular strategies used for conducting the
> analysis, the individual preferences for reagents, the different
> needs of the laboratory, or the complexity of the case.
> Additionally, the experience among the participants varied with
> different reagents.... Despite these shortcomings, the group
> reached broad consensus, supporting the notion that large panels
> of antibodies were important for adequate characterization of
> lymphoid neoplasms.... [T]he value of large panels was seen to
> ensure that abnormal populations of any lineage could be
> identified by sample, especially a newly diagnosed sample.
> Large panels also provided comprehensive characterization of
> any neoplastic population identified.[9]

15.    A majority of the 13 hematopathologists surveyed during the 2000 consensus

conference found more than 40 antibodies either "useful" or "essential" in the diagnosis of

blood and lymph disorders.[10] A majority of hematopathologists found all of the 26 antibodies

Dianon utilized to be at least "useful" in the diagnosis of one or more disorders.[11]

16.    Finally, the experts concluded that while an essential list of antibodies could

not be selected, a comprehensive panel of antibodies was needed for a complete and accurate

---

[9] *See* R. C. Braylan *et al.*, *Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting*, 46 CYTOMETRY 23, 26 (Feb. 15, 2001) (attached hereto at Ex. 7).

[10] *Id.* at 25.

[11] *Compare id.* at 25 (listing antibodies) *with* Dianon Systems Immunophenotyping Three Color Procedure at 2 (listing antibodies in Dianon's main panel) (excerpts attached hereto as Ex. 8).

immunophenotypic characterization and a reduced panel could impair a physician's ability to

diagnose, monitor, and treat these diseases:

> In conclusion, the results of our international meeting support
> the notion that hematolymphoid neoplasias and related
> conditions are complex disorders that require a rather large
> array of antibodies for their complete immunophenotypic
> characterization. Additional reagents might even be needed as
> new diagnostic applications prove to be useful…. **Alternative**
> **approaches that utilize reduced panels could significantly**
> **jeopardize our ability to diagnose, accurately subclassify, or**
> **adequately monitor and treat these serious diseases.**[12]

17.    Similarly, in a text cited in the Connecticut LMRP (described below)

governing flow cytometry under CPT 88180, the authors, Drs. Doyen Nguyen, Lawrence

Diamond, and Raul Braylan, recommended a comprehensive approach to flow cytometry. *See*

Nguyen, D., Diamond, L., & Braylan, R., FLOW CYTOMETRY IN HEMATOPATHOLOGY,

Humana Press (2003) (excerpts attached hereto at Ex. 11). Specifically, the authors

recommended a 27 antibody panel for blood and bone marrow analysis. *Id.* at § 2.7.2.

Approximately, ninety-five percent of Dianon's flow cytometry samples are blood or bone

marrow specimens. *See* Dep. of Dr. Stuart Flynn at 297:4-17 (hereinafter "Dr. Flynn Dep.")

(excerpts attached hereto at Ex. 12).[13]

---

[12] *Id.* at 27; *see also* Dep. of Michael J. Borowitz, M.D., at 181:16-183:6 (discussing the provision) (hereinafter "Dr. Borowitz Dep.") (excerpts attached hereto at Ex. 9). More accurate immunophenotyping benefits not only the patient but also the Medicare program resulting in shorter hospitalization periods or avoidance of hospital admissions. *See* B. H. Davis, *U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia by Flow Cytometry: Medical Indications*, 30 CYTOMETRY 249, 252-53 (Oct. 15, 1997) ("Immunophenotyping often allows the pathologist to make a more definitive diagnosis and classification of a leukemia or lymphoma when the morphology is equivocal, thus reducing the time to definitive diagnosis or therapeutic decisions and eliminating the need for repeat or more extensive invasive diagnostic procedures. This often translates into either shorter hospitalization periods or avoidance of hospital admissions") (attached hereto as Ex. 10).

[13] Dr. Flynn reviewed 437 cases in 2005-06 which provides the basis for the government's alleged damages in this case. In 391 tests Dr. Flynn identified a specimen (46 cases Dr. Flynn did not note the type of specimen). Blood and bone marrow comprised 382 of the analyzed tests (97.7%) and only 9 were tests on tissue (2.3%). Dianon incorporates by reference the documents the government produced Bates stamped SF0027 through SF0466 (Dr. Flynn's review of the 437 tests).

18.    The authors recommended a comprehensive approach because it optimized the

detection and characterization of the cancerous cells and facilitates the detection of two or

more unrelated neoplastic process present in the same specimen:

> In the authors' laboratory, the antibody panels have been
> designed based on a comprehensive approach to [flow
> cytometric] analysis.  The rationale is to optimize the detection
> and characterization of the critical cells for determining (1) the
> lineage of the cells of interest (e.g., myeloid, B-cell, T-cell) (2)
> their maturity status (3) the clonality, where appropriate (4) the
> specific subtype of hematopoietic malignancy and (5) the status
> of the normal elements present.  The use of large
> comprehensive panels also facilitates the detection of two or
> more unrelated neoplastic processes present in the same
> specimen.

