## INDEX TO DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

| Exhibit | Description |
|---|---|
| 1 | Dep. of Steve E. Phurrough |
| 2 | Medicare Program Integrity Manual |
| 3 | Carleton C. Stewart et al., *U.S. Canadian Consensus Recommendations on the Immunophenotypic Analysis Of Hematologic Neoplasia by Flow Cytometry: Selection of Antibody Combinations*, 30 CYTOMETRY 231 (1997) |
| 4 | Dep. of Maryalice Stetler-Stevenson, M.D. |
| 5 | Dep. of Raul C. Braylan, M.D. |
| 6 | Yan Xie, X., Filie, A., Jasper, G., Fukushima, P., & Stetler-Stevenson, M., *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, 42 CYTOMETRY 114 (2000) |
| 7 | Braylan *et al.*, *Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting*, 46 CYTOMETRY 23 (Feb. 15, 2001) |
| 8 | Dianon Systems Immunophenotyping Three Color Procedure |
| 9 | Dep. of Michel J. Borowitz, M.D. |
| 10 | B. H. Davis, *U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia by Flow Cytometry: Medical Indications*, 30 CYTOMETRY 249 (Oct. 15, 1997) |
| 11 | Nguyen, D., Diamond, L., & Braylan, R., FLOW CYTOMETRY IN HEMATOPATHOLOGY, Humana Press (2003) |
| 12 | Dep. of Dr. Stuart Flynn |
| 13 | Dep. of Jeannine T. Holden, M.D. |
| 14 | Decl. of Richert Goyette, M.D. |
| 15 | Decl. of James B. Amberson |
| 16 | Decl. of Valerie Palmieri |
| 17 | Dep. of Dr. Richert E. Goyette |
| 18 | Dep. of Dr. Suha Mishalani |
| 19 | Dep. of Glenn H. Segal, D.O. |
| 20 | Dep. of Ann Marie Connor, M.D. |
| 21 | Decl. of Glenn H. Segal, D.O. |
| 22 | Decl. of Suha Mishalani, M.D. |
| 23 | Dep. of Mark Florio |
| 24 | Dep. of Dr. James Amberson |
| 25 | Dep. of Arif Toof, M.D. |

| 26 | Dep. of Frank Delli Carpini, M.D. |
|---|---|
| 27 | United HealthCare Medicare Part B Connecticut Local Medical Review Policy re Immunophenotypic Analysis of Tissues by Flow Cytometry (1998) |
| 28 | Dep. of Jean Stone |
| 29 | Letter from Ellen DeFigueiredo, Medicare Fraud/Abuse Department, United HealthCare to Robert Tucciarone, Director of Billing and Collections, Dianon (dated Nov. 11, 1998) |
| 30 | Letter from James B. Amberson, M.D., Chief Medical Officer, Dianon to Arif A. A. Toor , M.D., Medicare Director, Medicare Part B, United Health Care (dated Dec. 4, 1997) |
| 31 | Dep. of Marie Casey |
| 32 | Dep. of Rose Sabo |
| 33 | Connecticut Medicare Part B Local Medical Review Policy |
| 34 | Rule 30(b)(6) Dep. of Dr. Delli Carpini |
| 35 | Dep. of Jennifer Collins |
| 36 | *Impath v. Nat'l Heritage Insur. Co.*, No. 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 (Aug. 27, 2003) |
| 37 | Dep. of James P. Menas |
| 38 | Letter of Alan Mertz, President, ACLA to Carolyn Mullen, Deputy Director, Practitioner Services Division, CMS (dated April 15, 2005) |
| 39 | Letter from Joe Papiez, MD, Esoterix Laboratory Services, Inc., to Thomas A. Scully, Administrator, CMS (dated Oct. 6, 2003) |
| 40 | Letter from Moacyr Dasilva, M.D., Medical Director, IMPATH Inc., to Thomas A. Scully, Administrator, CMS (dated Oct. 6, 2003) |

