# EXHIBIT 5

Case 3:02-cv-01573-MRK    Document 189-4    Filed 09/29/2006    Page 1 of 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

NO. 3:02 CV 1573(MRK)

UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

    Plaintiff(s),

- vs -

DIANON SYSTEMS, INC.,

    Defendant(s).

---

V I D E O  E X A M I N A T I O N

OF

RAUL C. BRAYLAN, M.D.

| | |
|---|---|
| TAKEN ON BEHALF OF: | The Plaintiff |
| DATE: | June 15, 2006 |
| TIME: | Scheduled start: 9:00 a.m.<br>Actual Start: 9:07 a.m.<br>Conclusion: 12:32 p.m. |
| PLACE: | Unites States Attorney's Office<br>300 West University Avenue<br>Suite 310<br>Gainesville, Florida 32601 |
| REPORTER: | Anne C. Noble, RPR, FPR, CSR-GA, WA<br>Notary Public: Florida and South Carolina |

Page 34

1  don't think there's going to be an end to that.
2      But at the moment, most laboratories use
3  four-color.
4      Q. Okay. Now, the samples that come from within
5  the hospital and the clinics, how do you bill for
6  those?
7      A. How do I bill?
8      Q. Uh-huh; how to charge somebody.
9      A. I don't bill.
10     Q. You don't bill for those?
11     A. No. No, no. I mean, I'm not involved with
12 the billing.
13     Q. Okay.
14     A. I only decide on the medical necessity of
15 using a particular procedure or something on samples
16 of all kinds.
17     Q. Do you know --
18     A. I don't bill. There's an office that does
19 that.
20     Q. Do you know how the various antibodies are
21 billed for?
22     A. How the antibodies are billed?
23     Q. Uh-huh.
24     A. According to the -- I guess the rules of the
25 time (phonetic) is according to the rules that are in

Page 35

1  place. In our institution, we have -- we have
2  technical and the professional component, and they are
3  billed differently, as far as I know.
4      The technical component is billed as per the
5  CMS mandate. I think it's billed -- the first
6  antibody is billed, and the subsequent antibodies are
7  billed with a different code. That is the technical.
8      The professional component is billed
9  according to the number of reagents, three different
10 tiers.
11     Q. And that's the present system?
12     A. That's the present.
13     Q. Okay.
14     A. In the past, I believe it was billed on a
15 per-reagent basis.
16     Q. Okay. And are you familiar with -- let me
17 ask you a question -- strike that.
18     Do you bill Medicare for any of your testing?
19     A. I believe they do, yes.
20     Q. Okay. Are you familiar with the Medicare
21 rules on medical necessity?
22     A. I think I am. They determined that Medicare
23 should be billed for medically-necessary tests.
24     Q. Okay.
25     A. Is that --

Page 36

1      Q. What do you think medically necessary means?
2      A. Medically necessary is a procedure or
3  medication that is necessary to restore the health of
4  a patient.
5      Q. Of a particular patient?
6      A. Of a particular patient?
7      Q. Uh-huh.
8      A. I'm not understanding.
9      Q. Well, is it medically necessary for that
10 patient?
11     A. Instead of --
12     Q. Well, instead of just a general test that
13 would apply to anybody.
14     A. Let me think about it. For that particular
15 patient? If the patient is sick and needs to be
16 healthy, there is a set of procedures, diagnostic and
17 therapeutic, that are applicable to that patient that
18 are medically necessary and for which, I think,
19 Medicare is charged -- billed.
20     Q. Okay. And if you --
21     A. I mean, I --
22     Q. Let me ask the question a different way. If
23 you -- if you do a panel of antibodies and certain of
24 the antibodies don't play any role in the diagnosis or
25 treatment of the patient, should Medicare be billed

Page 37

1  for them?
2      MR. PARKER: Objection.
3      A. The problem with that is that we don't know,
4  until the antibodies are used, that -- we don't know
5  if those antibodies are going to be useful or not
6  until we're finished with the analysis.
7      It's like an x-ray. How do I know, before I
8  take an x-ray, if it's going to be necessary or not?
9  If I take an x-ray and find nothing -- I mean, it's
10 the same thing.
11 BY MS. DAVIS:
12     Q. Well, if you -- I take it that when you --
13 when a specimen comes into your lab, you don't take
14 into account any of the clinical information that
15 you --
16     A. We do --
17     MR. PARKER: Doctor, let her finish her
18 questions.
19     THE WITNESS: Okay.
20 BY MS. DAVIS:
21     Q. Let me do it again.
22     A. I'm sorry. I'm sorry. I'm very sorry.
23     Q. Okay. I take it when the specimen comes into
24 the lab, you don't take into account any of the
25 clinical information that comes with the specimen or

Page 38

1  any other information you might have in determining
2  which antibodies to use?
3      A. Right. If you read my report, I think I
4  clearly stated that that is a mistake. In our hands,
5  and I think is the understanding of most people now,
6  that that is a mistake.
7      There is a forthcoming consensus next month
8  that is going to address this, and the majority of the
9  opinions is that we should not utilize that
10 information to direct our construction of panels.
11     There's a variety of reasons for that, and I
12 can list them for you. Those who -- and, again, this
13 is an evolving situation. It's not firm yet, although
14 the guidelines will be submitted for publication later
15 this year.
16     There are two schools of thought. One school
17 says you need to look at every piece of information
18 that comes with the sample, and you need to look at
19 the microscopy to see what the cells look like or the
20 tissues look like. And on the basis of those pieces
21 of information, you need then to design a panel that
22 will focus exclusively on what the potential problem
23 would be on the basis of that information that you
24 received.
25     Time and time again has proven that that

Page 39

1  approach is faulty, and I do not support it, and I'll
2  tell you why. First of all, the information, that
3  counts is extremely -- the clinical that comes with
4  the sample may or may not be informative enough, it
5  may not be accurate enough, it may not be thorough
6  enough. Why? Most of the times, unfortunately,
7  the histology laboratories don't have access to
8  computers in the offices of the doctors who pull the
9  samples or the hospitals where the samples are
10 obtained. Therefore, we have to rely on a handwritten
11 request for a test from the referring institution or
12 person. That handwritten request, there is a lot from
13 place to place. Usually, as I stated in my report,
14 and it is unfortunate, the amount of information that
15 we get, there is a lot, but it's usually scanty. It
16 tells us -- okay. "Patient, 46 year-old male with
17 anemia." We don't know anything about if the anemia
18 was worked up, for how long, all the tests that are
19 needed. All of that we do not get, we do not obtain
20 in most cases. The same thing with surgeons. They're
21 busy. They're asked to deal with a patient that has a
22 lump. They go ahead. They cut the lump out, send the
23 lump to us and "study this," but minimal information.
24 I'm not even sure they know all the specifics of that
25 particular patient.

Page 40

1      So one serious issue is that the amount of
2  information, particularly in a referring situation --
3  in a referral situation, the amount of information is
4  extremely variable and often scanty. Some errors also
5  do occur. In a busy, busy practice, oncologists
6  usually delegate to nurses or physician assistants or
7  even secretaries to fill out the forms, and whatever
8  comes to their mind -- or sometimes they hear
9  something, or they do this -- they may say M-A-L, or
10 they may say C-L-L or whatever. Unfortunately, that
11 is the case, and there are many examples of that.
12     So we decided -- now, that is in contrast to
13 a local hospital, where I have full access to the
14 complete history. I open the computer in my own
15 hospital, and I see exactly what's going on with that
16 patient; many visits, many laboratory testing, what
17 they did for the patient, treatment with the patient
18 which we never get information on. Treatment
19 affects -- many treatments affect the bone marrow and
20 affect the blood and affect the tissues. If we don't
21 know about those treatments, we may not focus on the
22 right diagnostic approach.
23     In a local situation, when you are in an
24 institution -- usually, academic institutions tend to
25 be better. They're more informative. You get a

