# EXHIBIT 15

| | |
|---|---|
| IN RE: DIANON SYSTEMS | ) <br> ) <br> ) <br> ) |

## DECLARATION OF JAMES B. AMBERSON, M.D.

I, James B. Amberson, hereby declare the following to be accurate and true:

1.     Throughout the 1990's to the current date, I have held a number of senior management positions at DIANON *Systems* ("Dianon"), including Medical Director and member of the Board of Directors. I am board certified in anatomic pathology and cytopathology. I received my medical degree from The Johns Hopkins University School of Medicine and did my residency training in pathology at The New York Hospital, Cornell University Medical Center. I was a cytopathology fellow under Leopold Koss, M.D., at Montefiore Medical Cente, Bronx, New York. Before joining DIANON *Systems*, I was Assistant Professor of Pathology at the Cornell University School of Medicine. I have authored articles in urology and general pathology, DNA flow cytometry and image cytometry. I also hold an M.B.A. from Columbia University. The following information is based upon personal knowledge.

2.     In approximately 1995, Dianon developed a strategy to expand by providing comprehensive outpatient anatomic pathology services, including hematopathology. To implement this strategy, the company hired Drs. Ann Marie Connor and Richert Goyette, both of whom were board certified in hematopathology. These pathologists had complete authority and discretion in the design of Dianon's flow cytometric panel for immunophenotyping. The immunophenotyping panel and other hematopathology offerings of Dianon were developed as

part of Dianon's strategic plan to be a full service anatomic pathology laboratory and had nothing to do with changes in Medicare reimbursement rates that might have been occurring at the time. I never became aware of any manager or non-physician attempting to influence Drs. Goyette or Connor to either add or delete antibodies to be performed on those panels.

3.      During the time period from 1996 through 1998, I had several conversations and corresponded at length with Dr. Arif Toor, the Connecticut Medicare carrier's Medical Director. After Dr. Toor left his position as Medical Director, I also had conversations and corresponded with the new Medical Director, Dr. Deli Carpini regarding immunophenotyping issues. During the course of those communications, both Drs. Toor and Deli Carpini should have become fully familiar with the comprehensive flow cytometric immunophenotyping panel Dianon provided. They never stated that fewer antibodies should be performed and never questioned the medical necessity of employing a large antibody panel for the diagnoses rendered by Dianon.

4.      I have reviewed Dr. Tiesinga's claim in paragraph 13 of his *qui tam* complaint in which he asserts that he learned in May 2002 that Dianon was performing (in his view) an unnecessary number of antibodies in conducting flow cytometric analysis and claims, in paragraph 14, that I recognized that the use of twenty-five antibodies was inappropriate.

5.      Contrary to his assertion, I do not recall and do not believe that Dr. Tiesinga ever claimed that Dianon either performed or had a policy of charging Medicare for medically unnecessary antibodies. Dr. Tiesinga's statement that he first became aware in May 2002 that Dianon was using 25 antibodies is simply untenable. By the time that this alleged discovery occurred, he had been working at Dianon for 10 months and signing reports based upon his interpretation of cases tested with these antibody panels. Dr. Tiesinga would have to have

2

become aware of the number of antibodies used in Dianon's flow cytometry panel as soon as he began working at Dianon in July 2001.

6.    Second, his statement is not credible because, during this same time period, Dr. Tiesinga readily agreed to visit the Oklahoma carrier to state that Dianon's comprehensive panel was medically necessary.  Because of his experience in the area, I asked him to confirm his belief that the comprehensive panel was medically necessary and that he could make a strong argument supporting the medical necessity of Dianon's flow cytometry antibody panel. He confirmed his view that Dianon's antibody panel was medically necessary, which is the direct opposite of what he stated in his complaint, and that he would be able to convincingly support Dianon's flow cytometric test offerings.

7.    Since January 2003, when Laboratory Corporation of America ("LabCorp") acquired Dianon, I have participated in conversations with Dianon's co-directors of hematopathology, Drs. Mishalani and Segal, regarding the standardization of flow cytometry panels between LabCorp and Dianon.  While Drs. Mishalani and Segal concur that reasonable hematopathologists can disagree as to the number of antibodies to perform, whether all important markers should be included at the outset, or whether antibodies should be added and studied in two or more stages; both have stated that, in their professional good faith opinion, Dianon's comprehensive panel is best tailored toward diagnosing the patient's condition where leukemia or lymphoma is suspected.

I have reviewed this declaration and declare under penalty of perjury that the foregoing is true and correct.

James B. Amberson, M.D.

3

# EXHIBIT 16

IN RE: DIANON SYSTEMS         )
         )
         )
         )

## DECLARATION OF VALERIE PALMIERI

I, Valerie Palmieri, hereby declare the following to be accurate and true:

1.       I have been employed by DIANON *Systems* ("Dianon") since December 1987. Since 1989, I have held various management positions at Dianon. In 2002, I became senior Vice President of Operations. The following information is based upon my personal knowledge.

2.       Beginning in 1995, after employing the Wilkerson Group, Inc., a consulting firm, to study the marketplace for anatomic pathology, Dianon made a decision to change the strategic direction of the company from clinical pathology to full service anatomic pathology, including more specifically, hematopathology. To implement this strategy, Dianon hired Drs. Ann Marie Connor and Richert Goyette, both of whom were board certified hemotopathologists.

3.       Drs. Connor and Goyette had full control to design Dianon's flow cytometry panel as they did with all hematopathology offerings. I never became aware of any business manager or non-physician attempting to influence Drs. Goyette or Connor to either add or delete antibodies to be performed on those panels.

4.       I have reviewed the statements that Dr. Tiesinga attributes to me in paragraph 14 of the Complaint. I do not recall any such meeting and I did not state the words that he attributes to me. Furthermore, I find Dr. Tiesinga's statements to be unbelievable because he claims that Dianon was performing medically unnecessary tests, while he was, at the same time, advocating

to the Medicare carrier for Oklahoma that all antibodies in Dianon's comprehensive panel were medically indicated and necessary. I have never heard Dr. Tiesinga express any concern or reservation about the number of antibodies in Dianon's immunophenotyping panel, nor as to how it was billed.

