# EXHIBIT 25

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**ORIGINAL**

- - - - - - - - - -x

UNITED STATES OF AMERICA,
ex rel. Dr. James J. Tiesinga,
            Plaintiffs,

No. 3:02CV1573 (MRK)

            v.

July 12, 2006

DIANON SYSTEMS, INC.
            Defendant.

- - - - - - - - - -x


DEPOSITION of ARIF TOOR, M.D.


Taken before Cindy J. Carone, LSR 383, a
Court Reporter and Notary Public, within and
for the State of Connecticut, pursuant to
Subpoena and the Federal Rules of Civil
Procedure, at The Tollgate Hill Inn, 571
Torrington Road, Litchfield, Connecticut, on
July 12, 2006, commencing at 10:10 a.m.


Falzarano Court Reporters
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258

1    This is one area where sometimes we then

2 went back, never objected to anything because it was

3 not in the policy.  But if subsequently we came to

4 know that it was not being done correctly or being

5 done excessively more than what was medically

6 necessary, then we would go back and recover it from

7 them.

8    So medical necessity is sort of a separate

9 issue other than creating a Local Medical Review

10 Policy which would give you broad guidelines.  But

11 medical necessity is the inherent medical duty and job

12 of the provider themselves.

13    Q    In conducting due diligence to learn whether

14 a service is medically necessary and indicated, what

15 should a physician do?

16    A    On the medical necessity side you again

17 reviewed literature and then went accordingly.  Also

18 you used your consultants if you couldn't find

19 information and asked people to help you with

20 literature and then made the decision accordingly.

21    Q    In terms of due diligence, would one factor

22 be to review research studies published in the

23 peer-reviewed medical journals?

24    MR. MOLOT:  Objection; due diligence?

25    MR. SALCIDO:  He used the term that it

1                    (Toor Exhibit 2:

2                    Marked for Identification.)

3

4    BY MR. SALCIDO:

5        Q        You'll note that the terminology changed

6    somewhat over the year as well.  What I'm going to

7    direct you to in particular, Dr. Toor -- and feel free

8    to review what you would like to review.  I'm going to

9    direct you to Section 13.7.1, and the document is not

10   numbered, so you'll have to thumb through.

11       A        13.7.1?

12       Q        Yes.

13       A        It's right on the front page, isn't it?

14       Q        No, I'm sorry.  Where they discuss it in the

15   text.

16       A        Oh, okay.

17       Q        In terms of this particular passage, and now

18   I'm referring specifically to the second bullet in the

19   text, "General acceptance by the medical community

20   (standard of practice) as supported by sound medical

21   evidence based on," and then it gives the first

22   sub-bullet, among other things, "research studies

23   published in peer-reviewed medical journals" -- second

24   sub-bullet -- "consensus of expert medical opinion;

25   that is, recognized authorities in the field or" --

1   third sub-bullet -- "medical opinion derived from

2   consultations with medical associations or other

3   health care experts."

4           Is it fair to say that you took such courses

5   into account when determining whether such services

6   were medically indicated and necessary?

7       A    Yes.

8       Q    I'd like to show you now Exhibit 3,

9   Dr. Toor.

10

11              (Toor Exhibit 3:

12               Marked for Identification.)

13

14  BY MR. SALCIDO:

15      Q    As you review it, Doctor, the specific

16  question I'm going to have is did this Local Medical

17  Review Policy contain a frequency limit?

18              MR. MOLOT:  Objection to the form.

19  BY MR. SALCIDO:

20      Q    Just by frequency limit, did it impose a

21  restriction on the number of units that could be

22  performed.

23      A    No.  That was left out as a medical

24  necessity issue.  Our reason to create the policy was,

25  one, this was a new code; two, since this was and it

1    had started being billed for various different

2    diseases, which on review of literature we found that

3    there was a limit to it and there was specific reasons

4    and specific diseases for which this test would be

5    done.  And within those specific diseases, we also

6    found that there in some of them there had to be

7    prerequisites before the test could be done.

8            That is where the concentration was the

9    disease, on that condition for which the test the

10   performed.  Its frequency or the frequency of the

11   components was left out for medical necessity.  If it

12   was medically necessary, considered by the provider,

13   he could use as many as he wanted.

14           The decision -- and if it ever came back to

15   us for frequency, then we would apply the medical

16   necessity rules to it, but generally this was to

17   control and see whether it was being done for the

18   right reasons.

19        Q    Just so I understand, when you applied

20   medical necessity to review the claim, do you mean

21   those factors we just reviewed in Section 13.7.1?

