# EXHIBIT 29



**MEDICARE**
PART B CARRIER

November 13, 1998                                       203-639-3034

Dianon Systems, Inc.
200 Watson Blvd.
Stratford, CT 06497
Attn. Robert Tucciarone
 Director, Billing and Collections

Dear Mr. Tucciarone

Re:                                 Case #1980600132/69-180
                                    Case #1980600163/69-180
                                    Case #1980600134/69-180

A Continuing responsibility of the Medicare Carrier, required by the Health Care Financing
Administration, involves reviewing hospital and office records to verify compliance with the regulations of
the Medicare Program.

The purpose of this review is to:
1.  Verify that reimbursements are made only for those services which are considered medically
    necessary;
2.  Identify problems regarding any unusual practice patterns; and
3.  Rule out over-utilization or abuse of the Medicare program.

Medical records were received from your office upon our request. Our medical staff based on Medicare
guidelines reviewed these records. The following medical determination were made:

On _____ date of service 12/16/97

Code 88305 x 3 - Tissue exam by pathologist
Determination: Documentation supports 2 services, not 3

Code 88313 x 6 - Special stains
Determination: The stains performed are not medically necessary.

Code 88311 - Decalcification procedure
Determination: No documentation

Code 88180 x 19 - Flow cytometry, each cell surface marker
Determination: Documentation supports service.

**CONFIDENTIAL HEALTH INFORMATION -
SUBJECT TO PROTECTIVE ORDER**

**UNITEDhealthcare**
United HealthCare Insurance Company
538 Preston Avenue • P.O. Box 9000 • Meriden, CT 06454-9000
A HCFA Contracted Carrier

CMS002476

Page 2

203-639-3034

Dianon Systems, Inc.
Attn. Robert Tucciarone
Director, Billing and Collections
November 13, 1998
Page 2

_____ date of service 2/26/98

    Code 88108 - Cytopathology
    Determination: Documentation supports service

    Code 88358 - Morphometric Analysis
    Determination: Documentation does not support medical necessity since test 88108 was negative.

_____ date of service 3/11/98

    Code 88182 - Flow Cytometry
    Determination: Documentation does not support medical necessity

    Code 88342 x 2 - Immunocytochemistry
    Determination: No documentation to support service

    Code 88323 - Consultation and report on referred material requiring preparation of slides
    Determination - No documentation to support service

The calculated overpayment is $526.86 and is now due Medicare. Refer to the attached worksheet for a complete breakdown of services.

We are required to inform you that billing Medicare for services not rendered is a fraudulent situation and the Inspector General has the authority to exclude from coverage your services should you decide to continue to bill your services incorrectly to Medicare.

In addition, under the Omnibus Budget Reconciliation Act of 1981, Congress enacted a Civil Monetary Penalties Law, Section 1128 (A) of the Social Security Act (42 USC 1320a-7a). This statute gives the Secretary the authority to impose a monetary penalty of up to $2,000 per incorrectly billed line item upon any person who presents or causes to be presented a false or fraudulent claim.

Title XVIII of the Social Security Act (1833)(e) states:
(e) No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period respect to which the amounts are being paid or for any prior period.

The payment you received of $526.86 is now an overpayment. Please return the overpaid amount to us by December 12, 1998 and no interest will be assessed. You are required to reimburse the amount of this overpayment by personal check or money order, payable to Medicare-United HealthCare Insurance Company. This reimbursement should be sent to P.O. Box 9000, Meriden, CT 06454-9000, Attn: Accounting Department along with a copy of this letter.

Section 117 of the Tax Equity and Fiscal Responsibility Act of 1982, Public Law 97-248, requires that interest be assessed on overpayments to providers which are outstanding more than 30 days following the final determination.

