# EXHIBIT 34

```
                 UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

- - - - - - - - - - X
UNITED STATES OF AMERICA,,      |
ex rel. Dr. James J. Tiesinga,  |
          Plaintiffs,           |   No. 3:02CV1573(MRK)
                                |
           v.                   |
                                |
DIANON SYSTEMS, INC.,           |
          Defendant.            |   July 25, 2006
- - - - - - - - - - X
```

VIDEOTAPE DEPOSITION OF FRANK DELLI CARPINI, M.D.

30(b)(6) Testimony

Taken before Kristine A. Paradis, LSR 338, a Court Reporter and Notary Public within and for the State of Connecticut, pursuant to Notice and the Federal Rules of Civil Procedure, at the offices of First Coast Service Options, Inc., 321 Research Parkway, Meriden, Connecticut, on July 25, 2006, commencing at 11:23 a.m.

FALZARANO COURT REPORTERS
117 North Saddle Ridge
West Simsbury, Connecticut 06092
860.651.0258

1  needed to develop the LMRP and acquire the
2  background information.  In particular, in regards
3  to 88180, there would be a research conducted onto
4  what is 88180, what is it utilized for, what is it
5  needed for, when would a clinician use it,
6  indications for usage, and the medical necessity and
7  the pertinence of the test.
8         And the literature and the text that are
9  listed there are used as reference material for
10 acquiring that knowledge to put that into an LMRP
11 format.
12    Q   Would that information contained in
13 Sources of Information a Basis for Decision provide
14 education to physicians regarding useful sources of
15 information regarding a service covered by the LMRP?
16         MR. MOLOT:  Object to the form.
17    A   The physician -- the provider community
18 has this list provided to them for that purpose at
19 the -- at the development of the LMRP and the -- and
20 bringing it to the CAC.  This is part of the
21 document that exemplifies to the provider community
22 the document -- the reference material that was used
23 to formulate the policy.
24         MR. SALCIDO:  Is this 13?
25         THE COURT REPORTER:  (Nod.)

```
 1   is the reason for this document being used in the
 2   LMRP.  It could have been used for a multitude of
 3   reasons.  It could have been -- anything in here
 4   could have been the purpose of referencing it in
 5   here.  It does not mean that in formation of the
 6   LMRP that we looked at Section 2.6 in here for that
 7   purpose.  It could have been for another -- another
 8   purpose for looking at this could have been to
 9   collaborate with another piece of literature; it
10   could have been for a different purpose altogether.
11              MR. SALCIDO:  Move to strike as
12         nonresponsive.
13   BY MR. SALCIDO:
14      Q   My question wasn't whether you used this
15   literature, or more specifically Section 2.6 when
16   you decided to cite it as a basis for your decision
17   in LMRP, that was not my question.
18              My question instead was:  Do you know
19   whether the authors of this text use a comprehensive
20   approach or a step -- what they define as a stepwise
21   approach?
22              MR. MOLOT:  Object to the form.
23      A   I'm not understanding the question.  If
24   the -- if the authors of this text that's in front
25   of us uses the stepwise or the comprehensive
```

```
 1   approach in what scenario?
 2   BY MR. SALCIDO:
 3        Q    Well, maybe it's easier -- I can direct
 4   you to page 22, Section 2.7.
 5        A    I'm sorry, what section?
 6        Q    Section 2.7, page 22.
 7        A    Okay.
 8        Q    Can you read that paragraph?
 9        A    Sure.  "In the authors' laboratory, the
10   antibody panels have been designed based on a
11   comprehensive approach to the FCM analysis.  The
12   rationale is to optimize the detection and
13   characterization of the critical cells for
14   determining the lineage of the cells of interest
15   (example myeloid, B-cell or T-cell), their maturity
16   status, the clonality, where appropriate, the
17   specific subtype of hematopoietic malignancy, the
18   status of the normal elements present.  The use of
19   large comprehensive panels also facilitates the
20   detection of two or more unrelated neoplastic
21   processes present in the same specimen.  Appropriate
22   isotype controls are included in the panels.  The
23   evaluation of the FCM data also relies on internal
24   controls, however.  Example T-cells serve as
25   internal control for B-cells and vice versa,
```

