## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| <u>ex</u> <u>rel</u>. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:02 CV 1573 (MRK) |
| | ) | |
| DIANON SYSTEMS, INC. | ) | November 1, 2006 |
| | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF STUART FLYNN, M.D.

**ORAL ARGUMENT REQUESTED**

## **Contents**

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      When Billing the Government for Flow Cytometry Services, Dianon
                Certified that the Antibodies in Question Were Medically Necessary
                for Each Patient. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Dr. Flynn, the Former Director of the Flow Cytometry Lab at Yale Medical
                School, is Clearly Qualified to Provide his Expert Opinion in this Case . . 5

        C.      After Reviewing Hundreds of Patient Charts, Dr. Flynn Found that
                Dianon Routinely Used Medically Unnecessary Antibodies. . . . . . . . . . . . 7

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      The *Daubert* Standard for Admissibility Focuses on Reliability
                and Relevancy, Not Disputed Factual Issues . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Dr. Flynn's Methodology was Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      Dr. Flynn Applied his Methodology in a Reliable Way
                to the Hundreds of Tests Reviewed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      Dr. Flynn's Opinions "Fit" or Have "Relevance" to the
                Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

IV.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I.
## INTRODUCTION

Defendant Dianon Systems, Inc. (Dianon) seeks to exclude the opinions of the

Government's medical expert, Dr. Stuart D. Flynn, the former Director of the Flow Cytometry

Laboratory at Yale University School of Medicine, pursuant to the standards set out in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As we show below, Dianon's motion

goes to the *weight* of Dr. Flynn's testimony, not its *admissibility*. In addressing a *Daubert*

motion, the Second Circuit has held that the Court's role is to serve as a "gatekeeper" to prevent

the jury from being exposed to unreliable expert opinion, not to evaluate the weight and

credibility of the evidence. *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998)

("[d]isputes as to the strength of [the expert's] credentials, faults in his use of . . . [the expert's]

methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility,

of his testimony") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

*Cf. Howard v. Walker*, 406 F.3d 114, 127 (2d Cir. 2005) ("On cross-examination, an attorney is

free to challenge an expert's methodology, her conclusions and the basis for her conclusions.").

Moreover, Dianon's motion fundamentally misconstrues Dr. Flynn's role in this matter.

The purpose of Dr. Flynn's opinion is to assist the jury in coming to a conclusion that goes to the

heart of this case: which antibodies utilized by Dianon in its flow cytometry tests were medically

necessary to the diagnosis and treatment of the particular patient in question, and, therefore,

*billable* to federal healthcare programs. Dr. Flynn's role was not to "create" a new panel for each

patient or to favor one method of performing flow cytometry over another method. Because

Dianon failed to exercise any medical judgment when conducting its flow cytometry tests, Dr.

Flynn was asked, after the fact, to review Dianon's testing for hundreds of patients and to

determine which antibodies used by Dianon were medically necessary to answer the diagnostic

question being asked by the treating physician. To do this, Dr. Flynn did what most pathologists

do prior to conducting a flow cytometry test – he looked at the diagnostic history, clinical information, prior tests, and other pertinent information, and utilized this information to choose antibodies that answered the clinical question being asked by the treating physician.

Although Dianon tries to poke holes in Dr. Flynn's review by pointing to supposed inconsistences in his analysis, at bottom, Dianon is simply dressing up its cross-examination as a *Daubert* motion. As we show below, Dianon's motion rests on factual inaccuracies and a mischaracterization of the record. Dr. Flynn's opinions are admissible because he is a well-qualified pathologist who utilized a reliable methodology during his detailed case-by-case review of hundreds of Dianon's patient charts; he applied that methodology in a reliable way to the tests he reviewed; and his opinions have a direct "fit" or "relevance" to the Government's case. Accordingly, Dianon's *Daubert* motion should be denied.

## II.
## FACTUAL BACKGROUND

### A.    When Billing the Government for Flow Cytometry Services, Dianon Certified That the Antibodies in Question Were Medically Necessary for Each Patient.

The medical service at issue in this lawsuit, flow cytometry, is a test used to analyze cells from blood, bone marrow, body fluids, lymph nodes, and other tissues. A treating physician, such as an oncologist, will send a patient specimen to a pathologist and request that the pathologist conduct a flow cytometry test. The treating physician will send a requisition form with the specimen setting forth the test being requested, clinical information about the patient, a diagnosis code, and in most cases a lab report on the patient's blood. A flow cytometry test uses various antibodies, also referred to as markers, assays or reagents, to help classify certain diseases, such as lymphoma. Different clinical indications require the use of different markers, depending on the diagnostic question being asked by the treating physician. *Exh. 1, Department*

2

*of Health and Human Services, Federal Register Publication, Flow Cytometry*, 68 Fed. Reg.
49047, 49030 (Aug. 15, 2003) (for a given clinical indiction, "there is a variation in the number
of markers performed. The number of markers that are necessary depends, in part, on the
pathologic information available to the pathologist at the time he/she orders flow cytometry.");
*Exh. 2, To Flow or Not to Flow: The Appropriate Laboratory Utilization of Flow Cytometric
Immunophenotyping*, at 2, Mayo Clinic (2000) (Mayo Clinic Communique) (pathologist uses the
pertinent clinical history and morphologic (i.e. microscopic) information to help "triage" the
sample, which may be "sufficient to answer particular clinical questions without proceeding to
large antibody panels.").

　　　Even Dianon admits, in its moving memorandum, that "[o]nly certain antibodies can
recognize or identify specific diseases." Dianon Memorandum in Support of Motion to Exclude
the Opinions of Stuart Flynn, M.D. (Dianon Mem.) at 4. *See also, Exh. 3*, expert report of
Dianon's expert, Dr. Michael Borowitz, of Johns Hopkins, at 2 (antibody panel choice "is
directed by the information submitted on the requisition form that accompanies the sample.").

　　　At all relevant times, Dianon was reimbursed separately for each antibody used in its flow
cytometry tests.[1] When Dianon billed the Government for 26 antibodies as opposed to, for
example, 18 antibodies, Dianon was paid hundreds of dollars more by the Government for each
test.[2] Although the information received by Dianon from the treating physician allowed Dianon's

---

[1] During the time period at issue in the Government's amended complaint, 1996-2004, flow
cytometry was billed pursuant to Current Procedural Terminology (CPT) code 88180, "Flow Cytometry,
each cell surface, cytoplasmic or nuclear marker." Thus, each marker was billed separately to the
Government. In 2005 the code was changed, and the professional interpretation of a flow cytometry test
was billed based on a range of markers (e.g. 8-16 markers), instead of for each and every marker used.
These new codes are not at issue in this case.

