# EXHIBIT 3

03/13/2006   22:30    PATHOLOGY → 94102447742                                NO.730   P02

# JOHNS HOPKINS
MEDICAL INSTITUTIONS

**Department of Pathology**
The Harry and Jeannette Weinberg Building
401 N. Broadway / Room 2335
Baltimore MD 21231-2410
410-614-2889 / Fax 410-502-1493
mborowit@jhmi.edu

Michael J. Borowitz, M.D., Ph.D.
Professor of Pathology and Oncology
Deputy Director for Clinical Affairs
Deputy Director for Education
Director, Hematologic Pathology and Flow Cytometry

March 14, 2006

Mr. William Piermattei, Esq.
Venable, LLP
2 Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201

Re: United States of America v Dianon Systems, Inc. #3:02CV1573 (MRK)

Dear Mr Piermattei:

I am a professor of Pathology and Oncology and the director of the clinical flow cytometry laboratory at Johns Hopkins Hospital. Prior to coming to Johns Hopkins I served in a similar capacity at Duke University, and have been involved in flow cytometric analysis of leukemia and lymphoma for as long as it has been a clinical test, about 25 years. I was chair of the National Committee on Clinical Laboratory Standards subcommittee that authored the original guidelines (H-43) for performance of leukemia flow cytometry, and helped to organize two consensus conferences to establish standards of practice in flow cytometry. I currently serve as Vice President of the Clinical Cytometry Society, the largest National organization devoted to the clinical application of flow cytometry. For these reasons I feel qualified to comment on the above litigation.

Flow cytometry, and specifically flow cytometric immunophenotyping, is a valuable tool in the diagnosis and classification of cancers of bone marrow, blood and lymphoid tissue, including acute and chronic leukemias and lymphomas. In this technique, antibodies directed against a variety of cell constituents (often called "markers") are labeled with chemicals called fluorophores that have the property that they emit different colors of light when illuminated by a laser. Using antibodies labeled with multiple different fluorophores, combined with specialized software to perform what is referred to as multiparameter analysis, flow cytometry practitioners can identify and characterize a full range of leukemias and lymphomas. Typically, antibodies are combined in what is referred to as panels in order to extract the maximum amount of information from samples. Combinations are critical, because they allow for the simultaneous detection of multiple markers on the same cell population, so that subtle distinctions between normal and abnormal populations can be discerned, a critical component of analysis.

Construction of antibody panels is geared toward answering two specific questions in flow cytometry: 1) Is an abnormal population present in the sample? 2) If an abnormal population is identified, what key markers are expressed or not expressed? From this latter knowledge these cancers can be classified. In addition, the abnormal population may express distinct, so-called "aberrant" markers that may be useful to monitor patients after therapy.

Page 2

Implicit in the first point above is the principle that proper analysis of hematologic tissue requires a sufficient panel to be able to identify normal constituents in a sample, so that abnormal cells can be recognized. This requires more than a minimum number of antibodies targeted solely at a specific diagnosis, a point to which I will return.

The first consensus conference on leukemia and lymphoma phenotyping by flow cytometry issued a report (1) that demonstrated broad consensus on many aspects of the technique including: instrument setup and specimen handling; analysis and interpretation of data; the application of the technique to different diseases; and reporting of results. However, while some general principles, discussed further below, were articulated regarding how reagent panels should be used to study leukemias and lymphomas, there was not consensus at that time regarding specific numbers of antibodies, or specific panels that should be used for phenotyping (2). In part for this reason, a second conference was organized that surveyed practitioners in the field of clinical flow cytometry in an attempt to assess how users selected antibodies to approach different clinical problems(3). Several consensual points were reached as a result of this second meeting including the optimal number of reagents needed to diagnose and classify certain types of malignancies. For virtually all diseases, these included a relatively small set of specific reagents that nearly everyone agreed needed to be used in all cases, and a larger set of reagents that were useful in many cases; consensus was not reached on exactly which of these additional reagents were needed in which cases.

Several critical points emerged from the two consensus conferences. From the first conference, it was recognized that there were three general approaches that could be used in assembling panels: 1) A comprehensive approach with a large panel that could identify all normal populations in a sample, and completely characterize any abnormal population that was detected; 2) A "screening" panel approach, where an initial panel could be used to identify but not fully characterize an abnormal population, to be followed by a more detailed panel to characterize abnormal populations that were identified; and 3) A "directed" approach, in which only markers targeted at a disease in question were used. The first of these approaches, which is the approach used by Dianon, was indicated to be the most sensitive and specific, and for that reason was presented at the first consensus conference as relatively preferable. However, the fact that unnecessary reagents would be used in some cases was recognized. The second approach was noted to require effective decision making in real time to ensure accuracy; for this reason this method was used by a minority of laboratories. Finally, the limitations of the third approach were emphasized, especially in environments in which clinical information was limited or potentially incorrect. But the most important point to come from the conference is that none of these three methods was indicated to be the only correct one; all three methods were offered as possibilities and noted to be suitable to different practice situations.

Analysis of the results of the second conference demonstrated that although some broad points of consensus were reached, there was still a very wide range in what different laboratories viewed as acceptable practice. Some laboratories used relatively small numbers of reagents to analyze their cases, while others used very large panels, in some cases more than 40 markers, as their standard of care.

