# EXHIBIT 11

# YALE UNIVERSITY

## SCHOOL OF MEDICINE

**STUART D. FLYNN, M.D.**
*Professor of Pathology and Surgery*
*Director of Medical Studies*
*Director of Residency Program*

TEL:  203.785.6424
FAX:  203.737.2922
EMAIL:  stuart.flynn@yale.edu



OVERNIGHT MAIL:
Yale University School of Medicine
Pathology/EP2-608
200 South Frontage Road
New Haven, Connecticut 06510

U.S. MAIL:
Yale University School of Medicine
Department of Pathology
P.O. Box 208070
New Haven, Connecticut 06520-8070

February 10, 2006

Attorney Richard Molot
US District Attorneys Office
United States Attorney
District of Connecticut
157 Church Street
23rd Floor
New Haven, CT 06510

Attorney Patricia Davis
US Department of Justice
Civil Division
601 D Street, Room 9026
Washington, DC 20530

### Re:  United States of America v Dianon Systems, Inc. #3:02CV1573 (MRK)

Dear Attorneys Molot and Davis,

This document represents my report regarding the above captioned case.

The following items have been reviewed and/or used in my generating this report:

1. The amended complaint.
2. Patients' charts/medical records obtained from Dianon.
3. Various Dianon company documents relating to flow cytometry.
4. Affidavits from Dianon employees
5. Local medical review policies related to flow cytometry.
6. Documents from the National Institutes of Health and Veterans Administration Hospital System regarding flow cytometry.
7. Compiled list of CPT codes
8. Regulations outlining medical necessity from HHS.
9. OIG compliance information
10. Medical literature and books relating to flow cytometry

As outlined in the complaint, the United States alleges that Dianon submitted false or fraudulent claims for payment to Federal Health Programs for Flow Cytometry tests containing antibodies that were not reasonable and medically necessary. A standard panel of antibodies was used for every case, regardless of clinical information provided. In addition, for repeat tests, the utilization of information gleaned from the previous tests performed by Dianon was not incorporated into determining which antibodies were medically necessary. Also, clinical/laboratory information which would have been valuable in the design of a panel of antibodies that were deemed medically necessary and would have been available from the referring physician's office, was not obtained (although some charts do make reference to either having called the physician's office for such information or that a call should be made).

To perform my assessment, I reviewed all supplied charts. Materials within each chart included an order requisition form which, in addition to pertinent patient and laboratory demographics, included an ICD-9 code and/or a written history, the source of the specimen submitted, and the test requested. Some variation was noted in regards to the completeness of such information. In addition, some charts included copies of relevant laboratory information as well as possible relevant past medical history. For those patients who had more than one test performed by Dianon, some had reference to such previous studies, whereas others did not. After having reviewed all of these documents for each case, I proceeded to review the antibodies used from Dianon's records and concluded from all such information which antibodies were medically necessary versus those which were not. Following designation of each antibody in either of these two categories, I reviewed the laboratory results and conclusions when included in the chart.

As discerned from the charts reviewed, Dianon used a standard panel of 22 antibodies in 1996 which subsequently evolved to a standard panel typically composed of 25, 26, or 27 antibodies. Major categories within which subsets of antibodies reside within these panels include B cell antibodies (including anti-kappa and lambda light chains), T cell antibodies, myeloid antibodies, and a subset of "miscellaneous" antibodies. However, some of the antibodies within a given category may offer additional information outside of their designated category proper. Representative examples would include the role of anti-CD7, a T cell antibody, which may also be immunoreactive with myelogenous leukemias, and anti-CD56, an antibody identified on natural killer cells and activated T cells, but which may also be expressed on the plasma cells of multiple myeloma, a B cell neoplasm. A major role for some antibodies is their "absence" of staining in specific diseases, examples including the absence of CD10 and CD23 on mantle cell lymphomas and the absence of CD5 in follicular center cell lymphomas. Some antibodies in the panel allow for "gating" during the performance of the assay, including anti-CD45 which should stain the vast majority of hematopoietic cells, and anti-CD16/56 which assist in identifying natural killer cells from the larger set of lymphocytes identified in the assay. Other antibodies assume significance for their specificity when immunoreactive, including the ratio of kappa versus lambda positive cells in B cell proliferations, and antibodies that are valuable in identifying hairy cell leukemia cells, namely anti-CD25, CD103, and CD11c. However, it should be emphasized that the value of specific antibodies in these tests is maximized (medically

