# EXHIBIT 22

Dr. Margaret G. Johnson                    8/24/2006

### SHEET 1 PAGE 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

   Plaintiffs,

vs.

DIANON SYSTEMS, INC.,

   Defendant.

DEPOSITION OF DR. MARGARET G. JOHNSON

THURSAY, AUGUST 24, 2006
9:02 A.M.

TERRY SANFORD FEDERAL BUILDING & COURTHOUSE
310 NEW BERN AVENUE, CONFERENCE ROOM 158
RALEIGH, NORTH CAROLINA

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

   PATRICIA R. DAVIS
   United States Department of Justice
   601 D Street N.W., Room 9154
   Washington, DC 20004
   (202) 307-0238
   (202) 305-4117 (fax)
   pat.davis@usdoj.gov

ON BEHALF OF THE DEFENDANT:

   BRUCE R. PARKER
   Venable LLP
   Two Hopkins Plaza, Suite 1800
   Baltimore, Maryland 21201-2978
   (410) 244-7354
   (410) 244-7742 (fax)
   brparker@venable.com

ALSO PRESENT:

   PAUL PROCTOR (Videographer)

### PAGE 2

T A B L E  O F  C O N T E N T S

| ATTORNEY | EXAMINATION | PAGE |
|---|---|---|
| MS. DAVIS | DIRECT | 5 |
| MR. PARKER | CROSS | 72 |

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| PLAINTIFFS' 1 | NOTICE OF DEPOSITION | 15 |
| PLAINTIFFS' 2 | LABCORP CENTER FOR MOLECULAR BIOLOGY AND PATHOLOGY 1/22/01 | 16 |
| PLAINTIFFS' 3 | FLOW CYTOMETRY ACUTE AND CHRONIC LEUKEMIA | 26 |
| PLAINTIFFS' 4 | DIRECTORY OF SERVICES SCREEN PRINT | 32 |
| PLAINTIFFS' 5 | E-MAIL TO KARWOWSKI FROM JONES (4/19/01) | 39 |
| PLAINTIFFS' 6 | BILLING COMPLIANCE COMMITTEE MINUTES | 40 |
| PLAINTIFFS' 7 | CONFERENCE CALL MINUTES (10/21/03) | 45 |
| PLAINTIFFS' 8 | MEMO TO SCIENCE AND TECHNOLOGY FROM FIORDALISI (3/21/03) | 48 |
| PLAINTIFFS' 9 | E-MAIL TO DAWKINS FROM JOHNSON (9/29/03) | 51 |
| PLAINTIFFS' 10 | LABCORP STANDARD OPERATING PROCEDURE | 52 |
| PLAINTIFFS' 11 | E-MAIL TO DAWKINS FROM FIORDALISI (12/18/02) | 54 |

### PAGE 3

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| PLAINTIFFS' 12 | HEMATOPATHOLOGY STANDARDIZATION MEETING MINUTES (1/13/04) | 56 |
| PLAINTIFFS' 13 | HEMATOPATHOLOGY STANDARDIZATION MEETING MINUTES (2/4/04) | 60 |
| PLAINTIFFS' 14 | 4-COLOR STRATEGY FOR CLL, LYMPHOMA, HAIRY CELL LEUKEMIA AND MULTIPLE MYELOMA | 64 |
| PLAINTIFFS' 15 | E-MAIL TO PALMIEN FROM BERG (3/31/04) | 65 |
| PLAINTIFFS' 16 | E-MAIL TO SEGAL FROM MISHALANI (11/14/05) | 69 |
| PLAINTIFFS' 17 | CIGNA HEALTH CARE NORTH CAROLINA LOCAL MEDICAL REVIEW POLICY | 70 |
| PLAINTIFFS' 18 | LEUKEMIA/LYMPHOMA ANALYSIS | 71 |

REPORTER'S CERTIFICATE                                78

### PAGE 4

1  PROCEEDINGS
2              VIDEOGRAPHER: This is the videotaped deposition of
3  Dr. Margaret Johnson taken by the plaintiff in the matter
4  of United States of America, ex rel. Dr. James J.
5  Tiesinga, Plaintiffs, versus Dianon, Incorporated,
6  Defendants, and -- or Defendant, excuse me. And this is
7  in the United States District Court for the District of
8  Connecticut and is Case No. 3:02 CV 1573 (MRK).
9              This deposition is being held in the offices of
10 the United States Attorney in the Terry Sanford Federal
11 Building and Courthouse, Room 158. It's located at 310
12 New Bern Avenue, Raleigh, North Carolina 27601.
13             Today's date is August 24th, 2006, and the time
14 is 9:02 a.m., Eastern Daylight Time. The court reporter
15 is Patti Elliott, representing Williams Reporting, located
16 in Raleigh, North Carolina. The videographer is Paul
17 Proctor, representing Video Visions, Incorporated, located
18 in Apex, North Carolina.
19             Would counsel please introduce themselves?
20             MS. DAVIS:     I'm Pat Davis. I'm representing the
21 United States.
22             MR. PARKER:    Good morning. Bruce Parker,
23 representing Dianon Systems.
24             VIDEOGRAPHER: Would the court reporter please swear
25 in or affirm the witness?

