# EXHIBIT 25

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - )
                                   )
UNITED STATES OF AMERICA,          )
ex rel. Dr. James J. Tiesinga      )NO.: 3:02CV1573(MRK)
         PLAINTIFFS                )
                                   )
VS.                                )
                                   )
DIANON SYSTEMS, INC.               )
         DEFENDANT                 )
                                   )
- - - - - - - - - - - - - - - - - )

DEPOSITION OF: STUART FLYNN, M.D.

DATE TAKEN: MAY 10, 2006

LOCATION: UNITED STATES DEPARTMENT OF

    JUSTICE

    157 CHURCH STREET

    NEW HAVEN, CONNECTICUT

REPORTED BY: IRENE J. PARRISH, RMR, LSR #085

Page 202

1  their capabilities in performing flow?
2  A  No.
3  Q  Had you ever in the course of your
4  professional capacity, not as a litigation expert,
5  reviewed any of their work in the context of patient
6  care?
7  A  I would imagine I did for patients that came
8  up to Yale, but I couldn't pinpoint that for you.
9  Q  Okay.  If you were to send a patient specimen
10 out to be analyzed in flow currently and I were to
11 prevent you from sending it to your own colleagues
12 upstairs, what lab would you choose?
13 A  I don't know, don't know.
14 Q  I take it then that you've never actually had
15 to make that decision?
16 A  I have not.
17 Q  One other follow-up question to this morning.
18 You mentioned that from the approximate 2000 time
19 period that we've been using when your lab stopped
20 doing immunophenotyping it nevertheless continued
21 doing what you described as DNA flow work for some

Page 203

1  period of time?
2  A  Correct.
3  Q  Can you explain a bit more what they were
4  doing in that regard?
5  A  Yes.  That's looking at ploidy of different
6  kinds of cancer, predominantly breast cancer, colon
7  cancer, so it translates to the number of chromosomes
8  in a given cancer very crudely, and you also get some
9  idea of the proliferation of that given tumor in
10 these studies.
11 Q  Is that work done on tissue removed or
12 biopsied from the site of the cancer?
13 A  That's one of the sources of specimens, yes.
14 Q  Do you also examine urine?
15 A  We've never -- I'm trying to think if we've
16 ever done urine.  I don't think we've ever done urine
17 for that.
18 Q  And did you submit for Medicare reimbursement
19 for that work?
20 A  Yes.
21 Q  At the time you shut your lab down, was

Page 204

1  Medicare still reimbursing you for the DNA work that
2  you were doing?
3  A  As far as I know.
4             (Defendant's Exhibit No. 15,
5              requisition form received on or
6              about 10/6/99, marked for
7              identification.)
8  BY MR. PARKER:
9  Q  Okay.  Let's shift gears a little bit.  Let
10 me show you, Dr. Flynn, Exhibit 15 which is the test
11 requisition form received by Dianon.  I'm looking for
12 a date, on or about October 6, 1999, with the
13 information reflected on this.  I'll represent for
14 the record that unless I overlook something -- and,
15 of course, that's certainly possible, but it was not
16 my intent -- this is the only information that Dianon
17 had in its file regarding this patient.
18            MR. MOLOT:  Do you know what patient
19         number in the sample this was or anything
20         like that?
21            MR. PARKER:  I think I can get that

Page 205

1         for you.  Patient No. 93, but I do not know
2         whether it was A or -- first 93 or second 93
3         since the same numbers were used.
4  BY MR. PARKER:
5  Q  Doctor, my question looking at this is:  Tell
6  me what panel you would design for this patient.
7  A  Can you -- I can't read.  I can see "Aplastic
8  anemia."  I'm not sure I can read just prior to that.
9  Can you read that, anybody?
10 Q  All I would say is, "Other," something,
11 "aplastic anemia."  That's as best I can do.
12            MR. MOLOT:  Do you have the chart so
13         you can give him the whole chart?
14            MR. PARKER:  I don't have the chart to
15         answer your question.  I have this
16         information.
17 BY MR. PARKER:
18 Q  You're the pathologist at Dianon.  You get
19 this test requisition.  Tell me what panel you're
20 going to construct.
21            MR. MOLOT:  I'm sorry to interrupt.

