## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA, | ) <br>) <br>) |
| Plaintiffs, | ) <br>) |
| v. | )    No. 3:02 CV 1573(MRK) <br>) |
| DIANON SYSTEMS, INC., | ) <br>)    November 1, 2006 |
| Defendant. | ) <br>) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.      Summary Judgment Standard ........................................................................... 2

II.     Dianon Ignored The Medical Necessity Requirement ........................................ 3

        A.      Tests Must Be Medically Necessary and Reasonable for the Patient ................... 3

        B.      Dianon Had a One-Size-Fits-All Flow Cytometry Panel ........................................ 7

        C.      Industry Practice Does Not Include Billing for A
                One-Size-Fits-All Panel ...................................................................................... 12

III.    Dianon Knowingly Billed for Medically Unnecessary Tests ........................................ 18

        A.      The False Claims Act ........................................................................................... 18

        B.      Dianon Knowingly Billed for Medically Unnecessary Tests ................................ 20

        C.      The Impath Decision ........................................................................................... 24

        D.      The Government Did Not Have Knowledge of the Falsity
                of the Claims ....................................................................................................... 25

IV.     The Government's Common Law Claims Governed By Federal
        Common Law ................................................................................................................. 28

V.      Dianon Has Not Met Its Burden to Show That There Is No Issue of
        Fact for Trial ................................................................................................................. 29

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
        477 U.S. 242 (1986) ............................................................................................. 3, 20, 30

Anesthesiologists Affiliated v. Sullivan,
        941 F.2d 678 (8th Cir. 1991) ........................................................................................ 11

In re Cardiac Devices Qui Tam Litigation,
        221 F.R.D. 318 (D. Conn. 2004) ............................................................................... 5, 19

Celotex Corp. v. Catrett,
        47 U.S. 317 (1986) ........................................................................................................ 2

Clearfield Trust Co. v. United States,
        318 U.S. 363, (1943) ................................................................................................... 28

Harrison v. Westinghouse Savannah River Corp.
        176 F.3d 776, (4th Cir. 1999) ..................................................................................... 19

Heckler v. Cmty. Health Servs.,
        467 U.S. 51, (1984) .................................................................................................. 6, 11

Heckler v. Ringer,
        466 U.S. 602, (1984) ................................................................................................. 4, 28

Luckey v. Baxter Healthcare,
        2 F. Supp. 2d. 1034 (N.D. Ill. 1998) ........................................................................... 15

Matarese v. Moore-McCormack Lines,
        158 F.2d 631 (2d Cir.1946) ......................................................................................... 28

Mount Sinai Hosp., Inc. v. Weinberger,
        517 F.2d 329 (5th Cir.1975) ...................................................................................... 4, 28

Pulaski v. Stratford Bd. of Educ.,
        No. 3:04CV2015, 2006 WL 2361724 (2006) ............................................................ 2, 3

Sims v. Apfel,
        530 U.S. 103 (2000) ..................................................................................................... 25

United States ex rel. Anderson v. Northern Telecom, Inc.,
        52 F.3d 810 (9th Cir. 1995) ............................................................................................ 16

United States ex rel. Burlbaw v. Michael Orenduff,
        400 F. Supp. 1276 (D.N.M. 2005) .................................................................................. 11

United States ex rel. Harris v. Bernard,
        275 F. Supp. 2d 1 (D.D.C. 2003) .................................................................................... 16

United States ex rel. Kneepkins v. Gambro Healthcare, Inc.,
        115 F. Supp. 2d 35 (D. Mass. 2000) .............................................................................. 14

United States ex rel. Milam v. The Regents of the Univ. of California,
        912 F. Supp. 868 (D. Md. 1995) ..................................................................................... 16

United States ex rel Quirk v. Madonna Towers, Inc.,
        278 F.3d 2002 (8th Cir. 2002) ........................................................................................ 11

United States ex rel. Swafford v. Borgess Med. Ctr.,
        98 F. Supp 2d. 822 (W.D. Mich. 2000) .......................................................................... 15

United States ex rel. Wang v. FMC Corp.,
        975 F.2d 1412 (9th Cir. 1992) ................................................................................... 16, 26

United States v. Adler,
        623 F.3d 1287 (8th Cir. 1980) ........................................................................................ 24

United States v. Southland Mgmt. Corp.,
        326 F.3d 669 (5th Cir. 2003) .......................................................................................... 26

United Seniors Ass'n v. Shalala,
        182 F.3d 965 (D.C.Cir.1999) ..................................................................................... 4, 28

United States ex rel. Bettis v. Odebrecht Contractors,
        297 F. Supp. 272 (D.D.C. 2004) .................................................................................... 11

United States ex rel. El-Amin v. The George Washington Univ.,
        Civ No. 95-2000, 2005 WL 3275997 (D.D.C. Aug. 31, 2005) ...................................... 12

United States ex rel. Hagood v. Sonoma County Water Agency,
        929 F.2d 1416 (9th Cir. 1991) ........................................................................................ 25

United States ex rel. Hochman v. Nackman,
        145 F.3d 1069 (9th Cir. 1998) ........................................................................................ 11

United States ex rel. Johnson v. MacNeal Health Servs. Corp.,
    No. 99C 6098, 2003 WL1627815 (N.D. Ill. 2003) ......................................................... 16

United States ex rel. Lamers v. City of Green Bay,
    168 F.2d 1013 (7th Cir. 1999) .......................................................................................... 11

United States ex rel. Lindenthal v. General Dynamics Corp.,
    61 F.3d 1402 (9th Cir. 1995) ............................................................................................ 11

United States ex rel. Mikes v. Strauss,
    274 F.3d 687 (2d Cir. 2001) .............................................................................. 5, 8, 15, 19

United States v. Borin,
    209 F.2d 145 (5th Cir. 1954) ............................................................................................ 28

United States v. Chen
    No. 2:04CV00859, 2006 WL 1554546 (D. Nev. 2006) .................................................... 21

United States v. Kimbell Foods, Inc.,
    440 U.S. 715, (1979) ........................................................................................................ 28

United States ex rel. Morton v. A Plus Benefits, Inc.
    139 Fed. Appx. 980 (10th Cir. 2005) ................................................................................ 11

United States v. Mead,
    426 F.2d 118 (9th Cir. 1970) ...................................................................................... 28, 29

United States v. Mendoza,
    464 U.S. 154 (1984) .......................................................................................................... 25

United States v. Napco Int'l, Inc.,
    835 F.2d 493 (D. Minn. 1993) .......................................................................................... 11

United States v. Prabhu
    442 F. Supp. 2d 1008 (D. Nev. 2006) ............................................................................... 15

United States v. Rogan,
    No. 02 C 3310, 2006 WL 2860972 .................................................................................. 28

United States v. Rutgard,
    116 F.3d 1270 (9th Cir. 1997) .......................................................................................... 14

United States v. Shaw,
    115 F. Supp. 2d 152 (D. Mass. 2000) .............................................................................. 16

United States v. Swinton,
  75 F.3d 374 (8th Cir. 1996) ............................................................................................. 24

United States v. Wurts,
  303 U.S. 414, (1938) ........................................................................................................ 28

