**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| ex rel. DR. JAMES J. TIESINGA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 3:02 CV 1573(MRK) |
| | ) |
| DIANON SYSTEMS, INC., | ) |
| | ) November 1, 2006 |
| | ) |
| Defendant. | ) |

**UNITED STATES' LOCAL RULE 56 (a)(2) STATEMENT**

1.  No need to admit or deny.

2.  Admitted in part denied in part. The Government's complaint speaks for itself. Defendant's description of the role of flow cytometry in the practice of hematopathology is incorrect. Several witnesses, including one of Dianon's experts, testified that flow is an ancillary procedure. *Borowitz, p. 44:17 to p. 47:16 (Exhibit 1)*; *Connor p. 68:9-16 (Exhibit 2)*. Further, the U.S. Canadian Consensus document describes flow cytometry as an ancillary procedure. *U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia By Flow Cytometry: Medical Indications, Cytometry* 30:249-263 (1997) *(hereinafter the "U.S.-Canadian Consensus")* *at p. 252. (Exhibit 3)*.

3.  The Government's complaint and disclosure statement speak for themselves. Dianon's statement with respect to penalties is incorrect; in certain circumstances, the Government can elect not to claim penalties for all claims submitted.

4.  First sentence admitted. Second sentence denied as inaccurate. CMS has specifically defined medical necessity for some services.

5.  Admitted.

6.  Admitted.

7.  Denied. The sections cited have to do with establishing LCDs, not making individual patient medical necessity decisions. *Delli Carpini 30(b)(6) p. 81:3 to p. 88:5 (Exhibit 5)*.

8.  Denied see response to number 7.

9.  Denied see response to number 7.

10. Admitted in part. Dianon fails to point out that flow cytometry is used for a number of different diseases. *Connor p. 92:17 to p. 93:3.* It is used to diagnose or stage bladder cancer, it is used for breast cancer diagnosis, as well as lymphoma and leukemia. *Connecticut LMRP (Exhibit 6).* This made establishing a NCD more difficult. *Phurrough p. 23:14 - 24:13 (Exhibit 7).*

11. Admitted that medical literature created by the proponents of flow cytometry stated that there are three logistical approaches to conducting flow cytometry. *U.S.-Canadian Consensus.* However, the literature does not address billing Medicare nor does it state that if large panels of antibodies are used for reasons of convenience that all of the individual antibodies in the panels are relevant to the diagnosis of all diseases. *U.S. Canadian Consensus; Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting, Cytometry, 46:23-27 (2001) (hereinafter the "International Consensus") (Exhibit 8).* In fact, the literature says just the opposite; the "large panels" referred to are 12-16 antibodies and

2

differ according to the suspected diagnosis. *See International Consensus*; *U.S.-Canadian Consensus pp. 253-257.*

12.   Denied in part. Dr. Stetler-Stevenson was not the Government's 30(b)(6) witness regarding the appropriate number of antibodies or the utility of antibodies. *Notice of Deposition (Exhibit 9)*. Dr. Stetler-Stevenson was the Government's 30(b)(6) witness for the practices at the National Institutes of Health, a research facility which only conducts clinical trials and which does not bill its tests to anyone, including Medicare and the patients in the trials. *Exhibit 9; Stetler-Stevenson p. 10:18-21, p.19:7-21, p. 39:15 to p. 40:13 (Exhibit 10).*

13.   Denied as irrelevant. Dr. Stetler-Stevenson works in a research setting, not a commercial lab, and she never has. *Stetler-Stevenson p. 22:15-19.* Further, there is no prohibition on Dr. Stetler-Stevenson conducting screening tests because the Medicare billing rules do not apply to her work at NIH. *Stetler-Stevenson p. 39:15 to p. 40:13.* Finally, it appears that NIH conducts rather rigorous and thorough testing before a patient is admitted to participation in a clinical trial. *Stetler-Stevenson p. 16:13 to p. 19:6.*

14.   Denied in part. The consensus document speaks for itself. However, the "large panels" Dianon refers to are 9-16 antibodies in some cases, and the document identifies antibodies' usefulness as they relate to particular diseases - the document does not state that all 40 antibodies are useful in all cases. *International Consensus.*

15.   See response to number 14.

16.   See response to number 14.

17.   Denied as irrelevant. Dr. Delli Carpini, the Medical Director for the Connecticut

3

Medicare Carrier, testified that the fact that an article is listed in the bibliography of an LMRP signifies nothing. *Delli Carpini 30(b)(6) p. 26:6 to p. 28:23, p. 36:23 to p. 37:10, p. 68:15 to p. 69:21.* Dr. Braylan appears to have altered his approach to flow cytometry since the CPT code has been changed to conducting smaller panels to detect diseases rather than larger panels to diagnose diseases. *Braylan documents (Exhibit 11).* Further, Dr. Borowitz himself does not perform one-size-fits-all panels, but performs disease-specific panels most of which are from 12-18 antibodies depending on the clinical information available. *Borowitz p. 33:1-12; p. 37:3-5; p. 38:2-14.* Further, both Drs. Braylan and Borowitz testified that they would take into account clinical information they had from previous testing in determining what flow cytometry markers to use. *Borowitz p. 38:2-14; Braylan, p. 21:11 to p. 22:1(Exhibit 12).* Further, Dr. Borowitz testified that it could be dangerous to diagnose cancer in the absence of a morphological review and referred to flow cytometry as an ancillary technique. *Borowitz, p. 44:17 to p. 46:22.*

18.    See response to 17.

19.    See response to 17. In addition, many prestigious medical centers in fact do what the authors caution against. For example, Yale New Haven Hospital determines which antibodies to use based on a morphological review of the specimen. *(Exhibit 13).* The Mayo Clinic follows a similar procedure. *(Exhibit 15).* Dianon's parent company, Lab Corp, until recently, also reviewed a slide before determining which panel to run. *Johnson p. 10:6 to p. 11:4 (Exhibit 14).* A former pathologist from Dianon, Dr. Ann Marie Connor testified that it is preferable to review a morphological slide before conducting flow cytometry to avoid doing unnecessary flow tests. *Connor p. 69:11 to p.*

4

*71:10 (paragraph 12 below).*

20.    See response to 19.

21.    Denied. Dianon misstates Dr. Flynn's testimony. What Dr. Flynn actually said was that
       Dianon's experts had one opinion and he had another, and it was up to the jury to decide
       between the two. *Flynn p. 336:3 to p. 337:15. (Exhibit 16)* Dr. Flynn also stated that
       Dianon claimed a large panel was necessary to detect all abnormal cells, but in reality it
       could not detect *all* abnormal cells. *Flynn p. 331:13 to p. 333:18.* However, in the
       absence of signs or symptoms of a disease, such "comprehensive" testing to look for any
       abnormal cell is screening which Medicare does not pay for. *Delli Carpini 30(b)(6) p.
       48:20 to p. 49:7; see also p. 44:24 to p. 45:14, p. 51:20 to p. 52:21, p. 56:23 to p. 59:12;
       p. 61:6-16, p. 74:22 to p. 75:21.*

