```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF CONNECTICUT

 3

 4    UNITED STATES OF AMERICA,       )

 5    ex rel. DR. JAMES J. TIESINGA,  )

 6              Plaintiffs,           )

 7         vs.                        ) No. 3:02CV1573(MRK)

 8    DIANON SYSTEMS, INC.,           )

 9              Defendant.            )

10              -  -  -  -  -

11         The videotaped deposition of

12    MICHAEL J. BOROWITZ, M.D. was taken on Thursday,

13    July 6, 2006, commencing at 9:10 a.m., at the

14    offices of Venable LLP, Two Hopkins Plaza,

15    Suite 1800, Baltimore, Maryland, before

16    Josett F. Whalen, Registered Merit Reporter and

17    Notary Public.

18              -  -  -  -  -

19

20

21

22
```

Page 30

1  different parts of the laboratory.
2     Q.  Okay.  So do you often get the two
3  different samples, the morphology sample and the
4  flow sample, from the same patient?
5     A.  Yes.
6         But as I say, with the exception of
7  like lymph node samples that would come in where
8  we would use the tissue and take one sample for
9  flow, if we're talking about a bone marrow, the
10 person procuring the bone marrow, who's not us
11 in the laboratory, would actually take two
12 separate samples, send one for morphology and
13 send the other one for flow.
14    Q.  I see.  Okay.
15        And you said when -- because of the
16 processing for the morphology slides, you get
17 those results in the afternoon, and about the
18 same time you're getting the flow results?
19    A.  Well, in an ideal world, the flow
20 results are out kind of the day before the
21 morphology results are out, when everything is
22 working formally, because when we're talking

Page 31

1  about at least a biopsy, those tissues have to
2  fix overnight before they can -- slides can be
3  cut, and we generally have the fresh flow
4  cytometry sample and we'll get the results out
5  kind of that evening.
6         And so the correlation that I'm
7  talking about takes place kind of the next
8  afternoon.
9     Q.  Day two.
10    A.  Day two.
11    Q.  Okay.  So from the time that the
12 specimen -- let's talk about two different
13 specimens -- the flow specimen comes into the
14 lab, how long is it before the results are
15 available?
16    A.  You mean the results from the flow?
17    Q.  Yes.
18    A.  Generally two to three hours.
19    Q.  Okay.  And then -- and the morphology
20 sample would come in and it would be available
21 when?  The next day?
22    A.  Yeah.

Page 32

1         So, again, if we're talking about a
2  bone marrow, there are two parts to the
3  morphology of a bone marrow.  One is the direct
4  smear that's made and stained without fixation
5  and putting in wax, and that generally is
6  available more or less in the same time frame as
7  the flow cytometry results.  As it happens
8  because of work flow issues, the flow is often
9  ready before that, although in principle it --
10 in principle, that piece of information should
11 be ready the soonest, but it isn't always.
12    Q.  And is the practice that we've just
13 been talking about the same for those specimens
14 that come in from the hospitals around Baltimore
15 or North Carolina?
16    A.  So most of our clients will have our
17 requisition forms, and they can provide us with
18 the same information.  Every once in a while
19 they'll run out of requisition forms, and every
20 once in a while we'll get a specimen from some
21 other client, and we won't have exactly that,
22 but for the most part it's the same.

Page 33

1     Q.  And what happens if they don't have a
2  req form and the specimen shows up?  What do you
3  do?
4     A.  Well, if we have no information, then
5  that's where we start with our sort of hybrid
6  panel, limited hybrid panel, and then reflex
7  from there.
8     Q.  So -- and approximately how many
9  antibodies are in the hybrid panel that you
10 run?
11    A.  Oh, I think 17-18, something like
12 that.
13    Q.  Okay.  And then based on the results of
14 the hybrid panel, you would go back and focus
15 on --
16    A.  Focus on either myeloid if it's
17 myeloid, B-cell if it's B-cell, T-cells.
18    Q.  Have you ever testified before?
19    A.  Yes.
20    Q.  When?
21    A.  So I think the last time I was in court
22 was something like five or six years ago.  I

