Steve E. Phurrough

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CONNECTICUT
 3
 4  UNITED STATES OF AMERICA,       *
    ex rel. Dr. James J. Tiesinga,  *
 5                                  *
              Plaintiffs,           * No. 3:02CV1573(MRK)
 6                                  *
    vs.                             *
 7                                  *
    DIANON SYSTEMS, INC.,           *
 8                                  *
              Defendant.            * Pages 1 - 77
 9
10
11
12       Videotaped Deposition of STEVE E. PHURROUGH
13                    Baltimore, Maryland
14                 Thursday, August 3, 2006
15
16
17
18
19
20  Reported by: Carla J. Briggs, RPR-RMR-CRR
21  Job No. 175904A
```

Steve E. Phurrough

Page 19

1 the committee failed to reach agreement on adopting

2 it, so it was tabled."

3          Do you know, Dr. Phurrough, why precisely

4 the committee failed to reach an agreement?

5    A    I have information from talking with

6 Miss Sheridan, Miss Eng and Dr. Burken about that

7 particular process, and the process that was

8 established to do the negotiated rulemaking was that

9 a committee was established by the agency to arrive

10 at the rule. They established six workgroups. One

11 of those workgroups was an oncology workgroup, and

12 they tasked those workgroups with deciding the

13 particular lab tests that they would review

14 internally.

15          The oncology workgroup was particularly

16 aggressive at selecting a large number of issues to

17 work on -- as I understand, more than the other

18 workgroups -- and they did not have in the time

19 allotted to them sufficient time to arrive at

20 decisions on all of the issues that were being

21 reviewed, and so the committee instructed the

1 workgroup, as I understand, to limit the number of

2 issues they were working on, and they deleted three

3 of the issues, flow cytometry being one of them.

4    Q    Now, when you say they didn't have time to

5 arrive at a decision at all issues, do you know why

6 they didn't have time to arrive at a decision with

7 respect to flow cytometry?

8    A    As I understand, the guidance that the

9 workgroup had was to select issues that you can work

10 on -- select lab tests that are common and simple

11 enough that you can do your review in the time

12 allotted.  Flow cytometry is a more complicated test

13 than some other tests and required more discussion

14 and interaction than some of the other tests.  And

15 because it was a more complicated test to address,

16 it was one of those that was selected to discontinue

17 work on.

18    Q    And where is Mrs. Sheridan currently?

19    A    She's retired.

20    Q    And Miss Eng?

21    A    She's retired.

Steve E. Phurrough

Page 23

1   Q   Niles Rosen. Do you know who he is?

2   A   Niles is a contractor medical director for
3   one of the Medicare contractors.

4   Q   You didn't speak to him?

5   A   No, I did not.

6   Q   And how about Paul Deutsch?

7   A   Paul Deutsch --

8   Q   Deutsch.

9   A   -- is also a medical director for another
10  contractor medical director -- for a Medicare
11  contractor.

12  Q   You didn't talk to him?

13  A   No, I did not.

14  Q   With respect to the entry by Niles Rosen,
15  he writes in part "They tried to do a policy through
16  laboratory negotiated rulemaking progress. They
17  could never come to any agreement on the maximum
18  number of units of service for different specimens
19  and diseases."

20          Do you know why they could not come to
21  agreement regarding a maximum number of units that

1 could be billed for specimens?

2   A   As I understand from talking with the
3 individuals I talked with, the medical literature
4 was not definitive on the exact number of specimens
5 that were necessary for the various indications.
6 They proposed in various working documents numbers
7 anywhere from 4 to 8 to 12, I think in one instance
8 up to 18. The review of the literature and the
9 discussions while ongoing would have required more
10 time than they -- the committee gave them to finish
11 their work, so that's -- again, as I mentioned
12 earlier, that's why the process was stopped for flow
13 cytometry.

14   Q   And with respect to the last sentence in
15 that entry, "He shared with me his frustration with
16 the approach of industry representatives who
17 outnumbered him significantly," do you know what
18 that passage is alluding to?

19   A   As I understand from reviewing the
20 documents and talking particularly, I believe, with
21 Joyce Eng, that the workgroup posted its draft

1 from that particular listserv.

2    Q    The next couple of sentences, "They are
3 discussing among themselves how to deal with it.  I
4 am not adverse to an NCD, but CAG will say there is
5 insufficient evidence for one."

6         What was the basis for the statement that
7 "CAG will say there is insufficient evidence for
8 one"?  And by "one," I take it that it's a national
9 coverage determination?

10   A    Correct.  The NCD does refer to national
11 coverage determinations.  The process we use at the
12 Medicare to do national coverage determinations is a
13 fairly rigid evidence-based medicine process where
14 we find all the medical literature we can find and
15 make decisions as to whether that medical literature
16 is both sufficient in quality as well as in quantity
17 and outcomes to determine that we, in fact, should
18 nationally cover something or not.  It is not
19 uncommon among the broad range of technologies that
20 there isn't sufficient evidence to make that
21 decision at a national level; and, therefore, we

Steve E. Phurrough

Page 30

1 choose to commonly not address that issue nationally,
2 and allow our contractors to address that issue
3 locally.
4    Q    And with respect to a flow cytometry
5 national coverage determination, what issue would
6 you leave to the carriers to decide locally?
7    A    Any time there is no national decision,
8 then all decisions around any aspect of coverage of
9 that particular issue is decided by the contractors
10 based upon their interpretation of statute,
11 regulations, and other guidance that the agency has
12 provided. So for the issue of flow cytometry, the
13 broad issue of will we in this particular region pay
14 for it at all would be a question the contractors
15 would have to decide, and then they would have to
16 decide other aspects within the decision of if we do
17 decide to pay for it, what are the other aspects of
18 it that we would make decisions about.
19    Q    With respect to the second paragraph, it
20 states "Not to say that we should do otherwise, but
21 in view of CAG's continuing refusal to give coverage

1 know what's being referred to there?

2    A    It refers back to the previous question.
3 If the agency chose for payment purposes to decide
4 here is the number we're going to use, 12 -- or
5 whatever the number is -- that would be sort of an
6 average of various indications rather than having a
7 specific number for each indication;
8 parenthetically, not an unusual position for the
9 agency to take in payment for things.
10              If they were to arrive at this particular
11 number, if it were to be done through the NCD
12 process, they would need evidence to choose that
13 rather than just selecting that number; so, this
14 says we need to find references. There needs to be
15 some evidence if we're going to use the NCD process
16 to set the number at 12 for all indications.
17 Typically, the evidence process would say for each
18 indication what is the number.
19    Q    In the next paragraph, "How should we --
20 how should we incorporate a payment-holding position
21 when the coverage doesn't restrict the number of

1 should be based on a disease-oriented approach as

2 described here by the authors?

3          MR. MOLOT:  Object to the form.  You can

4 answer.

5     A    We did not develop any national coverage

6 policy on that particular issue.

7     Q    Now, with respect to the same sentence

8 when he talks about one based on specimen type, the

9 next page, Page 23, under 2.7.2 second sentence they

10 write "In the authors' experience from several

11 laboratories (United States and Europe), incorrect

12 panel selection because of morphologic

13 misinterpretation is not an infrequent occurrence.

14 To circumvent these issues, the authors have

15 replaced the above antibody panels with panels

16 oriented by specimen type.  Thus, the two new panels

17 are blood/bone marrow/spleen (BBS) panel and a

18 tissue/fluid (TF) panel."

19          Do you know whether CMS in any binding

20 national coverage determination has indicated what

21 type of antibody panels should be used based on