```
                                                                    1
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF CONNECTICUT

              NO. 3:02 CV 1573(MRK)

UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

         Plaintiff(s),

- vs -

DIANON SYSTEMS, INC.,

         Defendant(s).
_____


              V I D E O  E X A M I N A T I O N
                          OF
                   RAUL C. BRAYLAN, M.D.


TAKEN ON
BEHALF OF:    The Plaintiff

DATE:         June 15, 2006

TIME:         Scheduled start:   9:00 a.m.
              Actual Start:      9:07 a.m.
              Conclusion:       12:32 p.m.

PLACE:        Unites States Attorney's Office
              300 West University Avenue
              Suite 310
              Gainesville, Florida 32601

REPORTER:     Anne C. Noble, RPR, FPR, CSR-GA, WA
              Notary Public: Florida and South Carolina
```

```
                                                                    2
              A P P E A R A N C E S
                    * * * * *

        COUNSEL FOR THE PLAINTIFF(S)

         PATRICIA R. DAVIS, ESQUIRE
              Assistant Director
       United States Department of Justice
              Civil Division
         Commercial Litigation Branch
              Fraud Section
          Patrick Henry Building
       601 D Street, N.W., Room 9154
           Washington, D.C. 20044
            pat.davis@usdoj.gov
          Telephone: 202.307.0238
          Facsimile: 202.305.4117


        COUNSEL FOR THE DEFENDANT(S)

          BRUCE R. PARKER, ESQUIRE
             Venable, L.L.P.
    1800 Mercantile Bank & Trust Building
              2 Hopkins Plaza
         Baltimore, Maryland 21201
            brparker@venable.com
          Telephone: 410.244.7534


              ALSO PRESENT

       JOHN "JACK" LEBRANT, Videographer
                 * * * * *
```

```
                                                                    3
                    I N D E X
        (Examination of Raul C. Braylan, M.D.)

                                              Page No.
Direct Examination by Ms. Davis:                 5
Cross-Examination by Mr. Parker:               137
Certificate of Oath:                           141
Certificate of Reporter:                       141
Errata sheet: (Attached separately)
Read and sign letter: (Attached separately)


           PLAINTIFF(S) EXHIBIT INDEX

Number    Description                          Page No.

No. 1, Dr. Braylan's "Expert Report" and
Curriculum Vitae                                 5

No. 2, Plaintiffs' Amended Complaint with
transfer correspondence and attached report
and CV documentation of experts                 50

No. 3, Article, "U.S.-Canadian Consensus
Recommendations on the Immunophenotypic
Analysis of Hematologic Neoplasia by Flow
Cytometry: Medical Indications"                 76

No. 4, Article, "Optimal Number of Reagents
Required to Evaluate Hematolymphoid
Neoplasias: Results of an International
Consensus Meeting"                             107

No. 5, Dianon clinic testing with results      121
```

```
                                                                    4
                  P R O C E E D I N G S
                       * * * * *

         VIDEOGRAPHER:  Time on the record, 9:05 a.m..  My
name is John LeBrant.  John LeBrant Court Video, Post
Office Box 140871, Gainesville, Florida 32614.  Today's
date, June 15th, 2006.  We are at U.S. Attorney's
Office, 300 East University Avenue, Gainesville,
Florida to videotape the deposition of -- please state
your name --
         THE WITNESS:  Raul Braylan.
         VIDEOGRAPHER:  -- in the case of United States of
America, et al., Dr. James J. Tiesinga, Plaintiffs, vs.
Dianon Systems. Inc., Defendant, filed in the United
States District Court for the District of Connecticut,
No. 3:02 CV 1573(MRK).
         The court reporter is Anne Noble from
Johns, Stephenson & Biery Court Reporters in
Gainesville, Florida.
         Will counsel please identify themselves
beginning with plaintiffs' count?
         MS. DAVIS:  I'm Pat Davis.  I'm representing the
United States.
         MR. PARKER:  Good morning.  Bruce Parker
representing the defendant, Dianon Systems.
         VIDEOGRAPHER:  Please raise your hand to be
```

