Dr. Margaret G. Johnson                                    8/24/2006

## SHEET 1 PAGE 1

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

        Plaintiffs,

vs.

DIANON SYSTEMS, INC.,

        Defendant.


DEPOSITION OF DR. MARGARET G. JOHNSON


THURSAY, AUGUST 24, 2006
9:02 A.M.


TERRY SANFORD FEDERAL BUILDING & COURTHOUSE
310 NEW BERN AVENUE, CONFERENCE ROOM 158
RALEIGH, NORTH CAROLINA


A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

    PATRICIA R. DAVIS
        United States Department of Justice
        601 D Street N.W., Room 9154
        Washington, DC 20004
        (202) 307-0238
        (202) 305-4117 (fax)
        pat.davis@usdoj.gov


ON BEHALF OF THE DEFENDANT:

    BRUCE R. PARKER
        Venable LLP
        Two Hopkins Plaza, Suite 1800
        Baltimore, Maryland 21201-2978
        (410) 244-7354
        (410) 244-7742 (fax)
        brparker@venable.com


ALSO PRESENT:

    PAUL PROCTOR (Videographer)
```

## PAGE 2

```
T A B L E   O F   C O N T E N T S
ATTORNEY          EXAMINATION      PAGE
MS. DAVIS             DIRECT          5
MR. PARKER            CROSS          72

EXHIBIT           DESCRIPTION             MARKED

PLAINTIFFS' 1    NOTICE OF DEPOSITION          15

PLAINTIFFS' 2    LABCORP CENTER FOR MOLECULAR  16
                 BIOLOGY AND PATHOLOGY 1/22/01

PLAINTIFFS' 3    FLOW CYTOMETRY ACUTE AND      26
                 CHRONIC LEUKEMIA

PLAINTIFFS' 4    DIRECTORY OF SERVICES SCREEN  32
                 PRINT

PLAINTIFFS' 5    E-MAIL TO KARWOWSKI FROM      39
                 JONES (4/19/01)

PLAINTIFFS' 6    BILLING COMPLIANCE COMMITTEE  40
                 MINUTES

PLAINTIFFS' 7    CONFERENCE CALL MINUTES       45
                 (10/21/03)

PLAINTIFFS' 8    MEMO TO SCIENCE AND TECHNOLOGY 48
                 FROM FIORDALISI (3/21/03)

PLAINTIFFS' 9    E-MAIL TO DAWKINS FROM JOHNSON 51
                 (9/29/03)

PLAINTIFFS' 10   LABCORP STANDARD OPERATING    52
                 PROCEDURE

PLAINTIFFS' 11   E-MAIL TO DAWKINS FROM        54
                 FIORDALISI (12/18/02)
```

## PAGE 3

```
EXHIBIT           DESCRIPTION             MARKED

PLAINTIFFS' 12   HEMATOPATHOLOGY STANDARDIZATION 56
                 MEETING MINUTES (1/13/04)

PLAINTIFFS' 13   HEMATOPATHOLOGY STANDARDIZATION 60
                 MEETING MINUTES (2/4/04)

PLAINTIFFS' 14   4-COLOR STRATEGY FOR CLL,      64
                 LYMPHOMA, HAIRY CELL LEUKEMIA
                 AND MULTIPLE MYELOMA

PLAINTIFFS' 15   E-MAIL TO PALMIEN FROM BERG   65
                 (3/31/04)

PLAINTIFFS' 16   E-MAIL TO SEGAL FROM MISHALANI 69
                 (11/14/05)

