Stuart Flynn, M.D. - 5/10/06

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
2

3   - - - - - - - - - - - - - - - - )
                                     )
4   UNITED STATES OF AMERICA,        )
    ex rel. Dr. James J. Tiesinga    ) NO.: 3:02CV1573(MRK)
5            PLAINTIFFS              )
                                     )
6   VS.                              )
                                     )
7   DIANON SYSTEMS, INC.             )
             DEFENDANT               )
8                                    )
    - - - - - - - - - - - - - - - - )
9

10

11      DEPOSITION OF: STUART FLYNN, M.D.

12      DATE TAKEN: MAY 10, 2006

13      LOCATION: UNITED STATES DEPARTMENT OF

14                JUSTICE

15                157 CHURCH STREET

16                NEW HAVEN, CONNECTICUT

17

18

19

20

21   REPORTED BY:  IRENE J. PARRISH, RMR, LSR #085

Stuart Flynn, M.D. - 5/10/06

Page 2

```
 1              APPEARANCES
 2
 3   Representing the Plaintiffs:
 4       UNITED STATES DEPARTMENT OF JUSTICE
         157 Church Street, 23rd Floor
 5       New Haven, CT  06510
             By: RICHARD M. MOLOT,
 6           ASSISTANT UNITED STATES ATTORNEY
 7   Representing the Defendant:
 8       VENABLE, LLP
         Two Hopkins Plaza, Suite 1800
 9       Baltimore, MD  21201-2978
             By: BRUCE R. PARKER, ESQ.
10
11   IN ATTENDANCE:
         Glenn Segal, M.D.
12
13
14
15
16
17
18
19
20
21
```

Page 3

```
 1              I N D E X
 2   WITNESS       DIRECT   CROSS   REDIRECT   RECROSS
 3   STUART FLYNN, M.D.
     By Mr. Parker:   8
 4
 5   EXHIBITS:                        MARKED
 6
 7   DEFENDANT'S:   (For Identification)
 8   1    notice of deposition .........    9
 9   2    letter, 3/26/03, and attachments   10
10   3    Optimal Number of Reagents Required   12
11        to Evaluate Hematolymphoid
12        Neoplasias:  Results of an
13        International Consensus Meeting
14   4    U.S.-Canadian Consensus .......   15
15        Recommendations on the
16        Immunophenotypic Analysis of
17        Hematologic Neoplasia by Flow
18        Cytometry:  Selection of Antibody
19        Combination
20   5    U.S.-Canadian Consensus .......   17
21        Recommendations on the
```

Page 4

```
 1        Immunophenotypic Analysis of
 2        Hematologic Neoplasia by Flow
 3        Cytometry:  Standardization and
 4        Validation of Laboratory Procedure
 5   6    Medical Legal Cases, Deposition    25
 6        and/or Trial, 1/1/02 to present
 7   7    curriculum vitae ..............    31
 8   8    YNHH Laboratory Manual, Flow ..    46
 9        Cytometry Consultation
10   9    copy of report prepared by ...    79
11        Dr. Flynn, 2/10/06
12   10   memo, 5/21/97 ................   130
13   11   Consensus Protocol for the Flow   135
14        Cytometric Immunophenotyping of
15        Hematopoietic Malignancies
16   12   Diagnosis of Unexpected Acute .   158
17        Myeloid Leukemia and Chronic
18        Lymphocytic Leukemia:  A Case Report
19        Demonstrating the Perils of
20        Restricted Panels in Flow Cytometric
21        Immunophenotyping
```

Page 5

```
 1   13   collection of documents, .....   176
 2        Sample No. 36
 3   14   Optimal Number of Reagents Required  187
 4        to Evaluate Hematolymphoid
 5        Neoplasias:  Results of an
 6        International Consensus Meeting
 7   15   requisition form received on or   204
 8        about 10/6/99
 9   16   requisition form, Patient 79 ..   211
10   17   requisition form, Patient 6 ...   221
11   18   Real-time Quantitative RT-PCR of   223
12        Cyclin D1 mRNA in Mantle Cell
13        Lymphoma:  Comparison with FISH and
14        Immunohistochemistry
15   19   collection of documents, .....   233
16        Sample No. 63
17   20   collection of documents, .....   239
18        Sample No. 129
19   21   collection of documents, .....   245
20        Sample No. 54
21   22   collection of documents, .....   250
```

