```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
         ------------------------------x
         UNITED STATES OF AMERICA      |
         ex rel. DR. JAMES J.          |  CIVIL ACTION NO.
         TIESINGA,                     |  3:02 CV 1573(MRK)
                         Plaintiff,    |
                                       |
              vs.                      |
                                       |
         DIANON SYSTEMS, INC.,         |  March 31, 2006
                         Defendant.    |
         ------------------------------x

              ATTACHED EXHIBITS CONTAIN CONFIDENTIAL HEALTH
              INFORMATION SUBJECT TO PROTECTIVE ORDER


                   DEPOSITION of SUHA MISHALANI, M.D.


                    Taken before Elzbieta A. Sirois, RPR,
                    LSR 350, a Court Reporter and Notary
                    Public within and for the State of
                    Connecticut, pursuant to Notice and the
                    Federal Rules of Civil Procedure, at the
                    Office of the United States Attorney for the
                    District of Connecticut, 157 Church Street,
                    New Haven, Connecticut on March 31, 2006,
                    commencing at 9:35 a.m.




                         FALZARANO COURT REPORTERS
                           117 North Saddle Ridge
                           West Simsbury, CT 06092
                                860-651-0258
```

---

APPEARANCES:

For the Plaintiff:

   UNITED STATES DEPARTMENT OF JUSTICE
   157 Church Street
   New Haven, Connecticut 06510
   203.821.3792
        By: RICHARD M. MOLOT, ESQ.


For the Defendant:

   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
   1333 New Hampshire Avenue, N.W.
   Washington, D.C. 20036-1564
   202.887.4000
   202.887.4288 Fax
        By: ROBERT S. SALCIDO, ESQ.

---

                    S T I P U L A T I O N S


     It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

     It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

     It is further stipulated that any defects in the Notice are waived.

     It is further stipulated that the deposition may be signed before any Notary Public.

---

     (Deposition commenced:  9:35 a.m.)

     SUHA MISHALANI, M.D., Deponent, of 810 Flintlock Road, Southport, Connecticut, being first duly sworn by the Notary Public, was examined and testified, on her oath, as follows:


                    DIRECT EXAMINATION

BY MR. MOLOT:
   Q   Good morning, Doctor.
   A   Good morning.
   Q   My name is Rick Molot, and I'm from the U.S. Attorney's office, and I represent the Government in the lawsuit that's been filed against Dianon Systems, Inc.; do you understand that?
   A   Yes, I do.
   Q   I'm going to be taking your deposition this morning; do you understand that?
   A   Yes.
   Q   And you understand that you're under oath?
   A   Correct.
   Q   The one thing with a deposition that's not like normal conversations is we can't talk over each

25

1  saying generally do blood and bone marrow make up 75,
2  80, 90 percent of the cases, that's what I'm trying to
3  get at.
     A   I would say 90 at least.
     Q   So blood and bone morrow is about 90 percent?
6  A   Right.
7  Q   What percent ballpark are lymph nodes?
8  A   Maybe less than five.
9  Q   Then?
10 A   Same with the fluids.
11 Q   Less than 5 percent fluids?
12 A   I'm answering before you're asking me the
13 question, sorry.
14 Q   Less than 5 percent fluids?
15 A   Yes.
16 Q   If you could take me through the general kind
17 of procedures, and let's say from 1996 to the present,
18 unless things have changed, what happens when a
19 specimen kind of first comes into Dianon, if you could
20 take me through the process until there's an
21 interpretation and a report given to a doctor.
22 A   The specimen comes and gets accessioned,
23 meaning it gets a case number, and it goes in the
   computer system.  Then they identify the case as a
   hematology cases versus a GI case, for example, versus

26

1  other specialties.  Then the --
2  Q   I'm sorry, who identifies?
3  A   The accessioning people, people who are
4  opening the boxes.
5  Q   What are their -- what do you call them,
6  accessioning people?
7  A   Technicians.
8  Q   Technicians, okay.  So the technicians open up
9  the boxes?
10 A   Yes.
11 Q   And they make a determination?
12 A   Right.
13 Q   Of what type of case it is?
14 A   Right.  Because they would have the
15 requisition, the tubes, and they would accession the
16 case, give it a case number.  Then the Heme lab gets
17 the cases and starts processing the requests in the
18 lab.
     Q   How does that work when it comes into the Heme
   lab, who does the processing?  Who starts the process?
     A   Again technologists will start the processing.
22 They have cases where it's only flow cytometry is
23 ordered versus cases where they wanted morphology
24 interpretation and flow cytometry --
25 Q   And morphology means you look at something

27

1  under a microscope?
2  A   Correct.
3  Q   I'm sorry, go ahead.
4  A   Then they would start the process of setting
5  up the cases.
6  Q   Then what happens next?
7  A   At the same time the case is flowing, someone
8  is flowing the case, the data is coming out.
9  Q   I'm sorry, what does that mean, flowing the
10 case?
11 A   It means that the case is going through the
12 flow cytometry machine and giving the histograms.
13 Q   Who sets up the antibodies to be used with
14 each specimen?
15 A   The technologist sets up the antibodies.  We
16 have a panel of antibodies that's set up.
17 Q   You have a standard panel?
18 A   Correct.
19 Q   And so the technologists don't have to consult
20 the doctors about what antibodies to run?
21 A   No, if the requisition is clear, the doctor
22 had checked XL3 because we also have XL9, which is
23 immunodeficiency panel, and then we have a panel that
24 is -- I forgot the number of it, but it's for PNH,
25 paroxysmal nocturnal hemoglobinuria panel.  If

