```
                                                    1
 1         UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2   ------------------------X
 3   UNITED STATES OF AMERICA|
     ex rel. DR. JAMES J.    | CIVIL ACTION NO.
 4   TIESINGA,               | 3:02 CV 1573(MRK)
             Plaintiff,      |
 5                           |
     vs.                     |
 6                           |
     DIANON SYSTEMS, INC.,   | March 24, 2006
 7          Defendant.       |
     ------------------------X
 8
 9   ATTACHED EXHIBITS CONTAIN CONFIDENTIAL HEALTH
       INFORMATION SUBJECT TO PROTECTIVE ORDER
10
11      DEPOSITION of GLENN H. SEGAL, D.O.
12
13
         Taken before Elzbieta A. Sirois, RPR,
14   LSR 350, a Court Reporter and Notary
     Public within and for the State of
15   Connecticut, pursuant to Notice and the
     Federal Rules of Civil Procedure, at the
16   offices of Office of the United States
     Attorney for the District of Connecticut,
17   157 Church Street, New Haven, Connecticut on
     March 24, 2006, commencing at 9:25 a.m.
18
19
20
21
22
23           FALZARANO COURT REPORTERS
               117 North Saddle Ridge
24            West Simsbury, CT 06092
                  860-651-0258
25
```

```
                                                    2
 1   APPEARANCES:
 2
 3   For the Plaintiff:
 4
     UNITED STATES DEPARTMENT OF JUSTICE
 5   157 Church Street
     New Haven, Connecticut 06510
 6   203.821.3792
        By:  RICHARD M. MOLOT, ESQ.
 7
 8
     For the Defendants:
 9
     AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
10   1333 New Hampshire Avenue, N.W.
     Washington, D.C. 20036-1564
11   202.887.4000
     202.887.4288 Fax
12      By:  ROBERT S. SALCIDO, ESQ.
13
14
```

```
                                                    3
 1
 2              S T I P U L A T I O N S
 3
 4
 5       It is stipulated by counsel for the parties that
 6   all objections are reserved until the time of trial,
 7   except those objections as are directed to the form of
 8   the question.
 9       It is stipulated and agreed between counsel for
10   the parties that the proof of the authority of the
11   Notary Public before whom this deposition is taken is
12   waived.
13       It is further stipulated that any defects in the
14   Notice are waived.
15       It is further stipulated that the deposition may
16   be signed before any Notary Public.
```

```
                                                    4
 1            (Government's Exhibit No. 1:
 2            Marked for Identification.)
 3
 4            (Deposition commenced: 9:25 a.m.)
 5
 6       GLENN H. SEGAL, D.O., Deponent, of
 7       46 Sullivan Road, New Milford, Connecticut,
 8       being first duly sworn by the Notary Public,
 9       was examined and testified, on his oath, as
10       follows:
11
12              DIRECT EXAMINATION
13
14   BY MR. MOLOT:
15     Q    Good morning.  My name's Rick Molot, and I'm
16   from the U.S. Attorney's Office, and I represent the
17   Government in the lawsuit that's been filed against
18   Dianon Systems, Inc.; you understand that?
19     A    Yes.
20     Q    I'm going to be taking your deposition this
21   morning; you understand that?
22     A    Yes.
23     Q    And in the deposition you've got to verbalize
24   your answers because the Court Reporter is taking
25   everything down.  So, a nod of the head won't work.
```

17

BY MR. MOLOT:

Q   So you said Dr. Goyette ran the flow cytometry lab during that time period?

A   Well, he was director of hematopathology, so he had responsibility over that area.

Q   Was there someone who managed the flow cytometry lab during that time period?

A   I believe, the laboratories, I guess, I don't know the exact term, laboratory supervisor or manager, I don't know the exact term. I believe Steve Brown was the first one I remember.

I don't know if he was doing that exactly when I came there, but he was the main person I remember early on.

Q   Right.

A   Then he had left, and Cindy Dawkins, who was a tech, took over then. She was promoted.

Q   I see. During that time period, before you left for Impath, about how many other doctors interpreted flow cytometry tests?

A   During that time period it would be, I would say between four and six.

Q   Between four and six. Could you tell me who they were besides yourself?

A   Dr. Goyette, Dr. Mishalani -- beside myself,

18

right?

Q   Correct.

A   Dr. Connor, she was there before I was as well.

