Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3                              NO. 3:02CV1573-MRK

4    -----------------------------------

5    UNITED STATES OF AMERICA,

6    ex rel. DR. JAMES J. TIESINGA

7          Plaintiff,

8    VS.

9    DIANON SYSTEMS, INC.,

10         Defendants.

11   -----------------------------------

12

13         Videotape Deposition of JAMES JAY

14   TIESINGA, MD, a witness called on behalf of the

15   Defendant, taken pursuant to notice before Cindy

16   M. Falcon, Certified Shorthand Reporter and

17   Notary Public in and for the Commonwealth of

18   Massachusetts, at Dechert, LLP, 200 Clarendon

19   Street, Boston, Massachusetts, on Wednesday,

20   September 13, 2006, commencing at 9:23 a.m.

21   REPORTED BY:  Cindy M. Falcon

Page 70

1  Q  Hartsell, okay. So Hickman and Hartsell gave
2     you information about how you bill for
3     performing flow for Medicare, right?
4  A  That's correct.
5  Q  All right. Is it your testimony that their
6     information on how you bill for that service
7     allowed you as a physician to better interpret
8     the medical information you were getting from
9     the lab techs?
10 A  I see your point. It's hard to say how that
11    information influenced my interpretation skills,
12    since I was ignoring the useless information at
13    Dianon the same way I ignored it at AmeriPath.
14       Dianon had a cookie-cutter template to just
15    circle things, and so as I went through this
16    list of unnecessary antibodies, I just circled
17    on the template without really thinking about
18    the significance of those antibodies or even
19    paying any attention to them because they were
20    superfluous.
21       At AmeriPath, the same thing. I paid no

Page 71

1     attention to the antibodies that weren't
2     necessary and which I had no control over and
3     only concentrated on the ones that were
4     necessary.
5        But as at Dianon, as at AmeriPath, I
6     ignored the unnecessary antibodies, but the
7     implications of that in terms of the Medicare
8     billing, that I was aware of when I started at
9     AmeriPath.
10 Q  I care not about billing, Doctor. Let me ask
11    you this.
12       You've testified before that you had no
13    knowledge of how Dianon billed for flow
14    cytometry before this May 3 conversation?
15 A  Well, I believe I've testified that I didn't
16    really understand how Dianon was billing for its
17    antibody panel until the week of May 6 when Dr.
18    Amberson explained to me that Dianon was billing
19    for the 26 antibody panel, each and every
20    antibody in that panel on each and every case.
21 Q  Did you have any understanding as to how flow

Page 72

1     was billed by Dianon before the week of May 6?
2  A  Bits and pieces, but not --
3  Q  Tell me what the bits and pieces were. I don't
4     care about whether it was full, complete,
5     right.
6        What was your understanding, if you had
7     one, of how flow was billed by Dianon before May
8     6?
9  A  Well, there was a process of understanding that
10    took place.
11 Q  Doctor, all I care about is what your
12    understanding was; not the process.
13       What was your understanding?
14 A  Well, it has to be put into a meaningful
15    context, or else I don't know how to answer the
16    question.
17 Q  Well, let me rephrase it the question.
18 A  Okay, please.
19 Q  Did you understand that it was billed on a
20    per-test basis?
21 A  No, sir.

Page 73

1  Q  All right. Did you understand that it was
2     billed on a per-antibody basis?
3  A  No, sir.
4  Q  Okay?
5  A  And I also didn't understand the concept of the
6     capitation until May 3. Dr. Lynn Hickman
7     explained the concept of the capitation to me.
8  Q  So you had no thought before May 6 that Dianon
9     was simply billing a flat fee for doing flow?
10 A  One, I never really gave it much thought how
11    they were billing for it until then; and two, I
12    just assumed that they were -- I mean, I'm
13    guessing, I just assumed that they billed it as
14    a flat rate. I never really gave it much
15    thought how they were billing for it.
16       But I did not know that they were billing
17    for each and every antibody in the panel, and I
18    did not understand the concept of the
19    capitation.
20 Q  Doctor, let's go back to your starting time at
21    AmeriPath.

