1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------x
UNITED STATES OF AMERICA      :
ex rel. JAMES J. TIESINGA,    :
                              :
         Plaintiff,           :
                              :
   v.                         :   No. 3:02CV1573(MRK)
                              :
DIANON SYSTEMS, INC.,         :
                              :
         Defendant.           :
------------------------------x
```

Washington, D.C.

Tuesday, March 28, 2006

Deposition of

JAMES AMBERSON

a witness, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at approximately 10:46 a.m., at the offices of the United States Department of Justice, 601 D Street, NW., Washington, D.C., before Denise Dobner Vickery of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

58

1  A  Yes.
2  Q  M. Monaco?
3  A  Mike Monaco.
4  Q  And what was his position?
5  A  I can't remember.
6  Q  Okay. Is he still with the
7  company?
8  A  No.
9  Q  Ms. Palmieri?
10 A  Yes.
11 Q  And we talked about Mr. McDowell.
12 S. Mishalani?
13 A  Hematopathologist.
14 Q  And is she still with the company?
15 A  Yes.
16 Q  And Mr. Verfurth we talked about.
17 And then S.?
18 A  Steve Wilz. He was a pathologist.
19 Q  Okay. Was he --
20 A  Well, he was -- he had been trained
21 in hematopathology, but he ended up actually
22 signing out in uropathology principally. But

59

1  I think at this point, I presume he's on here
2  because at that point he might be working in
3  hematopathology.
4  Q  Okay. And is he still with the
5  company?
6  A  No.
7  Q  When did he leave?
8  A  Oh, I don't know. Four or five
9  years ago maybe.
10 Q  Okay. Do you know where he is?
11 A  Last I heard, he was in Boston, but
12 I'm not sure.
13    MS. DAVIS: Okay. Take a look at
14 what's been marked as Exhibit 7.
15    (Deposition Exhibit No. 7 was
16    marked for identification.)
17    BY MS. DAVIS:
18 Q  Can you tell me what that is?
19 A  It looks like a report that's
20 looking at turn-around time in anatomic
21 pathology.
22 Q  Okay. Can you take a look at the

60

1  second page of the exhibit, which is PP
2  11365. Is this what was referred to in the
3  earlier document as the in-house report?
4  A  I don't know. This is not the
5  in-house report, I don't think. I'm not
6  sure, but it's a turn-around time report.
7  Q  Okay. And it's tracking pretty
8  carefully by each of the anatomic pathology
9  areas how -- how many days particular
10 specimens are or the turn-around time
11 basically for different specimens?
12 A  Yeah.
13    MS. DAVIS: Okay. Have you take a
14 look at what has been marked Exhibit 8.
15    (Deposition Exhibit No. 8 was
16    marked for identification.)
17    BY MS. DAVIS:
18 Q  Do you recognize that document?
19 A  I don't remember it, but...
20 Q  Do you remember having meetings in
21 2002 about improving the turn-around time?
22 A  Yes.

61

1  Q  Why were you having meetings about
2  the turn-around time?
3  A  I think at this point we were
4  getting increased pressure in turn-around
5  time, particularly in hematopathology. When
6  we had started off with our anatomic
7  pathology strategy, as I said, our principal
8  competitive advantage, if you will, was not
9  our turn-around time. It was that we were
10 perceived as -- and I believe correctly so --
11 as offering higher quality pathology services
12 than were routinely available and that our
13 reports were more informative, easier to
14 read, and we employed the latest in new
15 diagnostic technologies.
16    And also, finally, that we had
17 specialty services in pathology and that
18 these pathology specialists mirrored what the
19 clinicians, their own specialties.
20    What happened in around this time
21 period, there were a number of -- if you want
22 to call them DIANON knockoffs. Other

16 (Pages 58 to 61)

```
                                          54
 1   the clients expect?
 2      A   I think in general for specimens,
 3   they expected, you know, 48-hour turn-around
 4   time. I don't remember exactly what it was
 5   for hematopathology, but I think there was a
 6   little more leeway there because the testing
 7   was so much more extensive.
 8      Q   Tell me how you run through the
 9   names of the people on this -- on these
10   reports and tell me -- let's go with the
11   1/13/96 memo.
