## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA, ex rel.,
DR. JAMES J. TIESINGA,

    Plaintiff,

vs.    NO.: 3:02 CV 1573 (MRK)

DIANON SYSTEMS, INC.

    Defendant.
_____/

VIDEOTAPED
DEPOSITION OF:    GRANT CARLSON

DATE:    June 15, 2006

TIME:    9:00 a.m. to 1:31 p.m.

PLACE:    101 East Kennedy Boulevard
Suite 1200
Tampa, Florida

BEFORE:    KELLI ANN ELLIS, RPR
Registered Professional Reporter
Notary Public
State of Florida at Large

Pages 1 - 164

## Page 2

APPEARANCES:

RYAN FAYHEE
United States Department of Justice
Trial Attorney
601 D Street, NW
Room 9607
Washington, DC 20004
    Attorney for Plaintiff United States of America

ROBERT SALCIDO
Attorney-at-law
Akin, Gump, Strauss, Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
    Attorney for Defendant

ALSO PRESENT:

Greg Scrivener - Videographer

### INDEX TO PROCEEDINGS

| | PAGE |
|---|---|
| Direct Examination by Mr. Fayhee | 4 |
| Certificate of Oath | 162 |
| Court Reporter's Certification Page | 163 |
| Witness' Signature Page | 164 |

### EXHIBITS

| | | PAGE |
|---|---|---|
| No. 1 | - Memo Re: 2001 Fee Schedules | 20 |
| No. 2 | - Document entitled Hematopathology Services | 29 |
| No. 3 | - 8/29/06 Memo Re: Special Pricing/Threshold Pricing List | 31 |

## Page 3

EXHIBITS CONTINUED

| | | PAGE |
|---|---|---|
| No. 4 | - Federal Register Notice, Vol. 63 No. 163 Monday, August 24, 1998 | 40 |
| No. 5 | - Copy of 42 CFR 411.15 | 43 |
| No. 6 | - Compliance Committee Minutes February 27, 1998 | 45 |
| No. 7 | - Continuity File 12/10/06 | 48 |
| No. 8 | - Review of DSI Strategy | 57 |
| No. 9 | - Dianon Systems/The Definitive Choice in Hematopathology | 64 |
| No. 10 | - TAT Review Flow Cytometry Testing | 72 |
| No. 11 | - Hematopathology Role Play #3 | 78 |
| No. 12 | - Fee/CPT Code Change & New Tests/Profiles | 90 |
| No. 13 | - Hematopathology Services Fee Justification January 30, 1996 | 102 |
| No. 14 | - Hematopathology Services Fee Justification January 8, 1996 | 103 |
| No. 15 | - Memo dated 3/20/97 to Bill McDowell from Steve Brown | 105 |
| No. 16 | - 6/17/97 Memo to James Amberson, M.D. from Richert E. Goyette, M.D. | 106 |
| No. 17 | - Ap Test Code Creation Form | 120 |
| No. 18 | - Cytogenetics Worksheet | 130 |
| No. 19 | - Declaration of Richert Goyette, M.D. | 133 |
| No. 20 | - Deposition Transcript of Valerie Palmieri | 135 |
| No. 21 | - OPS Report - October '99 Summary | 147 |
| No. 22 | - Requisition Review Routing | 147 |

## Page 4

    THE VIDEOGRAPHER: This is the video operator speaking, Greg Scrivener, from A-Pro Video, Inc.

    The court reporter is Kelli Ellis.

    This videotaped deposition is taking place at 101 East Kennedy Boulevard, Tampa, Florida.

    We are here this day, June 15th, 2006, to take the video deposition of Grant Carlson in the matter of United States, ex rel, Dr. James Tiesinga, plaintiffs, versus Dianon Systems, Inc., defendant, in the United States District Court for the District of Connecticut.

    The time as indicated on the video monitor is approximately 9:00 a.m.

    Will counsels please introduce themselves for the record beginning with plaintiffs' counsel.

    MR. FAYHEE: My name is Ryan Fayhee. I represent the United States of America.

    MR. SALCIDO: My name is Robert Salcido. I represent the defendant, Dianon Systems, Inc.

    THE VIDEOGRAPHER: Madam Court Reporter, would you please swear the witness.

