```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT

- - - - - - - - - - - -x
UNITED STATES OF AMERICA,
ex rel. Dr. James J. Tiesinga,    No. 3:02CV1573 (MRK)
           Plaintiffs,

           v.
                                  July 12, 2006
DIANON SYSTEMS, INC.
           Defendant.
- - - - - - - - - - - -x
```

                DEPOSITION of ARIF TOOR, M.D.


Taken before Cindy J. Carone, LSR 383, a Court Reporter and Notary Public, within and for the State of Connecticut, pursuant to Subpoena and the Federal Rules of Civil Procedure, at The Tollgate Hill Inn, 571 Torrington Road, Litchfield, Connecticut, on July 12, 2006, commencing at 10:10 a.m.


                Falzarano Court Reporters
                   117 N. Saddle Ridge
                West Simsbury, CT  06092
                       860.651.0258

1   Q   In terms of over-utilization, could that
2   include ordering units of tests that are not needed to
3   treat the patient?
4           MR. MOLOT: Objection.
5   A   As I just mentioned to you, we noticed on
6   that complaint at that particular time. If that
7   included the number units, we would look at it.
8           I don't know whether this is -- we would
9   have looked at that or not. But even if we reviewed
10  this and said, yes, everything is okay or not okay, at
11  a subsequent date, somebody else could come back and
12  say, all right, there was a problem. And we would go
13  back and we look at that thing.
14          So at the time as you see we're very clear.
15  It says 88305; number, three. So that means that we
16  would be looking at on 88305, was it done times three
17  and why was it done times three? Six, and then why
18  six? And then 19. Yes, there's a 19 situation over
19  here.
20          But again it is at that particular moment in
21  time and space that you just looked at those, not
22  overall.
23  Q   So just to be clear with respect to those
24  19, you would look at each cell surface marker?
25          MR. MOLOT: Objection.

1  A    I don't recall that we specifically looked at that for each cell surface marker, but again what we were looking for was was this performed. That's what we looked at at that particular focus.

The focus was did they perform three tests? Did they perform six specific stains? Did they do decalcification? Did they do 19? That's what the focus was. That's not -- the focus wasn't were those 19 separate or not. That's a separate issue.

Q    Maybe I'm confused then. What do you mean by rule out over-utilization in point 3 above?

A    Okay. When somebody said, I did three, you look at did they perform three tests? If they had performed three tests, then were all those three necessary or not?

Similar with six stains. If they had done the six stains and there's evidence that they did perform them and look at them and look at the medical necessity of doing those and so on and so forth.

Q    So then is the same true of the 19?

A    Yes. At that particular moment, again, specific focus being at that time for which we were looking at.

Q    So you would look to see, just to be clear, whether the services were performed? Yes? No?

1    A    Yes, that's one.
2    Q    Then you would see whether they were
3 medically necessary and indicated?
4            MR. MOLOT: Objection.
5 BY MR. SALCIDO:
6    Q    Yes? No?
7    A    Yes.
8    Q    Now, look at the next page Bates 2477. It
9 says that the calculated overpayment is 526.86, and
10 it's now due Medicare. So I take it that the end
11 result of this review was there was found to be an
12 overpayment due to Medicare program?
13   A    Yes, for the particular specific instance.
14   Q    With respect to a particular service, if a
15 service was blatantly in violation of your Local
16 Medical Review Policy, would you permit payment for
17 that service?
18   A    A little while ago I had mentioned that
19 there are certain aspects of policy that go into other
20 prepayment screens which automatically deny them, the
21 major part of it. Can I go back to the LMRP, because
22 I can illustrate myself a little better?
23   Q    Absolutely, but if it helps, I'm looking for
24 postpayment review, not prepayment.
25   A    On the postpayment, we already paid. That's

