James P. Menas

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF CONNECTICUT

 3

 4  UNITED STATES OF AMERICA,          *

    ex rel. Dr. James J. Tiesinga,    *

 5                                     *

              Plaintiffs,      * No.  3:02CV1573(MRK)

 6                                     *

    vs.                                *

 7                                     *

    DIANON SYSTEMS, INC.,              *

 8                                     *

              Defendant.       * Pages 1 - 52

 9

10

11

12       Videotaped Deposition of JAMES P. MENAS

13                 Baltimore, Maryland

14               Friday, August 4, 2006

15

16

17

18

19

20  Reported by:  Carla J. Briggs, RPR-RMR-CRR

21  Job No. 175906A
```

James P. Menas

Page 12

1 group, HAPG.

2     Q     You mentioned he was a primary author.

3 Were there other authors?

4     A     He spoke to Dr. Niles Rosen who was the

5 medical officer or medical director involved in the

6 correct coding initiative under Medicare.

7     Q     Did he work with anyone else?

8     A     I don't recall. I think they were the two

9 principal parties.

10     Q     All right. Going to the JS49 --

11     A     Uh-huh.

12     Q     -- third full paragraph down, it states

13 "The current coding scheme (payment on a per marker

14 basis) may encourage the performance of more markers

15 than may be medically necessary because the

16 pathologist determines what markers to perform and

17 when to perform them."

18     What evidence is this sentence based upon?

19     A     Well, I think it's based on the fact that

20 the service -- the payment for the service was badly

21 overvalued and that could contribute to

James P. Menas

Page 13

1 overutilization, because this is one where the

2 payment went down from -- for a 16 marker test, it

3 probably went down from a thousand to five hundred

4 dollars in total.

5    Q    When you say that the test was overvalued,

6 was there specific empirical evidence showing that

7 it was overvalued that served as a foundation for

8 this particular passage?

9    A    Well, I think at that time having sat in

10 on some discussions with Dr. Rosen and Dr. Rudolf

11 mainly hearing their commentary that it was

12 overvalued.

13    Q    Okay.

14    A    And Dr. Rosen is a pathologist.

15    Q    Besides those discussions, is there any

16 other evidence you're aware of?

17    A    No.

18    Q    In terms of the same column last paragraph

19 starting with the word "however," it states

20 "However, we do believe that it is appropriate to

21 pay for the TC" -- technical component -- "of each

James P. Menas

Page 27

1 data, how would you file it?

2        A    I don't think I even kept a copy of it.

3 As a matter of fact, I know I didn't keep a copy of

4 it.  You would have had it.

5        Q    Now, I apologize.  I know I'm jumping

6 around a little here, but moving up to that second

7 paragraph, "Data is needed to determine the

8 appropriate break points for the tiers.

9 Unfortunately, the data is needed within two weeks

10 so that the RUC survey can be performed."

11             Do you know if a RUC survey was performed?

12       A    Ultimately, a RUC survey was done.  I

13 think what they're trying to do here is to try to --

14 in order to do a RUC survey, you have to have a

15 proposed code and you have to have a clinical

16 vignette that describes the underlying circumstance,

17 so you have to have some fair amount of detail in

18 terms of, if you're using a range of markers, in

19 terms of how those markers would stack out.

20       Q    And you mentioned a clinical vignette.

21 What's -- what purpose does the clinical vignette

## James P. Menas

1 serve?

2     A     The specialty group is going to look at

3 that vignette and then try to come up with a work

4 value -- an RVU work value for that code by looking

5 at that vignette and then comparing that back to

6 some base -- some reference code which is included

7 in the survey.

8     Q     Do you strive to use vignettes that

9 represent the type of service that would be provided

10 under the CPT code?

11          MR. MOLOT:  Object to the form.

12     A     The specialty group creates the vignette.

13 It has to be fairly clear, and I believe the folks

14 that complete the survey actually will indicate the

15 percentage of the time that they think that that

16 vignette will fit that code, so you want to have a

17 high match between the vignette and the code and the

18 descriptor that's attached to it.

19     Q     Now, does CMS do any work to ensure that

20 there is a high match between the vignette and the

21 code?

