1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
2

UNITED STATES OF AMERICA     )
3  ex rel. DR. JAMES J.       )
   TIESINGA,                  )
4                             )
            Plaintiff,        )
5                             )
   vs.                        )   CIVIL ACTION FILE
6                             )   NO. 3:02CV1573(MRK)
   DIANON SYSTEMS, INC.,      )
7                             )
            Defendant.        )
8

9

10

11  _____

12       DEPOSITION OF JEANNINE T. HOLDEN, M.D.

13                  JUNE 7, 2006

14                   9:00 A.M.

15  _____

16

17

18

19

20

21

22

23

24

25

Page 18

1  the peripheral blood and actual tissue from the lymph
2  nodes or it's fluid from the lymph?  I don't
3  understand.
4      A    Yeah, tissue or fluid.  So a tissue is
5  when you've actually done a certain excise and gone in
6  an retrieved a lymph node.  A fine needle aspirate, you
7  actually just puncture the skin as if you were drawing
8  a blood sample and aspirate cells from the target
9  tissue.  It could be a lymph node; it could be
10  something else.
11      Q    Okay.  So -- so other than peripheral
12  blood, you don't do a lot of fluids?
13      A    Well, bone marrow.
14      Q    Bone marrow.
15      A    And then things like pleural fluid.
16  That's the liquid that's surrounding -- that can build
17  up in the cavity surrounding the lungs, pericardial
18  fluid and cerebral spinal fluid.
19      Q    Okay.  And when you're -- when you're
20  doing the -- when you're looking at these various
21  specimens, what are you primarily looking for, specific
22  diseases?
23      A    I'm looking for any metallophoid disorder.
24  I'm looking to see whether or not normal cells that I
25  expect to find in that site are present.

Page 19

1      A    I'm looking -- we can actually find some
2  types of neoplasms that you don't think of as being
3  hemolymphomas but may involve those tissues, and so you
4  identify that as a more population.
5          You may have an idea what it is based on
6  the activity with the antibodies and will essentially
7  not render a final diagnosis but certainly render --
8  have an opinion as to what it actually represents.
9          The goal is to -- essentially you want
10  to be able to identify every cell in the sample.  Any
11  cells you can't identify is a candidate for being
12  something that shouldn't be there.
13      Q    Your report says that you get about 50
14  percent of your referrals from outside the Emory
15  system.
16      A    Uh-huh.
17      Q    Where do they come from?
18      A    They come from other hospitals in the
19  Atlanta area, and also come from doctors' offices in
20  the Atlanta area.
21          It's fairly common that the patient may
22  get -- have either peripheral blood or bone marrow
23  sample that's actually done in the doctor's office
24  setting rather than a hospital, so they send them
25  directly to us when they can.

Page 20

1          Insurance companies will, in many
2  instances, dictate where a sample is sent, which
3  laboratory gets it.
4      Q    And when you get them, how long do you get
5  them -- the ones from outside the Emory system, how
6  long after they're -- they are obtained do you get
7  them?
8      A    They arrive either the same day or the
9  next day, almost all instances.  Of course, we have --
10  if a sample is obtained on Friday and needs to be --
11  even if they don't need a diagnosis emergently over the
12  weekend, typically we will go ahead and process the
13  tissue.
14          A peripheral blood or bone marrow, say,
15  if it was done on Friday can wait until Monday, but
16  if it were a tissue, some other sample, with rapidly
17  falling viability, we would go ahead and process it
18  over the weekend.
19      Q    The referral that you get from outside the
20  hospital, who are the referring doctors primarily?
21      A    Both pathologists and hematologists and
22  oncologists.  We virtually never get a sample that is
23  not from either a pathologist or a hematologist.
24      Q    So you're not getting referrals from GPs
25  or something like that?

Page 21

1      A    No.  No.  That would be very unusual.
2  Possibly if a hematologist, you know, in consultation
3  with a GP said, why don't you go ahead and send this
4  before I see the patient.  I essentially know all the
5  people that send me cases.  Even if I haven't met them
6  in person, I speak to them on the phone.
7      Q    Okay.  Can you just describe for me the
8  process starting from when a specimen comes in the door
9  and tell me whether you treat -- whether it comes in
10  from inside the Emory system as opposed to outside the
11  Emory system, whether there's a difference and describe
12  that.
13      A    There is actually not much difference in
14  terms of whether a specimen has come in from the Emory
15  system or whether it comes in from the outside.
16          If it comes from the outside, it's
17  brought in by a courier.  It's usually one of the
18  couriers that we employ, the labs are called Emory
19  Medical Laboratories, and we have couriers that go
20  out and pick up samples.
21          If it comes from one of the operating
22  rooms at Emory, it would arrive -- essentially a
23  residence might have brought it down from the
24  operating room or if it came from one of the clinics,
25  a courier would have brought it.

