**Page 1**

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
   ------------------------x
   UNITED STATES OF AMERICA |
   ex rel. DR. JAMES J.     |   CIVIL ACTION NO.
   TIESINGA,                |   3:02 CV 1573(MRK)
              Plaintiff,    |
                            |
        vs.                 |
                            |
   DIANON SYSTEMS, INC.,    |   February 22, 2006
              Defendant.    |
   ------------------------x


               VIDEO DEPOSITION of VALERIE PALMIERI


        Taken before Elzbieta A. Sirois, RPR,
        LSR 350, a Court Reporter and Notary
        Public within and for the State of
        Connecticut, pursuant to Notice and the
        Federal Rules of Civil Procedure, at the
        offices of Office of the United States
        Attorney for the District of Connecticut,
        157 Church Street, New Haven, Connecticut on
        February 22, 2006, commencing at 9:07 a.m.





                    FALZARANO COURT REPORTERS
                      117 North Saddle Ridge
                      West Simsbury, CT 06092
                          860-651-0258
```

**Page 2**

APPEARANCES:

For the Plaintiff:

    UNITED STATES DEPARTMENT OF JUSTICE
    601 D Street N.W.
    Room 9154
    Washington, D.C. 20004
    202.307.0238
    202.305.4117 Fax
       By:  PATRICIA R. DAVIS, ESQ.

    UNITED STATES DEPARTMENT OF JUSTICE
    157 Church Street
    New Haven, Connecticut 06510
    203.821.3792
       By:  RICHARD M. MOLOT, ESQ.

For the Defendants:

    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
    1333 New Hampshire Avenue, N.W.
    Washington, D.C. 20036-1564
    202.887.4000
    202.887.4288 Fax
       By:  ROBERT S. SALCIDO, ESQ.

ALSO PRESENT:

    Thomas Kossl, Dianon Systems

VIDEOGRAPHER:

    Hamilton Communication
    60 Pine Lake Road
    Westbrook, Connecticut
          Jason Hamilton
          860.399.4999

**Page 3**

S T I P U L A T I O N S

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

**Page 4**

THE VIDEOGRAPHER: We are now on the record. This is the deposition of Valerie Palmieri, taken on behalf of the Plaintiff in the case of the United States of America vs. Dianon Systems Incorporated. Case number 3:02CV1573 (MRK) filed in the United States District Court for the District of Connecticut.

Today's date is February 22, 2006. Time on videotape record is 9:07 a.m. This deposition is being held at 157 Church Street in New Haven, Connecticut. My name is Jason Hamilton representing Hamilton Communications of 60 Pine Lake Road, Westbrook, Connecticut.

Would counsel please introduce yourselves for the record.

MS. DAVIS: My name is Pat Davis. I'm representing the United States.

MR. MOLOT: Richard Molot for the United States.

MR. SALCIDO: I'm Robert Salcido here on behalf of Dianon Systems.

MR. KOSSL: Tom Kossl, Dianon Systems.

THE VIDEOGRAPHER: The witness may now be sworn.

### Page 13

1 be today, but that's about it.
2 BY MS. DAVIS:
3    Q  When you say you talked to your managers, who would that be?
5    A  Matt Plamkoodan.
6    Q  Anyone else?
7    A  Tami Sessa and Sue Cowan.
8    Q  You didn't talk to any of the other managers or the other officers?
10   A  No.
11   Q  You didn't talk to any of the billing folks?
12   A  No.
13   Q  Any of the pathologists?
14   A  The only other person I talked to is Jay Amberson.
16   Q  What did you talk to him about?
17   A  Basically that I, you know, he was telling me he was going to also come here, and I said I was coming today. That was it.
20   Q  He didn't talk anything about substance?
21   A  No, not at all.
22   Q  Okay. Take a look at the deposition notice.
23   A  Sure.
24   Q  First thing you're being offered for is C, your -- that's Dianon's decision in or about 2000 to

### Page 14

1 bill for 26 antibodies for most flow cytometry services?
3    A  Yes.
4    Q  Including the reason for your re-examination of the numbers of antibodies to bill for?
6    A  Yes.
7    Q  At the time Dianon was billing for 18 antibodies; is that right?
9    A  Correct.
10   Q  What prompted, what prompted the decision to look at the number of antibodies that you were billing for?
13   A  It's customary for us to look at our competitors and see, you know, look at their offerings, see how they are billing. And we did a review of our competition, and we found out that we were actually severely underbilling for the antibodies that we were performing.
19   Q  What competitors did you look at?
     A  Various competitors. At the time, Impath is a competitor, at that time. I think that's the only one I can recall.
23   Q  Did you look at a number of different competitors?
25   A  No, I don't remember any other names being

### Page 15

1 brought up. It was a very informal conversation, you know, where this was brought up. It wasn't anything formal in terms of a market survey or anything like that.
5    Q  The only one you can remember talking about is Impath?
7    A  Yes.
8    Q  When was the, you talk about discussions, who was involved in the discussions?
10   A  It was originally raised at our senior management team meeting.
12   Q  Who is the senior management team?
13   A  It would include the finance, operations, sales, marketing, medical director and the president.
15   Q  Who were those -- at the time, who were in those positions?
17   A  Kevin Johnson.
18   Q  Was president?
19   A  President. Finance was Dave Schreiber. The medical director at the time, I believe, was Jack Snyder.
22   Q  Operations?
23   A  Myself. Sales was Marty Stefanelli, and marketing was Grant Carlson.
25   Q  What prompted the discussion?

### Page 16

1    A  It was customary for us at the end of the year, end of a fiscal year we would look at our pricing, we would look at competition's offering, we'd compare ourselves, and it was a nonformal process where we would review our offering and upon review of that, it was determined that we were, you know, possibly underbilling for what we were performing. We are performing 26 and only billing for 18.
9    Q  Who raised the issue?
10   A  It was not raised specifically. It was like a generic review of our offering at the end of the year. We said okay, what's our offering, how does it compare to the competition, and it was obvious that we were only billing for 18 and our competition was billing for more.
16   Q  You said at the end of the year it was customary to review your offering, does that mean you reviewed all the tests that you do?
19   A  Yes, that's correct.
20   Q  You went through and looked at each of the tests you do --
22   A  Yes.
23   Q  -- and compared yourself to the competitors?
24   A  Competitors, compared it to, you know, how they were billing, you know, and what CPT codes were