1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------x
UNITED STATES OF AMERICA          :
ex rel. JAMES J. TIESINGA,        :
                                  :
          Plaintiff,              :
                                  :
     v.                           : No. 3:02CV1573(MRK)
                                  :
                                  :
DIANON SYSTEMS, INC.,             :
                                  :
          Defendant.              :
------------------------------x

Washington, D.C.

Tuesday, March 28, 2006

30(b)6 Deposition of

JAMES AMBERSON

a corporate designee, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at approximately 9:08 a.m., at the offices of the United States Department of Justice, 601 D Street, NW., Washington, D.C., before Denise Dobner Vickery of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

Beta Court Reporting
(202) 464-2400        www.betareporting.com        (800) 522-2382

14

1  -- and this had been going on since we had
2  been doing flow cytometry. There were
3  constantly discussions about adding new
4  antibodies.
5       Hematopathology is a field where
6  they're constantly discovering new antigens
7  and new antibodies and also where new types
8  of leukemias or lymphomas are discovered, and
9  they're usually characterized by either these
10 antibodies or molecular studies and, you
11 know, all laboratories at a certain rate are
12 adding these antibodies.
13      The rate at which these antibodies
14 are added by laboratories varies. I mean,
15 and there are a lot of reasons for that.
16 Some of it just depends on the
17 hematopathologist. How current they are with
18 the literature. What's their level of
19 expertise. What are the resources they have
20 to actually validate these new antibodies and
21 actually set them up in their laboratory.
22 It's not a trivial thing. You just don't

15

1  throw them in a tube and start using them.
2       You have to configure the tubes and
3  the instrument. It may depend on the type of
4  instrument which you have, and some of it
5  just depends on the judgment of the -- of a
6  particular flow cytometrist, what they may
7  look at. You may have a chose of two or
8  three antibodies in which to use, and they
9  have to make a judgment which one do they
10 like, which one happens to work well with the
11 dyes and the instruments that they're using.
12      So I asked Dr. Goyette, even though
13 he felt and his colleagues felt very strongly
14 that they wanted to use the 26 antibodies
15 that they selected, I said if somebody were
16 to look at the antibodies we're using, what
17 would be the antibodies within that panel
18 that everybody would agree should be part of
19 a core panel. In other words, which
20 antibodies would be essential for any panel
21 to use.
22      They wouldn't be sufficient.

16

1  People would want to add others, but these
2  are the antibodies that would be generally
3  accepted. And he gave me a list of these
4  antibodies, and then I really asked a
5  marketing and billing. I said, let's bill
6  for these. If anybody looks, nobody is going
7  to argue about this particular antibody or
8  that particular antibody. Everybody would
9  agree that these antibodies are standard.
10      People might disagree about which
11 antibodies you should add on in addition to
12 these to pick up different diagnostic
13 entities. And so we added those or made up
14 that list, and the fee schedule was changed
15 accordingly.
16      BY MS. DAVIS:
17      **Q   All right. So let me make sure I**
18 **understand. You said that the -- what**
19 **prompted you to look at the antibodies, the**
20 **number that you were going to bill for was**
21 **what again?**
22      A   What had happened was that in March

17

1  -- I believe it was around March and this --
2  they had increased the number of antibodies
3  to 26. When -- in the process of doing that,
4  I believe that's when the company discovered
5  that in fact they were already billing for 26
6  antibodies. Although up until that point
7  they in fact had only been doing I think 21
8  or 22, and that's what got me particularly
9  upset and that is also what prompted me to
10 ask Dr. Goyette to give me a list of
11 antibodies.
12      And in this case, it was 18 that
13 would be essentially virtually universally
14 accepted. Even though the additional ones,
15 which I think were some of them were for
16 hairy cell leukemia or some other type of
17 either lymphoma or leukemia. I don't
18 remember specifically which.
19      You know, people might say, well, I
20 think you should use this antibody A and some
21 people might say you should use antibody B.
22 Whereas, the antibodies in that 18, that list

