IN RE: DIANON SYSTEMS )
)
)
)

## DECLARATION OF RICHERT E. GOYETTE, M.D.

I, Richert E. Goyette, M.D., hereby declare the following to be accurate and true to the best of my knowledge:

1.  From July 1995 to May 2000, I was employed by Dianon Systems, Stratford, Connecticut. From 1995 to 2000, I served as Dianon's Director of Hematopathology. From 1996 to 2000, I also served as the Director of Immunohistochemistry. Finally, from 1996 to 1998, I was one of three Associate Laboratory Directors at the company.

2.  I am board certified in anatomic and clinical pathology and hematology (American Board of Pathology). I graduated *magna cum laude* from Baylor College of Medicine in Houston, Texas, where I was awarded the Stuart A. Wallace Award as the Outstanding Student in Pathology. I received training in Internal Medicine at the University of Washington, Seattle, WA. I was trained in anatomic pathology, clinical pathology and also received training in hematopathology at Brooke Army Medical Center and the University of Southern California. Immediately prior to joining Dianon in 1995, I served as Chief of the Department of Pathology at Phelps County Regional Medical Center, Rolla, Missouri. I have authored numerous medical journal articles, monographs, educational slide kits and textbooks, including HEMATOLOGY – A COMPREHENSIVE GUIDE TO THE DIAGNOSIS AND TREATMENT OF BLOOD DISORDERS. Attached as Exhibit 1 is a copy of my *Curriculum Vitae*.

3.      When I began interviewing with Dianon in early 1995, the company did not employ a board certified hematopathologist. However, Dianon had strategically determined that it would become a leader in anatomic and clinical pathology in general as well as subspecialty pathology to include hematopathology, dermatopathology, gastrointestinal pathology and cytology. As a first step in that direction, it determined to hire board certified sub-specialty pathologists in all relevant specialty areas including hematopathology. Hence, the company hired, in early 1995, shortly before I was hired, Ann Marie Connor, who was, like me, board certified in hematopathology.

4.      Beginning in 1995, based upon our expertise and experience, Dr. Connor and I began to refine Dianon's immunophenotyping panels. Previously, because Dianon did not have any physician that was board certified in hematopathology, it lacked in-depth expertise and knowledge of which antibodies to perform. Dr. Connor and I extensively studied the subject. The antibody panel was incomplete at that time and did not represent the state of the art in the specialty. Furthermore, there were antibodies on the panel that did not appear to contribute significantly to patient care. Dr. Connor and I were especially well versed in the subject matter: She had recently completed her training in hematopathology under Richard Brunning a world-renowned expert on the subject and I had just finished a well-received draft of my textbook. Dr. Connor and I determined that the medically indicated and necessary basic panel should include a selection of antibodies that eventually totaled twenty-six. We determined that the previous immunophenotyping panel, which included nine antibodies, was inadequate and undermined patient care.

5.      I have reviewed the government's chart, titled 'Timeline: Fee Schedule and Standard Billed Panel', which is attached as Exhibit 2. I understand that the government

contends that the determination to expand the number of antibodies performed rose dramatically in response to a drop in reimbursement for the services performed. That viewpoint is mistaken. The hematopathology staff had absolutely no interest in the organization's billing practices and it was only serendipitously that we even learned that our division was making money. Physicians determined what antibodies to perform because it was a medical decision. Specifically, Dr. Connor and I made the decision. I had no knowledge or interest regarding the reimbursement impact of that decision. Indeed, during this time period, I actually believed that the reimbursement was the same regardless of the number of antibodies performed. I thought that the billing was for the panel analogous to that for a multiphasic chemistry analysis. As physicians, the antibody selection and number were made solely based upon patient care considerations, not financial consequences. The total premise underlying the government chart – the number of antibodies performed turned on the dollar amount reimbursed and Dianon intentionally increased the number performed to offset a projected short fall in reimbursement – is absolutely, completely wrong. The compensation of the hematopathologists and the laboratory staff was not based upon the number of antibodies and we believed that billing issues should have no influence on our ability to practice medicine.

