UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DR. JAMES J. TIESINGA, <br><br> Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br> Defendant. | No. 3:02 CV 1573(MRK) <br><br> October 27, 2006 |

**AFFIDAVIT OF DR. JAMES TIESINGA**

1. I am over eighteen (18) years of age. I am also a Board-certified hematopathologist.

2. On or about July 2001, I was hired by Dianon Systems, Inc. as a Staff Pathologist specializing in "flow cytometry" and other blood-related pathology services.

3. On or about March 18, 2002, I was offered the position of "Hematopathology Medical Director of Oklahoma Operations" for a facility the company recently had acquired in Oklahoma City ("UroCor"). According to the terms of that offer, my responsibilities as Medical Director would include helping the company establish a flow cytometry laboratory at UroCor.

4. I accepted the company's offer and, upon doing so, was instructed to report to James B. Amberson, M.D., Dianon's Chief Medical Officer and Executive Medical Director of Hematopathology. Dr. Amberson told me he was spearheading the company's efforts to develop the new laboratory. At Dr. Amberson's request, I immediately began recruiting a team of doctors and laboratory personnel for the UroCor

facility.

5.  In early April 2002, I was approached by Steven Gersen, Ph.D., a Vice President for the company. Dr. Gersen told me that Dianon had a big problem. He explained that someone in the billing department at Dianon had just discovered that reimbursement for flow cytometry in Oklahoma was much less than it was in Connecticut. I asked Dr Gersen what that discovery meant for the future of the new laboratory. Dr. Gersen told me management was planning a meeting within the next few days to discuss the matter.

6.  On or around April 9, 2002, I attended a meeting held in one of the executive offices at Dianon. Dr. Gersen, Dr. Amberson and Ms. Valerie Palmieri, Senior Vice President of Operations for the company, were present at the meeting when I arrived. I recall they were discussing how it was the company had come to discover reimbursement in Oklahoma was lower than it was in Connecticut, and what that lower reimbursement was. Ms. Palmieri said she thought the reimbursement was ten antibodies, based on information provided by Bob Tucciaroni in the billing department. Mr. Tucciaroni joined the meeting and told us he had read or heard that reimbursement in Oklahoma was ten antibodies; however, he was having trouble confirming that on the Blue Cross Blue Shield website.

7.  Mr. Tucciaroni left the room, and Ms. Palmieri immediately expressed her opinion it would not be in the company's financial interest to establish a flow cytometry laboratory in Oklahoma if reimbursement was, in fact, ten antibodies. Dr. Gersen reminded Ms. Palmieri Dianon had committed itself to establishing a flow cytometry laboratory in Oklahoma, funds had been allocated for that purpose and people had been

recruited to oversee the development and operation of that laboratory. Dr. Amberson pointed out that no one at Dianon knew what the reimbursement policy for flow cytometry in Oklahoma actually was. Consequently, Dr. Amberson encouraged management to send representatives to Oklahoma to meet the state Medical Director and determine the details of that policy. Ms. Palmieri then asked if anyone knew who the Oklahoma Medical Director was. Someone suggested that Dr. Gerard O'Dowd, a physician at UroCor, must know. Ms. Palmieri instructed me to call Dr. O'Dowd and find out that information.

8. On or around April 10, 2002, I attended another meeting, this time in the company's main conference room to discuss meeting with the Medical Director in Oklahoma. Dr. Amberson, Dr. Gersen, Ms. Palmieri and Todd Homan, a company manager in Sales and Marketing, were also present. At the start of the meeting, Ms. Palmieri expressed her concern over sending company representatives to meet with the Oklahoma Medical Director, since he might be inclined to communicate with the Medical Director in Connecticut, Dr. Delli-Carpini, to ascertain the justification for Connecticut's liberal reimbursement policy for flow cytometry. Specifically, Ms. Palmieri was concerned that after Dr. Gilson spoke with Dr. Delli-Carpini, Connecticut might lower its antibody reimbursement. I told the group I had tried to contact Dr. O'Dowd the day before, to enquire who the Oklahoma Medical Director was, but I had been unable to speak with him in person. Instead, I had left a telephone message for Dr. O'Dowd informing him there was a difference in reimbursement for flow cytometry between Oklahoma and Connecticut, and asking him for the Medical Director's contact information. I told the group Dr. O'Dowd had returned my call that very morning to tell

