UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DR. JAMES J. TIESINGA, <br><br> Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 3:02CV1573(MRK) <br> ) <br> ) <br> ) <br> ) |

**DIANON'S REPLY TO THE UNITED STATES' OPPOSITION TO ITS MOTION TO EXCLUDE THE OPINIONS OF STUART FLYNN, M.D.**

**I.   OVERVIEW**

According to the government, Dr. Flynn determined the medical necessity of antibodies Dianon utilized in its flow cytometry testing based upon his experience and use of a "widely recognized" methodology. Plaintiff's Opposition to Motion to Exclude the Opinions of Dr. Flynn ("Opposition") at 19, 26. Both assertions are incorrect because: (1) Dr. Flynn's review contradicted his medical practice and the sole article he co-authored on flow cytometry; and (2) Dr. Flynn does not articulate consistent standards that were consistently applied to the patient testing he reviewed.

In addition, Dr. Flynn's opinions do not "fit" the government's False Claims Act case. A False Claims Act case requires more than proof of negligence, it requires proof of knowing, wrongful conduct. False Claims Act liability must rest on objective falsity, not the unsupported, untested, unpublished opinion of one doctor.

**II.   UNREBUTTED FACTS**

The government's Opposition does little to support Dr. Flynn's methodology, fails to address most of Dianon's factual assertions, and relies upon bald assertions and

conclusory statements. The following unrebutted facts show that Dr. Flynn's opinions in this case contradict his medical practice and experience (1-5) and Dr. Flynn failed to use a scientific methodology that meets the *Daubert* standards (6-7). The government makes no effort to rebut the following facts:

1. A flow cytometry test must be validated before use on a patient. Dianon Memorandum in Support of Motion to Exclude the Opinions of Stuart Flynn, M.D. ("Dianon Memorandum") at 2, 4 and Exhibit 6 attached thereto, Opposition Exhibit 18, *Exhibits 1-3* (antibody panel combinations for Emory University, University of Florida Shands Hospital, and the National Institute of Health).

2. In this case, Dr. Flynn did not provide a set of standards whereby he designed combinations of two or more antibodies to be mixed in test tubes and used under specific circumstances. Dianon Memorandum at 2, 4, see also 42 CFR §493.1407(e)(3) (laboratory director must ensure that testing is verifiable, accurate, and reliable).

3. Dr. Flynn utilized a set, standard antibody panel in his flow cytometry lab for all cases – the opposite of his opinions in this case. Dianon Memorandum at 7, 12.

4. Dr. Flynn's published opinion that CD2, CD7, and CD22 were medically necessary in <u>all</u> cases of lymphoma contradicts his opinions in this case[1]. Dianon Memorandum at 13.

5. Dr. Flynn's opinion that CD2, CD7, CD16, Kappa and Lambda are medically unnecessary in acute leukemia cases contradicts his consultation with Yale New Haven Hospital's (YNHH) practice. Dianon Memorandum at 14.

---

[1] The government tries to distinguish Dr. Flynn's article from this case by asserting that these antibodies were used in "second and follow-up" tests. This is a distinction without a difference. Regardless of *how* the antibodies were utilized, the authors utilized them in every case to diagnose the patient's condition. *Exhibit 4*, Deposition of Dr. Flynn at 223:6 – 225:18.

6. Dr. Flynn does not follow his stated methodology in many cases he reviewed. Dianon Memorandum at 14-18.

7. Dr. Flynn "designed" varying panels of antibodies for the same medical condition based upon unstated, unknown factors contained in a patient's medical records. Dianon Memorandum at 16-18.

## III. ARGUMENT

### A. The government's theory of this case does not reflect medical reality.

As with any diagnostic test, flow cytometry is designed to help diagnose a patient's disease process – in this case blood disorders. Dr. Stetler-Stevenson, the director of the government's premier flow cytometry laboratory and government designee, testified that unless she has made a diagnosis, she considers the patient's disease process "unknown." *Exhibit 5*, Deposition of Dr. Stetler Stevenson at 77:11 – 13, 123: 9-17. Dr. Stetler Stevenson's "unknown" panel has 31 antibodies (including 25 of the 26 antibodies Dianon utilized) because she believes they are medically necessary to render an accurate diagnosis. *Id.* at 86:3-13, *Exhibit 3* ("unknown" flow cytometry panel). Dr. Stetler-Stevenson includes an array of antibodies to detect numerous blood disorders because a clinician's suspicions are not always correct and she is making life and death decisions for patients. *Id.* at 106:10 – 107:8, 109: 5-15, 120: 3-13.

