# EXHIBIT 8

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

NO. 3:02 CV 1573(MRK)

UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

      Plaintiff(s),

- vs -

DIANON SYSTEMS, INC.,

      Defendant(s).

---

V I D E O  E X A M I N A T I O N

OF

RAUL C. BRAYLAN, M.D.

| | |
|---|---|
| TAKEN ON BEHALF OF: | The Plaintiff |
| DATE: | June 15, 2006 |
| TIME: | Scheduled start: 9:00 a.m.<br>Actual Start: 9:07 a.m.<br>Conclusion: 12:32 p.m. |
| PLACE: | Unites States Attorney's Office<br>300 West University Avenue<br>Suite 310<br>Gainesville, Florida 32601 |
| REPORTER: | Anne C. Noble, RPR, FPR, CSR-GA, WA<br>Notary Public: Florida and South Carolina |

ADVANTAGE COURT REPORTERS

2291bb67-f68c-4f22-ac73-e80665553f8f

Page 42

1  results rather than select on the -- select on the --
2    (Whereupon, deponent's pages sounds.)
3    MS. DAVIS: Let's go off the record.
4    (Whereupon, there was a pause in the
5  proceedings.)
6   A. Excuse me. The information is mostly to
7  interpret the results and convey to the clinician the
8  appropriate information or to go back and look for
9  something that we did not look at because we didn't
10 have that piece of information. It is not to restrict
11 our panel, unless the number of cells in that sample
12 is insufficient, in which case, we have to determine,
13 in that case, what to do, what is the best panel to
14 use.
15   But the vast majority, if we have enough
16 cells, we just complete -- we do the whole panel for a
17 variety of reasons.
18 BY MS. DAVIS:
19   Q. And those reasons are?
20   A. What?
21   Q. And what reasons are those?
22   A. The other argument that is being proposed is
23 that we need to look at the microscopy, the
24 microscopic findings --
25   MR. PARKER: Didn't she ask you what your reasons

Page 43

1  were for --
2   A. Oh, I'm sorry. I couldn't hear that. My
3  reasons for --
4  BY MS. DAVIS:
5   Q. Reasons for -- in the situation where you
6  have the complete medical background for the patient,
7  and you still do the entire panel.
8   A. Well, it varies with the case. It depends on
9  the situation. But, in general --
10   Q. No; but you just said that it didn't. You
11 just -- even when you open the computer, and you can
12 look at --
13   A. I thought you said the reason for me to --
14 not to --
15   Q. No. You described a situation where you are
16 opening up the records for this type of patient.
17   A. Uh-huh.
18   Q. You have the complete medical history of the
19 patient, all of the tests that have been performed on
20 the patient, what medications have been given to the
21 patient, and despite all that information, you still
22 do the entire panel of antibodies. And you said you
23 had reasons for that. What reasons are those?
24   A. The reasons for using a complete panel -- I
25 consider a complete panel a single test; that each

Page 44

1  individual reagent provides information on a cell
2  type, on a cell stage of maturity, and on the function
3  of the cells and so on. So it gives us a complete
4  panoramic view of the marrow in that particular
5  situation.
6   Then if we have a concern for what we see,
7  then we would add more reagents or maybe we can call
8  the doctor and say, "Look, we're seeing something here
9  that we shouldn't be seeing."
10   So the approach of having a full panel as a
11 single test is something that we have instituted after
12 even trying several times to cut it down in pieces.
13 We found ourselves too often going back to the sample
14 and redoing more of the testing with a consequent
15 waste of time, waste of sample. Particularly after
16 hours, the sample deteriorates. It was more work and
17 more labor and more headaches. We could never
18 determine for sure if something that we are seeing on
19 this particular reagent was right or wrong. We have
20 to have more.
21   So this was several years ago. We decided
22 that that's not the way to go.
23   Now, when we have a full panel, first of all,
24 the diagnosis is complete. Second, the assessment of
25 all the cells in that particular sample -- and, again,

Page 45

1  I repeat this; are very precious samples and cannot be
2  recovered again. These are very difficult diseases
3  that require either very toxic drugs, very difficult
4  drugs for the patient or even transplantation
5  procedures, which are extremely, extremely risky for
6  the patients. We could not afford to miss something.
7  We could not afford to ignore something. We decided
8  that since we have that very precious sample, that is
9  very complex, in a patient with life-threatening
10 diseases, that we need to do our best to simply look
11 at every single aspect of that marrow because marrows
12 can change with treatment, secondary diseases can
13 occur, changes that we did not expect, an infection
14 can occur. Think all kinds of things. So our
15 approach is to simply get as much information as we
16 can once we have that sample in our hands.
17   And this is not going to end here. It's
18 going to continue on because we're getting more and
19 more very informative reagents from genetic studies,
20 from biological studies. So it's not going to be just
21 thirty or forty reagents in the future. It's going to
22 be more. We're just going to have to devise
23 techniques to assemble them and analyze them in a very
24 efficient manner.
25   Q. Now, you said one of the reasons you do the

ADVANTAGE COURT REPORTERS

2291bb67-f68c-4f22-ac73-e80665553f8f