IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. Dr. James J. Tiesinga,<br><br>Plaintiffs,<br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>Defendant. | )<br>)<br>) No. 3:02CV1573(MRK)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE GOVERNMENT'S CLAIMS THAT DEFENDANT'S MEDICAL SERVICES WERE NOT MEDICALLY NECESSARY AND INDICATED**

## TABLE OF CONTENTS

Page No.

I. THE GOVERNMENT HAS NOT DEMONSTRATED GENUINE ISSUES OF MATERIAL FACT REGARDING EITHER FALSITY OR KNOWLEDGE AND HENCE THE COURT SHOULD GRANT DEFENDANT'S MOTION ...................... 1

    A. Dianon's Claims Are Not False As A Matter of Law Because Dianon Complied with the Rules and Regulations Governing the Medicare Program .......................................................................................................... 1

    B. Dianon did not "Knowingly" submit any "False" Claim to the Government ........................................................................................................ 5

II. CONCLUSION ............................................................................................................ 9

## Table of Authorities

Page No.

### Federal Cases

*Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795 (D. Utah 1988)..............................................5

*Gartman v. Sec'y*, 633 F.Supp. 671 (E.D.N.Y. 1986) ................................................................3

*Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996)....................................5

*In re Cardiac Devices Qui Tam Action*, 221 F.R.D. 318 (D. Conn. 2004)...................................5

*Klementowski v. Sec'y*, 801 F.Supp. 1022 (W.D.N.Y. 1992) ......................................................3

*Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034 (N. D. Ill. 1998); aff'd
   183 F.3d 730 (7th Cir. 1999) .................................................................................................5

*State of N.Y. v. Sullivan*, 927 F.2d 57 (2d Cir. 1991)..................................................................3

*United States ex rel. Bettis v. Odebrecht*, 297 F. Supp. 2d 272 (D.D.C. 2004);
   aff'd, 393 F.3d 1321 (D.C. Cir. 2004) ....................................................................................5

*United States ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276 (D.N.M. 2005).......................5

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) .....................5

*United States v. Medica Rents*, 285 F. Supp. 2d 742 (N.D. Tex. 2003) ......................................9

*United States ex rel. Mikes v. Straus*, 84 F. Supp. 2d 427 (S.D.N.Y. 1999); aff'd
   274 F.3d 687 (2d Cir. 2001)...................................................................................................8

*United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868
   (D. Md. 1995) .......................................................................................................................5

*United States ex rel. Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999 (9th Cir. 2002).....................8

*United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619 (S.D. Ohio 2000).......................5

*United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) ..............................................5, 9

*United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822 (W.D. Mich. 2000) ......8

*United States ex rel. Will v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980 (10th Cir. 2005) .............5

*Wang v. FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992) ...............................................................5, 8

I. **THE GOVERNMENT HAS NOT DEMONSTRATED GENUINE ISSUES OF MATERIAL FACT REGARDING EITHER FALSITY OR KNOWLEDGE AND HENCE THE COURT SHOULD GRANT DEFENDANT'S MOTION**

To survive summary judgment, the government must establish a *genuine* issue of material fact that Dianon submitted more than 12,000 "false" claims and "lied" about those claims from 1996 to 2004, which would entitle the government to more than a $125 million dollar judgment. Because the government cannot establish a genuine issue of material fact, the Court should grant Dianon's motion for summary judgment.

A. **Dianon's Claims Are Not False As A Matter of Law Because Dianon Complied with the Rules and Regulations Governing the Medicare Program**

The undisputed facts demonstrate that Dianon's certification of medical necessity was accurate, not false, and that Dianon complied with Medicare rules governing medical necessity.

In determining whether a claim is medically necessary, one must start with the plain language of the physician's certification: "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction." *See* Gov't Opp. Br. at 5 (*quoting* CMS Form 1500). Dianon's claims were medically necessary to the patient's complaint, symptoms, and illness, because the referring physician ordered Dianon's Leukemia/Lymphoma panel based upon the patient's condition, and, as required for payment, pertained to either a provisional diagnosis listed on the Connecticut LMRP's "ICD-9-CM Codes That Support Medical Necessity" for flow cytometry or the patient's confirmed diagnosis. *See* Def.'s Local Rule 56(a)(1) Reply Statement (hereinafter "Def.'s Reply Statement") § III, Response 4. Once hematopathologists receive the physician's order, the uncontested peer reviewed medical literature provides that they may employ one of three methods: "comprehensive approach" (using "antibodies combinations that

1

usually answers most relevant questions"); "screening approach" (using "a minimal 'screening panel' ... followed by a secondary, more through, and specific set of reagents"); or "directed or targeted approach" ("based on the availability of other data such as morphologic or clinical information"). *See id* § II, Response 11. Dianon adopted the comprehensive approach because, as the NIH's Dr. Stetler-Stevenson and Drs. Braylan and Holden testified, it is best at diagnosing patients who may have cancers of the blood or lymph system. *See id.* § II, Response 12-18. Dianon's certification, therefore, is truthful and accurate because those antibodies were used to diagnose the patients who are suspected of or found to have (as reflected in the ICD-9s on the LMRP) a cancer of the blood or lymph system.

