IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. Dr. James J. Tiesinga,<br><br>   Plaintiffs,<br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>   Defendant. | )<br>)<br>) No. 3:02CV1573(MRK)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S LOCAL RULE 56(a)(1) REPLY STATEMENT**

## TABLE OF CONTENTS

I.   GENERAL OBJECTIONS ...................................................................................1
II.  RESPONSES AND OBJECTIONS TO THE GOVERNMENT'S STATEMENT ..............1
III. DIANON'S RESPONSE TO THE GOVERNMENT'S ISSUES OF DISPUTED FACTS ..................................................................................................27

I.  **GENERAL OBJECTIONS**

Under the Local Rules, the party opposing a motion for summary judgment must admit or deny the material facts set forth in the moving party's Rule 56(a)(1) Statement. However, in most of the government's responses it neither expressly admitted nor denied the asserted facts, but instead explained why, in its view, the facts were not dispositive of this case. Thus, for example, rather than admit that the government's leading expert in the area (Dr. Stetler-Stevenson) endorses defendant's approach to performing flow cytometry, or that the only text cited in the carrier's Local Medical Review Policy ("LMRP") that addresses the number of antibodies endorses Dianon's approach, or that the only Administrative Law Judge ("ALJ") decision on the issue ruled in favor the same approach Dianon uses to bill Medicare, the government simply "denies" these facts as "irrelevant."

Set forth below, at section II, is a description of the facts that the government did not contest in its opposition. Section III contains Dianon's Reply to the Government's statement of Disputed Issues.

II.  **RESPONSES AND OBJECTIONS TO THE GOVERNMENT'S STATEMENT**

1.  No objection.

2.  Dianon set forth the following facts:

   • Hematopathologists use flow cytometry for the identification and classification of specific white blood cells (leukocytes) using antibodies in single cell suspensions of either blood, bone marrow, or lymph tissue.

   • After interpreting the results of flow cytometry, often in conjunction with blood and bone marrow morphology and other procedures, hematopathologists provide other specialists, such as oncologists, surgical oncologists, hematologists, and radiation oncologists, with the appropriate diagnosis and classification of leukemias and lymphomas.

   • These specialists then provide specific treatment regimens and monitor the patients during treatment to determine remission status or recurrence of disease.

The government admitted in part and denied in part defendant's statement. It is unclear what part of defendant's statement the government is denying and what it means by the statement "flow is an ancillary procedure".

3. No objection.

4. The government's assertion that "CMS has specifically defined medical necessity for some services" is unsupported by any citation to admissible evidence and thus should not be considered in ruling on defendant's motion for summary judgment.

5. No objection.

6. No objection.

7. See objection to Response 9.

8. See objection to Response 9.

9. The government states that the Centers for Medicare & Medicaid Services ("CMS") Program Integrity Manual provision defendant cites in its Local Rule 56(a) Statement does not define how a physician should make a determination regarding medical necessity but only what benchmarks a carrier medical director should use. However, each government witness stated that physicians may reasonably rely upon peer reviewed medical journals when deciding whether a service is medically necessary. For example, the government's medical necessity expert expressly testified that physicians may reasonably take into account studies in published peer reviewed medical journals in determining what is medically necessary:

> Q. In making a medical necessity determination, would it be **reasonable for a physician** to take into account studies published in peer reviewed medical journals?
>
> A. Yes.

Stone Dep. 14:11-15 (excerpts attached at Ex. 1) (emphasis added).[1] Identically, both Medical Directors of Dianon's Medicare carrier testified that a physician should review literature in making a medical necessity determination. For example, Dr. Toor testified:

> Q. In conducting due diligence to learn whether a service is medically necessary and indicated, **what should a physician do**?
>
> A. On the medical necessity side you again reviewed literature and then went accordingly. Also you used your consultants if you couldn't find information and asked people to help you with literature and then made the decision accordingly.

Toor Dep. 22:13-20 (excerpts attached at Ex. 2) (emphasis supplied). Dr. Delli Carpini testified:

> Q. Would it be reasonable for a physician to rely upon peer-reviewed medical journals?
>
> A. Yes, a physician can certainly rely on peer-reviewed medical journals.
>
> Q. Could a physician also reasonably rely on consensus of expert medical opinion in determining whether a service is medically necessary and indicated?
>
> A. In relation to submitting a claim to Medicare?
>
> Q. Yes.
>
> A. Yes ....

