literature when making medical necessity determinations, but are instead limited to "clinical" information. First, there is no support for the government's contention. The government does not point to any rule, regulation, or standard that states that physicians cannot take into account guidance from peer reviewed medical literature in determining what services are medically necessary for a patient—because none exists. Second, the government does not explain why physicians cannot take into account the same criteria government officials use in determining which services are medically necessary. Third, the government's position is non-sensical. No one would be in favor of a standard that dictated that physicians should not or cannot rely upon peer reviewed medical literature in determining what is medically necessary to treat their patients and, if the physicians do, they could be held liable for a $100 million dollar judgment as the government contends here. Fourth, the government's own leading expert regarding flow cytometry believes that the Department of Justice's proposed method of performing flow cytometry based exclusively on morphology and clinical data to choose antibodies may be dangerous and result in patient death because that information may be faulty. *See supra* Response 20. Fifth, in any event, Dianon's hematopathologists relied upon the referring physician's provisional diagnoses in ordering the service. The referring physician made a provisional diagnosis of suspected cancer of the blood or lymph system when ordering Dianon's service and a service is only payable if the referring physician's ICD-9 or the confirmed diagnosis is listed on Connecticut's LMRP. *See infra* § III, Response 4.

36.     The government does not deny that:

•     Dianon's Medicare carrier reviewed several of Dianon's claims under CPT 88180 and although the carrier's notice to Dianon indicated that it was a medical necessity and utilization review, the carrier never notified Dianon that it objected to the size of Dianon's panel.

The government only downplays the significance of the review by stating that although the letters sent to Dianon stated that the carrier was conducting a medical necessity review, that

in fact, it was not a medical necessity review. Dianon is entitled to rely upon the plain language of the letter it received. Moreover, Dianon objects to the Dr. Delli Carpini memorandum the government attached at Ex. 35, because it is inadmissible hearsay for which no proper foundation has been established. The document also contains numerous instances of hearsay within hearsay. *See* Fed. R. Evid. 805.

37.    The government does not deny:

•    Besides its routine review of Dianon's claims, Dianon also had an extensive dialogue with its carrier regarding which patient diagnoses justified the use of CPT 88180.

•    Dianon submitted a detailed report to the carrier containing 1275 denied claims under CPT 88180 to explain why its list of diseases covered in its LMRP should be expanded.

•    Dianon invited the carrier medical director to personally review claims under CPT 88180.

38.    The government does not deny:

•    No one within the government – or its agents – ever informed Dianon that its panel of antibodies was too large. No carrier medical director or agents have any recollection of having made such a disclosure. *See* Toor Dep. 46:10-20; *see also id.*, at 47:16-48:4 ("Q. But you never recollect a problem coming up with respect to the number of markers billed under CPT 88180? A. Nobody in my time, at least, in the two years that it was – that the code was there came up with a utilization of the number of markers. Remember, we had determined that I think after 26 or after 30 – I don't recall exact numbers – all the markers available. And then we left it to the provider to provide the adequate or correct numbers of that particular patient and that particular disease. So sometimes they would bill 18, sometimes 19 or the rest sometimes. That's how we adjudicated it."); *see also* Delli Carpini Dep. 43:13-22.

•    Neither CMS nor Tricare representatives, including their Rule 30(b)(6) witnesses, informed Dianon that its antibody panel was too large. *See* Casey Dep. 26:7-10; Sabo Dep. 39:21-42:2.

The government only contends that these facts are irrelevant.

39.    The government does not deny that:

•    In 2003, the carrier substantively amended its LMRP governing flow cytometry services to include substantially all diagnoses that Dianon had recommended be included and which the carrier had previously refused to pay. *See* Delli Carpini Dep. 41:7-43-9.

- The carrier, at this time, amended its LMRP to include in its "Sources of Information and Basis for Decision" section a citation to Dr. Braylan's book in which he advocated the use of comprehensive panels and in which he identifies the blood, bone marrow, spleen panel he uses which is more expansive than the one Dianon employs. *See also* Connecticut Medicare Part B Local Medical Review Policy; *see generally* Rule 30(b)(6) Delli Carpini Dep. 37:14-39:1; 63:17-64:10.

- The carrier Medical Director, Dr. Delli Carpini, is not a pathologist and could not understand the basic table identifying the antibodies that Dr. Braylan cited in his book.

- The carrier medical director, who also was the government's Rule 30(b)(6) witness, did not ask anyone prior to the deposition why Dr. Braylan's publication was cited in the LMRP. *Id.* 70:9-12.

