tests was for the convenience of Dianon for business reasons" and Ex. 57, which the government cites as its sole support, does not state that.[10]

15. As described at § II, Response 31, Dianon's hematologists received a productivity bonus. The only evidence the government cites for the proposition that "some pathologists were able to double their salaries through these incentive payments" is from Dr. Mishalani's deposition, which applied only to her and related to her compensation in a single year.

16. The only evidence the government cites for the proposition that Dianon made no attempt, in hindsight, to exercise medical judgment regarding what to bill Medicare is a cite from Dr. Mishalani's deposition that does not support that proposition and does not even mention billing. *See* Mishalani Dep. 90:1-15. She testified there that each antibody is needed to diagnose the patient at the time the service is rendered although if the test is negative, in hindsight, one could say the whole panel was not needed. *Id.* The government does not cite to any Medicare authority that states that billing for physician services turns on whether the diagnosis was positive or benign or not, and that point is even disputed by its own medical necessity expert. *See supra* § II, Response 22.

17. The government suggests that Dianon increased the number of antibodies *used* from 8 to 26 in 1996 to increase its Medicare reimbursement. There is no testimony which supports this proposition. There is, however, testimony that Dianon was using upwards of 20 antibodies even though it may have been *billing* for fewer. *See e.g.*, Connor Dep. 76:25-77:18 (excerpts attached at Ex. 18) ("...that sort of doesn't make sense because we would have had

---

[10] The best evidence of the fact that the government has utterly no rule, regulation or standard to support its position is that its Ex. 57, which purportedly stands for the proposition that "doing a one-size fits-all panel of tests was for the convenience of Dianon for business reasons," apparently is a 2007 CMS statement regarding what is new regarding health plans or prescription drug plans. The government does not furnish any foundation regarding the document and hence it is inadmissible. It certainly does not state anything about Dianon nor does it cover any time period relevant to the complaint.

more than eight, so I don't know where the eight comes from... I'm assuming that the 26 comes from the number of antibodies we were doing, although I think we were running 22 or something like that...I don't even know where the eight and the nine comes from."); *see also* Amberson Personal Dep. 89:13-90:13 (Ex. 8); Amberson 30(b)(6) Dep. 67:12-18 (excerpts attached at Ex. 19) ("For example, as we've already discussed, in some instances in here, there are only 18 antibodies listed; whereas, 26 were performed and earlier there might have been 9 antibodies listed where an exact 21 were performed").

18.   The government states that proof of lack of medical input into the decision to bill for 26 antibodies is that for a period of time Dianon billed for 26 antibodies while performing 22. When Dianon decided to increase its panel to 26 antibodies, it realized that it had already been billing for 26. Dr. Amberson states that once this was discovered, Dianon reported this issue to its carrier. *See* Amberson 30(b)(6) Dep. 22:15-23:2 (Ex. 19). Moreover, rather than prove intent, this disclosure shows that Dianon did not act with the requisite intent to breach the False Claims Act. Specifically, Dianon initially uncovered this issue in 1997 and reported it to its carrier. *See* Letter from Robert Tucciarone, Director, Billings and Collections, Dianon to Accounting Department, Medicare MetraHealth (dated June 17, 1997) (excerpts attached at Ex. 20, Tab A); *see also id.* (dated July 28, 1997) (excerpts attached at Ex. 20, Tab B). At that point, Dianon believed that the discrepancy had existed from August 1, 1996 to March 24, 1997. *Id.* During the course of this litigation, it learned that the discrepancy had also occurred from January 1, 1996 to July 31, 1996. *See* Letter from Robert Tucciarone, Director, Accounts Receivables, Dianon to Connecticut Part B Medicare First Coast Service Options, Inc. (dated June 23, 2006) (excerpts attached at Ex. 20, Tab C). Courts have ruled where a party identifies an error and makes a prompt disclosure to the government (here the initial disclosure occurred in 1997), the

defendant did not act with the requisite scienter under the FCA.[11] The testimony moreover states that Dianon pathologists always thought that 26 antibodies were medically necessary. *See* Amberson 30(b)(6) Dep. 31:9-32:10 (referencing Goyette memorandum regarding the 26 antibodies: "I think this was in the context of our increasing to this 26 antibody panel, which Dr. Goyette and the other hematopathologists really felt was essential. In particular, one of our newer hematopathologists, Dr. Glenn Segal... had extensive experience in flow cytometry and felt that there were... another four or so antibodies that... he really felt we needed to add these antibodies or we would miss conditions. So... they put forth this 26 antibody panel...").

