## INDEX TO DEFENDANT'S LOCAL RULE 56(a)(1) REPLY STATEMENT

| Exhibit | Description |
|---------|-------------|
| 1 | Dep. of Jean Stone (excerpts) |
| 2 | Dep. of Arif Toor (excerpts) |
| 3 | 30(b)(6) Dep. of Frank Delli Carpini (excerpts) |
| 4 | Decl. of Constantijn Panis |
| 5 | Dep. of Michel Borowitz (excerpts) |
| 6 | Dep. of Stuart Flynn (excerpts) |
| 7 | Dep. of Raul Braylen (excerpts) |
| 8 | Personal Dep. of James Amberson (excerpts) |
| 9 | Plaintiff United States of America's Objections and Responses to Defendant Dianon Systems' First Set of Interrogatories and Request for Production of Documents (excerpts) |
| 10 | Richard E. Goyette, M.D., Hematology 55-56 (1997)(excerpts); David Jacobs et al., Laboratory Test Handbook 432-433 (5th ed. 2001) (excerpts) |
| 11 | Dep. of Suha Mishalani (excerpts) |
| 12 | Personal Dep. of Frank Delli Carpini (excerpts) |
| 13 | Dep. of Jeannine Holden (excerpts) |
| 14 | Dep. of Glenn Segal (excerpts) |
| 15 | Dep. of Richert Goyette (excerpts) |
| 16 | Dep. of Gerald Rogan (excerpts) |
| 17 | Dep. of Grant Carlson (excerpts) |
| 18 | Dep. of Ann Marie Connor (excerpts) |
| 19 | 30(b)(6) Dep. of James Amberson (excerpts) |
| 20 | Letters from Robert Tucciarone dated June 17, 1997 (Tab A); July 28, 1997 (Tab B); June 23, 2006 (Tab C) |
| 21 | Dep. of Mark Florio (excerpts) |
| 22 | Dep. of William McDowell (excerpts) |
| 23 | Dep. of Kimberly Hade (excerpts) |
| 24 | Dep. of James Tiesinga (excerpts) |

# EXHIBIT 1

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2
    - - - - - - - - - - - - -x
3   UNITED STATES OF AMERICA,
    ex rel. Dr. James J. Tiesinga,    No. 3:02CV1573 (MRK)
4              Plaintiffs,

5           v.
                                      June 21, 2006
6   DIANON SYSTEMS, INC.
                  Defendant.
7   - - - - - - - - - - - -x

8

9

10           DEPOSITION of JEAN STONE

11

12

      Taken before Cindy J. Carone, LSR 383,
13  a Court Reporter and Notary Public, within and
    for the State of Connecticut, pursuant to Notice
14  and the Federal Rules of Civil Procedure, at the
    United States Attorney's Office, 157 Church
15  Street, New Haven, Connecticut, on June 21, 2006,
    commencing at 12:06 p.m.

