**EXHIBIT 6**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
2

3     - - - - - - - - - - - - - - - - )
                                      )
4     UNITED STATES OF AMERICA,       )
      ex rel. Dr. James J. Tiesinga   )NO.: 3:02CV1573(MRK)
5             PLAINTIFFS              )
                                      )
6     VS.                             )
                                      )
7     DIANON SYSTEMS, INC.            )
              DEFENDANT               )
8     - - - - - - - - - - - - - - - - )

9

10

11            DEPOSITION OF: STUART FLYNN, M.D.

12            DATE TAKEN: MAY 10, 2006

13            LOCATION: UNITED STATES DEPARTMENT OF

14                      JUSTICE

15                      157 CHURCH STREET

16                      NEW HAVEN, CONNECTICUT

17

18

19

20

21    REPORTED BY:  IRENE J. PARRISH, RMR, LSR #085

Stuart Flynn, M.D. - 5/10/06

Page 142

1  follow-up questions, I'll ask you. Name, firstly,
2  the ones that you believe should not be included in
3  the standard of care by a flow lab seeking to get a
4  full distinction of immature and mature nucleated
5  bone marrow cells.
6      MR. MOLOT: Objection to the form of
7      the question.
8      A   I want to make it clear that Glycophorin A in
9  the overall sphere of all diseases has merit. Do I
10 think it's medically necessary for a
11 one-size-fits-all panel, and the answer is, no, I do
12 not so I think that is not within the standard of
13 care. I think CD61 is another antibody that stains
14 megakaryoblastic leukemias, very similar scenario as
15 Glycophorin A.
16      TCR gamma delta, TCR alpha beta are
17 elements that address the possibility of T cell
18 differentiation. Again, they have merit, but they
19 have merit when the very specific question for those
20 antibodies is being asked, not in a one-size-fits-all
21 panel. So that would -- and then there's overlap

Page 143

1  with some of these. So, once again, you know, you
2  get -- you don't get additional information. You
3  might get confirmatory information for some of these
4  antibodies.
5      Q   Doctor, that may or may not be true, but my
6  question is which ones are you going to tell me now
7  are not within the standard of care for a flow lab to
8  use to answer this question?
9      MR. MOLOT: Objection.
10     A   Well, again, this question is big and vague
11 enough where without being focused on a given
12 question at hand it becomes a problematic question to
13 answer. If you tell me a patient has erythroleukemia
14 should we use Glycophorin A to validate it or we're
15 following it, the answer would be yes.
16     So I will stop with those that I have
17 mentioned, but some of those others fall under the
18 same context, that we don't work in a vacuum and that
19 we do have the opportunity to not have to show
20 everything about a given case the first time we
21 address it.

Page 144

1  BY MR. PARKER:
2      Q   Anything else?
3      A   No.
4      MR. MOLOT: Are you finished with this
5      article?
6      MR. PARKER: Yeah.
7  BY MR. PARKER:
8      Q   Let's go next to Exhibit No. 4 which is the
9  United States/Canadian Consensus Recommendation. Do
10 you have that before you?
11     A   Yes.
12     Q   And, Doctor, this -- firstly, you didn't
13 participate in this United States/Canadian consensus,
14 did you?
15     A   I did not.
16     Q   And to your knowledge, none of your
17 colleagues at Yale participated in this effort to
18 develop a consensus statement for performing flow?
19     A   I don't see their names here.
20     Q   Just so we're looking at the same one, I'm
21 looking -- I think there were two documents for the

Page 145

1  United States/Canada consensus. I'm looking for a
2  moment in my notes for the one that says, "Selection
3  of antibody combinations." We're on the same one?
4      A   Correct.
5      Q   And, Doctor, if you would look on the first
6  page where it says, "Recommendations, Strategies for
7  Selection of Antibodies." Do you see that?
8      A   Yes.
9      Q   The authors -- and let me stop again and go
10 back. This was one of the papers in your materials
11 that you said you reviewed?
12     A   Correct.
13     Q   Okay. Now, these authors describe that there
14 were three different approaches that various
15 different experts that attended this conference
16 proposed, one of which is to use a general
17 comprehensive panel of antibody combinations. The
18 second was to use a minimal screening panel followed
19 by a more specific set of reagents, and the third was
20 to use a directed or targeted approach, correct?
21     A   Correct.

37 (Pages 142 to 145)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

Stuart Flynn, M.D. - 5/10/06

Page 146

1    Q    Now, as you understand the Dianon approach,
2  would you agree that they used a general
3  comprehensive panel?
4    A    Correct.
5    Q    And your lab, as you have described it, would
6  they fall into the minimal screening panel approach
7  or a targeted directed approach?
8    A    I think in those three definitions a
9  directed, targeted approach.
10   Q    Okay.  Do you see further with respect to the
11 directed or targeted approach on the right-hand
12 column these authors wrote --
13            MR. MOLOT:  What page?  I'm sorry.
14            MR. PARKER:  232.
15 BY MR. PARKER:
16   Q    "This may require" -- referring to the
17 directed or targeted approach, correct?
18   A    Correct.
19   Q    "This may require a single and relatively
20 reduced panel of antibodies but is impractical in
21 laboratories lacking the support of additional

