**EXHIBIT 16**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------x
UNITED STATES            :
OF AMERICA et al.,       :

                         :

        Plaintiffs,      :

                         :

        v.               :  No. 3:02cv1573(MRK)

                         :

DIANON SYSTEMS, INC.,    :

                         :

                         :

        Defendant.       :
------------------------x
```

Washington, D.C.

Thursday, July 6, 2006

Video deposition of

GERALD N. ROGAN

a witness, called by counsel for Plaintiffs pursuant to notice and agreement of counsel, beginning at approximately 9:03 a.m. at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Avenue, NW, Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

1    neurologist.

2         So a hematologist, a cancer doctor

3    is relying on the cytopathologist in the same

4    way.

5    Q    You -- you mentioned earlier a

6    screening test.  What is your understanding

7    of what a screening test is?

8    A    Screening doesn't actually appear

9    in the law so it's -- what I mean by that is

10   a test on a healthy patient that's not sick

11   to see if they might have something that has

12   no sign or symptom.  So, for example, you go

13   into the doctor, you get a cholesterol test

14   to see if your cholesterol's high because

15   your mother had a heart attack at 45 so you

16   want to check your cholesterol to see how

17   you're doing.  That's a screening test.

18   Nothing wrong with it.  That's a screening

19   test.

20   Q    Are screening tests reimbursable by

21   Medicare?

22   A    Some.  Depends on which ones.

1    Medicare -- Congress has -- decides which

2    screening tests Medicare will cover.

3        Q    Can you give me a couple examples

4    of some that you know are covered?

5        A    Sure.  A Pap smear with certain

6    frequency limits.  A mammogram, same way.  A

7    stool hemoccult test for blood, hidden blood

8    for cancer detection.  Cholesterol tests once

9    in a while, I think every five years.  A

10   welcome to Medicare exam, blood sugar test or

11   microhemo -- EK -- EKG I think when you get

12   on Medicare, and then some that are not

13   covered, like a urine test, just to see how

14   you're doing on a -- a SGOT is not covered,

15   things like that.

16       Q    And why is it that they limit them

17   so much to the screening tests?  Why are they

18   limited to just, you know, a select list?

19       A    Well, Congress --

20            MR. SALCIDO:  Objection.

21            THE WITNESS:  Pardon me?

22            MR. SALCIDO:  Objection.  Go on.

118

1          THE WITNESS:  So there's a U.S.

2    preventive task force that looks at, you

3    know, what tests are -- seem to be

4    appropriate to do to screen the population

5    for disease.  And they have recommendations.

6    And then Congress seems to -- I'm not sure

7    exactly how it works, but Congress has passed

8    laws to say we'll pay for this.  And every

9    now and then they add something, you know.

10          So Congress just seems to be in the

11    business of -- they want to expand the

12    benefit from just simple illness and injury

13    treatment to allowing for prevention. So

14    last -- couple years ago they added a -- a

15    cholesterol test as a one-time benefit, a

16    screening.  No signs, symptoms of illness,

17    you can get and Medicare will pay for it.

18          Another one was they added EKG.

19    When you get on Medicare you can get an EKG

20    in the first six months as a screening test.

21    So they did that because they think that's

22    the right thing to do.

1            BY MR. FAYHEE:

2        Q    Well, here, how about a

3    hypothetical maybe?  Say I walk in off the

4    street, I don't know, because I'm bored or

5    otherwise, and I want a CAT scan, not because

6    I have been injured in any way, but I just

7    want a CAT scan.  So I go in to the doctor

8    and I get a CAT scan.  Could I bill Medicare

9    for that?

10       A    Could the doctor bill Medicare?

11       Q    Could the doctor bill?

12       A    Sure, they could bill Medicare for

13   that.

14       Q    And would that be covered?

15       A    No.

16       Q    And why not?

17       A    Because there's nothing wrong with

18   the patient.  It's not a test for an illness

19   or injury.

20       Q    Would that be an example -- an

21   example of a screening test that would not be

22   covered?

120

1       A    Yes.  Let's assume it's a CAT scan.

2  Let's say they did a CAT scan of the head.

3       Q    Okay.

4       A    And so, yeah, that would be not

5  covered, no signs, symptoms, illness,

6  surgery.  The patient, the -- Medicare

7  beneficiary could get the test, the --

8  radiology could provide the service.

9  Radiology could bill Medicare for it.  And if

10  they bill it properly, Medicare will deny it

11  as a noncovered service.  They could -- the

12  laboratory could actually put a modifier

13  down, I think it's a G -- Z modifier

14  indicating that it's not a covered service,

15  and they could -- then Medicare will deny the

16  payment and the lab can charge the patient

17  for the test, retail, with no -- no limit of

18  -- no fee limit.  That's commonly done,

19  actually.

20           They got -- an example, a better

21  example is a virtual colonoscopy.  That's a

22  CT of the abdomen to see if you've got cancer

124

```
 1              BY MR. FAYHEE:

 2      Q    You do have an opinion?

 3      A    Yeah.

 4      Q    Okay.  And what is your opinion?

 5      A    Well, I -- well, first of all,

 6   there's something in your question that I

 7   disagree with.  There is a suspected

 8   diagnosis in all these cases --

 9      Q    No, no.

10      A    -- that I know.

11      Q    I was saying without regard --

12   basically to say it simply is they're running

13   26 antibodies every single time.

