**EXHIBIT 21**

**Page 1**

1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2
      - - - - - - - - - - X
3  UNITED STATES OF AMERICA,,   |
   ex rel. Dr. James J. Tiesinga,|
4          Plaintiffs,   | No. 3:02CV1573 (MRK)
5        v.              |
6  DIANON SYSTEMS, INC.,  |
           Defendant.   | July 27, 2006
7  - - - - - - - - - - X
8
9
10
11        VIDEO DEPOSITION OF MARK FLORIO
12
13      Taken before Kristine A. Paradis, LSR 338, a
        Court Reporter and Notary Public within and for
14      the State of Connecticut, pursuant to Notice
        and the Federal Rules of Civil Procedure, at
15      the Office of the U.S. Attorney, 157 Church
        Street, New Haven, Connecticut, on July 27,
16      2006, commencing at 9:49 a.m.
17
18
19
20
21
22
23            FALZARANO COURT REPORTERS
24             117 North Saddle Ridge
            West Simsbury, Connecticut 06092
25                 860.651.0258

**Page 2**

1  APPEARANCES:
2     For the Plaintiffs:
3        U.S. DEPARTMENT OF JUSTICE
           601 D Street, NW
4          Room 9607
           Washington, DC 20004
5          202.307.0240
             BY: RYAN P. FAYHEE, ESQ.
6
7     For the Defendant:
8        AKIN, GUMP, STRAUSS, HAUER, & FELD, LLP
           Robert S. Strauss Building
9          1333 New Hampshire Avenue, N.W.
           Washington, DC 20036-1564
10         202.887.4000
             BY: ROBERT S. SALCIDO, ESQ.
11
12    Videographer:
13       Hamilton Communications
           1442 Essex Road
14         Westbrook, Connecticut 06498
           Joe Castelot
15         860.399.4999
16
17    Also Present:
18       Richard M. Molot, Esq.*
           Assistant U.S. Attorney
19
20
21
22  * Present as noted in transcript.
23
24
25

**Page 3**

1            S T I P U L A T I O N S
2
3        It is stipulated and agreed by counsel for the
4  parties that all objections are reserved until the time
5  of trial, except those objections as are directed to the
6  form of the question.
7        It is stipulated and agreed between counsel for
8  the parties that the proof of the authority of the Notary
9  Public, before whom this deposition is taken, is waived.
10       It is further stipulated that any defects in
11 the Notice are waived.
12       It is further stipulated that the deposition
13 may be signed before any Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1        (Deposition commenced: 9:49 a.m.)
2
3        THE VIDEOGRAPHER:   We are now on record.
4  This is the deposition of Mark Florio taken
5  on behalf of the Plaintiff in the case of
6  United States of America, et al. v. Dianon
7  Systems, Inc., case number 3:02CV1573(MRK)
8  filed in the United States District Court for
9  the District of Connecticut.
10       Today's date is July 27, 2006.  The
11 time on videotape record is 9:53 a.m.
12 This deposition is being held at the
13 United States Attorney's office,
14 157 Church Street, New Haven, Connecticut.
15       My name is Joe Castelot representing
16 Hamilton Communications of 1442 Essex
17 Road, Westbrook, Connecticut.
18       Would counsel please introduce
19 yourselves for the record.
20       MR. FAYHEE:   My name is Ryan Fayhee
21 representing the United States.
22       MR. SALCIDO:   I'm Robert Salcido.  I
23 represent Defendant.
24
25

1   send a bone marrow sample up if you only do half of
2   what diagnostically could be the result.
3           So, you might as well send it to somebody
4   who can do it all and do it all efficiently,
5   rapidly, with the least problems with logistics or
6   bad samples. So, this is just, again, reinforcing
7   our positioning in the marketplace. Nothing more.
8   BY MR. FAYHEE:
9       Q    Right. And I'm not trying to misinterpret
10  what you're saying by this bullet point, but I want
11  to be very clear. It says that Dianon offers the
12  largest number of cell surface markers run on each
13  case for a better diagnostic sensitivity with low
14  cost.
15      A    Right.
16      Q    Do you know what you -- what kind of
17  analysis you prepared in order to make that
18  statement?
19      A    I don't recall. No, I really don't
20  remember. I mean, this is an end point of probably
21  several months of back and forth and changing over
22  to -- from, you know, the old anatomic pathology
23  services to the new ones. So, I would guess that,
24  you know, when it was -- when the dust all cleared,
25  we looked at our stuff, we looked at the

