UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DR. JAMES J. TIESINGA, <br><br> Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br> Defendant. | No. 3:02 CV 1573(MRK) <br><br> January 4, 2007 |

**UNITED STATES' RESPONSE TO DEFENDANT'S
LOCAL RULE 56 (a)(1) REPLY STATEMENT**

**I.    General Statement**

The only question for the court to decide on this motion is whether a reasonable trier of fact could decide in favor of the United States. The answer to that question has to be yes. In order to prove a violation of the False Claims Act, the United States must show that Dianon (1) knowingly or recklessly (2) submitted false or fraudulent claims for payment (3) to the United States. *31 U.S.C. § 3729.*

There is substantial evidence in the record to show that Dianon performed a one-sized-fits-all panel of antibodies on every patient specimen without even reviewing the clinical information before performing the test and then billed Medicare for every antibody without regard to whether each antibody was useful to the diagnosis of that particular patient. Disputed Issues ¶¶ 6-9.[1] Dianon does not seriously contest that it made any attempt to apply medical judgment to the billing decisions; in fact, Dianon witnesses admitted that the pathologists played

---

[1] References are to the *United States' Local Rule 56(a)(2) Statement, Disputed Issues* section.

no role in determining what was billed to Medicare - they did not even know what was being billed, *Disputed Issues* ¶¶ *10, 19*, and were never trained in Medicare regulations regarding medical necessity. *Disputed Issues* ¶¶ *19, 24.*

The "smoking gun" in this case is the "move to 18" memorandum. *Exhibit 30; Disputed Issues* ¶¶ *20- 21.* This memorandum and the affidavits submitted to the United States by Dianon amount to admissions by Dianon that the pathologists only believed that 18 antibodies were medically necessary for the initial work-up of a specimen under Dianon's one-pass approach to flow cytometry testing. *Disputed Issues* ¶ *21.* Since Dianon's pathologists did not believe that more than 18 were medically necessary, any routine billing to Medicare of more than that number were not medically necessary and were, therefore, false claims.

The story does not end there, however. Dianon's own pathologists - Dr. Mishilani, Dr. Connor and Dr. Tiesinga - testified that they recognized that not all of the antibodies were useful in all cases. *Disputed Issues* ¶¶ *12, 16, 20.* Further, the medical literature, some of which was written by Dianon's own experts, states that flow cytometry is not useful at all with some suspected diagnoses; yet Dianon performed the test and billed Medicare for it. *Disputed Issues* ¶¶ *7-8.* Finally, Dianon repeated the test, sometimes numerous times on the same patient, despite having previously diagnosed the patient; even Dianon's experts agree that such comprehensive repeat testing is not needed. *Disputed Issues* ¶ *8.* As a result, in those cases where Dianon's pathologists did not need flow cytometry or did not need a repeat test of a full panel of antibodies to diagnose the patient, those billings to Medicare were false. The Government's medical expert reviewed a sample of patient records to identify which billings included charges for antibodies which were not medically necessary and were false claims and

reported the results of that analysis in his report. *Exhibit 72.*[2]

There is also ample evidence in the record to show that Dianon knowingly or recklessly billed Medicare for unnecessary tests. There is the decision to resume billing for 26 antibodies in 2001 after the pathologists had already determined that no more than 18 antibodies could be justified; and the statement of Dianon's 30(b)(6) witness that the decision was made without consulting the pathologists and was intended to "meet competition." *Disputed Issues ¶¶ 25-26.* There is evidence from the 1995-96 time period indicating that Dianon's marketing personnel were increasing the number of units billed to offset losses caused by the reduction in the reimbursement per marker by CMS; Dianon does not even attempt to address this in its response. *Disputed Issues ¶ 17.* There is a clear admission on Dianon's part that the pathologists had no input into billing decisions. *Defendant's Response ¶¶ 10-11.* There is also evidence from Dianon's pathologists that they recognized that some of the testing was not necessary, and in fact, that they had never been trained on the medical necessity requirements and did not know that Medicare required that each test be medically necessary for that patient. *Disputed Issues ¶¶ 19, 24.* Thus, there is evidence which would support a finding by the jury that Dianon knowingly or reckless submitted claims for unnecessary testing.

