signs or symptoms.  *42 C.F.R. § 411.15.*  Two of Dianon's three experts testified that fewer antibodies would be needed for follow-up testing.  *Borowitz p. 38:2-14; Braylan 21:11-22:1.*

30.  See ¶ 22 above.  The evidence in the record is clear that Dianon made a business decision as to how to set up its lab processes - doing flow cytometry before a pathologist reviewed any of the clinical history or had reviewed the slides.  *Exhibit 24; Johnson p. 65:25 to 67:16.*  According to the pathologists, that decision dictated a decision by the pathologists to construct a panel which could detect most kinds of cancer, in one pass.  *Exhibit 24; Johnson p. 65:25 to 67:16.*  However, that business decision does not dictate the medical necessity of the individual antibodies for purposes of billing Medicare.  *Delli Carpini 30(b)(6) p. 73:12-25; 75:9-18; 77:16 to 80:21; Stone Expert Report p. 5.*  Three of the five pathologists who testified stated that they knew some of the antibodies they were using were not necessary for the diagnosis and treatment of certain patients; the only reason for doing them in some cases put forth by the pathologists was for screening purposes.  *Goyette p. 199:6 to p. 200:13; Connor p. 69:11 to 71:10; Mishilani p. 90:1-15; Tiesinga p. 194:9 to p. 196:11; Goyette p. 298:16 to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.*

31-32.  Beginning in 1998, Dianon pathologists got an incentive payment for moving cases quickly.  *Exhibit 30; Amberson personal deposition p. 104:22 to p. 106:22 (Exhibit 28); Goyette p. 210:2 to 215:18.*  The pathologists had an incentive to go along with Dianon's business model of doing flow cytometry without reference to the clinical information, suspected diagnosis or previous history of the patient.  Dianon presents no

16

evidence to rebut these facts.  Dianon also ignores the evidence from its own

pathologists which shows that it does not take long to read additional antibodies, but it

does take longer to screen the patients before deciding what antibodies to use.  *Segal*

*52:19 to 53:6 (Exhibit 84 ); Mishilani p. 29:7-10; Exhibit 56 p. 2: Connor p. 65:22 to*

*66:13.*  Rather than proving that the pathologists thought all 26 were necessary for the

diagnosis of every patient, the "move to 18" memorandum proves that, even under a

one-size-fits-all approach, at most, the Dianon pathologists thought only 18 were

medically necessary.  *Exhibit 30; Amberson p. 71:20 to p. 72:8.*

33-34.  See Government's original response.  Dianon's statement misrepresents the medical

director's testimony because Dr. Delli Carpini testified that a one-size-fits-all approach

could not be medically necessary in all circumstances.  *Delli Carpini 30(b)(6) p. 48:20*

*to p. 49:7; see also p. 44:24 to p. 45:14, p. 51:20 to p. 52:21, p. 56:23 to p. 59:12; p.*

*61:6-16, p. 74:22 to p. 75:21.*  Dr. Delli Carpini was the medical director for the

Connecticut carrier and was responsible for making medical necessity determinations on

behalf of Medicare.  *Delli Carpini p. 12:17 to 15:10 (Exhibit 94).*  Dr. Delli Carpini's

testimony is supported by Dianon's own witnesses who testified that not all antibodies

were necessary in all circumstances - including two of Dianon's three experts and three

of the five Dianon pathologists who testified.  *Borowitz p. 38:2-14; Braylan, p. 21:11 to*

*p. 22:1(Exhibit 12); (Exhibit 11); (Exhibit 54); Goyette p. 199:6 to p. 200:13; Connor p.*

*69:11 to 71:10; Mishilani p. 90:1-15; Tiesinga p. 194:9 to p. 196:11 (Exhibit 78).*

35.     See ¶¶ 7-9 above.

36-38.  Once again Dianon misstates the facts and ascribes agreement on the part of the

Government when the Government clearly does not agree with Dianon's statements. See Government's original response.

