EXHIBIT 78

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3                          NO. 3:02CV1573-MRK

 4    -----------------------------------

 5    UNITED STATES OF AMERICA,

 6    ex rel. DR. JAMES J. TIESINGA

 7          Plaintiff,

 8    VS.

 9    DIANON SYSTEMS, INC.,

10          Defendants.

11    -----------------------------------

12

13          Videotape Deposition of JAMES JAY

14    TIESINGA, MD, a witness called on behalf of the

15    Defendant, taken pursuant to notice before Cindy

16    M. Falcon, Certified Shorthand Reporter and

17    Notary Public in and for the Commonwealth of

18    Massachusetts, at Dechert, LLP, 200 Clarendon

19    Street, Boston, Massachusetts, on Wednesday,

20    September 13, 2006, commencing at 9:23 a.m.

21    REPORTED BY:  Cindy M. Falcon
```

1      me.

2 Q So I assume one of the first things you did was

3      to walk down, it's only a couple of doors down,

4      Dr. Segal and Mishalani, and sit down and talk

5      to them about what you had learned. Did you do

6      that?

7 A No, I wasn't really answering to them. I was

8      answering to Dr. Amberson. And yes, I did.

9 Q Well, I'm not talking about answering to anyone,

10      Doctor.

11      I'm talking about sharing information

12      amongst your colleagues. They were your

13      colleagues, right?

14 A Dr. Amberson, yes, he was.

15 Q No, I'm talking about Dr. Schula, I mean,

16      Mishalani and Dr. Segal.

17 A I did not go to them with this issue. I went to

18      Dr. Amberson.

19 Q They were your colleagues.

20 A Yes, sir.

21 Q And in fact, you reported to them. They were

```
 1           your bosses also.
 2     A     I was told to report to Dr. Amberson.
 3     Q     Doctor, my question is, in the chain of command,
 4           they were your bosses as the codirectors of your
 5           department.
 6     A     No.  Dr. Amberson was the director of
 7           hematopathology.
 8     Q     Doctor, let me make sure I understand.  Is it
 9           your testimony that in the time you were at
10           Dianon, neither Dr. Mishalani or Segal had
11           responsibilities as director for
12           hematopathology?
13                 MR. CARMODY:  Objection.
14     A     They had those responsibilities, yes.
15     Q     Right.  And did you understand the chain of
16           command essentially that you reported up to
17           them, and they in turn reported up to Dr.
18           Amberson?
19                 MR. CARMODY:  Objection.
20     A     Remember, sir, I was promoted in March to
21           hematopathology medical director of Oklahoma
```

```
1         information with him?
2    A    It was the week of May 6.
3    Q    And what do you remember telling Dr. Amberson?
4    A    I remember telling Dr. Amberson that I had had
5         this phone call, these phone calls with Lynn
6         Hickman and Brent Hartsell, and they told me
7         that Medicare only reimburses for medically
8         necessary tests and that they explained how this
9         capitation worked; that it didn't mean -- pardon
10        me -- didn't mean that you routinely billed
11        Medicare for this standard screening panel every
12        single time.  You only billed what was medically
13        necessary.
14             So that is when I asked Dr. Amberson what
15        he thought about what they said and how in fact
16        is Dianon billing.  And Dr. Amberson replied
17        that Dianon is billing for 26 antibodies in
18        every single case even though he recognized the
19        fact that 26 antibodies were not medically
20        necessary.
21   Q    So did you then go back to your colleagues who
```

1     were doing flow and say, and that would be
2     principally Drs. Mishalani and Segal on a
3     full-time basis, right?
4  A  Yes, sir.
5  Q  And say we have to change the way we, us
6     pathologists are doing our jobs?
7  A  No, I didn't start out by doing that.
8  Q  You never went to Dr. Segal and Mishalani and
9     said:  We, the people doing flow, have to change
10    the way we're doing our jobs, did you?
11 A  I don't believe it ever got to that point.
12 Q  When you say it never got to that point, you
13    were on the job working day in and day out,
14    signing out reports, for almost three weeks or
15    more after this conversation on May 3?
16 A  That's correct.
17           MR. CARMODY:  Objection to form.
18 Q  And during that period of time, Drs. Segal and
19    Mishalani were also coming into work just a few
20    doors down from you doing their jobs as well?
21 A  I would assume so.

Page 194

1  Q  I mean, they weren't off on vacation for three
2     weeks, right?
3  A  Yeah, right.
4  Q  All right, okay.  Doctor, elsewhere you've
5     talked about after your conversation with Dr.
6     Amberson, you conducted some form of an
7     investigation.  Do I have it right?
8  A  That's right.
9  Q  What type of investigation?  I wasn't clear when
10    I read your prior testimony what you actually
11    did.
12 A  Yeah.  Well, I'm not the kind of person to just
13    automatically believe everything that I hear.  I
14    want to -- maybe I'm a doubting Thomas, I don't
15    know, but I wanted to document for myself what
16    Dr. Lynn Hickman and Brent Hartsell told me.  I
17    wanted to see it for myself.
18         So I used the divvy sheets, I used the
19    divvy sheets to determine all the flow cytometry
20    cases that came into the Dianon laboratory the
21    week prior to May 6 and the week of May 6, and I

1    took all of those cases, I would go in the
2    evening when all the work was done.
3         And I would gather up these cases, and I
4    would look at the clinical question being asked
5    and I would sort these cases into diagnostic
6    groups, multiple myeloma, acute myeloid
7    leukemia, B-cell lymphoproliferative disorders,
8    et cetera.
9         And then I did basically the same kind of
10   exercise we performed earlier today in this
11   deposition, where I tried to determine, if I
12   have this clinical question, which antibodies
13   would I need to answer that clinical question.
14        And so I did that exercise in the evening
15   for these, and at the end of those two weeks, I
16   concluded that Dr. Lynn Hickman and Brent
17   Hartsell were correct; that for the overwhelming
18   majority of cases, it required no more than 10
19   to 15 antibodies.
20  Q  And was that true irrespective of whether it was
21     a tissue on which flow was performed or what's