EXHIBIT 79

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:02 CV 1573(MRK) |
| | ) | |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF JEAN STONE

1.    My name is Jean Stone.  I am currently employed as a Health Insurance Specialist

with the U.S. Department of Health and Human Services (DHHS).  The primary

focus of my job with DHHS is to prevent Medicare fraud, waste and abuse.

2.    I wrote an expert report in this matter dated February 13, 2006.  My report

summarizes my anticipated testimony.  A true and accurate copy of my report is

attached to this declaration.

3.    I have personal knowledge of the information contained in my report.  I declare

that the information contained in my report is true and accurate to the best of my

knowledge.  I adopt the contents of my report and incorporate my report by

reference into this declaration.

I do so affirm this **21ˢᵗ** day of December 2006

_____
Jean Stone



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
26 Federal Plaza
New York, New York 10278



February 13, 2006

Richard M. Molot, Assistant United States Attorney
Patricia Davis, Assistant Director of Commercial Litigation
Civil Division, U. S. Department of Justice
C/o District of Connecticut U.S. Attorney's Office
157 Church Street, 23rd Floor
New Haven, CT 06510

RE: US v. DIANON SYSTEMS, INC. No. 3:02CV157 (MRK)

Dear Mr. Molot and Ms. Davis:

In response to your request, following is a description of my anticipated testimony as an expert witness at trial:

I have worked for the U.S. Department of Health and Human Services (DHHS) for 35 years in a variety of oversight, Medicare and Medicaid positions and for the past 25 years, primarily in program integrity activities to prevent Medicare fraud, waste and abuse. I am currently employed in the New York Regional Office of DHHS' Centers for Medicare and Medicaid Services. I have testified on behalf of the Department of Human Services in numerous federal Medicare fraud trials.

In preparing this report, I have reviewed the following documents: United States' Amended Complaint, July 14, 2005; relevant Medicare statute, federal register and regulation, physician fee schedules, local coverage determination and AMA Current Procedural Terminology Coding for Flow Cytometry; DHHS Office of Inspector General Publication of OIG Compliance Program Guidance for Clinical Laboratories, August 24, 1998; DHHS Office of Inspector General Publication of the OIG Model Compliance Plan for Clinical Laboratories, March 3, 1997.

I will testify, based on experience and specialized knowledge of Medicare program, regulation and coding and review of the pertinent statutes, regulations and publications, regarding Medicare Part B coverage and payment for diagnostic testing services in general and flow cytometry in particular.

From what I understand the facts to be, Dianon Systems, Inc, a clinical laboratory, allegedly submitted false or fraudulent Medicare claims for flow cytometry tests containing antibodies or markers which were not reasonable and medically necessary.

Following is a summary of my testimony:

Medicare is a health insurance program for people age 65 or older; people under age 65 with certain disabilities, and people of any age with End-Stage Renal Disease. Medicare as several parts: Part A (Hospital Insurance); Part B (Supplemental Medical Insurance including physician services and diagnostic tests); Part C (Managed Care); and Part D (Prescription Drug Coverage).

Congress established Medicare Parts A & B (Original Medicare) in 1965 as Title XVIII of the Social Security Act (SSA). The Social Security Administration determines Medicare eligibility, issues Medicare numbers (Health Insurance Claim Numbers or HICs) and collects monthly premiums. The Centers for Medicare and Medicaid Services (CMS) administers the Medicare program. Prior to June 2001, CMS was known as the Health Care Financing Administration (HCFA). By law, CMS contracts with insurance companies to receive, process and pay Medicare claims. Those contractors handling Part B claims are called "carriers." First Coast Service Options, Inc. is the Part B carrier for Connecticut. Providers of medical services who wish to bill Medicare must apply to their local carriers for a Medicare Provider Identification Number (PIN) and demonstrate that they meet all state and local licensure requirements. Clinical Laboratories must agree to accept Medicare payment as payment in full ("mandatory assignment").

Beneficiaries are liable for an annual Part B deductible ($124 in 2006) and 20% co-payment of the Medicare-approved amount for most assigned claims, except approved clinical lab services for which Medicare pays 100%. Because it is categorized as a diagnostic test with a professional, physician component, flow cytometry is paid under the Medicare Physician Fee Schedule (instead of the Clinical Lab Fee Schedule) and is reimbursed at 80% of the allowed charge, so beneficiaries are liable for 20% co-payment.

