EXHIBIT 85

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------x
UNITED STATES          :
OF AMERICA et al.,     :
                       :
        Plaintiffs,    :
                       :
        v.             :  No. 3:02cv1573(MRK)
                       :
DIANON SYSTEMS, INC.,  :
                       :
        Defendant.     :
------------------------x

Washington, D.C.

Thursday, July 6, 2006

Video deposition of

GERALD N. ROGAN

a witness, called by counsel for Plaintiffs pursuant to notice and agreement of counsel, beginning at approximately 9:03 a.m. at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Avenue, NW, Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

```
 1   I was -- I was focusing on a particular --
 2   particular part.  But let's move on, please.
 3            BY MR. FAYHEE:
 4       Q    I've handed you a document here.
 5   Is this something you recognize, seen before?
 6       A    Yes.
 7       Q    Okay.  This document -- well, let
 8   me ask you to describe it.
 9       A    Oh, wait.  I'm sorry.  No, I
10   haven't seen this, I've seen something like
11   it.
12       Q    Okay.
13       A    It's a -- this is the -- this is
14   the hearing and -- office of hearings and
15   appeals for Impath.  I think this may be the
16   same document I looked at in a slightly
17   different format, I'm not quite sure.  But
18   I've seen the ALJ decision on --
19       Q    Well, let me take you through it
20   and then you can -- if -- if -- if you do
21   begin to recognize it, you know, please say
22   so.
```

1           This -- it starts out at the very,
2   very beginning, it says -- it says, "In the
3   case of Impath appellant and the carrier
4   National Heritage Insurance Company," also
5   known as you well know, NHIC.  And it states,
6   "This matter is before the undersigned
7   administrative law judge pursuant to a
8   request for hearing filed by the appellant,"
9   who is Impath," on January 28, 2003.
10          Doctor, you were the carrier
11  medical director -- the co-carrier medical
12  director at NHIC on January 28, 2003,
13  correct?
14      A   Yes.
15      Q   It states that a hearing was held.
16  And I want to paraphrase a little bit here,
17  but was held before the undersigned in west
18  Los Angeles on August 13th, 2003.  The
19  appellant at the hearing was -- well, it's a
20  medical doctor.  I'm -- I'm not sure how to
21  pronounce the first name, but Dr. DaSilva,
22  M.D., medical director.  Also appearing on,

```
 1   testifying on behalf of the appellant were
 2   Lawrence Hertzberg, M.D., and he's the
 3   director of hemato -- I'm sorry, hematology
 4   and oncology, and Joel Chan, MD, who is a
 5   staff hematopathologist.  I assume they are
 6   both employed by Impath.  Then the carrier
 7   was represented at the hearing by Maria
 8   Reyes, supervisor of Medicare review, and
 9   Jessica Engenio, RN, registered nurse.  Do
10   you know Maria Reyes?
11       A    Yes.
12       Q    Okay.  Is she a -- what's her --
13   when she was -- let me ask this:  When she
14   was supervisor of Medicare review, is that a
15   medical position a position that requires
16   medical training?
17       A    You're asking me my opinion, or
18   whether --
19       Q    You know what a supervisor of
20   medico -- Medicare review does, correct?
21       A    Yes.
22       Q    And you know who Maria Reyes is?
```

1    A    Yes.

2    Q    Let me ask first, does the -- in
3    order to obtain the job of supervisor of
4    Medicare review do you have to have a medical
5    background?

6    A    NHIC did not require that.

7    Q    Okay. Do you know whether Maria
8    Reyes was trained as a nurse or a doctor?

9    A    I believe she was not in either --
10   in either case.

11   Q    Either? Okay. And Jessica
12   Engenio, do you know her?

13   A    Yeah, no, no, I don't -- I don't
14   recall that I know her. I may have met her.

15   Q    It appears that she is a registered
16   nurse.

17   A    Yes.

18   Q    It doesn't appear that the carrier
19   was represented by anyone else except by the
20   supervisor of Medicare review and Jessica --

21   A    Engenio I think is --

22   Q    Is that -- is that what I'm trying

1   to say?

