EXHIBIT 91

```
                                                    1
            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
    ------------------------------x
    UNITED STATES OF AMERICA      |
    ex rel. DR. JAMES J.          |  CIVIL ACTION NO.
    TIESINGA,                     |  3:02 CV 1573(MRK)
              Plaintiff,          |
                                  |
        vs.                       |
                                  |
    DIANON SYSTEMS, INC.,         |  February 22, 2006
              Defendant.          |
    ------------------------------x


              VIDEO DEPOSITION of VALERIE PALMIERI


        Taken before Elzbieta A. Sirois, RPR,
        LSR 350, a Court Reporter and Notary
        Public within and for the State of
        Connecticut, pursuant to Notice and the
        Federal Rules of Civil Procedure, at the
        offices of Office of the United States
        Attorney for the District of Connecticut,
        157 Church Street, New Haven, Connecticut on
        February 22, 2006, commencing at 9:07 a.m.




                PALZARANO COURT REPORTERS
                  117 North Saddle Ridge
                  West Simsbury, CT 06092
                       860-651-0258
```

```
                                                    2
    APPEARANCES:

    For the Plaintiff:

        UNITED STATES DEPARTMENT OF JUSTICE
        601 D Street N.W.
        Room 9154
        Washington, D.C. 20004
        202.307.0238
        202.305.4117 Fax
          By:  PATRICIA R. DAVIS, ESQ.

        UNITED STATES DEPARTMENT OF JUSTICE
        157 Church Street
        New Haven, Connecticut 06510
        203.821.3792
          By:  RICHARD M. MOLOT, ESQ.


    For the Defendants:

        AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
        1333 New Hampshire Avenue, N.W.
        Washington, D.C. 20036-1564
        202.887.4000
        202.887.4288 Fax
          By:  ROBERT S. SALCIDO, ESQ.

    ALSO PRESENT:

        Thomas Kossl, Dianon Systems

    VIDEOGRAPHER:

        Hamilton Communication
        60 Pine Lake Road
        Westbrook, Connecticut
              Jason Hamilton
              860.399.4999
```

```
                                                    3

                    S T I P U L A T I O N S


 5      It is stipulated by counsel for the parties that
 6  all objections are reserved until the time of trial,
 7  except those objections as are directed to the form of
 8  the question.
 9      It is stipulated and agreed between counsel for
10  the parties that the proof of the authority of the
11  Notary Public before whom this deposition is taken is
12  waived.
13      It is further stipulated that any defects in the
14  Notice are waived.
15      It is further stipulated that the deposition may
16  be signed before any Notary Public.
```

```
                                                    4
 1          THE VIDEOGRAPHER:  We are now on the
 2  record.  This is the deposition of Valerie
 3  Palmieri, taken on behalf of the Plaintiff in
 4  the case of the United States of America vs.
 5  Dianon Systems Incorporated.  Case number
 6  3:02CV1573 (MRK) filed in the United States
 7  District Court for the District of
 8  Connecticut.
 9          Today's date is February 22, 2006.  Time
10  on videotape record is 9:07 a.m.  This
11  deposition is being held at 157 Church Street
12  in New Haven, Connecticut.  My name is Jason
13  Hamilton representing Hamilton Communications
14  of 60 Pine Lake Road, Westbrook, Connecticut.
15          Would counsel please introduce yourselves
16  for the record.
17          MS. DAVIS:  My name is Pat Davis.  I'm
18  representing the United States.
19          MR. MOLOT:  Richard Molot for the United
20  States.
21          MR. SALCIDO:  I'm Robert Salcido here on
22  behalf of Dianon Systems.
23          MR. KOSSL:  Tom Kossl, Dianon Systems.
24          THE VIDEOGRAPHER:  The witness may now be
25  sworn.
```

