# EXHIBIT 74

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
                        NO. 3:02 CV 1573(MRK)
 3

 4   UNITED STATES OF AMERICA, ex rel.
     DR. JAMES J. TIESINGA,
 5
              Plaintiff(s),
 6
     - vs -
 7
     DIANON SYSTEMS, INC.,
 8
              Defendant(s).
 9

10   _____

11

                  V I D E O   E X A M I N A T I O N
12
                                OF
13
                       RAUL C. BRAYLAN, M.D.
14

15
     TAKEN ON
16   BEHALF OF:      The Plaintiff

17   DATE:           June 15, 2006

18   TIME:           Scheduled start:   9:00 a.m.
                     Actual Start:      9:07 a.m.
19                   Conclusion:        12:32 p.m.

20   PLACE:          Unites States Attorney's Office
                     300 West University Avenue
21                   Suite 310
                     Gainesville, Florida 32601
22
     REPORTER:       Anne C. Noble, RPR, FPR, CSR-GA, WA
23                   Notary Public: Florida and South Carolina

24

25
```

Page 13

1   or the molecular lab that deals with genetic testing,
2   they send us the raw data, the actual data from the
3   laboratories, and it is up to the professional
4   hematopathologist to integrate all those data in the
5   context of the clinical information that we receive.
6           If there are questions about the results or
7   concerns, a telephone call is initiated to the
8   referring physician for clarification or communication
9   or reporting.
10          Subsequently, the whole case is put together,
11  dictated, transcribed, signed and submitted, in a
12  formal manner, to the referring physician, clinician
13  or pathologist.
14      Q.  Okay.  Let me ask you some questions about
15  that process.  You said you get specimens from your
16  hospital and the clinics, neighboring hospitals.
17  There's a VA Hospital, I take it, here?
18      A.  Uh-huh.
19      Q.  And then you get others from -- you said
20  distant places by courier or overnight mail?
21      A.  Correct.
22      Q.  How far afield would that be?
23      A.  We get cases north, from Georgia, South
24  Carolina.  We get cases all the way down to
25  Saint Petersburg and Sarasota.

1      Q.   Okay.  And when those specimens --
2      A.   I mean, that's -- I don't know if you're
3  familiar with it, but it's north central Florida,
4  south Georgia.
5      Q.   Okay.
6      A.   Yes.
7      Q.   And when you get those -- the specimens in,
8  the ones that come in by overnight or courier, what
9  information comes with them?
10     A.   It varies a lot.  Usually, it's, I would say,
11 scanty, unfortunately.  It usually says, "Patient such
12 and such an age and sex, anemia," or it says,
13 "Cytopenia."  It's just a very brief description in
14 most cases.  There are exceptions.  But in most
15 occasions, unfortunately, a fairly brief description
16 of what the situation is, and a -- frequently, a sheet
17 that has information on cell counts.  Those are for
18 bone marrow or blood disorders.
19          For tissue disorders, usually it's -- a
20 patient with a lump, a patient with a mass and that's
21 all we have.
22          Unfortunately, that's something that we've
23 been complaining about, but it's very hard to fix.
24     Q.   Okay.  And you said that when the sample
25 comes in, the technologist looks at the sample?

1       A.   Uh-huh.

2       Q.   Just looks at it in the tube?

3       A.   Right; looks at the tube and describes the
4  gross findings. Is it red? White? Is it -- the
5  volume, the color. Makes sure that the label on the
6  tube is the same label as the requisition form. Makes
7  sure that the sample matches the requisition. That's
8  the initial step, yes.

9       Q.   Okay. And then you said you do something
10 called a "triage"?

11      A.   Right. The triage is -- if the sample is
12 sufficiently large, then there is a formal triage.
13 There is a standard triage.

14           But, again, that will depend on the
15 situation. If it comes from our own hospital, it
16 would come from a pathologist, or, in general, if the
17 sample comes from a pathologist, the pathologist would
18 have his or her own histology. So we don't process a
19 histological portion of the sample.

20           We used to do it -- I think we do it, but
21 quality control is not part of the standard procedure
22 because we always can call the doctor and say, "Send
23 me a slide, a microscopic slide," and then we can
24 correlate that.

25           But if it comes from a clinician or directly

1  disease diagnosed, not the suspected disease.  I

2  wish -- in other words, this is for the specific

3  disease that has been diagnosed (indicating).  We

4  can't suspect the disease, unfortunately, all the

5  time.

6       Q.  Okay.  Let me -- then let me -- let me have

7  you turn to page -- what's been marked down at the

8  bottom -- SFO 756.

9       A.  Yes, 756 (indicating).  Uh-huh.

10      Q.  If you take a look at under -- up at the

11 "Results" section, the right-hand column --

12      A.  Uh-huh.

13      Q.  -- it says, "Based on the written answers and

14 on the meeting discussion" -- and this is under the

15 heading "Chronic Lymphoproliferative Disorder" -- it

16 says, "Based on the written answers and on the meeting

17 discussion, it became clear that although only 4

18 specific antibodies were agreed on as essential by

19 every participant, the majority of participants agreed

20 on 9 antibodies as essential reagents for the

21 evaluation of all cases of suspected CLD."

22           So if you suspect CLD, nine antibodies were

23 essential?

24      A.  Essential; right.

25      Q.  For suspected cases of CLD.

1       A.   Okay.

2       Q.   Okay?

3       A.   I take it.

4       Q.   And do you agree with that?

5       A.   This is what they agreed on, the group agreed

6  on; correct.

7       Q.   Okay.

8       A.   Okay.  In 2000?

9       Q.   Right; 2000.

10      A.   Uh-huh.

11      Q.   And then it goes on to say, "Nearly all the

12  participants agreed that although this generic panel

13  was adequate for the initial evaluation of the cases

14  suspecting CLD, that there might be other antibodies

15  that you might want to use to fully characterize the

16  disease"; is that right?

17      A.   Right.

18      Q.   Okay.  So that's the consensus of the -- of

19  all the flow cytometry experts?

20      A.   Not all of them but many of them; right.

21      Q.   So that if there's a suspected -- just go

22  down to the bottom of this.  So it's if there is a

23  suspected case of CLD, "There is near unanimity that

24  on average, 7 markers would be needed in addition to

25  the 9 considered essential, for a total of 16."