# EXHIBIT 2

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
2

3    UNITED STATES OF AMERICA,
     ex rel. Dr. James J.
4    Tiesinga,

5              Plaintiffs,
                                        No.3:02CV157(MRK)
6         vs.

7    DIANON SYSTEMS, INC.,

8              Defendant.
                                    /
9    ─────────────────────────────

10         The deposition of MARY ALICE

11   STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12   2006, commencing at 9:30 a.m. at the Law Offices of

13   Venable, L.L.P., 575 7th Street, N.W., Washington,

14   D.C., before Steven Poulakos, Notary Public in and for

15   the District of Columbia.

16

17

18

19

20

21   REPORTED BY:  Steven Poulakos
                   DISCREPORT@COMCAST.NET

Page 82

1  had made the initial diagnosis would your protocol be
2  the same that we just discussed in the context with
3  Exhibit Number 12?
4      MS. DAVIS: Objection.
5      THE WITNESS: I'm not sure I understand the
6  question.
7      BY MR. PARKER:
8    Q   If a patient who had received that panel,
9  Exhibit Number 13, been diagnosed and then, as I asked
10 you earlier, had come back through their physician for
11 repeat testing, would the panel that you provided to
12 them be subject to the same methodology that you
13 described earlier?
14   A   If it was for evaluation of -- you
15 mentioned a possible second process?
16   Q   Yes.
17   A   Then, yes, this is a diagnostic panel.
18   Q   And if it was to determine how they were
19 responding to treatment per the protocol you would
20 construct a targeted panel just to identify and answer
21 that particular question?

Page 83

1    A   Correct.
2        MS. DAVIS: Do you have a copy of that for
3  me?
4        MR. PARKER: I haven't found one.
5        MR. PIERMATTI: I have one.
6        MR. PARKER: Give to it Pat.
7        MS. DAVIS: And that was 13.
8        MR. PARKER: That was 13, yes.
9        (Whereupon, a document was marked as
10 Deposition Exhibit Number 14.)
11       BY MR. PARKER:
12   Q   Let's move on to 14, and, Dr. Stevenson,
13 could you please describe for the record what this
14 document is?
15   A   This is a panel for evaluation of a patient
16 with various diseases. If the patient has a history of
17 myelodisplastic syndrome or a myeloproliferative
18 disorder.
19   Q   That would be MPD or MPS?
20   A   Yes.
21   Q   Thank you.

Page 84

1    A   And we also use it in CML.
2    Q   So if a patient comes in with a suspicion
3  of CML not previously diagnosed by you is this the
4  panel that the patient receives?
5    A   Before -- so a patient just comes in with a
6  suspicion of CMRL?
7    Q   Well, if the patient is one of the NCI
8  protocols and the physician sends you a specimen and
9  says I suspect CML, would you do flow?
10   A   I would ask the physician, since I have
11 resource utilization problems, I have to limit my
12 specimens as much as possible.
13       I would ask them what studies have been
14 done. Have you looked at the bone marrow? I'd like to
15 see the bone marrow? I'd like to see the peripheral
16 smear. What is the CBC? What is the clinical history
17 of the patient? Have you looked for a chromosome
18 problem, various tests would have been done.
19       If nothing had been done I would say do
20 some other studies first. I would tell him to -- and
21 so this is because we're in a different situation than

Page 85

1  like a reference lab or some other facilities in that
2  I'm not getting paid for them. I have a limited budget
3  and I make decisions as to what I will do and I will
4  want a workup performed before I will accept a CML
5  specimen.
6    Q   Under what circumstances would you do this
7  panel, Exhibit 14, for someone suspected of having CML?
8    A   If the patient had a difficult diagnosis or
9  post-transplant or post-therapy to look for return of
10 abnormal cells in that it's really set to determine
11 small levels if necessary, and if the patient were
12 suspected of blasting off or was doing poorly there was
13 an un -- the clinician was concerned about some status
14 in the patient and they wanted an evaluation for blast
15 and abnormal cells and that type of situation.
16   Q   Under those conditions you would use this
17 panel, Exhibit 14, in that patient suspected of having
18 CML?
19   A   Yes.
20   Q   Dr. Stetler-Stevenson, let's go back just
21 for a moment, if you could pull in front of you

Page 86

1  Exhibits 12, 13, and 14 together?
2  A   Yes.
3  Q   Am I correct, Doctor, that when you design
4  these panels it was because you felt that this
5  combination of antibodies was what was medically
6  necessary for you to render correct and accurate
7  diagnoses of these suspected medical conditions?
8  A   Yes.
9  Q   These panels are not designed -- let me
10 rephrase it differently.
11     These panels are designed to provide
12 medical diagnostic services, correct?
13 A   Correct.
14 Q   You can put those aside and I have a couple
15 of others here.
16     (Whereupon, a document was marked as
17 Deposition Exhibit Number 15.)
18     BY MR. PARKER:
19 Q   I hand you Exhibit 15, and, Dr.
20 Stetler-Stevenson, can you identify for the record what
21 this exhibit is?

