## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
ex rel. DR. JAMES J. TIESINGA, )
)
     Plaintiffs, )
)
v. )     No. 3:02CV1573(MRK)
)
DIANON SYSTEMS, INC., )
)
     Defendant. )

## MOTION IN LIMINE REGARDING DISCOVERY VIOLATIONS

     Dianon Systems, Inc. (Dianon), through undersigned counsel, submit this Motion in Limine Regarding Discovery Violations requesting:

1.  That this case be dismissed with prejudice.

2.  In the alternative, that Dianon receive an adverse inference jury instruction to the effect that documents destroyed by the government would support the legitimacy of Dianon's flow cytometry practice.

3.  In addition, Dianon requests the exclusion of witnesses David Mehring and Georgina Auilar.

**ORAL ARGUMENT REQUESTED**

4.  Attached and fully incorporated herein is Dianon's Memorandum in Support of

Motion in Limine Regarding Discovery Violations.

Respectfully submitted,

Bruce R. Parker, Admitted *Pro Hac Vice*
Bar No. PHV01015
William Piermattei, Admitted *Pro Hac Vice*
Bar No. PHV 01585
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

Robert Salcido, Admitted *Pro Hac Vice*
Fed. Bar No. 447951
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for Dianon Systems, Inc.

BA2DOCS1\#315503

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of April, 2007, a copy of the

foregoing Motion in Limine Regarding Discovery Violations, Memorandum in Support

thereof, and Proposed Order were sent via U.S. mail, postage prepaid, to:

> Richard M. Molot, Esq.
> Assistant United States Attorney
> U.S. Department of Justice
> Connecticut Financial Center
> 157 Church Street
> P.O. Box 1824
> New Haven CT 06510
>
> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 266 Post Road East
> Westport, CT 06880

William F. Piermattei

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. DR. JAMES J. TIESINGA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:02CV1573(MRK) |
| | ) | |
| DIANON SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
REGARDING DISCOVERY VIOLATIONS**

## I.    INTRODUCTION

The Government's failure to timely produce relevant documents, preserve

documents, and disclose witnesses has prejudiced Dianon's ability to defend itself.

Dianon requests the following relief for the Government's discovery violations:

- Dismissal of the Case. The Government failed to issue a litigation hold

    when it was served with the relator's Complaint. As a result numerous documents

    from the Center for Medicare and Medicaid Services ("CMS"), National Institute

    of Health (NIH), and CMS carriers were destroyed or lost. In addition, the

    Government did not produce relevant documents in its possession and/or the

    possession of its agents, and purposely delayed production of relevant documents.

    The combined effect of all of the government's discovery violations is evidence

    of bad faith and warrants dismissal of the case.

- <u>Adverse Inference</u>. In the alternative, Dianon requests an adverse inference instruction that those destroyed, lost, or non-produced documents would have supported Dianon's flow cytometry practice.

- <u>Exclusion of Evidence</u>. In the alternative, the Government failed to disclose witnesses, failed to provide reports and failed to timely disclose facts and documents in its possession to Dianon. Dianon requests certain evidence and witnesses excluded from trial due to late disclosure.

## II.    BACKGROUND – PROCEDURAL AND DISCOVERY HISTORY

On September 6, 2002, relator James J. Tiesinga filed and served his Complaint on the Government his claim that Dianon's flow cytometry testing violated the False Claims Act. The filing of his complaint placed the government on notice of potential litigation concerning Dianon's flow cytometry practices. The Government investigated the matter thereafter and decided to intervene in this suit in March 2005 when it filed its Complaint. During the intervening period of investigation, and even thereafter, the Government never issued a litigation hold to protect relevant documents concerning its decisions to regulate flow cytometry nationally through CMS or locally (through Medicare's insurance carriers) as well as NIH documents concerning the practice of flow cytometry. In addition, documents, either in the Government's possession or readily available, were either never produced to Dianon or inappropriately delayed.

