# EXHIBIT 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA,<br><br>Plaintiffs,<br><br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>Defendant. | No. 3:02 CV 1573 (MRK) |

### Declaration of David Mehring

1. I am a Special Agent of the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI), and have been so employed since July 2005. Prior to working for HHS-OIG, I was employed from July 2001 to June 2005 as a Program Manager for the United States Department of Justice, Office of Inspector General, Audit Division.

2. I am a case agent assigned to the above-referenced matter.

3. HHS-OIG's Office of Audit Services (OAS) provided OI with Medicare claims data for Dianon Systems, Inc. (Dianon), a reference laboratory located in Connecticut. The data was comprised of all Medicare claims processed for Dianon for CPT Code 88180, flow cytometry, for the time period 1993 through 2003. It is my understanding that the Dianon Medicare claims data was turned over to Dianon during discovery in this action.

4. A review of the Dianon Medicare claims data indicates the following:

    a. In or about 1996, Dianon's standard flow cytometry panel rose from approximately 8 units (i.e. antibodies) paid to approximately 26 units paid;

    b. In or about September of 1997, Dianon's standard flow cytometry panel dropped from approximately 26 units paid to approximately 18 units paid;

    c. In or about January 2001, Dianon's standard flow cytometry panel again rose from approximately 18 units paid to approximately 26 units paid.

5. I have also reviewed the physician fee schedule for the years 1993 to 2003, for CPT Code 88180, flow cytomety. The physician fee schedule is the amount Medicare pays providers

for the service in question. A true and correct copy of a time-line comparing the physician fee schedule to Dianon's standard billed panel is attached to this declaration as Exh. A. It is my understanding that this time-line was provided to Dianon in or about March 2004.

6. HHS-OIG also received from CMS a 5% data extract for CPT Code 88180, flow cytometry, for the time-period 1997-2004, containing claims data from over 1,000 laboratories. The 5% data set is a database of 5% of all Medicare beneficiaries, selected on the basis of the last two digits of the beneficiary's social security number. The 5% data set is created by CMS to facilitate analysis. According to CMS, the 5% data set is statistically valid, and can be used to extrapolate conclusions to the 100% universe. The data files were supplied by CMS in variable length mainframe-usable format. A government data consultant converted the mainframe-usable files into a PC usable format (Access). It is my understanding that the CMS 5% data file and the Access database were turned over to Dianon during discovery in this action.

7. A review of the 5% database for CPT code 88180 indicates the following:

   a. For the over 1,000 labs in the database, approximately 90% of the paid claims are for panels with fewer than 26 units (i.e. antibodies). Thus, only approximately 10% of the paid claims contain 26 or more units.

   b. Dianon is one of the only labs that appears to use the same standard panel for all of its patients. Most other labs appear to use a variety of panels when conducting their flow cytometry testing.

   c. Laboratory Corporation of America (LabCorp), Dianon's parent company, utilizes a variety of different panels. Over 90% of its paid claims were for panels of less than 15 units.

   d. Johns Hopkins Medical Laboratories utilizes a variety of different panels. Over 90% of its paid claims were for panels of less than 16 units.

   e. Impath utilizes a variety of different panels. It utilizes 26 unit panels approximately 34% of the time; 28 unit panels approximately 10% of the time; 20 unit panels approximately 9% of the time; 24 unit panels 9% of the time; 15 unit panels approximately 9% of the time and 19 unit panels approximately 7% of the time. Numerous other panels account for the remaining 22% of its paid claims.

   f. Yale-New Haven Hospital, Department of Laboratory Medicine, was paid an average of 10 units per claim and employs a variety of panels. Panels of less than 19 units represented approximately 88% of its paid claims.

   g. Esoterix utilizes a wide variety of different panels. Approximately 34% of its paid claims were for panels of 22 units. Panels with less than 22 units accounted

2

for 59% and panels greater than 22 units the remaining 7%.

h. The members of the American Clinical Laboratories Association were paid an average of 9 units per claim.

I do so affirm this 26th day of October 2006

_____
Special Agent David Mehring

3

**EXHIBIT A**

Draft For Settlement Purposes Only

# Timeline: Fee Schedule and Standard Billed Panel



Legend: ♦ fee schedule, ■ standard panel

(1) 1996: fee schedule drops from $94 per unit to $28 per unit and Dianon raises its standard panel from 8 markers to 26 markers- resulting in a net increase of $139 in reimbursement for the standard panel ($448 in 1995 to $587 in 1996)
(2) 6/17/97: Dianon memo (300008): 18 antibodies are "essential" & their routine usage can be justified to insurance carriers; "move to 18"
(3) 2001: Dianon decids to bill for 26 markers; no justification provided in documentation produced