# EXHIBIT 22

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
2

3   UNITED STATES OF AMERICA,
    ex rel. Dr. James J.
4   Tiesinga,

5              Plaintiffs,
                                        No.3:02CV157(MRK)
6        vs.

7   DIANON SYSTEMS, INC.,

8              Defendant.
                                    /
9

10           The deposition of MARY ALICE

11  STETLER-STEVENSON, M.D. was held on Tuesday, August 22,

12  2006, commencing at 9:30 a.m. at the Law Offices of

13  Venable, L.L.P., 575 7th Street, N.W., Washington,

14  D.C., before Steven Poulakos, Notary Public in and for

15  the District of Columbia.

16

17

18

19

20

21  REPORTED BY:  Steven Poulakos
```

Mary Alice Stetler-Stevenson, M.D. - 8/22/06

Page 50

1  efforts to go after or to sue Dianon in this case?
2          MS. DAVIS: Objection.
3          THE WITNESS: Repeat the question?
4          BY MR. PARKER:
5   Q    Yes, ma'am.
6          We talked first about electronic or written
7  transmission. My question is the same except it's
8  verbal.
9          Have you spoken to anyone within the
10 government who is not an attorney, like Mr. Davis or
11 Mr. Molot or others in the Department of Justice or the
12 U.S. attorney's office regarding your thoughts on this
13 litigation?
14         MS. DAVIS: Objection.
15         THE WITNESS: I don't believe so.
16         BY MR. PARKER:
17  Q    Doctor, what is your understanding of the
18 government's theory against Dianon in this case?
19         MS. DAVIS: Objection. I'm going to direct
20 her not to answer. It's beyond the scope of the
21 30(b)6.

Page 51

1          BY MR. PARKER:
2   Q    I forgot to ask whether you're going to be
3  allowed to answer this question or not.
4          Do you know Dr. Flynn? Have you met him
5  before?
6          MS. DAVIS: Objection. I direct her not to
7  answer.
8          BY MR. PARKER:
9   Q    Okay. Doctor, in the course of your duties
10 as the director of flow cytometry for NCI, do you use
11 your e-mail to converse with your colleagues both
12 inside the government and outside regarding issues
13 involving flow cytometry?
14  A    Yes.
15  Q    And let me be more specific now for my next
16 question. Do you use your government e-mail computer
17 to discuss within the government direct or indirect
18 communications with colleagues regarding flow
19 cytometry?
20  A    Regarding flow cytometry in general, yes.
21  Q    And I want to make sure that my question is

Page 52

1  clear. The government has produced to us a number of
2  e-mails that you posted on an internet site which
3  people talk about flow cytometry. My questions don't
4  forth that sort of activity.
5          My questions pertain to your use of your
6  computer sending e-mails to other governmental
7  employees or other colleagues outside of the government
8  involving e-mail, regarding flow excuse me.
9          Was that clear?
10  A    Yes.
11  Q    Let me start over again.
12         Have you used and do you use regularly your
13 government computer with e-mail transmission to discuss
14 not on the internet but in direct e-mail-to-e-mail
15 transmission your colleagues in the pathology arena
16 regarding flow?
17  A    In pathology?
18  Q    Yes, ma'am.
19  A    Not on a regular basis.
20  Q    But --
21  A    It's possible I may have.

Page 53

1   Q    Over the course of whenever e-mail became
2  readily available, colleagues surely have sent e-mails
3  to you directly and said MaryAlice, Dr.
4  Stetler-Stevenson, I've got a difficult case, what do
5  you think about this, those sort of communications
6  occur?
7   A    Could you clarify? Are you talking about
8  within the government or in general?
9   Q    Within the government or outside,
10 physicians outside the government.
11  A    Physicians outside the government, yes,
12 definitely.
13  Q    And, Doctor, at any time before today have
14 you ever been instructed by counsel to save those
15 e-mail transmissions?
16  A    No.
17  Q    What is the government's destruction policy
18 of e-mails from your computer?
19  A    I believe that NIH saves e-mails for seven
20 days.
21  Q    So after seven days anything that you may

14 (Pages 50 to 53)

Mary Alice Stetler-Stevenson, M.D. - 8/22/06

Page 54

1  have discussed with a colleague regarding the design of
2  the panels, large, small, or in between are destroyed
3  by the government within seven days?
4      A    Unless I were to save them, yes.
5      Q    At no point before coming here today were
6  ever instructed and your department was ever instructed
7  by counsel representing the government to save all of
8  those type of e-mail transmissions; is that correct?
9      A    I don't remember any instruction to save
10 any e-mails pertaining to flow cytometry, or should I
11 say, all e-mails pertaining to flow cytometry.
12     Q    Have you ever been instructed to save any
13 particular type of e-mail that you have engaged --
14 e-mail traffic in which you have engaged regarding flow
15 cytometry?
16     A    I don't remember receiving instruction.
17     Q    Dr. Stetler-Stevenson, did you recently
18 participate in a consensus conference involving flow
19 cytometry?
20     A    Yes.
21          MS. DAVIS: Objection.

Page 55

1          BY MR. PARKER:
2      Q    Was your participation in that conference
3  as a government employee representing the NCI flow lab?
4      A    Yes.
5      Q    And what was the goal or purpose of that
6  conference?
7          MS. DAVIS: Objection.
8          THE WITNESS: There were multiple goals of
9  the conference. They were to update guidelines that
10 had previously been developed in lieu of advances in
11 the field.
12         And there were -- so there are many
13 multiple goals, not just one specific. It was to
14 update the guidelines.
15         BY MR. PARKER:
16     Q    Guideline for doing what, Doctor?
17         MS. DAVIS: Objection.
18         THE WITNESS: Performing flow cytometric
19 evaluation of leukemia and lymphoma.
20         BY MR. PARKER:
21     Q    And what guidelines exist that you were

Page 56

1  hoping and your colleagues were hoping to update?
2          MS. DAVIS: Objection.
3          THE WITNESS: The U.S.-Canadian consensus
4  document.
5          BY MR. PARKER:
6      Q    Are you aware of any other published
7  guideline for doing flow?
8          MS. DAVIS: Objection.
9          THE WITNESS: There was an international
10 guideline as well.
11         BY MR. PARKER:
12     Q    Was that the 1997 consensus?
13     A    I'm not sure of the date. You'd have to
14 show me the document.
15     Q    I may be wrong about the date myself.
16     A    It's usually referred to as the second
17 consensus.
18     Q    Second, meaning after the U.S.-Canadian?
19     A    Yes.
20     Q    So it couldn't have been 1997 then?
21     A    Right.

Page 57

1      Q    Okay. Those are the two existing sets of
2  guidelines of which you're currently aware regarding
3  the performance of flow cytometry?
4      A    Correct.
5      Q    And does your lab follow those guidelines?
6      A    Yes.
7      Q    Doctor, it's been described for me, and I
8  hope I can say this intelligently that the earlier
9  conferences the goal was to identify particular
10 diseases and try to identify within the universe of
11 reagents available to you which particular ones were
12 diagnostic disease.
13         MS. DAVIS: Objection.
14         BY MR. PARKER:
15     Q    This conference however was designed to try
16 to come to an understanding of how you perform flow
17 when presented with a provisional diagnosis or clinical
18 symptoms.
19         MS. DAVIS: Objection.
20         BY MR. PARKER:
21     Q    Is my understanding, correct?

15 (Pages 54 to 57)