# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CV 1573(MRK)
JUNE 1, 2006
-------------------------------------------

UNITED STATES OF AMERICA,
ex rel, Dr. James J. Tiesinga,

                          Plaintiff

              -vs-

DIANON SYSTEMS, INC.

                          Defendant

-------------------------------------------

      DEPOSITION OF Constantin T. Yiannoutsos, PhD.

APPEARANCES:


      UNITED STATES ATTORNEY
        Attorneys for the Plaintiff
        157 Church Street
      New Haven, Connecticut 06510
      BY: RICHARD M MOLOT, ESQUIRE
        Phone number: 203-821-3792


      VENABLE, LLP
        Attorneys for the Defendant
        Two Hopkins Plaza, Suite 1800
        Baltimore, Maryland 21201-2978
      BY:  BRUCE R. PARKER, ESQUIRE
        Phone number: 410-244-7534


REPORTED BY:  DEBORAH A. SMITH, CSR
LICENSE NUMBER: 00197

1      CDs.

2           Q      Of the Tricare data set?

3           A      I believe it is from the Medicare data set

4      and there is a listing of the diagnoses in one of

5      the spreadsheets in the -- from the Tricare, yes.

6           Q      Okay.  All right.  Now, that is helpful.

7      Let me go back.  Go through this and hopefully have

8      more logical systematic form but for present

9      purposes can we agree that the sampling that was

10     done in 2005 in terms of the absolute number was

11     numerically greater than the sampling done in 2003?

12          A      Yes.

13          Q      Okay.  As a function of a percentage of

14     the total cohort, however, was the sampling in 2003

15     a greater percentage of the total?

16          A      I do not know.

17          Q      Okay.  Your sampling was on the order of

18     about two percent, is that right?

19          A      In the case of non-repeats, yes.  In the

20     case of repeats it was probably closer to ten

21     percent.

22          Q      Is there a reason why you took a larger

23     percentage for the repeats versus the non-repeats?

24          A      The percentage was reflective of the

25     number of samples that could be reasonably reviewed

1   by the expert.

2       Q    So, the sampling size was not a function

3   of which you felt was needed statistically but

4   rather a limitation of what Dr. Flynn could review?

5           MR. MOLOT:  Object to the form of the

6       question.

7           THE WITNESS:  This is not correct review

8       of the reasoning behind this selection of the

9       sample.

10  BY MR. PARKER:

11      Q    That is what I'm asking.  Did -- were you

12  told that there was a outside number of files that

13  the medical consultant could review and that you had

14  to perform your statistical sampling within that

15  total number?

16      A    I was told that the number that could be

17  reviewed by the expert was not infinite clearly.

18          MR. MOLOT:  Was not infinite?

19          THE WITNESS:  Was not infinite.  So there

20      was some limitations from there and to try to

21      select a sample in such a manner that

22      reasonable statistical analysis could be

23      performed while at the same time a timely

24      review of the records could also be performed.

25

1    Q    Okay.  So, you've not gone back and looked

2  at how, if at all, Dr. Flynn changed his 2003

3  reports after he did his 2005 review, have you?

4            MR. MOLOT:  Objection to the form of the

5        question.

6            THE WITNESS:  I did not.

7  BY MR. PARKER:

8    Q    If that were the case, would that reflect

9  variability on Dr. Flynn's part?

10           MR. MOLOT:  Objection.

11           THE WITNESS:  I'm not sure what you're

12       asking.

13  BY MR. PARKER:

14   Q    If Dr. Flynn went back after doing the

15  review in 2005 and change the results of his

16  analysis in 2003, would that reflect factually a

17  variable approach to determining permissible number

18  of antibodies?

19           MR. MOLOT:  Object to the form.

20           THE WITNESS:  In what form would he be

21       changing his -- I'm not clear.

