## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| <u>ex rel</u>. DR. JAMES J. TIESINGA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  No. 3:02 CV 1573 (MRK) |
| | ) |
| DIANON SYSTEMS, INC. | )  May 11, 2007 |
| | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING DISCOVERY VIOLATIONS

## I.    INTRODUCTION

Defendant Dianon Systems, Inc. (Dianon) accuses the Government of destroying documents, not producing documents, and other "bad faith" conduct. Dianon's motion – which seeks dismissal of this case – is based on a series of misleading arguments and outright falsehoods. As just one example, defendant accuses the Government of *never producing* a document regarding the "mayo triage scheme." Defendant's Memorandum in Support of Motion In Limine Regarding Discovery Violations ("Def. Mem.") at 5 and fn. 6. Defendant calls the Government's conduct in never producing this document "outrageous." *Id*. at 6. However, the Government *did produce* this document to Dianon. *(Exh.1, mayo triage document with Government bates-stamp CMS013624-25)*. The Government is distressed that Dianon would accuse the Government of never producing a document and "outrageous" conduct without first at least taking the time to review the Government's document production with care.

As we show below, the Government has made every effort to comply with the extremely burdensome, nation-wide discovery requests that Dianon made in this matter. Although Dianon is located in Connecticut and submitted its claims to the Connecticut Medicare carrier, Dianon

nevertheless demanded documents from (a) CMS' central office in Baltimore and its regional offices around the country, (b) Medicare carriers, not just in Connecticut, but with jurisdiction in all 50 states, (c) Veterans' Administration (VA) hospitals nation-wide, and (d) the National Institutes of Health (NIH) in Washington, D.C.[1]

The Government produced over 17,000 pages of documents from CMS and Medicare carriers around the country, including carriers in California, Minnesota, Wisconsin and North Carolina, as well as VA facilities nation-wide, including Arkansas, Colorado, Texas, and San Juan, Puerto Rico. In addition, the Government produced hundreds of emails dating back as far as 1998 and various CD's containing electronic claims data from Dianon and numerous other labs around the country.

Although Dianon claims that documents from the Medicare carrires were lost because the Government failed to issue a nation-wide litigation hold, Dianon fails to inform the Court that the carriers are under a "do not destroy" document freeze policy instituted by CMS. For example, the custodian of records from the Connecticut carrier testified as follows:

Q: And is there any kind of CMS memo or directive about retaining documents for the carriers?
A: Yes. We are–all carriers and intermediaries are under a do not destroy. It's from a JSM, a joint signature memorandum.
Q: What does that mean?
A: That means you can't destroy any documents for any reason.

*(Exh. 2, Deposition of Serena Selzer, at 14:5-13).*

Throughout the discovery process, the Government met and conferred with Dianon's counsel to discuss their requests for production. Each time Dianon asked for more documents, the Government made every effort to comply with Dianon's new requests, even when Dianon

---

[1] The Government produced hundreds of pages of documents from the VA and the NIH even though these documents are totally irrelevant to this case, which involves Medicare's medical necessity billing regulations.

demanded documents with little or no relevance to this case.

There is no evidence that the Government engaged in any discovery violations, let alone egregious violations. Thus, the rare and extremely severe sanction of dismissal is clearly not warranted here. Moreover, there is no basis for any lesser sanction, such as an adverse inference, because Dianon has not shown that the Government destroyed or failed to produce evidence, let alone that such evidence might have been favorable to Dianon. Finally, because the Government's witness disclosure was proper, there is also no basis to exclude the testimony of any Government witness at trial. Accordingly, Dianon's motion should be denied in its entirety.

## II.    THE DISCOVERY PROCESS

Dianon served numerous document requests, interrogatories and requests for admission on the Government during discovery. Dianon also made many "follow-up" requests and new requests by letter, even after the close of discovery. Throughout the discovery process, the Government was cooperative and consistently produced the additional documents and data requested by Dianon.

In assessing the merits of Dianon's motion, it is important to review the discovery process, which involved substantial discussions among the parties as to the scope of production.

### A.    The Parties' Initial Disclosure and Dianon's First Request for Production

The parties filed their Form 26(f) Report of Parties Planning Meeting on or about June 1, 2005. *(Exh. 3)*. In that report, the parties requested that discovery commence on June 1, 2005 and close on January 31, 2006. The Court then set a discovery cut-off of January 31, 2006.

The Government provided its initial disclosures on June 1, 2005. *(Exh. 4)*. Approximately two and one-half months later, on August 12, 2005, Dianon served its first request for production. *(Exh. 5)*. On September 28, 2005, the parties filed a joint motion to

amend the Court's scheduling order. *(Exh. 6)*. The Court granted that joint motion, and
extended discovery to July 31, 2006. By mutual agreement, the Government and Dianon agreed
to serve their responses to each parties' first set of discovery requests on December 7, 2005. In
December 2005, the Government made its first production, which contained thousands of pages
of documents, as well as extensive electronic claims data. *(Exh. 7, Government's response to
first request for production)*.

## B.    Dianon's Additional Requests for Production
and the Meet and Confer Process

On March 22, 2006, over three months after the Government's December 7, 2005
response to Dianon's first request for discovery, counsel for Dianon sent the Government a letter
requesting that the Government clarify and supplement its prior production. *(Exh. 8)*. In
response to that letter, the Government arranged with Dianon to have a "meet and confer"
conference-call to discuss the discovery issues raised by Dianon's March 22, 2006 letter. That
conference-call took place on April 11, 2006. During that call, the parties discussed Dianon's
demands in detail.

