# Exhibit 9

Case 3:02-cv-01573-MRK     Document 241-11     Filed 05/11/2007     Page 1 of 6

 **U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*
*157 Church Street*
*P.O. Box 1824*
*New Haven, Connecticut 06510*

*(203) 821-3700*
*Fax (203) 773-5376*
*www.usdoj.gov/usao/ct*

April 18, 2006

<u>Via e-mail and regular mail</u>
Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

    Re:    <u>United States ex rel. Tiesinga v. Dianon Systems, Inc.</u>, 3:02CV1573 (MRK)

Dear Robert:

    This letter is written in response to your letter of March 22, 2006, and our meet and confer conference call of April 11, 2006, regarding the government's responses to Dianon's interrogatories and document requests.

<u>Government's Interrogatory Responses</u>

    In Interrogatory No. 1, you ask the government to state the basis for its contention in paragraph 24 of the amended complaint that Dianon acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations and guidance applicable to federal healthcare programs in submitting its claims. We have indicated in our response how Dianon was put on notice that Medicare only pays for medically necessary services, through the relevant statutes and C.F.R. provisions cited in our response, as well as the fact that each time Dianon submitted a CMS 1500 claim form it certified that the services in question "were medically indicated and necessary for the health of the patient." Moreover, we indicated that, pursuant to 42 C.F.R. § 411.406, a Medicare provider, such as Dianon, is on notice that the services it provided were not reasonable and necessary based on, among other things, its receipt of CMS notices, including manual issuances, bulletins or other written guidance or directives from carriers, as well as a provider's knowledge of what are considered acceptable standards of practice in the local medical community. You have asked us to identify the CMS notices, manual issuances, bulletins or other written directives we are referring to. In addition to the LMRP's for 88180, which we have previously produced, we are referring to the Publication of OIG Model Compliance Plan for Clinical Laboratories, 62 Federal Register 9435 (March 3, 1997) and 63 Federal Register 45076 (Aug. 24, 1998). In addition, we are also enclosing notices/bulletins from the Connecticut Medicare Carrier that are

responsive to this interrogatory, bates stamped CMS 004055 to CMS 004160. These are available on the Connecticut Medicare Carrier web site, www.connecticutmedicare.com. Both of the enclosed documents discuss examples of Medicare fraud, such as "[b]illing for services that are not medically necessary." One of the documents indicates that "[p]rimary responsibility for preventing Medicare fraud lies with Medicare providers and their staff" and that providers must ensure that their staff "is adequately trained in Medicare billing procedures." In addition, one of the notices specifically indicates that potential Medicare fraud includes "[c]laims for a panel or series of lab tests when only part of the group of tests in the panel were medically indicated for the patient's signs, symptoms, or complaints." We have asked the Carrier to double-check for any additional notices/bulletins that relate to this interrogatory and we will identify any additional notices that are provided by the Carrier.

Regarding Interrogatory No. 2, as we discussed during our April 11 conference call, the government plans on using its sample at trial, as set forth in our expert disclosure. Of course, should the Court rule that the government is not permitted to use its sample to prove its case, we reserve the right to introduce other evidence at trial. Our damages analysis will be produced by May 1, 2006.

As to Interrogatory No. 3 (and Request for Production 20), to answer this interrogatory and RFP would require obtaining and analyzing individual claims data for all providers and suppliers that ever billed Medicare for flow cytometry during a seven (7) year period, from 1997 to March 31, 2004. We do not have the massive amount of individual claims data that would be required to answer this interrogatory, and to obtain it would be extremely burdensome. For example, CMS informs us that to run this type of data search would take several months and would cost approximately $150,000. Even if CMS did run this data, it would be produced only in "main-frame compatible files" which we would be unable to analyze without converting the data into a usable format, which would require hiring an outside computer consultant. More importantly, we are informed that even if CMS ran such a data report, it would not contain the level of detail required to answer this interrogatory, specifically the number of markers on each paid claim. We are informed by CMS that for this level of detail, we would have to go to the individual Medicare Part B carriers around the country. Because the request asks for historical records going back almost ten years, many of the carriers do not have easy access to the data in question (it is archived) or to the beneficiary claims records that were processed by previous carriers who held Medicare B contracts for that region. In some cases, the information has been purged from the system, and would require carriers to manually scan in the information from hard copies of claims files.

