# Exhibit 10

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

Attorneys at Law

**ROBERT SALCIDO**
202.887.4095/fax: 202.887.4288
rsalcido@akingump.com

May 9, 2006

Richard M. Molot, Esq.
Assistant United States Attorney
Office of U.S. Attorney, District of Connecticut
Connecticut Financial Center
U.S. Department of Justice
157 Church Street
New Haven, Connecticut  06510

**Re:   U.S. v. Dianon Systems, Inc.**

Dear Rick:

I am writing in response to your April 18, 2006 letter concerning our objections to the government's discovery responses. Below is a list of documents we believe the government is obligated to produce and are examples of the types of documents we believe are necessary to adequately prepare for trial in this case. We provide this list to assist you in responding to Dianon's requests, but in no way limit our right to all relevant, non-privileged documents.

1.   **All documents reflecting Medicare reimbursement for antibody panels of 26 or greater from 1997 to 2004** -- by way of compromise you suggested that the government could produce a 5% data sampling encompassing the period 1997 through 2004, including over 45,000 claims for CPT Code 88180 from over 1,000 providers. We ask that you make this database accessible for inspection as soon as

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━ Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 2

possible. Upon inspection, we can make a determination of whether the 5% sample would fulfill our needs. However, as an initial matter, the sample of 45,000 claims does not seem to be 5% of the total claims Medicare paid during the 1997 to 2004 period. *See, e.g.*, CMS 003171 indicating nearly ten million claims paid during the relevant time period. If CMS 003171 is accurate, the 45,000 claims would constitute approximately 1/2% of all claims paid.

2. **Documents concerning how Medicare set reimbursement under former CPT Code 88180** -- to supplement your previous document production you provided the AMA/Specialty Society RVS Update Committee Summary of Recommendations for Flow Cytometry, documents Bates stamped CMS 004161 to CMS 004201. While your previous document production and your supplemental document production provided with your April 18, 2006 letter furnished documents related to Medicare's amendment in reimbursement policy effective January 1, 2005, you have failed to produce any documents concerning the revisions in reimbursement rates leading up to the 2005 billing amendments or for prior years (1995 to 2005).

You should produce all documents relating to the reimbursement rates for CPT Code 88180, amendments made to the reimbursement rate each year, information received from the AMA or other interested parties, the "variable factors in the physician fee schedule payment formula mandated by law, that could increase or decrease Medicare's payment allowance for a particular service," the annual updates to the

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 3

"conversion factor," locality adjustments referred to as the geographic practice cost index, and any documents reflecting application of the variables you listed to the year-to-year price revisions Medicare and/or the Connecticut Medicare carrier published.

3.  **Veterans' Administration Flow Cytometry Documents and Information.** You indicated in your letter that there are approximately 170 VA facilities in the United States and the "VA does not keep a centralized list of which facilities perform flow cytometry." Though the VA does not keep a centralized list of which facilities perform flow cytometry, establishing which facilities perform flow cytometry, how flow cytometry is practiced at each of these facilities, the doctors who perform flow cytometry services at each of these facilities, and laboratory protocols, panel designs, and correspondence or emails or other documents reflecting how the VA practices flow cytometry during the period 1995-2005 are all relevant, discoverable, and accessible to the United States government.

To date, you have provided 147 pages of documents from the Veterans' Administration regarding flow cytometry. It is difficult to imagine that of the 170 VA facilities in the country that these are the only documents concerning the practice of flow cytometry at VA facilities in the government's possession. We ask at a minimum that you provide the above information. As we related to you in our telephone call on April 11, 2006, Dianon does not request any patient file at VA facilities or the results of any specific flow test. To the contrary, Dianon wants the basic information concerning the

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━ Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 4

practice of flow cytometry at VA facilities as this information is relevant to the standard of care in flow cytometry. If you find this statement to be too broad, simply ask the VA facilities for the same type of documents you have routinely and frequently requested from Dianon and LabCorp regarding viability, panels, panel sizes, communications with physicians regarding flow, studies conducted regarding the standard of care and medical necessity, and communications regarding specific markers, among other things.

    4.    **Flow cytometry documents from the NIH**. Similar to our concerns with regard to the VA document production, to date you have provided 81 pages of documents from the NIH concerning flow cytometry. These documents include the panels, as of 2005, that the NIH lab runs in their practice of flow cytometry. Again, Dianon does not request individual patient reports or tests the NIH performed. Rather, Dianon seeks information concerning the practice of flow cytometry at the NIH, including laboratory protocols, historic panels performed from 1995 to 2005, correspondence and emails discussing the practice of flow cytometry, the selection of antibodies, and the appropriateness of testing.

In response to our Request for Admission no. 2, you indicated that the panels and/or antibodies that NIH uses are for research purposes or as part of clinical trials. If so, what are the research or clinical trial protocols, the research or clinical trial findings, data generated by the research or clinical trials, or other information concerning these clinical trials? To date, you have produced nothing in this regard. In addition, it is

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 5

difficult to imagine that the NIH operates a clinical flow cytometry laboratory and participates in clinical trials, but has only generated 81 pages of non-patient information concerning flow cytometry over a 10-year period. Have the doctors who performed flow cytometry at NIH conducted or attended seminars, drafted papers, corresponded with the flow cytometry community, corresponded with Medicare concerning flow cytometry reimbursement, had input regarding the definition of medical necessity, or otherwise generated documents concerning their profession or the research they conduct? If so, we are entitled to those documents as they are all relevant to the establishment of the standard of care for flow cytometry practice and may constitute governmental admissions.

