# Exhibit 19



Two Hopkins Plaza, Suite 1800  Telephone 410-244-7400  www.venable.com
Baltimore, Maryland 21201-2978  Facsimile 410-244-7742

William F. Piermattei
(410) 244-7473
wfpiermattei@venable.com

June 28, 2006

Richard M. Molot, Esq.
Assistant United States Attorney
Office of U.S. Attorney, District of Connecticut
Connecticut Financial Center
U.S. Department of Justice
157 Church Street
New Haven, Connecticut 06510

    Re: U.S. v. Dianon Second Supplemental Discovery Requests

Dear Rick:

  Enclosed please find Dianon's Second Supplemental Discovery Requests. Should you have any questions or problems, please do not hesitate to call.

              Sincerely,

              William F. Piermattei

WFP:vds
enclosure
BA2DOCS1\#294203/s7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DR. JAMES J. TIESINGA,<br><br>    Plaintiffs,<br><br>v.<br><br>DIANON SYSTEMS, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) No. 3:02CV1573(MRK)<br>)<br>)<br>)<br>) |

### DIANON SYSTEMS, INC.'S SECOND SUPPLEMENTAL
### REQUESTS FOR ADMISSION

TO:   United States of America

Dianon Systems, Inc., by and through its undersigned attorneys, hereby request the government to respond to the following Requests for Admission, Requests for Production of Documents, and Interrogatory, pursuant to Federal Rules of Civil Procedure.

All Requests for Admission cover the time period of 1996 through 2003.

### DEFINITIONS

APPROPRIATE NUMBER OF ANTIBODIES – The number of antibodies that are deemed reasonable and necessary for flow cytometry testing and therefore reimbursable under Medicare Part B.

CLINICAL INFORMATION – The information provided or could be provided by a clinician or referring physician when ordering flow cytometry testing including, but not limited to, information provided on the requisition form, blood test results, or other clinical information concerning the patient's condition and reason(s) for ordering flow cytometry testing.

CLINICIAN OR REFERRING PHYSICIAN – A medical doctor who orders or requests flow cytometry testing for a patient.

EXPERT – A healthcare provider who is a "recognized authority in the field" of flow cytometry. The term is meant in the same context as the term "recognized authority in the field" as used in Center for Medicare and Medicaid Services (CMS) Program Integrity Manual.

FLOW CYTOMETRY TESTING - Testing used for immunophenotyping a patient or beneficiary's blood, bone marrow, or tissue specimen for the detection of lymphoma, leukemia, or hematopoietic disease using flow cytometry.

HEALTHCARE PROVIDER – A doctor or other medical professional who is qualified to provide flow cytometry testing or analysis of flow cytometry testing.

MEDICAL LITERATURE – Peer reviewed publications in texts, journals, or other format concerning flow cytometry testing. The definition is intended to be used in the same context as "peer reviewed medical journals" as that term is used in CMS's Program Integrity Manual.

MEDICARE – The term is intended to mean Centers for Medicare & Medicaid Services (CMS), third party Medicare carriers or contractors charged with reviewing and administering the provision of healthcare under the Medicare Act, and any other government organization, department, employee, contractor, or other entity or person who has been authorized to act on behalf of the United States to administer the provision of healthcare services under the Medicare Act.

PANEL(S) – Refers collectively to the antibodies used for flow cytometry testing. This term is used in the same context as the United States expert, Stuart Flynn, M.D., uses the term in his testimony and report.

STANDARDS OF MEDICAL PRACTICE – The acceptable, medically reasonable and necessary methodologies of performing flow cytometry testing. The term is intended to mean the same as "accepted standards of medical practice" as used in the CMS Program Integrity Manual.

\* \* \* \* \*

1. Laboratories that perform flow cytometry testing utilize different antibodies in flow cytometry panels.

2. Laboratories that perform flow cytometry testing utilize different combinations of antibodies in flow cytometry panels.

