# Exhibit 24

**Jennifer M. Collins**

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF CONNECTICUT

3

4  UNITED STATES OF AMERICA,       *

   ex rel. Dr. James J. Tiesinga,  *

5                                   *

            Plaintiffs,    * No. 3:02CV1573(MRK)

6                                   *

   vs.                             *

7                                   *

   DIANON SYSTEMS, INC.,           *

8                                   *

            Defendant.    * Pages 1 - 27

9

10

11

12     Videotaped Deposition of JENNIFER M. COLLINS

13            Baltimore, Maryland

14          Friday, August 4, 2006

15

16

17

18

19

20  Reported by:  Carla J. Briggs, RPR-RMR-CRR

21  Job No. 175906B

**Esquire Deposition Services**                **MD - 1-800-539-6398**
**D.C. - 1-800-441-3376**                      **VA - 1-800-752-8979**

Jennifer M. Collins

Page 14

1 determinations publicly available?

2    A    I don't believe the ALJs generally posted
3 their decisions publicly. You probably might have
4 been able to get them through FOIA.

5    Q    I'd like to direct you, if I could, to
6 NHIC7 which at the top would say "Page 3 of 7."

7    A    Okay.

8    Q    And specifically, just as a reference
9 point, the paragraph after "Discussion" states
10 "After a thorough review of the documentary evidence
11 and testimony, the undersigned finds that the flow
12 cytometry studies performed by the appellant beyond
13 the 20 markers or tests allowed by the carrier (up
14 to 26 markers) were medically reasonable and
15 necessary."

16        Is there any other administrative law
17 decision that considered the issue of whether the --
18 a clinical laboratory's flow cytometry studies were
19 medically necessary and appropriate?

20    A    Not that I'm aware of. This is the only
21 one I'm familiar with.

Page 15

1    Q    That's all I have on that.

2        Now, in terms of -- well, are you familiar
3 with 42 CFR 426.400, those type of appeals?

4    A    426? I'm not sure.

5    Q    Another way, those are appeals that one
6 could take based on policies and LCDs.

7    A    Oh. I generally deal with claim appeals,
8 not coverage appeals.

9    Q    Uh-huh.

10    A    That process is generally managed out of
11 our -- the NCDs -- the national ones -- would be
12 handled mostly through our Office of Clinical
13 Standards and Quality Coverage and Analysis Group
14 and the LCDs -- the local coverage determinations --
15 are generally handled out of medical review. They
16 would have more familiarity with that coverage
17 appeals process.

18    Q    Have any coverage appeals been undertaken
19 under CPT 88180 when carriers have had frequency
20 limits?

21    A    I don't know. Not that I'm aware of.

Page 16

1    Q    Did that come up with any of the carrier
2 representatives you spoke with?

3    A    No.

4    Q    Okay. I believe that's all I have on 1D,
5 Miss Collins.

6        Going to item 5 now, what efforts did you
7 undertake regarding the government making production
8 on the discovery request in this case?

9    A    Well, I personally didn't do it, but what
10 I did do was follow up with the carriers in this
11 case to determine or confirm my original thought,
12 which was the production would be extremely
13 burdensome and difficult on the carriers, so I
14 discussed with them to make sure that my
15 understanding of how difficult it would be was true
16 and correct, which my discussions with them did
17 confirm that.

18    Q    Okay. And why would it be extremely
19 difficult?

20    A    First of all, appeals are not tracked by
21 CPT code. Some carriers may track them internally,

Page 17

1 but it's certainly not done nationally.

2 Additionally, carriers keep anywhere from 18 to 24
3 months of claims history in-house. Once it's past
4 that point, it's purged. Now, it can be re-called,
5 but to re-call is very time-consuming and it is also
6 expensive. Now, that just gets you claims. It does
7 not get you appeals. So you would have to pull up
8 the claims history; and once you got it, you would
9 have to sort through it to look for any denied
10 claims of 88180. Again, that doesn't mean those
11 were appealed.

