# Exhibit 36

```
                                                                Page 1
 1             IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF CONNECTICUT

 3

 4  UNITED STATES OF AMERICA,        *
    ex rel. Dr. James J. Tiesinga,   *
 5                                   *
                Plaintiffs,          * No. 3:02CV1573(MRK)
 6                                   *
    vs.                              *
 7                                   *
    DIANON SYSTEMS, INC.,            *
 8                                   *
                Defendant.           * Pages 1 - 52
 9

10

11

12       Videotaped Deposition of JAMES P. MENAS

13                  Baltimore, Maryland

14                Friday, August 4, 2006

15

16

17

18

19

20  Reported by:  Carla J. Briggs, RPR-RMR-CRR

21  Job No. 175906A
```

Page 10

1  Q    When did you get your BA?
2  A    1974 is the BA and the MBA is 1983.
3  Q    But what was the job that you had after
4  completing your MBA in 1983?
5  A    Principally the same job I'm doing today.
6  I work in position payment policy.
7  Q    So it was -- I take it back then, was that
8  HCFA?
9  A    Yes.
10 Q    And what's your current job title?
11 A    The job title is health insurance
12 specialist.
13 Q    And just briefly, what are the job duties
14 of a health insurance specialist?
15 A    Involved in developing Medicare physician
16 payment policies, which means writing regulations,
17 writing manual instructions, answering E-mails and
18 other questions on the subject.
19        MR. SALCIDO:  Mark this as Exhibit 2.
20        (Menas Deposition Exhibit Number 2 was
21 marked for identification.)

Page 11

1        BY MR. SALCIDO:
2  Q    What I'd like to direct you to
3  specifically is the -- the cover sheet, as you see,
4  is August 15th, 2003, and then the last page really
5  is the face page for the revisions to payment
6  policies under the physician fee schedule for
7  calendar year 2004.  And I noticed in the second
8  column halfway down -- roughly halfway down --
9  you're referenced for issues related to anesthesia.
10 Did you also handle issues related to flow
11 cytometry?
12 A    Yes.
13 Q    Now I'd like to direct you to Bates No.
14 JS49.
15 A    Okay.
16 Q    Well, I guess even better, go to JS48 and
17 third column over about halfway down the page item 4
18 CPT Code 88180.  Who drafted that portion on behalf
19 of CMS?
20 A    Well, the primary author of this was
21 Dr. Paul Rudolf.  He was the medical officer in our

Page 12

1  group, HAPG.
2  Q    You mentioned he was a primary author.
3  Were there other authors?
4  A    He spoke to Dr. Niles Rosen who was the
5  medical officer or medical director involved in the
6  correct coding initiative under Medicare.
7  Q    Did he work with anyone else?
8  A    I don't recall.  I think they were the two
9  principal parties.
10 Q    All right.  Going to the JS49 --
11 A    Uh-huh.
12 Q    -- third full paragraph down, it states
13 "The current coding scheme (payment on a per marker
14 basis) may encourage the performance of more markers
15 than may be medically necessary because the
16 pathologist determines what markers to perform and
17 when to perform them."
18       What evidence is this sentence based upon?
19 A    Well, I think it's based on the fact that
20 the service -- the payment for the service was badly
21 overvalued and that could contribute to

Page 13

1  overutilization, because this is one where the
2  payment went down from -- for a 16 marker test, it
3  probably went down from a thousand to five hundred
4  dollars in total.
5  Q    When you say that the test was overvalued,
6  was there specific empirical evidence showing that
7  it was overvalued that served as a foundation for
8  this particular passage?
9  A    Well, I think at that time having sat in
10 on some discussions with Dr. Rosen and Dr. Rudolf
11 mainly hearing their commentary that it was
12 overvalued.
13 Q    Okay.
14 A    And Dr. Rosen is a pathologist.
15 Q    Besides those discussions, is there any
16 other evidence you're aware of?
17 A    No.
18 Q    In terms of the same column last paragraph
19 starting with the word "however," it states
20 "However, we do believe that it is appropriate to
21 pay for the TC" -- technical component -- "of each

