# Exhibit 43

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF CONNECTICUT

 3

 4 UNITED STATES OF AMERICA,        *

   ex rel. Dr. James J. Tiesinga,  *

 5                                  *

              Plaintiffs,     * No. 3:02CV1573(MRK)

 6                                  *

   vs.                              *

 7                                  *

   DIANON SYSTEMS, INC.,            *

 8                                  *

              Defendant.      * Pages 1 - 77

 9

10

11

12     Videotaped Deposition of STEVE E. PHURROUGH

13               Baltimore, Maryland

14             Thursday, August 3, 2006

15

16

17

18

19

20 Reported by:  Carla J. Briggs, RPR-RMR-CRR

21 Job No. 175904A
```

**Steve E. Phurrough**

Page 14

```
1    Q    How long did you do that?
2    A    About 18 months.
3    Q    What did you do after that?
4    A    I rejoined the military.  That would have
5 been in December of 1984.
6    Q    How long were you back in the military?
7    A    I stayed in the military until September
8 of 2001.
9    Q    What did you do in the military?
10   A    In the early parts of that time, I did
11 just family practice, primary patient care.  As time
12 progressed, I did various administrative roles,
13 managing clinics, managing hospitals, doing
14 Department of Defense regional healthcare.
15   Q    Where did you go after you left the
16 military?
17   A    Here.
18   Q    So, you joined CMS in September 2001?
19   A    Yes.
20   Q    And what was your job title when you
21 started?
```

Page 15

```
1    A    My first job was division director for the
2 Division of Medical and Surgical Services in the
3 Coverage and Analysis Group in the Office of
4 Clinical Standards and Quality.
5    Q    And what did you do as the division
6 director?
7    A    The purpose of that particular division
8 was to review various technologies, particularly new
9 technologies to determine whether we would, in fact,
10 as an agency provide coverage for those
11 technologies.
12   Q    And how long were you a division director?
13   A    A little over a year, and then I --
14 somewhere between 12 and 18 months time period, and
15 then I became the acting director of the Coverage
16 and Analysis Group in which this division fell, and
17 then I became the director on August 8th, three
18 years ago.
19   Q    Are you still in that position?
20   A    Yes.
21   Q    And what does the director of the Coverage
```

Page 16

```
1 and Analysis Group do?
2    A    It manages the coverage process for CMS to
3 include the division I was a director plus two other
4 divisions doing similar things.
5    Q    I take it from the background you've
6 provided that you're not a board certified
7 hematopathologist?
8    A    No, I'm not.
9    Q    And you're not a hematopathologist,
10 either?
11   A    No.
12   Q    You've never signed out flow studies?
13   A    No, I have not.
14        MR. SALCIDO:  Would you mark this as
15 Exhibit 2.
16        (Phurrough Deposition Exhibit Number 2 was
17 marked for identification.)
18        BY MR. SALCIDO:
19   Q    Please review this, Dr. Phurrough, and
20 tell me when your review has been completed.
21   A    Okay.
```

Page 17

