## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DR. JAMES J. TIESINGA, <br><br>     Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)    No. 3:02 CV 1573(MRK)<br>)<br>)<br>)    May 11, 2007<br>)<br>) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTIONS IN LIMINE TO EXCLUDE EVIDENCE
## OF FALSE CLAIMS ACT LIABILITY

Dianon asserts that three types of evidence in this case relating to the company's False Claims Act liability should be excluded: (1) Dr. Stuart Flynn's testimony because admission of his testimony would violate Dianon's constitutional due process rights; (2) the Government's statistical sample; and (3) evidence that, between 1996 and 1997, Dianon billed Medicare for four flow cytometry antibodies that it never performed. For the reasons set forth herein, the Court should deny all of the motions.

**I.     Dianon's Constitutional Argument is Nothing More Than Its "Ambiguous Regulation" Argument  With Constitutional Trappings**

Dianon asserts that allowing the Government to prove its damages and penalties through Dr. Flynn's testimony would violate Dianon's due process rights apparently because Dianon was not aware of  Dr. Flynn's opinions about the medical necessity of particular antibodies, those opinions have not been published anywhere, and in the absence of any guidance from CMS and the Connecticut carrier about how many antibodies were appropriate for a particular patient,

Dianon cannot be held liable under the False Claims Act because there was no clear standard or guidance that it violated. According to Dianon, to hold it liable under the FCA would violate Dianon's due process rights.

In its motion for summary judgment, Dianon asserted that it should be granted summary judgment because the United States could point to no controlling rule or regulation that Dianon violated. *See Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on the Government's Claims That Defendant's Services Were Not Medically Necessary or Indicated, pp. 7-11 (hereinafter defendant's Summary Judgment Memorandum)*. Dianon also argued that it could not be held liable under the False Claims Act because the medical necessity regulation is ambiguous and neither the carrier nor CMS had provided guidance on when flow cytometry testing is medically necessary. *Id. at 11-15.*[1] In Dianon's *Daubert* motion, Dianon argued that Dr. Flynn's methodology was not reliable enough to be admitted at trial. *See Motion to Exclude the Opinions of Stuart Flynn M.D.* The present motion is nothing more than those arguments conflated into one and dressed up in constitutional clothing.

## A.      Dianon Was on Notice That Testing Had to Be Medically Necessary for the Patient

The Government will not repeat all of the arguments in its opposition to Dianon's summary judgment motion regarding whether Dianon had sufficient notice that its practice of one-size-fits-all testing violated the medical necessity requirements. However, we will reiterate the highlights of that argument here as they relate to "notice" since that seems to be the focus of

---

[1]      Dianon's summary judgment motion was denied by the Court. This motion is nothing more than an attempt to reargue that motion.

2

Dianon's latest iteration of the argument.

Before discussing the evidence that Dianon was on notice of the medical necessity requirement we must point out that all healthcare providers, including laboratories, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare, and a provider has a duty to know the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the requirement that they bill Medicare only for medically necessary tests. Participants in the Medicare program have a "duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Heckler v. Community Health Servs.*, 467 U.S. 51, 64 (1984). "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," therefore Medicare holds health providers "to the most demanding standards in [their] quest for public funds." *Id.* at 63.

In this case, the controlling rule or regulation applicable to Dianon's conduct is the clear and explicit requirement in the Medicare statute that healthcare providers only bill for medically necessary procedures. *42 U.S.C. § 1395y(a)(1)(A)*; *32 C.F.R. § 199* (similar medical necessity requirement for Tricare). Medicare also does not pay for "screening" tests, except in certain circumstances specifically set forth in the regulations. *42 C.F.R. § 411.15.* Screening tests are tests performed in the absence of signs, symptoms, complaints, personal history of disease or injury. Dianon was on actual notice of the regulations and indeed certified in each case that each antibody being billed for was "medically indicated and necessary to the health of *this* patient." *CMS 1500 (Emphasis added).*

Further, the Connecticut Carrier gave guidance to providers in Connecticut about types of activities that might involve fraud including:

3

Claims for a panel or series of lab tests when only part of the group of tests in the panel were medically indicated for the patient's signs, symptoms or complaints.

*Disputed Issues ¶ 2.*[2] Thus, Dianon was on notice that billing for a panel of tests when not all of the tests included in the panel were medically necessary for the patient was potentially fraudulent billing. The Tricare regulations contain similar guidance. *See 32 C.F.R. 199.9(c)(5)* (fraud defined in a part - billing for claims involving ". . . persistent overutilization of services without proper regard for results, the patient's ailments, condition [or] medical needs . . . ").[3]

Despite being on notice about how to properly bill for tests, Dianon set up a panel designed to detect "a majority of hematopoetic malignancies" in one pass. *Disputed Issues ¶¶ 4-6, 13.* As a result, Dianon set up a panel of tests which would virtually always have some antibodies that were not medically necessary in a particular case because not every antibody is relevant to every disease. *Disputed Issues ¶¶ 3, 6-13, 16.* The flow cytometry test was performed by Dianon without regard to the signs or symptoms of the patient. *Disputed Issues ¶¶ 4-6.* Dianon then exercised no medical judgment about which antibodies to bill to Medicare, but simply billed for all 26 in all cases. *Disputed Issues ¶¶ 6-8.* The pathologists recognized after the fact that some of the antibodies were not relevant to particular cases, but no one asked them what to bill to Medicare. *Disputed Issues ¶¶ 12, 16.* Dr. Richert Goyette's memo to Dr.

---

[2]     This reference is to the Disputed Issues section of the *United States' Local Rule 56(a)(2) Statement* filed on November 1, 2006. Rather than burden the record with further copies of documents and testimony already in the record, the United States will respectfully refer the court to portions of the summary judgment motion and response where those documents or testimony may be found.