*Id.* at § 2.7.

19.    Moreover, the authors warned physicians not to let "(t)he clinical impression or

the morphologic features of the specimens ... dictate the design and selection of an antibody

panel."  *Id.* at §2.6.  The authors cautioned against this approach because the clinical

information provided to laboratories such as Dianon is "often scanty, vague, and potentially

misleading."  *Id.*

20.    The government's litigation expert, Dr. Stuart Flynn, testified that of the three

approaches described in the medical scientific literature, his lab, when it was operational, used

the direct targeted approach, which is based on the availability of morphologic or clinical

information. *See* Dr. Flynn Dep. at 146:5-9; *see infra* ¶ 11.  Recognized international experts,

such as Drs. Stetler-Stevenson, of the NIH, and Dr. Braylan – experts recognized by even Dr.

Flynn – believe that the direct targeted approach may be dangerous and even result in patient

death because the morphologic or clinical information may be faulty and should not dictate

the antibodies that are used in the panel. *See infra* ¶ 13; *see also* Dr. Stetler-Stevenson Dep. at

142:6-143:10 (morphology unreliable because "you could evaluate by morphology looking at a slide specimen and detect no cancer yet be able to detect it by flow cytometry").[14]

21.    Although the government's expert, Dr. Flynn, disagreed with Dianon's panel, he acknowledged that Dianon's experts could defend the merit of their position that Dianon's panel was consistent with sound medical practice. *See* Dr. Flynn Dep., at 197:6-17; 336:3-12; 339:17-340:7.[15]    Indeed, he noted that if Dianon's goal was to detect all abnormal cells in the specimen, he believed that Dianon's panel was not comprehensive enough because it was not large enough to detect all abnormal cells. *Id.* 333:2-9.

22.    All agree that regarding the approaches discussed in the medical scientific literature Dianon used the "comprehensive approach." *See* Dr. Flynn Dep. at 145:13-146:4 ("Q. ... Now, these authors describe that there were three different approaches that various different experts that attended this conference proposed.... Now, as you understand the

---

[14] *See also* Dep. of Jeannine T. Holden, M.D., at 29:12-25 ("Q. ... The information that comes in the clinical history and the ICD 9, do you consider any of that information in deciding what antibodies to use? A. No. Q. Why not? A. It is frequently – not frequently, pretty frequently not complete. It can be very misleading. We actually find that, especially in a practice setting, it's much more efficient and better for patient care to simply essentially look for everything. The goal is to identify every cell in the sample.") (excerpts attached hereto as Ex. 13); *see also id.* at 36:6-38:7; 72:19-73-18; 74:12-77:22; 151:9-152:24; 175:13-176:24; Dr. Braylan Dep. at 37:23-41:9 (relying on clinical information with sample would be a "mistake" and "time and time again has proven that that approach is faulty" because "the clinical [data] that comes with the sample may or may not be informative enough, it may not be accurate enough"); *id.* at 52:16-62:11; Dr. Borowitz Dep. at 99:17-102:8 (relying on clinical history and morphology to decide whether to perform flow cytometry is "dangerous"); *id.* at 108:19-110:19.

[15] Dianon disputes that the sole "expert" the government has proffered, Dr. Flynn, has the requisite background to opine regarding a reference lab that predominantly performs flow cytometry on blood and bone marrow because he: (1) has not signed out flow cytometry studies since 2000; (2) even then, did not perform flow cytometry on the type of specimens that Dianon performs (blood and bone marrow); and (3) did two color rather three immunophenotyping. *See* Dr. Flynn Dep. 37:4-5; 45:11-13; 53:1-54:19; 65:2-4.    In its accompanying motion to strike Dr. Flynn's opinions, Dianon challenges Dr. Flynn's assessments that certain antibodies were medically unnecessary as he could not articulate a consistent methodology, did not consistently apply a discernable methodology to the tests he reviewed, and did not practice medicine consistent with his views in this case.

Dianon approach, would you agree that they used a general comprehensive panel? A.
Correct").

23.    As to the three possible approaches to performing flow cytometry described at
the 1997 United States and Canadian Consensus Conference – comprehensive, stepwise (or
screening), and disease-directed or targeted – CMS did not mandate that hematopathologists
must adopt any one of these three approaches. *See* Phurrough Dep. at 55:16-56:20.  Instead,
in light of its view that there was insufficient medical literature regarding these issues, CMS
ultimately elected to permit its carriers to determine what limits, if any, should be imposed on
coverage of flow cytometry services. *Id.* at 29:2-30:18.

## IV.    DIANON DEVELOPS A COMPREHENSIVE FLOW CYTOMETRY PANEL

24.    Beginning in 1995, Dianon strategically determined that it would become a
leader in anatomic pathology in general and hematopathology in particular. *See* Decl. of
Richert Goyette, M.D. ¶ 3 (hereinafter "Goyette Decl.") (excerpts attached hereto as Ex. 14);
Decl. of James B. Amberson, M.D. ¶ 2 (hereinafter "Amberson Decl.) (attached hereto as
Ex.15); Decl. of Valerie Palmieri ¶ 2 (hereinafter "Palmieri Decl.") (attached hereto as Ex.
16). As a first step in that direction, it hired two board certified hematopathologists: Ann
Marie Connor and Richert Goyette. *Id.*

25.    As Dr. Goyette pointed out, in designing a panel, Dianon sought to identify
antibodies that would best identify the patient's disease and these decisions were solely based
upon the physician's judgment:

> Q    Well, for example, in the flow cytometry test,
> there are a number of different markers that are used.  Did you
> have any input into how many markers got billed for?