# EXHIBIT 1

Steve E. Phurrough

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF CONNECTICUT

3

4  UNITED STATES OF AMERICA,        *   ORIGINAL
   ex rel. Dr. James J. Tiesinga,   *

5                                    *

                Plaintiffs,          *   No. 3:02CV1573(MRK)

6                                    *

   vs.                               *

7                                    *

   DIANON SYSTEMS, INC.,             *

8                                    *

                Defendant.           *   Pages 1 - 77

9

10

11

12   Videotaped Deposition of STEVE E. PHURROUGH

13             Baltimore, Maryland

14         Thursday, August 3, 2006

15

16

17

18

19

20  Reported by:  Carla J. Briggs, RPR-RMR-CRR

21  Job No. 175904A

**Esquire Deposition Services**        **MD - 1-800-539-6398**
**D.C. - 1-800-441-3376**              **VA - 1-800-752-8979**

**Steve E. Phurrough**

Page 9

1    A    Yes.

2    Q    Well, I'm going to be asking you a series

3 of questions.  If any of the questions are unclear,

4 please feel free to tell me, and I'll be more than

5 happy to clarify any questions you might have.

6         MR. SALCIDO:  Could you mark this as

7 Exhibit 1.

8         (Phurrough Deposition Exhibit Number 1 was

9 marked for identification.)

10        BY MR. SALCIDO:

11    Q    Please review the document.  And in

12 particular, what I'd like to direct you to is

13 Exhibit A of the document, and more specifically,

14 under "Matters To Be Examined," item 1B, and ask

15 whether you're here today to address that topic

16 area?

17    A    Yes, I am.

18        MR. MOLOT:  Robert, he's also here to the

19 extent you've asked for how documents were gathered

20 in No. 5, to the extent documents were gathered from

21 his area, he's prepared to testify about that.  And

**Steve E. Phurrough**

Page 23

1    Q    **Niles Rosen.  Do you know who he is?**

2    A    Niles is a contractor medical director for

3 one of the Medicare contractors.

4    Q    **You didn't speak to him?**

5    A    No, I did not.

6    Q    **And how about Paul Deutsch?**

7    A    Paul Deutsch --

8    Q    **Deutsch.**

9    A    -- is also a medical director for another

10 contractor medical director -- for a Medicare

11 contractor.

12    Q    **You didn't talk to him?**

13    A    No, I did not.

14    Q    **With respect to the entry by Niles Rosen,**

15 **he writes in part "They tried to do a policy through**

16 **laboratory negotiated rulemaking progress.  They**

17 **could never come to any agreement on the maximum**

18 **number of units of service for different specimens**

19 **and diseases."**

20        **Do you know why they could not come to**

21 **agreement regarding a maximum number of units that**

**Steve E. Phurrough**

Page 24

1 **could be billed for specimens?**

2      A      As I understand from talking with the

3 individuals I talked with, the medical literature

4 was not definitive on the exact number of specimens

5 that were necessary for the various indications.

6 They proposed in various working documents numbers

7 anywhere from 4 to 8 to 12, I think in one instance

8 up to 18. The review of the literature and the

9 discussions while ongoing would have required more

10 time than they -- the committee gave them to finish

11 their work, so that's -- again, as I mentioned

12 earlier, that's why the process was stopped for flow

13 cytometry.

14      **Q      And with respect to the last sentence in**

15 **that entry, "He shared with me his frustration with**

16 **the approach of industry representatives who**

17 **outnumbered him significantly," do you know what**

18 **that passage is alluding to?**

19      A      As I understand from reviewing the

20 documents and talking particularly, I believe, with

21 Joyce Eng, that the workgroup posted its draft

Page 29

1 from that particular listserv.

2    Q    The next couple of sentences, "They are

3 discussing among themselves how to deal with it.    I

4 am not adverse to an NCD, but CAG will say there is

5 insufficient evidence for one."

6        What was the basis for the statement that

7 "CAG will say there is insufficient evidence for

8 one"?  And by "one," I take it that it's a national

9 coverage determination?