Page 41

1  complete view of that patient. And in that situation,
2  then, you rely more on that piece of information if
3  you need to, particularly, when you have very, very
4  small samples.
5      But, frankly, even with all that
6  information -- that's one part of the argument that --
7  "Okay. You can rely on that information to then
8  proceed and construct a panel for each patient."
9      The other argument that is being put forth --
10     Q. Let me ask you a question.
11     A. Uh-huh.
12     Q. When you have that option, when you have a
13 sample that's from inside the hospital system, and you
14 can get onto the computer and look up the complete
15 medical record for this patient --
16     A. Inside the hospital?
17     Q. -- inside the hospital system or wherever --
18 what you just described, you can get on the computer,
19 you can pull up the medical record and look up the
20 entire history for this patient --
21     A. Uh-huh.
22     Q. -- do you still do the complete panel that
23 you just described?
24     A. Yes, the complete panel is done routinely.
25 The information that we use is to interpret the

Page 42

1  results rather than select on the -- select on the --
2        (Whereupon, deponent's pages sounds.)
3        MS. DAVIS: Let's go off the record.
4        (Whereupon, there was a pause in the
5   proceedings.)
6     A. Excuse me. The information is mostly to
7  interpret the results and convey to the clinician the
8  appropriate information or to go back and look for
9  something that we did not look at because we didn't
10 have that piece of information. It is not to restrict
11 our panel, unless the number of cells in that sample
12 is insufficient, in which case, we have to determine,
13 in that case, what to do, what is the best panel to
14 use.
15       But the vast majority, if we have enough
16 cells, we just complete -- we do the whole panel for a
17 variety of reasons.
18 BY MS. DAVIS:
19    Q. And those reasons are?
20    A. What?
21    Q. And what reasons are those?
22    A. The other argument that is being proposed is
23 that we need to look at the microscopy, the
24 microscopic findings --
25       MR. PARKER: Didn't she ask you what your reasons

Page 43

1  were for --
2     A. Oh, I'm sorry. I couldn't hear that. My
3  reasons for --
4  BY MS. DAVIS:
5     Q. Reasons for -- in the situation where you
6  have the complete medical background for the patient,
7  and you still do the entire panel.
8     A. Well, it varies with the case. It depends on
9  the situation. But, in general --
10    Q. No; but you just said that it didn't. You
11 just -- even when you open the computer, and you can
12 look at --
13    A. I thought you said the reason for me to --
14 not to --
15    Q. No. You described a situation where you are
16 opening up the records for this type of patient.
17    A. Uh-huh.
18    Q. You have the complete medical history of the
19 patient, all of the tests that have been performed on
20 the patient, what medications have been given to the
21 patient, and despite all that information, you still
22 do the entire panel of antibodies. And you said you
23 had reasons for that. What reasons are those?
24    A. The reasons for using a complete panel -- I
25 consider a complete panel a single test; that each

Page 44

1  individual reagent provides information on a cell
2  type, on a cell stage of maturity, and on the function
3  of the cells and so on. So it gives us a complete
4  panoramic view of the marrow in that particular
5  situation.
6        Then if we have a concern for what we see,
7  then we would add more reagents or maybe we can call
8  the doctor and say, "Look, we're seeing something here
9  that we shouldn't be seeing."
10       So the approach of having a full panel as a
11 single test is something that we have instituted after
12 even trying several times to cut it down in pieces.
13 We found ourselves too often going back to the sample
14 and redoing more of the testing with a consequent
15 waste of time, waste of sample. Particularly after
16 hours, the sample deteriorates. It was more work and
17 more labor and more headaches. We could never
18 determine for sure if something that we are seeing on
19 this particular reagent was right or wrong. We have
20 to have more.
21       So this was several years ago. We decided
22 that that's not the way to go.
23       Now, when we have a full panel, first of all,
24 the diagnosis is complete. Second, the assessment of
25 all the cells in that particular sample -- and, again,

Page 45

1  I repeat this; are very precious samples and cannot be
2  recovered again. These are very difficult diseases
3  that require either very toxic drugs, very difficult
4  drugs for the patient or even transplantation
5  procedures, which are extremely, extremely risky for
6  the patients. We could not afford to miss something.
7  We could not afford to ignore something. We decided
8  that since we have that very precious sample, that is
9  very complex, in a patient with life-threatening
10 diseases, that we need to do our best to simply look
11 at every single aspect of that marrow because marrows
12 can change with treatment, secondary diseases can
13 occur, changes that we did not expect, an infection
14 can occur. Think all kinds of things. So our
15 approach is to simply get as much information as we
16 can once we have that sample in our hands.
17       And this is not going to end here. It's
18 going to continue on because we're getting more and
19 more very informative reagents from genetic studies,
20 from biological studies. So it's not going to be just
21 thirty or forty reagents in the future. It's going to
22 be more. We're just going to have to devise
23 techniques to assemble them and analyze them in a very
24 efficient manner.
25    Q. Now, you said one of the reasons you do the

Page 50

1  some -- some number, some period of time that is
2  reasonable to think that the phenotype -- the
3  features, the characteristics of the cancer cells are
4  not going to change.
5      I mean, if you ask me, "Why not three
6  months?" I can't tell you why not three months. It's
7  safer at two months than three months. In three
8  months, things can happen. Usually, as a consequence
9  of the treatment, one can find other diseases that we
10 did not detect initially because the number of cancer
11 cells obscure them.
12     I mean, no, there is no particular reason why
13 not three months instead of two months. It's just
14 something that I decided that would be reasonable.
15     (Plaintiffs' Exhibit No. 2 was marked for
16     identification.)
17  Q. Okay. Let me have you take a look at what
18 has been marked as Exhibit 2.
19  A. Uh-huh.
20  Q. This was given to us -- just as an
21 explanation for you, this was given to us by
22 Mr. Parker's law firm as the documents that were
23 provided to you that you reviewed.
24  A. Uh-huh.
25  Q. Can you just take a look through these, and

Page 51

1  let me know whether this is, in fact, what you
2  reviewed?
3   A. (Deponent reviews document.) Yes, it looks
4  that way.
5   Q. Okay. Did you review anything else in
6  preparing your expert report?
7   A. Yes, I have. I have looked at Dr. Flynn's
8  deposition.
9   Q. I'm talking about in preparation for your
10 report.
11  A. Oh, for my report? No. This was afterwards.
12 For my report? The report was done in February.
13 Probably not. I can't be totally be sure whether I
14 had the -- some examples of cases that were sent to me
15 at that time, but I can't remember the time.
16     MR. PARKER: Pat, I'm going to put on the record
17     that I don't see in this package -- and the doctor can
18     testify, but I believe that the doctor was sent the
19     requisition forms and whatever medical records Dianon
20     would have received, in conjunction with the -- if I'm
21     recalling the number right -- thirteen cases in the
22     profile of any amended complaint.
23  A. Yes, they came before the report. Yes. So I
24 did have access, then, to thirteen cases that included
25 the requisition to Dianon and the tests and the report

Page 52

1  of the results.
2  BY MS. DAVIS:
3   Q. Okay. And those are the thirteen that are
4  listed in the amended complaint?
5   A. I think so.
6   Q. Okay.
7   A. At least some of them are, yes.
8   Q. Okay.
9   A. Yeah.
10  Q. And did you review those documents?
11  A. Yes; I did, yes. Yes.
12  Q. And did you reach a conclusion after
13 reviewing them?
14  A. Right; I did.
15  Q. And what was that?
16  A. Again, without knowing the very, very
17 specific situations where things were done and so
18 on -- okay. Let me ask it again. Did you ask me
19 whether I reviewed Dr. Flynn's comments on that or
20 just the reports themselves?
21  Q. Either one.
22  A. Well, they're different. I mean, I think the
23 reports are consistent to what we would do. Again,
24 without knowing exactly what was going on because I
25 wasn't there.

Page 53

1      With regards to Dr. Flynn's report, I have a
2  number of criticisms --
3   Q. Okay.
4   A. -- that stem from the fact that the approach
5  that he has is the approach that I told you before; as
6  far as I'm concerned, is the wrong approach. First of
7  all, he proposes sort of a cocktail for each patient,
8  a panel for each patient based on the clinical
9  information that he gets and the morphological -- I
10 mean, the microscopic information that he gets.
11     I didn't get a chance to tell you why
12 microscopic information is extremely dangerous to use
13 as a guideline for flow cytometric analysis. I will
14 if you want me to.
15  Q. Sure.
16  A. Now?
17  Q. Uh-huh.
18  A. Okay. The morphological information is the
19 information that an individual, usually a pathologist,
20 obtains by looking through the microscope at a number
21 of cells or tissues, usually stained with dyes, with
22 stains, that are fairly noninformative because they're
23 not like antibodies in terms of specificities in terms
24 of delineating a particular molecule that is
25 informative.