5.      Shortly after Laboratory Corporation of America ("LabCorp") acquired Dianon in January 2003, I had discussions with Dianon's co-directors of hematopathology, Drs. Mishalani and Segal, regarding LabCorp's desire to standardize the flow cytometry and other hematopathology offerings of Dianon and LabCorp. Both of these hematopathologists have expressed substantial reservations and grave concern about the adoption and use of the shorter, targeted panels offered by LabCorp. Both have stated that based upon their experience and expertise, Dianon's comprehensive panel is medically indicated and necessary to fully characterize and accurately diagnose leukemia and lymphoma disease states. They expressed serious concerns that a patient's condition might be misdiagnosed or a disease might be missed if the targeted panels were used. Their level of concern was so great that I thought they might refuse to adopt the targeted panels or render diagnoses based on them. Consequently, I considered the possibility of hiring or utilizing another hematopathologist who would be comfortable rendering a diagnosis based on the targeted panels. These thoughts are reflected in my handwritten notes produced to the government (Bates no. AG 00252, attached).

I have reviewed this declaration and declare under penalty of perjury that the foregoing is

2

true and correct.

Valerie Palmieri

4) Lab Corp Prias — John
   Dianon prices — (

5) them comfort level of paths.] reading shared
                                          panel
   → Already a company w/ shared panels.

6) ? Refusal to do it →)