22        A    That's correct.

23        Q    Did you, Dr. Toor, included with this LMRP,

24   have a LMRP file that you maintained that would have

25   contained, for example, the CAC comments on the LMRP,

1  antibodies, do you recognize those as the antibodies

2  that Dianon performed?

3          MR. MOLOT:  Objection.

4      A    I'm really not an expert of saying whether

5  they did it or not.  Anyhow, it seems that it's here.

6      Q    I'd like to direct your attention, Dr. Toor,

7  if I could to the document Bates numbered CMS 002145?

8      A    What page is it on?

9      Q    The last four digits would be 2145.

10     A    Okay.

11     Q    I'm going to focus now on the entry at the

12  bottom of the page, that has noted a date, time,

13  12-4-96, and more specifically to the note text which

14  starts, "Dr. Toor REV" -- which I would guess means

15  reviews -- "records," colon.  Did you as part of your

16  duties as Carrier Medical Director review medical

17  records?

18     A    Yes.

19     Q    I take it with respect to that note text,

20  was it one of your jobs to complete that?

21          MR. MOLOT:  Objection.

22  BY MR. SALCIDO:

23     Q    Or did this come from someone else?

24          MR. MOLOT:  Objection.

25     A    No, it was as it says over here.  I'm just

1   reading this, Dr. Toor review records.  That means I

2   reviewed it, and what is written seems to be my

3   opinion.

4        Q     Now, with respect to reviewing records, if

5   there were services you didn't understand as part of

6   reviewing the records, would you seek out guidance?

7                    MR. MOLOT:  Objection.

8        A     If I did not understand, yes.  There was a

9   sequence that we went through.  The first one, we

10  would go to the provider and ask, What did you do?

11  Why?

12            Then with his or her explanation if we felt

13  or I felt this was a legitimate situation, then I

14  would make the decision.  If I still felt not sure,

15  then I went to a consultant somewhere.

16       Q     That's all I have on that.

17

18                    (Toor Exhibit 5:

19                     Marked for Identification.)

20

21  BY MR. SALCIDO:

22       Q     Have you completed your review?

23       A     Yes.

24       Q     Do you recollect what triggered this type of

25  a review?

1     A     We did our best, but I will put a provisor

2    in there, that when you are doing such reviews, you're

3    focusing on what you're -- what is the particular

4    objective at that instance?

5         There may be many other things which may not

6    be correct in there which will escape your focus, and

7    I'll be concentrating on what you sent for, what you

8    asked for.  It doesn't mean that something else isn't

9    wrong with that.  It means that it never came into

10   focus.

11        From your question, my answer would be we

12   did our best to follow through the rules that applied

13   to that particular circumstances, and we applied them.

14    Q     With respect to the next sentence, "The

15   purpose of this review is to, one, verify that

16   reimbursements are made only for those services which

17   are considered medically necessary; two, identify

18   problems regarding any unusual practice patterns; and

19   three, rule out over-utilization or abuse of the

20   Medicare program."

21    A     Yes.

22    Q     Do you agree that was the purpose of this

23   review?

24    A     I agree.

25    Q     Do you know did anyone at the carrier ever

1    A    I don't recall that we specifically looked

2  at that for each cell surface marker, but again what

3  we were looking for was was this performed.  That's

4  what we looked at at that particular focus.

5        The focus was did they perform three tests?

6  Did they perform six specific stains?  Did they do

7  decalcification?  Did they do 19?  That's what the

8  focus was.  That's not -- the focus wasn't were those

9  19 separate or not.  That's a separate issue.

10    Q    Maybe I'm confused then.  What do you mean

11  by rule out over-utilization in point 3 above?

12    A    Okay.  When somebody said, I did three, you

13  look at did they perform three tests?  If they had

14  performed three tests, then were all those three

15  necessary or not?

16        Similar with six stains.  If they had done

17  the six stains and there's evidence that they did

18  perform them and look at them and look at the medical

19  necessity of doing those and so on and so forth.

20    Q    So then is the same true of the 19?

21    A    Yes.  At that particular moment, again,

22  specific focus being at that time for which we were

23  looking at.

24    Q    So you would look to see, just to be clear,

25  whether the services were performed?  Yes?  No?

1        A       Yes, that's one.

2        Q       Then you would see whether they were

3    medically necessary and indicated?

4                        MR. MOLOT:  Objection.

5    BY MR. SALCIDO:

6        Q       Yes?  No?

7        A       Yes.

8        Q       Now, look at the next page Bates 2477.  It

9    says that the calculated overpayment is 526.86, and

10   it's now due Medicare.  So I take it that the end

11   result of this review was there was found to be an

12   overpayment due to Medicare program?