CONFIDENTIAL HEALTH INFORMATION -
SUBJECT TO PROTECTIVE ORDER

CMS002477

Page 3                                                                                           203-639-3034

Dianon Systems, Inc.
Attn. Robert Tucciarone
Director, Billing and Collections
November 13, 1998
Page 3

If you do not repay the amount within 30 days, interest will accrue from that date of this letter, or December 12, 1998, at a rate of 13.50 percent for each 30 day period. Periods of less than 30 days will be counted as a 30 day period. Medicare has the authority to charge interest on its outstanding Part B debts in accordance with Section 1833(j) of the Social Security Act and 42CFR 405.376.

On December 22, 1998, we will automatically begin to offset the overpayment amount against any pending or future assigned claims. Offset payments will be applied to the accrued interest first and then to the principle. If you do not want the offset to be put into effect, and you decide to repay the overpaid amount close to the offset date, submit a statement within 15 days of the date of this letter to: P.O. Box 9000, Meriden, CT 06454-9000, Attn: Accounting Department. specifying how the overpayment will be repaid. This statement is not to protest the basis of the overpayment, but only the proposed offset.

Section 1862(a) of Title XVIII of the Social Security Act states:
    Notwithstanding any other provisions of this title no payment may be made under Part A or Part B for any expenses incurred for items or services—
        (1) Which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Section 1879 of the Social Security Act permits Medicare payment to be made on behalf of a beneficiary to a physician/supplier who has accepted assignment for certain services for which payment would otherwise not be made under Medicare, if neither the beneficiary nor the physician/supplier knew, or could reasonably have been expected to know, that the services were excluded. The service(s) affected by this provision are those which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Based on available information to the provider community, we have determined that you should have had knowledge that the service(s) were not medically necessary and reasonable.

Based on our notification to you through the Local Medical Review Policies we have determined that you should have had knowledge that the services(s) were not medically necessary and reasonable.

We have determined that these beneficiaries did not know and could not have been expected to know that these services were excluded from coverage. However, we find that you knew or could have been expected to know that these services were excluded. We also find that you did not notify the beneficiary(s) in writing, before the service were furnished that Medicare likely would not pay for the services. Because of this, you are held liable for the full charges for the service(s).

This overpayment is for services that are not medically reasonable and necessary per Medicare standards. If you collected the amount of the overpayment from the beneficiary, the beneficiary has the right to request payment from Medicare. Any such indemnification will be recovered from your.

If you disagree with the determination regarding your liability on the basis that the services were necessary or on the basis that you did not know, could not reasonably have been expected to know, that Medicare would not pay for the services or on the basis that you notified the beneficiary, in writing, before the services were furnished, that Medicare likely would not pay for the services, and if the amount in controversy is $100.00 or more, you may request a hearing within six months of the date of this letter or May 13, 1999, at which time you may present any new evidence that would have a material effect on this determination. Our office or your Social Security office will assist you if you need help in requesting a hearing.

CONFIDENTIAL - HEALTH INFORMATION
SUBJECT TO PROTECTIVE ORDER

CMS002478

Page 4

203-639-3034

Dianon Systems, Inc.
Attn. Robert Tucciarone
Director, Billing and Collections
November 13, 1998
Page 4

The overpayment resulted from payment made to you in excess of the allowed charge for services. If you have collected a coinsurance and/or deductible from the beneficiary based on the incorrect amount, please be sure to refund the excess amount to the beneficiary. Also, If you have collected a coinsurance an/or deductible from the beneficiary's second insurance, please be sure to refund that insurance company.

If you are dissatisfied with this review determination, you may request, within six months of the date of this notice, a hearing before a hearing officer, if the amount in controversy (the amount of benefits in question after subtracting any outstanding deductible amounts and the coinsurance) is $100.00 or more. To meet the $100.00 limitation, you may combine other claims of yours that have been through the review or reopening process six months prior to the date of the hearing request. This request must be sent, in writing, to either this office, **United HealthCare, Medicare Part B Appeals, P.O. Box C-1016, Meriden, CT 06454, Attention Hearing Coordinator,** or to any Social Security Office. Either office will be glad to assist you in requesting a hearing. A request for a hearing will not prevent the accrual of interest, or the offset of the overpayment against any pending or future assigned claims. If a hearing is requested, and part or all of the hearing determination is in your favor, any affected overpayment amount collected will be returned to you.