1 Figure 2.6."
2  Q    Now, is there any indication in the LMRP
3 that some other approach was advocated rather than a
4 comprehensive approach?
5          MR. MOLOT:  Objection.
6  A    No.  I do not recall the LMRP referencing
7 which approach should be used.  It was basically
8 left at the discretion of the provider to provide
9 medically necessary and pertinent services to the
10 carrier.
11 BY MR. SALCIDO:
12  Q    Do you know whether physicians can rely on
13 peer-reviewed medical journals when making decisions
14 regarding medical necessity?
15          MR. MOLOT:  Objection.
16  A    If -- if -- if a physician is referencing
17 peer-reviewed literature and incorporates it into
18 their practice of medicine, then I would assume that
19 they could incorporate that.
20 BY MR. SALCIDO:
21  Q    Would it be your view that a physician
22 could read this text which was cited in your LMRP
23 under Basis of Decision and then rely on this
24 comprehensive approach in terms of designing an
25 antibody panel?

```
 1              MR. MOLOT:  Object to the form of the
 2         question.
 3      A    If the situation was exactly the same,
 4 yes.
 5 BY MR. SALCIDO:
 6      Q    If you could, Doctor, could you go to the
 7 next page.
 8      A    Uh-hum.
 9      Q    Now, in terms of the first sentence on
10 that page, "The clinical impression or the
11 morphologic features of the specimen should not
12 dictate the design and selection of an antibody
13 panel"?
14              MR. MOLOT:  I'm sorry, where are you
15         reading, Robert?
16              MR. SALCIDO:  First sentence, page 17.
17              THE WITNESS:  Oh, you said 23.
18              MR. MOLOT:  You said the next page.  We
19         were on 22, you went to 23.
20              MR. SALCIDO:  Oh, I apologize.
21              MR. MOLOT:  We were both page 23.
22              MR. SALCIDO:  I'm sorry.  I skipped back
23         to 16.
24              THE WITNESS:  So, we're on 17?
25              MR. SALCIDO:  Yeah.  Yeah.  I must have
```

1  And polycythemia is the exact reverse of anemia.
2          So, therefore, it would really negate the
3  rest of the markers because the clinician and the
4  specimen is saying you have too many red cells and
5  you're looking -- you're doing markers for not
6  enough red cells. So, therefore, that would be a
7  parity.
8      Q   So, if I understand your interpretation of
9  Connecticut's LMRP, as the Government's 30(b)(6)
10 witness, your interpretation is that with respect to
11 each diagnosis listed on the LMRP that's furnished
12 by the referring physician as a provisional
13 diagnosis, the hematopathologist that receives the
14 provisional diagnosis should tailor his panel to
15 reflect the provisional diagnosis received by the
16 pathologist?
17     A   To reflect the disease process in that
18 provisional diagnosis. And the pathophysiology of
19 that disease process.
20     Q   Okay. Let's go back to that first
21 sentence on that page, page 17.
22             MR. MOLOT: Go back to the article.
23             THE WITNESS: I'm sorry, 17 of the
24         article?
25             MR. SALCIDO: Yes.

1  Q  Uh-hum.

2  A  -- it says, "To circumvent these issues,
3  the authors have replaced the above antibody panels
4  with panels oriented by specimen type."

5  Q  Uh-hum.

6  A  So, what we're saying is, in essence, the
7  same, in that the -- there is -- there are a
8  multiple -- there are multiple reasons that a
9  hemopathologist can be directed into doing medically
10 pertinent markers.