[2] In 1997, an internal memo prepared by Dianon pathologists indicated that only 18 of the 26
antibodies were "essential" and that "their routine usage can be justified to insurance carriers." *Exh. 4.*

pathologists to use their medical judgment to choose antibodies aimed at identifying the type of

cancer suspected by the treating physician, Dianon did not, unlike most other labs, exercise any

medical judgment. Instead, it utilized a full panel of 26 antibodies in each and every case,

regardless of the patient's history, diagnosis, or other information supplied by the treating

physician.[3]

For each and every claim it submitted to the Government, Dianon *certified* that the

antibodies it used were medically necessary for the particular patient. *Exh. 6*, sample CMS 1500

claim form, at 2  ("I certify that the services shown on this form were medically indicated and

necessary for the health of the patient. . . ."). Because of the large volume of claims, Medicare

relies on the physician's certification of medical necessity. *United States v. Beck*, 758 F.2d 1553,

1558 (11th Cir. 1985) ("This certification requirement puts the doctor on notice that the

assignment he takes from the patient is valid only where the services provided are medically

necessary.") (citations omitted).

Dianon is the entity that made the unusual decision to use *the same exact panel* for every

single patient tested, which is designed to classify not only the type of cancer suspected, but also

to exclude any other form of cancer that a patient may possibly have. If a pathologist chooses to

run a test to exclude all forms of unsuspected cancer, that pathologist may legally do so. A

---

[3] For example, one of Dianon's staff pathologists testified at her deposition as follows:

> Q: So you don't use the clinical information to choose the panel, right?
> A: No.
> Q: You don't use the morphology to choose the panel, right?
> A: The morphology is used to go side by side with the panel, yes.
> Q: But you don't use it to choose the panel?
> A: No.
> Q: And you don't use the prior test to choose the panel?
> A: No.

*Exh.5* , Deposition of Suha Mishalani, M.D., at 152:6-17

4

pathologist may not, however, knowingly *bill* the Government for antibodies that did not

contribute to the diagnosis or treatment of the patient being tested. *Exh. 7*, Medicare Provider

News, April 1998, at 13 (billing for services that are not medically necessary is Medicare fraud

and "[w]hen a provider submits a claim for services performed that were not medically

necessary, the claim must state: 'submitted for denial only.'"); 32 C.F.R. § 199.9(c)(5) (Tricare

regulations) (examples of fraud include billing for claims involving "persistent overutilization of

services without proper regard for . . . the patient's ailments, condition [or] medical needs. . . .");

*Exh. 8*, Program Safeguard Carrier web site publication, at 2 (examples of fraud include

"[c]laims for a panel . . . of lab tests when only part of the group of tests in the panel were

medically indicated for the patient's signs, symptoms, or complaints")[4]

## B.    Dr. Flynn, the Former Director of the Flow Cytometry Lab at Yale Medical School, is Clearly Qualified to Provide his Expert Opinion in this Case.

The United States retained Dr. Stuart Flynn, a former Professor of Pathology at Yale

University School of Medicine, and the former Director of the Flow Cytometry Laboratory at

Yale, to review two random samples of patient charts and medical records produced by Dianon.

*Exh. 10*, Dr. Flynn's *curriculum vitae*. Dr. Flynn produced an expert report pursuant to Fed. R.

---

[4] Medicare does not pay for "screening tests," except in certain circumstances specifically set forth in the regulations. 42 C.F.R. § 411.15. An example of screening, as noted above, is performing a panel of lab tests when only part of the panel is medically indicated for the patient's symptoms. *Exh. 8*. As Dr. Frank Delli Carpini, the former Medicare Carrier Medical Director for Connecticut, testified at his deposition:

> What I'm saying is that [a flow cytometry] comprehensive total approach would include screening tests because they're not all medically necessary. So, if you're going to do a comprehensive approach on every specimen, it would be impossible that – to think that every specimen would need a comprehensive approach. So, therefore, . . . included in that would be uncovered services by Medicare because they would be screening; they would not be medically necessary.

*Exh.9,* at 43:22-44:6.

5

Civ. P. 26(a)(2)(B), *Exh. 11*, and later sat for a deposition.[5]

Despite Dianon's suggestion to the contrary, Dr. Flynn is clearly qualified to provide his opinion on the medical necessity of the antibodies used by Dianon. Without reciting every detail from his *curriculum vitae*, some of Dr. Flynn's professional training and experience during the past twenty-five years do merit specific mention here. Dr. Flynn completed his residency in Combined Anatomic and Clinical Pathology at the University of Michigan Medical Center in 1983. Dr. Flynn has been a Clinical Instructor of Pathology at Stanford, and a Professor of Pathology and Surgery at Yale Medical School. At Yale Medical School, Dr. Flynn directed the Cytopathology, Cell Marker, and Flow Cytometry Laboratories, the latter two from 1986-2006. Dr. Flynn was the Director of the Pathology Residency Training Program from 2001-2006 and the Director of Surgical Pathology at Yale from 2000-2006. Dr. Flynn was also the Section Head of the Division of Hematopathology at Yale from 1993-2006. *Exh. 10*.

Dr. Flynn has been a member of numerous professional, clinical, and curriculum-based committees and is a member of various professional societies, including the Connecticut Society of Pathologists, the Society of Analytical Cytology, European Society for Analytical Cellular Pathology, and the A. James French Society of Pathologists. Additionally, Dr. Flynn has served on the editorial review boards or as a journal referee of numerous professional journals, including Advances in Anatomic Pathology, Modern Pathology, and Human Pathology. Dr. Flynn has published over seventy articles on pathologic disorders and written chapters in five text books. Finally, Dr. Flynn has been honored with several professional awards, including Teacher of the Year Award at the Yale University School of Medicine in 2004. *Id.*

With this long list of accomplishments, it is ironic, indeed, that Dr. Flynn is qualified to

---

[5] In June 2006, Dr. Flynn was appointed as the Associate Dean for Academic Affairs at the University of Arizona College of Medicine.

run a flow laboratory and train future hematopathologists at a premiere institution like Yale

Medical School, yet, as Dianon suggests, unable to help a jury understand hematology generally

and, more specifically, which antibodies are or are not reasonable and medically necessary for a

diagnosis. It is also ironic that Dianon's main criticism of Dr. Flynn's qualifications appears to

be that he does not hold a board certification in hematology, while two of the three Dianon

experts also appear to lack that certification. *See curriculum vitae* of Drs. Borowitz and Braylan,

attached as *Exh. 12* and *13* respectively. Dr. Flynn is, in plain and simple terms, a highly skilled

pathologist and is clearly qualified to express his expert opinion in this case.