In my own practice, which largely consists of Johns Hopkins Hospital patients with a small but significant number of outside samples, my approach is to use one of a small handful of screening panels, choice of which is directed by the information submitted on the requisition that accompanies the sample. In each of these panels I have some common reagents that allow me to identify all normal populations, and also—and this is very important—to identify potential abnormal population of any type. I also include more reagents to characterize in detail the abnormal populations present suggested by the clinical history, but have the ability to return to the sample and characterize more completely any unexpected populations I find. In my particular practice, I am able to do this because 1) we generally get very reliable historical

Page 3

information; and 2) I have a highly experienced and highly skilled workstaff that can recognize abnormalities and reflex to appropriate panels when an abnormality not suggested by the requesting physician is identified. My usual work-up of cases typically would include more antibodies than would be considered medically necessary by the government expert, but fewer antibodies than would have been used by Dianon. I believe my approach is optimal for my laboratory practice. However, unlike the government expert, I do not consider what I do the "standard of care" and would allow, as supported by the consensus conferences referenced above, that all 3 ranges of practice are within the standard. In my view, if there is deviation from the standard of care it is more likely the practice recommended by the government expert than the practice engaged in by Dianon.

The reason I say this is that I have an important philosophical disagreement with the government expert regarding how clinical information should be used in the practice of flow cytometry. It is his contention that antibody panels should be constructed to be focused around answering the question posed by clinical history and morphologic analysis. I personally believe this is not correct. While correlation of flow cytometry with clinical and morphologic information is essential for interpretation, I believe this is best done AFTER flow cytometric analysis, and not before. The reason for this is that flow cytometric immunophenotyping is what I like to refer to as a primary diagnostic modality. That is, it is a freestanding analytical tool that gives information that is complementary to morphology (and clinical history) and is not merely a confirmatory test. The reason this is a critical distinction is that focusing analysis on answering a particular clinical question, guarantees that you will only find what you are looking for. Flow cytometry is interpreted by a professional, most commonly a pathologist, because, appropriately performed, what the pathologist does is analogous to what a pathologist does in diagnostic surgical pathology. If one is presented with a biopsy and asked to evaluate it for the presence of, say, tuberculosis, and instead one identifies cancer, it is not sufficient to issue a report that no tuberculosis is present. Having a focused approach to flow cytometry, that, say, uses a history of CLL to construct a panel that only answers the question of whether CLL is present is similarly dangerous. For this reason, appropriate practice of flow cytometry requires panels be comprehensive enough to recognize and characterize all potential abnormal cells in the sample. To do this requires identification of normal cells, for these serve as reference points that allow recognition of abnormal cells. "Minimal" panels should be able to recognize abnormal populations, though not necessarily fully characterize all potential abnormalities. As noted in the consensus documents, there is room for discussion about exactly how many and which markers might be used for this purpose, and what strategies should be employed. Those choosing to use more comprehensive panel strategies would include reagents to characterize any detected abnormal populations up front; those choosing to use more focused strategies might have different panels directed at characterizing the specific abnormality in question, provided there were sufficient redundancy to recognize other abnormalities (which might be further characterized on reflex testing). But in either case some antibodies that might not, on the face of it, be "medically indicated" for a specific diagnosis, are, in fact, important. Thus, for example, it would be necessary, even in a panel focused on characterizing a specimen with CLL, to have antibodies that would allow for identification of a population of blasts of acute leukemia, should those be present in addition to, or in lieu of, the CLL cells.

I find it curious that the Justice Department is engaged in what is essentially a determination of appropriate reimbursement for laboratories practicing flow cytometry. This is because, for the last several years, another government agency, the Center for Medicare and Medicaid Services, has been engaged in just that. Reimbursement in flow cytometry includes a portion to reflect the technical performance of the test, as well as a portion, generally paid under Medicare Part B, that reflects the professional component of interpretation. In 2005 there was a change in the structure of reimbursement that came about after a comprehensive review by CMS, with comment by practitioners in the field. As a result of that review, CMS restructured the procedure for payment for the professional component of the procedure. In this

restructuring, there were limits placed on the number of markers reimbursed for interpretation based on specific clinical scenarios. However, it is important to recognize that in doing this CMS did NOT impose similar limits on reimbursement of the technical portion (though they did reduce the fee structure). This is because they clearly recognized that appropriate technical analysis of samples for leukemia flow cytometry might, of necessity, include more markers than might be essential for interpreting a case once all the results are known. Finally, it is worth emphasizing that the CMS restructuring took place in 2005, after the cases at issue in this litigation were performed.

The major point, however, to take away from the CMS decision is that there is a process in place that reviews expenditure for this test. This process included input from practitioners in the field. While the practicing community of course is not enthusiastic about price reductions, we at least feel that there was a rationale behind the decision making, and that we had an opportunity to voice our views of how the discipline should be practiced. This is in stark contrast to the position taken by the justice department in this lawsuit. They have engaged an expert whose opinion lies at one extreme of practice, and are taking the position that his opinion should represent standard of care and any that deviation from his proposed practice constitutes fraud. This is an amazingly chilling imposition on the practice of medicine, not only as it was practiced by Dianon, but as I and dozens of other physicians practice it. This intrusion on the practice of quality flow cytometry, so important for the care of patients with these severe diseases, should be avoided at all costs.

References

1) Braylan RC, Borowitz MJ, Davis BH, Stelzer GT, Stewart CC. U.S.-Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry. *Cytometry* 1997 30: 213.

2) Stewart CC, Behm FG, Carey JL, Combleet J, Duque RE, Hudnall SD, Hurtubise PE, Loken M, Tubbs RR, Wormsley S. U.S.-Canadian consensus recommendations on the immunophenotypic analysis of hematologic neoplasia by flow cytometry: selection of antibody combinations. *Cytometry* 1997; 30: 231-235

3) Braylan RC, Orfao A, Borowitz MJ, Davis BH. Optimal number of reagents required to evaluate hematolymphoid neoplasias: results of an international consensus meeting. *Cytometry* 2001; 46: 23-7.

Very truly yours,

Michael J. Borowitz, M.D., Ph.D.
Professor of Pathology and Oncology