2

necessary) when used within a panel devised to address the disease(s) in question and when correlated with other relevant parameters, which include peripheral blood laboratory results, bone marrow biopsy/aspirate results, and histopathologic information from other organs biopsied, including lymph nodes.   Such information is typically known by the referring physician. In many cases, there was sufficient clinical information to design a targeted panel of antibodies as opposed to using a large "standard panel" in each case. However, even in those cases in which the clinical information supplied was vague, such information could be garnered from the patient's chart in the referring physician's office. This does not necessitate having to talk directly with the physician. In my opinion, making such inquiries would have been very valuable in assuring that the flow cytometry tests used medically necessary antibodies to address the referring physician's diagnostic questions.

The disease categories which represented the vast majority of the cases submitted (as reflected in the ICD-9 code or history), for either diagnosis or staging, included lymphoproliferative processes, acute or chronic leukemia, monoclonal gammopathy/multiple myeloma, and anemia/myelodysplastic syndrome. Also included were infrequent examples of myeloproliferative disorders, thrombocytopenia, Hodgkin lymphoma, among others. There were also cases submitted with no or confusing history. As noted above, clinical information obtained from the physician's office would have been valuable in knowing what disease(s) was in the patient's differential diagnosis, would have assisted in deciding which antibodies were medically necessary and those which were medically unnecessary, and would have assisted in correlating the flow cytometry immunophenotyping studies with this clinical information.

The following represent comments regarding flow cytometry immunophenotyping studies in the workup of these various categories:

1. **Malignant lymphoma/lymphoproliferative disorders**

Immunophenotying studies by flow cytometry play a valuable role in this category. However, the results of the flow cytometry immunophenotyping studies require correlation with biopsy findings, peripheral blood findings, and the overall clinical picture.   Recognizing that specimens may be sent to Dianon without all of this information submitted, as mentioned above, request for such information from the referring physician's office would be clinically valuable and appropriate.   In my evaluation of those patients in which the history or ICD-9 code suggested the possibility of a malignant lymphoma/lymphoproliferative process, I believe a panel including anti-kappa and lambda, T cell antibodies anti-CD3, CD4, CD8, and CD5, B cell antibodies anti-CD19, CD20, CD23, and CD10 was appropriate. I believe that the T cell antibodies anti-CD2 and CD7 and the B cell antibody anti-CD22 are not of sufficient diagnostic value to include in this panel and, therefore, were not medically necessary. Additionally, the myeloid antibodies anti-CD13 and CD33, HLA-DR, CD57, and CD34 were also felt to not have significant diagnostic merit and, therefore, were not medically necessary. Anti-CD45, CD16, and CD56 were included as discussed above.  The role of anti-CD11c, CD25, CD103, and CD38 was determined based on the history/ICD-9 code submitted.

3

B cell neoplasms may be shown to be clonal using kappa and lambda antibodies and the presence and/or absence of specific antibodies is also valuable. For B cell lymphomas, in addition to anti-kappa and lambda, anti-CD19, CD20, CD10, CD5, and CD23 are very valuable in correlation with the histologic features and peripheral blood findings in subclassifying the vast majority of B cell lymphomas, inclusive of follicular center cell lymphoma, mantle cell lymphoma, marginal cell lymphoma, and small lymphocytic lymphoma/chronic lymphocytic leukemia.