PAGES BY PATTI

SHEET 3  PAGE 9

1  been that way for more than five years.
2    Q.    Okay. So since at least, say, 2001?
3    A.    Yes.
4    Q.    Okay. When you -- when you -- you say that when you
5  joined the -- what became LabCorp, there was already a small
6  flow cytometry group in place. Was -- were the procedures
7  already set up when you got there?
8    A.    Yes.
9    Q.    Did you have any input into changing them at any
10 point?
11   A.    Yes.
12   Q.    When was that?
13   A.    I think almost immediately when I got there --
14   Q.    Okay.
15   A.    -- we began working on new panel design.
16   Q.    Okay. And did your panel change over time?
17   A.    Yes.
18   Q.    And did you have one -- one panel or more than one
19 panel?
20   A.    We've always had more than one.
21   Q.    Okay. And why is that?
22   A.    Just how we evolved, basically, from what we started
23 with when we -- when we got there. And as we acquired more
24 work and more expertise, we changed the panel. And, of course,
25 the technology has changed tremendously over the years from

PAGE 10

1  initially doing two-color to doing four-color and the addition
2  of different markers that became available over this period of
3  time. So, yes --
4    Q.    Okay.
5    A.    -- it's evolved tremendously, I would say.
6    Q.    Okay. Let's -- let's say -- let's say, like -- I'll
7  just pick a date, 2000-2001. Describe for me the process of
8  how specimens would come into the lab and what would happen to
9  them once they got to the lab.
10   A.    Well, LabCorp is a -- is a large reference lab. And
11 so specimens come from the client by two different ways. They
12 can come by a courier or they can come by an overnight carrier.
13             Eventually, they reach our specimen management
14 department, where they are sent to the flow cytometry lab. And
15 a specimen comes from the client with a requisition and a test
16 order.
17   Q.    Okay. And then --
18   A.    And then once it's in the flow lab, then we -- we
19 process it from there.
20   Q.    Okay. And how do you process it?
21   A.    How do we process it?
22   Q.    Just generally.
23   A.    We receive the specimen. They review the information
24 that's provided. We do a smear review and look at the cells
25 there. We do a CBC if it's a peripheral blood or if there's a

PAGE 11

1  blood with a bone marrow. And then we set up the panel that's
2  requested, unless there's anything that we see that suggests
3  that that's not right or if we need to add more markers to
4  answer the question.
5    Q.    Okay. And so the -- when the -- when the specimen
6  comes in, you say you do a smear review.
7    A.    Uh-huh (yes).
8    Q.    Is that a smear that's already sent by the -- the --
9    A.    No.
10   Q.    -- the doctor?
11   A.    No. We make the smear.
12   Q.    Okay. You make the smear. And then -- and who
13 reviews that?
14   A.    The technologist.
15   Q.    Okay. And what's the purpose of -- of reviewing
16 the -- the smear?
17   A.    Well, you get an idea of the quality of the specimen,
18 whether it's, you know, hemodilute or if it's been damaged in
19 transit or -- and for acute leukemias -- I guess that's the
20 primary thing.
21            When we can look at the smear and say we have an
22 acute leukemia here, we tend to expedite that processing so we
23 can get it through faster, so we can call results, because
24 that's a life-threatening disorder. So --
25   Q.    Okay. And in doing the smear review --

PAGE 12

1    A.    Uh-huh (yes).
2    Q.    -- does the technologist ever look at it and say,
3  "Gee, this person picked the wrong panel. They should be doing
4  something," or "It looks like there's something else going on
5  here"?
6    A.    Yeah. Some things are pretty obvious, so, yes.
7    Q.    Okay.
8    A.    They are -- you know, they get experience very
9  quickly because we're a high-volume lab. So they can learn
10 real quickly to recognize certain things that are commonly
11 seen.
12   Q.    Okay. And then you say you got the specimens from
13 the -- from the referring doctors. Where, generally, are the
14 doctors located?
15   A.    You mean what states?
16   Q.    Uh-huh (yes). I mean, just generally.
17   A.    I think they're all over the eastern part of the
18 United States.
19   Q.    Okay. So you get -- you get specimens from all over
20 the eastern half of the U.S.?
21   A.    And Puerto Rico.
22   Q.    Okay. And those would come in by -- those outside
23 the local area would come in by overnight carrier?
24   A.    Most of our specimens actually come in through the
25 courier system, which means they go from -- they are picked up