Page 206

1  It just seems there might have been more
2  things in the chart like blood tests.
3      MR. PARKER: Sometimes there were.
4  Sometimes there were not as the doctor can
5  attest to.
6      MR. MOLOT: Are you representing there
7  was nothing else on this one?
8      MR. PARKER: I'm representing to the
9  best of my -- because I attempted to collect
10  because for some I have additional
11  information that for this particular patient
12  I do not recall seeing any additional
13  information.
14      MR. MOLOT: Okay.
15      MR. PARKER: And obviously the
16  doctor's answers will be taken in that
17  context. If there is something, I have been
18  mistaken, and the record will reflect that.
19  A   Well, there are ICD-9 codes here, and maybe
20  you've translated what those mean, and I would have
21  looked those up so I would hate to misrepresent the

Page 207

1  case by not knowing what those stand for because they
2  may be germane, and they certainly may not be.
3  BY MR. PARKER:
4  Q   All right. So what you're -- if I understand
5  your testimony is that you could not construct a
6  panel for this unless you knew the ICD-9 codes 284.8
7  and 285.9?
8  A   No, that's not what I said. I said there is
9  additional information here, and I don't know what
10  that information is, and that may or may not be
11  relevant to how I viewed the case.
12  Q   Fair enough. I'll take your answer with that
13  caveat in mind. You are given information presented
14  that this patient has anemia, and I understand the
15  caveat you've given that 284.8 and 285.9 might change
16  your answer with some respect. With that in mind,
17  tell me what panel you would construct that would be
18  medically necessary to properly within the standard
19  of care diagnose this patient's condition.
20      MR. MOLOT: So he's constructed a
21  panel already. You're taking -- testing his

Page 208

1  memory about what he's constructed?
2      MR. PARKER: I'm not testing his
3  memory. I'm testing his ability -- what he
4  said Dianon should have been doing and to
5  tell me what panel they should have
6  constructed. I'm assuming he doesn't need a
7  cheat sheet to do that.
8  A   You can represent the process, and obviously
9  I know the process how to do this.
10  BY MR. PARKER:
11  Q   Sure.
12  A   So, first of all, it's not just anemia. It's
13  aplastic anemia if I'm reading that correctly which
14  now engenders the real possibility that there's a
15  critical piece of clinical information that is not --
16  and the patient is 76. So there are variables here
17  that are uncomfortable. It's not a 6-year-old where
18  we see aplastic anemia in young children.
19      So that having been said, I would as I did
20  in virtually every panel -- I would address the
21  possibility of a B cell lymphoproliferative disorder.

Page 209

1  I would look at the T cell antibodies and more likely
2  than not not CD2 and CD7.
3  Q   But what? I'm asking for what.
4  A   Three, 4, 5 and 8.
5  Q   Thank you.
6  A   I would look at 19, 20, 23, 5, 10.
7  Q   Um-hum.
8  A   I would look at 16 and 56, 14, and at that
9  point -- I might do that as a first tier.
10  Q   All right. So your testimony is correct with
11  the caveats you've given me about not knowing the
12  ICD-9 codes, with the limited information you have
13  here, your panel which you argue would be within the
14  standard of care to determine this case are the
15  antibodies that you just mentioned?
16  A   Right, and, again, the standard of care, just
17  to make it perfectly clear, is knowing what I need to
18  know about the patient. So if this is all I know
19  about the patient, then this is all I know about the
20  patient.
21  Q   Okay.