White Motor Co. v. United States,
  372 U.S. 253 (1963) ................................................................................................... 20, 30

## STATUTES

18 U.S.C. §§ 1001 ............................................................................................................ 24

18 U.S.C. § 1344 .............................................................................................................. 24

31 U.S.C. § 3729 ................................................................................................... 18, 19, 25

42 U.S.C. § 1320c-5(a)(1) ................................................................................................. 3

42 U.S.C. § 1395y(a)(1)(A) ..................................................................................... 3, 4, 10

## RULES

42 C.F.R. § 411.15(k)(1) ............................................................................................... 4, 5

32 C.F.R. § 199 ............................................................................................................. 4, 6

Rule 56 ...................................................................................................................... 2, 3, 24

Rule 56(a) ....................................................................................... 5, 18, 17, 24, 25

Rule 56 (e) ....................................................................................................................... 3

## MISCELLANEOUS

U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of
  Hematologic Neoplasia By Flow Cytometry: Medical Indications,
  Cytometry 30:249-263 (1997) .......................................................................................... 10

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| ex rel. DR. JAMES J. TIESINGA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 3:02 CV 1573(MRK) |
| | ) |
| DIANON SYSTEMS, INC., | ) |
| | ) November 1, 2006 |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dianon's motion for summary judgment is a study in misdirection. Much as Dianon

wishes that this were a case involving a "scientific dispute" or the "standard of care," it is not.

This case is not about the practice of medicine; it is about fraudulent billing. This case is about

Dianon's one-size-fits-all practice of billing Medicare for tests it knew were not medically

necessary because Dianon pathologists did not use them in their diagnoses.

Dianon claims that the United States cannot make a case as a matter of law because it

cannot point to a controlling rule, regulation or statute. In making this argument, Dianon

completely ignores that portion of the Medicare statute which requires that providers only bill for

medically necessary tests and procedures. Dianon also does not mention the fact that it certified

to CMS with every billing that *Dianon* had determined that *each* of the antibodies it was billing

for was medically necessary for the diagnosis or treatment of *that* patient.

Dianon also tries to explain away a document that amounts to an admission by Dianon

that any routine billing of more than 18 antibodies was not medically necessary. Dianon ignores

all of the evidence in the record that shows that the panel of antibodies it billed for was chosen not for the "diagnosis or treatment" of a disease but for other reasons: to maximize reimbursement from Medicare, to compete with other labs for business, and to meet its business objectives of doing as many tests as possible in as short a time as possible.

The point of the Government's case is not, as Dianon would have the Court believe, to second-guess the medical judgment of the pathologists at Dianon. Rather, the Government contends that, in violation of the clear requirement of the Medicare statute that it only bill for medically necessary tests, Dianon exercised *no* medical judgment in deciding what to bill for and simply billed for 26 (or18) antibodies for every patient. By simply ignoring the requirement that they bill only for medically necessary tests, Dianon knowingly submitted false claims to the Government for tests that were not medically indicated or necessary.

## FACTS

The facts are as set forth in the accompanying Rule 56(a)(2) Statement and Statement of Disputed Issues of Material Fact.

## ARGUMENT

### I.    Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 47 U.S. 317, 322 (1986); *Pulaski v. Stratford Board of Education*, 2006 WL 2361724, Slip Op. p. 1 (D. Conn. August 15, 2006). A factual dispute will be genuine if a reasonable jury could return a verdict for the

2

nonmoving party. Summary judgment is appropriate only in cases where the evidence is so lop-sided that no reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Fed. R. Civ. P. 56(e); Pulaski v. Stratford Board of Education*, 2006 WL at 2361724. In assessing whether the movant has met its burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255. Once the moving party has met its burden, the non-movant must show a genuine dispute regarding any issue for which it will bear the burden of proof. *Celotex*, 477 U.S. at 324.

In this case, Dianon has not met its burden. As set forth in the accompanying Local Rule 56(a)(2) Statement and Statement of Disputed Issues of Material Fact, there is clearly sufficient evidence of a knowing submission of claims for medically unnecessary tests to require that the case be tried by the jury. Dianon has not shown that it is entitled to judgment as a matter of law.

## II.    Dianon Ignored The Medical Necessity Requirement

### A. Tests Must Be Medically Necessary and Reasonable for the Patient

Dianon first asserts that it should be granted summary judgment because the United States can point to no controlling rule or regulation which Dianon has violated. *Defendant's Memorandum p. 1.* That is simply absurd. The controlling rule or regulation applicable to Dianon's conduct is the clear and explicit requirement in the Medicare statute that healthcare providers only bill for medically necessary procedures. *42 U.S.C. § 1395y(a)(1)(A); 32 C.F.R. § 199* (similar medical necessity requirement for Tricare).

Medicare covers only reasonable and necessary medical services, *42 U.S.C. §*

3

*1395y(a)(1)(A)*, and requires that the services provided be economical medical services, and then, only when, and to the extent, medically necessary. *42 U.S.C. § 1320c-5(a)(1)*. The federal Medicare statute and regulations exclude from payment services that are not reasonable and necessary:

(a) Items or services specifically excluded

Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services--

(1)(A) which, except for items and services described in a succeeding paragraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

*42 U.S.C. § 1395y (a)(1)(A); see also 42 C.F.R. § 411.15(k)(1); see also 32 C.F.R. § 199.* Thus, the Medicare statute clearly requires that all tests billed to Medicare must be medically necessary for the diagnosis or treatment of the patient for whom the services were provided.

Because this section contains an express condition of payment - "no payment may be made"- it explicitly links each Medicare *payment* to the requirement that the particular item or service be "reasonable and necessary." The Supreme Court has noted that this section precludes the government from reimbursing a Medicare provider who fails to comply. *See Heckler v. Ringer,* 466 U.S. 602, 605 (1984); *see also United Seniors Ass'n v. Shalala,* 182 F.3d 965, 967 (D.C.Cir.1999) ("If a service is deemed not to have been reasonable and necessary, Medicare will not make payment and the doctor generally is prohibited from charging the patient."); *Mount Sinai Hosp., Inc. v. Weinberger,* 517 F.2d 329, 334 (5th Cir.1975) (explaining that § 1395y controls whether particular services are covered by Medicare).

4

Medicare also does not pay for "screening" tests, except in certain circumstances specifically set forth in the regulations. *42 C.F.R. § 411.15.* Screening tests are tests performed in the absence of signs, symptoms, complaints, personal history of disease or injury.

In order to bill the Medicare and Tricare Programs, a provider must submit an electronic or hard-copy claim form called a CMS 1500. When the CMS 1500 is submitted, the provider certifies that the services in question were medically indicated and necessary for the health of the patient:

> SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of *this* patient and were personally furnished by me or my employee under my personal direction.

*CMS Form 1500 (emphasis added); Statement of Disputed Issues of Material Fact ¶ 1.*[1] In this case, Dianon submitted its claims for payment to the Government on form 1500s and in each case certified that each of the services listed was medically indicated and necessary for the health of the particular patient for whom the services had been provided. Dianon's claim in every case was for 26 units of CPT Code 88180.[2] *Disputed Issues ¶ 1.* Certifying that a claim is medically necessary when it was not renders the claim for payment legally false. *See e.g. United States ex rel. Mikes v. Strauss*, 274 F.3d 687, 697-98 (2d Cir. 2001); *In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 346 (D. Conn. 2004).