22.    Denied. What Dianon chooses to do for logistics reasons does not dictate whether each
       of the antibodies used was medically necessary for the diagnosis or treatment of a
       particular patient. *Delli Carpini 30(b)(6) p. 73:6-25, p. 77:16 to p. 80:21; Stone Expert
       Report p. 5 (Exhibit 17).* The issue is not whether it is prudent to do a large panel of
       antibodies in order to improve turn-around time or to detect all cancers in one pass
       without looking at the clinical information available. *Id.* The issue is whether a
       particular antibody was used to diagnose a particular patient. *Id.* If it was not, it was not
       medically necessary. *Delli Carpini 30(b)(6) p. 80:12-21; Stone p. 26:8-17(Exhibit 18).*

23.    Admitted that CMS chose not to promulgate an LCD in 1998. One CMS witness testified
       that the committee considering this issue simply ran out of time. *Phurrough p. 19:3 to
       20:17.* However, individual providers were still required to make determinations as to

5

what tests were medically necessary for a particular patient and to certify that they were medically necessary. *42 U.S.C. § 1395y (a)(1)(A); see also 42 C.F.R. § 411.15(k)(1)*.

24. The United States has insufficient information to admit or deny the first sentence. Plaintiff admits that Dianon hired Drs. Goyette and Connor in 1995.

25. Admitted in part and denied in part. Dianon pathologists all testified that they had no input into billing and did not even know what Dianon billed for. *Goyette p. 314:5 to p. 316:19 (Exhibit 20); Connor p. 54:14-24; Mishilani p. 37:20 to p. 38:9 (Exhibit 21; Segal p. 19:11-14, p. 20:3-8 (Exhibit 22); Tiesinga p. 73:8-19 (Exhibit 23)*. Therefore, no medical judgment went into the decision of what to bill for - Dianon billed in a one-size-fits-all manner.

26. See number 25. Also, all of the pathologists testified that they were able to add on tests if initial test results produced anomalous or inconsistent results. *Goyette p. 74:9-20; Segal p. 61:25 to p. 62:9; Mishilani p. 31:4 to p. 32:11*. Thus, if a panel of antibodies without CD103 were run and a morphological review indicated "hairy" cells, the test could be rerun with CD103 to confirm a hairy cell diagnosis. *Tiesinga p. 131:1 to p. 133:13*.

27. See number 26. The standard operating procedure set up by the Dianon pathologists included antibodies intended to "detect a majority of hematopoetic malignancies." *(Exhibit 24)*. To the extent that Dianon made a business decision to set up its lab processes - i.e. doing flow cytometry before a pathologist reviewed any of the clinical history or had reviewed the slides and to detect all possible diseases in one-pass - and that process dictated a decision by the pathologists to construct a panel which could detect most kinds of cancer, that decision does not dictate the medical necessity of the

6

individual antibodies for purposes of billing Medicare. *Delli Carpini 30(b)(6) p. 77:16 to p. 80:21; Stone Expert Report p. 5.[1]*

28.   See number 27. Medicare does not pay for screening tests in the absence of signs or symptoms. *42 C.F.R. § 411.15.*

29.   The standard operating procedure for the lab prepared at the direction of the hematopathologists states:

> The following panel of antibodies was chosen by the Hematopathologists at Dianon Systems for its ability to detect a majority of hematopoetic malignancies.

*(Exhibit 24).* Dianon claims that, in the circumstances, a large panel was necessary to cover all the possibilities - to run only one panel to cover all the possible cancers before the doctors had reviewed any of the clinical information or the morphology − i.e. to improve turn-around time for a high volume reference lab. However, Dr. Mishilani testified that after the fact, she recognized that certain tests were not necessary to diagnose the particular patient. *Mishilani p. 90:1-15.* Yet, Dianon billed for all 26 antibodies in all cases. See also paragraph 27 above.

30.   Denied. To the extent that Dianon made a business decision as to how to set up its lab processes - doing flow cytometry before a pathologist reviewed any of the clinical history or had reviewed the slides - and that process dictated a decision by the pathologists to

---

[1]   Dr. Margaret Johnson, the flow cytometry director at Lab Corp, testified that prior to obtaining Dianon, her lab reviewed the slide before choosing which of two more limited disease-specific panels to run. *Johnson p. 10:23 to p. 11:4.* Lab Corp doctors referred to Dianon's panel as the "shotgun" panel. *Exhibit 25.* After the purchase, Lab Corp management decided to "Dianize" Lab Corp and other labs purchased by Lab Corp, and the company told the doctors to choose a panel that "could detect and diagnose all the common leukemias and lymphomas in one pass." *Johnson , p. 65:25 to p. 67:16.*

construct a panel which could detect most kinds of cancer, in one pass, that decision does not dictate the medical necessity of the individual antibodies for purposes of billing Medicare. *Delli Carpini 30(b)(6) p. 73:12-25; 75:9-18; 77:16 to 80:21; Stone Expert Report p. 5.*

31. Denied. Beginning in 1998, Dianon pathologists got an incentive payment for moving cases quickly. *Exhibit 30; Amberson personal deposition p. 104:22 to p. 106:22 (Exhibit 28); Goyette p. 210:2 to 215:18.* Some pathologists were able to double their salaries through these incentive payments. *Mishilani p. 195:22 to p. 196:13.* Further, the lab had goals to meet on cost, quality and turn-around-time. *Carlson p. 71:23 to p. 72:6 (Exhibit 29).*

32. Denied. Rather than proving that the pathologists thought all 26 were necessary for the diagnosis of every patient, the "move to 18" memorandum proves that, even under a one-size-fits-all approach, at most the Dianon pathologists thought only18 were medically necessary. *Exhibit 30; Amberson p. 71:20 to p. 72:8.*

33. Several states issued LMRPs relating to flow cytometry. *See e.g. Exhibits 31-33.* Some placed limits on the number of antibodies which could be billed for. *Exhibit 31.* Some limited the diagnosis codes for which flow cytometry might be medically necessary. *Exhibit 32.* All included that the antibodies billed for had to be medically necessary for the diagnosis or treatment of disease. *See e.g. Exhibits 31-33.*

34. Denied. Dianon's statement misrepresents the medical director's testimony because Dr. Delli Carpini testified that a one-size-fits-all approach could not be medically necessary in all circumstances:

8

> A. . . .And what I'm saying is that to think you would use the comprehensive approach on every appropriate ICD9 that's in the LMRP, to me, in my opinion that would not be correct.
>
> Q. Why is that?
>
> A. Because in doing – in taking that approach, doing 100% of the tests 100% of the time, it cannot be medically necessary.
>
> Q. Well why is that true?
>
> A. Well, because how could every diagnosis have every single antibody pertinent to it?