Page 34

1 can't remember exactly.
2   Q.  How many times have you testified?
3   A.  In court I've testified twice that I
4 can recall. I'm trying to recall if there was a
5 third time, but it's not --
6   Q.  Were you an expert in those cases?
7   A.  Yes.
8   Q.  What was the subject of the cases?
9   A.  The most recent one?
10  Q.  Either.
11  A.  It was -- one was a -- the most recent
12 case, a physician was on trial for -- was being
13 sued for failing to follow up an abnormal
14 physical finding and alleging that he had missed
15 the patient with lymphoma, and the complaint was
16 that, hey, had he saw it, then the patient would
17 have had a better outcome.
18  Q.  Okay. So it was a medical malpractice
19 case?
20  A.  Yes.
21      Every case that I've been involved in
22 has been a medical malpractice case -- well, the

Page 35

1 cases I've testified in have been medical
2 malpractice cases. That's true of all of them.
3   Q.  And what about depositions?
4   A.  I've done more depositions, probably
5 somewhere between five and ten, maybe as many as
6 a dozen. Again, I think all of those have been
7 medical malpractice cases.
8   Q.  And in each of those you were an
9 expert?
10  A.  In each of those I was an expert.
11  Q.  Okay. When we were talking about the
12 specimens that come into the lab, you said that
13 you have the capability of looking at previous
14 history for the patients; is that right?
15  A.  (Witness nodding.)
16  Q.  In cases where -- I take it the doctors
17 write something about the history on the req
18 form.
19      If you have already diagnosed a patient
20 previously, would you do the tests in the same
21 way?
22  A.  Slightly differently.

Page 36

1      So let's talk about -- I guess I would
2 do it differently if we would have already had a
3 specimen in the flow cytometry laboratory.
4      I mean, if we had made a morphologic
5 diagnosis, that probably wouldn't affect -- and
6 it was the first time we were doing a
7 flow cytometry specimen, it probably wouldn't
8 affect how we did it.
9      If we had previously done a
10 flow cytometry specimen, then what we'll
11 actually do is pull out the data from that
12 flow cytometry specimen. We'll inspect it to
13 make sure that there wasn't anything
14 specifically unusual about the case where one of
15 our standard combinations was not optimal for
16 evaluating a follow-up case and if we had to add
17 a specific additional combination.
18     And then we will slightly streamline
19 some of our panels, many of our panels, so
20 that -- and these numbers are not hard-and-fast.
21 But if in an acute leukemia case we have, say,
22 twenty -- our basic acute leukemia panel has

Page 37

1 21 antibodies, which is sort of why I'm not
2 quite sure of my list here.
3      But our basic leukemia panel has
4 21 antibodies and -- or our acute leukemia
5 screening panel has 21 antibodies. If we have
6 an established diagnosis of acute leukemia and,
7 you know, our standard panel was good at
8 recognizing the acute leukemia and we know that
9 that's appropriate from our previous study, we
10 will probably follow with something like
11 18 antibodies. There's one of them -- unless
12 one of the markers -- one of the combinations is
13 rarely useful in acute leukemia, it's mostly
14 there to see other things, and it may not be --
15 and we may not follow with that.
16     Again, this is predicated on the fact
17 that it's a recent specimen on a patient with
18 acute leukemia. You know, we're looking a month
19 or two months after treatment.
20     If this is a patient who we saw with
21 acute leukemia, you know, five years ago and we
22 get a new specimen, we treat that as if it's a

Michael J. Borowitz, M.D.    U.S.A. v. Dianon Systems, Inc.    7/6/2006

Page 38

1  new specimen.
2    Q.  Okay.  What about the chronic
3  leukemia?
4    A.  The same idea.
5       If, for example -- if, for example,
6  we -- in our chronic leukemia panel we're
7  weighted towards characterization of a B-cell
8  neoplasm because the B-cell neoplasms are most
9  common.  Once we have fully characterized a
10 B-cell neoplasm, we won't use all of the same
11 antibodies to fully characterize it again.
12 We're mostly interested in detecting it the
13 second time, so we may pare down our 16 basic
14 markers to 12 or something like that.
15   Q.  Some of the other folks we've deposed
16 have -- do things a little differently.  They do
17 a standard panel of, you know --
18   A.  That's correct.
19   Q.  -- 28 or 30 antibodies for every sample
20 that comes in the door.
21      Why don't you do it that way?
22   A.  Okay.  Fair question.