21

1   A.  In the case of a needle aspirate, since we
2 have no tissues, it's almost exclusively flow
3 cytometry and perhaps molecular biology. But in the
4 case of a biopsy, in a tissue biopsy, a portion goes
5 invariably to histology.
6   Q.  Okay. Before anybody looks at it under a
7 microscope or performs any other --
8   A.  Before anybody looks at it. A primary
9 lymphopathy (phonetic) is an absolute indication for
10 flow cytometry.
11   Q.  Okay. What about when the bone marrow -- or
12 I'm sorry -- the bone marrow and the blood come in?
13 Do those automatically go to flow cytometry?
14   A.  Well, it depends on the situation. If we had
15 a firm diagnoses in our own laboratory that it
16 occurred within, let's say, two months, and it is our
17 own information -- our own analyses, depending on --
18 again, depending on the case, depending on the
19 circumstances, if nothing has changed and people are
20 looking for a response to therapy, for example, within
21 two months, which is very common after the initial
22 diagnosis, we would generate a -- what is called a
23 panel focused exclusively on the disease, provided
24 that nothing has happened over two months except the
25 therapy and provided that we have firm information on

22

1 the initial diagnosis.
2       We have found time and time again that
3 relying upon somebody else's diagnosis or the
4 dictation or analysis is not sufficiently informative
5 for us to look for, in cases like this, a low level of
6 cancer cells which may escape our screening if we just
7 use a small panel, without knowing what the initial
8 panel in detail consisted of.
9   Q.  Okay. What percentage --
10       MS. DAVIS: Let's go off the record for a minute.
11       (Whereupon, there was a pause in the
12    proceedings.)
13       THE WITNESS: That's okay.
14 BY MS. DAVIS:
15   Q.  What percentage of the specimens that come in
16 are tissue as opposed to blood or bone marrow?
17   A.  The majority are bone marrows. I would say
18 78 percent.
19   Q.  Okay. And when -- you say you get some of
20 the specimens from outside your hospital system?
21   A.  Uh-huh.
22   Q.  Who generally refers those to you?
23   A.  Two types of people: Pathologists and
24 oncologists.
25   Q.  Okay.

23

1   A.  And you understand the difference; right?
2   Q.  Yes.
3   A.  Okay.
4   Q.  Okay. And the people that refer the
5 specimens to you, are they familiar with the various
6 techniques you use?
7   A.  Yes. Many of them have been trained by us,
8 and they are in the region practicing. So they know
9 exactly what we do.
10   Q.  Okay.
11   A.  Others we have to educate -- initially, at
12 least -- and explain what we do and how we integrate
13 results. Not all the laboratories, unfortunately,
14 practice in the same manner, and so clinicians
15 sometimes don't understand how one laboratory performs
16 things and another laboratory performs things.
17       So we try to explain, when there is a person
18 who doesn't know us, how we practice and what to
19 expect from the various laboratory techniques.
20   Q.  Okay. If -- let's say a bone marrow, since
21 that's mostly what you do, comes into the lab, and it
22 goes through this triage process, and then it goes to
23 flow cytometry.
24   A.  Uh-huh.
25   Q.  Exactly what happens to it with -- in

24

1 preparation for the flow cytometer?
2   A.  A bone marrow aspirate?
3   Q.  Uh-huh.
4   A.  Okay. The bone marrow aspirate is
5 initially what is called "smeared" on a slide for
6 quality control, a portion of that aspirate.
7       The aspirate contains something that we call
8 spicules, S-P-I-C-U-L-E-S, which is the actual true
9 bone marrow material that comes mixed with blood that
10 comes usually from the aspirate.
11       So the medical technologist tends to fish
12 those out and put them on a slide and smear them.
13       As for quality control, we use that to make
14 sure that there is a correlation between what we see
15 and what -- many of the slides come from the doctors.
16 We compare the two in case there are problems with the
17 sample; deterioration, mix-ups. Things like that.
18       The remaining of the sample, then, is
19 processed for flow cytometry.
20       Do you want to know the specifics or --
21   Q.  Yes? Basically, what antibodies -- reagents
22 you're calling them?
23   A.  Okay. Basically, we have two panels.
24   Q.  Okay.
25   A.  One is called the tissue panel. And the