PLAINTIFFS' 17   CIGNA HEALTH CARE NORTH       70
                 CAROLINA LOCAL MEDICAL REVIEW
                 POLICY

PLAINTIFFS' 18   LEUKEMIA/LYMPHOMA ANALYSIS    71









REPORTER'S CERTIFICATE                         78
```

## PAGE 4

1  PROCEEDINGS
2            VIDEOGRAPHER:  This is the videotaped deposition of
3  Dr. Margaret Johnson taken by the plaintiff in the matter
4  of United States of America, ex rel. Dr. James J.
5  Tiesinga, Plaintiffs, versus Dianon, Incorporated,
6  Defendants, and -- or Defendant, excuse me. And this is
7  in the United States District Court for the District of
8  Connecticut and is Case No. 3:02 CV 1573 (MRK).
9            This deposition is being held in the offices of
10 the United States Attorney in the Terry Sanford Federal
11 Building and Courthouse, Room 158. It's located at 310
12 New Bern Avenue, Raleigh, North Carolina 27601.
13           Today's date is August 24th, 2006, and the time
14 is 9:02 a.m., Eastern Daylight Time. The court reporter
15 is Patti Elliott, representing Williams Reporting, located
16 in Raleigh, North Carolina. The videographer is Paul
17 Proctor, representing Video Visions, Incorporated, located
18 in Apex, North Carolina.
19           Would counsel please introduce themselves?
20           MS. DAVIS:         I'm Pat Davis. I'm representing the
21 United States.
22           MR. PARKER:  Good morning. Bruce Parker,
23 representing Dianon Systems.
24           VIDEOGRAPHER:  Would the court reporter please swear
25 in or affirm the witness?

PAGES BY PATTI

Dr. Margaret G. Johnson                                    8/24/2006

SHEET 3   PAGE 9

PAGE 9

1  been that way for more than five years.
2      Q.    Okay.  So since at least, say, 2001?
3      A.    Yes.
4      Q.    Okay.  When you -- when you -- you say that when you
5  joined the -- what became LabCorp, there was already a small
6  flow cytometry group in place.  Was -- were the procedures
7  already set up when you got there?
8      A.    Yes.
9      Q.    Did you have any input into changing them at any
10 point?
11     A.    Yes.
12     Q.    When was that?
13     A.    I think almost immediately when I got there --
14     Q.    Okay.
15     A.    -- we began working on new panel design.
16     Q.    Okay.  And did your panel change over time?
17     A.    Yes.
18     Q.    And did you have one -- one panel or more than one
19 panel?
20     A.    We've always had more than one.
21     Q.    Okay.  And why is that?
22     A.    Just how we evolved, basically, from what we started
23 with when we -- when we got there.  And as we acquired more
24 work and more expertise, we changed the panel.  And, of course,
25 the technology has changed tremendously over the years from

PAGE 10

1  initially doing two-color to doing four-color and the addition
2  of different markers that became available over this period of
3  time.  So, yes --
4      Q.    Okay.
5      A.    -- it's evolved tremendously, I would say.
6      Q.    Okay.  Let's -- let's say -- let's say, like -- I'll
7  just pick a date, 2000-2001.  Describe for me the process of
8  how specimens would come into the lab and what would happen to
9  them once they got to the lab.
10     A.    Well, LabCorp is a -- is a large reference lab.  And
11 so specimens come from the client by two different ways.  They
12 can come by a courier or they can come by an overnight carrier.
13           Eventually, they reach our specimen management
14 department, where they are sent to the flow cytometry lab.  And
15 a specimen comes from the client with a requisition and a test
16 order.
17     Q.    Okay.  And then --
18     A.    And then once it's in the flow lab, then we -- we
19 process it from there.
20     Q.    Okay.  And how do you process it?
21     A.    How do we process it?
22     Q.    Just generally.
23     A.    We receive the specimen.  They review the information
24 that's provided.  We do a smear review and look at the cells
25 there.  We do a CBC if it's a peripheral blood or if there's a

PAGE 11

1  blood with a bone marrow.  And then we set up the panel that's
2  requested, unless there's anything that we see that suggests
3  that that's not right or if we need to add more markers to
4  answer the question.
5      Q.    Okay.  And so the -- when the -- when the specimen
6  comes in, you say you do a smear review.
7      A.    Uh-huh (yes).
8      Q.    Is that a smear that's already sent by the -- the --
9      A.    No.
10     Q.    -- the doctor?
11     A.    No.  We make the smear.
12     Q.    Okay.  You make the smear.  And then -- and who
13 reviews that?
14     A.    The technologist.
15     Q.    Okay.  And what's the purpose of -- of reviewing
16 the -- the smear?
17     A.    Well, you get an idea of the quality of the specimen,
18 whether it's, you know, hemodilute or if it's been damaged in
19 transit or -- and for acute leukemias -- I guess that's the
20 primary thing.
21           When we can look at the smear and say we have an
22 acute leukemia here, we tend to expedite that processing so we
23 can get it through faster, so we can call results, because
24 that's a life-threatening disorder.  So --
25     Q.    Okay.  And in doing the smear review --

PAGE 12

1      A.    Uh-huh (yes).
2      Q.    -- does the technologist ever look at it and say,
3  "Gee, this person picked the wrong panel.  They should be doing
4  something," or "It looks like there's something else going on
5  here"?
6      A.    Yeah.  Some things are pretty obvious, so, yes.
7      Q.    Okay.
8      A.    They are -- you know, they get experience very
9  quickly because we're a high-volume lab.  So they can learn
10 real quickly to recognize certain things that are commonly