Stuart Flynn, M.D. - 5/10/06

Page 190

1 not know.
2   Q   You are not a member though?
3   A   I am not.
4   Q   And this document says that in 2000 a meeting
5 was organized of international experts on flow
6 cytometry. You see that?
7   A   No. I was daydreaming.
8   Q   On the abstract, the first sentence of the
9 abstract --
10  A   Got you, yes.
11  Q   I do not mean to be facetious by this
12 comment, Doctor, but you were not one of the invited
13 international experts in flow cytometry?
14       MR. MOLOT: Objection.
15  A   That's correct.
16 BY MR. PARKER:
17  Q   Doctor, do you recognize Dr. Braylan as an
18 expert in flow cytometry?
19  A   Yes.
20  Q   Do you recognize Dr. Borowitz as an expert in
21 flow cytometry?

Page 191

1   A   Yes.
2   Q   Do you recognize Dr. Bruce Davis as an expert
3 in flow cytometry?
4   A   I worked with Bruce. Yes, I do.
5   Q   Where and when did you work with Dr. Davis?
6   A   '85 to '86.
7   Q   Okay. Now, you understand from having read
8 this that what was being done in this conference was
9 to get a bunch of experts -- international experts
10 together in this field and try to come up with some
11 common understanding as to both approach and size of
12 panels to use in performing flow cytometry?
13  A   That's fair.
14  Q   And, Doctor, if you turn to the last page,
15 page 27, you see where it says, "From the United
16 States"?
17  A   Yes.
18  Q   Down at the bottom, Dr. Maryalice
19 Stetler-Stevenson was also one of the invited
20 participants. Do you see that?
21  A   Yes.

Page 192

1   Q   She was one of the authors of the paper we
2 just finished discussing from the NIH?
3   A   Correct.
4   Q   Okay. Now, please turn to the discussion
5 portion of this page. Actually, let me go back to
6 the page before.
7       MR. MOLOT: Which page?
8       MR. PARKER: Good question. I wasn't
9    trying to confuse you, Rick, page 25.
10      MR. MOLOT: With the tables?
11      MR. PARKER: With the tables, right.
12 BY MR. PARKER:
13  Q   And, Doctor, when you read this, these
14 authors described their terminology of what was
15 essential and how they used the term "useful
16 information" in terms of the diagnostic markers?
17  A   I mean, I understood the premise. If you're
18 asking me did I -- I'll have to find where they
19 define what they mean by that if that's important.
20  Q   Well, if you don't know, then we'll move on
21 in the interest of time, but I'm asking you: As you

Page 193

1 read this paper, did you form a judgment in your own
2 mind that as they used the terminology something
3 which was useful was not in the context of this case
4 medically necessary?
5       MR. MOLOT: Objection.
6   A   No, that's not how I interpreted how they
7 were saying it.
8 BY MR. PARKER:
9   Q   So medical necessary -- or necessity would
10 encompass both those which were deemed to be
11 essential and those deemed to be useful for arriving
12 at diagnostic conclusions?
13      MR. MOLOT: Object to the form.
14  A   Within the entire set, both could
15 potentially, but, again, overlap and appropriate
16 utilization of the number that one needs.
17 BY MR. PARKER:
18  Q   Let's turn now to page 26 under "Discussion,"
19 and scroll down if you would to -- if you see the
20 sentence that begins, "Despite these shortcomings."
21 It's about two-thirds down on the right-hand side

49 (Pages 190 to 193)

Stuart Flynn, M.D. - 5/10/06

Page 194

1  under "Discussion." You see referenced "CD64"?
2  A  Yes. Okay.
3  Q  Okay. These authors wrote the following.
4  "Despite these shortcomings, the group reached broad
5  consensus, supporting the notion that large panels of
6  antibodies were important for adequate
7  characterization of lymphoid neoplasms." I read that
8  correctly, right?
9  A  Correct.
10  Q  That's not consistent with the basic approach
11  you took in reviewing Dianon's panel, is it, sir?
12      MR. MOLOT: Objection.
13  A  No. I disagree.
14  BY MR. PARKER:
15  Q  So you -- your testimony as we go through the
16  reports is that the panel sizes that you determined
17  were medically necessary in Dianon's case were large?
18  A  No. I'm making the statement that the panels
19  I designed for Dianon patients were medically
20  appropriate and necessary.
21  Q  But I'm asking you this question, sir. These