28

1  everything's clear on the rack, the XL3, they know the
2  panel, what it is and they set it up.
3  Q   So, if the referring physician checks off XL3
4  on the requisition form, the technician sets up the
5  standard panel of antibodies, correct?
6  A   Correct.
7  Q   And does not have to consult the doctor to ask
8  about what antibodies to use?
9  A   No.
10 Q   They don't have to do that?
11 A   No, they don't have to do that.
12 Q   What happens after they set up the panel, and
13 it starts, they start the test?
14 A   Excuse me.  They may consult us just if they
15 have a problem with the gating, but it rarely happens.
16 If they want us to check the gating, if they are gating
17 it correctly, but not with the panel.  The panel is
18 set.
19 Q   The panel is set, it's standard?
20 A   It's standard.
21 Q   They don't have to consult you on that?
22 A   No, unless there's a problem.
23 Q   The problem, the only problem you talk about
24 is the gating?
25 A   Or if the specimen was short and they can't

29

1  run the standard panel, then they consult us.
2      Q   But in most cases if the requisition form is
3  checked off XL3, they run the standard panel and don't
4  have to consult the doctor?
5      A   Correct.
6      Q   What happens next?
7      A   Again, the flow-only cases where the
8  morphology is not checked because the morphology takes
9  time to process the tissue and decalcify the bones, so
10 it takes 24 hours so it comes in the next day. The
11 flow cytometry only cases that are not linked to
12 morphology, I was saying the lab is flowing the case
13 part, another technologist in the morphology area is
14 smearing, giving us like a smear from the tube and the
15 cytospin.
16     Q   The smear is for the morphology?
17     A   The smear is not for morphology
18 interpretation, just for like kind of correlation.
19 It's for our own sake. So, we get the slides, and the
20 flows, and we do them, and we sign out the cases
21 looking at both, and the way we have it set up now is
22 we take a photograph on the case so we -- I take a
23 photo of the smears I looked at and it goes on the
   report.
       Q   Let me make sure I understand. When you sign

30

1  out the case, meaning the doctor does, what does the
2  doctor have to look at?
3      A   I have the case, the requisition, the flow
4  data, meaning the histograms, and I have a slide. Now,
5  sometimes they don't come hand in hand because I'd like
6  to look at them as soon as possible so I ask them to
7  bring me the case as soon as it's ready. So sometimes
8  the slide is not ready and it comes in a little bit
9  later or sometimes the slide comes first. It depends
10 on how busy they are.
11     Q   I see, okay. Then what happens next, once you
12 have all the materials in front of you?
13     A   I examine the histograms.
14     Q   Those are the -- that's from the flow
15 cytometry?
16     A   Exactly.
17     Q   That's from the flow cytometer?
18     A   Yes, exactly. I make an assessment. I look
   at the slide.
       Q   The slide is?
       A   Correlation.
22     Q   Slide is to correlate.
23     A   To correlate.
24     Q   But what's on the slide typically? It's
25 either blood, bone marrow?

31

1      A   Exactly.
2      Q   Or tissue?
3      A   Exactly.
4      Q   And you look at it under the microscope?
5      A   Correct. I make an assessment if I need to do
6  any addition things, I let the lab know immediately.
7  That's why I like to get my cases as soon as possible,
8  and then I may have to repeat certain things, depends
9  on the case.
10     Q   What do you mean by that?
11     A   It means that if I get a case and, for
12 example, the Kappa Lambda page is not clear, it didn't
13 split very well. So, I'm not sure if there's a
14 monocytic population or not. I go back and look at the
15 B markers, the CD5 and CD10 and say there might be
16 something hiding in there so I repeat some antibodies
17 in different combinations, meaning I do five with
18 Kappa, I do 10 with Kappa Lambda, and I do some B
19 markers mixed up with Kappa Lambda. Our standard now
20 is CD19 with Kappa Lambda, it may not be enough. So, I
21 may want to do the Kappa 2219, Lambda 2219, and I often
22 do that.
23     Q   I see. So you'll often run another
24 combination of antibodies after you get the results
25 from the first panel?

32

1      A   Correct, after the fact, if it's not clear, if
2  it didn't split well.
3      Q   How long after you get the results from the
4  first panel do you usually run these? Can I call them
5  add-ons?
6      A   Yes or repeats or add-ons.
7      Q   Repeats.
8      A   Repeats or add-ons, they are both.
9  Immediately I would say. As soon as I get the case I
10 let the lab know either by phone or through the
11 computer.
12     Q   I'll show you some charts later, and we'll
13 talk about it in more detail, but I just wanted to get
14 a general picture.
15     A   All right.
16     Q   Then what happens after that?
17     A   Sometimes I dictate my case, pending that
18 result just to speed up the transcription time,
19 because, yeah, so that I have the case ready, and then
20 I wait for those repeats to come and then depending
21 whether I'm changing or not, I may have to redictate
22 part of it or I may just have to let it go as it is
23 because I got my answer.
24     Q   Then what happens after the report is
25 dictated?

33

1  A  It gets transcribed. I get it back, correct
2  it, if there's any corrections, editing, give it back,
3  it gets automatic signature to be finalized. I check
4  it to be finalized. It gets finalized and the doctor
5  would get an automatic fax most of the time.
6  Q  Now, there's this concept of turnaround time.
7  You're heard that concept?
8  A  Yeah.
9  Q  Sometimes it's abbreviated TAT?
10 A  Yes.
11 Q  How important is turnaround time when you're
12 doing flow cytometry?
13 A  It's important.
14 Q  Why is it important?
15 A  First, the specimen may deteriorate and/or the
16 case is critical. The patient may be dying because of
17 acute leukemias and other disorders and because these
18 days, patients need their results like yesterday.
19 Q  What's the -- let's just take the '96 to 2003
20 time period, what's kind of the average turnaround time
21 for a flow cytometry test? Meaning from the, you know,
22 time it comes in until the time the doctor, referring
23 doctor is faxed the report?
24 A  Generally I would say it was around 48 hours,
25 maybe 24 to 48 hours.