Q   Is that AnnMarie Connor?

A   AnnMarie Connor, and Dr. Maiese came on board. I helped in recruiting him. I knew him from Florida.

Q   What's his first name?

A   Russell, Russ. I don't know, I think '97, but I don't know for certain.

Q   You think he started --

A   In '97 or '98 or '97, I don't remember exactly. And then there's also a person that works on weekends and some evenings if there's cases we can't complete during the day, for example, and his name is Dr. Bower.

Q   What's his first name?

A   Frank Bower.

Q   During that time period, that two and a half year time period, did you have any responsibility for billing?

A   No.

Q   Which people, during that time period to your knowledge, had any responsibility for billing?

19

Q   I'm saying employees of Dianon who might have had some responsibilities for billing insurance carriers.

A   I wouldn't know. I didn't know who did that.

Q   No idea?

A   I assumed there's people that do it, but I don't know who they are. I think they were even in a separate building or they are in a separate building, so we don't have much, really any interaction with them.

Q   During that time period, the '96 to '99 time period, did you have any knowledge of how flow cytometry tests were billed to Medicare?

A   No, I wasn't aware of how they billed.

Q   Did you come -- did there come a time when you learned how flow cytometry tests were billed by Dianon to Medicare?

A   Some of the discussions after the Qui tam was filed, I'm still not sure exactly, but I know some of the -- I guess some of the documents had things on there that suggested, you know, there were -- I wasn't sure how it was done, but I just know I've seen there was, you know, again, I don't know how specifically how it's done, but I really can't answer exactly, but I know there's -- I could see from some of the documents,

20

I had seen from some of the documents that they were billed certain ways.

Q   But just so I understand your testimony, it's fair to say that from the time you started in 1996 at Dianon until this lawsuit was filed, you didn't have knowledge of how flow cytometry tests were billed to Medicare?

A   Right.

Q   So, you didn't know that if Dianon used more antibodies they got paid more, you didn't know that?

A   What was the question?

Q   You didn't know that if Dianon used more antibodies in its flow cytometry panel it got paid more by Medicare?

A   I was not clear on that, no.

Q   You didn't know that?

A   No.

Q   Did you have -- withdrawn.

Did you think during that time period that flow cytometry was billed to Medicare on a, you know, per panel basis like one charge per test?

A   I did have that thought, yes.

Q   You had that impression?

A   Yeah.

Q   That it was one price per test?

21

1  A   That was an impression I had. I wasn't
2  certain of it.
3  Q   What was the basis for that impression?
4  A   I don't recall, but that's the impression I
5  had.
6  Q   During that two and a half year period when
7  you first worked at Dianon, did you ever receive any
8  training on Medicare rules and regulations?
9  A   Not to my recollection, no.
10 Q   During that time period, did you ever discuss
11 the concept of medical necessity as defined by Medicare
12 with anyone?
13 A   Not that I recall, no.
14 Q   Do you know of any internal policies in place
15 at that time to ensure that Dianon only performed
16 medically necessary tests?
17 A   Not that I was aware of, no.
18 Q   I'm sorry?
19 A   Not that I was aware of, no.
20 Q   Did you know at that time that Medicare would
21 only pay for medically necessary tests?
22     MR. SALCIDO: Objection.
23 BY MR. MOLOT:
    Q   You can answer.
    A   It really wasn't a focus of my, you know, work

22

1  there. I didn't really think of that detail.
2  Q   In July of 1999 you left Dianon and went to
3  join Impath?
4  A   Yes.
5  Q   Impath is another reference laboratory?
6  A   Another laboratory, yes.
7  Q   Where was that located?
8  A   New York City.
9  Q   Why did you leave Dianon?
10 A   My wife was working down there, and there was
11 a position for a director down there, and I wanted to
12 see if it would work out, but it was a very difficult
13 commute from where I was living, and my wife became
14 pregnant, and we just -- she didn't go back to work
15 thereafter, she had a back problem and didn't go back,
16 and so it was just me commuting alone. It just wasn't
17 working, the commute.
18 Q   Long commute.
   A   Luckily they accepted me back, brought me
   back.
   Q   What was your title at Impath?
22 A   I think it's a director of cytometry and
23 hematopathology services in the New York division.
24 Q   Your CV says director and senior consultant.
25 A   Okay. That was the title I had.