Page 130

1  Doctor.
2      The jury would have watched you on a tape,
3  you went through your report. I gave you all
4  the time you could to answer the question in
5  this case which antibodies provided you with
6  medically useless information, right?
7  A  Yes, sir.
8  Q  And when you went through that and the jury
9  watched you scribble on our exhibit, but that's
10  okay, two of the ones that you decided were
11  useless were 11c and 103.
12  A  Yes, sir.
13  Q  And in this one simple exercise, you've now
14  concluded that that initial assessment was wrong
15  in this case.
16  A  Well, you're skipping a very important step that
17  we also went through.
18  Q  I just asked you to tell me which ones were
19  useless and useful in this case. You gave me
20  the information.
21      Now you said I made a mistake about 11c

Page 131

1  and--
2  A  What I did it --
3  Q  Doctor, let me finish because I'm going to let
4  you finish?
5  A  Okay.
6  Q  You're now telling me that despite what you said
7  at the beginning, 11c and 103 actually in this
8  case were useful.
9  A  Turns out to be so, yes.
10  Q  Okay.
11  A  Now would you give me my opportunity?
12  Q  I think you've answered my question, sir.
13  Doctor, let's go on.
14  A  Well, no, I don't think I have answered your
15  question. In fact, I tried to answer your
16  question, and you said you would give me an
17  opportunity to finish, and you're now not giving
18  me an opportunity, and that's not fair.
19  Q  Doctor, if you want to speak, as you have
20  throughout the day, with long, protracted
21  answers, you gave me my answer. Go ahead,

Page 132

1  Doctor.
2  A  Thank you.
3  Q  Tell me why you made a mistake in this one
4  simple exercise.
5  A  Because I didn't want to peek at the answer
6  before telling you what I think was medically
7  necessary because I don't think that's fair.
8      I didn't want to, oh, this is what it is,
9  that's what's going to influence my decision,
10  because when I practice pathology and flow
11  cytometry, I don't have the answer in front of
12  me.
13      Now, at AmeriPath the hairy cell leukemia
14  markers are used as a reflex test because the
15  incidence of hairy cell leukemia is so rare that
16  it's just not appropriate to be including hairy
17  cell markers in the standard screening panel for
18  all the cases.
19      The only only time hairy cell leukemia
20  markers are appropriate is when you identify a
21  lymphoproliferative disorder that is negative

Page 133

1  for CD5 and negative for -- sorry -- negative
2  for CD5 and negative for CD10. That's a very
3  specific example of the differential diagnosis
4  that we talked about will either be marginal
5  cell lymphoma or hairy cell leukemia.
6      So hairy cell leukemia, upon receiving
7  those results that is negative for 5 and
8  negative for 10, hairy cell leukemia enters into
9  the differential diagnosis. And at AmeriPath, I
10  would go to the laboratory technologist and
11  say: Please add on CD11c, CD103, and CD25 and
12  perform those tests because I want to see if
13  this is hairy cell leukemia.
14      At some point or other, I would have also
15  called the clinician, tried to ascertain exactly
16  what kind of lymphoma this person had. You
17  know, I don't have a telephone here to call this
18  clinic, the Arena Oncology Association, and
19  say: Hey, do you remember that case in August
20  of 2001? What kind of lymphoma was it exactly?
21  But I would have been able to do it then.

34 (Pages 130 to 133)

Page 178

1  Q  Well, when you say: I never specifically asked,
2     did you ever ask a question, the purpose of
3     which was to find out how the Connecticut
4     Medicare carrier paid for flow?
5  A  I guess I assumed that that was just all paid as
6     one big test.
7  Q  Well, the answer to my question is then you
8     didn't ask?
9           MR. CARMODY:  Objection.
10 A  No.
11 Q  So let me make sure I understand.
12        You're going down, you're going to be the
13     director of hematopathology, and you're being
14     told that this Oklahoma City carrier may only
15     pay up to ten antibodies --
16 A  Well --
17 Q  Go ahead, if I got my understanding wrong.
18 A  The concept of up to I really wasn't clear
19     about.  I knew that what we were told, Bob
20     Tuccironi [phonetic] felt, understood the
21     reimbursement policy in Oklahoma was ten