12      A   Okay.
13      Q   And let me ask you. I'm looking at
14   the dates on these. If you read all the
15   documents, it looks like this review is
16   supposed to take place over a five-week
17   period, but we have documents that are
18   numbered -- are dated in '96 and then also in
19   '97. Do you recall which would be correct?
20   No?
21      A   I don't know. This one that's
22   dated '97 I think is correct because it says

                                          55
 1   received by Kevin Johnson looks like March
 2   '97.
 3      Q   Okay.
 4      A   So I assume that if it was stamped
 5   then, that's when he got it.
 6      Q   Okay. Okay. Let's go back to the
 7   1/13/96 and go through just the folks on the
 8   list. Raynae -- Raynae Barschow?
 9      A   Raynae Barschow.
10      Q   Okay. Who was?
11      A   She was in pathology support.
12      Q   Okay. Steve Brown?
13      A   He was the flow cytometry
14   supervisor.
15      Q   Kathy Jean Carney?
16      A   She was supervisor of histology.
17      Q   Chuck Frederick?
18      A   I don't remember.
19      Q   Aliza George?
20      A   I think she may have worked in
21   accessioning. That is, where specimens were
22   received, but I'm not certain.

                                          56
 1      Q   Okay. We know Dr. Goyette. Sandra
 2   Priest?
 3      A   I don't remember.
 4      Q   Dr. Segal?
 5      A   He's a hematopathologist.
 6      Q   Marty Stefanelli?
 7      A   He worked in operations. I think
 8   he was director of operations or that portion
 9   of operations at the time.
10      Q   Okay.
11      A   I think he was director of
12   operations.
13      Q   Is he still with the company?
14      A   No.
15      Q   What about Dr. Segal?
16      A   Dr. Segal? Yes, he's with the
17   company.
18      Q   Okay. Michelle Tartaglia?
19      A   Yes, I think she was a
20   transcriptionist.
21      Q   Dorothy Warner?
22      A   She -- I'm not sure what her

                                          57
 1   function is -- was at the time. I think she
 2   may still be at the company, but I'm not
 3   sure.
 4      Q   Okay. And then the cc's. Kevin
 5   Johnson we have identified. Mr. Amberson.
 6   Barry. A. Connor?
 7      A   Ann Marie Connor. She's a
 8   hematopathologist.
 9      Q   J. Garner?
10      A   Jim Garner. He was -- he was a
11   sales trainer, but I don't know what he was
12   -- that may have been his job at the time. I
13   don't remember.
14      Q   S. Gersen?
15      A   Steve Gersen was director of the
16   cytogenetics laboratory.
17      Q   L. Kuruc?
18      A   I don't know.
19      Q   B. McNamee?
20      A   Bob McNamee, director of quality
21   assurance.
22      Q   And he's still with the company?
```

15 (Pages 54 to 57)

**Page 62**

1  companies that came to play who duplicated
2  all of our kind of reports and the kind of
3  specialty services that we offered. And they
4  began to compete on turn-around time because
5  in effect, you know, they were trying to
6  level the playing field. And so that was one
7  area where they were trying to put pressure
8  on us, and so that was I think generated a
9  series of meetings of how we might respond to
10 that.
11    Q  Okay. And when did that
12 competition start?
13    A  It started in the early 2000.
14    Q  Okay.
15    A  I don't remember. I mean, there
16 was always some competition, but that's when
17 I remember it heating up.
18    Q  Okay. In early 2000?
19    A  I think -- in this decade. I don't
20 remember specifically.
21    Q  Okay. And who were the DIANON
22 knockoffs, the competitors?

**Page 63**

1    A  Well, there were a couple. One --
2  I think the one that was giving us the most
3  trouble at the time was US LABS, which is
4  based in California. There was another
5  laboratory, Esoterix, which was becoming a
6  stronger competitor. Initially they had done
7  just flow cytometry and then they added
8  hematopathologists, and then there were some
9  other players.
10       I think Impath. They were a
11 competitor. Although there was a period of
12 time where they were having all kind of
13 problems. I think that's when US LABS really
14 got stronger.