    GRANT CARLSON,
the witness herein, being first duly sworn on oath, was examined and deposed as follows:

    THE VIDEOGRAPHER: You may proceed.

    DIRECT EXAMINATION

53

1 better, how to differentiate our product in the market,
2 those sorts of things.
3     I don't think it has to do with anything beyond
4 that in terms of writing materials or, you know, going out
5 and giving sales pitches, but I think just cooperating and
6 teaching and training.
7     Q. During this time period from being a director of
8 R & D into your position as vice president for marketing,
9 what was the -- generally I suppose, the relationship
10 between the pathologists and the marketing department
11 like?
12     A. I think in general, it was pretty good.
13     Q. Okay. Were there any problems that you can
14 recall?
15     A. No, not -- I would say not interpersonal
16 problems. I mean, pathologists were a proud group and
17 they thought that their abilities and their -- I guess to
18 say that pathologists thought they were indispensable,
19 marketing thought they were indispensable, so where those
20 two met.
21     Q. Well, maybe this will help a little bit. If you
22 look at the bottom paragraph here, it says, Bill, please
23 make sure you educate my successor on the pitfalls of
24 pathology/product manager relationships. In many ways, a
25 person can --

54

1     A. Where are you?
2     Q. I apologize. I'm sorry. The last paragraph on
3 the first page. I'm sorry.
4     I'll start over there.
5     A. Okay.
6     Q. Bill, please make sure you educate my successor
7 on the pitfalls of pathology/product manager
8 relationships. In many ways, a person cannot avoid
9 butting heads with Ann Marie Connor especially as she
10 always seems to create conflict.
11     Do you recall Ann Marie Connor having a problem
12 with -- with marketing?
13     A. I don't think it's limited to marketing.
14     Q. Did she have a problem with other people in the
15 company?
16     A. Yes.
17     Q. Okay.
18     A. My recollection is Ann Marie was a difficult
19 person.
20     Q. Okay. In what ways?
21     A. Very abrupt, very -- just butted heads with a lot
22 of people.
23     Q. Okay.
24     A. Very vocal in her opinions.
25     Q. Did she butt heads with -- butt heads with you?

55

1     A. Not really. No, I don't recall any, but --
2     Q. Do you recall any sort of specific instances
3 where she butted heads? Perhaps you could give me an
4 example of one.
5     A. Yeah. I would be, I guess -- what do you call
6 it -- gossiping. I don't have any -- I didn't overhear it
7 directly.
8     Q. You wouldn't characterize her relationship with
9 the other members of the company as a -- as a good one?
10     A. No.
11     Q. Okay. What about --
12     A. She's not your go-to person.
13     Q. Okay. Do you know why that was?
14     A. I think it's just personality.
15     Q. Just personality? Okay. What about Dr.
16 Goyette's relationship with -- well, let's say marketing
17 specifically.
18     A. It was a good -- good relationship, good healthy
19 relationship. I think marketing respected his abilities
20 and I think he had some respect for marketing and what
21 they were trying to do, to grow -- you know, to grow that
22 business.
23     Q. Would he act as a contact point for people
24 outside the hematopathology lab?
25     A. Yes. I would say he was more of a go-to person

56

1 if you needed information in heme-path, in the department.
2     Q. And who is Steve Gersen?
3     A. And Steve was vice president of cytogenetics and
4 genetics.
5     Q. Okay. I'm going to move into another area. I'm
6 happy to go ahead, but if you want to break --
7     A. Yeah. Why don't we take a quick break.
8     Q. Good enough.
9     THE VIDEOGRAPHER: We're going to go off the
10 record at 10:22.
11     (Brief recess taken.)
12     THE VIDEOGRAPHER: We're now going back on the
13 record at 10:28.
14 BY MR. FAYHEE:
15     Q. Okay. Well, let's start back. The -- there was
16 an earlier reference on a couple of the other documents.
17 And I'll pull them back out if you need to, but it
18 referred to this acronym TAT. Do you know what that
19 means?
20     A. Turn-around time.
21     Q. Turn-around time. What's -- what is turn-around
22 time as it relates to the hematopathology lab?
23     A. It generally is defined by the number of days
24 from receipt of sample to the report being issued to the
25 physician.