1          MR. MOLOT: Objection.
2  Q   -- or through some other format?
3          MR. MOLOT: Objection.
4  A   Whenever it came to your attention that
5  there was something that we need to education people,
6  we would do that, but it doesn't mean this was a cover
7  of all situations.
8          Medicine and the practice of medicine is a
9  very huge field. It depends on what comes to our
10 focus, and if you find that a problem, you let people
11 know.
12         You just keep them guessing that there is a
13 problem or will be a problem until it came to your
14 notice. We did inform people when we found a problem
15 or a problem came to our notice more so.
16 Q   But you never recollect a problem coming up
17 with respect to the number of markers billed on CPT
18 88180?
19 A   Nobody in my time at least, in the two years
20 that it was -- that the code was there came up with a
21 utilization of the number of markers.
22         Remember, we had determined that I think
23 after 26 or after 30 -- I don't recall exact numbers
24 -- all the markers available. And then we left it to
25 the provider to provide the adequate or correct

1  numbers of that particular patient and that particular
2  disease. So sometimes they would bill 18, sometimes
3  19 or the rest sometimes. That's how we adjudicated
4  it.
5      Q    Do you recall offhand, Dr. Toor, having -- a
6  slightly different issue -- having any dialogue with
7  Dianon with respect to CPT 88180?
8      A    A lot of dialogue went on, but it was always
9  on what diagnosis you can perform this on. And they
10 would be coming up with their side of the literature.
11 You review that, and you look at the literature in
12 vogue. That is how this final decision came up, that
13 these are the diseases for which you can do the tests.
14
15          (Toor Exhibit 7:
16          Marked for Identification.)
17
18 BY MR. SALCIDO:
19     Q    On this, Dr. Toor, please excuse the
20 handwritten notations. I certainly don't think those
21 are yours.
22     A    No, these are not mine.
23     Q    I have a very general question that you can
24 think about as you peruse the document. Does that
25 reflect the type of a dialogue you recollect having

1  could look at it and make a decision.
2  Q  The next paragraph, first sentence says, "In
3  an attempt to assist you in determining what
4  additional codes should be covered, I undertook a
5  review of 1275 cases denied between April, 1996 and
6  August, 1997, the data from which is presented in
7  Tables 1 through 5 located in the attachments."
8      Do you recollect reviewing those attachments
9  in this letter during the time period in which you
10 were the Carrier Medical Director?
11 A  I don't recollect.  I may have, but I don't
12 exactly remember that.
13 Q  Was it consistent with your experience as
14 the Carrier Medical Director that a company would
15 openly disclose and discuss with you more than 1000
16 claims if, in fact, that company was perpetrating a
17 fraud or a scheme to defraud the Government?
18     MR. MOLOT:  Objection.
19 A  That's speculation, and I can't answer it
20 because I never thought of it that way.
21 Q  Would it make any rational sense at all?
22     MR. MOLOT:  Objection.
23 BY MR. SALCIDO:
24 Q  To want to have a dialogue with you with
25 respect to a thousand claims if, in fact, it was

```
 1    defrauding the Government with respect to those same
 2    thousand claims and invite you to review those claims?
 3                MR. MOLOT:  Objection.
 4         A    Again, it's totally speculation.
 5         Q    But what's the answer to the question?
 6                MR. MOLOT:  Objection.
 7    BY MR. SALCIDO:
 8         Q    Yes?  No?  Would it make rational sense to
 9    you?
10                MR. MOLOT:  Objection.
11         A    Saying that would make me think and look
12    into the minds of people and how they work and why
13    they would bring things up to us.
14                As I told you, our main focus was on
15    diagnosis, and that's what they were trying to bring
16    to us.  I don't know if they would have dreamt of
17    exposing it to us for one reason or another.  The main
18    course was they were looking at a diagnosis, and
19    that's what they're telling us, Guys, you're denying
20    us for X number of diagnosis.
21                I can't say whether they would bring it or
22    not bring it with what they knew, this is the reason
23    they were denying it, and they were showing it to us
24    that there is statistical evidence that X number of
25    cases are positive and, therefore, we should change
```