**James P. Menas**

Page 29

1    A    Again, I think the medical officer --

2 that's probably something they would look at when

3 they're at that meeting.

4    Q    Do you know, based on your discussion with

5 the medical officers, whether it was done in this

6 case?

7    A    I do not.

8         MR. SALCIDO:  Let's mark this as

9 Exhibit 4.

10         (Menas Deposition Exhibit Number 4 was

11 marked for identification.)

12         BY MR. SALCIDO:

13    Q    Please review the document, Mr. Menas, and

14 tell me when your review has been completed.

15    A    Okay.

16    Q    Now, I notice on Page 4 what's Bates

17 numbered 3274 that you were cc'd on this document?

18    A    Yes.

19    Q    And I also notice that the first sentence

20 says "On behalf of the American Clinical Laboratory

21 Association (ACLA), I would like to thank you and

James P. Menas

1 other CMS staff for taking the time recently to meet

2 with ACLA representatives to discuss our concerns

3 with the payment for flow cytometry services."

4　　　　Who was the CMS staff that participated at

5 the meeting?

6　　A　　It was Carolyn Mullen, the two cc's Edith

7 and myself.  Edith Hambrick -- Dr. Hambrick -- and

8 myself.  I think we were the only three folks from

9 CMS.

10　　Q　　Why did you attend?

11　　A　　Because I was -- I mean, I'm the staff

12 that's assigned to pathology services.

13　　Q　　I'd like to direct you to Page 3, if I

14 could.

15　　A　　Uh-huh.

16　　Q　　And more specifically to the third

17 paragraph first sentence.

18　　A　　Uh-huh.

19　　Q　　And I guess the first couple of sentences.

20 "We have spent a great deal of time analyzing this

21 issue with our laboratory members.  Based on a

James P. Menas

Page 31

1 resurvey of the laboratories, we found that the most

2 typical number of markers reported for a

3 myeloid/lymphoid panel was 26 markers."

4          Now, when conducting rulemaking, does CMS

5 typically accept a trade organization's survey data

6 without verification?

7     A    Well, I think there are times when that

8 happens.

9     Q    Do you know whether it happened here?

10    A    Oh, I don't think this data was -- I

11 don't -- I think we -- this data was not audited by

12 us or anyone else.

13    Q    Was something less than an audit done in

14 terms of verification?

15          MR. MOLOT:  Object to the form.

16    A    I think you're relying on the industry to

17 give you accurate information.  I think --

18    Q    Now, how about if you used it as a basis

19 for payment?  Would you do any verification before

20 relying on the data to base payment on?

21          MR. MOLOT:  Object to the form.

**James P. Menas**

Page 32

1     A     I think this is a case where we were

2 trying to correct a practice expense input data.

3 And normally, that goes through the Practice Expense

4 Advisory Committee, and I'm not -- I'm not sure if

5 this went back through that process or not.

6     Q     Yeah, but my question was, was that before

7 you rely on data you receive from industry sources

8 to base payment on that data, would you verify the

9 data?

10     A     I don't think we had any way of verifying

11 this data.  I think again we're relying on the

12 industry to give us accurate and complete

13 information.  When we establish practice expense

14 inputs for any code, I don't believe that any

15 specialty group attests that the data they provided

16 was audited or certified.  It's just best available

17 data based on what their membership provides.

18     Q     And just so I understand, so if, in fact,

19 you're trying to determine cost per marker and the

20 industry had said the average is 30 markers instead

21 of 26, that would have been accepted as a basis to

James P. Menas

Page 37

1 average antibody cost of $8.50 derived from a survey

2 of laboratories performing these services.  Using

3 the vignette of the myeloid/lymphoid panel to

4 represent the typical service, the average cost was

5 based on the cost of the total number of antibodies

6 that are required to report the typical service of

7 reported markers."

8          MR. MOLOT:  "Typical number of reported

9 markers."

10          MR. SALCIDO:  "Typical number of reported

11 markers."  Thanks.

12    Q    "Based on this information, we are

13 proposing to change the following direct inputs used

14 for PE," which are practice expense.  And then if

15 you go to the second bullet, "Supplies:  Change the

16 antibody cost for both CPT Codes 88184 and 88185 to

17 $8.50 from $3.544."

18          Does this show that CMS accepted the

19 survey data that ACLA provided regarding the cost

20 per marker?

21    A    I believe so.