6 (Pages 18 to 21)

Page 42

1  the fact, after you've seen the results?
2      A    Yes.  Yes.
3      Q    How often do you do that?
4      A    How often do I do that?  Less than five
5  percent of the time.  It's typically to work up a
6  possible T-cell disorder, and that I'm -- they are some
7  of the hardest to identify and characterize
8  phenotypically because there's some tetrogenetic normal
9  T-cells.  Some of the T-cell lymphomas are less common
10  than D cell lymphomas.
11      So, for instance, like a hepatosplenic
12  gamma delta T-cell lymphoma, although it's very
13  important to identify it, absolutely having
14  expressing the gamma delta T-cell receptor, it's not
15  such a common disease that I have it on my upfront
16  panel.  Although the upfront panel is designed to
17  detect it, to detect a T-cell lymphoproliferative
18  process if it's there.
19      Q    But it won't distinguish what is a rare
20  form of that disease?
21      A    It would identify it, but in order to
22  render a diagnosis of hepatosplenic gamma delta T-cell
23  lymphoma, I have to specifically demonstrate a gamma
24  delta T-cell receptor on the surface.  So based on the
25  immunophenotype I have, I would be very suspicious that

Page 43

1  that's what it was, but I can't render the diagnosis
2  absolutely without the official information.
3      Q    How long does it take to add on a test?
4      A    It typically adds a day to the -- to the
5  turnaround time, because by the time they actually
6  ground through it.
7      Q    Is that because -- you said it only takes
8  about a couple of hours to run the test?
9      A    Well, it depends on how stat we thought
10  the add-on was.  Every time you do something special,
11  it slows down the remainder of the work flow in the
12  lab.  So if I emphasize turnaround time on one case,
13  it's going to be to the detriment of the other
14  patients, and I have to consider all the patients in
15  the workload for the day.
16      Q    Okay.  So if you decided to add on, you
17  would take a look at whether it needed to be done
18  quickly or could wait.
19      A    Yes.
20      Q    So it could wait as much as a day.
21      A    It would just go back into the regular
22  work flow.
23      Q    It would go to the head of the line.
24      A    Essentially goes to the end of the line.
25      Q    Okay.  Now, when samples come from inside

Page 44

1  the Emory system, how does billing for those work?
2      A    When samples come from the Emory system,
3  how does the billing work?  Well, in terms of my
4  involvement, we bill exactly the same way all the cases
5  are billed.
6      Cases that have morphology, they are
7  different CPT codes.  I actually dictate the case,
8  and at the end of my dictation, go through and
9  essentially I'm able to say, I did one of this, one
10  of this, and one of this.  That's part of the
11  dictation.
12      When doing flow set hematotyping at the
13  same time I'm signing the case, I'm billing for it.
14  I don't bill for the technical.  That will have been
15  done by the techs, I think is where the charges are
16  posted, and I don't think it makes a difference how
17  they post it, depending on whether it's an inside or
18  outside client, they essentially put in the same CPT
19  codes.
20      What I put in at the time that I sign
21  the case is the professional CPT code, and that is
22  now tied to the number of markers that were run and
23  it's a rough -- it roughly correlates to the
24  complexity of the case.  Say if you were doing eight
25  markers, one charge; 16 or greater is another charge.