**Page 22**

1  use one, two, three, actually now it's done
2  with five colors or we're about to switch to
3  that. They switched from two to three
4  colors. When you do that, you can look at
5  more antibodies per tube and often, you know,
6  you may be able to use fewer antibodies.
7       And so he says here, "When we
8  switched to three-color analysis, we reduced
9  the panel," and the assumption at the time I
10 believe was that they had been doing 26.
11 They switched from two to three and then went
12 down to 22 antibodies, but nobody changed the
13 -- the fee schedule due to some sort of
14 miscommunication.
15      We have in the process of preparing
16 for this and looking at reports, we have
17 found that in fact even prior to August that
18 they were only doing 22 antibodies and that
19 went actually back to the beginning of the
20 year. And we actually this week we're
21 notifying our local carrier that we've
22 discovered this, and once we quantitate what

**Page 23**

1  the refund is due, we'll be forwarding that
2  to them.
3       You know, as best I can tell at the
4  time is that the decision to go from two to
5  three-color and also a decision to go to more
6  antibodies, that is going up from 22 to 26 or
7  whatever, those were being contemplated
8  throughout that year 1996 kind of
9  simultaneously. And I believe what happened
10 was that they eventually did go from two to
11 three, but they never did go to 26.
12      That, you know, knowing what I
13 know, particularly some of our recent
14 experience in the lab, doing these things
15 takes a lot of time and investment in
16 personnel. You have to validate the
17 antibodies. Going from, you know, two to
18 three-color or three to five-color is a
19 considerable production.
20      You need to reconfigure all your
21 tubes, you know, calibrate the lasers and do
22 all the stuff with which I'm not familiar,

**Page 24**

1  and I presume what happened is that they
2  couldn't do both simultaneously. They
3  eventually got the three-color up, but
4  somehow along the way the information that
5  was communicated to marketing and billing was
6  incorrect.
7       MS. DAVIS: Okay. Take a look at
8  what's been marked as Exhibit 3.
9            (Deposition Exhibit No. 3 was
10           marked for identification.)
11      BY MS. DAVIS:
12  Q   And this is a memorandum dated
13 March 20, 1997, which is the same day as
14 Exhibit 2; is that right?
15  A   Yes.
16  Q   Okay. And this one is from Bill
17 McDowell. That's the marketing person?
18  A   Yes.
19  Q   To three people and one of them is
20 Debra Klembara, Pat Torre and Bob Tucciarone?
21  A   Yes.
22  Q   Did I pronounce that right?

**Page 25**

1   A   Yes. Actually, I should add, he's
2  one of the other people I talked to in
3  preparation.
4   Q   Okay. And is he still at DIANON?
5   A   Yes. He's the head of billing.
6   Q   Okay. And Pat Torre?
7   A   She's in the billing department,
8  collections.
9   Q   And she's still there?
10  A   She's still there.
11  Q   And Debra Klembara?
12  A   She's actually in the IT
13 department, but she works on billing issues I
14 think.
15  Q   Okay. This says, "Updated antibody
16 listing for hematopathology" and it says,
17 "Effective March 25, 1997, the hemopath lab
18 is changing its normal XL 3 XL 4 antibodies
19 to the following list. Accordingly, we need
20 to change the billing to reflect the
21 antibodies as of March 25th. The number of
22 billed antibodies is not changing, still 26,

7 (Pages 22 to 25)

34

1  just don't remember.
2      MS. DAVIS: What's been marked as
3  Exhibit 6.
4      (Deposition Exhibit No. 6 was
5      marked for identification.)
6      BY MS. DAVIS:
7  Q  Do you recognize that document?
8  A  Yes, this is a copy of Dr.
9  Goyette's memo to me.
10 Q  And this is dated June 17, 1997?
11 A  Yes.
12 Q  And it's, once again, flow
13 cytometry antibody panel?
14 A  Yes.
15 Q  And it says, "Following
16 consultation among hematopathology staff, we
17 believe that the following 18 antibodies are
18 essential for the accurate and complete
19 initial workup of both cytometry specimens.
20 We believe that their routine usage can be
21 justified to insurance carriers."
22     Once again, Dr. Goyette testified