6.    The business and corporate personnel at Dianon had absolutely no role in the determination of what or how many antibodies would be performed. At no time would we permit business people to determine what constituted appropriate medical care. On a solitary occasion, a Dianon business manager attempted to cross the boundary between the practice of medicine and the company's financial performance. During the summer of 1995, at approximately 3:00 pm one afternoon, a product manager asked me specifically what I was doing to market the hematopathology services. I was offended by the question and believed that

3

such a query was inconsistent with our intent to practice our specialty. I resigned from the company immediately and left the office. When I arrived at my residence, I called my fiancee in Missouri who was planning to join me in Connecticut and asked her *not* to hand in her letter of resignation because I had no intention to ever work at Dianon again. That evening, Dr. James Amberson, the Medical Director at Dianon, called me and asked me to reconsider my decision. He took me to dinner at the Trumbull Marriot Hotel and told me that the whole situation was inappropriate and that he wished that I would reconsider my decision. He then promised that there would be absolutely no interference by any business person at Dianon regarding the practice of medicine. Accordingly, I returned to Dianon the next morning and resumed my practice of medicine. However, I waited several months before confirming to my fiancee that I would continue working at the company. From that time on, no person at Dianon ever again attempted to insert business considerations into medical decision-making in the hematopathology section.

7.    The diagnosis of hematologic disease is not just based on which antibodies are performed, or how many, but the relationship of the antibodies to each other. These relationships often cannot be observed unless a comprehensive panel is performed. For example, CD19, CD5 and CD23 must be viewed together to differentiate chronic lymphocytic leukemia from mantle cell leukemia. Both of these diseases have antigens that combine with CD19 and CD5. The level of expression in the CD23 differentiates the two. Both look similar under a microscope. Use of the 26-antibody panel substantially advances patient care. For example, shortly after we modified the panel and increased the number of antibodies, I observed that Dianon had begun to diagnose a vastly disproportionate number of cases of hairy cell leukemia and of mantle cell lymphoma than would be anticipated from a review of the literature. The reason that we were

4

able to accurately diagnose these cases is the comprehensive panel we used, the specialty

training of the Dianon hematopathologists, and our commitment to the practice of medicine. If

all of the antibodies selected by us for the panel were not performed, we knew that diseases

would not be fully characterized and we would miss subtleties that were clinically significant

based on the interaction of the antibodies and other factors. By performing the 26- antibody

panel, we diagnosed a number of conditions on a regular basis that otherwise would have been

missed to the detriment of the patient.

8.      I understand that it is the government's position that in selected cases a shorter

panel can be appropriately used, for example, in lymphoma cases or when Dianon had previously

diagnosed a patient's condition. In my medical judgment, this viewpoint is wrong for several

reasons. First, some lymphomas and leukemias have common characteristics and by failure to

test the cells with appropriate antibodies, you may misdiagnose the patient's condition. For

example, some specimens sent in as one type of lymphoma turned out to be a leukemia of a

different cell type and vice versa. In addition, some patient's develop second malignancies.

Second, regarding repeat specimens, patient's conditions evolve – a low-grade malignancy could

undergo a large cell transformation: an entity with a totally different clinical course and

treatment. Indeed, I received a number of calls from physicians who informed me that we had

properly diagnosed conditions that were missed by other commercial labs or hospital

pathologists. Another example is that we would receive a bone marrow specimen on a patient

with a history of lymphoma. In some instances, patients who had received pelvic radiation

would have a relatively acellular bone marrow specimen but the CD34 and myeloid antigens

would reveal a discrete population of myeloblasts that indicated the presence of an evolving

therapy-related myelodysplasia. We would have missed these conditions as well had we

performed fewer antibodies. Third, by using the 26 antibody panel, we were also able to diagnose hematological malignancies earlier. For example, outside of gene rearrangement studies, sometimes the only evidence that a T-cell proliferation is malignant is deletion of an antigen. Only by a comprehensive analysis, were we able to identify the antigens that were present as well as those that were aberrantly missing. The consequences of this early identification and characterization had the potential to allow therapy to be given while the tumor burden was lower and could, in some instances, save the patient's life.