me Dr. Mayo Gilson was the Oklahoma Medical Director. Dr. O'Dowd told me he had just spoken with Dr. Gilson himself, to inform Dr. Gilson Dianon would contact him shortly to discuss flow cytometry reimbursement issues. Ms. Palmieri reacted angrily to the fact Dr. O'Dowd had intervened in the matter with Dr. Gilson, noting that we now had to meet with Dr. Gilson. The decision was made that Dr. Gersen, Mr. Homan and I would travel to Oklahoma City later that month to meet Dr. Gilson in person.

9.  Dr. Gersen, Mr. Homan and I met again on or around April 24, 2002, in Dr. Gersen's office, to discuss the pending trip to Oklahoma and our presentation to Dr. Gilson. We agreed the purpose of our trip was a "fact finding mission" to determine the flow cytometry reimbursement policy in Oklahoma. Dr. Gersen, Mr. Homan and I flew to Oklahoma City on April 28, 2002, and met with Dr. Gilson the following morning, Monday, April 29. The meeting was brief. Dr. Gersen began the conversation by providing background information regarding the company. Dr. Gersen and Mr. Homan also described the company's medical testing markets. Dr. Gersen eventually brought up the flow cytometry reimbursement issue. He told Dr. Gilson the company understood the number of reimbursable antibodies per case to be ten, and he asked Dr. Gilson for confirmation. For his part, Dr. Gilson explained he was an obstetrician, and therefore, rather unfamiliar with the flow cytometry test; he thought the reimbursement was fifteen antibodies, but he wasn't sure. Dr. Gilson told us the Local Medical Review Policy (LMRP) for flow cytometry was currently being reviewed by a five-member Carrier Advisory Committee chaired by Lynn Hickman, M.D., Medical Director of Louisiana. He also informed us of an upcoming Public Forum regarding that LMRP to be held on or around July 16, 2002, which the company was welcome to attend. Otherwise, he

instructed us to direct all questions concerning flow cytometry to Dr. Hickman, and also to Brent Hartsell, M.D., former President of the Oklahoma State Association of Pathologists and chief advisor to the LMRP Carrier Advisory Committee. Dr. Gilson gave me contact information for Drs. Hickman and Hartsell.

10. On Friday, May 3, 2002, just days after my return from Oklahoma City, I called Dr. Hickman, Medical Director of Louisiana, from my office at DIANON. I explained I was calling at the request of Dr. Gilson to determine the reimbursement policy for flow cytometry in Oklahoma. We spoke for a few minutes; it quickly became apparent to Dr. Hickman that I did not understand Medicare's rules of reimbursement. Dr. Hickman said, "Son, let me tell you how Medicare works." He then explained Medicare reimburses only for services that are medically necessary for the patient. Dr. Hickman told me the number of reimbursable antibodies allowable under Medicare is a "capitation." He asked me if I understood what that meant and I said "No." Dr. Hickman said the Medicare Carrier establishes a capitation on the *maximum* number of antibodies it is willing to reimburse per case. He explained that they did not believe that more than fifteen antibodies would be required in the vast majority of cases. While there might be a few cases requiring more than fifteen antibodies, additional documentation must be provided to Medicare showing why it was medically necessary to utilize extra antibodies. I asked Dr. Hickman what he thought about Connecticut's capitation of 26 antibodies. He told me that the Carrier Advisory Committee was in the process of reviewing the LMRP for flow cytometry, and would - as a matter of course - review its current policy of a fifteen antibody capitation. He told me that it was unlikely the number would change to anything as high as 26.

5

11. Following my conversation with Dr. Hickman, I immediately called Dr. Hartsell, former president of the Oklahoma State Association of Pathologists. Dr. Hartsell reiterated many of the things Dr. Hickman told me, including the fact that Medicare only reimburses for medically necessary tests. He also said he had been influential in establishing the fifteen antibody capitation for the region. He told me that he had been practicing flow cytometry for many years and he rarely, if ever, needed to perform 26 antibodies on a case. Once in awhile, 18, 19, maybe even 20, but he said he couldn't think of the last time he needed so many antibodies to diagnose a case. In his experience, ten to fifteen antibodies is all that is medically necessary in the overwhelming majority of cases.