Contradicting both basic medical practice *and its own designee,* the Justice Department asserts the role of flow cytometry is "aimed at identifying the type of cancer *suspected* by the treating physician." (emphasis supplied) Opposition at 3-4. A referring physician does not order a test to confirm whether she is right or wrong, but to find out

what is wrong with the patient.[2] Even Dr. Flynn's definition of medical necessity for flow cytometry testing contradicts the government's theory:

> ...in the context of a given patient or in this case a given patient disease entity process and the antibodies that allow me to address *not only that question but also assure for diseases that have some likelihood of overlap* that I also at least can address the possibility that that's an issue.

*Exhibit 4* at 140:6 – 14 (emphasis supplied), *see also* 120: 6-21 (there is a "broad universe of differential diagnoses" for flow cytometry), 127:4 – 129:14 (acute leukemia in the differential diagnosis for suspicion of lymphoma). The limited inquiry the government suggests, either confirm or deny the clinician's leading hypothesis or suspicion, is not supported by medical literature, its own expert, or common sense.

Dianon did not attempt "to exclude any other form of cancer that a patient may possibly have," such as lung cancer, brain cancer, or gastrointestinal cancer, as the government asserts. Opposition at 4. Rather, Dianon's diagnostic test specifically targeted blood disorders where the only information presented to Dianon was a suspected blood disorder and an abnormal blood test result. See Opposition at 2 (treating physician provides Dianon a diagnosis code and a blood test result). By definition Dianon did not perform a "screening test," i.e. a test performed on a healthy patient absent signs or symptoms, as the government alleges. Opposition at 4-5, n.4, *See,* 63 Fed. Reg. 30,166, 30,171 (June 3, 1998) (definition of screening test). Dianon <u>must</u> consider numerous blood disorders because approximately 5% of patients have co-morbid (two or more) blood disorders. *Exhibit 9,* Deposition of Dr. Holden at 76:20 – 77:6.

---

[2] A clinician has a differential diagnosis for a patient with a "leading hypothesis" and "active alternatives" to the leading hypothesis. *Exhibit 6*, Richardson, W., et al., *How to Use an Article About Disease Probability for Differential Diagnosis*, JAMA 281:1214-1219 (1999) at 1215, Table 1 cited as "Suggested Reading" in *Exhibit 7*, January 12, 2006 Medicare Coverage Advisory Committee Operations and Methodology Subcommittee at 11, *Exhibit 8*, Deposition of Raul Braylan, M.D. at 43:18 – 45:24.

-4-

Leaping from the government's untenable and unsupported overarching theory, the government further alleges: (1) Dr. Flynn reviewed numerous records and relied on his experience to reach his conclusions; (2) his methodology is widely accepted; and (3) Dr. Flynn's "detailed" methodology is straight-forward and sufficiently explained. Opposition at 8-10, 12-13. These assertions are either irrelevant (what Dr. Flynn reviewed), unsupported (that his methodology is widely accepted), or overstated (Dr. Flynn's methodology is straight-forward). *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1316 (9th Cir. 1995) *on remand* (An expert's bald assurances of validity are not enough).

### B. Dr. Flynn's opinions are not consistent with his medical practice or experience, but created solely for this litigation.

Dr. Flynn created a "one-size-fits-all" antibody panel in his own flow cytometry laboratory and did not select antibodies based upon a patient's clinical information. Dianon Memorandum at 7, *Exhibit 4* at 64:4-12, 88: 7-17. Dr. Flynn's "experience" in designing a one-size-fits-all panel does not reflect his opinions in this case. *See, Id.* at 7 (patients suspected of having lymphoma receive 12 to 25 antibodies), 16 (chronic myelogenous leukemia receive 11 to 18 antibodies, acute myelogenous leukemia 10 to 22 antibodies), and 17 (anemia 11 to 24 antibodies). Dr. Flynn does not explain why his methodology in this case differs from his practice or the variability of his panel designs. *Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d at 1316-18 (Proffering party must present objective validation of expert's methodology and explanation on how he reached his conclusions), *Awad v. Merck & Co., Inc.,* 99 F.Supp.2d 301, 304, 307 (S.D.N.Y. 1999) (Failure to produce testable theory or reasons for conclusions grounds for exclusion).