Dianon's medical necessity certifications also conformed to Medicare rules. The first two benchmarks the government uses to determine medical necessity are: (1) did CMS address the issue by a National Coverage Determination (here it declined to do so; *see id.* § II, Responses 10, 23); and (2) did the carrier specifically address the issue (here the carrier did not impose a frequency limit).[1]

If CMS and the carrier do not specifically address the issue, then all witnesses agree, the physician may reasonably rely upon peer reviewed medical literature governing the area to determine whether the service is medically necessary. *Id.* § II, Responses 9, 35, 39. Here, it is undisputed that the peer reviewed medical literature supported Dianon's approach. *Id.* § II, Responses 11-19.[2] Moreover, as Dianon pointed out and the government never contested, in

---

[1] To the extent the carrier addressed the issue, it was only to cite to a book that stated that the comprehensive approach was superior to other approaches and endorsed a more extensive panel, a 27 antibody panel, regarding the samples Dianon performed. Def.'s Reply Statement § II, Responses 17 and 39).

[2] While the government concedes, as found by an Administrative Law Judge's ("ALJ") determination in *Impath v. Nat'l Heritage Insur. Co.*, No. 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 at 3-6 (Aug. 27, 2003), peer reviewed medical literature supports the comprehensive approach to flow cytometry, it asserts that that fact is not relevant because the medical literature does not address Medicare billing. *See* Gov't Br. at 15. This is the fatal flaw to the government's case because

2

assessing the physician's exercise of discretion, courts place "extra weight" on the treating physician's judgment.[3] There is no other approach to determining medical necessity but to follow these benchmarks – these objective criteria. Otherwise, as is the case here, physicians would be expected to read government officials' minds regarding what they deem to be the correct practice of medicine and confront a multi-million dollar judgment if they guess wrong.

The only material the government tenders to support its assertion that Dianon's claims are false are general policy statements that Medicare does not cover services that are not tailored toward the patient's signs and symptoms and that this practice resulted in prohibited "screening" of patients. *See* Gov't Opp. at 7. There is no evidence that supports the government's position. First, the services were tailored toward the patient's signs and symptoms because all were suspected or found to have a cancer of the blood or lymph system as reflected in the ICD-9 on the carrier's LMRP; hence, by definition, there was no screening.[4] Second, the government's

---

physicians may reasonably rely upon peer reviewed medical literature (in the absence of any controlling National Coverage Determination or LMRP) when determining medical necessity. First, the government's own expert, its Medical Directors, and an ALJ decision conclude that physicians may take into account medical and scientific literature when making medical necessity determinations. *See* Def.'s Reply Statement, § II, Responses 9, 11, 35. Second, the government points to no rule, regulation, or standard that states that physicians cannot take into account guidance from peer reviewed medical literature in determining what services are medically necessary for a patient – because none exists. Third, the government's position is non-sensical. No one would be in favor of a standard that dictated that physicians should not or cannot rely upon peer reviewed medical literature in determining what is medically necessary to treat their patients and, if the physicians do, they could be held liable for a $100 million dollar judgment as the government contends here.

[3] *See State of N.Y. v. Sullivan*, 927 F.2d 57, 60 (2d Cir. 1991); *Klementowski v. Sec'y*, 801 F.Supp. 1022, 1026 (W.D.N.Y. 1992); *Gartman v. Sec'y*, 633 F.Supp. 671, 680-82 (E.D.N.Y. 1986).