Delli Carpini Dep. 82:11-82:24 (excerpts attached at Ex. 3) (emphasis supplied).

    10.    No objection.

    11.    The government admits that medical literature created by proponents of flow cytometry stated that there are three approaches to conducting flow cytometry. The government, however, then asserts that this fact is not relevant because it does not address how to bill

---

[1] Where deposition testimony has not previously been submitted to the Court, excerpts are attached to this submission.

3

Medicare. The government is demonstrably wrong. It is relevant to billing because the government's own CMS Medical Expert and carrier Medical Director state that a physician may reasonably take into account peer reviewed medical literature in deciding whether the service is medically necessary and appropriate. *See* Response 9. The government does not cite to any evidence in its paragraph to support its contention that Dianon performed the test out of convenience. Finally, the government's assertion, that the peer reviewed medical literature found that comprehensive panels are 12-16, is undermined by the only ALJ decision on this issue which expressly ruled that almost all international experts participating in a consensus conference "believed that the appropriate number of markers for the complete characterization of acute leukemia would *average* 20-24." *See Impath v. Nat'l Heritage Insur. Co.*, No. 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 at 3-6 (Aug. 27, 2003); *see also* Def.'s Local Rule 56(a)(1) Statement ¶ 40.

  12. The government does not deny that:

- The NIH is the premiere governmental operated laboratory for purposes of performing leukemia and lymphoma studies through the use of flow cytometry. *See* Stetler-Stevenson Dep. 7:15-8:4, 123:8-17.

- Dr. Stetler-Stevenson, the head of the NIH's flow lab, testified that as to the approaches set forth in the United States and Canadian Consensus Conference, she uses the comprehensive approach. *Id.* at 128:9-130:13.

- She believes that a comprehensive approach was superior because the more antibodies that were used the higher the sensitivity of abnormal cell detection and the better the ability to delineate phenotypes that may be useful in disease monitoring. *Id.* at 134:19-135:4.

- She testified that the only difference between her blood and bone marrow panel and the panel that Dianon ran is that hers contained *more* antibodies. *Id.* at 149:9-150:9.

- Because of budgetary constraints, Dr. Stetler-Stevenson sought to limit the amount of antibodies used when diagnosing the patient and believed that each antibody she used was medically necessary. *See* Stetler-Stevenson Dep. 20:20-21:5 ("Q. ... As part of your professional judgment in constructing your various panels for use in flow, do you have to consider, because you operate with ... a budget, the financial implications of your decisions? A. Yes"); *see also id.* 86:3-13 ("Q. Am I correct, Doctor, that when you design these panels it was because you felt that this combination of antibodies was what was medically necessary for you to render correct and accurate diagnoses of these suspected medical conditions? A. Yes"); *id.* at

90:17-21 ("Q. Isn't it true with all of the panels we've talked about, if you have additional information you may add on to these basic panels? A. Yes, although I try to limit it as much as possible").

The government objects on the basis that Dr. Stetler-Stevenson was not the government's Rule 30(b)(6) witness regarding antibody design and implementation for flow cytometry testing for leukemia and lymphoma. But the Rule 30(b)(6) deposition notice expressly stated that she would testify as to "Antibody panel design and implementation for flow cytometry testing for leukemia and lymphoma or the diagnosis and staging of hematopoietic disease from January 1, 1996 through January 1, 2004." *See* Gov't Ex. 9 at 4.

13. The government does not deny as Dr. Stetler-Stevenson testified:

- She employed the comprehensive approach because otherwise a patient's serious medical condition could be misdiagnosed.

- She stated that the third approach outlined in the United States and Canadian Consensus Conference – a directed or targeted approach – is impractical in laboratories lacking the support of additional information and may be hazardous in cases in which this information is incorrect. *See Stetler-Stevenson Dep.* 133:10-19.

- She authored an article warning the flow cytometry community regarding how reliance on a limited or restricted panel – such as a disease specific panel – could result in patient death if it was used in the place of a panel that was capable of identifying all abnormal hematopoietic cells. *Id.* at 121:1-11; *see also id.* 119:14-120-13; 133:10-134:5.

- She testified that, as to repeat cases, if she received another specimen from the physician because the physician was concerned the patient could be developing a co-morbidity, she employed the same full panel to test the patient. *Id.* at 79:19-80:13; 82:8-17.

The government's response is simply that the conceded facts are "irrelevant".