- Dr. Delli Carpini testified that he never instructed Dianon that it should use a targeted or short panel, never informed Dianon not to use a comprehensive panel, and believed that physicians, based upon their training, should exercise their own judgment regarding which panel to use. *Id.*, 39:2-10 ("Q. Now, is there any indication in the LMRP that some other approach was advocated rather than a comprehensive approach.... A. No. I do not recall the LMRP referencing which approach should be used. It was basically left at the discretion of the provider to provide medically necessary and pertinent services to the carrier"); *see also id* at 71:22-72:6; 79:14-80:10.

The government claims that the fact that Connecticut cited to Dr. Braylan "has no significance" because physicians cannot rely upon peer reviewed medical literature in determining whether services are medically necessary. However, even Dr. Delli Carpini disagrees with the government. He testified that the purpose of the "Sources of Information and Basis for Decision" section is to "examplif[y] to the provider community ... the reference material that was used to formulate policy." Delli Carpini Dep. 28:12-23 (Ex. 3). Further, the carrier Medical Director stated that providers in the community can reasonably rely on literature cited in the LMRP in order to ensure that their practices are medically necessary and indicated. *Id.* 39:21-40:4 ("Q. Would it be your view that a physician could read this text [Braylan's book] which was cited in your LMRP under Basis of Decision and then rely on this comprehensive approach in terms of designing an antibody panel?... A. If the situation was exactly the same,

yes"); *see also id.* at 87:16-88:5; 82:11-83-9 (reasonable for physicians to rely upon peer-

reviewed medical journals and on consensus medical opinion).

      40.    The government does not deny that:

- In the only ALJ ruling on the issue, a Judge found that a clinical laboratory's 26 antibody flow cytometry studies were medically necessary and appropriate. *See* Collins Dep. 14:8-21; *see also Impath v. Nat'l Heritage Insur. Co.*, No. 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 at 3 (Aug. 27, 2003).

- The ruling demonstrates that, among other things, despite the government's contention that Dianon's claims for 18-antibodies are on their face fraudulent, a company had no apprehension in a public forum asserting entitlement to payment for a 26-antibody panel because the test is medically necessary and appropriate to treat the patient's condition.

- After an evidentiary hearing, an Administrative Law Judge agreed that not only was the practice not fraudulent but the company was entitled to full payment for a 26-antibody panel because (a) the company's practice was entirely consistent with the peer reviewed medical literature; (b) the company's practice was consistent with the viewpoint of recognized experts in the field; (c) the company's concern about the viability of the samples was an appropriate one; (d) reference labs have less information than hospital labs to act upon; and (e) the carrier's LMRP limiting a panel to 20 antibodies (whereas the government here considers 18 to be fraudulent) was "inconsistent with the general consensus in the medical community regarding the possible number of markers in a flow cytometry study which are necessary to make an accurate diagnosis" and that almost all international experts participating in a consensus conference "believed that the appropriate number of markers for the complete characterization of acute leukemia would *average* 20-24." *Id.* at 3-6 (emphasis supplied).

As to the government's response, defendant objects to the admission of the Affidavit of

Georgina Aguilar. She was not listed on the government's list of persons with knowledge about

claims and defenses and hence Dianon did not have the opportunity to depose her. *See* Fed. R.

Civ. P. 37(c) (A party that without substantial justification fails to disclose information required

by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence ... any

witness ... not so disclosed."). Further, her Declaration is refuted by the plain language of the

Judge's decision. Ms. Aguilar testified that "NHIC did not provide any expert medical testimony

at the hearing, and did not provide evidence to refute or respond to Impath Inc's position."

However, the Judge's opinion stated that the carrier did provide evidence to the Judge

subsequent to the hearing. *See Impath*, No. 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 at 5. Moreover, contrary to the

government's view regarding the legal effect of that decision, the Second Circuit has ruled that

"ALJ decisions … remain persuasive authority in interpreting Medicare law" because ALJs have

"extensive experience in dealing with that statute [the Medicare law]." *Furlong v. Shalala*, 156

F.3d 384, 395 (2d Cir. 1998). The decision was issued during the time period covered in the

government's complaint.

      41.    The government does not deny that:

- As part of the 2003 rulemaking regarding then CPT 88180, the American Clinical Laboratory Association ("ACLA") presented CMS with survey data pointing out that "the most typical number of markers reported for a myeloid/lymphoid panel was 26 markers." Menas Dep. 29:19-31:8.

- Based upon this typical panel, ACLA recommended that CMS determine that a cost per marker is $8.50. *Id.* at 36:1-37-21.