19.   As referenced above, the testimony is clear that Dianon pathologists were responsible for determining which antibodies were medically necessary. What and how to bill for the selected panel and markers was decided by Dianon billing and business personnel. The testimony is clear that Dianon's pathologists were *not* involved with the billing issues and that Dianon's billing and business personnel were *not* involved with issues of medical necessity. *See e.g.*, Carlson Dep. 107:18-108:5 (Ex. 17) ("Q: Who would have participated in that type of decision...A: In going from 18 [antibodies] to 26 [antibodies]? Q: Actually going from 26 down to 18 in 1997, who would have participated in that... decision? A: If it's a clinical decision, then it would be the hematopathologists...Q: What if I said... how many antibodies billed from 26 to 18...? A: Then that would primarily be marketing, chief medical officer, billing, that sort of thing"); Florio Dep. 152:5-14 (excerpts attached at Ex. 21) ("Q: Would you have any input into what they were billing as project manager? A: No... that came from the medical

---

[11] *See United States ex rel. Hefner v. Hackensack Univ. Medical Ctr.*, No. 01-CV-4078, 2005 U.S. Dist. LEXIS 36427, at *28-*29 (D.N.J. Dec. 23, 2005) (dismissing relator's action because "[w]hile it is clear that Defendants were negligent in monitoring of their billing practices, the hiring of [consultant] to monitor billing compliance and the return of reimbursed monies to Medicare upon discovery of their erroneous acceptance is more evidence of mistake than knowing submission of false claims").

director…depending on who the pathologist was would come down and say, here's the panel that we need to run"); McDowell Dep. 101:17-18 (excerpts attached at Ex. 22) ("We basically did what the lab told us to do on this stuff…").

20. Dianon's decision to *bill* for only 18 antibodies does not indicate that *using* a 26 antibodies was not medically necessary. Dr. Amberson set forth the basis for billing for 18 antibodies while performing 26:

> I wanted to be extremely cautious and I knew that if you looked at our 26 antibody panel and showed that to a group of hematopathology experts, some of them would say, well, rather than this particular antibody, I would use this or, you know, we might use, you know, 24 and somebody else might use 28. So I asked Dr. Goyette, give me a list of the 18 that you would consider would be the essential core of any panel. You know, they would be essential to any panel. They wouldn't be sufficient to diagnose everything. You would have to add additional antibodies, but these would be something that everybody would agree on, and that's what he supplied me…

Amberson 30(b)(6) Dep. 35:5-21; *see also id.* 36:6-11 ("[W]hat I asked him is to give me the antibodies that would be… essential in any panel. I did not ask him to give me what antibodies you think should make up a complete panel, but what antibodies should be part of any panel."). Further, he pointed out:

> Q. Okay. This says, the memo says, "The following antibodies are essential for the accurate and complete initial workup of flow cytometry specimens." Is that what you asked him to give you?
>
> A. I asked him to give – as I said, what I asked him to give me the antibodies that would be, you know, essential in any panel. I did not ask him to give me what antibodies you think should make up a complete panel, but what antibodies should be part of any panel.
>
> I guess as an analogy, I would say if a 55 year-old man goes to a doctor for a routine check-up, what are the – what are the things that everybody would agree should happen. Should

40

> take a history. You should do a physical exam. You should do an electrocardiogram.
>
> People might disagree on what laboratory values you should get. How complete a lipid profile. Some people might disagree on whether you should do a chest X-ray in somebody who's asymptomatic, and it wouldn't – you couldn't say that doing the chest X-ray would be excessive. A lot, you know, half of the physicians might say they would do it. Others might not do it. There are a lot of factors in there.
>
> But everybody would say you've got to do that history and physical. This is kind of analogous. You got to have these antibodies in there.