16

17

18

19

20

21

22

23           Falzarano Court Reporters
               117 N. Saddle Ridge
24           West Simsbury, CT  06092
                 860.651.0258
25
```

1   specific diagnosis, providers were nonetheless

2   expected to follow longstanding policy to only bill

3   Medicare for those services which are reasonable and

4   necessary."

5         How does a physician determine what is

6   reasonable and necessary?

7   A     In general under Medicare statute, the

8   regulation for local coverage determination, in the

9   absence of a specific policy it would be the general

10  standard of practice in the local medical community.

11  Q     In making a medical necessity determination,

12  would it be reasonable for a physician to take into

13  account studies published in peer reviewed medical

14  journals?

15  A     Yes.

16  Q     How about in making a medical necessity

17  determination, would it be reasonable for a physician

18  to take into account the opinions of recognized

19  experts in the area?

20  A     Yes.   To the extent that they're appropriate

21  to the individual patient's medical condition, yes.

22  Q     Also in making medical necessity

23  determinations, would it be reasonable for a physician

24  to take into account other consultations with other

25  health care experts?

1    overt notice to the provider that the service was

2    excluded from coverage.

3             So if you put both those factors together

4    and have a denied claim, because you're right, a

5    denied claim triggers it, would a provider be entitled

6    to payment is what I'm asking.

7                 MR. MOLOT:  Objection.

8        A    There are considerations in addition those

9    two that you cited.  It's not an automatic.

10       Q    I'd like to direct your attention to JS26,

11   the third paragraph.  Quoting, "Even if the laboratory

12   chooses to utilize an overly large panel of antibodies

13   for flow cytometry testing for each and every patient,

14   they should only bill Medicare for the particular

15   antibodies that are medically necessary for diagnosis

16   and treatment of an individual patient."

17             Based on that sentence, what I'd like to ask

18   is if a lab had a standard panel of let's say

19   20 antibodies that was consistent with the guidance

20   and peer reviewed medical journals and consistent with

21   the views of recognized experts in the area and used

22   to diagnose Leukemia or Lymphoma and it turned out

23   that let's say only four markers, four antibodies were

24   necessary to diagnosis the condition, say Hairy Cell

25   Leukemia, should the provider under those

Falzarano Court Reporters

1    circumstances bill for only those 4 antibodies or

2    could it bill for 20 which is the size of its panel?

3                    MR. MOLOT:   Objection.

4        A    Could you restate it because the number of

5    the panel varied in your example.

6        Q    Okay. I don't think it did.

7        A    You started at 26 and then end at 20.

8        Q    No.  You might be thinking of 26 for the --

9    but either way.

10                    THE WITNESS:  Could you read it back?

11

12                    (The last question was read

13                    back by the Court Reporter.)

14

15        A    I'm not a clinician, so I can't answer the

16    specifics because it went from Leukemia, Lymphoma to

17    Hairy Cell.

18                    If only four markers were necessary based on

19    the ordering physician's request, the information that

20    came in on the requisition form for that individual

21    patient, then the four should be what was billed to

22    Medicare.

23        Q    Well, is it your opinion then with respect

24    to a hemopathologist that he's limited to the

25    provisional diagnosis that the referring physician

1    provides in testing for the patient's disease?

2              MR. MOLOT:   Objection.

3        A    It's my understanding that it is the

4    provisional diagnosis, if there's any additional

5    information on the requisition form, the tissue itself

6    if there's a microscopic examination of the sample.

7              Under the OIG compliance guidance shows if

8    there's any question, the laboratory is encouraged to

9    pick up the telephone and talk to the doctor, and if

10   they can't reach the doctor, anyone else that has

11   access to the medical records.

12       Q    Maybe the question is unclear.  With respect

13   to the provisional diagnosis that has to do with a

14   potential cancer having to do with the blood or lymph

15   system --

16       A    Okay.

17       Q    -- upon running the panel, the

18   hemopathologist is able to diagnosis Hairy Cell

19   Leukemia and needs only four antibodies to diagnosis

20   that condition.

21             Under those circumstances, does he bill --