Page 147

1  information and may be hazardous in cases in which
2  this information is incorrect."  Now, firstly, I've
3  read it correctly?
4    A    You have.
5    Q    And do you agree with that or disagree?
6    A    Well, it would depend on how they're defining
7  "targeted."  If "targeted" means a history comes in
8  as CLL and you only look for CLL, I think their
9  statement is correct.  I don't believe that's how I
10 approached the Dianon cases, and at some point, we'll
11 be able to discuss that.  So that would be my first
12 point.  So I think I do have the ability in the
13 panels that I've come up with on the Dianon cases to
14 not just target the one piece of information that's
15 been given to Dianon.
16           And, secondly, I've already commented on
17 the support of additional information.  I think
18 Dr. Mishalani supports the fact that she was able to
19 at least inquire and, therefore, assumed to get
20 additional information on some if not most of her
21 patients.  That practice is no different than my

Page 148

1  practice so I think as a statement this statement is
2  defensible in some regard, and it's also debatable in
3  other regards.
4    Q    And you would agree that at least some
5  members of this conference advocated the very
6  approach that Dianon is using in this case and which
7  you've criticized?
8            MR. MOLOT:  Objection.
9    A    I don't know if they're advocating.  I think
10 they're addressing the merits and potentially the
11 detriments to those, and I think they've made that --
12 in the opening paragraph of the comprehensive panel,
13 they do comment on some of the detriments.
14 BY MR. PARKER:
15   Q    Doctor, the antibodies that constituted the
16 Dianon standard panel as it was described in
17 Dr. Goyette's memo that we just discussed are all
18 represented in this Table No. 1 of this paper, are
19 they not?
20           MR. MOLOT:  Do you want to look back?
21           THE DEPONENT:  No.

Page 149

1  BY MR. PARKER:
2    Q    It's not a trick question.
3    A    I know it's not, but I don't want it to come
4  back as a trick question.
5    Q    Well, if it did, I've already told you it was
6  not a trick question.
7    A    And I assumed you were telling me the correct
8  answer.  It looks like they're virtually all and
9  probably all represented here.
10   Q    Let's turn to the last page, page 235, of
11 this paper.  And the authors -- I'm referring to the
12 first paragraph -- at the end of that paragraph wrote
13 the following, "A restricted panel of antibodies may
14 limit our ability to recognize neoplastic cells or to
15 determine their correct type."  You agree with that
16 statement?
17   A    Again, I would have to just get clarification
18 of what they're referring to as a restricted panel.
19 I think there's too much play in this sentence to
20 really defend or refute.  I think in the overall
21 sphere of life every panel's restricted because

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

**EXHIBIT 7**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

NO. 3:02 CV 1573(MRK)


UNITED STATES OF AMERICA, ex rel.
DR. JAMES J. TIESINGA,

      Plaintiff(s),

- vs -

DIANON SYSTEMS, INC.,

      Defendant(s).

───────────────────────────


V I D E O   E X A M I N A T I O N

OF

RAUL C. BRAYLAN, M.D.


TAKEN ON
BEHALF OF:      The Plaintiff

DATE:           June 15, 2006

TIME:           Scheduled start:  9:00 a.m.
                Actual Start:     9:07 a.m.
                Conclusion:       12:32 p.m.

PLACE:          Unites States Attorney's Office
                300 West University Avenue
                Suite 310
                Gainesville, Florida 32601

REPORTER:       Anne C. Noble, RPR, FPR, CSR-GA, WA
                Notary Public: Florida and South Carolina


ADVANTAGE COURT REPORTERS

Page 42

1  results rather than select on the -- select on the --
2      (Whereupon, deponent's pages sounds.)
3      MS. DAVIS: Let's go off the record.
4      (Whereupon, there was a pause in the
5  proceedings.)
6      A. Excuse me. The information is mostly to
7  interpret the results and convey to the clinician the
8  appropriate information or to go back and look for
9  something that we did not look at because we didn't
10 have that piece of information. It is not to restrict
11 our panel, unless the number of cells in that sample
12 is insufficient, in which case, we have to determine,
13 in that case, what to do, what is the best panel to
14 use.
15      But the vast majority, if we have enough
16 cells, we just complete -- we do the whole panel for a
17 variety of reasons.
18 BY MS. DAVIS:
19     Q. And those reasons are?
20     A. What?
21     Q. And what reasons are those?
22     A. The other argument that is being proposed is
23 that we need to look at the microscopy, the
24 microscopic findings --
25     MR. PARKER: Didn't she ask you what your reasons

Page 43

1  were for --
2      A. Oh, I'm sorry. I couldn't hear that. My
3  reasons for --
4  BY MS. DAVIS:
5      Q. Reasons for -- in the situation where you
6  have the complete medical background for the patient,
7  and you still do the entire panel.
8      A. Well, it varies with the case. It depends on
9  the situation. But, in general --
10     Q. No; but you just said that it didn't. You
11 just -- even when you open the computer, and you can
12 look at --
13     A. I thought you said the reason for me to --
14 not to --
15     Q. No. You described a situation where you are
16 opening up the records for this type of patient.
17     A. Uh-huh.
18     Q. You have the complete medical history of the
19 patient, all of the tests that have been performed on
20 the patient, what medications have been given to the
21 patient, and despite all that information, you still
22 do the entire panel of antibodies. And you said you
23 had reasons for that. What reasons are those?
24     A. The reasons for using a complete panel -- I
25 consider a complete panel a single test; that each

Page 44

1  individual reagent provides information on a cell
2  type, on a cell stage of maturity, and on the function
3  of the cells and so on. So it gives us a complete
4  panoramic view of the marrow in that particular
5  situation.
6      Then if we have a concern for what we see,
7  then we would add more reagents or maybe we can call
8  the doctor and say, "Look, we're seeing something here
9  that we shouldn't be seeing."
10     So the approach of having a full panel as a
11 single test is something that we have instituted after
12 even trying several times to cut it down in pieces.
13 We found ourselves too often going back to the sample
14 and redoing more of the testing with a consequent
15 waste of time, waste of sample. Particularly after
16 hours, the sample deteriorates. It was more work and
17 more labor and more headaches. We could never
18 determine for sure if something that we are seeing on
19 this particular reagent was right or wrong. We have
20 to have more.
21     So this was several years ago. We decided
22 that that's not the way to go.
23     Now, when we have a full panel, first of all,
24 the diagnosis is complete. Second, the assessment of
25 all the cells in that particular sample -- and, again,