14      A    Okay.

15      Q    Is what -- what I meant to say.

16      A    I understand.  So I do have an

17   opinion.

18      Q    Okay.

19      A    And that's what I thought your

20   question meant.  And I have an opinion.

21           These are all covered services

22   because all the patients are sick.  None of
```

125

1    these patients come in off the street saying,

2    gee, I want to have some flow cytometry done,

3    doctor.  Help me out here.

4           All the patients have an illness.

5    They have an enlarged lymph node, they have

6    enlarged spleen, they've got anemia, they've

7    got abnormal white count, they've got a

8    history of cancer or they have cancer now,

9    they've had chemotherapy treatment.  There's

10   all -- all these patients have something

11   wrong with them.  So because these are all

12   sick, the laboratory test is a benefit.  Not

13   -- these are -- so these are not preventive

14   tests or screening tests outside, they're all

15   covered services under 1862.

16       Q    Okay.

17       A    And so they're all covered.  Now

18   the -- you know, the -- that's not to say

19   they're all medically necessary but they're

20   all a benefit.  They're all covered.

21   Potentially -- they are in a benefit category

22   and so they meet that criteria so they're a

# EXHIBIT 17

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA, ex rel.,
DR. JAMES J. TIESINGA,

          Plaintiff,

vs.                        NO.: 3:02 CV 1573 (MRK)

DIANON SYSTEMS, INC.

          Defendant.
_____/


VIDEOTAPED
DEPOSITION OF:     GRANT CARLSON

DATE:              June 15, 2006

TIME:              9:00 a.m. to 1:31 p.m.

PLACE:             101 East Kennedy Boulevard
                   Suite 1200
                   Tampa, Florida

BEFORE:            KELLI ANN ELLIS, RPR
                   Registered Professional Reporter
                   Notary Public
                   State of Florida at Large



                   Pages 1 - 164
```

**Page 2**

APPEARANCES:

RYAN FAYHEE
United States Department of Justice
Trial Attorney
601 D Street, NW
Room 9607
Washington, DC 20004
   Attorney for Plaintiff United States of America

ROBERT SALCIDO
Attorney-at-law
Akin, Gump, Strauss, Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
   Attorney for Defendant

ALSO PRESENT:

   Greg Scrivener - Videographer

                   INDEX TO PROCEEDINGS

|                                          | PAGE |
|------------------------------------------|------|
| Direct Examination by Mr. Fayhee         | 4    |
| Certificate of Oath                      | 162  |
| Court Reporter's Certification Page      | 163  |
| Witness' Signature Page                  | 164  |

                   EXHIBITS

|                                          | PAGE |
|------------------------------------------|------|
| No. 1 - Memo Re: 2001 Fee Schedules      | 20   |
| No. 2 - Document entitled Hematopathology Services | 29 |
| No. 3 - 8/29/06 Memo Re: Special Pricing/Threshold Pricing List | 31 |

**Page 3**

                   EXHIBITS CONTINUED

|                                          | PAGE |
|------------------------------------------|------|
| No. 4 - Federal Register Notice, Vol. 63 No. 163 Monday, August 24, 1998 | 40 |
| No. 5 - Copy of 42 CFR 411.15            | 43   |
| No. 6 - Compliance Committee Minutes February 27, 1998 | 45 |
| No. 7 - Continuity File 12/10/06         | 48   |
| No. 8 - Review of DSI Strategy           | 57   |
| No. 9 - Dianon Systems/The Definitive Choice in Hematopathology | 64 |
| No. 10 - TAT Review Flow Cytometry Testing | 72 |
| No. 11 - Hematopathology Role Play #3    | 78   |
| No. 12 - Fee/CPT Code Change & New Tests/Profiles | 90 |
| No. 13 - Hematopathology Services Fee Justification January 30, 1996 | 102 |
| No. 14 - Hematopathology Services Fee Justification January 8, 1996 | 103 |
| No. 15 - Memo dated 3/20/97 to Bill McDowell from Steve Brown | 105 |
| No. 16 - 6/17/97 Memo to James Amberson, M.D. from Richert E. Goyette, M.D. | 106 |
| No. 17 - Ap Test Code Creation Form      | 120  |
| No. 18 - Cytogenetics Worksheet          | 130  |
| No. 19 - Declaration of Richert Goyette, M.D. | 133 |
| No. 20 - Deposition Transcript of Valerie Palmieri | 135 |
| No. 21 - OPS Report - October '99 Summary | 147 |
| No. 22 - Requisition Review Routing      | 147  |

**Page 4**

THE VIDEOGRAPHER: This is the video operator speaking, Greg Scrivener, from A-Pro Video, Inc.

The court reporter is Kelli Ellis.

This videotaped deposition is taking place at 101 East Kennedy Boulevard, Tampa, Florida.

We are here this day, June 15th, 2006, to take the video deposition of Grant Carlson in the matter of United States, ex rel, Dr. James Tiesinga, plaintiffs, versus Dianon Systems, Inc., defendant, in the United States District Court for the District of Connecticut.

The time as indicated on the video monitor is approximately 9:00 a.m.

Will counsels please introduce themselves for the record beginning with plaintiffs' counsel.

MR. FAYHEE: My name is Ryan Fayhee. I represent the United States of America.

MR. SALCIDO: My name is Robert Salcido. I represent the defendant, Dianon Systems, Inc.

THE VIDEOGRAPHER: Madam Court Reporter, would you please swear the witness.