---

1   competitors, and wow, you know, we really got a more
2   comprehensive panel. Let's emphasize that because
3   that's a key point.
4           Because at the time everyone -- all the
5   flow -- you know, flow cytometry was new. So, the
6   market was constantly increasing the number of
7   panels and antibodies as new antibodies appeared and
8   as they were validated as being useful. So, sort of
9   like -- a bit like the cold war. You know, I have
10  more missiles than you do. Well, now I have more
11  missiles than you. You know, and that's part of
12  what labs do. I have more, I have better, I have
13  faster, and sometimes I have cheaper.
14      Q    Was there a competition among each of
15  these -- these labs to perform more antibodies than
16  the next one?
17      A    You know, that implies that we're all
18  locked into, you know, clean information. I mean,
19  there was no Internet back then, for the most part.
20  I mean, there was but we didn't have Internet. So,
21  it wasn't like I'd look on Impath's web page and
22  they would look on mine and it was an arm's race
23  where every day we were like, ah-ha, another
24  antibody.
25          These decisions were made once and then

---

1   you sat with it for a long period of time and then
2   you moved on. And our focus was not necessarily
3   what's -- what are the Jones doing and let's keep up
4   with them; it is what is the market considerations?
5   What do our customers want? And then, oh, by the
6   way, let's compare that to the competition because
7   those are the guys who are fighting with us out in
8   the trenches. So, the competitor or the competitive
9   landscape was always secondary to clinical necessity
10  and what the market will bear and what the customers
11  want.
12          But from our sales rep's standpoint, their
13  whole world is based on if they've got a good Impath
14  rep in their territory who's eating their lunch
15  every day, they get very concerned and they want to
16  know exactly what Impath's weaknesses and strengths
17  are. Just like Impath, I'm sure, had some of our
18  requisitions and the same sort of memos, just like
19  every single medical company out there does it on a
20  weekly basis. They keep an eye -- one eye on the
21  competition, one eye on the market.
22      Q    Well, it states here what Dianon was
23  performing. Do you know what they were billing for
24  during this time period?
25      A    No, I don't. I mean, if you showed me

---

1   documents I could tell you what they're billing, but
2   I don't recall. I have no idea.
3       Q    Would you have any input into what they
4   were billing as product manager?
5       A    No. I -- that came from the medical
6   director. I mean, basically Rich or you, know,
7   depending on who the pathologist was would come down
8   and say, here's the panel that we need to run. We
9   would look at it, we would measure what the
10  reimbursement was for that panel and try to
11  determine what the revenue stream was going to be up
12  or down based on those changes and then the process
13  would start to make those changes in the lab and
14  billing and requisitions and sales.
15          So, the input initiated -- originally
16  would initiate from, you know, Rich or Ann Marie or
17  both and then get filtered through the business
18  unit. I think Rich would sometimes get frustrated
19  that his decisions were not implemented as quickly
20  but these things take time. All the requisitions
21  have to be done; they have to be checked
22  50 different ways. The sales reps have to be
23  trained; the billing people have to be schooled on
24  what to do. So, it's a bit like turning the
25  Titanic. But once you get everything locked in,

1  then product management doesn't sit there and dwell
2  on, you know, everyday, oh, my God, do we need to
3  add one?  We would lock it down and move on.  And
4  then maybe revisit next budget year.  But again, I
5  was only there 18 months.  So, typically you would
6  revisit it every year to determine is the product
7  we're offering still consistent with market needs?
8  And that's all marketing is, trying to match up
9  those two statements.
10       Q     You state that Dr. Goyette, for example,
11  would come down and show you what he was running,
12  what test -- what antibodies he was using in his
13  test?
14       A     Well, he --
15           MR. SALCIDO:    Objection.
16       A     He would come down and tell me what he
17  thought the panel should be.
18  BY MR. FAYHEE:
19       Q     Okay.
20       A     You know, not what he was -- I mean, I had
21  no idea what he was running.  I mean -- I shouldn't
22  say that.  I knew what they were running because
23  they were reported every day but not by antibody.
24  We basically knew that the XL -- 50 XL3 tests were
25  done this quarter, you know, at this revenue and