Dianon's motion for summary judgment can be reduced to three primary arguments: (1) as a matter of law, the United States cannot show that the claims submitted by Dianon were false because there was no national coverage determination relating to flow cytometry; (2) as a matter of law, the claims were not false because there is support in the medical literature for a

---

[2] In order to avoid confusion, the exhibits referred to in this Response will be numbered beginning after the last number of the exhibits in the United States' Local Rule 56(a)(2) Statement.

"comprehensive" approach to conducting flow cytometry testing and the carrier never told them not to do it that way; and (3) Dianon is entitled to summary judgment because this is just a case involving a disagreement among medical experts and cannot, therefore, be the basis for False Claims Act liability. None of these arguments, or the ancillary arguments associated with them, dictates that summary judgment be granted in favor of defendant.

Dianon's first argument cannot be correct because, if it were, the medical necessity requirement in the Medicare statute and regulations would be eviscerated. In the absence of specific guidance as to each CPT code from CMS or the carrier, Medicare providers would be able to do whatever testing or procedures they wanted without regard to whether they were medically necessary for the health of a particular patient. *Disputed Issues ¶ 34*. That is clearly not what Congress had in mind when it made medical necessity a prerequisite for payment. Further, the carrier did provide guidance to labs on panels of tests - labs should ensure that all of the tests in a panel were medically necessary *for that patient* before billing Medicare for them. *Disputed Issues ¶ 24; Exhibit 47*. The evidence shows that Dianon's own experts and pathologists do not believe that a panel of 26 antibodies is necessary in all cases. *Disputed Issues ¶¶ 9, 16, 22*. In fact, at most, the pathologists thought 18 were medically necessary. *Disputed Issues ¶ 21*.

As for the second argument, this is nothing more than *post hoc* rationalization by Dianon's counsel. The medical literature to which Dianon refers did not even exist when Dianon first decided to bill for 26 antibodies in all cases and so Dianon could not have relied on it. *Disputed Issues ¶ 12, 35*. Further, the "consensus" documents do not even discuss billing Medicare. *Plaintiff's Local Rule 56(a)(1) Statement ¶ 11*. Simply because some labs choose to

set up their practices to perform comprehensive testing as a convenience to avoid doing multiple tests, and that fact has been reported in a medical journal, does not absolve Dianon from its responsibility to ensure that each of the tests in a panel of tests were necessary for the diagnosis or treatment of that patient before billing Medicare for those tests. *Disputed Issues ¶¶ 35-37.*

As to the third argument, that because there is a disagreement among experts Dianon cannot be found in violation of the False Claims Act, this is nothing more than a red herring. This case is not about medical practice or the standard of care; it is about appropriately billing Medicare. Dianon completely abrogated that responsibility and billed for a standard panel of tests in all cases without regard to the suspected medical condition of the patient, without regard to the results of Dianon's previous testing and with no medical judgment being applied to billing. *Disputed Issues ¶ 39-41.* For its own convenience, Dianon set up a one-size-fits-all panel and billed Medicare for it in all instances regardless of whether the pathologists used individual antibodies to diagnose a particular patient. *Disputed Issues ¶¶ 6-8.* In fact, three of the five Dianon pathologists who have testified said that they recognized that certain antibodies were not necessary to diagnose certain patients, but they were not consulted about billing issues. *Disputed Issues ¶¶ 10, 12, 14, 29.*

The case law actually applicable in the medical necessity area, as opposed to Government contracting and the other types of cases cited by defendant, is clear - a Medicare provider may not set up a practice for its own convenience, to increase profits or to streamline a process and ignore the medical necessity requirement. *See e.g., U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.,* 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000) and other cases cited in the United States' Opposition Memorandum. Dianon repeatedly refers to and relies upon an ALJ decision

5

as to certain Impath claims made to the California Medicare carrier. That decision is not binding on this Court or even on CMS. *United States v. Mendoza*, 464 U.S. 154, 155 (1984). The decision did not involve Dianon, was factually different from this case and no representative of the carrier or CMS presented medical evidence at the hearing. *Exhibit 37.* Further, to the extent Dianon relies on this decision to argue that it lacks scienter, Dianon could not have relied on a decision that did not exist until 2003.