39.    See responses to ¶¶ 37-38 and 17-18 above.

40.    Dianon's counsel once again cites the Impath ALJ decision as support for its assertion that Dianon could not have known that its approach was fraudulent. Since that case was not decided until 2003, it cannot be used to excuse Dianon's behavior because Dianon could not have relied on it. *Exhibit 37.* Further, the Impath decision is irrelevant and not binding on the United States or on this Court. *See e.g. United States v. Mendoza*, 464 U.S. 154, 155 (1984); *Sims v. Apfel*, 530 U.S. 103, 120 S. Ct. 2080, 2085 (2000).[9] The United States was not a party to the decision. *Affidavit of Georgina Aguilar, Exhibit 37.* The carrier did not even have an expert at the hearing. *Id.*[10]

---

[9]    The case cited by defendant, *Furlong v. Shalala,* 156 F.3d 384, 395 (2d Cir. 1998), does not help Dianon. In that case, which involved issues of due process, not medical necessity, the Second Circuit held that a consistent ALJ practice when not contradicted by the Secretary of HHS could create a "property interest." In this case, the Impath ALJ stands alone; there is no consistent practice. Further, subsequent to the decision, HHS changed the way it reimbursed providers for flow cytometry services thereby repudiating the decision. *68 Fed. Reg. 49047 (August 15, 2003); Menas p. 12:13 to 13:7.*

[10]    Dianon objects to the admissibility of Georgina Aguilar's affidavit because she was not on the Government's list of knowledgeable witnesses and Dianon did not have a chance to depose her. Dianon was aware of the Impath decision, served a document request relating to the decision on the United States, and received numerous documents in response to that request. Yet, Dianon never asked to depose a representative from the carrier, NHIC, about the decision. This is likely because Dianon had hired as an "expert" the person who was the NHIC medical director at the time the carrier decided to limit reimbursement for the number of antibodies for flow cytometry to 15. *Rogan p. 325:21 to 326:5 (Exhibit 85).* Dianon was, therefore, presumably aware of the facts set forth in Ms. Aguilar's deposition and chose for strategic reasons not to seek a deposition from NHIC about the Impath decision. Indeed, Dr. Rogan's testimony confirms parts of Ms. Aguilar's affidavit. *Rogan p. 320:3 to 327:19 (Exhibit 85).* Further, Ms. Aguilar's affidavit is not evidence "to support or rebut the plaintiffs' claims or defenses" and was not, therefore, required to be disclosed in the Government's initial disclosures. *F. R. Civ. P. 26(a)(2).* The affidavit was in the nature of rebuttal testimony which did not have to be identified in the Government's Initial Disclosures.

18

41-42. The ACLA information upon which CMS relied had to do with the cost of the

antibodies, labor and overhead, etc. *Menas p. 27:20 to p. 32:17, p. 37:12-21.* CMS did

not endorse any particular antibody panel. *Stone Expert Report p. 4.* Further, contrary to

the data presented by the ACLA to CMS, a review of the data regarding billing for

88180 by ACLA members shows that they billed an average of 9 units, not 26. *Affidavit*

*of David Mehring, Exhibit 39.* Further, CMS' change to the way it reimbursed for CPT

code 88180 was to limit the reimbursement to panels of antibodies for the professional

component. *Stone Expert Report p. 4.* One of the reasons for this was the

overutilization of the code by labs like Dianon. *Stone Expert Report p. 4.* The change

was made because CMS determined that the "[c]urrent coding scheme (payment on a per

marker basis) may encourage the performance of more markers than may be medically

necessary because the pathologist determines what markers to perform and when to

perform them." *Menas p. 12:13 to p. 13:1-7; Stone Expert Report p. 4; 68 Fed. Reg.*

*49047, 49030 (August 15, 2003).*

      Dianon objects to the admissibility of SA Mehring's affidavit on numerous

grounds. *(Exhbit 39.)* While SA Mehring was not identified in the Government's Rule

26 initial disclosures, SA Cummings was. *(Exhibit 86).* SA Cummings recently retired,

and SA Mehring replaced him as the case agent. *(Exhibit 39).* Dianon never sought to

depose SA Cummings, or anyone else from the Office of Inspector General, even

though the subject of SA Cummings potential testimony was listed in the initial

disclosures as "data." The United States need not qualify SA Mehring as an expert

because his testimony is factual; he merely summarizes the contents of the database with

the 5% data; he expresses no opinion about the data.  Further, because his affidavit

merely summarizes what the 5% data shows, it is not hearsay.  The 5% data is a public

record and is made available for purchase by the public on the CMS website and was

not, therefore, created for this litigation as Dianon contends.  *See,*

*http://www.cms.hhs.gov/FilesForOrderGenInfo/*  Data compilations of the activities of a

public agency are not hearsay.  *F.R.E.  803(8)(A).*  The 5% data was put into PC-readable

form by a consultant and reviewed by SA Mehring.  *(Exhibit 39).*  The data will be

admissible at trial and can be properly authenticated.[11]