Statute, regulation, national and local coverage determinations and rulings determine Medicare coverage and payment requirements. Congress passes laws; DHHS promulgates regulations; CMS publishes Manuals and Rulings; and Medicare carriers develop local coverage determinations, publish educational articles, maintain websites of policies, instructions and procedures for providers and beneficiaries and operate customer service, provider relations and appeals units to respond to written and telephone inquiries and requests for review.

Laboratory services must meet all applicable requirements of Clinical Laboratory Improvement Amendments of 1988 (CLIA) set forth at 42 CFR 493.

Per Section 1848 of the SSA, payment for all physician services must be based on a national fee schedule whose pricing is based on the relative value of three components of physicians' services (work, practice expense and malpractice). Medicare's uniform procedure coding system for all physicians' services is contained in its Healthcare Common Procedure Coding System (HCPCS).

HCPCS is divided into two subsystems: Level I and II. Level I is comprised of the American Medical Association's (AMA's) Current Procedural Terminology (CPT) which is a uniform numeric coding system of descriptive terms and codes to identify medical services and procedures furnished by physicians and other health care professionals. The AMA controls addition, deletion, or revision of CPT which is republished and updated annually. Level II of the HCPCS is a standardized coding system to identify products, supplies, and services not included in CPT and non-physician services such as ambulance transport and durable medical equipment.

Section 1862(a)(1)(A) of the Act provides that Medicare payment may not be made for services that are not reasonable and necessary. Diagnostic tests and clinical laboratory tests must be ordered and results used promptly by the physician who is treating the beneficiary as described in 42 CFR 410.32(a) or by a qualified nonphysician practitioner per 42 CFR 410.32(a)(3). Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary per 42 CFR 410.32(a). Medicare particularly excludes from coverage any services that are not reasonable and necessary for the diagnosis or treatment of illness or injury per 42 CFR 411.15(k)(I).

Flow cytometry is a technique to analyze single cell suspensions from blood, bone marrow, body fluids, lymph nodes, and other tissues. Flow cytometry is categorized as a diagnostic test by Medicare. Diagnostic tests generally contain both a Technical Component (performance of the test) and a Professional Component (physician interpretation of results). Global CPT codes include both components. Others are split into TC-only and PC-only coding. Prior to 2005, flow cytometry, CPT 88180, was a global code. Providers who performed both components billed 88180. Providers who performed only one component billed the code with the appropriate PC or TC modifier, to appropriately describe the service rendered. In 2005, the AMA split flow cytometry into 5 separate CPT codes. During the time period 1995 through 2005, CPT defined Flow Cytometry as follows:

1995 to 2000:
88180 Flow cytometry; each cell surface marker

2001 to 2004:
88180 Flow cytometry, each cell surface, cytoplasmic or nuclear marker.

2005:
88184 Flow cytometry, cell surface, cytoplasmic, or nuclear marker, technical component only; first marker
88185 each additional marker (list separately in addition to code for first marker)
        (Report 88185 in conjunction with 88184)
88187 Flow cytometry, interpretation; 2 to 8 markers
88188 Flow cytometry, interpretation; 9 to 15 markers
88189 Flow cytometry, interpretation; 16 or more markers

Flow cytometry results are frequently used to diagnoses certain cancers and monitor HIV and organ transplant patients. A single interpretation is made based on all the markers tested, not of each marker individually.

In 2003, CMS voiced concerns about the fact that pathologists determined what markers to perform, when and how many; that payment on a per marker basis encouraged performance of more markers than may be medically necessary; and that CPT coding did not match practice. Physicians did not interpret individual markers but rather interpreted and reported them on a panel basis. In 2004, in response to CMS' concerns, the AMA developed new CPT coding for flow cytometry which replaced 88180 with several new codes effective in 2005 to pay the technical component on a per marker basis and the professional component on a batch or panel basis.

Once a medical provider obtains its Part B Medicare Provider Identification Number (PIN), it may submit claims to its local carrier for payment of services rendered. If individual claims for covered services are complete on their face and contain all the necessary data elements (e.g., eligible performing and billing provider PINs and patient HIC number, date of service, diagnosis, ordering physician, place of service, etc.), they are processed and paid. Medicare carriers do not routinely review individual claims on a prepayment or postpayment basis. Rather, the Medicare program relies on the certification by the licensed health care professional or certified provider on the CMS/HCFA-1500 Medicare claim form that the services billed were medically indicated and necessary for the health of the patient. The hard copy claim form contains not only the certification ("I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.") but also two separate warnings against misrepresentation, falsification or incomplete or misleading information. Approved providers may also submit claims electronically after completing an Electronic Data Interchange agreement with their local carrier. Medicare contractors process nearly 1 billion claims a year from nearly 1 million providers for more than 45 million beneficiaries and do not review each and every individual claim for medical necessity. Rather, they rely on the honesty and integrity of the provider community and on the certification of licensed health care professionals to only bill medically necessary services.