2       A    I think it's Engenio.

3       Q    Okay.  Now down lower at the bottom

4   -- and it gives a nice little summary of the

5   case -- it says, "This matter concerns

6   services furnished by the appellant to a

7   total of 281 beneficiaries as specified in

8   the decisions by the carrier hearing officers

9   dated November 20th, 2002, November 21, 2002,

10  and December 4, 2002.  The total amount in

11  controversy for the services in question is 3

12  -- $379,000 -- I'm sorry, $379,618.74," and

13  it goes through naming the individual case

14  and docket numbers.

15           And then on the next page I think

16  in a more elementary way it says the general

17  issue is whether -- and this is a judge

18  writing the opinion, that the general issue

19  is whether payment may be made under part B

20  of Title XVIII of Social Security Act, the

21  Medicare program for services furnished by

22  the appellant in various -- to various

```
 1  beneficiaries during the period January 2000
 2  to August 2001.
 3          And just to sort of cut to the
 4  chase here, we're talking about flow
 5  cytometry services.  Those are the tests at
 6  issue here, is that correct?
 7      A   Yes.
 8      Q   Okay.  And even to focus a little
 9  more on page 3 of 7, it states during the
10  period January -- January 2000 to August 2001
11  the appellant, that is Impath, submitted a
12  signed request for payment to Medicare
13  carrier for flow cytometry tests rendered to
14  numerous beneficiaries as -- as we've
15  learned.  It states there how many were --
16  the total amount of tests and money
17  implicated.  It states, though, at the review
18  level of the appeals process, the carrier,
19  that is NHIC, allowed only 15 test antibodies
20  for each beneficiary.
21          Is it true that from this that
22  while you were carrier medical director,
```

1  co-carrier medical director at NHIC, the
2  tests for flow cytometry were limited to only
3  15 antibodies for each beneficiary based on
4  what you've read here?
5      A   Yes.
6      Q   Did you have any part in making the
7  decision to limit them to 15?
8      A   No.
9      Q   Who would have had that role?  Or
10 who -- who would have had that
11 responsibility?
12     A   Dr. Lurvey, if he did that, but it
13 could have been done by others.  It depends
14 on how -- but if -- if the medical doctor
15 were asked to make a decision, it would have
16 been Dr. Lurvey.
17     Q   Okay.  And the next paragraph
18 states, "In each decision, the hearing
19 officer held that the appellant was now
20 entitled to payment for up to 20 tests for
21 each beneficiary based on the opinion of the
22 carrier's medical director as well as

1  opinions of various medical advisors and
2  advisory groups."
3        So is it an accurate statement --
4  and I'm sorry, I'm sort of moving things
5  along here.  But is it an accurate statement
6  that the carrier initially wanted to limit
7  the number of antibodies to 15; however,
8  through the appeals process, it was moved up
9  to 20 antibodies?
10       A    Yes.
11       Q    Is that accurate?
12       A    Yes.
13       Q    Okay.
14       A    Well, the carrier did limit it to
15  15 and then moved it to 20.
16       Q    And then moved it to 20 based on
17  this appeals process that took place in these
18  cases?
19       A    Yes.
20       Q    Okay.
21       A    And there was also a policy that
22  allowed for 20.

Page 328

1    Q    Okay.

2    A    So a 15 edit would have been less

3 than what the policy allows.

4    Q    And this was all during the time

5 period you were co-carrier, medical director

6 at NHIC?

7    A    Yeah, although the hearing took

8 place after I left.  But the -- from -- I

9 stayed through July 23rd.

10   Q    Okay.

11   A    Of 2003.

12   Q    Okay.  Thank you.  I know I've

13 already asked and you stated you haven't read

14 any other depositions in this case but I want

15 to ask you a sort of unrelated hypothetical

16 that I hope you'll be able to provide an

17 answer to as a former carrier medical

18 director.

19         And obviously, we have been talking

20 today about -- at length about these lab

21 tests, the flow cytometry tests, and you've

22 stated that you were aware that during a

www.betareporting.com
(202) 464-2400                    (800) 522-2382