5

1
2          (Deposition commenced:  9:07 a.m.)
3
4          VALERIE PALMIERI, Deponent, of 63 Indian
5  Ledge Road, Monroe, Connecticut, being first
6  duly sworn by the Notary Public, was examined
7  and testified, on her oath, as follows:
8
9          THE COURT REPORTER:  Usual stipulations?
10         COUNSEL:  Yes.
11
12             DIRECT EXAMINATION
13
14 BY MS. DAVIS:
15    Q   Good morning, Ms. Palmieri.
16    A   Good morning.
17    Q   How are you?
18    A   Good.
19    Q   Could you just give us your name and address
20 for the record, please.
21    A   Sure.  Valerie B. Palmieri, 63 Indian Ledge
22 Road, Monroe, Connecticut.
23    Q   Thank you.  Can you tell us where you work?
24    A   Dianon Systems.
25    Q   Now, this is a, what's called a 30(b)(6)

6

1  deposition.  Has your counsel explained to you what
2  that means?
3     A   Yes.
4     Q   That you're testifying on behalf of the
5  company?
6     A   Yes.
7     Q   Let me give you a copy of the Notice of
8  Deposition.
9          MS. DAVIS:  If you could mark that as
10         Exhibit 1.
11
12         (Plaintiff's Exhibit No. 1:
13         Marked for Identification.)
14
15 BY MS. DAVIS:
16    Q   Have you seen that before?
17    A   Yes.
18    Q   Can you turn to the attachment, Exhibit A, and
19 can you tell me which parts of the depositions you're
20 being offered for?
21    A   C, D and E.
22         MS. DAVIS:  Okay.  Mr. Salcido, I
23         understand that there's another witness who's
24         going to be responding to A and B?
25         MR. SALCIDO:  That is correct.

7

1          MS. DAVIS:  And that's Mr. Amberson?
2          MR. SALCIDO:  Yes, it is.
3          MS. DAVIS:  And we'll schedule a date for
4          that in early March?
5          MR. SALCIDO:  Yes.
6  BY MS. DAVIS:
7     Q   I'm going to do -- I'm just going to ask you
8  some background questions briefly.
9     A   Sure.
10    Q   Can you just tell me what your educational
11 experience is?  I mean what your education is?
12    A   I have a bachelor's degree in medical
13 technology and a minor in chemistry.
14    Q   Can you tell me what medical technology is?
15    A   It's similar to a bachelor's degree in biology
16 in that you're educated in the biological sciences, the
17 laboratory sciences, so you're able to perform medical
18 laboratory tests, chemistry, hematology, microbiology,
19 blood bank.
20    Q   Have you been trained on flow cytometry?
21    A   Yes.
22    Q   Have you performed flow cytometry tests?
23    A   No, I have not.
24    Q   Can you give me -- where was your degree from?
25    A   Western Connecticut State University.

8

1     Q   Can you give me a brief description of your
2  work experience after you graduated from college?
3     A   Sure.  I graduated from college in -- okay, I
4  got to think back here -- 1983, and my first job out of
5  college was at Park City Hospital in Bridgeport,
6  Connecticut.  And in that job I was a microbiologist.
7         I continued to work there until 1987.  During
8  that time period, too, I worked at Bridgeport Hospital
9  part-time in chemistry on the evening shift, and in
10 1987 I started my employment with Dianon in December of
11 '87.
12    Q   What was your first position with Dianon?
13    A   I was a medical technologist.
14    Q   What did you do?
15    A   I performed tumor marker analysis, testing on
16 blood.
17    Q   What does that mean?
18    A   Basically perform chemical analysis of blood
19 to detect tumor markers from cancer patients to see
20 whether their cancer was progressing or getting better.
21    Q   This would be like in immunochemistry?
22    A   It was immunoassays.
23    Q   Okay.
24    A   Yes.
25    Q   And these were -- then someone would look

9

1 under the microscope at the --
2  A   No, they're chemical assays using radioactive
3 isotopes, enzymatic reactions, fluorescent reactions in
4 a test tube.
5  Q   I see. How long did you hold that position?
6  A   For two years.
7  Q   What was your next position?
8  A   Laboratory supervisor in 1989.
9  Q   What did that entail?
10  A   Supervising day and evening shift operations
11 of the laboratory.
12  Q   When you say "operations" what does that mean?
13  A   The analytical portion, the testing of the
14 specimens, the quality assurance.
15  Q   How long did you hold that job?
16  A   For four years.
17  Q   What was your next job?
18  A   Laboratory manager.
19  Q   What does a laboratory manager do?
20  A   I managed multiple functions, the chemistry
21 laboratory which I supervised, histology laboratory,
22 psychology laboratory, so it's a multidepartment
23 position.
24  Q   Did you receive, when you were the manager,
25 did you have people reporting to you?