Page 87

1  A   This is an unknown panel for a patient with
2  a diagnosis from an outside institution of acute
3  myelodisplastic leukemia, acute myeloleukemia, a
4  blastic and K-cell process, Burkitt's lymphoma, a stem
5  cell type leukemia or a dendritic cell leukemia.
6  Q   That was a lot.  Let me make sure I
7  understand this.
8  A   Yes.
9  Q   Unknown means that you have, your lab has
10 not previously diagnosed this patient, correct?
11 A   Correct.
12 Q   And when you say outside before, were you
13 referring to outside the NCI family?
14 A   Correct.
15 Q   Would there be a different panel that you
16 would use if a patient that you have not previously
17 diagnosed had these same suspected conditions but was
18 within an NCI protocol?
19 A   If the patient's within an NCI protocol and
20 I have rendered a diagnosis already?
21 Q   No, no.

Page 88

1  Q   If a patient has come to you who is in an
2  NCI protocol whom you have not previously diagnosed but
3  has one of these suspected conditions that we see in
4  Exhibit 15, do they get the panel shown in Exhibit 15
5  or some different panel?
6  A   It is unusual to get a patient with what
7  appears to be an acute leukemic process.  I would
8  expand the panel if it were a true unknown.
9      Usually -- all the time patients have some
10 sort of peripheral smear that leads to suspicion that
11 there is a neoplastic hematolymphoid process.  I would
12 examine the smear and to help as well in designing the
13 panel, but this would not cover possible lymphoma.
14     So this panel would not accurately
15 subclassify a mature lymphoid process.
16 Q   My question may have been unclear because
17 that wasn't, I don't think, what I was asking.
18     What you've explained to me as Exhibit 15
19 is a panel that you use in someone that your lab has
20 not previously seen who comes to you from outside of an
21 NCI protocol and who has a suspected condition that's

Page 89

1  one of the diseases mentioned in this heading: ALL,
2  AML, NK, Burkitt's, stem cell and an Drake cells; is
3  that correct?
4  A   Correct.
5  Q   What I'm trying to ascertain, Doctor, is if
6  someone who was in an NCI protocol who you have not
7  previously diagnosed comes to you with one of these
8  suspected conditions do they get the panel shown in
9  Exhibit 15 or do you have a different panel for NCI
10 patients?
11 A   I do not have different panels for NCI
12 patients and then for outside patients.  All NCI
13 patients come to NCI with a diagnosis correct or
14 incorrect.
15     So, therefore, when I talk about a previous
16 diagnosis they have a previous diagnosis of something.
17 They may have a diagnosis of acute lymphoplastic
18 leukemia received at a hospital out in Frederick, for
19 example, or whatever, and I consider anything I have
20 not diagnosed unknown personally.
21 Q   I understand that.

Page 94

1  A   It would be 12 unless the chronic lymphoid
2  leukemia. Chronic myeloid leukemia would not, of
3  course, have 12 but would have the CML.
4  Q   Thank you.
5      I'll hand 16 back to you.
6      (A short break was taken.)
7      (Whereupon, a document was marked as
8  Deposition Exhibit Number 17.)
9  BY MR. PARKER:
10 Q   Dr. Stetler-Stevenson, I'm going to hand
11 you in a moment Exhibit Number 17 -- I don't have an
12 extra copy, so bear with me for one moment -- which is
13 entitled Medi 507 initial diagnostic panel.
14     Can you first identify for me what Medi is?
15 A   Medi. It's a Medimune which is a company.
16 It identified a specific protocol.
17 Q   Let me hand you Exhibit 17. Doctor, how
18 does Exhibit 17 get used in comparison to Exhibit 12?
19 A   This is a panel for a patient with a
20 diagnosis of a T-cell lymphoma who's being evaluated
21 for protocol eligibility for the Medi 507 protocol.

Page 95

1  Q   So Medi doesn't refer to a vendor of
2  antibodies --
3  A   Right.
4  Q   -- it's a protocol study being done by NCI?
5  A   Yes.
6  Q   And without comparing each tube perhaps you
7  can tell me, is the cocktail used for patients who are
8  being evaluated for admittance into the MEDI protocol
9  different than the panel that's used for patients who
10 are suspected of having a blood or bone marrow
11 disorder, Exhibit Number 12?
12 A   It is not a general diagnostic panel. It
13 is a specific panel to evaluate protocol eligibility.
14 So that the diagnosis is not of importance to the
15 submitting physician per se. The importance -- the
16 important question being asked is, is there a T-cell
17 neoplasm present with certain characteristics.
18 Q   So let me make sure I understand. If a
19 patient came to you who was suspected of having a
20 T-cell neoplasm who is not being evaluated for purposes
21 of admitting into the MEDI protocol, they would be