Dianon served discovery requests on the government in August 2005. Dianon gave the Government ample time (until December 15, 2005) to produce responsive documents. *Exhibit* 1, Government Response to Dianon Request for Production of Documents. Dianon requested, *inter alia*, documents relevant to the reimbursement of

CPT Code 88180, the code used for flow cytometry, including documents reflecting proposed or actual changes to reimbursement policies, data on the number of markers billed, the correct number of markers that should be billed, and appeals of or challenges to any Medicare carrier payment policy. *Id.* at Request Nos. 15, 16, 20, 26, 45-47, and 50. The government, through CMS and its carriers, issued numerous policies (and considered even more) covering flow cytometry services. The documents that the government generated and relied upon for policy decisions are of vital interest to Dianon's defense.

The heart of the government's case is that Dianon's flow cytometry medical practice fell outside standard medical practices, was too expensive, and therefore fraudulent. Dianon's defense to these charges is two-fold: First, Dianon's flow cytometry practice is well within industry standards for independent reference laboratories, providing accurate and reliable diagnostic services for Medicare patients. Second, the government was aware of Dianon's and other laboratories similar flow cytometry practices and chose not to regulate flow cytometry nationally or provide notice to companies, like Dianon, that it believed comprehensive flow cytometry testing was medically unnecessary.

Instead, CMS allowed its carriers to regulate flow cytometry reimbursement on a local or regional basis. Virtually all carriers created Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs) to regulate flow cytometry reimbursement. Some carriers limited the number of reimbursable antibodies, others did not. Regardless of how each carrier chose to regulate flow cytometry, each considered data, medical literature, reports, held meetings, retained consultants, developed drafts,

rejected proposals, and received comments concerning each LMRP or LCD from 1996 to 2003. Unfortunately, the vast majority of these documents were not produced until on or about July 6, 2006 - 25 days before the close of discovery.[1] The reason these documents were not produced in a timely fashion is because CMS did not inform its carriers that it must produce all documents concerning flow cytometry reimbursement, including documents related to proposed or actual changes and data on flow cytometry reimbursement. ***Instead, on September 28, 2005, CMS instructed its carriers to only provide LMRPs and appeals.*** *Exhibit 2*, September 28, 2005 e-mail from John Warren, Director of Medical Review & Education to Medicare Carriers.[2]

### A. The Government failed to produce documents in its possession or inappropriately delayed the production of relevant documents.

Even though the government improperly limited its responsive production to only two types of documents, it still did not provide all of the documents in its possession. Dianon specifically requested all documents related to appeals by healthcare providers Impath and Genzyme in California. *Exhibit 1* at Request No. 50. The government failed to produce documents regarding the appeals of those two companies until on or about June 1, 2006 – including the ALJ decision holding that 26 antibodies were medically necessary for hundreds of claims.[3] *Exhibit 3*, ALJ decision. Subsequent to this production, the government marked as a deposition exhibit a copy of the ALJ decision with a facsimile tail indicating the government, the U.S. Attorney's Office and the California carrier possessed this decision on ***April 7, 2004 – more than two years prior to***

---

[1] On or about June 16, 2006 the government provided approximately 700 pages of documents (CMS 4563-5237) that appear to be from various Medicare carriers. On July 6, 2006, the government provided approximately 3000 pages of documents (CMS 5238-8280) from Medicare carriers.
[2] This document (CMS 4908-11) was provided to Dianon on June 16, 2006.
[3] The June 1, 2006 document production (NHIC 1 – 3567) came from the California Medicare carrier (NHIC).

**its production on June 1, 2006**. *Exhibit 4*, ALJ decision with facsimile tail. Despite the clear relevance of this document and Dianon's specific request for it, the government delayed production of this vital document for six months.