22  BY MR. PARKER:

23   Q    I'm sorry, I didn't mean to interrupt.

24           The determinations of which antibodies for

25  a particular case were permissible?

```
 1        A    I would imagine if he -- if he reviewed
 2   the same case and in one case he had one number of
 3   antibodies and another specific case he had a
 4   different number of antibodies, that may be
 5   construed as variability in his review of that
 6   particular case.
 7        Q    That is what I want to touch on next.
 8             Your statistical analysis does not address
 9   variability in the review of assessment as to what
10   is permissible, does it?
11             MR. MOLOT:  Object.
12             THE WITNESS:  It does not address that,
13        yes.
14   BY MR. PARKER:
15        Q    Doctor, do you -- I don't mean this to be
16   insulting, it is not intended to be that way.  Do
17   you know anything about flow cytometry?
18        A    I only know peripherally what it tries to
19   accomplish and some generically what the technique
20   involves.
21        Q    Has anybody told you that there is a gold
22   standard for the number of antibodies that are
23   permissible for particular presenting diseases?
24             MR. MOLOT:  Objection to form.
25             THE WITNESS:  I'm not aware whether there
```

1           is or isn't a gold standard.

2    BY MR. PARKER:

3        Q    So, that when you did your statistical

4    analysis, wouldn't it be reasonable to assume that

5    if you had two experts reviewing a particular case,

6    that they might well reach different decisions on

7    what were the permissible antibodies in a given

8    case?

9              MR. MOLOT:  Objection.

10             THE WITNESS:  I do not know how closely

11        flow cytometry experts agree or disagree on a

12        subject.

13   BY MR. PARKER:

14       Q    Precisely, and then as a statistician, if

15   you did not know that, wouldn't you have to include

16   in your statistical model, some accounting for

17   variability amongst different experts, unless you

18   were told it was, in fact, a gold standard?

19             MR. MOLOT:  Objection.

20             THE WITNESS:  Can you repeat the question.

21   BY MR. PARKER:

22       Q    Sure.  It was a long and probably

23   convoluted question.

24             You have not been told that there is a

25   gold standard, correct?

1      A      Correct.

2      Q      And so you would agree with me would you

3   not, that that mean in the absence of a gold

4   standard, it is reasonable to assume that

5   professionals might disagree in a given case about

6   the permissible number and -- not the number only

7   but the particular of ones that can be used to

8   diagnose a case?

9           MR. MOLOT:  Objection to form.

10          THE WITNESS:  Theoretically, yes, it is

11      possible.

12   BY MR. PARKER:

13     Q      That is referred to as variability,

14   correct?

15     A      It is referred by a number of things enter

16   into agreement, variability.

17     Q      But your analysis assumes that Dr. Flynn's

18   determination were the gold standard, were correct

19   in each and every case?

20          MR. MOLOT:  Object to the term gold

21      standard.

22          THE WITNESS:  My analysis assumes that --

23      my analysis addresses the issue of estimating

24      damages from Dr. Flynn's assessment of the

25      number of permissible test in -- rather

```
 1        antibodies in every test that he reviewed.
 2   BY MR. PARKER:
 3        Q    But your analysis assumes that his
 4   determination is medically correct?
 5        A    My analysis, yes, it does assume that it
 6   is medically correct.
 7        Q    Statistically, however, recognizing that
 8   variability in this area could well exist, you could
 9   construct a statistical model that allowed for some
10   variability around each and every one of Dr. Flynn's
11   determinations, correct?
12             MR. MOLOT:  Objection.
13             THE WITNESS:  Correct.
14   BY MR. PARKER:
15        Q    You did not do that?
16        A    No, I did do that.
17        Q    Where in your model do you describe the
18   variability that you permitted accounting for the
19   fact that different investigators might reach
20   different conclusions?
21        A    I didn't -- I'm sorry, I apparently
22   misunderstood your question.
23             My model has accounted for the possible
24   variability in the estimates derived from Dr.
25   Flynn's review of the case.
```

1    Q    Explain to me what you just meant by that.

2    A    What I meant is that every time there is

3    an estimate since we -- Dr. Flynn did not review --

4    to let's say just keep for the sake of argument, on

5    the non-repeats.

6    Q    Sure, fair enough.

7    A    So in the non-repeats the universe was

8    9601 non-repeat cases.  Dr. Flynn reviewed about

9    two percent of that sample, which is about 180

10   cases.  Clearly, from that sample we derived

11   estimates of the number of medically necessary tests

12   on average for each individual case that is being

13   tested.

14   Q    Uh-hum.

15   A    Since this was a sample of the population

16   there is an associated variability with these

17   estimates and this variability was accounted for by

18   the models that I introduced.

19   Q    But that is not really what I'm talking

20   about, if my questions haven't been clear let me go

21   back and try again.

22        You have a point estimate and you also

23   have a confidence in and around your point estimate

24   for the mean number of permissible antibodies, is

25   that correct?