Thereafter, one week later, on April 18, 2006, the Government sent Dianon a letter
clarifying its responses, providing additional answers to interrogatories, and producing additional
documents. *(Exh. 9)*. One of the issues that had been discussed during the April 11, 2006
conference call was Dianon's request that the Government produce flow cytometry claims data
from every provider in the country for a seven year period. The Government explained in its
April 18 letter, as it had done during the April 11 conference call, that producing this volume of
data (i.e. 100% of the claims data for all providers in the country) would be extremely
burdensome and expensive, and proposed a compromise, which involved producing a CMS "5%
data file":

CMS informs us that to run this type of data search [i.e. 100% data] would take several months and would cost approximately $150,000. Even if CMS did run this data, it would be produced only in "main-frame compatible files" which we would be unable to analyze without converting the data into a usable format, which would require hiring an outside computer consultant. More importantly, we are informed that even if CMS ran such a data report, it would not contain the level of detail required to answer this interrogatory, specifically the number of markers on each paid claim. We are informed by CMS that for this level of detail, we would have to go to the individual Medicare Part B carriers around the country. Because the request asks for historical records going back almost ten years, many of the carriers do not have easy access to the data in question (it is archived) or to the beneficiary claims records that were processed by previous carriers who held Medicare B contracts for that region. In some cases, the information has been purged from the system, and would require carriers to manually scan in the information from hard copies of claims files.

As we suggested during the April 11 conference call, as a compromise we are offering to produce the "5% data file" that we obtained from CMS. This file itself took several months to obtain and was not in usable format when we received it from CMS. Hence, we had to pay an outside computer consultant to put it in a format that would be usable on a normal PC. This 5% data encompasses the years 1997 through 2004 and has information on over 45,000 88180 claims for over 1000 providers. Although the data in this format is work-product, we would be willing to produce it as a compromise. Please advise if this is acceptable and we will produce it.

*(Id. at 2)*. In the Government's April 18, 2006 letter, the Government also outlined the burden regarding Dianon's request that every carrier in the country produce all "appeals" related to flow cytometry. Although the Government had previously produced numerous documents relating to appeals, Dianon was demanding more. As Dianon requested, the Government provided specific examples of the burden and expense that would be required for carriers around the country to produce the appeals information requested by Dianon:

You asked for some specific examples of the potential burden to the carriers. We spoke with representatives of CIGNA, in Tennessee. They indicated that they do not keep appeals by code, they are kept by provider. First, they would have to figure out which providers billed 88180; then pull all appeals by those providers and go through them to see which involved 88180 (these are kept on tapes); then, they would have to review the appeals to see which, if any, involved the number of antibodies; then, they would have to pull those cases and copy them. This would be an extremely time-consuming process that would cost in excess of $45,000. We spoke with representatives of NHIC in California. They indicated that just to produce a database to obtain relevant historical information

5

> on its appeals would take 17 weeks and cost $345,000. We spoke with
> HealthNow in New York. Again, because appeals are not accessible by CPT
> code, they would have to create a special data program to try to do this. It would
> take over 500 hours just to run the special data reports. Then, they would have to
> go off-site and pull the files and review all of them to see which ones, if any,
> related to the number of antibodies. This would cost at least $50,000. We also
> spoke to Wisconsin Physicians Service, which, like the other carriers above,
> indicated that this would be a massive, extremely time-consuming project that
> would cost up to $45,000. Again, if you could look at the appeals materials that
> we have produced to date and narrow your focus, that would be helpful.

*(Id. at 5)*. Finally, with its April 18, 2006 letter, the Government produced additional documents

from CMS and the VA.

On May 9, 2006, Dianon's counsel wrote another letter asking the Government to further

supplement its discovery responses. *(Exh. 10)*. Counsel requested that the Government send

Dianon the 5% database as a possible compromise. He also demanded, among other things,

further document production from the VA and the NIH.

One week later, on May 15, 2006, the Government supplied the 5% data to Dianon. *(Exh.

11)*. Shortly after that, on May 26, 2006, the Government sent Dianon a letter further

supplementing its production, which included production of additional documents from the VA

and the NIH, as well as approximately 3,500 pages of documents from NHIC, the California

Medicare carrier, relating to flow cytometry appeals. *(Exh. 12)*.

On May 23, 2006, Dianon served yet another request for production, calling it a

"supplemental" request for admissions, interrogatories, documents. *(Exh. 13)*. The Government

responded to Dianon's supplemental request on June 30, 2006. *(Exh. 14)*. The Government

produced additional documents and data to Dianon in June and early July 2006.

On June 20, 2006, the Court held a conference call with the parties to discuss the progress

of discovery and to hear Dianon's potential motion to compel the Government to produce

additional documents. During that call the Government pointed out that it had never refused to

6

produce documents, and had complied with Dianon's follow-up requests for production, but that many of Dianon's requests were extremely broad and burdensome. During the conference call, the Court indicated that it understood that the discovery process took give-and-take between the parties. After listening to the parties, the Court found that it did not have sufficient information to rule that the Government should be compelled to produce additional documents and the Court urged the parties to continue to cooperate in the discovery process. Along those lines, the Court suggested that the parties have their data consultants talk with each other on the phone to answer questions about the 5% data that the Government had produced.

Dianon waited over a month, until July 21, 2006, ten days before the close of discovery, to provide questions to the Government that it wanted answered by the Government's data consultant regarding the 5% database. *(Exh. 15)*. Dianon supplemented those questions with additional questions on July 26, 2006. *(Exh. 16)*. Thereafter, on August 9, 2006, the Government's data consultant and Dianon's data consultant had an hour-long conference call, at which time all of Dianon's questions about the 5% data were answered. Moreover, on September 1, 2006, at Dianon's request, the Government provided an additional CD to Dianon to help it identify all of the labs contained in the 5% database. *(Exh. 17)*.[2]

Dianon continued to make additional discovery requests up to and even after the close of discovery. On June 28, 2006 Dianon made "second" supplemental discovery request. *(Exh. 19)*. The Government responded to that request on July 31, 2006 and produced additional documents and data, including documents to help Dianon interpret the 5% database. *(Exh. 20)*.[3]

---

[2] It is clear that Dianon was able to fully understand and utilize the 5% database, as its data consultant, Stan Panis, submitted a detailed affidavit relying on the 5% database in support of Dianon's motion for summary judgment. *(Exh. 18)*.

[3] On July 14, 2006, the parties made a joint motion to take a few additional depositions in August 2006, after the close of discovery on July 31, 2006. The Court granted that motion.

Thereafter, on August 4, 2006, after the close of discovery on July 31, 2006, Dianon made a request for additional documents. *(Exh. 21)*. Some of the August 4, 2006 requests were for follow-up documents. However, other requests were for new information that had not been previously requested during discovery. The Government responded to this post-discovery request on September 22, 2006, *(Exh. 22)*, and produced additional documents, including the documents from the Wisconsin Medicare carrier that Dianon falsely accused the Government in its motion of "never" producing.