As we suggested during the April 11 conference call, as a compromise we are offering to produce the "5% data file" that we obtained from CMS. This file itself took several months to obtain and was not in usable format when we received it from CMS. Hence, we had to pay an outside computer consultant to put it in a format that would be usable on a normal PC. This 5% data encompasses the years 1997 through 2004 and has information on over 45,000 88180 claims for over 1000 providers. Although the data in this format is work-product, we would be willing to produce it as a compromise. Please advise if this is acceptable and we will produce it.

As to Interrogatories No. 7 and 8, we advised you that we were relying on our medical expert, Dr. Stuart Flynn, for this information. I have asked Dr. Flynn to collect this information for his May 10 deposition, pursuant to your notice of deposition. Dr. Flynn is currently out of town. However, I will attempt to provide you with this information, if possible, prior to Dr. Flynn's deposition.

Regarding Interrogatory No. 16, as we discussed during our April 11 conference call, we are relying on the statutory, regulatory, and other publicly available definitions of medical necessity. *See* 42 C.F.R. § 411.15(k) (services excluded from coverage include any services that "are not reasonable and necessary . . . [f]or the diagnosis and treatment of illness or injury. . . ."); §32 CFR 199.2 ("The frequency, extent, and types of medical services or supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness [and] injury . . . "); 42 U.S.C. §1395y(a)(1)(A) (no payments may be made for services which are "not reasonable and necessary for diagnosis or treatment of illness or injury . . . ."); 42 U.S.C. § 1320c5(a)(1)( it is the obligation of Medicare providers to provide services "economically and only when, and to the extent, medically necessary); *see also*, CMS web site glossary, at www.cms.hhs.gov & www.medicare.gov ("Services or supplies that are proper and needed for the diagnosis or treatment of your medical condition, are provided for the diagnosis, direct care, and treatment of your medical condition, meet the standards of good medical practice in the local area, and aren't mainly for the convenience of you or your doctor.").

As to Interrogatory No. 17, as we discussed during our call, please see our response to Interrogatory No. 1, above, and the additional CMS documents enclosed with this letter.

Government's responses to document requests

Regarding the government's responses to requests 1-2, 6-11, 14, 26-34, 44-45, the government did produce the documents "as they are kept in the usual course of business" pursuant to Fed.R.Civ.P. 34. As noted during our April 11 phone conference, Dianon did not identify which documents corresponded to each of the government's document requests and did not even identify which documents it produced were from Dianon and which were from LabCorp.

Regarding the government's responses to requests 3-5, 12-13, you asked during the April 11 conference call for us to clarify that there are no *government* documents responsive to these requests. We are so clarifying. While there are no government documents responsive to these requests, as noted in our original responses, there are Dianon documents which are responsive.

Requests 15-22 seek documents related to how the government set reimbursement and the estimated costs associated with providing services under CPT code 88180 and its successor codes. As we discussed during our April 11 call, it is my understanding from speaking with CMS that CMS does not establish the work relative value units (RVUs) that relate to developing the payment rate for a particular CPT code, and instead, relies on the Relative Value Update Committee (RUC), which is affiliated with the American Medical Association. After our April 11 call, we again asked CMS to double-check for any responsive documents relating to how flow cytometry Medicare payment policy was established. (Please note that we did produce responsive documents for the 1998 time period, and, in addition, listed documents on our privilege log for the 2002-2005 time period). Our CMS contact checked again with the CMS medical officers who attended the RUC meeting(s) related to 88180. All confirmed that they had no CMS-created responsive documents. They did, however, locate documents that were part of the RUC binder that each of them received as participants in the RUC meetings. Those documents are enclosed, bates stamped CMS 004161 to CMS 004201.

We also asked our CMS contact about the fluctuations in the reimbursement rate for 88180

3

services. Our CMS contact indicated that there were variable factors in the physician fee schedule payment formula, mandated by law, that could increase or decrease Medicare's payment allowance for a particular service. For example, there are annual updates to the "conversion factor" (one of the factors used to calculate Medicare's payment allowance for a service) in order to take into account medical inflation. There may also be annual changes to the locality adjustment for services. This locality adjustment, referred to as the Geographic Practice Cost Index ("GPCI") is updated every three years and changes are generally phased in over a three year period, thus causing annual fluctuations in the GPCI and to Medicare's payment allowance. Finally, Congress also wrote into the Medicare statute (see section 1848(c)(F) of the Social Security Act), a requirement that CMS make budget neutrality adjustments to RVUs or conversion factors in order to keep Medicare expenditures budget-neutral. This budget-neutrality requirement introduces yet another variable to the physician fee schedule payment formula.