5. **Appeals concerning CPT Code 88180** – you indicated in your letter that the request is overly burdensome and asked that we narrow the scope of the request. To that end, we propose you provide any and all documents concerning CPT Code 88180 appeals during the period 1995 to 2005 in those regions or states where the number of antibodies or markers is capped by an LMRP or LCD. We will further focus our request for only those appeals or challenges to the antibody cap in a particular case or as a policy. All documents relevant to any appeals or challenges to an LMRP or LCD antibody cap, including all related documents such as correspondence, are requested.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 6

      **6.**     **Documents related to statements in 68 Fed. Reg. 49030, 49048.** Any documents supporting or providing the basis for the statement, "The current coding system (payment of a per marker basis) may encourage the performance of more markers than may be medically necessary because the pathologist determines what markers to perform and when to perform them" you provided in your Answer to Interrogatory 12. What documents, data, or information, if any, provide the basis for this statement? In addition, any documents concerning how a pathologist performs flow cytometry, or relate to flow cytometry practice that form the basis of statement should also be produced.

      **7.**     **All facts and publications concerning the design of antibody panels for flow cytometry** – we need all documents and publications, the government or others have promulgated that you claim would have notified Dianon that Dr. Flynn's methodology was the standard of care or was required to establish medical necessity. To date, you have produced no documents specific to flow cytometry with regard to medical necessity or the standard of care in performing flow cytometry. If no documents exist, please so indicate.

      **8.**     **Connecticut Medicare carrier documents.** In neither your privilege log, nor your document production, do you list any documents, e-mails, correspondence, or other sources produced, received, or considered with regard to Connecticut's LMRP or LCD for flow cytometry CPT Code 88180. The Connecticut LMRP or LCD went through numerous revisions from 1995 to 2005 regarding flow cytometry, including the

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 7

reimbursable ICD-9 Codes. What were these amendments based upon? At a minimum, we need to know if these documents do, in fact, exist and, if so, which documents you intend to produce or claim privilege.

Moreover, as I have stated previously, we are concerned about the paucity of e-mail correspondence the government produced or designated as privileged. The documents, for example, contain virtually no e-mail correspondence regarding flow cytometry. What steps did you undertake to ensure that all responsive e-mails were produced? The government's privilege log lists 16 e-mails concerning flow cytometry policy as privileged. Apparently, based upon the government's production of documents to date, the sum total of all e-mail correspondence concerning flow cytometry, the practice of flow cytometry, determinations of medical necessity, and reimbursement policies of Medicare carriers only yielded a handful of e-mails over a 10-year time period. This representation is simply incredible.

There must be virtually hundreds if not thousands of e-mails between representatives of CMS, doctors performing flow cytometry at NIH, doctors performing flow cytometry at VA facilities, the larger flow cytometry community, and representatives of the Medicare carrier. To the extent that the government personnel discuss flow cytometry via email, the practice of flow cytometry, determinations of medical necessity with regard to flow cytometry, LMRPs, LCDs, antibody panel designs, research on flow cytometry, the utility of specific antibodies in detecting various

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 8

conditions, revisions in policy, draft policies, considerations of policies not implemented, or discussions concerning the standard of care or practice of flow cytometry, we believe that all of those communications should be produced. To the extent that you disagree and believe one or more of these areas would be privileged, then we need to be aware of the existence of the documents and the privilege asserted so we may challenge such an assertion.

The government's document production to date has been inadequate and, based upon the small additional response and your April 18th letter, we are not hopeful that the additional thousands of pages of documents described above will be provided promptly. Dianon's document production over the relevant time frame is more than three times larger than the government's production to date. It is impossible to imagine that a single laboratory has produced three times more documents on flow cytometry than the numerous VA laboratories, NIH laboratories, CMS, and Medicare and Medicare carriers. And, after all, we are not the party claiming more than $100 million in damages and civil penalties in this action. If producing responsive documents in such a lawsuit is too burdensome, then the government should not have filed a lawsuit in the first instance. It cannot have it both ways – file such a lawsuit and then claim that producing responsive documents is inconvenient.

Finally, I do not understand the reference in your letter that you do not need to "label [your documents] to correspond with the categories in the request," under Rule 34

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 9

because you produced them "as they are kept in the usual course of business." How can you maintain that the documents were produced "as they are kept in the usual course of business"? We received documents that were culled from multiple governmental agencies in no discernable order. *See, e.g., T.N. Taube Corp. v. Marine Midland Mortg. Corp.*, 136 F.R.D. 449, 456 (W.D.N.C. 1991) (finding that documents haphazardly placed in a box in no discernable order were not kept in the usual course of business). Who will certify from the government that the documents produced were produced to us as they are kept in the usual course of business?[1]

Besides the command of Rule 34, there is an additional reason you should comply with the Federal Rules of Civil Procedure and link the documents to the category in the request for production of documents. This is because, unless there is a dramatic shift in the government's understanding of its discovery obligations, we will have no choice but to file a motion to compel. It will be much easier for us, and the Court, to address whether your discovery responses are adequate if we can tie your responses to the discovery requests. Indeed, I suspect that the reason you have refused to comply with the Rule to date is to avoid precisely this type of matching from occurring.

Please provide dates when we will be able to inspect a 5% sample of claims you have collected to determine whether we can eliminate one of the issues of contention

---

[1] As I noted to you previously, Dianon will provide to you an index linking the documents it produced to the specific categories in the government's requests.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Richard M. Molot, Esq.
May 9, 2006
Page 10

listed above. If we otherwise do start to receive responsive documents by May 15, we have no option but to file a Motion to Compel.

Sincerely,

*(signature)*

Robert Salcido

cc:  Thomas Kossl
     Bruce R. Parker