3. Laboratories utilize "standard panel(s)," as the term is used by Dr. Flynn at SF0003, for flow cytometry testing.

4. There are no Medicare regulations that specifically instruct a laboratory to review a patient's clinical information and use this review as the basis for selecting antibodies to include in a panel for flow cytometry testing of a patient's specimen.

5. There are no Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs) that specifically require a laboratory to review a patient's clinical information and use this review as the basis for selecting antibodies to include in panel for flow cytometry testing of a patient's

-2-

      specimen.

6. There are no Connecticut Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs) that specifically require a laboratory to review a patient's clinical information and use this review as the basis for selecting antibodies to include in a panel for flow cytometry testing of a patient's specimen.

7. The medical literature does not require a laboratory performing flow cytometry testing to review a patient's clinical information and use this review as the basis for selecting antibodies to include in a panel for flow cytometry testing of a patient's specimen.

8. There are no Connecticut LMRPs or LCDs that specifically limit the number of antibodies a healthcare provider may use in flow cytometry testing.

9. There are no Medicare regulations that require a healthcare provider to select a specific number of antibodies for a flow cytometry testing panel based upon a patient's clinical information.

10. There are no Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs) that require a healthcare provider to select a specific number of antibodies for a flow cytometry testing panel based upon a patient's clinical information.

11. There are no Connecticut Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs) that require a healthcare provider to select a specific number of antibodies for a flow cytometry testing panel based upon a patient's clinical information.

12. The medical literature recognizes, as standards of medical practice, three basic approaches to flow cytometry testing: (a) "screening" approach; (b) "directed or targeted" approach; or (c) "comprehensive" approach as those terms are defined at SF0760-61.

13. There is no medical literature that <u>requires</u> a healthcare provider to use clinical information ". . . to design a targeted panel of antibodies. . ." instead of using a "large 'standard panel' in each (patient) case" as noted in Dr. Flynn's report at SF0003.

14. There are no LMRPs or LCDs that <u>require</u> a healthcare provider to use clinical information ". . . to design a targeted panel of antibodies. . ." instead of using a "large 'standard panel' in each (patient) case" as noted in Dr. Flynn's report at SF0003.

15. There are no Connecticut LMRPs or LCDs that <u>require</u> a healthcare provider to use clinical information ". . . to design a targeted panel of antibodies. . ." instead of using a "large 'standard panel' in each (patient) case" as noted in

-3-

Dr. Flynn's report at SF0003.

16. Using a "comprehensive" panel, as that term is used at SF0760, for flow cytometry testing falls within recognized standards of medical practice.

17. The U.S.-Canadian Consensus Recommendations on the Immunophenotypic Analysis of Hematologic Neoplasia by Flow Cytometry: Selection of Antibody Combinations, Cytometry 30:231-235 (1997) at SF0760-0764 specifically cautions that using a "targeted approach" to "confirm or classify a disease" may be "hazardous in cases in which (clinical) information" is incorrect at SF0761.

18. Absent a controlling rule, regulation, LMRP or LCD governing an appropriate number of antibodies for flow cytometry testing, a laboratory should look to "accepted standards of medical practice," as that term is used in the CMS Program Integrity Manual, to determine whether its panel has an appropriate number of antibodies for flow cytometry testing.

19. In order to establish "accepted standards of medical practice," as that term is used in the CMS Program Integrity Manual, with regard to flow cytometry testing, a healthcare provider should rely upon published authoritative evidence derived from randomized clinical trials or other definitive studies.

20. In order to establish "accepted standards of medical practice," as that term is used in the CMS Program Integrity Manual, with regard to flow cytometry testing, a healthcare provider should rely upon general acceptance by the medical community as supported by scientific data or research published in medical literature.

21. In order to establish "accepted standards of medical practice," as that term is used in the CMS Program Integrity Manual, with regard to flow cytometry testing, a healthcare provider should rely upon a consensus of recognized authorities or experts in flow cytometry testing.