12        You would then have to look further to
13 determine -- and this is manual process -- to
14 determine if any of those denied claims were then
15 appealed, and then you would have to take a further
16 step of going to wherever all of those potential
17 files are -- probably in storage somewhere at like,
18 say, a place like Iron Mountain -- and you'll have
19 to re-call all of those and go through that
20 manually. And even then, you would have to once
21 you, say, got all those files were you able to

5 (Pages 14 to 17)

**Jennifer M. Collins**

---

Page 18

1 locate all of them, you would then have to read

2 through them because you would have to determine if

3 the issue in the appeal was relative to the number

4 of markers. It could have been something else

5 entirely that was the subject of the appeal.

6         And one final reason why it would be very

7 difficult is it happened on a flow basis, so I can't

8 give you the time of when every carrier

9 transitioned, but we -- the carriers used to be on

10 different claims processing systems, and we as an

11 organization transitioned them to what we call

12 MCS -- the MultiCarrier System -- so some of the

13 carriers brought up to me that in particular, their

14 old system and the new MCS system didn't quite work

15 with each other, so if they were able to re-call all

16 of that data, you know, with the expense and the

17 time that it would take, it would be extremely

18 difficult to read that data because it -- on their

19 new system.

20    Q    Uh-huh. Now, in terms of when you

21 initiated the process with the carriers regarding

---

Page 19

1 learning what they have, when approximately was

2 that?

3         MR. MOLOT: Objection. I don't think

4 she -- she wasn't responsible for initiating any

5 process.

6         MR. SALCIDO: No. I'm asking when she

7 initially did it herself as opposed to when a first

8 communication went out to them.

9         MR. MOLOT: You can answer.

10    A    I called them this week actually.

11    Q    Now, do you know when the government's

12 first contact went out regarding carrier appeal

13 information?

14    A    From what I know -- it could have been

15 earlier, but from what I know, I believe it began in

16 October of 2005.

17    Q    You had mentioned earlier that in terms of

18 one of the difficulties in tracking the appeal

19 information was that previously, the carriers were

20 on different systems, and then the transition

21 occurred between the old and the new. Do you know

---

Page 20

1 when that occurred?

2    A    Well, that's what I was telling you. That

3 we did it on a -- the agency, I should say, did it

4 on a flow basis. They didn't transition all the

5 carriers at once because that would have been very

6 risky should there have been problems, so they

7 usually would do, like, one carrier at a time. I

8 believe they started -- I want to say they started

9 around 2001 maybe and the most -- I think the last

10 transitions happened around 2004.

11    Q    And earlier you'd described keeping the

12 appeals for 18 months in-house and then purged, but

13 that you could re-call them, but they're expensive?

14    A    It's not the appeals, it's their actual

15 claims history.

16    Q    Claims history. Thank you.

17    A    Uh-huh.

18    Q    What would be the process for re-calling

19 those?

20    A    I believe it's our system's maintainers.

21 I'm not familiar with the process. I know -- I

---

Page 21

1 believe it's some sort of, like, data re-call.

2    Q    But you can't describe more specifically

3 why it would be time-consuming and expensive?

4    A    No. I just know that it does take the

5 system's maintainers time, for whatever reason, to

6 re-call the data in the system. From what I

7 understand, it has to be ordered and that payment is

8 involved when something like that is ordered.

9    Q    Do you know of any instruction that went

10 out to the carriers before September 2005

11 instructing them to retain documents responsive to

12 this lawsuit?

13    A    Not that I'm aware of.

14         MR. SALCIDO: All right. Let's take a

15 five-minute break. That's all that I have, but I

16 want to talk to Bill.

17         THE VIDEOGRAPHER: Okay. We're taking a

18 break. We're going off the record. The time is

19 11:21 a.m.

20         (Brief Recess.)

21         THE VIDEOGRAPHER: We're back on the

---

6 (Pages 18 to 21)