Page 18

1 service was valued again, you know, for the
2 technical -- again, where we start it and where we
3 end it. Before the coding proposal, I think we were
4 badly overpaying the technical component also; not
5 just the professional, but the technical.
6     Q    Uh-huh.
7     A    That the coding system probably really
8 wasn't in sync with the way the service was
9 provided.
10    Q    Uh-huh. And what was that perception
11 based upon in terms of evidence?
12    A    Mainly discussions with Dr. Rosen and
13 Dr. Rudolf.
14    Q    Okay. In terms of the next column at the
15 top of that page last sentence, "We welcome comments
16 and recommendations on appropriate values for the
17 procedure that we would -- that we could use in
18 developing any future proposal."
19         Did you read -- strike that.
20         Did you receive comments based on the
21 commentary you had here regarding flow cytometry?

Page 19

1     A    Yes, we did get comments.
2     Q    And how are those comments maintained by
3 CMS once you receive them?
4     A    They come into -- I believe they're
5 components of OSRA -- and that's Strategic Operation
6 and Regulatory Affairs -- and they date stamp those
7 and then they forward those down to the program
8 component that has responsibility for reviewing
9 those and responding to those.
10    Q    Are they available publicly?
11    A    Yes.
12    Q    And in what form are they available to the
13 public?
14    A    I think they're on display. And if
15 someone requests them, we will provide them.
16    Q    Now, during this time period, when you say
17 "on display," during 2003?
18    A    I want to take that back. Strike that,
19 okay?
20    Q    Okay.
21    A    I meant the reg is on display. I just

Page 20

1 thought about it. Yeah, the comments aren't
2 displayed anywhere, but I think the public can have
3 access to those comments.
4     Q    How so?
5     A    You know, I don't want to speak -- I know
6 they can ask us and we can give them, but I think
7 the entry point -- if the public wanted to see those
8 comments, they would talk to OSRA instead of us.
9     Q    All right. We'll be coming back to this
10 exhibit in a little bit, but I want to go to another
11 one right now.
12         MR. SALCIDO: Mark this as Exhibit 3.
13         (Menas Deposition Exhibit Number 3 was
14 marked for identification.)
15    A    Okay.
16         BY MR. SALCIDO:
17    Q    Now, with respect to this particular
18 E-mail, I know you referenced him previously, but
19 who is Niles Rosen?
20    A    He's the medical director for the correct
21 coding initiative.

Page 21

1     Q    Did you talk to him in preparing for this
2 deposition?
3     A    I did not.
4     Q    What occurred with regard to development
5 of new rules regarding flow cytometry between
6 August 15th, 2003 -- the date reflected in the
7 Federal Register -- and this E-mail by Niles Rosen?
8     A    Well, the College of American Pathologists
9 provided comments to us, and I believe they came up
10 with a coding proposal, but it was more along the
11 lines of paying for the first marker separate and
12 then for each subsequent marker and had that same
13 coding system for both the professional and
14 technical. I believe they also said that they
15 presented that coding proposal to the CPT Editorial
16 Panel. That was probably in '03 -- sometime in late
17 '03. And then there would have been discussions
18 because we -- our two medical officers attend the
19 CPT coding meetings, so there would have been some
20 discussions about how the new coding system would be
21 set up. So at that point, I don't think our medical

Page 38

1        MR. SALCIDO:  I'd like to introduce this
2 as Exhibit 5 and introduce this as Exhibit 6.
3        (Menas Deposition Exhibit Numbers 5 and 6
4 were marked for identification.)
5        BY MR. SALCIDO:
6    Q   Now, my question on this is with respect
7 to Exhibit 5, the Esoterix letter, the last two
8 sentences first page reads "In our experience with a
9 very large number of cases, we consistently report
10 an average of 21 markers per case, with a range of 4
11 to 30.  This data is compiled using all sample types
12 and all levels of complexity."
13       And then Exhibit 6, the last two sentences
14 in the third paragraph, "Furthermore, this
15 interaction is complex and depends on the specimen
16 type or origin (example bone marrow, peripheral
17 blood, tissue sample or body fluids).  Therefore, we
18 believe that the number of markers used should
19 reflect that complexity, which in most cases ran
20 from 16 to 26 markers."
21       Do you know whether any other clinical