```
1    Q    Do you know who Daniel Schwartz is?
2    A    No, I do not.
3    Q    Did you ask anyone who Daniel Schwartz is?
4    A    No, I did not.
5    Q    And how about Brigid Davison?
6    A    No, I don't know who that is, either.
7    Q    Did you ask anyone?
8    A    No, I did not.
9    Q    On the next page of that document USA34
10 Bates number, do you know who Laurie Feinberg is?
11   A    Yes, I do.
12   Q    Who is she?
13   A    She previously was a medical officer in
14 the Center for Medicare Management.
15   Q    Is that a position here at CMS?
16   A    Yes.
17   Q    I take it from what you said earlier, you
18 didn't discuss this matter with her?
19   A    No, I didn't.  She no longer is employed
20 here.
21   Q    And on the cc line, I could guess on
```

5 (Pages 14 to 17)

**Steve E. Phurrough**

Page 66

1 specific date, but I believe it's been within the

2 last year.

3        Q      And within your group, what is your

4 document retention policies?

5        A      For our national coverage determination

6 process, we have an official file that we create at

7 the end of the process once we have made our

8 decision, and that official file includes all -- all

9 final documents and all documents that we considered

10 as evidence in that particular review; so, articles,

11 public comments, the official request and so forth

12 are all part of that official file.  In addition,

13 the staff who worked on that particular issue keep

14 some number of working documents -- internal working

15 documents that are a part of that particular

16 process.  I ～ so that's the requirement for

17 document collection.

18       Q      And the documents you were asked to

19 assemble related to specifically those types of

20 documents, your official file related to the

21 creation of national coverage determinations?

Page 67

1             MR. MOLOT: Objection.  Go ahead.

2        A      I don't recall what the official request

3 was.  In general, any time we get a request for

4 documents, I provide any document that we have

5 related to that, and then someone in the agency

6 determines what is releasable and what isn't, so my

7 role is to provide anything that we have.  In this

8 case, in my conversation with Miss Strathy, she --

9 she found from our analyst all documents that we had

10 available.

11       Q      When you received the request to collect

12 documents, did you issue any instruction to the

13 staff regarding the need to retain potentially

14 responsive documents?

15       A      I do not recall at that time providing any

16 additional guidance to my staff as to what documents

17 to keep.  I only provided guidance, as I recall, to

18 Miss Strathy to do your usual process and find who

19 has documents and retain documents.

20       Q      Was -- were electronic files searched?

21       A      Again, my guidance to Miss Strathy was to

Page 68

1 use the usual process, and the usual process does

2 include reviewing what records you may have

3 maintained in your -- electronically.

4        Q      And just at a practical level, what does

5 that mean, to produce documents that you would have

6 maintained electronically?  For example, does it

7 mean downloading your E-mails, as you understand it?

8        A      Yes.  If they have maintained E-mails on

9 this particular issue electronically and not in hard

10 copy, then they would produce those also.  They

11 would download them from electronic to hard copy at

12 that time.

13             MR. SALCIDO: Okay.  Can we take a

14 five-minute break?  I just want to check with Bill

15 and see if there was any additional questions.

16             MR. MOLOT: Sure.

17             MR. SALCIDO: And then we'll be done.

18             MR. MOLOT: Okay.

19             THE VIDEOGRAPHER: We're going off the

20 record.  The time is 11:46 a.m.

21             (Brief Recess.)

Page 69

1             THE VIDEOGRAPHER: We're back on the

2 record.  The time is 11:51 a.m.  You may proceed.

3             BY MR. SALCIDO:

4        Q      Hi, Dr. Phurrough.  Just a couple of more

5 questions.  We had referenced earlier the CMD chat

6 room.  Do you know how far back in time that goes?

7        A      I do not know when it began.  Some of the

8 E-mails that were provided were from that -- in the

9 '97, '98 time frame I believe were from that chat

10 room, but I don't know when it initially began.

11       Q      In terms of -- you had referenced earlier,

12 I believe, an official file relating to national

13 coverage determinations.

14       A      Uh-huh.

15       Q      Are all employee documents that touch upon

16 consideration of national coverage determination

17 considered part of that official file?

18       A      No.  All final documents -- all

19 non-working documents are part of the file as well

20 as any information that we used in arriving at the

21 determination.  So, medical literature, public

18 (Pages 66 to 69)

**Steve E. Phurrough**

---

Page 70

1 comments, any type of -- any such comments, minutes
2 of meetings, anything that's of a public nature
3 would be part of that file.
4   Q   Now, were materials outside of the
5 official file assembled and produced as part of the
6 production in this case?
7   A   There was no official file for this since
8 we never had a national coverage determination
9 process. There was not an official file for flow
10 cytometry.
11   Q   Okay.
12   A   Miss Strathy looked to see if there was;
13 there was not.
14   Q   Okay.
15   A   So, all of these were documents that were
16 kept that were not part of that official folder for
17 NCDs.
18   Q   And with respect to former employees, were
19 their files searched for responsive documents?
20   A   Miss Sheridan and Miss Eng -- well, when
21 an employee leaves in coverage, their -- the

---

Page 71

1 documents they have are transferred to the employee
2 that's going to assume responsibility for that
3 particular subject, and that may be to various
4 employees if those subjects are parceled out to
5 various employees, and so all issues for flow
6 cytometry, as far as I'm aware, were transferred to
7 either Miss Eng or Miss Sheridan. The only other
8 employee that I'm aware of currently was Dr. Burken,
9 and so his documents that would have been relevant
10 to this would have been transferred either to Miss
11 Eng or Miss Sheridan.
12   Q   Okay. Besides Burken, Eng and Sheridan,
13 were other files reviewed for potential production
14 in this action?
15   A   My understanding of the process when I
16 asked Miss Sheridan to find the files is that she
17 asked -- I'm sorry -- asked Miss Strathy to locate
18 the files is that she asked Miss Eng and
19 Miss Sheridan to locate all the files, so I did not
20 question specifically what files they looked
21 through. My assumption is, is as our usual process,

---

Page 72

1 they would have looked anywhere they suspected there
2 to have been any documents. I do not know
3 specifically where they looked for that.
4   Q   And did you see any memo that had a
5 distribution list to employees regarding documents
6 they should search for?
7   A   I believe I did see an E-mail that went to
8 the entire staff asking do you have any documents in
9 relationship to this.
10   Q   And by "entire staff," who would you mean?
11   A   Coverage within my division, within my
12 group, Coverage and Analysis Group.
13   Q   Okay.
14   A   I do not know what occurred outside the
15 Coverage and Analysis Group.
16      MR. SALCIDO: Okay. Thank you. That's
17 all for me.
18      MR. MOLOT: Thank you. I have no
19 questions.
20      THE VIDEOGRAPHER: This concludes the
21 deposition of Dr. Steve E. Phurrough. The time is

---

Page 73

1 now 11:56 a.m. Thank you very much.
2      (Reading and signing requested.)
3      (Deposition concluded at 11:56 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

---

19 (Pages 70 to 73)