[3]     See *United States v. Rutgard,* 116 F. 3d 1270, 1281 (9th Cir. 1997) in which the court found that a doctor could be held liable for submitting false claims for a procedure even though there was no Medicare guidance on the specific procedure, where there was evidence that he was performing the procedure in such a way as to ensure that Medicare would reimburse him.

James Amberson lists 18 antibodies as being medically necessary, not 26, and states:

> . . .we believe the following 18 antibodies are essential for the accurate and complete initial work up of flow cytometry specimens.  We believe that their routine usage can be justified to insurance carriers.

*Disputed Issues ¶ 20.*  This document clearly indicates that Dianon's pathologists thought that, even in a one-sized-fits-all panel, at most 18 antibodies could be justified as medically necessary.

Dianon argues, however, that because reasonable people could disagree about which antibodies are needed for a particular case, the Government cannot prove damages under the False Claims Act because to allow the Government to do so would violate its constitutional right to due process.  Dianon argues that the Government is attempting to use Dr. Flynn's opinion to impose a retroactive requirement on Dianon of which it had no notice.

However, there is no retroactive application of a new standard in this case.  The standard in 1996-2003 was the same as it is now – each of the tests performed must be medically necessary for the treatment of the patient and should not be performed in the absence of signs or symptoms of disease.[4]  That standard applies regardless of whether the billing entity is a doctor, a hospital-based laboratory, or a large reference laboratory.  The standard does not change.

Dianon's suggestion that the Government had to give notice to Dianon of Dr. Flynn's

---

[4]      Courts have held that labs can be held liable under the FCA where they set up a panel of tests and charged Medicare for the entire panel in all cases regardless of whether all elements of the panel were useful in particular cases. *See, e.g., United States v. Shaw,* 115 F. Supp. 2d 152, 157 (D. Mass. 2000); *see also United States ex rel. Johnson v. MacNeal Health Services Corp.,* No. 99 C 6098, 2003 WL1627815, at *2 (N.D. Ill. March 27, 2003) (defendant could be held liable under the FCA for bundling tests together to encourage doctors to order tests that were not medically necessary); *U.S. ex rel. Harris v. Bernard,* 275 F. Supp. 2d 1, 7 (D.D.C. 2003) (court rejected defense claim that complaint only alleged difference of opinion and found that government stated cause of action for knowingly submitting false claims through upcoding).

opinion regarding the medical necessity of the various antibodies for individual patients is
absurd. There simply is no constitutional requirement that the Government give a potential
defendant prior notice of what its potential expert might think about a defendant's conduct
(apparently before the defendant commits the fraudulent conduct) before it can be held liable
under the FCA. Dianon cites no authority for this proposition because there is none.

    Dr. Flynn's testimony is being offered to enable the Government to prove the extent of
its damages. Because of Dianon's fraudulent behavior, the Government was harmed – it was
charged for antibodies that were not necessary for the diagnosis or treatment of patients.
Because the medical necessity requirement is specific to the individual patient, the only way to
determine which antibodies were necessary to treat a particular patient is to have a
hematopathologist review the records for that patient and attempt to recreate what Dianon
should have done – exercise medical judgment about what was necessary for that patient.
Experts give after-the-fact opinions about what defendants should have done or should not have
done all the time. Lack of notice to the defendant of an expert's specific opinions, prior to the
fraudulent conduct, is neither necessary to protect the defendant's due process rights nor is it
feasible.

    Further, the law is well-established that where the conduct of the defendant causes
damages to the plaintiff, uncertainty as to the amount of damages does not preclude recovery.
*See, e.g., Lasker v. Bear, Sterns & Co.*, 757 F.2d 15, 19 (2d Cir. 1985); *EGL Gem Lab Ltd v.
Gem Quality Inst.*, 90 F. Supp. 2d  277, 308 (S.D.N.Y. 2000); *Coastal Power Int'l Ltd. v.
Transcontinental Capital Corp.*, 10 F. Supp. 2d. 345, 369 (S.D.N.Y. 1998); *Am. Jur. 2d,* s. 332 -
Certainty Not Required as to Amount of Damages (2007).  Rather, all the plaintiff need do is

6

present the best evidence available sufficient to allow the jury to make a fair and reasonable
estimate of the damages. In this case, Dr. Flynn used his expertise – based on his 25 years as a
practicing hematopathologist and professor of hematopathology at Yale University – to
determine which antibodies were necessary for particular patients given the signs and symptoms
contained in the medical records available to Dianon at the time Dianon did the flow cytometry
testing. Further, Dr. Flynn "gave the benefit of the doubt" to Dianon and if there was not
sufficient information in the records to have enabled Dianon to narrow down the possible
differential diagnoses and therefore the necessary antibodies, he allowed virtually all of the
antibodies as being medically necessary.[5] *See Expert Report of Stuart Flynn, M.D. (Exhibit 1 to
Dianon's Motion to Exclude the Opinion of Stuart Flynn, M.D.) (Exhibit 1).* While Dianon
may quibble with Dr. Flynn's choices in particular cases, that is an issue for cross examination
and for the jury to decide, not a reason to exclude his testimony altogether, and certainly not on
constitutional grounds. *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.*, 305 F.3d 256, 267
(2d Cir. 2002) (minor flaw in an expert's reasoning not grounds for exclusion); *Olin Corp. v.
Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006) (weaknesses in
expert's conclusions treated on cross-examination and by opposing expert testimony, not
exclusion); *Olson v. Ford Motor Co.*, 481 F.3d 619, 627 (8th Cir. 2007) (factual basis for expert

___

[5]        Since Dianon had a tissue or blood specimen in all cases, presumably Dianon had
more information and so could have narrowed the testing even more. Further, Dr. Flynn allowed
some antibodies in cases even where the patient's diagnosis did not call for flow cytometry
because it is not useful for the diagnosis or treatment of that disease, e.g., CML and Hodgkins.
*Disputed Issues ¶¶ 7-8.* Thus, to the extent that there is any uncertainty in Dr. Flynn's results,
that uncertainty is offset by the overly generous approach to reviewing the patient records and
allowing antibodies in cases where they would not have been medically necessary if Dianon had
properly exercised medical judgment.

opinion goes to credibility not admissibility); *United States v. Vargas,* 471 F.3d 255, 265 (1st Cir. 2006) (same).