13

> A    As a component of the practice of medicine, we
> were – we believed it was in the patient's best interest to select
> antibodies that best – would best identify the patient's disease.
>
> And as such, we made recommendations which,
> quite honestly, were, in fact, not challenged because they were
> our medical opinion.

Dep. of Dr. Richert E. Goyette, at 23: 5-18 (hereinafter "Dr. Goyette Dep.") (excerpts attached

hereto at Ex. 17); *see also* Dep. of Dr. Suha Mishalani at 92:12-19 (hereafter "Dr. Mishalani

Dep.") (excerpts attached hereto at Ex. 18).

26.    Dianon's pathologists learned through experience that their use of a

comprehensive antibody panel substantially advanced patient care, and Dianon did not

employ a shorter panel because it would compromise patient care. For example, Dr.

Mishalani learned that without CD 103, cases, such as hairy cell leukemia, could be

misdiagnosed even though clinical evidence and a physician's provisional diagnosis indicated

a different disease, follicular lymphoma:

> A    . . . I had the case where it was CD10 positive, it
> was a B-cell neoplasm, and it was monotypic, and he even
> checked, the doctor checked BCL2, which is a molecular test.
>
> So, that molecular tests tends towards follicular
> lymphoma and follicular lymphoma is CD10 positive. So, there
> was no reason for me, finding all this, to suspect hairy cell
> leukemia because on the smear it wasn't so evident.
>
> And so, I remember calling the doctor, he was on
> vacation, telling him that I found something with CD10 positive
> and that I'm suspecting follicular lymphoma, which is treated
> differently. And he was on vacation for a week and I remember
> that the BCL2, which is a molecular test that takes longer, came
> back positive, which again tells you that you're leaning towards
> follicular lymphoma. And then a week later or more I get a
> phone call from the pathologist who got the bone marrow result,
> and he's saying, well, on histology it appears to be hairy cell
> leukemia.

14

> So, this is a perfect example how this could
> mislead you, a short panel could mislead you and you can stop
> there. You have your diagnosis.
>
> Q        And what role did CD103 play in that particular
> case you were talking about?
>
> A        I didn't have it. It would be brightly positive.
> There's no way I would miss hairy cell leukemia then if I had it.

*See* Dr. Mishalani Dep. at 81:10-82:24; *see also* Dep. of Glenn H. Segal, D.O. at 60:13-22

("So this panel is designed for that purpose [evaluate leukocytes for potential abnormalities]

in a comprehensive fashion because using other limited methodologies or limited panels, I

know from experience that we would have probably missed things . . . .) (hereafter "Dr. Segal

Dep.") (excerpts attached hereto at Ex. 19).

27.     For this reason, Dianon rejected performing a shorter panel because it would

potentially harm patients because frequently referring physicians were not immediately

available for consultation, the viability of the specimen would diminish, and the diagnosis of

the patient would thus become less accurate. As Dr. Goyette testified:

> Q        Did you consider having more –smaller, more
> focused panels based on what the supposed or suspected
> diagnosis was?
>
> A        I'm sure that that was considered; but, our
> situation was very unique, and that would have been – we
> believed that would have, actually, potentially harmed patients.
>
> Q        Why was that?
>
> A        That's because you – sometimes you can do kind
> of a step-wise panel: Do a few, do a few more.
>
> If you're in a hospital, a specimen has just been
> taken out in the operating room, the doctor is there for
> immediate consultation, can add, subtract. You can do a lot
> things that you can't do in a reference laboratory.

> And so since these specimens start dying – the minute you take them out of the body they start dying – by doing – start doing kind of a sequential approach, you have cells dropping out.
>
> And it's interesting that the cells don't just die at an even rate. Some populations die faster than others.
>
> For example, neoplastic cells or tumor cells can die faster than normal cell. And so the longer you wait, the less likely it is that you're going to be able to examine a spe – or cells that are representative of the patient's condition.
>
> So we elected at that time to try to apply our professional experience based upon which antibodies we thought were appropriate for the specimens, which comprise this panel.

*See* Dr. Goyette Dep. at 103:20-105:10.