10    A    Correct.  The NCD does refer to national

11 coverage determinations.  The process we use at the

12 Medicare to do national coverage determinations is a

13 fairly rigid evidence-based medicine process where

14 we find all the medical literature we can find and

15 make decisions as to whether that medical literature

16 is both sufficient in quality as well as in quantity

17 and outcomes to determine that we, in fact, should

18 nationally cover something or not.  It is not

19 uncommon among the broad range of technologies that

20 there isn't sufficient evidence to make that

21 decision at a national level; and, therefore, we

**Steve E. Phurrough**

1 choose to commonly not address that issue nationally

2 and allow our contractors to address that issue

3 locally.

4      Q      And with respect to a flow cytometry

5 national coverage determination, what issue would

6 you leave to the carriers to decide locally?

7      A      Any time there is no national decision,

8 then all decisions around any aspect of coverage of

9 that particular issue is decided by the contractors

10 based upon their interpretation of statute,

11 regulations, and other guidance that the agency has

12 provided.  So for the issue of flow cytometry, the

13 broad issue of will we in this particular region pay

14 for it at all would be a question the contractors

15 would have to decide, and then they would have to

16 decide other aspects within the decision of if we do

17 decide to pay for it, what are the other aspects of

18 it that we would make decisions about.

19      Q      With respect to the second paragraph, it

20 states "Not to say that we should do otherwise, but

21 in view of CAG's continuing refusal to give coverage

**Steve E. Phurrough**

Page 39

1 from my discussions with the CMDs to conclude that

2 there is still -- that there still is not a lot of

3 evidence out there on this."

4          Do you know at this particular time

5 3-13-03 what literature was out there regarding the

6 question of number of markers?

7     A    No, I do not.

8     Q    Did you ask Miss Sheridan?

9     A    We talked in general about her discussions

10 and particularly about this issue of the amount of

11 literature.  And as she stated here, she reiterated

12 that she had not reviewed the literature at this

13 particular time.  It was her assumption that there

14 was not amounts of literature that typically at a

15 national level for national coverage determination

16 we would typically expect for making a national

17 decision.

18     Q    Now, with respect to the same paragraph,

19 when she writes -- I guess third sentence -- "We

20 might want to let them continue with their work and

21 evaluate the situation after carriers have had an

**Steve E. Phurrough**

Page 40

1 opportunity to use LMRP to address the situation.

2 If we were to take this on as an NCD, the CMDs would

3 stop their work, and we, in all likelihood, would

4 not be able to address the thorny issue in the NCD

5 due to lack of evidence."

6          Do you know what she means, that we, in

7 all likelihood, would not be able to address the

8 thorny issue of NCD due to lack of evidence?

9     A    The same issue of -- well, any time we do

10 a national coverage determination, there are issues

11 around do we pay for this particular technology at

12 all, and if the answer to that is yes, what are the

13 circumstances under which we pay for it.  In this

14 particular issue of flow cytometry at both the

15 national and local level, the first issue is do we

16 pay for it at all, and then if we pay for it, do

17 we -- what are the circumstances under which we pay

18 for it.  One of those is the number of tests at any

19 particular time for any particular indication.  So

20 in our conversations and in reviewing these

21 particular documents, my understanding from

**Steve E. Phurrough**

Page 41

1 conversations with her is the thorny issue would be

2 is there sufficient evidence for us to give a

3 specific number of antibodies that would be covered

4 for a specific indication, can we specify that it

5 should be four or eight or twelve for any particular

6 indication.  In my conversations with her, her

7 impression at this particular point in time is that

8 she was not aware that there would be more evidence

9 than there was in the '90s when the negotiated rule

10 committee was doing their deliberations.

11          MR. SALCIDO:  Mark this as Exhibit 9.

12          (Phurrough Deposition Exhibit Number 9 was

13 marked for identification.)

14     A    Okay.

15          BY MR. SALCIDO:

16     Q    **Who's Aron Primack?**

17     A    He was a former CMS employee.  I do not

18 know whether -- I do not recall whether he was a

19 health insurance specialist or a physician, and I

20 believe he was a member of this particular oncology

21 workgroup.