Page 54

1    There are a number of problems with the
2    microscopic observation. One is that the samples that
3    arrive with the microscopic preparations, the slides
4    that arrive with the samples, may or may not be
5    prepared at the site where the sample was obtained.
6    If it's not, then the flow cytometry laboratory -- and
7    particular reference laboratory, obtain samples
8    usually the next day -- has to prepare a
9    microscopic -- what is called a "smear" or preparation
10   that is not fresh, and, therefore, the cells do not
11   look the same. Preservation is not adequate. So
12   that's one factor.
13       The other factor is that more and more we're
14   seeing poor preparations made at the bedside. Even if
15   they were fresh, even if they were obtained at the
16   site where the patient was married (phonetic), the
17   sample may not be adequate. They may be bloody; they
18   may be what we call contaminated with blood. They may
19   not be representative.
20       But even in the best scenario, the best case,
21   where the sample is perfect and everything is fine,
22   then we have to rely on conventional stainings.
23   Conventional stainings are good, they're very
24   colorful. They give you information which is not even
25   close to the information that one gets with antibodies

Page 55

1    that are so specific for each individual molecule.
2    That is very informative. The stains that are used
3    are regular stains that have been with us for a
4    hundred years, haven't changed, and they stain red and
5    blue and things like that. But it gives us a general
6    appearance of cells and tissues. But they don't give
7    us enough functional information. That's another
8    problem.
9        Most important is the fact that the
10   interpretation of what one observes through the
11   microscope depends so much on the individual who
12   observes. This technology of observing through the
13   microscope is somewhat subjective in that there is no
14   measurement attached to it. There's no quantitative
15   result. It's just simply an impression that a
16   pathologist, or other individuals, obtain by looking
17   at something from previous experience, from bias, from
18   a number of factors that they used in the past.
19       Most pathologists get trained to look through
20   the scope for many years to see what is normal, what
21   is not normal, what is this cancer, what is this other
22   cancer.
23       Time and time again this approach has been
24   proven to be highly imprecise. I mean that the
25   reproducibility between observers on the same slides,

Page 56

1    on the same glass slides, or the reproducibility
2    within the same observer over time of the same slide,
3    leaves a lot to be desired. It's been proven, as I
4    said, many, many times.
5        Flow cytometry actually grew out of this
6    deficiency. Many of us have used flow cytometry to
7    simply -- almost in desperation for not being able
8    to -- to be certain of what we were looking for
9    through the microscope.
10       Flow cytometry, in contrast to microscopy, is
11   objective. It doesn't depend upon the training of an
12   individual necessarily to obtain results. This is
13   machine results, not the final interpretation. It
14   does not -- it uses antibodies which are highly
15   specific reagents for putting markers in cells that
16   are very informative. These are not routine
17   conventional stains. And it does it very rapidly
18   and -- simply the personal bias doesn't play and role.
19       Q. Let me ask you a question about that though.
20       A. Uh-huh.
21       Q. It's my understanding that different
22   practitioners of flow cytometry use different markers
23   and interpret them differently.
24       A. To a certain extent. I mean, I wish there
25   was a complete standardization. We wouldn't be having

Page 57

1    consensus meetings.
2        There is debate whether this marker is better
3    in 100 percent of the cases than others, or 50 percent
4    of the cases. It's a constant debate, and is a moving
5    target, and we having meetings and consensus. And
6    this is not just in this country. Everywhere, in
7    Europe and in Asia, it depends upon the experience of
8    the individual, it depends on what is in the
9    literature, and, again, what is essential versus less
10   essential.
11       I mean, every one is important for something.
12   The problem is that we don't know up front whether or
13   not it's going to be useful or not. If we knew, then
14   we would be more discrete. But at the moment, we just
15   don't know.
16       The technology is far superior than
17   morphology. If you were to ask me, as a screening
18   procedure, I would use flow cytometry and then
19   determine what to look at through the microscope on
20   the basis of the results of the flow cytometry, not
21   the other way around. So --
22       Anyway, back to the initial question, which I
23   forgot.
24       MR. PARKER: Which was your criticisms of
25   Dr. Flynn's approach.

ADVANTAGE COURT REPORTERS

2291bb67-f68c-4f22-ac73-e80665553f8f

Page 58

1    A. Right. So he uses that approach of selecting
2 a group of reagents prepared according to the clinical
3 and/or morphological or microscopic information that
4 he receives.
5        And for the reasons that I mentioned to you,
6 I don't think that is the appropriate approach.
7 That's one thing I have to criticize him for.
8        The other criticism I have for him is that
9 what he is stating here is not what he apparently does
10 in his own laboratory or at least accepts being done
11 in a neighboring laboratory at Yale. From his
12 deposition, I learned that he uses a panel approach as
13 well. It may be a different panel, but he does use a
14 panel approach.
15        I think, to a certain extent, his remarks are
16 based on general ideas that he has, but I think he
17 lacks the experience of somebody who does this on a
18 day-in and day-out basis. He hasn't done flow
19 cytometry of bone marrows, particularly, ever, as far
20 as I know; of bone marrow aspirates, at least. He's
21 done only tissues. So I think some of his remarks
22 reflect that type of -- lack of exposure to that.
23        At Yale, the two laboratories that do flow
24 cytometry, or at least did flow cytometry, as far as I
25 know, were separated into two different units, which

Page 59

1 is an artificial separation. I fought for this
2 twenty, thirty years ago. I think it has to be
3 integrated. But if they don't have it integrated,
4 it's their problem. I don't know.
5        The laboratory that does tissues is separate
6 from the laboratory that does bone marrow aspirates.
7 And so the bone marrow aspirates and the bone marrow
8 requires different skills. It requires different
9 situations and so on. I think he uses his theoretical
10 understanding to make some of his remarks but not what
11 he's in practice in the other laboratory. I think
12 it's reflected in some of his inconsistencies when he
13 talks and when he describes the cases or criticizes
14 the cases; the fact that, at one time, he accepts one
15 thing, and then the next time he doesn't, or the other
16 way around; the fact that what he's published -- and I
17 believe he only published one paper, as a co-author,
18 with regards to, peripherally, immunophenotyping or
19 flow cytometry in lymphomas -- and what is in that
20 paper is not what he says is supposed to be.
21        So because of that, I get the feeling that he
22 is missing something or his report is not completely
23 acceptable, as far as I'm concerned, if I read, you
24 know, in an abstract form.
25        I don't know him personally. He's not part

Page 60

1 of our, you know, family, if you wish, of people who
2 do this every day. He stopped doing this. So what he
3 discusses is something that he read perhaps or he
4 talked about, but it's not his own experience. And
5 that's my major concern. Because this is a very
6 complex technology, very complex decisionmaking
7 process, if you don't do it on a daily basis or at
8 least supervise it on a daily basis, you would be
9 prone to make mistakes or make judgments or make
10 statements that are not correct.
11 BY MR. DAVIS:
12    Q. So am I understanding, from what you've just
13 been saying --
14    A. It's a lot. Sorry.
15    Q. -- that's all right -- that if a lab uses an
16 approach, where they look at the morphology first,
17 they look at it under the microscope, and then they
18 make a determination, based on what they see under the
19 microscope, either not to do flow cytometry or to do a
20 panel addressing what they see under the microscope,
21 do you think that's bad medicine?
22    A. As far as I'm concerned, this is incorrect.
23 Okay? There will be some individuals who would say
24 the opposite. But as I mentioned to you -- and this
25 would be clarified once this consensus ends in a