7) (Possible to do with different Hemepath.) ⊗

8) Converting other customers:
   Causing other people to order full panels

AG 00252

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
----------------------------x
UNITED STATES OF AMERICA,      :
ex rel., JAMES J. TIESINGA,    :
                               :
          Plaintiffs,          :
                               :
     v.                        :  No. 3:02CV1573(MRK)
                               :
                               :
DIANON SYSTEMS, INC.,          :
                               :
          Defendant.           :
----------------------------x
```

Washington, D.C.

Tuesday, February 28, 2006

Deposition of

RICHERT E. GOYETTE

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 9:00 a.m., at

the offices of United States Department of Justice,

601 D Street, NW., Washington, D.C., before Lohna

Esteb of Beta Court Reporting, notary public in and

for the District of Columbia, when were present on

behalf of the respective parties:

22

1    A    Yes.
2    Q    What did you do?
3    A    Well, we -- we, as physicians and
4    practitioners of medicine at the hospital, we
5    billed patients for the professional
6    component of clinical and anatomic laboratory
7    services.
8    Q    Okay.  And did you ever submit
9    bills to Medicare?
10    A    When you say you, you refer to our
11    practice?
12    Q    Yes.
13    A    I don't know why we wouldn't.  I
14    mean, I wasn't -- we had billing people.  We
15    had a billing system.  And so, you know, for
16    me to actually try to tell you what -- who we
17    billed and how we billed, it would be beyond
18    my knowledge.
19    Q    Okay.  What about when you were at
20    Dianon, did you --
21    A    I didn't bill anybody at Dianon.
22    Q    But Dianon billed somebody?

23

1    A    They certainly did.
2    Q    Okay.  Did you have any role in
3    deciding what got billed?
4    A    I think you have to clarify that.
5    Q    Well, for example, in the flow
6    cytometry test, there are a number of
7    different markers that are used.  Did you
8    have any input into how many markers got
9    billed for?
10    A    As a component of the practice of
11    medicine, we were -- we believed it was in
12    the patient's best interest to select
13    antibodies that best -- would best identify
14    the patient's disease.
15        And as such, we made
16    recommendations which, quite honestly, were
17    in fact, not challenged because they were our
18    medical opinion.
19    Q    I'm sorry.  You made
20    recommendations for, what?
21    A    For specific antibodies to be added
22    or taken away from a panel of tests that we

24

1    used.
2    Q    Okay.  Let me -- you provided an
3    affidavit to -- well, actually, let me do
4    something else first.
5        Let me have you talk a little bit
6    about some of the diseases that are diagnosed
7    by Dianon.  I going to talk about -- have you
8    just sort of walk me through what they are so
9    that when we talk about them later we'll all
10    be talking about the same thing.
11        Will you just give me sort of a
12    general, and keep in mind that I am a history
13    major, have no science background, so words
14    of one syllable if you can.
15    A    Okay.
16    Q    What ALL is?
17    A    Now, are you going to ask me
18    specific diseases, or did you want more of a
19    broad overview?
20    Q    Actually, I'm going to -- I want to
21    ask you about specific diseases.
22    A    Okay.  ALL is an abbreviation for

25

1    acute lymphocytic leukemia.
2    Q    Wand hat is the problem when
3    somebody has that disease?
4    A    Well, a leukemia is a malignant
5    proliferation of white blood cells.  And the
6    term lymphocytic in between acute and
7    leukemia refers to the lineage or family that
8    the lymphocytes belong to.
9        And the proliferation of immature
10    lymphocytes in patients with acute
11    lymphocytic leukemia --
12        COURT REPORTER:  Can you slow down
13    just a little bit?
14        THE WITNESS:  Certainly.
15        COURT REPORTER:  The proliferation
16    of immature.
17        THE WITNESS:  The proliferation of
18    immature lymphocytes in patients with acute
19    leukemia is unregulated.  And, consequently,
20    they displace the normal elements of the bone
21    marrow.
22        And since the bone marrow makes

102

1    here, represented the fact that this, in
2    fact, was designed by me in, probably, July
3    because of the amount of work we were doing
4    trying to simply it for myself, whereas this
5    came out in November.
6        So it was an evolving process.
7    Antibodies were added or taken off, I assume.
8    I don't remember specifically.
9        But as new hematopathologists would
10   join the staff, based on their practiced and
11   their experience, they would say, "You know
12   what, we really need this."
13       And we'd discuss it. I mean, you
14   are not going to tell a physician don't use
15   your stethoscope or don't use this tool. So,
16   I mean, if they really believed it was
17   important to make the diagnosis, we would go
18   ahead and add it.
19       So -- what was your question?
20   Q    The question, I've forgotten. The
21   question was how did you -- when you and Dr.
22   Connor --

103

1    A    Oh, okay. I'm sorry.
2    Q    -- sat down and put together the
3    panel that you chose, how did you decide
4    which antibodies to put on it?
5    A    Okay. Well, at the time, I had a
6    lot of book knowledge shown by what I believe
7    to be shown in my book. But Dr. Connor
8    actually had been practicing -- had recently
9    trained and been practicing hematopathology.
10   So she basically suggested most of these
11   antibodies. And based on my knowledge, I
12   concurred.
13       So the initial panel represented
14   her professional opinion, with my
15   concurrence.
16   Q    Okay. And there are roughly
17   somewhere in the low 20s in terms of
18   antibodies.
19   A    Okay.
20   Q    Did you consider having more --
21   smaller, more focused panels based on what
22   the supposed or suspected diagnosis was?

104

1    A    I'm sure that that was considered;
2    but, our situation was very unique, and that
3    would have been -- we believed that would
4    have, actually, potentially harmed patients.
5    Q    Why was that?
6    A    That's because you -- sometimes you
7    can do kind of a step-wise panel: Do a few,
8    do a few more.
9        If you're in a hospital, a specimen
10   has just been taken out in the operating
11   room, the doctor is there for immediate
12   consultation, can add, subtract. You can do
13   a lot things that you can't do in a reference
14   laboratory.
15       And so since these specimens start
16   dying -- the minute you take them out of the
17   body they start dying -- by doing -- start
18   doing kind of a sequential approach, you have
19   cells dropping out.
20       And it's interesting that the cells
21   don't just die at an even rate. Some
22   populations die faster than others.

105

1        For example, neoplastic cells or
2    tumor cells can die faster than normal cells.
3    And so the longer you wait, the less likely
4    it is that you're going to be able to examine
5    a spe -- or cells that are representative of
6    the patient's condition.
7        So we elected at the time to try to
8    apply our professional experience based upon
9    which antibodies we thought were appropriate