13       A       Yes, for the particular specific instance.

14       Q       With respect to a particular service, if a

15   service was blatantly in violation of your Local

16   Medical Review Policy, would you permit payment for

17   that service?

18       A       A little while ago I had mentioned that

19   there are certain aspects of policy that go into other

20   prepayment screens which automatically deny them, the

21   major part of it.  Can I go back to the LMRP, because

22   I can illustrate myself a little better?

23       Q       Absolutely, but if it helps, I'm looking for

24   postpayment review, not prepayment.

25       A       On the postpayment, we already paid.  That's

1    something, but your question is if it contradicts the

2    Local Medical Review Policy would you be paying it?

3        Q    Let me put a final point on it.  If upon

4    postpayment review you find that a particular claim

5    was blatantly in violation of the LMRP, would you

6    notwithstanding -- no, that's the confusing part --

7    would you demand an overpayment on that claim?

8        A    Yes, we would.

9        Q    Turning back to Exhibit 5, I'd like to

10   direct you if I could to the last four digits of 2481.

11       A    Okay.

12       Q    Do you recognize that sheet of paper?

13       A    Yes, I do.

14       Q    How was this sheet of paper used?

15       A    This was a sheet of paper prepared by the

16   MRU Department for my adjudication.  They would make

17   this as the top page of the whole case, and this would

18   be looking at the summary, that this is the date on

19   which such-and-such code times so many has been

20   billed.  Then I was supposed to review the papers

21   underneath that and complete my decision.

22          Here it says 88305 times three.  And we said

23   no, times two or specific stains.  There's no

24   documentation of that.  So no documentation of

25   decalcification procedure.  That means that we would

1  not consider that as a claim that should be paid.

2  Flow cytometry, that's okay over here.  And that's how

3  you signed, how we signed it.

4      Q     With respect to the handwritten portion of

5  that page, do you recognize any of those handwritten

6  notations as being yours?

7      A     All of those are mine on the right-hand

8  side.  This number 18 doesn't seem to be mine.  I

9  don't recall, but I don't think it's mine.  Must be

10 put there by whoever, Ellen or whoever brought it to

11 me.

12     Q     In terms of the entry which looks like the

13 second to the last line at the bottom, If any of the

14 test (sic) NMN, why.  What's that marking?

15     A     Not medically necessary.

16     Q     The handwritten entry adjacent to that, do

17 you know what that is?

18     A     That's my signature.

19     Q     Why did you put your signature on that page?

20     A     That's on every page.  You had to sign it

21 off.  So this is my signature on that page.  All of

22 those pages once you had written something, you sign

23 it off and dated it.

24     Q     So you signed it after you reviewed the

25 page?

1  purposely ignore red flags that would lead to obvious

2  errors?

3              MR. MOLOT:  Objection.

4  BY MR. SALCIDO:

5      Q      Did you turn a blind eye to evidence that

6  claims were miscoded on a routine basis?

7              MR. MOLOT:  Objection.

8      A      No.

9      Q      You would not do that?

10     A      No.

11     Q      With respect to this entry, and by this, I

12  mean on page 2469, it states, "88180 times 19/DOC doc

13  supports svc"?

14     A      Documentation supports services.

15     Q      On the next page, 2470, just based on your

16  understanding of how the office worked, there is one

17  part that puzzled me and maybe you can shed some light

18  on it.  It starts at the very end of the first line,

19  "MR, rev'd."  Do you have any insight on what that

20  might mean?

21     A      Medical reviewed.  That's what I think it

22  is.

23     Q      Would you think it's medical record

24  reviewed.

25              MR. MOLOT:  Objection.

1    A    Could be anything.  I'm not sure.

2    Q    Not sure; okay.  The next line reads, "88305

3    times three/doc supports two."

4    A    Yes.

5    Q    Next, "88313 times six, NMN," then,

6    "88311/no documentation."  Then, 88180 times 19/okay.

7         Do those different abbreviations based on

8    your experience in the office:  Doc supports, NMN, no

9    doc, okay, have any differences to them?

10        MR. MOLOT:  Objection.

11   A    The only difference here I see is that

12   documentation supports two.  There's no documentation

13   for three, so not medically necessary.  So medical

14   necessity for this particular test has not been

15   established.

16        And 88311, there's no documentation.  This

17   okay, again, it's anybody's guess.  Okay means okay.

18   It's not medically necessary.

19   Q    When you were Carrier Medical Director, did

20   the carrier furnish any educational programs to

21   providers and suppliers?

22   A    The newsletter always went out which always

23   gave you the latest changes or advice from Medicare.