If you have any questions regarding this letter, I may be reached at 203-639-3034.

Sincerely,

Ellen DeFigueiredo
Medicare Fraud/Abuse Department

CONFIDENTIAL HEALTH INFORMATION -
SUBJECT TO PROTECTIVE ORDER

CMS002479

# EXHIBIT 30

December 4, 1997

Arif A. A. Toor, MD
United Health Care
Medical Director, Medicare Part B
538 Preston Avenue
Meriden, CT  06450

Dear Dr. Toor:

Since April, 1996 DIANON has been denied payment for flow cytometric immunophenotyping when the requesting physician used certain ICD 9 codes. You and I have had several meetings on this matter. You agreed that denial of payment for certain ICD 9 codes, 789.2 - splenomegaly, 238.4 - polycythemia vera, and 228.0 - agranulocytosis, to name a few, was inappropriate. You also requested that I assist you in drafting an appropriate policy governing coverage of this service. In doing so, I have based my recommendations on the policy published in the *Medicare News* of March, 1993 and on a detailed review of the 1275 reports issued by our laboratory between April 1996 and August 1997 and for which we were denied payment. I am assuming that the policy to which I am referring is the most current written policy. A copy of the relevant page is attached. Please let me know if this is not correct.

Your published policy states that immunophenotyping (CPT code 88180) is a covered service in the following circumstances:

1. Diagnosed or possible leukemia of any type. May repeat for evaluation of status with consideration of change of treatment.

2. Diagnosed or possible non-Hodgkin's lymphoma. May repeat for evaluation of status with consideration of change of treatment.

3. Possible Hodgkin's disease, will be denied for previously diagnosed Hodgkin's disease unless there is a possibility of #1 or #2 being considered (acute leukemia or non-Hodgkin's lymphoma post Hodgkin's therapy).

**S00100**

EXHIBIT 7

Defendants
KAP 7/25/06

The policy also mentions coverage for HIV+ patients and in cases of bone marrow transplantation. This is a rational policy with a firm basis in the established utility of immunophenotyping, primarily as a tool for:

1. Diagnosing a suspected malignancy by demonstrating monoclonality, enumerating populations of blasts, or characterizing aberrant phenotypes with a strong association with malignancy.

2. Staging patients with known malignancy.

3. Monitoring disease status in response to treatment.

While the policy reflects a clear understanding of the utility of immunophenotyping, the same cannot be said for the method currently employed in practice. In conversations with me you have indicated that in processing claims, the computer at your facility has been programmed to reject all claims that do not have an ICD 9 code referring to a preexisting diagnosis of either leukemia or non-Hodgkin's lymphoma. This change is inconsistent with your written policy, since possible leukemia, possible non-Hodgkin's lymphoma, and possible Hodgkin's disease, all of which are covered conditions in the policy, are excluded by the computer. (I should also note that the computer is even rejecting some claims with ICD 9 codes corresponding to diagnoses of leukemia or lymphoma - see Attachments, TABLE 5.)

In an attempt to assist you in determining what additional codes should be covered, I undertook a review of 1275 cases denied between April, 1996 and August, 1997, the data from which is presented in Tables 1 - 5 located in the Attachments. Our laboratory diagnosed 57% of these cases as non-neoplastic and 43% as neoplastic (TABLE 1). The category of neoplastic includes only hematologic malignancies. The breakdown into the various types of hematologic malignancies is also presented. I have included myelodysplastic syndromes and myeloproliferative disorders in this category since they are regarded as either neoplastic or preneoplastic by hematologists and hematopathologists. What are most instructive are the tables demonstrating the findings in cases coded by the ordering physician as Non-hematologic Neoplasms (TABLE 2), Non-neoplastic Hematologic Conditions (TABLE 3), and Non-neoplastic Non-hematologic Conditions (TABLE 4). The frequency of hematologic neoplasia is virtually identical in all 3 groups: 41%, 38%, and 42%, respectively. The frequencies of the various types of hematologic malignancy are also remarkably similar. Hematologic malignancy rates in the range of 40% are extremely high when compared with a rate of 0.04% in the general population. This 1000 fold increase indicates a preselected patient population. In this case the selection criteria must have been a strong clinical suspicion of leukemia or lymphoma. There is no other plausible explanation for such high frequencies of disease. Our data suggest, therefore, that clinicians are using immunophenotyping in an