11 Q  Uh-hum.

12 A  And there are clinical scenarios, there's
13 morphological scenarios, and there's -- based on
14 experience from looking at the specimen they would
15 know to do certain markers. So, I think we're
16 saying the same thing.

17 Q  Okay. Well, let's continue on with that
18 sentence, the next sentence you read into the
19 record. "To circumvent these issues, the authors
20 have replaced the above antibody panels with panels
21 oriented to specimen type. Thus, the two new panels
22 are blood/bone marrow/spleen panel and a
23 tissue/fluid panel."

24     Would it be appropriate for a
25 hematopathologist to design panels based on specimen

```
 1   type if that was needed to diagnose a patient's
 2   condition?
 3              MR. MOLOT:  Objection.
 4        A     For the test that's in front of him?
 5   BY MR. SALCIDO:
 6        Q     Yes.
 7        A     Yes.  That's what we're saying, that the
 8   hematopathologist would have a specimen in front of
 9   them that they would decide for that specimen, this
10   is the panel I need to do.
11        Q     Uh-hum.
12        A     One, two, three, four, five or whatever --
13   how many it takes to make the diagnosis and be
14   medically necessary and pertinent.
15        Q     Okay.  And could you go to the next page,
16   page 24, table 2.1.  Do you know how many markers or
17   antibodies are in the author's blood/bone
18   marrow/spleen panel?
19        A     No, I wouldn't know.
20        Q     Now, do -- do you know based on your
21   experience as carrier medical director that Dianon
22   billed for fewer than 27 antibodies?
23        A     I'm sorry, can you repeat that?  Is --
24        Q     Yeah.  Do you know based on your
25   experience as carrier medical director that Dianon
```

1  articles cited in your LMRP when deciding whether a
2  service was medically necessary or indicated?
3         MR. MOLOT:  Object to the form.
4     A   They can -- they can reference them as we
5  did.  If they're -- if they're looking at them for
6  the exact same reference that we did, they certainly
7  can.
8  BY MR. SALCIDO:
9     Q   In terms of preparing for this deposition,
10 did you ask anyone why this article was cited as a
11 basis for the decision for the LMRP?
12    A   No.
13    Q   Now, based on your experience as carrier
14 medical director and the Government's 30(b)(6)
15 witness, was it ever the intent to include citations
16 to medical journals to confuse the provider and
17 supplier community in terms of medical necessity?
18    A   Never.
19        (Pause.)
20    Q   And earlier you stated that the article
21 might have been referenced for some other reason.
22 Were you just speculating or was that based on
23 personal knowledge?
24    A   Well, it's based on personal knowledge in
25 the sense that it would be incomprehensible to think