### C.     After Reviewing Hundreds of Patient Charts, Dr. Flynn Found that Dianon Routinely Used Medically Unnecessary Antibodies.

Dr. Flynn reviewed hundreds of patient medical charts based on two statistically valid

random samples. The first sample, which was selected by the Department of Health and Human

Services, Office of Inspector General, Office of Audit Services, consisted of randomly selected

dates of service for 200 patients during the time period 1998 through 2002. This sample was

utilized to help the Government make its decision to intervene in this *qui tam* action.

After the Government intervened in this action, the Government retained Clifton

Gunderson, LLP, a forensic accounting firm, to design a broader and more detailed sample (and

to perform a damages assessment) for use at trial. *Exh. 14*, Expert Report of Constantin T.

Yiannoutsos, Ph.D. and R. James Alerding (Clifton Gunderson Report). Clifton Gunderson

designed a stratified random sample for the period 1996 through 2003. The sample was stratified

by time-period, based on Dianon's charging patterns. The sample was further divided into repeat

and non-repeat tests, to account for the numerous times when Dianon would repeatedly perform

flow cytometry tests on the same patient over time, in each instance using its "full" panel of 26

antibodies. The sample designed by Clifton Gunderson consisted of randomly selected dates of

service for 240 patients (180 patients who had only one test, plus 60 patients who had repeat tests). *Exh. 14* at 9-11.[6]

During discovery in this action, the Government received from Dianon the complete patient charts for the 240 patients in the Clifton Gunderson sample. Those 240 patient charts, containing the same information that the Dianon pathologists had when they performed the original flow cytometry tests, were provided to Dr. Flynn for his review. Dr. Flynn described his review as follows:

> To perform my assessment, I reviewed all supplied charts. Materials within each chart included an order requisition form which, in addition to pertinent patient and laboratory demographics, included an ICD-9 code and/or a written history, the source of the specimen submitted, and the test requested. Some variation was noted in regards to the completeness of such information. In addition, some charts included copies of relevant laboratory information as well as possible relevant past medical history. For those patients who had more than one test performed by Dianon, some had reference to such previous studies, whereas others did not. After having reviewed all of these documents for each case, I proceeded to review the antibodies used from Dianon's records and concluded from all such information which antibodies were medically necessary versus those which were not. Following designation of each antibody in either of these two categories, I reviewed the laboratory results and conclusions when included in the charts.

*Exh. 11*, at 2.

After conducting a review of each chart, Dr. Flynn filled out a review sheet setting forth his findings. An example of a review sheet is attached at *Exh. 15*. Each review sheet set forth the information related to the claim, such as the sample number, the beneficiary name, and the date of service. Each review sheet also set forth the number of units (i.e. antibodies) performed

---

[6] Dianon contends that instead of using a sample, Dr. Flynn should have reviewed each and every one of the over 9,000 tests at issue here. Dianon Mem. at 1 fn. 1. First, putting aside the financial and logistical burdens that this would have entailed, a broad and well designed statistical sample that is representative of the patient population as a whole obviates the need to review all of the tests at issue. Thus, Courts have approved the use of statistical sampling in Medicare and Medicaid overpayment and fraud cases. *See Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 90 (2d Cir. 1991) (use of statistical sample to determine Medicaid overcharges against clinical lab does not violate due process); *Chaves Cty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 917-18 (D.C. Cir. 1991) (affirming use of statistical sampling to determine Medicare overpayment); *United States v. Cabrera-Diaz*, 106 F.Supp.2d 234, 240-42 (D. Puerto Rico 2000) (statistical sample used to prove damages in False Claims Act case).

8

and the number considered medically necessary. Finally, each review sheet set forth pertinent

comments, such as the patient's diagnosis and history, as well as a complete list of each antibody

that Dr. Flynn determined was not medically necessary. Dr. Flynn signed and dated each review

sheet. *Id.*

As part of his assessment, and as set forth in his expert report, Dr. Flynn reviewed the

following documents and information:

> 1. The amended complaint.
> 2. Patients' charts/medical records obtained from Dianon.
> 3. Various Dianon company documents relating to flow cytometry.
> 4. Affidavits from Dianon employees.
> 5. Local medical review policies related to flow cytometry.
> 6. Documents from the National Institutes of Health and Veterans Administration Hospital System regarding flow cytometry.
> 7. Compiled list of CPT codes.
> 8. Regulations outlining medical necessity from HHS.
> 9. OIG compliance information.
> 10. Medical literature and books relating to flow cytometry.[7]

*Exh. 11*, at 1.

As set forth in his report, after reviewing the materials listed above, as well as conducting

a detailed review of hundreds of patient charts, Dr. Flynn reached the following central

conclusion:

> After having reviewed more than 400 flow cytometry services by Dianon, it is my opinion as set forth above that Dianon used medically unnecessary antibodies on a routine basis. This is because Dianon used a standard panel, typically 26 antibodies, in almost every case. So, in almost all such cases, they did not exercise medical judgment based on clinical, laboratory, or pathology information

---

[7] Dianon criticizes Dr. Flynn for only spending two hours reviewing the medical articles provided to him by counsel for the Government. Dianon Mem. at 6. This ignores the fact that Dr. Flynn has been a practicing pathologist for over 25 years who directed the Flow Cytometry Laboratory at Yale. Because of his practice, experience, and training, it was not necessary for Dr. Flynn to conduct an extensive literature review on flow cytometry before engaging in his analysis, especially as there is no single definitive textbook, journal article or other publication on flow cytometry. *Cf. Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir.1994) (refusal of the expert to base his testimony on a particular medical textbook or journal article did not warrant exclusion of his testimony).

> submitted by the referring physician. In many cases, there was sufficient clinical
> information that would have allowed Dianon to run panels with fewer antibodies
> than those used, without comprising Dianon's role in patient care and diagnosis.

*Id.* at 7.