T cell lymphomas make up a small, but distinct minority of lymphomas encountered in the United States. Flow cytometry immunophenotyping studies are of value in T cell lymphomas once a histologic diagnosis has been made. Thus, immunophenotyping studies may be of value in distinguishing the T cell nature of a lymphoproliferative processes (recognizing that entities such as T cell rich B cell lymphoma may be misinterpreted as a T cell neoplasm if the diagnosis is based primarily on the immunophenotype obtained by flow cytometry studies). Unlike B cell lymphomas where a marked discordance between the percentage of kappa and lambda positive cells is very valuable in distinguishing lymphoid neoplasms from non-neoplastic processes, no such discordance exists for the identification of T cell lymphomas. So-called aberrant loss of antigen expression on T cells has been noted to sometimes occur in T cell lymphoproliferative processes, but this is not diagnostic, but rather supportive information in a pathologically diagnosed lymphoproliferative disorder. Rather, both genotyping studies and immunophenotyping studies performed on a pathology specimens (tissue immunohistochemistry) are of greater diagnostic value in supporting both the diagnosis and immunophenotype of such lymphoproliferative processes. Two examples of a T cell lymphoproliferative disorder in this patient cohort are B69, and the multiple specimen case A102-106. The interpretations of the results from the A102-106 set of cases note an increase in NK-associated marker expression on T lymphocytes. This is noted to be of uncertain significance, possibly representing reactive versus a T cell lymphoproliferative disorder of granular lymphocytes. Immunophenotyping studies were done initially on both the bone marrow and the peripheral blood. Highlighting the above stated role of ancillary studies other than flow cytometry for possible T cell lymphoproliferative disorders, Dianon was recommended that PCR genotyping studies be performed and this was done on several specimens over periods of several week intervals.

2.  **Chronic Leukemias**

    **A. Chronic Lymphocytic Leukemia**
    Flow cytometry immunophenotyping studies are of significant value in the diagnosis and definitive classification of chronic lymphocytic leukemia. This is a usually a B cell neoplasm and presents with circulating neoplastic cells, marrow involvement and may also involve lymph nodes, engendering malignant lymphoma in the differential diagnosis. Diagnostic specimens submitted for flow cytometry immunophenotyping studies may include peripheral blood, bone marrow, or a lymph node. In relative terms, this is a common leukemia in middle aged and elderly adults. Thus, it is the most common

diagnosis of lymphoproliferative processes in the peripheral blood. However, the differential diagnosis does include other lymphoproliferative disorders such as mantle cell lymphoma and hairy cell leukemia, among others. Additional information about the patient and information about any histopathology would be very helpful in suggesting the likelihood of the latter entities. However, where such information was not available for the patients in this analysis, but could have been obtained from the referring physician's office, I gave the "benefit of the doubt" for those antibodies considered medically necessary to address other potential entities in the differential diagnosis of chronic lymphocytic leukemia.

## B. Chronic Myelogenous Leukemia

The role of flow cytometry immunophenotyping studies is not the primary diagnostic study in the diagnosis of chronic myelogenous leukemia (CML). CML is typically considered to be in the general category of a myeloproliferative disease, all of which represent clonal proliferations of the hematopoietic stem cell. These patients typically present with an elevated white count (WBC) which has a distinctive WBC differential of a predominance of cells in the myeloid lineage and a "left shift", including the presence of infrequent promyelocytes and myeloblasts. Techniques addressing the presence of a "Philadelphia chromosome", a translocation of chromosomes 9 and 22, represent the definitive standard for the diagnosis of this entity. There is no role for flow cytometry immunophenotyping studies in the intitial work up of a patient suspected of having CML. However, if in the natural evolution of CML a patient is suspected of undergoing "blast crisis", flow cytometry would be of value in subclassifying the phenotype of the blasts. The panel I proposed in the CML cases is designed to address this particular question, but information about the patient obtained from the physician's office should have been very valuable in addressing if this was a diagnostic consideration and, therefore, if flow cytometry immunophenotyping studies were necessary. At the time of intial diagnosis, the non-flow cytometry immunophenotyping tests mentioned above would have been the appropriate tests to use for diagnosis. Such tests were recommended and performed in some of the cases reviewed.