from the client by a courier and delivered to a branch. And then from the branch, it may go to a -- we have several main laboratories. And then they are shipped on LabCorp planes or --
Q. I see.
A. -- wherever to come to Research Triangle Park, which is where we're located.
Q. Okay. So -- so let me make sure I understand. So there's -- there's a Dr. X in -- someplace in Ohio, let's say.
A. Okay.
Q. Let's just pick a state, Ohio. And a courier goes to his office, picks up the sample and takes it to a local LabCorp lab?
A. Or it could be just a branch. It could be a -- a drawing station that has pretty limited capability.
Q. Okay. So it's --
A. But in Ohio, it would be Columbus. There's a big -- there's a LabCorp lab there.
Q. Okay.
A. So it would go to Columbus.
Q. Okay. And so then it would be put on a plane --
A. Uh-huh (yes).
Q. -- from Columbus to Raleigh?
A. Right.
Q. Okay. And then -- and, roughly, how long is it

between the time that the -- the courier picks up the -- the -- the specimen and it gets to your flow lab?
A. That's quite variable. It depends on a lot of -- lot of things. But, ideally, they come in between 24 and 48 hours of collection. If they're out of that time frame, then there's been a delay.
Q. Okay. Okay. And the -- the -- the process that you described as having -- being in place around 2000-2001 --
A. Uh-huh (yes).
Q. -- is that -- is that still in place?
A. Yes, it is.
Q. Okay. How many pathologists who review flow -- flow cytometry do you have in the -- in your office?
A. We have three -- four: myself, Dr. McCune, Dr. Hessling and Dr. Bentley.
Q. Okay. And has that been the case through -- throughout the time period from --
A. Dr. Bentley hasn't -- has only been there three years.
Q. Okay.
A. Dr. McCune came maybe a year or two after me, I think. And Dr. Hessling's been there for a while, but I've been there the longest.
[PLAINTIFFS' EXHIBIT NO. 1 MARKED FOR IDENTIFICATION]

Q. Okay. Actually, I've already marked this, and I'm just going to put it into the record. This is the deposition notice -- this Exhibit 1 is the deposition notice for your appearance here today. I'll just put that in the record.
[PLAINTIFFS' EXHIBIT NO. 2 MARKED FOR IDENTIFICATION]
Q. Let me ask you to take a look at what I'm marking as Exhibit No. 2.
MR. PARKER: Why don't you just give it to Dr. Johnson and she can hand me one?
MS. DAVIS: Okay.
MR. PARKER: Okay.
MS. DAVIS: Otherwise, I'm going to have to throw them at you.
MR. PARKER: All right.
BY MS. DAVIS:
Q. And I'll just ask you to take a look at what's page 23 of 25. And this is a document that's labeled at the top "LabCorp Center for Molecular Biology and Pathology 1/22/01."
And all I'm going to do is ask you to take a look at the profiles under the test name on the upper left-hand corner there.
A. Uh-huh (yes).
Q. Are those the -- the test panels that were in place at -- at one -- 1/22/01?

A. Yes.
Q. Okay. Can you tell me -- for the acute leukemia profile, can you tell me how you chose the particular markers that you put on that panel?
A. We chose -- to diagnose acute leukemias, you need to cover lymphoid markers and myeloid markers. And so those are the ones that are in there. Those are the Pan T and B and -- and common myeloid markers.
Q. Okay. And what about for the chronic leukemia profile?
A. The chronic -- chronic -- it's chronic lymphocytic leukemia/lymphoma profile. And this is for diagnosing lymphoproliferative disorders, and it contains primarily -- well, only lymphoid markers.
Q. Okay. And the hairy cell/plasma cell leukemia profile?
A. Yes. Those were designed as kind of add-on -- well, the hairy cell/plasma cell really is more of an add-on to the chronic profile, which has the markers that identify hairy cell leukemia and plasma cells. And the lymphoma profile was for specimens that we received that were solid tissues. And, again, it's to diagnose lymphomas. And so it has a combination of both T- and B-cell markers.
Q. Okay. And -- and why did you choose to -- to have four separate profiles, instead of just one profile?