Page 210

1   A   Right, but you know exactly what I'm
2   referring to. I would find this history an
3   exceedingly unusual history in which I'm being asked
4   to do flow cytometry. So I would call, and I would
5   find out exactly what the story is. What I may find
6   out is this patient's been treated for some kind of
7   cancer, and the end result is this is the end result.
8   I may find out that this patient has an acute
9   leukemia who's been treated with a bone marrow
10  transplant. In other words, that's a very large kind
11  of history for a given patient.
12  Q   Doctor, and I understand what you might have
13  done and what you might have learned, but if you
14  tried to call and you could not get an answer, the
15  doctor's off for two weeks, taking vacation down in
16  Brazil, and you've got to do something with this
17  information, do I understand that the panel -- do I
18  understand, firstly, that you would go ahead and do a
19  study or would you wait for the doctor to come back?
20  A   We've already addressed that. You don't have
21  to wait for the doctor to come back. You talk with

Page 211

1   somebody in the office.
2   Q   And you get no information?
3   A   You get very viable information when you do
4   that, and there would be information on this
5   patient's 76 years old so one would assume this isn't
6   the first physician's visit. In addition, it's a
7   peripheral blood specimen so you have an opportunity
8   to look at the smear once again.
9        So, once again, I'm defending the fact this
10  is not in a vacuum, but that having been said, that
11  is a reasonable first-tier antibody that's going to
12  give me a lot of information -- first-tier panel for
13  me to run.
14  Q   Let's go to the next one, and we'll mark this
15  one as Exhibit 16.
16          (Defendant's Exhibit No. 16,
17          requisition form, Patient 79,
18          marked for identification.)
19       MR. MOLOT: Are we done with
20   patient --
21       MR. PARKER: We're done with 15.

Page 212

1        MR. MOLOT: Do you know what patient
2    from the sample this particular one is?
3        MR. PARKER: This one I don't have a
4    reference to. Oh, I do, 79.
5   BY MR. PARKER:
6   Q   And, Doctor, you understand what I'm trying
7   to get with you is not the world of possibilities
8   that you might have gotten. I'm asking you that if
9   you got no other information other than what you have
10  here and this is what you have to deal with how would
11  you have constructed a flow panel, and that's my
12  question to you with regard to Exhibit 16.
13       MR. MOLOT: Even though there may have
14   been more in the chart that you're not
15   showing him?
16       MR. PARKER: I don't know that there
17   is any more in the chart.
18       MR. MOLOT: I could get the charts and
19   bring them here.
20       MR. PARKER: No, I don't want the
21   doctor to see the answers.

Page 213

1   BY MR. PARKER:
2   Q   My question is: If the only information that
3   you have -- it may or may not be true, but if I'm
4   correct this is the only information you have, I want
5   to know how you would construct a panel.
6   A   Well, that's a hypothetical and artificial
7   way to present this. If, in fact, there is no other
8   information, then that's how I constructed the panel.
9   If there is additional information, then whatever I
10  say has no validity.
11  Q   And I accept that, Doctor. I'm asking you:
12  If this is all the information that Dianon has, how
13  would you construct a panel for the patient for
14  Exhibit No. 16?
15  A   So this is a patient -- let me figure out how
16  old she is. Something is yellowed out here so I
17  would assume I would know her age when I did this
18  case.
19  Q   Can I -- what are you referring to here?
20  A   It looks like up here might be her birth
21  date.

Page 214

1  MR. MOLOT: Yeah, there's stuff on the
2  page that's illegible.
3  BY MR. PARKER:
4  Q  I can't help you with that. I don't have --
5  A  Once again, that's important, needless to
6  say.
7  Q  Except it's a he, but that's all right.
8  A  It's a he, but the bottom line is this is
9  working in a vacuum once again. This is a bone
10 marrow specimen, and if I'm reading the history
11 correctly, the patient is on two different
12 medications. "Splenomegaly" is checked. I don't
13 know what's checked because the copy is too dark, and
14 there's a history -- clinical diagnosis in here that
15 says, "Leukopenia and hypersplenism," I believe.
16 Q  If you don't mind me interrupting your
17 answer, let me refer you to a previous exhibit where
18 that copy is a little bit easier to read. I think
19 you'll see what those two check marks are for.
20 A  So they've checked off "Cytopenia" and
21 "Anemia."