---

[1]     References are to the United States' Statement of Disputed Issues of Material Fact which accompanies the United States' Local Rule 56(a)(2) Statement (hereinafter "Disputed Issues").

[2]     Or 18 units in all cases during the time period July 1997 through December 31, 2000. *Disputed Issues ¶ 1.*

CMS and the HHS OIG have given guidance to laboratories on types of activities that might constitute Medicare fraud including billing for tests that are not medically necessary. *See e.g., 63 Fed. Reg. 45076, 45079 (1998); Disputed Issues ¶ 2.* In addition, the Connecticut Carrier gave guidance to providers in Connecticut about types of activities that might involve fraud including:

Claims for a panel or series of lab tests when only part of the group of tests in the panel were medically indicated for the patient's signs, symptoms or complaints.

*Disputed Issues ¶ 2.* Thus, Dianon was on notice that billing for a panel of tests when not all of the tests included in the panel were medically necessary for the patient was potentially fraudulent billing. See also, the Tricare regulations, *32 C.F.R. 199.9(c)(5)* (fraud defined in a part - billing for claims involving ". . . persistent overutilization of services without proper regard for results, the patient's ailments, condition [or] medical needs . . . ").

All healthcare providers, including laboratories, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare, and a provider has a duty to know the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the requirement that they bill Medicare only for medically necessary tests. Participants in the Medicare program have a "duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Heckler v. Community Health Servs., 467 U.S. 51, 64 (1984).* "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," therefore Medicare holds health providers "to the most demanding standards in [their] quest for public funds." *Id.* at 63.

6

### B. Dianon Had a One-Size-Fits-All Flow Cytometry Panel

In this case, Dianon set up a one-sized-fits-all panel of antibodies aimed at detecting "a majority of hematopoetic malignancies" in one pass. *Disputed Issues ¶¶ 4-6, 13.* As a result, Dianon set up a panel of tests which would virtually always have some antibodies that were not medically necessary in a particular case because not every antibody is relevant to every disease. *Disputed Issues ¶¶ 12-13, 16.* The flow cytometry test was performed without regard to the signs or symptoms of the patient. *Disputed Issues ¶¶ 4-6.* Dianon then exercised no medical judgment about which antibodies to bill to Medicare, but simply billed for all 26 in all cases. *Disputed Issues ¶¶ 6-8.* In fact, the pathologists played no role in determining what to bill for; they had no idea what Dianon was billing Medicare for because those decisions were made by the operations and marketing personnel. *Disputed Issues ¶¶ 10-11, 19.* The pathologists recognized after the fact that some of the antibodies were not relevant to particular cases, but no one asked them what to bill to Medicare. *Disputed Issues ¶¶ 12, 16.*

Dianon argues, however, that because reasonable people could disagree about which antibodies are needed for a particular case, Dianon's claims could not be false within the meaning of the False Claims Act. *Defendant's memorandum p. 5.* This is not a case like those cited by Dianon where a regulation is ambiguous and can have two equally reasonable readings. An antibody is either needed to diagnose a particular patient or it is not. Either Dianon used a particular antibody to diagnose a patient or it did not.

One important piece of evidence about whether particular antibodies were medically necessary to Dianon's pathologists is the memorandum written by Dr. Goyette, Dianon's chief

7

hematopathologist, at the request of Dr. Amberson, the chief medical officer at Dianon, in July of

1997. *Disputed Issues ¶ 20.* That memo lists 18 antibodies and states:

> . . .we believe the following 18 antibodies are essential for the accurate and complete
> initial work up of flow cytometry specimens. We believe that their routine usage can be
> justified to insurance carriers.

*Disputed Issues ¶ 20.* Dr. Amberson asked Dr. Goyette to provide him with a list of essential

antibodies or as Dr. Goyette described it:

> Hence I was asked to identify those antibodies that any responsible payor with knowledge
> of the complexities of modern hematopathology would agree were essential and for which
> they could never question medical necessity.

*Disputed Issues ¶ 20.* This document clearly indicates that Dianon's pathologists thought that,

even in a one-sized-fits-all panel, at most 18 antibodies could be justified as medically necessary.

*Disputed Issues ¶ 20.* However, from January of 1996 until July of 1997 and from January 1,

2001 until December 31, 2004, Dianon billed Medicare for 26 antibodies in all cases. *Disputed*

*Issues ¶ 22.* Clearly, if Dianon's pathologists only believed that 18 were necessary, 8 antibodies

of every billing were not. As a result, when Dianon submitted claims for those eight antibodies,

it submitted claims for medically unnecessary tests, and those claims were legally false. *Mikes*,

274 F.3d at 697-98.

     However, Dianon did not believe that even these 18 antibodies were necessary in all

cases. Dr. Mishilani, one of the co-directors of the hematopathology lab, testified that once she

reviewed the results of flow cytometry testing, it was apparent that some of the markers were not

necessary to the diagnosis in that case. *Disputed Issues ¶¶ 16, 28-31.* However, because Dianon

never asked her what she thought and because she had no idea what Dianon was billing for,

Dianon billed for a complete panel of antibodies in all cases. *Disputed Issues ¶ 16.*

Additional evidence that Dianon did not think particular antibodies were necessary in particular cases are those cases where flow cytometry is not medically indicated or useful, other than as a screening tool. For example, according to the medical literature and Dianon's own documents, flow cytometry is not useful or indicated to diagnose Chronic Myelogeonous Leukemia (CML).[3] *Disputed Issues ¶ 7.* Yet, Dianon billed Medicare for all 26 antibodies in cases of suspected, or already diagnosed, CML - sometimes repeatedly for the same patient. *Disputed Issues ¶¶ 7-8.* Similarly, Dianon's pathologists knew that flow cytometry is not indicated or useful to diagnose Hodgkin's disease; yet, Dianon billed Medicare for a complete panel of antibodies in cases of suspected or diagnosed Hodgkin's - sometimes repeatedly for the same patient. *Disputed Issues ¶¶ 7-8.*

Further evidence of the lack of medical necessity for Dianon's tests are those tests where Dianon billed for full panels of 26 antibodies for cases where Dianon had already diagnosed the patient ("repeat tests"). *Disputed Issues ¶ 9.* Dianon has no explanation for why a full panel of antibodies would be needed to diagnose or treat the patient once a diagnosis had already been made, other than for screening purposes, which Medicare does not pay for. *Disputed Issues ¶ 9.*

Finally, from January 1, 1996 until mid-1997, Dianon billed for four antibodies the lab was not even performing. *Disputed Issues ¶ 18.* Clearly, there was no medical necessity for antibodies the doctors were not even using.

Thus, the record is replete with evidence of claims submitted by Dianon which were false

---

[3]     A limited panel of antibodies might be useful if, after reviewing a specimen it appears that the specimen contains blasts (blast crisis), but not 26 or 18 antibodies. *Disputed Issues ¶ 8.*

9

because Dianon billed for tests Dianon did not need to diagnose the patient in light of the

patient's signs and symptoms. There is no ambiguity, or scientific debate, about the medical

necessity of the tests. Dianon simply did not need all of the antibodies to diagnose particular

patients and billed for them anyway.