*Delli Carpini 30(b)(6) p. 48:20 to p. 49:7; see also p. 44:24 to p. 45:14, p. 51:20 to p.*

*52:21, p. 56:23 to p. 59:12; p. 61:6-16, p. 74:22 to p. 75:21.* He further testified that the

tests chosen for billing had to be based on the signs and symptoms of the suspected

disease - the clinical information. *Delli Carpini 30(b)(6) p. 61:6-16.* Dianon fails to

point out that the physician's discretion was limited to what was medically necessary and

indicated for the diagnosis of the particular patient. *42 U.S.C. § 1395y (a)(1)(A); see also*

*42 C.F.R. § 411.15(k)(1); see also* paragraph 33 above.

35.   Denied. Dianon misstates the medical director's testimony. While consultants, the

literature and experts might be useful for consultation in preparing an LMRP or LCD or

NCD, what governs the medical necessity for a particular patient is the clinical

information available for that patient. *Delli Carpini 30(b)(6) p. 72:22 to p. 74:4; see also*

*paragraph 34 above.*

36.   Denied. Dianon again misstates the facts. The Connecticut carriers' reviews of the cases

cited was to ensure that there was evidence to support that 19, rather than 10 or 12 or 2,

antibodies had been performed. *Toor p. 35:5-22 (Exhibit 34); Delli Carpini personal*

*deposition p. 22:11-20, p. 23:20-25 (Exhibit 36).* The carrier was just trying to confirm

that the documentation supported the number of claims for payment. *Toor p. 36:1-23.*

9

There was not a finding by the carrier that individual antibodies were necessary in that

case. *Toor p. 36:10 to p. 37:1.* In fact, Dr. Delli Carpini did not focus on the issue of

frequency of the tests until after this litigation was initiated and the Department of Justice

asked for his assistance. *Exhibit 35.*

37.    Denied. Once again Dianon selectively reports the facts. While there were numerous

communications about the ICD9 codes for which it would be appropriate to bill for flow

cytometry, those discussions never focused on the number of antibodies. *Toor p. 47:16 to*

*p. 48:13; Amberson personal deposition p. 148:1-5; see also paragraph 36 above.* What

Dr. Toor actually said was:

> Q: Was it consistent with your experience as the Carrier Medical Director that a
> company would openly disclose and discuss with you more than 1000 claims if, in
> fact, that company was perpetrating a fraud or a scheme to defraud the
> Government?
> A. That's speculation, and I can't answer it because I never thought of it that way.
>                 *            *            *            *
> A. Saying that would make me think and look into the minds of people and how
> they work and why they would bring them to us. As I told you, our main focus
> was on the diagnosis and that's what they were trying to bring to us.

*Toor p. 53:13 to 54:20.*

38.    Denied in part. See paragraphs 36-37 above. The onus is not on CMS or the carrier to

police the medical necessity of every billing of every CPT code billed to Medicare. *Stone*

*Expert Report p. 4.* There are literally millions of such claims every year. *Stone Expert*

*Report p. 4.* Rather, Dianon is required to ensure that its billings are medically necessary

and appropriate in each case. *Stone Expert Report p. 4.* In fact, Dianon certified each

time it billed Medicare for CPT 88108 that each test was medically necessary. *Exhibit*

*43.* CMS relies on these certifications. *Stone Expert Report p. 4.*

39. Denied in part. Once again, Dianon selectively reports facts. Dr. Delli Carpini testified that the fact that a particular document was included in the bibliography of an LMRP has no significance, is not a part of the LMRP and is not an endorsement of anything in the document. *Delli Carpini 30(b)(6) p. 26:6 to p. 28:23, p. 36:23 to p. 37:10, p. 68:15 to p. 71:21.* Dr. Delli Carpini also testified that, with regard to a specific specimen, medical necessity with reference to that specimen is governed by clinical indications, not some general statement in the medical literature. *Delli Carpini 30(b)(6) p. 86:14-20.* The Government's CMS expert witness testified similarly. *Stone p. 14:16-21.*

40. Denied as irrelevant. The Impath decision is irrelevant and not binding on the United States or on this Court. *See e.g. United States v. Mendoza*, 464 U.S. 154, 155 (1984); *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000). The United States was not a party to the decision. *Affidavit of Georgina Aguilar, Exhibit 37.* The carrier did not even have an expert at the hearing. *Id.* As a result, the decision was based on the one-sided presentation of Impath to the ALJ. *Id.* Further, Dianon could not have relied on the Impath ALJ decision because it was not decided until 2003. *Id.*

41. Denied. The ACLA information upon which CMS relied had to do with the cost of the antibodies, labor and overhead, etc. *Menas p. 27:20 to p. 32:17, p. 37:12-21.* CMS did not endorse any particular antibody panel. *Stone Expert Report p. 4.* Further, contrary to the data presented by the ACLA to CMS, a review of the data regarding billing for 88180 by ACLA members shows that they billed an average of 9 units, not 26. *Affidavit of David Mehring, Exhibit 39.* Further, CMS' change to the way it reimbursed for CPT

11

code 88180 was to limit the reimbursement to panels of antibodies for the professional

component. *Stone Expert Report p. 4.* One of the reasons for this was the overutilization

of the code by labs like Dianon. *Stone Expert Report p. 4.* The new CPT codes pay for

flow cytometry as follows:

> 88184 - 1 marker technical component
>
> 88185 - add on marker technical component
>
> 88187 - professional component - read panel of 2-8
>
> 88188 - professional component - read panel of 9-15
>
> 88189 - professional component - read panel of 16+

*Stone Expert Report p. 4.* The change was made because CMS determined that the

"[c]urrent coding scheme (payment on a per marker basis) may encourage the

performance of more markers than may be medically necessary because the pathologist

determines what markers to perform and when to perform them." *Menas p. 12:13 to p.*

*13:1-7; Stone Expert Report p. 4; 68 Fed. Reg. 49047, 49030 (August 15, 2003).*

42.    Denied. The NIH panel is irrelevant because it is used in a research facility and is not

used to bill Medicare. *Stetler-Stevenson p. 10:18-21, p. 19:7-21.* Further, Dianon's

practices, rather than being in the mainstream, are outside the norm. *Affidavit of S.A.*