Page 39

1       So I think we have a few advantages
2  over the people that you've deposed, at least
3  depositions that I've read -- I don't know if
4  there are other people -- and for that matter
5  over -- the same advantages exist over Dianon
6  for that matter.  And that has to do with the
7  fact that we have a fixed -- a fairly fixed
8  clientele whom we know fairly well, and they're
9  right on site.
10      So the first thing is we get our
11 samples, 90 percent of our samples, in an hour.
12      I know Dr. Holden runs largely a
13 reference laboratory business and -- or much of
14 her work comes from -- and they get samples, you
15 know, the next day, for DIANON gets their
16 samples the next day, and so they're, from a
17 turnaround point of view, they're already
18 24 hours behind me, so I have a little -- so my
19 process is a little bit more cumbersome and
20 takes a little bit more time, but I have a
21 little more time to work with.
22      The other thing is, I have a very

Page 40

1  skilled staff with fellows really on-site and
2  it's part of their training exercise to sort of
3  learn about making these decisions, and so I
4  have the luxury, because time is not so
5  pressing, that I can sort of incorporate that
6  training aspect of making them make some
7  decisions into the process without sacrificing
8  turnaround time.
9       You know, and the other thing is having
10 a -- having a, you know, a physician clientele
11 whom I know well and who know what we do allows
12 me to sort of trust the information that comes
13 from them to a greater degree than if I didn't
14 know my clientele and samples were coming in
15 from all over.
16      And you know, sometimes we get a sample
17 from somebody not trustworthy and we may handle
18 it a little bit differently because, you know,
19 that's when we'll, you know, we'll start with
20 a -- we may add some extra things, because even
21 though they say it's acute leukemia, we don't
22 know who this person is and we may do the acute

Page 41

1  leukemia panel but add on some of the things
2  from the chronic leukemia panel to make sure
3  that we've done, we've done it all because we
4  don't trust the information.  But that's the
5  rare case.
6       The great majority of cases, we know
7  when Dr. So-and-so orders something, we know
8  that we can trust them.
9    Q.  You said, though, that when a sample
10 comes in and it may come in without a req form
11 that you do some sort of --
12   A.  Hybrid.
13   Q.  -- hybrid panel, and I think you said
14 that had like 17 or 18 antibodies?
15   A.  Right.
16   Q.  Is that what you're talking about?
17   A.  Yeah.  Something -- well, I can't be --
18 I don't want to be overly precise.  That -- if
19 we have no information at all, but -- I guess --
20 I guess what -- that's usually what we do.  I
21 guess that's a fair statement, is that's usually
22 what we do.

depo@ftrinc.net    For The Record, Inc.    301-870-8025

Page 42

1    But there also have been
2    circumstances -- and I can't tell you exactly
3    instances -- where we've done the whole acute
4    leukemia but added onto it, so instead of doing
5    17 antibodies, we may end up doing
6    24 antibodies to start with or something like
7    that.
8        And there are no hard-and-fast rules
9    that govern that, but that happens sometimes as
10   well.
11   Q.  But that's the rare case.
12   A.  Yeah, that's the rare case.
13   Q.  If a req form comes in and somebody
14   has, you know, written down the history and you
15   have a previous flow result and you don't think
16   that the -- you know, even though they've
17   checked the box that they want you to do a flow,
18   and you don't think that's really necessary in
19   this case, what would you do?
20   A.  Well, again, that depends a lot upon
21   who's ordering the test.  You know, many of
22   our -- many of our clinicians are very -- are

Page 43

1    reasonably sophisticated.  They understand the
2    uses of flow cytometry.  And our default
3    position is, clinicians taking the care of the
4    patient, they really know what's going on.  If
5    they want a test, in general they will get it.
6        Having said that, if we get a
7    requisition, say, from a resident or a fellow
8    whom we don't know as well and it sounds like
9    they may be asking for something that's not
10   useful, we might call them up and say, you know,
11   do you really want this.
12       And again, it's more for educational
13   purposes.  You know, if -- to -- because if they
14   really are asking for something that's not
15   useful, we teach them that they shouldn't be
16   asking for it.
17       On the other hand, they may tell us,
18   oh, yes, there's something different going on on
19   with the patient, that even though the patient
20   has a history of X, I'm not satisfied with that
21   diagnosis, and so forth, and then we will
22   certainly do it.