11 seen.
12     Q.    Okay.  And then you say you got the specimens from
13 the -- from the referring doctors.  Where, generally, are the
14 doctors located?
15     A.    You mean what states?
16     Q.    Uh-huh (yes).  I mean, just generally.
17     A.    I think they're all over the eastern part of the
18 United States.
19     Q.    Okay.  So you get -- you get specimens from all over
20 the eastern half of the U.S.?
21     A.    And Puerto Rico.
22     Q.    Okay.  And those would come in by -- those outside
23 the local area would come in by overnight carrier?
24     A.    Most of our specimens actually come in through the
25 courier system, which means they go from -- they are picked up

Dr. Margaret G. Johnson                                          8/24/2006

SHEET 17   PAGE 65

1  the percentages was that, at some point in time, they felt like
2  if you did a marker that you had to report some sort of result
3  for that marker.
4           And that's -- you know, they -- they agreed with us
5  about removing the percentages. So it was not a huge
6  discussion about it. It was -- from their point of view, they
7  felt that it was a requirement to have a result for each marker
8  to bill for them. And -- and that was not true. And I think
9  that's what they were talking about in terms of compliance
10 issue.
11      Q.    Okay. But it says compliance issues on LabCorp's
12 end?
13      A.    Well -- yeah. I don't know. The fact that we didn't
14 report something for each marker. I think that was not true.
15      Q.    Okay. And then the next one -- the next note says --
16      A.    Uh-huh (yes).
17      Q.    -- "Target date by end of next week for shotgun panel
18 validation."
19      A.    Uh-huh (yes).
20      Q.    What does that refer to?
21      A.    Well, it's just -- it was -- it's the word that was
22 used for the comprehensive panel. And, basically, we had to
23 validate about two or three additional markers to be able to
24 offer that comprehensive panel.
25      Q.    Okay. At some point after LabCorp acquired, I guess,

PAGE 66

1  Esoterix and U.S. Labs, there was a meeting to talk about
2  standardizing all of the companies.
3       A.    Yes.
4       Q.    Okay. Did you attend that meeting?
5       A.    I did.
6       Q.    Where was it?
7       A.    It was in Tennessee, outside of -- what's the name of
8  that town? It was basically in the town where Esoterix is
9  located and I can't remember right now, under pressure, what
10 the name of the town was.
11      Q.    Brentwood?
12      A.    Brentwood. Exactly.
13      Q.    Okay. And who all was there?
14      A.    Bruce Davis was there for U.S. Labs. Dr. Braylan was
15 there as a moderator. There were multiple hematopathologists
16 from Dianon there whom I don't recall all their names. Greg
17 Stelzer was there.
18      Q.    Who's Greg Stelzer?
19      A.    He's a -- works for -- for Esoterix. I was there for
20 LabCorp, and Suha was there for Dianon. And Dr. Goldman was
21 there. And the supervisor of the Esoterix lab was there, and
22 the supervisor of the U.S. Labs was there.
23      Q.    Okay. And you said Dr. Braylan was there as a
24 moderator?
25      A.    Yes.

PAGE 67

1       Q.    What exactly was his role?
2       A.    Just to sort of moderate the discussions as a -- as
3  not -- he was not one of the corporations that was being
4  merged. He was considered an independent party, so he was the
5  one that was moderating.
6       Q.    Okay. So there -- were there disagreements among
7  the -- the various companies about what -- how the
8  standardization should -- should occur?
9       A.    I personally felt that it went very easily, that
10 there was not a lot of disagreement. In fact, it was fairly
11 easy to come up, given the parameters that we were given to
12 work with.
13      Q.    And what were those parameters?
14      A.    It would be for a blood or bone marrow specimen that
15 you could detect and diagnose all the common leukemias and
16 lymphomas in one pass. And it was a five-color tube --
17      Q.    Okay.
18      A.    -- so it's -- it's talking about moving to -- from
19 four-color to five-color.
20      Q.    Okay.
21            MS. DAVIS:    Okay. Why -- why don't we go off and
22 change tape now?
23            VIDEOGRAPHER:    All right. We're going to go off
24 record for the end of Tape 1 and the time is 11:05 a.m.
25 [RECESS - 11:05 A.M. TO 11:06 A.M.]

PAGE 68

1             VIDEOGRAPHER:    We're back on record, Videotape 2,
2  11:06 a.m.
3  [PLAINTIFFS' EXHIBIT NO. 16 MARKED
4  FOR IDENTIFICATION]
5             BY MS. DAVIS:
6       Q.    Okay. Doctor, let me show you what's been marked as
7  Exhibit 16. Have you seen that before?
8       A.    Well, the front page is obviously a memo from Dr.
9  Segal from Dr. Mishalani, so I haven't seen that. But the next
10 page is the summary of the -- of that consensus meeting.
11      Q.    Okay. And then --
12      A.    It was the -- this is obviously -- it's a draft.
13      Q.    Oh, it's a draft?
14      A.    It says "Draft."
15      Q.    Okay. Oh, yeah. I see that up there.
16            Okay. And at page 13802, are those the -- let's --
17 the -- the top panel there, that's -- is that the consensus on
18 the panel that you were going to standardize on?
19      A.    Yes.
20      Q.    Okay. And then what's the -- the secondary panel
21 there? There's a list of specialty tubes for standardization.
22      A.    Yes. Well, those are tubes that you would add onto
23 the -- to the base panel, depending on what your results were.
24 These are, yeah, tubes that further define other conditions
25 that aren't completely defined in the first panel.