Page 195

1  authors said that they reached broad consensus that
2  large panels of antibodies were important for
3  adequate characterization of neoplasms.
4  A  Again, the adjectives "large" and "adequate"
5  need to be defined.
6  Q  And they are defined in the study, are they
7  not?
8  A  I mean, they're defined in a broad, loose
9  fashion which is very understandable when you're
10  reading it from that perspective. If you're asking
11  from a given patient's perspective, knowing what you
12  know, that's a different issue to state the obvious.
13  Q  Let's go with -- perhaps with more clarity
14  for your purposes to page 27, the last page, and the
15  left-hand column with the paragraph beginning, "AL
16  proved."
17  A  Yes.
18  Q  The fourth sentence begins, "Although."
19  A  Yes.
20  Q  These authors wrote, "Although it is obvious
21  that the size of the total panel used would vary with

Page 196

1  the complexity or the specific lineage of the case,
2  virtually all voting participants agreed that 20 to
3  24 antibodies would be necessary for an adequate
4  evaluation of AL" -- that would be acute lymphoma --
5  acute leukemia, excuse me -- "at diagnosis."
6      With my interruption, I've read it
7  correctly?
8  A  You have.
9  Q  Doctor, the panels that you constructed when
10  you reviewed Dianon's cases for AL were smaller than
11  20 and 24, 20 to 24, were they not?
12  A  They were as -- so I'll run with this, and
13  you can stop me. So my limitation was what Dianon
14  had in their panel. So Dianon did not have 20 to 24
15  antibodies addressing the issue of acute leukemia.
16  And, again, this paper addresses disease-specific
17  entities, and so they're focused on acute leukemia.
18  They're devising a panel for it. That would actually
19  be a targeted approach to use the terminology we've
20  used here this morning.
21      In Dianon's panel, they don't have all of

Page 197

1  these, and I would not have been critical of
2  additional antibodies that they might have used in
3  that assessment, but I used the ones that address the
4  issue, that would help phenotype a patient's given
5  acute leukemia.
6  Q  Doctor, before we break for lunch, have you
7  read the reports submitted in this case by
8  Drs. Holden, Braylan and Borowitz?
9  A  I have.
10  Q  Collectively they expressed a view that
11  Dianon's approach in using a standard panel, as you
12  say one panel fits all, the way you describe it, is
13  well within the appropriate standard of care and
14  commonly employed in the flow community?
15      MR. MOLOT: Objection.
16  A  I don't know -- I'm not sure if they say it's
17  commonly employed. They defend the practice.
18  BY MR. PARKER:
19  Q  Not only did they defend the practice, but
20  they say in the context of a flow lab and the volume
21  of cases that are seen in a flow lab it's necessary

50 (Pages 194 to 197)

Stuart Flynn, M.D. - 5/10/06

Page 326

1  A  So give me a little bit to read this chart.
2  BY MR. PARKER:
3  Q  Take your time. Don't rush.
4      MR. MOLOT: Off the record.
5      MR. PARKER: Off the record.
6          (A short break was taken.)
7          (Defendant's Exhibit No. 32,
8           notes, Bates stamped SF0479,
9           marked for identification.)
10 BY MR. PARKER:
11 Q  Okay. Are we all set?
12 A  Well, I'm definitely losing it. I thought I
13 saw a white count in here, but I am losing it. So
14 maybe I can ask you to ask your question once again.
15     MR. PARKER: Would you read that,
16 please.
17         (Reporter read the last
18          question.)
19 A  So 2 and 22 we've discussed. They're
20 supportive antibodies. That question is being
21 addressed. CD2 has other T cell antibodies that will

Page 327

1  give you information about the T cells and if it's an
2  abnormal T cell population, for instance. CD22 the
3  same issue with B.
4      CD25 in this case would have been an
5  attempt to detect hairy cell, and I can honestly
6  say -- maybe it's the time of day. I'd like to say
7  it's an incomplete chart, that there was a reason for
8  that, and HLA DR again in this scenario seems to be
9  superfluous to me. So conversely I included
10 obviously 18 of the 22 antibodies to try to address
11 this question in a medically appropriate fashion.
12 BY MR. PARKER:
13 Q  I'm going to hand you Exhibit 32, and, for
14 the record, the circles and the question marks are
15 all my creations, not yours. Doctor, firstly, this
16 is a copy out of your notes of your workup of this
17 case, B6?
18 A  Correct.
19 Q  And with regard to this case, you wrote, did
20 you not, sir, "Anemia, must cover all possibilities.
21 Interpretation, question mark, LGL"?