34

1  Q  How long does the average case take for you,
2  your portion of it?
3  A  It depends on the case. If everything is
4  straightforward, and I have no problems with any of the
5  histograms, and I have no problems with the
6  correlation, then I'm not sure exactly how much time.
7  I would say from the time I look at everything, date
8  it, get it back, correct it, roughly, I'm saying maybe
9  half hour to 45 minutes, depends.
10 Q  Per case?
11 A  Per case, yeah, depends on the case.
12 Q  How much time does the flow interpretation
13 take versus the morphological interpretation?
14 A  Again, I'm not interpreting the morphology.
15 It's for correlation so they go together sort of. I
16 don't give a time for this and a time for that. Unless
17 rarely, like I said, when I get the slides first, which
18 rarely happens, I may start looking at them if I'm done
19 with my other cases and start just to have an idea of
20 what I'm getting and maybe start some of the photos.
21 Q  But I want to understand the morphology part
22 of it.
23 A  So now you're referring to the morphology
24 interpretation, it comes checked by the doctor under

35

1  Q  Yes.
2  A  This is different than from the smear I was
3  describing to you.
4  Q  Then I didn't understand that. Could you
5  explain the difference to me, please.
6  A  Yes. Under the requisition we have a section
7  that's morphologic interpretation and the doctor could
8  check the biopsy, the aspirate and he wants us to
9  interpret it and give a signed interpretation, official
10 interpretation on that, that's the morphology, that's
11 where the biopsy when it comes to us, it goes to the
12 histology department where it gets processed, decaled,
13 imbedded, 24 hours, comes out next day on a slide for
14 us to look at.
15    He may also, excuse me, send smears that are
16 unstained. Those stay in the Heme lab, they get
17 stained by Giemsa for us to look at under the
18 microscope.
19 Q  But you don't have to do an official
20 interpretation?
21 A  Yes, it's because he checked it, yes.
22 Q  What if -- are there times you do, I think you
23 called it, you were correlating?
24 A  Yes.
25 Q  Tell me what you do with the microscope when

36

1  you're doing the correlation? And can I distinguish
2  correlation from official interpretation, is that?
3  A  Yes, I think so.
4  Q  Tell me when you're doing correlation, what
5  that means and what you're doing?
6  A  It tells me that what I'm looking at is
7  exactly the stuff that came from the patient. It makes
8  sense sort of putting them together.
9  Q  You compare the flow cytometry results?
10 A  Correct.
11 Q  And the morphological results?
12 A  Correct. It sort of helps you make sure that
13 what you're looking at is accurate, but they sort of
14 complement each other.
15 Q  But unless the doctors checked off that he
16 wants an official morphological interpretation on the
17 requisition form, you don't do an official
18 interpretation for those times when you're just
19 correlating?
20 A  Exactly. In fact, if he checks off an
21 interpretation official we will want him to do the
22 smears in his office, let them air dry, unstained, we
23 stain them because the smears that are done directly
24 air dried have a better morphology than the smear we do

37

1 because the tube has an anticoagulant that makes the
2 cell look different.
    It may, the cell may appear to be dysplastic
   when in fact it may not because of the anticoagulant.
   We call it an artifact. So, if he really wants a good
6 interpretation, he needs to send us smears that are
7 prepared, air dried, unstained, along with a biopsy.
8    Q    How often do you do an official interpretation
9 and flow cytometry together?
10   A    Often.
11   Q    Often?
12   A    Yeah.
13   Q    In those cases when you're doing the official
14 interpretation of the morphological...
15   A    Case.
16   Q    Case, right, and the flow cytometry, do you
17 ever look at the morphological portion first?
18   A    I may, yes. It depends on the case, yes,
19 quite often I do actually, yeah.
20   Q    During your time at Dianon, have you had any
21 responsibility for billing?
22   A    No.
23   Q    Do you know, let's say take the 1996 through
   2003 time period before the acquisition by LabCorp, who
   at Dianon had responsibility, to your knowledge, for

38

1 billing insurance carriers?
2   A    I'm not sure. I know we have a billing
3 department.
4   Q    Where was the billing department located?
5   A    I'm not sure. It may have been in the same
6 building or a separate building.
7   Q    Did you have any interaction with the billing
8 people?
9   A    None. I don't even know who they are.
10  Q    From 1996 to 2000, before you became
11 co-director, did you ever have any training regarding
12 Medicare rules and regulations?
13  A    No, did you say which year? The year?
14  Q    1996 to 2000?
15  A    No.
16  Q    No training regarding Medicare rules and
17 regulations?
18  A    No.
    Q    How about in the time period from when you
   became co-director, 2000 until the time you were
   acquired by LabCorp, any training regarding Medicare
22 rules and regulations during that time period?
23  A    I think we started having training around
24 2003, but I may be wrong. There was a time when we
25 started, after 2000 we started having like they called

39

1 them compliance meetings, lectures.
2   Q    Before 2003 had you ever had any compliance
3 lectures before at Dianon?
4   A    I don't remember.
5   Q    You don't remember one way or the other?
6   A    Yeah, it might be around 2003. It might be
7 little bit before 2003, I'm not sure.
8   Q    But how about in the 1996 through let's say
9 2001 time period, did you ever have any compliance
10 training?
11  A    No.
12  Q    Have you had any kind of training regarding
13 Medicare outside of Dianon? Did you go to any seminars
14 or anything like that?
15  A    No.
16  Q    When someone says something is "medically
17 necessary," what does that mean to you?
18  A    It means that it's something that's important
19 for the patient to have the right diagnosis for
20 treatment that's going to follow. Like a mammogram is
21 medically necessary for certain patients, just as an
22 example.
23  Q    Have you ever, during your time at Dianon,
24 seen any documents that contained Medicare's definition
25 of medical necessity?