23

1  Q   What were your responsibilities at Impath?
2  A   It was basically signing cases, very similar,
3  it's what I did at Dianon.
4  Q   Signing out cases and doing flows?
5  A   That's what I mainly did, yes.
6  Q   Doing flow cytometry interpretations?
7  A   Flow cytometry and morphology interpretations,
8  yes.
9  Q   Did you have any responsibility for billing
10 while you were at Impath?
11 A   No.
12 Q   Did you get any Medicare training while you
13 were at Impath?
14 A   Not that I recall, no.
15 Q   In April of 2000 you returned to Dianon,
16 correct?
17 A   Yes, I believe so, April.
18 Q   It's not a memory test. I'm just, that's what
19 I have. And what was your -- what were your
20 responsibilities when you returned to Dianon in April
21 of 2000?
22 A   I went back to the position I had, senior
23 hematopathologist because Dr. Goyette was director.
24 Q   Dr. Goyette was still there at that time?
25 A   Yes.

24

1  Q   And then in June of 2000 your CV indicates you
2  became codirector hematopathology services, correct?
3  A   Yes.
4  Q   Tell me how it was that you became codirector?
5  A   Dr. Goyette had resigned and Dr. Mishalani and
6  I approached, I don't know exactly who was there at
7  that point as far as, it could have been Jay or someone
8  else, but to be -- you know, since we were remaining
9  that we need to have someone in that position to do,
10 you know, just a general director-type role thing,
11 proficiency tests and, you know, to sign off on those
12 and make sure those are accurate, and to do just
13 general things, QA type of things for the lab.
14     If there's problems that arise, general
15 problems with clients, you know, that is what the
16 codirector would deal with, other than a specific case,
17 so those kind of things.
18 Q   Why did Dr. Goyette leave, to your knowledge?
19 A   I'm not really sure.
20 Q   Do you know whether he was asked to leave or
21 left voluntarily?
22 A   Oh, he left voluntarily.
23 Q   During the time -- from the time you became
24 codirector in June of 2000 up until the -- there was an
25 acquisition by LabCorp in early 2003, correct?

25

1  A   I don't have the date, if you have it. I
2  don't know, but definitely in the last several years,
   yes.
3  Q   Maybe this will refresh your recollection if
   you look at paragraph 11 of your declaration.
6  A   Okay.
7  Q   Does that refresh your recollection --
8  A   Okay, yes.
9  Q   -- that Dianon was acquired by Laboratory
10 Corporation of America in early 2003?
11 A   Yes.
12 Q   During that time period, did you have any
13 responsibility for billing?
14 A   No.
15 Q   Do you recall during that time period, being
16 the 2000 through early 2003 time period, who at Dianon
17 may have had responsibilities for billing?
18 A   No.
19 Q   Didn't have any interaction with them?
20 A   No.
21 Q   They weren't -- were they in a different
22 building you said?
23 A   I believe there are or I don't know when that
   occurred, but I think they're in a different building.
   Q   Did you get any training related to Medicare

26

1  during that time period?
2  A   We had general compliance training beginning
3  in 2003, but nothing in specifics to flow that I
4  recall. Just general for all the pathologists and the
5  whole staff basically was to circulate. In fact, next
6  week I have that.
7  Q   You have another training?
8  A   To be compliant, once a year we have to do
9  that.
10 Q   Was 2003 the first time you received
11 compliance training?
12 A   I believe that's true, yes.
13 Q   When Dianon was acquired by LabCorp -- I'll
14 call it LabCorp is that, okay?
15 A   Yes.
16 Q   In either 2003, how, if at all, did that
17 affect your job or your responsibilities?
18         MR. SALCIDO: Objection.
           MR. MOLOT: What's the objection?
           MR. SALCIDO: It assumes that it did
           change his responsibilities and duties. It's
22         assuming facts not in evidence.
23         MR. MOLOT: Fair enough.
24 BY MR. MOLOT:
25 Q   Did the acquisition affect your job or your

27

1  responsibilities?
2  A   No, not that I -- no, it's the same.
3  Q   The same, you stayed on as codirector and your
4  responsibilities remained the same?
5  A   Yes.
6  Q   Currently you're -- as of today you're still
7  codirector with Dr. Mishalani?
8  A   Yes.
9  Q   And your responsibilities are the same as you
10 just described?
11 A   Yes.
12 Q   Taking you now back to the time period before
13 you went to Impath in '96 to '99 time period, that two
14 and a half year period, did you have any interaction
15 with the Medicare carrier during that time period?
16 A   No.
17 Q   Did you have any interaction with what was
18 called the healthcare financing administration HCFA or
19 now called CMS?
20 A   No.
21 Q   Did you ever communicate in any way with a
22 person named Dr. Torr?
23 A   No.
24 Q   Ever communicate with a person named Dr. Delli
25 Carpini?