Page 179

1     antibodies, and he couldn't find the LMRP on the
2     website.
3  Q  Okay.  My question I was driving to is that
4     you're telling me and telling the jury that, as
5     the future director of hematopathology in
6     Oklahoma learning this information, you never
7     were even curious about how you were being --
8     how the company was being paid in Connecticut?
9  A  No, I was, and I asked Dr. Amberson that
10    question the week of May 6.
11 Q  Almost a month after you wrote the letter that
12    we just talked about.
13 A  Well, two and a half, three weeks.
14 Q  April 18 to May 6, it is what it is.
15        Before you wrote the letter of April 18,
16    you weren't curious enough to go to anybody in
17    the company and say:  How are we getting paid?
18 A  Not that I specifically recall.
19 Q  Okay.  All right.  So April 18 you go down, you
20    don't get your question answered, you come back,
21    you have the conversation on May 3.

Page 180

1     I have it chronology so far basically
2     correct, right?
3  A  Yes, sir.
4  Q  And does -- do the physicians that talk to you
5     tell you how many antibodies Oklahoma will pay?
6  A  I'm sorry, I beg your pardon.
7  Q  Do either Drs. Hickman or Hartsell clarify for
8     you how many antibodies Oklahoma will pay for?
9  A  Both gentlemen clarified this concept of the
10    capitation, that Medicare would reimburse those
11    tests that were medically necessary up to 15
12    antibodies in the state of Oklahoma under Blue
13    Cross Blue Shield of Arkansas.
14       If more tests than 15 were medically
15    necessary, then additional documentation would
16    have to be provided documenting that those
17    additional antibodies were in fact medically
18    necessary.  And in that case, they would be
19    reimbursed.
20       But in their experience, the overwhelming
21    majority of cases required 15 antibodies or

Page 181

1     fewer, and that is why the capitation for these
2     states covered by Blue Cross Blue Shield of
3     Arkansas was set at 15.
4  Q  Which one of these physicians was a
5     hematopathologist?
6  A  Brent Hartsell.
7  Q  And what lab did Dr. Hartsell run?
8  A  I think he operated his own laboratory in Tulsa,
9     Oklahoma.
10 Q  Do you know what the size of the panel was that
11    he used?
12 A  No, sir.
13 Q  And was the conversation -- I'm not clear,
14    Doctor.
15       Was the conversation on May 3 with both
16    these gentlemen on the phone at the same time?
17 A  No, sir.
18 Q  So you spoke to whom first?
19 A  Dr. Lynn Hickman.
20 Q  And Dr. Hickman said:  I guess for the details
21    of flow you got to talk to Dr. Hartsell?

### Page 182

1  A  No, no. Dr. Gilson had recommended that I speak
2     to both Dr. Lynn Hickman and Dr. Brent Hartsell,
3     and so I spoke to both.
4  Q  And did Dr. Hickman, although not a
5     hematopathologist, also offer the opinion that
6     rarely do you need more than 15 antibodies to
7     diagnose a case?
8  A  That was his opinion, yes, sir.
9  Q  Have you ever seen Dr. Hartsell at a
10    professional meeting?
11 A  Never have met him, no, sir.
12 Q  Have you ever seen him publish any papers of any
13    type?
14 A  No, sir.
15 Q  Sitting here today, you don't know to what
16    extent he actually has any expertise in
17    hematopathology with respect to flow?
18 A  Well, he told me that he was a practicing
19    hematopathologist for many years with many years
20    flow cytometry experience, and I valued that.
21 Q  Okay. Other than the gentleman saying: I do