15    Q  Okay. And let me just make sure.
16 You think the heavy competition from these
17 other labs started in about --
18    A  Yes.
19    Q  -- early 2000s?
20    A  Yeah, where it really became
21 significant.
22    Q  Okay. And then I note the document

**Page 64**

1  that's attached to this second page is --
2  which is 13721, it seems to refer to
3  hematopathology. I take it that's what HEM
4  is?
5    A  Yes.
6    Q  And so was the focus on
7  hematopathology primarily?
8    A  Well, in this particular, that's
9  what this meeting is referring to and that's
10 what US LABS was doing almost exclusively.
11 That's what their -- they specialized in.
12 Essentially in hematopathology and some
13 related stuff.
14    Q  Okay. Let's take a look at the
15 attendees. Jay. Is that you?
16    A  Yes.
17    Q  Valerie is Ms. Palmieri?
18    A  Uh-huh.
19    Q  Marty Stefanelli?
20    A  Yes.
21    Q  Todd?
22    A  Holman.

**Page 65**

1    Q  And what was his position?
2    A  I think he was director of
3  marketing at the time.
4    Q  And Suha. That's Dr. Mishalani?
5    A  Yes.
6    Q  And Glenn is Dr. Segal?
7    A  Yes.
8    Q  And were these generally the same
9  people who were in the meetings that you
10 would discuss the -- how to respond to the
11 competition?
12   A  Well, I think this, this meeting I
13 can't remember whether it was either Valerie
14 or Marty who called this meeting of how --
15 because we had lost some accounts and how we
16 could respond to it.
17   Q  Okay. Did -- since you've been at
18 DIANON, have you ever had any compliance
19 training with reference to the Medicare
20 program?
21   A  Yes.
22   Q  And when -- when was that?

17 (Pages 62 to 65)

66

1  A  We had that yearly.
2  Q  Starting when?
3  A  Well, we certainly had a formal
4  training ever since the OIG investigation
5  settlement with the government. I don't
6  remember exactly when it started, but
7  sometime in the early part of this decade and
8  we have yearly training.
9  Q  Okay. And before that time?
10  A  I believe that we did have some
11  training, and certainly I worked fairly
12  closely with Tom Cassel. Learned a lot about
13  compliance from him.
14  Q  Okay. Did the -- other than
15  working with Mr. Cassel, did you -- did
16  other members of the staff, the medical
17  staff, get compliance training?
18  A  Yes. I mean, as I say, everybody,
19  every member of the medical staff gets
20  compliance training on a yearly basis.
21  Q  Okay. Starting in the early 2000s?
22  A  Yeah. I don't remember when that

67

1  formal process started.
2  Q  Okay. Has a part of the training
3  -- has a part of the training included
4  training on what medical necessity is?
5  A  Yes.
6  Q  And that's starting in the early
7  2000s?
8  A  Yeah. Definitely I know that in
9  this yearly training we've had, I mean, I
10  know that that's been covered.
11  Q  Okay. And once again, I just want
12  to make sure I got my time. Starting in the
13  early 2000s?
14  A  I think so, but don't hold me to
15  the dates.
16  Q  Okay. So, in, say, the '96 until
17  2000, had there been any compliance training
18  where the medical staff were told by medical
19  necessity?
20  A  I don't remember.
21  Q  Okay. Would you have taken part in
22  it if there had been?

68

1  A  Yes.
2  Q  Okay. And who -- who typically
3  provides the compliance training?
4  A  It's done out of Mr. Cassel's
5  office.
6  Q  Okay. Does Mr. Cassel have a
7  staff?
8  A  He has one person who works for
9  him.
10  Q  Okay. Is he -- I'm just trying to
11  figure out. At one point he was a
12  contractor? Is he now?
13  A  Yes. He's corporate counsel for
14  DIANON.
15  Q  Okay. But early in '96-'97 time
16  period, he was a contractor?
17  A  Yes, he -- I think he was an
18  independent and he had his own law practice,
19  but he -- his specialty was compliance.
20  Q  Okay. And during the '96 through
21  the end of the '90s time period, did he do
22  any compliance presentations to DIANON staff?