57

1  Q.  Okay. Does it also apply to -- you mean the
2  referring physician?
3  A.  Correct.
   Q.  Okay. And can you tell me how turn-around time
5  was important to marketing of the product?
6  A.  Yeah. Physicians always wanted to get their
7  reports back as quick as possible. You're often competing
8  against hospital pathologists that are right there. So
9  Dianon Systems lost one day just in Federal Express in
10 terms of getting a sample to Connecticut. So you're
11 already behind the eight ball in terms of getting a report
12 out as quick as their hospital.
13      So it was important to get back reports as -- as
14 soon as possible so the physician could counsel the
15 patient on their diagnosis.
16 Q.  Okay.
17      (Exhibit No. 8 was marked for identification.)
18 BY MR. FAYHEE:
19 Q.  This is a thick one I know, but I promise I won't
20 take you through every page.
21      Let me ask you, before we get into it here just
22 to focus it, what year did -- do you recall the
23 hematopathology lab, when did it begin?
24 A.  I don't know that date.
25 Q.  Was it before you got to Dianon or after?

58

1  A.  It was after I got to Dianon.
2  Q.  Okay.
3  A.  After 1991 when I got there.
4  Q.  Okay.
5  A.  Maybe '95 or something.
6  Q.  Okay. Was it around the same time that Dr.
7  Goyette was hired, do you recall?
8  A.  I don't recall.
9  Q.  Okay. Okay. Well, the document I've handed you
10 is called "Review of DSI strategy." DSI, of course, is
11 Dianon Systems, Inc. There's a lot of references in this
12 document. There's no -- there's no specific date at the
13 top of it, but there's a lot of references to 1996. If we
14 turn to page 8305 --
15 A.  Do you know the author of this?
16 Q.  No, I don't. Do you?
17 A.  No.
18 Q.  Okay. Just -- and I'm using this just to sort of
19 try to put a time line down. If you turn to 8305, you'll
20 see a graph there.
21 A.  Uh-huh. (Indicates affirmatively.)
22 Q.  I'm just using this as an example to try to get
23 the time down, but you'll see where the graph says 94 and
24 then there are a series of numbers and the 95 EST. Do you
25 know what EST means?

59

1  A.  Probably estimated.
2  Q.  Right. So is it fair to say that in the 96 EST,
3  97 EST, would it be fair to say that this document came
4  from in or around -- you know, within a year or so of the
5  start of the hematopathology lab?
6  A.  No. I think they're unrelated. This is a
7  prostate biopsy service.
8  Q.  No, no, no. I understand that, but I'm talking
9  about this -- this document. We're trying -- I'm trying
10 to find what date this document was drafted.
11      There is no date, but it talks about, for
12 example, on the first page, with financial sufficiency,
13 reintroduce DSI equity in 1996. I'm trying to sort of,
14 you know, come up with a date for the document because
15 there's not one listed on the top of it.
16      I'm using these hints throughout the document to
17 try and -- maybe this will help. Page 8285.
18 A.  Okay.
19 Q.  Okay. Let me ask --
20 A.  DSI 1996 plan, yeah.
21 Q.  Let me ask before we get to this, do you
22 recognize this document? Have you seen it before?
23 A.  I don't recognize it.
24 Q.  Let me ask you this. A review of DSI strategy,
25 was this a common document that was done perhaps on a

60

1  yearly basis?
2  A.  Could be. This looks like a sales or marketing
3  strategy document.
4  Q.  Okay. Is it accurate to say that something like
5  this would be issued on a yearly basis or more frequently?
6  A.  No.
7  Q.  Less frequently?
8  A.  Could be less frequently.
9  Q.  Okay. If you turn to page 8286, the table of
10 contents --
11 A.  Yes.
12 Q.  -- you'll see in the fourth set of one, two --
13 beginning in the fourth set of, you know, the separation
14 of the paragraphs, do you see your name there, Grant
15 Carlson, page 14, 15, 16?
16 A.  Uh-huh. (Indicates affirmatively.)
17 Q.  Okay. But you don't recall specifically getting
18 this document?
19 A.  I don't recall this exact document. It looks --
20 like I said, a review of key initiatives probably driven
21 by marketing. This could be from Jim Barry, something
22 like that.
23 Q.  Okay. But do we have any better idea of when the
24 date may have been for this document?
25 A.  Probably around '96 it looks like.