Page 45

1      Q    That's the new CPT codes.
2      A    That's the new CPT codes, yes.
3      Q    But the old CPT codes?
4      A    You have to actually know how many markers
5  you had run and add them.
6      Q    And you do it per marker.
7      A    Yes.
8      Q    If you used, for example, you mentioned
9  that you used CD 45 several times, different tubes.
10  Are there different charges for every time you use it?
11      A    No.  And you'd asked also about the -- for
12  instance, adding on those tubes looking at chromoplasma
13  cells, well, because the markers I do in those tubes
14  are markers I've already run on the panel, including
15  DC38 and kappa lambda and CD 45, I can't charge for
16  that additional work either, even if I were working up
17  a T-cell lymphoma and were trying to decide to pull out
18  a subset of the T-cells, typically the markers, even
19  though I'm doing additional staining, the markers I'm
20  using are markers I've already used on the panel, I
21  can't charge them again.  I just use them in different
22  combinations.
23      Q    Are you familiar with the Medicare
24  regulations on medical necessity?
25      A    Vaguely.  I certainly see the term

12 (Pages 42 to 45)

Page 46

1  "medical necessity" on documents from Medicare.  I
2  guess on the Medicare website is where I usually am
3  most likely to see that, specifically in the context of
4  what used to be called LMRPs, local medical review
5  policies, but are now called LCDs, local code
6  determinations.
7      Q      Do you bill Medicare?
8      A      Yes.  I know that some of my patients are
9  Medicare patients, so I'm assuming that's done, yes.
10     Q      Do you -- what's your understanding of
11  what medical necessity is?
12     A      Equivalent to standard of care, what's
13  medically appropriate.
14     Q      Medically appropriate for who?  For what?
15     A      For any patient, for a patient, you know.
16  The -- as far as I'm concerned, the -- for me, medical
17  necessity is not a term that necessarily relates
18  specifically to the government or Medicare.  That's
19  what you do for patients.  Good practice, standard of
20  care.
21     Q      Good practice for who?  For a particular
22  patient?
23     A      For -- yeah, for all patients and for a
24  particular patient, yes.
25     Q      So in determining whether something is

Page 47

1  medically necessary for a particular patient, do you
2  have to take into account the information that you know
3  about that patient in deciding which antibodies to use?
4      A      Not in deciding which antibodies to use
5  because I'm going to use the same antibodies for
6  essentially all the patients.
7      Q      Regardless of what information you had
8  about --
9      A      Oh, yes.  Yes.
10     Q      And you think that that -- that -- that
11  using all -- however many there were, 30?
12     A      Uh-huh.
13     Q      Thirty antibodies, each one of those
14  antibodies is medically necessary in each case?
15     A      Yes, I do.
16     Q      And why is that?
17     A      Because it's the idea that -- that each of
18  the antibodies is a separate test is a false premise.
19  That dates to a time when it was actually technically
20  and cumbersome and expensive to run the lab -- to test
21  for these antibodies, and at that time they were tested
22  singularly or in pairs, if you really wanted to be sort
23  of fancy about it at that time, and that was pretty
24  much the mid 1980s.
25          We no longer do it that way.  We now

Page 48

1  take a panel approach.  And so that anybody even asks
2  about antibodies is essentially -- the best word
3  would be an artifact of the billing structure in the
4  CPT codes.
5          I went on record actually back in the
6  late '90s saying that I thought the entire billing
7  structure was flawed and that it should not never --
8  should never have been per marker; it should have
9  been per panel, essentially effective from the time
10  we started doing more than one color at a time or one
11  antibody at a time.
12         I have been happy to see that that has
13  changed recently in terms of the professional billing
14  for -- for flow cytometry interpretation.  I would
15  actually like to see the technical side follow
16  this -- follow the same principle.  That I bill per
17  marker is purely because I have to and not because
18  I'd like to.
19     Q      I'm sorry.  Run that one by me again.  You
20  bill for markers solely because you have to, not
21  because you want to?
22     A      The CPT codes are tied to a number of
23  markers.  There's no way for me to untie them.
24     Q      So you felt no responsibility to -- to --
25  given the fact that you were charging, and we'll just

Page 49

1  stick with Medicare for now, policies.  I don't care
2  about private insurers.  I mean, I do, but not for this
3  purpose.
4      A      Not for this, yeah.
5      Q      So you felt no obligation to look at the
6  individual markers you were using and find out whether
7  they were medically necessary for that patient at that
8  time when you were billing for every marker?
9      A      They were all medically necessary.
10     Q      And they were all medically necessary why
11  again?
12     A      I think I've explained this.
13     Q      Well, tell me again.
14     A      Okay.  When you're looking at a sample,
15  you have to identify all the cells in the sample.  Any
16  population that you haven't identified is a candidate
17  of malignant population.
18         As that patient's physician, I can't
19  not -- I can't ignore -- I -- I can't look at that
20  sample and not have identified every cell in the
21  sample.
22     Q      So your approach is essentially --
23     A      I'll give you this.  I'll give you a good
24  example of this.  Let's say a biopsy is done for -- a
25  skin biopsy is done, and they send it to me, and the