35

1  the other day that you asked him to prepare
2  this memo?
3  A  Yes.
4  Q  And why did you ask for it?
5  A  As I stated earlier, I wanted to be
6  extremely cautious and I knew that if you
7  looked at our 26 antibody panel and showed
8  that to a group of hematopathology experts,
9  some of them would say, well, rather than
10 this particular antibody, I would use this
11 or, you know, we might use, you know, 24 and
12 somebody else might use 28.
13     So I asked Dr. Goyette, give me a
14 list of the 18 that you would consider would
15 be the essential core of any panel. You
16 know, they would be essential to any panel.
17 They wouldn't be sufficient to diagnose
18 everything. You would have to add additional
19 antibodies, but these would be something that
20 everybody would agree on, and that's what he
21 supplied to me.
22 Q  Okay. This says, the memo says,

36

1  "The following antibodies are essential for
2  the accurate and complete initial workup of
3  flow cytometry specimens." Is that what you
4  asked him to give you?
5  A  I asked him to give -- as I said,
6  what I asked him is to give me the antibodies
7  that would be, you know, essential in any
8  panel. I did not ask him to give me what
9  antibodies you think should make up a
10 complete panel, but what antibodies should be
11 part of any panel.
12     I guess as an analogy, I would say
13 if a 55-year-old man goes to a doctor for a
14 routine check-up, what are the -- what are
15 the things that everybody would agree should
16 happen. Should take a history. You should
17 do a physical exam. You should do an
18 electrocardiogram.
19     People might disagree on what
20 laboratory values you should get. How
21 complete a lipid profile. Some people might
22 disagree on whether you should do a chest

37

1  X-ray in somebody who's asymptomatic, and it
2  wouldn't -- you couldn't say that doing the
3  chest X-ray would be excessive. A lot, you
4  know, half of the physicians might say they
5  would do it. Others might not do it. There
6  are a lot of factors in there.
7      But everybody would say you've got
8  to do that history and physical. This is
9  kind of analogous. You got to have these
10 antibodies in there.
11 Q  Okay. Let me go back to the
12 language of this memo. It says, "These
13 antibodies are essential for the accurate and
14 complete initial workup of flow cytometry
15 specimens."
16     Is that what you asked him to do is
17 to prepare a panel that would enable him to
18 do an accurate and complete initial workup of
19 flow cytometry specimens?
20 A  I don't remember the exact wording
21 when I made the request what I wanted. What
22 I asked for was a panel, the elements of

10 (Pages 34 to 37)

**Page 38**

1  which would be essential in any complete flow
2  cytometry panel.
3  Q  Okay. And then it says, "We
4  believe that their routine uses can be
5  justified to insurance carriers"?
6  A  Yes.
7  Q  Do you know why he said that?
8  A  I mean, I don't know why he said
9  that. I had said I want antibodies that if
10 people to look at them, these antibodies,
11 everybody would agree, yeah, you've got to
12 have these antibodies in there.
13 Q  Okay. Were insurance companies
14 raising issues about whether the individual
15 antibodies were necessary?
16 A  No. No.
17 Q  Nobody was raising that issue?
18 A  No.
19 Q  Okay. Take a look at the top of
20 the document. It says, "Bill, as per your
21 request, hopefully you already have a copy of
22 this information" and then "Jay." Is that

**Page 39**

1  you?
2  A  Yes.
3  Q  That's your handwriting?
4  A  Yes.
5  Q  And is -- is the Bill, Bill
6  McDowell again?
7  A  Yes.
8  Q  And Bill requested the information,
9  Mr. McDowell?
10 A  I assume so. I don't remember
11 writing that, but it would appear to be the
12 case.
13 Q  Okay. So you don't remember
14 whether he asked for it or not?
15 A  No.
16 Q  Okay. Up at the top you see some
17 fax numbers up there and one of them says
18 10/1997, Christopher F. Metz.
19 A  Yes.
20 Q  Who is Mr. Metz?
21 A  He was -- at the time I think he
22 was in sales.