9.      Further, by performing 26 antibodies, Dianon was not "screening" patients, which I also understand the government contends. We, obviously, were not testing persons walking in off the street. Hematologists and oncologists referred these patients to us to consult and diagnose the patient's condition. These specialists had determined that the patient's condition had sufficient complexity that they needed to avail themselves of our expertise. Indeed, there were many cases where the referring clinician's impression was wrong and hence we could not rely upon his statement of the patient's condition, for example, when lymphoma was the preliminarily diagnosis and the patient had multiple myeloma or another hematologic disorder. Moreover, if we used the step approach, the referring clinician would not have learned that what came in as a lymphoma was really another condition. If we did not use the comprehensive approach, we would not have made an accurate diagnosis in some cases. Therefore, we treated each patient sample as a request for a medical consultation. The specimen reached Dianon because the patient had already been screened by the referring hematologist who had referred the patient sample to us. Almost every specimen arrived with a presumptive diagnosis of concern about a hematologic malignancy; not with a request for screening. On many instances, we called the referring physician with preliminary results of the immunophenotyping and discussed the

diagnosis and treatment with them. This consultation usually clarified the diagnosis, caused the patient to be referred to a tertiary referral center, or necessitated additional testing.

10.    Early in 1997, Dianon determined to review its immunophenotyping panel to verify that its billing was appropriate. I was asked at that time to analyze whether all of the antibodies in the 26 antibody panel were medically indicated and necessary. Accordingly, on May 21, 1997, I authored a memo to Dr. Amberson that provided a justification for the number and variety of antibodies that we used in our flow cytometry panel. *See* Exhibit 3. At that time, I had just completed all work on my hematology textbook and combining that academic expertise with the clinical experience I had obtained at Dianon, along with consultation with the other hematopathologists reinforced my opinion that performing those 26 antibodies was absolutely necessary to provide adequate patient care. I informed the Dianon business representative that I did not care what antibodies they elected to charge or not charge-for, we would not compromise patient care by restricting our ability to fully examine patient specimens. Subsequently, I learned that the management of Dianon concluded that our rationale for the testing was appropriate and had determined that while 26 antibodies should be performed and would continue to be performed that it was considering billing for fewer antibodies to avoid any possible dispute with the carrier. In other words, the representatives of the corporation elected to support optimal patient care rather than economic benefits. Hence, I was asked to identify those antibodies that any responsible payor with knowledge of the complexities of modern hematopathology would agree were essential and for which they could never question medical necessity. After consulting with the hematopathology staff, I identified those antibodies in a June 17, 1997 memo, which happened to number 18. *See* Exhibit 4. I understand that it is the government's position that this memo constitutes Dianon's admission that only 18 antibodies are

"essential" and that, by implication, the additional 8 antibodies performed are "non-essential." This viewpoint is absolutely false. I simply identified those antibodies that no hematopathologist with the training and experience that were linked with the number of specimens that we examined could question; this was simply an attempt to avoid what we perceived to be harassment by payers regarding our medical judgment concerning what constituted appropriate medical care. However, although a business decision was made to bill for 18 antibodies, the hematopathology staff continued to perform all 26 antibodies because 26 was indeed medically indicated and necessary. In fact, it was not uncommon to perform more than 26 antibodies in some situations. That is absolute proof we believed that 26 was medically indicated and necessary. Even though Dianon was not compensated for performing those 8 additional antibodies and even though performing these antibodies required the hematopathology staff to work more and review more documents, we were unwilling to compromise patient care for economic benefits. Indeed, in my view, use of a restricted panel of antibodies to diagnose a complex hematologic disorder is analogous to a patient with potential heart disease who goes to a cardiologist who decides to limit the examination by performing only 3- of the 12-leads of an electrocardiogram. Failure to fully examine the patient's hematologic disease is also equivalent to a cardiologist examining a patient with atrial fibrillation prior to cardioversion with only a transthoracic echocardiogram. It is not good enough to be right most of the time. Failure to fully employ all of the diagnostic tools, such as transesophageal echocardiography, to detect a left atrial thrombus in this condition impairs healthcare outcomes and compromises patient care. Forcing the hematopathologists to compromise our practice of medicine would probably have led to wholesale resignations of the Dianon hematopathology staff: a group of physicians who continue to practice the highest standards of hematopathology in a difficult environment.

I have reviewed this declaration and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Richert E. Goyette, M.D.