12. The following week, on or shortly after Monday, May 6, 2002, Dr. Amberson asked me how my recent conversations with Drs. Hickman and Hartsell had gone. I repeated what Drs. Hickman and Hartsell told me. I also told Dr. Amberson that I had just learned that Medicare only reimbursed for medically necessary tests. Dr. Amberson told me that Dianon was billing Medicare for the full panel of 26 antibodies in every case. He also told me that he realized that the entire panel was not necessary in all cases. He said it would be too expensive for us at this stage of the game to alter our computer reporting system and our billing system. He said we can't afford to do that, so that's why we bill for the full panel.

13. I knew the company management was planning a meeting to discuss the fate of the new UroCor facility. In preparation for that meeting, I decided to compile data to confirm or exclude what Drs. Hickman and Hartsell had told me, specifically, that no more than fifteen antibodies was medically necessary to analyze the vast majority of flow

cytometry cases.

14. I began to look at flow cytometry cases sent to Dianon during the week of May 6, and during the preceding week. Those cases were readily available, and I reviewed them for one or two hours each evening, after work, for about one week. I recall dividing cases into diagnostic categories based on the clinical question being asked by the ordering physician; I also recall reviewing the diagnoses made on those cases by the Dianon pathologist. Based on my data, I determined a 26 antibody panel was not medically necessary to analyze most cases. In fact, only ten to fifteen antibodies were medically necessary in the vast majority of cases. I compiled my notes into a report that I intended to present at the company's upcoming meeting to discuss the fate of the UroCor laboratory.

15. Management held a meeting in Dr. Gersen's office on May 14, 2002. Dr. Gersen, Mr. Homan and Martin Stefanelli, Dianon's Senior Vice President of Sales, Marketing and Business Development, were present when I arrived. Dr. Gersen was calculating how much money Dianon made when it billed for the full 26-antibody panel and how much money Dianon would make if it performed that same test in Oklahoma billing for a full panel of only fifteen antibodies. Ms. Palmieri and Dr. Amberson arrived shortly after I did, and Dr. Gersen shared his calculations with them. Mr. Stefanelli said that if the company was successful in reaching its objective of having all flow cytometry cases from the West, Midwest and Southwest transferred to Oklahoma City, the company would lose hundreds of thousands of dollars.

16. The meeting then turned to a discussion of whether new growth in business would offset the loss of Medicare reimbursement. The group discussed whether

it was possible to determine which states had the highest percentage of Medicare patients so that specimens from those states could be routed to Connecticut. The group also discussed the possibility of doing the same analysis on a client-by-client basis and routing specimens from clients with the most Medicare patients to Connecticut.

17. I reported what I had learned from Drs. Hickman and Hartsell, and I presented the conclusions of my own study that showed no more than fifteen antibodies was medically necessary to analyze the overwhelming majority of flow cytometry cases. Dr. Amberson said that while he knew that all 26 antibodies were not necessary in all cases there could be no difference in a report generated at Stratford and a report generated at UroCor. In other words, Dianon couldn't use 26 antibodies in Stratford and fifteen antibodies in Oklahoma City. He said that if I got sick and cases had to be rerouted to Stratford, those cases can't differ from one region to the other. It has to be "seamless reporting." Dr. Amberson also said that making changes to our system - our computer generated billing and the way the reports are generated - would be far too costly for us to do.

18. On May 15, 2002, Dr. Amberson informed me the start date for the UroCor facility had been pushed back to late October 2002, and on May 22, Dr. Amberson advised me the company no longer considered me to be "Director material." The following day, May 23, I was placed on paid suspension from Saturday, May 25 to Monday, June 3. Shortly after my suspension, I resigned from DIANON due to the intolerable conditions of my employment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

*James J. Tiesinga, M.D.* (signature)    JAMES J. TIESINGA, M.D.

*Heather Tinoco* (signature)

Notary Public
HEATHER MARIE TINOCO
State of Alaska
My Commission Expires August 10, 2009