Dr. Flynn also consulted with Yale New Haven Hospital (YNHH) in cases where a clinician suspected acute leukemia. *Exhibit 4* at 55:13 – 57:21, 69: 11-13. Yet Dr. Flynn excluded numerous antibodies YNHH utilized in addressing patients with suspected acute leukemia. Dianon Memorandum at 14-15. For lymphoma cases, Dr. Flynn's only published article shows that three antibodies Dianon routinely used (CD2, CD7, CD22) were also utilized at Yale in all 39 cases of suspected lymphoma or chronic lymphocytic leukemia (CLL) to diagnose the patients. Dianon Memorandum at 13-14, *Exhibit 4* at 223:6 – 225:18, 228:18 – 233:8. Yet in this case, Dr. Flynn found these same antibodies medically unnecessary in virtually every case of suspected lymphoma or CLL he reviewed. *Id.*

None of Dr. Flynn's litigation standards or opinions have been published or subjected to the peer review process. *Raynor v. Merrell Pharmaceuticals Inc.*, 104 F.3d 1371, 1375 (D.C.Cir. 1997) (None of excluded expert opinions subject to peer review, conclusions drawn solely for litigation purposes). Dr. Flynn created his standards of including or excluding antibodies solely for this litigation. The methods he describes have not been put to a non-judicial use, tested through peer review, and do not exhibit "the same level of intellectual rigor" as the practice of flow cytometry in the field. *Perkins v. Origin MedSystems, Inc.* 299 F.Supp.2d 45, 53-54 (D.Conn. 2004).

Finally, Dr. Flynn's determination of medical necessity using unspecified clinical information provides no real standards for a laboratory or this Court to assess reliability. Opposition at 13, *Exhibit 10,* Dr. Flynn report at 3-6. Flow cytometry tests require set, validated protocols to ensure quality results, verification procedures to determine accuracy, and assurances that lab personnel are reliably performing the test. 42 C.F.R. §493.1407(e)(3)(i-iii), Dianon Memorandum at 2, 4, *Daubert v. Merrell Dow Pharms.,*

-6-

*Inc.*, 509 U.S. 579, 590 (1993) (scientific method requires validation). Every test using different antibody combinations has to be independently validated before being used on patients. If a panel is designed specific to each patient's symptoms, each patient test would have to be independently validated. Neither Dr. Flynn's laboratory nor any other laboratory "reinvents the wheel" each time it performs flow cytometry.

### C. When Dr. Flynn stated specific standards for antibody selection they were either contradictory or he did not follow them.

Dr. Flynn's "methodology" either does not provide set standards or, when it does, he does not adhere to them. Dianon Memorandum at 14-18. Dr. Flynn could not even reproduce his <u>standards</u>, let alone the application of those standards to individual patients. *Id.* The Government asserts that Dr. Flynn's methodology of reviewing clinical information to determine appropriate antibodies on a patient-by-patient basis is widely recognized. Opposition at 26. However, this is not a "methodology" at all, i.e., "a body of methods, rules and postulates employed by a discipline: a particular procedure or set of procedures." Webster's New Collegiate Dictionary (1979), *Joiner v. General Electric,* 78 F.3d 524, 532 (11th Cir. 1996) *rev'd on other grounds,* 522 U.S. 136 (1997) (issue is whether the expert's <u>use</u> of information to formulate his opinion is methodologically sound).

Dianon challenges the standards Dr. Flynn employed to determine medical necessity, not the information he reviewed. As Dianon demonstrated, Dr. Flynn's standards in his report differed from those stated in his deposition (Dianon Memorandum at 14), are too vague to be consistently applied (*Id.* at 15), or were applied inconsistently (*Id.* at 16-18). *Ruffin v. Shaw Industries, Inc.* 149 F.3d 294, 297 (4th Cir. 1998) (the "key question" in determining scientific reliability is whether the theory has been tested and

BA2DOCS1\#305579

independently validated or replicated), *Pick v. American Medical Systems, Inc.*, 958 F.Supp. 1151, 1158 n.19 (E.D. La. 1997) (peer review means the scientific hypothesis is subjected to independent evaluation through testing and replication of results).

### D. Dr. Flynn's opinions do not fit the government's Medicare fraud case.

Dr. Flynn's alleged methodology does not "fit" the government's case. The government concedes that the meaning of the term "medically necessary" as it relates to flow cytometry antibody panel design is contained in: (1) statutes and regulations; (2) Local Medical Review Policies and Local Coverage Determinations; and (3) medical literature, i.e. published sources. *Exhibit 11*, Government Answer to Interrogatory 16. The government does not rely on any of these sources to support Dr. Flynn's opinions. Neither the government nor Dr. Flynn provide any objective medical support for any of Dr. Flynn's conclusions that certain antibodies are not medically indicated under certain conditions. For example, Dr. Flynn notes in his report:

> *I believe* that the T cell antibodies anti-CD2 and CD7 and the B cell antibody anti CD22 are not of sufficient diagnostic value to include in the panel and, therefore, were not medically necessary. Additionally, the myeloid antibodies anti CD13, and CD33, HLA-DR, CD57, and CD34 *were also felt* to not have significant diagnostic merit and, therefore, were not medically necessary.