[4] Medicare defines non-covered "screenings" as those services furnished in the absence of signs or symptoms indicating potential illness or injury. *See* 63 Fed. Reg. 30,166, 30,171 (June 3, 1998); *see also* Def.'s Reply Statement, § III, Responses 4, 9. The specimens Dianon receives stem from very invasive procedures. *See* Def.'s Reply Statement § III, Response 9. The government sets forth no evidence that any physician undertook these very invasive dangerous procedures on healthy patients without signs and symptoms so Dianon could run a "screening" flow cytometry test. Because screening did not occur, there was no obligation for Dianon to restrict its bills to only those antibodies that confirmed the patient's diagnosis because Medicare reimbursement, as both the government's expert testified and the ALJ ruled in *Impath*, can be based upon the patient's suspected diagnosis at the time the service is ordered, and not the result of the service. *See id.* § II, Response 22. Moreover, although the government tries to make an issue of the fact that Dianon uses one panel, only one panel is needed, because 97.7 percent of Dianon's samples are of one specimen type, blood and bone marrow, a fact the government does not contest. *See id* § II, Response 42. Finally, contrary to the government's contention, Dianon did employ medical judgment to place

3

essential contention is that physicians practicing medicine in this area should use the "directed or targeted approach," which is based on the availability of other data such as morphologic or clinical information. However, leading experts, including the NIH's Dr. Stetler-Stevenson, testified that this approach is "dangerous" and could result in patient death. *See* Def.'s Reply Statement § II, Responses 13 and 20.

Finally, the government protests that Dianon's position cannot be correct because it is over-inclusive. That is, if Dianon's position were correct, then no one could be sued under the FCA. For example, the government posits what if Dianon had billed for 45 or 60 antibodies instead; under its theory, it would not be liable. *See* Gov't Opp. at 13.

The government is wrong. First, Dianon's claims would have been false if the carrier had a frequency limit and Dianon exceeded that limit. Second, Dianon would potentially be liable if someone from the government (CMS, TriCare, the carrier) had informed it, orally or in writing, that its claims were wrong. Here, it is undisputed that no one did. *See* Def.'s Reply Statement § II, Responses 34, 36, 38. Third, Dianon's claim would be false if reasonable experts did not support it. Here, the opposite is true. The leading experts (both the government's leading expert and private experts) have tripped over themselves to support Dianon's position, because the Department of Justice's method of practicing medicine would harm patients. *Id.* § II, Responses 12-22.

In sum, experts disagree regarding how to furnish flow cytometry in the most effective and efficient manner. *Id.* Dianon supplied to this Court a substantial body of case law (a dozen FCA cases) where courts uniformly rule that when the government's rule or regulation calls for

---

only antibodies on its panel that were needed in each case. As Dr. Mishalani testified, Dianon could have placed several additional antibodies on its panel but elected not to because those antibodies were not needed in each case. *See id* § II, Response 29.

4

an exercise of discretion (such as what service is medically necessary), and the defendant's exercise of discretion falls within the range of reasonableness, and the government has never notified the defendant that it has a different viewpoint, then there can be no falsity as a matter of law.[5] Here, the government does not point to an alternate body of case law, because none exists. Accordingly, because Dianon exercised reasonable judgment in furnishing patient care, the government cannot establish falsity as a matter of law.

**B.    Dianon did not "Knowingly" submit any "False" Claim to the Government**

As defendant pointed out and the government does not contest, under this circuit's authority, the government must establish that defendant's conduct resulted from "lies," and not, at worst, negligence or honest mistakes. *See In Re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 339 (D. Conn. 2004).[6] Because the government does not create a genuine issue of material fact that Dianon lied about each of the 12,000 alleged false claims it submitted to the government, the Court should grant Dianon's motion.

First, as proof of a "lie," the government points to Dr. Goyette's memo stating, in part, that "we believe that the following 18 antibodies are essential for the accurate and complete initial work up of flow cytometry specimens. . ." *See* Gov't Opp. at 8, 20. Both evidence and

---

[5] *See, e.g., United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996); *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992); *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000); *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1047 (N. D. Ill. 1998), *aff'd*, 183 F.3d 730 (7th Cir. 1999); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 886 (D. Md. 1995); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (D. Utah 1988); *see also United States ex rel. Will v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 982 (10th Cir. 2005); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006); *United States ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276, 1288 (D.N.M. 2005); *United States ex rel. Bettis v. Odebrecht*, 297 F. Supp. 2d 272, 294-95 (D.D.C. 2004), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2004).

[6] Dianon cited a substantial body of case law ruling that defendants do not violate the FCA if they act in good faith or act within a reasonable interpretation of ambiguous regulations. *See* Def.'s Mot. for Summary J. at 12-13. The government does not try to distinguish these cases. Thus, if at worst, any genuine disputed fact showed that Dianon's claims were "false" but that Dianon acted in good faith or had a reasonable interpretation of ambiguous regulatory guidance, the Court should grant Dianon's motion.