14. The government asserts that the peer reviewed medical journal article that Dianon cited indicates that large panels included 9-16 antibodies. The article addresses panels from 20 to 24 antibodies. *See* Def.'s Rule 56(a)(1) Statement at Ex. 7, p. 26. Additionally, in the only ALJ decision to address this issue, a Judge, after reviewing this same literature, opined that almost all international experts participating in a consensus conference "believed that the

5

appropriate number of markers for the complete characterization of acute leukemia would average 20-24." *See Impath*, No. 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 at 3-6 (emphasis supplied); *see also* Def.'s Local Rule 56(a)(1) Statement ¶ 40. Dianon received payment for an average of 22.9 antibodies during the time period governing the complaint. *See* Declaration of Constantijn Panis (hereinafter "Panis Decl.")(attached at Ex. 4) at ¶ 13; *see also* Response 42.

  15. See Objection to 14.

  16. See Objection to 14.

  17. The government does not deny that in a text cited in the Connecticut LMRP governing flow cytometry under CPT 88180:

- The authors, Drs. Doyen Nguyen, Lawrence Diamond, and Raul Braylan, recommended a comprehensive approach to flow cytometry. *See* Nguyen, D., Diamond, L., & Braylan, R., FLOW CYTOMETRY IN HEMATOPATHOLOGY, Humana Press (2003).

- The authors recommended a 27 antibody panel for blood and bone marrow analysis. *Id.* at § 2.7.2.

- That 97.7% of Dianon's flow cytometry samples are blood or bone marrow specimens.

The remainder of the government's response is simply that the conceded facts are "irrelevant" because one of the carrier's Medical Directors, Dr. Delli Carpini, testified that the citation in the LMRP "signifies nothing." Actually, Dr. Delli Carpini testified that the purpose of the "Sources of Information and Basis for Decision" section of the LMRP is to "exemplif[y] to the provider community ... the reference material that was used to formulate policy." Delli Carpini Dep. 28:12-23 (Ex. 3). Further, he stated that providers in the community can reasonably rely on literature cited in the LMRP in order to ensure that their practices are medically necessary and indicated. *Id.* 39:21-40:4 ("Q. Would it be your view that a physician could read this text [Braylan's book] which was cited in your LMRP under Basis of Decision and then rely on this comprehensive approach in terms of designing an antibody panel?... A. If the

6

situation was exactly the same, yes.");[2] *see also id.* 87:16-88:5; 82:11-83-9 (reasonable for physicians to rely upon peer-reviewed medical journals and on consensus medical opinion). Finally, the government's Exhibit 11 is not admissible, and hence the Court should not consider the document in ruling on a Summary Judgment Motion (*see* Fed. R. Civ. P. 56(e)). It is hearsay and inadmissible, because it does not satisfy any exception to the hearsay rule. *See* Fed. R. Evid. 802. The document purports to attribute statements to Dr. Braylan made at a Hematopathology Meeting. The government has not laid any foundation as to when the document was created or whether it was prepared in the ordinary course of business. *See* Fed. R. Evid. 803(6).

18.  The government does not deny that a peer reviewed medical publication cited in the Connecticut LMRP governing flow cytometry under CPT 88180 states:

• Antibody panels that have been designed based on a comprehensive approach to [flow cytometric] analysis optimizes the detection and characterization of the critical cells for determining (1) the lineage of the cells of interest (e.g., myeloid, B-cell, T-cell) (2) their maturity status (3) the clonality, where appropriate (4) the specific subtype of hematopoietic malignancy and (5) the status of the normal elements present.

• The use of large comprehensive panels also facilitates the detection of two or more unrelated neoplastic processes present in the same specimen.

19.  The government states that "many prestigious medical centers in fact do what" the article cited in Connecticut's LMRP caution against. None of the documents the government cites are admissible and hence should not be considered: Exhibits 13 and 15 – apparently internet printouts from the Yale University Hospital and Mayo Clinic websites, respectively – have not been authenticated and are inadmissible hearsay. These website printouts have not been

---

[2] Indeed, this admission should resolve this case because Dianon's situation is precisely the same as that referenced in Dr. Braylan's book upon which Dr. Delli Carpini states a physician can reasonably rely. It is uncontested that Dr. Braylan endorsed the use of a comprehensive panel utilizing 27 antibodies when the laboratory receives a blood or bone marrow specimen. *See* Response 17. It is also undisputed that 97.7 percent of Dianon's samples are blood or bone marrow. *Id.* If in fact Dianon could reasonably rely upon Dr. Braylan's text cited in Connecticut's LMRP, as Dr. Delli Carpini states, which endorses the use of *more* antibodies than Dianon used, then Dianon's billings could not be false or fraudulent as a matter of law.