- Rather than determine that this panel was atypical or fraudulent, CMS adopted ACLA's survey, agreeing that "[u]sing the vignette of the myeloid/lymphoid panel to represent the typical service," that the cost per antibody would be $8.50. *Id.* at 36:16-37-21; *see also* 70 Fed. Reg. 45,764, 45,778 (Aug. 8, 2005).

- CMS's Rule 30(b)(6) representative agreed that CMS seeks to ensure that the clinical vignette upon which it bases payment is consistent with physicians' actual practice. *See* Menas Dep. at 28:19-29:3.

- ACLA provided a clinical vignette of a typical panel of antibodies laboratories utilized. The clinical vignette was nearly identical to Dianon's panel – 23 of the 26 antibodies listed in ACLA's sample clinical vignette were the same as the antibodies Dianon utilized in its panel.

The government only contends that although the ACLA letter stated that the most typical

panel *reported* was 26 that the amount *paid* was 9. Regarding why the government's data is

deficient, see Panis Declaration at ¶ 8. (Ex. 4).

Further, the affidavit of David Mehring is not admissible, because he was not listed on

the government's list of persons knowledgeable about claims and defenses, *see* Fed. R. Civ. P.

26(a)(1), nor has he been proffered as an expert witness. *Id.* at 26(a)(2). Thus, Dianon has been

deprived of the opportunity to depose Mr. Mehring, and the declaration should be excluded in its

entirety.  *See* Fed. R. Civ. P. 37(c) ("A party that without substantial justification fails to disclose

information required by Rule 26(a) … is not, unless such failure is harmless, permitted to use as

evidence … any witness … not so disclosed"); *Bastys v. Rothschild*, 154 Fed. Appx. 260, 263 (2d

Cir. Oct. 13, 2005) (affirming District Court's exclusion of previously undisclosed expert in

summary judgment proceedings).[8]

The government has neither offered a justification for nondisclosure nor proffered Mr.

Mehring as an expert witness.  Should this Court not exclude the Mehring declaration, Dianon

hereby objects to the following portions:

| Portion | Objection |
| --- | --- |
| Paragraph 3 | Testimony as to whether HHS-OIG provided a data set of "all Medicare claims" is speculative, inadmissible hearsay, and without foundation.  Testimony as to what Medicare claims data may have been provided to Dianon during discovery is also speculative and inadmissible hearsay. |
| Paragraph 4 | Testimony about what the Medicare claims data provided to Mr. Mehring may indicate is hearsay.  Mr. Mehring's testimony that Dianon's standard flow cytometry panel increased "in or about 1996" is vague and any probative value of the statement is outweighed by the danger of unfair prejudice.  *See* Fed. R. Evid. 403.  The same is true of testimony about what may have happened "in or about September of 1997" and "in or about January 2001." Testimony about whether Dianon's standard flow cytometry panel "rose" or "fell" is without foundation and inadmissible hearsay. |
| Paragraph 5 | There is no foundation for the testimony about physician fee schedules for flow cytometry.  Exhibit A is inadmissible hearsay that was created in anticipation of litigation.  *See, e.g., Potamkin Cadillac Corp., v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("Data prepared or compiled for use in litigation are not admissible as business records."); *Timberlake Const. Co. v. U.S.* |

---

[8] Dr. Panis was not previously identified.  His use only became necessary to rebut information the government has introduced from a previously unidentified witness.

| Portion | Objection |
|---|---|
| | *Fidelity & Guar. Co.*, 71 F.3d 335, 342 (10th Cir. 1995) ("It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business."). Testimony about when exhibit A may have been provided to Dianon is inadmissible hearsay. |
| Paragraph 6 | All testimony contained in paragraph 6 is without foundation and inadmissible hearsay. The 5% dataset allegedly created by CMS and provided to HHS-OIG was compiled for purposes of this litigation and is inadmissible hearsay. *See Potamkin*, 38 F.3d at 632, *Timberlake*, 71 F.3d at 342.<br>The first sentence—testimony about the nature and type of data extract CMS provided to HHS—is without foundation and inadmissible hearsay. The second sentence—testimony that the data set is composed of claims from all Medicare beneficiaries—is without foundation and inadmissible hearsay. The third sentence—testimony about what CMS' motivation might have been for creating a sample dataset—is without foundation, speculative and inadmissible hearsay. The fourth sentence—testimony as to whether or not CMS believes the data set to be statistically valid—is without foundation, speculative and inadmissible hearsay. The fifth sentence—testimony about what work may have been performed by a government data consultant—is without foundation and inadmissible hearsay. The sixth sentence—testimony purporting to know what materials were disclosed to Dianon—is also without foundation and inadmissible hearsay. |
| Paragraph 7 | The sample set database is inadmissible hearsay compiled for this litigation. *See Potamkin*, 38 F.3d at 632, *Timberlake*, 71 F.3d at 342. Testimony about what Mr. Mehring's analysis of the data may indicate is without foundation and inadmissible hearsay. Mr. Mehring has not been proffered as an expert and there has been no showing that he is qualified to conduct any such analysis. |

Finally, no admissible evidence supports the government's contention that the regulations were revised because of "overutilization of the code by labs like Dianon." In fact, the government continued to pay the technical component of the code on a per-antibody basis.