*Id.* 35:22-37:10. Although the government's sole interpretation of the referenced document is that it establishes that only 18 antibodies are medically necessary, that interpretation is completely refuted by the fact that it is undisputed that Dianon always performed a 26 antibody panel, notwithstanding the costs associated with performing those additional antibodies. *See supra* § II, Response 32. If the government's interpretation of the cited memorandum is correct, and the pathologists truly believed that only 18 antibodies were medically necessary, there would be no logical reason for Dianon physicians to continue to perform, over a multi-year period, 26 antibodies on each patient. *Id.* There would likewise be no logical reason for the company to continually incur costs associated with performing those services. *Id.* In reality, Dianon physicians believed the 26 antibodies were needed to properly treat its patients. *Id.*

21. The government contends that there is an inconsistency in Dr. Amberson's and Dr. Goyette's Declaration where they stated that they wished to "avoid" harassment by payors regarding their medical judgment and their deposition testimony where they stated that they had not experienced any actual harassment. There is no inconsistency. One can seek to avoid a potentially unpleasant event, and take precautions against the event occurring, without ever

41

actually having experiencing the event. For Dr. Amberson's actual testimony regarding the decision to bill for 18, *see supra* § III, Response 20.

22.  As to the first sentence, the government does not cite any admissible evidence to support the contention that when billing for 18 Dianon exercised medical judgment "for the first time." As to the second sentence, the government does not cite any support for its assertion that Dianon continued to "bill for 18 antibodies in all cases regardless of the utility of individual antibodies." The only citation the government furnishes is its own report that finds that Dianon billed for 18 during this period but says nothing about the utility of antibodies that were billed. As to the third sentence, Dianon did not ignore the clinical information available to them. *See supra* § III, Response 4. Finally, as referenced above, the government's allegation that Dianon pathologists had no explanation for the role that many of the antibodies played in the diagnosis of its patient is inaccurate. *See supra* § III, Response 9.

23.  The government is wrong in asserting that the medical literature did not support Dianon's billings for 18. As noted, the only ALJ decision on point on this issue expressly ruled that almost all international experts participating in a consensus conference "believed that the appropriate number of markers for the complete characterization of acute leukemia would average 20-24." *See Impath*, at 6. Further, the government's leading expert, Dr. Stetler-Stevenson testified that she uses a larger panel when analyzing the same specimens Dianon performed. *See supra* § II, Response 12. She also testified that each antibody she used was medically necessary. *Id.* Moreover, in the only text referenced in Dianon's LMRP that addresses the number of antibodies that should be used, the authors endorse a panel that was more expansive than Dianon's. *Id.*, Response 17. As to the government's reference to CML and Hodgkins, *see supra* § III, Responses 7 and 8.

42

24. Dianon did not conduct uncovered screening tests when it used its standard panel of markers on samples suspected of having lymphoma or leukemia. As indicated above, Medicare defines non-covered "screenings" as those services furnished in the absence of signs or symptoms indicating potential illness or injury. *See* 63 Fed. Reg. at 30,171; *see also* Rogan Dep. 116:5-120:11 (Ex. 16) ("Q: What is your understanding of what a screening test is? A: Screening… is a test on a healthy patient that's not sick to see if they might have something that has no sign or symptom…"). As also referenced above, Dianon itself conducted a review of its denied payments, found that 43% of the specimens showed neoplasias, and concluded that such patients could hardly be characterized as asymptomatic. *See supra* § III, Response 9. The record is replete with similar examples of how all patient samples sent to Dianon were suspected of leukemias or lymphomas. Dianon thus *did* exercise medical judgment based upon the referring physician's provision diagnoses of leukemia/lymphoma. *See supra* § III, Response 9.