22   as an expert medical necessity, does he bill for the

23   four antibodies used that he ultimately concluded was

24   the diagnosis, or does he bill for the full panel of

25   20?

1       MR. MOLOT:  Objection.

2       A     If I understand the question to be that the

3    requesting physician's potential diagnosis was

4    associated with 20 markers for that individual patient

5    because the suspected diagnosis would have included a

6    panel of 20 and the subsequent confirmed diagnosis

7    would have only needed four, if the ordering

8    physician's suspected diagnosis for that particular

9    patient would have required 20 in that specific

10    example, then 20 could have been billed.

11       Q     Yes, you understood the question.

12            One other question I have on this particular

13    paragraph that confused me, and that is -- I'm jumping

14    to where the comma starts on the second line if I can

15    -- "It should only bill Medicare for the particular

16    antibodies that are medically necessary for the

17    diagnosis and treatment of the individual patient."

18            My question is I want to compare that to a

19    statement you make a couple pages earlier.   I

20    apologize for this jumping around.

21            It's going to be JS24, the paragraph that is

22    second to the bottom and more specifically the last

23    sentence there which reads, "a single interpretation

24    is made based on all the markers tested, not of each

25    marker individually."

1          Is that your understanding of how an

2    interpretation is made?

3        A    Yes.

4        Q    Now, if an interpretation is made based upon

5    all markers tested, then going to the other sentence I

6    brought to your attention; that is, "it should only

7    bill Medicare for the particular antibodies that are

8    medically necessary for the diagnosis and treatment of

9    an individual patient," how would it know which

10   antibodies to take out if it bills for the panel as a

11   whole?

12          MR. MOLOT:  Objection to the form.

13       A    The comment on page JS24 says that a single

14   interpretation is made on all the markers tested, not

15   of each marker individually.  The assumption in that

16   statement was that the markers tested would only be

17   the medically necessary markers.

18          The comment on page 26 talks about if a

19   laboratory for its own convenience uses a specific

20   panel every time, then they should only bill Medicare

21   for the antibodies that were medically necessary for

22   that individual patient.  And it would be contingent,

23   the responsibility of the lab to determine which ones

24   would have been appropriate.

25       Q    How does it do that?  How does it determine

1  which ones are appropriate?

2      A     The assumption that I gather from the AMA is

3  that they have broken out the codes into three

4  different categories of interpretation:  2 to 8

5  markers, 9 to 15 markers, 16 or more markers or that

6  different patient conditions require different

7  markers.

8           It's not a one size fits all.  So that if an

9  individual patient's condition, they only need a

10  certain number of markers, only those markers should

11  be billed to Medicare.

12          If they're going to run a bigger panel,

13  that's the lab's problem to figure out which ones are

14  appropriate.  The pathologist should be choosing for a

15  particular patient which are the appropriate markers

16  to utilize.  Not every marker is appropriate for every

17  cancer.

18      Q     How does a physician judge which markers are

19  appropriate for which cancers?

20      A     Based on training, based on standard of

21  practice in the local medical community.

22      Q     Rather than speaking generally, speaking

23  specifically with respect to CPT 88180, is it your

24  experience that in local medical review policies, that

25  carriers will list ICD9s that justify medical

**EXHIBIT 2**

1    UNITED STATES DISTRICT COURT
         DISTRICT OF CONNECTICUT      ORIGINAL
2
     - - - - - - - - - - - -x
3    UNITED STATES OF AMERICA,
     ex rel. Dr. James J. Tiesinga,    No. 3:02CV1573 (MRK)
4              Plaintiffs,

5          v.
                                       July 12, 2006
6    DIANON SYSTEMS, INC.
               Defendant.
7    - - - - - - - - - - - -x

8

9

10        DEPOSITION of ARIF TOOR, M.D.

11

12
         Taken before Cindy J. Carone, LSR 383, a
13    Court Reporter and Notary Public, within and
      for the State of Connecticut, pursuant to
14    Subpoena and the Federal Rules of Civil
      Procedure, at The Tollgate Hill Inn, 571
15    Torrington Road, Litchfield, Connecticut, on
      July 12, 2006, commencing at 10:10 a.m.

16

17

18

19

20

21

22

23
             Falzarano Court Reporters