Page 45

1  I repeat this; are very precious samples and cannot be
2  recovered again. These are very difficult diseases
3  that require either very toxic drugs, very difficult
4  drugs for the patient or even transplantation
5  procedures, which are extremely, extremely risky for
6  the patients. We could not afford to miss something.
7  We could not afford to ignore something. We decided
8  that since we have that very precious sample, that is
9  very complex, in a patient with life-threatening
10 diseases, that we need to do our best to simply look
11 at every single aspect of that marrow because marrows
12 can change with treatment, secondary diseases can
13 occur, changes that we did not expect, an infection
14 can occur. Think all kinds of things. So our
15 approach is to simply get as much information as we
16 can once we have that sample in our hands.
17     And this is not going to end here. It's
18 going to continue on because we're getting more and
19 more very informative reagents from genetic studies,
20 from biological studies. So it's not going to be just
21 thirty or forty reagents in the future. It's going to
22 be more. We're just going to have to devise
23 techniques to assemble them and analyze them in a very
24 efficient manner.
25     Q. Now, you said one of the reasons you do the

12  (Pages 42 to 45)

ADVANTAGE COURT REPORTERS

2291bb67-f68c-4f22-ac73-e80665553f8f

## Page 102

1  patient's sake. If I were the patient, that is what I
2  would demand.
3       Q. What does, for example, one of the things you
4  have on your add-on list is CD-57.
5       A. Uh-huh.
6       Q. Under what circumstances would you add that
7  on?
8       A. When we find something unusual with T-cells,
9  for example. It's an NK marker. Cancers are
10  caricatures of normal cells. They don't behave like
11  normal cells. So if you have a cancer of NK cells,
12  they may or may not have the usual markers for NK
13  cells as we have on the initial panel. So 57 is used
14  to confirm that something is an NK; "natural killer
15  cell," NK. So it's to confirm that. You can use it
16  up front, or you can use it as an add-on, and people
17  argue as to whether or not it's necessary. But, you
18  know, we're not going to get a standardization at this
19  point.
20       Q. Okay. What about 103?
21       A. 103 is -- again, we had it before. We had
22  that in our panel. One of the most common -- most
23  common indications of flow is what is called
24  cytopenias, which means low cell counts, and it's
25  invariably -- when the patient has cytopenias, the

## Page 103

1  patient goes to a hematologist or an oncologist, who
2  then looks at the marrow or pulls the marrow and sends
3  it to flow cytometry. It's a standard procedure.
4       And "hairy" cell leukemia, even though it's a
5  relatively infrequent disorder, can cause cytopenias
6  and may not be detectable by routine morphology.
7       So 103 is one of the markers that we use for
8  "hairy" cell leukemia. In a patient with cytopenias,
9  if we find "hairy" cell leukemia, it's a major, major
10  discovery, even though it's infrequent, because those
11  patients, at the moment, can be almost -- almost
12  cured -- okay? -- by just a single injection of a drug
13  over one week. So it's important to detect it even
14  though it's not so frequent.
15       Q. Okay. Are any of the other markers, that are
16  listed on your base panel, do they detect "hairy"
17  cell?
18       A. Nothing is detected by a single -- I wish it
19  did, then we would use this -- those ones. The
20  approach, as I mentioned, initially, this is a test.
21  No single antibody gives every answer. So it is a
22  combination of antibodies that allow us to say this is
23  disease A, this is B, this is C. "Hairy" cell
24  leukemia is an exception. "Hairy" cell leukemia
25  requires a set of antibodies for its detection. The

## Page 104

1  set of antibodies are usually considered to be helpful
2  in the diagnosis of B-cell reagents, either 19 or 20.
3  We use 20. Other people believe 19. Both are even
4  more, you know, strong indicators.
5       In addition to the B-cell markers, of course,
6  Kappa and Lambda for clonality. But what really tells
7  that it's a "hairy" cell leukemia is a combination of
8  CD-103, CD-25 and something called 11-C. So when you
9  have a B-cell that is clonal and has all of that, you
10  have "hairy" cell leukemia.
11       Q. Okay. So if you ran this panel, the base
12  panel, what, in the panel, would trigger you to go and
13  add the 103?
14       A. At the present time, the panel just that I
15  mentioned, it will be the fact that I have a
16  B-cell clonal population that has 11-C, and it has 25.
17  Did I give you 25 somewhere?
18       MR. PARKER: Yes.
19       A. I may have forgotten.
20  BY MS. DAVIS:
21       Q. I have to add it.
22       A. Okay. Sorry.
23       Q. You're not doing very well on this test.
24       A. It's on a per basis. So if I see something
25  that is clonal -- also, it changes the physical