GRANT CARLSON,

the witness herein, being first duly sworn on oath, was examined and deposed as follows:

THE VIDEOGRAPHER: You may proceed.

DIRECT EXAMINATION

93

1    Who would have input into this type of document,
2  just by title? I don't need specific names, but by title.
3    A.  Product manager, director of marketing, vice
   president of marketing, director of lab operations, chief
   medical officer. I forgot. There's two titles within
6  billing. It was typically Pat Torre and Deborah Clambara
7  and then director of billing. And even it could go so far
8  at this time maybe a controller.
9    Q.  What role -- I know you're, you know, a marketing
10  guy at least by the end of the time you were at Dianon,
11  but what type of input would a marketing person have into
12  this in deciding how many antibodies to bill on a
13  particular test?
14    A.  They might do the leg work, and if it's an
15  established test and we're bringing it on, let's say, it's
16  an industry standard test, they would do some of the leg
17  work in looking at what's the competition doing, what are
18  the universities doing, what are the other competitive
19  reference laboratories doing, what do their panels look
20  like, fees, that sort of thing.
21    There would be a discussion with the pathologist
22  in terms of medical necessity and clinically what are the
23  proper tests to be running. You know, what are those CPT
24  codes, they work with billing on getting CPT codes, those
25  sorts of things. They would set fees based on industry

94

1  standards or costs, those sorts of things. I think that's
2  it.
3    Q.  Would a -- would this be -- this type of change,
4  would that be put before the compliance committee?
5    A.  I don't think so.
6    Q.  Why would it not be?
7    A.  Well, first of all, there was not a compliance
8  committee at the time of this document.
9    Q.  Right.
10    A.  I don't know if -- it doesn't seem like that was
11  part of the procedure. There was -- similar individuals
12  that serve on that committee would have signed off on it.
13  I mean, it would have been signed off by a chief medical
14  officer, a pathologist, marketing, sales, lab, billing.
15  That would go into a queue that would be globally reviewed
16  by compliance in terms of doing audits and reviews, but
17  test by test would not go to the compliance committee.
18  That would bog that committee down. Again, you're --
19  you're bringing on hundreds of tests.
20    Q.  Okay. Would a change in the amount of
21  reimbursement be a consideration that would be taken into
22  account when determining what antibodies to bill for?
23    A.  Yeah. Determining what antibodies to bill for I
24  think is a clinical decision --
25    Q.  Okay.

95

1    A.  -- based on what is ordered or what is run or in
2  immunophenotyping, it's what the pathologists feel they
3  need to have to make a diagnosis.
4    In terms of all other lab testing, you can only
5  do what's ordered.
6    Q.  If you look at this document that's before
7  you, it says, type of change effective 1/1/96. It says,
8  price decrease by marker, number of markers increase.
9    I understand you were not -- you know, that you
10  didn't draft this document.
11    Does it appear to you from your experience as
12  vice president of marketing that that factor,
13  reimbursement rates, were taken into account in making
14  this test code change?
15    A.  No. If you asked ask me to speculate, in looking
16  at this document, I would say that clinically there was a
17  need to go to 26 markers, but it hit a wall in terms of
18  perception and price that -- speculating that the
19  pathologists wanted 26 markers. If we were to bill those
20  at $95 at the time, it would put that at a price that
21  would be prohibitive to the customers.
22    So it looks like as you billed more markers, 26,
23  they reduced to 45 to make it more palatable so it's not a
24  huge increase in the fees as ultimately a patient or a
25  doctor is being charged, but you're doing what's necessary

96

1  to make that panel. That's my speculation of why that
2  would be reduced. Otherwise, it should be billed at $95
3  per marker. This should be 95.
4    Q.  Would that consideration change if Medicare was
5  only reimbursing $95 or if Medicare had changed the
6  reimbursement rate from $45 -- from 95 to 45 per antibody?
7    A.  I don't think that would have any bearing.
8    Q.  So your opinion of looking at this type of
9  document is that the reimbursement rate had no bearing on
10  the decision to bill for more antibodies?
11    A.  The reimbursement?
12    Q.  Reimbursement amount per antibody.
13    A.  My understanding of Medicare is that you get what
14  they reimburse. If they drop the reimbursement, whether
15  you charge 95 or 45, you get the same amount.
16    So that doesn't seem to be in my opinion why that
17  might have happened.
18    Q.  Okay.
19    A.  I think it may have just been more palatable.
20    Q.  Okay. Flip to that second page of this document
21  here.
22    Down at the bottom, it says, per Steve Brown, use
23  these cell marker 2/8/96, 5:30 p.m.
24    Do you know Steve Brown?
25    A.  I don't. I saw him on something else, and I

105

1  drafted this document?

2      A.   Don't know.

3      Q.   Don't know. Okay. All right. Did you

participate in or around early 1997 in an update of the

flow cytometry panel, you know, in the sense of the number

6  billed? Do you recall?

7      A.   That one.

8      Q.   Excuse me. What's that? Sure, oh, let me give

9  you a document. It will help you. I'll ask you again.

10         (Exhibit No. 15 was marked for identification.)

11         THE WITNESS: Okay.

12  BY MR. FAYHEE:

13     Q.   Okay. My question was -- well, let's do it this

14  way. Strike that.

15         This document, do you recognize this document?

16     A.   No.

17     Q.   Okay. Never seen -- never seen it before?

18     A.   No.

19     Q.   This document says, hematopathology department,

20  date, March 20th, 1997, to Bill McDowell from Steve Brown.