1  this cost, and that's how we looked at it in
2  marketing.  And then Rich would -- you know, I don't
3  recall exactly, but my -- I sense that the process
4  started by some sort of review.  And maybe when Rich
5  came on board, he looked at our old panels and said
6  that this is not adequate for two board-certified
7  heme paths who want to make the service the best
8  service in the country.
9           So, the natural progression would be he
10  would come down and say, you know, I need these
11  antibodies.  I need the panels to change to reflect
12  these antibodies or these tests.  And then we would
13  go through the process of making that happen.  And
14  it -- it took months.  And part of that process was
15  putting it down on paper, learning how Medicare
16  reimbursed for that times the events, learning what
17  the appropriate number of events Medicare would
18  reimburse, and then trying to calculate what our
19  revenue was based off of that.  It's just standard
20  business practice.  And that would go into the
21  revenue forecast.  And then we would try to predict,
22  okay, how many XL3s would be ordered versus XL8s
23  versus XL9s.  And that was the difficult part of it,
24  was the mixing of the different panels and what they
25  would equate in terms of revenue.  So...

1       Q     In that analysis, did that have an effect
2  on the number of antibodies billed?  Not performed,
3  but billed?
4       A     I don't -- I don't -- what do you mean by
5  that?
6       Q     Well, you understand that these antibodies
7  were billed individually, do you?
8       A     I don't.  No, I don't understand that.
9       Q     Okay.  Do you -- do you know -- whether or
10  not the XL3 panel was -- was billed as one
11  comprehensive test or --
12       A     Oh, oh.  No.
13       Q     -- whether it was billed as individual
14  antibodies?
15       A     It would be billed by -- sorry.  It would
16  be -- I mis -- it would be billed by individual
17  antibodies clearly.
18       Q     Or events, as you said.
19       A     Yeah.  Medicare doesn't know an XL3 from
20  what Impath's panel was.  All they know is that
21  you've got a CPT code, 88180, times 15, equals this,
22  you know.  88136 times two equals that.  So, that's
23  how we would -- the panels would be made up of
24  events times the CPT code.
25           I had no idea what the antibodies were.

1  And the antibody names could change, for example.
2  You know, Rich may play -- replace a CD4 with a CD6
3  on that panel if the CD6 was the newest and latest
4  and greatest for all -- that was all medically --
5  they did that in the lab without any input from us.
6  Our interest was simply what does the panel equal in
7  revenue, how to sell it in the market, and can we
8  get the requisitions changed in time to make all
9  this happen.
10       Q     And what I'm interested in is Dr. Goyette,
11  you tell me Dr. Goyette said, this is what we are
12  performing in the lab?
13       A     Yes.
14       Q     Is that correct?
15       A     Yes.
16       Q     And then you say that you would take that
17  information and do an analysis?
18       A     Uh-hum.
19       Q     And would you take into consideration
20  reimbursement rates?
21       A     Right.
22       Q     What other factors would you take into
23  consideration?
24       A     I mean, logistics, reimbursement rates,
25  changes to sales training, what do we have to do to

**EXHIBIT 22**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF CONNECTICUT

2     _____

3

    UNITED STATES OF AMERICA,

4     EX REL., JAMES J. TIESINGA,

5

                    Plaintiff,

6

7     VS.                        NO. 3:02CV1873 (MRK)

8

9     DIANON SYSTEMS, INC.,

10              Defendant.

    _____

11

12

13

14

15

                THE VIDEOTAPED DEPOSITION OF

16                  WILLIAM McDOWELL

                  TAKEN JUNE 2, 2006

17

18                  **COPY**

19

20     _____

21

22          ALPHA REPORTING CORPORATION

            LAUREN EDWARDS, CCR, CSR

23              236 Adams Avenue

            Memphis, Tennessee 38103

24            1-800-556-8974

            www.alphareporting.com

Page 100

1    that, hey, we're going to move to 18.  And I'm

2    sure there were discussions leading up to that,

3    but I can sort of remember that final one.

4         In fact, when this all came out last summer

5    that I became aware that this was all going on,

6    you know, if you would have asked me then how many

7    markers was Dianon billing, I would have said 18,

8    because that's the number that stuck in my head,

9    you know.  I mean, my memory up and down and all

10   that stuff is pretty limited, but 18 is the number

11   I remember.

12        Q.   Okay.  And at this meeting, was there any

13   discussion of why you were moving to 18?

14        A.   I don't remember.  I mean, there probably

15   was, but I just remember that -- I remember the

16   18, you know, and I'm sure there was, but I don't

17   know what it would have been.

18        Q.   Was there any particular person at the

19   meeting taking the lead on the argument on the

20   move to 18?