The bottom line is that summary judgment is not appropriate in this case. There are factual issues about whether particular antibodies were medically necessary for the diagnosis or treatment of particular patients. There are factual issues about whether Dianon used any medical judgment in determining what to bill Medicare for. The Government thinks it is clear that Dianon did not, but that is an issue for the jury to decide, not the Court on a motion for summary judgment. There are factual issues about whether Dianon "knowingly" or "recklessly" billed Medicare for medically unnecessary testing. Issues of scienter are particularly inappropriate for decision on a summary judgment motion. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986); *White Motor Co. v. U.S.,* 372 U.S. 253, 259 (1963)

II.  **Government's Surreply to Dianon's Response and Objections to the Government's Rule 56(a)(2) Statement**

Dianon quibbles with the United States' qualification of its "admits" and "denies" in the United States' response to Dianon's factual statement. Unfortunately, because Dianon's statement skewed the facts, misrepresented the actual evidence in the record and selectively cited to portions of testimony and documents while leaving out other parts, it was not possible to simply admit or deny Dianon's statements without explaining why. To have done so would have

been to accept the flaws in Dianon's "factual" statements.

The United States will not respond in detail to each and every item in Defendant's reply. The United States believes that the United States' Local Rule 56 Statement contains sufficient evidence to defeat defendant's summary judgment motion so it will not repeat that evidence here. Rather, the United States will focus on those parts of Dianon's Reply Statement that raise new arguments, cite to factual issues not previously raised, or misstate the evidence.

1-6.    No reply necessary.

7-9.    The witnesses actually testified that providers could take peer reviewed literature into account in generally determining what kind of medical treatment was appropriate, but that for individual patients the signs and symptoms of the patient determine what medical treatment is appropriate, not some general statement in medical literature. *Delli Carpini 30(b)(6) p. 81:3 to p. 88:5 (Exhibit 5)*. Further, there is nothing in the record to support the notion that Dianon relied on the consensus documents when setting up its approach. Dr. Connor, who established the initial panel in 1995-96, could not have read an article that was published in 1997, and she testified that she never read the publication *Cytometry* in which it was published. *Connor p. 90:6 to 92:7 (Exhibit 73)*. Further, there was no testimony from any of Dianon's witnesses that the publications in any way had any impact on Dianon's billing decisions. This is nothing more than *post hoc* rationalization by counsel for Dianon.

10.    No response necessary.

11.    The record is full of evidence that Dianon established its panel to improve turn-around time (TAT) to compete with other labs. *Disputed Issues ¶¶ 13-14*. Further, when Lab

7

Corp decided to "Dianize" its newly-purchased labs, it instructed the pathologists to craft a panel that could detect and diagnose a majority of potential cancers in "one-pass." *Johnson p. 65:25 to 67:16.* This is similar to the language contained in the Standard Operating Procedure (SOP) established by the Hematopathology lab at Dianon in 1995. *Exhibit 24.* While the medical literature created by the proponents of flow cytometry stated that there are three logistical approaches to conducting flow cytometry, nowhere in that literature do the authors address billing Medicare nor does it state that if large panels of antibodies are used for reasons of convenience that all of the individual antibodies in the panels are relevant to the diagnosis of all diseases. *U.S. Canadian Consensus; Optimal Number of Reagents Required to Evaluate Hematolymphoid Neoplasias: Results of an International Consensus Meeting, Cytometry, 46:23-27 (2001) (hereinafter the "International Consensus") (Exhibit 8).* In fact, the literature says just the opposite; the "large panels" referred to are 12-16 antibodies and differ according to the suspected diagnosis. *See International Consensus; U.S.-Canadian Consensus pp. 253-257.* Further, two of the authors of those articles and defendant's experts - Braylan and Borowitz - do not use a comprehensive approach in their own practices. *Exhibit 11; Borowitz p. 33:1-12, 37:3-5 and 38:2-14.* Finally, the fact that one ALJ decided to allow Impath to bill for 20 antibodies based on one-sided evidence is not dispositive or even persuasive and certainly not binding on this Court. *Exhibit 37.*