Finally, the United States objects to the Panis affidavit and  Dianon's analysis of

the 5% data.  That analysis should not be admitted for several reasons: (1) the analysis

excludes hospital labs and provides no factual support for doing so; and (2) the analysis

selected only "independent" labs without defining what that means and with no factual

support for the selection.  *Panis Declaration ¶ 8.*  Dianon claims that hospital practice is

different from practice in an independent lab.  Dianon appears to rely on a statement

made by Dr. Goyette in isolation and ignores all of the evidence in the record which

contradicts Dr. Goyette's statement.  All three of Dianon's experts practice in hospital

labs, and the description they gave of the types of specimens they received did not

---

[11]     Summary judgment evidence need not be in a form that would be admissible if the party
opposing summary judgment will be able to prove the underlying facts at trial. *See e.g., Love v. National
Medical Enterprises,* 230 F.3d 765, 776 (5th Cir.2000).  Authentication or identification of evidence is
satisfied if there is sufficient evidence to support a finding that the matter in question is what it purports
to be - e.g. testimony of a witness. *Id.* Further, voluminous documents (or as in this case a database of
thousands of records) can be summarized by a witness if the underlying records have been made
available for review. *Id.* SA Mehring's affidavit identifies the source of the data, and it is clear from
Dianon's Response and the Panis declaration that Dianon has had every opportunity to review the
underlying records.

appear to be remarkably different from those received by Dianon. *See for example, Braylan p. 13:14 to 15:24 (Exhibit 74); Borowitz p. 18:7 to 19:5 and 32:12 to 33:12 (Exhibit 87); Holden p. 19:13 to 21:25 (Exhibit 88).* The analysis is also flawed for other reasons. For example, by calculating an "average" number of antibodies, Dianon attempts to hide the fact that virtually 100% of Dianon's billings were for a set panel of antibodies - either 18 or 26 depending on the time period involved. *Panis Declaration ¶¶ 10 and 12.* Even Dianon's analysis shows the dearth of billings at other levels. *Panis Declaration ¶¶ 10 and 12.* On the other hand, Dianon's analysis shows that other labs have a much broader distribution of antibodies ranging from 1 to 30. Even the "independent" labs chosen by Dianon show this broader distribution. *Panis Declaration ¶¶ 10 and 12.*

43.   See ¶¶ 12-13 above. NIH's practices are not relevant to whether Dianon should have billed for 26 antibodies in every case. NIH does not bill Medicare or anyone else for the flow cytometry testing it does. *Stetler-Stevenson p. 10:18-21, p. 19:7-21.*

44.   See Government's original response.

45-49. No additional response necessary.

## III.   Reply to Dianon's Response to Government's Issues of Disputed Facts

1.   Even Dianon's analysis shows that Dianon's billings were for 26 or 18 units, depending on the time period, with very minor exceptions. *Panis Declaration ¶¶ 10-12.*

2.   CMS and the HHS OIG have given guidance on types of activities that might constitute Medicare fraud including billing for tests that are not medically necessary. *63 Fed. Reg. 45076, 45079; Exhibit 45 and Exhibit 46.* In addition, the Connecticut Carrier gave

guidance to providers in Connecticut about types of activities that might involve fraud

including

> "Claims for a panel or series of lab tests when only part of the group of tests in
> the panel were medically indicated for the patient's signs, symptoms or
> complaints." *Exhibit 47.*

Dianon is deemed to have constructive notice of such publications. *See e.g. McKenzie
Medical Supply, Inc. v. Leavitt,* 419 F. Supp.2d. 766, 774 (D. Md. 2006).

3.   Dr. Delli Carpini was the 30(b)(6) witness for the carrier and Ms. Stone was the

Government's expert on the Medicare regulations.  They both testified about the

meaning of the medical necessity requirement as it applies to the facts of this case.  In

order to so testify, they need not be pathologists or even medical personnel.  However, as

the Medical Director for the Connecticut carrier, part of his duties included making

medical necessity determinations. *Delli Carpini p. 12:17 to 15:10 (Exhibit 94).*  The

Government specifically included in its Local Rule 56 Statement, evidence of several

false claims. *See e.g. Exhibits 50, 51, 52 and 68.*  At the summary judgment stage, the

United States does not have to prove up each and every false claim.  The Government

has provided sufficient evidence to allow a trier of fact to find that Dianon submitted

claims to the Government, that some of those claims were false, and that the false claims

were knowingly or recklessly submitted.  The Government identified specific claims the