On March 3, 1997, DHHS' Office of the Inspector General (OIG) published in the Federal Register a Model Compliance Plan for Clinical Laboratories to provide clear guidance to the clinical laboratory industry on how to reduce fraud and abuse within their organizations and ensure that claims are only submitted for services that the lab has reason to believe are medically necessary. In the August 24, 1998 Federal Register, OIG published Compliance Program Guidance for Clinical Laboratories. While acknowledging that labs do not treat patients or make medical necessity determinations, OIG advised labs to take steps to maximize the likelihood of only billing appropriate, covered tests. In addition to educating physicians to only order medically necessary tests, OIG advised labs to design uniform requisition forms that: encourage doctors to order only those tests appropriate for each patient; require physicians to document the need for each test ordered by inserting a diagnosis code for each such test; contain a printed statement reiterating that physicians should only order tests that are medically necessary for the diagnosis or treatment of a patient rather than for screening purposes. Requisition forms should be constructed to capture the correct Federal program information and promote the conscious ordering of tests by physicians or other authorized individuals. On selection of ICD-9CM Codes, OIG directed laboratories to contact the ordering physician to obtain diagnostic information in the event that the physician has failed to do so. Further, laboratories should: encourage physicians or other authorized individuals to submit diagnosis information for all tests ordered as documentation of the medical necessity of the service and should contact the ordering physician, authorized person on the physician's staff or other individual authorized to order tests to obtain information in the event that such information was not provided. If a lab receives a specimen with a test order which is vague or ambiguous, the lab must verify the tests which the physician wants before submitting a claim to Medicare. One of the clarifying elements in OIG's 1998 Compliance Guidance was the recognition that additional claim information, such as requesting the diagnosis information contained in the medical record, can be obtained from an authorized person rather than directly from the physician.

As set forth above, per relevant federal statute, regulations, HCFA/CMS 1500 claim form, and OIG compliance guidance, Medicare payment may only be made for medically necessary lab services. While laboratories may provide other services, only those which are necessary for the diagnosis and treatment of an illness or injury may be billed to the Medicare program.

While during the relevant timeframe, there was no national or local carrier policy in Connecticut limiting the number of antibodies which could be billed for specific diagnoses, providers were nonetheless expected to follow longstanding policy to only bill Medicare for those services which were reasonable and necessary.

Even if a laboratory chooses to utilize an overly large panel of antibodies for flow cytometry testing for each and every patient, it should only bill Medicare for the particular antibodies that are medically necessary for the diagnosis and treatment of the individual patient.

Enclosed is a trial list which is, to the best of my knowledge, a record of the cases in which I have testified since January 2002; my curriculum vitae; and slides relating to the Medicare program.

Sincerely,

Jean Stone
Health Insurance Specialist

Enclosures



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**Centers for Medicare & Medicaid Services**
26 Federal Plaza
New York, New York 10278



List of federal Medicare cases in which Jean Stone has testified:

**2005**

US v. Rafel Dhafir, Northern District of NY
US v. Dr. William Johnson, Southern District of New York
US v. Goodlife Medical, Southern District of New York

**2004**

US v. Barry Uko, Leslie Shepherd, Eastern District of CA (LA)
US v. Shpirt, et. Al (Greybor Medical Transportation) Central District of California (LA)
US v. Abdorasool Janati, Eastern District of Virginia
US v. Scott Michael Vogelsang, Eastern District of CA (Sacramento)

**2003**
US v. Godwin Sunday Edukere Eastern District of CA (LA)

**2002**
US v. Errico, Kalagian and Carter (Jamaica Foot Care), Southern District of NY
US v. Dr. Archie Laano, Eastern District of NY (deposition)