10

1  A   Yes.
2  Q   Did the technologists?
3  A   No, supervisors reported to me.
4  Q   Supervisors, I see, okay.
5      How long did you hold that job?
6  A   I held that job until 1998.
7  Q   What was your next job?
8  A   I became director of clinical pathology and
9 pretty much service operations.
10  Q   What did you do in that job?
11  A   I managed the laboratory plus all the customer
12 service, laboratory processing, all the preanalytic
13 steps.
14  Q   The intake?
15  A   Yes, and the output.
16  Q   Okay?
17  A   Logistics, materials management.
18  Q   How long were you in that position?
19  A   I was in that position for one year, and then
20 I became the vice-president of laboratory operations.
21  Q   What were your duties in that job?
22  A   Managing the clinical as well as the anatomic
23 portion of the laboratory, as well as the preanalytic,
24 analytic, postanalytic, the entire gamut.
25  Q   So all the logistics --

11

1  A   Everything.
2  Q   -- all the materials? Okay. How long were
3 you in that position?
4  A   I was in that position until 2001, and then I
5 became senior vice president of laboratory operations.
6  Q   How did what you did differ from what you had
7 done previously?
8  A   I managed multiple locations.
9  Q   I see. What were those locations?
10  A   New York, Florida and Connecticut, two
11 locations in New York.
12  Q   Then how long were you in that position?
13  A   Until we were acquired by LabCorp.
14  Q   Then what was your title?
15  A   Vice-president of operations.
16  Q   Vice-president of operations or vice-president
17 of lab operations?
18  A   Same thing.
19  Q   Same thing?
20  A   Yeah, same thing pretty much. Then my
21 position was just limited to Connecticut and New York.
22  Q   And no more responsibility for Florida?
23  A   Florida or Oklahoma. Actually in 2001 too we
24 purchased UroCor so I took on Oklahoma in 2001.
25  Q   When was Dianon acquired by LabCorp?

12

1  A   January of 2003.
2  Q   And have you held that position since then?
3  A   Yes.
4  Q   Do you have stock in the company?
5  A   Yes.
6  Q   As the vice-president, you're an officer of
7 the corporation?
8  A   Yes.
9  Q   Tell me, generally, what did you do to prepare
10 for this deposition?
11  A   I reviewed the documents relating to the
12 subject matter.
13  Q   And you're talking about the documents
14 relating to C, D and E of the deposition notice?
15  A   Correct, yes.
16  Q   Did you talk to anyone?
17  A   No.
18  Q   You didn't ask anybody information about any
19 of this?
20      MR. SALCIDO: Anyone other than me and
21      Tom.
22  A   Did I talk to anyone? Well, in pulling
23 together information like cost information and things
24 like that I talked to my managers and things like that.
25 I talked to my husband, told him where I was going to

69

1  1996?
2  A  Yes.
3  Q  What was your position then?
4  A  1996, lab manager.
5        MS. DAVIS: If you could take a look at
6     the deposition notice again. Let me make
7     sure, before we move on, you're going to look
8     for documents that would have information
9     about costs per accession or cost per
10    antibodies for previous years and would
11    produce those to us?
12       MR. SALCIDO: Yes.
13  BY MS. DAVIS:
14  Q  You've also been offered to testify on
15  section E; is that right?
16  A  That is right.
17  Q  And that's Dianon's decision in not to open --
18  I think there's a typo there. The decision not to open
19  a hematopathology laboratory at Dianon's facility in
20  Oklahoma City; is that right?
21  A  Yes.
22  Q  When did Dianon first consider opening up a
23  hematopathology lab in Oklahoma City?
24  A  Early 2002.
25  Q  Who raised, who first raised the idea?