Page 96

1  tested with Exhibit 12?
2  A   Correct.
3  Q   And it's only for purposes of the unique
4  questions that are raised by this MEDI protocol that
5  you would use Exhibit 17?
6  A   Correct.
7  Q   I'm going to take some time over break and
8  make other copies of some of these panels. We'll come
9  back to this in a second.
10     I'd like for the moment, Doctor, to ask you
11 to pull up Exhibit Number 12? Do you have that?
12 A   Yes.
13 Q   Thank you. Doctor, you utilize antibody
14 CD2 in your panel, correct?
15 A   Correct.
16 Q   And, again, for the record, this is for any
17 patient who you have not previously diagnosed your lab,
18 who is suspected of having a blood or bone marrow
19 neoplasia, a mature lymphoid neoplasia?
20 A   Correct.
21 Q   And, Doctor, in such a patient, am I

Page 97

1  correct that the use of CD2 as a marker you consider to
2  be medically necessary to render correct diagnoses of
3  such patients?
4  A   Correct.
5  Q   And you also utilize CD7, correct?
6  A   Correct.
7  Q   Do you also consider to be medically
8  necessary to use CD7 in your cocktail to render a
9  accurate diagnosis of patients suspected of having a
10 mature lymphoid neoplasia?
11 A   Yes, correct.
12 Q   So I don't stumble over the word, is
13 neoplasia just your word for cancer?
14 A   Yes.
15 Q   You also utilize 11C in your panel?
16 A   Correct.
17 Q   Doctor, am I correct that in your medical
18 judgment 11C is medically necessary for making correct
19 diagnoses of patients suspected of having mature
20 lymphoid cancers?
21 A   Correct.

Page 98

1  Q  You also utilize CD22 in your panel,
2  correct?
3  A  Correct.
4  Q  And do you believe, Doctor, that the use of
5  CD22 is medically necessary to render an accurate
6  diagnosis of patients suspected of having mature
7  lymphoid cancers?
8  A  Correct.
9  Q  You utilize CD25 in your assay, correct?
10  A  Correct.
11  Q  Do you believe that it is medically
12  necessary to use CD25 to render a correct diagnosis of
13  patients suspected have having mature lymphoid cancers?
14  A  Yes.
15  Q  And in collectively, Doctor, you also
16  utilize CD56, CD57, and CD1034 in this panel?
17  A  Correct.
18  Q  And it is your medical judgment, is it not,
19  as a director of the NCI flow lab that it is medically
20  necessary to use CD56, 57, and 103 to render an
21  accurate diagnosis of patients suspected of having

Page 99

1  mature lymphoid cancers?
2  A  Yes.
3  Q  Thank you.
4      If you would please turn to Exhibit 14?
5  Could you again tell the jury here, Doctor, what
6  medical conditions are -- well, let me start again.
7      In what patients will you use the panel
8  that's shown in Exhibit 14?
9      MS. DAVIS: Objection, asked and answered.
10     THE WITNESS: What was that?
11     MS. DAVIS: Go ahead.
12     THE WITNESS: A patient with suspected
13 diagnosis of myelodysplastic syndrome or a
14 myeloproliferative process which would include an
15 appropriate evaluation of CML.
16     BY MR. PARKER:
17  Q  Doctor, in your panel you utilize CD2,
18 correct?
19  A  Correct.
20  Q  You use CD5, correct?
21  A  Correct.

Page 100

1  Q  CD7 also?
2  A  Correct.
3  Q  You use CD22?
4  A  Correct.
5  Q  You use CD -- excuse me, you use kappa and
6  lambda?
7  A  Correct.
8  Q  And you use the HLADR antibody?
9  A  Correct.
10  Q  And, Doctor, am I correct that in your
11 medical judgment use of all of those antibodies are
12 medically necessary to render an accurate diagnosis in
13 patients suspected of having one of those conditions?
14     MS. DAVIS: Objection.
15     THE WITNESS: The question is problematic
16 to me.  Those aren't necessary to diagnose the presence
17 of myelodysplastic syndrome or myeloproliferative
18 disorder.
19     Usually when we're evaluating a patient
20 with CML they already have a diagnosis and we're
21 looking for a plastic process.