Similarly, other carriers likely withheld documents as well. Included in the government's July 6, 2006 document production were documents from Wisconsin Physician Services (WPS), a Medicare carrier that covers Wisconsin, Illinois, Michigan, and Minnesota. The government produced approximately 400 pages from WPS.[4] Included in the document production was a Freedom of Information Act (FOIA) request for "Any info(rmation) on flow cytometry." *Exhibit 5*. Dianon requested a copy of documents from the FOIA requestor and received *more than 900 pages related to flow cytometry with hundreds of pages that were not produced to Dianon through this litigation*. *Exhibit 6*, July 11, 2006 letter from CMS enclosing 1,012 pages of documents related to Wisconsin Physician Service's flow cytometry policy.[5]

The documents produced in the FOIA request, but not to Dianon, are important to Dianon's defense of this litigation and include: (1) doctor comments that the "mayo triage scheme of doing screening flow is not standard practice nor efficient in most setting(s)" (*Exhibit 7*)[6]; (2) reference to data produced for all providers – including all

---

[4] Because the government has not identified the source of documents (where and how they were kept in the ordinary course of business) or identified which carrier produced certain documents pursuant to Fed. R. Civ. Pro. 34(b), Dianon is unable to ascertain exactly what documents came from Wisconsin Physician Services. It appears that Wisconsin Physician Services documents are interspersed in documents CMS 8025 – 8387 and CMS 8647 – 8766.

[5] Upon receipt of this information, Dianon requested from the government copies of all documents provided pursuant to the FOIA request. The government refused to produce the documents after specific request. Dianon, at its expense recently obtained a second, complete bates stamped set of the Wisconsin Physician Services documents (WPS 1 – 1015) and forwarded them to the government requesting that it stipulate to authenticity which the government has done.

[6] The fact that the doctor who corresponded with the carrier specifically rejects the "(M)ayo triage scheme" is particularly important given the government's reliance on the Mayo Clinic's flow cytometry methodology in opposition to both Dianon's Motion for Summary Judgment and Motion to Exclude the Opinions of Stuart Flynn, M.D.

providers "who bill consistently 23 or more units of service (antibodies) per claim;" (*Exhibit 8*); (3) a history and explanation of how a carrier can use audits and computer programs to limit or cap the number of antibodies billed (*Exhibit 9*); (4) correspondence from the carrier noting that an absolute limit of flow cytometry markers may be "unreasonable" and that sometimes up to 30 markers are used (*Exhibit 10*); (5) correspondence confirming that sometimes up to 30 antibodies are necessary, but the author does not believe "Medicare wants or needs to pay for all the 25 antibody 'one size fits all disease' panels that are being done (*Exhibit 11*);" (6) correspondence from the medical community objecting to the Mayo Clinic "triage" panel because, *inter alia*, it will "lengthen turnaround time" and lead to "increased false negative" results (*Exhibit 12*); and (7) a redline draft of Wisconsin's LMRP (*Exhibit 13*). The government did not produce any of these documents. In addition, the government never produced hundreds of additional pages from WPS, including internal and external correspondence, medical literature, LMRP drafts and flow cytometry reimbursement data, to Dianon.

By July 6, 2007, the government's total production of carrier documents was approximately 4000 pages from more than a dozen carriers.[7] The production from WPS alone is more than 1000 pages. Not only does the WPS production establish that the government failed to produce relevant WPS documents to Dianon, but it is strong circumstantial evidence that other carriers have not produced all documents in their possession.[8] What is most outrageous concerning the government's failure to produce all

---

[7] This is an estimate. The government has failed to label the source of any of documents it provided – all documents from carriers and CMS are labeled with a "CMS" bates stamp.
[8] On August 4, 2006, Dianon requested numerous additional documents referenced in documents the government produced on July 6, 2006. The government provided some additional documents on or about September 25, 2006, but failed to produce numerous documents claiming they no longer exist. *Exhibit 14*, September 22, 2006 Rick Molot letter.

WPS documents to Dianon is that the government admits the "strong similarity" between the FOIA request and Dianon's request – apparently a private citizen has better and more rapid access to information than a company accused of Medicare fraud. *Exhibit 15*, August 11, 2006 Ryan Fayhee e-mail, *Exhibit 6* (July 11 response to FOIA requests from September 22 and December 1, 2006).