1    A    That is correct.

2    Q    If the government had retained two

3 qualified hematopathologist instead of just Dr.

4 Flynn, you would expect, would you not, that your

5 confidence interval when you analyze all those files

6 would be wider than the ones that you derived?

7    A    The confidence interval derived from two

8 experts would not be shorter certainly.

9    Q    In other words, you agree with me, it

10 would be wider?

11    A    It would be either the same size or wider.

12    Q    And the only way it would be the same

13 would be in the case that each and every case both

14 those investigators, presumably doing their work

15 blindly to each other, happen to reach exactly the

16 same conclusion, right?

17    A    That is correct.

18    Q    That you would agree statistically would

19 not be likely with the sample size that you have

20 here in a situation where there is no gold standard?

21         MR. MOLOT:  Objection.

22         THE WITNESS:  There is a reasonable

23      possibility that they might not agree.

24 BY MR. PARKER:

25    Q    Okay.  And if you had just two medical

1    experts reviewing these files, the point estimate

2    might well be different and you would agree that the

3    confidence intervals most likely would be wider?

4              MR. MOLOT:  Objection.

5              THE WITNESS:  I agree the common intervals

6         may have been wider.

7    BY MR. PARKER:

8         Q    What about the point estimate?

9         A    It would be different as well.

10        Q    Okay.  All right.  Did you discuss with

11   the government -- withdraw that question.

12             With our discussion that we just had in

13   mind, could you not have constructed a model that

14   would have said if we had had more than one

15   investigator, we would have anticipated some

16   variability so we are going to build into our model,

17   in a case where we only have one investigator, some

18   variability?

19             MR. MOLOT:  Objection.

20             THE WITNESS:  I did not construct such a

21        model.

22   BY MR. PARKER:

23        Q    But it is statistically possible to do so,

24   correct?

25        A    It is statistically possible to do

1  simulations and speculate in the absence of a second

2  reviewer, to speculate as to various levels of

3  agreement between reviewers.

4      Q    There is a term called sensitivity

5  analysis in the statistical field, is there not?

6      A    Yes.

7      Q    Would that refer to going back and testing

8  your model to see just how accurate you thought your

9  model was?

10     A    Correct.

11     Q    And, Doctor, if you had wanted to assure

12 yourself that it was reasonable to assume that Dr.

13 Flynn's determinations were the gold standard, could

14 you have done a sensitivity analysis by asking the

15 government to retain two pathologist and do just a

16 small number of cases and see how they compared to

17 Dr. Flynn's cases?

18         MR. MOLOT:  Objection to form.

19         THE WITNESS:  I was not given the option

20     of retaining another --

21 BY MR. PARKER:

22     Q    I understand.  My question is, doing so --

23 doing what I just described, would be a form of

24 sensitivity analysis on the accuracy of your model,

25 correct?

1      A      Usually when we do sensitivity analysis

2  that involves simulations and this sort of thing.

3  What you're describing is actually deriving an

4  estimate of the agreement between the two experts.

5      Q      Okay.  And also doing so with a smaller

6  number of samples with two experts and seeing what

7  the estimate would be, and the confidence interval

8  around that estimate in the very same files that Dr.

9  Flynn reviewed would give you some idea as to how

10  accurate your model was that you constructed?

11      A      I would like to understand what we're

12  saying about accuracy.

13      Q      Okay.

14      A      My model is attempting to derive a point

15  estimate of the damages which is a function, of

16  course, of the point estimate of the average

17  permissible test.  My model is, and, of course, give

18  some idea of the -- of the variability around these

19  estimates.  In terms of accuracy of the estimates

20  the -- if you have a wider variability clearly the

21  estimates are less accurate.

22      Q      Thank you.  Your model is no more accurate

23  than Dr. Flynn's underlying conclusion, correct?

24          MR. MOLOT:  Objection.

25          THE WITNESS:  My model estimates what

1    Q    The third sentence, he writes "there are

2    no data to assess the accuracy and/or reliability of

3    this rating procedure or of the medical expert's

4    determination of medically necessity" --

5    grammatically incorrect -- nevertheless, do you

6    agree with this proposition?

7            MR. MOLOT:  Objection to the form.

8            THE WITNESS:  There were no data, no.

9    BY MR. PARKER:

10    Q    Two sentences down Dr. Cutter writes,

11    "relying on a single opinion underestimates the

12    variability in the number of medically necessary

13    procedures as the performance characteristics are

14    based on solely on the single individual."  Do you

15    agree with that statement?