Thus, as one can see from the above chronology, far from the "bad faith" conduct alleged by Dianon in its motion, the Government cooperated throughout the discovery process and consistently produced additional documents requested by Dianon, even after the close of discovery. The Government collected and produced thousands of documents from across the country, even though many of Dianon's requests for production were both irrelevant, as well as overly broad and burdensome.

As we show below, there is no legal or factual basis for Dianon's motion and it should be denied.

## III.    ARGUMENT

### A. The Relevant Legal Standards

A district court has wide discretion in deciding whether or not to impose sanctions under Federal Rule of Civil Procedure 37. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). Outright dismissal of a lawsuit, although within a court's discretion, is a "particularly severe sanction." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45 (1991). Dismissal of an action for discovery violations is only appropriate in egregious cases. *See, e.g., West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (because dismissal is "drastic remedy" it should

8

only be imposed in "extreme circumstances") (*quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)); *Di Nardo v. Briguglio*, No. 05 Civ. 5568, 2007 WL 582809, at * 5 (S.D.N.Y. Feb. 23, 2007) (dismissal is an "extreme measure appropriate only in extreme circumstances") (*quoting Fritter v. Dafina, Inc.*, 176 F.R.D. 60, 63 (N.D.N.Y. 1997)).

As a lesser sanction, if relevant evidence is destroyed or lost, a court can provide the jury with an adverse inference instruction. *See Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). Before an adverse inference instruction may be given, however, there must be a showing that there is a "nexus" between the proposed inference and the lost evidence. *See Turner v. Hudson Transit Lines*, 142 F.R.D. 68, 76 (S.D.N.Y. 1991). For example, in *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 923-24 and n.7 (2d Cir. 1981), the Second Circuit refused to infer from defendant's destruction of personnel records that it had engaged in discrimination, because it was unlikely that the documents in question would support the facts to be inferred. In other words, an adverse inference will not be drawn absent a demonstrated link between the proposed inference and the lost evidence. *Turner*, 142 F.R.D. at 74-75.

Finally, Federal Rule of Civil Procedure Rule 26(a)(1)(A) requires a party to identify "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." Further, Rule 37(c)(1) provides that any "party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such a failure is harmless, permitted to use as evidence at trial . . . any witness . . . not so disclosed." Fed.R.Civ.P. 37(c)(1). Thus, in appropriate situations, a court has the discretion to preclude a witness from testifying at trial who was not properly disclosed under Rule 26. *See Patterson v.*

*Balsamico*, 440 F.2d 104, 117-18 (2d Cir. 2006) (where defense witnesses were not identified under Rule 26, no evidence from defense witnesses were submitted in connection with defendant's summary judgment motion, and there was no explanation for the failure to disclose, district court did not abuse its discretion in refusing to allow witnesses identified ten days before commencement of trial to testify).

In addition, before sanctions are imposed, there should be a finding of prejudice, "since sanctions are not as a rule imposed where there has been no prejudice to a party." *McGuire v. Acufex Microsurgical, Inc.*, 175 F.R.D. 149, 154 (D. Mass. 1997) (*quoting White v. Office of the Public Defender*, 170 F.R.D. 138, 147 (D. Md. 1997)).

As we show below, there are no grounds for an adverse inference instruction or the preclusion of any Government witnesses, let alone the more severe sanction of dismissal of the Government's lawsuit.

## B.    The Government's Document Production From CMS and the Medicare Carriers Was Proper

The Centers for Medicare and Medicaid Services (CMS) is the government agency that administers the Medicare program.  CMS utilizes private contractors, known as intermediaries (for Medicare Part A) and carriers (for Medicare Part B), to issue local policies, publish provider education material, process claims, and adjudicate appeals. These private contractors are located throughout the country.   Dianon argues that CMS improperly limited the documents it collected from its Medicare carriers. Dianon Mem. at 4.   However, many of Dianon's document requests in its first request for production of documents did not involve requests for documents from the Medicare carriers across the country.  Most of the document requests called for documents from CMS itself, the Connecticut Medicare carrier, the VA and the NIH.  The Government produced numerous documents from these sources.

10

Dianon does not even bother to attach its first request for documents to its motion. *(Exh. 5)*. A review of Dianon's first request for production shows that many of Dianon's requests were not directed toward the Medicare carriers, but instead called for documents that supported the Government's "contentions" in specific paragraphs of the Government's amended complaint. *(See, e.g., id.*, Request for Production No. 3: "Produce each document supporting the contention in paragraph 30 of the amended complaint that Dianon prepared an internal memo purporting to justify the company's standard panel of 26 antibodies."). Many of the other requests called for production from CMS' central office, not the carriers throughout the country. *(See, e.g., id.*, Request for Production No. 17: "Produce each document that relates to how CMS established the relative value of work units for interpreting flow results under CPT Codes 88187, 88188 and 88189." Request for Production No. 21: "Produce each document that relates to how CMS set or modified the payment rate for the technical component codes for flow cytometry, CPT Codes 88184 and 88185."). Some of Dianon's requests sought documents from the Connecticut Medicare carrier *(see, e.g., id.*, Request for Production 44), the VA (Request for Production No. 24 ) and the NIH (Request for Production No. 25), and documents were produced from each of those entities.

The types of documents related to flow cytometry that Medicare carriers regularly issue are (1) policies that relate to flow cytometry and (2) documents relating to appeals of claims. *(See e.g.* Dianon Request for Production No. 50 regarding appeals). Accordingly, these were the types of documents initially requested by CMS of its carriers (for production to Dianon), and even these request were extremely burdensome and difficult to coordinate among all the carriers

11

around the country.[4]

First, to request documents from all of the carriers in the country, CMS has to use a nationwide "Medicare listserv" with over 100 participants, which is read by all the Medicare carrier managers and all the carrier Medical Directors. *(Exh. 23, Deposition of Marie Casey, at 31:19-32:4)*. Second, once the carriers were contacted, there was a tremendous burden and expense to even attempt to collect all the appeals related to flow cytometry. For example, as the Government informed Dianon during discovery:

> We have produced approximately 800 pages of responsive documents [related to appeals] that were supplied to us by Medicare carriers who could obtain this information without undue burden and expense. As we discussed during our call, if you could tell us how any of these particular documents are relevant, and if you could then narrow the scope of your request, that would be helpful. You asked during the call if we had asked the carriers to produce not just appeals related to particular beneficiaries, but any "policy" appeals. We did ask the carriers for both types of appeals, but did not receive any "policy" appeals. As we pointed out in our original response, your request is overly broad and unduly burdensome, as this request calls for the production of all appeals related to 88180 for all carriers for a ten year period. As we explained on the call, some of the key problems are that most carriers are not able to access appeals by particular codes and that much of the data is archived. Also, even when carriers can locate an 88180 appeal, in many cases it will have nothing to do with the number of antibodies at issue.