Requests 24 and 25 relate to flow cytometry panels used by the VA and the NIH. You indicated in your March 22 letter that the government's response was unclear. As we clarified during the April 11 call, your request arguably called for the production of all patient charts related to flow cytometry from the VA and NIH, which we believed was unduly broad and burdensome, as it would involve pulling thousands of charts for a ten year period. In addition, as we pointed out in our response, there are approximately 170 VA facilities in the United States and the VA does not keep a centralized list of which facilities perform flow cytometry. These were our main objections. We did, however, produce all the information we received from the VA and NIH relating to their flow cytometry panels and procedures. You also asked during the April 11 call whether what we produced included historical information related to the panels. For the VA panels, it does include older information regarding the panels. As to the NIH, we produced all the panels we received from the NIH. We are double-checking with our NIH contact, and if older information exists, we will produce it.

Regarding requests 39-40, as we discussed during our April 11 call, the government plans on using its sample. Please see our response to Interrogatory No. 2, above.

Regarding requests 41-43, we will produce our damages analysis on May 1, as we have previously discussed.

Regarding request 47, please see our response clarifying Interrogatories No. 7 and 8, above.

Request 50 involves appeals related to 88180. We have produced approximately 800 pages of responsive documents that were supplied to us by Medicare carriers who could obtain this information without undue burden and expense. As we discussed during our call, if you could tell us how any of these particular documents are relevant, and if you could then narrow the scope of your request, that would be helpful. You asked during the call if we had asked the carriers to produce not just appeals related to particular beneficiaries, but any "policy" appeals. We did ask the carriers for both types of appeals, but did not receive any "policy" appeals. As we pointed out in our original response, your request is overly broad and unduly burdensome, as this request calls for the production of all appeals related to 88180 for all carriers for a ten year period. As we explained on the call, some of the key problems are that most carriers are not able to access appeals by particular codes and that much of the data is archived. Also, even when carriers can locate an 88180 appeal, in many cases it will have nothing to do with the number of antibodies at issue.

4

You asked for some specific examples of the potential burden to the carriers. We spoke with representatives of CIGNA, in Tennessee. They indicated that they do not keep appeals by code, they are kept by provider. First, they would have to figure out which providers billed 88180; then pull all appeals by those providers and go through them to see which involved 88180 (these are kept on tapes); then, they would have to review the appeals to see which, if any, involved the number of antibodies; then, they would have to pull those cases and copy them. This would be an extremely time-consuming process that would cost in excess of $45,000. We spoke with representatives of NHIC in California. They indicated that just to produce a database to obtain relevant historical information on its appeals would take 17 weeks and cost $345,000. We spoke with HealthNow in New York. Again, because appeals are not accessible by CPT code, they would have to create a special data program to try to do this. It would take over 500 hours just to run the special data reports. Then, they would have to go off-site and pull the files and review all of them to see which ones, if any, related to the number of antibodies. This would cost at least $50,000. We also spoke to Wisconsin Physicians Service, which, like the other carriers above, indicated that this would be a massive, extremely time-consuming project that would cost up to $45,000. Again, if you could look at the appeals materials that we have produced to date and narrow your focus, that would be helpful.

Request number 52 calls for documents related to viability. Please be advised that my review of our production indicates that the government did produce documents that relate to viability. See NIH 000026 and NIH 000040-42; VA 000003, 000052, 000069, 000088. Attached are some additional documents relating to viability which we just received from the VA, bates numbers VA 000120 to VA 000147.

Please note that we reserve the right to further supplement our responses and to use any information we obtain during discovery in this action.

After reviewing this letter and the enclosures, please contact me if you would like to discuss this further or if you need any additional clarification of the government's responses.

Very truly yours,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

*[signature]*

RICHARD M. MOLOT
ASSISTANT U.S. ATTORNEY

Encl.
cc:     (via e-mail)
        Bruce Parker, Esq.
        Pat Davis, Esq.

5