22. In order to establish "accepted standards of medical practice," as that term is used in the CMS Program Integrity Manual, with regard to flow cytometry testing, a healthcare provider should consult medical opinion derived from consultations with medical associations or experts in flow cytometry testing.

23. Clinical information, including the provisional diagnosis provided by the clinician in requesting flow cytometry testing, can be incorrect.

24. The article *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping,* Cytometry 42:114-117 (2000) is a United States government work.

25. One of the purposes of the article *Diagnosis of Unexpected Acute Myeloid*

    *Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) is to educate healthcare providers performing flow cytometry testing.

26. The article *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) warns clinicians performing flow cytometry testing that "(i)f a restricted lymphoma panel had been used, only the diagnosis of CLL (Chronic Lymphocytic Leukemia) could have been made. Because AML (Acute Myeloid Leukemia) was the disease causing the clinical deterioration, patient care would have been severely compromised."

27. The article *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) warns clinicians that concomitant AML and CLL may be difficult to evaluate morphologically.

28. The authors of *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) worked for the National Cancer Institute, National Institute of Health at the time the article was submitted for publication.

29. The authors of *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) recommend to healthcare providers performing flow cytometry to "…(employ) a panel of antibodies capable of identifying abnormal hematopoietic cells instead of simply using a disease-specific panel."

30. The authors of *Diagnosis of Unexpected Acute Myeloid Leukemia and Chronic Lymphocytic Leukemia: A Case Report Demonstrating the Perils of Restricted Panels in Flow Cytometric Immunophenotyping*, Cytometry 42:114-117 (2000) conclude their article "…reinforces the U.S.-Canadian consensus recommendations and indicates the danger of restricting reimbursement to disease-specific antibody panels."

31. Raul Braylan, M.D. is an expert in the field of flow cytometry testing.

32. Michael Borowitz, M.D. is an expert in the field of flow cytometry testing.

33. Jeannine Holden, M.D. is an expert in the field of flow cytometry testing.

34. Dr. Raul Braylan believes, to a reasonable degree of medical certainty, that

-5-

Dianon's use of a comprehensive, standard panel for flow cytometry testing is within accepted standards of medical practice.

35. Dr. Michael Borowitz believes, to a reasonable degree of medical certainty, that Dianon's use of a comprehensive, standard panel for flow cytometry testing is within accepted standards of medical practice.

36. Dr. Jeannine Holden believes, to a reasonable degree of medical certainty, that Dianon's use of a comprehensive, standard panel for flow cytometry testing is within accepted standards of medical practice.

37. Dianon's use of antibodies over and above those deemed medically reasonable and necessary by Dr. Flynn provide the ability to detect disease processes or abnormal cell populations that were not indicated by the clinician or referring physician.

38. Dianon's use of antibodies over and above those deemed medically reasonable and necessary by Dr. Flynn provide additional medical information concerning a patient's various normal and abnormal blood and lymph cells.

39. Each antibody or marker Dianon used in its flow cytometry testing had the potential to detect or define an abnormal cell population or disease or provide medically relevant information regarding a patient's condition.

**REQUEST FOR PRODUCTION OF DOCUMENTS**

1. Produce all documents relied upon or reviewed in responding to the above Requests for Admissions.

2. All documents that form the record, including any transcript or recording of any hearing held in conjunction with the Administrative Law Judge's decision, concerning the Impath appeals in California.

**INTERROGATORY**

1. Describe with particularity and list all documents relied upon or reviewed in responding to the above Requests for Admissions identifying the specific Request for Admission(s) that each document relates to.

Bruce R. Parker, admitted pro hac vice
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

-6-

Robert Salcido, admitted pro hac vice
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for Dianon Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of June, 2006, a copy of the foregoing

Second Supplemental Discovery Requests was sent via, electronic mail to

Richard.Molot2@usdoj.gov and via first class mail, postage prepaid to:

Richard M. Molot, AUSA
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven CT 06510

Bruce R. Parker

-7-

BA2DOCS1\296256 v1