Page 39

1 laboratories commented on the size of their panel in
2 response to CMS's proposed changes for reimbursement
3 of CPT 88180?
4    A   I don't recall the specific -- the
5 specific commenters on this rule.
6    Q   The only other thing I have related at
7 least to F and G is at more precisely item G.  And
8 I'm sorry.  This is going back to Exhibit 1 now, the
9 notice of deposition.
10   A   Uh-huh.
11   Q   With respect to G, Medicare communications
12 related to payments under CPT Codes 88187, 88188,
13 and 88189, what kind of data does CMS reflecting
14 payments that are made under those codes?
15       MR. MOLOT:  Object to the form.
16   A   I'm not sure I understand your question.
17   Q   Yeah.  What I'm wondering is since these
18 codes have been instituted, what kind of claims data
19 that you would -- would you have reflecting the
20 payments that have been made under these codes?
21   A   I'm still not -- you have to be more

Page 40

1 specific.
2    Q   For example, would there be utilization
3 data going to these codes?  Claims data.
4    A   Yes.  Yes.  I mean yes, yes.  I mean,
5 these codes were put in effect in 2005, so we would
6 have -- we would be able to look at national claims
7 data on these.
8    Q   Uh-huh.  And what kind of national claims
9 data do you keep?
10   A   Can you be more specific?  I mean --
11   Q   Yeah.  I guess what I'm driving at is if
12 someone wanted to access the data regarding payments
13 that have been made under those codes, how would --
14 what question would they ask for to obtain that data
15 from CMS?
16   A   Well, there's a public user division that
17 they can go to to obtain national claims history.
18   Q   Now, Mr. Menas, would that be the five
19 percent data?
20   A   Yeah, I believe -- I believe you can --
21 actually, you would have to request a special run

Page 41

1 for them to do that for you, which you would get
2 because you would get a hundred percent's claims
3 data if you bought the tape.
4    Q   And the public can buy the tape?
5    A   Yes.
6    Q   Who do they go to to buy the tape?
7    A   Robin Thomas is a division director of a
8 division in OIS that's involved in that.
9    Q   Do you know her title offhand?
10   A   She's a division director.
11   Q   Okay.
12       MR. MOLOT:  Can we go off the record for
13 one second?
14       MR. SALCIDO:  Sure.
15       THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 10:24 a.m.
17       (Brief Recess.)
18       THE VIDEOGRAPHER:  We're back on the
19 record.  The time is 10:30 a.m.  Please continue.
20       BY MR. SALCIDO:
21   Q   Now, Mr. Menas, the only area I had left

Page 42

1 was No. 5 -- item 5 Page 6 Exhibit 1, and that is
2 your efforts that you undertook to ensure that
3 responsive documents were provided to defendants in
4 this lawsuit. Could you describe those for me?
5    A    Well, I guess when Sylvia got involved in
6 this, I -- since we are the payment component, she
7 contacted me, and I made suggestions to her who I
8 thought the appropriate folks were across CMS that
9 she could go to to get documents from relative areas
10 such as, you know, OFM for, you know, LMRP type
11 issues, OCSQ for coverage type issues, who to go to
12 for data help, things of that nature.
13    Q    And I apologize. You may have given me
14 these acronyms before, but I think you used OFM; is
15 that right?
16    A    Yes. OFM is the Office of Financial
17 Management.
18    Q    And who was Sylvia?
19        MS. YU: (Gesturing).
20        MR. SALCIDO: Oh. I'm sorry.
21    Q    And I do believe you gave me this once

Page 43

1 before. OSP?
2    A    I'm sorry. OCSQ.
3    Q    Oh.
4    A    Office of Clinical Standards and Quality.
5    Q    Okay. Did you do anything more?
6    A    Well, I spoke to Robin Thomas about, you
7 know, particular issues involving data.
8    Q    Well, even before we go to that, meaning
9 did you review your files?
10   A    Yes, yes. I attempted to produce any
11 documents I had in my files and I spoke to, you
12 know, the medical officers and Carolyn Mullen who is
13 my deputy division director to see which records
14 they had as well as, you know, I did talk to Paul
15 Rudolf, and he did not have any records.
16   Q    Now, in terms of going to your file to
17 produce your documents, when did that occur?
18   A    Whenever I got the initial request. I
19 don't know what the particular time frame was. It
20 was whenever the initial request came in.
21   Q    Well, was it in the year 2002?