Dianon could have chosen to present expert testimony to rebut Dr. Flynn's opinions as to the utility of individual antibodies, but chose not to do that. Dianon could have had its three experts review the same medical records Dr. Flynn reviewed and opine on the usefulness of particular antibodies to the diagnosis or treatment of the particular patient in light of that patient's signs and symptoms. Dianon chose not to. Presumably, this is because Dianon's experts, if asked about individual patient records, would have had a hard time justifying particular antibodies as anything other than screening for "anything else that might be there" – much like Dianon's pathologists did when questioned during their depositions. *Disputed Issues* ¶ *9.*

To the extent that there are any uncertainties in Dr. Flynn's results, Dianon bears the burden of that uncertainty, not the Government, because Dianon's fraud caused the Government's damages. Dianon should not be permitted to escape the consequences of that fraud by now arguing that the Government must prove its damages precisely.

### B.    No Violation of Due Process in this Case

Further, the cases cited by Dianon on the due process issue are simply inapposite. Those cases involve situations where (1) there was no actual notice of a legal requirement or reason to believe that the defendant should have been aware of the requirement or (2) the statute or regulation was so vague that it did not provide adequate notice of what activity would be illegal. For example, *Lambert v. California,* 355 US 225 (1957), involved failure to register as a felon as required by a local ordinance about which the defendant had no notice. Because the

8

ordinance did not require any activity, that is, mere presence in the city without registering could trigger criminal liability, the Court held that no liability could attach unless the defendant had prior notice of the ordinance or there was proof of the probability of such knowledge. 355 U.S. at 229. In this case, there is no question that Dianon had actual notice of the medical necessity requirements – it certified on each claim that it submitted to CMS that the company had complied with the requirement. Further, Dianon had at least constructive notice of the other pertinent regulations and guidance from the carriers. In fact, Dianon had a duty to ensure that it understood the requirements before billing Medicare. *Heckler v. Community Health Servs.*, 467 U.S. at 64.

Other cases cited by Dianon such as *United States v. Lachman*, 387 F.3d 42 (1st Cir. 2004) also do not help it. In *Lachman,* the court stated that a regulation could be unconstitutionally vague where (1) the agency itself gave differing public interpretations of a statute or (2) that the regulation was so ambiguous that the only way to resolve the ambiguity was to defer to the agency's interpretation and there had been no public interpretation by the agency prior to the violation by defendant. 387 F.3d at 57. Neither situation is present in this case. The agency has given no differing public interpretations of the medical necessity requirement. In fact, the Connecticut Medicare carrier gave specific guidance that all tests in a panel had to be medically necessary.

Neither is this case an attempt to retroactively apply legal requirements that did not exist prior to the initiation of this case as in *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988). There has always been a requirement that Dianon only bill for tests that are medically necessary for the diagnosis or treatment of the patient; in fact, Dianon certified that it had

9

complied with this requirement every time it submitted a bill to Medicare.

Further, if Dianon believed at the time it billed Medicare that there was an ambiguity about how it should bill, Dianon had a duty to inquire and clarify ambiguities. *Heckler v. Community Home Health Servs.*, 467 U.S. at 64. Simply because Dianon can now concoct an after-the-fact, theoretical ambiguity in the governing standard, does not mean that the regulation actually is ambiguous. To hold otherwise would mistakenly absolve of liability any defendant who can advance, post-hoc, a plausible basis for his submission of admittedly false claims.

## II. The Government Should Be Permitted to Use a Statistical Sample to Prove FCA Damages.

Dianon next argues that the United States should not be permitted to prove its FCA damages through the statistical sample designed by Dr. Constantine Yiannoutsos. Defendant cites three alleged flaws with the use of the sample. First, according to defendant, the sampling technique places a retroactive cap of 16 antibodies on reimbursement without providing prior notice to the defendant. Second, the sample was not constructed around the "presenting symptoms" of the patients and therefore may not be representative of the entire population. Third, the sample does not account for variability of Dr. Flynn's reviews, or that experts might differ regarding the number of appropriate antibodies, and because of this the sample does not fit the Government's theory of the case and is irrelevant.

### A. Use of Statistical Sampling to Calculate Damages is Well-Established

Before specifically responding to Dianon's contentions regarding due process[6] and the

---

[6]     Due process requires the consideration of three distinct factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the "probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function

relevance of the Government's statistical sample evidence, the Government must point out that

Dianon seems to have a fundamental misunderstanding of the use of statistical sampling as a

method for calculating damages. A statistical sample is used to calculate the likely damages in

cases where the claims are simply too numerous to review on a case-by-case basis. It is a well-

established method of calculating damages in cases such as this where there are literally

thousands of individual claims for payment.[7]

In the Second Circuit, it is clear that the government may use a valid statistical sample to

determine and recoup Medicare and/or Medicaid overpayments made by the government due to

a defendant's improper and/or fraudulent billing. *See Yorktown Med. Lab., Inc. v. Perales,* 948

F.2d 84, 90 (2d Cir. 1991). The Second Circuit has found that the government's interest in

minimizing administrative burdens outweighs the defendant's private interest in retaining

Medicaid payments. *See id.* at 90. Indeed, the Second Circuit has stated that "[t]o rule

---

involved and the fiscal and administrative burdens that the additional or substitute procedural
requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976); *see Yorktown Med.
Lab., Inc. v. Perales,* 948 F.2d 84, 90 n. 7 (2d Cir. 1991); *Ill. Physicians Union v. Miller,* 675
F.2d 151, 157, 157 (7th Cir. 1982).