28.    Similarly, where physicians ordered tests on patients that Dianon had

previously diagnosed, Dianon ran its panel because experience taught that the patient's

diagnosis may evolve, there may be another type of cancer, or the patient's condition may

have changed because of treatment. As Dr. Goyette testified:

> But the plan [sic] fact of the matter is that diseases evolve over time, okay. So at any one time you're only looking at a specific element of that disease.
>
> Not only do they evolve over time, but they involve different areas of the body. For example, you can find something in the peripheral blood that wasn't there in the bone marrow that was sampled.
>
> Okay. And, also, you know, it's amazing to me, and quite honestly, actually, I'd have to look up on the Internet to confirm it because it's been six years or so since I was there, but these hematologic disorders don't just occur in isolation, they very commonly occur with other diseases.
>
> So – and, furthermore, treatment actually alters the population, for example, somebody that's treated for chronic myelogenous leukemia, the very drugs that they are treated with can induce acute leukemia.

16

>       So it's a very dynamic situation in which a flow test at one point in time doesn't necessarily at all represent what you're going to see at another point in time.
>
>       I mean, you wouldn't want your cardiologist to just listen to your heart because he'd listen to your heart before. You'd want him to listen – examine you completely.

*See* Dr. Goyette Dep. at 111:14-113:9; *see also id.* at 113:19-117:20; 299:20-300:21; 301:4-303:2; 308:8-309:2; 311:19-313:9; Dr. Mishalani Dep. at 160:13-25; Dr. Segal Dep. 151:1-24, 155:3-11; *see generally id.* at 75:17-23 (you do repeats because "you could have other diseases that occur in the interim when you follow up. Patients are treated with chemotherapeutic agents where you can get secondary MDS or AMLs. Also you can develop a different disorder that you may miss if you do an abbreviated or limited target panel like that. Something I wouldn't do or wouldn't want to do").

29.     Indeed, each Dianon hemepath firmly believed that each antibody used was medically necessary and indicated to diagnose the patients condition. *See* Dr. Goyette Dep. at 326:4-12; Dr. Mishalani Dep. at 52:16-23; 92:12-19; 134:4-8; 161:9-22; 198:12-24; 198:25-199:9; Dr. Segal Dep. at 114:19-115:25; Dep. of Ann Marie Connor, M.D., at 103:16-105:15; 117:23-118:2 (hereinafter "Dr. Connor Dep.") (attached hereto as Ex. 20).

30.     No business or corporate personnel at Dianon had any role in determining what antibodies, or how many, would be performed. *See* Goyette Decl. ¶¶ 5-6; Amberson Decl. ¶ 2; Palmieri Decl. ¶ 3; *see also* Decl. of Glenn H. Segal, D.O. ¶¶ 4-5 (hereinafter "Segal Decl.") (attached hereto as Ex. 21); Decl. of Suha Mishalani, M.D. ¶ 4 (hereinafter "Mishalani Decl.") (attached hereto as Ex. 22); Dr. Connor Dep. at 123:13-124:21; *see generally* Dr. Goyette Dep. at 325:14-19 ("Q. Was it the hematopathologists who decided what antibodies ought to be in the panel, or did the business people decide that? A. No. The

17

hematopathologists decided solely"). Indeed, the physicians steadfastly refused to permit any business person to determine what constituted appropriate medical care. *See, e.g.,* Goyette Decl. ¶ 6; Segal Decl. ¶ 5. In fact, Dr. Goyette resigned even when a product manager simply inquired into what the pathologists were doing to market the company's services. *See* Goyette Decl. ¶ 6; *see also* Dep. of Mark Florio at 235:4-20 (excerpts attached as Ex. 23).

31.     Moreover, Dianon's pathologists had no financial incentive to order additional antibodies. Specifically, Dianon's pathologists' receive a set salary plus a productivity incentive based upon the number of cases reviewed above a set threshold. If the pathologists performed fewer antibodies, they would presumably be able to review additional cases and, accordingly, potentially receive additional compensation. *See, e.g.,* Goyette Decl. ¶ 10. However, because they believe that performing a short panel would undermine patient care, they have insisted upon Dianon performing a comprehensive panel. *See* Segal Decl. ¶ 11; Mishalani Decl. ¶ 9; Dr. Goyette Dep. at 334:1-19; *see also* Amberson Decl. ¶ 7.

32.     Additional proof that Dianon pathologists believed that its antibody panel was medically indicated and necessary occurred in 1997 when Dianon determined to bill for 18 antibodies. Although a business decision was made to bill for 18 antibodies, Dianon continued to perform 26 antibodies because 26 was indeed medically indicated and necessary. *See* Dep. of Dr. James Amberson at 30:20-32:9; 35:4-37:10; 79:6-8 (attached hereto as Ex. 24). That is absolute proof that Dianon believed that 26 was medically indicated and necessary.[16] Even though Dianon was not compensated for performing those 8 additional

---

[16] The use of each antibody creates additional costs. *See, e.g., supra* ¶ 41 (CMS estimates each antibody costs $8.50 based upon a 26 antibody panel). It is simply untenable to imagine that a for profit company would arrive at the conclusion that only 18 antibodies are necessary but, notwithstanding that, incur the substantial cost, over a multi-year period regarding thousands of claims, of performing 26 antibodies (and hence bear the cost of the additional 8 antibodies that it does not bill for) unless it genuinely believes, as it does here,

antibodies and even though performing these antibodies required the hematopathology staff to work more and review more documents, its pathologists determined that they would do that work without compensation because they were not willing to compromise patient care. *See* Dr. Goyette Dep. at 187:5-188:4 (" I think that pathologists or hematologists that do the 18 ... antibodies listed on this memo are not practicing a standard of care because as, I document in . . . my declaration, Exhibit 3, I had my eyes opened to the diagnosis of a number of different disorders that would not have been diagnosed with the additional use of these antibodies on a routine basis, such as hairy cell leukemia"); *see also* Segal Decl. ¶ 3; Mishalani Decl. ¶ 4.