**Steve E. Phurrough**

Page 55

1 the documents I was asked to review.  I would have

2 to verify that not having those documents with me at

3 the moment.  And if so, my assumption is they had it

4 available.  Whether it was one of the official

5 documents they used or not, I can't answer that.

6 It's not in this reference list, so my assumption is

7 that it was not.

8    Q    Do you know whether it was considered

9 later in 2002, 2003 when there was at least an

10 E-mail dialogue regarding the development of a

11 national coverage determination?

12    A    No, I do not.  There was no discussion

13 among E-mails or in my discussion with the three

14 entities as to whether -- as to any specific

15 evidence they reviewed.

16    Q    In terms of the article itself, it --

17 under "Recommendations Strategies for Selection of

18 Antibodies," it addresses three different approaches

19 that may be considered in the choice and assembly of

20 reagents.  And what they list as item 1 is the

21 application of a general, comprehensive panel of

Steve E. Phurrough

Page 56

1  antibody combinations that usually answers most

2  relevant questions, and then it lists additional

3  commentary on it; and then the second is the

4  additional use of a minimal screening panel to

5  obtain general information on the sample followed by

6  a secondary, more thorough, and specific set of

7  reagents chosen according to the results obtained

8  with the initial panel, with additional commentary

9  on the pros and cons; and then a third one, the

10  selection of a directed or targeted approach which

11  is based on the availability of other data such as

12  morphologic or clinic information, and then it lists

13  the relative advantages, disadvantages with respect

14  to that.

15          As to CMS, did it ever issue a binding

16  national coverage determination which adopted any of

17  these three different approaches to performing --

18      A    No, it didn't.

19      Q    -- flow cytometry?

20      A    No, it did not.

21          MR. MOLOT:  Rob, the other witness is

# EXHIBIT 2

# Medicare Program Integrity Manual
## Chapter 13 – Local Coverage Determinations

Table of Contents
(Rev. 99, 01-21-05)

*13*.1 - Medicare Policy
    *13.1.1* - National Coverage Determinations (NCDs)
    *13.1.2* - Coverage Provisions in Interpretive Manuals
    *13.1.3 - Local Coverage Determinations  (LCDs)*
*13.3 - Individual Claim Determinations*
 *13.4* - When to Develop New/Revised LCDs
*13.5* - Content of an LCD
    *13.5.1* – Reasonable and Necessary Provisions  in LCDs
    *13.5.2* - Coding Provisions in LCDs
    *13.5.3* - Use of Absolute Words in LCDs
    *13.5.4* - LCD Requirements That Alternative Service Be Tried First
*13.6* - LCD Format
    *13.6.1* - AMA Current Procedural Terminology (CPT) Copyright Agreement
*13.7* - LCD Development Process
    *13.7.1* - Evidence Supporting LCDs
    *13.7.2* - LCDs  That Require A Comment and Notice Period
    *13.7.3* - LCDs That Do Not Require A Comment and Notice Period
    *13.7.4* - LCD Comment and Notice Process
    *13.7.4.1* - The Comment Period
    *13.7.4.2* - Draft LCD Web Site Requirements
    *13.7.4.3* - The Notice Period
    *13.7.4.4* - Final LCD Web Site Requirements
*13.8* - The LCD Advisory Process
    *13.8.1* - The Carrier Advisory Committee
    *13.8.1.1* - Purpose of the CAC
    *13.8.1.2* - Membership on the CAC
    *13.8.1.3* - Role of CAC Members
    *13.8.1.4* - CAC Structure and Process
    *13.8.2* - Durable Medical Equipment Regional Carrier (DMERC) Advisory Process (DAP)
*13.9* - Provider Education Regarding LCD
*13.10* - Application of LCD
*13.11* - Local Coverage Dermination (LCD) Reconsideration Process
*13.12 - Retired LCD*
*13.13* - Challenge of an LCD
    *13.13.1* - The Challenge
    *13.13.2* - The LCD Record
    *13.13.3 - Ex Parte Contacts*
    *13.13.4* - Discovery
    *13.13.5 - Subpoenas*
    *13.13.6* - Evidence