Page 61

1 publication -- that approach is dangerous. It's not
2 necessarily totally incorrect because, obviously, you
3 do something, but it's dangerous because it doesn't --
4 it may miss something. It may not provide all the
5 information that you could extract from a sample. And
6 it always or very often leaves some uncertainties that
7 people might or may ignore with a restricted panel.
8        So I would not support it. I think the group
9 of people involved in this consensus, again, is going
10 to recommend -- and, again, I don't know the number of
11 reagents they're going to recommend, but it's going to
12 be a full, I would say, panoramic set of reagents that
13 will encompass pretty much every cell in the bone
14 marrow to make sure that that bone marrow does or does
15 not have a problem. If it does have a problem, then
16 additional reagents very likely will be -- will be
17 used, will be appropriate to use.
18        So, yes, in answer to your question, I am
19 against that approach. It's something that we do not
20 agree completely, but the majority will agree.
21    Q. So if a lab is performing the way I just
22 described -- they look at the morphology, and they
23 decide, based on what they see under the microscope,
24 either not to do the test or to -- or not to do the
25 flow cytometry or to do a limited panel -- you think

16 (Pages 58 to 61)

Page 62

1  that's bad medicine?
2      A. I think it's not appropriate knowing what we
3  know right now. If I'm the chief of a division of the
4  hematopathology division, and I think I share this
5  with everybody right now, I would not support that
6  approach. It's not completely -- I mean, if you do
7  find something, it's useful, but it's incomplete --
8  let's put it that way -- and leaves room for
9  equivocation (phonetic), for error, which, in these
10 patients, you can't afford to have.
11     Q. All right. Let's go back to Exhibit 2 for a
12 minute. There's an invoice, which is the very top
13 page. That says that you charged for five hours of
14 personal consultations with the two lawyers
15 representing Dianon and a review of records; is that
16 right?
17     A. Correct.
18     Q. And it's as of February 8th, 2006. Have you
19 done any other work since then?
20     A. Yeah, we've been doing some work. I haven't
21 billed for the work -- or I have? But I haven't
22 collected for the work.
23     Q. They're late paying, huh?
24     A. Ah -- maybe.
25         MR. PARKER: If we got paid for our flow, we

Page 63

1  could pay his bills.
2      A. I think I submitted more, but I don't know
3  for sure.
4  BY MS. DAVIS:
5      Q. Okay. Do you know roughly how many hours
6  you've done?
7      A. I was thinking yesterday how many hours I've
8  spent. I think it would be approximately, by now,
9  twelve hours.
10     Q. Okay.
11     A. Yeah.
12     Q. Okay. So the five hours that you billed for
13 here, what were those for?
14     A. Well, Bill Piermattei came to me and spoke a
15 few times, and then I spent time with Mr. Parker
16 discussing the case.
17        But most of, I think -- well, not most of it,
18 but a significant amount of time is reviewing the
19 records, the paperwork, yeah.
20     Q. Okay. And that's -- let me just make sure I
21 understand. That's this package of documents they
22 gave you, plus the thirteen records (indicating) --
23     A. Plus the thirteen. But I don't know when
24 this -- this was generated February 8th. I should
25 have had the thirteen cases by then; right?

Page 64

1          MR. PARKER: Pat, I'll check. I don't know off
2  the top of my head whether we have received another
3  statement since this February 8th statement, but my
4  guess is that Dr. Braylan -- because this precedes the
5  preparation --
6          MS. DAVIS: Of his report?
7          MR. PARKER: -- of his report, I think. He
8  probably has spent more than twelve hours. I was
9  thinking about in general. But if we have any other
10 statements, I'll certainly forward them to your office.
11         MS. DAVIS: Okay.
12         MR. PARKER: I don't know whether we do.
13         MS. DAVIS: Okay.
14     A. I need to start looking at my -- I'm not
15 pretty good at that. I need to go back and look at my
16 notes, yeah.
17 BY MS. DAVIS:
18     Q. Okay. All right. So when you met with
19 Mr. Piermattei and Mr. Parker, what did you talk
20 about?
21     A. Do you mean initially?
22     Q. Yes.
23     A. Well, the nature of the case. The nature of
24 the situation, this was a government-initiated, I
25 guess, legal case against Dianon for charging for

Page 65

1  medically-unnecessary tests.
2      Q. Okay. Did you discuss whether you were going
3  to be an expert or not?
4      A. Way back when. I think it was last year that
5  I think -- yes, we did, yes.
6      Q. Okay.
7      A. I think it was April/May last year that Bill
8  approached me.
9      Q. Okay.
10     A. Yeah.
11     Q. When you prepared your report, how did that
12 work? How did you prepare it?
13     A. Again, Mr. Piermattei asked me to prepare a
14 report and asked me to include the elements that I did
15 include; my background, my CV, what I do and my
16 philosophy and my approach to things like this. I
17 just simply typed this myself, and then we had a
18 meeting with Mr. Parker about the contents of my
19 report, and we modified that essentially just to --
20 for style mostly, not for content.
21     Q. Okay. So are there any drafts of the report?
22     A. Drafts? No. I typed on my computer.
23     Q. Okay. And so you said you made changes to
24 it?
25     A. On the computer. He was in my office.

# EXHIBIT 6

EXHIBIT
Drs 18
G

Cytometry (Communications in Clinical Cytometry) 42:114–117 (2000)

*Case Reports*

# Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping

Xiu Yan Xie,[1] Armando C. Filie,[2] Gregory A. Jasper,[1] Paula I. Fukushima,[1] and Maryalice Stetler-Stevenson[1*]

[1]Flow Cytometry Unit, Laboratory of Pathology, Division of Clinical Sciences, National Cancer Institute, National Institutes of Health, Bethesda, Maryland

[2]Section of Cytopathology, Laboratory of Pathology, Division of Clinical Sciences, National Cancer Institute, National Institutes of Health, Bethesda, Maryland

We report on the flow cytometric identification of concomitant acute myeloid leukemia and chronic lymphocytic leukemia in cytology specimens submitted with minimal clinical information. A 64-year-old man presented with fever and progressive dyspnea on exertion. Chest X-ray and computed tomography scan showed a left upper lobe pulmonary mass. Pulmonary capillary pullback specimens were collected to determine infectious verses neoplastic etiology. The pulmonary capillary pullback specimens showed atypical mononuclear cells with enlarged, slightly irregular nuclei; visible nucleoli; and basophilic cytoplasm. Flow cytometric analysis of the specimen for lymphoma was requested. Flow cytometric immunophenotypic studies showed that 78% of the cells were CD34 positive, CD45 dim positive and CD11c positive, consistent with acute myeloid leukemia. About 0.75% of the cells expressed CD5 as well as dim CD20 and were monoclonal for kappa light chains; consistent with chronic lymphocytic leukemia/small lymphocytic lymphoma. At this time the clinician communicated a history of myelodysplastic syndrome of refractory anemia subtype. Peripheral blood was obtained for further immunophenotyping and the patient was immediately treated for his acute myeloid leukemia. This case demonstrates that a diagnostic antibody panel should allow evaluation of all cell types as per the U.S./Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry (Stewart et al.: Cytometry 30:231–235, 1997). Cytometry (Comm. Clin. Cytometry) 42:114–117, 2000. Published 2000 Wiley-Liss, Inc.[†]

Key terms: immunophenotypic panels; acute myeloid leukemia; chronic lymphocytic leukemia; flow cytometry

In the interest of cost containment, laboratories are constantly seeking to minimize antibody panels in flow cytometric immunophenotypic analysis of patient materials. The use of "disease-directed panels" such as a lymphoma panel or a leukemia panel is one method used to lower antibody consumption. This is often done despite the availability of minimal clinical information to direct panel choice. However, in patients without an established diagnosis, one runs the risk of being unable to identify an unexpected malignant population. We report flow cytometric detection of concomitant chronic lymphocytic leukemia (CLL) and acute myeloid leukemia (AML) in a specimen submitted for evaluation of lymphoma. This case illustrates the need to use multiparametric analysis with antibody panels designed to detect all abnormal hematopoietic populations.