10   for the specimens, which comprise this panel.
11   Q    Okay. And that panel was applied
12   for all the specimens that came in?
13   A    I wouldn't say all. There were
14   times that a specimen would come in and
15   somebody in the lab would call the
16   hematopathologist and say, "This is a strange
17   request."
18       And if it appeared to be a strange
19   request, the hematopathologist might call the
20   physician or, in fact, he'd say, "Well, based
21   on the IDC9 code and the diagnosis here, I
22   think we should add an antibody or two."

110

1    On the other hand, I also believe
2 that a lab that only does four antibodies or
3 six antibodies and doesn't have the knowledge
4 of what the additional antibodies would
5 contribute to the diagnosis of specimens
6 referred by hematologists/oncologists from
7 around the country wouldn't be committing
8 malpractice.
9    Now, did I say it so that -- if
10 they didn't know any better, they wouldn't be
11 doing malpractice.
12    If they knew and failed to do it,
13 failed to do those additional antibodies, I
14 think they could very likely be sued for
15 malpractice.
16    BY MS. DAVIS:
17    Q    Let's talk about suppose you have a
18 case where the disease has already been
19 diagnosed, and all you're doing is staging
20 the disease. Would it be possible to use a
21 smaller, more focused panel in that case?
22    MR. PARKER: Objection.

111

1    THE WITNESS: It would be possible
2 but not proper.
3    BY MS. DAVIS:
4    Q    Why?
5    A    That's because on numerous
6 occasions, we'd get something in with one
7 diagnosis. And based on the fact that we
8 were doing this more comprehensive panel,
9 we'd arrive at a totally different diagnosis.
10    Q    How often did that happen?
11    A    On a -- often enough so that I
12 considered it to be a fairly regular
13 occurrence. And I can't quantitate.
14    Q    What about if Dianon had already
15 done flow cytometry on previous specimens
16 from the patient so you already knew what the
17 diagnosis was; and, in fact, what the
18 immunophenotyping was for that particular
19 patient?
20    A    Well, in a perfect world, if
21 nothing changed, then they'd never have to do
22 another panel.

112

1    But the plan fact of the matter is
2 that diseases evolve over time, okay. So at
3 any one time you're only looking at a
4 specific element of that disease.
5    Not only do they evolve over time,
6 but they involve different areas of the body.
7 For example, you can find something in the
8 peripheral blood that wasn't there in the
9 bone marrow that was sampled.
10    Okay. And, also, you know, it's
11 amazing to me, and quite honestly, actually,
12 I'd have to look up on the Internet to
13 confirm it because it's been six years or so
14 since I was there, but these hematologic
15 disorders don't just occur in isolation, they
16 very commonly occur with other diseases.
17    So -- and, furthermore, treatment
18 actually alters the population. So, for
19 example, somebody that's treated for chronic
20 myelogenous leukemia, the very drugs that
21 they are treated with can induce acute
22 leukemia.

113

1    So it's a very dynamic situation in
2 which a flow test at one point in time
3 doesn't necessarily at all represent what
4 you're going to see at another point in time.
5    I mean, you wouldn't want your
6 cardiologist to just listen to your heart
7 because he'd listened to your heart before.
8 You'd want him to listen -- examine you
9 completely.
10    MS. DAVIS: Let me have you take a
11 look at what's been marked as Exhibit 8.
12    (Deposition Exhibit No. 8 was
13    marked for identification.)
14    THE WITNESS: Okay.
15    BY MS. DAVIS:
16    Q    Let me just -- have you seen that
17 document before?
18    A    No.
19    Q    Let me just direct your attention
20 to the -- about two thirds of the way down
21 the page where it says, "The new profiles
22 will offer the following components:" And

114

1  then it says, "Chronic Leukemia Profile, Flow
2  Cytometry" and "Acute Leukemia Profile, Flow
3  Cytometry."
4        Can you take a look at each of
5  those profiles and tell me in your opinion
6  would they be sufficient?
7        MR. PARKER: Objection. Sufficient
8  for what?
9        THE WITNESS: Well, Counselor, I
10 think that first, I've never seen this
11 before, but I think the initial premise given
12 in Paragraph 1 "Dear Valued Client" is wrong
13 because it predisposes that the diagnosis has
14 already been established, saying that the
15 physician is coming in saying, "Here's a case
16 of CLL, take a look at."
17        And, in fact, in the majority of
18 specimens that we received may have had a
19 provisional diagnosis; but, in fact, were not
20 what the provisional -- did not turn out
21 eventually to be what the provisional
22 diagnosis was.

115

1        And then they then proceed from
2  what I believed to be an incorrect premise to
3  say that if you have chronic leukemia, we
4  will do the following antibodies. And, in
5  fact, they added the -- and the following
6  supplemental markers may also be added. And,
7  in fact, I'm fairly certain that additional
8  markers will probably added on a regular
9  basis.
10       So do I believe that these
11 antibodies help to establish? Yes. Are
12 there antibodies here that -- are there
13 antibodies missing from these different
14 panels that would have more further
15 elucidated the patient's diagnosis?
16 Probably.
17       And I'd have to go through the same
18 exercise about writing them down. If you
19 wish me to do that, I'd be glad to do it.
20       But, you know, the thing is -- and
21 I'll try not to be pompous here, okay -- the
22 thing is that we were practicing medicine,

116

1  okay. And we were referred specimens by
2  these clinicians, okay. And these were not
3  dummies off the street. These were board
4  certified hematologists/oncologists, and they
5  oftentimes were in cancer centers.
6        And they would send us a specimen.
7  And it wasn't to -- Well, here it is, you
8  know, just for the record, they were actually
9  asking for our help on these things.
10       And I think that was indicated by
11 the fact that in our phone consultations with
12 them, when we'd talk with them about cases,
13 or also by some of the things that we
14 discovered by using the more comprehensive
15 panel.
16       So, it would be, like, a doctor --
17 and I'm going to use this again because it's
18 such a nice analogy -- it's when you go to
19 your cardiologist, if the doctor says, "You
20 know, I think they've had a heart attack."
21       You would still expect your
22 cardiologist to really check and make sure

117

1  that the chest pain you're having isn't from
2  a pulmonary embolism, for example.
3        I mean, it's kind of like -- the
4  whole process is a process of establishing
5  the diagnosis, the prognosis.
6        And so we were in the diagnostic
7  chain, which meant that the diagnosis wasn't
8  already established. We were making the
9  diagnosis.
10       And as such, like, even if you come
11 in with chest pain, the doctor will listen
12 and examine your stomach.
13       So it was just part of an
14 examination that we were performing. And I
15 believe by taking this approach, and in all
16 sincerity, I just -- I know from my personal
17 experience that doing this compromises
18 outcomes. And not on every case. But on
19 enough cases that it made an impression on
20 me.
21       MR. PARKER: I want to add an
22 objection. I think the -- certainly the