24   Sometimes it reminded them of the old policies.

25        The other part, our area advisory committees

1    were always available to answer any questions from

2    anybody.  Similarly, if anybody wanted to come talk to

3    you, we would do that.

4         Many times we -- by "we," I mean myself and

5    my staff members -- would go out to various gatherings

6    of the physicians and present ourselves to answer any

7    questions or give presentations where people would ask

8    any questions.  So there was a constant effort going

9    on in that respect.

10        Q     In terms of you yourself, did you ever

11   provide Dianon any instruction that imposed a

12   limitation on the number of antibodies that could be

13   billed when performing CPT 88180?

14             MR. MOLOT:  Objection.

15        A     I don't recall.

16        Q     Do you recall anyone on your staff ever

17   providing that instruction to Dianon?

18             MR. MOLOT:  Objection.

19        A     I don't recall at all because that's too

20   long ago.

21        Q     If there was an important medical necessity

22   criteria to be communicated to the provider supplier

23   community, would you seek to communicate that through

24   either an LMRP or one of the educational

25   newsletters --

1          MR. MOLOT:  Objection.

2     Q     -- or through some other format?

3          MR. MOLOT:  Objection.

4     A     Whenever it came to your attention that

5  there was something that we need to education people,

6  we would do that, but it doesn't mean this was a cover

7  of all situations.

8          Medicine and the practice of medicine is a

9  very huge field.  It depends on what comes to our

10  focus, and if you find that a problem, you let people

11  know.

12          You just keep them guessing that there is a

13  problem or will be a problem until it came to your

14  notice.  We did inform people when we found a problem

15  or a problem came to our notice more so.

16     Q     But you never recollect a problem coming up

17  with respect to the number of markers billed on CPT

18  88180?

19     A     Nobody in my time at least, in the two years

20  that it was -- that the code was there came up with a

21  utilization of the number of markers.

22          Remember, we had determined that I think

23  after 26 or after 30 -- I don't recall exact numbers

24  -- all the markers available.  And then we left it to

25  the provider to provide the adequate or correct

1    numbers of that particular patient and that particular

2    disease.  So sometimes they would bill 18, sometimes

3    19 or the rest sometimes.  That's how we adjudicated

4    it.

5         Q    Do you recall offhand, Dr. Toor, having -- a

6    slightly different issue -- having any dialogue with

7    Dianon with respect to CPT 88180?

8         A    A lot of dialogue went on, but it was always

9    on what diagnosis you can perform this on.  And they

10   would be coming up with their side of the literature.

11   You review that, and you look at the literature in

12   vogue.  That is how this final decision came up, that

13   these are the diseases for which you can do the tests.

14

15                  (Toor Exhibit 7:

16                  Marked for Identification.)

17

18   BY MR. SALCIDO:

19        Q    On this, Dr. Toor, please excuse the

20   handwritten notations.  I certainly don't think those

21   are yours.

22        A    No, these are not mine.

23        Q    I have a very general question that you can

24   think about as you peruse the document.  Does that

25   reflect the type of a dialogue you recollect having

1    A    Yes.  But this is the decision that we did

2  based on some information that had been provided by

3  the provider.

4                    (Pause.)

5                    MR. MOLOT:  Are you finished reviewing?

6                    THE WITNESS:  Not yet.

7                    MR. MOLOT:  Okay.

8    A    Okay.

9    Q    What I'd like to do, Dr. Toor, is direct you

10  to the first page, Bates No. 800100, in particular,

11  the second sentence, You and I have had several

12  meetings on this matter.

13                Do you recollect meeting with Dr. Amberson

14  in regard to this matter?

15    A    Yes, a number of times.  I don't have a

16  total recollection of what transpired.  I recall him

17  coming to my office, me going to the laboratories at

18  least twice, and he came two or three times.

19    Q    What did you discuss?

20    A    Mainly the issues of the diagnoses for which

21  these tests could be done.

22    Q    Working forward to the fourth sentence, "You

23  also requested that I assist you in drafting an

24  appropriate policy governing coverage of this

25  service."  Do you recollect making that request?

1  could look at it and make a decision.

2      Q      The next paragraph, first sentence says, "In

3  an attempt to assist you in determining what

4  additional codes should be covered, I undertook a

5  review of 1275 cases denied between April, 1996 and

6  August, 1997, the data from which is presented in

7  Tables 1 through 5 located in the attachments."

8          Do you recollect reviewing those attachments

9  in this letter during the time period in which you

10  were the Carrier Medical Director?

11      A      I don't recollect.  I may have, but I don't

12  exactly remember that.