300101

appropriate fashion. If the situation were otherwise, one would expect a much lower rate of malignant diagnoses more in line with the findings in the general population. In fact, the incidence of significant disease in our immunophentyping cases is higher than that found in the prostate biopsies which we are asked to interpret. We diagnose carcinoma on 33% of the 40 to 50,000 prostate biopsies we see each year at DIANON. The incidence of newly diagnosed prostate cancer in males in the United States is 0.3%. Thus DIANON's experience with prostate biopsies reflects a selection of patients with a 100 fold increased risk of malignancy as compared with a 1000 fold increase in cases sent for immunophenotyping.

You and I have already agreed that coverage determination based only on ICD 9 codes referring to an established diagnosis of leukemia or lymphoma is inadequate. Coverage needs to be expanded to encompass patients with possible leukemia or lymphoma for whom immunophenotyping could well offer the means to a diagnosis permitting appropriate medical care. One approach would be to add those codes with a high likelihood of positive findings and to continue to exclude those where there is little likelihood of finding neoplasia. In the Non-neoplastic Hematologic Conditions (TABLE 3) neoplasia was found in 22 to 100% of the cases depending on the ICD 9 code provided by the clinician. These frequencies are high enough to warrant coverage. There are 4 codes in the Non-hematologic Neoplasm group (TABLE 2) in which the incidence of neoplasia is 0%, but each of these codes has only 1 or 2 cases. All the others have frequencies above 25%. A similar situation obtains in the Non-neoplastic Non-hematologic Conditions (TABLE 4): only codes with 4 or fewer cases show no neoplasia. The codes with 10 or more cases all have frequencies of neoplasia of 33% or higher. Thus there is no empirical evidence in these numbers upon which one could select codes for denial of coverage.

If one excludes those with codes for Hematologic Neoplasms (TABLE 5), the majority of cases in this series are those with Non-neoplastic Hematologic Conditions (TABLE 3), as one would expect in patients being worked up for a possible hematologic malignancy. That is how leukemias, lymphomas, and myelomas present: with anemias, various cytopenias, monoclonal gammopathies, and all the other hematologic conditions through which these malignancies first manifest themselves. Even codes like 280.9 (iron deficiency anema) are understandable from this perspective. Patients can present with an anemia, presumed to be iron deficient based on initial work-up, but fail to respond as expected to iron replacement therapy. A more serious condition becomes more likely and must be ruled out. Our data set does beg an important question, however. Why were 179 cases with codes for Non-neoplastic Non-hematologic Conditions (TABLE 4) and 112 for Non-hematologic Neoplasms (TABLE 2) sent for immunophenotyping? There are two reasons. First, some of the codes in these categories are for conditions that in fact are manifestations of leukemia or lymphoma. Splenomegaly and enlarged lymph nodes are obvious examples. Another example is that of intertrochanteric fracture.

Immunophenotyping is not standard of care for broken bones, but what about in the case of a suspected pathologic fracture? One of these 4 cases turned out to have a lymphoma. The clinician could have coded the case as a pathologic fracture of the hip, 733.14, but that diagnosis remained to be established.

Poor coding is undoubtedly the second explanation for codes seemingly unrelated to leukemia or lymphoma. Judging from the high rates of malignancy in these patients, we must assume that there were strong clinical suspicions. These suspicions must also have been based on signs or symptoms that, in most cases, could have been coded. For example, a patient with a history of prostate cancer (ICD 9 - 185) who turned out to have chronic lymphocytic leukemia might have presented with lymphocytosis (ICD 9 - 288.8). Another common example of less than optimal coding is the use of 742.59, unspecified anomalies of the spinal cord. If one looks up the term myelodysplasia in the index of some ICD 9 CM coding manuals, the reader is referred to 742.59 under which is listed myelodysplasia, albeit a different disorder than myelodysplastic syndrome, for which the correct code is 238.7. I'm sure that in many of these examples the coding is done by non-physician or even non-professional staff in very busy physician offices. If a code is already in the chart, they pick that one. If not, they do their best.