1   that every article and every piece of literature
2   that's stated in this bibliography is taken in its
3   entirety to formulate the LMRP.  Because then the
4   LMRP would be the size of a textbook.
5       Q    I asked whether you knew based on personal
6   knowledge that your previous statement that this was
7   cited potentially for some other reason was an
8   accurate one or not.
9            MR. MOLOT:  Objection.  Asked and
10           answered.
11      A    The -- the statement is correct in saying
12  that the article is referenced at some -- for some
13  reason in this article -- in this LMRP, which I'm
14  not sure what it is at this point.  It could have
15  been referenced for other reasons other than what
16  we're discussing.
17
18           (Defendant's Exhibit 14:
19           Marked for Identification.)
20
21  BY MR. SALCIDO:
22      Q    In terms of your interpretation of the
23  proper use of CPT 88180, did you have any specific
24  discussion with anyone at Dianon that their use of
25  specific markers should change based on the

```
 1   provisional diagnosis provided by physicians?
 2            MR. MOLOT:  Objection.
 3       A    No.
 4   BY MR. SALCIDO:
 5       Q    Do you know whether anyone on your staff
 6   ever had that discussion with Dianon?
 7            MR. MOLOT:  Objection.
 8       A    Not to my knowledge.
 9   BY MR. SALCIDO:
10       Q    Let's turn to the final exhibit.  Before
11   we turn to that exhibit, are you aware as you sit
12   here today as the Government's 30(b)(6) deponent
13   regarding the medical necessity of CPT 88180 of any
14   literature that says specifically that with respect
15   to each ICD9, which is the provisional diagnosis of
16   the referring physician, that hematopathologists
17   have a duty to rely upon that provisional diagnosis
18   in determining the panel that they should use of
19   markers?
20            MR. MOLOT:  Object to the form.
21   BY MR. SALCIDO:
22       Q    And just to put a final point on the
23   question, we went through literature which
24   essentially said the opposite.  So, now, I'm asking:
25   Is there any literature you're aware of that says
```

```
 1  But just correct me if I'm wrong.  You're not a
 2  pathologist, are you?
 3       A    Oh, no, I'm an internist.
 4       Q    Now, with respect to -- getting back to my
 5  initial question, we have two separate approaches
 6  articulated again in the articles, cited to -- as a
 7  basis for decision in the LMRP, comprehensive
 8  approach, stepwide (sic) approach.
 9            Now, the authors, as we discussed, used
10  the comprehensive approach.  So, here again is my
11  question that got us off on this, and I'm going to
12  need an answer unfortunately.  Is there any
13  literature that you're aware of -- now, before it
14  was -- you know, it related to Connecticut's
15  development of an LMRP.  But I'm willing to even go
16  broader now.
17            Is there any literature that you're aware
18  of that says that with respect to complying with
19  Medicare's medical necessity standard, the
20  hemopathologist must use a stepwise approach as
21  opposed to the comprehensive approach?
22            MR. MOLOT:  Object to the form of the
23       question.
24       A    The question is not answerable in the
25  format in which it's delivered because your question
```

```
1   Medicare program, and that expands based on stepwise
2   by stepwise by stepwise to a comprehensive approach,
3   well then that would be the medically prudent and
4   medically necessary way to get to a comprehensive
5   approach.
6           So, therefore, yes, the stepwise approach
7   would be the approach that is most in accordance
8   with the Medicare program.
9   BY MR. SALCIDO:
10      Q   That wasn't my question.  And I'm sorry I
11  have to keep asking the question.
12      A   Oh, by all means do.  I have no problem
13  with it.
14      Q   I just noticed an important point.
15          Is there any literature that you're aware
16  of -- and again, it could -- any authoritative
17  literature put out by the carrier, CMS, Medicare,
18  that dictates that as opposed to a comprehensive
19  panel as it's been defined here versus a stepwise
20  approach as was defined in the text, that the
21  stepwise approach is the one that is needed in order
22  to satisfy Medicare's medical necessity standard?
23          MR. MOLOT:  Object --
24  BY MR. SALCIDO:
25      Q   That's the question.
```

```
 1      A    Right.
 2           MR. MOLOT:  Sorry.  Object to the form.
 3      A    And I apologize for not understanding
 4  before.
 5           Absolutely not because that's why we did
 6  not even address it in the policy because there is
 7  no mandate.  The mandate is medical necessity and
 8  medical prudency of the test.  So, whether it's
 9  comprehensive or stepwise is not the question.  The
10  question is the medical necessity of it.
11  BY MR. SALCIDO:
12      Q    And how does a physician determine medical
13  necessity?
14      A    The hematopathologist?
15      Q    Yes.
16      A    By doing the amount of testing or the --
17  in any Medicare service, doing the appropriate test
18  that's approp -- that's significant for that
19  diagnosis and doing -- it has to be mandated by
20  medical necessity by signs and symptoms or
21  indications to lead them to that particular test.
22      Q    Okay.  Now, with respect to -- which leads
23  us to the last exhibit.  And what I'm going to
24  direct you to is Section 13.7.1.
25      A    Evidence supporting LCDs?
```