It is important to note that in those cases where there was limited or missing clinical

information from the referring physician, Dr. Flynn allowed many more antibodies as medically

necessary. For example, when discussing chronic lymphocytic leukemia in his report, Dr. Flynn

stated that "[a]dditional information about the patient and information about any histopathology

would be very helpful in suggesting the likelihood of [other lymphorproliferative disorders] . . . .

However, where such information was not available for the patients in this analysis, but could

have been obtained from the referring physician's office, I gave the 'benefit of the doubt' for

those antibodies considered medically necessary to address other potential disease entities in the

differential diagnosis of chronic lymphocytic leukemia." *Exh. 11*, at 5. Thus, in those cases

where it was warranted, Dr. Flynn allowed for a large, "comprehensive" panels of 20 or more

antibodies. In fact, for the patients in the Clifton Gunderson sample, Dr. Flynn allowed for 20 or

more antibodies in approximately 5-10% of the cases reviewed. *Exh. 14*, at 13.

### III.
### ARGUMENT

### A.    The *Daubert* Standard for Admissibility Focuses on
### Reliability and Relevancy, Not Disputed Factual Issues.

The Federal Rules of Evidence allow for expert testimony if such testimony will "assist

the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid.

702. Thus, an expert may testify in the form of an opinion if (1) the testimony is based on

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case. *Id.*

A trial judge has a special "gatekeeping" obligation to ensure that expert testimony is

10

both relevant and reliable before being admitted into evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993). This "gatekeeping" role requires that judges undertake a two-step inquiry to determine "[1] whether the reasoning or methodology underlying the testimony is scientifically valid and . . . [2] whether that reasoning or methodology properly can be applied to the facts in issue." *Zuchowicz,* 140 F.3d at 387 (quoting *Daubert*, 509 U.S. at 592-93).

*Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. The specific factors announced by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) whether the technique or theory has been generally accepted in the scientific community. *Zuchowicz,* 140 F.3d at 386. However, these factors are not "exclusive or dispositive" and the "trial court's inquiry should be a 'flexible one.'" *Id.* at 386-87 (quoting *Daubert*, 509 U.S. at 594).

It is clear that a Court's role as "gatekeeper" does not involve evaluating the credibility of an expert witness or the weight of the evidence. As the Second Circuit indicated in *McCullock*:

> Trial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*. [Defendant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul – separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

*McCullock,* 61 F.3d at 1045.

Because our adversary system provides the tools necessary to challenge an expert's opinion, "it is not surprising that a review of the case law after *Daubert* shows that the rejection

11

of expert testimony is the exception rather than the rule." *Perkins v. Origin Medsystems, Inc.*,

299 F.Supp.2d 45, 54 (D. Conn. 2004) (quoting Advisory Committee Notes, 2000 Amendments,

Fed. R. Evid. 702) (internal quotations omitted). *See also Howard*, 406 F.3d at 127 ("On cross-

examination, an attorney is free to challenge an expert's methodology, her conclusions and the

basis for her conclusions."). Moreover, the Second Circuit has indicated that where the district

court "decides to admit the testimony of well-credentialed experts relying on scientific

methodology, we should and will be reluctant to upset that decision as an abuse of discretion."

*Zuchowicz,* 140 F.3d at 387.

**B.      Dr. Flynn's Methodology was Reliable.**

Dr. Flynn's methodology is the only analysis consistent with the rules governing federal

health care programs. Those rules make it clear that medical services, if billed to federal health

care programs, must be reasonable and medically necessary to the diagnosis or treatment of *each*

*individual patient. Exh. 6* (CMS 1500 certification of medical necessity for each patient). Thus,

Dr. Flynn's methodology relied on a review of the patient charts and a case-by-case

determination of medical necessity. As noted above, Dr. Flynn did the following when he

analyzed each patient chart:

- Reviewed the clinical information. This included the diagnosis code submitted by the treating physician; the clinical history; other lab tests, such as the complete blood count; and any prior flow cytometry tests on the same patient.

- Reviewed the panel of antibodies utilized by Dianon and indicated on his review sheet which antibodies were medically necessary for the patient in question and which were not medically necessary.

- Completed a review sheet which set forth his findings in detail for each patient.

In his report, Dr. Flynn also set forth, in great detail, the basis for his opinions that certain

disease types generally required only certain antibodies, including (1) malignant lymphoma and lymphoropliferative disorders, (2) chronic leukemias (which included chronic lymphocytic leukemia and chronic myelogenous leukemia), (3) acute leukemia, (4) anemia/myelodysplastic process, (5) monoclonal gammopathy/multiple myeloma, and (6) various miscellaneous categories.  Dr. Flynn's detailed explanations of his reasoning related to each of these disease categories can be found in his expert report at pages 3-6.  *Exh. 11*.

Dr. Flynn's methodology is straightforward, clear, and open to objective challenge.  For each test, Dr. Flynn individually notes which antibodies were not medically necessary and which contributed to the diagnosis.  Those notes have been made available to Dianon's experts who can review them, along with patient information, and challenge each of Dr. Flynn's individual conclusions.  Contrary to Dianon's suggestions, *Daubert* does not require that experts generally rely on any particular methodology, especially when the analysis was guided by the professional experience of the expert.  On this front, *Daubert* simply requires that the "expert's theory can be challenged in some objective sense." *Perkins*, 299 F.Supp.2d at 54 (citing *Daubert*, 509 U.S. at 593-94).  Dianon has already shown its capacity to challenge Dr. Flynn's methodology and conclusions–as it has openly done, albeit improperly, on the face of the current motion.

Furthermore, contrary to Dianon's suggestion, Dianon Mem. at 9, Dr. Flynn's methodology was not created for this litigation and is, in fact, widely used by the medical community.  Dr. Flynn's methodology – reviewing the clinical information to determine which antibodies are appropriate to answer the question presented by the treating physician – is the same methodology used by Dr. Flynn and his colleagues at Yale-New Haven Hospital (YNHH) in practice, and is the same methodology used by most other labs, including, to name only a few, the Mayo Clinic, Johns Hopkins, and Dianon's parent company, LabCorp.  For example,

13

YNHH's Department of Laboratory Medicine, in its Laboratory Manual, describes its process for

analyzing flow cytometry samples:

> When a sample is sent for flow cytometry, the sample is always first reviewed
> morphologically by a clinical pathologist (Laboratory Medicine physician). This
> is essential in determining the proper group of immunophenotypic markers and
> flow cytometry assays to analyze as well as for determining which cell sub-
> populations . . . should be studied. The pathologist also reviews past flow
> cytometry results on the same patient (if available in the YNHH laboratory) and
> when relevant, past surgical or clinical pathology reports on the patient (again, if
> available at YNHH). Finally, the clinical history is reviewed - in some cases, in
> order to render the most comprehensive and accurate diagnosis, the ordering
> clinician will be called prior to performing the flow assay to ascertain key
> elements of the history. *Thus, each flow cytometry specimen is highly
> "individualized" with respect to its analysis.*

*Exh. 16*, YNHH Laboratory Manual, at 1 (emphasis added). The manual also discusses repeat

tests: "[I]n the case of repeat flow cytometry analysis looking for minimal residual disease in a

patient with leukemia, *it would be wasteful to carry out a full 'leukemia panel' analysis*; instead,

a more limited but customized panel targeting the patient's unique leukemic immunophenotypic

and/or DNA ploidy 'fingerprint' is most appropriate." *Id.* (emphasis added). Although the

YNHH manual lists various standard panels that can be used, the manual emphasizes that

"customized" panels are "more appropriate" for many patients. *Id.*[8]

Dr. Flynn's methodology has also been used by the Mayo Clinic. *Exh. 2* (Mayo Clinic

Communique). When a flow cytometry specimen comes in to the Mayo Clinic, it first "will

proceed to an evaluation by a Mayo hematopathologist." *Id.* at 1. The hematopathologist

"reviews the clinical history, morphology, and differential count [part of the complete blood

count] for the patient." *Id.* The Mayo Clinic advises treating physicians that "[s]ubmitting a

---

[8] In fact, Dr. Brian Smith, the Director of the YNHH Flow Cytometry Laboratory, has stated that
"[t]he Hospital lab has not used a standard panel of antibodies in its flow cytometry testing. Instead, it
tailors each panel to the individual circumstance of each patient." *Exh. 17* at ¶ 8.

14

brief, but pertinent clinical history and a reason for the referral are critical in assuring that the desired flow cytometric testing is performed. This information, together with the morphologic review, determines the initial direction of the laboratory work-up." *Id*. at 2. The Mayo Clinic engages in a "triage" step first, and indicates that "[t]he triage step may also be sufficient to answer particular clinical questions without proceeding to larger antibody panels." *Id*.

Even Dianon's own expert, Dr. Michael Borowitz, from Johns Hopkins, uses a methodology that is similar to Dr. Flynn's. In his expert report in this case, Dr. Borowitz wrote: "my approach is to use one of a small handful of screening panels, *choice of which is directed by the information submitted on the requisition form that accompanies the sample*. In each of these panels I have some common reagents that allow me to identify all normal populations, and also – and this is very important – to identify potential abnormal population of any type. I also include more reagents to characterize in detail the abnormal populations present *suggested by the clinical history*, but have the ability to return to the sample to characterize more completely any unexpected populations I find. *Exh. 3*, at 2-3 (emphasis added). Pursuant to this methodology, Johns Hopkins tests patients using over 20 different customized flow cytometry panels. *Exh. 18*, Johns Hopkins' panels. For example, when the clinical question asked by the referring physician is whether or not the patient has multiple myeloma, Johns Hopkins apparently uses a panel of only 16 antibodies. *Id*. at JHH 000001 and JHH 000005. It is only when the specimen is "unclassifiable" that Johns Hopkins appears to use larger, comprehensive panels of between 23-25 antibodies. *Id*. at JHH 000001. This is consistent with Dr. Flynn's methodology.[9]

---

[9] Even Dianon admits that Johns Hopkins chooses its panels based on the relevant clinical information for the patient in question. In its reply memorandum in support of its motion to compel the production of documents from YNHH, Dianon attached a summary of Johns Hopkins' panels, *see Exh. 18* at JHH000002, which Dianon described as "Johns Hopkins University summary of *how it tailors its panels to particular clinical symptoms*." Dianon's Reply to Yale-New Haven Hospital's Opposition to

In addition, LabCorp, which is Dianon's parent company, also utilizes various panels, depending on the clinical diagnosis in question. A LabCorp pathologist testified that, in 2001, the company used four different flow cytometry panels, which the pathologist described as "diagnosis-directed profiles." *Exh. 22* at 16:24-17:8; *see also Exh. 23*, list of LabCorp profiles. LabCorp would "do a smear review" (i.e. look at the specimen morphologically-under a microscope) and review the CBC (complete blood count) prior to running one of its panels. *Exh. 22* at 10:23-12:6.

Accordingly, pathologists regularly use the clinical information supplied by the treating physician and draw from their professional experience and training to choose an antibody panel that is relevant to the diagnosis in question. This is just what Dr. Flynn did in reviewing Dianon's patient records in this case.[10]

---

Motion to Compel, at 3 (emphasis added).

Moreover, Dr. Raul Braylan, another of Dianon's experts, has now started to utilize a two-step approach to flow cytometry, for certain cases, that appears to rely on the patient's clinical information. The minutes from a May 17, 2006 Hematopathology meeting from Shands Hospital at the University of Florida, indicate the following:

> [W]e will begin using a two-stage DETECTION versus DIAGNOSIS approach: for the initial screening tests we will use new types of trays that have a fewer number of wells in order to be more cost-effective. Once preliminary screening data shows an abnormality, more specific antibodies will be run for a definitive diagnosis.

*Exh. 19*. Also, both Drs. Borowitz and Braylan testified that they would take into account clinical information from previous testing in determining what flow cytometry markers to use. *Exh. 20*, Borowitz deposition at 38:2-14; *Exh. 21*, Braylan deposition, at 21:11-22:1.

[10] Dianon contends that Dr. Flynn's opinions also are not reliable because they are different then the 13 experts surveyed for one of the consensus conferences. Dianon Mem. at 9-11. This is not accurate. The average number of antibodies Dr. Flynn found medically necessary ranged from 12 to 17. *Exh. 14*, Clifton Gunderson Report, at 12, 16. The 2000 consensus conference paper indicated that, on average, 16-19 markers were utilized by clinical laboratories (mostly in the United States) for flow cytometry. Exh. 10 to Dianon's motion, at SF0758. Further, in the 2000 consensus conference paper, the authors indicated that for B-cell lymphoproliferative disorders, the number of markers needed would be between 12 and 15, and for T-cell disorders, the number was 16; for tissue lymphomas the range was

Finally, appellate courts have repeatedly upheld the admission of expert testimony analogous to that presented by Dr. Flynn in this case. *See, e.g., McCullock*, 61 F.3d at 1044 (allowing expert physician testimony based on expert's training and experience, as well as review of medical records, pathological studies and medical literature)*; Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir.1994) (allowing testimony of cardiologist based on 30 years of practice and review of medical/clinical records and published materials); *Hopkins v. Dow Corning,* 33 F.3d 1116, 1125 (9th Cir. 1994) (allowing expert testimony of toxicologist based on experience, review of medical records and general scientific knowledge of the subject-matter in question). *See also Zuchowicz*, 140 F.3d at 385 (upholding admission of expert testimony by Yale professor of medicine based on, in part, the doctor's "extensive experience" in the area of pulmonary diseases); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (physician's expert opinion admissible where testimony based on personal observations, professional experience, education and training).