## 3. Acute Leukemia

Acute leukemias typically demonstrate either lymphoid or myeloid differentiation, but evidence of differentiation in both categories (bilineage) is not uncommon. Typically peripheral blood and bone marrow represent sites in which the neoplastic cells are found and, therefore, either site represents an appropriate specimen for flow cytometry immunophenotyping studies. The role of flow cytometry immunophenotyping studies is valuable in subcategorizing acute leukemias and, therefore, some antibodies addressing lymphoid lineage, T and B, and myeloid lineage, as well as CD34, a hematopoietic progenitor cell antigen, are of value. Other antibodies, such as those used for the diagnosis of hairy cell leukemia, kappa and lambda, CD57, CD38 and CD23 do not play substantive roles in this interpretation and in virtually all cases, are not medically necessary.

5

4.    **Anemia/myelodysplastic process**

The clinical diagnosis of "anemia" is very broad and includes some entities in which flow cytometry immunophenotyping studies may play a role whereas flow cytometry studies in many other categories would serve no diagnostic value. Thus, clinical and laboratory information would be very valuable in helping to assess not only the role of flow cytometry, but the specific antibodies one would utilize. Specifically, an anemia with an associated lymphocytosis would warrant assessment for the possibility of a lymphoproliferative process, namely CLL. Also, consideration of hairy cell leukemia might be warranted. Additionally, anemia may be a presenting feature for a myelodysplastic process and in this regard, the myeloid antibodies are of value assessing their distribution in the maturation of cells in the myeloid series. However, in many of the reviewed cases, I gave Dianon the benefit of the doubt for the antibodies allowed in my panel, but believe that information obtained from the referring physician's office would have been helpful in designing a much more targeted panel of medically necessary antibodies or even determining if there was merit in doing this study at all.

5.    **Monoclonal gammopathy/multiple myeloma**

Once again, the role of flow cytometry immunophenoytyping studies in the assessment of a patient with a monoclonal gammopathy and possible multiple myeloma must be evaluated in the context of additional laboratory and clinical findings, including serum and urine characteristics of the monoclonal protein, bone marrow biopsy findings, serum calcium, bone radiographs, etc. The entities included in this category are clonal B cell prolifierations, the majority composed of a clonal plasma cell proliferation. In this regard, some of the B cell lymphoid antibodies, including kappa and lambda, are of value as is the evidence of expression of anti-CD56 and CD38 on the plasma cells. T cell and myeloid antibodies as well as antibodies for hairy cell leukemia, CD57, CD34 and HLA-DR serve no diagnostic value in this assessment and, therefore, are not medically necessary.

6.    **Miscellaneous**

There were infrequent examples of cases in which there was difficulty in discerning the role of flow cytometry immunophenotyping studies and, hence, which antibodies to use in the panel. Once again, I gave Dianon the benefit of the doubt, but flow cytometry immunophenotyping studies in these categories were probably unnecessary or could have used targeted antibodies based on information gleaned from the referring physician's office.

Those patients with repeat samples analyzed at Dianon afford the opportunity to design refined antibody panels for subsequent tests. The initial sample submitted in such cases is similar to those patients who only had one sample evaluated at Dianon. However, the information gleaned from the initial sample in repeat sample cases not only may offer insights into the immunophenotype of the cells in question for a given patient's disease, but also offers insights as to the absence of antigen expression on such cells. Therefore, it is my opinion that many patients evaluated in repeat tests could have had well-designed and refined panels based on

6

the data available to Dianon. One disease process for which several patients were evaluated with serial tests over a several week/month period was Acute Myelogenous Leukemia (AML). The immunophenotype for AML is helpful in the initial subclassification of the leukemia, but also allows for a very targeted panel of antibodies to assess subsequent specimens for possible recurrent disease. One illustrative case of AML demonstrating the ability to target antibodies is represented by the patient A158-161. The initial history accompanying a bone marrow biopsy stated leukopenia; evaluate for AML. 26 antibodies were used by Dianon, 18 of which I thought were medically necessary. The interpretation of this assay was "CD34 postive myeloid blast population with is also CD13, 33, 117, 11c, HLA-DR, 38, and 7 positive." Two weeks later, another bone marrow biopsy was submitted and again a panel of 26 antibodies was used by Dianon. Given the information gleaned from the first test, I believe only 11 antibodies were medically necessary to address the diagnostic question of ongoing marrow involvement by AML versus remission. Twelve days later, another bone marrow was analyzed with 26 antibodies used, again with only 11 being medically necessary. Less than 3 months later, another bone marrow was submitted with a panel of 26 antibodies used by Dianon, whereas only 11 were medically necessary.