Dr. Margaret G. Johnson  8/24/2006

SHEET 5 PAGE 17

1  A.  Because we started out -- when I got there, there
2  were kind of these lineage-specific profiles, and we went to
3  kind of diagnosis-directed profiles. And that is in part
4  because a lot of our specimens are peripheral blood specimens,
5  and we have a fairly high percentage of negative specimens
6  because of our clientele. And these profiles were kind of
7  targeted to two major categories, towards acute leukemias and
8  myeloid disorders of lymphoid disorders.
9  Q.  Okay. And when you say you had a lot of negative --
10  A.  Uh-huh (yes).
11  Q.  -- specimens, what does that mean?
12  A.  It means that they've been sent in for screening
13  because they have a -- a lymphocytosis in it. It's a reactive
14  process. It's not a leukemia. Or they have a relative
15  lymphocytosis, and it's because they have an -- an absolute
16  decrease in their neutrophils due to some other problem. So
17  there's not a leukemic process going on. That's when I say
18  it's negative.
19  Q.  Okay. And you say that's because of your -- of
20  your -- your clientele. What does that mean?
21  A.  Well, because we're a large reference lab and -- so
22  primary care doctors will order our tests. We do have
23  oncologists and pathologists that order our tests, but we have
24  a real spectrum of people ordering. And they often send blood.
25       Usually, an oncologist is sending you a bone

PAGE 18

1  marrow specimen because they've been referred because a primary
2  care physician has discovered that they have probably leukemia.
3       So -- so we have a lot of screening, I think,
4  that's basically to -- to rule out a leukemia. And then -- so
5  we consequently have a lot of negative specimens.
6  Q.  Okay. Approximately what percentage of your -- of
7  your -- your -- the specimens that you get are -- are -- and
8  I'll break it down -- bone marrow, blood and tissue?
9  A.  I don't have the statistics on that. I mean --
10  Q.  Roughly.
11  A.  -- our primary specimen is blood, followed by bone
12  marrows, followed by tissues.
13  Q.  So tissues is the smallest portion?
14  A.  It is the smallest portion.
15  Q.  Okay. You said when -- when the specimen comes into
16  the lab it has a requisition form attached to it.
17  A.  When it's sent from the client, it has a requisition
18  form, yes.
19  Q.  As opposed to what?
20  A.  Well, the requisition form can be held at a branch.
21  Q.  Okay.
22  A.  So we don't always receive that. So we request
23  information about the specimen if we need to.
24  Q.  Okay.
25  A.  A lot of them don't provide information, but if I

PAGE 19

1  have a question, I don't hesitate to ask them to get me a copy
2  of the requisition or the CBC or whatever.
3  Q.  Okay. And you said when -- when the specimen comes
4  in, you routinely do a CBC as well?
5  A.  If it's a peripheral blood, yes.
6  Q.  Okay. And so if the -- if the specimen comes in
7  without a requisition form, what -- what would you do?
8  A.  Well, it's got a test order on it. It's on a
9  worksheet. It's got a specimen number and it's got a test
10  order. So if it doesn't have the requisition, the lab has --
11  they -- the processing bench has an algorithm that they go
12  through. So I insist that we have a -- some sort of diagnosis
13  for all the bone marrows.
14       If -- if we don't have a CBC for a blood -- say, if
15  it's a old specimen or -- or it's in a yellow-top or green-top
16  tube, which is not suitable for doing a CBC, we can -- we'll
17  ask the client. So all that stuff is requested kind of up
18  front so when the -- when the histograms come to me, that
19  information is all ready for me to look at.
20  Q.  Okay. So the -- the staff -- your staff knows that
21  if it comes out -- it's something -- if it comes in without a
22  diagnosis that they're supposed to go get the diagnosis from
23  the client?
24  A.  If it's a bone marrow.
25  Q.  And if it's a -- if it's peripheral blood, they're

PAGE 20

1  supposed to find out -- find the requisition form or get a copy
2  of it or the CBC?
3  A.  If it's a peripheral blood and -- and they're able to
4  do the CBC -- and it's not really the CBC in the sense that
5  you're thinking. What I'm looking at is what the total white
6  count is --
7  Q.  Uh-huh (yes).
8  A.  -- because I have a differential by the -- by the
9  phenotyping. But I -- I like to know kind of what ballpark
10  white blood cell count I'm working with. That's the primary
11  thing.
12       And, also, they use that to dilute the specimens.
13  They have to dilute the cellular ones. So it's -- it's just
14  basically getting a white blood cell count.
15  Q.  Okay. All right. So you said that when -- let me
16  make sure I understand. So the specimen comes in and let's say
17  it's with -- it doesn't have a requisition form.
18  A.  Uh-huh (yes).
19  Q.  And I'll just use bone marrow example.
20  A.  Okay.
21  Q.  Bone marrow comes in. It doesn't have a requisition
22  form. The technologist would know to call the client and get a
23  diagnosis?
24  A.  They send a form to customer service, yes, and they
25  will ask for a diagnosis and a CBC; just, you know, whatever