Page 215

1  Q  Um-hum.
2  A  And then there are two ICD-9 codes which
3  again I don't have put to memory so I don't know if
4  they're just addressing the same issue or not.
5  Q  Fair enough.
6  A  And, again, I don't know the patient's age,
7  but let's work from maybe the assumption that the
8  patient's only 60 years old to play the game.
9  Q  Fair enough as well.
10 A  So this patient has -- does not have a
11 picture that suggests the possibility of an acute
12 leukemia, does have a picture with the hypersplenism
13 which may have no bearing on any kind of
14 hematopoietic -- primary hematopoietic abnormality
15 but certainly could be a presentation for a
16 lymphoproliferative process.
17   So in that regard, again, I would address
18 the B cell issue of kappa, lambda, 19, 20, 23, 5 and
19 10. I would include in this case the possibility
20 that this might be hairy cell leukemia so 11C, 103
21 and 25, 16, 56 once again, would not do HLA DR, would

Page 216

1  not do CD57. Again, I'm pulling these panels from
2  memory.
3  Q  Not from memory but your personal knowledge.
4  You're an expert, right?
5  A  That's my memory. I'm addressing the Dianon
6  panel, am I not?
7  Q  I'm addressing your panel that you're putting
8  together.
9  A  No. I'm putting a panel together versus
10 Dianon.
11 Q  No. That's not what I'm asking you to do.
12 I'm asking you if this is the information that you
13 have -- this happened to be information that Dianon
14 received in a case, but if this is the information
15 that came to you and all you had was this
16 information, what panel would Dr. Flynn put together?
17 A  You know, I would not have this limited
18 information so it's a question that I can't answer
19 because I wouldn't allow myself to get into that
20 setting.
21 Q  So the record's clear, with respect to the

Page 217

1  previous exhibits 15 and 16, your testimony is if I
2  received this information reflected in a requisition
3  for 15 and 16 and this information alone and I tried
4  but was unable to get any other clinical information
5  from the physician, I would not do a flow study?
6  A  No. I have a smear, and I will get
7  information. It's not a matter that I won't get
8  information. I will get information.
9  Q  I'm going to move --
10 A  There is somebody following this patient.
11 Q  I'm going to move to strike. Doctor, I'm
12 going to tell you that in my hypothetical the
13 physician office is shut down for two weeks. You
14 call, and you get a recorded message saying, "We're
15 gone for two weeks." This is what you have. Do you
16 do a flow study or do you say, "I'll try again in two
17 weeks"?
18 A  First of all, this isn't dealing with
19 hypotheticals so that hypothetical is just not --
20 it's never played out in my career. I don't
21 anticipate it playing out so at some point we're

Page 218

1  going to get so far out on the ledge that anything we
2  discuss is not going to have significant merit
3  because it's become so hypothetically watered down.
4  This is a hypothetically watered-down scenario. It's
5  a bone marrow specimen. You have a smear to look at.
6  There's information in that smear. I don't need a
7  doctor's office to look at that smear. I have my own
8  eyes to look at that smear.
9    Q   So you're saying, Doctor, just so I
10 understand the answer, you're unable or you're
11 refusing, I can't tell which it is, to answer my
12 question because you're saying unless you also tell
13 me all of these other things that I think I'd like to
14 know I won't construct a panel for you or I can't
15 construct a panel for you?
16   A   I don't need to construct a panel. I have
17 additional information that's going to be helpful for
18 me in constructing the panel. I get asked
19 hypotheticals by my residents all the time, and I
20 tell them, "Show me when it happens," and the bottom
21 line is show me that I can't get to a doctor's office

Page 219

1  for information. I've never encountered that yet so
2  I think it's a question that doesn't have merit.
3    Q   So when I ask you in front of the jury and I
4  give you this sheet and I say, "Doctor, this is all
5  the information you have because, you know, sometimes
6  that's all that Labcorps has or Dianon has, tell this
7  jury what sort of panel you're going to use," you're
8  going to say, "I can't tell you that until you can
9  tell me what I would learn when I definitely get
10 ahold of that treating doctor"?
11         MR. MOLOT: Objection to the form of
12     the question.
13   A   No. I'm going to tell you there is more
14 information for this patient.
15 BY MR. PARKER:
16   Q   And when I say, "Doctor, this is the
17 hypothetical, this is all you have," and the judge
18 says, "Dr. Flynn, answer the question" --
19   A   Then I'll put together a panel which is what
20 I've started to do for you.
21   Q   Okay. I thought that's where we were.