The cases cited by Dianon relating to ambiguous regulations are also not relevant. There

is no legal dispute about the meaning of the term "medical necessity' in this case. That

definition is clearly set out in the statute and regulations: a procedure must be "reasonable and

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a

malformed body member." *42 U.S.C. § 1395y (a)(1)(A); see also 32 C.F.R. § 199.* Further,

Dianon certified in each case that each antibody being billed for was "medically indicated and

necessary to the health of *this* patient." *CMS 1500 (Emphasis added).*

However, Dianon attempts to argue that this clear standard is somehow made ambiguous

by the fact that hematopathologists do not agree on which antibodies are useful in various

circumstances. First, Dianon neglects to mention that while the consensus documents referred to

in Dianon's brief set forth some consensus within the flow cytometry community about what

antibodies are useful to detect and diagnose various disease states, and the "optimal" number to

detect and diagnose certain disorders,[4] those documents also point out that flow cytometry has no

utility in diagnosing or detecting certain diseases, e.g. Hodgkin's disease. *Disputed Issues ¶¶ 35-*

---

[4]*U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia By Flow Cytometry: Medical Indications, Cytometry* 30:249-263 (1997) (*herinafter the "U.S.-Canadian Consensus"*) *at p. 252, and Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting, Cytometry, 46:23-27 (2001) (hereinafter the "International Consensus")*

10

*36, 63.* However, even if that were not the case, Dianon's argument must fail because the

Government is alleging that even *Dianon* did not think certain antibodies were necessary in

particular cases. The Government is not questioning Dianon's exercise of medical judgment;

rather, the Government is asserting that Dianon did not exercise medical judgment in

determining what to bill for. As a result, the cases cited by Dianon relating to ambiguity of

regulations are simply inapposite.[5]

Further, if Dianon believed at the time it billed Medicare that there was an ambiguity

about how it should bill, Dianon had a duty to inquire and clarify ambiguities. *Heckler v.

Community Home Health Servs.*, 467 U.S. at 64. A failure to do so constitutes evidence of at

least "deliberate ignorance." It should not matter that, in the context of later litigation, the

defendants are able to find some theoretical ambiguity in the governing standard, if all of the

facts and circumstances at the time that the claims were submitted show, for example, that they

made themselves deliberately ignorant of the proper application of the regulation. To hold

---

[5] *United States v. Napco International, Inc.*, 835 F.2d 493 (D. Minn. 1993) (case decided
on fact that allegedly false certifications were literally true); *U.S. ex rel. Burlbaw v. Michael
Orenduff*, 400 F. Supp. 1276 (D.N.M. 2005) (conflicting statements of Government agencies led
to legal dispute about eligibility for Government program); *U.S. ex rel Quirk v, Madonna
Towers, Inc.*, 278 F.3d 2002 (8th Cir. 2002) (no evidence of intent); *United States ex rel. Morton
v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980 (10th Cir. 2005) (expression of legal opinion about
ambiguous regulation does not give rise to FCA liability); *United States ex rel. Lindenthal v.
General Dynamics Corp.*, 61 F.3d 1402 (9th Cir. 1995) (relator alleged design drawings did not
meet specifications but court found that the drawings satisfied the Government so no FCA
liability); *United States ex rel. Hochman v. Nackman,* 145 F.3d 1069 (9th Cir. 1998) (allegedly
fraudulent practices permitted by VA regulations); *United States ex rel. Lamers v. City of Green
Bay,* 168 F.2d 1013 (7th Cir. 1999) (no FCA liability where city was simply confused about
regulations); *United States ex rel. Bettis v. Odebrecht Contractors,* 297 F. Supp. 272 (D.D.C.
2004) (faulty or mistaken engineering judgments about estimates of future costs not grounds for
FCA liability).

otherwise would mistakenly absolve of liability any defendant who can advance, post-hoc, a plausible basis for his submission of admittedly false claims.

Dianon certainly was not shy about discussing issues with the carrier when it would benefit them. They had several meetings with and much correspondence with the carrier medical director about expanding the number of diagnosis codes in the Connecticut Local Medical Review Policy (LMPR) for which flow cytometry was billable.

## C.    Industry Practice Does Not Include Billing For A One-Sized-Fits-All Panel

Dianon claims that the use of its comprehensive antibody panel is an accepted industry practice and is, therefore, reasonable. However, merely because a practice is an acceptable business practice does not determine whether a test is medically necessary and billable to the Government. Dianon claims that CMS or the carrier should have told them how to conduct their business, and since CMS did not tell Dianon how to perform flow cytometry, Dianon could establish whatever procedure it wanted and bill Medicare for the results, even if not all of the tests were useful in all cases. *Defendant's Memorandum p. 3.*

Dianon's argument is very simply wrong. As Dr. Delli Carpini, the carrier medical director, and Ms. Stone, the Government's CMS expert, testified, Medicare does not tell companies how to structure their businesses. *Disputed Issues ¶ 37.* However, if a company decides to bill Medicare, they must use medical judgment and only bill for tests that are medically necessary for the particular patient. As one court noted, it is imperative that Medicare providers realize that federal regulations are requirements for receiving reimbursement for services. The regulations are not the Government telling providers how to practice medicine;

12

providers can practice as they please, however, they should not send the bill to Medicare unless the billings meet the legal requirements for payment. *See, United States ex rel. El-Amin v. The George Washington University*, 2005 WL 3275997, Slip Op. p. 7 (D.D.C. August 31, 2005).

Thus, the onus was not on CMS or the carrier to tell Dianon that it should use one approach or another to conduct flow cytometry tests. The onus was on Dianon to ensure that the tests it billed to CMS were medically necessary for a particular patient based on that patient's signs or symptoms. *Disputed Issues ¶ 34*. In fact, the Connecticut carrier has provided some relevant guidance about appropriate and inappropriate billing of panels of tests:

Other types of potential fraud include:

Claims for a panel or series of tests when only part of the group of tests in the panel were medically indicated for the patient's signs, symptoms or complaints.
*Disputed Issues ¶ 2*. Thus, Dianon was on notice that it had to bill for only those tests justified by the signs or symptoms of the patient. Dianon completely ignored that guidance and chose instead to bill for a one-sized-fits-all panel. *Disputed Issues ¶ 6*. As Dr. Delli Carpini noted during his deposition, it was impossible for 100% of the antibodies to be useful in 100% of the cases because every antibody would not be pertinent to every potential diagnosis. *Disputed Issues ¶ 3*.

If Dianon's argument were correct, Dianon could choose to perform any number of antibodies for purely business reasons and then bill Medicare for all antibodies in all cases regardless of the utility of the antibodies to any particular case. For example, Dianon could establish a panel of 45 or 60 antibodies in an attempt to avoid having to do any add-on tests, to improve the efficiency of the lab and to improve turn-around-time and then bill all 45 or 60 antibodies to Medicare, even though some would be useful only infrequently to detect or

13

diagnose very rare diseases. And, according to Dianon, if the carrier or CMS had not specifically instructed Dianon not to bill in that manner, all 45 or 60 antibodies would be medically necessary and billable in all cases.