*David Mehring, Exhibit 39 .* Billing data for the relevant time period indicates that no

other lab always billed for a standard panel of antibodies. *Id.* Yale New Haven Hospital

Lab bills for an average of 10 antibodies. *Id.* Comparison to other reference labs also

shows that Dianon's approach is not the norm. *Id.* Billing data for Impath shows that

Impath charged for a number of different panels of antibodies, ranging from 15-28. *Id.*

Dianon's parent corporation, Lab Corp, used disease-directed panels. *Exhibits 40-41.*
Even one of Dianon's own experts does not bill for large antibody panels - Dr.
Borowitz's lab billed for less than 16 units 90% of the time. *Exhibit 39.* When the CPT
code for flow cytometry changed so that each antibody is no longer being reimbursed
fully, another of Dianon's experts changed his procedure to using a smaller screening
panel for the initial work-up of a specimen. *Exhibit 11.* Finally, the data shows that for
the labs that are members of the ACLA the average number of units paid was 9, not 26 as
reported by the ACLA to CMS. *Exhibit 39.*

43.    Denied. NIH's practices are not relevant to whether Dianon should have billed for 26
       antibodies in every case. NIH does not bill Medicare or anyone else for the flow
       cytometry testing it does. *Stetler-Stevenson p. 10:18-21, p. 19:7-21.*

44.    Denied. Emory conducts flow cytometry using 30 antibodies in most, but not all cases,
       because Dr. Holden wants to be able "to identify every cell in the sample." *Holden p. 19:
       9-12 (Exhibit 42).* Dr. Holden also testified that she was "vaguely" familiar with the
       Medicare regulations relating to medical necessity. *Holden, p. 45:23 to p. 46:2.*
       However, she further indicated that she would conduct the same panel of antibodies
       regardless of the clinical information she had about a patient. *Holden p. 46:25 to p. 47:9.*
       Dr. Holden also testified that she caps the number of antibodies she bills to clients other
       than Medicare at 15 antibodies. *Holden p. 162:12-24.*

45.    Denied in part. ACLA's data did not say "billed for" it says "reported." Further, billing
       data shows that ACLA members billed for an average of 9 units of 88180, not 26.
       *Exhibit 39.*

13

46.    Denied.  The CMS data shows that Esoterix billed Medicare for a wide variety of panels.
       *Exhibit 39.*

47.    Admitted that Impath billed for panels varying from 15-26.

48.    Denied as irrelevant.  The inclusion of the article in the bibliography has no significance.
       *Delli Carpini 30(b)(6) p. 26:6 to p. 28:23, p. 36:23 to p. 37:10, p. 68:15 to p. 71:21.*

49.    Denied in part.  The document says that there are 45 markers which might be useful in
       some cases, not that all 45 would be useful in all circumstances.  *International*
       *Consensus.*

### DISPUTED ISSUES OF MATERIAL FACT

1.     In this case, Dianon submitted its claims for payment to Medicare on form 1500s and in
       each case certified that the services provided were medically indicated and necessary for
       the health of the particular patient for whom the services had been provided.  *See e.g.*
       *Exhibit 43.*  Dianon's claim was for 26 or 18 units, depending on the time period, of CPT
       Code 88180 in each case.  *Exhibit 44.*

2.     CMS and the HHS OIG have given guidance on types of activities that might constitute
       Medicare fraud including billing for tests that are not medically necessary.  *63 Fed. Reg.*
       *45076, 45079 Exhibit 45 and Exhibit 46.*  In addition, the Connecticut Carrier gave
       guidance to providers in Connecticut about types of activities that might involve fraud
       including

> "Claims for a panel or series of lab tests when only part of the group of tests in the
> panel were medically indicated for the patient's signs, symptoms or complaints."
> *Exhibit 47.*

14

Thus, Dianon was on notice that billing for a panel of tests when not all of the tests included in the panel were medically necessary for the patient was potentially fraudulent billing.

3.    Both the 30(b)(6) witnesses for the carrier and CMS testified that each test for which Dianon billed had to be individually needed to diagnose or treat the patient and that one-size-fits-all does not meet the standard for medical necessity. *Stone Expert Report p. 4. Delli Carpini 30(b)(6) p. 80:12-21; Stone p. 26:8-17.* Dr. Delli Carpini, the medical director for the Connecticut carrier, testified that medical necessity is determined by the signs and symptoms of the patient and that performing 100% of the antibodies 100% of the time would ensure that some were not medically necessary because not all antibodies are relevant to the diagnosis of all diseases. *Delli Carpini 30(b)(6) p. 48:20 to p. 49:7.* The CMS witness also indicated that Medicare relies on the provider to ensure that tests conducted are medically necessary and requires them to certify that they are. *Stone Expert Report p. 4.*

4.    Dianon processed its specimens in a one-sized-fits-all process without regard to the clinical information available about the patient. *Exhibit 48; Mishilani p. 27:13 to p. 28:11.* A referring physician, usually a hematologist or oncologist, would take a sample from the patient - blood, bone marrow or tissue - and package the specimens and overnight mail them to Dianon. *Connor p. 60:22 to p. 66:18.* Accompanying the specimen would be a requisition form setting forth the testing being requested, clinical information about the patient, a diagnosis indication and in almost all cases lab report on the patients blood. *Connor p. 60:22 to p. 66:18; Mishilani p. 169:23 to p. 170:25.* Dr.

15

Delli Carpini and Ms. Stone testified that the suspected diagnosis sent by the referring physician and any clinical information should have determined what markers were billed to Medicare. *Delli Carpini 30(b)(6) p. 80:12-21; Stone p. 26:8-17.*

5.    The technicians at Dianon would prepare a slide the pathologist could use in making his or her diagnosis, and prepare the sample for testing as set forth on the requisition form. *Goyette p. 67:2 to p. 69:22; Connor p. 60:22 to p. 66:18.* If flow cytometry testing was selected on the form, the technicians would run the test before the pathologist looked at any of the clinical information or reviewed the slide. *Mishilani p. 169:23 to p. 170:25.* Thus, in all cases, the flow cytometry was actually performed before a pathologist made a determination that particular antibodies were relevant to the diagnosis or that flow cytometry would even be useful for the diagnosis or treatment of that patient. *Connor p. 60:22 to p. 66:18.* The pathologist then reviewed the slide and any test results and rendered a diagnosis. *Goyette p. 74:21 to p. 77:9.*

6.    Dianon's billings for flow cytometry (CPT Code 88180) were on a per-marker basis, i.e. Dianon submitted a claim for payment for each Medicare beneficiary for each of the 26 antibodies used in its leukemia/lymphoma panel (XL3). *Exhibit 49.* Dianon's approach to billing Medicare was a "one-size-fits-all" approach; Dianon established a panel of 26 antibodies and simply billed Medicare for all 26 for all patients regardless of the clinical information they had about the patient. *Goyette p. 298:16 to p. 300:21; Mishilani p. 28:3-11, p. 35:4-14; Segal p. 151:14 to p. 152:10.* Dianon even ignored its own previous test results on the same patient and billed for 26 antibodies when Dianon had already diagnosed that patient and further immunophenotyping of the patient's disease was

16

unnecessary. *Goyette p. 298:16 to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.* Dianon also billed for 26 antibodies in cases where the medical literature, and Dianon's own documents, do not support billing for flow cytometry. See paragraph seven below.