Page 44

1    But we'll communicate.  Like I said, if
2    it's a clinician we know well and we know that
3    they're not making a stupid request, because
4    they're sophisticated, we'll go ahead and do it.
5    If it's someone we don't know, we'll try to
6    communicate.
7        (Pause in the proceedings.)
8    Q.  I hand you what's been marked as
9    Exhibit 2.
10       (Pause in the proceedings.)
11       Have you seen that before?
12   A.  I'm not sure I've actually seen a paper
13   copy, but yeah.
14   Q.  The Internet is a wonderful thing,
15   isn't it?
16   A.  That's right.
17   Q.  I just had a question I guess about
18   some of the -- this is -- by the way, this is
19   from your Web site.
20   A.  That's correct.
21   Q.  If you take a look at down under
22   Professional Services, it says "expert

Page 45

1    consultation"?
2    A.  Uh-huh.
3    Q.  And then it says: "Although we have
4    expertise in the appropriate application of
5    state-of-the-art technology to the diagnosis of
6    leukemia and lymphoma, we are also experts in
7    the morphologic diagnosis of these tumors.  We
8    believe that excellent morphologic analysis is
9    essential to the interpretation of ancillary
10   techniques and that it continues to provide the
11   cornerstone to diagnosis."
12       Could you tell me what that means.
13   A.  I'm not sure exactly what you're
14   asking.  But I will -- first of all, are you
15   asking what the second sentence means or
16   what -- what is the -- what's the antecedent to
17   "that"?
18   Q.  Well, I guess -- I guess it says that
19   the -- what this means to me, in my history
20   degree rather than a medical degree --
21   A.  Okay.
22   Q.  -- is that when something says

Page 46

1  "cornerstone to diagnosis," in the morphologic
2  analysis it's the cornerstone to diagnosis, it
3  sounds to me that's the most important part of
4  the diagnosis.
5       Is that -- am I misreading that?
6    A.  I guess I would question -- I would --
7  I mean, again, I don't quibble -- I don't like
8  to quibble -- lawyers try to, you know, make
9  exact -- every word be exactly precise.  When we
10 write things, we don't, we don't think of things
11 in a legal term.
12      So if you're asking me is
13 "cornerstone" equivalent to "most important,"
14 I'm not sure I necessarily think of it that
15 way.
16      But what I'm trying to convey is that
17 what we're offering is, in this sort of
18 marketing tool, is a multifaceted approach to
19 the best diagnosis for leukemias and lymphomas
20 and that with rare exceptions, doing that
21 completely in absence of any morphologic
22 consideration is hazardous.

Page 47

1       And so I guess if you think of this
2  from a marketing perspective -- okay? -- that
3  one of the things that we differentiate
4  ourselves from the standard reference
5  laboratory is that we are also interested in
6  looking at glass slides of morphology in
7  concert with these various other ancillary
8  procedures and sort of doing a holistic
9  approach to diagnosis.
10      Not every reference laboratory in the
11 universe approaches things the same way, and
12 they sort of say I'm going to give you a piece
13 of the puzzle, and it's up to you to sort of
14 put the things together.
15      So that's what we're trying to convey
16 in that, in that paragraph.
17   Q.  Okay.  So you -- as I understood what
18 you just said is you think that the
19 morphology -- looking at the sample under the
20 microscope is an important diagnosing -- part of
21 the diagnosis.
22   A.  Yes.

Page 48

1    Q.  And that, if I heard you right, you
2  said you thought it was dangerous to make a
3  diagnosis not using the morphology, not looking
4  at the sample.
5    A.  No.  I said with some exceptions it can
6  be dangerous to look at things completely -- in
7  making a final interpretation completely in a
8  void.  That's not to say that sometimes it can
9  be done.
10      And part of the importance of
11 ancillary techniques, or for that matter any
12 diagnostic technique, is it's a matter of
13 probabilities.  And there's some results with
14 one particular technique that are so dramatic
15 and so strong that they can overturn any other
16 probability suggested by any other technique,
17 whereas other times, oftentimes, they're not as
18 strong and so by themselves they don't have
19 quite as much weight and you have to sort of
20 put them together and weigh them with other
21 things.  And that's kind of how we approach
22 these.

Page 49

1    Q.  Okay.  So let me just ask, would you
2  feel comfortable making a diagnosis based just
3  on a flow cytometry result?
4    A.  For some diseases, yes.
5    Q.  But not in all cases.
6    A.  But not in all cases.
7    Q.  But in what cases would you feel
8  comfortable with just using a flow cytometry
9  result?
10   A.  Chronic lymphocytic leukemia.  Acute
11 lymphoblastic leukemia.  Some cases of acute
12 myeloid leukemia.
13      Some of the subclassifications of the
14 acute myeloid leukemia if subclassification is
15 important might not be possible.
16      If there's a specific question of
17 whether residual disease is present after
18 treatment, it's very clear that flow cytometry
19 is more sensitive than morphology, and you'll be
20 able to detect things that are -- represent
21 disease when you can't see anything by
22 morphology, and that's well-established.