Page 328

1  A  Correct.
2  Q  What did you understand when you say, "Must
3  cover all possibilities"?
4  A  This is an example where the history -- there
5  certainly is history, but there is not other
6  information that allows me to be grounded. So it was
7  actually the cases with the least amount of history
8  or clinical information where although I don't think
9  it's appropriate practice and I think that is borne
10 out by the histories Dianon got and the fact that at
11 least Dr. Mishalani would call for histories, but in
12 this case, "Must cover all possibilities" means to me
13 that anything within reason from this panel that I
14 could keep in there in kind of a shotgun approach I
15 kept in there.
16 Q  So if you were consistent in your analysis,
17 would I be correct in concluding that when I see
18 patients with anemia with no more, no less clinical
19 information than what is presented in case No. 6 I
20 should expect to see you concluding that up to 18
21 antibodies were permissible to use?

Page 329

1  A  Identical to this?
2  Q  Well, Doctor, with no significant difference.
3  A  Well, again, in fairness to me now as opposed
4  to in fairness to anybody else, as we've seen in
5  several cases here today, what you thought were
6  superimposable cases turned out to have information
7  that made them not superimposable. The assay test
8  would be give me a case with this kind of information
9  and no more and see where my consistency is in
10 devising a panel.
11 Q  But what I'm getting at is: It would be fair
12 for me to hold you to a standard of having to be
13 consistent if there is no material difference in the
14 clinical histories of someone presenting with anemia
15 with regard to the construction of a panel?
16 A  I think that is a fair blanket statement,
17 but, again, it all harks back to what other
18 additional information is there for a given patient
19 which might make that case distinctive from another
20 case.
21 Q  When you said in your notes, "Must cover all

Towson Reporting Company          GORE BROTHERS          Whitman Reporting-Rockville
410-828-4148                      410-837-3027                     301-279-7599

Stuart Flynn, M.D. - 5/10/06

Page 330

1 possibilities," one of those would include hairy cell
2 leukemia, correct?
3  A  Correct.
4  Q  Then let's go back. I'm not sure I
5 understood. With that in mind, is CD25 permissible
6 or not?
7  A  In the chart that I'm looking at, it would
8 be, and so I don't have an explanation for why --
9  Q  So we should strike that out and say that was
10 wrong?
11      MR. MOLOT: Objection.
12  A  If you would like to do that.
13 BY MR. PARKER:
14  Q  You would agree with me?
15  A  I would agree with this chart that you've
16 handed me.
17  Q  Okay. Doctor, in the interest of the 50 or
18 so minutes that I have left --
19      MR. MOLOT: Did you say "15" or "50"?
20      MR. PARKER: "50."
21 BY MR. PARKER:

Page 331

1  Q  -- I want to shift gears with you for a
2 moment and talk about the expert report submitted by
3 Dianon in this case, and then we'll come back time
4 permitting to additional cases cited in the amended
5 complaint. Unfortunately, Doctor, I do not have
6 clean copies or extra copies of the expert reports in
7 this case.
8      MR. MOLOT: I can burn a few copies.
9      MR. PARKER: I'm not sure I want to
10    hand you these because all of them have some
11    degree of handwriting on them.
12 BY MR. PARKER:
13  Q  Let me ask you generally, sir, not to repeat
14 anything we've talked about, can you tell me sitting
15 here other than the philosophical differences that
16 you have with Drs. Holden, Braylan and Borowitz with
17 regard to their belief that the Dianon approach was
18 wholly appropriate, was there anything else in those
19 reports with which you had specific professional
20 disagreements?
21      MR. MOLOT: Objection. You're asking