40

1   A    No, not before this qui tam, I haven't seen
2 anything.
3   Q    So before the qui tam was filed you never saw
4 any documents containing Medicare's definition of
5 medical necessity?
6   A    No, not to my knowledge.
7   Q    In the time period, let's say from 1996 until
8 the filing of the qui tam, were you aware that Medicare
9 would only pay for medically necessary tests?
10  A    Could you repeat the time period, please.
11  Q    Sure. From 1996 when you first joined Dianon
12 until let's say 2002 when the qui tam was filed, did
13 you have any knowledge that Medicare would only pay for
14 medically necessary tests?
15  A    Not really.
16  Q    What do you mean "not really"?
17  A    I wasn't aware, no.
18  Q    You weren't aware of that?
19  A    No.
20  Q    You weren't aware that Medicare wouldn't pay
21 -- excuse me. You weren't aware that Medicare would
22 only pay for medically necessary tests?
23  A    It sort of made sense, that's why I'm saying
24 not really because it sorts of make sense that they
25 would or wouldn't, right?

61

1  A  It appears that way after the fact, and I
2  don't know that for a fact, but...
3  Q  But it appears that way to you?
4  A  Post qui tam I know, again, that there is the
   issue of being not as one test, being 18 and being
6  individual antibodies, and we are doing 26, and so I
7  don't know it for a fact.
8  Q  But do you have a general recollection or some
9  general knowledge that there came a time where Dianon
10 started billing for all 26 antibodies?
11 A  I have a general assumption, which may be
12 false.
13 Q  What's that assumption based on?
14 A  Based on this whole thing after the qui tam.
15 Q  Do you know who made the decision to bill for
16 26?
17 A  No.
18 Q  You were co-director, were you consulted at
19 the time?
20 A  No.
21 Q  Have you ever been told why, as you sit here
22 today, Dianon started billing for 26 again?
23 A  No.
24 Q  Do you know Dr. James Tiesinga?
25 A  Yes.

62

1  Q  Who is he?
2  A  He was a staff pathologist that we actually
3  hired.
4  Q  During what time period did he work for
5  Dianon?
6  A  I think in 2000 to I'm not sure exactly the
7  date.
8  Q  Who did he report to?
9  A  Well, it was a little vague because things
10 were changing around, but it was Glenn and I
11 co-director, Dr. Segal and myself. And so he sort of
12 reported to us but just in a sense that, you know,
13 again, vacations stuff and things like that, and we
14 sort of reported to Dr. Amberson who was the executive
15 medical director EMD.
16    But, excuse me, I think at one point
17 Dr. Amberson wasn't so, I think there was a short
18 period of time where we were directly reporting to the
19 CEO, but that was very brief until Dr. Amberson was
20 EMD.
21 Q  Do you think Dr. Tiesinga was a good doctor?
22 A  That's very general question. Maybe you can
23 ask me more specifically.
24 Q  Was he skilled in his profession?
25 A  He was okay. He was board certified.

63

1  Q  Did you notice or become aware of any kind of
2  problems with how he practiced during the time he was
3  there? When you say he was just okay, I'm just trying
4  to get a sense of why you're saying that.
5  A  Well, there were a few issues where doctors
6  would call me because they had a complaint about him
7  because he was very rude to them over the phone. I ha
8  one incident, and I think Dr. Segal had an incident,
9  but when I mean okay, it's just my own observation. H
10 may be very knowledgeable, I'm just...
11 Q  I'm just asking for your observation.
12 A  Just my observation.
13 Q  You say he was just okay because you received
14 some complaints about his work?
15 A  Yes, and because also I did see some of the
16 reports and he's -- his comments are pages long and no
17 focused. You have to give a comment at the end to
18 explain something that you find to the doctor, he need
19 to use that, and that's my observation.
20 Q  Would you say Dr. Tiesinga is a truthful
21 person?
22 A  No.
23 Q  Why do you say that?
24 A  Again, this is very general, but this is base
25 after the qui tam and knowing all this.

64

1  Q  But based on the qui tam and knowing all this
2  why are you saying he's not, in your opinion, a
3  truthful person?
4  A  Because if I understand everything correctly,
5  this comes as a shock. There was at no point any
6  question about the panel and the number of antibodies
7  not a question. And again, he was the type of person
8  where the comment would go pages, so...
9  Q  Well, now I was focusing more -- now I'm not
10 talking about his skill as a doctor. I'm talking abo
11 his -- your opinion of him as a truthful or not a
12 truthful person. And you said based on the qui tam
13 filing. Any other reasons that you might say he was
14 not a truthful person?
15 A  You know what, I think I may have many
16 reasons, but I don't have a clear recollection right
17 now. If I may have a minute to just try to remember
18 some things. You want like an exact example or
19 something like that or?
20 Q  Whatever you can recall about him that helpe
21 form your opinion one way or the other. Do you want
22 take a short break?
23 A  Okay. Thank you.
24
25    (Recess taken: 10:53 to 11:00 a.m.)

89

1 anything to markers you already have in the panel?
2  A  Exactly.
3  Q  Because the markers you already have in the panel do --
5  A  Cover.
6  Q  Cover that?
7  A  Cover that. Now, CD15 I may add, rarely if I have such an acute leukemia, and it happens rarely, that it's not showing me any lineage. I try everything. I do the 117, the MPO the TDT, I don't have lineage. One other tool that I may try on that case after I exhaust others is to see if 15 is a myeloid. If it's going to give me at least one myeloid, just some lineage specific. So then I would use 15.