28

1  A   No.
2  Q   During that time period, did you learn of
3  anyone at Dianon communicating with the Medicare
4  carrier regarding flow cytometry?
5  A   What was your question again?
6  Q   Did you learn of or hear of anyone at Dianon
7  communicating with the Medicare carrier regarding flow
8  cytometry?
9  A   At that time or subsequent?
10 Q   At that time.
11 A   No.
12 Q   Subsequently have you heard of people
13 communicating from Dianon with the Medicare carrier?
14 A   Yes.
15 Q   Tell me what you've heard about that.
16 A   I just heard that Dr. Goyette and Dr. Amberson
17 were interacting with at least the first name,
18 Dr. Torr.
19 Q   You didn't know that at that time but you've
20 since heard that?
21 A   Yes.
22 Q   Who told you that?
23 A   I learned it during preparations and
24 discussions over the last several years.
25 Q   I'm not asking for discussions with counsel.

41

1  basic core of most panels that general
2  hematopathologists were using, could be used.
3      Q   Again, were any payors questioning the medical necessity of Dianon's antibodies at that time?
4          MR. SALCIDO: Objection.
6          MR. MOLOT: What's the objection?
7          MR. SALCIDO: Asked and answered. I think
8      it might be the third time.
9  BY MR. MOLOT:
10     Q   Okay. You can answer.
11     A   I wasn't aware, no.
12     Q   You are not aware of anyone challenging Dianon
13 on the number of antibodies it was using?
14     A   Not that I'm aware of.
15     Q   There came a time in or about September of
16 1997 when Dianon made a decision to bill for only 18 of
17 its antibodies in its panel?
18     A   Yes, I've seen that in the post Qui tam
19 discussions.
20     Q   Were you aware of that at the time?
21     A   No.
22     Q   Do you know who made the decision to bill for
23 only 18?
       A   No.
       Q   Who would have been in the position to make

42

1  such a decision at that time?
2      A   Again, I don't know. I was totally unaware of
3  it.
4      Q   No, I know you were unaware of the decision,
5  but I'm asking who at the company might have been in
6  the position to make such a decision at that time?
7      A   I don't know because I don't know who makes
8  those decisions.
9      Q   Were you ever told why Dianon had made this
10 decision?
11     A   No.
12     Q   Sitting here today, do you know why Dianon
13 made the decision to perform 26 antibodies yet only
14 bill Medicare for 18?
15     A   No, I don't.
16     Q   No idea?
17     A   I'm not certain, no.
18     Q   Well, I'm not asking if you're certain. Do
   you have any idea?
       A   Maybe because of that memo, but that's all. I
   don't know, that's the only -- I can make an
22 assumption.
23     Q   But you have no knowledge?
24     A   No knowledge of it.

43

1  Exhibit 2 of your declaration at the end, towards the
2  end, it's the last two pages. It's the 8-2-2004
3  document.
4      A   Yes.
5      Q   It says By Glenn Segal, D.O. and Suha
6  Mishalani, M.D. It says: Purpose, use and
7  justification for performing eight antibodies. Why did
8  you choose these eight antibodies to explain?
9      A   I was asked to -- we were asked to by Tom
10 Kossl, since I guess those were from that sheet.
11     Q   Were these the eight that weren't billed for
12 during that '97 through 2000 period?
13     A   That I'm not certain about.
14     Q   Do you know if there was any feeling by the
15 company that these eight might be questioned by an
16 insurance carrier?
17     A   Can you repeat that?
18     Q   Was there any kind of feeling by the company,
19 by Dianon, that these particular eight might be
20 questioned by an insurance company and that's why they
21 weren't billed for?
22     A   I'm not certain. It's possible.
23     Q   You became codirector in June of 2000,
24 correct?
25     A   Yes.