### Page 183

1     flow, I've done flow for many years, did you
2     have any other information on which to assess
3     his credibility, his credentials as a flow
4     cytometrist?
5  A  Yes, sir.
6         MR. CARMODY: Objection to form.
7  A  Dr. Hartsell was selected to be the advisor to
8     Blue Cross Blue Shield regarding its LMRP for
9     flow cytometry, and he was also functioning as
10    advisor to the Medicare advisory committee that
11    was reviewing the local medical review policy.
12    So that board recognized his expertise as a
13    consultant.
14 Q  Now, Doctor, when you went to AmeriPath, which
15    is in Texas, you would submit, the company would
16    submit its bills to the Texas carrier?
17 A  That's correct.
18 Q  Now, the Texas carrier was more generous in the
19    number of antibodies that they would pay for,
20    weren't they?
21 A  No.

### Page 184

1  Q  How many -- I thought they reimbursed over 20
2     antibodies. Am I wrong?
3  A  That's not a correct statement, sir.
4  Q  Okay. Well, then, correct me. How many
5     antibodies would they pay for?
6  A  Only those that are medically necessary.
7  Q  I understand, Doctor, but was there a limit over
8     which they would not pay?
9  A  Their capitation was 24 antibodies.
10 Q  Okay. So they would pay up to 24 antibodies?
11 A  They would pay what was medically necessary up
12    to 24 antibodies.
13 Q  And did they have any provision where they would
14    ever consider more than 24 antibodies?
15 A  I don't know that for a fact but-- I don't know
16    that for a fact.
17 Q  So it would appear -- tell me if I'm wrong --
18    that the authorities, the experts in Texas,
19    determined that there are certainly cases where
20    it is medically necessary to use up to 24
21    antibodies in contradiction to the experts in

### Page 185

1     Oklahoma which said it's almost never necessary
2     to use more than 15?
3  A  I don't know why they established their cap at
4     24.
5  Q  Other than they disagreed professionally?
6  A  I don't know why.
7  Q  Would you agree, Doctor, that there is a debate
8     within your profession with regard to the
9     various ways in which you could perform flow,
10    the pluses and minuses of doing a targeted
11    approach versus a comprehensive approach like
12    Dianon uses?
13        MR. CARMODY: Objection.
14 A  I think this case is evidence that there is in
15    fact a debate.
16 Q  In fact, the consensus documents would verify
17    that fact as late as as early as 1997.
18        MR. CARMODY: Objection.
19 A  No, I disagree with that.
20 Q  So you're saying as you read the consensus
21    statements in '97 and 2000, you find uniformity

Page 190

1  your bosses also.
2  A  I was told to report to Dr. Amberson.
3  Q  Doctor, my question is, in the chain of command,
4     they were your bosses as the codirectors of your
5     department.
6  A  No. Dr. Amberson was the director of
7     hematopathology.
8  Q  Doctor, let me make sure I understand. Is it
9     your testimony that in the time you were at
10    Dianon, neither Dr. Mishalani or Segal had
11    responsibilities as director for
12    hematopathology?
13        MR. CARMODY: Objection.
14 A  They had those responsibilities, yes.
15 Q  Right. And did you understand the chain of
16    command essentially that you reported up to
17    them, and they in turn reported up to Dr.
18    Amberson?
19        MR. CARMODY: Objection.
20 A  Remember, sir, I was promoted in March to
21    hematopathology medical director of Oklahoma

Page 191

1     operations. And with that promotion, the chain
2     of command, the go-to, also changed.
3        I was told now I needed to report directly
4     to Dr. Amberson, and in fact Dr. Mishalani and
5     Dr. Segal encouraged me to go to Dr. Amberson
6     with any issues that may arise with regard to
7     the Oklahoma facility.
8  Q  Okay, fair enough. Did you have more corporate
9     authority or were you promised to have more
10    corporate authority in Oklahoma City than Dr.
11    Mishalani and Segal had at Stratford?
12       MR. CARMODY: Objection.
13 A  I don't know that to be the case.
14 Q  Well, what we can agree upon is after you
15    learned this new information on May 3, you never
16    went to your cohematopathologists, Dr. Segal and
17    Mishalani, and shared with them what you had
18    been told?
19 A  No. I went to Dr. Amberson.
20 Q  And when was the first time you went to Dr.
21    Amberson as you now recall and shared this new