69

1  A  Yeah, I believe he did. I don't
2  remember them specifically honest but --
3  honestly, but I think he did.
4  Q  Okay. And did he talk about what
5  medical necessity meant?
6  A  Again, I don't remember the
7  specific talks.
8  Q  Okay. Do you specifically remember
9  any discussions during that time period of
10  medical necessity?
11  A  I'm sure we talked about medical
12  necessity. I mean, it's something that's
13  unavoidable in laboratory testing.
14  Q  Okay. What's your understanding of
15  what medical necessity is?
16  A  It's that any procedure or test is
17  necessary for the diagnosis and treatment of
18  the patient.
19  Q  Okay. And what's that
20  understanding based on?
21  A  What I've read and experienced. I
22  mean, I can't refer you to a specific

18 (Pages 66 to 69)

102

1  which is 13692, there's a list there. "The
2  top contributors will be identified using a
3  variety of criteria which include, but are
4  not necessarily limited to, the following
5  factors." Are those the factors that would
6  have been taken into account in determining
7  the performance of the pathologist?
8     A   Yes.
9         MS. DAVIS: Take a look at what's
10 been marked as Exhibit 15.
11         (Deposition Exhibit No. 15 was
12         marked for identification.)
13        BY MS. DAVIS:
14    Q   Do you recognize that document?
15    A   Yes.
16    Q   What is it?
17    A   It was a document to describe a
18 concept for creating an incentive system for
19 physician productivity.
20    Q   And what was the -- how would you
21 -- under this program would you -- how would
22 you measure productivity?

103

1     A   It would be by the amount of work
2  that the pathologist produced.
3     Q   The number of cases they signed
4  out?
5     A   Yes.
6     Q   Okay. And then how would they be
7  compensated?
8     A   The way this system would work is
9  that we would set an amount of work that a
10 pathologist -- every pathologist should be
11 able to do. One of the issues that we
12 learned as with experience is that when we
13 hired more pathologists, there was a
14 tremendous difference in the amount of cases
15 that individual pathologists were willing and
16 able to sign out, and that was creating some
17 tensions within the laboratory.
18        Because some of the pathologists
19 who could comfortably sign out more cases,
20 you know, at very high quality, they felt
21 like they were doing more work, but they were
22 compensated the same as pathologists who

104

1  either were unable or didn't want to sign out
2  as many cases. So we decided to set up a
3  system whereby we would compensate those
4  pathologists who voluntarily would sign out
5  extra work.
6         And the way the system was set up
7  was that cases were weighted by what percent
8  of a day's work they would take, and then
9  once the pathologist was above a 100 percent,
10 which was, if you will, that minimum number,
11 they would be compensated extra.
12    Q   Okay. And was this program put
13 into place?
14    A   Yes. There was some, you know, it
15 was modified over time but, yes, that basic
16 concept was put into -- put into place.
17        MS. DAVIS: Okay. Time to take a
18 look at what's marked as Exhibit 16.
19        (Deposition Exhibit No. 16 was
20        marked for identification.)
21        BY MS. DAVIS:
22    Q   Is this -- it says, "Revised 1998,

105

1  Pathology Incentive Program." Is this the
2  program that was actually put into place?
3     A   Well, it was one version of it. I
4  don't remember if it was the first version
5  that was put into place, but certainly I
6  believe a version, this version was put into
7  place or something very similar to it.
8     Q   Okay. So let me just -- let's see.
9  It says, "The purpose of the incentive
10 program is to award productivity. It is
11 based solely on individual performance."
12 And then if you look at, it says I'm assuming
13 HEME is hemopaths?
14    A   Hematopathology, yes.
15    Q   Right. And under standard for half
16 day it's 5.5?
17    A   Yes.
18    Q   So, for a standard day, the average
19 amount a pathologist would be expected to
20 sign out 5.5 cases or 10 or 11 cases a day?
21    A   Yes.
22    Q   And then they would get $90 for

**Page 106**

1  each case over that?
2  A  Yes.
3  Q  And they were limited to eight over
4  that?
5  A  Yes. Initially we put in a
6  maximum. I think that -- and at that point I
7  guess it was eight.