61

1  Q.  Okay. That's all I was trying to get at.
2  A.  Okay.
3  Q.  All right. If we go now to -- we were talking about turn-around time before. If we go to 8324.
5  A.  82 --
6  Q.  3 -- oh, I'm sorry, 8324.
7  A.  8324. Okay.
8  Q.  Okay. If we look down at the third bullet point there, just read along with me. Our challenge is to improve our level of service in the face of markedly increased specimen volume and complexity while at the same time reducing our costs. Can we improve TAT, turn-around time, without simply throwing bodies at the problem.
14     Can you explain that -- that bullet point to me about throwing bodies at the problem? Do you know what that means?
17  A.  Yeah. It's essentially saying can we use technology to get more efficiencies from the system rather than hiring more cytotechnologists and histopathologists and everything else to improve our turn-around time to get results out quicker.
22  Q.  Do you recall turn-around time being a large problem in this sort of '95, '96 time period?
24     MR. SALCIDO: Objection to form.
25  BY MR. FAYHEE:

62

1  Q.  Let me ask, do you recall it being -- the turn-around time being a problem in 1995?
3     MR. SALCIDO: Objection to form. Just over the use of the word "problem." There's no foundation for that, but go on and answer.
6     THE WITNESS: I think turn-around time is an industry-wide constant issue in laboratory services.
8  BY MR. FAYHEE:
9  Q.  Okay.
10 A.  So I think it is one of the things that you're measured by against your competitors. Just like you want to have high quality service and a rapid turn-around time. It's just always there.
14 Q.  It was a big factor in --
15 A.  Yeah. One day could have a huge impact on your business.
17 Q.  Okay. In what way?
18 A.  If you were at seven days and all of a sudden now you're at nine or eight, it's noticed. Patients come back for their repeat visit to get their diagnosis, have their session with their doctor and the results not there. Doctors get upset.
23 Q.  When you say throw -- not when you say. When the document says throwing bodies at the problem, that means they wanted to avoid hiring more pathologists?

63

1  A.  No. This is primarily talking about histotechnologists, I believe.
3  Q.  Okay.
4  A.  Histotechnologists were hard to get in our geographic area. They're hard to recruit. They're not paid as well. You don't typically give them a relo and everything else, and there's just not that many in Connecticut.
9  Q.  What is a histotechnologist?
10 A.  They prepare tissue samples for the pathologists to read.
12 Q.  Was turn-around time an important selling point for salespeople when going to meet with a potential client?
15 A.  It was one that you had to be competitive on. It wasn't our selling feature because, again, we lost a day shipping to Connecticut, and there's some time getting back. In addition, we're an east coast lab, so we had a lot of difficulty in -- you know, you're two hours ahead of everybody as well or three hours ahead of the west coast.
22     So what was the question again.
23 Q.  Whether it was -- whether it was important to salespeople -- let me ask it a different way.
25     Was turn-around time mentioned in a typical sales

64

1  call?
2  A.  It was usually asked by a physician, what's your turn-around time.
4  Q.  Okay. But it wasn't used as sort of a -- one of the -- you know, a large factor in a sales call, it wasn't part of the pitch in other words?
7  A.  I don't think so.
8  Q.  Okay.
9     MR. FAYHEE: What number are we at?
10    THE REPORTER: Nine.
11    (Exhibit No. 9 was marked for identification.)
12    THE WITNESS: Okay.
13 BY MR. FAYHEE:
14 Q.  Do you recognize this document?
15 A.  No.
16 Q.  You've never seen this document before?
17 A.  I don't recall this one.
18 Q.  Okay. Do you know what this document is?
19 A.  It's a sales aid for hematopathology, cytogenetics.
21 Q.  If you can turn to the second page of this document.
23 A.  Yes.
24 Q.  It says, Dianon delivers a service of a local pathologist along with responsiveness of a full-service