13 (Pages 46 to 49)

Page 158

1 was the government was recognizing that the lab was
2 doing more markers and consequently decreased --
3 decreased the reimbursement, and this is when we
4 started seeing the panel approach to these cases.
5        It was no longer difficult to do more
6 than one -- one or two markers at a time, we were
7 doing three markers and even in my laboratory four
8 markers by then and requiring -- it was only at this
9 time that the clinical utility of this testing was
10 really being recognized and the use of this test was
11 exploding as a result of it being medically very,
12 very helpful.
13        I don't think Dianon was responding to
14 the government. I think the government was
15 responding to clinical practice.
16    Q    Do you have any -- any personal knowledge
17 about why Dianon was doing what Dianon was doing?
18    A    No personal knowledge, no.
19    Q    Okay.
20    A    I can tell you what we were doing.
21    Q    Okay. Go to page 5.
22    A    Holden 5?
23    Q    Yes. The note there says HCL.
24    A    Hairy cell leukemia.
25    Q    Uh-huh.

Page 159

1    A    And since it's covered the number 7, well,
2 I've written the number 7, I've circled it, and beside
3 it I've written HCL, which stands for hairy cell
4 leukemia, and that's a note to myself about the need
5 for any panel to be able to recognize hairy cell
6 leukemia.
7    Q    Okay.
8    A    There's a note on the next page of section
9 8, clinical history pathology slash microscopy often
10 misleading.
11    Q    Actually, I'm looking for -- okay. And
12 then they also gave you -- I take it this was before
13 the meeting, your first meeting, they gave you page
14 Holden 49.
15    A    Okay. Page 49.
16    Q    Okay. Do you know why this was prepared?
17 Did they tell you?
18    A    Well, let's see. It's prepared on -- in
19 2004 by Glenn Segal, Suha Mishilani, for performing
20 eight antibodies, and this looks like the eight
21 antibodies in question are CD23, C11C, CD103, CD16,
22 CD38, CD25, C57, HLADR. This is -- I don't know why it
23 was prepared. Certainly the information included here
24 is very similar to the information that I just gave you
25 about those various antibodies, albeit more elegantly

Page 160

1 presented.
2    Q    Okay. Turn to page -- begins on page 65,
3 which is a copy of the amended complaint.
4    A    Uh-huh.
5    Q    Okay. And at various points during the
6 complaint, you have stickies as well.
7    A    More stickies, uh-huh.
8    Q    Okay. Take a look at page 8 on the
9 bottom?
10    A    Yes.
11    Q    I just can't read that. What does that
12 say?
13    A    Beside number 32?
14    Q    Yes.
15    A    Let's see. That would be referring to --
16 above that I see the number 31, so probably item number
17 32 in the amended complaint is covered by my sticky,
18 but I'm commenting on the point they are making here
19 about 1998, 2N or about 2000 upon information and
20 belief -- something six antibodies -- probably 26
21 antibodies but only billed Medicare for 18.
22        So this is apparently there was a time,
23 according to this, where Dianon was performing 26
24 antibodies, according to the physicians felt the 26
25 antibodies were medically appropriate and necessary

Page 161

1 and was only billing for 18, and so my note here
2 apparently I have a question mark. Question mark,
3 rationale Dianon because I don't know why they were
4 doing this.
5        I make a note here EML, which is where I
6 work, the medical, quote, caps at 15 for client
7 billing, and that's actually -- so when we bill
8 Medicare, we were -- it's my understanding we are
9 required to bill for the work that we do that if we
10 don't do that, at least at various points in the past
11 the question of inducement came up.
12        If you were doing work and not billing
13 for it, it was considered very bad and potential --
14 potentially problematic practice. When we do work
15 for clients, institutional billing for another
16 hospital in Atlanta, for instance, we actually don't
17 charge as much and that's because we already know
18 we'll be paid for sure, and because we still have to
19 put in CPT codes to generate bills, we actually cap
20 that at 15. That only occurs with the clients. And
21 that was a question of us going back and seeing how
22 much it really cost us and adding a margin and so
23 forth. So the situation with third-party payors,
24 Medicare included, we distinguish them, is that we
25 anticipate denials have the hassle -- not a hassle