**Page 40**

1  Q  Okay. Do you know what position he
2  held in sales?
3  A  Well, he had a lot of different
4  positions. He was involved in sales with
5  managed care, and then he was also just a
6  straightforward sales rep. I'm not sure what
7  he was at the time.
8  Q  Okay. But he dealt with managed
9  care organizations?
10 A  In the latter part of his career at
11 DIANON. I'm not certain he was even doing
12 that at that point. I just don't remember.
13 Q  Okay. And what about Cathleen
14 Pavlowski?
15 A  I have no idea who that is.
16 Q  Okay. And then down at the bottom
17 there's a notation that says "Move to 18."
18 Do you know who -- who wrote that?
19 A  No. I would guess it was Mr.
20 McDowell, but I don't know.
21 Q  Okay. So Mr. McDowell made the
22 decision to -- to bill for 18?

**Page 41**

1  A  No. I made the decision.
2  Q  You made that decision?
3  A  (Nodding)
4  MS. DAVIS: Okay. This has been
5  marked as Exhibit 7.
6  (Deposition Exhibit No. 7 was
7  marked for identification.)
8  BY MS. DAVIS:
9  Q  Can you tell me what that is?
10 A  Yes. This is a form for either
11 changing fees or CPT codes or test profiles
12 that was in existence at the time.
13 Q  Okay.
14 A  And this is the form where they
15 went -- we changed from billing for 26
16 antibodies to 18.
17 Q  Okay. And in the very center it
18 says "Current patient fees/CPT codes." Then
19 it says 26 -- I don't know what that says.
20 A  Typings I believe.
21 Q  Typings times $45?
22 A  Yes.

**58**

1  A   No. He called me before I saw this
2  document.
3  Q   So, do you have his number? Could
4  you have called him back?
5  A   I don't have -- I actually -- do I
6  have his number or not? I may have his
7  number. I'm not certain.
8  Q   But you didn't call him back?
9  A   No, I didn't call him back.
10 Q   Okay. So you don't have any idea
11 what those numbers mean?
12 A   They look to me like he was just
13 modeling things, looking at pricing for flow
14 cytometry, the number of antibodies and the
15 price per antibodies and just, you know,
16 doing some calculations.
17 Q   Okay. That's a guess based on just
18 looking at the numbers?
19 A   Yes.
20 Q   Okay. Page 500191. What did you
21 do to find out what the origin of this
22 document was?

**59**

1  A   Again, showed it to all the people
2  I mentioned.
3  Q   And -- and what was?
4  A   Nobody knew specifically what it
5  was.
6  Q   Okay. And, once again, did you
7  talk to anybody, any former employees at
8  DIANON?
9  A   No.
10 Q   Okay. And then page 500175 and
11 actually I believe the way this was produced
12 to us, the next two pages are also part of
13 the same document. So 500175 through 177.
14 What did you do to discover the origin of
15 this document?
16 A   Again, showed it to various people
17 at DIANON. Actually, also I think I showed
18 this one in particular to Joe Hurley, who's
19 in finance. He wasn't -- I don't think he
20 was there at the time this would have been
21 produced, and trying to decide whether this
22 was produced by finance or marketing. Best

**60**

1  guess it might have been produced by finance.
2  Q   Okay. But you don't -- you didn't
3  find anybody --
4  A   I don't know that.
5  Q   -- find anybody who recognized it?
6  A   No.
7  Q   And you didn't call anybody who was
8  no longer with the company?
9  A   No.
10 Q   Who would have been in Mr. Hurley's
11 position when this -- the document was
12 created, which was in approximately I guess
13 late 1999 or early 2000?
14 A   Well, we have both a controller and
15 a CFO. The CFO was Dave Schreiber and the
16 controller was Chris Rausch.
17 Q   So it could have been one of those
18 folks?
19 A   Yes.
20 Q   I'm sorry. Chris?
21 A   Rausch.
22 Q   R-a-u-s-c-h?