*Exhibit 10* at 3, *see also* at 3-6 (no medical justification or explanation why certain antibodies are unnecessary). Dr. Flynn provides no rationale or support for his "belief" or "feeling" that the above listed antibodies are inappropriate for suspected lymphoma analysis (although his sole published article refutes the above statement).

The government has produced no evidence that Medicare notified laboratories that "Dr. Flynn's methodology is the only analysis consistent with the rules governing federal health care programs" – *contradicting its own Answer to Interrogatory*. Opposition at 12, *Exhibit 11*, Answer to Interrogatory 16. Conversely, Dianon has

provided numerous publications (including a "U.S. Government work" co-authored by Dr. Stetler Stevenson and a book that formed the basis of Connecticut's flow cytometry policy) as well as expert opinions (including the government's designee on flow cytometry antibody panel design) that state the opposite: selecting antibodies tailored to a particular disease is hazardous and endangers patient health. Dianon Memorandum at 11-12, *Exhibit 12* (Purpose of Local Coverage Determination is to "provide references upon which a policy is based").

The government's logic in this case leads to absurd results. According to the government, it can pursue a Medicare fraud case based on the unsupported opinions and experience of one doctor despite the fact that: (1) that expert's opinions have never been published or peer-reviewed; (2) the government never adopted the expert's unpublished opinions or notified health care providers that it favored them; (3) the government published a policy based upon literature refuting the expert's opinions; and (4) the published literature and leading experts support the health care provider's medical practices. Dr. Flynn's opinions, at most, can provide evidence of one approach to flow cytometry testing, albeit a criticized, unpublished approach.

Before the "powerful engine" of False Claims Act liability can be employed, the Court must make a careful assessment of the opinion(s) supporting liability and whether there is a reasoned methodology supporting such liability. *See Joiner v. General Electric Co.,* 522 U.S. 136, 148-49 (1997) (J. Breyer concurring) (noting that the regulatory power of tort liability through expert opinion must be scrutinized so as not to eliminate useful products). Justice Breyer's concerns are particularly appropriate in this case involving more than $100 million in statutory penalties where: (1) a patient can only be helped by thorough testing; and (2) Medicare can, as it recently did, limit payment or

issue guidance on what antibodies it will cover. *See, e.g. Exhibit 5* at 134:19 – 135:12 (Government designee Dr. Stetler-Stevenson agrees the more antibodies used in flow cytometry the "higher the sensitivity of abnormal cell detection").

## IV. CONCLUSION

Since Dr. Flynn: (1) did not utilize his general theory (a series of targeted panels) in his own medical practice; (2) does not provide reasoned, objectively supported bases for his standards of antibody selection; (3) articulates conflicting standards; (4) does not follow his articulated standards for each patient; (5) utilizes unarticulated standards; and (6) has not submitted his general theory or specific standards for peer review, his opinions contain none of the hallmarks of reasoned scientific opinion. *Daubert* 509 U.S. at 593-94. The government has failed to carry its burden to show that Dr. Flynn's opinions are "scientific" in any sense and admit that the term "medically necessary" is defined by *published* sources, not personal opinions.

The government asks this Court to accept Dr. Flynn's inconsistent, unsupported, untested, unpublished opinions where, *on average*, independent reference laboratories like Dianon use more antibodies than Dr. Flynn claims are medically necessary and therefore are committing Medicare fraud. *See Exhibit 13,* Declaration of S. Panis at 5, 7 (59% to 67% of paid flow cytometry claims for leukemia/lymphoma testing submitted by independent laboratories are greater than 16 antibodies, average is 18 to 19.5). For the reasons stated above and in Dianon's Memorandum, Dr. Flynn's opinions are unreliable, do not fit the government's case, contradict both published medical literature and common medical practice and therefore are inadmissible.

WHEREFORE, Dianon requests this Court to exclude Dr. Flynn's opinions in their entirety.

Respectfully submitted,

Bruce R. Parker, admitted pro hac vice
bar no. PHV01015
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400

Robert Salcido, admitted pro hac vice
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of November, 2006, a copy of the foregoing Reply to the United States' Opposition to Motion to Exclude the Opinions of Stuart Flynn, M.D. was sent via U.S. mail, postage prepaid, to:

Richard M. Molot, AUSA
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven CT 06510

Bryan T. Carmody
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880

                                                    Bruce R. Parker