5

logic undermine the government's contention. As to evidence, there is no testimonial support for the government's interpretation. *See* Def.'s Reply Statement § II, Response 32; § III, Responses 20-24. As to logic, as the defendant pointed out and the government in its opposition never tries to rebut, if the hematopathologists really believed only 18 antibodies were medically necessary, it would be illogical for the company to continue to perform 26 antibodies in each case and incur the substantial costs with doing so unless, as they testified, the hematopathologists insisted upon 26 because it was medically necessary in each case. *Id.* Indeed, the best, most tangible evidence of the hematopathologist's genuine good faith belief in the necessity of performing the panel (aside from their testimony) is the fact that they always performed 26 even though the company only billed for 18.

Second, the government states that Dianon's lie is reflected in that the hematopathologists knew little about billing and that the marketing and sales force was interested in increasing sales. *See* Gov't Opp. at 20-23. The government, however, points to no evidence of a "lie" regarding medical necessity. All witnesses who were at Dianon at the time the panel was created (whether present or former employees, whether from operations, management or clinicians) uniformly testified that the hematopathologists created the panel solely based upon medical judgment. *See* Def.'s Reply Statement § II, Responses 25-32; § III, Responses 17-26. From 1997 to the present date, Dianon has used a 26 antibody panel to test for cancers of the blood or lymph system. The number has remained the same regardless of amendments to CMS reimbursement policies, revisions in the Medicare fee schedule, changes in ownership, or whether the payor was Medicare, Medicaid, commercial, self-pay or charity care. The panel size has stayed the same notwithstanding regulatory revisions, billing changes, price revisions, or marketing initiatives, because the physicians (as supported by the government's leading expert, peer reviewed medical

6

literature, and the only ALJ decision on point) believe it to be medically necessary and indicated to treat the patient.[7]

Third, as a lie, the government points to the relator's alleged disclosure, in 2002, to Dr. Amberson that the relator did not believe that the services were medically necessary and Dr. Amberson's alleged agreement. See Gov't Opp. Br. 24. As an initial matter, neither the relator nor the government tenders any corroborating evidence because none exists.[8] However, even assuming facts most favorable to the government, this contention does not create a triable issue of fact because, even under relator's facts, there is no evidence that Dianon "knew" that its claims were "false."

Dr. Amberson is not a hematopathologist and did not design Dianon's panel nor did he have a role in determining which antibodies to place on the panel, a decision initially made by Drs. Goyette and Connor and later Drs. Segal and Mishalani. See Def.'s Reply Statement § III, Responses 28, 30. At worst, all the relator's allegation amounts to is his belief that comprehensive panels result in the submission of medically unnecessary services and that Dr. Amberson agreed. All this means is that aligned on one side of the debate regarding the medical necessity of comprehensive panels are Dr. Stetler-Stevenson (who uses more antibodies), Drs. Braylan, Holden, Goyette, Connor, Mishalani, Segal, and an ALJ decision (*Impath*), and, on the other side, Drs. Flynn, Tiesinga, and, at worst, Amberson. Neither side can "know" that the other is wrong – it is a debated scientific and medical issue. The only way in which one could "know"

---

[7] While the government makes much of the fact that Dianon went from billing 8 antibodies to 26 in 1996, what it does not explain is that at that time Dianon was already performing more than 20 antibodies and only billing for 8. See id § III, Response 17. It, therefore, did not revise the amount it performed as a result of revisions in the Medicare fee schedule, but simply began to bill for what it was already performing. *Id.*

[8] After leaving Dianon, the relator went to work for Ameripath, another reference laboratory, which also uses a comprehensive approach, and employs a 24 antibody panel. Not surprisingly, the relator has also accused that company of fraud and apparently has filed a *qui tam* action against it. See Def.'s Reply Statement § III, Response 30. As to objections regarding the admissibility of the relator's affidavit, see id. § III, Response 28 and 30.

that a claim is "false" under these circumstances under the FCA is if the government has resolved the debate and notified one side or the other what it should do. Here, CMS, first, and Dianon's carrier, later, did not resolve the debate.[9]