authenticated by anyone, much less anyone with personal knowledge of the testing procedures of the respective medical institutions. *See* Fed. R. Evid. 901 (documents must be authenticated prior to admission). Moreover, the government clearly seeks to offer these website printouts as "proof" of how these two medical institutions conduct antibody testing without making witnesses from the respective institutions available for questioning. *See* Gov. Local Rule 56(a)(2) Statement at ¶ 19. Finally, even if the documents were admissible, there is no foundation for the government's claim regarding what "many prestigious medical centers in fact do" because the government only lists examples from one university. Moreover, actual testimony in this case indicates that the Mayo Clinic document the government proffers may be inaccurate due to subsequently identified shortcomings in the Mayo Clinic's triage procedure. *See* Borowitz Dep. 100:2-102:5 (excerpts attached at Ex. 5) (setting forth how use of the alleged protocol may have resulted in serious patient harm and hence "[i]t's possible that they [Mayo Clinic] haven't changed their Web site and they've changed their practice...").

20. The government does not deny that:

- The government's litigation expert, Dr. Stuart Flynn, testified that of the three approaches described in the medical scientific literature, his lab, when it was operational, used the direct targeted approach, which is based on the availability of morphologic or clinical information. *See* Flynn Dep. 146:5-9.

- Recognized international experts, such as Drs. Stetler-Stevenson, of the NIH, and Dr. Braylan – experts recognized by even Dr. Flynn – believe that the direct targeted approach may be dangerous and even result in patient death because the morphologic or clinical information may be faulty and should not dictate the antibodies that are used in the panel. *See also* Stetler-Stevenson Dep. 142:6-143:10 (morphology unreliable because "you could evaluate by morphology looking at a slide specimen and detect no cancer yet be able to detect it by flow cytometry").

21. The government does not deny that:

- Its expert, Dr. Flynn: (1) has not signed out flow cytometry studies since 2000; (2) even then, did not perform flow cytometry on the type of specimens that Dianon performs (blood and bone marrow); and (3) did two color rather three color immunophenotyping. *See* Flynn Dep. 37:4-5; 45:11-13; 53:1-54:19; 65:2-4.

8

Further, the government contends that Dianon misstated Dr. Flynn's testimony when Dianon stated that Dr. Flynn agreed that Dianon's experts could defend their position. The government contends that what "Dr. Flynn actually said was that Dianon's experts had one opinion and he had another, and it was up to the jury to decide between the two." First, Dr. Flynn did appropriately state that he believed that Dianon's experts "can defend the merit of their thought processes." Flynn Dep. at 336:11-12 (attached to Gov't Rule 56(a)(2) Statement at Ex. 16). Second, even under the government's formulation, the government's action must be dismissed because when reasonable experts merely disagree, courts rule that there is no fraud as a matter of law unless the government has notified defendant that the defendant's interpretation is incorrect. *See* Def.'s Mot. to Dismiss at 10. Finally, the government cites to Dr. Delli Carpini's testimony – stating that "in the absence of signs or symptoms of a disease," comprehensive testing "to look for any abnormal cell is screening which Medicare does not pay for" – should not be considered for purposes of defendant's motion. First, no Dianon patient received testing "in the absence of signs or symptoms of a disease." All were suspected of having cancer of the blood or lymph system. *See infra* § III, Responses 4 and 5. Second, Dr. Delli Carpini's testimony regarding the signs or symptoms necessitating flow cytometry is inadmissible because he is not a qualified expert. Indeed, he is not even a pathologist (let alone a hematopathologist) and could not even understand the simple table listing relevant antibodies used to perform flow cytometry contained in Connecticut's LMRP. *See* Def.'s Rule 56(a)(1) Statement ¶ 39.