42.    The government contends that Dianon's billings "are outside the norm." This is not accurate. The government's claims analysis included all healthcare entities submitting claims

under CPT 88180, not just independent laboratories, and all ICD-9 codes, including diagnosis codes not at issue in this case, and claims from states that had frequency limits on the number of antibodies a laboratory could bill. *See* Panis Decl. at ¶ 8 (Ex. 4). The government's claims also included ICD-9 codes that involved fewer antibodies. [9] Hospital billings are not relevant because it is a materially different practice setting. As the ALJ found in *Impath*, in considering this same issue, most cases in a reference lab do not have an established diagnosis, unlike cases received by a hospital lab. *See Impath*, No. 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 at 4; *see also* Goyette Dep. 104:9-14 ("[i]f your're in a hospital, a specimen has just been taken out in the operating room, the doctor is there for immediate consultation, can add, subtract. You can do a lot of things you can't do in a reference laboratory"). Once only independent labs are included in the data and only ICD-9s that are actually at issue in this lawsuit, CMS' data shows that Dianon was paid for 22.9 antibodies during the relevant time period while all other independent laboratories were paid 18. *See* Panis Decl. at ¶ 11 (Ex. 4). Thus, under the government's theory of the case, where 18 or more antibodies are per se fraudulent, the average independent laboratory, by definition, violated the FCA, presumably entitling the government to more than $100 million judgments, like here. *Id.* (noting that 56.9 percent of other laboratories' paid claims were for 18 or more antibodies). Further, if the data is further refined to include independent laboratories operating in states, like Connecticut, where there is no frequency limit on the number of antibodies and hence physicians

---

[9] Flow cytometry has many different clinical applications in hematology and immunology aside from immunophenotyping to detect lymphomas and leukemias that are at issue in this lawsuit. *See* Richard E. Goyette, M.D., Hematology 55-56 (1997)(excerpts attached at Ex. 10); *see also* David Jacobs et al., Laboratory Test Handbook 432-433 (5th ed. 2001) (excerpts attached at Ex. 10). Dianon requests that this court take judicial notice of the "readily ascertainable" fact of the aforementioned publications. *See* Fed. R. Evid. 201(b)(2). In this regard, the government's results do not represent flow cytometry as specifically used by Dianon and comparable laboratories. As a comparison between Dr. Panis' first chart (depicting the government's analysis) with charts that include only ICD-9's that are relevant to this lawsuit reveals, the government's analysis included ICD-9's that are not pertinent to this lawsuit. For example, the government's analysis showed a frequency of one antibody 19.8% of the time, *see* Panis Decl. at ¶ 7 (Table), whereas if one reviews the ICD-9's relevant to this lawsuit, one antibody is used only 2% of the time. *See* Panis Decl. at ¶ 10 (Table).

could bill based upon solely their medical judgment, the average number of antibodies that were paid was 19.5 (compared to Dianon's 22.9). *Id.* at ¶ 13 (Ex. 4). In these states, 64.2 percent of the laboratories' claims contained 18 or more antibodies, which would result in 64% of the claims being fraudulent under the FCA under the government's theory. *Id.*

Finally, the government makes much of the fact that Dianon used one panel. Only one panel is needed because 97.7 percent of Dianon's samples are of one specimen type, blood and bone marrow, a fact the government does not contest. *See supra,* Response 17. Additionally, there is no admissible evidence that can support the government's contention regarding the number of panels other laboratories used because that information is not contained in claims data. *See* Panis Decl. at ¶ 5 (Ex. 4). Indeed, looking at the claims data it would appear that Dianon utilized three primary panels. *Id.* at ¶ 12 (Table).

43.     The government does not deny:

- The NIH uses more antibodies than Dianon regarding blood and bone marrow specimens. *See* Stetler-Stevenson Dep. 149:9-150-9.

- Although Dr. Stetler-Stevenson testified that each antibody she uses is medically necessary to diagnose the patient, the government contends that her testimony is irrelevant. *See supra*, Response 13.

44.     The government does not deny:

- Emory uses 30 antibodies in most cases.