25. Dianon, like other independent laboratories, is always under heavy pressure from competition. It thus sought to improve its processes and conduct business more efficiently. *See, e.g.*, Amberson Personal Dep. 50:3-15 (Ex. 8) (responding to purpose of earlier planning meetings: "I believe it was to look at what we could do to improve our processes. Do things more efficiently… it looked like it would have been whatever we can do to… provide more timely service and make things more efficient."); *see id.* 53:3-6 (with regard to turn-around time: "I think the focus on this was to do what we could do to provide the most timely and efficient services to problems that would result in specimens delays").

26. In 2000, Dianon began billing for use of its 26 markers. This decision was not made by the Dianon pathologists. *See* Hade Dep. 28:19-25 (excerpts attached at Ex. 23) ("Q: Do you know why there was a change from 18 to 26 antibodies? A: Because it was discovered that

43

we were only billing 18. And being that we knew we were doing 26, we knew we should bill for 26, so... we changed that"). Moreover, as referenced above, the decision to bill for 26 antibodies reflected a decision to bill for the panels that the pathologists, knowing them to be medically necessary, *had already been using.* See supra § III, Responses 18 and 20.

27.  The first sentence is incorrect that Dianon billed 26 antibodies in all cases "regardless of the utility of the various antibodies for a particular case." *See supra* § III, Response 20. As to the second sentence, the government attaches what appears to be excerpts of four medical reports as support for its contention that Dianon "continued to bill for flow cytometry was not indicated or useful or where Dianon had already diagnosed the patient and further flow cytometery was not necessary." Other than attach the bare documents, the government does not even try to explain how the findings in the medical report support its contention that the services were not medically necessary or include expert testimony explaining why those services were not necessary; hence the documents are inadmissible.

28.  Various statements the government cites related to Dr. Tiesinga's deposition and Affidavit (hereinafter "Tiesinga Affidavit") contain inadmissible hearsay and other incompetent evidence. Dianon objects to the following portions of the Tiesinga Affidavit:

| Objectionable Portion(s) | Objection(s) |
|---|---|
| Paragraph 5 | Testimony about what Dr. Gersen may have said is inadmissible hearsay. Fed. R. Evid. 802. Dr. Gersen is merely identified as a "Vice President." No other explanation of Dr. Gersen's job duties or responsibilities is provided. In order for hearsay to be admissible as an admission by a party-opponent, the party seeking introduction of the testimony must show (a) the existence of an employment relationship; (b) that the statement was made during the course of the employment relationship and (c) that the statement must relate to a matter within the scope of the employment. See Fed. R. Evid. 801(d)(2)(D); *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537-538 (2d Cir. 1992); *Morris v. State of New York*, U.S. Dist. LEXIS 4531, at *25 |

| Objectionable Portion(s) | Objection(s) |
|---|---|
|  | (N.D.N.Y. April 5, 1995). The burden of proof lies with the party seeking admission. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990); *Morris*, at *25. The government has provided no information indicating that flow cytometry reimbursement would even be related to Dr. Gersen's job duties or responsibilities and any such statement attributed to Dr. Gersen should be excluded. *See Douglas v. Pfingston*, 284 F.3d 999, 1004-1005 (9th Cir. 2002) (upholding summary judgment dismissal because, *inter alia*, relator's affidavit was replete with inadmissible hearsay that failed to meet the requirements of 801(d)(2)(D); "The record does not clearly reveal that [the declarant's] statements concern a matter within the scope of employment. While [the relator] identifies [the declarant] as the MTA's 'Project Engineer,' he does not provide any description of [the declarant's] job responsibilities. Specifically, he does not show that [the declarant's] job duties had anything to do with the MTA's request for federal funding."). <br> Moreover, testimony about what Dr. Gersen may have said to Dr. Tiesinga about what "someone in the billing department" may have told Dr. Gersen is hearsay within hearsay. Fed. R. Evid. 805. |
| Paragraph 6 | This paragraph is replete with inadmissible hearsay. Testimony about what Ms. Palmieri might have said is inadmissible for the reasons set forth in Paragraph 5, above. As with Dr. Gersen, no description of Ms. Palmieri's job duties or responsibilities is provided. Moreover, testimony about what Ms. Palmieri might have said about what Mr. Tucciaroni might have said is hearsay within hearsay. Fed. R. Evid. 805. |
| Paragraph 7 | Testimony about what Dr. Gersen and Ms. Palmieri might have said in inadmissible hearsay for the reasons set forth in paragraphs 5 and 6. <br> Testimony about what "someone suggested" is vague, conjecture and lacks any probative value. |
| Paragraph 8 | Testimony about what Dr. Gersen and Ms. Palmieri might have said is inadmissible hearsay for the reasons set forth in paragraphs 5 and 6. |
| Paragraph 9 | Testimony about what Dr. Gersen may have said to Dr. Gilson is inadmissible hearsay, as is testimony about what Dr. Gilson may have said to Dr. Gersen |
| Paragraph 11 | Testimony about what Dr. Hickman might have said is inadmissible hearsay. There has been no indication that Dr. Hickman is an unavailable witness. |
| Paragraph 12 | Testimony about what Dr. Amberson may have said is inadmissible hearsay for the reasons stated in paragraphs 5 and 6. Dr. Amberson is not a hematopathologist and alleged statements as |