24              117 N. Saddle Ridge
             West Simsbury, CT  06092
25                860.651.0258

1        This is one area where sometimes we then

2   went back, never objected to anything because it was

3   not in the policy.  But if subsequently we came to

4   know that it was not being done correctly or being

5   done excessively more than what was medically

6   necessary, then we would go back and recover it from

7   them.

8        So medical necessity is sort of a separate

9   issue other than creating a Local Medical Review

10  Policy which would give you broad guidelines.  But

11  medical necessity is the inherent medical duty and job

12  of the provider themselves.

13     Q    In conducting due diligence to learn whether

14  a service is medically necessary and indicated, what

15  should a physician do?

16     A    On the medical necessity side you again

17  reviewed literature and then went accordingly.  Also

18  you used your consultants if you couldn't find

19  information and asked people to help you with

20  literature and then made the decision accordingly.

21     Q    In terms of due diligence, would one factor

22  be to review research studies published in the

23  peer-reviewed medical journals?

24                 MR. MOLOT:  Objection; due diligence?

25                 MR. SALCIDO:  He used the term that it

**EXHIBIT 3**

# ORIGINAL

1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2
    - - - - - - - - - - X
3  UNITED STATES OF AMERICA,,    |
   ex rel. Dr. James J. Tiesinga,|
4          Plaintiffs,           |   No. 3:02CV1573(MRK)
                                  |
5              v.                 |
                                  |
6  DIANON SYSTEMS, INC.,          |
              Defendant.          |   July 25, 2006
7  - - - - - - - - - - X

8

9

10   VIDEOTAPE DEPOSITION OF FRANK DELLI CARPINI, M.D.

11               30(b)(6) Testimony

12

13       Taken before Kristine A. Paradis, LSR 338, a
         Court Reporter and Notary Public within and for
14       the State of Connecticut, pursuant to Notice
         and the Federal Rules of Civil Procedure, at
15       the offices of First Coast Service Options,
         Inc., 321 Research Parkway, Meriden,
16       Connecticut, on July 25, 2006, commencing at
         11:23 a.m.

17

18

19

20

21

22

23          FALZARANO COURT REPORTERS
24            117 North Saddle Ridge
        West Simsbury, Connecticut 06092
25               860.651.0258

1    needed to develop the LMRP and acquire the

2    background information.  In particular, in regards

3    to 88180, there would be a research conducted onto

4    what is 88180, what is it utilized for, what is it

5    needed for, when would a clinician use it,

6    indications for usage, and the medical necessity and

7    the pertinence of the test.

8              And the literature and the text that are

9    listed there are used as reference material for

10   acquiring that knowledge to put that into an LMRP

11   format.

12        Q    Would that information contained in

13   Sources of Information a Basis for Decision provide

14   education to physicians regarding useful sources of

15   information regarding a service covered by the LMRP?

16              MR. MOLOT:  Object to the form.

17        A    The physician -- the provider community

18   has this list provided to them for that purpose at

19   the -- at the development of the LMRP and the -- and

20   bringing it to the CAC.  This is part of the

21   document that exemplifies to the provider community

22   the document -- the reference material that was used

23   to formulate the policy.

24              MR. SALCIDO:  Is this 13?

25              THE COURT REPORTER:  (Nod.)

Falzarano Court Reporters

1    Figure 2.6."

2         Q    Now, is there any indication in the LMRP

3    that some other approach was advocated rather than a

4    comprehensive approach?

5                   MR. MOLOT:  Objection.

6         A    No.  I do not recall the LMRP referencing

7    which approach should be used.  It was basically

8    left at the discretion of the provider to provide

9    medically necessary and pertinent services to the

10   carrier.

11   BY MR. SALCIDO:

12        Q    Do you know whether physicians can rely on

13   peer-reviewed medical journals when making decisions

14   regarding medical necessity?

15                   MR. MOLOT:  Objection.

16        A    If -- if -- if a physician is referencing

17   peer-reviewed literature and incorporates it into

18   their practice of medicine, then I would assume that

19   they could incorporate that.

20   BY MR. SALCIDO:

21        Q    Would it be your view that a physician

22   could read this text which was cited in your LMRP

23   under Basis of Decision and then rely on this

24   comprehensive approach in terms of designing an

25   antibody panel?