## Page 105

1  properties. The "hairy" cells are different from
2  normal lymphocytes. So if I see physical differences,
3  usually in size or complexity, and I note that those
4  are B-cells and not clonal, and that they have 11-C
5  and they have 25, then in a patient, you know, then I
6  might take a look and see if the patient is cytopenic.
7  Then I would add 103.
8       Q. Okay. Are there some diseases out there that
9  are very rare that would not be picked up by this
10  panel (indicating)?
11       A. I would say, "No." That panel serves not
12  necessarily for diagnosis but for detection of
13  abnormalities. So I doubt that there would be
14  anything that we would miss from that panel. It may
15  not be diagnostic. In other words, we may not know
16  what it is, but we will see something is abnormal, and
17  it will prompt us to do more.
18       Q. Okay. Which of the antibodies would indicate
19  to you that you needed to do something more in terms
20  of -- I'm just going to give you a name. It's
21  erythroleukemia?
22       A. Erythroleukemia. It's -- we will pick up
23  with glycophorin A, which is a red cell marker. A
24  CD-71 is a marker that is not specific for red cells,
25  but it has something to do with the fact that the red

ADVANTAGE COURT REPORTERS

2291bb67-f68c-4f22-ac73-e80665553f8f

**EXHIBIT 8**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------x
UNITED STATES OF AMERICA        :
ex rel. JAMES J. TIESINGA,      :
                                :
         Plaintiff,             :
                                :
         v.                     :  No. 3:02CV1573(MRK)
                                :
DIANON SYSTEMS, INC.,           :
                                :
         Defendant.             :
-----------------------------x

                              Washington, D.C.

                         Tuesday, March 28, 2006

Deposition of

             JAMES AMBERSON

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 10:46 a.m.,

at the offices of the United States Department of

Justice, 601 D Street, NW., Washington, D.C.,

before Denise Dobner Vickery of Beta Court

Reporting, notary public in and for the District

of Columbia, when were present on behalf of the

respective parties:

50

1  project?
2      A   Like I say, I don't remember this
3  very well.  I believe it was to look at what
4  we could do to improve our processes.  Do
5  things more efficiently.
6      Q   Okay.  If you look at the middle of
7  the page it says "The overall goals of the
8  projects are to" and then it has four bullet
9  points listed there.  Is that consistent with
10 what you remember of the purposes of the
11 review?
12     A   Yes.  It looked like it would have
13 been whatever we can do to make things --
14 provide more timely service and make things
15 more efficient.
16     Q   Okay.  So, one of those is reduce
17 turn-around time?
18     A   Yes.
19     Q   Okay.  And I have got several other
20 memos.  Let me just have you take a look at.
21     MR. PARKER:  There are two other
22 memos that were attached to Exhibit 4.

51

1      MS. DAVIS:  Attached to them?
2      MR. PARKER:  Do you intend to have
3  them all?
4      MS. DAVIS:  No.  Just take off --
5  take off the other two.
6      MR. PARKER:  Okay.
7      MS. DAVIS:  Take a look at 5.
8          (Deposition Exhibit No. 5 was
9          marked for identification.)
10     MS. DAVIS:  Sorry about that.  I'm
11 giving you my copy again.  And this
12         (Deposition Exhibit No. 6 was
13         marked for identification.)
14 BY MS. DAVIS:
15     Q   Are these -- also they're titled
16 "Status Reports."  Are these status reports
17 on the process review that we were just
18 talking about?
19     A   They appear to be, yes.
20     Q   Okay.  If you take a look at page
21 16532.  It's on the 2/14 memo.
22     A   Yes.

52

1      Q   It says, "Three top priority
2  problems have been identified.  Specimens
3  need to reach pathologists by 9 a.m. on day 3
4  second day in-house in order to significantly
5  reduce TAT, turn-around time.  The current
6  window for diagnosis, dictation and callbacks
7  of morphology is only about a half a day."
8  Do you know what that refers to?
9      A   It looks like it's referring to the
10 optimal time to get the specimens to the
11 pathologist.
12     Q   Were you -- were you present at any
13 of these meetings that apparently they held?
14 Other than the first one?
15     A   I don't remember.  I don't think I
16 was present at them on a regular basis.
17     Q   Okay.  You're cc'ed, though, on
18 these reports?
19     A   Yes.
20     Q   So you got the reports?
21     A   Yes.
22     Q   Was the focus of this review

53

1  primarily to reduce the turn-around time of
2  the specimens through the lab?
3      A   I think the focus on this was to do
4  what we could do to provide the most timely
5  and efficient services to problems that would
6  result in specimens delays.
7      Q   Okay.  If you take a look at page
8  number PP 10782.  I think it's Exhibit 6.
9      A   This one.  Okay.
10     Q   Yeah.  And if you look at number 2.
11 It says, "Tish Liaguno -- Liaguno reported a
12 50 percent reduction in hematopathology cases
13 on the day's in-house report.  This report
14 documents all hematopathology cases over
15 three days in-house."  Did you keep pretty
16 close track of which cases were in-house a
17 long time?
18     A   Yes, we would do that.  We've
19 always done that to look for cases that were
20 in-house longer than what our clients would
21 expect.
22     Q   Okay.  What would -- and what would

14 (Pages 50 to 53)

54

1 the clients expect?
2     A    I think in general for specimens,
3 they expected, you know, 48-hour turn-around
4 time.  I don't remember exactly what it was
5 for hematopathology, but I think there was a
6 little more leeway there because the testing
7 was so much more extensive.
8     Q    Tell me how you run through the
9 names of the people on this -- on these
10 reports and tell me -- let's go with the
11 1/13/96 memo.
12    A    Okay.
13    Q    And let me ask you.  I'm looking at
14 the dates on these.  If you read all the
15 documents, it looks like this review is
16 supposed to take place over a five-week
17 period, but we have documents that are
18 numbered -- are dated in '96 and then also in
19 '97.  Do you recall which would be correct?
20 No?
21    A    I don't know.  This one that's
22 dated '97 I think is correct because it says

55

1 received by Kevin Johnson looks like March
2 '97.
3     Q    Okay.
4     A    So I assume that if it was stamped
5 then, that's when he got it.
6     Q    Okay.  Okay.  Let's go back to the
7 1/13/96 and go through just the folks on the
8 list.  Raynae -- Raynae Barschow?
9     A    Raynae Barschow.
10    Q    Okay.  Who was?
11    A    She was in pathology support.
12    Q    Okay.  Steve Brown?
13    A    He was the flow cytometry
14 supervisor.
15    Q    Kathy Jean Carney?
16    A    She was supervisor of histology.
17    Q    Chuck Frederick?
18    A    I don't remember.
19    Q    Aliza George?
20    A    I think she may have worked in
21 accessioning.  That is, where specimens were
22 received, but I'm not certain.