21         Bill, here is the updated antibody list and the

22  date we're going to implement it. Flow cytometry XL3

23  antibody panel as of 3/25, 1997.

24         Would you have participated -- even though you

25  haven't seen this document, but would you have

106

1  participated in making the decision to update this

2  antibody list as of that date?

3      A.   No -- what's the question again?

4      Q.   Whether you would be involved in this decision

5  that was made.

6      A.   No. I was in R & D at the time of this. This is

7  not a document I would have seen.

8      Q.   Okay. Do you recognize the handwriting on the

9  right side of the document? There's some mathematical

10  figures there. One says 94, seven times $70 equals 490.

11  It goes through a number. Nine times -- 1 October '95,

12  nine times 95 equals 855, and then January '96, 26 times

13  45 equals 170 -- 1170.

14         Do you recognize that handwriting?

15     A.   Not really.

16     Q.   Okay.

17     A.   Might be McDowell's, but I don't know.

18         (Exhibit No. 16 was marked for identification.)

19  BY MR. FAYHEE:

20     Q.   Do you recognize this document I've just given to

you? It says, memo to James B. Amberson from Richert

22  Goyette, flow cytometry antibody panel, date, 17 June

23  1997?

24     A.   I don't recall this document.

25     Q.   Okay. During the course of your responsibilities

107

1  in 17 June 1997, would you have received this document?

2      A.   No.

3      Q.   Okay. Do you recall -- well, let me -- do you

4  recall in or around June of 1997 participating in a

5  decision to move the number of antibodies billed from 26

6  down to 18?

7      A.   No.

8      Q.   You would -- would you have participated in that

9  type of decision as -- in the course of your duties at the

10  time?

11     A.   I don't -- I don't recall that situation.

12     Q.   Okay. Would that have been something that you

13  would have ordinarily done in your position?

14     A.   No.

15     Q.   Okay.

16     A.   I meant, not in R & D or any of those -- in that

17  role.

18     Q.   Who would have participated in that type of

19  decision based on perhaps what you learned later as vice

20  president of marketing?

21     A.   In going from 18 to 26?

22     Q.   Actually going from 26 down to 18 in 1997, who

23  would have participated in that -- in that decision?

24     A.   If it's a clinical decision, then it would be the

25  hematopathologists and Jay, marketing.

108

1      Q.   Let me direct a little better. What if I said,

2  bill -- changing how many antibodies billed from 26 to 18,

3  would that change your answer?

4      A.   Then that would primarily be marketing, chief

5  medical officer, billing, that sort of thing.

6      Q.   But you know -- do you know anything about the

7  decision to go down during that time period in the --

8      A.   I vaguely remember there was some situation with

9  Dr. Torre in Connecticut and that's about all I know.

10     Q.   You don't remember --

11     A.   I don't know the situation or anything else.

12     Q.   Do you recall during this time period any

13  influence from insurance companies on how many antibodies

14  should have been billed on this test or any others?

15     A.   On this test, I don't. I just don't recall

16  those.

17     Q.   Do you recall on other tests pressure to sort of

18  only perform necessary tests?

19     A.   I mean, that's always there, but not really.

20     Q.   Nothing specific?

21     A.   Nothing specific.

22     Q.   Do you recall insurance companies questioning

23  medical necessity of any tests at all during this time

24  period?

25     A.   Yes.

**EXHIBIT 18**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA,
ex rel., JAMES J. TIESINGA,

        Plaintiffs,

vs.                         Case No. 3:02CV1573 (MRK)


DIANON SYSTEMS, INC.,

        Defendant.




VIDEOTAPED DEPOSITION OF ANN MARIE CONNOR, M.D.

Taken on behalf of the Plaintiffs

August 8, 2006


BE IT REMEMBERED THAT, pursuant to the Connecticut Rules

of Civil Procedure, the deposition of ANN MARIE CONNOR,

M.D. was taken before Marla J. Cusano, a Certified

Shorthand Reporter, #2986, on August 8, 2006, commencing

at the hour of 8:58 a.m., the proceedings being reported

at 920 W. Riverside Avenue, Suite 340, Spokane,

Washington.

Ann Marie Connor, M.D.                                    August 8, 2006

Page 74

1  when you're a -- I'm assuming this is what he meant is
2  that when you're a salesperson, you have to go out there
3  and meet a new hematologist/oncologist, you want to show
4  him what excellent information he's getting from his
5  pathologist and/or her pathologist, and so you want to
6  show them an impressive report. I'm assuming that's what
7  he's talking about --
8      Q.  Okay. But you don't remember?
9      A.  -- because he's talking about a new format.
10  But I never recall -- I don't recall actually seeing
11  this.
12          (Whereupon, three Hematopathology Services Fee
13  Justification documents were marked Exhibits-8thru10 for
14  identification.)
15  BY MS. DAVIS:
16      Q.  Okay. I'm going to give you what's been marked
17  as Exhibits 8, 9 and 10, and I'm going to ask you -- I'll
18  direct you. Don't worry about where to look. And,
19  Bruce, I apologize, I don't have a copy of 8 for you.
20          MR. PARKER:  Okay.
21          MS. DAVIS:  It's the January -- or wait, maybe
22  I do. What I don't have for you is the --
23          MR. PARKER:  Tell me what it is. I may have a
24  copy of it.
25          MS. DAVIS:  Okay. It's the fee justification