21        A.   Well, I mean, I think if anybody, it

22   would have been probably Jay.

23        Q.   Do you remember whether it was him or --

24        A.   I don't.  I just -- I remember, you know,

Page 101

1    Jay being there.  I can sort of in my mind's eye

2    still see us sitting there.  But, you know, the

3    leading up to it, I mean, it just -- like I said

4    to him, if you had asked me last summer, I would

5    have remembered 18, and all the rest of this is

6    sort of getting pieced back together by looking at

7    these memos.

8        Q.    Was there any discussion, if you recall,

9    about -- I mean, obviously if you're going to only

10   charge for 18 as opposed to 26, you're giving up a

11   significant amount of revenue.

12       A.    Right.

13       Q.    Was there any discussion about that?

14       A.    I don't remember.  I would certainly

15   guess that there would have been.  You know, but,

16   again, you know, I know I've said it a few times,

17   but we basically did what the lab told us to do on

18   this stuff.  And, you know, our influence on flow

19   cytometry -- I mean, you have met Rich Goyette,

20   and I said to Robert, I mean, any notion of Bill

21   McDowell saying to Rich Goyette, "You're going to

22   run this many markers," and Anne-Marie Connor,

23   once you meet her, is absolutely ludicrous.  I

24   mean, that is just not even worth talking about.

Page 102

1    We would have done what the lab said to do, and

2    did it.  I mean, and I would have gotten all this

3    stuff because marketing was the liaison to

4    billing, and so I don't know, I would assume there

5    is another memo that probably says, "Billing,

6    we're going to run these 18 markers."

7        Q.    We're going to look at that.

8        A.    Okay.  And that would have been normal.

9    I would have gotten it from the lab, and I would

10   have handed it off to Deb Klembara, and she would

11   have put it in the system.

12        But, I mean, this stuff -- I mean, even

13   today after all the additional knowledge I have

14   gained, if you took this away from me and told me

15   to construct an appropriate number of markers in

16   flow cytometry, I have no clue which ones it would

17   have been.  There is no way, even today.

18        Q.    Okay.  Go back to Dr. Goyette's

19   affidavit.  It's Exhibit 24, I think.

20        A.    Where do you want to go?

21        Q.    Go to Page 8, the top of the page.

22   Dr. Goyette is talking about his June 17, 1997

23   memo, which is the one we just looked at and --

24        A.    Where?

**EXHIBIT 23**



1  UNITED STATES DISTRICT COURT
   DISTRICT OF CONNECTICUT
2
   - - - - - - - - - - X
3  UNITED STATES OF AMERICA,,    |
   ex rel. Dr. James J. Tiesinga,|
4        Plaintiffs,             | No. 3:02CV1573 (MRK)
5        v.                      |
6  DIANON SYSTEMS, INC.,         |
         Defendant.              | July 19, 2006
7  - - - - - - - - - - X

11  VIDEO DEPOSITION OF KIMBERLY HADE

13  Taken before Kristine A. Paradis, LSR 338, a
    Court Reporter and Notary Public within and for
14  the State of Connecticut, pursuant to Notice
    and the Federal Rules of Civil Procedure, at
15  the law offices of Epstein, Becker & Green,
    One Landmark Square, Stamford, Connecticut, on
16  July 19, 2006, commencing at 9:02 a.m.

23        FALZARANO COURT REPORTERS
24           117 North Saddle Ridge
          West Simsbury, Connecticut 06092
25              860.651.0258

---

2

1  APPEARANCES:
2     For the Plaintiffs:
3        U.S. DEPARTMENT OF JUSTICE
         601 D Street, NW
4        Room 9607
         Washington, DC 20004
5        202.307.0240
            BY: RYAN P. FAYHEE, ESQ.
6
7     For the Defendant:
8        AKIN, GUMP, STRAUSS, HAUER, & FELD, LLP
         Robert S. Strauss Building
9        1333 New Hampshire Avenue, N.W.
         Washington, DC 20036-1564
10       202.887.4000
            BY: ROBERT S. SALCIDO, ESQ.
11
12    Videographer:
13       Hamilton Communications
         1442 Essex Road
14       Westbrook, Connecticut 06498
            Robin Kormos
15          860.399.4999

---

3

      S T I P U L A T I O N S

          It is stipulated and agreed by counsel for the
parties that all objections are reserved until the time
of trial, except those objections as are directed to the
form of the question.
          It is stipulated and agreed between counsel for
the parties that the proof of the authority of the Notary
Public, before whom this deposition is taken, is waived.
          It is further stipulated that any defects in
the Notice are waived.
          It is further stipulated that the deposition
may be signed before any Notary Public.