12-13. See Government's original response. Dr. Stetler-Stevenson was not the Government's 30(b)(6) witness regarding the appropriate number of antibodies or the utility of antibodies. *Notice of Deposition (Exhibit 9).* Dr. Stetler-Stevenson's practices

supporting research protocols at the National Institutes of Health (NIH), a research facility which only conducts clinical trials and which does not bill its tests to anyone, including Medicare and the patients in the trials, is not relevant to this case. *Exhibit 9; Stetler-Stevenson p. 10:18-21, p.19:7-21, p. 39:15 to p. 40:13 (Exhibit 10)*. Dr. Stetler-Stevenson works in a research setting, not a commercial lab, and she never has. *Stetler-Stevenson p. 22:15-19*. Further, there is no prohibition on Dr. Stetler-Stevenson conducting screening tests because the Medicare billing rules do not apply to her work at NIH. *Stetler-Stevenson p. 39:15 to p. 40:13*

14-16. The consensus document speaks for itself. However, the "large panels" Dianon refers to are 9-16 antibodies in some cases, and the document identifies antibodies' usefulness as they relate to particular diseases - the document does not state that all 40 antibodies are useful in all cases. *International Consensus*. The fact that an ALJ misinterpreted the document is not dispositive of anything. One of the authors of the consensus document and one of Dianon's experts, Dr. Braylan, testified that the panels chosen by the participants were based on the "suspected" diagnosis. *Braylan p. 109:6 to 110:20 (Exhibit 74)*.

17-18. The Government does not deny that an article written in 2003 by Drs. Braylan and Borowitz appears in the citations for a version of the Connecticut LMRP. However, it is impossible for Dianon to have relied on this fact when it developed its panel of 22 antibodies in 1995 or when it changed to 26 antibodies in 1997. Therefore, it is clear that this is nothing more than a rationalization by Dianon's lawyers in an attempt to justify the fact that Dianon exercised no medical judgment in deciding how to bill Medicare.

Further, Dr. Delli Carpini testified that the mere fact that an article is cited in the LMRP has no significance and is not an endorsement. *Delli Carpini 30(b)(6) p. 26:6 to p. 28:23, p. 36:23 to p. 37:10, p. 68:15 to p. 69:21.* Finally, Dr. Braylan no longer follows a "one-size-fits-all" approach to flow cytometry, *(Exhibit 11)*,[3] and Dr. Borowitz never did, but instead performs disease-specific panels most of which are from 12-18 antibodies depending on the clinical information available. *Borowitz p. 33:1-12; p. 37:3-5; p. 38:2-14.* Both Drs. Braylan and Borowitz testified that they would take into account clinical information they had from previous testing in determining what flow cytometry markers to use. *Borowitz p. 38:2-14; Braylan, p. 21:11 to p. 22:1(Exhibit 12).* Further, Dr. Borowitz testified that it could be dangerous to diagnose cancer in the absence of a morphological review. *Borowitz, p. 44:17 to p. 46:22.*

19-20. See response to ¶ 17 above. Dianon quibbles with the evidentiary value of several of the Government's exhibits and neglects to mention that Dr. Flynn confirmed the Yale approach in his testimony, and documents produced by Yale in response to a Rule 45

---

[3] The Government did not have this document at the time it deposed Dr. Braylan and counsel for the Government so could not ask him about it. However, at trial, the Government will be able to establish its authenticity through the testimony of Dr. Braylan. The document is a business record maintained by Dr. Braylan's lab and was produced in response to a Rule 45 subpoena served on the hospital where Dr. Braylan's lab is located. *(Exhibit 75).* At the summary judgment stage, a court may accept admissible evidence which is not in admissible form as long as it will ultimately "be reducible to admissible form at trial." *See e.g., Love v. National Medical Enterprises,* 230 F.3d 765, 776 (5th Cir. 2000); *Horton v. Nicholson,* 435 F. Supp. 2d 429, 437 (E.D. Pa. 2006); *Cranmore v. Unumprovident Corp.,* 430 F. Supp. 2d 1143, 1149 (D. Nev. 2006). There must only be sufficient evidence to support a finding that the matter is what it purports to be. *Fed. R. Evid. 901(a).*

subpoena issued by Dianon also confirm that approach.[4] *Exhibit 77.*[5] Dianon's counsel also ignores the inconvenient fact that until recently Dianon's parent company, Lab Corp, also reviewed a slide before determining which panel to run. *Johnson p. 10:6 to p. 11:4 (Exhibit 14)*. A former pathologist from Dianon, Dr. Ann Marie Connor, testified that it is preferable to review a morphological slide before conducting flow cytometry to avoid doing unnecessary flow tests. *Connor p. 69:11 to p. 71:10.*[6]