Government contends were knowingly false.  In addition, the Government's expert

medical report contains the results of the Government's medical review of a statistically

valid sample of patient records and the expert concludes that many of the antibodies in

those cases were not medically necessary given the signs and symptoms of the patient, available clinical information and previous testing by Dianon. Both the selection of the statistical sample and the expert medical review are a part of the record in this case. *(Exhibits 72 and 80).*

4-5.    Once again Dianon attempts to misrepresent both the Government's argument and the facts in the record. The Government is not asserting, as Dianon claims, that there was no clinical information available to trigger the performance of the flow cytometry test. The Government is asserting just the opposite - that there was clinical information available to Dianon prior to conducting the test and Dianon simply ignored that information, conducted the test without reference to that information and before any of the doctors had even looked at it. *Goyette p. 298:16 to 300:21; Mishilani p. 28:3-11, 35:4-14, 150:10-25; Segal p. 151:14 to 152:10, 148:5-149:7.* Not all antibodies are useful or necessary for the diagnosis in all cases. See e.g., *Goyette p. 31:4 to 40:12 (Exhibit 89).* All of the Dianon pathologists testified that the test was performed by the technicians before the pathologists ever saw the clinical information available. *Exhibit 48; Goyette p. 298:16 to 300:21; Mishilani p. 28:3-11, 35:4-14, 150:10-25; Segal p. 151:14 to 152:10, 148:5-149:7.* The ICD-9 code placed on the form by the referring doctor was irrelevant to the decision about what antibodies to run - Dianon ran them all in all cases. *Id.* Further, Dianon's pathologists believed that they were responsible for the choice of antibodies to use - not the referring physician - and the Dianon requisition form reflected this by stating "The number of antibodies used will be based on the professional opinion of the hematopathologists." *Segal p. 59:4-12 (Exhibit 84) and Exhibit 51 p. bates*

23

*numbered 006341.* Dianon's own pathologists testified that the flow cytometry was actually performed before a pathologist made a determination that particular antibodies were relevant to the diagnosis or that flow cytometry would even be useful for the diagnosis or treatment of that patient. *Connor p. 60:22 to p. 66:18; Goyette p. 298:16 to 300:21; Mishilani p. 28:3-11, 35:4-14, 150:10-25; Segal p. 151:14 to 152:10, 148:5-149:7. .*

6-8.    Dianon's billings for flow cytometry (CPT Code 88180) were on a per-marker basis. Dianon submitted claims for payment for 26 antibodies during the period from 1996 to mid-1997, Dianon submitted claims for payment for 18 antibodies from mid-1997 until the beginning of 2001 and submitted claims for 26 antibodies from 2001 until the end of 2004.[12] The record is absolutely clear that none of the pathologists reviewed previous tests Dianon had conducted BEFORE deciding which antibodies to perform; Dianon just did 26 in all cases and billed for all 26 (or 18). *Goyette p. 298:16 to p. 300:21; Segal 148:5 to 149:7; Mishilani p. 150:10-25.* Dianon also billed for 26 antibodies in cases where the medical literature, and Dianon's own documents, do not support billing for flow cytometry. *See e.g. Exhibits 50, 51, 52 and 68.* The US-Canadian Consensus states that "Flow cytometric immunophenotyping in not recommended in the chronic phase of chronic myelogenous leukemia and other chronic myeloproliferative disorders." *Exhibit 3 p. 251 number 26 and p. 256.* The U.S.-Canadian Consensus also states that flow cytometry is not the method for diagnosing Hodgkin's lymphoma. *Exhibit 3 p. 254.*

---

[12]    The 5% data reflects billing for 22 antibodies for some period of time because Dianon refunded to the carrier payment for 4 of the markers in 1997 and again after the initiation of this suit. *Defendant's Exhibit 20.*

However, Dianon billed for a full panel of antibodies in cases where Hodgkins or
Chronic Myelogenous Leukemia (CML) had already been diagnosed by Dianon. *See
e.g. Exhibit 52.* Dianon's citation to Dr. Stetler-Stevenson's testimony is also
unavailing. Dr. Stetler-Stevenson is supporting research, and her testimony indicated
that she would be reluctant to do a flow cytometry test for a CML patient unless a lot of
other tests had been done first and the referring doctor gave a very good reason for it
such as a "blast crisis" or a very complicated case. *Stetler-Stevenson p. 84:2 to 85:15
(Exhibit 90).* Further, if one reads Dr. Holden's testimony in its entirety she said that
flow cytometry would not tell her anything about the existence or non-existence of
Hodgkin's disease - it would tell her whether there was "anything else there" - i.e.
screening for unsuspected disease. *Holden p. 95:18 to 96:3 (Exhibit 88).* Dr. Goyette
prepared training materials for the sales reps which stated that, in cases of suspected or
diagnosed Chronic Myelogonous Leukemia (CML), flow cytometry was not indicated.
*(Exhibit 54); Goyette p. 199:6 to p. 200:13.*