**Jean Stone**
**Health Insurance Specialist**
**Centers for Medicare and Medicaid Services– New York**

B.A. - Immaculata College, Immaculata, PA

35 years of federal experience in US Dept of Health & Human Services; 31 years of Central & Regional Office experience in the Centers for Medicare and Medicaid Services (CMS) and its predecessors [e.g., Health Care Financing Administration (HCFA) and Social and Rehabilitation Service (SRS)] in a variety of positions in Medicare & Medicaid program compliance & monitoring:

- HCFA New York Regional Office: Monitored Medicaid Early and Periodic Screening, Diagnosis and Treatment (EPSDT) programs (1975-1980). Conducted Program Integrity (PI) Operational Reviews to identify inefficiency, fraud, waste & abuse in Medicaid and Medicare Parts A & B via medical record reviews and beneficiary & provider interviews in wide variety of settings (e.g., hospitals, SNFs, nursing homes, boarding homes, HHAs, neighborhood health centers and dialysis clinics) and recommended statutory, regulatory & operational changes (1980-1985).

- HCFA New York Regional Office (RO): Oversaw or conducted RO II monitoring of a variety of Medicare contractor A &/or B functions; i.e., claims processing, electronic claims, coverage, overpayment collection, Part B reimbursement, secondary payer, QA, medical review, fraud & abuse, data analysis, OIG Hotline & Medicare Managed Care (1986-1996) and served as Technical Advisor on Medicare operational issues (1997-1998).

- HCFA New York RO and CMS' Office of Principal Advisor for National Policy Implementation: As Program Integrity Senior Specialist, led HCFA's National Comprehensive PI Plan Initiative "to Improve Effectiveness of MR and Benefit Integrity Activities" (1998-2000); drafted HHA Venipuncture proposal enacted in Balanced Budget Act (1997) and led team which wrote IDTF (Independent Diagnostic and Testing Facility) regulation (1997); worked on National Medicare Program Integrity issues (1999- 2006); served as member of Physician Fee Schedule Regulation Development Team (1998-2004); worked on NY 5-County Paramedic Intercept Ambulance Pilot (2002-2003); Medicare Contracting Reform, Data Analysis, Program Integrity and Dual-Eligible Demos and initiatives (2002-2005). Provided training to law enforcement (OIG, DOJ, FBI) at regional and national conferences (1995-2005).

- CMS Atlanta RO: As Acting Associate Regional Administrator, Miami Satellite Division (11/2004 – 5/2005), led South Florida Fraud Initiatives on Durable Medical Equipment and Infusion services which resulted in suspension of 487 DME suppliers; revocation of 493 Prosthetic and Orthotic suppliers' Medicare provider numbers; prepayment edits of 2,500 Miami-Dade Beneficiaries; prepayment denials of nearly $17 million and identification of overpayments in excess of $134 million. Florida Infusion Initiative has saved more than a half a billion dollars to date.

- Currently on detail as Health Insurance Specialist from CMS' New York Regional Office to Central Office to work on national and regional fraud and abuse special projects and serve as CMS representative to Florida Federal/State/Local Infusion Task Force.

Stone Pg. 2.

- Testified as Medicare expert witness innumerous federal Medicare fraud trials, in 1 state and 2 federal grand juries in New York, and in Part B Fair Hearings and Administrative Law Judge Hearings (1993-2005).

- Awards: Atlanta Regional Administrator's Cash Award for Florida Fraud and Abuse Activities (2005); Region IV Certificate of Appreciation for 7-Month Miami Detail (2005); DHHS Inspector General's Integrity Awards (2005, 2000 & 1993); CMS Administrator's Achievement Award for Medicare & Medicaid Fraud Prevention (2004); CMS Special Act Award for IDTF Review (2003); CMS Special Service Award for continuity of NY operations after 9/11 (2002); US DHHS Secretary's Distinguished Service Awards for preventing Medicare waste, fraud & abuse (1998) & reengineering contractor performance evaluation (1995); FBI's Award for Exceptional Service in the Public Interest (2001); HCFA Administrator's Employee of the Month Award for Comprehensive PI Plan/Contractor Performance Evaluation (2/2000); HCFA Regional Administrator's Special Act Award for OIG Audit of psychiatric hospital outpatient services (1999); HCFA Administrator's Team Citation for writing Medicare Independent Diagnostic Testing Facility reg. (1997); HCFA Administrator's Citations (1999, 1995, 1993, 1987, 1984).

2/06

# MEDICARE OVERVIEW



## Providing Pathology Lab Tests to Medicare
## Beneficiaries (Assigned Claims)