70

1  A  I believe Steve Gersen and Todd Homan.
2  Q  Why did they want to open up a lab in Oklahoma
3  City?
4  A  Number one is we had space out there. We just
5  acquired UroCor. Number two is we wanted a West Coast
6  or Midwest presence for our HemePath offering.
7  Q  What did -- were there any meetings to discuss
8  this?
9  A  Yes.
10 Q  Who was present at the meetings?
11 A  I don't recall every meeting because I did not
12 attend every meeting, but the meetings that I was at
13 Todd Homan, Steve Gersen, Jim Tiesinga, Marty
14 Stefanelli, Jay Amberson.
15 Q  What was Todd's position?
16 A  I believe VP of marketing.
17 Q  So he's replaced by Mr. Carlson?
18 A  Correct.
19 Q  Mr. Gersen?
20 A  VP of genetics services.
21 Q  Jim Tiesinga?
22 A  Staff hematopathologist.
23 Q  Mr. Stefanelli?
24 A  VP of sales and marketing, senior VP.
25 Q  Is he Todd's boss?

71

1  A  That's correct.
2  Q  Jay Amberson?
3  A  Medical director.
4  Q  And what was your position at this point?
5  A  VP of operations.
6  Q  About how many meetings were held on this
7  subject?
8  A  I can recall two.
9  Q  Two that you were at?
10 A  Yeah, two that I was at.
11 Q  Did you talk to any of the other folks about
12 whether there were meetings that you did not attend?
13 A  No, I did not.
14 Q  When were these two meetings?
15 A  Initially I want to say Q1 2002 when the idea
16 was raised.
17 Q  Was that again Gersen and Homan --
18 A  Yes.
19 Q  -- raised the issue?
20 A  Yes.
21 Q  Wait until I finish the question.
22 A  Okay.
23 Q  I know I'm slow, but I'll get there. Okay.
24    Were the people you just named at this first
25 meeting?

72

1  A  They could be. I don't remember exactly.
2  Q  Did you talk to any of them to find out
3  whether they were at the meeting or what their
4  recollection of the meeting were?
5  A  No, I did not.
6  Q  Did you review any documents relating to the
7  first meeting?
8  A  No, I did not.
9  Q  Did you -- did anybody take any notes at the
10 meeting?
11 A  Not that I have reviewed.
12 Q  Do you know whether anybody took notes?
13 A  I don't, you know, I don't recall seeing notes
14 or meeting minutes.
15 Q  Did you ask anybody if they took notes?
16 A  No, I did not.
17 Q  What was the -- why were each of these folks
18 at the meeting: Mr. Homan, Gersen, Tiesinga,
19 Stefanelli and Amberson and yourself, what was your
20 role?
21 A  Each one was representing a specific area,
22 specific department. Todd was representing marketing
23 and the need to, you know, strategically locate
24 ourselves within a certain area of the country for
25 HemePath's offering. Steve Gersen was --

73

```
 1    Q    I'm sorry. Let me back up again.
 2    A    Okay.
 3    Q    Why was there a marketing, perceived marketing
 4   need to have a location somewhere in the Midwest or
 5   West?
 6    A    Based on the fact that HemePath specimens are
 7   very labile and customers wanted their specimens to
 8   stay within a local geographic area versus going across
 9   the country.
10    Q    So, what -- I take it when you chose
11   Oklahoma City, it's simply because you had lab space
12   there?
13    A    That is correct.
14    Q    I'm sorry. Then Mr. Gersen?
15    A    He was the vice-president of genetic services
16   which was responsible for cytogenetics, molecular
17   genetics.
18    Q    Were you also considering putting a genetics
19   lab in Oklahoma City?
20    A    That is correct.
21    Q    What about Mr. Tiesinga?
22    A    He, I don't believe he was in the initial
23   meeting. He was in the later meetings.
24    Q    So you don't think he was actually at this
25   meeting?
```

74

```
 1    A    No.
 2    Q    What was Mr. Stefanelli's role?
 3    A    The senior VP of sales and marketing.
 4    Q    What was he there for?
 5    A    Supporting Todd's efforts.
 6    Q    How about Mr. Amberson?
 7    A    The medical director.
 8    Q    He's the medical director for all of Dianon?
 9    A    All of Dianon.
10    Q    You were there as VP of operations?
11    A    Correct.
12    Q    Would you have been responsible for the
13   operations of the lab in Oklahoma City?
14    A    Yes.
15    Q    All right. So there was one meeting with five
16   of you. What about, were there other meetings?
17    A    I can recall a meeting before they visited the
18   Medicare carrier for Oklahoma.
19    Q    When was that?
20    A    Some time in May 2002.
21    Q    Who was at that meeting?
22    A    Todd Homan, Steve Gersen, Jim Tiesinga, I
23   don't recall if Marty or Jay were there.
24    Q    Were you there?
25    A    I was there.
```