Page 101

1     BY MR. PARKER:
2  Q  Let me rephrase my question.
3     You would agree with me that all of the
4  antibodies I just mentioned, so I don't have to say
5  them all over again, in your medical judgment is
6  medically necessary to render a correct diagnosis of
7  patients suspected of having NDS and MPD?
8     MS. DAVIS: Objection.
9     THE WITNESS: Yes.
10     BY MR. PARKER:
11  Q  And, Doctor, and help me understand, in a
12 patient under the conditions you've described earlier
13 who was thought to have CML but who you have not
14 previously tested, they would get all of those
15 antibodies that I just identified, correct?
16  A  It would depend on what the question was,
17 the clinical question.
18  Q  What -- I'm sorry, I didn't mean to
19 interrupt.  Are you done?
20  A  Yes.
21  Q  What clinical question would cause you to

Page 102

1  use CD2, CD5, CD7, CD22, CD -- excuse me, and kappa,
2  lambda, and HLADR?
3     A   If there was a clinical patient had -- was
4  not doing well and there was a question of is the
5  patient -- so this panel would be performed, including
6  those antibodies, if there's a question of the patient
7  having -- developing a blast crisis or simply not doing
8  well, and there's a question is something going on.
9     Q   And your reference to blast is referring to
10 the evolution of a chronic process into an acute
11 process?
12    A   Correct.
13    Q   You can put that aside.
14        Doctor, can you hand back, since I didn't
15 have a copy of Exhibit 13. I may have a question about
16 that.
17        MS. DAVIS:  Here.
18        MR. PARKER:  Yes.
19        If you don't mind, Pat, let me use this for
20 a second. Actually, I can hand that back to you.
21        BY MR. PARKER:

Page 103

1     Q   Doctor, Exhibit 13 is your panel that is
2  used in patients who are suspected of having lymphoma
3  and which you have not previously diagnosed?
4     A   Correct.
5     Q   Doctor, in your panel you utilize CD
6  markers, among others, 2, 7, 11C, 13, 22, 33, 34, 57,
7  and 103?
8     A   Correct.
9         MS. DAVIS:  Objection.
10        BY MR. PARKER:
11    Q   Am I correct, Doctor, that in your medical
12 judgment all of those antibodies are medically
13 necessary to use to render a correct diagnosis in a
14 patient suspected of having lymphoma?
15        MS. DAVIS:  Objection.
16        THE WITNESS:  Yes.
17        BY MR. PARKER:
18    Q   You can put those aside for a moment.
19        (Whereupon, a document was marked as
20 Deposition Exhibit Number 18.)
21        BY MR. PARKER:

Page 104

1     Q   I'm handing you, Doctor, Exhibit Number 18,
2  and could you identify this exhibit for the record?
3     A   This is a case report in communications and
4  clinical cytometry that I authored with a fellow.
5     Q   Tell me, Doctor, why do physicians and
6  scientists like yourself publish case reports?
7     A   Primarily because they're unusual or they
8  have something instructive in general to the medical
9  community.
10    Q   In other words, you felt that your
11 experience diagnosing this patient that you describe in
12 this exhibit was instructive and helpful to other
13 physicians doing flow cytometry?
14        MS. DAVIS:  Objection.
15        THE WITNESS:  Yes.
16        BY MR. PARKER:
17    Q   And am I correct, Doctor, that you held
18 that belief regardless whether the pathologist was a
19 government pathologist or a nongovernment reference
20 laboratory or an academic institution?
21        MS. DAVIS:  Objection.

Page 105

1         THE WITNESS:  Yes.
2         BY MR. PARKER:
3     Q   Tell me, Doctor, in a way that our jury can
4  understand, what this patient presented with and what
5  you ultimately diagnosed this patient with?
6     A   The patient -- actually, I have two here.
7     Q   Okay.
8     A   The patient presented with fever, dyspnoea
9  on exertion and a lot platelet count, low hemoglobin,
10 and he had a mass and interstitial changes demonstrated
11 on chest X-ray. He was rather sick. A specimen was
12 submitted to cytopathology for diagnosis. The
13 clinician suspected infection.
14        The cytopathologist examined the specimen
15 and felt there was a lymphoma present, or a chronic
16 lymphoproliferative process and sent the specimen to
17 flow cytometry.
18    Q   Can I stop you there?
19    A   Yes.
20    Q   The cytopathologist is not someone doing
21 flow cytometry?

Page 106

1   A   Correct.
2   Q   I'm sorry, continue.
3   A   And we evaluated the specimen.
4   Q   What did you determine the patient's
5   condition was?
6   A   We determined that the patient had an acute
7   myeloid leukemia that was unexpected, and in addition
8   had a incidentally a process consistent with an early
9   chronic lymphocytic Leukemia.
10   Q   What you diagnosed was not what was
11   suspected?
12   A   Correct.
13   Q   And one of the conditions you diagnosed, an
14   acute myeloid cancer?
15   A   Yes.
16   Q   Is a potentially fatal cancer?
17   A   Correct.
18   Q   Such that if one is not treated rather
19   quickly and promptly you will die?
20   A   Correct.
21   Q   So the is it fair to say, Doctor, that you