The government also failed to produce documents in its possession and witnesses that it used to oppose Dianon's Motion for Summary Judgment. Dianon requested all documents concerning reimbursement of flow cytometry. The government had, in its possession, 5% data which it claims "is a public record and is made available for purchase by the public on the CMS website and was not, therefore created for this litigation." United States Response to Defendant's Local Rule 56(a)(1)Reply Statement at 20. However, the government did not produce this data until May 2006. The government never produced a CMS designee for deposition to discuss the 5% data and never produced the documents it used to oppose summary judgment. *Exhibit 16*, government 5% data summary attached as Exhibit 39 to the United States Local Rule 56(a)(2) statement.

On June 30, 2006 counsel for Dianon and the government had a discovery conference with the Court. The Court instructed the government to informally provide someone from CMS who could answer questions concerning CMS's 5% data. On or about August 9, 2006, after the close of discovery, the government provided this opportunity. Based on this meeting, Dianon requested a deposition of the CMS witness who would be testifying about the 5% data. The government refused to produce or name such a witness.

This failure to identify CMS's witness and subsequent refusal to allow Dianon to depose him concerning the 5% data and failure to disclose the data summary significantly prejudiced Dianon's ability to defend itself. For example, Dianon was unable to obtain discovery or establish a record that the government's 5% data summary includes testing that is wholly irrelevant to this case. *See Exhibit 17*, Connecticut LMRP showing flow cytometry testing used for numerous conditions such as stem cell transplants, HIV infection monitoring, and juvenile arthritis that are not at issue in this litigation.

In addition, the government never disclosed Georgina Aguilar, a witness with knowledge of the California appeal and ALJ decision, whose affidavit was used to oppose Dianon's Motion for Summary Judgment. *Exhibit 18*, Affidavit of Georgina Aguilar attached as Exhibit 37 to the United States Local Rule 56(a)(2) Statement. Therefore Dianon was denied the ability to depose the witness and discover her knowledge concerning the California appeal prior to filing summary judgment.

**B.  The government never issued a litigation hold after receiving notice of the suit in September 2002. As a result numerous, relevant documents were destroyed.**

The government delayed intervening in this matter and allowed relevant documents to be destroyed. Despite receiving notice of this suit in September 2002, the government never placed a litigation hold on documents, never contacted its NIH designee, Mary Alice Stetler-Stevenson, M.D., and never told CMS or its carriers to preserve documents relevant to flow cytometry policy. As a result <u>at least</u> the following documents were lost or destroyed: (1) electronic and other documents from CMS; (2) electronic documents from NIH flow cytometry laboratory; (3) data concerning flow cytometry reimbursement; and (4) CMS carrier documents.

### 1. CMS documents

James Menas testified on behalf of the government as a corporate designee regarding CMS's document production. *Exhibit 19*, Deposition of James Menas at 7:3 – 7:15. Mr. Menas testified as to the steps he took to produce documents in this matter. *Id.* at 41:21 – 46:15. Mr. Menas testified that he never received any notice to retain documents related to this lawsuit. *Id.* at 47:5 – 47:15. The first time Mr. Menas attempted to gather documents on behalf of CMS was within the previous year (August 2005-August 2006). *Id.* at 43:16 to 44:5. Prior to August 2005 (approximately 2003 to 2004), CMS changed its electronic mail system. *Id.* at 45:4 – 45:13. During the conversion of the electronic mail system, CMS "lost a fair number of documents." *Id.* In addition, Mr. Menas admitted he did not save electronic communications concerning the August 2003 proposed rule and final rule. *Id.* at 46:2 – 46:9.

CMS also lost other documents pertaining to the 2003 proposed rulemaking for flow cytometry reimbursement announced in the Federal Register in August 15, 2003. The notice of rulemaking specifically states that "(o)ur review of flow cytometry reports confirms that markers are interpreted (and reported) on a panel basis. From our review, physicians do not typically interpret individual markers." *Exhibit 20*, 68 Federal Register notice, at 49048 (August 15, 2003). The government failed to produce the reports that provide the basis of this statement, nor did they provide the documents concerning the basis for the assertion that current reimbursement policy "may encourage the performance of more markers than may be medically necessary." *Id., Exhibit 19* at 12:12 – 13:17.