16    A    I agree with the fact that multiple

17    reviewers may -- the variability generated by

18    multiple reviewers would likely be higher then the

19    variability by a single reviewer.

20    Q    Thank you.  He goes on to state, "It is

21    highly likely that there would be variability from

22    medical expert to medical expert in terms of the

23    need for various tests.  It isn't generally good

24    practice to rely on a single opinion when there is

25    not an objective gold standard."  Do you agree with

```
 1   that statement?
 2        A    I do not.
 3        Q    What portion do you not agree with?
 4        A    The portion that says it isn't generally
 5   good practice to rely on a single opinion when there
 6   is not an objective gold standard.  I would like to
 7   qualify that statement --
 8        Q    Sure.
 9        A    -- if I may.
10        Q    Sure.
11        A    It is frequently the case that -- for one
12   thing, I am not certain as a statistician and not a
13   flow cytometry expert, whether there is or isn't a
14   gold standard in flow cytometry.  In my personal
15   experience in the field of medical application of
16   statistics, there is frequently the need to have
17   central review of, for example, X-rays or MRIs or
18   other medical examinations by a single expert,
19   precisely to avoid variability in the estimates.
20        Q    Okay.
21        A    So it may or may not be, depending -- we
22   can not make a general statement about whether it is
23   or is not a good statistical practice to rely on the
24   single expert versus relying on a number of experts.
25        Q    Is that a function of whether there is, in
```

1    fact, a gold standard?

2        A    It is a function of whether the expect

3    that you're relying on can be considered to be a

4    more highly qualified or then the average experts or

5    evaluators that you have in a field.

6        Q    And what do you know about Dr. Flynn's

7    qualifications to assess wet specimen flow

8    cytometry?

9        A    I can not evaluate -- I'm not a peer of

10   Dr. Flynns and I'm not a flow cytometry expert so I

11   can not evaluate Dr. Flynn's opinion.

12       Q    I understand that, sir.  Is it also true

13   that you took no attempts and your colleagues at

14   Clifton Gunderson made no attempts to investigate

15   the extent to which Dr. Flynn has any qualifications

16   in assessing wet specimen flow cytometry?

17       A    He was presented as an expert by the

18   government to us, as an expert in flow cytometry.  I

19   have access to this CV and that is the extent that I

20   personally was involved in reviewing his

21   qualifications.

22       Q    So, you really didn't review, the

23   government told you he was an expert and gave you

24   his CV?

25       A    Correct.

1    information?

2        A    I cannot recall.  I just -- it is part of

3    this general understanding that I have about the

4    flow cytometry.

5        Q    Is that understanding that, in fact, the

6    various consensus effects the conclusion of those

7    conferences generally reach panel sizes that were

8    larger than what Dr. Flynn determined in this case

9    was appropriate?

10            MR. MOLOT:  Object to the form.

11            THE WITNESS:  It is my understanding that

12       larger and similar panels have been proposed.

13   BY MR. PARKER:

14       Q    Have you done any research, sir, at any

15   point in your work with the government in this case

16   to determine how the government's flow cytometry

17   labs practice?

18       A    No, I have not.

19       Q    So, you don't know whether your client's

20   own labs performed as Dr. Flynn said they should

21   perform or whether they performed more like Dianon

22   performs?

23       A    I do not know what the general practice in

24   government labs is.

25       Q    Okay.  That is helpful.

```
 1              Let's go back to your report.  And lets
 2   turn to page CG6.
 3         A    (Witness complies).
 4         Q    Sir, am I correct that you were given a
 5   list of 9600 some odd claims that, non-repeat
 6   claims, that was represented to you by the
 7   government that had been claims that had been
 8   presented and paid by the government?
 9         A    That is correct.
10         Q    And then you and your colleagues or you,
11   determined the particular files, randomly chosen,
12   that Dr. Flynn would then review for damages
13   purposes?
14         A    That is correct.
15         Q    If we look, sir, well, before we move off
16   page CG6, you say that you stratified your random
17   sample for three different time periods, correct?
18         A    That is correct.
19         Q    Doctor, why did you not stratify your
20   sample with respect to presenting diseases?
21              MR. MOLOT:  Objection.
22              THE WITNESS:  I -- because the -- this
23         stratification would provide -- because of the
24         presenting disease were so many, they would --
25         the stratification would be very untenable.
```

BY MR. PARKER:

Q    Did you understand that it was Dr. Flynn's position that the permissible antibodies to be used in a case is a function of the presenting disease and what someone can ascertain from looking at whatever specimen is provided with the request?