*(Exh. 9, at 4)*.

Furthermore, Dianon took the deposition of a CMS 30(b)(6) witness, Jennifer Collins, at CMS' central office in Baltimore, who provided the following testimony regarding the burden on the carriers around the country:

---

[4] We note that many of the documents from the carriers across the country have no relevance to this case. For example, a flow cytometry policy issued by a Medicare carrier in Minnesota, which has no jurisdiction over Connecticut providers, would not have any impact on Dianon, which is a Connecticut lab subject to the policies issued only by the Connecticut carrier. The Government nevertheless produced carrier policies from around the country to Dianon.

Q. Okay. And why would it be extremely difficult [to produce documents related to appeals]?

A. First of all, appeals are not tracked by CPT code. Some carriers may track them internally, but it's certainly not done nationally. Additionally, carriers keep anywhere from 18-24 months of claims history in-house. Once it's past that point, it's purged. Now, it can be re-called, but to re-call is very time-consuming and it is also expensive. Now, that just gets you claims. It does not get you appeals. So you would have to pull up the claims history; and once you got it, you would have to sort through it to look for any denied claims of 88180. Again, that doesn't mean those were appealed.

You would then have to look further to determine– and this is manual process–to determine if any of those denied claims were then appealed, and then you would have to take a further step of going to wherever all of those potential files are–probably in storage somewhere at like, say, a place like Iron Mountain–and you'll have to re-call all of those and go through that manually. And even then, you would have to once you, say, got all those files were you able to locate all of them, you would then have to read through them because you would have to determine if the issue in the appeal was relative to the number of markers. It could have been something else entirely that was the subject of the appeal.

*(Exh. 24, Deposition of Jennifer Collins, at 16:18-18:6).*

Most importantly, when Dianon clarified and supplemented its requests for production in

subsequent letters and phone calls, and asked for other types of documents from the carriers,

such as all emails relating to flow cytometry, CMS went back to the carriers and requested that

they produce additional documents. Those documents from the carriers were then produced to

Dianon. For example, another of the Government's 30(b)(6) witnesses, Marie Casey, testified as

follows:

> We asked [the carriers] for any internal or external E-mails, meaning E-mails between staff members within the contractor organization as well as any E-mails that they had sent out to the provider community or any communications they had with the provider community, and then we asked them for information related to determinations - - any determinations that the number of antibodies were not reasonable and necessary, and any information on ICD9 codes and LMRP's that did not reflect medically appropriate indications.

*(Exh. 23, at 34:1-11).*

In addition, the Connecticut carrier, which had the documents most relevant to Dianon,

made an extensive search for documents. The 30(b)(6) custodian of records from the

Connecticut carrier, First Coast Services Options, Inc., testified as follows:

> Q.    Now, with respect to items 4 and 5, what efforts have you undertaken in order to
>        provide responsive documents to Defendants?
>
> A.    We did an exhaustive search of all files that are housed on-site, medical review
>        files, medical policy files, files contained in the office of the medical director, and
>        personal files kept by those employees that did or could have potentially been
>        involved in any exchange of information with Dianon. We did an exhaustive
>        search of all e-mails of those individuals, same individuals that were or could
>        have been potentially involved with Dianon. We performed an IT universal
>        search of all public folders kept on our mainframe, more specifically, the H
>        drives, the J drives, and the P drives. And we did a search of all logs that
>        document those– documents that are housed in off-site storage at Iron Mountain,
>        We keep logs. We reviewed the logs. And we reviewed all what they call archive
>        databases, which is when information gets too voluminous, they archive certain
>        databases, and we searched those as well.

*(Exh. 2, Deposition of Serena Selzer, at 6:14-7:11).* Pursuant to Dianon's requests, the

Government received and produced numerous additional documents from the carriers, including

thousands of pages of documents related to flow cytometry, as well as hundreds of email

messages.

The bottom line is that the Government acted in good faith and produced documents

from the Medicare carriers across the country that it reasonably believed were called for by

Dianon's first request for production. When Dianon clarified its requests and requested

additional documents from the carriers, the Government complied and produced those additional

documents. Although some of the documents from the carriers were produced toward the end of

the discovery period, Dianon never asked the Government to stipulate to extend discovery past

July 31, 2006, nor did it file a motion with the Court for such an extension. Although the Court

allowed the parties to take additional depositions in August 2006, after the close of discovery on

July 31, 2006, Dianon never requested to take the depositions of employees of any of the carriers

14

during that extended deposition period. In fact, although Dianon took two depositions of individuals employed by the Connecticut Medicare carrier, *Dianon never sought to take a single deposition from any of the other carriers around the country*, even though it received thousands of pages of documents and emails from these entities. There is no evidence that Dianon suffered any prejudice in relation to the documents produced by the carriers. Accordingly, its motion related to this aspect of the production by the Government should be denied.