Page 44

1    A    I don't think so. I don't remember the
2 specific time frame it was when --
3    Q    Yeah. Well, what I'm doing is -- was it
4 within the last six months?
5    A    Within the last year.
6    Q    Now, with respect to Robin Thomas, you
7 said you spoke to her regarding data. What did she
8 tell you?
9    A    In terms of the hundred percent data on
10 the service that -- and over the years that had
11 spanned, that it would cost about 150, $160,000 to
12 comply with that request.
13   Q    Did you ask her why? Why that would be
14 the cost?
15   A    They're the program component that really
16 has the expertise to come up with a cost estimate.
17 I don't. I imagine a fair chunk of that might be
18 computer time -- mainframe computer time.
19   Q    Do you know whether the data -- the
20 hundred percent data you referenced -- is that kept
21 permanently or is that discarded at a point in time?

Page 45

1    A    I don't know the -- the -- the time
2 requirements for data retention, but it -- it
3 probably goes back at least five years.
4    Q    Now, in terms of your own files, how long
5 do you keep your files?
6    A    I mean, most of my material I put into
7 folders in my E-mail system. Now, the one thing we
8 had here is basically, you know, we moved from a --
9 we moved -- we changed E-mail systems from Groupwise
10 to Outlook, so I know myself and other folks lost a
11 fair number of documents when there was a
12 conversion, plus also the archival capacity of
13 Groupwise wasn't exactly the best.
14   Q    When did the conversion occur?
15   A    Probably two years ago, two to three years
16 ago.
17   Q    Facts may disprove this, but at least my
18 recollection is that we didn't receive any E-mails
19 from you. Did you review your --
20   A    I have -- I have a file on flow cytometry,
21 and I did not have anything in there for the time

Page 46

```
 1  period for which the records were requested.
 2      Q    So even going back to the August 2003 work
 3  that you did on the proposed rule, you didn't have
 4  any E-mails related to that?
 5      A    The only thing I have saved is the
 6  document you have, the proposed rule and the final
 7  rule.  Certain internal communications, I
 8  personally -- I mean I may -- I do not save those, a
 9  lot of personal internal communications.
10      Q    Do you know that -- whether CMS has rules
11  in terms of what you can retain and what you can
12  discard?
13      A    I don't know what the requirements are for
14  personal communications.  I don't know if there even
15  is a requirement.
16           MR. SALCIDO:  All right.  I just need a
17  five-minute break to consult with Bill, but at least
18  until Bill educates me, I don't have anything more.
19           MR. MOLOT:  Okay.
20           THE VIDEOGRAPHER:  We're going off the
21  record.  The time is 10:38 a.m.
```

Page 47

```
 1           (Brief Recess.)
 2           THE VIDEOGRAPHER:  We're now back on the
 3  record.  The time is 10:44 a.m.  You may proceed.
 4           BY MR. SALCIDO:
 5      Q    I only have one additional question,
 6  Mr. Menas.  You had referenced earlier the
 7  approximate time frame back when you assembled
 8  documents responsive to this lawsuit such as
 9  reviewing your file.  What my question is, is even
10  before that time, did you receive any notice to
11  retain documents responsive to this lawsuit?
12      A    Prior to the initial request?
13      Q    Right.
14      A    No, I did not.
15           MR. SALCIDO:  Okay.  That's all I have.
16           MR. MOLOT:  I have no questions.  Thank
17  you.
18           Thank you, Mr. Menas.
19           THE VIDEOGRAPHER:  Okay.  This concludes
20  the deposition of Mr. James Menas which is being
21  taken at the Centers for Medicare and Medicaid.  The
```

Page 48

```
 1  time is now 10:45 a.m. and the date is August 4th.
 2           (Reading and signing requested.)
 3           (Deposition concluded at 10:45 a.m.)
```

Page 49

```
 1             ACKNOWLEDGMENT OF DEPONENT
 2  I hereby certify that I have read and examined the
 3  foregoing transcript, and the same is a true and
 4  accurate record of the testimony given by me.
 5  Any additions or corrections that I feel are
 6  necessary, I will attach on a separate sheet of
 7  paper to the original transcript.
 8
 9
10
11
12
13 Date                    James P. Menas
```

13 (Pages 46 to 49)