[7]       In this case, the sample represented close to 3.56 percent of the population. There
is no touchstone for how large a percentage of the total population must be sampled to afford the
defendant due process. *See Ratanasen v. State of Cal., Dep't of Health Servs.*, 11 F.3d 1467,
1472 (9th Cir. 1993); *Mich. Dep't of Educ. v. United States Dep't of Educ.*, 875 F.2d 1196, 1206
(6th Cir. 1989); *Webb v. Shalala*, 49 F. Supp. 2d 1114, 1125 (W.D. Ark. 1999). Cases have held
that as little as a 0.4% sample was sufficient to extrapolate to a larger population. *See Mich.
Dep't of Educ.*, 875 F.2d at 1199; *see also Ratanasen*, 11 F.3d at 1469 (finding a 3.4% sample
sufficient); *Webb*, 49 F. Supp. 2d at 1122 (holding a 2.74% sample sufficient). So long as the
sampling methods are valid and reliable, and the defendant is afforded an opportunity to
challenge the government's sample and/or introduce their own sample, due process is satisfied.
*See Mich. Dep't of Educ.*, 875 F.2d at 1206; *Webb*, 49 F. Supp. 2d at 1125; *see also Chaves
County Home Health Serv. v. Sullivan*, 931 F.2d 914, 921 (D.C. Cir. 1991); *Georgia v. Califano*,
446 F. Supp. 404, 410 (N.D. Ga. 1977).

11

otherwise would hamstring [the government's] attempts to eliminate fraud, without materially

advancing [the defendant's] interest." *Perales,* 948 F.2d at 90; *see Ratanasen v. State of Cal.,*

*Dep't of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993) (citing to *Perales* and stating that

"[t]o deny public agencies the use of statistical and mathematical audit methods would be to

deny them an effective means of detecting abuses in the use of public funds."). Every other

circuit court to address this issue, as well as a number of district courts, have similarly held that

the government's interest in combating fraud and recouping overpayments far outweighs the

defendant's interest in retaining payments. *See Ratanasen*, 11 F.3d at 1471; *Chaves County*

*Home Health Serv. v. Sullivan*, 931 F.2d 914, 922 (D.C. Cir. 1991) (stating that the private

interest at stake is "easily outweighed" by the government interest); *Ill. Physicians Union v.*

*Miller*, 675 F.2d 151, 157 (7th Cir. 1982) ("[I]n view of the enormous logistical problems of

Medicaid enforcement, statistical sampling is the only feasible method available."); *Webb v.*

*Shalala*, 49 F. Supp. 2d 1114, 1122-23 (W.D. Ark. 1999); *Georgia v. Califano,* 446 F. Supp

404, 410 (N.D. Ga. 1977); *see also Mich. Dep't of Educ. v. United States Dep't of Educ.*, 875

F.2d 1196, 1205-06 (6th Cir. 1989) (denying defendant's due process claim in the context of

Federal Rehabilitation Act expenditures). Thus, the propriety of the Government's use of

statistical sampling in order to prove damages is not in doubt.[8]

---

[8]    Courts have also recognized the fact that, even allowing into evidence statistical
sampling to prove damages, such evidence still may not make the Government whole. *See*
*Sullivan*, 931 F.2d at 919; *Mich. Dep't of Educ.*, 875 F.2d at 1205, emphasizing that sample
adjudication is a valid and scientifically accepted method of proving damages and, "is no more
likely to result in a situation where the [billing entity] will be required to return monies when
there has been no overpayment than in a situation where the [government] will not recoup the
full amount overpaid." *Miller*, 675 F.2d at 156; *see Sullivan*, 931 F.2d at 919 (noting that "minor
errors" in a sample will tend to balance out in the end). In other words, the government has just
as much to lose as a defendant by using sampling to prove damages.

Given the private and governmental interests involved in this case, it is clear that the government may introduce a statistical sample of fraudulent claims under the False Claims Act and extrapolate that sample to the entire universe of 12,304 claims for the purposes of calculating single damages (i.e. the overpayment) without violating the defendant's due process rights. The defendant has been able to review and challenge the government's statistical sample, was presented with the option of introducing its own statistical sample, and will further be given an opportunity to challenge the government's statistical sample in open court before a jury. Due process requires nothing more; the government's statistical sample should therefore be admitted into evidence for the purpose of proving False Claims Act damages.[9] *See United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234 (D. P.R. 2000) (allowing treble damages on a

---

[9]     The fact that the overpayment gets trebled in a False Claims Act case does not change the due process concerns involved. The private and governmental interests remain the same, as does the risk of an erroneous deprivation of the private interest. Any error inherent in a statistical sample is just as likely to decrease the amount of money the government is entitled to recover as it is to occasion the defendant to pay on a claim in which there was no fraudulent billing. Treble damages under the False Claims Act are not punitive in nature; the Supreme Court has found that treble damages serve a compensatory function - to make the government whole after it has been defrauded. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 552 (1943); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998); *see also Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 131 n.9 (2003). Liability beyond the amount of the fraud in a False Claims Act case is "necessary to compensate the Government completely for the costs, delays, and inconveniences occasion by fraudulent claims." *United States ex rel. Chandler*, 538 U.S. at 130 (citations and internal quotations omitted). Treble damages are thus part and parcel of the overpayment claimed by the government, and should be equally eligible to proof by way of statistical sampling.

The defendant may also have a due process interest in not paying penalties to the government under the False Claims Act. In this case, however, that interest is not present because, for the purposes of this case, the United States will exercise its discretion and only ask for penalties on the claims associated with medical records actually reviewed by Dr. Flynn, not on extrapolated claims.