## V.    CONNECTICUT'S LMRP DOES NOT TAKE A POSITION ON WHICH OF THE THREE APPROACHES TO FLOW CYTOMETRY SHOULD BE USED, IMPOSES NO FREQUENCY LIMIT ON FLOW CYTOMETRY SERVICES, AND NEVER QUESTIONED THE SIZE OF DIANON'S PANEL

33.    As noted, when, as here, CMS elects not to issue an NCD, Medicare carriers have discretion to cover services and impose limits on the frequency of services. *See infra* ¶¶ 10, 23. As to CPT 88180, multiple carriers across the country instituted LMRPs governing the provision of flow cytometry services. The majority of carriers, such as Connecticut (described below) did not impose any frequency limits regarding the use of CPT 88180, such as limit the number of antibodies that can be billed as a general matter.[17] A minority of

---

that each of the antibodies was in fact medically necessary and indicated. Courts have ruled that when "the factual context renders" a party's "claim implausible – if the claim is one that simply makes no economic sense," the party *"must come forward with more persuasive evidence"* to support their claim than would otherwise be necessary" to survive summary judgment. *See Matsushit Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis supplied); *United States v. R.D. Prabhu, M.D.*, No. 2:04-CV-0589-RCJ-LRL, 2006 U.S. Dist. LEXIS 49690 at *47-*48 (D. Nev. July 20, 2006) (same).

[17] *See, e.,g.,* Blue Cross/Blue Shield (BCBS) (Western NY), LMRP (No. L-97-8) (no limit); Trailblazers Health Enterprises (TX), LMRP (No. L-16Bmd-R2) (no limit); Cahaba Gov. Benefit Administrators (MS), LMRP (No. OTH-9722) (no limit); Arkansas Medicare Services (AR), (AC-02-022) (no limit); Oklahoma/New Mexico Medicare Services, BCBS of Arkansas (NM, OK), (AC-02-022) (no limit); Local Medical Review Policy for Colorado, North Dakota, South Dakota and Wyoming (CO, ND, SD, WY), LMRP (No. 2000.01) (no limit); Trailblazers Health Enterprises, Professional Component for Pathology Tests (DC, DE), LMRP (No. Z-3Bdcde-R3) (no limit); United Healthcare Group (CT) (no limit); Group Health Inc.

carriers did impose frequency limits regarding the number of antibodies that could be billed absent additional documentation.[18]

34.      Beginning in 1998, Dianon's carrier promulgated an LMRP governing the immunophenotypic analysis of tissues by flow cytometry and, as noted, it followed the majority of jurisdictions and imposed no express limitation on the number of antibodies that could be billed. *See* Dep. of Arif Toor, M.D. (hereinafter "Dr. Toor Dep.") at 25:20-26:18 (excerpts attached hereto at Ex.25); Dep. of Frank Delli Carpini, M.D., (hereinafter "Dr. Delli Carpini Dep.") at 43:10-12 (excerpts attached hereto at Ex. 26).[19]   Instead, it focused on identifying which diseases would be listed that would justify the provision of the service. Dr. Toor Dep. at 25:20-26:18. Once these diseases were listed on the claim, the carrier elected to leave it to the physician's discretion to determine the number of antibodies that were needed to diagnose the patient. *Id.* at 26:10-13 ("Its frequency or the frequency of the components was left out for medical necessity. If it was medically necessary, considered by the provider, he could use as many as he wanted").

---

(Queens, NY), LMRP (No. LAB-1154) (no limit); Empire Medicare Svcs. (Southeastern NY), LMRP (No. YPF #145 Path #33) (no limit); TrailBlazer Health Enterprises (MD), LMRP (No. L-16Bmdtx-R2) (no limit); Cahaba Govt. Benefits Admin. (GA), LMRP (No. 197) (no limit); Lousiana Medicare Services (LA) (no limit); National Heritage Ins. Co. (MA, ME, NH, VT) (no limit); First Coast Svc. Options (CT) (no limit).