EXHIBIT 14
Defendant's
kAr 7/25/06

*13*.13.7 - Dismissals for Cause
*13*.13.8 - New Evidence
*13*.13.9 - Contractor Options
*13*.13.10 - The ALJ Decision
*13*.13.11 - Effectuating the Decision
*13*.13.12 - Appeals
*13*.13.13 - Board Review of an ALJ Decision
*13*.13.14 - Effect of a Board Decision
*13*.13.15 - Future New or Revised LCDs

## *13*.1 - **Medicare Policies**
(Rev. 71, 04-09-04)

The primary authority for all coverage provisions and subsequent policies is the Social Security Act (the Act). Contractors use Medicare policies in the form of regulations, NCDs, coverage provisions in interpretive manuals, and LCDs to apply the provisions of the Act.

## *13*.1.1 - **National Coverage Determinations (NCDs)**
(Rev. 71, 04-09-04)

NCDs are developed by CMS to describe the circumstances for Medicare coverage nationwide for a specific medical service procedure or device. NCDs generally outline the conditions for which a service is considered to be covered (or not covered) under §1862(a)(1) of the Act or other applicable provisions of the Act. NCDs are usually issued as a program instruction. Once published in a CMS program instruction, an NCD is binding on all Medicare carriers/DMERCS, FIs, Quality Improvement Organizations (QIOs, formerly known as Peer Review Organizations or PROs), Program Safeguard Contractors (PSCs) and beginning 10/1/01 are binding for Medicare+Choice organizations. NCDs made under §1862(a)(1) of the Act are binding on Administrative Law Judges (ALJ) during the claim appeal process. (See 42 CFR 405.732 and 42 CFR 405.860). An example of a NCD can be found at http://cms.hhs.gov/pubforms/06_cim/ci50.htm#_1_56.

When a new NCD is published, the contractor shall notify the provider community as soon as possible of the change and corresponding effective date. This is a Provider Communications (PCOM) activity. Within 30 calendar days after an NCD is issued by CMS, contractors shall either publish the NCD on the contractor Web site or link to the MCD from the contractor Web site. The contractor shall not solicit comments on national coverage decisions. Contractors shall amend affected LCDs in accordance with §*13*.4C of this chapter. Since ALJs are bound by NCDs but not LCDs, simply repeating an NCD as an LCD will cause confusion as to the standing of the policy. If a contractor is clarifying a national "reasonable and necessary" policy, the contractor shall reference that national policy in the "CMS National Coverage Policy" section of the LCD.

The contractor shall apply NCDs when reviewing claims for services addressed by NCDs. When making individual claim determinations, contractors have no authority to deviate from NCD if absolute words such as "never" or "only if" are used in the policy.

National Coverage Determinations should not be confused with "National Coverage Requests" or "Coverage Decision Memoranda".

- **National Coverage Request** -- A national coverage request is a request from any party, including contractors and CMS staff, for CMS to consider an issue for a national coverage decision. The information CMS requires prior to accepting a national coverage request is described in the "Federal Register" (FR) Notice entitled "Revised Process for Making Medicare National Coverage Determinations" and is located

- A new or revised coverage provision in an interpretive manual; or

- A change to national payment policy.

**Within 120 Days**

The Medicare Coverage Database will notify contractors of each LCD that is affected by an update to a HCPCS code or ICD-9-CM code.

The database automatically incorporates code deletions into revised LCDs (and LMRPs and articles) that are placed in "to be reviewed" status. In all cases (code deletions, code insertions, and code description changes) a new version of the LCD (and LMRP and article) is automatically made to incorporate the change, and the new version is placed in the "to be reviewed" status.