## MATERIAL AND METHODS
### Patient Clinical Data

A 64-year-old man was admitted to the National Institutes of Health with fever and progressive dyspnea on exertion. The patient had a platelet count of 5,000/mm$^3$, hemoglobulin of 8 g/dl, hematocrit of 22.9%, and white count of 1,500/µl with absolute neutrophil count of 610/mm$^3$. Chest X-ray and computed tomography scan showed a left upper lobe mass with bilateral interstitial changes. The differential diagnosis included infection, pul-

*Correspondence to: Maryalice Stetler-Stevenson, Flow Cytometry Unit, Laboratory of Pathology, Division of Clinical Sciences, NCI, NIH, Bethesda, MD 20892.
E-mail: stetler@box-s.nih.gov

Received 20 April 1999; Accepted 17 January 2000

Published 2000 WILEY-LISS, INC.    †This article is a US government work and, as such, is in the public domain in the United States of America.

Table 1
Antibody Panel for Pulmonary Pullback Specimens*

| Tubes | FITC CD/antibody/source | PE CD/antibody/source | PerCP CD/antibody/source |
|---|---|---|---|
| 1 | CD45/T29-33/D | CD14/TuK4/D | |
| 2 | CD4/LEU3BD | CD8/DK25/D | CD3/LEU4/BD |
| 3 | CD57/LEU7/BD | CD7/3A1/C | CD3/LEU4/BD |
| 4 | CD3/UCHT1/D | CD16/DJ130C/D CD56/MOC-1/D | CD20/LEU16/BD |
| 5 | CD5/LEU1/BD | CD2/T11/C | CD3/LEU4/BD |
| 7 | CD10/J5/C | CD19/HD37/D | CD45/HLE1/BD |
| 8 | Poly KAPPA/C | CD22/4KB128/D | CD20/LEU16/BD |
| 9 | Poly LAMBDA/C | CD22/4KB128/D | CD20/LEU16/BD |
| 10 | Mono KAPPA/BD | Mono LAMBDA/BD | CD20/LEU16/BD |
| 11 | CD103/BerAct/D | CD11c/LEUM5/BD | CD20/LEU16/BD |
| 12 | FMC-7/D | CD23/MHM6/D | CD20/LEU16/BD |
| 13 | CD13/WM-47/D | CD34/HPCA-2/BD | CD45/HLE1/BD |

*D, Dako; BD, Becton Dickinson; C, Coulter; Cal, Caltag.

Table 2
Antibody Panel for Repeat Peripheral Blood Specimen*

| Tubes | FITC CD/Antibody/Source | PE CD/Antibody/Source | PerCP CD/Antibody/Source |
|---|---|---|---|
| 1 | CD3/UCHT1/D | CD16/DJ130C/D | CD45/HLE1/BD |
| 2 | CD4/LEU4/BD | CD8/DK25/D | CD45/HLE1/BD |
| 3 | CD71/TFN/BD | GPHA/JC159/D | CD45/HLE1/BD |
| 4 | CD13/WM-47/D | CD33/MY9/C | CD45/HLE1/BD |
| 5 | HLA-DR/CR3-43/D | CD38/LEU17/BD | CD45/HLE1/BD |
| 6 | CD15/LEUM1/BD | CD11b/LEU15/BD | CD45/HLE1/BD |
| 7 | CD117/c-KIT/C | CD34/HPCA-2/BD | CD45/HLE1/BD |
| 8 | CD19/HD37/D | CD5/LEU1/BD | CD45/HLE1/BD |
| 9 | CD36/FA6.152/C | CD64/10.1/CAL | CD45/HLE1/BD |
| 10 | CD41/P2/C CD61/RUU-PL7F12/BD | CD42b/AN51/D | CD45/HLE1/BD |
| 11 | CD65/88H7/C | CD56/MOC-1/D | CD45/HLE1/BD |

*D, Dako; BD, Becton Dickinson; C, Coulter; Cal, Caltag.

FIG. 1. Pulmonary capillary pullback specimens from cytopathology show atypical mononuclear cells with slightly irregular nuclei, visible nucleoli, and basophilic cytoplasm.

monary emboli, and neoplasm. A bronchoalveolar lavage submitted to cytopathology demonstrated normal flora with a wet prep negative for fungus and negative for *Pneumocystis carinii* pneumonia staining. A lower extremity Doppler ruled out deep venous thrombosis as a possible cause of pulmonary emboli. The patient experienced worsening dyspnea and developed a large pericardial effusion that required drainage. Pulmonary capillary pullback specimens, which consisted of pullback capillary wedge, venous blood, and arterial blood, were sent to cytology with a differential diagnosis of infection verses neoplasia.

### Cytology

Pulmonary capillary pullback specimens, including 3.5 ml of pullback capillary wedge, 4 ml of mixed venous blood, and 4 ml of peripheral blood, were received in cytology. Mononuclear cells were isolated by density gradient separation using LYMPHOPREP (Nycomed 221395) according to manufacturer's recommendation. Two cytospins were prepared for morphology studies. Atypical mononuclear cells were observed with enlarged, slightly irregular nuclei; visible nucleoli; and basophilic cytoplasm (Fig. 1). A portion of each specimen was sent to flow cytometry for evaluation of possible lymphoma.

### Flow Cytometric Analysis

The cells were studied with a panel of antibodies (Tables 1 and 2). One hundred microliters of cell suspension with $1 \times 10^6$ cells were added to each tube and stained according to manufacturers' recommendations as previously described (1). Five-parameter, three-color flow cytometry was performed with a BD FACScan flow cytometer equipped with a 15 mW argon laser (excitation at 488 nm). The sensitivity of fluorescent detectors was set and

116    XIE ET AL.



FIG. 2. A: Forward (FSC) versus side scatter (SSC) and CD45 versus side scatter on pulmonary capillary pullback specimens. Blast population is circled. B: FSC/SSC gated blast population. Cells are larger and express dim CD45, CD34, and CD11c, but are negative for CD20, CD3, and CD13. C: FSC/SSC lymphoid gate. The neoplastic B cells are circled. A dim CD20, dim CD22 monoclonal kappa B cell population is identified. The percent of dim CD22 monoclonal B cells correlates with the percent of CD5 positive CD2 negative cells. More events were acquired for selected tubes.

monitored using Calibrite beads (BD) according to manufacturer's recommendations. Compensation was adjusted using FITC-CD4/PE-CD8-stained cells. Data (collected in List mode) was analyzed with CellQuest software (BD). At least 5,000 lymphocytes were acquired per tube. For analysis, lymphocytes and blasts were gated by forward and side scatter as well as CD45 versus side scatter. CD19, CD20, CD3, and CD34 populations were back-gated to determine if analysis gates were appropriate.

## RESULTS

All of the specimens studied, including the pulmonary pullback capillary wedge, venous blood, and peripheral blood specimens, contained approximately 78% primitive blasts (the atypical mononuclear cells) (Fig. 2B) expressing dim CD45, CD34, and CD11c, but negative for CD13, CD14, CD4, CD8, CD57, CD3, CD2, CD5, CD20, CD56, CD16, CD19, CD10, CD22, and CD103. There was partial expression of CD7. This is most consistent with a myeloid leukemia. About 0.75% of all cells were monoclonal B-cells expressing dim surface kappa light chains, CD5, CD19, dim CD20, and dim CD22 (Fig. 2C). This was consistent with CLL or a small lymphocytic lymphoma. The morphologic review correlated with the immunophenotypic findings. The clinician was contacted and a diagnosis of "consistent with acute myeloid leukemia" was communicated. At this time, the clinician reported a history of myelodysplastic syndrome (MDS) of refractory anemia subtype with monosomy 7. Peripheral blood for repeat studies was obtained immediately prior to initiation of Ara-C therapy and the patient was discharged to follow-up with his hematologist at home. Repeat immunophenotypic studies demonstrated that the blasts expressed CD34, CD33, and CD38 with partial HLA-DR and CD15. The blasts were negative for T-cell antigens, B-cell antigens, megakaryocytic antigens, CD14, Glycophorin A, CD13, CD11b, CD117, CD36, and CD64. The diagnosis of AML was confirmed. In addition, 0.75% of the cells were consistent with CLL.