186

1    apologize.
2        THE WITNESS: I'll calm down.
3        BY MS. DAVIS:
4    Q    What about CD23?
5    A    CD 23 is absolutely essential to
6    differentiate between chronic lymphocytic
7    leukemia and mantel cell lymphoma.
8    Q    Okay. And CD25?
9    A    Twenty-five, key antibody for the
10   diagnosis of hairy cell leukemia.
11   Q    Sixteen, we already talked about.
12   That was, which?
13   A    I think it's an NK cell marker.
14   Q    All right. Thirty-eight?
15   A    Thirty-eight, I believe, is an
16   activation marker and it -- it can be very
17   valuable in cases of multiple myeloma. And
18   we received a number of cases in which either
19   myeloma was asked for, or it turned out to be
20   the diagnosis that we felt it was important
21   to include.
22   Q    HLABR?

187

1    A    It's an activation antigen. It's
2    present on a variety of cells. It can be
3    present on leukemic blasts, as an additional
4    marker for leukemic blast.
5    Q    All right. So does -- those eight
6    antibodies that we just talked about that are
7    not on your list on Exhibit 13, are those
8    antibodies that if you did the initial 18,
9    and for some reason suspected there might be
10   hairy cell anemia, (sic) you could go back
11   and do those tests as a second round?
12   A    No, because I think -- we had
13   established we were going to do all 26,
14   irrespective of this memo.
15       I think that pathologists or
16   hematologists that do the 18 memos -- I mean,
17   excuse me, the 18 antibodies listed on this
18   memo are not practicing a standard of care
19   because as, I document in my deposition -- or
20   not deposition, what is this thing -- my
21   declaration, Exhibit 3, I had my eyes opened
22   to the diagnosis of a number of different

188

1    disorders that would not have been diagnosed
2    with the additional use of these antibodies
3    on a routine basis, such as hairy cell
4    leukemia.
5    Q    Hairy cell -- isn't hairy cell
6    leukemia a sort of subset of one of the
7    leukemias?
8    A    Not really. It's a very distinct
9    pathologic entity. It's got very distinct
10   clinical presentation. And it's one of those
11   fortunate diseases that the cells have
12   something we can relate to. And there are
13   little hairs all over them.
14   Q    So you can look at the slide and
15   see --
16   A    You can look at the slide and you
17   can say "Gee, whiz, this might be hairy cell
18   leukemia."
19   Q    And so after you looked at the
20   slide, you could then go back and try -- and
21   do the hairy cell --
22   A    No, because some of them don't have

189

1    hairs, unfortunately. And the other thing is
2    sometimes the hairs are only seen on phase
3    microscopy, which requires live -- specimens
4    still alive. And at Dianon, they were dying
5    as we talked.
6    Q    Okay. I asked you earlier, the
7    affidavit we've been looking at, Exhibit 3,
8    you said that Tom Kossl wrote the initial
9    draft of it, is that right?
10   A    After -- after a long conversations
11   with me.
12   Q    Okay. And then you said you had
13   some changes to it?
14   A    No. I extensively revised it. This
15   no longer looks like Tom Kossl's document;
16   although, I can't tell you for sure that
17   there aren't elements of his still in here.
18   Q    Okay. How many drafts did you go
19   through?
20   A    One.
21   Q    One draft?
22   A    Yeah.

298

1    THE WITNESS: Similar changes. But
2  there were so many examples of -- by doing
3  this, we picked up new diagnoses, refined
4  diagnoses, or new diagnosis, refined
5  diagnosis, or something totally different
6  that it would not have been the standard of
7  care in my professional opinion to have
8  limited either a physical examination on this
9  patient named Lewis -- I'm sorry, on this
10  patient KL, to limit a physical examination,
11  or to limit my professional examination.
12    Why would I do that?
13  Q  All right. Let's look at Page
14  1187.
15  A  Okay.
16  Q  What role did CD103 play in your
17  diagnosis of this patient?
18  A  Well, by the nature of your
19  question you're telling me that you're
20  thinking in a binary standpoint, either they
21  have hairy cell leukemia, or they don't need
22  CD103.

299

1    And I think what I mentioned is
2  that aberrant expression of antigens is a
3  fairly consistent feature of hematologic
4  disorders.
5    And by doing the 103, I obtained
6  another marker that may have been aberrantly
7  expressed, is not commonly aberrantly
8  expressed, but may have been, on this
9  particular patient.
10    Plus, there are reports of patients
11  with, let's say, hairy cell leukemia and
12  multiple myeloma. And had I just looked --
13  and this is not -- this patient doesn't have
14  multiple myeloma or hairy cell leukemia, but
15  if the doctor had said hairy cell leukemia,
16  and I only did hairy leukemia, I might have
17  very well missed the multiple myeloma.
18  Q  Okay. But let's look at --
19  A  Okay.
20  Q  You've got a test report from four
21  months previously where 103 was tested. And
22  as far as I can tell, it's zero. It doesn't

300

1  show up at all.
2  A  I'm sorry, what, 103?
3  Q  Yep. If you look at 1179. So what
4  does you doing 103 four months later add to
5  the diagnosis of this patient?
6  A  Well, I'm not being clear, clearly,
7  because we don't understand each other. It's
8  like a toenail grows, okay? Well, this
9  disease evolves.
10    And does the fact that there's no
11  103 on this disease four months earlier mean
12  it's not going to appear later? Does the
13  fact that there's no 103 expression four
14  months prior mean this patient isn't going to
15  develop a concurrent hairy cell leukemia?
16  No.
17    Does it mean that the cells aren't
18  going to -- didn't abb -- didn't aberrantly
19  express 103 four months ago aren't going to
20  show it up now and it won't be a valuable
21  marker for tracking a clone of cells? No.
22  Q  What about 11C?

301

1  A  Same --
2  Q  What role in your diagnosis?
3  A  Same thing, exactly the same thing.
4  Q  Even though you had a test result
5  available from four months previously where
6  CD11C was tested and came up net zero?
7  A  I'm going to try to -- since you
8  keep asking the same question, I am going to
9  try to be very concise here.
10    These are not static disorders;
11  therefore, what was present four months ago
12  is not likely to be present. It could be,
13  but it's oftentimes not present four months
14  later.
15    In addition, just because a patient
16  has acute leukemia doesn't mean that they
17  don't have a smoldering myeloma that is
18  picked up later. And to restrict our
19  examination would have been doing an
20  incomplete examination.
21    You will not find any clinician who
22  will examine a patient and say, "I'm only

302

1  going to look at the ears," because they have
2  ear pain, okay.
3       You do an examination. You examine
4  the patient completely. You ask all the
5  relevant questions. And you don't just come
6  up with a diagnosis of chronic otitis media,
7  or ear infection.
8       You say, "This person has enlarged
9  tonsils. Maybe they are contributing to it."
10  Or "This patient has recurrent infections.
11  Maybe the fact that they have got acute
12  otitis, and I can see candidid infection
13  around their fingernails, means that they've
14  got an immunologic deficiency."
15       So it's a constellation of things