13      Q      Was it consistent with your experience as

14  the Carrier Medical Director that a company would

15  openly disclose and discuss with you more than 1000

16  claims if, in fact, that company was perpetrating a

17  fraud or a scheme to defraud the Government?

18              MR. MOLOT:  Objection.

19      A      That's speculation, and I can't answer it

20  because I never thought of it that way.

21      Q      Would it make any rational sense at all?

22              MR. MOLOT:  Objection.

23  BY MR. SALCIDO:

24      Q      To want to have a dialogue with you with

25  respect to a thousand claims if, in fact, it was

1  defrauding the Government with respect to those same

2  thousand claims and invite you to review those claims?

3          MR. MOLOT:  Objection.

4    A     Again, it's totally speculation.

5    Q     But what's the answer to the question?

6          MR. MOLOT:  Objection.

7  BY MR. SALCIDO:

8    Q     Yes?  No?  Would it make rational sense to

9  you?

10         MR. MOLOT:  Objection.

11   A     Saying that would make me think and look

12 into the minds of people and how they work and why

13 they would bring things up to us.

14         As I told you, our main focus was on

15 diagnosis, and that's what they were trying to bring

16 to us.  I don't know if they would have dreamt of

17 exposing it to us for one reason or another.  The main

18 course was they were looking at a diagnosis, and

19 that's what they're telling us, Guys, you're denying

20 us for X number of diagnosis.

21         I can't say whether they would bring it or

22 not bring it with what they knew, this is the reason

23 they were denying it, and they were showing it to us

24 that there is statistical evidence that X number of

25 cases are positive and, therefore, we should change

1  our policy.  And whatever change we made subsequently

2  to our policy -- and I don't recall the original

3  policy.  We did add a couple of additional codes in

4  there, but again this is all the diagnosis codes, why

5  do the test.

6           MR. SALCIDO:  Move to strike;

7           nonresponsive.

8  BY MR. SALCIDO:

9      Q     The question was would it make rational

10  sense to you?

11          MR. MOLOT:  Objection.

12  BY MR. SALCIDO:

13     Q     Would you do that, would you invite the

14  Government, you yourself to examine 1000 claims, more

15  than 1000 claims in detail if, in fact, you're

16  committing fraud with respect to those same thousand

17  claims?

18          MR. MOLOT:  Objection.

19     A     See --

20     Q     I'm asking you.

21     A     Yes.  You're asking me a question, but I

22  don't think this is a question related to this because

23  they undertook a review of 1200 cases.  They did not

24  make me review those 1200 cases, and they have come up

25  with their own findings.

1    If it had been sent to me, then your

2  question would have been very, very legitimate, but at

3  this time, I cannot answer that.

4    Q    But isn't it true they're sending to you

5  those claims and there's asking you to review those

6  claims?

7    A    No.  They're not sending me back those

8  claims.  What he's saying is in an attempt to assist

9  you in determining whether additional codes should be

10  covered, I undertook a review of 1275 cases denied and

11  that the data from which is represented in Table 1,

12  our denial data.  Our laboratory diagnosed 57 percent

13  of these cases as non-neoplastic and 43 percent as

14  neoplastic.  The category of neoplastic is blah, blah,

15  blah.

16    That is their analysis of what they

17  analyzed.  They didn't ask us to review them or go

18  back over them.  This is the point that he was trying

19  to prove, that there are so many positive cases in

20  here, and that maybe our policy is flawed when 1275

21  cases have been denied and out of this, according to

22  him, 43 percent is positive; then something is wrong.

23    According to him, this is what the whole

24  discussion was based on.  I'm trying to recall and

25  remember that.  So that question whether they made me

1    look at those again or go back to review 1275 or even

2    the possibility was that it really did not exist.

3         So how can I say that this is something

4    which they would not have done it because they didn't

5    really present to us those cases.  They just analyzed

6    them themselves, gave us the results, and based on

7    this letter and the literature that came with it and

8    our discussions with other entities, we finally came

9    and made a decision which resulted in this policy of

10   1998, a revised policy.

11        Q    Do you know whether Dianon was requesting

12   repayment with respect to any of those 1275 claims?

13        A    They had asked for it at the time.  I'm not

14   sure what decision we made and whether we paid them or

15   not.  I am absolutely not sure at this time.  No, I

16   don't recall.

17        Q    Just to focus the question, if you can refer

18   to page 8103, the final paragraph on that page.  In

19   particular, "You have expressed your willingness to

20   pay Dianon for those claims that would be covered

21   under mutually agreed upon modifications of your

22   current policy.  You have told me that your

23   responsibility as Medical Director of Medicare Part B

24   is to determine proper coverage based upon medical

25   necessity and to prevent expenditure of taxpayer funds