These data, which are based upon actual clinical practice, should compel us to reconsider the utility of using ICD 9 codes as a means for determining coverage for this diagnostic test. There is no correlation between the ICD 9 codes used and the frequency of hematologic malignancy in those cases when immunophenotyping is requested in patients undergoing a diagnostic work-up. The fact that we find more disease in patients with known malignancy is neither surprising nor relevant. The issue in question, in the words of your published policy, is whether or not this testing is being performed when there truly is a justified clinical concern of "possible leukemia" or "possible lymphoma". The high frequency of positive findings answers the question in the affirmative. There is no evidence of unnecessary testing.

DIANON Systems has been denied payment on 1275 claims for immunophenotyping performed between April 1996 and August 1997. Most of those, 1131, were for cases sent to us because of a concern for possible leukemia or possible lymphoma. The remainder were cases with known malignancy. You have expressed your willingness to pay DIANON for those claims that would be covered under mutually agreed upon modifications of your current policy. You have told me that your responsibility as Medical Director of Medicare Part B is to determine proper coverage based upon medical necessity and to prevent expenditure of tax payer funds on inappropriate testing. Analysis of these claims and the laboratory reports generated by DIANON shows no evidence of unnecessary testing. The likelihood of finding significant disease, namely neoplasia, is extremely high and compares favorably with other types of diagnostic testing such as prostate biopsy. Coverage for immunophenotyping

based on ICD 9 coding cannot be justified on the grounds that it will eliminate unnecessary testing. All that it accomplishes is to arbitrarily exclude some patients who have just as high a likelihood of disease as those with coverage. It does save money, but by using a method that is at best capricious and at worst unethical. I know that you would never knowingly countenance such draconian methods unless forced to do so by statute or directives from HCFA. If that is the unfortunate situation, then the number of covered ICD 9 codes will need to be expanded dramatically. I have included a proposed list of covered codes in the Attachments. Of necessity it includes hundreds of codes. Dealing with this number of codes will be an enormous burden for your staff and mine. I hope that we are able to simply abandon the use of ICD 9 codes for this purpose. If that is the case your policy can stand as written.

Please let me know as soon as possible your response to this letter. The analysis presented here has taken months of effort on the part of numerous individuals. Retrieving all this data had to be done manually. If you would like to see the reports themselves, I invite you down to look at them. It would literally take a truck to transport them to your office. Could you also please let me know how the claims should be resubmitted once the criteria for coverage are determined? I look forward to your timely response.

Sincerely,

James B. Amberson MD
Chief Medical Officer

S00104

# ATTACHMENTS

S00105

PML CONDITIONS

PHYSICIAN DIAGNOSIS

CHRONIC LYMPHOCYTIC LEUKEMIA
CHRONIC MYELOCYTIC LEUKEMIA
ACUTE LYMPHOCYTIC LEUKEMIA
ACUTE MYELOCYTIC LEUKEMIA
ONE OR MORE MYELOPROLIFERATIVE DISORDER OR MYELODYSPLASTIC SYNDROME
(E.G., POLYCYTHEMIA VERA)

**TABLE 1**

LABORATORY DIAGNOSIS

| ICD9 CODE | TOTAL | ALL | NONNEOPLASTIC | NEOPLASTIC | CLL | CML | ALL | AML | LYMPHOMA | MDS OR MPD | PLASMA CELL DYSCRASIA | P. VERA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

800106

TABLE 2

NON-HEMATOLOGIC NEOPLASMS

| CLINICIAN'S DIAGNOSIS | ICD9 CODE | TOTAL | NONNEOPLASTIC | | NEOPLASTIC | | CLL | | CML | | ALL | | AML | | LYMPHOMA | | MPD or MDS | | PLASMA CELL DYSCRASIA | | P. VERA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | |

S00107

**TABLE 3**

## NON-NEOPLASTIC HEMATOLOGIC CONDITIONS

LABORATORY DIAGNOSIS

| CLINICAL DIAGNOSIS | ICD9 CODE | TOTAL | NONNEOPLASTIC | NEOPLASTIC | CLL | CML | ALL | AML | LYMPHOMA | MPD or MDS | PLASMA CELL DYSCRASIA | P. VERA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| monoclonal gammopathy | 273.1 | | | | | | | | | | | |
| other disorders of protein metabolism | 273-273.9 | | | | | | | | | | | |
| disorders of iron metabolism | 275 | | | | | | | | | | | |
| disorders of fluid, electrolyte, and acid-base balance | 276-276.8 | | | | | | | | | | | |
| hyperprothrombinemia, unspecified | 279 | | | | | | | | | | | |
| deficiency anemias | 280-281.9 | | | | | | | | | | | |
| hereditary hemolytic anemias | 282-282.9 | | | | | | | | | | | |
| acquired hemolytic anemias | 283-283.9 | | | | | | | | | | | |
| aplastic anemia | 284-284.9 | | | | | | | | | | | |
| unspecified anemias | 285-285.9 | | | | | | | | | | | |
| coagulation defects | 286-286.9 | | | | | | | | | | | |
| purpura and other, etc | 287-287.9 | | | | | | | | | | | |
| erythrocytopenia, unspecified | 287.5 | | | | | | | | | | | |
| leukocytopenia unspecified | 288-288.9 | | | | | | | | | | | |
| agranulocytosis | 288 | | | | | | | | | | | |
| other specified diseases of WBCs | 288.8 | | | | | | | | | | | |
| other diseases of blood ... | 288.9-289.9 | | | | | | | | | | | |
| TOTAL | | 640 | 517 | 123 | 93 | 17 | 1 | 46 | 63 | 87 | 30 | 1 |

800108

NON-NEOPLASTIC NON-HEMATOLOGIC CONDITIONS

TABLE 4



800109

# NEOPLASTIC HEMATOLOGIC CONDITIONS

## TABLE 5



800110

# PROPOSED COVERED ICD 9 CODES FOR IMMUNOPHENOTYPING (CPT 88180)

| CODES | RATIONALE FOR COVERAGE |
|-------|------------------------|
| 140 - 199.1 | These codes encompass all non-hematologic malignancies. Extranodal lymphomas can present as a mass lesion virtually anywhere. In cases where that is the clinical suspicion, these are the codes the clinician is forced to use. |
| 200 - 208.9 | All hematologic malignancies. Includes myeloma since patients with myeloma are treated with alkylating agents and, like those with Hodgkin's disease, may develop secondary leukemia or lymphoma. |
| 238.4 | Polycythemia vera may transforms to acute leukemias |
| 238.7 | Myelodysplastic syndromes and myeloproliferative disorders are listed under this code. |
| 273.1 | Monoclonal gammopathy may indicate lymphoma as well as myeloma. |
| 280 - 281.9 | Leukemia in particular may initially be mistaken for a deficiency anemia. |
| 284 - 284.9 | Leukemias can present as cytopenias. |
| 285 - 285.9 | Anemias of uncertain etiology where leukemia or lymphoma is suspected are coded in this fashion. |
| 287 - 287.9 | Thrombocytopenias are often the first manifestation of leukemia and lymphoma. |