1  forth in published peer-reviewed medical journals?
2            MR. MOLOT:  Objection.
3            THE WITNESS:  Should a physician --
4            MR. SALCIDO:  You're changing the
5       question.
6            THE WITNESS:  I'm sorry, I don't
7       understand the question.
8  BY MR. SALCIDO:
9       Q    Would it be reasonable -- not should.
10      A    Okay.
11      Q    Would it be reasonable for a physician to
12 rely upon peer-reviewed medical journals?
13           MR. MOLOT:  Objection.
14      A    Yes, a physician can certainly rely on
15 peer-reviewed medical journals.
16 BY MR. SALCIDO:
17      Q    Could a physician also reasonably rely on
18 consensus of expert medical opinion in determining
19 whether a service is medically necessary and
20 indicated?
21      A    In relation to submitting a claim to
22 Medicare?
23      Q    Yes.
24      A    Yes.  And -- and for the record, this
25 particular section of the manual talks to the CAC

1  process and that we did get a consensus of expert
2  medical opinion by that process, by putting this
3  through the CAC process. The pathologists of
4  Connecticut and the hematopathologists and our
5  representation to the CAC process were -- were --
6  were alerted to the policy and to the comment
7  period. So, we did include that whole paradigm of
8  clinical people to help us with this policy in the
9  comment period.
10 BY MR. SALCIDO:
11     Q    But you understand that wasn't my
12 question.
13     A    But I answered your question.
14     Q    Yes. But that second part was -- I mean,
15 it's fine, but just so the record is clear, that
16 that's unrelated what my question was.
17     A    Yeah, but I wanted to make sure that the
18 record was clear that -- what we were referencing in
19 these bullets.
20     Q    Okay. Fair enough.
21          Is it also reasonable for physicians to
22 rely upon medical opinions derived from consultation
23 with medical association and other health care
24 experts?
25          MR. MOLOT: Objection.

```
 1   circumstance an expert would say that blanketly they
 2   can bill the frequency that is being asked?
 3              MR. SALCIDO:  No, I'm sorry.  We'll have
 4        to change the tape.  I tried to wrap it up
 5        before the last tape.  I'm sorry.
 6              THE VIDEOGRAPHER:  Going off record --
 7              MR. SALCIDO:  It got butchered.
 8              THE VIDEOGRAPHER:  Going off record.
 9        Time is 1:21.
10
11              (Recess taken:  1:21 to 1:22 p.m.)
12
13              THE VIDEOGRAPHER:  Back on record.  Time
14        is 1:22.
15   BY MR. SALCIDO:
16       Q    Okay.  Let me try it this way.  Let's say
17   peer-reviewed medical journals containing
18   international consensus conferences, so recognized
19   medical experts, determine that a certain frequency,
20   a service is needed in order to diagnose the
21   patients.  Can a physician reasonably rely on the
22   expert opinions embodied in that peer-reviewed
23   medical journal to determine whether a service is
24   medically necessary or indicated?
25              MR. MOLOT:  Object to the form.
```

```
 1      A    In clinically evidence-based research, if
 2  the particular piece of literature references the
 3  specific specimen that they're using to gain
 4  knowledge from, I would assume that they could, if
 5  everything being the same.
 6              MR. SALCIDO:  Okay.  I think I'm done,
 7  Rick, but give me five minutes --
 8              MR. MOLOT:  Sure.
 9              MR. SALCIDO:  -- to look over my notes.
10              THE VIDEOGRAPHER:  Going off record.
11  Time is 1:24.
12
13              (Recess taken:  1:24 to 1:28 p.m.)
14
15              THE VIDEOGRAPHER:  Back on record.  Time
16  is 1:28.
17              MR. SALCIDO:  I've concluded my exam.
18              MR. MOLOT:  I have no questions.
19              THE VIDEOGRAPHER:  Going off record.
20  Time is 1:28.
21
22              (Deposition concluded:  1:28 p.m.)
23
24
25
```