For example, in *McCullock,* the Second Circuit considered whether plaintiff's ears, nose and throat specialist had properly provided his expert opinion that glue fumes at plaintiff's workplace caused plaintiff's throat polyps. *McCullock*, 61 F.3d at 1041. Defendant argued that plaintiff's expert could not point to a single piece of medical literature that said glue fumes caused throat polyps. *Id*. at 1043. In addition, defendant argued that the methodology used by plaintiff's expert to arrive at his opinion, "differential etiology," did not qualify as scientific under *Daubert*. *Id*.

---

12-16; for plasma cell disorders, 5-8 were considered essential; and 13-15 were considered essential for acute leukemia. *Id*. at SF 0758-59. Thus, Dr. Flynn's average panel of 12-17 markers is actually similar to the panels discussed by the participants at the 2000 conference.

The Second Circuit found that plaintiff's expert's testimony was properly admitted. *Id.* at 1043-44. First, the Court held that the expert's background was sufficient to permit his testimony on throat ailments and its causes. *Id.* at 1043. Second, the Second Circuit found that plaintiff's expert had properly based his opinion on his training and experience, as well as, among other things, the expert's review of medical records and pathological studies, his training and experience, his use of a scientific analysis, and reference to various medical/scientific publications. *Id.* at 1044.

Like *McCullock*, Dianon attacks Dr. Flynn's credentials and his methodology, implying that he is unqualified to render an opinion and that his methodology is suspect. However, as in *McCullock*, Dr. Flynn's background and experience as a pathologist clearly qualify him to render an opinion here. Also, Dr. Flynn, like the expert in *McCullock*, reviewed medical and pathological records, as well as medical literature, and applied an objective methodology to his review. As the Second Circuit emphasized in *McCullock*, "[d]isputes as to the strength of his credentials, faults in the use of [his] . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Id.*

In another analogous case, *Carroll v. Morgan*, 17 F.3d 787 (5th Cir.1994), the Fifth Circuit held that the lower court, during a medical malpractice trial, had properly found that defendant's expert cardiologist was qualified under *Daubert* to give an expert opinion on the standard of medical care, based on thirty years of professional experience, a review of plaintiff's medical records and various published materials. *Carroll*, 17 F.3d at 790. The Fifth Circuit concluded, on these factors alone, that the expert's testimony was "ground[ed] in the methods and procedures of science" and was not mere "unsupported speculation." *Id.* (quoting *Daubert*, 113 S.Ct. at 2795).

18

Finally, in *Hopkins v. Dow Corning,* 33 F.3d 1116 (9th Cir. 1994), a products-liability action against a manufacturer of silicone breast implants, the Ninth Circuit permitted the plaintiff's expert medical witnesses to testify as to the causation of plaintiff's mixed connective tissue disease, although defendant argued that the expert's methodology was not based on generally accepted scientific principles. *Hopkins*, 33 F.3d at 1124. In allowing the testimony, the Ninth Circuit made it clear that a "rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'" *Id.* (quoting *Daubert*, 113 S.Ct. at 2794). The Court was satisfied that the standard set out in *Daubert* was met in light of the expert's testimony that his opinion was based on "his experience as a toxicologist, his review of medical records . . . , and his general scientific knowledge of silicone's ability to cause immune disorders as established by animal studies and biophysical data." *Id.* at 1125.

Much like the cardiologist's application of scientific principles in *Carroll*, Dr. Flynn consistently relied upon his professional training and experience during his review of each individual test in this case. Dr. Flynn has been a pathologist for more than 25 years. Not only has Dr. Flynn taught future doctors how to administer the flow cytometry test in the classroom, but has also directed a flow laboratory in a practical setting at Yale. Dr. Flynn's testimony is clearly not "unsupported speculation." Moreover, like *Hopkins*, Dr. Flynn relied on his practice as a pathologist, his review of extensive medical records, and his general scientific knowledge of flow cytometry, which itself is based on his knowledge of the medical literature and his training and experience as a pathologist.

Thus, as set forth above, appellate courts have routinely upheld the admission of expert testimony similar to the testimony Dr. Flynn proposes to provide in this case. Dr. Flynn's

19

testimony should be admitted in this case as well.

C.    **Dr. Flynn Applied his Methodology in a Reliable Way**
      **to the Hundreds of Tests Reviewed**

As noted above, *Daubert* is about the admissibility of an expert's testimony, not the

weight that such testimony should carry with the trier of fact.  Dianon disguises its potential

cross-examination of Dr. Flynn at trial as a *Daubert* challenge in an attempt to have the Court

exclude testimony that would clearly be helpful to the jury.  Dianon claims that Dr. Flynn's

review was not reliable by attempting to point out various alleged inconsistencies and

contradictions in his analysis.  Although the Government will address many of these supposed

contradictions below, it should again be emphasized that Dianon's argument goes to the weight

of Dr. Flynn's testimony, not its admissibility.  *McCullock*, 61 F.3d at 1044.

Dianon argues, for example, that Dr. Flynn's methodology is unreliable, because when

testifying at his deposition about several cases (of the over 600 he reviewed), he supposedly

allowed for different antibodies than he did in the patient review sheets he had filled out earlier.

Dianon Mem. at 16-17.  The problem with this argument, beside the fact that it is more

appropriate for cross-examination than for a *Daubert* motion, is that Dianon refused to allow Dr.

Flynn to apply his methodology during his deposition, as the attorney conducting the deposition

for Dianon did not supply Dr. Flynn with the complete patient charts for the patients in question.