Another example of repeat tests in which a standard panel of 26 antibodies was used on all specimens and some of the repeat studies were very close in time to one another is composite case A53-63. Specifically, blood was sent in for analysis with the only clinical information being the ICD-9 code 202. With this limited information, I gave Dianon the benefit of the doubt and found 23 antibodies were medically necessary. The test was negative. Approximately six weeks later, another blood specimen was submitted for which I thought 14 antibodies were medically necessary. Two weeks later, another blood specimen was submitted, and again I thought 14 antibodies were medically necessary. Approximately eleven weeks later, peripheral blood was submitted followed one week later by a bone marrow specimen, both of which I felt 14 antibodies were medically necessary. Peripheral blood was submitted again approximately eight weeks later with five more peripheral blood samples submitted over an approximate thirty two month period with 14 antibodies medically necessary for each. In all cases, there was no evidence of a B or T cell lymphoproliferative disorder or other abnormalities noted. I also did not see any amplification in any of these charts as to what the referring physician knew about the patient (i.e. pathology, lab results, clinical information) or what medical "question(s)" Dianon was trying to answer with the results of the assays.

After having reviewed more than 400 flow cytometry services by Dianon, it is my opinion as set forth above that Dianon used medically unnecessary antibodies on a routine basis. This is because Dianon used a standard panel, typically 26 antibodies, in almost every case. So, in almost all such cases, they did not exercise medical judgment based on clinical, laboratory, or pathology information submitted by the referring physician. In many cases, there was sufficient clinical information that would have allowed Dianon to run panels with fewer antibodies than those used, without compromising Dianon's role in patient care and diagnosis. For those patients who had repeat flow cytometry tests performed, not only did Dianon have the initial clinical information submitted by the referring physician to design a targeted panel of antibodies, but for subsequent tests, they then had data from their own previous flow cytometry tests. Although this

7

information allows the design of a very focused, considerably smaller panel of antibodies to address the patient's disease in question, Dianon did not use such information, but rather used their standard panel, typically of 26 antibodies, for every date of service for such patients. Recognizing that Dianon is a reference laboratory that does a significant number of flow cytometry testing, it would be reasonable for Dianon to craft a series of smaller, targeted antibody panels, depending on the diagnostic question(s) being asked by the referring physician. The pathologist is responsible for choosing the number of antibodies used for a given panel, and with the incorporation of the clinical information supplied by the referring physician, assumes the responsibility to use medically necessary antibodies.

The opinions and conclusions in this report are based on the information I have reviewed to date. I reserve the right to supplement or amend my opinions and conclusions if additional information is supplied.

Very truly yours,

Stuart D. Flynn, M.D.
Professor of Pathology and Surgery

SDF/jhr

8

Dianon Report Case 53-63

| Test | History | Date | Specimen | Ab Done | Ab Medically Necessary | Conclusion |
|------|---------|------|----------|---------|------------------------|------------|
| 53 | 202 | 8/10/2000 | Blood | 26 | 23 | No evidence of T or B cell neoplasm |
| 54 | 202.8 | 9/25/2000 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 55 | 202.8 | 10/9/2000 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 56 | 202.8 | 12/26/2000 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 57 | Lymphoma | 1/2/2001 | Bone Marrow | 26 | 14 | No evidence of T or B cell neoplasm |
| 58 | Staging, Lymphoma | 2/28/2001 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 59 | None | 10/29/2001 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 60 | 202.8 | 1/28/2002 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 61 | 202.8 | 7/29/2002 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 62 | 202.8 | 4/23/2003 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |
| 63 | 202.8 | 10/21/2003 | Blood | 26 | 14 | No evidence of T or B cell neoplasm |