Page 220

1    A   But it's an illogical discussion from my
2  perspective. It might be logical from yours.
3    Q   Then humor me from your perspective of it
4  being illogical since I am paying for your time
5  today, but you didn't tell me what T cells you were
6  going to use.
7         MR. MOLOT: Although we didn't decide
8     yet who's paying.
9         MR. PARKER: I'll pay for yours. You
10    pay for mine. Since I'm taking the doctor's
11    time, it's only fair I pay.
12 BY MR. PARKER:
13   Q   What T cells are you going to use?
14   A   Maybe it was the other case I said. I would
15 use 3, 4, 5 and 8.
16   Q   You gave me the B cells. You gave me the HCL
17 markers, and you gave me 16 and 56?
18   A   Right.
19   Q   Anything else?
20   A   Not in that setting, no. Did I include 14 on
21 that? I apologize if I didn't. I would include 14.

Page 221

1    Q   No, you didn't, but that's fine.
2    A   Thank you.
3    Q   Let me show you one other one.
4         (Defendant's Exhibit No. 17,
5         requisition form, Patient 6,
6         marked for identification.)
7         MR. PARKER: Exhibit 17 I did find
8     additional information in the file.
9         MR. MOLOT: What patient is it for,
10    the sample?
11        MR. PARKER: Six, I believe.
12 BY MR. PARKER:
13   Q   And for the record, Doctor, Exhibit 17 is a
14 requisition form received by Dianon on February 1,
15 1996, from Dr. Salim, S-A-L-I-M, Osta, O-S-T-A. I
16 think it's your case No. 6 if my notes are correct.
17 This -- my review of this file reflects that there
18 was certain information provided to Dianon, what you
19 have called morphologic information, attached to the
20 report.
21        So, Doctor, with that additional

Page 274

1  A  No.
2  BY MR. PARKER:
3   Q  Okay. I think we're up to 24.
4       (Defendant's Exhibit No. 24,
5       collection of documents, Sample
6       No. 72, marked for
7       identification.)
8  BY MR. PARKER:
9   Q  I'm going to hand you, Dr. Flynn, Exhibit 24
10 which is a copy of your worksheet and various Dianon
11 file information pertaining to sample No. 72; is that
12 correct?
13  A  Correct.
14  Q  All right. Let me check my notes. This is a
15 patient presenting with cytopenias and a request to
16 rule out MDS?
17  A  Correct.
18  Q  Now, so I can go back and understand what you
19 did in other cases involving MDS, tell me why this
20 case you allowed 22 of the 25 antibodies.
21  A  Well, I don't know what ICD-9 288.7 stands

Page 275

1  for so I'd have to know if that played into my
2  thought processes or not.
3   Q  Well, did you know it at the time you did the
4  report?
5   A  I would have. I would have had a cheat sheet
6  of ICD-9 codes.
7   Q  Would it help you if I gave you your notes?
8   A  My notes aren't going to help me. I need the
9  codes. I have my notes right here.
10  Q  Okay.
11  A  So I'm not sure -- I can certainly tell you
12 the things -- although that's not going to be
13 valuable, the things that I made sure that we
14 screened for.
15  Q  So I want to make sure I understand. Here at
16 this deposition exploring why you reached certain
17 conclusions that you reached, neither your notes of
18 your evaluation, your actual report or looking at the
19 file allows you to tell me why 22 of the 25
20 antibodies Dianon used you determined to be medically
21 necessary in this case?