Dianon's argument turns the whole process on its head. The regulation requires that Dianon determine what is medically necessary, based on the signs and symptoms of the patient, and certify to CMS that all of the tests billed were necessary for that patient. Procedures chosen for business reasons or for reasons of profitability do not meet the definition of medical necessity. *See e.g., U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000).[6] See also, *United States v. Rutgard,* 116 F. 3d 1270, 1281 (9th Cir. 1997) in which the court found that a doctor could be held liable for submitting false claims for a procedure even though there was no Medicare guidance on the specific procedure where there was evidence that he was performing the procedure in such a way as to ensure that Medicare would reimburse him.

Dianon points to various "consensus" documents as supporting its approach of using a "comprehensive" panel of antibodies. Dianon argues that because these consensus documents recognize three approaches to testing (screening, targeted and comprehensive), that its decision to use a comprehensive panel is within the standard of care. However, these consensus documents do not support Dianon's position. *Disputed Issues ¶ 35-36.* First, they do not establish "comprehensive" panels as an industry standard. *Disputed Issues ¶ 35-36.* While these

---

[6]        It is interesting to note that in 2001, when Dianon resumed billing for 26 antibodies after having concluded that only 18 were medically necessary, Dianon received an additional $262 dollars for *every* flow cytometry panel it billed to Medicare for the 8 antibodies Dianon had concluded were not medically necessary.

14

consensus documents point out that labs perform flow cytometry in three general ways (screening, targeted and comprehensive), these consensus documents do not address the issue of billing. *Disputed Issues ¶ 35-36.* These documents state that doing a comprehensive panel is acceptable as a method of doing business, and actually might be preferable in high-volume reference labs; however, the consensus documents do not address what labs who perform a comprehensive panel should bill to Medicare. *Disputed Issues ¶ 35-36.* Rather, they set forth a view of what antibodies would be useful for various suspected disease states in particular cases based on the signs and symptoms of the patients, i.e. the "suspected diagnosis." *Disputed Issues ¶ 35-36.* In fact, these documents support the Government's position in many respects. *Disputed Issues ¶ 35-36.* The documents set forth various antibody combinations which might be useful depending on what the "suspected diagnosis" is. *Disputed Issues ¶ 35-36.* Further, the panels of useful antibodies connected to the various disease states involved are much smaller than Dianon's comprehensive panel. *Disputed Issues ¶ 35-36.* They also point out that flow cytometry is not useful for diagnosis of certain suspected diseases such as CML and Hodgkins disease. *Disputed Issues ¶ 35-36.*

The cases Dianon cites relating to standard of care also do not help its case. This is not a "quality of care" case like most of the cases cited by Dianon. For example, *United States v. Prabhu,* 442 F. Supp. 2d 1008 (D. Nev. 2006), involved an allegation that the doctor was billing improperly because he was not including a particular procedure as a part of the test he was billing for - i.e. that he was not properly performing the test. There was also evidence in that case that the carrier had directed the doctor about what CPT code to use for billing the procedure he was performing. That is not the case here.

15

The other cases cited by Dianon also involved allegations of substandard care. *See e.g. Mikes,* 274 F3d 687 (defendant's performance of spirometry tests did not meet standards); *Luckey v. Baxter Healthcare,* 2 F. Supp. 2d. 1034 (N.D. Ill. 1998) (dispute about whether a particular blood screening procedure was adequate); *U.S. ex rel. Swafford v. Borgess Medical Center*, 98 F. Supp 2d. 822 (W.D. Mich. 2000) (dispute over whether doctors properly interpreted ultrasound tests); *U.S. ex rel. Milam v. The Regents of the University of California,* 912 F. Supp. 868 (D. Md. 1995) (scientific dispute about proper research procedures); *U.S. ex rel. Wang v. FMC Corp.,* 975 F.2d 1412 (9th Cir. 1992) (relator alleged faulty calculations by engineering firm); *U.S. ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810 (9th Cir 1995) (telephone switch failed to work properly and Government was aware of the faulty performance).

Whether Dianon's practice of performing a standard panel of 26 antibodies in all cases is within the standard of care is simply a red herring. The United States is not alleging that Dianon's work was substandard or that they were not doing something they should have been doing or that they were doing one thing and claiming it was something else. The United States is not questioning the medical judgment of Dianon's pathologists in *performing* the tests. The United States is alleging that Dianon exercised no medical judgment in deciding *what to bill* the Government for as they were required to do by the clear medical necessity requirement in the relevant statutes. The facts of this case are more akin to those cases where a lab set up a test panel and charged Medicare for it in all cases regardless of whether all elements of the panel were useful in particular cases. *See e.g. United States v. Shaw*, 115 F. Supp. 2d 152, 157 (D. Mass. 2000); *see also, United States ex rel. Johnson v. MacNeal Health Services Corp.*, 2003 WL1627815, Slip op. at p. 2 (N.D. Ill. March 27, 2003) (defendant could be held liable under the

16

FCA for bundling tests together to encourage doctors to order tests that were not medically necessary); *U.S. ex rel. Harris v. Bernard,* 275 F. Supp. 2d 1, 7 (D.D.C. 2003) (court rejected defense claim that complaint only alleged difference of opinion and found that government stated cause of action for knowingly submitting false claims through upcoding.)

Dianon would also have the Court believe that it is within the mainstream in its billing practices. In fact, that is not the case. After reviewing CMS payment data, the Government could find no other lab which charged for a large panel of antibodies in all cases.[7] *Disputed Issues ¶ 38.* One of the labs cited by Dianon as evidence that it was roughly equivalent to other labs was Impath. However, CMS data for Impath shows that Impath was paid for a number of different panels of antibodies, ranging from 15-28. *Disputed Issues ¶ 38.* Comparison to other reference labs also shows that Dianon's approach is not the norm. Yale New Haven Hospital was paid for an average of 10 antibodies. *Disputed Issues ¶ 38.* Dianon's parent corporation, Lab Corp, had disease-directed panels with far fewer antibodies. *Disputed Issues ¶ 38.* In fact, Lab Corp was paid for less than 15 antibodies 90% of the time. *Disputed Issues ¶ 38.* Even one of Dianon's own experts does not bill for large antibody panels - Dr. Borowitz's lab at John Hopkins University was paid for less than 16 units of CPT code 88180 90% of the time. *Disputed Issues ¶ 38.* When the CPT code for flow cytometry changed so that each antibody is no longer being reimbursed fully, another of Dianon's experts changed his procedure from using a large comprehensive panel to using a smaller screening panel for the initial work-up of a

---

[7]     Dianon points to the panels used by the NIH lab, but fails to note that those panels are for use in clinical trials and that no one is billed for any of the antibodies used - not the patient and not Medicare. *United States' Local Rule 56(a) Statement ¶¶ 12-13.*

specimen. *Disputed Issues ¶ 38.* Finally, the data shows that for the labs that are members of the

American Clinical Lab Association (ACLA) the average number of units paid was 9. *Disputed*

*Issues ¶ 38.* Thus, rather than being within the mainstream in its billing practices for 88180,

Dianon is out of the mainstream and on the fringe of billing practices. Fewer than 10% of all

billings for 88180 for the relevant time period were for panels of 26 antibodies or higher.