7.  Dianon charged for 26 antibodies for disorders for which flow cytometry is not indicated or useful according to the medical literature. For example, the US-Canadian Consensus states that "Flow cytometric immunophenotyping in not recommended in the chronic phase of chronic myelogenous leukemia and other chronic myeloproliferative disorders." *Exhibit 3 p. 251 number 26 and p. 256.* The U.S.-Canadian Consensus also states that flow cytometry is not the method for diagnosing Hodgkin's lymphoma. *Exhibit 3 p. 254.* However, Dianon billed for a full panel of antibodies in cases where Hodgkins or CML had already been diagnosed by Dianon. *See e.g. Exhibit 52 .*

8.  Dianon documents show that Dianon was billing for 26 antibodies even in cases where the pathologists did not believe that flow cytometry was indicated or necessary. For example, Dr. Goyette prepared training materials for the sales reps which stated that, in cases of suspected or diagnosed Chronic Myelogonous Leukemia (CML), flow cytometry was not indicated (*Exhibit 54); Goyette p. 199:6 to p. 200:13*; yet, Dianon performed flow cytometry on specimens on which the suspected diagnosis was CML and on patients Dianon had already diagnosed as having CML. *See e.g. Exhibits 50-51 .* Despite the fact that the flow cytometry test was not indicated for the diagnosis of CML, Dianon charged

17

Medicare for 26 antibodies in each case, in some cases multiple times.[2] *Exhibit 52.*
Similar documents relate to charging for flow cytometry for the diagnosis of Hodgkins
disease for which flow cytometry is not indicated or necessary. *Goyette p. 61:8-16;
Mishilani p. 185:23 to p. 186:5; (Exhibits 20 & 21).*

9.     When Dianon's pathologists were questioned about various patient medical records, they
       had no explanation for what role many of the antibodies played in the diagnosis of the
       particular patient other than that if there was anything unsuspected going on with the
       patient, the extra antibodies would ensure that they would pick it up. *See e.g. Goyette p.
       233:7 to p. 235:3; Mishilani p. 187:10 to 188:3.* Performing tests in the absence of
       symptoms is screening. *42 C.F.R. § 411.15.* Medicare does not pay for screening tests.
       *42 C.F.R. § 411.15.* Dianon exercised NO medical judgment, but simply billed for all
       antibodies in all cases, regardless of the clinical information they had and regardless of
       the utility of some of the antibodies to the diagnosis of that particular patient.

10.    All of the Dianon pathologists, present and former, who testified said that they did not
       know what Dianon billed for flow cytometry. *Goyette p. 314:5 to p. 316:19; Connor p.
       54:14-24; Mishilani p. 37:20 to p. 38:9; Segal p. 19:11-14, p. 20:3-8; Tiesinga p. 73:8-
       19.* They did not even know whether the test was billed as a panel or per marker. Id.
       The administrative types took care of billing. *Id.*

11.    Several Dianon marketing and operations personnel testified that the panel Dianon billed
       for was decided by the marketing and operations departments. *Palmieri p. 15:25 to p.*

---

<sup></sup>    ² Dianon claims that flow cytometry might be of use for a CML patient with a
"blast crisis." However, as Dianon's own expert recognizes, only a very few antibodies are
necessary for this. *Exhibit 11 .*

*16:15 (Exhibit 53); Carlson p. 117:18 to p. 118:1.* They also testified that billing for

flow cytometry was based on factors such as what the competition was doing and

maximizing reimbursement from Medicare. *Exhibit 58*; *Palmieri p. 15:25 to p. 16:15;*

*Carlson p. 117:18 to p. 118:1.*; *McDowell p. 68:2-17; (Exhibit 55).*

12.  Dr. Connor testified that rather than doing a comprehensive panel in all circumstances, it

would have been preferable to view the morphology first, before deciding whether to

conduct flow cytometry to avoid doing flow when it was not medically indicated for that

patient:

Q. Would it have been preferable to have been able to review the morphology before you
did the flow?
A. Oh yeah. Sure.
Q. And why is that?
A. I have to say that a lot of this comes from having done hospital practice before I went
to Dianon. And the answer to that is this. Is that if you can get – if you as a pathologist,
especially if you're trained in hematopathology, can examine a blood or bone marrow
first and have a good idea of what's going on there, you often know right offhand that
flow cytometry studies aren't really required or that they really are not going to add much
to the patient's care. . .But since they — at Dianon since it would have come with a
request for flow, we would have done it instead of – I mean how can I say this. When a
clinician requests something, we didn't pick up the phone and try to talk him out of it.
Whereas, in the hospital situation I may very well have picked up the phone and said, you
know, Dr. Girsh, I really don't think this needs flow.

*Connor p. 69:11 to 71:10.* Dr. Connor suggested that the reason for this failure to cull

out cases where flow was not necessary was because reference labs are just looking for

what they can bill for. *Connor p. 70:4-11.*

13.  The standard operating procedure for the lab prepared at the direction of the

hematopathologists states: "The following panel of antibodies was chosen by the

Hematopathologists at Dianon Systems for its ability to detect a majority of hematopoetic

19

malignancies." *Exhibit 24.* Thus, the intent of Dianon was to craft a panel that could identify all potential diseases, not just the disease suggested by the signs and symptoms of the individual patient. *Id.* Dr. Connor testified that, as a high-volume reference lab, Dianon was all about efficiency. *Connor p. 38:24-25.*

14. Had Dianon performed more targeted panels, or reviewed the morphology first, that would have slowed down the process. The morphology usually was not available for the pathologists until the afternoon or the next day. *Mishilani p. 29:7-10.* Had the flow cytometry been done after the morphology was reviewed, that would have increased turn around time (TAT) because the flow cytometry also took some time. *Exhibit 56 p. 2*; *Connor p. 65:22 to 66:13 .* An increase in TAT and could have made Dianon less competitive. *Carlson p. 57:4-15, p. 62:1-16.* Thus, doing a one-sized-fits-all panel of tests was for the convenience of Dianon for business reasons; testing that is done for the convenience of the doctor or patient does not make that testing medically necessary. *Exhibit 57.*