Page 332

1 him from all those reports from memory to
2 pick out particular things without showing
3 him the reports?
4      MR. PARKER: I already said, Rick, I'm
5 not refusing to show the gentleman copies of
6 the reports. If you've got clean copies, by
7 all means, bring them in. I'll be happy to
8 show them to him, and we'll go from there.
9 With everything else I had caught up here, I
10 didn't bring those three reports.
11      MR. MOLOT: Go ahead.
12  A  Well, I've already mentioned two elements.
13 One is Dr. Braylan making inference to the fact that
14 a reference laboratory in essence is -- it's very
15 problematic to get any kind of clinical information,
16 however he phrased it. I don't want to misphrase
17 him, and the fact that the history may be different
18 than what one receives in a hospital-based
19 laboratory. I actually don't see that as being a
20 difference much at all, and my guess is if we were to
21 trade horror stories we would be amazingly similar

Page 333

1 with one another.
2      In regards to Dr. Borowitz's, whatever,
3 affidavit or whatever this is called, again, I would
4 only come back to the comment that to validate
5 Dianon's panel their job is to detect all abnormal
6 cells in the specimen, and I would just suggest that
7 Dianon is not -- with their panel is not detecting
8 all abnormal cells. Their panel is not that
9 comprehensive.
10      So I think if you're going to cast
11 dispersions to someone who wants to design a panel
12 that is felt to be medically necessary based on
13 history, based on morphology, based on laboratory
14 medicine and based on other facets that one knows
15 about a patient, then I think you also then can't
16 turn right around and out of the other side of your
17 mouth make the comment that Dianon was detecting all
18 abnormal cells in a specimen. That's wrong, and he
19 will declare that's wrong when he is deposed. I
20 don't have Dr. Holden's, whatever these are called,
21 put to memory so I can't --

Stuart Flynn, M.D. - 5/10/06

Page 334

1  BY MR. PARKER:
2  Q  So let's say, for example, Dr. Braylan when
3  he is deposed by the government tells the government
4  that our comprehensive panel is no smaller, in fact,
5  may be a few antibodies bigger and that confronted
6  with the patients that Dr. Flynn has reviewed in the
7  vast majority of cases would have done exactly what
8  Dianon did in using our comprehensive panel, is it
9  your testimony that, therefore, Dr. Braylan's
10 facility is also acting in an inappropriate fashion?
11         MR. MOLOT:  Object to form of the
12     question.
13 A  So, again, a yes/no answer?  I think
14 Dr. Braylan will not defend that.  When asked to
15 defend a given patient, I don't believe he will turn
16 around and say, for instance, repeat tests with
17 patients with CLL that you need to use a
18 comprehensive panel and believe it intellectually.
19         If he says it, so be it, and he will defend
20 it, and he will defend it well undoubtedly, but I
21 don't think that that is good medicine.  I don't

Page 335

1  think it's fiscally sound medicine, and I am
2  comfortable with the fact that my peers in this
3  field -- that would resonate with them more than a
4  one-size-fits-all panel.
5  BY MR. PARKER:
6  Q  So you used the example -- I notice that you
7  picked into your answer or you put into your answer a
8  repeat CLL case, and I'm curious as to why you did
9  that, but let me not address that for the moment.
10         What you just told me was, "If Dr. Braylan
11 says that, he may say it, but he doesn't really
12 believe it.  I know that."  Is that what you just
13 told me?
14         MR. MOLOT:  Objection.
15 A  I think he may say that in the overarching
16 concept, but I think when one would ask him to look
17 at specific patients as I've been asked to do I think
18 he would not want to defend one size fits all.  If he
19 wants to do it, it's not for medical reasons.  It's
20 for convenience reasons.  It's for volume reasons.
21 It's for reasons above and beyond what is medically

Page 336

1  necessary for the given patient.
2  BY MR. PARKER:
3  Q  So you're saying you would be shocked then if
4  people of the stature like Dr. Braylan or
5  Dr. Borowitz would come in and say, "In our judgment,
6  good medical practice requires reference laboratories
7  to do flow as Dianon has done"?
8          MR. MOLOT:  Objection to the form
9     "shocked."
10 A  I'm not shocked by anything.  I think -- like
11 I have for seven hours, I think they can defend the
12 merit of their thought processes.
13 BY MR. PARKER:
14 Q  All right.  So, Doctor, are you saying that
15 what you've told me now for seven hours and what you
16 did in all these reports is not what you
17 intellectually believe, but you can just simply
18 defend it?
19         MR. MOLOT:  Objection.
20 A  I don't think I said that.
21 BY MR. PARKER:

Page 337

1  Q  So you intellectually believe this to be true
2  what you've told me for seven hours, right?
3  A  Correct.
4  Q  And are you suggesting that Drs. Braylan,
5  Borowitz -- and who did I forget -- Braylan, Borowitz
6  and Dr. Holden cannot believe what they've said in
7  their reports to be true and consistent with good
8  medical practice?
9          MR. MOLOT:  Objection,
10     mischaracterizes his testimony.
11 A  Well, I think they can believe what they
12 want.  Ultimately it's going to be up to whether or
13 not a jury believes them or me, and I'm very
14 comfortable with my ability to defend my premise in
15 this case.
16 BY MR. PARKER:
17 Q  You're very skilled at testifying, aren't
18 you, Doctor?
19         MR. MOLOT:  Objection.
20 A  I don't know if I am.
21 BY MR. PARKER:

85 (Pages 334 to 337)

Stuart Flynn, M.D. - 5/10/06

Page 338

1    Q    You've done it an awful lot of times, haven't
2    you?
3         MR. MOLOT: Objection.
4    A    Doing something a lot of times doesn't mean
5    you're skilled.
6    BY MR. PARKER:
7    Q    Well, we can agree you've done it a lot of
8    times?
9    A    I don't know what "a lot" means.
10   Q    You're comfortable in a witness chair?
11        MR. MOLOT: Objection.
12   A    I don't think I'm ever going to be
13   comfortable in a witness chair.
14   BY MR. PARKER:
15   Q    Doctor, you recall us talking about consensus
16   statements earlier, some of which you actually read
17   before you did your report?
18   A    Correct.
19   Q    And is it your understanding when those
20   consensus groups concluded that large comprehensive
21   panels were to be used that they were not large

Page 339

1    comprehensive panels of the type that Dianon used?
2         MR. MOLOT: Objection to the --
3    BY MR. PARKER:
4    Q    Your phrase one size fits all?
5         MR. MOLOT: Objection to the
6         conclusions in the consensus panels.
7    A    I'm not sure I understand your question.
8    BY MR. PARKER:
9    Q    It's a poor question. It's late in the day,
10   and I apologize for it.
11        Doctor, do you believe that what you've
12   testified to today represents one viewpoint on a
13   spectrum of the flow community as to how you do flow?
14        MR. MOLOT: Objection.
15   A    It is my viewpoint, correct.
16   BY MR. PARKER:
17   Q    And will you at least agree that there are
18   world-renowned experts who believe that laboratories
19   like Dianon are wholly within their rights if not
20   required by good medicine to conduct flow as Dianon
21   has conducted its flow studies?

Page 340

1         MR. MOLOT: Objection.
2    A    So within their rights or within good
3    medicine?
4    BY MR. PARKER:
5    Q    Within good medicine, sir.
6    A    I'm sure there's somebody and probably more
7    than one that would defend that premise.
8    Q    Doctor, you said that -- it struck me as
9    interesting. You said that there really isn't any
10   difference with the ability and the quality of
11   information that a pathologist in a hospital
12   getting -- a hospital setting gets from physicians
13   who send samples down to you from the operating room
14   two floors above than the information that Dianon
15   gets when a sample is sent to it 48 hours earlier
16   from Seattle, Washington.
17   A    I would actually submit in many cases it's
18   easier for them to get information than it is for a
19   hospital-based lab, and I'll clarify that.
20   Q    Sure. It would be a treat to hear that.
21   A    Because often a specimen may come down

Page 341

1    with -- to give you an example, with a radiologist's
2    name on the report who really only did the procedure,
3    really knows nothing else about the patient. So the
4    first person you're going to call is, of course, the
5    person's name on the requisition.
6         Now, the name on the requisition for
7    Dianon -- and I don't know this to be the case but I
8    will assume arose from the doctor's office in which
9    the appropriate information is kept about that
10   patient. So I can end up making several phone calls
11   or, as we clarified this morning, my assistant will
12   before I can actually find a doctor that knows
13   anything about the patient and can answer my
14   questions for me. And making a call to Bridgeport is
15   probably no less or more difficult than making a call
16   to Seattle, Washington.
17   Q    Okay. Let me then turn to -- let's turn to
18   some of the cases in the time we have remaining that
19   you discuss in your amended -- in the amended
20   complaint.
21        MR. MOLOT: Objection to him