CD61 is megakaryoblastic, which is extremely rare, megakaryoblastic leukemia. Glycophorin A is for erythroid precursors. And again, you would need that only in cases of erythroleukemia, which are AML M6, which are rare, and in addition, I wouldn't personally need Glycophorin A to diagnose that because I would utilize the myeloid blast percentage, and this diagnosis you need to also correlate with morphology to see how much erythroid precursors you have. TDT, like I said, we use it with acute leukemias.

90

1  Q  So, I mean these aren't in the standard panel, but so is it fair to say that not every antibody that exists is necessary to run every time, right?
4  A  Not in my panel. In retrospect, if you're going back after you've done the case, you can say, well, yeah, maybe I didn't need this, but that's in retrospect.
8  Q  I see. In retrospect you may look at a case and say, I could have done it without some of the antibodies in the standard panel?
11  A  That's only in retrospect.
12  Q  In hindsight?
13  A  Theoretically -- in hindsight you may also decide the whole panel you may not have needed, but that's only in hindsight.
16  Q  After you finished the case?
17  A  After the fact. So that's fruitless, but the point, to take you back to when you have those smears, if I have a smear and I'm deciding what panel, there is a danger there that I may stop and not include other things.
22  Q  But again, for example, CD61, you don't believe it's medically necessary to run it every time in a panel?
25  A  Yes. It's extremely rare to have AML M7,

91

1 that's the erythroleukemia. AML M7 is extremely rare. So first you would have a leukemia then if you have any problem with lineage, so that would be after the fact. This is extremely rare.
5  Q  So because it's extremely rare, you don't think it's medically necessary to put in a standard panel?
8  A  The other point is that --
9  Q  I'm sorry. If you could just focus on my question.
11  A  Could you ask the question again?
12  Q  Sure. Because CD61, just using it as an example, is extremely rare, you don't think it's medically necessary to put in the standard panel that you run?
16  A  Not necessarily. It's not just the rarity of the event; it's the chance of missing the event. There's no chance of me missing it when I already have this. It may be extremely rare, and if I may miss it, I would include it in the panel. It's not just the rarity.

It's what am I going to miss if I don't include a certain antibody. So, to me I'm not going to miss an M7 if I have this panel. An M7 I may confirm after the fact was CD61, but I'm not going to miss.

92

1 So, that's the difference.
2  Q  I understand that.
3  A  Okay.
4  Q  And then, for example, 11B you don't think it's medically necessary to include that in your standard panel because you have CD11b?
7  A  C, because I have CD11c.
8  Q  I'm sorry. So because you don't you have CD11c, you don't think it's medically necessary to put CD11b in your standard panel?
11  A  Exactly. And CD11c is more inclusive.
12  Q  So I guess all I'm trying to get at is you're making some decisions about which antibodies are medically necessary to put in the standard panel and which aren't?
16  A  Yes. And the decision is based on having, providing the accurate and complete diagnosis. I can't afford to have an incomplete diagnosis or an inaccurate diagnosis. So, that's how this is designed.
20  Q  Going back to -- that's all I have with that.
21  A  Okay.
22  Q  Going back to the other school of thought you were talking about in your declaration, you know the comprehensive approach versus using the shorter panel and doing it in stages.

149

1  A  Based on our professional opinion of how to
2  handle the case.
3  Q  Right, but doesn't this seem to indicate that
4  the pathologist will be exercising some judgment in
5  crafting a panel for this particular patient?
6  A  Not necessarily.
7  Q  You don't agree with that?
8  A  No.
9  Q  So, even though it said the number of
10 antibodies used will be based on the professional
11 opinion of the hematopathologist, when you did this,
12 you ran the standard panel, right?
13 A  Correct, it's our comprehensive panel, and if
14 I may ask, I haven't seen this or haven't paid
15 attention to this being before on the requisition.  Is
16 this something that you saw on one or more because I'm
17 not familiar with that.  I think what it implies is
18 that maybe the add-ons.
19 Q  You said at the beginning it might be
20 misleading, what did you mean?
21 A  Because, again, you used the word "craft".  We
22 don't craft it towards a diagnosis.  We believe that
23 that comprehensive panel is needed to assess abnormal
   leukocytes in the sample that is provided to us.
   Q  Right, but the reason it might be misleading

150

1  is because somebody reading this might think you craft
2  a panel each time when the case is you do a
3  comprehensive standard panel each time.
4  A  They might because I had the impression that
5  that's what you thought too.
6  Q  I'm just asking you what you think.
7  A  I think it might but I didn't think about it
8  before and actually, I've never actually seen it
9  before.
10 Q  On the lower left there's information filled
11 in on the clinical diagnosis?
12 A  Yes.
13 Q  And there's also information filled in on the
14 indications for the study?
15 A  Indications for the study, yes.
16 Q  That information plays no the part in the
17 panel you choose to run, correct?
18 A  It doesn't play a part in choosing the panel
   because we have the standard panel, but it helps direct
   certain things.  I may have to make a phone call to ask
   more questions.  It depends on the case, but the panel
22 is the standard panel.
23 Q  So even if this information was blank, you'd
24 run the same panel?

151

1  Q  So, the number of antibodies you run is not
2  based on your opinion of this particular patient, it's
3  based on your opinion of every patient?
4  A  Exactly.
5  Q  From time to time Dianon would run flow
6  cytometry tests on patients that had previously had a
7  test, right?
8  A  Correct.
9  Q  And in those cases when there was a second or
10 a third or fourth test done, would you look at the
11 prior flow cytometry results?
12 A  Definitely.
13 Q  That was standard practice?
14 A  To me, yes, it's attached, and I would always
15 look for priors.
16 Q  Did you use those prior tests in any way to
17 help choose the antibodies to run in your panel?
18 A  Again, the antibodies are chosen and we run
19 them.  It helps me direct my findings.  A prior would
20 definitely help me direct my findings.  For example, if
21 the prior was a Kappa monotypic and it had 10, and in
22 this new one I'm finding the Kappa Lambda is not clear.
23 It may be normal, but it's not clear and the 10 is not
24 clear.  Knowing the prior would help me do a 10 Kappa
25 Lambda additional repeat.  That's how it would help me.