44

1      Q   There came a time when Dianon made a decision
2  to start billing again for all 26 antibodies, correct?
3      A   After the fact I've learned that.
4      Q   But did you know that at the time?
5      A   No, I don't recall anyone telling me, and I
6  didn't initiate anything of that nature.
7      Q   They didn't, no one came to you as codirector
8  and said and discussed this idea of now billing for all
9  26 again?
10     A   Not that I recall.
11     Q   Have you since become aware that Dianon
12 started billing for all 26 antibodies again?
13     A   Yes, after the Qui tam discussions.
14     Q   Who made that decision to bill for all 26
15 again?
16     A   I don't know.
17     Q   You haven't learned that information?
18     A   No.
19     Q   Were you ever told why that decision was made?
20     A   No.
21     Q   Were there any discussions you know of when
22 the decision was made to bill for 26 about why Dianon
23 had been billing for only 18 for the previous
24 three years?

61

1  A  Yes.
2  Q  Are there any ever times where you delete one or more of the antibodies in the standard panel?
   A  Only when the sample is short, for example, it's a term we use or insufficient material to do the
6  complete panel.
7  Q  I see. What does that mean, when it's short?
8  A  It's just not enough fluid or enough bone
9  marrow and you just can't, you don't have enough cells.
10 Q  So when you, in that situation you would use
11 fewer antibodies in the panel?
12 A  Yes, that's all you could do.
13 Q  How would you decide which antibodies to
14 delete when a specimen that's short comes in?
15 A  We wouldn't delete them. You couldn't run the
16 full panel, you know what I mean?
17 Q  No, I'm sorry. I'm not following you.
18 A  There's not enough cells in there. It
19 wouldn't be able to run the full panel.
20 Q  So do you not do the test?
21 A  No, we do a few antibodies.
22 Q  I see, but I guess my question is how do you
23 decide which few antibodies to run?
   A  It may depend on the clinical information.
   Q  Are there ever times where you add one or more

62

1  antibodies to the standard panel?
2  A  That's more frequent, yes.
3  Q  About how often do you add antibodies to the
4  standard panel?
5  A  You say add a new, totally new antibody or
6  just do repeats with the same markers to get better
7  delineation?
8  Q  Either.
9  A  Very frequently.
10 Q  Why don't we break it down. How often do you
11 add totally new antibodies?
12 A  I can't give a specific. It's less common
13 than delineating, for example, what we call Kappa
14 Lambda, which helps us define monotypic and B-cells.
15 It helps us determine whether the B-cell may be
16 monotypic or reactive, benign or polytypic, words like
17 that.
18       In those cases there's a lot of, there's
   sometimes when there's the mixture of cells. There may
   be normal B-cells, which are obscuring the monotypic.
   When we look at multiparameters and different
22 combinations, we can pick it up better. And we might
23 miss it if we don't do repeats in that regard.
24       So, basically we're doing different

63

1  then we may have to add Kappa Lambda 20, Kappa Lambda,
2  excuse me, Kappa 19-22, Lambda, you know, separate them
3  out into different tubes to see them because we look
4  for intensities. The abnormal B-cells can be different
5  -- have different intensity than normal B-cells.
6        They will carry the marker differently because
7  they're malignant. We don't know they're malignant
8  until we see these. They don't come with a label on
9  them, so, but the difference helps us sometimes pull
10 out a small monotypic in contrast to when it's mixed
11 with normal B-cells.
12 Q  I'm following some of that, but I still want
13 to get a sense of how often you -- what's the
14 difference between adding new antibodies and
15 delineating? Can you distinguish those two or am I
16 wrong about that?
17 A  Delineating would be repeating antibodies that
18 are within the standard panel. Adding new antibodies,
19 would be, for example, that would be less frequent. We
20 typically add, when we have an acute leukemia, since
21 the markers on the panel sometimes leukemias can be
22 very or acute leukemias can have very marked lineage
23 discordance or abberancy where there's combinations of
24 lymphoid and myeloid, and you have to do what's called
25 cytoplasmic, supermialize[phonetic] the membrane and