Page 192

1     information with him?
2  A  It was the week of May 6.
3  Q  And what do you remember telling Dr. Amberson?
4  A  I remember telling Dr. Amberson that I had had
5     this phone call, these phone calls with Lynn
6     Hickman and Brent Hartsell, and they told me
7     that Medicare only reimburses for medically
8     necessary tests and that they explained how this
9     capitation worked; that it didn't mean -- pardon
10    me -- didn't mean that you routinely billed
11    Medicare for this standard screening panel every
12    single time. You only billed what was medically
13    necessary.
14       So that is when I asked Dr. Amberson what
15    he thought about what they said and how in fact
16    is Dianon billing. And Dr. Amberson replied
17    that Dianon is billing for 26 antibodies in
18    every single case even though he recognized the
19    fact that 26 antibodies were not medically
20    necessary.
21 Q  So did you then go back to your colleagues who

Page 193

1     were doing flow and say, and that would be
2     principally Drs. Mishalani and Segal on a
3     full-time basis, right?
4  A  Yes, sir.
5  Q  And say we have to change the way we, us
6     pathologists are doing our jobs?
7  A  No, I didn't start out by doing that.
8  Q  You never went to Dr. Segal and Mishalani and
9     said: We, the people doing flow, have to change
10    the way we're doing our jobs, did you?
11 A  I don't believe it ever got to that point.
12 Q  When you say it never got to that point, you
13    were on the job working day in and day out,
14    signing out reports, for almost three weeks or
15    more after this conversation on May 3?
16 A  That's correct.
17       MR. CARMODY: Objection to form.
18 Q  And during that period of time, Drs. Segal and
19    Mishalani were also coming into work just a few
20    doors down from you doing their jobs as well?
21 A  I would assume so.

49 (Pages 190 to 193)

Page 194

1  Q  I mean, they weren't off on vacation for three
2     weeks, right?
3  A  Yeah, right.
4  Q  All right, okay. Doctor, elsewhere you've
5     talked about after your conversation with Dr.
6     Amberson, you conducted some form of an
7     investigation. Do I have it right?
8  A  That's right.
9  Q  What type of investigation? I wasn't clear when
10    I read your prior testimony what you actually
11    did.
12 A  Yeah. Well, I'm not the kind of person to just
13    automatically believe everything that I hear. I
14    want to -- maybe I'm a doubting Thomas, I don't
15    know, but I wanted to document for myself what
16    Dr. Lynn Hickman and Brent Hartsell told me. I
17    wanted to see it for myself.
18       So I used the divvy sheets, I used the
19    divvy sheets to determine all the flow cytometry
20    cases that came into the Dianon laboratory the
21    week prior to May 6 and the week of May 6, and I

Page 195

1     took all of those cases, I would go in the
2     evening when all the work was done.
3        And I would gather up these cases, and I
4     would look at the clinical question being asked
5     and I would sort these cases into diagnostic
6     groups, multiple myeloma, acute myeloid
7     leukemia, B-cell lymphoproliferative disorders,
8     et cetera.
9        And then I did basically the same kind of
10    exercise we performed earlier today in this
11    deposition, where I tried to determine, if I
12    have this clinical question, which antibodies
13    would I need to answer that clinical question.
14       And so I did that exercise in the evening
15    for these, and at the end of those two weeks, I
16    concluded that Dr. Lynn Hickman and Brent
17    Hartsell were correct; that for the overwhelming
18    majority of cases, it required no more than 10
19    to 15 antibodies.
20 Q  And was that true irrespective of whether it was
21    a tissue on which flow was performed or what's