8  Q  Okay. And then the amount someone
9  got for signing out additional cases depended
10 on -- I mean, the numbers here varied from
11 $2.60 per case to $90. What was the
12 difference in the --
13 A  Well --
14 Q  -- compensation?
15 A  -- if you look, for example, if in
16 a half a day you could do -- let's make the
17 number simpler. If in a day you could do a
18 hundred cases of one type, but if you signed
19 out another case -- type of case you could
20 only do 10, then that meant that the first
21 type of case essentially you could do, each
22 case would comprise 1 percent of the day's

**Page 107**

1  work. Whereas, in the second case, each case
2  would comprise 10 percent of a day's work.
3  And so these numbers were to approximate the
4  amount of extra time it would take to do a
5  case.
6  Q  Okay. So, did it have something to
7  do with the complexity of the cases?
8  A  Complexity and just the amount of
9  time it took to sign them out.
10 Q  Okay.
11 A  That would -- that varied. For
12 example, dermatopathologists could sign out a
13 fair number of cases; whereas, if you got
14 fine needle aspirates, they tended to take
15 longer. There was more material to look at.
16 MS. DAVIS: Okay. Take a look at
17 what's been marked as Exhibit 17.
18        (Deposition Exhibit No. 17 was
19         marked for identification.)
20 BY MS. DAVIS:
21 Q  I'm sorry. Do you recognize that
22 document?

**Page 108**

1  MR. PARKER: Do you have one for
2  me?
3  MS. DAVIS: Oh, I'm sorry. I keep
4  forgetting you.
5  MR. PARKER: That's all right.
6  THE WITNESS: It looks familiar.
7  It looks like, again, it's another version of
8  the incentive system.
9  BY MS. DAVIS:
10 Q  Okay. And this one is dated 1999?
11 A  Yes.
12 Q  If you turn to the second page, the
13 hematopathology standard for half a day has
14 gone down to 5?
15 A  Yes.
16 Q  And the case rate for additional
17 cases is $60 now?
18 A  Uh-huh.
19 Q  And there's no maximize; is that
20 right?
21 A  I don't know. I don't see it
22 mentioned here.

**Page 109**

1  Q  Okay. Do you know why that the
2  case rate went down?
3  A  I think that this -- this program
4  went through several iterations as we gained
5  more experience how long it really to do
6  these cases.
7  Q  Okay. Do you know -- do you have
8  any sort of feeling for how many extra cases
9  an individual hematopathologist routinely
10 did?
11 A  I don't remember.
12 MS. DAVIS: Okay. Let me show you
13 what's been marked as Exhibit 18.
14        (Deposition Exhibit No. 18 was
15         marked for identification.)
16 BY MS. DAVIS:
17 Q  Do you recognize this document?
18 A  Specifically, no.
19 Q  Do you recognize it as a type of
20 document?
21 A  Yeah. It looks like a document for
22 one of those monthly management meetings that

118

1  morphology?
2      A   Yeah, it would be the diagnosis and
3  in a case where you had both flow and
4  morphology, it would be based on both.
5      Q   Okay. And about what time period
6  you said this happened?
7      A   This was, you know, in the early
8  2000s. I don't remember the date of this
9  particular document.
10     Q   Okay. Do you recognize the
11 handwriting?
12     A   Yeah. It's mine.
13     Q   It's yours; okay. So these are
14 your notes --
15     A   Yes.
16     Q   -- at one of the meetings?
17     A   Yes.
18     Q   Okay. Take a look at the first
19 line. Actually the first three lines. It
20 says -- I take that that arrow pointing out
21 means larger panels? Is that what that arrow
22 pointing out means?

119

1      A   That means US LABS was offering
2  larger panels.
3      Q   Okay. And more comprehensive?
4      A   Yes, I think they had a very large
5  panel.
6      Q   Do you remember how many?
7      A   No.
8      Q   Okay. And then better turn-around
9  time?
10     A   Yes.
11     Q   "At least 48 hours, if not 24 hours
12 for flow"?
13     A   Right.
14     Q   That's what you were just talking
15 about?
16     A   Right. They would do this
17 preliminary report.