69

1    A.   Marty -- I don't know the -- what period of time,
2  but Marty was the lab operations -- VP of lab operations
3  for a period of time, so they reported to Marty.
4    Q.   Is this Marty --
5    A.   Stefanelli.
6    Q.   -- is that Stefanelli?
7    A.   Yeah.
8    Q.   In December 10, 1996, he would have been the VP
9  of lab operations?
10   A.   I believe so.
11   Q.   You believe so.  Okay.
12   A.   I'm not sure.
13   Q.   Let's go to the second page, the top paragraph.
14 Another area that needs desperate improvement is the
15 turn-around time issue for morphology and flow.  This is a
16 constant struggle for heme-paths to get specimens out the
17 door in a timely manner.  I recommend you talk with Marty,
18 Jay and the pathologists before trying to tackle this
19 sensitive topic.  Also call-backs are inconsistent and
20 unrecorded.  These problems are continuous and a real sore
21 spot for the heme-paths, Jay and the sales force.
22       Do you remember -- and, again, I recognize that
23 you were during this time period just becoming the R & D
24 director, but throughout your tenure, do you recall there
25 being a -- recall turn-around time being a sensitive topic

70

1  as its characterized here?
2    A.   Like I said, I think for every test and product
3  line, turn-around time became an issue at some point
4  where we couldn't meet the volume given the number of
5  pathologists or instruments we had.
6         This sounds like it was during a period of time
7  when volume exceeded what we could read in a day to get
8  things out.
9    Q.   Was there any specific rub between sort of the
10 business side and the medical side on -- on this point, on
11 this issue?
12   A.   Probably.  I would say probably because the sales
13 force would hear it directly from the clients and the
14 sales force would call into marketing or sales because
15 that was their primary contact, and it was marketing's
16 role typically to go back to the lab and figure out what
17 the heck's going on.  Reps were all calling, samples
18 aren't out, doctors are upset, what's happening, what's
19 the turn-around time, what's my sample.  You know, Dr.
20 Smith hasn't gotten his results, when -- how long has it
21 been here, and we would have to go research through what
22 the problem was, what the holdup was and try to at least
23 initiate some changes to get samples back out.
24   Q.   What would you do to research that issue if a
25 doctor -- if a salesperson called and said, where the

71

1  heck's this doctor's sample?
2    A.   Yeah.  Usually we would work with customer
3  service or we also had typically like a lab interface, lab
4  marketing interface that would look at when the sample
5  arrived, how long it took in transit, whether it was
6  accessioned, where it is in the queue in the laboratory,
7  what tests have been done and then we might go back to
8  some of those areas to figure out, you know, what's the
9  story here, you know, are you guys backed up, where's the
10 slowdown, where's the bottleneck.
11       The lab -- you know, the lab would help,
12 marketing would help.  At times sales would go back there
13 and they would help.  Obviously we could not read the
14 cases.  All you could do was influence.
15   Q.   Did -- when you approached a pathologist, were
16 some offended by being approached in that manner to
17 discuss turn-around time?
18   A.   Possibly.
19   Q.   You don't recall any specific instances?
20   A.   Yeah.  I don't recall.
21       I didn't have that role of generally going back
22 and confronting them on turn-around time.
23   Q.   Do you recall whether or not Dianon studied the
24 issue of how to improve turn-around time?
25   A.   Yes.  We would do that, I guess, at multiple

72

1  levels.  The lab, that was part of their goals as well in
2  terms of laboratory and things they were measured on;
3  quality, cost, turn-around time.  So they would put things
4  in place.  Certain exercises we did and best practices to
5  try to set up processes for getting samples through
6  quicker.
7    Q.   Do you recall seeing any detailed reports on a
8  doctor's turn-around time, a particular doctor's
9  turn-around time?
10   A.   By a doctor, do you mean pathologist?
11   Q.   I'm sorry, a pathologist, I should say.
12   A.   No, not really.
13   Q.   Okay.
14       (Exhibit No. 10 was marked for identification.)
15 BY MR. FAYHEE:
16   Q.   The document -- oh, I'm sorry.
17       The document I've just handed you appears to be
18 from after you left Dianon.  It talks of, you know, time
19 periods in and around 2004 from my best review of it.
20       But do you -- let me ask whether you recognize
21 this type of document.
22   A.   No.
23   Q.   Never seen anything like it?
24   A.   These are by client.
25   Q.   Okay.