Page 162

1  but there's all the submitting of the claim and so
2  forth so --
3      Q    So you --
4      A    I don't know why Dianon did this. I was
5  just making the observation that, as I've said before,
6  I think the practice of billing per marker is
7  problematic. We only did it for Medicare because there
8  was no other way to bill and we had to.
9      Q    But when you did client billing to the
10  hospitals or oncology practice.
11      A    Well, we actually billed them a set fee.
12      Q    And that was based on capping at 15?
13      A    It wasn't capping at any particular
14  amount. We went back and said, well, how much does it
15  actually cost us to do the test, and we went back and
16  looked at what -- I don't know if this is the Medicare
17  price or list price, probably a product of our list
18  price. If we took that list price and multiplied it by
19  what number was, it gave us that final amount. It has
20  nothing to do with whether that's an appropriate number
21  of antibodies to do. It's just a number that when we
22  plugged it into the system, it gave us a dollar amount
23  that I knew was an reasonable amount of money to be
24  charging in terms of the test itself.
25      Q    Okay. So --

Page 163

1      A    And my expenses.
2      Q    And you couldn't cap number of CPT codes
3  to Medicare for what reason?
4      A    It was certainly my impression at the time
5  and still that that is not considered appropriate that
6  if I perform testing, if it's testing that I consider
7  medically necessary that I have to bill for it. I'm
8  not the one who sets that policy; I'm not the one who
9  sets Medicare reimbursement. I mean, I could turn
10  around and say, you're paying me too much per marker
11  but what --
12      Q    And what is your understanding of that you
13  had to bill for everything you did. What was that
14  based on?
15      A    I can't point to a specific time when that
16  was told to me. It was told to me more than once by
17  administrators and people that are essentially the
18  compliance office of my department as well as the
19  client office for the hospital. It was made very clear
20  to us that we are never to do any work for which we
21  don't bill whether it's Medicare, Medicaid, private
22  insurer, my brother, my brother's wife, my doctor buddy
23  I golf with. If you do it, you have to bill for it.
24      Q    But when you're billing the other
25  hospitals you're not billing for it.

Page 164

1      A    I'm billing for the work, I just don't
2  have to tie it to CPT's. I'm allowed to say I did
3  this -- I'm allowed to do it the way I want essentially
4  which is per panel. It doesn't matter how many markers
5  I did on that case. I'm charging that much. If I
6  might have -- if it was a short sample, fewer cells, I
7  might have only done 16 antibodies or 18 antibodies.
8  If I do 40 antibodies, if I end up having to open the
9  refrigerator and get out everything in the world, it's
10  still the same price, which is actually the way I think
11  it should be billed.
12      Q    So did you ever consider whether you go
13  back and do the panel of 30 and it turns out that some
14  of the antibodies don't have any -- play any role in
15  determining what the diagnosis or subsequent treatment
16  would be to not bill for those?
17      A    They were always -- they always gave me
18  information. They were always helpful.
19      Q    They gave you information, but did they
20  play a role in the diagnosis or determining the
21  treatment.
22      A    Yes.
23      Q    In what way? Every single one?
24      A    Every single one.
25      Q    So that the codes or the antibodies that

Page 165

1  have to do with hairy cell leukemia --
2      A    As I pointed out, all of those are useful
3  things and are all present in certain cell populations.
4      Q    But are they diagnostic of anything else?
5  Is that what you rely on?
6      A    You don't rely on single markers to
7  diagnose anything, and you use a combination of markers
8  to characterize all the cells in the sample candidate
9  malignant cells as well as normal cells. The hardest
10  case to diagnose are those that do not harbor a
11  malignant population. For me to actually -- if you --
12  if your physician sends me a sample and says this
13  patient is anemic or this patient has lymphadenopathy,
14  if I identify a reason for this patient to have
15  lymphadenopathy, that's actually quite -- especially if
16  there's lots of cell, that's a very straightforward
17  thing to do. What's actually difficult is for me to go
18  back and say this patient didn't have anything, and
19  that's what I'm expected to do. The physician is
20  requesting a consultation from me.
21          MS. DAVIS: You want to change the tape?
22          THE VIDEOGRAPHER: Going off the video
23  record at 2:24 with the completion of tape
24  three.
25          (Whereupon, there was a brief recess.)

42 (Pages 162 to 165)