**61**

1  A   Yes, I believe so.
2  Q   All right. If you turn to the page
3  that's Bates numbered 600 -- I can't tell
4  whether that's another 0 or 6. 000.
5  A   Looks like all zeros on this one.
6  Q   Okay. What can you tell me about
7  the origin of this document?
8  A   This is a test code creation form
9  which was -- this is the version was current
10 in 2000. I believe is substantially the same
11 as the form that we use now, and from looking
12 at this, it looks like a form to go up to 26
13 antibodies.
14 Q   Okay. Let me ask. Take a look at
15 Exhibit 7.
16 A   Yes.
17 Q   Is this a replacement for Exhibit
18 7?
19 A   Yes, I believe so.
20 Q   Okay. Now, let's just go through
21 each of the people who's on there. If you
22 look at the -- up at the top, it says,

16 (Pages 58 to 61)

## Page 62

1  "Initiator's name, Kim Hade"?
2  A  Yes.
3  Q  That's -- we've already talked
4  about her, and then it says, "Description.
5  Need to bill for all 26 markers performed and
6  recorded." Do you know why that's there?
7  A  I don't know specifically, no.
8  Q  Okay. Did you ask Ms. Hade?
9  A  No. I don't know where Ms. Hade
10 is.
11 Q  Okay. And then under billing
12 information, it says cell service marker
13 88180, 26 events, fee per event is $75 and
14 the patient fee is 1950; is that right?
15 A  Yes.
16 Q  Okay. That would be the fee
17 charged to the patient directly?
18 A  Yes.
19 Q  Or the patient's insurance company?
20 A  Yes.
21 Q  And then the client fee is 1300.
22 What did you say again the client fee was?

## Page 63

1  A  Client fee was when you would bill
2  the physician who submitted the specimen and
3  usually that would be -- most commonly that
4  was the pathology laboratory.
5  Q  Okay. Then if you go down under
6  Approvals, it says Jack W. Snyder?
7  A  Yes.
8  Q  It says "Chief Medical Officer"?
9  A  Yes.
10 Q  What did Mr. Snyder do?
11 A  He was at that time the chief
12 medical officer and the director of the
13 laboratory.
14 Q  Okay. And did you report to him?
15 A  Yes.
16 Q  Okay. And then I guess that is
17 Valerie Palmieri underneath there, vice
18 president?
19 A  Yes.
20 Q  Okay. We've already talked to her.
21 Is Mr. Snyder still with the company?
22 A  No.

## Page 64

1  Q  Do you know where he is?
2  A  No.
3  Q  And then corporate controller?
4  A  That's Chris Rausch whom I already
5  mentioned.
6  Q  Okay. And under "Vice President
7  Marketing" would that -- I think that's Grant
8  Carlson?
9  A  Yes.
10 Q  Is he still with the company?
11 A  No.
12 Q  Do you know where he is?
13 A  Last I heard he's somewhere -- I
14 think he might be somewhere in Florida, but
15 I'm not sure.
16 Q  Okay. And then over on the corner
17 there Department Approvals. Do you recognize
18 any of those initials?
19 A  I do not recognize them. Although
20 I asked people and got some help discovering
21 who's they were.
22 Q  Okay.