Fourth, as proof of a "lie," the government suggests that the number of antibodies Dianon billed is vastly disproportionate than others that bill under CPT 88180. The government's claims analysis is flawed. It included all healthcare entities submitting claims under CPT 88180, not just independent laboratories, all ICD-9 codes, including diagnosis codes not at issue in this case, and claims from states that had frequency limits on the number of antibodies a laboratory could bill. *See id.* § II, Response 42. Hospital billings are not relevant because, as the ALJ ruled in *Impath*, hospitals frequently have established diagnosis, unlike cases independent labs receive. *Id.* Once only independent labs are included in the data and only ICD-9s that are actually at issue in this lawsuit, CMS' data shows that Dianon was paid for 22.9 antibodies during the relevant time period while all other independent laboratories were paid for 18. *Id.* Thus, under the government's theory of the case, where 18 or more antibodies are per se fraudulent, the average independent laboratory, by definition, violated the FCA, presumably entitling the government to more than $100 million judgments, like here. *Id.* (noting that 56.9 percent of the laboratories' paid claims were for 18 or more antibodies). Further, if the data is further refined to

---

[9] Courts have routinely found that where all that exists is relator's affidavit asserting a violation of law, but it is questionable whether there was a violation of law in the first instance, summary judgment should be granted for the defendant. *United States ex rel. Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002) (affirming dismissal notwithstanding relator's affidavit stating that he observed violation because there was no established breach of the FCA); *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992) (affirming dismissal notwithstanding relator's condemnation of defendant's performance on contracts because relator's allegations only amounted to scientific disagreements which could not establish falsity as a matter of law); *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 829-31 (W.D. Mich. 2000) (dismissing relator's claim notwithstanding submission of affidavit asserting defendant's conduct failed to adhere to regulations when whether there was compliance with regulations was debatable in the first instance); *United States ex rel Mikes v. Straus*, 84 F. Supp. 2d 427, 439 (S.D.N.Y. 1999) (dismissing relator's claim notwithstanding submission of relator's affidavit asserting that she informed her employer that medical service breached the law because whether there was in fact a violation a law was debatable), *aff'd* 274 F.3d 687 (2d Cir. 2001).

include independent laboratories operating in states, like Connecticut, where there is no frequency limit on the number of antibodies and hence physicians could bill based upon solely their medical judgment, the average number of paid antibodies was 19.5 (compared to Dianon's 22.9). *Id.* In these states, 64.2 percent of the laboratories' claims contained 18 or more antibodies, which would result in 64% of the claims being fraudulent under the FCA under the government's theory. *Id.*

## II.  CONCLUSION

Contrary to the government's assertion, this *is* a case about scientific and medical debate regarding the best method to furnish patient care to those with suspected cancer. No one can read the record of this case—the depositions of Drs. Stetler-Stevenson, Holden, Braylan, Borowitz, and Flynn—without arriving at that conclusion.

Dianon's position in this debate finds wide-spread support in peer reviewed medical literature and in the only ALJ decision on this issue. The government intervened in this case without speaking to the person within the government most knowledgeable regarding flow cytometry (Dr. Stetler-Stevenson) and, remarkably, did not interview the Dianon hematopathologists that designed its panel (Drs. Goyette and Connor). Instead, it simply interviewed an expert (Dr. Flynn), who does not analyze the specimens Dianon performs and who is unknown to those who actually practice in the area. It has had to doggedly pursue this "fraud" case even after it learned that its own leading expert (Dr. Stetler-Stevenson) disagreed with its position and an ALJ opinion had found that a 26 antibody panel *was* medically necessary, based upon clear medical and scientific literature, in the hope that its demand for $125 million would be sufficient to spur settlement. Recently, in two factually identical cases—*United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) and *United States v. Medica Rents*, 285 F.

Supp. 2d 742 (N.D. Tex. 2003)—district courts dismissed the government's fraud claim at summary judgment. This case deserves the same fate.

                Respectfully submitted,

*/s/ Robert Salcido*

Robert Salcido
Fed. Bar No. 447951
(admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4095
Fax: (202) 887-4288
E-mail: rsalcido@akingump.com

Bruce R. Parker
Fed. Bar No. PHV01015
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, MD 21201
Telephone: (410) 244-7400
Fax: (410) 244-7742
E-mail: BRParker@Venable.com

Attorneys for Defendant Dianon Systems, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing and Defendant's Reply and Objections to the Government's Local Rule 56(a)(2) Statement was sent via overnight mail to:

> Richard Molot, Esq.
> Assistant United States Attorney
> Office of U.S. Attorney, District of Connecticut
> Connecticut Financial Center
> U.S. Department of Justice
> 157 Church Street
> New Haven, Connecticut 06510

by messenger to:

> Patricia R. Davis
> 601 D Street N.W.
> Washington, D.C. 20004

and via United States first class mail, postage prepaid to:

> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 266 Post Road East
> Westport, CT 06880

on November 16, 2006.

_____
Penney Hughes