22. The government cites to no evidence to dispute the fact that Dianon used the "comprehensive approach" as that is defined in peer reviewed medical literature. Indeed, its own expert opined that Dianon uses the comprehensive approach. *See* Dr. Flynn Dep. at 145:13-

9

146:4 (excerpts attached at Ex. 6)("Q. ... Now, these authors describe that there were three different approaches that various different experts that attended this conference proposed.... Now, as you understand the Dianon approach, would you agree that they used a general comprehensive panel? A. Correct"). The government cites to no admissible evidence to support its statement that what "Dianon chooses to do for logistics [sic] reasons does not dictate whether each of the antibodies used was medically necessary for the diagnosis or treatment of a particular patient." Instead, it cites to Dr. Delli Carpini, who does not know or describe what Dianon does for "logistical reasons" and Stone's Expert Report, which is not admissible, and who does not describe what, if anything, Dianon does for "logistical reasons".[3] Moreover, the government is flat-out wrong in stating that the only amount that can be billed is the amount of antibodies needed to confirm the diagnoses. Its own medical necessity expert stated otherwise:

> Q. I'd like to direct your attention to JS26, the third paragraph. Quoting, "Even if the laboratory chooses to utilize an overly large panel of antibodies for flow cytometry testing for each and every patient, they should only bill Medicare for the particular antibodies that are medically necessary for diagnosis and treatment of an individual patient." Based on that sentence, what I'd like to ask is if a lab had a standard panel of let's say 20 antibodies that was consistent with the

---

[3] "[U]nder Rule 56(e), only admissible evidence may be used to resist a motion for summary judgment." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 218 n.6 (2d Cir. 2000). Under Local Rule 56(a)(3), a party's 56(a)(2) statement in opposition to a motion for summary judgment must contain citations to either (1) "the affidavit of a competent witness" and/or (2) "evidence that would be admissible at trial." *See* D. Conn. L. Civ. R. 56(a)(3) (2006).

Ms. Stone's report satisfies neither element. Its use here would be an impermissible use of an unauthenticated document because it is neither an "affidavit of a competent witness" nor would it be admissible at trial. D. Conn. L. Civ. R. 56(a)(3). The expert memorandum of Ms. Stone in support of the government's Rule 56(a)(2) statement was not supported by an adopting affidavit or any other document purporting to establish its authenticity and, therefore, is inadmissible. *See e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 n. 16, 17 (1970) (unsworn statements do not meet requirements of Fed. R. Civ. P. 56(e)).

The government relies on the Stone memorandum in denying averments 22, 38 and 41 in Dianon's Rule 56(a)(1) statement. *See* Gov't. Rule 56(a)(2) Statement at pp. 5, 10, 11. These paragraphs should be treated as admitted. Moreover, the government relies on the Stone memorandum in paragraphs 3, 34, 37, and 43 of its statement of "disputed facts." *See* Gov't. Rule 56(a)(2) Statement at pp. 15, 27, 28, 31. These statements should be disregarded in their entirety.

> guidance and peer reviewed medical journals and consistent with the views of recognized experts in the area and used to diagnose Leukemia or Lymphoma and it turned out that let's say only for [sic] markers, for [sic] antibodies were necessary to diagnosis the condition, say Hairy Cell Leukemia, should the provider under those circumstances bill for only those 4 antibodies or could it bill for 20 which is the size of its panel?
>
> A. Could you restate it because the number of the panel varied in your example.
>
> \* \* \*
>
> Q. With respect to the provisional diagnosis that has to do with a potential cancer having to do with the blood or lymph system –
>
> A. Okay.
>
> Q. – upon running the panel, the hemopathologist [sic] is able to diagnosis Hairy Cell leukemia and needs only four antibodies to diagnosis that condition. Under those circumstances, does he bill – as an expert medical necessity, does he bill for the four antibodies used that he ultimately concluded was the diagnosis, or does he bill for the full panel of 20?
>
> A. If I understand the question to be that the requesting physician's potential diagnosis was associated with 20 markers for that individual patient because the suspected diagnosis would have included a panel of 20 and the subsequent confirmed diagnosis would have only needed four, if the ordering physician's suspected diagnosis for that particular patient would have required 20 in that specific example, then 20 could have been billed.

Stone Dep. 21:10-25:10 (objections omitted) (Ex.1). Moreover, in the only ALJ decision rendered on this issue, the Judge did not employ the government's purported medical necessity standard – only antibodies that confirmed the diagnosis may be billed – but instead ruled that each antibody that was billed that was based upon the referring physician's provisional diagnosis or confirmed diagnosis was appropriate under Medicare. *See Impath*, No. 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 at 3-6. As both Ms. Stone's testimony indicates and the ALJ decision finds, the medical necessity

11

determination may be based upon the patient's suspected diagnosis and not simply based upon the results of the service. Otherwise, each negative X-Ray, lab result, or other diagnostic service could not be billed by any healthcare entity. A proposition for which the government cannot—and does not—provide any support.