- Dr. Holden believes that each antibody is necessary to diagnose the patient.

45.     See Response 41.

46.     In correspondence to CMS during its rule-making regarding revisions to CPT 88180, Esoterix, a major reference lab, reported that it uses an average of 21 markers per case. *See* Letter from Joe Papiez, MD, Esoterix Laboratory Services, Inc., to Thomas A. Scully, Administrator, CMS (dated Oct. 6, 2003). The government denies this simply on the basis that

"CMS data shows that Esoterix billed Medicare for a wide variety of panels." There is no admissible evidence that supports that contention because the CMS data does not identify how many panels a company used. *See supra,* Response 42.

    47.    No objection.

    48.    The government does not deny that:

- In FLOW CYTOMETRY IN HEMATOPATHOLOGY, referenced in the Connecticut LMRP, the authors recommend a 27 antibody panel to analyze blood and bone marrow specimens.

The government only states that this fact is "irrelevant".

    49.    No objection. The document speaks for itself.

## III.    DIANON'S RESPONSE TO THE GOVERNMENT'S ISSUES OF DISPUTED FACTS

    1.    The government furnishes no admissible proof that Dianon submitted its claims on Form 1500 attached as Gov't Ex. 43. In fact, it did not. Additionally, Dianon did not submit claims for only 18 or 26 units during the time period covered in the complaint. This is reflected even in CMS' own 5% data. *See* Panis Decl. at ¶ 12 (Table) (Ex. 4).

    2.    The documents speak for themselves. Dianon did not receive notice of the government's interpretation of those documents, and the government cites to no evidence that it did. *See also infra,* Response 9 (setting forth what constitutes "screening" under the Medicare program).

    3.    The government cites to Ms. Stone's Expert report and Dr. Delli Carpini's testimony for the proposition that Dianon's panel does not meet the standard for medical necessity. The government has tendered no admissible evidence to support that conclusion. Ms. Stone is not a physician and expressly disavowed having any clinical knowledge and Dr. Delli Carpini is not a pathologist and could not even understand a simple chart listing antibodies used

to perform flow cytometry. *See supra* § II, Response 34; *see* Stone Dep. 22:15-17 (Ex. 1) ("I'm not a clinician, so I can't answer the specifics because it went from Leukemia, Lymphoma, to Hairy Cell"). Moreover, Dianon did rely upon the referring physician's clinical suspicion when it ordered services. *See infra* § III, Response 4. Finally, in this alleged disputed issue, and all others, the government never submits admissible proof demonstrating that Dianon submitted a single fraudulent claim, let alone more than 12,000, as the government alleges. For example, in its list of disputed issues, it never even cites to Dr. Flynn's findings to support that a single fraudulent claim was submitted. This lack of proof, by itself, is a sufficient basis to grant defendant's motion for summary judgment. *See* Local Rule 56.

    4.    The government asserts that Dianon processed its specimens without regard to the clinical information available about the patient. The statement is inaccurate. Dianon performs flow cytometry only when it receives a requisition form from the referring physician (such as checking "XL3" on the requisition form, "Leukemia/Lymphoma Phenotyping"). *See* Dr. Mishalani Dep. 27:19-21 (excerpts attached at Ex. 11). For claims to be payable, the referring physician must designate an ICD-9 listed on the Connecticut carrier's LMRP (or upon examination the hematopathologist must find that the condition exists). *See* Delli Carpini Personal Dep. at 38:7-20 (excerpts attached at Ex. 12)(referencing exhibit confirming that Dianon could bill either for the provisional or the definitive diagnosis and ICD-9 code). Hence, the government is incorrect that no clinical information triggers the test: it must be a clinical suspicion listed by the referring physician or found by Dianon of a diagnosis identified on Connecticut LMRP. Further, as to the government citation again to Dr. Delli Carpini and Stone regarding what clinical data the hematopathologists should review, both individuals are unqualified to render that opinion. *See supra* § III, Response 3. As noted by admissible

evidence and peer reviewed medical literature, hematopathologists disagree regarding when in the process of diagnosis they should review morphology and evaluate clinical data and some, including the government's leading expert, Dr. Stetler-Stevenson, believe that performing flow cytometry based exclusively on morphology and clinical data to choose antibodies may be dangerous and result in patient death, because that information may be faulty. *See supra* § II, Response 20. Neither CMS nor the carrier has taken a position regarding which of these methods physicians should use. *See supra* § II, Response 34. Finally, all agree, that physicians may reasonably take into account, peer-reviewed medical literature when making medical necessity determinations. *See supra* § II, Response 35.