| Objectionable Portion(s) | Objection(s) |
|---|---|
| | to the medical necessity of antibody testing are outside the scope of his employment. *See* Amberson 30(b)(6) Dep. 32:2-9 ("So, you know, they [Drs. Goyette and Segal] put forth this 26 antibody panel and I simply asked Dr. Goyette… I'd like to have something in writing that if I'm ever asked why are we using 26 antibodies that I can refer to because I'm not an expert on this…"). |
| Paragraph 13 | Testimony about what Drs. Hickman and Hartsell might have said is inadmissible hearsay. |
| Paragraph 15 | Testimony about what Dr. Gersen may have been doing when Dr. Tiesinga arrived is inadmissible hearsay and without foundation. Testimony about what Mr. Stefanelli might have said is inadmissible hearsay for the reasons set forth in Paragraphs 5 and 6. There has been no showing that the alleged statement is within the scope of his employment. |
| Paragraph 16 | The paragraph is inadmissible as testimony about what "the group" might have said is conjecture and inadmissible hearsay. Moreover, the danger of unfair prejudice substantially outweighs the probative value of admitting vague statements attributed to "the group." Fed. R. Evid. 403. |
| Paragraph 17 | Testimony about what Dr. Amberson may have said is inadmissible hearsay for the reasons set forth in Paragraphs 5, 6 and 12. |

After leaving Dianon, the relator went to work for Ameripath, another reference laboratory, which also uses a comprehensive approach, and employs a 24 antibody panel. Not surprisingly, the relator has also accused that company of fraud and apparently has filed a *qui tam* action against it. *See* Tiesinga Dep. 287:3-288:10 (excerpts attached at Ex. 24).

29.     Relator's deposition testimony speaks for itself regarding his purported viability study.

30.     *See supra* § III, Response 28. Dianon deferred to its pathologists in the construct of the panels of antibodies used. *See supra* § II, Response 29. Their uniform testimony indicates that they believed all antibodies selected were medically necessary. *Id.* Dr. Amberson was not involved in designing Dianon's panel of 26 antibodies; rather, he deferred to his pathologists' determination that the 26 were medically necessary. *See* Amberson Personal Dep.