```
1                    MR. MOLOT:  Object to the form of the
2            question.
3        A    If the situation was exactly the same,
4  yes.
5  BY MR. SALCIDO:
6        Q    If you could, Doctor, could you go to the
7  next page.
8        A    Uh-hum.
9        Q    Now, in terms of the first sentence on
10 that page, "The clinical impression or the
11 morphologic features of the specimen should not
12 dictate the design and selection of an antibody
13 panel"?
14                   MR. MOLOT:  I'm sorry, where are you
15           reading, Robert?
16                   MR. SALCIDO:  First sentence, page 17.
17                   THE WITNESS:  Oh, you said 23.
18                   MR. MOLOT:  You said the next page.  We
19           were on 22, you went to 23.
20                   MR. SALCIDO:  Oh, I apologize.
21                   MR. MOLOT:  We were both page 23.
22                   MR. SALCIDO:  I'm sorry.  I skipped back
23           to 16.
24                   THE WITNESS:  So, we're on 17?
25                   MR. SALCIDO:  Yeah.  Yeah.  I must have
```

```
 1    forth in published peer-reviewed medical journals?
 2                    MR. MOLOT:  Objection.
 3                    THE WITNESS:  Should a physician --
 4                    MR. SALCIDO:  You're changing the
 5           question.
 6                    THE WITNESS:  I'm sorry, I don't
 7           understand the question.
 8    BY MR. SALCIDO:
 9        Q    Would it be reasonable -- not should.
10        A    Okay.
11        Q    Would it be reasonable for a physician to
12    rely upon peer-reviewed medical journals?
13                    MR. MOLOT:  Objection.
14        A    Yes, a physician can certainly rely on
15    peer-reviewed medical journals.
16    BY MR. SALCIDO:
17        Q    Could a physician also reasonably rely on
18    consensus of expert medical opinion in determining
19    whether a service is medically necessary and
20    indicated?
21        A    In relation to submitting a claim to
22    Medicare?
23        Q    Yes.
24        A    Yes.  And -- and for the record, this
25    particular section of the manual talks to the CAC
```

1    process and that we did get a consensus of expert

2    medical opinion by that process, by putting this

3    through the CAC process.  The pathologists of

4    Connecticut and the hematopathologists and our

5    representation to the CAC process were -- were --

6    were alerted to the policy and to the comment

7    period.  So, we did include that whole paradigm of

8    clinical people to help us with this policy in the

9    comment period.

10   BY MR. SALCIDO:

11       Q    But you understand that wasn't my

12   question.

13       A    But I answered your question.

14       Q    Yes.  But that second part was -- I mean,

15   it's fine, but just so the record is clear, that

16   that's unrelated what my question was.

17       A    Yeah, but I wanted to make sure that the

18   record was clear that -- what we were referencing in

19   these bullets.

20       Q    Okay.  Fair enough.

21            Is it also reasonable for physicians to

22   rely upon medical opinions derived from consultation

23   with medical association and other health care

24   experts?

25            MR. MOLOT:  Objection.

Falzarano Court Reporters

1    circumstance an expert would say that blanketly they

2    can bill the frequency that is being asked?

3           MR. SALCIDO:  No, I'm sorry.  We'll have

4           to change the tape.  I tried to wrap it up

5           before the last tape.  I'm sorry.

6           THE VIDEOGRAPHER:  Going off record --

7           MR. SALCIDO:  It got butchered.

8           THE VIDEOGRAPHER:  Going off record.

9           Time is 1:21.

10

11           (Recess taken:  1:21 to 1:22 p.m.)

12

13           THE VIDEOGRAPHER:  Back on record.  Time

14           is 1:22.

15   BY MR. SALCIDO:

16       Q    Okay.  Let me try it this way.  Let's say

17   peer-reviewed medical journals containing

18   international consensus conferences, so recognized

19   medical experts, determine that a certain frequency,

20   a service is needed in order to diagnose the

21   patients.  Can a physician reasonably rely on the

22   expert opinions embodied in that peer-reviewed

23   medical journal to determine whether a service is

24   medically necessary or indicated?

25           MR. MOLOT:  Object to the form.

1        A    In clinically evidence-based research, if

2    the particular piece of literature references the

3    specific specimen that they're using to gain

4    knowledge from, I would assume that they could, if

5    everything being the same.

6                    MR. SALCIDO:  Okay.  I think I'm done,

7             Rick, but give me five minutes --

8                    MR. MOLOT:  Sure.

9                    MR. SALCIDO:  -- to look over my notes.

10                    THE VIDEOGRAPHER:  Going off record.

11             Time is 1:24.

12

13                    (Recess taken:  1:24 to 1:28 p.m.)

14

15                    THE VIDEOGRAPHER:  Back on record.  Time

16             is 1:28.

17                    MR. SALCIDO:  I've concluded my exam.

18                    MR. MOLOT:  I have no questions.

19                    THE VIDEOGRAPHER:  Going off record.

20             Time is 1:28.

21

22                    (Deposition concluded:  1:28 p.m.)

23

24

25