56

1     Q    Okay.  We know Dr. Goyette.  Sandra
2 Priest?
3     A    I don't remember.
4     Q    Dr. Segal?
5     A    He's a hematopathologist.
6     Q    Marty Stefanelli?
7     A    He worked in operations.  I think
8 he was director of operations or that portion
9 of operations at the time.
10    Q    Okay.
11    A    I think he was director of
12 operations.
13    Q    Is he still with the company?
14    A    No.
15    Q    What about Dr. Segal?
16    A    Dr. Segal?  Yes, he's with the
17 company.
18    Q    Okay.  Michelle Tartaglia?
19    A    Yes, I think she was a
20 transcriptionist.
21    Q    Dorothy Warner?
22    A    She -- I'm not sure what her

57

1 function is -- was at the time.  I think she
2 may still be at the company, but I'm not
3 sure.
4     Q    Okay.  And then the cc's.  Kevin
5 Johnson we have identified.  Mr. Amberson
6 Barry.  A. Connor?
7     A    Ann Marie Connor.  She's a
8 hematopathologist.
9     Q    J. Garner?
10    A    Jim Garner.  He was -- he was a
11 sales trainer, but I don't know what he was
12 -- that may have been his job at the time.  I
13 don't remember.
14    Q    S. Gersen?
15    A    Steve Gersen was director of the
16 cytogenetics laboratory.
17    Q    L. Kuruc?
18    A    I don't know.
19    Q    B. McNamee?
20    A    Bob McNamee, director of quality
21 assurance.
22    Q    And he's still with the company?

15 (Pages 54 to 57)

70

1  document that I've read.
2      Q   Okay.
3      A   Although I'm sure I've read
4  numerous.
5      Q   When you received this compliance
6  training, were you ever given any -- were you
7  shown the Medicare regulation dealing with
8  medical necessity?
9      A   We -- actually it was given --
10  these were given PowerPoint presentations and
11  handouts with quotes from various
12  regulations.
13      Q   Okay.  And these were prepared by
14  Mr. Cassel?
15      A   Yes, and his assistant.
16      Q   Okay.  What about did there -- was
17  there any reference in these -- in this
18  training to OIG guidance on compliance
19  programs?
20      A   Yes.
21      Q   And would -- and the -- was there
22  any discussion of the OIG compliance program

71

1  as it related to medical necessity?
2      A   Other than the fact that, you know,
3  you are only allowed to, you know, you know,
4  bill the government for those tests that fit
5  the definition of medical necessity.
6      Q   Okay.  Have you ever -- has DIANON
7  ever conducted a review of the tests that you
8  do to determine whether they are medically
9  necessary or not?
10      A   Which tests?
11      Q   Any test.  Have you ever looked at
12  the test that you're conducting, panels of
13  tests, or anything like that to determine
14  whether in fact you're compliant with
15  Medicare regulations?
16      A   I mean, we're constantly looking at
17  them.  If -- to my knowledge, we don't offer
18  a test if we don't think it has medical
19  necessity.
20      Q   Okay.  Would -- did DIANON ever
21  look at 88180 and the panel of markers to
22  decide whether in fact each of the markers

72

1  was medically necessary?
2      A   I know that I asked Dr. Goyette
3  that question.  That particularly when we
4  went up to 26 antibodies, you know, asked him
5  if these were necessary, why they were
6  necessary, and I think that memo that you
7  showed me this morning was his response to
8  that question.
9      Q   Okay.
10      A   He was extremely passionate, as
11  were the other hematopathologists, that we
12  really needed to offer these antibodies.
13      Q   Okay.  And then -- and then also
14  the -- I think you said this morning that the
15  decision to go to 18, was that based on a --
16  on a medical necessity determination?
17      A   No, not at all.
18      Q   And how -- I may have misunderstood
19  what you testified to this morning.  Let's
20  take a look at the memo again.  Hang on.
21  Okay.  Take a look at that.  That was marked
22  as Exhibit 6 in the deposition this morning.

73

1      A   Yes.
2      Q   Sorry.  I lost the clip.  I'm
3  having to improvise here.  Okay.  This memo,
4  which is the June 17, 1997 memo from Dr.
5  Goyette to yourself, tell me again what you
6  asked him to do?
7      A   Again --
8      MR. PARKER:  I'm going to object.
9  We've already gone over this one time, and
10  although I appreciate the fact that Dr.
11  Amberson was here as a corporate designee, it
12  did represent his personal knowledge as well.
13  So we've already gone over this ground one
14  time rather thoroughly.
15      BY MS. DAVIS:
16      Q   Okay.
17      A   Again, I asked him to provide me
18  with the list of antibodies which he felt
19  everybody would agree that these particular
20  antibodies should be in a panel such as this.
21  That while he thought and the other
22  hematopathologists, for that matter, felt