Page 75

1  memo that's dated at the end of 1995. That's 8.
2          MR. PARKER:  Uh-huh.
3          MS. DAVIS:  And then I have 9 and 10 for you.
4  Sorry about that. I thought I had copies of all those.
5          MR. PARKER:  Which one is 9?
6          MS. DAVIS:  9 is the one dated January 8th and
7  10 is dated January 30th.
8          MR. PARKER:  Thank you.
9  BY MS. DAVIS:
10      Q.  Okay, Doctor, if I could just have you take a
11  look at this and ask you a question. This is, again,
12  something that according to Dianon was prepared by Mark
13  Florio, these three documents. Let me just ask you
14  generally have you seen documents like this before?
15      A.  (Shaking head.)
16      Q.  No?
17      A.  No, I haven't.
18      Q.  Okay. And if you take a look at page -- the
19  second page. If you'd just open them up to the second
20  page.
21      A.  Of all of them?
22      Q.  Yes.
23      A.  Okay.
24      Q.  Okay. And if you take a look at XL-3, which is
25  the first test at the top.

Page 76

1      A.  Uh-huh.
2      Q.  That's immunophenotyping. That's what we've
3  been talking about all day?
4      A.  Yes.
5      Q.  Okay. And it says new -- old and new and it
6  has eight billable events and nine billable events on
7  Exhibit 8?
8      A.  Yes.
9      Q.  And then on Exhibit 9 it has on 9 billable
10  events and then 20?
11      A.  Yes.
12      Q.  And then on the last one it has 9 billable
13  events and 26?
14      A.  Yes.
15      Q.  Do you know why those particular numbers
16  were -- in other words, why there was consideration of
17  billing for those particular numbers?
18          MR. PARKER:  Objection. You can go ahead.
19  BY MS. DAVIS:
20      Q.  You can go ahead. He just does that.
21      A.  Well, gee, I would have thought that the -- I
22  mean, he's talking here about -- this would be like on a
23  per case.
24      Q.  Per antibody.
25      A.  So billable events would be per case, so it

Page 77

1  would be eight billable events in theories, but eight
2  antibodies?
3      Q.  Uh-huh. Yeah. If you see, there's 88180.
4      A.  Yeah.
5      Q.  That's how that was billed, right?
6      A.  Exactly, but I mean, that sort of doesn't make
7  sense because we would have had more than eight, so I
8  don't know where the eight comes from.
9      Q.  What about the 20 and the 26?
10      A.  Well, we talked about 20 and 26 on the phone,
11  so I'm assuming that the 26 comes from the number of
12  antibodies we were doing, although I think we were
13  running 22 or something like that. So, right, wouldn't
14  that have --
15      Q.  So you don't know where he got the numbers
16  they're using here?
17      A.  No. I don't know -- yeah, I don't even know
18  where the eight and the nine comes from.
19      Q.  Did he ever consult with you about these?
20      A.  No.
21      Q.  Do you know whether he consulted with
22  Dr. Goyette?
23      A.  Oh, I don't know. I mean, if he had -- well,
24  he didn't tell me. Mark wouldn't have told me about
25  that. And I don't think Rich would have talked to me

3f7507a3-6da5-4bdf-bcd7-7b7ca253ebdb

Ann Marie Connor, M.D.                          August 8, 2006

Page 78

1  about that, I mean, even if he had talked with Mark, so I
2  don't know.
3      Q.   Okay.  Take a look at Exhibit 9, I guess it is,
4  the second one.
5      A.   Yes.
6      Q.   If you flip those back to the front page.
7      A.   Yes.
8      Q.   It says over on the left-hand side, "Rich
9  believes legal times 2."  Do you have any idea what that
10 means?
11     A.   (Shaking head.)
12     Q.   Is there anybody else at Dianon then whose name
13 was Rich other than Dr. Goyette?
14     A.   No.  I mean, I imagine he's referring to Rich
15 Goyette.  I just don't know what the times 2 is.
16     Q.   Okay.  Did you ever -- we talked earlier about
17 training for --
18     A.   I mean, it is legal for us to charge a
19 consultation fee.  I mean, that's what we do for a living
20 or that's what I did for a living.
21     Q.   Okay.  No.  I was trying to figure out what
22 the --
23     A.   Legal times 2, no.  That's --
24     Q.   Okay.  We talked earlier about providing
25 training for the techs.  Did you ever help provide

Page 79

1  training for any of the sales folks?
2      A.   No.
3      Q.   No?  What about Dr. Goyette?
4      A.   I'm sure they asked him.  The only reason I say
5  that is because Rich is a very good speaker, a very good
6  instructor, and Dianon sort of self-trains their whole
7  sales force.  So they all believe they're mini doctors,
8  which makes them rather obnoxious, but -- so he may
9  have.  I mean, they may have asked him to like give a
10 talk about how flow cytometry works or why do people do
11 bone marrows anyway or something like that, because they
12 did try their best to send into doctors' offices at least
13 intelligent speaking people.
14     (Whereupon, a Hematopathology Services Study
15 Sheet was marked Exhibit-11 for identification.)
16 BY MS. DAVIS:
17     Q.   All right.  I won't ask you what -- I will have
18 you take a look at what I'm marking as Exhibit 11.
19         Okay.  I believe, and I'm sure Bruce will tell
20 me if I'm wrong, that Dr. Goyette identified this as
21 something that he prepared to help train the sales folks,
22 the sales reps.
23     A.   Oh, okay.  That's good.
24     Q.   Do you recognize this at all?
25     A.   No.  You mean, have I -- do I -- no.