---

4

          (Deposition commenced:  9:02 a.m.)

          THE VIDEOGRAPHER:   We are now on the
record.  This is the deposition of Kimberly
Hade taken on behalf of the Plaintiff in this
case of United States of America ex rel.
Dr. James J. Tiesinga versus Dianon Systems,
Inc., case number 3:02CV1573(MRK) filed in
the United States District Court for the
District of Connecticut.
          Today's date is July -- July 19,
2006.  The time on the videotape record is
9:05 a.m.  This deposition is being held
at One Landmark Square Stamford,
Connecticut.  My name is Robin Kormos
representing Hamilton Communications of
1442 Essex Road, Westbrook, Connecticut.
          Would counsel please introduce
yourselves for the record.
          MR. FAYHEE:   My name is Ryan Fayhee.  I
represent the United States.
          MR. SALCIDO:   My name is Robert Salcido.
I represent Defendant, Dianon.
          THE VIDEOGRAPHER:   Will the Court
Reporter please swear in the witness.

25

1    A   No. Which antibodies? You mean which --
2 just that we should bill for all the antibodies.
3 Yes, I had a contribution in that.
4    Q   So, whatever the medical side of Dianon,
5 if we can call them the lab people decided they
6 would run, that is, in fact, what would be billed
7 for?
8    A   Yes.
9    Q   Okay. And so was -- while you were at the
10 test code meetings you didn't consider what -- for
11 example, what competitors were -- were billing for?
12    A   No.
13    Q   That was never a consideration into how
14 many would actually be billed?
15    A   Never.
16    Q   Okay. Were there any other factors that
17 went into that determination other than what the lab
18 was actually running?
19    A   Yes -- no. No other factors went into
20 that, only what the lab was running.
21    Q   Only that?
22    A   Only that.
23    Q   Did changes in reimbursement rates from
24 Medicare have any effect on how many antibodies
25 would be billed?

26

1    A   No.
2          MR. FAYHEE:  Please mark this as the
3 first exhibit.
4
5         (Plaintiffs' Exhibit 1:
6         Marked for Identification.)
7
8 BY MR. FAYHEE:
9    Q   Handing you this document that's been
10 marked as Exhibit 1, I want to ask you to take a
11 quick look and whether or not you recognize this
12 document.
13    A   I recognize the content, the subject
14 matter but not this physical document.
15    Q   Do you recall whether you've seen this
16 document before?
17    A   I don't recall.
18    Q   Well, at the top of this document it -- on
19 the right corner it says Grant Carlson, vice
20 president, marketing and business development. Do
21 you know Grant Carlson?
22    A   Yes.
23    Q   And was he the vice president of marketing
24 and business development while you were at Dianon?
25    A   Yes, he was.

27

1    Q   Okay. And then it says "To: TSRs, RMs,
2 and CSRs." Do you know what a TSR is?
3    A   Technical sales rep.
4    Q   And an RM?
5    A   Regional manager.
6    Q   And a CSR?
7    A   It was a -- sort of an associate -- no,
8 no, no, I'm sorry. Customer sales representative.
9    Q   Okay.
10    A   That's what that is.
11    Q   And you were a product -- product manager
12 at this time?
13    A   A market manager.
14    Q   I'm sorry.
15    A   Yes.
16    Q   A market manager?
17    A   Yes.
18    Q   Excuse me. And would you have received
19 this document as being a marketing manager?
20    A   Most likely, yes.
21    Q   Okay. Well, I want to look at the
22 beginning of this document. And it states, "As you
23 know how, Dianon is raising fees 5 percent across
24 the board. This includes list fees for both patient
25 and client, as well as special pricing for both