21. Dianon misstates Dr. Flynn's testimony. See the Government's original response at ¶ 21. Dianon's assertion that the mere fact that the parties have experts with differing views dictates that summary judgment be granted in favor of the defendant is ridiculous.[7] All it does is underscore the Government's argument that there are issues of fact for the jury to decide. The fact that experts disagree is a basis for denying a summary judgment motion so that the competing testimony can be decided by the trier of fact. *See e.g., Rodriguez v. City of New York*, 72 F.3d 1051, 1064 (2d Cir. 1995) ("it was beyond the province of the court on a motion for summary judgment to decide between the experts' competing testimony. . . "); *Diamond v. Sokol*, No. 05 Civ. 4993 (GEL), 2006 WL

---

[4] The Government notes that Exhibit 13 was used by Dianon during Dr. Flynn's deposition. *See Exhibit 76, Flynn p. 47:1 to 48:3.*

[5] Exhibit 77 consists of documents produced by Yale New Haven Hospital in response to a Rule 45 subpoena issued to Yale by Dianon. See footnote 3.

[6] Dr. Stetler-Stevenson operates in a research setting and is not bound by the medical necessity requirements nor does she bill anyone for her testing. If she chooses to use 50 antibodies to test every patient, there would be no bar to her doing so. If she did, that would not provide support for Dianon performing 50 antibodies on every sample and billing Medicare for them.

[7] It is significant that two of the three Dianon experts (Drs. Braylan and Borowitz) appear to agree with Dr. Flynn because that is how they practice. *Borowitz p. 33:1-12, p. 37:3-5, p. 38:2-14; Braylan p. 21:11 to 22:1; Exhibit 11.*

11

3804577, *6 fn. 9 (S.D.N.Y. Dec. 27, 2006) ("[T]he qualifications and opinions of dueling experts are issues for trial; defendant cannot win summary judgment on the strength of a contested expert opinion.").

In addition, there are significant factual issues relating to whether Dianon "knowingly" submitted false claims. Dianon ignores all of the evidence of an improper motive in this case. Dianon's business people decided what was to be billed; the pathologists were not consulted. *Goyette p. 314:5 to p. 316:19; Connor p. 54:14-24; Mishilani p. 37:20 to p. 38:9; Segal p. 19:11-14, p. 20:3-8; Tiesinga p. 73:8-19; Palmieri p. 15:25 to p. 16:15 (Exhibit 53); Carlson p. 117:18 to p. 118:1; (Exhibit 58); McDowell p. 68:2-17; (Exhibit 55)*. Dianon's business people wrote three memoranda in as many weeks changing the number of antibodies from 8 to 9, then to 20 and finally to 26 to "maximize reimbursement from Medicare." *Exhibits 60, 62 & 63*. Significantly, the lab was only using 22 antibodies at the time. *Amberson p. 16:22 to p. 17:8, p. 22:15-20*. When the pathologists were finally consulted, they decided that only 18 antibodies were medically necessary. *Exhibit 30; Amberson p. 71:20 to p. 72:8*. The business people made the decision to begin billing for 26 antibodies in 2001 to "meet competition" - once again without consulting the pathologists. *Carlson p. 117:19 to p. 118:1; Palmieri p. 15:25 to p. 16:15*. Three out of the five Dianon pathologists who testified said that they recognized that certain antibodies were not useful for diagnosing certain patients, and the other two justified using these antibodies to screen for other possible cancers not evident from the signs or symptoms of the patients. *Goyette p. 199:6 to p. 200:13; Connor p. 69:11 to 71:10; Mishilani p. 90:1-15; Tiesinga p. 194:9*

*to p. 196:11; Goyette p. 298:16 to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.* Dr. Tiesinga testified that he discussed the fact that not all of the antibodies Dianon was billing for were medically necessary with Dr. Amberson, Dianon's Medical Director, and Dr. Amberson acknowledged that not all the antibodies were necessary. *Tiesinga p. 192:3-20 (Exhibit 78).*

22. The record is full of evidence that the Dianon business people were obsessed with improving turn-around-time to the extent that they used incentive payments to the pathologists to get them to move cases faster. *(Exhibit 30); Amberson personal deposition p. 104:22 to p. 106:22 (Exhibit 28); Goyette p. 210:2 to 215:18.* Further, the lab had goals to meet on cost, quality and turn-around-time. *Carlson p. 71:23 to p. 72:6 (Exhibit 29).* The standard operating procedure for the lab prepared at the direction of the hematopathologists states:

> The following panel of antibodies was chosen by the Hematopathologists at Dianon Systems for its ability to detect a majority of hematopoetic malignancies.