9.   The statements cited by Dianon are taken out of context. The pathologists had
explanations about what certain antibodies were useful in diagnosing. What they did not
have an explanation for when they were questioned about particular patient files was
why particular antibodies were necessary to diagnose a particular patient given that
patient's signs and symptoms other than , if there was anything unsuspected going on
with the patient, the extra antibodies would ensure that they would pick it up. *See e.g.
Goyette p. 233:7 to p. 235:3; Mishilani p. 187:10 to 188:3.* Simply because a referring
physician suspects that a patient may have a particular type of blood  disorder does not

25

justify, as Dianon did, billing Medicare for a panel of tests geared toward detecting and diagnosing ALL types of blood disorders. *Delli Carpini 30(b)(6) p. 48:20 to p. 49:7; see also p. 44:24 to p. 45:14, p. 51:20 to p. 52:21, p. 56:23 to p. 59:12; p. 61:6-16, p. 74:22 to p. 75:21.* Performing tests in the absence of symptoms is screening. *42 C.F.R. § 411.15.* Medicare does not pay for screening tests. *42 C.F.R. § 411.15.*

10.     Dianon agrees with the Government's statement so no further response is necessary.

11.     See ¶ 11 in Government's Statement of Disputed Issues.

12.     No further reply necessary.

13.     Dianon's response once again is disingenuous. Simply because a referring physician suspects that a patient may have a particular type of blood disorder does not justify, as Dianon did, billing Medicare for a panel of tests geared toward detecting and diagnosing ALL types of blood disorders. *Delli Carpini 30(b)(6) p. 48:20 to p. 49:7; see also p. 44:24 to p. 45:14, p. 51:20 to p. 52:21, p. 56:23 to p. 59:12; p. 61:6-16, p. 74:22 to p. 75:21.*

14.     Had the flow cytometry been done after the morphology was reviewed, that would have increased turn around time (TAT) because the flow cytometry also took some time. *Exhibit 56 p. 2; Connor p. 65:22 to 66:13 .* An increase in TAT and could have made Dianon less competitive. *Carlson p. 57:4-15, p. 62:1-16.* Thus, doing a one-size-fits-all panel of tests was for the convenience of Dianon for business reasons; testing that is done for the convenience of the doctor or patient does not make that testing medically necessary. *Stone Report pp. 3-4.*

15.     No further response necessary.

16.   The issue is not whether the diagnosis was positive or negative; the issue is whether

certain antibodies played any role in detecting or diagnosing the suspected disease based

on the signs and symptoms presented by the patient. *Stone Report pp. 3-4.* Dr.

Mishilani testified that after the test was complete and the diagnosis made, the

pathologists recognized in retrospect that not all of the antibodies had been useful.

*Mishilani p. 90:1-15.* This was so of necessity because not all antibodies are useful to

diagnose all suspected diseases. *See e.g,. Goyette p. 31:4 to 40:12 (Exhibit 89).*

17.   No further response necessary because Dianon does not address any of the evidence in

this paragraph.

18-19.  The evidence in the record shows Dianon marketing personnel putting together a panel

of first 20, then 26 antibodies to bill to Medicare to "maximize reimbursement"

apparently without consulting the lab because the SOP for the lab shows the lab only

using 22 antibodies. *Exhibit 62, 63 & 64; Goyette p. 126:2-21.* The fact that Dianon

later discovered the problem and *partially* reimbursed Medicare for the four missing

antibodies does not undercut the point of the paragraph which is that Dianon did not

consult the medical staff on what to bill to Medicare. If they had, the billings would

have been for 22 antibodies. *Amberson p. 16:22 to 17:8, p. 22:15-20.* Further, the one

time the pathologists were consulted, they said that only 18 were medically necessary

given Dianon's requirement that the testing be done in one-pass. *Exhibit 30.* Finally,

despite this determination of medical necessity, the marketing people resumed billing for

26 antibodies in 2001 without any consultation with the pathologists at all. *Palmieri p.*

*15:25 to p. 16:15.*

27

20.    Dianon's explanations for what this document means are belied by the words in the

memorandum.  That memorandum listed 18 antibodies and stated that --

> . . .we believe the following 18 antibodies are essential for the accurate and
> complete initial work up of flow cytometry specimens.  We believe that their
> routine usage can be justified to insurance carriers.