75

```
 1    Q    Let me go back to the first meeting. What
 2   exactly was discussed at the first meeting?
 3    A    The opportunity to utilize the Oklahoma
 4   facility, the opportunity to strategically place
 5   ourselves in the middle of the country from an offering
 6   perspective so customers could send less distance than
 7   to Connecticut, the reimbursement challenges, you know,
 8   the differences in reimbursement between Oklahoma and
 9   Connecticut.
10    Q    What do you mean by reimbursement challenges?
11    A    Just the differences between the Medicare
12   carrier and how they would reimburse us for flow
13   cytometry and the difference between that, Oklahoma and
14   Connecticut.
15    Q    What were the differences?
16    A    I don't remember exactly, but it was -- they
17   were reimbursing for less antibodies.
18    Q    What was the discussion of -- what did the
19   discussion center on on this issue?
20    A    Kind of getting in the works for laboratory,
21   you know, kind of what we would need to do to set up a
22   laboratory space, identifying the space, identifying
23   the labor pool, the technical and professional labor
24   pool, and then understanding reimbursement issues and
25   the changes.
```

76

```
 1    Q    When you say "understanding the reimbursement
 2   issues" let's just look at the reimbursement issues for
 3   right now. What was the discussion about?
 4    A    Just the differences, basically the
 5   differences between the Arkansas Medicare bulletin and
 6   the Connecticut bulletin.
 7    Q    Was there any discussion about what to do
 8   about that?
 9    A    They were going to put together a phone call
10   to the Medicare carrier and a meeting.
11    Q    Who was going to do that?
12    A    Steve Gersen and Todd Homan.
13    Q    They were going to call the medical director,
14   the carrier?
15    A    That's correct.
16    Q    Then you said there was another meeting in May
17   of 2002?
18    A    That was a meeting before they visited the
19   Medicare carrier, just reviewing, you know, the game
20   plan and kind of what we were going to say to them, how
21   we were going to outline our need for 26 antibodies.
22    Q    You said that to the best of your recollection
23   Mr. Homan, Mr. Gersen, Mr. Tiesinga and yourself were
24   there?
25    A    That's correct.
```

77

1   Q   You don't remember whether Mr. Stefanelli or
2   Amberson were there?
3   A   I do not recall.
4   Q   Where did the meeting take place?
5   A   In Steve Gersen's office.
6   Q   Was there any, was there anything put in
7   writing?
8   A   I don't recall.
9   Q   Did you, when you -- when you said you were
10  game planning or outlining what you were going to tell
11  the carrier, the Oklahoma carrier about your need for
12  26 antibodies, had somebody put together an outline of
13  the issues?
14  A   I believe Todd did put together some outline.
15  I mean, I know people were taking notes, but I did not
16  get a copy of those notes.
17  Q   So Todd put together an outline. What was on
18  the outline?
19  A   Really understanding, you know, the
20  differences between their IC9 codes, our IC9 codes, the
21  differences in their reimbursement and making them
22  understand why we felt it was medically necessary for
23  us to keep the 26.
24  Q   Was there any -- this outline was done by
25  Mr. Homan who was marketing?

78

1   A   Marketing.
2   Q   Was there any input into this from any of the
3   medical personnel?
4   A   Yes. Jim Tiesinga was also involved at that
5   point, and he spoke to them on the phone.
6   Q   Spoke to whom on the phone?
7   A   The Medicare carrier.
8   Q   Who did he speak to?
9   A   I do not know.
10  Q   Other than speaking to the Medicare carrier on
11  the phone, did he have any other import into the
12  outline?
13  A   He reviewed it and, you know, agreed with what
14  they came up with in terms of the summary to present
15  and they scheduled a meeting with the carrier.
16  Q   Was any sort of PowerPoint presentation put
17  together?
18  A   No, I do not believe that.
19  Q   Any sort of outline for the medical director
20  at the carrier?
21  A   I assume there was. I did not see it.
22  Q   Did you ask any of the other people at the
23  meeting whether such a presentation was put together?
24  A   Did I ask them at the time?
25  Q   No, in preparation for this deposition, did