Page 107

1   and your colleagues who perform flow cytometry are
2   called upon to make life and death decisions?
3       MS. DAVIS:  Objection.
4       THE WITNESS:  Yes.
5       BY MR. PARKER:
6   Q   So it's important to be correct in what you
7   do?
8   A   Yes.
9   Q   Doctor, you wrote in the first paragraph,
10   and I'm going to paraphrase, but I think I'll get the
11   gist of it, that you wrote, in an effort to cut costs
12   or to reduce costs laboratories constantly try to
13   reduce antibody panels performing flow cytometry,
14   correct?
15   A   Correct.
16   Q   And that pressure on cost, as we discussed,
17   is also something you experience as part of your
18   budgetary process?
19   A   Right.
20   Q   In fact, Doctor, as you explain it to me,
21   unlike what some people might think you don't have

Page 108

1   unlimited resources in terms of performing flow
2   cytometry, do you?
3   A   No.
4   Q   In fact, you have to make decisions on to
5   which patient you do flow on as to whether it fits
6   within your protocol?
7   A   Correct.
8   Q   Something which an outside laboratory
9   doesn't have to do?
10   A   Correct.
11   Q   You comment, and you put in quotes, disease
12   directed panels.
13       Do you see that, Doctor?
14   A   Yes.
15   Q   What do you mean by that?
16   A   People who receive a true unknown and
17   suspected of a lymphoma and do a panel that will only
18   detect lymphoma, that would be a disease specific
19   panel, would be unable to detect an acute myeloid
20   leukemia, for example.
21   Q   Does your -- today in the course of this

Page 109

1   morning's discussion we've looked at number of panels,
2   some of which have a number of diseases, some of which
3   have fewer. I don't recall seeing anyone that just had
4   one.
5       Is your approach disease specific or is it
6   something different?
7   A   Our approach is not disease specific,
8   although our approach is based on the fact that
9   patients present already with a diagnosis.
10       In all panels we include antibodies that
11   will detect another process. It may not fully
12   characterize it, but will detect it, as in this case
13   where we had to request a second blood sample to fully
14   characterize the acute myeloid leukemia, however, we
15   detected its presence with our limited panel.
16   Q   Doctor, I didn't ask you this before. In
17   your laboratory when you're performing flow on a
18   patient who's within an NCI protocol study, does your
19   lab require that morphologic examination of the
20   specimens be conducted before you do your flow study?
21   A   No.

Page 110

1  Q   And just so the jury understands, when I
2  refer to morphologic examination, I mean what people
3  see on TV, a pathologist taking a specimen and looking
4  under a microscope?
5  A   Correct, we do not require that.
6  Q   So you believe it to be medically
7  appropriate for your patient population to, when you
8  get a specimen, to use your indicated panel without
9  first doing a microscope examination of the specimen?
10 A   Correct.
11 Q   Now, is a microscope inspection of the
12 specimen part of your case workup?
13 A   Yes.
14 Q   So before you write out or report out your
15 case it will include both a what I'll call a microscope
16 inspection or morphologic inspection of the specimen in
17 addition to your interpretation of the flow?
18 A   Correct.
19 Q   Let's go back to your paper.
20 A   Yes.
21 Q   When commenting on the disease directed

Page 111

1  panel approach that some laboratories use you wrote,
2  and I quote you now, this is often done dispute the
3  availability of the minimal clinical information to
4  direct panel choice. However, in patients without an
5  established diagnosis one runs the risk of being unable
6  to identify an unexpected malignant population.
7      That was your statement correctly read?
8  A   Correct.
9  Q   And I assume you still subscribe to this
10 approach?
11 A   Correct.
12 Q   You further wrote, this case illustrates
13 the need to use a multi-parametric analysis with
14 antibody panels designed to detect all abdominal
15 hematopoietic population?
16 A   Correct.
17 Q   Now, let me break that down. Firstly, what
18 does multi-parametric mean?
19 A   That means not using single color flow but
20 to use multiple colors as well as light scatter
21 characteristics -- this is rather technical -- in your

Page 112

1  analysis so that you look at multiple parameters all at
2  once.
3      So when I analyze data I look at at least
4  two parameters at all times. One can look at three
5  parameters in a sort of three-dimensional
6  representation as well.
7  Q   Doctor, is it your assertion that in 2000
8  and up to today your lab used a multi-parametric
9  analysis in doing flow studies?
10 A   Yes.
11 Q   And is it your testimony, Dr.
12 Stetler-Stevenson that the NCI flow lab in 2000 and
13 presently constructs its panels in a way that they are
14 designed to detect all abnormal hematopoietic
15 populations?
16 A   Yes.
17 Q   If it were the case that Dr. Flynn says
18 that that can't be true, I presume you would disagree
19 with him?
20     MS. DAVIS: Objection.
21     THE WITNESS: If he said that what can't be