According to Mr. Menas, Dr. Rosen and Dr. Rudolf worked on the proposed rulemaking. *Id.* Dr. Rudolf, a former CMS employee, left CMS after August 2003 and CMS does "not have any of [t]his (sic) prior records on flow cytometry." *Exhibit 21*, affidavit of Michael Marquis at ¶19. Dr. Rosen served as Medical Director for the National Correct Coding Initiative (NCCI) contractor as well as other government contractors. *Id.* at ¶¶15-16. NCCI did not have any documents concerning Dr. Rosen's work on the proposed rulemaking including any information forwarded by Dr. Rosen to Dr. Rudolf. *Id.* at ¶¶17, 19.

### 2. Electronic documents from National Institute of Health

Mary Alice Stetler-Stevenson, M.D. testified on behalf of the government concerning NIH's response to Dianon's discovery request. Dr. Stetler-Stevenson testified that she "definitely" used her government computer to correspond with doctors inside and outside the government concerning flow cytometry. *Exhibit 22*, Deposition of Dr. Stetler-Stevenson at 51:9 – 51:20. However, Dr. Stetler-Stevenson was never instructed to save any of her e-mail correspondence concerning flow cytometry with doctors within or outside the government – despite the fact that NIH destroys e-mails after seven days unless they are saved. *Id.* at 53:1 – 54:11. Given the views Dr. Stetler-Stevenson has expressed in this litigation, and that Dianon has used in support of both its Motion for Summary Judgment and Motion to Exclude the Opinions of Dr. Flynn, it is likely that this correspondence would have further supported Dianon's defense in this matter.

### 3. Data for flow cytometry reimbursement

CMS carriers have the ability to obtain data concerning flow cytometry reimbursement using the STARS data mining software. *Exhibit 23*, WPS STARS data

input (not produced by the government to Dianon). Using the STARS system, a carrier can obtain data concerning reimbursement for flow cytometry by entering a few parameters into a computer (such as CPT code 88180, dates of reimbursement, allowed amount, and relevant ICD-9 codes). *Id.* The government failed to request that any of its carriers preserve data, or use the STARS program to obtain relevant reimbursement information from carrier databases. According to information produced by WPS, the carriers could have accessed data going back three or more years from the date of inquiry. *Id.* Had the government issued a hold notice in September 2002, data from as far back as September 1999 could have been preserved for review in this litigation.

Instead, Dianon had to spend thousands of dollars to hire its own consultant to retrieve relevant data from the government's 5% data which included a great deal of irrelevant information rather than a clear and concise summary from the STARS program. *See, e.g., Exhibit 24*, Data from New York carrier for 2002-03 showing the frequency of the number of units billed per flow cytometry test.

### 4. CMS carrier documents

According to the designee for the Connecticut carrier, Serena Selzer, she became involved in gathering documents pursuant to Dianon's requests in September 2005. *Exhibit 25,* Deposition of Serena Selzer at 15:4 – 15:24. Ms. Selzer is unaware of any notices sent to anyone at the Connecticut carrier to preserve documents relevant to this lawsuit. *Id.* at 10:17 – 11:3. Instead of issuing a litigation hold for relevant documents, apparently the government relies upon a CMS directive ordering carriers not to destroy documents. *Id.* at 13:18 – 14:13. However, numerous documents from other carriers have been either lost or destroyed since September 2002. *See Exhibit 14,* September 22,

2006 government response to Dianon's request for further document production at

response nos. 17, 20, 34, and 36 (documents and attachments referenced no longer exist).