A    I know that Dr. Flynn's position was that a panel specific to the individual patient, I would imagine the disease -- that the specific disease should be constructed.

Q    So, you're saying that it was not possible because there were so many diseases presented for you to construct a randomized sample stratified based upon presenting disease?

A    It would have been difficult.

Q    Okay.  So you understood Dr. Flynn to say that the lab should create a customized test for each and every case coming in, but you couldn't even create a statistical sampling model because there was so many diseases, is that right?

MR. MOLOT:  Objection to the form.

THE WITNESS:  It would have been difficult to stratify according to the number of -- to the specific disease.

```
 1  BY MR. PARKER:
 2       Q    Okay.  Doctor, you eventually did
 3  stratify, as we said, by three time periods?
 4       A    Correct.
 5       Q    Did you ever attempt to assess whether or
 6  not the presenting disease profiles, if I can use
 7  that term, were similar in each of the three time
 8  periods?
 9       A    I did not.
10       Q    Okay.  Would that affect the reliability
11  of your assessment?
12            MR. MOLOT:  Objection.
13            THE WITNESS:  By -- if by reliability you
14       mean the precision of my assessment?
15  BY MR. PARKER:
16       Q    Uh-hum.
17       A    It would affect the variability in the
18  estimates and I imagined that this would create
19  potentially, this being not taking into account the
20  specific diseases, would increase the variability
21  because it would -- it would -- it would have -- the
22  sample rather would have a number of subgroups based
23  on disease and complexity of the case in it.  So we
24  were aware that this would increase the variability
25       --
```

1    Q    Okay.

2    A    -- in the estimate.

3    Q    Okay.  Doctor, can you please turn to CG9?

4    A    (Witness complies.)

5    Q    Doctor, help me understand what you're

6    attempting to represent in that histogram for 2002

7    and 2003, with the bin that says 52 antibodies?

8    A    This was the number of antibodies

9    associated with a single date of service, as we

10   became better understanding of the data, it most

11   likely represents cases where multiple tests were

12   carried out on the same patient and on the same

13   sample.  So these are multiples that you see here of

14   26, like, the bin of 52 is -- probably represents

15   cases where two samples were drawn on the same date

16   and run, and sample on 78 is also a multiple of 26,

17   and most likely represents three samples that were

18   done on the same date of service.

19   Q    I'm not sure I understand, sir.

20        First, these various histograms presented

21   on pages CG07 through CG9, is your attempt to show

22   us, how many antibodies were being charged by Dianon

23   to the government at different periods of time,

24   correct?

25   A    No, not exactly.  What I'm trying to show

1    colleague, Travis Chamberline, that he had not

2    received adequate information from Dianon to be able

3    to make a full review of these two samples.

4        Q    Now, Doctor, the whole point of doing a

5    randomized sample is because you think that your

6    sample that you end up is supposed to be

7    representative of the larger group, correct?

8        A    Correct.

9        Q    So, Doctor, if one percent of the larger

10   group had the same problem then Dr. Flynn would not

11   have been able to ascribe a number of permissible

12   antibodies, correct?

13           MR. MOLOT:  Object to the form of the

14       question, same problem.

15           THE WITNESS:  What Dr. Flynn is saying is

16       that Dianon has not provided him with

17       information that he could use to make this

18       adjudication.  I do not know whether Dianon

19       possessed this information or not in this file.

20   BY MR. PARKER:

21       Q    That wasn't my question, sir.  My question

22   is, the reason why you, as a statistician, perform a

23   random sample of the 9600 claims, is because you

24   don't want to look or the government doesn't want to

25   pay for, or somebody doesn't want to look at 9600

1    claims and do an individual assessment of what is

2    medically necessary in each of those claims,

3    correct?

4        A    Correct.

5        Q    All right.  So, because you want to do a

6    shortcut, statistically speaking, of the 9600 claims

7    and just look at a small universe, the reason why

8    you're confident that you're able to so that is

9    because you believe you have drawn a random sample

10   of the larger group, correct?

11       A    The reason I'm able to estimate, to

12   perform an estimation, yes, is based on the

13   assumption that the random sample is representative

14   of the population.