## 1.    The Impath ALJ Decision

Dianon accuses the Government of purposefully delaying the production of an ALJ decision related to an appeal in California by a lab called Impath. Dianon Mem. at 4. Dianon continues to make this false accusation, even though Dianon apparently had the ALJ decision in question *before* the Government did and even though the Government provided a detailed explanation of this issue to Dianon in a letter dated September 12, 2006. During discovery, Dianon went even further and falsely accused the Government of actually "altering" the ALJ decision. The Government set the record straight in its September 12, 2006 letter:

> Next, you falsely accused the government of "altering" an Impath ALJ decision document. In a March 2004 settlement meeting (before you were retained on this case) Thom Kossl [Dianon's in-house counsel] indicated that he had a decision from an ALJ in the Impath matter and that the decision was favorable to Dianon's position. After learning of this decision from Thom, we retrieved a copy of the decision from HHS in April of 2004. We did not produce a copy of the decision at the time of our original production, because we understood that Thom already had the decision and your document request appeared to be seeking the underlying documents related to the decision, such as correspondence and exhibits. Although the relevant Medicare carrier in California, NHIC, initially had trouble locating responsive documents, it eventually did produce approximately 3,500 pages related to the Impath appeal. As part of that production, NHIC produced a copy of the ALJ decision. Thus, the two ALJ decision documents attached to your letter came from two different sources and, of course, were not "altered" in any way. Even a cursory review of the two documents would have told you that, as one is stamped "COPY" and the other is not. Furthermore, since you had the 3,500 page NHIC production well before the close of discovery, it is difficult to understand how Dianon was "hampered" in its ability to conduct discovery.

15

*(Exh. 25, at 2)*. Thus, the Government produced the ALJ decision in question, along with over 3,500 underlying documents from the California Medicare carrier, NHIC, in May 2006, over two months before the close of discovery. Yet Dianon never asked to take a single deposition of anyone from NHIC. Instead, Dianon choose to falsely accuse the Government of "altering" a document and of purposefully delaying production of documents. Dianon's argument regarding this issue, like its other arguments, is totally without merit.

### 2.    The FOIA Documents from Dianon's Agent, James T. O'Neill

Instead of conducing all of its discovery pursuant to the Federal Rules of Civil Procedure, Dianon apparently hired an individual, James T. O'Neill, to make several extensive requests for flow cytometry documents on Dianon's behalf under the Freedom of Information Act (FOIA). *(Exh. 26, examples of James T. O'Neill FOIA requests regarding flow cytometry)*.[5]

Dianon accuses the Government of producing seven documents to Mr. O'Neill from Wisconsin Physician Services (WPS), the Wisconsin Medicare carrier, under FOIA, but not producing these same documents directly to Dianon in this litigation. Dianon Mem. at 6-7 and Dianon Exhibits 7-13. Dianon calls the Government's conduct "outrageous." Dianon Mem. at 6. First, this is not true, as six of the seven documents were produced directly to Dianon. *(Exh. 1, 27-31)*. Second, there is no prejudice to Dianon, as Dianon had access to these documents from Mr. O'Neill when they were produced by CMS on July 11, 2006 and the Government has agreed to Dianon's request to stipulate to the authenticity of the documents. *(Exh. 32)*.[6]

---

[5] Although the Government asked Dianon to confirm that Mr. O'Neill was acting on Dianon's behalf in making the FOIA requests for flow cytometry documents, Dianon refused to confirm or deny this.

[6] The one document that was not produced directly to Dianon, but was produced to Dianon's agent, Mr. O'Neill, is an email that supports the Government's position in this case, as

16

Moreover, although Dianon claims that the Government produced only 400 documents from WPS, this is also not true. The Government actually produced over 800 pages of WPS documents (CMS08025-8387, CMS08647-8766, CMS013375-13723). Moreover, many of the documents produced to Mr. O'Neill under FOIA were duplicates of the same policy, "PATH-016," in both draft and final form. In fact hundreds of pages of the documents produced to Mr. O'Neill were duplicate versions of this same draft and final PATH-016 policy. The Government produced these same draft and final policies directly to Dianon during discovery. *(Compare Exh. 34 with Exh. 35, same draft and final PATH-016 policies)*. The fact that the FOIA production to Mr. O'Neill contains hundreds of pages of duplicates of the same policy, accounts for the difference in the volume of documents between the two productions.

### 3.    The 5% Data

Dianon claims that the Government "delayed" production of the 5% data and that it failed to produce a CMS witness to be deposed about the 5% data. First, as noted above, the production of the 5% data was a compromise with Dianon because producing 100% of the data from every provider in the country would have cost in excess of $150,000. *(Exh. 36, Deposition of James Menas, at 44:6-18)*. The Government did not "delay" production of this data. In fact, this data is publically available and could have been purchased by Dianon at any time *(id. at*

---

it discussed a "frequency" edit of 16 antibodies, so there would have been no reason to withhold it. WPS provided the Government with a series of emails, all of which the Government produced behind the document titled "WPS Internal E-Mail Docs." *(Exh. 33, some examples of WPS emails produced, at CMS013639)*. The Government also produced numerous other emails from the same individual, indicating that the failure to produce this one document was due to inadvertence. *(Id. at CMS013643, CMS013647, CMS013652)*. In any event, since Dianon received this document from Mr. O'Neill under FOIA and the Government has agreed to stipulate to the authenticity of all the documents produced to Mr. O'Neill, there is no prejudice to Dianon. *See Breitling U.S.A. v. Federal Express Corp.*, 45 F.Supp.2d 179, 182-83 n.3 (D. Conn. 1999) (where document was not produced due to inadvertence and where other party was later provided with the document, court found that any error was "harmless").

*40:11-41:8)*, yet the Government provided it to Dianon without requesting payment. Also, the

data was in a main-frame compatible format; the Government utilized its own data consultant, at

the Government's expense, to put the data into PC readable format so it was usable. In addition,

the Government had its data consultant answer all of Dianon's questions related to the 5% data,

which included providing Dianon with an extra CD with all of the relevant lab information from

around the country. *(Exh. 17).*[7]

Moreover, the Government provided the 5% data to Dianon on May 15, 2006, over two

months prior to the close of discovery. Between May 15, 2006 and the close of discovery on July

31, 2006, Dianon never noticed the deposition of any witnesses regarding the 5% data.[8]

## 4.    Georgina Aguliar

Dianon claims that the Government never disclosed the identity of Georgina Aguliar, who

submitted an affidavit in opposition to Dianon's summary judgment motion. *(Exh. 37).* First,

Ms. Aguliar's affidavit was not evidence "to support" the Government's claims and was not,

therefore, required to be disclosed in the Government's initial disclosures. *Fed.R.Civ.P.*

*26(a)(2).* The affidavit was submitted to *rebut* arguments Dianon made in support of its

---

[7] The Government's data consultant was paid approximately $2,500 for converting the 5% database into a usable format for Dianon's and the Government's use and for the time he spent answering Dianon's questions about the database. The Government did not ask Dianon to share the cost for its data consultant's time.