13

statistical sample in a False Claims Act case).

## B.    Government's Statistical Sample Does Not Retroactively Cap Reimbursement at 16 Antibodies

While Dianon seeks to argue that the statistical sample impermissibly caps antibodies at

16, Dianon apparently fails to appreciate the significance of the word "mean" and its application

in this case. To understand the extent of Dianon's misunderstanding, it is important first to

review how the statistical sample was developed. The Government's expert, Dr. Yiannoutsos,

first divided the entire test population into Repeat Tests and Non-Repeat Tests. (*See Clifton*

*Gunderson Report, attached as Exhibit. 2, at p. 9) (Exhibit 2)*. Next, Dr. Yiannoutsos designed

and selected a *stratified random sample* for the entire damages period for the Non-Repeat

Tests.[10] *Id. at 9-10.* The sample was stratified because Dr. Yiannoutsos divided the damages

period into three distinct time frames, based upon Dianon's billing practices.[11] *Id.* Dr. Flynn

then reviewed the claims from this statistically valid random sample. *Id. at 5.* As to each claim,

Dr. Flynn considered whether each of the antibodies were medically necessary for that patient.

*Id.* Based upon this review, Dr. Yiannoutsos then was able to develop a mean number of

medically necessary tests for each strata. *Id. at 12.* To derive the number of medically

unnecessary units per test in the remainder of the population (the claims not specifically

reviewed by Dr. Flynn) Dr. Yiannoutsos subtracted from the total number of units performed in

---

[10]    The Non-Repeat Tests were not similarly stratified because Dr. Yiannoutsos discovered that the variability across strata was virtually the same. *Id. at 15.*

[11]    These strata were (1) 1996 to August 31, 1997, when Dianon predominantly billed 26 antibodies per test; (2) September 1, 1997 to December 31, 2000, when Dianon predominantly billed 18 antibodies per test; and (3) 2001 to 2003, when Dianon again predominantly billed 26 antibodies per test. *Id. at 9-10.*

14

each test the mean number of units considered medically unnecessary. *Id. at 14.* The resulting number was multiplied by the average per-unit fee for each test in order to calculate total damages. *Id. at 15.*

While Dianon asserts that this computation of damages constitutes a "retroactive adoption of a cap on antibodies," it is no such thing. Rather, because the medical necessity requirement is patient-specific, the only reasonable way to determine the Government's damages in this case is to have a hematopathologist review the medical records for each patient and determine which antibodies were necessary for the diagnosis or treatment of that patient. This is what Dr. Flynn did. Further, in order to ensure that the estimate of the Government's damages resulting from Dr. Flynn's review was fair, the Government instructed Dr. Flynn that he was to give every benefit of the doubt to Dianon while conducting his review, even if this meant allowing some antibodies for medical conditions for which flow cytometry is not indicated. *See Flynn Report, Exh. 1.* Moreover, as Dr. Flynn testified during the *Daubert* hearing, he actually allowed more antibodies in cases in which Dianon did not have sufficient information to narrow down the possible diagnoses.[12] Thus, the average number of necessary antibodies is not a retroactive cap; it is merely the only way to reasonably estimate the damages caused by Dianon's fraudulent billing.

Dianon complains that during the time period of September 1997 through December 2000, (the second strata), Dianon only billed for 18 antibodies. However, in some of those cases from that time period, Dr. Flynn allowed more than 18 antibodies. Dianon argues based

---

[12]     Since in all cases Dianon had a specimen to examine, Dianon's pathologists could have used that examination to further narrow the number of necessary antibodies if they had exercised any medical judgment prior to billing Medicare. *See, e.g., Disputed Issues ¶ 12.*

15

upon this fact that applying an average of around 16 antibodies to every test in the population necessarily overstates Dianon's liability.

In making this argument, Dianon ignores the actual data in Dr. Yiannoutsos' expert report. While Dianon may have only billed for 18 antibodies from September 1997 through December 2000, the *mean* number of medically necessary antibodies during that time frame was 15.32, a number not significantly different from the mean number of medically necessary antibodies for the other two strata (14.67 and 15.84, respectively). *See Exh. 2, p. 12.*

In terms of developing damages for the claims reviewed, Dr. Yiannoutsos did not assign any damages to a particular claim if Dr. Flynn had allowed more than the 18 antibodies billed during the September 1997 through December 2000 time frame. *See Id. at 14.* However, when extrapolating damages for the rest of the population during the time frame, Dr. Yiannoutsos calculated damages based upon the mean number of medically necessary antibodies. *Id.* This mean was calculated taking all of the claims into consideration, including claims where Dr. Flynn found more antibodies were necessary than what Dianon actually billed and claims where Dr. Flynn found fewer antibodies were necessary than what Dianon actually billed. *Id.* Thus, in no way does applying a mean of close to 16 antibodies to every test overstate Dianon's liability as to the second strata claims, because it takes into account both the high and low test scores in computing the mean that is used to compute those damages. The fact that this may assign some small number of damages to some claims for which Dianon would not theoretically be liable is balanced out by the fact that for other claims Dianon is not asked to repay a larger amount.[13]

---

[13]     In any event, as previously stated, for the purposes of this case, the Government will exercise its discretion and will not ask for penalties on claims that were extrapolated, only on claims that were actually reviewed by Dr. Flynn.

## C.    A Random Sample Takes Into Account a Variability of Symptoms and Stratification Based Upon Disease-State is Both Inappropriate and Unnecessary

Defendant argues that Dr. Yiannoutsos' sampling technique did not ensure that the

sample Dr. Flynn reviewed was representative of different presenting symptoms. Once again,

defendant misconstrues the purpose of the sample and also appears to fundamentally

misunderstand the bedrock statistical theory that the purpose of generating a random sample is

to make the sample representative of the population.[14]  Dr. Yiannoutsos did not stratify based

upon presenting disease or patient condition because to do so would be virtually impossible

while not significantly increasing the sample size for Dr. Flynn to review, thereby also

significantly increasing the cost to the Government to recover for Dianon's false claims.