[18] *See, e.g.,* CIGNA (TN), LMRP (No. 2000-16) (12 units for technical component; 4 units for professional; limits removed 10/15/01); National Heritage Ins. Co. (Northern CA), LMRP (No. 02-06.1) (20 units); National Heritage Ins. Co. (Southern CA), LMRP (No. 2-06.1R1) (if more than 20, explanation required); BCBS of Arkansas, Missouri Medicare Services, Medicare Medical Policy for Eastern MO (Eastern MO), LMRP (No. 32) (12 units; limits removed Dec. 15, 2002); Wisconsin Physician Service Ins. Co. (WI, IL, MI, MN), LMRP (No. PATH-016) (an additional 8 units if initial panel indicates potential B cell lymphoma or B cell lymphoproliferative disorder are used; if process reveals acute leukemia or T-cell lymphoproliferative disorder, 7-12 units for more analysis; panel may include 12 units for acute leukemia, 18 for lymphoma) (policy revised eff. 8/2004); Noridian Mutual Life Ins. Co. (AL, AR, CO, HI, IA, NV, ND, OR, SD, WA, WY), LMRP (No. B2003.23) (most cases, 20 sufficient to address diagnostic and prognostic concerns).

[19] *See infra* n. 17. *See* United HealthCare Medicare Part B Connecticut Local Medical Review Policy re Immunophenotypic Analysis of Tissues by Flow Cytometry (1998) (attached hereto as Ex. 27).

35.     When there is no frequency limitation, physicians, according to Connecticut's Medical Director, determine whether a service is medically necessary by reviewing the medical literature and making inquiries of consultants. *See* Dr. Toor Dep. at 22:13-20.  More specifically, when Dr. Toor was showed a CMS Manual publication stating that a carrier should determine medical necessity by consideration of medical scientific literature, the views of recognized experts in the area, and medical opinion derived from consultations with medical associations or other health care experts, he concurred that is the standard that he used to determine medical necessity. *Id.* at 24:17-25-7 (Q: "... It is fair to say that you took [this] into account when determining whether such services were medically indicated and necessary? A: Yes"); *see also id.* 26:19-22 ("Q:      Just so I understand, when you applied medical necessity to review the claim, do you mean those factors we just reviewed in Section 13.7.1? A: That's correct"). Each government witness concurred that this criteria is used to determine whether physician services are medically necessary and appropriate. *See, e.g.,* Dep. of Jean Stone (government's expert regarding CMS' medical necessity standard) at 17:22-18:23 (excerpts attached hereto as Ex. 28).

36.     Dianon's Medicare carrier reviewed several of Dianon's claims under CPT 88180 and although the carrier's notice to Dianon indicated that it was a medical necessity and utilization review, the carrier never notified Dianon that it objected to the size of Dianon's panel. *See, e.g.,* Dr. Toor Dep. 32:14-24 ("... Q: Do you agree that this was the purpose of the review? A: I agree."); *see also* Dr. Toor Dep. 29:11-30:3; 36:20-37:7; 38:14-39:3 (stating that flow cytometry reflected in the medical record was "okay" as performed); 44:11-14 (agreeing that as to the 19 units billed "[d]ocumentation supports service"); 45:5-18 (agreeing that 19 units billed "okay"); Dr. Delli Carpini Dep. at 33:11-35-10; 35:19-36-5. *See also*

Letter from Ellen DeFigueiredo, Medicare Fraud/Abuse Department, United HealthCare to

Robert Tucciarone, Director of Billing and Collections, Dianon (dated Nov. 11, 1998) (typical

carrier notification to Dianon indicating scope of carrier review to include verification that

"reimbursements are made only for those services which are considered medically necessary"

and to "[r]ule out over-utilization or abuse of the Medicare program") (patient names

redacted) (attached hereto as Ex. 29).

37.    Besides its routine review of Dianon's claims, Dianon also had a prolonged

dialogue with its carrier regarding which patient diagnosis justified the use of CPT 88180.

For example, Dianon submitted a detailed report to the carrier containing 1275 denied claims

under CPT 88180 to explain why its list of diseases covered in its LMRP should be expanded.

*See* Dr. Toor Dep. 51:9-18 ("Q. ... Do you recollect meeting with Dr. Amberson in regard to

this matter? A. Yes, a number of times. I don't have a total recollection of what transpired. I

recall him coming to my office, me going to the laboratories at least twice, and he came two

or three times"). The carrier medical director could not explain why a company would

demand payment from the government for 1275 denied claims if in fact the company believed

it was defrauding the government regarding precisely those same claims. *See id.* 53:13-57-

16.[20]

38.    No one within the government – or its agents – ever informed Dianon that its

panel of antibodies was too large. No carrier medical director or agents have any recollection

of having made such a disclosure. *See* Dr. Toor Dep. at 46:10-20; *see also id.*, at 47:16-48:4

---

[20] *See* Letter from James B. Amberson, M.D., Chief Medical Officer, Dianon to Arif A. A. Toor , M.D., Medicare Director, Medicare Part B, United Health Care (dated Dec. 4, 1997) (attached hereto as Ex. 30). In the letter, Dianon invited the carrier medical director to personally review the claims. *Id.* at bates number 800104. Interestingly, in 2003, the carrier expanded its LMRP to cover essentially all the diagnosis that Dianon said in 1997 should be covered and, if covered, would have resulted in payment on thousands of Dianon claims that were wrongfully denied. *See* Dr. Delli Carpini Dep. at 41:7-43-9.