Contractors shall review and approve and/or appropriately revise affected LCD within 120 days of the date of this notification. Contractors shall revise the effective date, revision number, and the revision history on all revisions due to major HCPCS and ICD-9-CM changes. Contractors need not revise the effective date, revision number and revision history on revisions due to minor HCPCS changes. Contractors shall ensure that corresponding changes are made to the LCD appearing on the contractor's LCD Web sites.

**NOTE:** The Medicare Coverage Database will only alert contractors to the existence of new codes if the new code falls within a code range listed in the LCD.

**Annually**

To ensure that all LCDs remain accurate and up-to-date at all times, at least annually, contractors shall review and appropriately revise LCDs based upon CMS NCD, coverage provisions in interpretive manuals, national payment policies and national coding policies. If an LCD has been rendered useless by a new/revised national policy, the LCD shall be retired. This process shall include a review of the LCDs in the Medicare Coverage Database and on the contractor's Web site.

**Contractors should consider retiring LCDs that are no longer being used for prepay review, post pay review or educational purposes. For example, contractors should consider retiring LCDs for outdated technology with no claims volume.**

## 13.5 - Content of an LCD
(Rev. 71, 04-09-04)
Contractors shall ensure that LCDs are developed for services only within their jurisdiction.

The LCD shall be clear, concise, properly formatted and not restrict or conflict with NCDs or coverage provisions in interpretive manuals. If an NCD or coverage provision in an interpretive

manual states that a given item is "covered for diagnoses/conditions A, B and C," contractors should not use that as a basis to develop LCD to cover **only** "diagnoses/conditions A, B and C." When an NCD or coverage provision in an interpretive manual does not exclude coverage for other diagnoses/conditions, contractors shall allow for individual consideration **unless** the LCD supports automatic denial for some or all of those other diagnoses/conditions.

## *13*.5.1 – Reasonable and Necessary Provisions in LCDs
**(Rev. 71, 04-09-04)**

**A service may be covered by a contractor if:**

- It is reasonable and necessary under 1862(a)(1)(A) of The Act.

  Only reasonable and necessary provisions are considered part of the LCD.

**Reasonable and Necessary**

In order to be covered under Medicare, a service shall be reasonable and necessary. When appropriate, contractors shall describe the circumstances under which the proposed LCD for the service is considered reasonable and necessary under 1862(a)(1)(A). Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:

- Safe and effective;

- Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and

- Appropriate, including the duration and frequency that is considered appropriate for the service, in terms of whether it is:

  o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

  o Furnished in a setting appropriate to the patient's medical needs and condition;

  o Ordered and furnished by qualified personnel;

  o One that meets, but does not exceed, the patient's medical need; and

  o At least as beneficial as an existing and available medically appropriate alternative.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury. The exceptions appear in the full text of §1862(a)(1)(A) and include but are not limited to:

- Pneumococcal, influenza and hepatitis B vaccines are covered if they are reasonable and necessary for the prevention of illness;

- Hospice care is covered if it is reasonable and necessary for the palliation or management of terminal illness;

- Screening mammography is covered if it is within frequency limits and meets quality standards;

- Screening pap smears and screening pelvic exam are covered if they are within frequency limits;

- Prostate cancer screening tests are covered if within frequency limits;

- Colorectal cancer screening tests are covered if within frequency limits; and

- One pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an interlobular lens.

### *13.5.2. - Coding Provisions in LCDs*
**(Rev. 71, 04-09-04)**

Only codes describing what is covered and what is not covered can be part of the LCD. This includes, for example, lists of HCPCs codes that spell out which services the LCD applies to, lists of ICD-9 codes for which the service is covered, lists of ICD-9 codes for which the service is not considered reasonable and necessary, etc.

### *13.5.3 - Use of Absolute Words in LCDs*
**(Rev. 71, 04-09-04)**

Contractors should use phrases such as "rarely medically necessary" or "not usually medically necessary" in proposed LCDs to describe situations where a service is considered to be, in almost all instances, not reasonable and necessary. In order to limit unsolicited documentation, clearly state what specific clinical situation would have to exist to be considered reasonable and necessary. If a contractor chooses to apply these kinds of policy provisions (whether in NCD, national coverage provisions in interpretive manuals, or LCDs) during prepay review, they should not do so via automated review if documentation is to be submitted with the claim for manual review of such claims.