## DISCUSSION

We report on the successful flow cytometric diagnosis of AML and CLL, despite inadequate clinical information and that the specimen was submitted for evaluation of lymphoma. The patient presented with fever, progressive dyspnea on exertion, and a pulmonary mass with bilateral interstitial changes. Pulmonary pullback specimens were submitted to cytopathology for diagnostic evaluation. The patient had MDS with monosomy 7, which has a high incidence of pulmonary fungal infections, so the clinicians did not immediately suspect AML and did not notify the laboratory of the patient's history. Initial morphologic evaluation of the pulmonary pullback specimens detected malignant cells. Because adequate clinical history was not provided and because granulation was not apparent, a diagnosis of AML was not made based on morphology. In addition, the presence of CLL in the background of the immature myeloblasts may have confused the morphologic picture. Although the number of cells in the specimens determined the panel used, the panel was sufficient to detect all cell populations present as per the US/Canadian consensus recommendations on immunophenotypic analysis of hematologic neoplasia by flow cytometry (2). Despite the fact that the specimen was submitted for evaluation of lymphoma, the panel utilized allowed detection of myeloid leukemia as well. If a restricted lymphoma panel had been used, only the diagnosis of CLL could have been made. Because AML was the disease causing clinical deterioration, patient care would have been severely compromised.

Concomitant AML and CLL, although rare, can occur (3–7) and may be difficult to evaluate morphologically. In this report, we demonstrate the importance of employing a panel of antibodies capable of identifying abnormal hematopoietic cells instead of simply using a disease-specific panel. This reinforces the US/Canadian consensus recommendations and indicates the danger of restricting reimbursement to disease-specific antibody panels.

## LITERATURE CITED

1. Fukushima P, Nguyen P, O'Grady P, Stetler-Stevenson M. Flow cytometric analysis of kappa and lambda light chain expression in evaluation of specimens for B-cell neoplasia. Cytometry 1996;26:243–252.
2. Stewart CC, Behm FG, Carey JL, Cornbleet J, Duque RE, Hudnall SD, Hurtubise PE, Loken M, Tubbs RR, Wormsley S. U.S.-Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry: selection of antibody combinations. Cytometry 1997;30:231–235.
3. Mateu R, Bellido M, Sureda A, Gonzalez Y, Rubiol E, Aventin A, Nomdedeu J. Concomitant chronic lymphocytic leukemia and acute myeloid leukemia with an uncommon immunophenotype. Am J Hematol 1997;56:281–287.
4. Lima M, Porto B, Rodrigues M, Teixeira M, Coutinho J, Ribeiro A, Malheiro M, Justica B. Cytogenetic findings in a patient presenting simultaneously with chronic lymphocytic leukemia and acute myeloid leukemia. Cancer Genet Cytogenet 1996;87:36–40.
5. Caballero M, Gonzalez M, Canizo M, Orfao A, Nieto M, Miguel J. Concomitant chronic lymphocytic leukemia (CLL) and acute myeloid leukemia. Complete remission of CLL achieved with high-dose cytosine arabinoside. Leukemia 1992;6:856–858.
6. Tamul K, Meyers D, Bentley S, Folds J. Two color flow cytometric analysis of concomitant acute myeloid leukemia and chronic lymphocytic leukemia. Cytometry 1994;18:30–34.
7. Catovsky D, Galton DAG. Myelomonocytic leukemia supervening on chronic lymphocytic leukemia. Lancet 1971;1:478–479.

# EXHIBIT 7

Cytometry (Communications in Clinical Cytometry) 46:23–27 (2001)

## Original Articles

# Optimal Number of Reagents Required To Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting

Raul C. Braylan,[1*] Alberto Orfao,[2] Michael J. Borowitz,[3] and Bruce H. Davis[4]

[1]Department of Pathology, University of Florida, Gainesville, Florida
[2]Cytometry Service and Centro de Investigaciones del Cancer, University Hospital of Salamanca, Salamanca, Spain
[3]Department of Pathology, Johns Hopkins Medical Institutions, Baltimore, Maryland
[4]Maine Medical Center Research Institute, South Portland, Maine

At the ISAC 2000 Congress, the Clinical Cytometry Society organized a meeting of international experts to reach consensus on the minimum number of antibodies required for a full evaluation of hematologic and lymphoid neoplasias. A questionnaire was distributed prior to the meeting to numerous experts from US and European institutions and 13 responses were received. At the meeting, 25 individuals, including most of those who returned responses, participated in the discussions and voted on the issues presented. In chronic lymphoproliferative disorders (CLD), 9 antibodies (anti-CD5, CD19, kappa, lambda, CD3, CD20, CD23, CD10, and CD45) were deemed essential for initial evaluation by 75% of the participants. There was near unanimity that additional markers (selected from CD22, FMC7, CD11c, CD103, CD38, CD25, CD79b and heavy chains for B-cell disorders, and CD4, CD7, CD8, CD2, CD56, CD16, TCRa/b, and TCRg/d for T-cell disorders) would be needed to fully characterize CLD, although not every marker would be useful in all cases. Tissue lymphomas were believed to be similar to CLD, needing a minimum of 12–16 markers. However, for some cases, CD30, bcl-2, TdT, CD71, CD1a, and CD34 were cited as useful by the participants. Markers mentioned for plasma cell disorders included kappa, lambda, CD38, CD45, CD56, CD19, CD20, CD138, and heavy chains. Of 17 voting participants, 16 agreed that between 5 to 8 markers would be essential reagents for plasma cell disorders. For acute leukemia (AL), 10 markers (CD10, CD19, CD13, CD33, CD34, CD45, CD7, CD14, CD3, and HLADR) were considered essential by 75% of participants for initial characterization of the leukemia lineage. Most (>75%) agreed that at least one more B (CD20, CD22, CD79a, IgM), T (CD1a, CD2, CD4, CD5, CD8), myeloid (CD11b, CD15, CD64, CD117, myeloperoxidase), erythroid (CD36, CD71, glycophorin A), and megakaryocytic (CD41, CD61) reagents should be included in the essential panel. However, there was no agreement as to which was optimal. Thus, approximately 13–15 of those reagents would be considered essential in all cases of AL, whereas others (CD16, CD56, CDw65, TdT, and cytoplasmic CD3) were mentioned as useful in some cases. Almost all voting participants believed that the appropriate number of markers for complete characterization of AL would average 20–24. The majority of the responders (11 of 13) indicated that fewer reagents could be used in monitoring or staging patients with previously characterized disease, but not all ventured a specific number of reagents. From the above results, we conclude that the phenotypic analysis of hematologic and lymphoid neoplasia requires a rather extensive panel of reagents. Supplementary reagents might even be necessary if they prove to become relevant for diagnostic purposes. Reducing the number of antibodies could significantly compromise the diagnostic accuracy, appropriate monitoring, or therapy of these disorders. Cytometry (Comm. Clin. Cytometry) 46:23–27, 2001. © 2001 Wiley-Liss, Inc.

Key terms: immunophenotyping; leukemia; lymphoma; antibody panels; consensus

The flow cytometric analysis of leukemia, lymphoma, myeloma, and other related neoplastic conditions is a highly complex laboratory procedure that requires the use of a large number of reagents. Disparity exists among laboratories regarding the minimal number and type of antibodies needed, their specificity, or the selection of particular multicolor combinations for this purpose. Most surveys of practicing laboratories have suggested that a satisfactory analysis designed to diagnose, characterize, or monitor hematolymphoid neoplasms requires a large number of antibodies (1–7). Except for efforts designed to standardize a research approach to acute leukemia (3), no

*Correspondence to: Raul C. Braylan, M.D., Box 100275, Department of Pathology, University of Florida College of Medicine, 1600 SW Archer Rd., Gainesville, FL 32610.
E-mail: Braylan@ufl.edu
Received 3 November 2000; Accepted 8 November 2000

© 2001 Wiley-Liss, Inc.

studies have directly addressed the question of the minimum number of antibodies required for adequate analysis by flow cytometry. Such information is important as a guideline for diagnostic accuracy and harmonization of disease classification. Furthermore, in some regions, it could provide guidelines for appropriate reimbursement or fiscal support to diagnostic laboratory services.