16  that we look at. And as far as I'm
17  concerned, to have done less on any of these
18  patients would have been malpractice.
19       And I'm expressing it from my
20  perception of malpractice. For me, it would
21  have been malpractice to do a slipshod,
22  partial examination, even though I had heard

303

1  previously that this patient had this
2  diagnosis, and it had these characteristics.
3       Q   All right. I thought I lost a
4  patient there.
5       A   You don't want to lose a patient.
6       Q   That's why I went to law school and
7  not medical school.
8       A   Right.
9       Q   I can lose patients and it doesn't
10  have the same meaning.
11       A   I should have gone to law school,
12  too.
13           (Deposition Exhibit No. 29 was
14           marked for identification.)
15       BY MS. DAVIS:
16       Q   All right, 29. Okay. And once
17  again, this is another package. And --
18       A   Okay.
19       Q   -- as you will see, there are
20  repeat tests. And to my count there are
21  three repeat tests.
22       A   All right.

304

1       Q   Take a look at Page 3683.
2       A   Hang on just a second. I'm
3  actually trying to reacquaint myself with
4  what's going on with this patient.
5       Q   Okay.
6       A   And looking at dates and things.
7           (Pause)
8       A   Okay. These reports are out of
9  chronological order.
10       Q   I understand.
11       A   Okay. So let's see now -- Okay.
12  Please ask.
13       Q   Okay. Pick the dates out now?
14       A   Yeah, I did.
15       Q   Okay. Turn to Page 3673.
16       A   Okay. I turned to that page.
17       Q   Okay.
18       A   I do not see a corresponding report
19  to it, though, but...
20       Q   I don't either.
21       A   Okay. Ask.
22       Q   So that that report is dated, at

305

1  least at the top, it says received 3/24/99?
2       A   Yes.
3       Q   Okay. And then there's another
4  report at 3683?
5       A   6899?
6       Q   3683. It's dated 6/11/99.
7       A   I'm sorry. I'm lost here. Are you
8  talking about --
9       Q   3683.
10       A   Is that the patient accession
11  number? Oh, the page --
12       Q   Page number.
13       A   3683. Okay, 3683. Okay. I see
14  this report.
15       Q   Okay. And --
16       A   This is the only report I see.
17  Everything else --
18       Q   Other than the, what appears to be
19  the printout of the flow cytometry data from
20  earlier?
21       A   Right. So I don't see any reports
22  here. I see the laboratory -- printout of

306

1  laboratory worksheet.
2      Q    Okay.  Turn to Page 3674.
3      A    Okay. I'm there.
4      Q    Okay.  And that is -- it says
5  collection date, 6/8/99?
6      A    Yes.
7      Q    And that corresponds with the
8  collected date on your report?
9      A    Yeah, this -- these -- this
10  specimen requisition appears to correlate
11  with my -- does correlate with my written
12  report and my typed report.
13      Q    Okay.  And down at the bottom it
14  says, "In clinical diagnosis"...
15          It says, "Clinical diagnosis,
16  non-Hodgkin's lymphoma high grade."
17      A    Okay.
18      Q    And then it says, down at the
19  bottom, "Indications for study staging
20  lymphoma."
21      A    Uh-huh.
22      Q    Okay.  And what is the ICD9 code

307

1  202.8?  What does that indicate?
2      A    I think that -- you know, I don't
3  know.  I don't memorize, but I think it's a
4  lymphoma code.
5      Q    Okay. And then if you turn to your
6  report, under clinical history, it says,
7  "77-year-old woman with high grade,
8  non-Hodgkin's lymphoma, bone marrow for
9  restaging following chemotherapy."
10      A    Okay.
11      Q    What is it that the doctor was
12  asking you to look for?
13      A    He is asking me to look for
14  recurrent -- the very nature of the request
15  is for a flow cytometry.  This is not what he
16  is asking me for.  This is saying -- he's
17  providing me history so I can interpret the
18  results of a flew.
19          As far as I'm concerned, the fact
20  that he requested the XL3 or 4, whatever the
21  test was, is an indication he is asking for
22  my professional opinion on this patient's

308

1  bone marrow.  And he's concerned that there
2  may be malignant lymphoma in it.  And he's
3  not even specific about the type of lymphoma.
4  He doesn't say it's a T-cell, a B-cell.
5          And even if he were, I wouldn't
6  necessarily trust him, I would still look at
7  it and make sure.
8      Q    All right.  So when he said
9  indications for study staging lymphoma, does
10  that mean anything in terms of what you would
11  look at?
12      A    No, no, because that -- that would
13  be such a mistake if I said, okay, I just
14  looked at the specimen, limited my
15  examination saying there's no lymphoma and
16  didn't tell the patient the fact that there's
17  metastatic prostate cancer in his bone
18  marrow, for example.
19          Now, that's not a flow thing; but a
20  lot of diagnoses by flow, you wouldn't want
21  to restrict your examination.  It's like only
22  tell me what I want to know is there, and if

309

1  it's not there, don't tell me -- I don't want
2  to hear any bad news.
3      Q    All right.  And so -- and when --
4  when you did this test that's dated 6/11/99,
5  or interpreted it, would you have had
6  available to you the results of the test that
7  are 3/24/99?
8      A    Well, I would hope so.
9      Q    Is that usually the way it happened
10  at Dianon?
11      A    Yeah, usually, they did try to
12  provide us with the test.
13          But, remember, the fact that they
14  biopsied the left iliac crest, and three
15  months later they biopsied the right or a
16  different site doesn't mean that this next
17  biopsy isn't going to pick what they're
18  looking for, or something else.
19      Q    All right.  So despite the fact
20  that three months before your test, less than
21  three months before your test, Dianon at
22  already dona a flow cytometry on this

310

1    patient, you felt the need to do all 20 —
2    I'm assuming all 25 or 26 of the antibodies
3    listed in your report?
4        A    Quite honestly, there's no doubt in
5    my mind that that was appropriate.  And I
6    would expect the clinician to thank me for
7    doing a complete examination rather than a
8    slipshod one, which I believe doing fewer
9    would have been slipshod.
10       Q    Okay.  For purposes of staging
11   lymphoma, which of the antibodies listed
12   there would be necessary to do that?
13       A    All of them.
14       Q    How so?
15       A    Because, first thing, we don't know
16   if it's a T-cell or a B-cell lymphoma.  So
17   you have to do the T-cell because there are
18   T-cell lymphomas.  You have to do the B-cell
19   because there are B-cell lymphomas.
20       Secondly, I don't -- have not made
21   the diagnosis that I know of of lymphoma
22   here, which means them may have seen a

311

1    collection of cells which, actually, a
2    collection of blasts.  And, in fact, the
3    patient didn't have lymphoma, that they had
4    something else.
5        And so, I mean, the world's -- the
6    chief of hematology/oncology at NIH could
7    submit a sample to me, and I would not be
8    exercising my professional judgment if I
9    restricted my examination to only identifying
10   something that he thought were there.
11       Q    Even if you had already had
12   Dianon's analysis from three months before?
13       A    The analysis from three months