300111

## PROPOSED COVERED ICD 9 CODES FOR
## IMMUNOPHENOTYPING (CPT 88180)

| CODES | RATIONALE FOR COVERAGE |
|---|---|
| 288 | Leukemia and lymphoma may present with agranulocytosis. |
| 288.8 | Includes lymphocytopenia as well as leukocytosis and lymphocytosis, common presentations of leukemia and lymphoma. |
| 289 - 289.9 | Includes poorly specified disorders such as poycythemia, myelofibrosis, splenic disorders, and blood dyscrasias. |
| 733.10 -733.19 | Pathologic fractures, a potential manifestation of lymphoma or myeloma |
| 758 | Down syndrome patients have a very high incidence of leukemia. |
| 782.2 | Subcutaneous nodule is a presentation of lymphoma. |
| 784.2 | Head or neck mass, same reason as above. |
| 789.2 | Splenomegaly is a frequent manifestation of leukemia and lymphomas. |
| 789.3 | Abdominal mass, same reason as above |

300112

Attachment C

S00113

17. Psoriasis (696.1)
18. Atopic Dermatitis (691.8)
19. Nummular Eczema (692.9)

## FLOW CYTOMETRY

Immunophenotyping CPT code 88180

DNA Content and Cycle Analysis - 88182

1. Diagnosed or possible leukemia of any type. May repeat for evaluation of status with consideration of change of treatment. (88180)

2. Diagnosed or possible non-Hodgkin's lymphoma. May repeat for evaluation of status with consideration of change of treatment. (88180)

3. Possible Hodgkin's Disease, will be denied for previously diagnosed Hodgkin's disease unless there is a possibility of #1 or #2 being considered (acute leukemia or non-Hodgkin's lymphoma post Hodgkin's therapy). (88180)

4. AIDS - HIV positive patient - not necessarily clinically active. Every three months if T4 lymphocyte count more than 200/mm3. If T4 count less than 200/mm3, deny if T4 value remains less than 200/mm3 more than twice consecutively. (88180)

5. Possible congenital immunodeficiency of any type - repeated at intervals of every three months with Explanation of Medical Necessity as needed, or repeated for evaluation of status with consideration of change of treatment. (88182)

6. Bone marrow transplantation - after transplantation and every three months times 4, then every 6 months unless there is a change in clinical status. (88180)

7. Node negative (stage 1) cancer of breast, less than 2cm diameter - post lumpectomy when node dissection is not planned. (88182)

8. DND analysis (88182) of body fluids, including urine or bladder washings will be covered at six months interval when a diagnosis of recurrent tumor is indicated (e.g.. urine of patients with a history of successfully treated transitional cell CA).

9. Choriocarcinoma diagnosis, one test. (88182)

10. Hydatiform mole diagnosis, one test. (88182)

11. Plasmacytoma or multiple myeloma, one test. (88182)

12. DNA content and cell cycle analysis (88182) for other tumors require justification on a case-by-case basis.

## FUNGAL CULTURES OF TOENAIL CLIPPINGS

Travelers Medicare will no longer pay for the following laboratory services when they are performed in conjunction with, or as part of, onychomycotic toe nail debridements.

87102 - Culture, fungi, isolation (with or without presumptive identification); other source (except blood)

87106 - Culture, fungi, definitive identification of each fungus

87205 - Smear, primary source, with interpretation; routine stain for bacteria, fungi, or cell type

87220 - Tissue examination for fungi (e.g., KOH slide)

Individual consideration will be given in cases where it is necessary to differentiate psoriatic nails from those of onychomycosis and when laboratory services are billed in conjunction or in anticipation of a curative treatment regime (i.e., Grisofulvin) after a positive fungus culture has been reported.

## LAPAROSCOPIC RETROPERITONEAL NODE DISSECTION

Laparoscopic retroperitoneal pelvic node dissection will be reimbursed under code 38770. For indications of high PSA levels without evidence of metatasis (i.e., negative bone scan, pelvic CD/MRI) are patients undergoing external beam radiation to prostate.

2. Radon seed implantation of the gland.

3. Perineal prostatectomy.

If, for any reason, the surgeon has to resort to do prostatectomy after laparoscopic node dissection, codes 38770 and 55831 or 55840 will be combined and paid under code 55815.

An assistant at surgery will also be covered.

## PAMIDRONATE SODIUM (Aredia)

Travelers Policy Pamidronate sodium will be reimbursed when administered by intravenous infusion, incident to a physician's service in appropriate dosage

300114