For example, for patient #93, the attorney for Dianon only showed Dr. Flynn one document from

the chart:  the patient requisition form (part of which was illegible).  *Exh. 24*; *see also Exh. 25*,

Deposition of Dr. Stuart Flynn, at 204:9-205:16.  The Dianon attorney did not show Dr. Flynn

the complete patient chart, which was over fifty pages, and which contained both a complete

blood count (CBC) and a prior test for the same patient from approximately four months earlier.

20

*See Exh. 26* (additional documents for patient #93, not shown to Dr. Flynn at his deposition).

The attorney for Dianon stated that he did not have the chart for the patient in question and

represented that "for this particular patient I do not recall seeing any additional information" and

that "[i]f there is something, I have been mistaken, and the record will reflect that." *Exh. 25*, at

205:12-206:18. However, there *was* additional information, not shown to Dr. Flynn during his

deposition, such as the prior CBC test and the prior flow cytometry test on the exact same

patient. *Exh. 26.* Dr. Flynn had clearly relied on this information, as he had referred to the prior

test in the comments written on his review sheet for the patient in question. *Exh. 27.* At his

deposition, Dr. Flynn also testified that he would need to know the definitions of the particular

diagnosis codes at issue in the case (which he had not committed to memory), noting that "there

is additional information here, and I don't know what that information is, and that may or may

not be relevant to how I viewed the case." *Exh. 25*, at 207:8-11. Thus, the record shows that

there was relevant clinical information and history from the patient chart that was not provided to

Dr. Flynn during his deposition.

The same issue arose again in regard to patient #79. Dianon Mem. at 16-17. The

attorney for Dianon only showed Dr. Flynn the one-page requisition form, instead of the

complete patient chart. The following ensued at Dr. Flynn's deposition:

> Q: And, Doctor, you understand what I'm trying to get with you is not the world of
> possibilities that you might have gotten. I'm asking you that if you got no other
> information other than what you have here and this is what you have to deal with how
> would you have constructed a flow panel, that's my question to you with regard to
> Exhibit 16.
> MR. MOLOT:  Even though there may have been more information in the chart that
> you're not showing him?
> MR. PARKER: I don't know that there is any more in the chart.
> MR. MOLOT: I could get the charts and bring them here.
> MR. PARKER: No, I don't want the doctor to see the answers.
> Q: My question is: If the only information that you have – it may or may not be true, but

21

> if I'm correct that this is the only information you have, I want to know how you would construct a panel.
>
> A: Well, that's a hypothetical and artificial way to present this. . . .

*Exh. 25*, at 212:6-213:7.  Dr. Flynn testified that he needed to know the patient's age, which was "important." *Id.* at 213:15-214:6.  Because he had incomplete information at his deposition, Dr. Flynn made an "assumption" that the patient in question was only 60 years old. *Id.* at 215:6-8. However, information in the chart (on the Dianon diagnostic report), which the Dianon attorney did not show to Dr. Flynn, indicated that the patient was actually 86 years old. *Exh. 28*.  Dr. Flynn thereafter testified that "I would not have this limited information, so it's a question I can't answer because I wouldn't allow myself to get into that setting." *Exh. 25*, at  216:17-20.  He also testified that "there is more information for this patient." *Id.* at *219:13-14*.   When the Dianon attorney asked Dr. Flynn to "humor me" and come up with a panel anyway, he did so, although he testified that not providing him with the additional information made it "an illogical discussion from my perspective. . . ." *Id.* at 220:1-21.  Thus, Dr. Flynn was not permitted to apply his methodology when questioned at his deposition.

Dianon also argues that Dr. Flynn's selection of medically necessary antibodies could not work in actual practice, as the antibody combinations need to be "validated." Dianon Mem. at 2. Dianon makes this argument in the abstract, however, without pointing to any specific examples of where the medically necessary antibodies chosen by Dr. Flynn would not have been workable to use in actual practice.  It is important to note that not one of Dianon's three experts did a comprehensive, patient-by-patient review of the hundreds of patients analyzed by Dr. Flynn.  Not surprisingly, therefore, the reports prepared by Dianon's experts do not indicate that the antibody combinations in question would not have worked in actual practice.  Dianon's motion is silent on this point as well.

22

Dianon also contends that Dr. Flynn's analysis is inconsistent with one of his own published papers, because in that paper antibodies CD2, CD7 and CD22 were used in 39 lymphoma cases, but Dr. Flynn did not allow for those in his review of Dianon's cases. Dianon Mem. at 13. Dianon distorts the record here. Dr. Flynn did allow for CD2, CD7 and CD22 as medically necessary in various cases, although he did not *routinely* allow for those particular antibodies. This approach is consistent with the actual practice of Dr. Flynn and his co-authors of the article, with whom he consulted at the YNHH flow cytometry lab. The panels used by the YNHH flow lab indicate that CD2, CD7 and CD22 were not *routinely* used for the initial flow cytometry testing of lymphoma cases. *Exh. 29* (common combinations 2001-2004: 12 markers listed in "first phase" of lymphocytoses testing do not include CD2, CD7 and CD22, which are only utilized in second and follow-up phases; common combinations 2006: Lympho I panel does not include CD2, CD7 or CD22); *see also Exh. 16,* YNHH Manual (Lymphoma/Lymphocytosis panel does not routinely included CD2, CD7, or CD22; added only if certain suspicious clinical history). Thus, Dr. Flynn's review is not inconsistent, contrary to Dianon's suggestion.[11]

Finally, Dianon criticizes Dr. Flynn as being inconsistent because, in certain cases, he allowed for a range of antibodies for particular types of diseases. Dianon Mem. at 16-18. For example, Dianon points out that Dr. Flynn allowed between 11 and 23 antibodies in cases which presented with a clinical indication of myelodysplastic syndrome (MDS). Dianon Mem. at 17-18. Dianon's argument ignores the fact that when two different patients had varying clinical

---

[11] Dianon also claims that because an article from one if its experts was included in the bibliography of the Connecticut Local Medical Review Policy (LMRP), providers were entitled to rely on that article for their flow cytometry practices. Dianon Mem. at 12. However, Dr. Delli Carpini, the Carrier Medical Director, testified that the LMRP did not reference which approach should be used: "[i]t was basically left at the discretion of the provider to provide medically necessary and pertinent services . . ." *Exh. 9* at 39:6-10. Dr. Delli Carpini also testified that just because an article was mentioned in the "bibliography" did not make the article "interchangeable with the policy." *Id.* at 69:8-19.

histories, different antibodies were considered to be medically necessary.