Page 276

1       MR. MOLOT: Objection. I think he
2   said he would have to see the ICD-9 codes.
3       MR. PARKER: I don't have it. Come
4   on. I'm not holding anything from the
5   doctor.
6       MR. MOLOT: I'm just saying you're
7   mischaracterizing his testimony.
8   A  There's a piece of information here, and I
9  don't know if it would be germane or not so I can't
10 address that.
11 BY MR. PARKER:
12  Q  You don't know whether it would be germane or
13 not, but without knowing that, you still can't tell
14 me why 22 antibodies in an MDS case were medically
15 necessary?
16  A  Well, I think they're intimately related,
17 correct?
18  Q  I don't know, Doctor. You're the expert.
19  A  Well, no, and the expert's telling you that I
20 don't have all the information.
21  Q  I've got to understand. If that was so

Page 277

1  important, explain to me why you didn't put it in
2  your notes or why you didn't put it in your report as
3  to why that critical piece of information is missing.
4       MR. MOLOT: Object.
5   A  Oh, I think there were several cases where
6  there were critical pieces of information missing,
7  but if I were to write everything germane to every
8  one of these cases from my perspective, we'd be
9  talking about 400 hours of work, not the number.
10 There is an additional piece of information here I
11 can just share with you in looking at this.
12      This patient has a percentage lymphocytes
13 of 70.4 percent so that would certainly explain the
14 workup for any kind of lymphoproliferative process.
15 The MDS issue addresses the various myeloid and
16 myelocytic markers. So that would address very
17 quickly at least 20 without having put them to
18 memory -- in fact, I have the chart here so I don't
19 have to put them to memory -- yeah. So that
20 warrants -- that piece of additional information
21 that's in the chart warrants doing everything but the

70 (Pages 274 to 277)

Page 278

1  three that I said I didn't think needed to be done.
2  BY MR. PARKER:
3    Q  Doctor, in almost every case regardless of
4  the presentation, with regard to T cells, you
5  permitted the use of 3, 4, 5 and 8, correct?
6    A  Correct.
7    Q  And in virtually every case -- not in this
8  one, but in virtually every case, you found
9  unnecessary 2 and 7?
10   A  Correct.
11   Q  Regardless of the presenting case, regardless
12 of the morphology. That's a pretty accurate
13 statement. In almost 400 cases, you found 2 and 7
14 not to be necessary?
15   A  Right, but I think the better way to frame it
16 is where I found it necessary what was the rationale
17 because there should be a rationale.
18   Q  Can you think of one case in which you found
19 CD2 to be medically necessary?
20   A  You'd have to show it to me. I don't know.
21   Q  I'm asking you: Sitting here today, do you

Page 279

1  remember ever saying to yourself, "You know, I
2  finally found one. In this one, CD2 is necessary"?
3    A  It's a guess, but I will say yes.
4    Q  You think? Okay.
5    A  But tell me I'm wrong.
6    Q  I have to save some things for trial, Doctor.
7    A  I'll be happy to get in front of a jury and
8  address that case. I think it will be enjoyable and
9  intellectual.
10   Q  You may be surprised.
11   A  I may be surprised. So may you.
12   Q  Why did you throw 7 in this case?
13   A  Well, because one of the issues here is MDS
14 which raises the issue of aberrant myeloid
15 maturation, and certainly some of the MDSs can end up
16 as an acute leukemia, and CD7 is one of the
17 antibodies that gets aberrantly expressed in that
18 evolution of the disease.
19   Q  And similarly you -- I cannot think of a case
20 in which you permitted the use of CD22. Is that
21 consistent with your recollection?