*Disputed Issues ¶ 38.*

What Dianon also does not mention is that when CMS changed the way it pays for flow

cytometry, it did so because CMS determined that the "[c]urrent coding scheme (payment on a

per marker basis) may encourage the performance of more markers than may be medically

necessary because the pathologist determines what markers to perform and when to perform

them." The agency acted to discourage labs like Dianon from charging Medicare for tests which

were clearly not medically necessary just because they could get away with it. United States'

*Local Rule 56(a)(2) Statement ¶ 41.*

## III.    Dianon Knowingly Billed for Medically Unnecessary Tests

### A .  The False Claims Act

The False Claims Act provides in pertinent part:

> (a) Any person who (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States Government or a member of
> the Armed Forces of the United States a false or fraudulent claim for
> payment or approval; (2) knowingly makes, uses, or causes to be made or
> used, a false record or statement to get a false or fraudulent claim paid or
> approved by the Government,
>
> * * *
>
> is liable to the United States Government . . . .
>
> (b) For purposes of this section, the terms  "knowing" and

18

> "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required. 31 U.S.C. § 3729.

Thus, the elements of a claim under section 3729(a)(1) are: (1) that the defendant presented or

caused to be presented to an agent of the United States a claim for payment; (2) that the claim

was false or fraudulent; (3) that the defendant knew that the claim was false or fraudulent; and

(4) the statement was capable of causing a loss to the government.[8] *Mikes,* 274 F.3d at 695.

For purposes of the FCA, knowledge that the statement or document was false or

fraudulent means that the defendant: (1) had actual knowledge that the statement or claim was

false; (2) acted in deliberate ignorance of the truth or falsity of the statement or claim; or (3)

acted in reckless disregard of the truth or falsity of the statement or claim. No specific intent to

defraud is required. *31 U.S.C. § 3729(b).*

By knowingly submitting claims for payment to the Government for services provided to

Medicare patients which were not necessary for the treatment or diagnosis of that particular

patient, Dianon violated the FCA and is liable for damages and penalties.

A plaintiff can establish a strong inference of a "knowing" submission of false claims in

two ways:  either by proving facts to show that the defendant had both a motive and opportunity

---

[8]     The elements of a claim under § 3729(a)(2) are: (1) that the defendant made, used, or
caused to be made or used, a record or statement to get a claim against the United States paid or
approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant
knew that the record or statement and the claim were false or fraudulent; and (4) the statement
was capable of causing a loss to the government. *Harrison v. Westinghouse Savannah River
Corp.*, 176 F.3d 776, 788 (4th Cir. 1999).

19

to commit fraud or by showing facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Cardiac Devices* 221 F.R.D. at 341.

In ruling on a motion for summary judgment, a court should limit its findings to a determination of whether there are material disputed issues of fact, and should not weigh the evidence and decide the disputed factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at, 249. Summary judgment is particularly inappropriate in cases where, as here, state of mind is at issue. *White Motor Co. v. United States*, 372 U.S. 253, 259 (1963).

## B.    Dianon Knowingly Billed for Medically Unnecessary Tests

There are clearly factual questions relating to Dianon's "knowing" conduct in this case which should be decided by the trier of fact and not on a motion for summary judgment. There is ample evidence that Dianon totally ignored the medical necessity requirements and established a one-size-fits-all approach to billing for its own convenience in processing cases, to maximize reimbursement from Medicare, and to meet competition. *Disputed Issues ¶ 9-26, 30.* The "move to 18" memorandum, by itself, amounts to an admission by Dianon the company did not believe that routinely billing for more than 18 antibodies was medically necessary. *Disputed Issues ¶¶ 20-21.*

Dianon claims it did not knowingly bill for medically unnecessary testing because it relied on the expertise of its hematopathologists in deciding what to bill for. However, the record shows just the opposite. The pathologists testified that they were not consulted about billing decisions. *Disputed Issues ¶¶ 10-11.* Billing decisions were made by the marketing and operations personnel. *Disputed Issues ¶¶ 11, 39.* Each of the pathologists testified that he or she

20

had no idea what Dianon was billing to Medicare. *Disputed Issues ¶¶ 10, 39.* Most assumed that

flow cytometry was billed per panel, rather than per marker. *Disputed Issues ¶ 10.* Further,

each of the pathologists testified that he or she had not received training on the medical necessity

requirements in the Medicare regulations. *Disputed Issues ¶¶ 19, 24.* At a minimum, these

facts show a complete indifference by Dianon about the truth or falsity of the claims the company

submitted to Medicare. *See e.g United Sates v. Chen*, 2006 WL 1554546 (D. Nev. May 30,

2006) (facts and circumstances sufficient to find that doctor either knew his billing was improper

or that he acted recklessly or in deliberate ignorance of Medicare regulations).

Further, the record contains much evidence showing that Dianon's billing decisions were

made, not by the pathologists - who knew nothing about billing or the medical necessity

requirements - but by operations personnel. *Disputed Issues ¶¶ 10, 26, 39.* The evidence shows

that Dianon's billing decisions were based, not on medical judgment but on business reasons -

the need to meet competition – the need to stay competitive by reducing turn-around-time,[9] the

need to have a "comprehensive" test panel to meet competition, and the need to maximize

reimbursement by Medicare. *Disputed Issues ¶¶ 11-18, 25-26, 37, 41.*

Marketing and operations personnel testified that, if Dianon did not meet a turn-around

time for specimens that was competitive, they would have lost business. *Disputed Issues ¶ 14.*

The one-size-fits-all approach was instrumental in ensuring that Dianon met the competition in

this respect. *Disputed Issues ¶ 14.* When a specimen arrived at the lab and the referring doctor

had selected flow cytometry on the requisition form, Dianon performed the test without

---

[9] Turn-around-time is the time from receipt of the specimen at the lab, until the lab
results are reported to the referring doctor.

21

reviewing any of the clinical information provided with the specimen - even if Dianon had

previously diagnosed the patient. *Disputed Issues* ¶¶ *5-6.* In fact, the doctor never looked at the

case until after the flow cytometry test had been performed. *Disputed Issues* ¶ *5.* Dr. Connor, a

former Dianon pathologist, testified that reviewing the specimen before performing the test

would have helped to cull out specimens where flow cytometry would not be useful:

> Q. Would it have been preferable to have been able to review the morphology before you did the flow?
>
> A. Oh yeah. Sure.
>
> Q. And why is that?
>
> A. I have to say that a lot of this comes from having done hospital practice before I went to Dianon. And the answer to that is this. Is that if you can get – if you as a pathologist, especially if you're trained in hematopathology, can examine a blood or bone marrow first and have a good idea of what's going on there, you often know right offhand that flow cytometry studies aren't really required or that they really are not going to add much to the patient's care. . .But since they — at Dianon since it would have come with a request for flow, we would have done it instead of – I mean how can I say this. When a clinician requests something, we didn't pick up the phone and try to talk him out of it. Whereas, in the hospital situation I may very well have picked up the phone and said, you know, Dr. Girsh, I really don't think this needs flow.