15. Pathologists were expected to sign out a certain number of cases per day and received an extra, "incentive" payment for each additional case above that amount that they signed out. *Exhibits 26 & 27; Amberson personal deposition p. 104:22 to p. 106:2; Goyette p. 210:2 to 215:18; Mishilani p. 188:7 to p. 189:12.* Some pathologists were able to double their salaries through these incentive payments. *Mishilani p. 195:22 to p. 196:13.*

16. Dianon also made no attempt after-the-fact to exercise medical judgment about what to bill Medicare for. Dr, Mishilani testified that after the test was complete and the diagnosis made, the pathologists recognized in retrospect that not all of the antibodies

20

hade been useful. *Mishilani p. 90:1-15.* Yet, Dianon billed for all of the antibodies. Dr. Tiesinga testified that while he was employed at Ameripath after he left Dianon that he did just such a retrospective review of the panel of antibodies in each case and limited billing to only those antibodies that had been useful to the diagnosis. *Tiesinga p. 290:1 to 292:8.*

17. Dianon first started billing for a panel of 26 antibodies in January of 1996. *Exhibit 49.* Internal Dianon documents show that prior to that time Dianon was billing for 8 antibodies. *Exhibit 49.* In late 1995, Dianon considered raising the number to 9. *Exhibits 49 & 60.* However, CMS decided in 1995 to lower the reimbursement per antibody from $94 to $28, thus significantly reducing the amount of reimbursement Dianon would receive for its flow cytometry panel (XL3) - from $843 per panel to $253 per panel for a total "reimbursement hit" of roughly $1 million per year. *Exhibit 60*. During the month of January, Dianon considered raising the number of antibodies to 20, however, that did not produce enough reimbursement from Medicare ($710 per panel), so they raised the number of antibodies in their panel to 26 ($807 per panel) and billed Medicare for 26 until July of 1997. *Exhibits 62 & 63.* Not coincidentally, the result of raising the number of antibodies to 26 was to produce Medicare reimbursement in substantially the same amount as they had been receiving for 9 antibodies before Medicare reduced the per/marker reimbursement rate ($843 vs $807 per panel). *Exhibit 63.*

18. Evidence of the lack of medical input into the decision to bill for 26 antibodies in all cases is supported by the fact that, despite charging Medicare for 26 antibodies in all

cases for the time period from January 1996 through July of 1997, the pathology lab was only actually using 22 antibodies to perform its flow cytometry leukemia/lymphoma panel (XL3). *Amberson p. 16:22 to p. 17:8, p. 22:15-20.* The operating procedure prepared by flow lab personnel did not even mention them. *Exhibit 64; Goyette p. 126:2-21.* Since the lab was not even using 4 of the antibodies for testing, there clearly was no medical necessity for the 4 antibodies which were not being used in the tests.

19.    Dianon's hematopathologists, Dr. Connor and Dr. Goyette, testified that they were not consulted about these billing decisions which were made by the marketing and operations departments. *Goyette p. 314:5 to p. 316:19; Connor p. 54:14-24.* Dr. Goyette assumed that flow cytometry was billed as a panel rather than by individual marker. *Goyette p. 314:5 to p. 315:19.* In addition, Dr. Goyette testified that he never received any training on how Medicare reimbursed for flow cytometry or on the Medicare regulations relating to medical necessity. *Goyette p. 315:1-20.*

20.    In 1997, Dianon changed from billing for 26 antibodies in all cases to billing for a panel of 18 antibodies in all cases. *Exhibit 65; Amberson 30(b)(6) p. 40:16 to p. 41:16. Exhibit 59).* Dr. Goyette testified that he prepared a memorandum at the request of Dr. Amberson after consulting with the other pathologists. *Goyette p. 138:3 to 142:13.* That memorandum listed 18 antibodies and stated that --

> . . .we believe the following 18 antibodies are essential for the accurate and complete initial work up of flow cytometry specimens. We believe that their routine usage can be justified to insurance carriers."

*Exhibit 30.* Dr. Amberson testified that he asked Dr. Goyette to identify "essential"

22

antibodies. *Amberson 30(b)(6) p. 34:7 to 35:21; Exhibit 30.* Thus, after reviewing the panel of 26 antibodies for medical necessity, Dr. Goyette and the other pathologists concluded that only 18 could be justified medically for the initial work up of specimens. *Exhibit 30.* In his affidavit provided the United States prior to intervention in this case, Dr. Goyette stated that the purpose of the review was to ensure that Dianon was billing for medically necessary tests:

> Hence I was asked to identify those antibodies that any responsible payor with knowledge of the complexities of modern hematopathology would agree were essential and for which they could never question medical necessity.

*Exhibit 66; Goyette p. 141:16 to p. 143:10.* Thus, Dianon has essentially admitted that any routine billing to Medicare in excess of 18 antibodies was medically unnecessary. *Exhibit 30.*

21.     Drs. Goyette and Amberson both provided affidavits to the United States prior to the initiation of this suit. *Exhibits 66 & 67.* In those affidavits, both doctors claimed that the reason for the "move to 18" was to "avoid what we perceived to be harassment by payers regarding our medical judgment." *Exhibits 66 & 67.* However, when questioned during their depositions, the two doctors could not point to any harassment by payers about the number of antibodies in their panels. *Goyette p. 166:12-19; Amberson 30(b)(6) p. 38:3-18.* Rather, Dr. Amberson stated that the decision to "move to 18" was triggered by a desire to ensure that they were only billing for medically necessary testing. *Amberson personal deposition p. 76:16 to p. 77:8.*

22.     With the move to billing for 18 antibodies Dianon, for the first time, used some medical

23

judgment in deciding what to bill for. *Exhibit 30.* However, Dianon continued to use a one-sized-fits-all approach to billing and continued to bill for 18 antibodies in all cases regardless of the utility of individual antibodies for the treatment or diagnosis of a particular patient. *Exhibit 44.* They ignored clinical information available to them in choosing to bill for 18 antibodies in all cases. *Mishilani p. 150:10-22 .* Pathologists had no explanation for what role various antibodies played in the diagnosis of particular patients other than to screen for possible unknown cancers - a purpose that the Medicare regulations does not cover. *Goyette p. 298:16 to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.*