152

1  The comprehensive I believe is needed to follow-up the
2  patient.
3  Q  But so you don't use the prior test to choose
4  the panel?
5  A  Correct.
6  Q  So you don't use the clinical information to
7  choose the panel, right?
8  A  No.
9  Q  You don't use the morphology to choose the
10 panel, right?
11 A  The morphology is used to go side by side with
12 the panel, yes.
13 Q  But you don't use it to choose the panel?
14 A  No.
15 Q  And you don't use the prior test to choose the
16 panel?
17 A  No.
18 Q  I think there were three -- again referring to
19 Government Exhibit 23.  I think it looks like there
20 were three specimens collected on March 22nd, 2001.
21 Bone marrow, left, that's at page 53.  Bone marrow
22 right, at page 67?
23 A  Yes.
24 Q  And blood at page 78, correct?

169

1  Q  Absolutely. If or I might not even ask you
2  questions about it so you could just turn it around. I
3  apologize for that.
   A  No problem.
4  Q  Now, page 3775, this is -- through 3776, this
6  is a morphological interpretation that you did?
7  A  Yes.
8  Q  This is what you're talking about when you
9  refer to a formal morphological interpretation?
10 A  Let me see the requisition again. Yes.
11 Correct.
12 Q  Just to make sure I understand you, you would
13 never use this information -- withdrawn.
14    Would you ever look at this morphological
15 information before running a flow test?
16 A  No, they come hand in hand.
17 Q  Page 3753, it's the second page of the packet?
18 A  Just one second, sorry. Okay.
19 Q  The second page of the packet?
20 A  Yes.
21 Q  3753.
22 A  Yes.
23 Q  It appears to be a microscopic interpretation
   done by the submitting doctor or done by someone, not
   Dianon; is that right?

170

1  A  Yeah. This, yeah, it appears that way, yes.
2  Q  What's the purpose of the doctor sending you
3  this type of microscopic description?
4  A  Usually they send the CBC data.
5  Q  The complete blood count?
6  A  The complete blood count. In this case there
7  happens to be a smear review of some sort, but it's not
8  signed by anybody and maybe it was just attached to the
9  CBC data so they send it together.
10 Q  Did you from time to time get this type of
11 information from the referring physicians?
12 A  The CBC data we get all the time, and if we
13 don't get it, we have someone call to get it.
14 Q  The CBC data, that's on page 3754?
15 A  Correct.
16 Q  That you get with every flow specimen?
17 A  Every case.
18 Q  What is the purpose of that?
   A  It gives you an idea of what's going on with
   the patient, if the counts -- the platelet count, the
   white count, if there's a differential you'd have an
22 idea of how the lymphocytes versus PBS.
23 Q  But that's not something used to help you
24 chooses the panel?

171

1  Q  Do you use that in the CBC results in part in
2  your interpretation?
3  A  It helps me a lot of the interpretation
4  because if I'm finding abnormal granulocytes by flow
5  and the CBC data is, the white count is low versus
6  being high, if the counts are low, I would be leaning
7  more towards myelodysplasia. If the counts are high, I
8  would be leaning more towards the myeloproliferative
9  process. So it would help in the comments section.
10 Q  The microscopic description on 3753 that was
11 submitted by the referring physician or -- what was the
12 purpose of him submitting that? He or she submitting
13 that, to your knowledge? I'm not talking about the
14 CBC. I'm talking about the microscopic description,
15 the peripheral blood smear.
16 A  Right. I think it happened in this case that
17 because the white count was so high someone looked at
18 the smear and had an impression, and he's basically
19 giving me that information.
20 Q  Looking at page 3765?
21 A  Okay.
22 Q  These are, there are, these are the smears,
23 the aspirate smears that you interpreted?
24 A  Yes.
25 Q  Just to go back to what we were discussing

172

1  earlier in terms of how LabCorp does things. LabCorp
2  uses a smear like this to help it choose which panel to
3  run, right?
4  A  I'm not sure what smear they use, if it's like
5  this or I'm not sure.
6  Q  What's your general understanding based on if
7  I could show it to you again if you want Government
8  Exhibit 12 where they said we use smears to help choose
9  the correct panel. What's your understanding of that?
10 A  My understanding, and I may be wrong, is that
11 they smear from the tube, just like we do.
12 Q  And they use that to help choose a panel?
13 A  Right, right.
14 Q  On page 3763, which is part of your flow
15 cytometry report for the specimen collected on 2-2-00.
16 It seems like you didn't use CD38 here, and I count
17 only 25 antibodies used for this?
18 A  That's -- yeah, it seems like there's no
19 percentage for CD38, but I definitely used it. It
20 would probably be in the histograms.
21 Q  I see. So, I guess what I was trying to find
22 out is were there times when you deviated slightly from
23 the standard panel and used 25 or 27 as opposed to 26?
24 A  I don't remember that at all. I don't

185

1  regular PMMs that you have in the blood.
2       Flow alone is not going to diagnose CML for
   you.  It's a clinic pathologic diagnosis, but it may
   help guide you because the grans will be, although they
   look like they are just your usual mature grans they
6  would be aberrant, they would have certain aberrancies
7  in them like down related 10 and 16 they would
8  co-express CD56, which is an abnormal finding.  Usually
9  they shouldn't co-express 56 normal grans and then they
10 would have increased population of baso-cells, which is
11 a subset of cells that happens to express in a dual
12 fashion 13 and 25.
13      In addition, CML has a small population of
14 blasts that may proliferate and then you call the
15 patient accelerated phase or blast crisis.  When this
16 happens those blasts can be in any lineage, myeloid,
17 lymphoid, B or T lymphoids or monocytic so that happens
18 if the patient moves away from the chronic phase and
19 goes to an accelerated phase blast crisis.  So, flow
20 plays a part in it but it's a whole clinic pathologic
21 correlation and a cytogenic analysis that documents the
22 specific translocation that the patients usually have.
23   Q   That's helpful.  What about for Hodgkins
   lymphoma, is there, what role is there, if any, for
   flow cytometry?