64

1  then they do markers inside the cell.
2        Then like the cytoplasmic CD3 or -- do you
3  want to know these or no interest in that?
4  Q  No, no, I do.
5  A  Cytoplasmic CD3, we have the surface CD3,
6  which we do, but it may be present inside the cell and
7  not on the surface. That's an abberancy and also
8  something that may delineate a T-cell ALL.
9        Cytoplasmic CD79a is something that helps us
10 in identifying a precursor B-cell ALL. It may have be
11 very primitive. Cytoplasmic myeloperoxidase, another
12 very important marker distinguishing possibly a
13 biphenotypic leukemia from AML with an aberrant T-cell
14 marker for example.
15       Then at TDT, that's the abbreviation, that's a
16 very important marker differentiating immature lymphoid
17 from a mature lymphoid. As well as it's not typically
18 present in AML nor present in ALL. So those are
19 markers we commonly add in acutes. When we see an
20 acute and can't be certain.
21 Q  So you'll add them after you run the standard
22 panel of 26?
23 A  Yes.
24 Q  And how long after do you add, do you add

145

1 clarify additional history that wasn't clear or
2 something like that.
3    Q  Right, but wouldn't you want to clarify that
4 before you ran the flow test?
5    A  Not necessarily, no.
6    Q  I mean, what if certain information like on
7 the requisition form, the clinical diagnosis or the
8 clinical history was not filled out, would anyone from
9 Dianon, prior to the flow test, call the referring
10 physician's office and ask for that information?
11   A  Not that I know, not routinely.
12   Q  Even nonroutinely, did that ever happen?
13   A  I'm not really sure.
14   Q  Did it ever happen?
15   A  I don't know.
16   Q  I'm asking if you recall it?
17   A  I don't recall, no.
18   Q  You don't recall one instance of that ever
19 happening?
20   A  There's always, there's usually something.
21   Q  I'm just asking for your recollection.
22   A  I just don't recollect, and I can't be
23 certain.
     Q  Was there any kind of a system in place at
   Dianon to make attempts to contact the referring

146

1 physician if certain clinical information was left off
2 the requisition form?
3    A  The only thing I know of is the CBC report.
4 There's something in the system for that where the
5 client services calls to get a CBC report for us. That
6 was about it. I don't think any, I don't think
7 anything else that I've heard of is any directive like
8 that.
9    Q  So, beyond the CBC report, there was no system
10 in place to contact the referring physician if certain
11 information was missing from, certain clinical
12 information was missing from the requisition form?
13   A  No, it was just left up to the judgment of the
14 pathologist signing the case, if they were going to
15 call or not.
16   Q  Oh, so, the pathologist assigned to the case
17 had to make a decision whether to call or not?
18   A  Right.
19   Q  Were there ever times that you made the
   decision to call?
21   A  Yeah, I would call, typically to give a
22 significant diagnosis, for example.
23   Q  Right. But again I'm talking about when stuff
24 was missing from the requisition form, like indications

147

1 place to call before the flow cytometry test was run to
2 ask the referring physician about that information?
3    A  There was no system in place that I know of.
4    Q  From time to time Dianon would run flow
5 cytometry tests on patients that had previously had a
6 flow cytometry test with Dianon, right?
7    A  Yes.
8    Q  And in those cases when a second or third or
9 fourth test on the same patient was run, would you look
10 at the prior tests?
11   A  Yes.
12   Q  Was that a standard practice at Dianon to look
13 at the prior tests?
14   A  We would look at the prior reports, and they
15 would be typically attached or there was also a button
16 we could push called priors more recently in the
17 computer to pull them up on an individual case.
18   Q  When did that button start that you could call
19 priors?
20   A  I don't know specifically. Within the last
21 several years.
22   Q  But now there's a button that's called priors
23 and you push it and any prior test from that Dianon ran
24 comes up on your computer?
25   A  Well not, most tests basically -- when we get

148

1 the, we get the hard copies printed out as well. So,
2 those come with it too. So, if you don't get a copy
3 that we can check to see if it wasn't attached by
4 mistake, so I push the prior button.
5    Q  I see, but was it in your experience standard
6 practice when you get a specimen to do a flow test if
7 there had been one or two or three or four or five
8 prior tests, those were all attached?
9    A  As far as I remember, I don't know right at
10 the beginning, but it's typical practice standards, at
11 most places attempt to do that.
12   Q  And if the patient had five or six prior
13 tests, you'd look at all five or six prior tests as
14 part of your review of the case of the new test?
15   A  I would look at the reports typically.
16   Q  Why would you look at those prior reports?
17   A  Just to see what was going on in the past, for
18 example. What the history was in part because the
19 history may be vague or incomplete.
20   Q  Did you use those prior tests in any way in
21 relation to your diagnosis of the current test?
22   A  Well, it's a new -- it's basically a new
23 examination. It may be, I mean obviously it's
24 important if the patient had a preexisting condition t