Page 196

1     called a wet specimen?
2  A  Pretty much.
3  Q  When you say pretty much, I want to know, did
4     you seize upon 15 as the number for both types
5     of specimens?
6  A  What I noticed was that 10 to 15 antibodies was
7     all that was needed to answer the clinical
8     questions that were coming into the laboratory
9     in the overwhelming majority of cases, and by
10    that I would assume lymph nodes, bone marrow,
11    blood.
12 Q  Doctor, help me understand one thing.
13       You've been on the job now from August of
14    2001, you're board-certified, and you're now
15    talking about May, so we're almost eight or nine
16    months in which you've been going to the office
17    every day, sometimes six days a week, and doing
18    flow, right?
19 A  Yes, sir.
20 Q  And you've talked, we've talked a bit about
21    today about your judgment that over that period

Page 197

1     of time you began -- actually, I think you said
2     it was the first day -- the realization that
3     some of the information that was provided to you
4     was medically unnecessary while you were doing
5     flow.
6  A  Correct.
7  Q  Doctor, I just don't understand, after eight
8     months of being on a job and being told by two
9     people that you've never met before, you know,
10    you only need 15 antibodies, why your own
11    experience didn't tell you that was grossly
12    right or wrong; that you had to do two weeks of
13    research to figure that out.
14 A  I guess because I'm kind of a scientist. I want
15    to see the data. I respected Dr. Lynn Hickman,
16    I respected Dr. Brent Hartsell. I had no reason
17    to suspect what they were telling me was not
18    so.
19       But I wanted to see it with my own eyes
20    with the cases that were coming into the lab. I
21    wanted to see it for myself.

Page 286

1  sent to AmeriPath; is that right?
2  A  Yes, sir.
3  Q  Had you raised with others at AmeriPath the
4     substance of what you discussed in this exhibit
5     before November 18, 2002?
6  A  Yes, sir.
7  Q  And if I've understood where we are at this
8     point, notwithstanding this letter of November
9     18, 2002, as of the day you left sometime in --
10    help me, was it 2005 sometime when you left
11    AmeriPath?
12 A  Left AmeriPath, yes. My last day in the
13    laboratory was August 19, 2005.
14 Q  So notwithstanding this Exhibit 15, in three
15    years of working there, you never were able to
16    assure yourself that in fact they were billing
17    what you told them to bill?
18 A  At AmeriPath North Texas, when I told them to
19    bill my cases a certain way, I don't know how
20    they ultimately decided to do it.
21        And when I raised complaints to the company

Page 287

1     about how they should bill, I don't know how
2     they ultimately decided to do it.
3  Q  Now, Doctor, I take it that you hold the
4     opinion, I think you've told me this today, that
5     like Dianon, the 24 antibody panel that you used
6     for three years also provided in your judgment
7     medically unnecessary or useless information.
8  A  Yes, sir.
9  Q  And does it follow, sir, that if AmeriPath,
10    despite your letter of November 18, decided that
11    they disagreed with your interpretation of the
12    Medicare provisions, they would bill for all the
13    work that they actually do, it would follow that
14    they are also committing some form of illegality
15    as you have alleged against Dianon.
16        MR. CARMODY: Objection to form.
17 A  That's correct.
18 Q  Have you sued them, too?
19 A  To the extent that there may possibly be some
20    case under seal, my lawyers have instructed me
21    not to discuss it.

Page 288

1  Q  Forget about allegations of Medicare fraud. Put
2     those aside. I can't imagine anything else
3     could be under seal.
4        Have you sued AmeriPath?
5  A  To the extent that there may possibly be a case
6     under seal, I can't discuss it.
7  Q  I'm not talking about under seal. Have you sued
8     them?
9  A  To the extent that there may possibly be a case
10    under seal, I can't discuss it.
11 Q  Right. So Doctor, let's go back to your report,
12    if we could, please. Let me just see if I can
13    understand the way AmeriPath set up the
14    reports.
15        There is a section in all those reports --
16    again, I don't have the one that you have in
17    front of you -- where it says: Test performed.
18    Do you see that?
19 A  Yes, sir.
20 Q  And there are, at least in the one I'm looking
21    at, two rows of antibodies.