18     Q   Okay. And then "conclusion up
19 front." I take it that means the front of
20 the report?
21     A   Right. The bottom line diagnosis.
22 It was right there in the front. Ours was

120

1  way at the end.
2      Q   You had to read through all that to
3  get through it?
4      A   Right.
5      Q   Okay. And then there's an arrow
6  and then two things there. Do you know what
7  those are? Looks like --
8      A   "Path manpower transcription."
9  I'm not sure what I'm talking. One of the --
10 there were some bottlenecks as far as our
11 getting the morphology out on time. Flow
12 wasn't a problem. Morphology you had to have
13 the pathologist available, particularly on
14 weekends, and do his transcription. That was
15 probably the biggest bottleneck.
16     Q   Okay. Then you got "to do" written
17 there?
18     A   Uh-huh. Yes.
19     Q   "Get sample of panels and reports."
20 Samples of who?
21     A   I assume -- I think US LABS.
22     Q   Okay. Then it says "Talk to Glenn

121

1  and Suha about A expanded panels." What does
2  that mean?
3      A   I'm not sure. I wanted to get an
4  estimate from them whether they -- what they
5  thought of their panels.
6      Q   US LABS' panels?
7      A   Yes. You know, these big panels.
8      Q   And then the next line, what does
9  that mean?
10     A   See if we can't decrease that
11 turn-around time. In other words, our flow,
12 if there was morphology with it, reporting
13 out the results of the flow was delayed. I
14 mean, our -- and so how could we deal with
15 that. And then down below where I say
16 "Conclusion at front of the report" and look
17 at that transcription bottleneck to see what
18 we could do to get the morphology out
19 quicker.
20     Q   Okay. And when you say -- you said
21 A expanded panels, you said you thought that
22 meant you were talking to Glenn and Suha,

31 (Pages 118 to 121)

Page 122

1  that's Dr. Segal and Mishalani about US LABS'
2  panels?
3    A   Yes, I think so. Yes.
4    Q   Or expanding DIANON's panels?
5    A   I don't remember ever talking about
6  expanding our panels. I think it was talking
7  to them about these expanded panels that US
8  LABS had.
9    Q   Okay. And then it says, "Talk to
10 Rich Cornell re"?
11   A   Yes.
12   Q   I guess OK was Oklahoma?
13   A   Yeah.
14   Q   And what does that refer to?
15   A   I assume that refers to that at
16 this time, as you know, we were or at some
17 point -- and I assume that's when this was
18 written -- we were looking at establishing a
19 hematopathology lab in Oklahoma. We were
20 having trouble recruiting people for that
21 facility.
22   Q   Uh-huh.

Page 123

1    A   Rich Cornell was the recruiter we
2  were working with.
3    Q   I see. Okay. So, at the time you
4  were working on getting what?
5  Hematopathologists for Oklahoma City or just
6  pathologists in general?
7    A   No. It would have been
8  hematopathologists.
9    Q   Okay.
10   A   And also technical people, flow,
11 flow people. I mean, that's -- they are hard
12 people to find.
13   Q   Okay.
14   A   And probably also cytogenetics.
15 Since we were planning on putting a
16 comprehensive program out there.
17   Q   Okay. And then the second page, is
18 that also your handwriting?
19   A   Yes.
20   Q   Okay. Do you know what -- as a
21 result of this, this meeting whether you took
22 any action?

Page 124

1    A   I believe eventually we did modify
2  our reports as I discussed.
3    Q   Did you do anything with the
4  panels?
5    A   With our panels?
6    Q   Yeah.
7    A   No.
8    Q   When we were -- during the 30(b)6
9  deposition this morning, we talked about --
10 briefly about a decision -- I think we talked
11 about it -- a decision to go from 18 to 26
12 antibodies and we looked at a document that
13 represented that in the year 2000-2001?
14   A   Yes.
15   Q   Were you involved in that decision?
16   A   No.
17   Q   Who was?
18      MR. PARKER: For the record, we're
19 making it clear going from 18 to 26, we're
20 talking about billing?
21      MS. DAVIS: Yes, we are.
22      MR. PARKER: Okay.

Page 125

1       MS. DAVIS: I'm sorry if I'm not
2  being precise. That's what I mean.