117

1  Q. Okay.
2  A. Well, that was kind of a top-down decision, we
3  are not giving away tests.
4  Q. Okay. Who made that -- who made that --
5  A. Kevin Johnson.
6  Q. Kevin Johnson said. Okay.
7     And so Steve Gersen, Perry Chan, Kim Hade and
8  yourself made a decision to bill for -- start billing for
9  all 26 because Kevin Johnson said we will now bill for all
10 tests performed?
11    MR. SALCIDO: Objection.
12    THE WITNESS: Yeah, and I wouldn't say we made
13 that decision. I mean, the committee went -- in audit
14 identified these opportunities. We discussed them at
15 various meetings, and we said no, we should lift these
16 caps, these self-imposed caps.
17 BY MR. FAYHEE:
18 Q. And I'm sorry. I just don't understand the
19 reason for lifting them. Was it because it would be
20 viewed as a kickback or inducement?
21 A. I think there's multiple things. I mean, when
22 you find that you've been giving something out of your
23 factory away and you should be -- when people are ordering
24 it, you need to bill for it. I think just that level from
25 top down, we are not giving away tests. We're billing for

118

1  every test performed, no giveaways.
2  Q. And did the extra -- we're talking about an extra
3  six antibodies that weren't being billed for.
4     How much money are we talking a difference, I
5  mean, vaguely? Are we talking about hundreds of dollars?
6     MR. SALCIDO: Objection.
7     THE WITNESS: We didn't even -- we didn't even
8  look at it. The volumes are miniscule. The -- that
9  wasn't a factor in terms of okay, let's do revenue models
10 or anything else. It was just no, we're removing those.
11 BY MR. FAYHEE:
12 Q. You don't know -- you don't recall what specific
13 number we're talking about, the difference between -- in
14 reimbursement, 18 to 26?
15 A. No.
16 Q. Okay. Let's see here. Was there -- for this
17 change from 18 to 26, was there a legal opinion on the
18 matter?
19 A. I don't recall.
20 Q. Did this issue go before the compliance
21 committee?
22 A. I don't recall. Again, I don't know if --
23 remember I said I did not remember if the compliance
24 committee was meeting during that time.
25 Q. Well, this is in -- this is in 2000?

119

1  A. Yeah, I don't.
2  Q. Was there a compliance committee?
3  A. I was not on it. I remember I was on it earlier
4  and then we -- I pulled off. I don't recall whether I was
5  back on it or whether I wasn't.
6  Q. Do you know as the vice president of marketing
7  whether there was a compliance committee that met on a
8  regular basis at Dianon during this time period?
9  A. I don't recall.
10 Q. Okay. Do you recall whether or not Thom Kossl
11 was employed by Dianon in late 2000, early 2001?
12 A. In late 2000, early 2000 --
13 Q. Well, this memo is December 14, 2000.
14 A. Right.
15 Q. So as of the date of that memo.
16 A. I think Thom Kossl -- I don't know if he was
17 employed or a consultant. I don't know.
18 Q. Okay. He was one -- he was either a consultant
19 or --
20 A. Yes.
21 Q. -- employed?
22 A. Yeah.
23 Q. Good enough. Do you recall whether or not Thom
24 Kossl issued a legal opinion on this matter, the change?
25 A. Like I said, I don't recall.

120

1  Q. Do you recall whether Thom Kossl looked at this
2  issue?
3  A. I don't recall.
4  Q. Do you recall having any discussions with Thom
5  Kossl about this issue?
6  A. I don't recall.
7  Q. Would this issue have been one that ordinarily
8  you would have sent through the compliance committee?
9  A. No. Again, compliance committee did not deal
10 with granular issues on the test code level for the most
11 part. It was more labs, procedures, global procedures
12 that were in place, not down to a test code, CPT code. So
13 this would be -- primarily this exercise takes place with
14 our test code creation committee that has our chief
15 medical officer on it, our senior vice president of sales
16 and marketing -- vice president of sales -- vice president
17 of marketing, our vice president of lab operations, our
18 vice president of genetics and cytogenetics, billing, all
19 the management. It's within that committee that this is
20 implemented and presented.
21    (Exhibit No. 17 was marked for identification.)
22 BY MR. FAYHEE:
23 Q. I've handed you a document that is referred to as
24 the Ap Test Code Creation Form. It says, initiator's
25 name, you see there Kim Hade. Who is Kim Hade?