## Page 65

1  A  The top one, people were uncertain
2  who that is. Fred Ferrera and our
3  information service thought it might be
4  William Tilton, who at the time worked in the
5  lab. He doesn't any longer. Under billing,
6  that's Bob Tucciarone. Under information
7  systems, that's Maria Conte, and under
8  marketing, that's Kim Hade.
9  Q  Okay. And we already talked about
10 Kim Hade. She's not there any more and I'm
11 sorry, who did you say the info system was?
12 A  Maria Conte.
13 Q  Is she still there?
14 A  Yes.
15 Q  And Tucciarone?
16 A  He's still there.
17 Q  He's still there. And the first
18 one on the list, I'm sorry, Bill?
19 A  Bill Tilton.
20 Q  Is he still there?
21 A  No.
22 Q  Let's turn to actually the next two

17 (Pages 62 to 65)

Beta Court Reporting
(202) 464-2400      www.betareporting.com      (800) 522-2382

```
                                          74
 1  about this particular document?
 2     A   Again, everybody that I mentioned.
 3     Q   Okay. And did they -- did anybody
 4  know who created it or when it was created or
 5  why it was created?
 6     A   No. People did the same thing I
 7  did. They surmised it was probably Kim Hade.
 8     Q   Okay. All right. And then the
 9  next two documents, just generically these
10  are the fee code changes again?
11     A   Yes.
12     Q   200042 and 43. And these are for
13  the change from 9 markers to 26 markers in
14  1996?
15     A   Yes.
16     Q   Okay. And who did you talk to
17  about these?
18     A   Again, everybody that I mentioned.
19     Q   Okay. Okay. Let's go off the
20  record for a little bit. Take a break while
21  we're doing that.
22     A   Okay.
```

```
                                          75
 1        THE VIDEOGRAPHER: Going off the
 2  record at 10:18 a.m. tape 1.
 3        (Recess)
 4        THE VIDEOGRAPHER: Back on the
 5  record at 10:29 a.m. tape 1.
 6        BY MS. DAVIS:
 7     Q   Okay. I'd like to go back to a
 8  couple of things we talked about earlier.
 9        You said that in '97 you discovered
10  that DIANON had been overbilling Medicare by
11  four antibodies; is that right?
12     A   Yes.
13     Q   And how did you discover that?
14     A   I didn't discover it. I don't
15  remember precisely how it was discovered, but
16  I believe it was discovered in the context of
17  going up to 26 antibodies from 20 -- 22 that
18  in that process it became apparent that they
19  were already billing for 26.
20     Q   Okay. And so who -- do you know
21  who discovered it?
22     A   I don't know. I think Mr. McDowell
```

```
                                          76
 1  might have, but I honestly don't know.
 2     Q   Okay. And you didn't ask him that
 3  when you talked to him?
 4     A   No.
 5     Q   And you said that at that time,
 6  DIANON calculated how much they had been
 7  overbilling Medicare?
 8     A   Yes.
 9     Q   Who did that calculation?
10     A   I don't know.
11     Q   Okay. And you issued a refund to
12  the carrier?
13     A   Yes.
14     Q   Do you know how much that was?
15     A   I think it was around $26,000.
16     Q   Okay. And as I understood your
17  testimony earlier, you said that this, this
18  refund, this overbilling prompted you to
19  decide to move to 18 antibodies billing?
20     A   The -- several things were going on
21  at the time. We discovered the overbilling
22  and we had increased in fact to 26
```

```
                                          77
 1  antibodies. I talked to Rich Goyette and as
 2  I said asked him, look, I want to be
 3  extremely cautious here and so could you give
 4  me this list of antibodies do you think that
 5  everybody would agree should be in any panel.
 6  He gave me those antibodies. Then I asked
 7  and convinced others that let's just bill for
 8  these 18.
 9     Q   Okay. Who did you talk to about
10  this decision?
11     A   I don't remember precisely. I'm
12  sure I talked to Mr. McDowell and I'm sure I
13  talked to Mr. Johnson, Kevin Johnson, but
14  beyond that, I don't know who I would have
15  talked to.
16     Q   Okay. And let me make sure I
17  understand. This was -- this was based
18  solely on the fact that you had a $26,000
19  error and had to refund the money to
20  Medicare?
21     A   Well, it was that and I didn't --
22  if anybody were to question, were to look, I
```

20 (Pages 74 to 77)