23.   The government does not deny that:

- As to the three possible approaches to performing flow cytometry described at the 1997 United States and Canadian Consensus Conference—comprehensive, stepwise (or screening), and disease-directed or targeted—CMS did not mandate that hematopathologists must adopt any one of these three approaches. *See* Phurrough Dep. at 55:16-56:20.

- Instead, in light of its view that there was insufficient medical literature regarding these issues, CMS ultimately elected to permit its carriers to determine what limits, if any, should be imposed on coverage of flow cytometry services. *Id.* at 29:2-30:18.

24.   No objection.

25.   The government does not deny that:

- In designing a panel, Dianon sought to identify antibodies that would best identify the patient's disease and these decisions were solely based upon the physician's judgment.

The government simply states that these physicians did not perform the billing. However, with the exception of Dr. Tiesinga (*see infra* § III, Response 28) each physician testified that each antibody for each patient was needed to treat the patient's complaint, symptom, or illness. *See infra* Response 29.

26.   The government does not deny that:

- Dianon's pathologists learned through experience that their use of a comprehensive antibody panel substantially advanced patient care, and Dianon did not employ a shorter panel because it would compromise patient care.

The government contends that an antibody (specifically CD 103) could be rerun if hairy cell leukemia appeared upon a morphologic review. The undisputed medical testimony is that hairy cell leukemia cannot always be detected upon morphologic review. *See* Goyette Dep. 188:5 – 189:5 ("[Hairy cell leukemia] is a very distinct pathological entity. It's got very distinct

clinical presentation... [but] some of them don't have hairs, unfortunately"); *see also* Braylen Dep. 103:4-6 (excerpts attached at Ex. 7)("And 'hairy cell leukemia', even though it's a relatively infrequent disorder, can cause cytopenias and may not be detectable by routine morphology").

27. The government does not deny that:

- Dianon rejected performing a shorter panel because it would potentially harm patients because frequently referring physicians were not immediately available for consultation, the viability of the specimen would diminish, and the diagnosis of the patient would thus become less accurate.

The government only states that "to the extent that Dianon made a business decision to set up its lab processes" to achieve business goals, its decision would not satisfy Medicare's medical necessity standard. The government, however, fails to furnish evidence to support its blanket assertion that business considerations impacted Dr. Goyette's and Connor's decision regarding how to set up Dianon's flow cytometry lab.

28. The government does not deny that:

- Where physicians ordered tests on patients that Dianon had previously diagnosed, Dianon ran its panel because experience taught that the patient's diagnosis may evolve, there may be another type of cancer, or the patient's condition may have changed because of treatment.

29. In paragraph 29, Dianon tendered admissible evidence that each Dianon hematopathologist firmly believed that each antibody used was medically necessary and indicated to diagnose the patients' condition (citing Goyette Dep. 326:4-12; Mishalani Dep. 52:16-23; 92:12-19; 134:4-8; 161:9-22; 198:12-24; 198:25-199:9; Segal Dep. 114:19-115:25; Connor Dep. 103:16-105:15; 117:23-118:2). The government, in response, makes an assertion that Dianon used a comprehensive panel solely to "improve turn-around time," an assertion that lacks any supporting evidence and therefore, under Rule 56, does not create a genuine issue of material fact. Moreover, its assertion that Dr. Mishalani "testified that after the fact, she

13

recognized that certain tests were not necessary to diagnose the particular patient" is a gross distortion. In fact, she testified the opposite: that at the time the test is run, each antibody for each patient is necessary. *See* Mishalani Dep. 52:16-23; 92:12-19; 134:4-8; 161:9-22; 198:12-24; 198:25-199:9.[4] In hindsight anyone can claim that a service is not necessary if it is negative, but that is not how you determine whether to bill the Medicare program, which turns on the patient's complaint, diagnosis, and symptoms—not based upon whether the test was negative or not. The government's medical necessity expert and the only ALJ decision on this issue agree that the medical necessity determination can be based upon information available to the physician at the time the service is ordered, not hindsight. *See* Response 22.

30.     In paragraph 30, Dianon tendered admissible evidence demonstrating that no business or corporate personnel at Dianon had any role in determining what antibodies, or how many, would be performed (citing Goyette Decl. ¶¶ 5-6; Amberson Decl. ¶ 2; Palmieri Decl. ¶ 3; *see also* Segal Decl. ¶¶ 4-5; Mishalani Decl. ¶ 4; Connor Dep. 123:13-124:21; *see generally* Goyette Dep. 325:14-19 ("Q. Was it the hematopathologists who decided what antibodies ought to be in the panel, or did the business people decide that? A. No. The hematopathologists decided solely"). The government's simply asserts, in response, that "to the extent that Dianon made a business decision to set up its lab processes" to achieve business goals, its decision would not satisfy Medicare's medical necessity standard. The government, however, fails to furnish evidence to support its blanket assertion that business considerations impacted Dr. Goyette's and Connor's decision regarding how to set up Dianon's flow cytometry lab.