     5.    The government asserts that "in all cases, the flow cytometry was actually performed before a pathologist made a determination that particular antibodies were relevant to the diagnosis or that flow cytometry would even be useful for the diagnosis or treatment of that patient." That statement is inaccurate. In each case, flow cytometry would only be performed if the referring physician suspected that the patient had leukemia/lymphoma as designated on the requisition form and the service would only become payable if the physician identified a diagnosis listed on Connecticut's LMRP or the Dianon physician diagnosed the patient with cancer of the blood or lymph system. *See supra* § III, Response 4.

     6.    The government's first sentence is inaccurate. Dianon did not submit "a claim for payment for each Medicare beneficiary for each of the 26 antibodies used in its leukemia/lymphoma panel (XL3)". This is disproved by CMS's own 5% data. *See Panis Decl.* at ¶ 12 (Table) (Ex. 4) (listing antibodies for which Dianon was paid from 1996-2004). The second sentence is incorrect because it is based upon the false premise that Dianon billed for 26 antibodies in each case and is wrong in stating that Dianon billed each case without regard to

clinical information. *See supra* § III, Response 4. Each test is based upon a provisional or confirmed diagnosis. *See id.* Further, the government's contention that Dianon's hematopathologists "ignored" prior test results are rebutted by the evidence the government cites and the government cites to no evidence to support its contention that further immunophenotyping of the patient's disease was unnecessary. *See, e.g.,* Mishalani Dep. 151:9-12 (Ex. 11) ("Q. And in those cases when there was a second or a third or fourth test done, would you look at the prior flow cytometry results? A. Definitely."); *see also* Segal Dep. 148:5-149:7 (reviewed prior tests); Goyette Dep. 111:14-112:9 ("Q: What about if Dianon had already done flow cytometry on previous specimens from the patient so you already knew what the diagnosis was; and, in fact, what the immunophenotyping was for that particular patient? A: Well, in a perfect world, if nothing changed, then they'd never have to do another panel. But the plan [sic] fact of the matter is that diseases evolve over time… so at any one time you're only looking at a specific element of that disease. Not only do they evolve over time, but they involve different areas of the body. For example, you can find something in the peripheral blood that wasn't there in the bone marrow that was sampled").

     7.     The government is incorrect that flow cytometry is not indicated or useful for disorders such as chronic myelogenous leukemia and other chronic myeloproliferative disorders or Hodgkin's lymphoma. With regard to CML, expert testimony indicates consistent need and use for flow cytometry. *See e.g.,* Stetler-Stevenson Dep. 85:6-19 ("Q: Under what circumstances would you do this panel… for someone suspected of having CML? A: If the patient had a difficult diagnosis or post-transplant or post-therapy to look for return of abnormal cells in that it's really set to determine small levels if necessary, and if the patient were suspected of blasting off or was doing poorly… [and] the clinician was concerned about some status in the patient and

they wanted an evaluation for blast and abnormal cells and that type of situation"); Holden Dep.

at 88:5-89:12 (excerpts attached at Ex. 13)("Q: And so what's the purpose of doing the flow

cytometry on cases of CML?  A: First time the patient is being diagnosed, if it's that first

diagnostic marrow, they'll want to see if there was anything else going on.  At the same time

assuming it is CML, the clinical impression was correct, they want to see whether or not that

patient's already evolving into an accelerated or blast phase of the disease.  And so even if... the

patient's apparently presenting in the chronic phase, if we identify a blast population, even if it's

quite small and not morphologically apparent, if it's typically apparent, they know they want to

move quickly on that patient towards definitive therapy, because, of course, they are inherently

unstable and eventually will go into a blast crisis.  Whether on subsequent testing... typically

they do that on the original diagnostic marrow.  Subsequent testing, whether or not they ask for

flow is generally tied to whether or not they think the patient may be evolving or may be going

into blast crisis, so we'll be asked to look at it at that point.  Q: So if there' no suggestion that the

patient might be going into blast crisis, is there any reason to do flow cytometry on a CML

patient?  A: Well... the possibility of the patient going into blast crisis is always present").  With

regard to Hodgkin's lymphoma, flow cytometry can also be appropriately used to identify related

comorbidities.  *See e.g.* Holden Dep. at 94:16-96:8 (Ex. 13) ("Q: Do you agree with that [that

Hodgkin's disease is not indicated for flow cytometry]?  A:  I do not actually.  A patient with a

known or suspected Hodgkin's disease may well actually have a second B-cell lymphoma... Q:

So if a request came in with the only indication that the person has Hodgkin's disease and has

previously been diagnosed, you would run a complete panel of 30?  A: I would...it wouldn't

specifically tell me anything about the Hodgkin's disease... it would tell me that there was

nothing else present... which, of course, is highly informative"); *see also* Segal Dep. 163:12-

165:16 (excerpts attached at Ex. 14) ( regarding use of flow cytometry for both CML and Hodgkin's disease).