80:17-81:5 (Ex. 8) ("Q: Who would choose the antibodies that were performed? A: At this time, Dr. DeSilva would, but I believe at this time I think that we had Dr. Connor... my recollection is that she had felt that the panels that when she first saw them that we were using were totally inadequate and that we needed to add more antibodies, and I think she had worked with Dr. DeSilva to do that..."); *see also id* 84:4-12 ("Q: And when... Dr. Connor suggested increasing the number of antibodies, did she have to get approval for that from somebody? A: Well, she would have... mentioned it to me and Dr. DeSilva and she would have made suggestions, and I would have deferred to her judgment"). As to the second sentence, testimony about what "Dianon Management" management may have said is speculative and lacks probative value as the statement is attributed to an undefined group of people called "Dianon Management." *See* Fed. R. Evid. 402, 403. The testimony is also inadmissible hearsay. *See* Fed. R. Evid. 802. As the party seeking to introduce the hearsay, the government bears the burden of proving admissibility. *See, e.g. Douglas v. Pfingston*, 284 F.3d 999 (9th Cir. 2002); *Morris v. Department of Correctional Servs.*, 1995 U.S. Dist. LEXIS 4531, at *26. The statement is not admissible as an admission by a party-opponent under Rule 801(d)(2) because the government has made no showing that the alleged statements, which pertain to Medicare billing procedures, relate to a matter within the scope of the employment of this undefined group. *See Morris,* at *27-29 (excluding hearsay statement alleged to qualify as admission by party-opponent; "the party who is the proponent of the statement has the burden to demonstrate that the agent's statements concern a matter within the scope of the agency... [P]laintiff has failed to establish ... that these statements concern matters within the scope"); *see also Douglas*, 284 F.3d at 1004 (excluding hearsay in FCA summary judgment proceeding because plaintiff failed to provide any

description of job responsibilities of the declarant nor did he show the job duties were related to the alleged statement).

31.    The government is wrong that Dianon could have deleted from claims antibodies that, viewed from hindsight, were not needed to diagnose the patient's condition. The determination regarding whether a service is medically necessary can be based upon the patient's complaint, symptoms, and illness at the time the service is ordered. *See supra* § III, Response 4. Medicare law prohibits knowingly providing patients free services that may induce them to utilize a particular provider, and the Office of the Inspector General (hereinafter "OIG") has opined on multiple occasions that companies are at risk of violating Medicare fraud and abuse laws if they provide free goods or services. *See e.g.*, OIG Advisory Opinion 06-20 (concerning a durable medical equipment supplier's practice of providing patients with free home oxygen until the patients qualify for Medicare coverage of oxygen, as well as the supplier's proposed arrangement to provide patients with a free overnight oximetry test); Advisory Opinion 06-01(concerning a home health agency's practice of providing prospective customers with a free preoperative home safety assessment); Advisory Opinion 05-08 (concerning a laboratory's proposal to provide free blood collection supplies to physicians and pay those physicians for the collection of blood samples); Advisory Opinion 04-04 (concerning a proposed program to provide free vision screening tests for infants); Advisory Opinion 03-4 (concerning a proposed program by a provider of home health care services to provide free medical-alert pagers and pager monitoring service to homebound patients during the period such patients are receiving the company's home health services); Advisory Opinion 02-14 (concerning whether a proposed program to provide free safety equipment to hemophilia patients, as well as free electronic pagers to the parents of pediatric hemophilia patients); Advisory Opinion No. 01-14 (concerning

a hospital's policy of waiving out-of-pocket copayments and deductibles for screening services and certain follow-up services that the hospital offers to promote early detection of breast and gynecological cancers); Advisory Opinion No. 01-19 (concerning a hospital's proposed donation of free office space to an entity that provides free end-of-life services to patients with terminal illnesses). Accordingly, if Dianon did not bill patients for medically necessary services, it would potentially be running afoul of the Medicare Act Civil Monetary Penalty Law and Anti-Kickback Law. *See* 42 U.S.C. § 1320a-7a (a) (5); 42 U.S.C. § 1320a-7b (b). As to the final sentence, Dianon denies that the tests it conducted on patient samples suspected of having leukemia or lymphoma were impermissible general screening tests. *See supra* § III, Response 9.

32. The government does not even bother to cite to any evidence to support its contentions. Hence, for summary judgment purposes, its alleged facts cannot provide a basis for denying defendant's motion for summary judgment. *See* D. Conn. L. Civ. R. 56(a)(3).