19 (Pages 70 to 73)

78

1  that back to you.  But at any rate, which
2  list, you know, that fee file tells how many
3  markers were in fact being billed at the
4  time.  Again -- well, it was in the material
5  that I was supposed to prepare for this.
6      Q    I'm sorry.  Of the --
7      A    Yes.
8      Q    One of the attachments to the --
9      A    Yes.
10     Q    -- deposition notice?
11     A    The screens with the fee file.
12  Yeah, around this time we were billing like
13  eight or nine markers.
14     MS. DAVIS:  Okay.  That's been
15  marked as Exhibit 10.
16         (Deposition Exhibit No. 10 was
17          marked for identification.)
18  BY MS. DAVIS:
19     Q    Can you tell me what that is?
20     A    It's a flow cytometry report.
21     Q    Okay.  And if you look on the
22  second page of the document, it's got two

79

1  signatures?
2      A    Yes.
3      Q    One of them is Dr. DeSilva's?
4      A    That's correct.
5      Q    And he was the person performing
6  the hematopathology repeat?
7      A    That's right.
8      Q    And then your signature is next to
9  it?
10     A    Yes.
11     Q    And why are you signing on this?
12     A    I believe there had been some
13  complications with Dr. DeSilva getting a
14  Connecticut license.  He came from Kansas and
15  until he could get a Connecticut license, I
16  was countersigning his reports.
17     Q    Okay.  And on the front of the
18  report, the antibodies that are listed there,
19  are those the ones that are reported, are
20  those the ones that were actually done?
21     A    Those are the antibodies --
22     Q    That were actually performed?

80

1      A    -- that were performed, yes.
2      Q    Okay.  And -- okay.  So, in
3  November of '94, DIANON was doing this panel
4  of antibodies that's listed on this report?
5      A    I don't know whether what we were
6  doing on a regular basis.  All I can say is
7  this is what was being -- that was done on
8  this particular report.
9      Q    Oh, I see.  Okay.
10     A    I don't know what we did on a
11  routine basis.
12     Q    Okay.  So you don't know whether
13  this -- this particular report is
14  representative of what you did?
15     A    No.
16     Q    Okay.  Who would choose -- at that
17  point in time, who would choose the
18  antibodies that were performed?
19     A    At this time, Dr. DeSilva would,
20  but I believe at this time I think that we
21  had Dr. Connor, had already interviewed her
22  and while she couldn't join us in the spring,

81

1  my recollection is that she had felt that the
2  panels that when she first saw them that we
3  were using were totally inadequate and that
4  we needed to add more antibodies, and I think
5  she had worked with Dr. DeSilva to do that.
6      Q    Okay.  Before she came onboard?
7      A    Yeah.
8      Q    Okay.  And what time period was
9  that?
10     A    I believe '94-'95.
11     Q    Okay.  So let me make sure I
12  understand.  Do you think this particular
13  report that we just looked at has the
14  antibodies that Dr. Connor thought were
15  essential?
16     A    You know, I don't know
17  specifically.
18     Q    Okay.
19     A    I do know that she was involved,
20  you know, talking to us about the panel and
21  upgrading it.
22     Q    Okay.  And when did she come

21 (Pages 78 to 81)

82

1  onboard?
2      A   She came onboard sometime I believe
3  in the spring of '95.
4      Q   Okay.  And so Dr. Connor came
5  onboard in the spring of '95 and increased
6  the number of antibodies that were used or
7  just substituted antibodies?
8      A   I believe that she had talked to
9  Dr. DeSilva and had felt that we needed to
10  increase the number of antibodies.
11      Q   Okay.
12      A   Based on her experience and her
13  training and prior employment.
14      Q   Okay.  How did you come about
15  hiring Dr. Connor?
16      A   I believe I found out about her
17  from a physician recruiter.
18      Q   Okay.  And was she -- what kind of
19  background did she have?
20      A   She was a graduate of MIT.  I don't
21  remember exactly where she went to medical
22  school.  Might have been the University of

83

1  Pennsylvania, but I don't recall, and then
2  she trained with a very well-known
3  hematopathologist at the University of
4  Minnesota, Dr. Richard Brunen, and then I
5  think she was out in Washington state.
6      Q   Okay.  So, were her credentials
7  good?
8      A   Her credentials were superb.
9      Q   Okay.
10      A   She was a brilliant woman.
11      Q   And then at some point around this
12  time period you also hired Dr. Goyette?
13      A   Yes.  Dr. Goyette came I believe
14  several months after Dr. Connor.
15      Q   Okay.  And so -- but when Dr.
16  Goyette came onboard, was the panel of
17  antibodies already pretty much set?
18      A   I don't know whether it was set.
19  It had been increased.
20      Q   Okay.
21      A   I think there were constant
22  discussions about changing the panel.  Again,

84

1  new antibodies were constantly being produced
2  in reports in the literature.  So this was an
3  ongoing process.
4      Q   Okay.  And when -- when Dr. Connor
5  suggested increasing the number of
6  antibodies, did she have to get approval for
7  that from somebody?
8      A   Well, she would have, again, and I
9  don't remember this in any great detail, but
10  she would have mentioned it to me and Dr.
11  DeSilva and she would have made suggestions,
12  and I would have deferred to her judgment.
13      Q   Okay.  And then once the -- once
14  the antibody panel had been increased, how
15  would that decision be put into operation?
16      A   Once the antibody -- once a desire
17  was to increase the number of antibodies,
18  then there would be a process where they
19  would have to be validated in the lab, you
20  know, compared with known samples and things
21  like that and eventually when everything was
22  sort of locked in place and all the

85

1  parameters set, then that would be
2  established.
3      Q   Okay.  I had a more mundane
4  bureaucratic issue in mind.  How would the --
5  how would the decision be conveyed to the
6  people who were actually doing the test?
7      A   You mean the technicians in the
8  laboratory?
9      Q   Yes.
10      A   Dr. Connor and Dr. Goyette would
11  talk to them.
12          MS. DAVIS:  Let me have you take a
13  look at what's been marked as Exhibit 11.
14          (Deposition Exhibit No. 11 was
15          marked for identification.)
16      BY MS. DAVIS:
17      Q   Do you recognize that document?
18      A   Actually, yes, I saw it recently.
19      Q   You reviewed it in preparation for
20  your deposition?
21      A   Yes.
22      Q   Okay.  Can you tell me what it is?