Page 80

1      Q.   No?
2      A.   I mean --
3      Q.   Did he run this by you before he used it?
4      A.   Oh, I don't remem- -- I don't recall that.  I
5  mean, he may have and I just don't remember.
6      Q.   Okay.
7      A.   But there were quite frequently things that,
8  you know -- I mean, if Rich didn't think he had to bother
9  me about something, he wouldn't have bothered me.  I
10 mean, if you told me this had been prepared after I left
11 Dianon, I would have believed you.
12     Q.   Okay.  No.  I think he said he did this early
13 in the process.
14     A.   Okay.  Yeah.
15     Q.   But this doesn't ring any bells for you?
16     A.   No.  No, but it's good to have explanations
17 like this.  I mean, that's the kind of explanation you
18 put in sort of a generalized procedure manual for
19 technologists, except that it's a slightly more
20 clinically relevant level.
21     Q.   Okay.  Just take a look at -- let me point to
22 you maybe something that he might have more likely run by
23 you.  Toward the end starting at this page, which is
24 10610.
25     A.   Yes.

Page 81

1      Q.   Okay.  And there's a -- I don't know.  There's
2  like a -- there's a graph of the different kinds of
3  leukemia, and then on the next page there's sort of a
4  bullet point outline of the different diseases, and then
5  after that there are some two page discussions or two or
6  three page discussions of each of the kinds of --
7      A.   Oh, my goodness.  This would be great if you're
8  cramming for the boards.
9      Q.   But this is not something he ran by you,
10 consulted you on?
11     A.   No.
12     Q.   Okay.
13     A.   For all I know -- I mean, he could have just
14 taken this out -- he wrote a hematology text, you know,
15 so he could have even just taken this right out of his
16 book.
17     Q.   In fact I have a copy of it.  He thanked me for
18 buying his book.
19     A.   So...
20     Q.   Okay.  So he didn't run any of these sales
21 training things by you?
22     A.   Not that I recall, no.
23     Q.   Okay.  What about -- he said he also prepared a
24 videotape.  Did you have any role in helping him do that?
25     A.   (Shaking head.)