28

1 patient and client." And it continues on this fee.
2 It says, "Please be aware that we need to supply
3 fees every year to insure that physicians know the
4 tests and fees billed to third-party payers."
5        And then on down at the beginning of the
6 next paragraph it says, "Certain tests had some
7 overhauls, meaning the fees changed by more or less
8 than 5 percent for various reasons. These fees are
9 highlighted in the attached fee schedules. You will
10 notice that" and the first bulletted point says
11 "immunophenotyping will change from 18 to 26
12 billable events."
13        Now, it says immunophenotyping. Does that
14 mean flow cytometry?
15    A   Yes.
16    Q   Okay. The tests we're talking about
17 today?
18    A   Yes.
19    Q   Okay. Do you know why there was a change
20 from 18 to 26 antibodies?
21    A   Because it was discovered that we were
22 only billing 18. And being that we knew we were
23 doing 26, we knew we should bill for 26. So --
24    Q   Who --
25    A   -- we changed that.

```
 1      Q     Who discovered that you were billing for
 2  only 18?
 3      A     More than likely I believe I probably
 4  discovered it.  But I can't say for sure.
 5      Q     You don't recall discovering that --
 6      A     This was -- there was a -- this was a
 7  period of time where we were reviewing -- I was
 8  reviewing all of the tests in my product line.  So,
 9  if you look at those -- I don't know if you have the
10  fee schedules.  There's probably a hundred tests
11  there.  And one by one going through each test
12  looking at the fees and looking at the fee files,
13  making sure they were up-to-date and correct and
14  fixing them before this January 1st implementation
15  of a fee change.
16      Q     Did you go ask someone why --
17      A     I certain --
18      Q     -- they were billing for 18?
19      A     I certainly would have if -- at any change
20  that I discovered, would have brought it to Grant
21  first.
22      Q     You went and asked Grant -- did -- is that
23  what you did here is went and asked Grant Carlson?
24      A     I don't recall, but I would have done
25  that.
```

```
 1      Q     Is that the first person you would have
 2  went to?
 3      A     Yes.
 4      Q     Okay.  And do you recall going to him to
 5  talking -- and talking about -- to him about this
 6  particular test?
 7      A     Not specifically this one test.  This
 8  was -- this was part of a much larger picture of
 9  changing any test.  So, there was probably a list of
10  50 tests that I would have taken to him to say
11  here's some changes that I think maybe we may need
12  to look at or to be made when we -- when we do this
13  fee change.
14      Q     Do you remember discussing the 18 to 26
15  change with anyone else?
16      A     No.
17      Q     Do you know who Grant Carlson talked to?
18      A     No.
19      Q     Okay.
20      A     I would have discussed this then as we
21  implemented it with billing and compliance, and it
22  would go beyond at that point.  But upon first
23  discovery, I would bring it to Grant's attention.
24      Q     So, you have absolutely no recollection of
25  why they were only billing for 18 rather than 26?
```

31

```
 1          MR. SALCIDO:   Objection.
 2      A     No recollection of why, no.
 3
 4              (Plaintiffs' Exhibit 2:
 5              Marked for Identification.)
 6
 7  BY MR. FAYHEE:
 8      Q     I'm handing you what's been marked by the
 9  Court Reporter as Exhibit 2.  Do you recognize this
10  document?
11      A     Yes, I do.
12      Q     What is this document?
13      A     This is a form that if I needed to -- if I
14  was creating a new test or modifying an existing
15  test I would fill out and bring to these test code
16  creation meetings to implement the change or
17  creation of a new test.
18      Q     Okay.  And it says, in fact, up at the
19  top, initiator's name, Kim Hade.  And date,
20  11/14/2000.  And then down a little lower it states
21  billing information, cell surface marker, the CPT
22  code 88180 and 26 events.  And then even further
23  below that it says approvals.  Do you recognize the
24  signatures under the approvals section there?
25      A     I do.
```

```
 1      Q     Okay.  The first signature, pretty good
 2  handwriting I can read, Jack Snyder?
 3      A     Right.
 4      Q     Did you discuss this billing issue with
 5  Jack Snyder?
 6      A     I don't recall having a specific
 7  conversation with him about it, no.  If he was in
 8  attendance at the meeting, which I again don't -- I
 9  can't say that I recall, then yes, there would have
10  been a -- a table discussion about this matter.
11      Q     Did you take this document to Jack Snyder
12  for him to sign it?
13      A     No.  I -- I am the initiator with this.
14  And then from that point on, this document would
15  stay with Bob McNamee or Donna Demattia.
16      Q     Okay.  And would Bob McNamee take this to
17  Jack Snyder to sign it?
18      A     Yes.  Somebody from compliance would --
19  would rotate this document.
20      Q     Below that it says vice president.  And I
21  think the signature is Valerie Palmieri; is that
22  correct?
23      A     Correct.
24      Q     Did you have a discussion with Valerie
25  Palmieri about the move from 18 to 26 antibodies?
```

32