*(Exhibit 24).* Dr. Amberson testified that when Lab Corp bought Dianon and some other small labs they decided to standardize on Dianon's business model - to "Dianize" the other labs. *Amberson personal deposition p. 171:16 to 174:15.* Dr. Johnson, Lab Corps' director of flow cytometry, testified that during this "Dianonization" of the labs, the pathologists were told to come up with a panel of antibodies that could "detect and diagnose all the common leukemias and lymphomas in one pass" - like Dianon had been doing. *Johnson p. 66:25 -68:16.* Thus, the record contains significant evidence to show that Dianon chose a business model that dictated a large panel - to maximize

13

reimbursement and to meet competition.

What Dianon chooses to do for logistics or for business reasons does not dictate whether each of the antibodies used was medically necessary for the diagnosis or treatment of a particular patient. *Delli Carpini 30(b)(6) p. 73:6-25, p. 77:16 to p. 80:21; Stone Expert Report p. 5 (Exhibit 17)*.[8] The issue is not whether it is prudent to do a large panel of antibodies in order to improve turn-around time or to detect all cancers in one pass without looking at the clinical information available. *Id.* The issue is whether a particular antibody was used to diagnose a particular patient. *Id.* If it was not, it was not medically necessary. *Delli Carpini 30(b)(6) p. 80:12-21; Stone p. 26:8-17(Exhibit 18)*.

Dianon's citation to the Impath ALJ decision is also unavailing. That matter was not decided until 2003 so Dianon could not have relied on it. *Affidavit of Georgina Aguilar, Exhibit 37*. Further, Dianon once again misinterprets the decision and Ms. Stone's testimony. If in fact the choice of antibodies by Dianon had been made on the basis of the signs and symptoms of a particular patient and/or the provisional diagnosis of the referring doctor, and not all of the antibodies had ultimately been useful because it turns out that the patient did not have the suspected disease, Dianon would have been able to bill for all of the selected antibodies. *Stone 21:10 to 26:17 (Exhibit 81)*. That is not what happened here - Dianon performed the same 26 antibodies without regard to the provisional diagnosis of the referring physician, without regard to the signs or

---

[8] Affidavit adopting Ms. Stone's report at *Exhibit 79*. Affidavit adopting Clifton Gunderson report at *Exhibit 80*.

symptoms exhibited by the patient and without regard to Dianon's own previous test results. *Goyette p. 298:16 to p. 300:21; Mishilani p. 28:3-11, p. 35:4-14; Segal p. 151:14 to p. 152:10.* Dianon exercised no medical judgment in deciding what to bill to Medicare.

23. The committee considering this issue simply ran out of time. *Phurrough p. 19:3 to 20:17.*

24. No response necessary.

25. Dianon once again misstates the evidence and the Government's position. See response to ¶ 22 above. Dianon pathologists all testified that they had no input into billing and did not even know what Dianon billed for. *Goyette p. 314:5 to p. 316:19 (Exhibit 20); Connor p. 54:14-24; Mishilani p. 37:20 to p. 38:9 (Exhibit 21); Segal p. 19:11-14, p. 20:3-8 (Exhibit 22); Tiesinga p. 73:8-19 (Exhibit 23).* They were also not trained in the medical necessity requirements and had no idea that Medicare required that each test be medically necessary for each patient. *Goyette p. 315:1-20; Mishilani p. 38:10 to p. 40:19; Segal p. 21:6 to 22:1.* Further, the business people who managed the billing and made decisions regarding billing also were not trained on the Medicare regulations or the medical necessity requirements. *See e.g., McDowell p. 79:4-14 (Exhibit 82); Carlson p. 36:17-22 (Exhibit 83).* Therefore, no medical judgment went into the decision of what to bill for and the Medicare regulations were not considered - Dianon billed in a one-size-fits-all manner.

26. See ¶¶ 22, 25 above and Government's original response.

27-29. See ¶¶ 22, 25 and 26 above. Medicare does not pay for screening tests in the absence of

15