*Exhibit 30.*  Dr. Amberson testified that he asked Dr. Goyette to identify "essential"

antibodies.  *Amberson 30(b)(6) p. 34:7 to 35:21; Exhibit 30.*  Thus, after reviewing the

panel of 26 antibodies for medical necessity, Dr. Goyette and the other pathologists

concluded that only 18 could be justified medically for the initial work up of specimens.

*Exhibit 30.*  Dianon's rationalization also belies the statements in the affidavits

submitted to the United States prior to intervention in this case.  Dr. Goyette stated that

the purpose of the review was to ensure that Dianon was billing for medically necessary

tests:

> Hence I was asked to identify those antibodies that any responsible payor with
> knowledge of the complexities of modern hematopathology would agree were
> essential and for which they could never question medical necessity.

*Exhibit 66; Goyette p. 141:16 to p. 143:10.*  Dr. Amberson stated that the decision to

"move to 18" was triggered by a desire to ensure that they were only billing for

medically necessary testing.  *Amberson personal deposition p. 76:16 to p. 77:8.*  Thus,

Dianon has essentially admitted that any routine billing to Medicare in excess of 18

antibodies was medically unnecessary.  *Exhibit 30.*

21-23.  No further response necessary.

24.    Dianon's argument does not address the Government's statements in this paragraph.

Instead, Dianon addresses "screening." Dianon asserts that simply because the referring physician suspected some type of blood or lymphatic disorder Dianon was justified in testing for ALL such disorders and billing Medicare for all the tests regardless of whether particular antibodies were relevant to the suspected diagnosis. If this were the case, the medical necessity requirement would be eviscerated. Under Dianon's argument, a provider could set up a panel of tests which included 60 antibodies even though some of those antibodies would only rarely be useful. The medical necessity requirement requires that there be signs or symptoms of a suspected disease before billing Medicare for a test. *42 C.F.R. § 411.15.*

25-26. No further response necessary.

27.    See Government's original statement and the Government's medical expert's report. *(Exhibit 72).*

28.    Defendant objects to portions of Dr. Tiesinga's affidavit as inadmissible hearsay. In fact, the statements in Dr. Tiesinga's affidavits to which Dianon objects are admissible because they are not hearsay but admissions of a party opponent under FRE 801(d)(2)(D). A statement is deemed to be an admission of a party if it "a statement of a party's agent or servant concerning a matter within the scope of the agency or employment relationship." *FRE 801(d)(2)(D).* To support the introduction of such statements, a party must establish (1) the existence of the employment relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the relationship. *Pappas v. Middle Earth Condominium Assn.,* 963 F.2d 534, 537 (2d Cir. 1992); *Henderson v. General Electric Co.,* 2006 Lexis

29

8914 (D. Conn. 2006).   The statements reported by Dr. Tiesinga are statements made by various management employees within Dianon who were responsible for matters relating to the establishment of a lab in Oklahoma City and took place during the decision making process.   Dianon's 30(b)(6) witness on this issue testified that there were several Dianon employees involved in the decision making process - Valerie Palmieri, Vice President of Laboratory Operations; Todd Homan, VP of Marketing; Steven Gerson, VP of Genetics Services; Martin Stefanelli, VP of Sales and Marketing; Dr. Tiesinga, staff hematopathologist; and Dr. Amberson, Medical Director of Dianon. *Palmieri 69:14 to 86:12 (Exhibit 91); Amberson p. 193:4 to 194:12 (Exhibit 92).*   The statements reported by Dr. Tiesinga were made by these employees while they were employed by Dianon, in the course of their duties regarding looking into the establishment of the Oklahoma City lab. *Palmieri p. 69:14 to 86:12 (Exhibit 91).*   The statements at issue need not be statements of the ultimate decision maker but may be statements of participants in the decision making process. *Nyack v. Southern Connecticut State University,* 424 F. Supp.2d 370, 375 (D. Conn. 2006).   In addition, statements made to Dr. Tiesinga by Dr. Amberson regarding the lab were within his authority as Medical Director for the company. *Amberson p. 14:4 to 20:16 (Exhibit 92).*   To the extent the statements are based on Dr. Tiesinga's own personal knowledge, they are admissible.