79

1   you ask them?
2   A   No, I did not.
3   Q   So, you didn't ask Mr. Homan whether he put
4   together some sort of formal presentation for the
5   medical director in Oklahoma City?
6   A   No, I did not.
7   Q   Did you talk to Mr. Gersen?
8   A   No, I did not.
9   Q   Are either of them still at the company?
10  A   No, they are not.
11  Q   Okay. So, you said that the outline prepared
12  by Mr. Homan talked about the ICD9 codes. I take it
13  there was some sort of difference between which codes
14  were reimbursed by Oklahoma as opposed to Connecticut;
15  is that right?
16  A   That's correct.
17  Q   Was the plan to convince the medical director
18  of the carrier in Oklahoma that he should add ICD9
19  codes to their local medical review policy?
20  A   I don't believe so. I believe the Oklahoma or
21  Arkansas policy was more extensive than ours.
22  Q   So it covered more ICD9 codes?
23  A   That's correct.
24  Q   What about the number of antibodies, was there
25  something put together to convince the medical director

80

1   in Oklahoma that the number of antibodies reimbursed
2   should increase?
3   A   I believe so.
4   Q   What was the basis for that?
5   A   Based on what we felt was medically necessary
6   and we were currently performing.
7   Q   What was the basis for your presentation to
8   the medical director in Oklahoma City about why 26 were
9   medically necessary?
10  A   That is based on our hematopathologists
11  directors they created these panels and felt very
12  strong and passionate about why we needed all these
13  antibodies, and for us to provide HemePath services in
14  Oklahoma we needed to offer this panel.
15  Q   So, let me ask it differently. Who were the
16  medical directors in hemopathology?
17  A   At that time Sueha Michelleanni [phonetic] and
18  Glen Segal.
19  Q   What was the basis for why they thought all 26
20  were medically necessary?
21  A   I'm not aware of their medical basis. I'm not
22  a medical doctor.
23  Q   Did you talk to them in preparation for this
24  deposition?
25  A   No, I did not.

81

1  Q  Did you talk to Mr. Homan about and ask him
2  whether he had talked to them?
3  A  No, he did not.
4  Q  How about Mr. Gersen?
5  A  I did not speak with him.
6  Q  All right. So I take it some group of Dianon
7  folks went to Oklahoma City?
8  A  I believe Arkansas.
9  Q  To Arkansas?
10 A  Yes.
11 Q  Who did they meet with?
12 A  I am not sure who they met with.
13 Q  Did you ask anybody who they met with in
14 preparation for this deposition?
15 A  I believe it was the medical director at the
16 Medicare carrier.
17 Q  Do you know?
18 A  I do not know his name or her name.
19 Q  Did you ask anybody?
20 A  No, I did not.
21 Q  Do you know who went to Oklahoma City or
22 Arkansas, wherever it was?
23 A  Yes, I do.
24 Q  Who was that?
25 A  Steve Gersen, Jim Tiesinga and Todd Homan.

82

1  Q  Those were the only three?
2  A  That's correct.
3  Q  Were there any meetings after they came back?
4  A  I don't believe there was an official meeting.
5  I did have conversations with Jim and Steve.
6  Q  When you say there wasn't an official meeting,
7  what does that mean?
8  A  That no one called a meeting post their visit,
9  you know, a set scheduled meeting.
10 Q  So, but there was some sort of
11 informal meeting?
12 A  Yes.
13 Q  Where did that take place?
14 A  I think I had a discussion with Steve in his
15 office.
16 Q  Was anybody else there?
17 A  I do not believe so.
18 Q  What did, what did Mr. Gersen tell you?
19 A  That it was a very favorable meeting. They
20 were willing to listen, did not have any large breadth
21 of experience with HemePath and wanted us to prepare
22 the documentation to support our case.
23 Q  Did he have any notes from the meeting?
24 A  I did not see any notes.
25 Q  Did you ask him if he had any notes?