Page 113

1  true?
2      BY MR. PARKER:
3  Q   Well, let me actually read the testimony
4  for you so I don't misquote it.
5      (Whereupon, a document was marked as
6  Deposition Exhibit Number 19.)
7      BY MR. PARKER:
8  Q   I've marked as Exhibit Number 19 excerpts
9  from the deposition given by the government's expert in
10 this case, Dr. Flynn, and I believe, if I did it
11 correctly, I've included in that excerpt pages 160 and
12 161.
13     Do you see that, Doctor?
14 A   Yes.
15 Q   And do you see upwards on the top of page
16 160 beginning on line 4 I read to Dr. Flynn the very
17 sentence that I just read to you?
18 A   Yes.
19 Q   If you look down you will see beginning on
20 line 12 of page -- let me start again.
21     You'll see beginning on line 12 of page 160

29 (Pages 110 to 113)

Page 122

1  Q  This reinforces the U.S.-Canadian consensus
2  recommendations and indicates the danger of restricting
3  reimbursement to disease specific antibody panels.
4      Have I read that correctly?
5  A  Yes.
6  Q  When you referred to reimbursement you're
7  speaking not as a government flow cyrtometrist but to
8  those out there, your colleagues out there, who are
9  doing flow cytometry whether in academic centers or in
10 reference laboratories and are getting compensated for
11 that either by patients or third-party insurers or the
12 U.S. government through Medicare?
13     MS. DAVIS: Objection.
14     THE WITNESS: Yes.
15     BY MR. PARKER:
16 Q  Thank you. No other questions on this
17 paper.
18     MR. PARKER: Let's go off the record.
19     (A discussion was held off the record.)
20     BY MR. PARKER:
21 Q  Mr. Stetler-Stevenson, putting modesty

Page 123

1  aside, is the NCI flow lab, in your judgment, the
2  premiere flow cytometry lab operated by the United
3  States government?
4  A  There are laboratories that are research
5  laboratories that have different missions and to mix
6  them all together would be -- it's not a type of
7  question I could answer.
8  Q  Fair enough. Let me rephrase my question.
9      Is the NCI flow lab, your lab, in your
10 judgment, the premiere government operated laboratory
11 for purposes of running diagnostic services through the
12 use of flow cytometry?
13 A  I'd have to restrict it further. I only
14 study leukemia and lymphoma.
15 Q  Restricting it further, as you've
16 suggested, is it?
17 A  I believe so.
18     (Whereupon, a document was marked as
19 Deposition Exhibit Number 20.)
20     BY MR. PARKER:
21 Q  I'm going to hand you a paper, Exhibit

Page 124

1  Number 20, that was published in 1996 which is the
2  first year of damages sought by the government against
3  my client.
4      Doctor, are you familiar with this paper?
5  A  Yes. It's been a long time since I've
6  looked at it, but I am familiar with it.
7  Q  I have I think just one question. If you
8  could turn to the second page of this study. Now,
9  before I ask you my questions let me put this into
10 context.
11     In 1996, the year this paper was published,
12 you had been the chief of the flow lab for six or seven
13 years?
14 A  Correct.
15 Q  And, Doctor, at that time, 1996, if you had
16 to describe your approach to performing diagnostic flow
17 cytometry would you say you used a restricted approach
18 or a comprehensive panel approach?
19 A  A comprehensive panel approach.
20 Q  And is it fair to say -- strike that.
21     Is it accurate to state that that has been

Page 125

1  your approach throughout your criteria as the chief of
2  the flow cytometry laboratory?
3  A  I believe that initially when I assumed the
4  position as chief of the flow cytometry unit things
5  were done quite differently and I evolved as a
6  clinician through study, and it would take a year or
7  two to get up to the comprehensive panel approach.
8  Q  Then is it more accurate to state that
9  early on in your tenure as the chief of the flow
10 cytometry lab for NCI you developed a comprehensive
11 panel approach?
12 A  Correct.
13 Q  Now, let's go to this paper, Exhibit
14 Number 20, on the second page of this journal article
15 on the right-hand column section 2.3. The paragraph
16 beginning, alternatively?
17 A  Yes.
18 Q  Do you see that?
19 A  Yes.
20 Q  And in 1996 -- these are largely, by the
21 way, international European pathologists?