## III.    LEGAL STANDARD – FAILURE TO PRODUCE DOCUMENTS

### A. Spoliation of Evidence

Once the Government was put on notice of this lawsuit, it had a duty to identify

and preserve relevant documents. *Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423,*

*436* (2d Cir. 2001). Failing to preserve evidence or spoliation of evidence is defined as

the "destruction or significant alteration of evidence, or the failure to preserve property

for another's use as evidence in pending or reasonably foreseeable litigation." *West v.*

*Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A claim for spoliation

exists when: (1) the destroying party had an obligation to preserve the evidence at the

time of destruction; (2) the evidence destroyed was relevant; and (3) it was destroyed

with a "culpable state of mind." *Reilly v. Natwest Market Group, Inc.*, 181 F.3d 253, 267

(2d Cir. 1999). A culpable state of mind includes intentional destruction, destruction in

bad faith or gross negligence. *Id.* Failing to investigate the location of relevant

documents or to issue a litigation hold indicates bad faith. *Id.* (party must take steps to

search for and preserve relevant evidence).

The Government cannot be said to have negligently destroyed documents,

because they did nothing to investigate the existence of relevant documents, and did not

put anyone on notice that relevant flow cytometry documents should be saved, protected

or otherwise set aside. Instead, apparently the Government relied solely on their standard

document retention policies. Reliance on such policies is insufficient because: (1) they

apparently did not cover electronic mail or other electronically stored data; (2) they do

not provide notice that those possessing documents have an <u>additional</u> duty to protect <u>any</u> information in his or her possession; and (3) document retention policies did not protect all relevant documents outside the Government's possession, but within the Government's control such as documents possessed by Dr. Rosen, a government contractor. As a result, many documents relevant to this case, including documents from CMS, its carriers, and NIH were lost or destroyed. The Government's failure to take affirmative steps to ensure it complied with discovery obligations to preserve documents mirrors its failure to affirmatively <u>produce</u> documents in its possession in a timely manner.

### B. Failure to produce responsive documents

Parties are expected to "cooperate in good faith both in question and response" in conducting discovery under the Federal Rules. *Cine Forty-Second Street Theatre Corp v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979). The Court has "inherent power to levy sanctions in response to abusive litigation practices." *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998). Similar to spoliation of evidence, a court is required to make a finding of bad faith through either "clear evidence" or "harassment or delay or . . . other improper purposes" before imposing such sanctions. *Id.* at 136. This inherent power includes the power to sanction a party for delaying the production of documents. *Id.* at 135-36, *Residential Funding Corp. v. DeGeorge Financial Corp*, 306 F.3d 99, 110, 113 (2d Cir. 2002) (delaying tactics or "purposeful sluggishness" of party in producing responsive documents warrants imposition of sanctions).

In response to Dianon's 52 separate requests for documents, including all documents pertaining to flow cytometry reimbursement, Medicare requested from each of its carriers: (1) a copy of all LMRPs or LCDs; (2) any appeals concerning CPT Code 88180. *Exhibit 2*. Not surprisingly, that is the most Dianon received from each carrier until days before the end of discovery. Because CMS did not issue a national flow cytometry policy, documents from the individual carriers who created reimbursement policy during the relevant time period are even more important to Dianon's defense, but these documents were not produced in a timely fashion.

The local carriers regularly discussed flow cytometry policy with the medical community and considered information regarding flow cytometry reimbursement. *See Exhibits 7-13.* Carriers also maintain databases specific to flow cytometry reimbursement. For example, a carrier's document showing that 26 antibodies were, by far, the most common number of antibodies billed in New York during the years 2002-2003, was withheld from Dianon and not produced until near the close of discovery – 6 months after they were due and 10 months after the request for documents related to flow cytometry reimbursement. *Exhibit 24*, Empire Medicare Services Flow Cytometry Frequency of Units of Services Billed. No effort was made to collect these documents at an early (and appropriate) stage in this litigation.

Despite the fact that Dianon made specific discovery requests for material concerning flow cytometry reimbursement, the carriers failed to produce thousands of pages of notes, drafts, correspondence, data summary, meeting minutes, emails, reports - all relating to the formulation and execution of flow cytometry reimbursement policy and standard flow cytometry practice. The carriers did not produce these documents because

they were not instructed to do so - the government took it upon itself to reduce Dianon's 52 document requests to two, one of which consisted of publicly available documents (LMRPs and LCDs), the other a limited response (appeals).