15       Q    So, the sample that you created, that you

16   believe statistically was representative of the

17   larger sample, one percent was not usable by the

18   government's expert?

19       A    One percent was not usable.

20       Q    But nevertheless, Doctor, when you did

21   your damage assessment, you believe that a hundred

22   percent of the sample of that 9600 would be usable?

23       A    Yes.

24       Q    So, Doctor, I'm just a little bit puzzled

25   by that, statistically speaking.  If one percent of

1          MR. MOLOT:  Objection.

2          THE WITNESS:  The discussion in the

3     Appendix?

4  BY MR. PARKER:

5     Q     Yes, sir.

6     A     Because I wanted the reviewer, the reader,

7  you, the statistician, to be able to understand with

8  greater -- in greater detail how I performed the

9  otherwise straightforward calculation of, based on a

10  medically -- the estimate of confidence interval of

11  medically necessary tests and the number and the

12  point estimate and the confidence interval of the

13  medically unnecessary tests.

14     Q     You wrote in this section we're looking

15  at, as follows, "to derive the number of medically

16  unnecessary units per test in the entire population,

17  the mean number of units considered medically

18  necessary as calculated in the review sample was

19  subtracted from the total number of units performed

20  for each test."  Now, I've read that correctly,

21  right?

22     A     Yes.

23     Q     Doctor, why was it subtracted from the

24  total number of units performed rather than number

25  of units billed?

1      A     This is a misstatement.  It was subtracted

2  from the number of units billed.

3      Q     Did you actually compute a mean number of

4  medically unnecessary antibodies?

5      A     For each case?

6      Q     Yes.

7      A     I did.

8      Q     And is that in the data files?

9      A     It can be generated by running the

10  statistical programs, which are in the data files.

11      Q     So, let me make sure that I'm clear on

12  this.  I think I am, but I think this hypothetical

13  will put it most clearly for me.  Let's assume in a

14  given case, Dianon used 35 antibodies in the

15  performance of its test, all right?

16      A     All right.

17      Q     Prepared a report and reported on the

18  results of using 35 antibodies, okay?  But for

19  whatever business reasons it may have had it decided

20  to give the government a break and only bill it for

21  18 antibodies.

22      A     Okay.

23      Q     And let's assume in that that file, Dr.

24  Flynn decides he thinks only ten antibodies ought to

25  be used or to have been used.

1       A     Okay.

2       Q     Was your damage assessment based off the

3    difference between 18 and 10 or 35 and 10?

4       A     It was based on the difference between 18

5    and 10.

6       Q     Okay.  Let's talk about the interest

7    before we leave the Medicare claims on page CG18 of

8    your report.

9              Explain to me how you calculated the

10   prejudgement interest?  Was it -- well, let me just

11   ask that question.

12      A     The question is how I calculated the

13   prejudgement interest?

14      Q     Yeah.  What you say here is you say you

15   utilize the Federal Hospital Insurance Trust Fund

16   data, I assume?

17      A     We were given interest rates for each

18   month starting in January 1996 and ending in

19   December 31, 2003.  So, we were given the interest

20   rates for each month.  What we did was we

21   determined -- we determined which cases belong to

22   each month, and from these cases we determined that

23   the damage, the contribution to the total damage

24   without interest from these cases from that month,

25   and we multiplied it by the interest rate for that

1       Q    So your damage calculation is only as

2   valid as Dr. Flynn's assessments are correct?

3            MR. MOLOT:  Objection.

4            THE WITNESS:  I'm not exactly clear what

5       you mean in saying correct.

6   BY MR. PARKER:

7       Q    Well, if your data is unreliable then your

8   assessment is going to be unreliable, correct?

9       A    Correct.

10      Q    And the underlying data is Dr. Flynn's

11  opinion as to what is medically necessary or what

12  was medically necessary in the 178 cases that he

13  reviewed?

14      A    The underlying data is, yes, assessment of

15  Dr. Flynn, correct.

16      Q    Okay.  Let's go back I just have a few

17  questions, looks like we might be done before lunch

18  time.  You all look happy.

19           Let's go back to Dr. Cutter's report

20  please.

21      A    (Witness complies).

22      Q    Please turn to the second to the last page

23  of Dr. Cutter's report where there is a section

24  heading "Simulations of excess cost."

25      A    Yes.