[8] In its Rule 26 initial disclosure, served on June 1, 2005, the Government listed its case agent, Special Agent Kevin Cummings, HHS, Office of the Inspector General, and indicated that the subject-matter of the agent's testimony would be data. *(Exh. 4, at 2).* In the year that the parties conducted discovery, *Dianon never asked to take the deposition of Special Agent Cummings.* Special Agent Cummings retired from HHS-OIG in July 2006 and Special Agent David Mehring was substituted as the case agent. In opposition to Dianon's summary judgment motion, the Government submitted an affidavit from Special Agent Mehring regarding the 5% data. Thus, Dianon was on notice for over a year that the HHS case agent would testify about data, but never sought to take the agent's deposition.

18

summary judgment motion. The Government does not plan on calling Ms. Aguliar as a witness during its case-in-chief. Moreover, Ms. Aguliar did not provide any substantive evidence. All she did is provide a chronology of the events relating to the Impath appeal. Dianon was aware of the Impath decision, served a document request relating to the decision on the United States, and received numerous documents in response to that request. Yet, Dianon never asked to depose any representative from the carrier, NHIC, about the ALJ decision. This is likely because Dianon had hired as an "expert" the person who was the NHIC medical director at the time the carrier decided to limit reimbursement for the number of antibodies for flow cytometry to 15. Dianon was, therefore, presumably aware of the facts set forth in Ms. Aguliar's declaration and chose for strategic reasons not to seek a deposition from NHIC about the Impath decision.

## C. There is No Evidence That Any Relevant Documents Were Lost or Destroyed

Dianon next argues when the relator filed his complaint under seal in 2002, the Government should have instituted a nation-wide litigation "hold" to all relevant federal agencies regarding all documents related to flow cytometry. This argument is without merit for several reasons. First, the Government receives and investigates hundreds of *qui tam* complaints each year, many of which contain sketchy and incomplete information. To institute a litigation hold to every federal agency that might possess relevant documents about some partially defined subject matter regarding the  hundreds of *qui tams* filed each year would be extremely burdensome on the federal agencies. For example, this case, like many *qui tams* that are filed, contained very little substantive information. In fact, relator's thirty-five page complaint contained only one substantive paragraph about the potential fraud related to billing for medically unnecessary antibodies. Based on this one paragraph, Dianon would have had the Government issue a nation-wide litigation hold to CMS' central office and all of its regional offices, all Medicare carriers

19

throughout the country, all VA hospitals throughout the country, and the NIH. Clearly, it would be impractical to institute a litigation hold to numerous federal agencies regarding each of the hundreds of *qui tam* actions that are filed each year.

Although Dianon neglects to mention this in its motion, there is a nation-wide document freeze for all Medicare carriers relating to Medicare records. For example, the Government's 30(b)(6) witness for the Connecticut Medicare carrier testified that all carriers are under a "do not destroy" instruction, meaning "you can't destroy any documents for any reason." *(Exh. 2 at 14:5-13)*. Many older carrier documents were produced to Dianon during discovery, showing that the document retention policies are effective. *(Exh. 38, examples of carrier documents produced from March 1995, June 1995 and December 1996)*.

CMS also has document retention policies in place, including document retention policies related to rulemaking. The official rulemaking record is retained permanently and internal and preliminary drafts and comments pertaining to rulemaking are retained for 9 years. *(Exh. 39, at 5, Part N, "Rulemaking Records for Regulations" and Part O, "Internal and Preliminary Drafts Relating to Rulemaking")*. These document retention policies apply to e-mails as well as hard copy documents. *(Exh. 40, CMS email retention policy)*; *see also* 36 C.F.R. § 1222.34(e) ("Electronic mail messages. Messages created or received on electronic mail systems may meet the definition of a record in 44 U.S.C. § 3301."). The proof that these CMS document retention policies are effective is that the Government produced numerous CMS emails and other documents relating to flow cytometry from as far back as 1998, four years before the relator's complaint in this action was filed. *(See, e.g., Exh. 41, examples of CMS emails and faxes from 1998)*. Thus, there is no evidence that any relevant documents were lost or not produced.

### 1. CMS Documents

Dianon alleges that CMS emails relating to a 2003 proposed rulemaking related to flow cytometry were lost, citing to the testimony of Jim Menas, one of the four CMS 30(b)(6) witnesses who sat for a deposition. Def. Mem. at 9. However, Dianon neglects to inform the Court that many relevant e-mails from 2002 and 2003 related to the proposed rulemaking *were produced* to Dianon. *(Exh. 42, examples of emails produced from 2002 and 2003).*[9]

Dianon also neglects to inform that Court that the CMS corporate designees who testified about the production of documents, in addition to Mr. Menas, were Dr. Steve Phurrough and Marie Casey. Dr. Phurrough is the director of the CMS Coverage and Analysis Group, which manages the Medicare coverage process and makes national coverage decisions. *(Exh. 43, Deposition of Dr. Steve Phurrough, at 15:13-16:4).* Dr. Phurrough alerted his "entire staff" to search for relevant documents. *(Id. at 72:4-13).* He specifically requested that his staff produce emails and any other relevant electronic documents. *(Id. at 67:20-68:12).* Moreover, Marie Casey, another CMS 30(b)(6) witness, testified that CMS' Office of Strategic and Regulatory Affairs requested all three of CMS' main components to "look through E-mails, research any documents that they have in both hard copy and electronically for any documents related to flow cytometry." *(Exh. 23, Deposition of Marie Casey, at 27:15-28:1).*

Although Dianon implies that relevant e-mails from Jim Menas may have been lost, there is no evidence of this. E-mails from other CMS employees regarding the proposed rulemaking

---

[9] It is important to note that many of these emails support the Government's medical necessity argument. Thus, there would have been no reason to withhold these or any other relevant CMS documents. *(See, e.g., Exh. 42, 11/27/02 email from Dr. Rosen to Dr. Rudolph, USAO010)* ("I think people have NOT focused on the basic issue that the only covered markers are those that are reasonable and necessary for diagnosis and treatment."); *(id., 11/14/02 email from Dr. Rosen, USAO013)* ("It is my personal opinion that what is going on with flow cytometry constitutes an industry accepted abuse or fraud. . . .").