Defendant's own statistical expert Dr. Gary R. Cutter agrees that statistical sampling based upon

disease state would have been difficult to accomplish, likely would have led to a "very large

sample," and, had he been asked to perform the Government's statistical analysis, Dr. Cutter

admitted that he may well have approached creating the sample the same way. *See Deposition

of Gary R. Cutter, pp. 63:05-66:21, 66:15-17* ("I don't feel like even with what I know right

now I would necessarily design something totally different.") *(Exhibit 3).*

However, what Dianon fails to emphasize is that the construction of a random sample of

the claims data is a hallmark of statistical theory that was created to deal with this very problem

of properly extrapolating a sample to an unknown population.  A random sample means that

---

[14]    This is particularly true where mathematical theory can assess any sampling error through a standard error or confidence interval.  In this case, Dr. Yiannoutsos also calculated the standard deviation of the mean for each strata. *See Exh. 2, p. 12.*

17

every unit of the population has the same known chance of being a part of the sample. Thus, it becomes unnecessary to stratify by disease state in order to generate a sample representative of the population, because theoretically the sample represents the population as it was randomly generated. *See Ratanasen*, 11 F.3d at 1472 (upholding a simple random sampling method). Further, while there is some variability in the diseases in the patient population in this case, e.g., lymphoma versus leukemia, that variability is somewhat limited. The type of disease suspected in all cases is a blood-related disease, and the corresponding panels put together by Dr. Flynn to address these disease states do not significantly vary in the number of antibodies considered medically necessary, although they may differ in the actual antibodies used.[15]

Dianon does not put forth any evidence to show that the randomly generated sample was not representative of the population; instead, Dianon merely asserts that the sample may be skewed in the Government's favor. Such an assertion is not well-founded; the sample may just as likely be skewed in Dianon's favor based upon their logic, and in either case, Dianon has presented *no evidence* to show that the sample does not accurately represent the population of claims.

Moreover, while Dianon blankly asserts that the statistical sample should be excluded because the assumptions underlying the statistical sample do not directly fit the manner in which Dr. Flynn conducted his review, the cases cited by Dianon in favor of this proposition do not fit

---

[15]      The 2000 consensus conference paper indicated that for B-cell lymphoproliferative disorders, the number of markers need would be between 12 and 15, and for T-cell disorders, the number was 16; for tissue lymphomas the range was 12-16; for plasma cell disorders, 5-8 were considered essential; and 13-15 were considered essential for acute leukemia. *See Exh. 10* to Dianon's Daubert Motion, at SF0758-59. Thus, Dr. Flynn's average panel of 12-17 markers is actually similar to the panels discussed by the participants at the 2000 conference. *See Exh. 2, at pp. 12-16.*

18

the facts of this case. For example, Dianon cites to *Boucher v. Suzuki Motors Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) for the proposition that expert testimony should be excluded when assumptions underlying the opinion do not fit the facts of the case, thereby creating an "apples to oranges comparison." However, in *Boucher*, what the Court actually says is that

> [a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison,' other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.' A district court has discretion under Federal Rule of Evidence 703 'to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'

*See Boucher*, 73 F.3d at 21 (internal citations omitted.) In *Boucher*, the facts showed that an expert opined on the future earnings of an individual injured in an accident. The court rejected the expert's opinion, because while the expert's analysis assumed a future 40-hour work week and benefits, the facts showed that prior to the accident the individual's work history was sporadic, with many periods of no income whatsoever. *Id.* at 22. This the court considered to be an "insufficient factual foundation" for the expert's opinion as to the individual's future earnings. Similar to *Boucher*, Dianon cites to *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994), for the proposition that an expert's opinions should be excluded when the assumptions made by the expert are not based in fact. In that case, an expert opined that the lack of sand at a construction project caused increased costs. However, all the testimony admitted showed that there never was a lack of sand. *Id.* at 142. Accordingly, the court determined that the expert's testimony should not have been admitted.

Neither *Boucher* nor *Tyger Const. Co.* apply to the present matter. Here, the generation

19

of a random sample by Dr. Yiannoutsos, the claims analysis by Dr. Flynn, and the extrapolation

of that claims analysis to the claims population in no way constitutes an insufficient factual

foundation for the damages assessment. It is a fact that Dr. Yiannoutsos generated a random

sample based upon the claims actually paid by the Government to Dianon over the damages

period. It is a fact that Dr. Flynn considered each of the patient files and determined, in his

expert analysis, which antibodies were medically necessary based upon that patient's medical

history. Had Dr. Flynn failed to consult any patient records, but nevertheless opined that a

particular patient only required a certain number of antibodies – much like Dianon's actual

practice – that would be similar to *Boucher* and *Tyger Const. Co.*, and his opinion would be

properly excluded. However, in this case, Dr. Flynn's opinion is neither speculative nor

conjectural, it does not represent an apples to oranges comparison, and as such, any other attacks

on the underlying assumptions go to the weight, but not the admissibility, of the testimony of

both Dr. Flynn and Dr. Yiannoutsos.

Thus, based upon the actual evidence in the record, and not contradicted by Dianon nor

supported by the case law cited by Dianon, the randomly generated statistical sample is

representative of the population of claims data, and may be used to establish False Claims Act

damages.