("Q. But you never recollect a problem coming up with respect to the number of markers billed under CPT 88180? A. Nobody in my time, at least, in the two years that it was – that the code was there came up with a utilization of the number of markers. Remember, we had determined that I think after 26 or after 30 – I don't recall exact numbers – all the markers available. And then we left it to the provider to provide the adequate or correct numbers of that particular patient and that particular disease. So sometimes they would bill 18, sometimes 19 or the rest sometimes. That's how we adjudicated it."); *see also* Dr. Delli Carpini Dep. at 43:13-22. Neither CMS nor Tricare representatives, including their Rule 30(b)(6) witnesses, informed Dianon that its antibody panel was too large. *See* Dep. of Marie Casey at 26:7-10 (excerpts attached hereto as Ex. 31); Dep. of Rose Sabo at 39:21-42:2 (excerpts attached hereto as Ex. 32).

       39.     In 2003, the carrier substantively amended its LMRP governing flow cytometry services to include substantially all diagnosis that Dianon had recommended be included and which the carrier had previously refused to pay. Dr. Delli Carpini Dep. at 41:7-43-9. Further, when the carrier amended its LMRP it included in its "Sources of Information and Basis for Decision" section a citation to Dr. Braylan's book in which he advocated the use of comprehensive panels and in which he identifies the blood, bone marrow, spleen panel he uses which is more expansive than the one Dianon employs. *See infra* ¶¶ 17-19; *see also* Connecticut Medicare Part B Local Medical Review Policy (attached hereto as Ex. 33); *see generally* Rule 30(b)(6) Dep. of Dr. Delli Carpini at 37:14-39:1; 63:17-64:10 (excerpts attached hereto as Ex. 34). Although the carrier Medical Director was not a pathologist and could not understand the basic table identifying the antibodies that Dr. Braylan cited in his book, he opined that he did not think that a comprehensive panel could be medically

necessary in all cases because the pathologist should rely on the provisional diagnosis of the referring physician. *Id.*, at 55:8-19; *see also id.*, at 76:1-3; 64:15-19. However, the carrier medical director, who also was the government's Rule 30(b)(6) witness, did not ask anyone prior to the deposition why Dr. Braylan's publication was cited in the LMRP. *Id.*, 70:9-12. He conceded, moreover, that the purpose of the "Sources of Information and Basis for Decision" section is to "exemplif[y] to the provider community ... the reference material that was used to formulate policy." *Id.* at 28:12-23. Further, the carrier Medical Director stated that providers in the community can reasonably rely on literature cited in the LMRP in order to ensure that their practices are medically necessary and indicated. *Id.* 39:21-40:4 ("Q. Would it be your view that a physician could read this text [Braylan's book] which was cited in your LMRP under Basis of Decision and then rely on this comprehensive approach in terms of designing an antibody panel?... A. If the situation was exactly the same, yes."); 87:16-88:5; *see also id.*, at 82:11-83-9 (reasonable for physicians to rely upon peer-reviewed medical journals and on consensus medical opinion). Moreover, he admitted that he never instructed Dianon that it should use a targeted or short panel, never informed Dianon not to use a comprehensive panel, and believed that physicians, based upon their training, should exercise their own judgment regarding which panel to use. *Id.*, 39:2-10 ("Q. Now, is there any indication in the LMRP that some other approach was advocated rather than a comprehensive approach.... A. No. I do not recall the LMRP referencing which approach should be used. It was basically left at the discretion of the provider to provide medically necessary and pertinent services to the carrier."); *see also id.*, at 71:22-72:6; 79:14-80:10.

**VI.    THE ONLY APPLICABLE LEGAL AUTHORITY FOUND A 26 ANTIBODY COMPREHENSIVE PANEL MEDICALLY NECESSARY AND INDICATED**

40.    In the only Administrative Law Judge ruling on the issue, a Judge found that a clinical laboratory's 26 antibody flow cytometry studies were medically necessary and appropriate. *See* Dep. of Jennifer Collins at 14:8-21 (excerpts attached hereto at Ex. 35); *see also See Impath v. Nat'l Heritage Insur. Co.*, No. 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 at 3 (Aug. 27, 2003) (excerpts attached hereto at Ex. 36). The ruling demonstrates that, among other things, despite the government's contention that Dianon's claims for 18-antibodies are on their face fraudulent, a company had no apprehension in a public forum asserting entitlement to payment for a 26-antibody panel because the test is medically necessary and appropriate to treat the patient's condition. Specifically, after an evidentiary hearing, an Administrative Law Judge agreed that not only was the practice not fraudulent but the company was entitled to full payment for a 26-antibody panel because (a) the company's practice was entirely consistent with the peer reviewed medical literature; (b) the company's practice was consistent with the viewpoint of recognized experts in the field; (c) the company's concern about the viability of the samples was an appropriate one; (d) reference labs have less information than hospital labs to act upon; and (e) the carrier's LMRP limiting a panel to 20 antibodies (whereas the government here considers 18 to be fraudulent) was "inconsistent with the general consensus in the medical community regarding the possible number of markers in a flow cytometry study which are necessary to make an accurate diagnosis" and that almost all international experts participating in a consensus conference "believed that the appropriate number of markers for the complete characterization of acute leukemia would *average* 20-24." *Id.* at 3-6 (emphasis supplied).