When strong clinical justification exists, contractors may also develop LCDs that contain absolute words such as "is never covered" or "is only covered for". When phrases with absolute words are clearly stated in LCDs, contractors are not required to make any exceptions or give individual consideration based on evidence. Contractors should create edits/parameters that are as specific and narrow as possible to separate cases that can be automatically denied from those requiring individual review.

- Develop a policy if no policy exists or an existing policy cannot be adapted to the specific situation.

The process for developing the LCD includes developing a draft LCD based on review of medical literature and the contractor's understanding of local practice.

## A – Multi-State Contractors

A contractor with LCD jurisdiction for two or more States is strongly encouraged to develop uniform LCDs across all its jurisdictions. However, carriers shall continue to maintain and utilize CACs in accordance with §13.8 below.

## 13.7.1 - Evidence Supporting LCDs
(Rev. 71, 04-09-04)

Contractor LCDs shall be based on the strongest evidence available. The extent and quality of supporting evidence is key to defending challenges to LCDs. The initial action in gathering evidence to support LCDs shall always be a search of published scientific literature for any available evidence pertaining to the item/service in question. In order of preference, LCDs should be based on:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and

- General acceptance by the medical community (standard of practice), as supported by sound medical evidence based on:

  o Scientific data or research studies published in peer-reviewed medical journals;

  o Consensus of expert medical opinion (i.e., recognized authorities in the field); or

  o Medical opinion derived from consultations with medical associations or other health care experts.

Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical community. The broad range of available evidence must be considered and its quality shall be evaluated before a conclusion is reached.

LCDs, which challenge the standard of practice in a community and specify that an item is never reasonable and necessary, shall be based on sufficient evidence to convincingly refute evidence presented in support of coverage.

Less stringent evidence is needed when allowing for individual consideration or when reducing to the least costly alternative.

## 13.7.2 – LCDs That Require A Comment and Notice Period
**(Rev. 71, 04-09-04)**

Contractors shall provide for both a comment period and a notice period in the following situations:

- **All New LCDs**

- Revised LCDs that **Restrict** Existing LCDs - Examples: adding non-covered indications to an existing LCD; deleting previously covered ICD-9 codes.

- Revised LCDs that make a Substantive Correction - If the contractor identifies an error published in an LCD that substantively changes the reasonable and necessary intent of the LCD, then the contractor shall extend the comment and/or notice period by an additional 45 calendar days.

## 13.7.3 - LCDs That Do Not Require a Comment and Notice Period
**(Rev. 71, 04-09-04)**

When a comment and notice period is unnecessary, contractors may immediately publish a revised LCD electronically (e.g., Medicare Coverage Database, Contractor Web site, email). In the following situations, the comment and notice processes are unnecessary:

- **Revised LCD that Liberalizes an Existing LCD** - For example, a revised LCD expands the list of covered indications/diagnoses. The revision effective date may be retroactive.

- **Revised LCD Being Issued for Compelling Reasons** - SHALL OBTAIN RO *(for PSCs, the GTL, Co-GTL, and SME)* APPROVAL - For example, a highly unsafe procedure/device.

- **Revised LCD that Makes a Non-Substantive Correction** - For example, typographical or grammatical errors that do not substantially change the LCD. The revision effective date may be retroactive.

- **Revised LCD that makes a Clarification** - For example, adding information that clarifies the LCD but does not restrict the LCD. The revision effective date may be retroactive.

- **Revised LCD that Makes a Non-discretionary Coverage/Payment/Coding Updates** - Contractors shall update LCDs to reflect changes in NCDs, coverage provisions in interpretive manuals, payment systems, HCPCS, ICD-9 or other standard coding systems within the timeframes listed in §*13.4*C. The revision effective date may be retroactive depending on the effective date of the NCD, etc.