As part of the ISAC 2000 Congress, the Clinical Cytometry Society (CCS) sponsored a meeting designed to bring together recognized international experts in the area of hematologic and lymphoid neoplasia phenotyping to determine consensus on the optimal use of monoclonal antibody reagents in the diagnosis and subclassification of such diseases. Representation at this meeting included not only the CCS, but also several European organizations including the European Group on Immunologic Classification of Leukemia (EGIL), the Biomed Working Group on Minimal Residual Disease, and the Leukemia/Lymphoma Task Force of the European Working Group on Clinical Cell Analysis. In spite of the magnitude of the challenge, broad consensus was reached on the minimum number and specificity of reagents needed to adequately characterize the most important hematologic and lymphoid neoplastic conditions.

## MATERIALS AND METHODS

Prior to the meeting, a questionnaire was distributed to participants. They were asked to rank the usefulness of various CD antigens and other leukocyte-associated markers in the initial diagnosis of a patient falling into various disease categories including chronic lymphoproliferative disorders (CLD), tissue lymphoma, plasma cell myeloma, and acute leukemia (AL). Participants were asked to indicate whether an antibody was essential for that diagnosis, useful for some but not all cases of that diagnosis, or not useful. Participants were also given the option of saying they had no experience with the marker. Furthermore, they were asked if the analysis of an initial diagnostic sample would differ from that of a subsequent sample submitted for disease monitoring or staging. It was recognized that the structure of the questionnaire was not ideal. Before selecting reagents, one often does not know to which of these categories a particular sample belongs. Also, the selection of antibodies might vary depending on previous analysis, how they are combined in multiple staining procedures, or on the concurrent clinical or morphologic information. However, at least in the United States, reimbursement is linked to particular diagnostic categories, so that devising the consensus findings with this format was believed to be useful.

The answers from 13 questionnaires were available before the meeting. The graphs in Figure 1 reflect these data. With one exception, everyone who returned answers was present at the meeting. In addition, the meeting included experts who did not return the questionnaire but who participated in the discussions and voted on the issues at the time of the meeting. Optimal combinations of markers, preferred fluorochromes, or topics related to the medical value of flow cytometry were not addressed due to time limitations of the meeting.

## RESULTS
### Chronic Lymphoproliferative Disorders

Based on the written answers (Fig. 1) and on the meeting discussion, it became clear that although only 4 specific antibodies were agreed on as essential by every participant, the majority (75%) of participants agreed on 9 antibodies as essential reagents for the evaluation of all cases of suspected CLD. These included anti-CD5, CD19, kappa, lambda, CD3, CD20, CD23, CD10, and CD45. In addition, however, nearly all participants agreed that although this generic panel was adequate for the initial evaluation of a case of a suspected CLD, it was not adequate for a complete characterization of the process once an abnormal lymphoid population was found. Additional markers that were deemed useful for B-cell diseases included CD22, FMC7, CD11c, CD103, CD38, CD25, CD79b, and heavy chains, although it was agreed that not every marker was useful in every case. In order to assess the total number of markers needed to completely characterize a B-cell lymphoproliferative disorder, participants were asked to estimate how many additional markers would be needed on average. Of the 14 participants who expressed a vote, 11 indicated that 3 to 6 additional markers would be necessary depending on the specific diagnosis. Thus, there was broad consensus that the minimum number of markers needed to fully characterize a B-cell lymphoproliferative disorder was between 12 and 15. It was agreed that this number would also be sufficient to detect (although not completely characterize) other abnormal populations that might coexist with a B-cell neoplasm.

Because the initial essential panel was heavily weighted toward the more common B-cell tumors, it was also agreed that if a case was determined to be a T-cell lymphoproliferative disorder, additional markers would be needed. Useful additional markers mentioned included CD4, CD7, CD8, CD2, CD56, CD16, TCR alpha/beta, and TCR gamma/delta reagents. There was near unanimity that on average, 7 markers would be needed in addition to the 9 considered essential, for a total of 16.

### Tissue Lymphoma

Tissue lymphomas were recognized to be very similar to CLD in terms of the basic type of analysis needed (Fig. 1). Discussion focused on whether any antibody deemed necessary for CLD could be eliminated from consideration, or whether additional markers specifically useful in tissue samples should be recommended. It was agreed that for some specific diagnoses, markers including CD30, bcl-2, TdT, CD1a, CD34, and CD71 might prove useful, although none was considered essential. Moreover, there was no consensus on whether, on average, the total number of markers needed for characterization of a tissue lymphoma would be greater than for CLD. However, 8 of 14 participants believed that 2 to 3 more markers from this list would be necessary. Because there was no agreement, participants believed that the minimum number of markers for full characterization of tissue lymphomas is again in the range of 12-16, depending on the diagnosis.







FIG. 1. Written answers from 13 participants who indicated, according to disease, the antibodies that were essential (black bars) or useful (white bars). Blanks indicate no answer or no experience with the marker. Only antibodies considered essential or useful by at least 7 of the 13 respondents are shown.

### Plasma Cell Disorders

Markers mentioned as useful in the evaluation and characterization of plasma cells included cytoplasmic kappa and lambda immunoglobulin light chains, CD38, CD45, CD56, CD19, CD20, CD138, and cytoplasmic immunoglobulin heavy chains (IgH), (Fig. 1). Again, there was no consensus on each one of these. 16 of 17 participants at the meeting agreed that between five and eight markers were essential reagents. However, this minimal panel would not be considered adequate to ensure that other abnormal populations (particularly T-cell populations) were not present in the sample.

### Acute Leukemia

Of the 13 responses to the questionnaire, at least 10 indicated 10 reagents as essential in AL. These included CD10, CD19, CD13, CD33, CD34, CD45, CD7, CD14, CD3, and HLADR (Fig. 1). This opinion was validated at the meeting. Most participants agreed that a combination to include at least one more B, T, myeloid, erythroid, and megakaryocytic reagent should be part of the essential panel. These additional reagents could be selected from among the following, although there was no consensus as to which one was optimal: for B-cell lineage: CD20, CD22, CD79a, IgM; for T-cell lineage: CD1a, CD2, CD4, CD5, CD8; for myeloid lineage: CD11b, CD15, CD64, CD117, myeloperoxidase (MPO); for erythroid lineage: CD36, CD71, glycophorin A; for megakaryocytic lineage: CD41, CD61. Thus, approximately 13-15 reagents would be considered essential in the initial evaluation of AL. In contrast to CLD, it was not possible to specify this list. As with CLD, once lineage was established, more markers of that particular lineage would become part of the core workup. In addition to the above, other reagents were mentioned at the meeting as useful for some cases. These included CD14, CD16, CD56, CDw65, TdT, and cytoplasmic CD3. Achieving overall consensus on the appropriate average minimal panel was difficult because it depended so heavily on the particular lineage and on the complexity of the case. The majority (18 of 19) of voting participants believed that the appropriate number was in the range of 20-24 total markers.

### Monitoring Patients With Known Diagnoses

There was insufficient time to discuss the appropriate number of reagents for samples of patients with known diagnoses who are studied for the presence of residual or recurrent disease or who are undergoing staging procedures. The initial questionnaire posed this question and the majority of responders (11 of 13) believed that some reduction was possible. Although the magnitude of the reduction was not discussed at the meeting, the 5 responders to the questionnaire who suggested a reduction and ventured a number of reagents recommended antibody panels ranging from 3 to 8 antibodies (average 7) for CLD or lymphoma, 3 to 8 (average five) for myeloma, and from 3 to 12 (average 8) for AL. The ability to use a reduced number of reagents in evaluating disease relapse or staging was dependent on prior characterization of the phenotypic profile of that patient's disease and knowing which antigens would be useful in subsequent evaluations.

### DISCUSSION

Because of its unique advantages, the flow cytometric immunophenotypic analysis of neoplasias of the bone marrow and lymphoid tissue has become a widely used laboratory procedure. In contrast to most clinical laboratory tests, however, this practice is highly complex and has not been completely standardized. Surveys of clinical laboratories (mainly from the United States) showed that on average, 16-19 reagents are utilized for lymphoma and leukemia analysis, but different laboratories may use as many as 45 or as few as 5 reagents for this purpose (2,4). It is obvious that some laboratories trim down the extent of the analysis, perhaps due to reimbursement policies, budgetary constraints, or other nonmedically based causes, even at the expense of reducing their ability to properly detect or characterize by immunophenotype these serious diseases.