14   before was negative.  He wants to know has it
15   come back in the three months, or at a
16   different site, present three months ago, but
17   it's -- I biopsied a different site, and is
18   it here?
19       Q    Okay, you told me what the T-cells
20   and the B-cells would tell you.  What about
21   CD103, what role would that play in the
22   diagnosis of this patient?

312

1        A    I'm only taking the time because I
2    know you're trying to learn this, but I'm
3    getting very frustrated by this line of
4    questioning.
5        Hairy cell leukemia -- those
6    antibodies would have been useful in the
7    diagnosis of hairy cell leukemia.
8        Hairy cell leukemia can present
9    with enlarged spleen, enlarged lymph nodes,
10   which to a clinician could appear to be a
11   malignant lymphoma instead of hairy cell
12   leukemia.
13       Secondly, patients with hematologic
14   neoplasm sometimes get additional neoplasms.
15       Third, I never established the
16   diagnosis of non-Hodgkin's lymphoma in this
17   patient.  I don't know that that's even the
18   correct diagnosis.
19       Q    So is the only diagnose you would
20   accept would be your own?
21       MR. PARKER:  Objection.
22       THE WITNESS:  The first thing I

313

1    would have to say, it is customary and usual
2    practice for pathologists to always review
3    previous biopsy material that's submitted to
4    them, and render their own interpretation and
5    not to accept anybody else's diagnosis.
6        And I believe that's the standard
7    of care in all hospitals.  Outside material
8    comes in, and the inhouse pathologist reviews
9    it and also diagnoses it.
10       MS. DAVIS:  Okay.  Let's take a
11   break.  He's got to change the tape, okay.
12       THE VIDEOGRAPHER:  Going off the
13   record at 4:28 p.m.  Tape 4.
14       (Recess)
15       THE VIDEOGRAPHER:  Going back on
16   the record at 4:30 p.m.  Tape 5.
17       BY MS. DAVIS:
18       Q    Okay.  Believe it or not, I think
19   we are done with the charts, patient charts.
20       A    Yea.
21       Q    Me, too.  Let me -- can you take a
22   look at just a couple more questions on your

322

1    THE WITNESS: I'm sorry, you know,
2  this is what's happening. I'm decompensating
3  here.
4    MR. PARKER: I'm highly offended.
5    THE WITNESS: I'm sorry.
6  BY MS. DAVIS:
7    Q  You met with Dianon lawyers on
8  three separate occasions?
9    A  I think that's what I just said.
10    Q  Okay. What about, did you talk to
11  anyone else at Dianon?
12    A  No.
13    Q  Any former employees?
14    A  I've had no -- virtually no contact
15  with Dianon since I left, with employees or
16  anything else.
17    Q  Okay. Are you being compensated in
18  any way for --
19    A  Yes, I am.
20    Q  -- your testimony?
21    A  This experience represents a
22  significant compromise to my professional

323

1  activities. So when Mr. Kossl originally
2  talked to me, it was not about money, and I
3  volunteered to help.
4    But then I said "Well, how much
5  time is this going to take?"
6    And he said, "Oh, don't worry.
7  We'll compensate you." And that was the
8  extent --
9    MR. PARKER: I want to put an
10  objection because your question was
11  compensated for his testimony.
12    MS. DAVIS: No --
13    MR. PARKER: He has been retained
14  to serve as consulting services in connection
15  with the litigation. It's not paid to
16  testify.
17  BY MS. DAVIS:
18    Q  Okay. So let me make sure I
19  understand what it is you're being
20  compensated for. Can you tell me what it is?
21    A  I guess it's the time I've spend
22  involved in preparing for the deposition.

324

1    Q  Okay. Are you --
2    A  And advising them --
3    Q  Okay. Are you -- are you --
4    A  -- of what happened.
5    Q  We are talking over each other
6  again. Go ahead.
7    A  I'm through.
8    Q  Okay. Are you being compensated --
9  are you -- have you been hired as a
10  consulting expert or --
11    A  No, I don't believe so.
12    MS. DAVIS: Okay. I think that's
13  all the questions I have.
14    Just to put on the record, though,
15  because we've got medical records and we need
16  to protect those, can we have the --
17  everything marked confidential?
18    And there's -- at the bottom,
19  there's a statement about confidential health
20  information, put that on the tape and on the
21  transcript. And keep the transcript and the
22  exhibits confidential. Okay. That's all I

325

1  have.
2    EXAMINATION BY COUNSEL FOR DEFENDANT
3  BY MR. PARKER:
4    Q  Dr. Goyette, I want to go back and
5  talk about a few issues that were discussed
6  six hours or so ago.
7    A  Okay.
8    Q  Dr. Goyette, in the period of time
9  in which you were at --
10    A  Didn't want to forget your name.
11    Q  In the period of time in which you
12  were at Dianon, from 1995 to 2000?
13    A  Yes.
14    Q  Was it the hematopathologists who
15  decided what antibodies ought to be in the
16  panel, or did the business people decide
17  that?
18    A  No. The hematopathologists decided
19  solely.
20    Q  In the five years you were at
21  Dianon, was there ever an instance in which
22  anyone outside of the hemopathologists

**326**

1 decided what was going to be in the flow
2 cytometry panel?
3    A    No.
4    Q    Dr. Goyette, in the five years you
5 were at Dianon, and using the panel that you
6 and your colleagues created as you have
7 testified to today, did you believe in each
8 an every instance in which you used that
9 panel that that was what was necessary to
10 provide medical care within the standard of
11 care?
12    A    Yes.
13    Q    Dr. Goyette, you're a physician,
14 obviously, correct?
15    A    Yes.
16    Q    You worked in a laboratory, right?
17    A    Yes.
18    Q    Was what you were doing providing
19 medical treatment any different than the
20 example you used several times today of going
21 to a cardiologist and getting an examination?
22    A    No.

**327**

1    Q    Can you explain it to the jury?
2    A    Certainly.
3        MR. PARKER:  If you're going to
4 play this tape, I want the jury to understand
5 what it is you're trying to say in this
6 litigation.
7        THE WITNESS:  Well, medicine is
8 divided into specialties.  And, for example,
9 even though he examines the entire body, a
10 nephrologist focuses upon the kidney.  Even
11 though a cardiologist examines the whole
12 body, he focuses on the heart.
13        As a hematopathologist, we are also
14 interested in the entire patient by our
15 examination is focused but not restricted to
16 the hematologic system.
17        And we viewed the receipt of a
18 specimen, a portion of a patient, specimen
19 drawn from a live patient, as a request for
20 consultation.
21        And for that purpose, we -- we
22 acted in the patient's best interest to

**328**

1 completely examine that specimen to the best
2 of our knowledge, both diagnosing things, and
3 excluding other diagnoses.
4        BY MR. PARKER:
5    Q    Dr. Goyette, when a physician asks
6 you to have a flow study done on his or her
7 patient, and provided you with what they
8 thought was or could be the diagnosis, was
9 your practice to assume that the physician
10 was right and tailor an approach just to that
11 presumed diagnosis; or, did you seek to
12 confirm whether that was, in fact, right, and
13 whether there were other things going on in
14 that patient unbeknownst to the physician?
15    A    Throughout my practice of medicine,
16 including my five years at Dianon, I viewed