For example, Dr. Flynn was asked at his deposition about two different patients, Patient

# 72 and Patient #128, both with a provisional diagnosis of MDS. *Exh. 25,* at 274:3-287:20. For

patient #72, Dr. Flynn found that 22 antibodies were medically necessary, while for patient #128,

Dr. Flynn found that 17 antibodies were medically necessary. For patient #72, Dr. Flynn

described his rationale for allowing 22 antibodies as follows:

> This patient has a percentage lymphocytes of 70.4 percent so that would certainly explain
> the workup for any kind of lymphorproliferative process. The MDS issue addresses the
> various myeloid and myelocytic markers. So that would address very quickly at least 20
> without having to put them to memory – in fact, I have the chart here so I don't have to
> put them to memory – yeah. So that warrants – that piece of additional information that's
> in the chart warrants doing everything [in the panel] but the three that I said I didn't think
> needed to be done.

*Id.* at *277:12-278:1.* When asked about patient #128, Dr. Flynn pointed out that, although both

patient #72 and patient #128 were MDS cases, there were significant differences that were

relevant to his analysis.

> Q: Now does this patient get the full 22 antibodies?
> A: Well, obviously not. The patient got 17.
> Q: Well, now help me understand. Why did we get shortchanged on this . . . person, who
> only get 17 with the same condition – I won't describe the lab values – and the previous
> patient about 22.
> * * *
> A: Let me just read the entire chart. Well, two comments. One is when you look at this
> patient's differential [related to the patient's white blood count], now you don't have an
> absolute preponderance of lymphocytes, first of all. You have an actual minority
> population. So her differential is different . . . than the first patient.

*Exh. 25*, at *283:9-285:3.* Thus, because of differences in the clinical history, Dr. Flynn allowed

for a different number of medically necessary antibodies and when asked about these differences

at his deposition, Dr. Flynn was able to provide a clear medical rationale for his conclusions.

In sum, although Dianon points to various alleged inconsistencies in Dr. Flynn's review,

24

when analyzed, these "inconsistencies" are actually not inconsistent at all.  Beside the fact that

Dianon's arguments are more appropriate for cross-examination, and even assuming, *arguendo*,

that Dr. Flynn was not perfect in his analysis of hundreds of charts, Courts have found that they

should afford experts some "deference" and that a "minor flaw" in an expert's reasoning will not

render an expert's opinion inadmissible.  *Perkins*, 299 F.Supp.2d at 54 (citations omitted).

### D.    Dr. Flynn's Opinions "Fit" or Have "Relevance" to the Government's Case.

Finally, Dianon argues that Dr. Flynn's opinion does not "fit" the Government's legal

theory.  Dianon Mem. at 18.  Dianon contends that, to prove its case, "the Government must

show that rules, regulations, or standards mandate that the medical community follow Dr.

Flynn's approach to flow cytometry and failing to follow this approach amounts to fraud."

Dianon Mem. at 18-19.  This is simply wrong.

In considering the second prong of the *Daubert* analysis - whether testimony will assist

the trier of fact – the analysis "primarily concerns relevance . . . .  The district court must

determine whether the proffered expert testimony 'is sufficiently tied to the facts of the case that

it will aid the jury in resolving a factual dispute.'"  *Ambrosini v. Labarraque*, 101 F.3d 129, 134

(D.C. Cir. 1996) (*quoting Daubert* 509 U.S. at 591).  *E.E.O.C v. Beauty Enterprises, Inc.*, 361

F.Supp.2d 11, 15 (D. Conn. 2005) ("The second prong of the *Daubert* inquiry, relevance, asks

whether an expert's scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact at issue.").  This is the analysis that the

*Daubert* decision referred to as "fit."  *Daubert*, 509 U.S. at 591.

In order to prove its case, the Government must demonstrate that Dianon knowingly

submitted claims for payment containing medically unnecessary antibodies.  There is no

"requirement" that Dianon utilized a particular approach to flow cytometry.  The "requirement"

25

is that its claims be *medically necessary*. 42 U.S.C. §1395y(a)(1)(A) (no payments may be made for services which are "not reasonable and necessary for diagnosis or treatment of illness or injury . . . ."). As Dr. Delli Carpini, the former Medicare Carrier Medical Director for Connecticut, testified at his deposition, there is "no mandate" by Medicare to use a particular approach when conducting flow cytometry tests. *Exh. 9*, at 80:5-10. "The mandate is medical necessity and medical prudency of the test. So, whether it's comprehensive or stepwise is not the question. *The question is the medical necessity of it.*" *Id*. (emphasis added)

The key fact at issue here is whether Dianon billed the Government for antibodies that were medically unnecessary. Obviously, expert testimony is relevant to this question. *See* Fed. R. Evid. 702. Dr. Flynn's opinions will certainly "assist the trier of fact to understand the evidence or to determine a fact at issue." *Beauty Enterprises*, 361 F.Supp.2d at 15. Thus, Dr. Flynn's testimony satisfies the second prong of the *Daubert* analysis.

## IV.
## CONCLUSION

The *Daubert* admissibility inquiry focuses on the approach the expert employs, not the expert's conclusions. *Ambrosini*, 101 F.2d at 140. Here, a well-qualified pathologist, Dr. Flynn, who has practical experience actually running a flow cytometry laboratory at Yale University School of Medicine, utilized a widely recognized methodology in reviewing hundreds of Dianon's patient records. Dr. Flynn's review sheets and notes have been made available to Dianon and he will be subject to vigorous cross-examination at trial by Dianon's attorneys.

Dianon's *Daubert* motion, which goes to the weight of Dr. Flynn's testimony, not its

admissibility, should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

RICHARD M. MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
Richard.Molot2@usdoj.gov
(203) 821-3700

MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0240
Facsimile:  (202) 305-7797
Attorneys for the United States

27

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the United States' Opposition to Dianon's Motion to Exclude the Opinions of Stuart Flynn, M.D., was served by email and regular mail, this 1st day of November 2006 on:

> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 266 Post Road East
> Westport, CT 06880
> bcarmody@mayalaw.com
>
> Robert Salcido, Esq.
> Akin Gump Strauss Hauer & Feld, LLP
> Robert Strauss Building
> 1333 New Hampshire Ave, NW
> Washington, D.C. 20036
> rsalcido@akingump.com
>
> Bruce R. Parker
> Venable LLP
> 1800 Mercantile Bank & Trust Bldg.
> 2 Hopkins Plaza
> Baltimore, Md.  21201
> brparker@venable.com

Richard M. Molot
Assistant U.S. Attorney