Page 280

1    A  That one I may have to tell you you're right
2  on.
3    Q  All right. And that's just because you don't
4  think it has much diagnostic value in any case?
5    A  Well, I think, first of all, to go back, it
6  has a redundancy with other antibodies here, and the
7  mirror I would hold up against that is where did that
8  ever play out in retrospect in any of these cases
9  being valuable, and the answer is I don't remember
10 one.
11       So it is a little bit of a circular
12 argument. I don't find it to have merit in this
13 panel. I understand why it's used. I understand
14 what it's used for. That having been said, in 400
15 cases, I do not remember once CD22 being the crux of
16 the importance of a diagnosis. So the proof
17 ultimately is in its value, and I think in 400 cases
18 it didn't demonstrate any value.
19   Q  Tell me is CD45 ever the crux of a diagnosis?
20   A  CD45 is important because you need to know
21 when you look at your population of cells what are

Page 281

1  the hematologic cells in that specimen and are there
2  other cells in there that are not hematologic.
3    Q  Move to strike. That was not my question.
4  My question was, picking up what you just said, can
5  you think of one case where CD45 was the crux, your
6  word, of the diagnosis?
7    A  Sure, sure. You have a metastatic carcinoma.
8  You do CD45 to see that a hundred percent of your
9  cells are staining, and, lo and behold, you get a low
10 number. There's a message there. There's not
11 another antibody in that panel that's going to tell
12 you what you just ran through the flow cytometer, but
13 there will be a piece of information saying whatever
14 these cells are they're not CD45 positive.
15   Q  So a piece of information translates into the
16 crux of a diagnosis?
17   A  You tell me. I find that very important
18 information as opposed to signing it out as negative
19 which is part of the intimation of these cases.
20   Q  So did you ever see a case where CD22
21 provided important information, not the crux of the

71 (Pages 278 to 281)

Page 282

1  diagnosis but important, helpful information?
2      A   I would say maybe supportive is another
3  comment.
4      Q   Let's go back to this case for a moment,
5  Doctor. Is a white cell count of less than 3 and a
6  hemoglobin count of less than 12.5 sufficient in your
7  opinion to justify the inclusion of the hairy cell
8  leukemia markers?
9      A   Well, you also have the preponderance of the
10 cells remaining as being lymphocytes. So, again,
11 this is an example where I wouldn't want to shut the
12 door too hard on a disease entity that's not
13 particularly common but is within reason.
14     Q   Let's go to another one and help me
15 understand how you did this one.
16             (Defendant's Exhibit No. 25,
17             collection of documents, Sample
18             No. 128, marked for
19             identification.)
20 BY MR. PARKER:
21     Q   And I'm going to mark as Exhibit 25 your

Page 283

1  workup of case No. 128, and you did this review in
2  December of 2005, right?
3      A   Correct.
4      Q   With your new perspective, right?
5      A   Correct.
6      Q   Okay. And this is a case also with a
7  provisional diagnosis of MDS?
8      A   Correct.
9      Q   So just so we're clear, we're talking about
10 the same condition we just talked about in case
11 No. 72, right?
12     A   What's the comparison?
13     Q   MDS here. We just got done with an MDS case
14     A   Well, and plus we added versus myelofibrosis
15 and also a history of splenomegaly.
16     Q   What's myelofibrosis?
17     A   It's fibrosis of the bone marrow.
18     Q   Thank you. This patient has a white blood
19 count, if my notes are correct, of 2.6 which is
20 better than the previous case, 72, marginally better,
21 right?

Page 284

1      A   Correct.
2      Q   And it had a hemoglobin count which was worse
3  than the previous case?
4      A   Right.
5      Q   And this patient presents with anemia?
6      A   Correct.
7      Q   Now, does this patient get the full 22
8  antibodies?
9      A   Well, obviously not. The patient got 17.
10     Q   Well, now help me understand. Why did we get
11 shortchanged on this lady -- excuse me -- this
12 person, we only get 17 with the same condition -- I
13 won't describe the lab values -- and the previous
14 patient about 22?
15             MR. MOLOT: Object to the form of the
16         question.
17     A   Let me just read the entire chart. Well, two
18 comments. One is when you look at this patient's
19 differential, now you don't have an absolute
20 preponderance of lymphocytes, first of all. You have
21 actually a minority population. So her differential