*Disputed Issues* ¶ *12.* Dr. Connor suggested that the reason for this failure to cull out cases

where flow was not necessary was because reference labs like Dianon are just looking for what

they can bill for. *Disputed Issues* ¶ *12.* However, if Dianon had taken this step, it would have

slowed down the process and increased turn-around-time. *Disputed Issues* ¶ *12.*

The evidence also shows that trying to maximize reimbursement from Medicare was one

reason for the decision to bill for 26 antibodies. In late 1995, Dianon considered raising the

number to 9. *Disputed Issues* ¶ *17.* However, CMS decided in 1995 to lower the reimbursement

per antibody from $94 to $28, thus significantly reducing the amount of reimbursement Dianon

would receive for its flow cytometry panel - from $843 per panel to $253 per panel for a total "reimbursement hit" of roughly $1 million per year. *Disputed Issues ¶ 17.* During the month of January, Dianon considered raising the number of antibodies to 20, however, that did not produce enough reimbursement from Medicare ($710 per panel), so they raised the number of antibodies in their panel to 26 ($807 per panel) and billed Medicare for 26 until July of 1997. *Disputed Issues ¶ 17.* Not coincidentally, the result of raising the number of antibodies to 26 was to produce Medicare reimbursement in substantially the same amount as they had been receiving for 9 antibodies before Medicare reduced the per/marker reimbursement rate ($843 vs $807 per panel). *Disputed Issues ¶ 17.*

Apparently in 1997, Dianon recognized that its one-size-fits-all approach was not supportable because all of the antibodies were not necessary in all cases. *Disputed Issues ¶ 20.* Dianon partially corrected the problem, conducted a medical necessity review and determined that eight of the antibodies could not be justified in all cases. *Disputed Issues ¶ 20.* For the next three years, Dianon billed for 18 antibodies in all cases, rather than 26.[10] *Disputed Issues ¶ 20.*

In around 2000, Dianon came under increased pressure to compete with labs performing similar services. *Disputed Issues ¶ 25.* As a result, according to Dianon's 30(b)(6) witness, Dianon made a decision to resume billing for 26 antibodies in all cases in order to meet competition, despite the pathologists determination that no more than 18 antibodies could be justified as an initial screening panel. *Disputed Issues ¶ ¶ 25-26.*

---

[10]     While this certainly cut down on the number of medically unnecessary testing Dianon was billing for, it did not correct the problem of repeatedly testing the same patient with a full panel of antibodies or the problem that flow cytometry was simply not necessary or indicated to diagnose certain diseases. *Disputed Issues ¶¶ 22-23.*

23

In 2002, while Dianon was contemplating placing a new flow cytometry lab at its facility in Oklahoma, one of the hematopathologists, Dr. Tiesinga, became aware of the medical necessity requirements and discovered that Dianon was billing for antibodies which were not useful in their diagnoses. *Disputed Issues ¶ 28-30.* He pointed out to Dianon management that Dianon was billing for antibodies that were not useful to diagnoses and were, therefore, not medically necessary. *Disputed Issues ¶ 28-30.* Dianon's response was to say that they knew that the testing was not medically necessary, but that it would be too costly in terms of reimbursement and in changes to the computer and billing system to change the way they were operating. *Disputed Issues ¶ 28-30.* Thus, rather than relying on the pathologists to determine what was medically necessary in each case, Dianon ignored the pathologists and the marketing/operations personnel made the determination about what to bill for and based that decision on business reasons, not medical judgment.

Intent may be inferred from all the facts and circumstances surrounding the defendant's actions. *See e.g. United States v. Swinton*, 75 F.3d 374, 380 (8th Cir. 1996) (under 18 U.S.C. § 1344); *U.S. v. Adler*, 623 F.3d 1287, 1289 (8th Cir. 1980) (under 18 U.S.C. §§ 1001 and 287). The facts and circumstances detailed above and in the Government's Rule 56(a)(2) Statement and Statement of Disputed Issues of Material Fact clearly provide sufficient facts and circumstances for a jury to find that Dianon "knowingly" submitted false claims.

## C.    The Impath Decision

In arguing that they could not knowingly have submitted false claims, Dianon says that the only legal decision relating to billing for flow cytometry was a decision by an ALJ relating to

24

flow cytometry cases submitted to the California carrier by Impath, another reference lab. First, since this decision was not made public until 2003, Dianon clearly could not have relied on it when making its own decisions as to what to bill to Medicare. *United States Local Rule 56(a) Statement ¶ 40.* It is therefore not relevant to Dianon's mental state when submitting claims to Medicare.

That decision is also irrelevant because the ALJ decision has no precedential effect. The Government was not represented at the hearing and so cannot be estopped by that decision. *See e.g. United States v. Mendoza*, 464 U.S. 154, 155 (1984). The carrier did not even present expert testimony to the ALJ because of a scheduling conflict so all the ALJ heard was a one-sided presentation by Impath. *United States Local Rule 56(a)(2) Statement ¶ 40.* As a matter of law, that ALJ decision is not binding on the United States. *See e.g.*, *Sims v. Apfel*, 530 U.S. 103, 108 (2000).

### D. The Government Did Not Have Knowledge of the Falsity of the Claims

Finally, Dianon claims that it did not knowingly bill for medically unnecessary tests because it had numerous discussions and correspondence with the Connecticut carrier about reimbursement for flow cytometry and the carrier never questioned the number of antibodies Dianon was billing for. This is nothing more than a thinly disguised "government knowledge" defense.

It is well settled that Government knowledge of falsity is not a defense to an action under the False Claims Act. Instead, only the state of mind of the *defendant* is relevant:

> That a defendant has disclosed *all* the underlying facts to the government may, the
> United States in its brief concedes, show that the defendant had no intent to

25

> deceive. But what constitutes the offense is not intent to deceive, but knowing
> presentation of a claim that is either "fraudulent" or simply "false." 31 U.S.C. §
> 3729(a)(1) and (2). The requisite intent is the knowing presentation of what is
> known to be false. *That the relevant government officials know of the falsity is
> not in itself a defense.*

*United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.

1991) (emphasis added; citation omitted). Government knowledge has been found relevant in a

False Claims Act case only where there was full disclosure of the specific facts underlying the

particular claim prior to submission of that claim. *See e.g. Wang v. FMC Corp.*, 975 F.2d 1412

(9th Cir. 1992). Thus, in order to prevail on a Government knowledge defense, a defendant has

to prove that the Government was in possession of all the material facts and acted in such a

manner as to negate the scienter requirement in the FCA. For example, in the *Southland* case

cited by Dianon, the court found that the Department of Housing and Urban Development (HUD)

was aware of all of the material facts - that a subsidized housing property was not in compliance

with certain HUD regulations. *U.S. v. Southland Management Corp.*, 326 F.3d 669, 676-677 (5th

Cir. 2003). However, rather than cut off subsidizations payments altogether HUD officials chose

to work with the owners of the property to try to get the property into compliance and so

continued to make payments while being aware of the non-compliance. The court held that, in

light of the conduct of the parties in the case, vouchers submitted by the owners to HUD were not

knowingly false claims.