23. Finally, they continued to bill for 18 antibodies in cases where the medical literature and Dianon's own pathologists believed flow cytometry was not indicated or useful, e.g. CML and Hodgkins disorders. *See e.g. Exhibit 51.*

24. In fact, specific guidance from the Connecticut carrier informed providers that billing for a panel when not all of the tests are medically indicated for the patient is not appropriate. *Exhibit 47.* However, none of the Dianon pathologists had been given any training on the Medicare regulations nor did they understand the requirement that each test had to be medically necessary. *Goyette p. 315:1-20; Mishilani p. 38:10 to p. 40:19; Segal p. 21:6 to 22:1.*

25. During 2000, Dianon came under heavy competitive pressure from other reference labs like U.S. Labs. *Amberson personal deposition p. 62:11 to p. 63:21.* At this time, there were a series of meetings about improving Dianon's turn-around-time and discussions about the panels being offered by competing companies. *Amberson personal p. 61:1 to p.*

24

*62:13, p. 120:22 to p. 121:15.*

26.    In late 2000, Dianon made the decision to resume billing for 26 antibodies. *Carlson p.*
       *117:19 to p. 118:1; Palmieri p. 15:25 to p. 16:15.* Once again, the decision was made by
       the marketing people, not the pathologists. *Id.* The pathologists were not consulted and
       the decision about what to bill for was not made on any sort of medical judgment, but to
       meet the competition. *Palmieri p. 15:25 to p. 16:15*; *Mishilani p. 61:8-23; Segal p. 44:1-*
       *10.*

27.    During this time period, Dianon once again billed for all 26 antibodies in all cases,
       regardless of the utility of the various antibodies for a particular case. *Goyette p. 298:16*
       *to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.* They also continued to bill
       for flow cytometry for cases for which flow cytometry was not indicated or useful or
       where Dianon had already diagnosed the patient and further flow cytometry was not
       necessary - and certainly not a comprehensive panel of 26 antibodies. *See e.g. Exhibit 68.*

28.    Dr. Tiesinga has stated that, in preparing to open a flow cytometry lab at a Dianon facility
       in Oklahoma, he first learned about the Medicare medical necessity requirements.
       *Tiesinga Affidavit ¶ 10 (Exhibit 69).* He testified that he contacted representatives of the
       Oklahoma Medicare carrier who told him that Oklahoma capped the number of
       antibodies they would pay for at 15. *Tiesinga p. 180:7 to p. 182:8.* The Carrier
       representative told him that more than 15 antibodies would seldom be needed to
       diagnosis a suspected disease. *Id.*

29.    Dr. Tiesinga testified that he conducted a review of two weeks worth of patient specimens
       referred to Dianon and concluded that only 15 antibodies were necessary to initially

screen the specimens and be able to ensure that the question being asked by the referring physician would be answered and also ensure that if any other blood-related processes were occurring, the tests would catch those as well. *Tiesinga p. 194:9 to p. 196:11.*

30.   Dr. Tiesinga testified that he brought this information - the medical necessity issue and the results of his study - to the attention of Dianon management. *Tiesinga p. 191:20 to p. 192:20.* Dianon management told him that they knew they were billing for medically unnecessary testing, but that they would lose too much revenue if they stopped. *Id.*

31.   Dr. Tiesinga also testified about his subsequent employment as a hematopathologist at Ameripath. Dr. Tiesinga testified that while Ameripath performed 24 antibodies in all cases, he made it a practice to review the case after his diagnosis was complete, determined which antibodies were relevant to the diagnosis (the clinical question being asked by the referring doctor) and directed Ameripath's billing department to bill only for those medically necessary tests. *Tiesinga p. 289:11 to 292:8.* Dianon could have done the same thing to ensure that their billings were for medically necessary testing, but they chose not to. Instead, Dianon chose to use a comprehensive panel and to bill for 100% of the tests 100% of the time, even though all of the antibodies could not possibly have been relevant in all cases - except to screen for diseases for which there were no signs or symptoms. *Delli Carpini 30(b)(6) p. 48:20 to 49:7.*

32.   Dianon exercised NO medical judgment when determining what to bill for and charged Medicare for 26 antibodies in all cases. As a result, Dianon received from Medicare

26

hundreds of additional dollars for each flow cytometry test it billed for.[3]

33.    Dr. Tiesinga, brought to the attention of Dianon management that they were billing for
antibodies that were not useful or medically necessary in some cases. *Tiesinga affidavit*
*¶17.* Dianon management's response was to say that they knew they were billing for
medically unnecessary tests, but that they would lose too much money if they stopped.
*Tiesinga affidavit ¶ 17.* Dr. Amberson told Dr. Tiesinga that they could not have the
Oklahoma City lab billing for 15 antibodies and the Connecticut lab billing for 26
because they had to have seamless reporting and because it would require expensive
changes to Dianon's computer system. *Tiesinga Affidavit ¶ 17.* Management considered
analyzing whether it was possible to steer cases from clients with lots of Medicare
patients to the Connecticut lab and those with fewer Medicare patients to the Oklahoma
lab. *Tiesinga Affidavit ¶ 16.* Dianon management decided not to put a flow cytometry
lab in Oklahoma. *Tiesinga Affidavit ¶ 16.*

34.    The absence of an LMRP does not mean that Dianon can bill for whatever it wants and
just because there is no specific guidance on this particular test escape liability under the
FCA because of the requirement that tests billed for must be medically necessary. *Stone
Report p. 5.* Medicare relies on the providers to comply with the medical necessity
requirements and on their certifications that the tests are indeed medically necessary.
*Stone Report p. 4.*

---

³    For example, in 2001 when Dianon resumed billing for 26 antibodies after having
concluded that only 18 were medically necessary, Dianon received approximately an additional
$262 dollars for *every* flow cytometry test it billed to Medicare for that time period for the 8
antibodies Dianon had concluded were not medically necessary.