186

1   A   Hotchkiss lymphoma usually has a
2  characteristic finding which is the Reed-Sternberg
3  cells, those are like huge cells that are sometimes
4  they are few and sometimes there are a lot in the lymph
5  node or the marrow.
6       Flow helps throughout other types of lymphoma.
7  You don't really actually -- you remember when you
8  asked me about the CD30, it is a marker for that, but
9  it's very hard to get it by flow cytometry.  It's not a
10 flow suddenly to diagnose Hodgkins.  Hodgkins has to be
11 in the right -- we call it "mere".  In the right
12 environment to diagnose it, but flow helps in ruling
13 out non-Hodgkins lymphoma.
14   Q   Which antibodies are most relevant to hairy
15 cell leukemia?
16   A   Relevant to or diagnosing hairy cell leukemia?
17 What?
18   Q   I mean, which are most important in diagnosing
   hairy cell leukemia?
20   A   Well, to diagnose hairy cell leukemia you have
   to document that you have a B-cell disorder, that the
22 B-cells are aberrantly expressing certain markers.
23 Commonly in hairy cell the CD103 would be very bright.
24 CD11c would be very bright and CD25 is critical to

187

1       In addition, you have to determine a light
2  change restriction with the Kappa and the Lambda.  It
3  has to be restricted to one or the other because normal
4  B-cells would express both and you have a polytypic
5  population.  You would want to restrict one, meaning
6  abnormal population.
7       At the same time, like I told you, hairy cell
8  leukemia sometimes it co-expresses 10, which is an
9  uncommon finding.  So, yeah.
10   Q   How about, why would you run 11c, 103, and
11 CD25 when you have a lymph node specimen?
12   A   In case a lymph node, although it rarely
13 happens, but in case the lymph node has a hairy cell
14 leukemia infiltrate in it, and 11c, that's for 103, 11c
15 and 25 are co-expressed on another type of lymphoma,
16 which is splenic marginal zone B-cell lymphoma, which
17 can also be nodal in the lymph node, but in this case
18 11c wouldn't be that bright like in hairy cell.
19   Q   But it would be rare for those to express in
20 the lymph node you said?
21   A   The hairy cell would be, having a hairy cell
22 infiltrate but the splenic marginal zone B-cell
23 lymphoma nodal, I mean, it's one of those B-cell
24 lymphomas.  It's one of those low grade B-cell
25 lymphomas.  There's a number of them.

188

1   Q   But having hairy cell in the lymph node, that
2  would be rare?
3   A   Yeah, I would say, but it does happen.
4   Q   Okay.  We're getting close to the end.  From
5  the 1996 to let's say 2003 time period, what were the
6  components of your compensation at Dianon?
7   A   From '96 when I first joined there was like a
8  base salary and then there was a bonus, and I think I
9  got the bonus once, I think, and then it changed.
10  Q   How did it change?
11  A   It became like an incentive program.
12  Q   When did that start?
13  A   I'm not sure exactly, maybe a year and a half
14 later after I joined.  It may be something around that.
15  Q   '97, '98?
16  A   Yeah, maybe two years, yeah.
17  Q   How did the -- withdrawn.
18      The incentive compensation you received was in
19 addition to your base salary?
20  A   Correct.
21  Q   Can you explain how the incentive compensation
22 program worked?
23  A   Yes.  The base salary, there's a certain
24 number of cases that you have to do on a daily basis

189

1  extra.
2     Q    And what was the kind of the minimum or base
3  number of cases per se?
4     A    It was 10 cases per day.
5     Q    And how much would you get paid for each case
6  over 10 per day?
7     A    It was $90.
8     Q    You say "it was". For what time period was it
9  $90?
10    A    It was 90 for some period, and then it
11 recently changed. Dr. Amberson changed it. He just
12 got promoted.
13    Q    So he changed it?
14    A    It coincided with his promotion. No, he did
15 it, actually, it's -- he made it computerized which is
16 actually good. Before you had to fill in papers and
17 turn them in. Now you don't have to worry about that.
18 It's computerized. I'm not sure exactly how it works.
19         He tried to explain, but what he assured me is
20 that he ran it over some time and it's like plus or
21 minus five percent of the old plan. It didn't really
22 change much, but it's just that before I knew it was
23 like 10 cases now I'm not sure exactly, but...
24    Q    This change was just in the last year or so?
25    A    I would say so, yeah.

190

1     Q    Let me show you what was previously marked as
2  Government's Exhibit 18 at Dr. Segal's deposition and
3  Government's Exhibit 19. 18 reads, 1998 pathology
4  incentive program revised see changes. And 19,
5  Government 19 says, Pathology workload standards and
6  incentive program 1999.
7          Do you recognize either of those documents?
8     A    Yeah, I've seen them.
9     Q    Let's just take Government 18. It looks like
10 the 1998 program. Just, does that look like a kind of
11 accurate representation of what the program was like?
12    A    I'm not sure exactly of other specialties, but
13 oh, I'm not sure what the swing factor is, but I just
14 saw the 90, which is, that's...
15    Q    $90?
16    A    $90, yes. I see that, yeah.
17    Q    And are you generally familiar with this
18 document, Government's 19?
19    A    I'm not familiar with it, but I remember at
20 one point they tried to lower it to 60, and it happened
21 to be around the time when also there was some kind of,
22 I don't know, I think a change in -- Dr. Amberson
23 wasn't the CMO at one point.
24    Q    Is that when Dr. Snyder was?