149

1 for example, but it's basically a new workup for a
2 potential secondary problems or comorbid disorders that
3 may arise.
4    Q    But it's not the case that you use the prior
5 tests to help choose which antibodies to use in the
6 current test?
7    A    No.
8
9         (Government's Exhibit No. 22 and 23:
10        Marked for Identification.)
11
12 BY MR. MOLOT:
13   Q    Doctor, showing you what's been marked for
14 identification as Government's Exhibit 22, it's a
15 series of requisition forms and test reports produced
16 by Dianon. The first page in the packet is PP2500 and
17 again, if you need access to the whole chart, it's
18 here, but I just pulled out some relevant pages to try
19 to move it along. Let me direct your attention to, I
20 think the second page of the packet, PP2511 through
21 2512. Do you recognize that document?
22   A    I recognize this as a flow cytometry report
23 that I signed out or diagnosed.
24   Q    It's got a collection date of 4-3-03 upper
   right?

150

1    A    Yes.
2    Q    And that's your signature indicating you did
3 the interpretation?
4    A    Yes.
5    Q    I, also then want to direct your attention to
6 a few pages back, PP2524 through 25. Is that another
7 flow cytometry interpretation report that you did?
8    A    Yes.
9    Q    That's, the collection date is 4-17-03?
10   A    4-17-03, yes.
11   Q    It's on the same patient?
12   A    Yes.
13   Q    Now, these reports, it appears to me, are for
14 bone marrow specimens collected approximately two weeks
15 apart. Does that seem correct to you?
16   A    Yes.
17   Q    On the second test, specimen collected
18 4-17-03, you ran the same panel as it did for the test,
   the prior test from 4-3-03, right, it's the same panel?
     A    Yes.
     Q    Tell me why you ran the same panel for both?
22   A    Since, again I'm looking for residual disease
23 because I need to establish whether the AML was present
24 or not and also to look for particular comorbid

151

1    Q    Well, why couldn't you have run a more kind of
2 targeted or directed panel for the second test based on
3 the findings of the first test?
4    A    I just don't believe that would be optimal. I
5 think it's best to make sure that again, there's
6 different sites, the bone marrows are evaluated at
7 different sites. There could be diseases at different
8 sites. Even though it's bone marrow, they're typically
9 not done at the same site, a repeat.
10   Q    It's your opinion that you had to run all 26
11 for the second test, even though you had just gotten
12 results two weeks before from the first test?
13   A    Yes.
14   Q    Looking at the interpretations, is it fair to
15 say that the interpretation of the first test, the
16 4-3-03 specimen is similar to the interpretation of the
17 4-17-03 specimen?
18   A    No, there's a difference.
19   Q    What are the differences?
20   A    The blast count had decreased by flow, by I
21 guess 50 percent at least by flow.
22   Q    What's the significance of that?
23   A    That means the patient is benefitting from
24 treatment but still has residual disease.
25   Q    Which antibody or antibodies were relevant to

152

1 that conclusion you just made?
2    A    To the conclusion of having residual AML?
3    Q    Yes.
4    A    The antibodies that I listed in the phenotype.
5    Q    Which ones are those?
6    A    Of the phenotype is CD45, CD34, CD13, CD33,
7 117, 11c, DR 38 and 7, and also documenting the absence
8 of additional B or T-cell associate antigens as there
9 is aberrant CD7, which again you have to distinguish by
10 phenotypic leukemia.
11   Q    Directing your attention to page 2524 towards
12 the bottom, you wrote that the antigenic profile is
13 similar to a prior study in our files, and then you
14 gave a reference number, see SA 3005535, I think
15 referring to the prior test with the 4-3-03 specimen.
16        What did you mean, I'm not pronouncing that
17 word, antigenic profiles similar?
18   A    That it was similar to the original. There
19 hadn't been any alterations.
20   Q    Those are the critical antibodies that you
21 talked about before?
22        MR. SALCIDO: Objection.
23   A    Well, basically for looking at for the AML
24 component, you also have to establish that it doesn't