Page 289

1  A  Yes, sir.
2  Q  Is the way that AmeriPath would report out their
3     cases, they would state there which particular
4     antibodies were used by the lab?
5  A  I'm sorry, sir. Could you repeat that?
6  Q  Absolutely.
7  A  I was distracted for a moment.
8  Q  That's okay. In the section that's labeled
9     tests performed --
10 A  Yes, sir.
11 Q  -- can we understand correctly that each and
12    every one of these antibodies would have been
13    used by the AmeriPath flow cytometry lab?
14 A  They would have performed those antibodies.
15 Q  And to the extent that they added on to a basic
16    panel, where would those have been indicated?
17 A  Under tests performed.
18 Q  So you would have just extended this down
19    another row or something and list those
20    additional antibodies?
21 A  That's correct.

73 (Pages 286 to 289)

Page 290

1  Q  And Doctor, tell me what type of document you
2     created that was your method of communicating
3     with the billing department which of the
4     antibodies they should bill in each and every
5     case.
6  A  On a case-by-case basis.
7  Q  Yeah, each and every case.
8  A  There was a worksheet that I obtained for use
9     from the Center for Advanced Diagnostics in
10    Orlando which was intended to communicate
11    between me and the laboratory technologist.
12       And that worksheet had all the tests to be
13    performed, and I used that worksheet to
14    communicate -- excuse me -- I used that
15    worksheet to communicate between me and billing.
16 Q  Tell me how you did it because I haven't seen
17    this document. So help me understand what it
18    looks like and what you told them.
19 A  Okay. Well, as I said, it was basically
20    intended to be a communication between me and
21    the laboratory technologist.

Page 291

1        So it had a place on the worksheet where
2     the laboratory technologist would write down
3     rudimentary results of the flow cytometry test,
4     how many cells, you know, how many T-cells, how
5     many B-cells, what percentage of this, what
6     percentage of that.
7        It had a row of tests performed, not unlike
8     this row of tests performed, where if I wanted
9     her to or him to repeat a study, I would, you
10    know, be able to circle it on that worksheet and
11    make a note or whatever it was.
12       And I took that worksheet, and when I first
13    got the worksheet, it said somewhere in that
14    worksheet, 88180 times 24, indicating that by
15    default CAD automatically performed 24
16    antibodies on each and every case. And I
17    changed that worksheet to have it read 88180
18    times blank.
19       And then what I would do, depending upon
20    which antibodies I considered useful, I would
21    cross out on that worksheet the antibodies that

Page 292

1     I did not find useful and then would count up
2     the ones that I did find useful, and then 88180
3     times that number.
4        And this went to the transcriptionist who
5     then entered that data into the laboratory
6     information system along with information that
7     was being provided and had been checked by me
8     from the flow lab.
9  Q  So should there be in AmeriPath a piece of
10    paper, unless they've destroyed it, for each and
11    every report that you did that got back to the
12    billing department and said Dr. Tiesinga wants
13    only this number of antibodies billed?
14       MR. CARMODY: Objection to form.
15 A  I don't think it -- I don't think it ultimately,
16    that particular worksheet went all the way to
17    the billing department. It went to my
18    secretary/transcriptionist who took that data
19    and communicated that data in some way that I
20    was never quite sure about to the billing
21    office.

Page 293

1  Q  Doctor, you were the director of this operation,
2     correct, of hematopathology?
3  A  Yes, sir.
4  Q  What directive did you give and to whom did you
5     give it to make sure that your instruction of
6     how many antibodies should be billed actually
7     got billed?
8  A  Well, I had faith in my receptionist to write
9     down -- she was entering that number into the
10    LIS system, and I had confidence that she was
11    communicating that to the billing department.
12    That was her job.
13 Q  What was her name?
14 A  Well, I had several secretaries.
15 Q  And do you remember ever asking just one of
16    them: Do you know whether or not my
17    instructions on what to bill are being followed
18    by the billing department?
19 A  Until somebody tells me otherwise, I have no
20    reason to believe that they weren't sending it
21    to the billing office.

Towson Reporting Company    GORE BROTHERS    Whitman Reporting-Rockville
410-828-4148                410-837-3027                301-279-7599