3       BY MS. DAVIS:
4    Q   I'm sorry. You said you were not
5  involved in that decision?
6    A   The decision to go from billing 18
7  to 26 antibodies is the number where we were
8  performing. I was not involved in that at
9  all. I didn't even know it had been made.
10   Q   Okay. Wouldn't you normally be
11 involved in discussions of -- of what to bill
12 for?
13   A   I wasn't the lab director at the
14 time.
15   Q   In 2000 you were?
16   A   That was Dr. Snyder.
17   Q   Ah, that's right. That's right.
18 So he would have been involved in those
19 discussions?
20   A   I would presume so.
21      MS. DAVIS: Okay. Let's go off the
22 record for a minute.

32 (Pages 122 to 125)

146

1  A  I sent to Dr. Toor numerous letters
2  and some of them quite extensive where I
3  reviewed in fact reports that we'd actually
4  done. Looked at certain ICD 9 codes and
5  would show that the incidence of significant
6  diagnosis was very high, you know, a
7  thousand, or two, you know, I don't know how
8  many times higher than you would expect in
9  the general population. Trying to show him
10 that this was not an inappropriate use of
11 this test.
12     And whenever I would send him these
13 documents, I would never get a reply back.
14 When I would call him, my general impression
15 was that either he hadn't read it or he
16 clearly didn't understand it.
17 Q  Okay.
18 A  And there was no action given --
19 taken by him as far as I could tell.
20 Q  Okay. And how -- so this -- this
21 issue was never really resolved until you --
22 until Dr. Delli Carpini came on?

147

1  A  That's correct.
2  Q  Okay. So, did the carrier just
3  continue to deny anything that didn't --
4  wasn't included in those ICD 9 codes or did
5  at some point he agree to add ICD 9 codes?
6  A  Well, at some points he would agree
7  to add them. Sometimes they would in fact be
8  added. Sometimes they wouldn't. Sometimes I
9  would walk away feeling like we were going to
10 have some action and then no action was
11 forthcoming. So I was never clear exactly
12 what they did.
13 Q  Okay. Did you have face-to-face
14 meetings with him or was it --
15 A  I think -- I believe I had one or
16 two face-to-face meetings with him about
17 this.
18 Q  Okay. Was it just you or did
19 someone else go along to the meetings?
20 A  I believe Dr. Goyette went with me
21 for one meeting with Dr. Toor. I don't think
22 that particular meeting was very productive.

148

1  Q  Okay. And, once again, the issue
2  was that they either denied the whole claim
3  or -- or paid the claim? It wasn't a
4  question of how many antibodies?
5  A  No, that never came up.
6     MS. DAVIS: Okay. Take a look at
7  what's been marked as Exhibit 28.
8         (Deposition Exhibit No. 28 was
9         marked for identification.)
10    BY MS. DAVIS:
11 Q  Do you recognize that document?
12 A  Yes.
13 Q  What is it?
14 A  I believe this is something I asked
15 Dr. Goyette to do for me to help me in
16 putting together, you know, arguments for Dr
17 Toor.
18 Q  Okay. And we asked him about this
19 during his deposition and he said he
20 basically reviewed some -- some -- some of
21 the denied claims?
22 A  Yes.

149

1  Q  And tried to figure out whether
2  there was a pattern?
3  A  Right, and also do you think this
4  was corporately denied or not.
5  Q  Right. He didn't remember, though,
6  like how many claims he reviewed or claims
7  denied he reviewed. Was this some sort of
8  comprehensive review, or did he just take a
9  sample, or do you remember?
10 A  I don't remember specifically.
11 Q  Okay. And did you discuss with Dr.
12 Toor the possibility of -- because I take it
13 he would only pay based on what the diagnosis
14 code was on the incoming requisition; is that
15 right?
16 A  I believe for -- yes, I think so.
17 Q  Okay. Did you discuss with Dr.
18 Toor the possibility of, you know, once the
19 diagnosis was made by the pathologist at
20 DIANON paying based on that code?
21 A  I don't remember specifically. I
22 believe that I may have suggested that and --