---

[4] Moreover, as Dr. Mishalani pointed out, Dianon could have included additional antibodies on its panel, but it did not because it was found that they would not have been needed in each case. *See e.g.,* Mishalani Dep. 88:5-92:3 (identifying additional useful antibodies that Dianon sometimes uses, but that are not on the panel because they are not needed in each case). She concluded that the decision to use extra antibodies turns on "what am I going to miss if I don't include a certain antibody... I'm not going to miss an M7 if I have this [the standard 26] panel. An M7 I may confirm after the fact was CD61, but I'm not going to miss." *Id.* at 91:23-25.

14

31.   The government does not deny that:

- Dianon's pathologists had no financial incentive to order additional antibodies. because they received a set salary plus a productivity incentive based upon the number of cases reviewed above a set threshold. If the pathologists performed fewer antibodies, they would presumably be able to review additional cases and, accordingly, potentially receive additional compensation. *See, e.g.*, Goyette Decl. ¶ 10.

- Because they believe that performing a short panel would undermine patient care, they have insisted upon Dianon performing a comprehensive panel. *See* Segal Decl. ¶ 11; Mishalani Decl. ¶ 9; Dr. Goyette Dep. at 334:1-19; *see also* Amberson Decl. ¶ 7.

The government simply states that the hematopathologists received an "incentive payment for moving cases quickly." The government's assertion is unrelated to Dianon's point that they could have moved more cases if they had used fewer antibodies. And, as the pathologists uniformly pointed out (*see* cites above), they could have moved cases more quickly using a shorter panel, but did not because it would compromise patient care.

32.   The government does not deny that:

- The use of each antibody creates additional costs. *See, e.g.*, Def.'s Rule 56(a)(1) Statement ¶ 41 (CMS estimates each antibody costs $8.50 based upon a 26 antibody panel).

- Dianon continued to perform a full 26 antibody panel after it made a decision to bill for only 18.

- Dianon's hematopathologists testified that they insisted upon performing a full 26 antibody panel, notwithstanding the amount billed, because performing 26 was necessary for patient care.

The only admissible evidence the government cites in support of its interpretation is an excerpt from Dr. Amberson's deposition where, rather than state that the physicians did not believe that 26 antibodies were necessary, states the opposite; that the physician's were "passionate" that each antibody was necessary to diagnose the patient's cancer:

>    Q.   Okay. Would – did DIANON ever look at 88180 and the panel of markers to decide whether in fact each of the markers was medically necessary:

15

  A. I know that I asked Dr. Goyette that question. That particularly when we went up to 26 antibodies, you know, asked him if these were necessary, why they were necessary, and I think that memo that you showed me this morning was his response to that question.

  Q. Okay.

  A. He was extremely passionate, as were the other hematopathologists, that we really needed to offer these antibodies.

Dr. Amberson Personal Dep. 71:20-72:12 (excerpts attached at Ex. 8).

  33. The government does not dispute that:

  • The majority of carriers, such as Connecticut did not impose any frequency limits regarding the use of CPT 88180, such as limit the number of antibodies that can be billed as a general matter.[5]

  • A minority of carriers did impose frequency limits regarding the number of antibodies that could be billed absent additional documentation.[6]

  34. The government does not dispute that:

  • Beginning in 1998, Dianon's carrier promulgated an LMRP governing the immunophenotypic analysis of tissues by flow cytometry and, as noted, it followed the majority