8.      The government is also incorrect that Dianon was billing for antibodies in cases where the pathologists did not believe the flow cytometry was indicated or necessary. *See* Goyette Dep. 46:2-47:2 (excerpts attached at Ex. 15) ("Q: What role does flow cytometry play [in CML]? A: Well, I think that the flow cytometry is used because it helps confirm the presence of a discreet population of blasts.  It supports the morphologic evaluation of the bone marrow; in other words, sometimes it can be very hard to identify and recognize blasts.  They can be very subtle.  So it's a way to further characterize the blasts, identify the number of blasts.  And, in addition, there are a number of times that hematopathologists receives a specimen from somebody labeled chronic myelogenous leukemia that is totally sometime [sic] else.  And, lastly, these things just don't occur by themselves.  People oftentimes have more than one disorder.  And even in somebody with CML, we found some other hematologic disorders").  Similarly, in cases of Hodgkin's Disease related co-morbidities, testimony confirms that flow cytometry was indeed appropriate. *See id.* 61:8- 62:9 ("Q: Would there be any role for flow cytometry in diagnosing this disease [Hodgkin's Disease]? A: Well… lots of times things are called Hodgkin's disease and they are not.  So often, as part of the initial diagnosis, all the test would be run and you could have Reed-Sternberg like cells in a non Hodgkin's lymphoma, for example.  So I would separate the type of flow cytometry I'd do for somebody with an enlarged lymph node based on whether I thought there was Hodgkin's disease there or not… there are surprises"); *see also* Segal Dep. 163:12-165:16 (Ex. 14) (regarding use of flow cytometry for both CML and Hodgkin's disease).  Finally, the government is wrong that Dianon billed

32

Medicare 26 antibodies in each case; that is refuted by CMS's own 5% data. *See supra* § III, Response 6.

9.     The government's allegation that Dianon pathologists had no explanation for the role that many of the antibodies played in the diagnosis of its patient is inaccurate. Although *some* antibodies were in fact used to rule out certain diagnoses, all contributed to the overall search for the underlying leukemia or lymphoma. *See e.g.,* Segal Dep. 57:2-58:24 ("CD 16… identifies NK cells…CD103 is most useful in making a diagnosis or assisting in making a diagnosis of Hairy cell Leukemia…CD11c is another marker that's very useful at distinguishing various B-cell neoplasms…[CD57] is another marker useful in identifying or helping to identify the T-cell lymphoproliferative disorder or R-cell leukemia of granular lymphocytes…"); *see also* Goyette Dep. 229:15-242:22 (Ex. 15) ("[T-cell antibodies] helped establish that the lymphocyte population that was identified by the clinician … was, in fact, a B-cell population…And that the fact that there's no CD 10 let's us know that not only does it have these markers, but it's probably not a follicular lymphoma. The fact that CD 23 and CD 19 are partially expressed means it's not a mantel cell lymphoma…The fact that CD 56 is low means there's not an associated or concomitant NK cell disorder probably… the fact that CD 25 is elevated would certainly raise concerns about the possibility of hairy cell leukemia…"). Further, the government is incorrect that Dianon's tests were tantamount to non-covered general screenings. Medicare defines non-covered "screenings" as those services furnished in the absence of signs or symptoms indicating potential illness or injury. *See* 63 Fed. Reg. 30,166, 30,171 (June 3, 1998); *see also* Rogan Dep. 116:5-120:11 (excerpts attached at Ex. 16) ("Q: What is your understanding of what a screening test is?  A: Screening… is a test on a healthy patient that's not sick to see if they might have something that has no sign or symptom…"); *see also* Letter dated Dec. 4, 1997 from James B.