33. The government's disputed issue of fact 33 is replete with inadmissible hearsay. The paragraph purports to put at issue statements allegedly made by Dr. Amberson and an amorphous group of people referred to as "Dianon management" to Dr. Tiesinga about flow cytometry lab billing and attempts to imply that Dianon did not view testing for 26 antibodies as medically useful. There is no issue of material fact here because the government's reliance on testimony from Dr. Tiesinga about what various, usually unnamed individuals may have said to him is clearly hearsay. Moreover, the testimony does not satisfy any of the exceptions to the hearsay rule as the government does not assert that any of the declarants—only some of whom are actually identified—are unavailable nor can the statements be viewed as admissions by a party-opponent under rule 801(d)(2). In order for hearsay to be admissible as an admission by a party-opponent, the party seeking introduction of the testimony must show (a) the existence of an

employment relationship; (b) that the statement was made during the course of the employment relationship and (c) that the statement must relate to a matter within the scope of the employment. *See* Fed. R. Evid. 801(d)(2)(D); *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537-538 (2d Cir. 1992); *Morris v. State of New York*, U.S. Dist. LEXIS 4531, at *25 (N.D.N.Y. April 5, 1995). In *Douglas v. Pfingston*, the Court, in granting the defendant in a *qui tam* case summary judgment, refused to consider the relator's affidavit because it was filled with inadmissible hearsay statements like those at issue here. 284 F.3d 999, 1004-1005 (9th Cir. 2002) ("The record does not clearly reveal that [the declarant's] statements concern a matter within the scope of employment. While [the relator] identifies [the declarant] as the MTA's 'Project Engineer,' he does not provide any description of [the declarant's] job responsibilities. Specifically, he does not show that [the declarant's] job duties had anything to do with the MTA's request for federal funding."). Dr. Tiesinga's hearsay statements are even further removed from the realm of admissibility because all but one of the hearsay statements were allegedly made by unnamed individuals referred to merely as "Dianon management." This makes it impossible to determine the identity of the declarant, much less whether the statements had anything to do with the declarant's job duties. The one statement attributed to Dr. Amberson pertains to matters outside the scope of his employment. *See* Amberson 30(b)(6) Dep. 32:2-9 ("So, you know, they [Drs. Goyette and Segal] put forth this 26 antibody panel and I simply asked Dr. Goyette... I'd like to have something in writing that if I'm ever asked why are we using 26 antibodies that I can refer to because I'm not an expert on this...").

    34.    Dianon agrees that the absence of an LMRP (or other official guidance) does not mean that a Medicare provider or supplier can "bill whatever it wants" but it also does not mean that the provider or supplier can be accused of fraud when it acts within a reasonable

interpretation of Medicare's medical necessity rule, as demonstrated by the fact that its decision is: (1) sanctioned by the only ALJ decision on the matter; (2) is endorsed by the government's leading authority on the matter; (3) is recommended by the only text on the issue cited in the carrier's LMRP; and (4) is supported, recognized practice in peer reviewed medical journals. Dianon agrees that the Medicare program relies on providers to correctly certify that their services are medically necessary and indicated.

35.  The government is wrong in that the peer reviewed academic literature is not related to Medicare billing. In the absence of a governing National Coverage Determination issued from CMS and an LMRP, physicians may reasonably rely upon peer reviewed medical literature in determining what services are medically necessary. *See supra* § II, Response 9. Here, in a medical text cited in Connecticut LMRP's, the authors recommend the comprehensive approach and recommend a panel more extensive than the one used by Dianon. *See supra* § II, Response 17. Dianon may reasonably rely on that material until CMS or the carrier adopts or promulgates an alternate rule. *See id.* Moreover, in the only ALJ decision on this issue, the Judge heavily relied on the same peer reviewed medical journals to rule that Impath's 26 antibody claims were appropriately billed to Medicare. *See Impath*, at 6.

36.  These articles do not support the government's position. *See supra* § III, Responses 7 and 8.

37.  Dianon agrees that CMS and carriers do not directly instruct reference labs "how to organize their businesses." As to the second sentence, the government submits no admissible evidence that Dianon elected to establish a "factory-style system" to review every specimen regardless of whether flow cytometry would "even be useful". *See supra* § III, Response 20. The record is replete with evidence that Dianon deferred to its pathologists to determine the

51

medical necessity of its antibodies and that the pathologists, at all times, believed them to be medically necessary. *This* is why the same 26 antibodies were consistently used. *See* Amberson Personal Dep. 72:2-12 (Ex. 8) ("I know that I asked Dr. Goyette that question. That particularly when we went up to 26 antibodies... asked him if these were necessary, why they were necessary... He was extremely passionate, as were the other hematopathologists, that we really needed to offer these antibodies").