22 (Pages 82 to 85)

86

1    A    It's a -- one of our standard
2  operating procedures specifically for
3  immunophenotyping.
4    Q    Okay. So this would have been the
5  flow cytometry standard operating procedure?
6    A    Well, it's a standard operating
7  procedure that's been written. I don't know
8  whether this ever went into effect.
9    Q    Okay. Up in the left-hand corner
10 it says, "Reviewed by A. Connor." That's
11 Dr. Connor?
12   A    Yes.
13   Q    And then "Approved James Amberson"?
14   A    Yes, but this particular one is not
15 approved.
16   Q    It's not a signed version?
17   A    It's not signed and dated by me and
18 there's no effective date.
19   Q    Okay. And would there -- if this
20 went into effect, would there be one?
21   A    Would there be one what?
22   Q    Would there be a signed version?

87

1    A    Yes.
2    Q    Take a look at 400204. At the top
3  of the page where it says, "Tubes will be
4  labeled as follows." Do you know whether
5  that represents the procedure that was being
6  used at this time period in the lab?
7    A    I don't know.
8    Q    Who would know that?
9    A    I'm not sure because, again, this
10 has never been signed. So I'm not sure
11 whether this was what was planned to be
12 implemented or whether it was in fact
13 implemented and, if so, when. I don't know.
14   Q    Who actually performed the tests,
15 the cyto or I'm sorry. What are the
16 technologists called?
17   A    They're called medical
18 technologists, but these would have just been
19 the flow cytometry technologists.
20   Q    All right. And you said Steve
21 Brown. Steve Brown was the --
22   A    Supervisor.

88

1    Q    Supervisor. So would he know
2  whether in fact these procedures went into
3  effect?
4    A    He might or might not.
5    Q    Do you recall when Dr. Connor
6  suggested adding to the number of antibodies,
7  how many antibodies were on the panel that
8  she suggested?
9    A    No.
10   MS. DAVIS: We've got only four
11 minutes left. Why don't we break at this
12 point for lunch.
13   MR. PARKER: Sure.
14   MS. DAVIS: It's about lunch time.
15   MR. PARKER: Okay.
16   THE VIDEOGRAPHER: Going off the
17 record 12:12 p.m. tape 2 -- tape 1. Sorry.
18   (Whereupon, at 12:12 p.m, a
19 luncheon recess was taken.)
20
21
22

89

1    A F T E R N O O N   S E S S I O N
2    (1:14 p.m.)
3    THE VIDEOGRAPHER: On the record at
4  1:14 p.m. tape 2.
5  Whereupon,
6    JAMES AMBERSON
7  was recalled as a witness and, having been
8  previously duly sworn, was examined and testified
9  further as follows:
10   EXAMINATION BY COUNSEL FOR PLAINTIFF
11   CONTINUED
12 BY MS. DAVIS:
13   Q    Okay. While we were at lunch or
14 before lunch, we were talking about generally
15 the panel that was in place starting in late
16 1995 and into '96. And as I recall, I asked
17 you if you could remember what -- how many
18 antibodies were in that panel? This is the
19 panel after Dr. Connor got -- got to DIANON.
20   A    As I recall, at some point we were
21 doing -- and I don't remember when it started
22 -- a 21, 22 antibody panel.

23 (Pages 86 to 89)

90

1    Q   Okay.  And, you know, you can't
2   place that in time at any point?
3    A   No.
4    Q   Okay.  But it would have been at
5   some point after Dr. Connor came onboard at
6   DIANON?
7    A   Yes.
8    Q   Okay.  And this morning we talked
9   about you discovered in '97 that despite the
10  fact that the lab had been doing 26 -- I'm
11  sorry, 22 antibodies that DIANON was billing
12  for 26?
13   A   Yes.
14   Q   And you said that you refunded some
15  money to the -- to the carrier?
16   A   Yes.
17      MS. DAVIS:  Take a look at what's
18  been marked Exhibit 12.
19         (Deposition Exhibit No. 12 was
20         marked for identification.)
21  BY MS. DAVIS:
22   Q   Is that -- Exhibit 12, is that the

91

1   refund that you made to the carrier?
2    A   Yes.
3    Q   Okay.  If you look at the text of
4   the letter.  This is dated June 17, 1997 and
5   the Bates number is 14326.  It says that:
6   "Enclosed is a refund check in the amount of
7   $26,331.20 for overpayments related to
8   immunophenotyping flow cytometry studies
9   performed by our laboratory during this time
10  period August 1, 1996 through March 24, 1997
11  and billed under CPT code 88180."  Can you
12  tell us, again, why you chose the August 1,
13  1996 date?
14   A   I didn't choose that date.
15   Q   Who did?
16   A   I don't know.
17   Q   You don't know who did it?
18   A   No.
19   Q   Okay.  The letter is signed by Mr.
20  Tucciarone?
21   A   Yes.
22   Q   Who you said is director of billing