**EXHIBIT 19**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
---------------------------x
UNITED STATES OF AMERICA      :
ex rel. JAMES J. TIESINGA,    :
                              :
            Plaintiff,        :
                              :
      v.                      : No. 3:02CV1573(MRK)
                              :
                              :
DIANON SYSTEMS, INC.,         :
                              :
            Defendant.        :
---------------------------x
```

Washington, D.C.

Tuesday, March 28, 2006

30(b)6 Deposition of

JAMES AMBERSON

a corporate designee, called for examination by

counsel for Plaintiff, pursuant to notice and

agreement of counsel, beginning at approximately

9:08 a.m., at the offices of the United States

Department of Justice, 601 D Street, NW.,

Washington, D.C., before Denise Dobner Vickery of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

18

1  of 18 are like CD 45. Those would --
2  everybody would agree you have to have it.
3  You have to have these in your panel.
4  Whatever else you decide to put in, you've
5  got to have these 18.
6      MS. DAVIS: Okay. Let me have you
7  take a look at this has been marked as
8  Exhibit 2.
9          (Deposition Exhibit No. 2 was
10         marked for identification.)
11     THE WITNESS: Yes.
12     BY MS. DAVIS:
13     Q  And I'm just going to ask you
14  general questions about this right now. This
15  -- this document, is this the -- when you
16  were referring to increasing the panel to 26,
17  is this the panel that was -- is this the
18  panel of 26?
19     A  I think so. I don't remember what
20  all the antibodies were in the panel, but
21  given looking at the date and looking at this
22  thing, as best I believe this is it, yes.

19

1      Q  Okay. And this is a memo from
2  Steve Brown to Bill McDowell?
3      A  Yes.
4      Q  And who is Steve Brown?
5      A  Steve Brown was the supervisor in
6  the flow cytometry lab at the time.
7      Q  Okay. And is he a technical guy?
8      A  Yes.
9      Q  What's his background in?
10     A  He was a -- background was he was a
11  major in biology in college, and then came to
12  DIANON and really learned flow cytometry
13  there.
14     Q  Okay. And is he still at DIANON?
15     A  No. He's been gone for --
16     Q  Can you --
17     A  -- I don't know, five or seven
18  years.
19     Q  Okay. Do you know where he is, by
20  any chance?
21     A  I have no idea where he is.
22     Q  Okay. And Bill McDowell. That's

20

1  who you referred to earlier?
2      A  Yes.
3      Q  Okay. And what was his role at
4  DIANON?
5      A  He was in marketing at the time. I
6  don't remember what his specific title was,
7  but he was in a fairly senior position at
8  marketing.
9      Q  Okay. And he's the one who called
10  you and asked if you needed to be worried
11  about -- about this?
12     A  Well, he had been contacted by one
13  of our attorneys and, you know, he really
14  didn't know much about what was going on. He
15  just asked me, you know, "What's this all
16  about? You know, should I be worried?"
17     Q  Okay. And you said he was with
18  marketing?
19     A  Yes.
20     Q  Okay. And is this -- let's take a
21  -- I'm sorry. Take a look at Exhibit 2 as
22  well again. It says there underneath the

21

1  list, it says, "We reduced the panel when we
2  switched to three-color analysis in the
3  beginning of August of last year." Is that
4  what prompted you to look at what they were
5  doing before?
6      A  Yeah. Well, what happened was as
7  best I can reconstruct this is that when they
8  got ready to go to the 26 antibodies -- and
9  let me add, this talk of going to these
10  additional antibodies, that had been going on
11  for over a year, you know, about adding some
12  more antibodies. But when they went to do
13  that, and I presume -- I think it might have
14  been Bill -- discovered that the fee file we
15  were already billing for 26, and I think
16  Steve Brown -- and I think he's alluding to
17  this here -- mentioned that in the prior
18  August they had switched to three-color
19  analysis.
20         In flow cytometry, you're
21  essentially shooting a laser beam at cells as
22  they pass in a stream of water and you can

22

1  use one, two, three, actually now it's done
2  with five colors or we're about to switch to
3  that. They switched from two to three
4  colors. When you do that, you can look at
5  more antibodies per tube and often, you know,
6  you may be able to use fewer antibodies.
7      And so he says here, "When we
8  switched to three-color analysis, we reduced
9  the panel," and the assumption at the time I
10 believe was that they had been doing 26.
11 They switched from two to three and then went
12 down to 22 antibodies, but nobody changed the
13 -- the fee schedule due to some sort of
14 miscommunication.
15     We have in the process of preparing
16 for this and looking at reports, we have
17 found that in fact even prior to August that
18 they were only doing 22 antibodies and that
19 went actually back to the beginning of the
20 year. And we actually this week we're
21 notifying our local carrier that we've
22 discovered this, and once we quantitate what

23

1  the refund is due, we'll be forwarding that
2  to them.
3      You know, as best I can tell at the
4  time is that the decision to go from two to
5  three-color and also a decision to go to more
6  antibodies, that is going up from 22 to 26 or
7  whatever, those were being contemplated
8  throughout that year 1996 kind of
9  simultaneously. And I believe what happened
10 was that they eventually did go from two to
11 three, but they never did go to 26.
12     That, you know, knowing what I
13 know, particularly some of our recent
14 experience in the lab, doing these things
15 takes a lot of time and investment in
16 personnel. You have to validate the
17 antibodies. Going from, you know, two to
18 three-color or three to five-color is a
19 considerable production.
20     You need to reconfigure all your
21 tubes, you know, calibrate the lasers and do
22 all the stuff with which I'm not familiar,

24

1  and I presume what happened is that they
2  couldn't do both simultaneously. They
3  eventually got the three-color up, but
4  somehow along the way the information that
5  was communicated to marketing and billing was
6  incorrect.
7      MS. DAVIS: Okay. Take a look at
8  what's been marked as Exhibit 3.
9          (Deposition Exhibit No. 3 was
10         marked for identification.)
11 BY MS. DAVIS:
12 Q  And this is a memorandum dated
13 March 20, 1997, which is the same day as
14 Exhibit 2; is that right?
15 A  Yes.
16 Q  Okay. And this one is from Bill
17 McDowell. That's the marketing person?
18 A  Yes.
19 Q  To three people and one of them is
20 Debra Klembara, Pat Torre and Bob Tucciarone?
21 A  Yes.
22 Q  Did I pronounce that right?

25

1  A  Yes. Actually, I should add, he's
2  one of the other people I talked to in
3  preparation.
4  Q  Okay. And is he still at DIANON?
5  A  Yes. He's the head of billing.
6  Q  Okay. And Pat Torre?
7  A  She's in the billing department,
8  collections.
9  Q  And she's still there?