29.   No response necessary.

30.   It is clear from Dr. Tiesinga's testimony that the "Dianon management" with whom Dr. Tiesinga talked about the lack of medical necessity for some of the flow cytometry testing was Dr. Amberson, Dianon's Medical Director:

30

Q:   And what do you remember telling Dr. Amberson?

A:   I remember telling Dr. Amberson that I had had this phone call, these phone calls with Lynn Hickman and Brent Hartsell, and they told me that Medicare only reimburses for medically  necessary tests and that they explained how this capitation worked; that it didn't mean -- pardon me -- didn't mean that you routinely billed Medicare for this standard screening panel every single time. You only billed what was medically necessary.  So that is when I asked Dr. Amberson what he thought about what they said and how in fact is Dianon billing.  And Dr. Amberson replied that Dianon is billing for 26 antibodies in every single case even though he recognized the fact that 26 antibodies were not medically necessary.

*Tiesinga p. 192:3-20 (Exhibit 78)*.  This statement is an admission of a party opponent, not hearsay.  *FRE 802(d)(2)(D)*.  Dr. Amberson, at the time of the statement, was the Medical Director for Dianon and was the Dianon manager responsible for the hematopathology and other labs.  The medical personnel reported to him.  *Amberson personal deposition p. 14:4-20:16, 124:8 to 125:20, 126:7-19 (Exhibits 28 and 92); Amberson 30(b)(6) p. 40:16 to 41:3 (Exhibit 93)*.  Further, Dr. Amberson testified that as one of Dianon's managers he was involved in issues relating to billing, participated in management meetings and participated in decisions about what to bill for.  *Id.*

Q.     Okay.  And then down at the bottom there's a notation that says "Move to 18."  Do you know who wrote that?

A.     No.  I would guess it was Mr. McDowell, but I don't know.

Q.     Okay.  So Mr. McDowell made the decision to – to bill for 18?

A.     No.  I made that decision.

*Amberson 30(b)(6) p. 40:16 to 41:3 (Exhibit 93)*.

31.     Dianon's argument is absolutely absurd, once again, is nothing more than an after-the-fact rationalization by Dianon counsel, and is very simply wrong as a matter of law. First, none of the Advisory Opinions cited were in existence at the time Dianon decided to resume billing for 26 antibodies so Dianon clearly did not rely on them.  Further, there

31

is no contemporaneous evidence that Dianon made a decision to bill for 26 antibodies because they were worried about "kickbacks." The Government specifically sought discovery of any such evidence and received none - no memoranda, no minutes of the compliance committee discussing the issue, no advice from counsel, nothing. Dianon also did not seek an Advisory Opinion of its own from the OIG. Finally, conduct prohibited by the Antikickback Act is defined as knowingly and wilfully offering to pay any remuneration in cash or in kind to any person to induce such person to purchase any good or service for which payment may be made in whole or in part by a Federal Healthcare program. *42 U. S. C. § 1320a-7b(b)(1)(B).* Dianon is essentially arguing that it has to bill Medicare for medically unnecessary tests because, if it continued to perform medically unnecessary tests and did not charge for them, that would be a "kickback." And presumably, since under Dianon's theory Medicare would be getting the financial benefit of not being billed for the medically unnecessary tests, the "kickback" would be to Medicare?[13] Defendant's whole theory is simply nonsense.

32.    No response necessary.

33.    See response to ¶¶ 28-30 above regarding the admissibility of statements made by Dianon employees to Dr. Tiesinga.

34.    There is no contemporaneous evidence indicating that Dianon relied on the Consensus documents, the 2003 Impath decision, the 2006 article cited in the LMRP or on Dr. Stetler-Stevenson in crafting its one-size-fits-all panel. Reliance on these are all *post*

---

[13]    It is not clear from Dianon's statement whether it is claiming that medically unnecessary tests being provided to the patient somehow induce the patient to insist on their specimens being referred to Dianon. In either case, the argument is nonsense.

32

*hoc* rationalizations by counsel.  Dianon conveniently ignores all of the evidence indicating that billing decisions were made to "maximize reimbursement by Medicare," to make up for lost revenue when the per marker reimbursement changed and to "meet competition."  See ¶¶ 21-22 above.  Dianon also ignores the "move to 18" memorandum and the testimony of Dianon's own pathologists and experts which contradicts its position.  See ¶¶ 21-22 above.

35-37.   No further response necessary.