83

1  A  No, I did not.
2  Q  What did Mr. Gersen tell you was the
3  documentation that the carrier in Connecticut wanted?
4  I'm sorry, in Oklahoma City wanted.
5  A  Basically they wanted support documentation.
6  They did not have much familiarity with HemePath and
7  they wanted specific case study examples to support our
8  need for 26.
9  Q  Did they suggest that Dianon talk to anyone
10 else other than the medical director?
11 A  Not that I'm aware of.
12 Q  Did you ask?
13 A  No.
14 Q  Were there any other discussions other than
15 your meeting with Mr. Gersen after the visit to
16 Oklahoma City?
17 A  I think I had a hallway conversation with Jim
18 Tiesinga and just, you know, kind of great job, good
19 feedback.
20 Q  What did Mr. Gersen tell you that they told
21 the medical director?
22 A  Basically that they -- that there was a need
23 for running the 26 antibody panel, and that we felt it
24 was medically necessary to continue to perform that 26
25 antibody panel in Oklahoma.

84

1  Q  Did you explain why each of the 26 antibodies
2  was necessary?
3  A  I don't know.
4  Q  Did he explain why the panel of 26 was
5  necessary in all cases?
6  A  I don't know exactly what they discussed.
7  Q  Did you ask Mr. Gersen or Mr. Homan?
8  A  No, I did not.
9  Q  All right. You said you had a hallway
10 conversation with Mr. Tiesinga?
11 A  Yes.
12 Q  When did that take place?
13 A  Shortly after they returned.
14 Q  So it would be before or after the meeting you
15 had with Mr. Gersen?
16 A  After.
17 Q  How long after they got back was the meeting?
18 A  Few days.
19 Q  What was the gist of the conversation with
20 Mr. Tiesinga?
21 A  Great feedback, he was going to, as the
22 medical person who was supporting this, he was going to
23 pull together these case studies and support these
24 efforts.
25 Q  Did he do that?

85

1   A   To my knowledge he did.
2   Q   Was there a meeting to discuss it?
3   A   No.
4   Q   So he put together a case studies and what was done with them?
6   A   I am not sure.
7   Q   Did you ask anybody else involved in the process, Mr. Gersen or Mr. Homan, what was done with the information Mr. Tiesinga put together?
10  A   No, I did not.
11  Q   So you don't know whether that information was ever presented to the carrier in Oklahoma?
13  A   I don't, no.
14  Q   Was any other action taken with regard to discussions with the medical director about the number of antibodies that Dianon can charge for?
17  A   I'm not aware of any additional actions.
18  Q   Did you -- there were no other meetings to discuss this?
20  A   Not that I'm aware of.
21  Q   As I understand it, a decision was made not to open the lab in Oklahoma City; is that right?
23  A   Correct.
24  Q   What was the basis for that decision?
25  A   Really two reasons. Jim had resigned and also

86

1   we were having very -- we were having a lot of
2   difficulty in recruiting technical labor as well as
3   professional labor, and in the background there was
4   also we were being acquired, Dianon was up for sale.
5   Q   Would opening a lab in Oklahoma City, is that, would that be something that would require board approval?
8   A   No.
9   Q   So the officers could just take that action without consulting with the board?
11  A   I don't think there was, you need official approval, but they would have to be made aware of it.
13  Q   So somebody would report it at a board of directors meeting?
15  A   I'm sure, yes.
16  Q   Did you review any board of directors meetings related to this issue in preparing for this deposition?
18  A   No, I did not.
19  Q   Are you aware of any?
20  A   No.
21  Q   Did you ask if there are any?
22  A   No, I did not.
23      (Pause.)
24      MS. DAVIS: Let's go off the record for a
25  minute.

87

1       THE VIDEOGRAPHER: Going off the record at
2   11:21 a.m.
3
4       (Off-the-record discussion.)
5
6       THE VIDEOGRAPHER: Back on the record at
7   11:25 a.m.
8       MS. DAVIS: Let's mark that.
9
10      (Government's Exhibit No. 8:
11      Marked for Identification.)
12
13  BY MS. DAVIS:
14  Q   This has been marked as Exhibit 8, do you recognize that document?
16  A   Yes.
17  Q   Did you review it in preparation for this deposition?
19  A   Yes.
20  Q   Do you know who prepared it?
21  A   Cindy Dawkins.
22  Q   Cindy Dawkins. If you can turn to the second page 700065.
24  A   Yup.
25  Q   At 2/14/02 there's a reference, OK City