Page 130

1  additional staining is only rarely required.
2      That describes what you were doing in 1997
3  in your lab?
4    A   Correct.
5    Q   If we turn now, Doctor, to the second page
6  of this journal article, table number 1. Am I correct,
7  Doctor, without putting them side-by-side that what is
8  subscribed here is useful antigenic targets, although
9  CD markers. The vast majority of those were being used
10 by you in 1997 when you did your unknown PB or BM
11 samples?
12     MS. DAVIS: Objection.
13     THE WITNESS: Yes.
14     BY MR. PARKER:
15   Q   Doctor, thank you. Incidentally, could we
16 turn back just for a moment to Exhibit Number 12 which
17 is the panel that I just referenced, the unknown PB or
18 BM samples.
19     I failed to ask you earlier, Doctor, in
20 1996 I appreciate the fact that with the
21 state-of-the-art developing panel reagents cocktails

Page 131

1  may change, but was there significant difference in the
2  size or the composition of your panel in 1996 for
3  samples that were drawn from peripheral blood or bone
4  marrow?
5    A   Repeat the question, please.
6    Q   Yes.
7       Was there a significant difference in
8  either the composition or the quantity of antibodies
9  that you were using in your panel in 1996 for what you
10 would call unknown PB or BM samples?
11   A   No.
12   Q   Now I'm not sure I got an answer to my
13 question. If you go back to table 1 you would agree
14 with me that when this paper was published in 1997 the
15 majority of these antibodies shown as useful in table
16 number 1 were, in fact, being used by your lab?
17     MS. DAVIS: Objection.
18     THE WITNESS: Yes.
19     BY MR. PARKER:
20   Q   Now, at the bottom of page 2, it's a
21 carryover from paragraph 2 on the preceding page

Page 132

1  discussing the second option of using an initial
2  minimal screening panel followed by a more thorough
3  specific set of reagents.
4       Do you see that?
5    A   Yes.
6    Q   And on the second page the authors of this
7  document wrote, this approach may be more economical,
8  but is lengthier, more involved, and may require
9  strategic decisions in antibody selection.
10      Some laboratory professionals feel that
11 when total time and material costs are considered it is
12 more cost effective to run more antibodies once than
13 fewer antibodies twice or more times. Stopping there.
14      Do you agree with that statement?
15     MS. DAVIS: Objection.
16     THE WITNESS: Yes.
17     BY MR. PARKER:
18   Q   Did you agree with the statement in 1997?
19     MS. DAVIS: Objection.
20     THE WITNESS: Yes.
21     BY MR. PARKER:

Page 133

1    Q   These authors go on. In fact, all of the
2  committee members objected to this practice and in the
3  general inquiry to the conference participants only
4  30 percent indicated they followed this approach.
5       You objected as well to their practice,
6  didn't you, Doctor, in 1997?
7      MS. DAVIS: Objection.
8      THE WITNESS: Yes.
9      BY MR. PARKER:
10   Q   Going on then to option number 3 which is a
11 directed or targeted approach. These authors wrote,
12 this may require a single and relatively reduced panel
13 of antibodies, but is impractical in laboratories
14 lacking the support of additional in formation and may
15 be hazardous in cases in which this information is
16 incorrect.
17      You agreed with that statement in 1997
18 didn't you?
19     MS. DAVIS: Objection.
20     THE WITNESS: Yes.
21     BY MR. PARKER:

Page 142

1  Braylan on the left-hand side, in general -- I'll let
2  you catch up with me. Right about right here.
3     A   Okay.
4     Q   You wrote in general, do you see that?
5     A   Yes.
6     Q   Flow cytometry is more sensitive than
7  morphologic analysis and is particularly valuable in
8  staging for detection of bone marrow and peripheral
9  blood involvement, right?
10    MS. DAVIS: Objection.
11    THE WITNESS: Correct.
12    BY MR. PARKER:
13    Q   I agree and assume since you're one of the
14 authors you agree with that statement?
15    MS. DAVIS: Objection.
16    THE WITNESS: Yes.
17    BY MR. PARKER:
18    Q   And so the jury understands, when you say
19 sensitive, you're really saying it's more accurate?
20    MS. DAVIS: Objection.
21    BY MR. PARKER:

Page 143

1     Q   In the context that's how you're using that
2  word; isn't that right?
3     A   Accuracy has many different definitions.
4  What I mean by it's more sensitive is that you could
5  evaluate by morphology looking at a slide a specimen
6  and detect no cancer yet be able to detect it by flow
7  cytometry.
8     Q   And my layman sense that's more accurate
9  because I want to know whether I got cancer?
10    A   Right.
11    Q   Now, Doctor, morphologic again is looking
12 through the microscope with the human eye?
13    A   Correct.
14    Q   And flow cytometry is the use of machines
15 that detect antibodies or small proteins that bind to
16 other cellular components in the specimen you're
17 looking at?
18    A   Correct.
19    Q   I think we've covered the other areas in
20 this paper. Let's put that aside.
21    (Whereupon, a document was marked as

Page 144

1  Deposition Exhibit Number 23.)
2     BY MR. PARKER:
3     Q   Let me hand you an excerpt Exhibit 3, and
4  Exhibit 3 is an excerpt of --
5     MS. DAVIS: 23?
6     MR. PARKER: 23, I'm sorry.
7     BY MR. PARKER:
8     Q   Is an excerpt of from a context written by,
9  among others, Dr. Braylan, which also for the record
10 is --
11    MS. DAVIS: Once again, I'm going to object
12 to this as being outside of the scope of the 30(b)6
13 deposition.
14    MR. PARKER: Okay.
15    BY MR. PARKER:
16    Q   -- referenced in the materials by the
17 Connecticut LMRP.
18    Doctor, I'd like you to turn please to page
19 17 of this document.
20    A   Yes.
21    Q   I'm going to read the first two sentences