Dianon requested documents concerning Impath's and Genzyme's appeals concerning California's 20 antibody cap on reimbursement in August 2005. The government did not produce a copy of the ALJ's decision, holding 26 antibodies as medically reasonable, until June 16, 2006 - 10 months after it was requested. On July 7, 2006, the government introduced another copy of the ALJ decision with facsimile information indicating the government had this decision in April 2004, but refused to produce it to Dianon. The late disclosure compromised Dianon's ability to conduct discovery concerning the decision that clearly supports Dianon's position in this case.

Finally, the government never produced to Dianon hundreds of pages of relevant documents, including documents that disparage the "Mayo triage scheme" of conducting flow cytometry which the government cites as an example of the standard of care.

## IV.    CONCLUSION – REQUEST FOR RELIEF

Trial courts "have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing." *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). Sanctions serve the additional purposes of deterring future conduct of the offending party as well as deterring similar behavior in other litigation. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 762-63 (1980). Appropriate sanctions for violations are determined on a case-by-case basis depending upon the facts of the case. *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d at 267.

Taken together, the above abuses of the government's discovery obligations have prejudiced Dianon's ability to defend itself against the government's allegations. The pattern of refused or delayed production, lost documents and absolutely no efforts to preserve documents since September 2002 show the government's bad faith in prosecuting this lawsuit. Dianon does not know, nor will it ever know, how many electronic documents at CMS and the NIH were destroyed. Dianon produced evidence that, in fact, documents were destroyed due to this failure such as CMS electronic mail prior to 2003-04, all of Dr. Stetler-Stevenson's e-mail concerning flow cytometry, and carrier documents. In addition, Dianon produced evidence that numerous carrier documents were withheld and never produced to Dianon – hundreds of pages of relevant documents from a single carrier. This improper withholding of documents is at least circumstantial evidence that other carriers have similarly withheld documents.

The government's delayed production of documents is further evidence of bad faith. This delay was due to the government's purposeful instruction to its carriers to only produce one type of publicly-available document (LMRPs and LCDs) concerning flow cytometry reimbursement when it knew that thousands of pages of relevant documents were readily available from the carriers, but only produced them at "the eleventh hour." *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d at 268. Just as in *Reilly*, this production was "sanitized" as numerous important documents were not included in the late document production. *See Exhibits 7-14*.

This is not the first time the government has been accused of being "heavy handed" in its treatment of healthcare companies regarding False Claims Act liability. *See Ohio Hosp. Ass'n v. Shalala,* 201 F.3d 418, 419 (6th Cir. 1998) (District Court

characterized government's tactics as "heavy-handed" in coercing payments from healthcare providers through the threat of False Claims Act litigation and exclusion from Medicare). The government should not be able to ignore its discovery obligations - particularly when its charges are so serious and the stakes so high.

Given the nature of the case, the power wielded by the government, the flagrant and pervasive discovery abuses, the failure to issue any litigation hold, the failure to request relevant documents from CMS carriers, the destruction of relevant documents and the frequent appearance of the government in litigation before this Court, Dianon requests that the Court dismiss this matter in its entirety. Where the government failed to establish any contemporaneous standards that allegedly would impose massive civil penalties and then destroy or fail to produce evidence relevant to those non-existent standards, it should not be allowed to proceed with the case. *See* Dianon's Motion in Limine to Preclude Evidence Regarding False Claims Act Liability at 3-5 (failure to promulgate and place party on notice of standards that impose penalties violates Due Process Clause).

In the alternative, Dianon requests an adverse inference jury instruction to the effect that documents that were destroyed, lost, or not produced would have supported Dianon's position that its medical practice was appropriate. In addition, Dianon requests that government witnesses and evidence that were not timely disclosed to Dianon should be excluded from trial.

Respectfully submitted,

Bruce R. Parker, Admitted *Pro Hac Vice*
Bar No. PHV01015
William Piermattei, Admitted *Pro Hac Vice*
Bar No. PHV 01585
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

Robert Salcido, Admitted *Pro Hac Vice*
Fed. Bar No. 447951
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for Dianon Systems, Inc.