were produced. However, Mr. Menas is not copied on any of those emails, nor does his name appear on any of the replies or other email trails, indicating that he was not part of any substantive e-mail discussions regarding the proposed rules. Moreover, Mr. Menas testified that Dr. Rosen and Dr. Rudolph were the primary authors of the proposed rule. *(Exh. 36, Menas deposition, at 11:20-12:9).* Yet Dianon fails to inform the Court that the Government's production contains emails to or from both Dr. Rosen and Dr. Rudolph. *(See, e.g., Exh. 42).* Also, Mr. Menas testified that he "sat in on discussions" with Dr. Rosen and Dr. Rudolph and that his knowledge was mainly based on hearing the "commentary" between Dr. Rosen and Dr. Rudolph. *(Exh. 36, Menas deposition, at 12:4-13:17) (see also id.* at 13:15-17, Q: "Besides those discussions, is there any other evidence you're aware of? A. No."; *id.* at 18:7-13, Q: "...And what was that perception [that the coding system was not in sync with the way the service was provided] based on? A: Mainly discussions with Dr. Rosen and Dr. Rudolph." ). Mr. Menas "communicated orally" with Dr. Rosen and Dr. Rudolph regarding the proposed rule, and has no recollection of sending or receiving emails on this subject. *(Exh. 44, Declaration of James P. Menas, at ¶ 5).* Thus, the evidence shows that Mr. Menas sat in on "discussions" with Dr. Rosen and Dr. Rudolph and listened to their "commentary" on this issue. There is no evidence that any relevant emails on this particular issue were sent or received by Mr. Menas, let alone that they were lost as Dianon contends.[10]

_____

[10] The "flow cytometry reports" Dianon refers to in its motion, Dianon Mem. at 9, were apparently sample flow cytometry records sent to Dr. Rosen, who did not work for CMS, but for one of its contractors in Indiana. *(Exh. 45, USAO018).* These flow cytometry medical records apparently indicated that physicians interpret flow cytometry tests on a panel basis, not on a per marker basis, and that the CMS reimbursement policy at the time "may encourage the performance of more markers than may be medically necessary." *See* 68 Federal Register, at 49048 (Aug. 15, 2003), Exh. 20 to Dianon's motion. Not surprisingly, because this *supports the Government's case*, Dianon never requested to take the deposition of either Dr. Rosen or Dr. Rudolph, the principal authors of the proposed rule, to ask about their discussions of

## 2.    NIH Documents

Dianon claims that the Government should have issued a litigation hold to the NIH, a

government research institution, to preserve all documents and emails relating to flow cytometry.

First, when the relator's complaint was filed, the Government would not have known to issue a

litigation hold to the NIH, because NIH documents are not relevant to this case. NIH conducts

research and clinical trials. Neither Medicare nor the patients who participate in those clinical

trials are billed for its services. Thus, the Medicare medical necessity regulations, which are

central to this case, do not apply to the NIH. Even though documents from the NIH are

irrelevant, the Government produced over 400 pages of documents from that institution, as well

as from the director of the NIH's flow cytometry laboratory, Dr. Maryalice Stetler-Stevenson.

Second, Dianon claims that emails from Dr. Stetler-Stevenson were not produced or were

lost. The one document request that Dianon made concerning the NIH called for the production

of documents "related to the flow cytometry *panels* used by the National Institute of Health."

*(Exh. 5, Request for Production No. 25)* (emphasis added). Thus, the document request focused

on the panels used by the NIH; it did not request any documents from the NIH that mentioned the

words flow cytometry (which clearly would have not only been irrelevant, but also overly broad

and burdensome). After receiving the document request, the Government contacted Dr. Stetler-

Stevenson and asked her to provide all the NIH's panels. These were produced to Dianon. The

Government also asked Dr. Stetler-Stevenson if she regularly communicated by email regarding

the panels used by the NIH. She said she did not, but that she did post emails regarding flow

---

this issue. Instead, Dianon waited until 9 months after discovery closed and made the instant
motion. Because there is no indication that the reports in question would support Dianon's
position in this case, there are no grounds for an adverse inference instruction. *See Turner*, 142
F.R.D. at 74-75

cytometry on a Purdue University Cytometry Laboratories discussion board. Accordingly, even though this information was irrelevant, the Government produced hundreds of pages of emails from Dr. Stetler-Stevenson regarding flow cytometry from that Purdue University email discussion board. *(Exh. 46, examples of emails produced from Dr. Stetler-Stevenson).*[11]

The bottom line is that, even though NIH documents and testimony are irrelevant to this lawsuit, Dianon nevertheless received all of the NIH panels on flow cytometry and hundreds of pages of emails from Dr. Stetler-Stevenson from the Purdue University discussion board. In addition, Dianon took the deposition of Dr. Stetler-Stevenson and was able to question her extensively on the NIH flow cytometry panels. There is no reason to believe that relevant emails from Dr. Stetler-Stevenson regarding NIH's panels existed but were not produced.

### 3.    STARS Data

STARS is a software management tool used by some of the Medicare carriers. Dianon falsely accuses the Government of not preserving and producing "STARS data." Contrary to Dianon's accusations, the Government *did* produce data from the STARS software system from several of the carriers during discovery. *(Exh. 48, examples of STARS data produced).* Moreover, in response to Dianon's August 4, 2006 post-discovery document request, the Government explained why demanding production of STARS data was burdensome and not a proper request. The following is Dianon's August 4, 2006 request and the Government's

---

[11] At her deposition, Dr. Stetler-Stevenson was asked if she regularly used her government computer to discuss flow cytometry with her pathology colleagues. She testified: "Not on a regular basis" and then added "It's possible I may have." *(Exh. 47 at 52:12-19)*. She was then asked if she sometimes received emails from colleagues who said "I've got a difficult case, what do you think about this, those sort of communications" and she replied that she did receive such emails. *(Id.* at 53:1-12). However, an email from a colleague regarding a "difficult case" has nothing to do with the panels that are used by the NIH. Moreover, as noted above, even though they were not relevant, the Government produced hundreds of pages of emails from Dr. Stetler-Stevenson from the Purdue discussion board.