## D.    Variability of Expert Opinion is Not Necessary in This Case to Prove Damages

As previously discussed, Dianon also argues that the sample does not account for

variability of Dr. Flynn's reviews, or that experts might differ regarding the number of

appropriate antibodies. With this argument, Defendant ignores one simple fact. There is no

20

admissible evidence in the record that experts differ as to the utility of particular antibodies for particular patients. Dr. Flynn is the only one of the parties' experts to have reviewed all of the medical records contained in the sample and opine on whether particular antibodies are medically necessary for those patients. Defendant's experts did not review the charts and did not include in their expert reports the results of any such review. There is, therefore, no admissible conflicting testimony or opinions for the sample to take into account.

Further, to the extent that defendant argues that the sample used should have been based on the review by more than one expert, such an argument fails to acknowledge that many scientifically-valid and peer reviewed studies utilize a single expert precisely to minimize variability. *See Cutter Deposition, Exh. 3, 91:8-11, 100:11-13.* Such a practice can result in a more accurate analysis, in that holding the reviewer constant helps to ensure that the review of potentially subjective data is consistent. *See Yiannoutsos Deposition, 50:3-51:25 (attached as Exhibit 4).* As stated earlier, the Government is using this statistical analysis to prove damages, and not liability. Certainty is not required as to the amount of damages, just the best evidence available. *See, e.g., Lasker v. Bear, Sterns & Co.*, 757 F.2d 15, 19 (2d Cir. 1985). This statistical evidence is the best evidence available to the Government to allow the jury to make a fair and reasonable estimate of the damages for the entire population of claims, and as such, it should be ruled admissible.

Due process has been satisfied in this case because Dianon has been afforded the opportunity to challenge the Government's sample or to offer its own sample. Further, there is no mismatch between the Government's theory of the case and the method of Dr. Flynn's review. The Government's theory of the case is that Dianon should have exercised medical judgment and

21

determined what was medically necessary for the diagnosis or treatment of the patients instead of billing Medicare for a one-sized-fits-all panel. Dr. Flynn's review is merely an attempt after the fact to reasonably estimate the Government's damages by doing the medical necessity review Dianon failed to perform. To the extent Dianon has quibbles about Dr. Flynn's review and the development of the statistical sample, those are issues more appropriate for cross-examination than for a motion to exclude evidence altogether.

## III.    Evidence of Dianon's Billing Medicare for Four Antibodies It Did Not Perform Is Relevant to the Government's Amended Complaint and Should Be Admitted

Dianon's final motion is to exclude from the trial evidence of the fact that Dianon billed for four antibodies that it never performed. Dianon argues essentially that because the failure to perform four antibodies was not among the illustrations of the defendant's fraud which were set forth in the Government's Amended Complaint, the Government is foreclosed from admitting evidence of the overbilling in the case. This argument must fail for several reasons.

First, the Government is not limited at trial to only the evidence specifically set forth in the Amended Complaint. The purpose of the pleading requirements is to ensure that the defendant is on notice of the fraudulent conduct it is being charged with and the time period during which the fraud occurred. The purpose of the pleading requirements is not to limit the Government's proof to the specific examples, or type of examples, listed in the complaint. If evidence of a subspecies of the general type of fraud alleged in the complaint is uncovered in discovery, that evidence cannot be excluded unless the defendant can point to some prejudice which would result from admission of the evidence. Dianon can point to no prejudice because there is none.

22

The amended complaint in this action sufficiently pled the facts and law to support a

cause of action for knowingly submitting false claims for medically unnecessary testing for the

1996-1997 time period. The complaint alleges generally that:

27. In or about 1995, Dianon's "standard" flow cytometry panel consisted of 8 antibodies.

28. Beginning in or about 1996, Dianon significantly increased the number of antibodies in its flow cytometry panel. On information and belief, Dianon's standard panel was increased to 26 antibodies.

29. In late 1996, Medicare reduced the amount it would reimburse for each flow cytometry test from $94.00 per antibody to $28 per antibody. By increasing the number of antibodies on its panel to 26, Dianon was able to ensure that pre-1996 reimbursement per panel (8 antibodies x $94=$752) did not drop significantly in post-1996 reimbursement (26 antibodies x $28 = $728). Not all of the 26 antibodies in Dianon's standard panel are necessary, or appropriately used, to evaluate all types of cancer.

36. From in or about 1996 to the present, when Dianon billed for flow cytometry a significant portion of the antibodies billed to Federal healthcare programs were not medically necessary.

Thus, the Government alleged generally that in 1996 Dianon increased its panel to 26 antibodies

to maximize reimbursement from Medicare, that some of the tests included in the panel of 26

were not medically necessary and that, as a result, Dianon submitted bills to Medicare for

medically unnecessary testing.

One element of the Government's case developed during discovery is evidence that for

the time period between January of 1996 and mid-1997 four of the antibodies contained in the

panel of 26 were not medically necessary because Dianon did not perform them. Testing cannot

be more medically unnecessary than that which is never actually performed.

This particular subspecies of medically unnecessary testing was not specifically alleged in

the Government's Amended Complaint in 2005 as an illustrative example of Dianon's fraud

because counsel for the Government did not become aware of the issue until early 2006 when Dr.

23

Flynn's analysis was complete. Once the Government became aware of the issue, the

Government clearly made Dianon aware of the fact that these unperformed tests were additional

examples of medically unnecessary testing – a particularly compelling example since the billing

people did not seem to care enough to ensure that CMS was being billed for what the lab was

actually performing.