## VII.     WHEN CMS REVISED CPT 88180 IT RELIED UPON A 26 ANTIBODY COMPREHENSIVE PANEL

41.     When, in 2003, CMS revised what was previously CPT 88180, it based the

costs of reimbursement on a panel of 26-antibodies, which is the amount that Dianon billed

for a part of this litigation.  Recognizing that antibodies are generally analyzed on a "panel"

basis, not an individual basis, CMS revised the basis upon which the government will

reimburse the professional component for flow cytometry. *See* 68 Fed. Reg. 49,030, 49,048

(Aug. 15, 2003); *see also* 68 Fed. Reg. 63,196, 63,216 (Nov. 7, 2003).  As part of the

rulemaking, the American Clinical Laboratory Association ("ACLA") presented CMS with

survey data pointing out that "the most typical number of markers reported for a

myeloid/lymphoid panel was 26 markers." Dep. of James P. Menas at 29:19-31:8 (hereinafter

"Menas Dep.") (excerpts attached hereto at Ex. 37).  Based upon this typical panel, ACLA

recommended that CMS determine that a cost per marker is $8.50. *Id.* at 36:1-37-21.  Rather

than determine that this panel was atypical or fraudulent, CMS adopted ACLA's survey,

agreeing that "[u]sing the vignette of the myeloid/lymphoid panel to represent the typical

service," that the cost per antibody would be $8.50. *Id.* at 36:16-37-21; *see also* 70 Fed. Reg.

45,764, 45,778 (Aug. 8, 2005).   CMS's Rule 30(b)(6) representative agreed that CMS seeks

to ensure that the clinical vignette upon which it bases payment is consistent with physicians'

actual practice. *See* Menas Dep. at 28:19-29:3.[21]

---

[21] ACLA provided a clinical vignette of a typical panel of antibodies laboratories utilized.  The clinical vignette was nearly identical to Dianon's panel – 23 of the 26 antibodies listed in ACLA's sample clinical vignette were the same as the antibodies Dianon utilized in its panel. *Compare* Letter of Alan Mertz, President, ACLA to Carolyn Mullen, Deputy Director, Practitioner Services Division, CMS (dated April 15, 2005) at bates number CMS003285 (attached hereto as Ex. 38) *with* Dianon's panel at Ex. 8.

## VIII. THE GOVERNMENT AND OTHER REFERENCE LABS USE COMPREHENSIVE PANELS

42.    Dianon's use of a 26 antibody panel is consistent with what the government's premier flow cytometry laboratory uses regarding blood and bone marrow specimens and the panels of other reference laboratories that use the comprehensive approach.

43.    The NIH uses more antibodies than Dianon regarding blood and bone marrow specimens. *See* Dr. Stetler-Stevenson Dep. at 149:9-150-9.

44.    The Emory Flow Lab uses a standard panel of 30 antibodies because each is medically necessary and indicated to diagnose the patient's cancer. *See* Dr. Holden Dep. at 47:10-51:13.

45.    ACLA reported to CMS that it "found that the most typical number of markers reported for a myeloid/lymphoid panel was 26 markers." *See* Ex. 38.

46.    In correspondence to CMS during its rule-making regarding revisions to CPT 88180, Esoterix , a major reference lab, reported that it uses an average of 21 markers per case. *See* Letter from Joe Papiez, MD, Esoterix Laboratory Services, Inc., to Thomas A. Scully, Administrator, CMS (dated Oct. 6, 2003) (attached hereto as Ex. 39).

47.    Similarly, in correspondence to CMS during its rule-making regarding revisions to CPT 88180, Impath, another major reference lab, reported that the number of markers that would be used in most cases range from 16-26. *See* Letter from Moacyr Dasilva, M.D., Medical Director, IMPATH Inc., to Thomas A. Scully, Administrator, CMS (dated Oct. 6, 2003) (attached hereto as Ex. 40).

48.    In FLOW CYTOMETRY IN HEMATOPATHOLOGY, referenced in the Connecticut LMRP, the authors recommend a 27 antibody panel to analyze blood and bone marrow specimens. *See infra* ¶ 17.

27

49.     According to the 2000 consensus conference paper, laboratories utilize up to 45 markers in flow cytometry testing.  *See* Ex. 7 at 26.

Respectfully submitted,

_____

Robert Salcido
Fed. Bar No. 447951
(admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone:  (202) 887-4095
Fax:  (202) 887-4288
E-mail:  rsalcido@akingump.com

Bruce R. Parker
Venable LLP
Fed. Bar No. PHV01015
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, MD 21201
Telephone:  (410) 244-7400
Fax:  (410) 244-7742
E-mail:  BRParker@Venable.com

Thomas Kossl
Dianon Systems, Inc.
200 Watson Boulevard
Stratford, CT 06615
Telephone:  (973) 492-1509
Fax:  (973) 492-9763
E-mail:  kosslt@labcorp.com

Attorneys for Defendant Dianon Systems, Inc.