A previous consensus meeting outlined broad principles to be used in assembling antibody panels for the analysis of hematolymphoid neoplasms. However, it stopped short of recommending a universal set or defined combination of reagents and did not specify a minimum number of reagents required (6,7). There are few objective data in the literature that specifically address the issue of the minimal number of antibodies required for this analysis. Our meeting was designed to survey the current practice of international experts to determine if general consensus on this question could be reached. Achieving overall consensus on essential or useful panels is predictably difficult. This is because the choice depends heavily on the particular strategies used for conducting the analysis, the individual preferences for reagents, the different needs of the laboratory, or the complexity of the case. Additionally, the experience among the participants varied with different reagents. For example, not all participants were familiar with using CD64 as a monocytic marker or using intracellular antigen detection in AL. Despite these shortcomings, the group reached broad consensus, supporting the notion that large panels of antibodies were important for adequate characterization of lymphoid neoplasms. Based on the responses to the questionnaire distributed prior to the meeting and the subsequent discussions, the value of large panels was seen to ensure that abnormal populations of any lineage could be identified in a sample, especially a newly diagnosed sample. Large panels also provided comprehensive characterization of any neoplastic population identified. The value of this latter function was not specifically discussed. For some diseases, such as CLD, there was good general consensus on the specific sets of antibodies to be used. For AL, there was consensus only on the principles that needed to be followed in a panel and there was less agreement on the specific reagents employed. As noted above, there is little in the literature that covers the clinical utility of any particular panel of antibodies in the characterization of hematolymphoid neoplasms. This consensus meeting can potentially provide a starting point for

outcome studies documenting the value of the approach shared by so many participants in the field.

The original questionnaire asked that antibodies be classified as either essential or useful for a particular disease. Some concerns were raised about the significance of specifying an essential antibody panel. It became apparent during the meeting that to accept the essential list as the minimal panel was not adequate. In many instances, following the application of a minimal panel, the analysis would necessitate additional testing to further characterize the process or define unexpected abnormalities. It should be emphasized that although the results presented comprise a core of essential panel plus supplementary markers for best characterization, no position was taken as to whether it is better to include all important markers at the outset or to study a sample in two or more stages.

For the diagnosis and classification of CLD, the group recommended 9 antibodies as essential but indicated that additional ones (for a total of 12-15 or 16, depending on whether the process is of B- or T-cell derivation) would be necessary to fully characterize the disorder. With minimal modifications, tissue-based lymphomas were recognized to be very similar to CLD in terms of the basic type of analysis needed for diagnosis and categorization. With regard to plasma cell disorders, the majority of the voting participants suggested that between 5 to 8 reagents were essential. However, it was recognized that this was a very "focused" approach for the evaluation of plasma cells and that such a relatively small panel would not be useful in the assessment of other cell lineages, allowing for the potential of missing other disease processes.

AL proved the most difficult topic to discuss. This was largely due to the fact that there is significant redundancy in leukemic cell reactivity of many antibodies. Also, participants supported the use of their own preferred reagents based on their experience. Although it is obvious that the size of the total panel used would vary with the complexity or the specific lineage of the case, virtually all voting participants agreed that 20-24 antibodies would be necessary for an adequate evaluation of AL at diagnosis. The majority of the responders also believed that some reduction in the number of the reagents recommended at the time of initial diagnosis is possible for monitoring disease following diagnosis or therapy, although the magnitude of the reduction would vary depending on the disease process.

In conclusion, the results of our international meeting support the notion that hematolymphoid neoplasias and related conditions are complex disorders that require a rather large array of antibodies for their complete immunophenotypic characterization. Additional reagents might even be needed as new diagnostic applications prove to be useful (8). Alternative approaches that utilize reduced panels could significantly jeopardize our ability to diagnose, accurately subclassify, or adequately monitor and treat these serious diseases.

## ACKNOWLEDGMENTS

We express our sincere appreciation to the following participants who greatly contributed to the success of this meeting:

*From the United States:* **Charles Caldwell**, University of Missouri, Columbia, MO; **Michelle Y. Clark-Stuart**, US FDA, Center for Devices and Radiological Health, Rockville, MD; **Charles Goolsby**, Northwestern University, Chicago, IL; **Jeannine Holden**, Emory University, Atlanta, GA; **Michael Loken**, Hematologica, Seattle, WA; **David Miller**, Cytometry Associates-Esoterix, Inc., Brentwood, TN; **Marilyn Owens**, Impath, Inc., New York, NY; **Maryalice Stetler-Stevenson**, National Cancer Institute, Bethesda, MD; **Carlton Stewart**, Roswell Park Cancer Institute, Buffalo, NY.

*From Europe:* **Maria Arroz**, Hospital Egas, Lisbon, Portugal; **Giuseppe Basso**, University of Turin, Turin, Italy; **Marie Christine Béné**, Faculte de Medecine de Nancy, Nancy, France; **Gianluigi Castoldi**, University of Ferrara, Ferrara, Italy; **H. Choremi**, Laikon General Hospital, University of Athens, Athens, Greece; **Jan W. Gratama**, University Hospital Rotterdam, Rotterdam, The Netherlands; **J. Kraan**, University Hospital, Rotterdam, The Netherlands; **Annalisa Kunkl**, San Martino Hospital, University of Genoa, Genoa, Italy; **Francis Lacombe**, University of Bordeaux, Bordeaux, France; **Francesco Lanza**, University of Ferrara, Ferrara, Italy; **Rodica Lenkei**, St. Gorans Hospital, Stockholm, Sweden; **G. del Poeta**, University of Roma, Rome, Italy; **Gregor Rothe**, Institute for Clinical Chemistry and Laboratory Medicine, Regensburg, Germany.

We also acknowledge the following companies for their generous financial support: Beckman-Coulter, Becton Dickinson Biosciences, Caltag Laboratories, Cytometry Associates-Esoterix, Inc., Impath, Inc., Mayo Medical Laboratory, Spherotech, Inc., and Streck Laboratories, Inc.

## LITERATURE CITED

1. van't Veer MB, Gratama JW. Quality assessment for immunophenotyping of leukaemias and lymphomas: the Dutch experience. The SIHON Study Group. Leuk Lymphoma 1994;13 (Suppl 1):77-79.
2. Hassett J, Parker J. Laboratory practices in reporting flow cytometry phenotyping results for leukemia/lymphoma specimens: results of a survey. Cytometry 1995;22:264-281.
3. Bene MC, Castoldi G, Knapp W, Ludwig WD, Matutes E, Orfao A, van't Veer MB. Proposals for the immunological classification of acute leukemias. European Group for the Immunological Characterization of Leukemias (EGIL). Leukemia 1995;9:1783-1786.
4. McCoy JP Jr, Overton WR. A survey of current practices in clinical flow cytometry. Am J Clin Pathol 1996;106:82-86.
5. Rothe G, Schmitz G. Consensus protocol for the flow cytometric immunophenotyping of hematopoietic malignancies. Working Group on Flow Cytometry and Image Analysis. Leukemia 1996;10:877-895.
6. Stewart CC, Behm FG, Carey JL, Combleet J, Duque RE, Hudnall SD, Hurtubise PE, Loken M, Tubbs RR, Wormsley S. U.S.-Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry: selection of antibody combinations. Cytometry 1997;30:231-235.
7. Davis BH, Foucar K, Szczarkowski W, Ball E, Witzig, T, Foon KA, Wells D, Kotylo P, Johnson R, Hanson C, Bessman D. US-Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry: Medical Indications. Cytometry 1997;30: 249-263.
8. Orfao A, Schmitz G, Brando B, Ruiz-Arguelles A, Basso G, Braylan R, Rothe G, Lacombe F, Lanza F, Papa S, Lucio P, San Miguel JF. Clinically useful information provided by the flow cytometric immunophenotyping of hematological malignancies: current status and future directions. Clin Chem 1999;45:1708-1717.