17 each one of these requests or similar
18 requests as a request for a consultation, for
19 me to practice medicine to the best of my
20 knowledge in the specialty in which I'm
21 licensed and board certified.
22        At no time did I interpret the fact

**329**

1 that a physician submitted a sample, for
2 example, an appendix to me, to only restrict
3 my diagnosis to whether the patient had acute
4 appendicitis or not.
5        I completely examined the appendix.
6 In some instances, saw parasites; in some
7 instances, saw malignant tumors.
8        So, I mean, each specimen is -- you
9 are required, I believe, by professional
10 ethics to examine to the complete and full
11 extent of your ability.
12        And prior to this deposition today,
13 I really hadn't heard people suggesting that
14 you should only practice partial medicine; in
15 other words, just do a little bit.  And if --
16 because -- and if the doctor thinks that's
17 what it says, don't look for anything else.
18    Q    Harry, you've mentioned throughout
19 today's session reference to a cancer
20 referred to as hairy cell --
21    A    Leukemia.
22    Q    -- leukemia?  Okay.  That's a

330

1 cancer of the blood --
2    A   Yes.
3    Q   -- correct?
4    A   And bone marrow.
5    Q   And that, in your experience, is
6 found from time to time in the lymph nodes,
7 correct?
8    A   It can be.
9    Q   Okay. Now, Doctor, if you did the
10 stripped-down panel that the government
11 claims you should have done in this case, and
12 you stripped out those markers that are
13 helpful in identifying hairy cell leukemia,
14 would you see it?
15    A   I think we'd know something was
16 wrong, but I couldn't make a diagnosis.
17    Q   And if you used just a
18 stripped-down panel that the government
19 claims you should have been doing in this
20 case, and you weren't able to diagnose the
21 hairy cell leukemia --
22    A   Yes.

331

1    Q   -- would that patient go untreated
2 for that cancer?
3    A   Yes, and they'd die from that
4 cancer.
5    Q   Does stripping down the panel, like
6 the government claims you should have done,
7 is going to leave some people exposed to
8 cancers and other serious illnesses
9 untreated?
10    A   That's correct. And it will also
11 result in me being sued for malpractice.
12    Q   And, Doctor, stripping down a panel
13 as the government claims you should have
14 done, and your colleagues, would it also
15 have, in some instances, not given the
16 treating physician the full information he
17 needed in order to determine the treatment,
18 the proper treatment, to be given to certain
19 patients?
20    A   That's correct.
21    Q   The question was asked you, Doctor,
22 as to whether you got training in Medicare

332

1 provisions. Do you recall that?
2    A   I do, on two occasions.
3    Q   Billing was something that were
4 left to other specialists, not medical
5 doctors at Dianon, is that correct?
6    A   I wouldn't even call them
7 specialists. They were not -- it was
8 non-physicians.
9    Q   Non-physicians. From what I've
10 told us, Doctor, is it fair to say that the
11 non-physicians and other people at Dianon
12 could reasonably conclude, since you created
13 the panel, that that is what you thought to
14 be appropriate and necessary medicine in
15 treating patients?
16    A   Absolutely.
17    Q   And then whether or not they billed
18 one antibody or every antibody that was
19 tested in your panel was something of a
20 business decision that didn't affect you and
21 your colleagues, is that correct?
22    A   That's correct. I could careless.

333

1    Q   Incidentally, Doctor, you recall
2 being questioned on a number of documents
3 involving incentive programs and the like --
4    A   Yes.
5    Q   -- do you recall? Would you will
6 put out just Exhibit No.
7       20, please.
8    A   All right.
9    Q   Now, this is the one, just for the
10 jury's benefit, this is labeled "Revised 1998
11 Pathology Incentive Program."
12       Do you recall this one exhibit that
13 we looked at?
14    A   I recall looking at it today.
15    Q   And there were a lot of discussions
16 regarding the fact that you would get more
17 money if you could do more than the standard
18 number of cases, correct?
19    A   If you did more than the standard
20 number of cases, you would receive incentive
21 pay.
22    Q   Now, Dr. Goyette, help me out here.

334

1  If you did what the government says you
2  should have done and stripped your panel down
3  by ten or more antibodies, is it fair to
4  conclude you could have pushed out more cases
5  a day?
6      A   Yeah, and it would have been a lot
7  easier.
8      Q   So a lot easier; probably
9  misleading, right?
10     A   Yes.
11     Q   A lot easier, a lot faster?
12     A   Oh, yes.
13     Q   You put more money in your pocket?
14     A   Yeah.
15     Q   But you didn't do that?
16     A   No.
17     Q   Why not?
18     A   Because it would have compromised
19 patient care.
20     Q   Doctor, did anybody ever, in your
21 five years, ever come to you and say,
22 "Richert, Dr. Goyette, we got to get more

335

1  money for the company. Help us build up the
2  panel so we can bill the government for more
3  antibodies"?
4      A   No. I would be insulted by that.
5      Q   I think you told us, Doctor, in
6  your affidavit, did you not, that one
7  occasion shortly after you joined the
8  company, there was a suggestion that you help
9  market the services, and you resigned?
10     A   That's correct. The — I saw at
11 that one period of time an attempt by
12 marketing to intrude into my practice of
13 medicine. And I immediately resigned from
14 the company, called my fiance and told her:
15 Don't plan to move to Connecticut," and went
16 home to start the process of finding another
17 job.
18         And that evening, J. Amberson
19 phoned me and said he would like to talk to
20 me. And during that talk, he asked me to
21 stay. And he also assured me that he would
22 keep the suits and the accountants out of the

336

1  practice of hematopathology.
2      Q   Suits, meaning the businessmen --
3      A   Businessmen, yes.
4      Q   — that you fondly refer to?
5      A   Yes, sorry.
6      Q   Okay. Doctor, please, if you
7  would, look at Exhibit No. 8, please.
8      A   Okay.
9      Q   Do you recall being asked about
10 this document, and specifically being
11 referred to the description about the new
12 profiles?
13     A   Yes.
14     Q   Do you see down at the bottom of
15 this page in handwriting it says, "Modified
16 6/2, 2000."?
17     A   Yes.
18     Q   Well, firstly, Doctor, what is the
19 name of the company that appears at the top
20 of the document?
21     A   Labcorp.
22     Q   Did you ever work for Labcorp?

337

1      A   No.
2      Q   Does this document have anything to
3  do what was going on at Dianon in the time
4  you were at Dianon?
5      A   I don't know why this document was
6  presented to me, but I have no idea what was
7  going at Labcorp nor do I care.
8      Q   Doctor, let's turn to Exhibit No.
9  12, please. This is your memo of May 21,
10 1997?
11     A   Yes.
12     Q   Doctor, is it fair to say that this
13 document and the attached paper description
14 is a good summary of your mindset or your
15 thinking, let's say, in May of 1997 as to why
16 the antibodies, whatever their number might
17 have been, that constituted your panel were
18 medically necessary?
19     A   That's correct.
20     Q   And then we go, Doctor, to Exhibit
21 No. 13.
22     A   Okay.