Page 285

1  is different or this patient's -- I don't even know
2  if it's a he or she is different than the first
3  patient. So that would be point No. 1, and that may
4  have been my driving thought process in this.
5  BY MR. PARKER:
6      Q   So just so we're clear, would the lab values
7  as they are, the white blood count for case No. 128
8  is a little bit higher -- that's better, right?
9      A   No, not necessarily, but it's a little bit
10 higher. That's a fair comment.
11     Q   And it's a little bit lower for hemoglobin,
12 right, than the previous case?
13     A   Correct.
14     Q   In this case, you say, "I have no concerns
15 about hairy cell leukemia. I'm not going to allow
16 them to put the markers in for hairy cell leukemia,"
17 right?
18             MR. MOLOT: Objection.
19     A   Those wouldn't be my words, but the outcome
20 is the same, yes, did not put the markers in.
21 BY MR. PARKER:

Page 286

1  Q  So this patient you have already determined
2  has virtually no chance of having hairy cell
3  leukemia, and we're not going to include it in the
4  workup?
5      MR. MOLOT:  Objection, asked and
6      answered.
7  A  First of all, any patient is highly unlikely
8  to have a diagnosis of hairy cell leukemia, but to
9  put this in the context of the mentality of you
10 haven't burned every bridge behind you if this
11 patient, in fact, does have hairy cell leukemia, the
12 panel allowed is going to pick up that there is a
13 lymphoproliferative process.
14 BY MR. PARKER:
15 Q  Now, as we discussed, CD38 has nothing to do
16 with hairy cell leukemia.  In the previous case, you
17 allowed it.  In this one, you said they were wrong to
18 include it.  What's your reason for that?
19     MR. MOLOT:  Objection.
20 A  It's not listed on their panel, the previous
21 case.

Page 287

1  BY MR. PARKER:
2  Q  Well, then can I assume that since you didn't
3  allow it in case No. 128, if they had done the test
4  in May of 2000 using CD38, you would have said they
5  were wrong to use that as well?
6      MR. MOLOT:  Objection.
7  A  I think that's a fair comment, yes.
8  BY MR. PARKER:
9  Q  And what about CD25?  It made the cut the
10 first time through on case No. 72, and now they were
11 wrong to use CD25?
12     MR. MOLOT:  Objection.
13 A  Well, we can go through each of the three
14 hairy cell antibodies, but that's one of the three.
15 We've already discussed that.
16 BY MR. PARKER:
17 Q  I stand corrected.  I forgot that.  That's
18 right.  That would be 11C, 25 and 103?
19 A  Correct.
20 Q  Thank you.
21     MR. MOLOT:  Five-minute break,

Page 288

1  bathroom break?
2      MR. PARKER:  Sure, absolutely.
3      (A short break was taken.)
4      MR. MOLOT:  Just before we start, I
5  want to clarify some of the charts that you
6  showed him I don't think are complete, and I
7  don't mean to imply you're playing games, but
8  maybe your staff missed things.  I went and
9  pulled one, for example, Exhibit No. 23.
10     You gave the sheet, and the -- there's
11 the requisition form which is PP3811, and
12 then the next thing is PP3813.  What your
13 staff didn't put in is PP3812 which seems to
14 be a CBC result so I think there are
15 documents in here that you're showing him
16 that are incomplete, and I just want that put
17 on the record.
18     MR. PARKER:  Sure, and if you want at
19 the end of my seven hours to question the
20 doctor about any additional documents, you
21 certainly have my blessing to do so.  I'm not

Page 289

1  going to object.  If you think that will
2  help, by all means, do that.  By my count, I
3  have two hours left of my seven-hour
4  deposition.
5      (Defendant's Exhibit No. 26,
6      collection of documents, Sample
7      No. 102, marked for
8      identification.)
9  BY MR. PARKER:
10 Q  Let's proceed with Exhibit 26, Doctor.  These
11 are -- with comments by counsel now on the record, as
12 they were, these are records.  I will not represent
13 to you that they are complete records since we've
14 already had doubt cast upon that.  So these are
15 records from patient No. 102.
16     You did this review in August of 2003, and
17 you came back in December and did some more work it
18 looks like; is that right?
19 A  Yes, correct.
20 Q  All right.  Firstly, this is yet another case
21 presenting with a provisional diagnosis of MDS?