This case is very different, however. While Dianon did have discussions with the carrier

about CPT code 88180 in terms of the *diagnosis codes* for which the carrier would reimburse

Dianon, those discussions did not focus on the *number of antibodies*. *Disputed Issues ¶¶ 42-43.*

Both of the Connecticut carrier's medical directors testified that they never discussed the number

26

of antibodies with Dianon. *Disputed Issues ¶¶ 42-43.* Dianon's own witnesses testified that there was no discussion of the number of antibodies with the Connecticut carrier. *Disputed Issues ¶¶ 42-43.* Since there was no discussion about the number of antibodies, the Connecticut carrier clearly could not have given any sort of indication to Dianon that it approved of Dianon's billing for 26 antibodies in every case.

Both of the carrier medical directors who dealt with Dianon on this issue testified that they were not experts in the area of flow cytometry and did not recognize that the reimbursement for 26 antibodies might be a problem. *Disputed Issues ¶¶ 42-43.* It was not until after the filing of this case and after he consulted with experts that Dr. Delli Carpini, one of the medical directors, recognized that 26 antibodies might not be medically necessary in all cases. *Disputed Issues ¶¶ 42-43.* Since the medical directors had no idea that Dianon was performing medically unnecessary tests, they were not in possession of all the material facts, and Dianon cannot prove a valid government defense knowledge in this case.

Further, the fact that the carrier did not tell Dianon that it should stop billing for 26 antibodies, in the absence of some evidence that the carrier approved of the billing, cannot absolve Dianon of FCA liability in this case. Once again, Dianon is attempting to slough off onto CMS the responsibility to determine medical necessity that rightfully belongs to Dianon. Dianon has to determine what tests are used in the diagnosis of a particular patient and certify that those tests were medically necessary when seeking payment. Dianon cannot escape liability under the FCA for knowingly submitting false claims because the carrier medical director did not recognize that the tests were not medically necessary and refuse to pay for them. The carrier's medical directors were entitled to rely on Dianon's certification that Dianon had exercised

27

medical judgment in determining what to bill for. *Disputed Issues ¶¶ 42-43.* Dianon cannot

completely abrogate its responsibility to exercise medical judgment, certify that it had done so

and then lay the blame for false claims having been submitted on the carrier for not catching

them committing the fraud.[11]

## IV.  The Government's Common Law Claims Are Governed By Federal Common Law

The Government also has asserted common law claims for unjust enrichment and

payment under mistake of fact.  Because the assertion of these common-law claims involves

rights of the United States under a nationwide federal program, federal common law governs

these claims. *See e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, (1979); *Clearfield*

*Trust Co. v. United States,* 318 U.S. 363, 366-67 (1943); *United States v. Rogan*, 2006 WL

2860972, Slip Op. p. 20 (N.D. Ill September 29, 2006).

Under common law, the United States has a right to recover funds lost through the

erroneous acts of its agents. *United States v. Mead,* 426 F.2d 118, 124 (9th Cir.1970) ("If the

government made these payments under an erroneous belief which was material to the decision

to pay, it is entitled to recover the payments."); *United States v. Wurts,* 303 U.S. 414 (1938);

*United States v. Borin,* 209 F.2d 145, 148 (5th Cir. 1954).

The equitable theory of unjust enrichment allows restitution where "the person sought to

---

[11]  It is not clear that the carrier could have approved billing for tests that were not
medically necessary.  The Medicare statute precludes the government from reimbursing a
Medicare provider who fails to comply with the medical necessity requirement. *See Heckler v.
Ringer,* 466 U.S. at 605; *see also United Seniors Ass'n v. Shalala,* 182 F.3d at 967 ("If a service
is deemed not to have been reasonable and necessary, Medicare will not make payment and the
doctor generally is prohibited from charging the patient."); *Mount Sinai Hosp., Inc. v.
Weinberger,* 517 F.2d at 334.

28

be charged is in possession of money or property which in good conscience he should not retain, but should deliver to another. *Matarese v. Moore-McCormack Lines,* 158 F.2d 631, 634 (2d Cir. 1946). Under the equitable theory of unjust enrichment, "a person is unjustly enriched if the retention of [a] benefit would be unjust." *Restatement of Restitution, § 1* (1937). As discussed above, Dianon received substantial financial benefits from billing the Government for medically unnecessary tests, and was, therefore, unjustly enriched.

If agents of the federal government, acting on behalf of the United States, paid claims submitted by Dianon as a result of Dianon's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments" under a mistake-of-fact theory. *Mead,* 426 F.2d at 124. Here, the express certifications of compliance with the medical necessity requirements on the CMS 1500s submitted by Dianon were material to the United States' decision to pay Dianon; and, as these certifications were false, the United States erroneously paid Dianon.

## V.    Dianon Has Not Met Its Burden to Show That There Is No Issue of Fact for Trial

Dianon's summary judgment motion must fail because Dianon is not entitled to judgment as a matter of law. There is a clear requirement in the relevant statutes which require that Dianon only bill the Government for medically necessary tests. There is evidence that Dianon set up a one-size-fits-all billing system for its own business reasons, exercised no medical judgment in determining what to bill to the Government, and billed for antibodies that were not used to diagnose or treat disease. As a result, Dianon submitted claims to the Government which were false because they were not medically necessary for the diagnosis or treatment of the patient.

29

Dianon knowingly submitted these false claims to the Government for payment. Dianon was on notice that it could not bill for those antibodies that were not medically indicated for that patients symptoms, and it was specifically on notice that billing for a panel of tests when all of the tests were not necessary for that patient was potentially fraudulent behavior. Dianon knew that not all 26 antibodies were useful in all cases, yet billed for them all in all cases. Dianon knew that it was billing for flow cytometry in cases where the medical literature states that flow cytometry is not indicated and when their own pathologists did not believe the tests were necessary.

Dianon's attempts to excuse its behavior do not entitle it to escape liability under the FCA as a matter of law. There are numerous disputed factual issues which should be decided by the jury, not decided on a motion for summary judgment. To the extent those disputed issues relate to scienter, they are particularly inappropriate for determination on summary judgment. Where issues of knowledge or intent are at issue, those issues should be left for the trier of fact. *Anderson v. Liberty Lobby*, 477 U.S. at 249; *White Motor*, 372 U.S. at 259.

The Court should deny Dianon's motion.

> Respectfully submitted,
> PETER D. KEISLER
> Assistant Attorney General
>
> KEVIN J. O'CONNOR
> United States Attorney
> RICHARD M. MOLOT
> Assistant United States Attorney
> Federal Bar No. CT21676

30

157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

Pat Davis/by RMH

MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0240
Attorneys for the United States

31

## CERTIFICATION OF SERVICE

I hereby certify that on this 1st day of November 2006, a true and correct copy of the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment was served by email and first-class mail on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880
bcarmody@mayalaw.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

Bruce R. Parker
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Md. 21201
brparker@venable.com

Patricia R. Davis