27

35.    Dianon also points to consensus documents as supporting its approach.  However, those
documents do not advocate billing Medicare for large panels of antibodies.  *See U.S.-*
*Canadian Consensus; International Consensus.*  Rather, they attempt to establish some
consensus among the flow cytometry community on the optimal number of antibodies
which should be used when conducting flow cytometry depending on what the suspected
diagnosis is.  *International consensus.*  While these consensus documents point out that
labs perform flow cytometry in three general ways (screening, targeted and
comprehensive), those consensus documents do not address the issue of billing.  *U.S.-*
*Canadian Consensus; International Consensus.*  While those documents state that doing
a comprehensive panel is acceptable as a method of doing business, the consensus
documents do not address what providers who perform a comprehensive panel should bill
to Medicare.  *U.S.-Canadian Consensus; International Consensus.*  Rather, they set forth
the view of the participants about what antibodies would be useful for various suspected
disease states.  *U.S.-Canadian Consensus; International Consensus.*

36.    In fact, these documents support the Government's position in many respects.  The panels
of useful antibodies connected to the various disease states involved range in panels for
suspected cases of Chronic Lymphoproliferative Disorders of 9-16 antibodies.
*International Consensus p. 24.*  They also point out that flow cytometry is not useful for
certain suspected diseases.  *U.S.-Canadian Consensus p. 256.*

37.    CMS and the carriers do not tell reference labs how to organize their businesses.  *Delli*
*Carpini 30(b)(6) p. 73:6-25, p. 77:16 to p. 80:21; Stone Expert Report p. 5.*  If Dianon,
for business reasons, chooses to set up a factory-style system and perform the same 26

28

antibodies on every specimen regardless of whether all 26 will be used to diagnose a
particular case and regardless of whether flow cytometry will even be useful at all
depending on the suspected (or already diagnosed) disease, that is Dianon's choice, but
they should only bill for those tests that are medically necessary to diagnose and treat that
patient. *Delli Carpini 30(b)(6) p. 73:6-25, p. 77:16 to p. 80:21; Stone Expert Report p. 5.*
The record is replete with evidence of the business reasons they set up such a system - to
match their competitors' panels, to run as many tests as possible in as short a time as
possible ("short turn-around-time TAT), to compete with local pathologists and to be able
to market themselves as a "comprehensive" testing facility. *Exhibits 58, 70 & 71;
Carlson p. 56:21 to 57:15, p. 61:1 to 62:16, p. 71:23 to 72:6; McDowell p. 14:5 to 15:11.*

38.    The Government could find no other lab which charged for a large panel of antibodies in
       all cases.[4] *Exhibit 39.* In fact, panels of antibodies of 26 or more accounted for ony 10%
       of all paid claims. *Id.* One of the labs cited by Dianon as evidence that it was roughly
       equivalent to other labs was Impath. However, the data shows that Impath charged for
       panels ranging from 15-28 antibodies. *Id.* Comparison to other reference labs also shows
       that Dianon's approach is not the norm. Yale New Haven Hospital billed for an average
       of 10 units of 88180. *Id.* Dianon's parent corporation, Lab Corp, had disease-directed
       panels and 90% of the billings were for less than 15 antibodies. *Id.* The members of the
       ACLA billed an average of 9 antibodies. *Id.* Even one of Dianon's own experts does not

---

[4]     Dianon points to the panels used by the NIH lab, but fails to note that those panels
are for use in clinical trials and that no one is billed for any of the antibodies used - not the
patient and not Medicare. *Stetler-Stevenson p. 10:18-21, p. 19:7-21.*

bill for large antibody panels; data shows that Johns Hopkins, Dr. Borowitz's lab billed for 16 or fewer antibodies 90% of the time. *Id.* Finally, when the CPT code for flow cytometry changed so that each antibody is no longer being reimbursed fully, another of Dianon's experts, Dr. Braylan, changed his procedure form using a comprehensive panel to using a smaller screening panel to be more "cost effective." *Exhibit 11*.

39.    Dianon claims it did not knowingly bill for medically unnecessary testing because it relied on the expertise of its hematopathologists in deciding what to bill for. However, the record shows just the opposite; the pathologists testified that they were not consulted about billing decisions and they had no idea what Dianon was billing to Medicare. *Goyette p. 314:5 to p. 316:19; Connor p. 54:14-24; Mishilani p. 37:20 to p. 38:9; Segal p. 19:11-14, p. 20:3-8; Tiesinga p. 73:8-19.* Billing decisions were made by the marketing and operations personnel. *Id.*

40.    In fact, for a year and a half Dianon billed for 26 antibodies when the lab was only performing 22 - clearly there was no medical judgment being exercised in determining to bill for tests that were never performed. *Amberson 30(b)(6) p. 20:20 to 23:2.* Dianon apparently recognized in 1997 that its billing system was not supportable and for a short period partially corrected the problem by not billing for all 26 antibodies. *Exhibit 30.*

41.    Finally, when one of the pathologists, Dr. Tiesinga, pointed out to Dianon management that many of the antibodies for which Dianon was billing were not being used in the diagnosis, Dianon's response was to say that they knew that the testing was not medically necessary but that it would be too costly in terms of reimbursement to change the billing system. *Tiesinga affidavit ¶ 17.* Thus, rather than relying on the pathologists to

30

determine what was medically necessary in each case, Dianon ignored the pathologists and the marketing/operations personnel made the determination about what to bill for and based that decision on business reasons, not medical judgment.  *See paragraph 26 above.*

42.    Finally, Dianon claims that it did not knowingly bill for medically unnecessary tests because it had numerous discussions and correspondence with the Connecticut carrier about reimbursement for flow cytometry and the carrier never questioned the number of antibodies Dianon was billing for.  While Dianon did have discussions with the carrier about CPT code 88180 in terms of the diagnosis codes for which the carrier would reimburse Dianon, those discussions did not focus on the number of antibodies.  *Toor p. 35:5-22; Delli Carpini personal deposition p. 22:11-20, p. 23:20-25.*  Dianon's own witnesses have testified that there was no discussion of the number of antibodies so the carrier could not have given any sort of indication to Dianon that it was approving of Dianon's billing for medically unnecessary tests.  *Amberson personal deposition p. 148:1-5*; *Toor p. 36:10 to p. 37:7; Exhibit* 35.

43.    Both of the carrier medical directors who dealt with Dianon on this issue testified that they did not recognize that the reimbursement for 26 antibodies might be a problem because they were focused on the diagnosis codes rather than on the number of markers.  *Toor p. 48:5-13.*  It was not until after the Department of Justice asked Dr. Delli Carpini, to research the issue that he became aware that 26 might not be medically necessary after he consulted with experts.  *Exhibit 35.*  Once again, Dianon is attempting to slough off onto CMS the responsibility to determine medically necessity that rightfully belongs to Dianon; Dianon has to determine what tests are used in the diagnosis of a particular

31

patient and certify that those tests were medically necessary when seeking payment.

*Stone Report p. 4.*

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

RICHARD M. MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700

MICHAEL F. HERTZ
JOYCE R. BRANDA
PATRICIA R. DAVIS
RYAN FAYHEE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0240
Attorneys for the United States

32

## CERTIFICATION OF SERVICE

I hereby certify that on this 1st day of November 2006, a true and correct copy of the Plaintiff's Rule 56 Statement was served by first-class mail and email on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880
bcarmody@mayalaw.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

Bruce R. Parker
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Md. 21201
brparker@venable.com

Patricia R. Davis