191

1  else, I'm not sure, tried to lower it but it didn't go
2  to that rate.
3     Q    Is it didn't go to 60, it stayed at 90?
4     A    Yes.
5     Q    So from the time you remember it starting,
6  whenever that was --
7     A    Right.
8     Q    -- '97 or '98 --
9     A    Right.
10    Q    -- until just about a year ago?
11    A    Right.
12    Q    Your understanding was it was anything over
13 10 cases you got an extra $90?
14    A    Yes.
15         MR. MOLOT: Why don't we mark as
16         Government 10, please.
17
18         (Government's Exhibit No. 10:
19         Marked for Identification.)
20
21 BY MR. MOLOT:
22    Q    I'm showing you what's been marked for
23 identification as Government's Exhibit 10.
24    A    Yes.
25    Q    Do you recognize those documents?

192

1     A    Yes.
2     Q    Just for the record, it's a series of examples
3  of sign-out records?
4     A    Right.
5     Q    And the name S. Mishalani?
6     A    Yes.
7     Q    And each one has a version where there's some
8  handwriting on it?
9     A    Right.
10    Q    And then the next page is the typed version?
11    A    Correct.
12    Q    The handwriting on all these sign-out records,
13 is that your writing?
14    A    Yes.
15    Q    This shows -- this shows the -- let's just
16 take a look at PP 11600.
17    A    Okay.
18    Q    Why don't you just explain to me how the sign
19 out -- how this document was created and what the
20 purpose was? When you filled it out. Take me through
21 how it all happened.
22    A    It's again the incentive program. So, you
23 fill out the cases you did that day and then you turn
24 it over to an admin who puts it in the computer and

193

1  Q  These appear to be true and accurate copies of
2  these documents?
3  A  Yes.
4  Q  You created or you wrote the ones with
5  handwriting on them just as part of your job at Dianon?
6  A  Right.
7  Q  Would you fill them out at the end of each day
8  or at the end of each week?
9  A  I would personally fill them at the end of the
10 week, but I would put down somewhere at the end of the
11 day, I think.
12 Q  I see. So you'd make your own notation at the
13 end of each day and then you'd fill out this type of
14 document indicating PP 11600 at the end of the week?
15 A  Exactly.
16 Q  When it says at the bottom $6,523, is that how
17 much extra you were paid for that week?
18 A  Yes.
19 Q  Was the incentive compensation a significant
20 portion of your compensation at Dianon?
21 A  Yes.
22 Q  I'm trying to get a sense out of your entire
23 compensation for the year about how much was base
    salary and how much was incentive compensation?
    A  It depends on how many cases you were going to

194

1  do, but I would say it was, for me, it was like half
2  and half.
3  Q  I see. About 50 percent of your compensation
4  was your base salary and another 50 percent were the
5  incentive compensation?
6  A  But that's just for me. For someone else it
7  may be less. It may be less than 50.
8  Q  But 50/50 for you, ballpark?
9  A  Yes.
10    MR. MOLOT: Let's go off the record for a
11    second.
12
13    (Off-the-record discussion.)
14
15    MR. MOLOT: Could we mark this as
16    Government 11, please.
17
18    (Government's Exhibit No. 11:
       Marked for Identification.)

    BY MR. MOLOT:
22 Q  Doctor, I'm showing you what's been marked as
23 Government's Exhibit 11.
24 A  Yes.

195

1  The first is PP 14563, the second is PP 14565. Just
2  ask if you recognize those documents?
3  A  No, I don't.
4  Q  You don't recognize them?
5  A  No.
6  Q  It appears to me that these are documents
7  indicating your salary, your annual salary. The first
8  one dated 3-5-04, that's page PP 14563, and the second
9  it's hard to read the date. It looks like 3-23-05.
10 Looking at the one dated 3-5-04 and you see your annual
11 salary there?
12 A  Yes.
13 Q  Does that, I'm not saying to the penny, does
14 that seem to accurately reflect what your annual salary
15 was at or about that time?
16 A  I think so, around that time. I'm not even
17 sure exactly how much.
18 Q  The same thing with the page 14565?
19 A  Yes.
20 Q  That was your base salary?
21 A  Yes.
22 Q  So, the -- we'll just call it a round number
23 for on 3-5-04 around $220,000 was your base salary?
24 A  Yes.
25 Q  And so, would you make another $220,000 in

196

1  incentive compensation?
2  A  It depends. I think I did that, yes.
3  Q  So, and the same thing with page PP 14565?
4  A  Yes.
5  Q  Your annual salary was around $230,000 and so,
6  but that was the base salary. You'd make another over
7  $200,000 in incentive compensation?
8  A  I would say a little less, but I'm not exactly
9  sure of the numbers but less than this.
10 Q  Less than that?
11 A  Yes.
12 Q  But still a significant amount?
13 A  Yes.
14 Q  Basically throughout these years it more or
15 less doubled your base salary?
16 A  Yes. Not throughout every year but...
17 Q  But through most of the years? I'm not saying
18 double to the penny but it approximately doubled your
19 salary on average each year?
20 A  I'm not sure of each year, maybe the last year
21 or so, I'm not sure of each year, maybe last two years,
22 I'm not really sure.
23 Q  Few more questions then I'll just take a break
24 and see if I'm finished. Have you ever been