---

[5] *See, e.g.,* Blue Cross/Blue Shield (BCBS) (Western NY), LMRP (No. L-97-8) (no limit); Trailblazers Health Enterprises (TX), LMRP (No. L-16Bmd-R2) (no limit); Cahaba Gov. Benefit Administrators (MS), LMRP (No. OTH-9722) (no limit); Arkansas Medicare Services (AR), (AC-02-022) (no limit); Oklahoma/New Mexico Medicare Services, BCBS of Arkansas (NM, OK), (AC-02-022) (no limit); Local Medical Review Policy for Colorado, North Dakota, South Dakota and Wyoming (CO, ND, SD, WY), LMRP (No. 2000.01) (no limit); Trailblazers Health Enterprises, Professional Component for Pathology Tests (DC, DE), LMRP (No. Z-3Bdcde-R3) (no limit); United Healthcare Group (CT) (no limit); Group Health Inc. (Queens, NY), LMRP (No. LAB-1154) (no limit); Empire Medicare Svcs. (Southeastern NY), LMRP (No. YPF #145 Path #33) (no limit); TrailBlazer Health Enterprises (MD), LMRP (No. L-16Bmdtx-R2) (no limit); Cahaba Govt. Benefits Admin. (GA), LMRP (No. 197) (no limit); Lousiana Medicare Services (LA) (no limit); National Heritage Ins. Co. (MA, ME, NH, VT) (no limit); First Coast Svc. Options (CT) (no limit).

[6] *See, e.g.,* CIGNA (TN), LMRP (No. 2000-16) (12 units for technical component; 4 units for professional; limits removed 10/15/01); National Heritage Ins. Co. (Northern CA), LMRP (No. 02-06.1) (20 units); National Heritage Ins. Co. (Southern CA), LMRP (No. 2-06.1R1) (if more than 20, explanation required); BCBS of Arkansas, Missouri Medicare Services, Medicare Medical Policy for Eastern MO (Eastern MO), LMRP (No. 32) (12 units; limits removed Dec. 15, 2002); Wisconsin Physician Service Ins. Co. (WI, IL, MI, MN), LMRP (No. PATH-016) (an additional 8 units if initial panel indicates potential B cell lymphoma or B cell lymphoproliferative disorder are used; if process reveals acute leukemia or T-cell lymphoproliferative disorder, 7-12 units for more analysis; panel may include 12 units for acute leukemia, 18 for lymphoma) (policy revised eff. 8/2004); Noridian Mutual Life Ins. Co. (AL, AR, CO, HI, IA, NV, ND, OR, SD, WA, WY), LMRP (No. B2003.23) (most cases, 20 sufficient to address diagnostic and prognostic concerns).

of jurisdictions and imposed no express limitation on the number of antibodies that could be billed. *See* Toor Dep. 25:20-26:18; Delli Carpini Dep. 43:10-12.

- Rather than frequency, it focused on identifying which diseases would be listed that would justify the provision of the service. Toor Dep. 25:20-26:18.

- Once these diseases were listed on the claim, the carrier elected to leave it to the physician's discretion to determine the number of antibodies that were needed to diagnose the patient. *Id.* at 26:10-13 ("Its frequency or the frequency of the components was left out for medical necessity. If it was medically necessary, considered by the provider, he could use as many as he wanted").

The government, in its response, only adds that Dr. Delli Carpini testified that the comprehensive approach would not be necessary in each case. Dr. Delli Carpini's view is inadmissible for this proposition. Dr. Delli Carpini is not even a pathologist (let alone a hematopathologist) and could not even understand the simple table listing relevant antibodies used to perform flow cytometry contained in Connecticut's LMRP. *See* Def.'s Rule 56(a)(1) Statement ¶ 39. As to Dianon's reliance on the patient's signs and symptoms, *see infra* § III, Response 4.

35. The government is wrong in asserting that physicians cannot rely upon peer reviewed medical and scientific literature when determining whether a service is medically necessary or not.[7] *See* Response 9. Notwithstanding the clear, point-blank testimony of its expert, its Medical Directors, and an ALJ decision, the government contends, for purposes of this FCA action, that physicians cannot take into account peer reviewed medical and scientific

---

[7] The government's own proffered definition of "medical necessity" contradicts its assertions now. At the start of discovery, the government correctly agreed that physicians may rely upon medical literature when determining what services are medically necessary." *See* Plaintiff United States of America's Objections and Responses to Defendant Dianon Systems' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 16 (excerpts attached at Ex. 9) ( "... The medical necessity definitions are contained in publicly available statutes and regulations, as well as publically available Local Medical Review Policies and Local Coverage Determinations related to flow cytometry (which are being produced in response to Dianon's document requests, below), as well as the ***publically available medical literature related to flow cytometry.***") (emphasis added). Now that it has been confronted with a substantial body of medical literature that endorses Dianon's comprehensive approach, it has now reversed course and decided, for purposes of opposing defendant's motion for summary judgment, that physicians *cannot* rely upon medical literature in determining what services are medically necessary.

17