Amberson to Arif A. Toor (attached at Def.'s 56(a)(1) Statements at Ex. 30) (letter to Medicare carrier Medical Director stating that of 1,275 cases in which Medicare denied payment, 43% of the specimens showed neoplasias and indicating that "such patients can hardly be characterized as asymptomatic").  As noted, the undisputed evidence is 97.7% of the specimens Dianon receives are blood or bone marrow.  As the ALJ noted in *Impath*, these specimens result from very invasive procedures.  *See Impath*, No. 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 at 4.  No one would contend that physicians would undertake these very invasive dangerous procedures on non-sick patients without signs and symptoms so Dianon could run a "screening" flow cytometry test.  *See also supra* § III, Response 4 (referring physician suspected leukemia or lymphoma); *see also* Rogan Dep. 124:22-125:15 (Ex. 16) ("A: [A]ll the patients are sick.  None of these patients come in off the street saying, gee, I want to have some flow cytometry done, doctor…All the patients have an illness.  They have an enlarged lymph node, they have enlarged spleen, they've got anemia, they've got abnormal white count, they've got a history of cancer or they have cancer now, they've had chemotherapy treatment… all these patients have something wrong with them.  So because these are all sick, the laboratory test is a benefit…. so these are not preventative tests or screening tests outside, they're all covered services under [the Medicare Act]").

   10.    The testimony is clear and consistent that Dianon's pathologists were exclusively responsible for determining the medical necessity of its panels and markers; Dianon billing personnel was responsible for the billing of those medically necessary tests.  *See e.g.,* Goyette Dep. 325:8-19 ("Q: Was it the hematopathologists who decided what antibodies ought to be in the panel, or did the business people decide that?  A: No.  The hematopathologists decided solely.  Q: In the five years you were at Dianon, was there ever an instance in which anyone outside of the hematopathologists decided what was going to be in the flow cytometry panel?  A: No");

Carlson Dep. 107:18 (excerpts attached at Ex. 17)("Q: Who would have participated in that type of decision…A: In going from 18 to 26?  Q: Actually going from 26 down to 18 in 1997, who would have participated in that… decision?  A: If it's a clinical decision, then it would be the hematopathologists…Q: What if I said, bill-changing how many antibodies billed from 26 to 18…?  A: Then that would primarily be marketing, chief medical officer, billing, that sort of thing").

11.     As referenced above in Response 10, Dianon's pathologists were exclusively responsible for determining the contents of their panels; Dianon billing personnel were thereafter responsible for the billing of those antibodies. *Id.; see also* Goyette Dep. 332:10-22 ("Q: [I]s it fair to say that the non-physicians and other people at Dianon could reasonably conclude, since you created the panel, that that is what you thought to be appropriate and necessary medicine in treating patients?  A: Absolutely.  Q:  And then whether or not they billed one antibody or every antibody that was tested in your panel was something of a business decision that didn't affect you and your colleagues, is that correct?  A: That's correct.  I could careless [sic]"); Carlson Dep. 93:11-23 (Ex. 17) ("Q: What type of input would a marketing person have into this in deciding how many antibodies to bill on a particular test?  A: They might do the leg work, and if it's an established test and we're bringing it on, let's say, it's an industry standard test, they would do some of the leg work in looking at what's the competition doing… There would be a discussion with the pathologist in terms of medical necessity and clinically what are the proper tests to be running…").

12.     The deposition testimony quoted from Dr. Connor's deposition speaks for itself. As noted, hematopathologists differed regarding when they reviewed the morphology. *See supra* § III, Response 4.  The government's leading expert believes that basing the number of

antibodies on morphology could result in patient death. *Id.* As to the second sentence in the government's disputed issues, whatever Dr. Connor's general view is regarding independent labs, she testified that each antibody Dianon used was medically necessary and appropriate. *See supra* § II, Response 29.

13.    It is true that Dianon's hematopathologists did seek to diagnose accurately the majority of hematopoetic malignancies that a patient may have. It is not accurate that these antibodies were not tailored to the patient's signs and symptoms because the patients were suspected of having a hematopoetic malignancy. *See supra* § III, Response 5. It is true that Dianon sought to operate its lab efficiently but it is inaccurate to state that Dianon was all "about efficiency." *See supra* II, Response 29.

14.    The government's first sentence is unsupported and hence inadmissible for purposes of summary judgment. The government does not cite to any rule, regulation or standard that mandates that morphology should be performed before performing flow cytometry and several experts, including the government's leading expert, Dr. Stetler-Stevenson, question the value of morphology when performed before flow cytometry. *See supra* § III, Response 4. The citation the government furnishes from Dr. Connor's deposition does not support the proposition that morphology was not reviewed before flow cytometry because of business concerns. Moreover, turn around time is important for patient care. *See e.g.*, Braylen Dep. 44:10-45:24 (Ex. 7); Holden Dep. 38:14-43:25 (Ex. 13); Borowitz Dep. 39:1-40:15 (Ex. 5); (all referencing turn around time in the context of patient care and the need to review and deliver results quickly). As Dianon is in the "business" of providing quality patient care, every concern for improving the quality of healthcare is related to Dianon's business. Moreover, the government cites absolutely no evidence for its assertion that "doing a one-size fits-all panel of