38.  The government's statistical findings are incorrect. Its assertions are based on a non-representative analysis of Medicare claims, which includes all types of laboratories (not just independent laboratories), all ICD-9 diagnosis codes (not just the ICD-9 codes relevant to this lawsuit), and all states regardless of whether they had a cap on the number of antibodies they could bill for. As referenced above, using only comparable data demonstrates that Dianon's panel of antibodies was not substantially above the norm between 1996-2004. *See* Panis Decl. at ¶ 13 (Ex. 4). The government's assertion that it could find no other lab that performed a single panel is also inadmissible because the data it relies upon does not contain that data. *See supra* § II, Response 42. If non-independent laboratories and ICD-9's that are not part of this lawsuit are included in the data, then roughly 10% of the claims are for 26 antibodies or more. However, if independent laboratories and ICD-9's that *are* part of this lawsuit are reviewed, then approximately 56% of all claims contain 18 or more antibodies, which the government considers fraudulent. As to the government's contention that this data showed that Impath was paid for panels ranging from 15-28 antibodies, the same data show that Dianon was paid for panels ranging from 18-26. As to Yale's and Johns Hopkins' payment, as the ALJ ruled in *Impath*, hospital's practices vary substantially from independent labs because it frequently has an established diagnosis, *see supra* § II, Response 42, and also have easy access to the referring

52

physician, *see id.* The evidence regarding Dr. Braylan's billings is unsupported and inadmissible. *See supra* § II, Response 17.

39. Dianon has always maintained that its pathologists selected the medically necessary antibodies and that its billing personnel decided what to bill for those antibodies once they were selected. This is confirmed by all the record testimony. *See supra* § III, Response 11. As mentioned above, all billing decisions were made by Dianon billing personnel independent of the medical necessity decision made by the pathologists. *Id.* Since the Dianon billing staff deferred to the professional judgment of its pathologists, it believed it was billing for those markers which were medically necessary.

40. As to the facts regarding Dianon's 1997 voluntary disclosure to the carrier, *see supra* § III, Response 18.

41. As to Dr. Tiesinga's alleged discussion with "management", *see supra* § III, Responses 28, 30, and 33.

42. Dianon did not have any oral conversation with the carrier regarding the number of antibodies under CPT 88180. However, as all agree, Dianon had multiple conversations with the carrier regarding Dianon's billing practices under CPT 88180 and the carrier's application of CPT 88180. *See supra* § II, Response 37. The government is wrong in asserting that these conversations could not have "given any sort of indication to Dianon that it was approving of Dianon's billing for medically necessary tests" because the government's own written communications stated that it was conducting a medical necessity and utilization review and it approved Dianon's claims. *See supra* § II, Response 36.

43. Ex. 35 is inadmissible to support what Dr. Delli Carpini knew and what he communicated to alleged "experts." Dianon agrees that it has responsibility to ensure that

services that are billed are medically necessary and there is no evidence from the Stone Report, which the government cites, to support the government's contention that Dianon attempted to "slough off onto CMS the responsibility to determine medically [sic] necessity."

Respectfully submitted,

/s/ Robert Salcido
Robert Salcido
Fed. Bar No. 447951
(admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4095
Fax: (202) 887-4288
E-mail: rsalcido@akingump.com

Bruce R. Parker
Venable LLP
Fed. Bar No. PHV01015
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, MD 21201
Telephone: (410) 244-7400
Fax: (410) 244-7742
E-mail: BRParker@Venable.com

Thomas Kossl
Dianon Systems, Inc.
200 Watson Boulevard
Stratford, CT 06615
Telephone: (973) 492-1509
Fax: (973) 492-9763
E-mail: kosslt@labcorp.com

Attorneys for Defendant Dianon Systems, Inc.

54