92

1   and collections.  Is it likely that he
2   calculated that amount or somebody working
3   for him?
4    A   They may have.  I don't know who
5   calculated it.
6    Q   And you don't know how they chose
7   the August 1st date?
8    A   I don't know, other than there is
9   that mention in that memo by Steve Brown to
10  Bill McDowell that in August was when they
11  went from two to three color and that's when
12  he thought that they had reduced the amount
13  of antibodies billed.
14   Q   Okay.  And you also testified this
15  morning that you since discovered that in
16  fact DIANON was performing 22 and billing
17  Medicare for 26 prior to that date?
18   A   Yes.
19   Q   Do you know how far back that went?
20   A   I believe it went back to January
21  of '96.
22   Q   Okay.  Starting in January of '96?

93

1    A   Yes.
2    Q   And you said you were in the
3   process of putting together a refund for that
4   period of time as well?
5    A   Well, they're notifying the
6   carrier, but they need to calculate --
7    Q   Okay.
8    A   -- how many patients were involved.
9    Q   Okay.  How did you discover that in
10  fact DIANON had been doing -- performing 22
11  antibodies and charging for 26 from
12  January through August of '96?
13   A   I don't know precisely who
14  discovered it.  I believe it was discovered
15  by looking at reports and noticing that there
16  were only 22 antibodies.
17      MS. DAVIS:  Okay.  What's the
18  number on that?  12.  Let me have you take a
19  look at what's been marked as Exhibit 13.
20         (Deposition Exhibit No. 13 was
21         marked for identification.)
22

24 (Pages 90 to 93)

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA            )        No. 3:02CV1573(MRK)
ex rel. DR. JAMES J. TIESINGA,      )
                                    )
                                    )
        Plaintiff,                  )
        v.                          )
                                    )        December 7, 2005
DIANON SYSTEMS, INC.,               )
                                    )
                                    )
                                    )
        Defendant.                  )

## PLAINTIFF UNITED STATES OF AMERICA'S OBJECTIONS AND RESPONSES TO DEFENDANT DIANON SYSTEMS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff, United States of America submits the following responses and objections to

Defendant Dianon Systems' First Set of Interrogatories and Request for Production of

Documents:

### Introductory Statement and General Objections

1.      The objections and responses set forth herein are based on information now

known to the United States and its attorneys and are made without prejudice to the United States'

right to assert additional objections should grounds for objection be discovered at a later time.

2.      The United States will respond to unobjectionable interrogatories and document

requests or portions of these requests to the best of its present ability.  Because the United States

has not completed discovery of the facts pertaining to this action or its preparation for trial, the

United States reserves the right to rely on any facts, documents, or other evidence that may

develop or come to its attention at a later time.

1500 claim form that the services in question "were medically indicated and necessary for the health of the patient." Thus, Medicare and Tricare do not generally review claims for medical necessity prior to paying claims.

**INTERROGATORY NO. 15**

List all instances in which you declined to reimburse Dianon for a claim submitted to you for flow cytometry antibody panel testing for leukemia and lymphoma during the period 1997 through March 31, 2004 and state the reasons for declining to reimburse Dianon.

**RESPONSE TO INTERROGATORY NO. 15**

The United States objects to this interrogatory on the following grounds. First, the United States incorporates by reference its General Objections, stated above. Second, the United States objects to this interrogatory on the grounds that it seeks information not relevant to the claims or defenses of any party and is not reasonably calculated to lead to the discovery of admissible evidence. Third, the United States objects to this interrogatory to the extent that it seeks documents and information that is in the control, custody or possession of Dianon. Fourth, the interrogatory is overly broad and unduly burdensome.

Subject to and without waiving these objections, the United States responds as follows: Each time a claim is denied a Remittance Advice containing a denial code (formerly called an "Action Code" and currently called a "Reason Code") and/or a Remark Code is sent to the Medicare provider who submitted the claim. Thus, for each instance where a flow cytometry claim was denied by Medicare, Dianon already has in its possession the reason for the denial.

**INTERROGATORY NO. 16**

Provide a definition of the term "medically necessary" as it relates to flow cytometry antibody panel design and evaluation.

**RESPONSE TO INTERROGATORY NO. 16**

The United States objects to this interrogatory on the following grounds. First, the United States incorporates by reference its General Objections, stated above. Second, the United States objects to this request to the extent that it seeks documents and information that is in the control, custody or possession of Dianon. Third, the request is overly broad and unduly burdensome. For example, this interrogatory appears to call for the production of any and all medical literature, text books, treatises, articles and abstracts relating to flow cytometry and medical necessity. Fourth, the United States objects to this interrogatory to the extent it seeks information that is publically available, such as Medicare's regulations related to medical necessity, as well as publically available Local Medical Review Policies and Local Coverage Determinations that discuss flow cytometry and medical necessity. Fifth, the United States objects to this interrogatory pursuant to Fed. R. Civ. P. 33(d), because the answer to this interrogatory can be derived or ascertained from the documents being produced pursuant to document requests below.

Subject to and without waiving these objections, the United States responds as follows: The medical necessity definitions are contained in publicly available statutes and regulations, as well as publically available Local Medical Review Policies and Local Coverage Determinations related to flow cytometry (which are being produced in response to Dianon's document requests, below), as well as the publically available medical literature related to flow cytometry.

**INTERROGATORY NO. 17**

Describe all efforts you made to notify Dianon that you believed its 26 antibody panel, or portions thereof, used in leukemia and lymphoma testing was medically unnecessary.

17