10 A  She's still there.
11 Q  And Debra Klembara?
12 A  She's actually in the IT
13 department, but she works on billing issues I
14 think.
15 Q  Okay. This says, "Updated antibody
16 listing for hematopathology" and it says,
17 "Effective March 25, 1997, the hemopath lab
18 is changing its normal XL 3 XL 4 antibodies
19 to the following list. Accordingly, we need
20 to change the billing to reflect the
21 antibodies as of March 25th. The number of
22 billed antibodies is not changing, still 26,

7 (Pages 22 to 25)

30

1 that's not. Sorry about that. That's my
2 copy. It's got all the highlighting on it.
3    A  Oh.
4    MR. PARKER:  Secret codes.
5    MS. DAVIS:  Can't give you that
6 one. Give you hints.
7    THE WITNESS:  Wouldn't want to give
8 me an advantage.
9    MS. DAVIS:  There you go.  That's
10 been marked as Exhibit 4.
11    (Deposition Exhibit No. 4 was
12    marked for identification.)
13    BY MS. DAVIS:
14    Q  Okay.  This has been marked as
15 Exhibit Number 4, and it's a memorandum on
16 May 21, 1997 from Dr. Goyette to you and its
17 "Subject Flow Cytometry Antibodies"; is that
18 right?
19    A  Yes.
20    Q  It also says, "Attached is the
21 justification for the number and variety of
22 antibodies we use in our flow cytometry

31

1 panel.  While there is no national consensus
2 on the number of antibodies to use, our
3 practice is not uncommon."  And then it has
4 an explanation.
5    What was -- Dr. Goyette basically
6 when he testified a couple days ago said that
7 he prepared this at your request.  Why did
8 you ask him to prepare this?
9    A  Again, I think this was in the
10 context of our increasing to this 26 antibody
11 panel, which Dr. Goyette and the other
12 hematopathologists really felt was essential.
13 In particular, one of our newer
14 hematopathologists, Dr. Glenn Segal, who I
15 believe had joined us the previous fall, had
16 extensive experience in flow cytometry and
17 felt that there were -- I don't remember the
18 number -- another four or so antibodies that,
19 again, as I mentioned before, I think they
20 might have had something to do with hairy
21 cell leukemia, but anyway he really felt we
22 needed to add these antibodies or we would

32

1 miss conditions.
2    So, you know, they put forth this
3 26 antibody panel and I simply asked Dr.
4 Goyette, you know, I'd like to have something
5 in writing that if I'm ever asked why are we
6 using 26 antibodies that I can refer to
7 because I'm not an expert on this, and so he
8 graciously put this -- put this together for
9 me.
10    Q  Okay.  Did you -- I mean, this was
11 just something you wanted to have in your
12 file?
13    A  Yeah, I wanted to have a record of
14 it.  Again, this is in context of that
15 overbilling problem.
16    MS. DAVIS:  Okay.  This has been
17 marked as Exhibit 5.
18    (Deposition Exhibit No. 5 was
19    marked for identification.)
20    BY MS. DAVIS:
21    Q  This is that same memo but with
22 some handwriting on it.  At the top it says,

33

1 "Bill, as you requested, Jay"?
2    A  Uh-huh.
3    Q  Is that your handwriting?
4    A  Yes.
5    Q  And that Jay is you?
6    A  Yes.
7    Q  And who is Bill?
8    A  McDowell.
9    Q  That suggests that Mr. McDowell
10 asked for the -- the justification?
11    A  Yes.
12    Q  And why did he ask for that?
13    A  I don't remember.
14    Q  No idea?
15    A  No.
16    Q  Did you -- down at the bottom there
17 are three bullet points or three numbered.
18 One of which of them is "Jay discuss" and
19 then the last one says "More detail on second
20 paragraph."  Did you discuss this with --
21 with Mr. McDowell?
22    A  I don't recall it.  We may have.  I

9 (Pages 30 to 33)

66

1  pages, which are 600003 and 4. I think they
2  were -- when they were produced to us, they
3  were produced together. This is essentially
4  the same sort of document as the previous
5  one, except for a different test?
6      A   Yes, it's a larger profile. That
7  also includes some molecular tests used to
8  characterize these kinds of cancers.
9      Q   Okay. And then next couple of
10  pages looks like 900000 through 03. Can you
11  tell what that is?
12      A   Yes. This is a print of the fee
13  file maintenance portion of our information
14  system, and it prints out fee files for a
15  specific test or profile going from the most
16  recent to the oldest.
17      Q   Okay. So, if -- if -- let me ask
18  following question. So this -- this is
19  what's in the computer system essentially for
20  billing purposes?
21      A   Yes, that's the -- that's the fee
22  file. Don't ask me how this all -- the

68

1      Q   We've already talked about those.
2  Those are the --
3      A   That's going from 26 antibodies to
4  18.
5      Q   Right. Okay. And then 2000068?
6      A   Yes.
7      Q   69 and it goes through -- goes on
8  quite some time here.
9      A   Goes through 75.
10      Q   75; okay. What can you tell me
11  about the origin of this document?
12      A   This was I believe produced by Mark
13  Florio, who was the hematopathology product
14  manager at the time. It looks like it was
15  produced in the first week in January or so,
16  and it was to look at some hematopathology
17  fee changes and take a look at the impact of
18  that, and also he kind of alludes to this,
19  although it's not clear to me, that there
20  might have been a change in Medicare
21  reimbursement.
22      Q   Okay. Up at the top, it says, "Ask

67

1  mechanics of this works.
2      Q   Right. Okay.
3      A   That's my understanding.
4      Q   Okay. So if somebody put in that
5  they performed the XL 3, all of this
6  information would be pulled up? In other
7  words, if you wanted to know what individual
8  antibodies were in the XL 3?
9      A   Well, which individual antibodies
10  would be billed. It --
11      Q   Right.
12      A   -- doesn't correspond to what is
13  necessarily performed. For example, as we've
14  already discussed, in some instances in here,
15  there are only 18 antibodies listed; whereas,
16  26 were performed and earlier there might
17  have been 9 antibodies listed where an exact
18  21 were performed.
19      Q   Okay. And let's go to the next
20  couple of pages. I can't read those numbers
21  at all. It looks like 300004 and 05.
22      A   Yes.

69

1  Pat for Medicare reimbursement table 31
2  January 96." Do you know who wrote that?
3      A   Again, it looks to me like it might
4  be Bill McDowell's handwriting.
5      Q   Okay.
6      A   I think Mark reported to him at the
7  time.
8      Q   And did you -- did you discuss this
9  document with either Mr. McDowell or Mr.
10  Florio?
11      A   No. I don't know where Mr. Florio
12  is.
13      Q   Okay. So what -- why was this
14  document produced?
15      A   Every year really starting around
16  September, but continuing right up until the
17  turn of the year, one of the things that goes
18  on at our laboratory and I think virtually
19  every other laboratory is you start preparing
20  for your budget for next year. That involves
21  a number of things. First of all, doing a
22  sales forecast. It also involves looking at

18 (Pages 66 to 69)