38.      Dianon's analysis of the 5% data is flawed.  The Government could find no other lab which charged for a large panel of antibodies in all cases.[14]  *Exhibit 39*.  Despite Dianon's claim to the contrary, if one sorts the data by provider, one can tell whether a lab has a one-size-fits-all approach because the data would look like the Dianon data with spikes for the panels of 26 and 18, depending on the time period.  *See e.g. Panis declaration ¶¶ 10-12*.  One of the labs cited by Dianon as evidence that it was roughly equivalent to other labs was Impath.  However, the data shows that Impath's billings ranged from 1-30 antibodies.  *Mehring Affidavit*.  Dianon provides no sound basis for excluding all but independent labs from the sample.  *See ¶¶ 41-42 above*.  Further, Dianon provides no explanation for what "independent labs" it included in its analysis or what criteria it used to chose those labs.  Dianon's citation to the non-binding Impath decision about one ALJ's unsupported statement that hospital and independent labs differ is belied by the evidence in the record of this case.  The evidence in the record from Dianon's own

---

[14]      Dianon points to the panels used by the NIH lab, but fails to note that those panels are for use in clinical trials and that no one is billed for any of the antibodies used - not the patient and not Medicare.  *Stetler-Stevenson p. 10:18-21, p. 19:7-21.*

experts, who all practice at hospitals, contradicts this statement. *See ¶¶ 41-42 above.*

Dianon's statements about Yale New Haven Hospital is not supported by the evidence in

the record. *See ¶ 20 above.* Dianon ignores the fact that Dianon's parent corporation,

Lab Corp, had disease-directed panels and 90% of the billings were for less than 15

antibodies, and that the members of the ACLA billed an average of 9 antibodies.

*Mehring Affidavit.* Even one of Dianon's own experts does not bill for large antibody

panels; data shows that Johns Hopkins, Dr. Borowitz's lab billed for 16 or fewer

antibodies 90% of the time. *Id.* Finally, the evidence about Dr. Braylan's practice will

be admissible at trial. The evidence cited is a business record produced by Dr. Braylan's

hospital lab in response to a Rule 45 subpoena issued in this case. *See footnote 3 above.*

*Exhibit 11.*

39.    Dianon claims it did not knowingly bill for medically unnecessary testing because it

relied on the expertise of its hematopathologists in deciding what to bill for. However,

the record shows just the opposite; the pathologists testified that they were not consulted

about billing decisions, and they had no idea what Dianon was billing to Medicare.

*Goyette p. 314:5 to p. 316:19; Connor p. 54:14-24; Mishlani p. 37:20 to p. 38:9; Segal*

*p. 19:11-14, p. 20:3-8; Tiesinga p. 73:8-19.* Billing decisions were made by the

marketing and operations personnel. *Id.* No one was trained on the medical necessity

requirements. *See Section II, ¶ 25 above.*

40-41. No further response necessary.

42-43. Dianon's statements about the carrier's reviews is contradicted by the clear testimony of

the carrier medical directors. *Toor p. 35:5-22, 48:5-13.; Delli Carpini personal*

*deposition p. 22:11-20, p. 23:20-25.* Dianon's own witnesses have testified that there

was no discussion of the number of antibodies so the carrier could not have given any

sort of indication to Dianon that it was approving of Dianon's billing for medically

unnecessary tests. *Amberson personal deposition p. 148:1-5; Toor p. 36:10 to p. 37:7;*

*Exhibit* 35.

                                          Respectfully submitted,

                                          PETER D. KEISLER
                                          Assistant Attorney General

                                          KEVIN J. O'CONNOR
                                          United States Attorney

                                          RICHARD M. MOLOT
                                          Assistant United States Attorney
                                          Federal Bar No. CT21676
                                          157 Church Street
                                          New Haven, Connecticut 06510
                                          (203) 821-3700

                                          MICHAEL F. HERTZ
                                          JOYCE R. BRANDA
                                          PATRICIA R. DAVIS
                                          ANDREW STEINBERG
                                          Attorneys, Civil Division
                                          Commercial Litigation Branch
                                          Post Office Box 261, Ben Franklin Station
                                          Washington, D.C. 20044
                                          Telephone: (202) 307-0240
                                          Attorneys for the United States

## CERTIFICATION OF SERVICE

I hereby certify that on this 4th day of January 2007, a true and correct copy of the United States' Response to Defendant's Local Rule 56(a)(1) Reply Statement was served by first-class mail and email on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880
bcarmody@mayalaw.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

Bruce R. Parker
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Md. 21201
brparker@venable.com

_____
Patricia R. Davis

36