88

1   meeting, and then Craig, Gersen, Valerie, Jay and Bill.
2   Can you tell me who those are?
3   A   Craig McKee, Steve Gersen, myself, Jay Amberson and Bill Tilton.
5   Q   What was the purpose of the meeting that's referenced there?
7   A   It looks like talking about setting up a lab, what IS issues would be able to interface the histograms. April, May, doing some testing in April or May. QC issues, splitting of specimens. Doing some correlation with the histology, which is the IHC and the bone marrow biopsies, and then call Coulter, who's the instrument vendor and ask them for a trade-in, and then the staffing.
15  Q   So this is sort of a to-do list of what you have to do to set up a lab work?
17  A   Just some of the action items, yeah, very basic.
19  Q   Were you at this meeting?
20  A   Yes.
21
22      MS. DAVIS: Mark that, please.
23
24      (Government's Exhibit No. 9:
25      Marked for Identification.)

89

BY MS. DAVIS:
Q    Do you know what this is?
A    This is a summary from John Hazard which he sent to me.
Q    What is -- who is Mr. Hazard?
A    He was my director of laboratory operations.
Q    Then if you look at, down at the critical factors at the bottom it says training in OKC several individuals are out there. What does that mean?
A    Training in OKC, it could have been microcyte training because we trained him on our microcyte procedure.
Q    What is that procedure?
A    That is for cytology.
Q    Then under, if you go back up, it says under accomplishments, "HemePath, interviewed candidates. One has accepted and will start June 3rd?"
A    That's in our Connecticut facility.
Q    Then, "Since we'll be opening a HemePath laboratory in OKC, we will meet with the Coulter people to establish a national account status with them."
A    That was the planning process to set up a vendor relationship with our Oklahoma site.
Q    Then under disappointments, it says, "The

90

start date for the HemePath laboratory in OKC has been pushed back."
A    I believe at this time it was pushed back because of hiring. We had a very difficult time finding people.
Q    Who were having trouble finding? What positions?
A    Pathologists and technologists.
Q    Had you hired any pathologists or?
A    I do not believe so.
Q    Or the technologists?
A    I do not believe so.
Q    Did you ever get to the point where you had people ready to take a job?
A    We had people from Connecticut that were looking to relocate.
Q    How many?
A    One pathologist and one senior histologist -- senior HemePath technologist.
Q    I'm sorry, one pathologist?
A    Yes.
Q    And one?
A    Senior HemePath technologist.
Q    And how many did you need to run the lab in Oklahoma City?

91

A    I believe we were looking for about five technologists.
Q    Okay.
A    And at least two to three HemePaths.
Q    How many, is it basically by pathologist how many support staff you would need? For example, if you have one pathologist --
A    Yes.
Q    -- how many HemePaths would you need?
A    For one HemePath you probably would need a half a histotech and two technologists.
Q    So, as of May, how many of each did you have?
A    As of May we had internal candidate, Jim Tiesinga for the HemePath, and we had one HemePath technologist identified.
Q    And no other candidates?
A    No.

        (Government's Exhibit No. 10:
        Marked for Identification.)

BY MS. DAVIS:
Q    Do you recognize that document?
A    Yes, I do.
Q    What is it?

92

A    It's the histology cytology summary for the month of May.
Q    That's also from Mr. Hazard --
A    Yes.
Q    -- who reported to you?
A    Yes.
Q    If you look down at disappointments it says "The start date for the HemePath laboratory in Oklahoma City has been placed on hold." Why was it placed on hold?
A    Due to a couple of reasons. Number one, Jim Tiesinga resigned. We had to start from scratch in finding a HemePath director for Oklahoma. Second reason is just the difficulty we had with the labor pool, and also, as I mentioned previously, we were also looking at being acquired.
Q    Was the reimbursement level that the Oklahoma carrier was willing to -- let me rephrase that.
    Were the amount of antibodies that the carrier in Oklahoma City was prepared to reimburse Dianon, did that play a role in the decision not to open a lab in Oklahoma City?
A    I do not believe so.
Q    What's the basis for that belief?
A    That we felt the strategic need from a market