Page 145

1  and ask whether you agree with these authors. The
2  clinical impression or the morphologic features of the
3  specimens should not dictate the design and selection
4  of an antibody panel. Despite efforts to improve the
5  communication between the clinical and laboratory
6  services, the clinical information on the FCM request
7  forms is often scanty, vague, and potentially
8  misleading.
9     Do you agree with that statement?
10    MS. DAVIS: Objection.
11    THE WITNESS: Yes.
12    BY MR. PARKER:
13    Q   They further write, furthermore to have an
14 antibody panel for each specific group of hemotologic
15 neoplasms -- I'll skip the parenthetical -- would be
16 inappropriate and defeat the purpose of FCM
17 immunophenotype.
18    Do you agree with that?
19    MS. DAVIS: Objection.
20    THE WITNESS: Yes.
21    BY MR. PARKER:

Page 158

1    I direct you not to answer.
2    BY MR. PARKER:
3  Q    Doctor, let's move on to the government's
4  expert report, Exhibit Number 6.
5       Dr. Stetler-Stevenson, please refer to or
6  please look at page number 3 of this report, the
7  paragraph that's labeled malignant lymphoma
8  lymphoproliferative disorders.
9       Are you with me?
10 A    Yes.
11 Q    And to correlate this would at least
12 include Exhibit Number 12, your blood bone marrow
13 panel?
14 A    Yes.
15 Q    So your Exhibit Number 12 would be the
16 panel that you would use, perhaps others as well, to
17 look at malignant lymphomas and lymphoproliferative
18 disorders?
19 A    Correct.
20 Q    Now, Dr. Flynn, the government's expert,
21 says midway down that paragraph, I believe that the

Page 159

1  T-cell antibodies anti-CD2 and CD7 and the B-cell
2  antibody anti-CD22 are not of sufficient diagnostic
3  value to include in this panel and, therefore, not
4  medically necessary.
5       Do I take it from what you've told me,
6  Doctor, that you disagree with the proposition that
7  CD2, 7 and CD22 are not helpful or necessary when
8  attempting to correctly diagnose these conditions?
9       MS. DAVIS:  Objection.
10      THE WITNESS:  Could you repeat the
11 question?
12      BY MR. PARKER:
13 Q    Yes.
14      Doctor, you disagree, based on your earlier
15 testimony in the panel construction, Exhibit Number 12,
16 with Dr. Flynn's statement that using CD2, 7, and 22
17 are not of sufficient diagnostic value to include in
18 the panel?
19      MS. DAVIS:  Objection.
20      THE WITNESS:  Yes.
21      BY MR. PARKER:

Page 160

1  Q    Yes, you disagree?
2  A    Yes, I disagree.
3  Q    He goes on to say, additionally myeloid
4  antibodies CD13, 3, HLADR, CD57 and 34 are also
5  lacking -- I'm paraphrasing now -- significant
6  diagnostic merit.
7       Do you also disagree with that statement?
8       MS. DAVIS:  Objection.
9       THE WITNESS:  Yes.
10      BY MR. PARKER:
11 Q    You can put his report aside for the
12 moment.  Doctor, I'm sorry, I may have asked you this
13 and if I did, I apologize.
14      Did you actually read Dr. Flynn's
15 deposition?
16 A    Yes.  No.  Deposition, no.  I read this.
17 Q    Let's take a short break and let me step
18 outside with my associate and let make sure I've asked
19 you everything that I need to ask you today.
20      (A short break was taken.)
21      BY MR. PARKER:

Page 161

1  Q    Dr. Stetler-Stevenson, when did you first
2  learn about this lawsuit in particular?
3  A    I'm not sure when, but it was in 2006 I
4  would say.  I'd have to guess that it was in the spring
5  of 2006.
6  Q    Of this year?
7  A    Yes, I believe that is when I was contacted
8  specifically, but I'm not sure.  I'm not sure when I
9  was contacted concerning this.
10 Q    Okay.  And were you told about the fact
11 that this lawsuit existed from a colleague or by a
12 government lawyer?
13      MS. DAVIS:  Objection.
14      THE WITNESS:  About this specific lawsuit
15 with mentioning of the Dianon's name, I was told by
16 government lawyers.
17 Q    And I'm not going back into the discussion
18 we had earlier about some recollection possibly -- I
19 don't want to mischaracterize your testimony -- about a
20 conversation with Dr. Holden about a lawsuit; but had
21 you been told about the fact that the government was