24

response:

> 8. All Stars data compiled or available for CPT code 88180 for the period 1996 through
> 2003 from all CMS carriers. Based on the information we have seen, a carrier can easily
> enter search parameters by: (a) CPT code; (b) time period; (c) claims allowed/denied; and
> (d) the frequency or number of units billed per claim.

> **Response**: This was not requested during discovery. More importantly, it is overbroad
> and burdensome. STARS is simply a software data management system used by some of
> the Medicare carriers, not by CMS itself. Since it is not used by CMS central office, to
> respond to this request would necessitate going to each and every carrier in the country to
> try to obtain this information. Some carriers don't even use STARS. Also, I have spoken
> with some of the carriers who do use STARS. They informed me that the STARS system
> only goes back 18 months and that they can't use the STARS system for older data.
> Thus, you could not use STARS for data from 1996 to 2003, because it is more than 18
> months old. Also, it is my understanding that there is no "STARS data" per se; it is
> simply claims data that is sorted or analyzed using the STARS software program. In
> order to obtain data from STARS, even for the last 18 months, carriers would have to run
> special STARS reports. In other words, it's not like this information currently exists in
> their files. Thus, this is not even a proper document request. Finally, because you have
> the 5% data, you can sort the data by frequency, which is the reason you say you need
> STARS in the first place. Your attempt to shift the cost of sorting this claims data from
> your client to the government is improper.

*(Exh. 22, at 3)*. Thus, STARS data was produced, to the extent the carriers had this information

in their files. Moreover, the Government produced, at its own expense, the 5% data to Dianon,

which allowed them to do the same type of analysis as would have been possible with STARS

data.

## D.    Because There Was No Spoilation of Evidence and No Prejudice to Dianon, Neither Dismissal of This Case, Nor the Lesser Sanctions of an Adverse Inference Instruction or Preclusion of a Witnesses is Appropriate

As noted above, outright dismissal of a lawsuit for discovery violations is a "particularly

severe sanction." *Chambers*, 501 U.S. at 45. Dismissal of a case should only be contemplated for

egregious conduct. *See, e.g., Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)

(underlying action dismissed with prejudice where attorneys failed to appear at hearings, answer

interrogatories, produce client for depositions, or file briefs, all in violation of court orders); *John*

*B. Hull, Inc.,* 845 F.2d at 1117 ("flagrant disregard" of repeated court orders regarding discovery justified dismissal). This type of flagrant or egregious conduct clearly did not occur here.

Moreover, even lesser sanctions of an adverse inference instruction or preclusion of witnesses are not called for in this case. In order to justify an adverse inference there must first be an indication that evidence has actually been destroyed. *See, e.g., Turner,* 142 F.R.D. at 72 (court has authority to impose spoilation sanctions where "a party has destroyed evidence. . ."). Thus, the cases relied on by Dianon indicate that relevant evidence had actually been lost or destroyed. *See, e.g., West,* 167 F.3d at 778 (destruction of "exemplar wheel"). Here, as discussed in detail above, there is no evidence that relevant documents have been destroyed or lost.

In addition, to warrant an adverse inference, the Second Circuit has indicated that there must be some evidence to indicate that the documents which were destroyed would support the facts to be inferred. *See Stanojev,* 643 F.2d at 924 n.7 ("We do not believe that an inference that [plaintiff] was discharged on account of his age can logically be drawn from the failure of the defendant to produce the management succession charts."); *see also Turner,* 142 F.R.D. at 77 ("Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate."). In the instant case, there is no evidence that any documents unfavorable to the Government were not produced.

Furthermore, Dianon has not shown that it was prejudiced in any way regarding the documents produced by the Medicare carriers from around the country. *See McGuire,* 175 F.R.D. at 154 (sanctions not as a rule imposed where there has been no prejudice to a party). After receiving the additional carrier documents it requested, Dianon never asked to extend

26

discovery or to depose *any* individuals who worked at *any of* the Medicare carriers, with the exception of the Connecticut carrier. Even when the Court gave the parties extra time to take depositions in August 2006, after the official close of discovery on July 31, 2006, Dianon never asked to take depositions of any carrier employees. Thus, Dianon's allegation that it was "compromised" in its ability to conduct discovery is simply not accurate.

Finally, there is also no basis for exclusion of any witness. The Government disclosed that its HHS case agent would testify about data in June 2005, over a year before the close of discovery. Yet, during that year time-period, Dianon never sought to take the agent's deposition. Moreover, the only other witness that Dianon complains of, Georgina Aguliar, is merely a rebuttal witness, that was not required to be disclosed under Rule 26 and will not be called by the Government in its case-in-chief.

## IV.   CONCLUSION

The Government produced over 17,000 documents to Dianon in this litigation. It produced thousands of pages of additional information and data in electronic form. Dianon has not provided any credible evidence that the Government withheld or destroyed any documents or other information. Moreover, Dianon has falsely accused the Government of "never" producing documents that it did, in fact, produce. Dianon's motion is without factual or legal basis and should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNOR
United States Attorney

27

RICHARD M. MOLOT
Assistant United States Attorney
Federal Bar No. CT21676
157 Church Street
New Haven, Connecticut 06510
Richard.Molot2@usdoj.gov
(203) 821-3700

JOYCE R. BRANDA
PATRICIA R. DAVIS
JENNIFER CHORPENING
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0240
Attorneys for the United States

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the United States' Opposition to Defendant's Motion In Limine Regarding Discovery Violations, was served by email and regular mail, this 11th day of May 2007 on:

> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 266 Post Road East
> Westport, CT 06880
> bcarmody@mayalaw.com

> Robert Salcido, Esq.
> Akin Gump Strauss Hauer & Feld, LLP
> Robert Strauss Building
> 1333 New Hampshire Ave, NW
> Washington, D.C. 20036
> rsalcido@akingump.com

> Bruce R. Parker
> Venable LLP
> 1800 Mercantile Bank & Trust Bldg.
> 2 Hopkins Plaza
> Baltimore, Md. 21201
> brparker@venable.com

Richard M. Molot
Assistant U.S. Attorney