The issue was raised in the Clifton Gunderson expert report. *See Clifton Gundersen*

*report, Exh. 2, p. 25 section VI paragraph 5 and exhibit VI.* Further, the issue was the subject of

several depositions including a 30(b)(6) deposition and the personal deposition of Dr. James

Amberson on March 28, 2006. *Amberson Deposition, p. 20:20-23:2 (Exhibit 5).* The issue was

also raised in Dr. Richert Goyette's deposition on February 28, 2006 *(Goyette Deposition,*

*Exhibit 6)*, and Mr. William McDowell's deposition on June 2, 2006. *McDowell Deposition, pp.*

*84-88 (Exhibit 7).* Finally, the Government's damages disclosure which was dated May 1, 2006

calculated damages based on billing for 26 antibodies while only performing 22. *See United*

*States' Damage Disclosure dated 5/1/06, section I C page 3 and section II D page 4 (Exhibit 8).*

Dianon sent a refund check dated June 20, 2006 to the Medicare carrier in Connecticut for

\$38,924.21 for the overbillings in those cases where Dianon had billed for 26 antibodies while

only performing 22. *(Exhibit 9).*[16] Discovery in this case did not close until July 31, 2006.

Dianon cannot credibly claim at this late date that it was not aware prior to the close of

discovery that the United States was pursing this issue as a part of its case, both as an issue of

---

[16]        A defendant cannot evade responsibility for multiple damages and penalties
simply by paying the money back. At best, Dianon would be entitled to an offset against treble
damages for the amount of the repayment. *See, e.g., United States v. Bornstein,* 423 U.S. 303,
316-317 (1976).

damages and because it relates to Dianon's scienter. It has been clear throughout the litigation that the United States has been asserting a cause of action for billing for medically unnecessary tests and that the four unperformed tests were a part of the Government's claims. Dianon cannot claim surprise or prejudice because there has been none. This is not a case where a party is attempting to assert an entirely new claim or cause of action for the first time after the close of discovery which is clearly not alleged in the complaint. *See, e.g., Coleman v. Quaker Oats Company,* 232 F.3d 1271, 1291-92 ( 9th Cir. 2000). Rather, this issue is one that the Government repeatedly raised during the discovery period, and so Dianon has been on notice throughout that the Government was asserting this as another example of Dianon performing medically unnecessary testing. Further, the allegations in the Amended Complaint were broad enough to encompass the four unperformed, and therefore unnecessary, tests so again amending the complaint was and is not necessary.

Aside from the issue of whether the United States should be able to recover damages for the four unperformed tests, the evidence of billing for them should be admitted at trial because it is relevant to the issue of "knowledge" under the False Claims Act. Dianon desperately wants to keep this evidence from the jury because it clearly illustrates the total lack of medical judgment applied by Dianon regarding what they billed to Medicare. The billing people did not even bother to ensure that they were billing for the antibodies actually being performed by the lab; they were only concerned with ensuring that they maximized reimbursement from Medicare. While this evidence will surely prejudice Dianon's defense, the fact that particular facts are bad for one party or another is not the kind of prejudice which would justify excluding evidence from the trial. Thus, the evidence should be admitted because it bears on the issue of scienter.

25

Finally, the United States raised this issue in its response to Dianon's motion for

summary judgment. *Disputed Issues ¶ 18.* Dianon did not contest that it billed for four tests it

did not perform as alleged by the Government. *Defendant's Local Rule 56(a)(1) Reply Statement*

*p. 38 ¶ 18.* Undisputed facts as presented on a summary judgment motion serve as a "basis to

deem the complaint amended to conform with the proof pursuant to F. R. Civ. P. 15(b)."

*Clomon v. Jackson*, 988 F.2d 1314, 1323 (2d Cir. 1993); *Bail v. Ramirez,* No. 04 Civ. 5084,

2007 WL 959045, at *1 n. 1 (S.D.N.Y. March 29, 2007). Therefore, should the court conclude

that the Government's Amended Complaint cannot be read to include the claims for the four

unperformed tests, it can deem the complaint amended to conform to the evidence pursuant to F.

R. Civ. P. 15(b).

## IV.    Conclusion

The court should deny Dianon's attempts to exclude evidence it finds inconvenient on

specious constitutional grounds. Dianon has not been denied due process. It had adequate notice

of the medical necessity requirements, has had an opportunity to challenge the Government's

sample and Dr. Flynn's methodology. That is all that is required.

The grounds Dianon presents for excluding Dr. Flynn's testimony more properly are

grounds for cross-examination, not exclusion. Similarly, the issues Dianon raises with respect to

the Government's sample are also grist for the cross-examination mill, not grounds for exclusion.

Finally, the allegations in the Government's complaint are broad enough to encompass

the evidence of Dianon's billing for four antibodies it did not perform or if the court does not

believe so, the court has the discretion to deem the complaint conformed to the evidence. The

evidence should be admitted not only to prove FCA damages for the four antibodies, but also

26

because it is relevant to scienter.

      Defendant's motions in limine should be denied in their entirety.

                    Respectfully submitted,

                    PETER D. KEISLER
                    Assistant Attorney General

                    KEVIN J. O'CONNOR
                    United States Attorney
                    RICHARD M. MOLOT
                    Assistant United States Attorney
                    Federal Bar No. CT21676
                    157 Church Street
                    New Haven, Connecticut 06510
                    (203) 821-3700

                    *Pat Davis / by RMM*

                    JOYCE R. BRANDA
                    PATRICIA R. DAVIS
                    JENNIFER CHORPENING
                    Attorneys, Civil Division
                    Commercial Litigation Branch
                    Post Office Box 261, Ben Franklin Station
                    Washington, D.C. 20044
                    Telephone: (202) 307-0240
                    Attorneys for the United States

CERTIFICATION OF SERVICE

I hereby certify that on this 11th day of May 2007, a true and correct copy of the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion in Limine to Exclude Evidence of FCA Liability was served by email and first-class mail on:

Bryan T. Carmody, Esq.
Maya & Associates, P.C.
266 Post Road East
Westport, CT 06880
bcarmody@mayalaw.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert Strauss Building
1333 New Hampshire Ave, NW
Washington, D.C. 20036
rsalcido@akingump.com

Bruce R. Parker
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Md.  21201
brparker@venable.com

Patricia R. Davis