Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-----------------------------x
UNITED STATES OF AMERICA        :
ex rel. JAMES J. TIESINGA,      :
                                :
        Plaintiff,              :
                                :
        v.                      : No. 3:02CV1573(MRK)
                                :
                                :
DIANON SYSTEMS, INC.,           :
                                :
        Defendant.              :
-----------------------------x
```

                        Washington, D.C.

                    Tuesday, March 28, 2006

30(b)6 Deposition of

                JAMES AMBERSON

a corporate designee, called for examination by

counsel for Plaintiff, pursuant to notice and

agreement of counsel, beginning at approximately

9:08 a.m., at the offices of the United States

Department of Justice, 601 D Street, NW.,

Washington, D.C., before Denise Dobner Vickery of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:



Page 2

```
 1  APPEARANCES:
 2    On behalf of Plaintiff:
 3    PATRICIA R. DAVIS, ESQUIRE
      RYAN P. FAYHEE, ESQUIRE
 4    United States Department of Justice
      Civil Division
 5    601 D Street, NW., Room 9154
      Washington, D.C. 20004
 6    (202) 307-0238
 7    On behalf of Defendant:
 8    BRUCE R. PARKER, ESQUIRE
      Venable, LLP
 9    Two Hopkins Plaza, Suite 1800
      Baltimore, Maryland 21201-2978
10    (410) 244-7534
11  ALSO PRESENT:
12    Rick Molot, Esquire
13            * * * * *
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1              C O N T E N T S
 2  EXAMINATION BY:                  PAGE
 3    Counsel for Plaintiff          5
 4  DEPOSITION EXHIBITS:
 5  No.  1 - Notice of 30(b)6 Deposition      8
 6  No.  2 - Memorandum, Brown to McDowell   18
 7  No.  3 - March 20, 1997, Memorandum      24
 8  No.  4 - May 21, 1997, Memorandum        30
 9  No.  5 - May 21, 1997, Memorandum        32
10  No.  6 - June 17, 1997, Memorandum       34
11  No.  7 - Change Patient Fees/CPT Codes   41
12  No.  8 - July 30, 1997, Memorandum       43
13  No.  9 - Letter, Metz to AOR             47
14  No. 10 - Letter, Aetna to McGinnis       50
15
16
17            * * * * *
18
19
20
21
22
```

Page 4

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  This is the
 3  video deposition of Dr. James Amberson taken
 4  on behalf of plaintiff in the matter of
 5  United States of America v. DIANON Systems in
 6  the US District Court for the District of
 7  Connecticut, case number 302 CV 1573.  This
 8  deposition is being held at 601 D Street,
 9  Northwest, Washington, D.C. 20004.
10          The date is March 28, 2006.  The
11  time is approximately 9:08 a.m.  I'm the
12  videographer, Andy White.  The court reporter
13  is Denise Vickery.  We are both from the firm
14  of Beta Court Reporting.
15          The attorneys please introduce
16  themselves and who they represent.
17          MS. DAVIS:  I'm Pat Davis.  I
18  represent the United States.
19          MR. FAYHEE:  Ryan Fayhee
20  representing United States.
21          MR. PARKER:  Good morning.  Bruce
22  Parker representing DIANON Systems, Inc., the
```

Page 5

```
 1  defendant.
 2          THE VIDEOGRAPHER:  Denise, please
 3  swear in the witness.
 4  Whereupon,
 5          JAMES AMBERSON
 6  was called as a witness and, having been first
 7  duly sworn, was examined and testified as follows:
 8      EXAMINATION BY COUNSEL FOR PLAINTIFF
 9      BY MS. DAVIS:
10  Q   Good morning, Dr. Amberson.
11  A   Good morning.
12  Q   How are you?
13  A   Fine.  Thank you.
14  Q   Okay.  Let me get some background
15  information from you.  First I'm going to
16  just ask general questions.  I'll go into
17  more detail when we do your second deposition
18  later today.  This is going to be the 30(b)6
19  deposition.
20  A   (Nodding)
21  Q   Okay?
22  A   Yes.
```

2 (Pages 2 to 5)

Page 6

1    Q   Do you understand what a 30(b)6
2  deposition is?
3    A   I know one I am the corporate
4  representative.  In the other I'm a fact
5  witness.
6    Q   Right.  Okay.  And we're doing the
7  corporate representative one first, okay?
8         Can you just give us a little
9  background information about yourself, your
10  schooling, prior work experience?
11    A   I'm a physician.  I went to college
12  at Wesleyan University.  I went to medical
13  school at Johns Hopkins University in
14  Baltimore.  I was trained in pathology at
15  Cornell Medical College in New York City.
16  Following my training there, I joined the
17  faculty.  I also completed a fellowship in
18  cytopathology and then joined DIANON Systems
19  in 1989.
20    Q   Okay.  And when you first joined
21  DIANON, what was your -- what was your
22  position?

Page 7

1    A   I joined DIANON to set up a program
2  in urine cytology and image cytometry, and I
3  believe my title at the time was director
4  flow or director cytometry business unit.
5  Although, I'm not certain.
6    Q   Okay.  And that was in 1989?
7    A   Yes.
8    Q   And how long were you in that
9  position?
10    A   I don't remember.  My title changed
11  over the years, but I've been at DIANON
12  since.
13    Q   Okay.  And what's your position
14  now?
15    A   Now I'm divisional medical director
16  for DIANON.
17    Q   And when you say divisional medical
18  director, what does that mean?
19    A   It means our medical laboratory in
20  Stratford, the physicians there report to me.
21  I'm also the laboratory director for that
22  laboratory, and it means that with regards to

Page 8

1  our laboratory in Long Island, the laboratory
2  director there also reports to me.
3    Q   And do any of the other lab
4  facilities report to you?
5    A   No, just those two.
6         MS. DAVIS:  This has been marked as
7  Exhibit 1.
8         (Deposition Exhibit No. 1 was
9         marked for identification.)
10    BY MS. DAVIS:
11    Q   And this is the notice of
12  deposition for this 30(b)6 deposition.  And
13  as I understand it, if you could turn to
14  Exhibit A, which is page 3.  Two page 3s.
15  The second page 3.  As I understand it,
16  you've been offered for section B.  The
17  decision in or about 1997 to reduce the
18  number of antibodies billed for most of the
19  cytometry service to approximately 18; is
20  that right?
21    A   That's correct.
22    Q   And also for A, which is the

Page 9

1  identity of some documents that are attached?
2    A   That's correct.
3    Q   Okay.  And you're not being offered
4  for any of the other sections?
5    A   No.
6    Q   Okay.  Okay.  Let me ask you some
7  questions.  What did you do to gather
8  information so that you could be the company
9  representative in this deposition?
10    A   I was given some copies of
11  documents, which are -- I believe are in what
12  you just handed me.  I reviewed those, went
13  over them with counsel, and also talked to a
14  number of people at DIANON to see if they
15  remembered what they were, who the authors
16  were, and why they were composed.
17    Q   Okay.  And who was -- who did you
18  talk to at DIANON?
19    A   Let's see.  I talked to, in
20  addition to counsel, Tom Cassel and Mr.
21  Parker, I spoke with Ms. Palmieri, a Robert
22  McNamee, Fred Ferrera, Debra Klembara, Pat

3 (Pages 6 to 9)

Page 10

1    Torre, Maria Conte, Erlvin Young.
2        Q    I'm sorry.  What was that?
3        A    Erlvin Young.
4        Q    Okay.
5        A    I think those were all the people I
6    talked to.  I may have forgotten one or two
7    but...
8        Q    Okay.  And all these people are
9    still at DIANON?
10       A    Yes.
11       Q    Did you talk to anybody who's not
12   with DIANON any more?
13       A    Not in preparing for these.  Before
14   I received these documents, one person who's
15   not at DIANON called me about this.
16       Q    And who was that?
17       A    That was a Mr. William McDowell.
18       Q    Okay.
19       A    And he called me actually to ask me
20   if he should be worried about this and then
21   he also volunteered.  He says, "You know, I
22   can remember virtually nothing about this 10

Page 11

1    years ago."
2        Q    Okay.  But you didn't call any --
3    any of the other former employees at DIANON?
4        A    No.
5        Q    In preparing for this deposition,
6    did you review any documents that aren't the
7    ones attached to the deposition notice?
8        A    Yes.  Counsel and I went over some
9    other documents.
10       Q    Okay.  Do you remember what those
11   were?
12       A    There's quite a few.  I don't
13   remember them all.  Just some reports and
14   standard operating procedures, various other
15   documents.
16       MS. DAVIS:  Okay.  I'm sorry.  We
17   have to go off the record for a minute.  I
18   was supposed to dial in Rick and I totally
19   forgot it.
20       MR. PARKER:  Oh, sure.
21       THE VIDEOGRAPHER:  Going off the
22   record at 9:15 a.m. tape 1.

Page 12

1        (Discussion off the record)
2        THE VIDEOGRAPHER:  Back on the
3    record at 9:16 a.m. tape 1.
4        BY MS. DAVIS:
5        Q    Okay.  I'm sorry about that.  Let's
6    get into the substance of section B of the
7    depo notice, which is the decision in '97 to
8    reduce the number of antibodies to 18 you
9    billed for.  Just generally explain to me
10   what it is that your investigation uncovered
11   on that in that respect.
12       MR. PARKER:  Objection.
13       BY MS. DAVIS:
14       Q    You can answer.  Go ahead.
15       MR. PARKER:  Go ahead.
16       THE WITNESS:  Where would you like
17   me to start?
18       BY MS. DAVIS:
19       Q    Just -- just give -- tell me.  I
20   mean, basically the decision in -- in or
21   about 1997 to reduce the number of antibodies
22   to be billed for most flow cytometry services

Page 13

1    to approximately 18, including the reason for
2    the reexamination, how you chose the
3    individual antibodies to bill for.  Just
4    generally explain what you found out.
5        MR. PARKER:  Objection.  You can
6    answer.
7        THE WITNESS:  At that time, we were
8    performing 26 antibodies, which I believe we
9    had started to do that in March of that year.
10   And in the process of adding the additional
11   antibodies and setting up the fee schedules
12   to do that, it was discovered that the
13   company was already billing for 26
14   antibodies.  And as I think you know, the
15   company discovered that it had been
16   overbilling for these 26 antibodies, which
17   believed had been going on since the prior
18   August.
19       At that -- when I learned about
20   this, I was to put it mildly very upset and
21   really because of that, I wanted to be
22   particularly cautious.  So, I also knew that

4 (Pages 10 to 13)

Page 14

1  -- and this had been going on since we had
2  been doing flow cytometry. There were
3  constantly discussions about adding new
4  antibodies.
5        Hematopathology is a field where
6  they're constantly discovering new antigens
7  and new antibodies and also where new types
8  of leukemias or lymphomas are discovered, and
9  they're usually characterized by either these
10 antibodies or molecular studies and, you
11 know, all laboratories at a certain rate are
12 adding these antibodies.
13       The rate at which these antibodies
14 are added by laboratories varies. I mean,
15 and there are a lot of reasons for that.
16 Some of it just depends on the
17 hematopathologist. How current they are with
18 the literature. What's their level of
19 expertise. What are the resources they have
20 to actually validate these new antibodies and
21 actually set them up in their laboratory.
22 It's not a trivial thing. You just don't

Page 15

1  throw them in a tube and start using them.
2        You have to configure the tubes and
3  the instrument. It may depend on the type of
4  instrument which you have, and some of it
5  just depends on the judgment of the -- of a
6  particular flow cytometrist, what they may
7  look at. You may have a chose of two or
8  three antibodies in which to use, and they
9  have to make a judgment which one do they
10 like, which one happens to work well with the
11 dyes and the instruments that they're using.
12       So I asked Dr. Goyette, even though
13 he felt and his colleagues felt very strongly
14 that they wanted to use the 26 antibodies
15 that they selected, I said if somebody were
16 to look at the antibodies we're using, what
17 would be the antibodies within that panel
18 that everybody would agree should be part of
19 a core panel. In other words, which
20 antibodies would be essential for any panel
21 to use.
22       They wouldn't be sufficient.

Page 16

1  People would want to add others, but these
2  are the antibodies that would be generally
3  accepted. And he gave me a list of these
4  antibodies, and then I really asked a
5  marketing and billing. I said, let's bill
6  for these. If anybody looks, nobody is going
7  to argue about this particular antibody or
8  that particular antibody. Everybody would
9  agree that these antibodies are standard.
10       People might disagree about which
11 antibodies you should add on in addition to
12 these to pick up different diagnostic
13 entities. And so we added those or made up
14 that list, and the fee schedule was changed
15 accordingly.
16       BY MS. DAVIS:
17    Q   All right. So let me make sure I
18 understand. You said that the -- what
19 prompted you to look at the antibodies, the
20 number that you were going to bill for was
21 what again?
22    A   What had happened was that in March

Page 17

1  -- I believe it was around March and this --
2  they had increased the number of antibodies
3  to 26. When -- in the process of doing that,
4  I believe that's when the company discovered
5  that in fact they were already billing for 26
6  antibodies. Although up until that point
7  they in fact had only been doing I think 21
8  or 22, and that's what got me particularly
9  upset and that is also what prompted me to
10 ask Dr. Goyette to give me a list of
11 antibodies.
12       And in this case, it was 18 that
13 would be essentially virtually universally
14 accepted. Even though the additional ones,
15 which I think were some of them were for
16 hairy cell leukemia or some other type of
17 either lymphoma or leukemia. I don't
18 remember specifically which.
19       You know, people might say, well, I
20 think you should use this antibody A and some
21 people might say you should use antibody B.
22 Whereas, the antibodies in that 18, that list

Beta Court Reporting
(202) 464-2400    www.betareporting.com    (800) 522-2382

Page 18

1  of 18 are like CD 45. Those would --
2  everybody would agree you have to have it.
3  You have to have these in your panel.
4  Whatever else you decide to put in, you've
5  got to have these 18.
6        MS. DAVIS: Okay. Let me have you
7  take a look at this has been marked as
8  Exhibit 2.
9            (Deposition Exhibit No. 2 was
10           marked for identification.)
11       THE WITNESS: Yes.
12       BY MS. DAVIS:
13    Q   And I'm just going to ask you
14  general questions about this right now. This
15  -- this document, is this the -- when you
16  were referring to increasing the panel to 26,
17  is this the panel that was -- is this the
18  panel of 26?
19    A   I think so. I don't remember what
20  all the antibodies were in the panel, but
21  given looking at the date and looking at this
22  thing, as best I believe this is it, yes.

Page 19

1    Q   Okay. And this is a memo from
2  Steve Brown to Bill McDowell?
3    A   Yes.
4    Q   And who is Steve Brown?
5    A   Steve Brown was the supervisor in
6  the flow cytometry lab at the time.
7    Q   Okay. And is he a technical guy?
8    A   Yes.
9    Q   What's his background in?
10   A   He was a -- background was he was a
11  major in biology in college, and then came to
12  DIANON and really learned flow cytometry
13  there.
14   Q   Okay. And is he still at DIANON?
15   A   No. He's been gone for --
16   Q   Can you --
17   A   -- I don't know, five or seven
18  years.
19   Q   Okay. Do you know where he is, by
20  any chance?
21   A   I have no idea where he is.
22   Q   Okay. And Bill McDowell. That's

Page 20

1  who you referred to earlier?
2    A   Yes.
3    Q   Okay. And what was his role at
4  DIANON?
5    A   He was in marketing at the time. I
6  don't remember what his specific title was,
7  but he was in a fairly senior position at
8  marketing.
9    Q   Okay. And he's the one who called
10  you and asked if you needed to be worried
11  about -- about this?
12   A   Well, he had been contacted by one
13  of our attorneys and, you know, he really
14  didn't know much about what was going on. He
15  just asked me, you know, "What's this all
16  about? You know, should I be worried?"
17   Q   Okay. And you said he was with
18  marketing?
19   A   Yes.
20   Q   Okay. And is this -- let's take a
21  -- I'm sorry. Take a look at Exhibit 2 as
22  well again. It says there underneath the

Page 21

1  list, it says, "We reduced the panel when we
2  switched to three-color analysis in the
3  beginning of August of last year." Is that
4  what prompted you to look at what they were
5  doing before?
6    A   Yeah. Well, what happened was as
7  best I can reconstruct this is that when they
8  got ready to go to the 26 antibodies -- and
9  let me add, this talk of going to these
10  additional antibodies, that had been going on
11  for over a year, you know, about adding some
12  more antibodies. But when they went to do
13  that, and I presume -- I think it might have
14  been Bill -- discovered that the fee file we
15  were already billing for 26, and I think
16  Steve Brown -- and I think he's alluding to
17  this here -- mentioned that in the prior
18  August they had switched to three-color
19  analysis.
20        In flow cytometry, you're
21  essentially shooting a laser beam at cells as
22  they pass in a stream of water and you can

Page 22

1  use one, two, three, actually now it's done
2  with five colors or we're about to switch to
3  that. They switched from two to three
4  colors. When you do that, you can look at
5  more antibodies per tube and often, you know,
6  you may be able to use fewer antibodies.
7        And so he says here, "When we
8  switched to three-color analysis, we reduced
9  the panel," and the assumption at the time I
10  believe was that they had been doing 26.
11  They switched from two to three and then went
12  down to 22 antibodies, but nobody changed the
13  -- the fee schedule due to some sort of
14  miscommunication.
15        We have in the process of preparing
16  for this and looking at reports, we have
17  found that in fact even prior to August that
18  they were only doing 22 antibodies and that
19  went actually back to the beginning of the
20  year. And we actually this week we're
21  notifying our local carrier that we've
22  discovered this, and once we quantitate what

Page 23

1  the refund is due, we'll be forwarding that
2  to them.
3        You know, as best I can tell at the
4  time is that the decision to go from two to
5  three-color and also a decision to go to more
6  antibodies, that is going up from 22 to 26 or
7  whatever, those were being contemplated
8  throughout that year 1996 kind of
9  simultaneously. And I believe what happened
10  was that they eventually did go from two to
11  three, but they never did go to 26.
12        That, you know, knowing what I
13  know, particularly some of our recent
14  experience in the lab, doing these things
15  takes a lot of time and investment in
16  personnel. You have to validate the
17  antibodies. Going from, you know, two to
18  three-color or three to five-color is a
19  considerable production.
20        You need to reconfigure all your
21  tubes, you know, calibrate the lasers and do
22  all the stuff with which I'm not familiar,

Page 24

1  and I presume what happened is that they
2  couldn't do both simultaneously. They
3  eventually got the three-color up, but
4  somehow along the way the information that
5  was communicated to marketing and billing was
6  incorrect.
7        MS. DAVIS: Okay. Take a look at
8  what's been marked as Exhibit 3.
9        (Deposition Exhibit No. 3 was
10        marked for identification.)
11  BY MS. DAVIS:
12    Q    And this is a memorandum dated
13  March 20, 1997, which is the same day as
14  Exhibit 2; is that right?
15    A    Yes.
16    Q    Okay. And this one is from Bill
17  McDowell. That's the marketing person?
18    A    Yes.
19    Q    To three people and one of them is
20  Debra Klembara, Pat Torre and Bob Tucciarone?
21    A    Yes.
22    Q    Did I pronounce that right?

Page 25

1    A    Yes. Actually, I should add, he's
2  one of the other people I talked to in
3  preparation.
4    Q    Okay. And is he still at DIANON?
5    A    Yes. He's the head of billing.
6    Q    Okay. And Pat Torre?
7    A    She's in the billing department,
8  collections.
9    Q    And she's still there?
10    A    She's still there.
11    Q    And Debra Klembara?
12    A    She's actually in the IT
13  department, but she works on billing issues I
14  think.
15    Q    Okay. This says, "Updated antibody
16  listing for hematopathology" and it says,
17  "Effective March 25, 1997, the hemopath lab
18  is changing its normal XL 3 XL 4 antibodies
19  to the following list. Accordingly, we need
20  to change the billing to reflect the
21  antibodies as of March 25th. The number of
22  billed antibodies is not changing, still 26,

7 (Pages 22 to 25)

Page 26

1  nor will the fees change. Only the
2  antibodies that we mention in the bills will
3  change."
4       So, is this the kind of document
5  that would be sent to the billing people to
6  implement the change in antibodies?
7       A   To change the fee schedule, yes,
8  and I think Bill at this time clearly still
9  assumed that they had been doing 26 and they
10 were just changing a couple of the
11 antibodies. Because at this time they did
12 change the antibodies that were listed in the
13 fee schedule.
14      Q   Okay. So this memo would prompt
15 the billing people to start listing the
16 antibodies that are listed there on the
17 billing?
18      A   Yeah, to take change them -- to
19 have an updated fee schedule.
20      Q   Okay. So this would essentially
21 implement change?
22      A   It would implement the billing

Page 27

1  change. It would -- has nothing to do with
2  what was actually going on in the laboratory.
3       Q   Right.
4       A   The laboratory -- this is simply
5  Bill communicate -- communicating his
6  understanding of what antibodies were going
7  to be billed under the new panel.
8       Q   Okay. Now, why would marketing
9  have a role in -- in telling billing what
10 would charge for the or what -- what
11 antibodies to list on the bill?
12      A   Our marketing people, sometimes
13 they were called product managers. They
14 really played a role of -- their job was to
15 understand, you know, what the offering was
16 and also to work with billing and setting
17 things such as pricing.
18      Q   Okay. So would the product manager
19 essentially be the person at DIANON who
20 interacted with both the medical people and
21 the billing people?
22      A   Yes.

Page 28

1       Q   And the --
2       A   Yes.
3       Q   -- salespeople?
4       A   Yes.
5       Q   Okay. Sort of a central location
6  for whatever the product was?
7       A   Yes.
8       Q   And the product in this case would
9  be hematopathology?
10      A   Yes.
11      Q   Okay. So would -- I guess the
12 question is, was Bill McDowell the product
13 manager at this point for --
14      A   No, I think the original product
15 manager --
16      Q   I'm sorry. Let me. Let me. You
17 have to let me finish the question because
18 otherwise it's not going to make sense when
19 it's on the transcript, okay?  So let me ask
20 the question again.
21      At this point in time, was Bill
22 McDowell the product manager for

Page 29

1  hematopathology?
2       A   No.
3       Q   Who was?
4       A   I believe at this time, I'm not
5  sure there was one. We did have a person and
6  I know he was there in '96, but I'm not -- I
7  think he left at some point in '96, Mark
8  Florio, and I believe he was asked to leave
9  and so I think this task fell on Bill.
10      Q   Okay. Why? Why was he asked to
11 leave?
12      A   I think there was some performance
13 issues.
14      Q   Okay. And then so Bill McDowell
15 basically took over his job when he left?
16      A   Yeah, until they could get a
17 replacement.
18      Q   And who replaced him?
19      A   I believe it was Kim Hade
20 eventually, but I'm not certain.
21      Q   Okay. I show you what's been
22 marked as -- actually, let me make sure

8 (Pages 26 to 29)

Page 30

1 that's not. Sorry about that. That's my
2 copy. It's got all the highlighting on it.
3    A   Oh.
4        MR. PARKER: Secret codes.
5        MS. DAVIS: Can't give you that
6 one. Give you hints.
7        THE WITNESS: Wouldn't want to give
8 me an advantage.
9        MS. DAVIS: There you go. That's
10 been marked as Exhibit 4.
11        (Deposition Exhibit No. 4 was
12        marked for identification.)
13    BY MS. DAVIS:
14    Q   Okay. This has been marked as
15 Exhibit Number 4, and it's a memorandum on
16 May 21, 1997 from Dr. Goyette to you and its
17 "Subject Flow Cytometry Antibodies"; is that
18 right?
19    A   Yes.
20    Q   It also says, "Attached is the
21 justification for the number and variety of
22 antibodies we use in our flow cytometry

Page 31

1 panel. While there is no national consensus
2 on the number of antibodies to use, our
3 practice is not uncommon."  And then it has
4 an explanation.
5        What was -- Dr. Goyette basically
6 when he testified a couple days ago said that
7 he prepared this at your request. Why did
8 you ask him to prepare this?
9    A   Again, I think this was in the
10 context of our increasing to this 26 antibody
11 panel, which Dr. Goyette and the other
12 hematopathologists really felt was essential.
13 In particular, one of our newer
14 hematopathologists, Dr. Glenn Segal, who I
15 believe had joined us the previous fall, had
16 extensive experience in flow cytometry and
17 felt that there were -- I don't remember the
18 number -- another four or so antibodies that,
19 again, as I mentioned before, I think they
20 might have had something to do with hairy
21 cell leukemia, but anyway he really felt we
22 needed to add these antibodies or we would

Page 32

1 miss conditions.
2        So, you know, they put forth this
3 26 antibody panel and I simply asked Dr.
4 Goyette, you know, I'd like to have something
5 in writing that if I'm ever asked why are we
6 using 26 antibodies that I can refer to
7 because I'm not an expert on this, and so he
8 graciously put this -- put this together for
9 me.
10    Q   Okay. Did you -- I mean, this was
11 just something you wanted to have in your
12 file?
13    A   Yeah, I wanted to have a record of
14 it. Again, this is in context of that
15 overbilling problem.
16        MS. DAVIS: Okay. This has been
17 marked as Exhibit 5.
18        (Deposition Exhibit No. 5 was
19        marked for identification.)
20    BY MS. DAVIS:
21    Q   This is that same memo but with
22 some handwriting on it. At the top it says,

Page 33

1 "Bill, as you requested, Jay"?
2    A   Uh-huh.
3    Q   Is that your handwriting?
4    A   Yes.
5    Q   And that Jay is you?
6    A   Yes.
7    Q   And who is Bill?
8    A   McDowell.
9    Q   That suggests that Mr. McDowell
10 asked for the -- the justification?
11    A   Yes.
12    Q   And why did he ask for that?
13    A   I don't remember.
14    Q   No idea?
15    A   No.
16    Q   Did you -- down at the bottom there
17 are three bullet points or three numbered.
18 One of which of them is "Jay discuss" and
19 then the last one says "More detail on second
20 paragraph." Did you discuss this with --
21 with Mr. McDowell?
22    A   I don't recall it. We may have. I

Beta Court Reporting
www.betareporting.com
(202) 464-2400                            (800) 522-2382

Page 34

1  just don't remember.
2        MS. DAVIS:  What's been marked as
3  Exhibit 6.
4             (Deposition Exhibit No. 6 was
5             marked for identification.)
6  BY MS. DAVIS:
7     Q    Do you recognize that document?
8     A    Yes, this is a copy of Dr.
9  Goyette's memo to me.
10    Q    And this is dated June 17, 1997?
11    A    Yes.
12    Q    And it's, once again, flow
13 cytometry antibody panel?
14    A    Yes.
15    Q    And it says, "Following
16 consultation among hematopathology staff, we
17 believe that the following 18 antibodies are
18 essential for the accurate and complete
19 initial workup of both cytometry specimens.
20 We believe that their routine usage can be
21 justified to insurance carriers."
22            Once again, Dr. Goyette testified

Page 35

1  the other day that you asked him to prepare
2  this memo?
3     A    Yes.
4     Q    And why did you ask for it?
5     A    As I stated earlier, I wanted to be
6  extremely cautious and I knew that if you
7  looked at our 26 antibody panel and showed
8  that to a group of hematopathology experts,
9  some of them would say, well, rather than
10 this particular antibody, I would use this
11 or, you know, we might use, you know, 24 and
12 somebody else might use 28.
13           So I asked Dr. Goyette, give me a
14 list of the 18 that you would consider would
15 be the essential core of any panel.  You
16 know, they would be essential to any panel.
17 They wouldn't be sufficient to diagnose
18 everything.  You would have to add additional
19 antibodies, but these would be something that
20 everybody would agree on, and that's what he
21 supplied to me.
22    Q    Okay.  This says, the memo says,

Page 36

1  "The following antibodies are essential for
2  the accurate and complete initial workup of
3  flow cytometry specimens."  Is that what you
4  asked him to give you?
5     A    I asked him to give -- as I said,
6  what I asked him is to give me the antibodies
7  that would be, you know, essential in any
8  panel.  I did not ask him to give me what
9  antibodies you think should make up a
10 complete panel, but what antibodies should be
11 part of any panel.
12           I guess as an analogy, I would say
13 if a 55-year-old man goes to a doctor for a
14 routine check-up, what are the -- what are
15 the things that everybody would agree should
16 happen.  Should take a history.  You should
17 do a physical exam.  You should do an
18 electrocardiogram.
19           People might disagree on what
20 laboratory values you should get.  How
21 complete a lipid profile.  Some people might
22 disagree on whether you should do a chest

Page 37

1  X-ray in somebody who's asymptomatic, and it
2  wouldn't -- you couldn't say that doing the
3  chest X-ray would be excessive.  A lot, you
4  know, half of the physicians might say they
5  would do it.  Others might not do it.  There
6  are a lot of factors in there.
7            But everybody would say you've got
8  to do that history and physical.  This is
9  kind of analogous.  You got to have these
10 antibodies in there.
11    Q    Okay.  Let me go back to the
12 language of this memo.  It says, "These
13 antibodies are essential for the accurate and
14 complete initial workup of flow cytometry
15 specimens."
16           Is that what you asked him to do is
17 to prepare a panel that would enable him to
18 do an accurate and complete initial workup of
19 flow cytometry specimens?
20    A    I don't remember the exact wording
21 when I made the request what I wanted.  What
22 I asked for was a panel, the elements of

Page 38

1  which would be essential in any complete flow
2  cytometry panel.
3      Q   Okay.  And then it says, "We
4  believe that their routine uses can be
5  justified to insurance carriers"?
6      A   Yes.
7      Q   Do you know why he said that?
8      A   I mean, I don't know why he said
9  that.  I had said I want antibodies that if
10  people to look at them, these antibodies,
11  everybody would agree, yeah, you've got to
12  have these antibodies in there.
13      Q   Okay.  Were insurance companies
14  raising issues about whether the individual
15  antibodies were necessary?
16      A   No.  No.
17      Q   Nobody was raising that issue?
18      A   No.
19      Q   Okay.  Take a look at the top of
20  the document.  It says, "Bill, as per your
21  request, hopefully you already have a copy of
22  this information" and then "Jay."  Is that

Page 39

1  you?
2      A   Yes.
3      Q   That's your handwriting?
4      A   Yes.
5      Q   And is -- is the Bill, Bill
6  McDowell again?
7      A   Yes.
8      Q   And Bill requested the information,
9  Mr.  McDowell?
10      A   I assume so.  I don't remember
11  writing that, but it would appear to be the
12  case.
13      Q   Okay.  So you don't remember
14  whether he asked for it or not?
15      A   No.
16      Q   Okay.  Up at the top you see some
17  fax numbers up there and one of them says
18  10/1997, Christopher F. Metz.
19      A   Yes.
20      Q   Who is Mr. Metz?
21      A   He was -- at the time I think he
22  was in sales.

Page 40

1      Q   Okay.  Do you know what position he
2  held in sales?
3      A   Well, he had a lot of different
4  positions.  He was involved in sales with
5  managed care, and then he was also just a
6  straightforward sales rep.  I'm not sure what
7  he was at the time.
8      Q   Okay.  But he dealt with managed
9  care organizations?
10      A   In the latter part of his career at
11  DIANON.  I'm not certain he was even doing
12  that at that point.  I just don't remember.
13      Q   Okay.  And what about Cathleen
14  Pavlowski?
15      A   I have no idea who that is.
16      Q   Okay.  And then down at the bottom
17  there's a notation that says "Move to 18."
18  Do you know who -- who wrote that?
19      A   No.  I would guess it was Mr.
20  McDowell, but I don't know.
21      Q   Okay.  So Mr. McDowell made the
22  decision to -- to bill for 18?

Page 41

1      A   No.  I made the decision.
2      Q   You made that decision?
3      A   (Nodding)
4      MS. DAVIS:  Okay.  This has been
5  marked as Exhibit 7.
6          (Deposition Exhibit No. 7 was
7          marked for identification.)
8      BY MS. DAVIS:
9      Q   Can you tell me what that is?
10      A   Yes.  This is a form for either
11  changing fees or CPT codes or test profiles
12  that was in existence at the time.
13      Q   Okay.
14      A   And this is the form where they
15  went -- we changed from billing for 26
16  antibodies to 18.
17      Q   Okay.  And in the very center it
18  says "Current patient fees/CPT codes."  Then
19  it says 26 -- I don't know what that says.
20      A   Typings I believe.
21      Q   Typings times $45?
22      A   Yes.

Page 42

1    Q    And then the CPT code is underneath
2 that?
3    A    Yes.
4    Q    And then below that, I guess that's
5 the patient fee?
6    A    Right.  That would be I believe the
7 patient fee for the entire profile.
8    Q    Okay.  At the -- at the -- in other
9 words, that was what you were charging before
10 the change to 18?
11    A    Yes.
12    Q    Okay.  And then the new patient
13 fee, which is the next column over, it says
14 18 typings times $70?
15    A    That's correct.
16    Q    And then it's says new patient fee
17 would be $1,260?
18    A    Yes.
19    Q    Okay.  And this, is this something,
20 is this form something that they use in the
21 billing department?
22    A    Yes.  At the time I believe this is

Page 43

1 the form that they were using.
2    Q    Okay.  Take a look at what's been
3 marked as -- I'm sorry.
4    A    This is 7.
5        MS. DAVIS:  Lost track.  8.  This
6 is Exhibit 8.
7        (Deposition Exhibit No. 8 was
8        marked for identification.)
9    BY MS. DAVIS:
10    Q    Do you recognize this document?
11    A    No.
12    Q    Okay.  This is dated -- I'm sorry.
13 Okay.  Gave you two copies.
14    MR. PARKER:  You intended to have
15 two of them there?  Sorry.
16    BY MS. DAVIS:
17    Q    This is dated July 30, '97.  It's
18 from Bill McDowell to Bob Tucciarone and it
19 says, basically, "Bob, please have the
20 following changes made in the hematopathology
21 product line."
22        And then it says, "Effective 1

Page 44

1 August remove CPT code 88323 from both the XL
2 3 and XL 4 profiles and adjust the patient in
3 account B in the following manner" and then
4 it has basically those numbers that we just
5 discussed I guess.  No, different.  Patient
6 fee decreased from 1300 to 1170.
7        Why is that different from what we
8 just looked at?
9    A    I don't know.
10    Q    Okay.  And then "Effective 1
11 September change the XL 3 and XL 4 profiles
12 to reflect billing for the following 18
13 tests."  Are those the 18 that are on Dr.
14 Goyette's list?
15    A    I need to check.  Yes.
16    Q    Okay.  And then if you turn to the
17 next page, which is Bates numbered 300001.
18 What's the fee for 88180, which is the flow
19 cytometry?
20    A    $70.
21    Q    Okay.  And then what is the next
22 page, next couple pages?   Is that the fee

Page 45

1 schedule?
2    A    Yes, this looks -- this is an
3 account fee schedule.
4    Q    Okay.  What's an account fee
5 schedule?
6    A    There are two ways you can bill
7 specimens.  You can bill a patient directly
8 or you can bill the account.
9    Q    Okay.  When you say bill an
10 account, what's that mean?
11    A    Bill the physician who submitted
12 the specimens.  Typically in this particular
13 product line, I believe this would be in the
14 case where the specimen was submitted through
15 another laboratory like a pathology
16 laboratory.  So we would bill them, and they
17 would then bill the patient.
18    Q    Okay.  Or bill the insurance
19 company or whatever?
20    A    Or however.
21    Q    Okay.  When we were talking to Dr.
22 Goyette the other day, we went through his

Beta Court Reporting
www.betareporting.com
(202) 464-2400                                         (800) 522-2382

Page 46

1    affidavit and discussed some of the things he
2    said in his affidavit. Let me see if I can
3    find it. When he talks about the decision to
4    go to 18 from 26, he said, "I identified
5    those antibodies that no hematopathologist
6    with the training and experience that were
7    linked with the number of specimens that we
8    examined could question. This was simply an
9    attempt to avoid what we perceive to be
10   harassment by payers regarding our medical
11   judgment concerning what constituted
12   appropriate medical care." Do you know what
13   he's referring to?
14        A    I don't specifically know what he's
15   referring to. I -- I had told him I wanted
16   him to give me these 18 antibodies which
17   would be totally noncontroversial.
18        Q    Okay. Did you say anything about
19   having insurance companies were questioning
20   the number of antibodies?
21        A    No. I may have mentioned to him the
22   problem with the overbilling. I don't know.

Page 47

1        Q    But you didn't -- you didn't
2    suggest that -- that perhaps some of the
3    insurance companies were questioning whether
4    you really needed to do 18?
5        A    I don't --
6        Q    I mean, I'm sorry. 26?
7        A    I don't remember that being the
8    issue.
9             MS. DAVIS: Okay. Give you what's
10   been marked as Exhibit 9.
11             (Deposition Exhibit No. 9 was
12             marked for identification.)
13             BY MS. DAVIS:
14        Q    Have you seen that letter before?
15        A    I don't believe so, no.
16        Q    Okay.
17        A    This is from Chris Metz.
18        Q    Okay. You're listed as one of the
19   cc's on the letter.
20        A    Okay. I may have.
21        Q    I know it's a long time ago, right?
22        A    I don't remember it.

Page 48

1        Q    Okay. You didn't review this in
2    preparation for either of your depositions
3    today?
4        A    You know, I don't remember whether
5    we -- I don't remember going over this one.
6        Q    Okay. Let me ask you a question.
7    This is a letter from Chris Metz, whose --
8    whose title appears to be director of
9    national accounts?
10        A    Okay.
11        Q    To someone at the director of the
12   laboratory and diagnostic services at AOR,
13   Inc. What was AOR Inc.?
14        A    I think that was a big oncology
15   practice in Texas. I remember vaguely that
16   there was an effort for us to get their
17   business.
18        Q    Okay. And Chris Metz was the
19   director of national accounts. What did the
20   director of national accounts do?
21        A    I think that had to do with sales
22   to either very large practices or -- and also

Page 49

1    I think that it also involved managed care.
2        Q    Okay. Attached to the -- to the
3    memo is Dr. Goyette's June 17, 1997
4    rationale for the 18 markers. Do you know
5    why Mr. Metz attached that?
6        A    No.
7        Q    Okay. Do you know whether AOR was
8    questioning the need for 18 markers?
9        A    No. In fact, we were doing 26.
10        Q    Take a look at page that's marked
11   PP 15236. This says Hematopathology Special
12   Pricing Form?
13        A    Yes.
14        Q    And then if you look at test code
15   XL 3, is that the flow cytometry
16   immunophenotyping?
17        A    Yes.
18        Q    And the AOR price is $200?
19        A    That's what it says.
20        Q    What was -- what is special
21   pricing?
22        A    That would be a price for that

13 (Pages 46 to 49)

Page 50

1  particular account.
2  Q   Okay.  So, in this case, DIANON is
3  offering to do the flow cytometry panel for
4  $200?
5  A   I don't know if that's what
6  DIANON's offering to do or whether this was
7  something that came from AOR.
8  MS. DAVIS:  Okay.  Take a look at
9  what's been marked as Exhibit 10.
10  (Deposition Exhibit No. 10 was
11  marked for identification.)
12  BY MS. DAVIS:
13  Q   Have you seen that document before?
14  A   No.
15  Q   It's not something you reviewed in
16  preparation for your deposition?
17  A   No.
18  Q   Do you know what it is?
19  A   No.
20  Q   Okay.  It says at the first page,
21  which is Bates numbered PP 16550, is a letter
22  from Aetna Health Care to David McGinnis,

Page 51

1  contract manager, DIANON Systems, Inc.  Who
2  -- who was David McGinnis?
3  A   He was a contract manager who was
4  involved in managing contracts with third
5  party payers.
6  Q   Okay.  Is he still at --
7  A   No.
8  Q   -- DIANON?   Do you know where he
9  is?
10  A   I'm not certain where he is.  He
11  left I believe in 2003 after our acquisition.
12  Q   Okay.  I forgot to ask you.  Is
13  Chris Metz still with DIANON?
14  A   No.
15  Q   Okay.  Do you know where he is?
16  A   I think he -- I think he's still at
17  a laboratory called CBL, but I'm not certain.
18  I haven't talked to him for a while.
19  Q   Okay.  Back to this letter, which
20  is Bates number 16550.  It says, "Enclosed
21  for your files please find an original fully
22  executed national ancillary service agreement

Page 52

1  between Aetna US Healthcare and DIANON Inc.
2  for provision of laboratory services."
3  Is this essentially a contract
4  between DIANON at Aetna where DIANON provides
5  laboratory services to the -- for Aetna US
6  Healthcare?
7  MR. PARKER:  Let me object.  I
8  think this goes a little bit far afield of
9  the designation for which Dr. Amberson is
10  offered today as a corporate designee.
11  MS. DAVIS:  I'll get there.
12  MR. PARKER:  Okay.
13  THE WITNESS:  It appears to be a
14  contract.
15  BY MS. DAVIS:
16  Q   Okay.  Okay.  Turn to the page
17  that's Bates number PP 16562 and look down at
18  Section 12.7 entitled Medically Necessary
19  Services.  It says, "Medically necessary
20  services shall remain, unless otherwise
21  defined in the applicable plan, health care
22  services that are appropriate and consistent

Page 53

1  with the diagnosis in accordance with
2  accepted medical standards and are likely to
3  result in demonstrable medical benefit and
4  which are the least costly alternative
5  supplies or levels of service which can be
6  safely and effectively provided to the
7  patient."
8  Does this refresh your recollection
9  about whether certain plans were questioning
10  the medical necessity of certain of the tests
11  that DIANON performed?
12  MR. PARKER:  Objection.  It's
13  outside the scope of the designation.
14  THE WITNESS:  No.
15  BY MS. DAVIS:
16  Q   And so medical necessity
17  requirements from health care companies,
18  insurance companies or managed care
19  organizations were not the impetus for the
20  move to 18?
21  A   No.
22  Q   Okay.  Doctor, let's turn to the

14 (Pages 50 to 53)

Page 54

1  documents that are attached to the deposition
2  notice which are -- and let's just go through
3  each of them, and I'll refer to the Bates
4  numbers that are down in the corner so you
5  can keep track of what we're talking about.
6  That's these numbers down here.
7      A   Yes.
8      Q   Okay.  The first number -- the
9  first page that I want you to take a look at
10 is 500234.  Okay.  What did you do to
11 discover what this -- the origin of this
12 document?
13     A   I showed it to the people that I
14 mentioned to see if any of them knew what it
15 was.  Nobody did.  I inferred from the fact
16 that Kim Hade's name on it that she prepared
17 it.
18     Q   Okay.  And that you're talking
19 about her name --
20     A   Yes.
21     Q   -- which is right here?
22     A   Yes.

Page 55

1      Q   Okay.  Did you talk to her about
2  it?
3      A   No.
4      Q   Is she still with the company?
5      A   No.
6      Q   Do you know where she is?
7      A   I have no idea.
8      Q   And so you don't know what this
9  document is?
10     A   It appears to be an estimate of
11 growth, you know, by percentage but for
12 various testing services.  Kind of a
13 back-of-the-envelope type of thing that she
14 did.
15     Q   But do you know whether that's what
16 it is or not?
17     A   All I can say is that it just says
18 growth and, you know, the last column is
19 increase of 7 -- in the first row is an
20 increase of 17 percent over the second
21 column, but beyond that I can't tell you what
22 it is.

Page 56

1      Q   Okay.  I mean, you can tell that
2  just by doing the math?
3      A   Exactly.
4      Q   Okay.  The next page 500189.
5      A   Yes.
6      Q   What did you do to figure out what
7  the origin of this document was?
8      A   I recognized the handwriting, which
9  I thought was Kevin Johnson's, the president
10 of the company, and I believe Ms. Palmieri
11 also thought it was his handwriting.  Other
12 people didn't recognize it.
13     Q   Okay.  And did you talk to Mr.
14 Johnson about this document?
15     A   No.
16     Q   Okay.  He's not still with the
17 company?
18     A   No.
19     Q   Do you know where he is?
20     A   I don't know where he is.  I'm not
21 sure what he's doing now.
22     Q   Okay.  He got moved out when

Page 57

1  LabCorp bought DIANON?
2      A   Yeah.  He retired.
3      Q   Okay.  So, do you have -- so, you
4  have no information about what this -- the
5  information on this document means or why it
6  was created?
7      A   No.
8      Q   Okay.  Next page 200058.  Okay.
9  We've sort of talked about this document, but
10 what I'm interested in is the handwriting on
11 the side.
12     A   Yes.
13     Q   Do you know whose handwriting that
14 is?
15     A   I believe that's Mr. McDowell's.
16     Q   Okay.  Did you talk to him about
17 this document?
18     A   No.
19     Q   You think this handwriting is his?
20     A   I think so.  I'm not certain.
21     Q   Okay.  Did you -- when he called,
22 you didn't ask him about it?

15 (Pages 54 to 57)

Page 58

1      A    No.  He called me before I saw this
2   document.
3      Q    So, do you have his number?  Could
4   you have called him back?
5      A    I don't have -- I actually -- do I
6   have his number or not?  I may have his
7   number.  I'm not certain.
8      Q    But you didn't call him back?
9      A    No, I didn't call him back.
10     Q    Okay.  So you don't have any idea
11  what those numbers mean?
12     A    They look to me like he was just
13  modeling things, looking at pricing for flow
14  cytometry, the number of antibodies and the
15  price per antibodies and just, you know,
16  doing some calculations.
17     Q    Okay.  That's a guess based on just
18  looking at the numbers?
19     A    Yes.
20     Q    Okay.  Page 500191.  What did you
21  do to find out what the origin of this
22  document was?

Page 59

1      A    Again, showed it to all the people
2   I mentioned.
3      Q    And -- and what was?
4      A    Nobody knew specifically what it
5   was.
6      Q    Okay.  And, once again, did you
7   talk to anybody, any former employees at
8   DIANON?
9      A    No.
10     Q    Okay.  And then page 500175 and
11  actually I believe the way this was produced
12  to us, the next two pages are also part of
13  the same document.  So 500175 through 177.
14  What did you do to discover the origin of
15  this document?
16     A    Again, showed it to various people
17  at DIANON.  Actually, also I think I showed
18  this one in particular to Joe Hurley, who's
19  in finance.  He wasn't -- I don't think he
20  was there at the time this would have been
21  produced, and trying to decide whether this
22  was produced by finance or marketing.  Best

Page 60

1   guess it might have been produced by finance.
2      Q    Okay.  But you don't -- you didn't
3   find anybody --
4      A    I don't know that.
5      Q    -- find anybody who recognized it?
6      A    No.
7      Q    And you didn't call anybody who was
8   no longer with the company?
9      A    No.
10     Q    Who would have been in Mr. Hurley's
11  position when this -- the document was
12  created, which was in approximately I guess
13  late 1999 or early 2000?
14     A    Well, we have both a controller and
15  a CFO.  The CFO was Dave Schreiber and the
16  controller was Chris Rausch.
17     Q    So it could have been one of those
18  folks?
19     A    Yes.
20     Q    I'm sorry.  Chris?
21     A    Rausch.
22     Q    R-a-u-s-c-h?

Page 61

1      A    Yes, I believe so.
2      Q    All right.  If you turn to the page
3   that's Bates numbered 600 -- I can't tell
4   whether that's another 0 or 6.  000.
5      A    Looks like all zeros on this one.
6      Q    Okay.  What can you tell me about
7   the origin of this document?
8      A    This is a test code creation form
9   which was -- this is the version was current
10  in 2000.  I believe is substantially the same
11  as the form that we use now, and from looking
12  at this, it looks like a form to go up to 26
13  antibodies.
14     Q    Okay.  Let me ask.  Take a look at
15  Exhibit 7.
16     A    Yes.
17     Q    Is this a replacement for Exhibit
18  7?
19     A    Yes, I believe so.
20     Q    Okay.  Now, let's just go through
21  each of the people who's on there.  If you
22  look at the -- up at the top, it says,

16 (Pages 58 to 61)

Page 62

1  "Initiator's name, Kim Hade"?
2      A    Yes.
3      Q    That's -- we've already talked
4  about her, and then it says, "Description.
5  Need to bill for all 26 markers performed and
6  recorded."   Do you know why that's there?
7      A    I don't know specifically, no.
8      Q    Okay.  Did you ask Ms. Hade?
9      A    No.  I don't know where Ms. Hade
10  is.
11      Q    Okay.  And then under billing
12  information, it says cell service marker
13  88180, 26 events, fee per event is $75 and
14  the patient fee is 1950; is that right?
15      A    Yes.
16      Q    Okay.  That would be the fee
17  charged to the patient directly?
18      A    Yes.
19      Q    Or the patient's insurance company?
20      A    Yes.
21      Q    And then the client fee is 1300.
22  What did you say again the client fee was?

Page 63

1      A    Client fee was when you would bill
2  the physician who submitted the specimen and
3  usually that would be -- most commonly that
4  was the pathology laboratory.
5      Q    Okay.  Then if you go down under
6  Approvals, it says Jack W. Snyder?
7      A    Yes.
8      Q    It says "Chief Medical Officer"?
9      A    Yes.
10      Q    What did Mr. Snyder do?
11      A    He was at that time the chief
12  medical officer and the director of the
13  laboratory.
14      Q    Okay.  And did you report to him?
15      A    Yes.
16      Q    Okay.  And then I guess that is
17  Valerie Palmieri underneath there, vice
18  president?
19      A    Yes.
20      Q    Okay.  We've already talked to her.
21  Is Mr. Snyder still with the company?
22      A    No.

Page 64

1      Q    Do you know where he is?
2      A    No.
3      Q    And then corporate controller?
4      A    That's Chris Rausch whom I already
5  mentioned.
6      Q    Okay.  And under "Vice President
7  Marketing" would that -- I think that's Grant
8  Carlson?
9      A    Yes.
10      Q    Is he still with the company?
11      A    No.
12      Q    Do you know where he is?
13      A    Last I heard he's somewhere -- I
14  think he might be somewhere in Florida, but
15  I'm not sure.
16      Q    Okay.  And then over on the corner
17  there Department Approvals.  Do you recognize
18  any of those initials?
19      A    I do not recognize them.  Although
20  I asked people and got some help discovering
21  who's they were.
22      Q    Okay.

Page 65

1      A    The top one, people were uncertain
2  who that is.  Fred Ferrera and our
3  information service thought it might be
4  William Tilton, who at the time worked in the
5  lab.  He doesn't any longer.  Under billing,
6  that's Bob Tucciarone.  Under information
7  systems, that's Maria Conte, and under
8  marketing, that's Kim Hade.
9      Q    Okay.  And we already talked about
10  Kim Hade.  She's not there any more and I'm
11  sorry, who did you say the info system was?
12      A    Maria Conte.
13      Q    Is she still there?
14      A    Yes.
15      Q    And Tucciarone?
16      A    He's still there.
17      Q    He's still there.  And the first
18  one on the list, I'm sorry, Bill?
19      A    Bill Tilton.
20      Q    Is he still there?
21      A    No.
22      Q    Let's turn to actually the next two

Page 66

1  pages, which are 600003 and 4. I think they
2  were -- when they were produced to us, they
3  were produced together. This is essentially
4  the same sort of document as the previous
5  one, except for a different test?
6      A    Yes, it's a larger profile. That
7  also includes some molecular tests used to
8  characterize these kinds of cancers.
9      Q    Okay. And then next couple of
10  pages looks like 900000 through 03. Can you
11  tell what that is?
12      A    Yes. This is a print of the fee
13  file maintenance portion of our information
14  system, and it prints out fee files for a
15  specific test or profile going from the most
16  recent to the oldest.
17      Q    Okay. So, if -- if -- let me ask
18  following question. So this -- this is
19  what's in the computer system essentially for
20  billing purposes?
21      A    Yes, that's the -- that's the fee
22  file. Don't ask me how this all -- the

Page 67

1  mechanics of this works.
2      Q    Right. Okay.
3      A    That's my understanding.
4      Q    Okay. So if somebody put in that
5  they performed the XL 3, all of this
6  information would be pulled up?  In other
7  words, if you wanted to know what individual
8  antibodies were in the XL 3?
9      A    Well, which individual antibodies
10  would be billed. It --
11      Q    Right.
12      A    -- doesn't correspond to what is
13  necessarily performed. For example, as we've
14  already discussed, in some instances in here,
15  there are only 18 antibodies listed; whereas,
16  26 were performed and earlier there might
17  have been 9 antibodies listed where an exact
18  21 were performed.
19      Q    Okay. And let's go to the next
20  couple of pages. I can't read those numbers
21  at all. It looks like 300004 and 05.
22      A    Yes.

Page 68

1      Q    We've already talked about those.
2  Those are the --
3      A    That's going from 26 antibodies to
4  18.
5      Q    Right. Okay. And then 2000068?
6      A    Yes.
7      Q    69 and it goes through -- goes on
8  quite some time here.
9      A    Goes through 75.
10      Q    75; okay. What can you tell me
11  about the origin of this document?
12      A    This was I believe produced by Mark
13  Florio, who was the hematopathology product
14  manager at the time. It looks like it was
15  produced in the first week in January or so,
16  and it was to look at some hematopathology
17  fee changes and take a look at the impact of
18  that, and also he kind of alludes to this,
19  although it's not clear to me, that there
20  might have been a change in Medicare
21  reimbursement.
22      Q    Okay. Up at the top, it says, "Ask

Page 69

1  Pat for Medicare reimbursement table 31
2  January 96." Do you know who wrote that?
3      A    Again, it looks to me like it might
4  be Bill McDowell's handwriting.
5      Q    Okay.
6      A    I think Mark reported to him at the
7  time.
8      Q    And did you -- did you discuss this
9  document with either Mr. McDowell or Mr.
10  Florio?
11      A    No. I don't know where Mr. Florio
12  is.
13      Q    Okay. So what -- why was this
14  document produced?
15      A    Every year really starting around
16  September, but continuing right up until the
17  turn of the year, one of the things that goes
18  on at our laboratory and I think virtually
19  every other laboratory is you start preparing
20  for your budget for next year. That involves
21  a number of things. First of all, doing a
22  sales forecast. It also involves looking at

Page 70

1  whatever reimbursement changes there might
2  be.
3        And usually in the fourth quarter,
4  Medicare releases figures for any changes in
5  reimbursement for various CPT codes and so we
6  naturally have to take that into account.
7        This looks like this one was done
8  rather at the very last minute.  Typically
9  this kind of analysis would be done much
10  earlier in the fourth quarter, not already
11  into the new year.  But it looks to me like
12  that's what this is.
13     Q    Okay.  Do you -- do you know what
14  it is?
15     A    No.  That's my best guess.
16     Q    Okay.  So that's a guess based on
17  -- did you discuss this with anybody who's
18  still at the company?
19     A    I showed it to all the people I
20  mentioned.  Nobody knew specifically what it
21  was.
22     Q    Okay.  If you look over on the

Page 71

1  left-hand side next to 88180 it says "MOI."
2  Do you know what that means?
3     A    No.
4     Q    And under it says -- what looks to
5  me it says, "Rick believes legal times 2."
6  Do you know what that mean?
7     A    No.
8     Q    Do you know who wrote it?
9     A    I guess Mr. McDowell, but I'm not
10  certain.
11     Q    Okay.  Looks like his handwriting?
12     A    Could be.
13     Q    Okay.  And you --
14     A    I'm not certain about that.
15     Q    When did Mr. McDowell call you?
16     A    Oh, I believe he called me on -- I
17  could tell you in just a second because I
18  need to look at a calendar here.  I think on
19  March 20th.  I'm not certain.
20     Q    Okay.  And you didn't discuss any
21  of these documents with him at the time?
22     A    No.  I didn't have any of these

Page 72

1  documents at the time.
2     Q    All right.  When were you
3  designated to be the 30(b)6 witness?
4     A    I don't know when I was formally
5  designated to be the witness.
6     Q    Okay.  So can -- let's turn -- turn
7  to the next page, which is 200069.  Up at the
8  top where it's talking about the XL 3
9  immunophenotyping.  Do you know what those --
10  any of those numbers are?
11     A    Again, it looks he's modeling the
12  fee times the -- as he calls it -- the number
13  of billable events to calculate the price of
14  the profile.
15     Q    Okay.  But do you know or are you
16  just guessing based on what you're looking
17  at?
18     A    That's my best interpretation of
19  this, but I don't know for certain.
20     Q    Okay.  All right.  Let's go to --
21  let's see.  Let's just skip that one.  This
22  is -- I'm trying to find a number on it.  Oh,

Page 73

1  here we are.  600051.
2     A    Where's the number?
3     Q    It's over here.  It's hard to see.
4     A    Okay.  I see it.
5     Q    Can you tell me what that is?  Says
6  up at the top "fee schedule"?
7     A    Yes.  This looks like the fee
8  schedule when we were billing 18 and then
9  over on the right is what the new fee
10  schedule will be when they went up to 26.
11     Q    Okay.
12     A    In 2000.
13     Q    Okay.  This is dated October 19,
14  2000?
15     A    Yeah.  When --
16     Q    When it was printed out?
17     A    Yeah, was when it was printed out.
18     Q    Okay.
19     A    I believe they went -- I don't know
20  when they actually made the change, but this
21  is...
22     Q    Okay.  And who did you talk to

19 (Pages 70 to 73)

Page 74

1  about this particular document?
2      A   Again, everybody that I mentioned.
3      Q   Okay. And did they -- did anybody
4  know who created it or when it was created or
5  why it was created?
6      A   No. People did the same thing I
7  did. They surmised it was probably Kim Hade.
8      Q   Okay. All right. And then the
9  next two documents, just generically these
10  are the fee code changes again?
11      A   Yes.
12      Q   200042 and 43. And these are for
13  the change from 9 markers to 26 markers in
14  1996?
15      A   Yes.
16      Q   Okay. And who did you talk to
17  about these?
18      A   Again, everybody that I mentioned.
19      Q   Okay. Okay. Let's go off the
20  record for a little bit. Take a break while
21  we're doing that.
22      A   Okay.

Page 75

1          THE VIDEOGRAPHER:  Going off the
2  record at 10:18 a.m. tape 1.
3          (Recess)
4          THE VIDEOGRAPHER:  Back on the
5  record at 10:29 a.m. tape 1.
6          BY MS. DAVIS:
7      Q   Okay. I'd like to go back to a
8  couple of things we talked about earlier.
9          You said that in '97 you discovered
10  that DIANON had been overbilling Medicare by
11  four antibodies; is that right?
12      A   Yes.
13      Q   And how did you discover that?
14      A   I didn't discover it. I don't
15  remember precisely how it was discovered, but
16  I believe it was discovered in the context of
17  going up to 26 antibodies from 20 -- 22 that
18  in that process it became apparent that they
19  were already billing for 26.
20      Q   Okay. And so who -- do you know
21  who discovered it?
22      A   I don't know. I think Mr. McDowell

Page 76

1  might have, but I honestly don't know.
2      Q   Okay. And you didn't ask him that
3  when you talked to him?
4      A   No.
5      Q   And you said that at that time,
6  DIANON calculated how much they had been
7  overbilling Medicare?
8      A   Yes.
9      Q   Who did that calculation?
10      A   I don't know.
11      Q   Okay. And you issued a refund to
12  the carrier?
13      A   Yes.
14      Q   Do you know how much that was?
15      A   I think it was around $26,000.
16      Q   Okay. And as I understood your
17  testimony earlier, you said that this, this
18  refund, this overbilling prompted you to
19  decide to move to 18 antibodies billing?
20      A   The -- several things were going on
21  at the time. We discovered the overbilling
22  and we had increased in fact to 26

Page 77

1  antibodies. I talked to Rich Goyette and as
2  I said asked him, look, I want to be
3  extremely cautious here and so could you give
4  me this list of antibodies do you think that
5  everybody would agree should be in any panel.
6  He gave me those antibodies. Then I asked
7  and convinced others that let's just bill for
8  these 18.
9      Q   Okay. Who did you talk to about
10  this decision?
11      A   I don't remember precisely. I'm
12  sure I talked to Mr. McDowell and I'm sure I
13  talked to Mr. Johnson, Kevin Johnson, but
14  beyond that, I don't know who I would have
15  talked to.
16      Q   Okay. And let me make sure I
17  understand. This was -- this was based
18  solely on the fact that you had a $26,000
19  error and had to refund the money to
20  Medicare?
21      A   Well, it was that and I didn't --
22  if anybody were to question, were to look, I

20 (Pages 74 to 77)

Page 78

1  wanted to be able every antibody would be
2  noncontroversial.
3      Q    Okay.  Was anybody questioning it
4  at the time?
5      A    I don't remember anybody
6  questioning at the time, no.
7      Q    Okay.  Was Medicare questioning the
8  number of antibodies?
9      A    Medicare?  I don't remember
10  Medicare ever questioning the number of
11  antibodies.  We certainly had issues with
12  Medicare about them denying flow cytometry
13  totally, saying it wasn't that they weren't
14  going to cover it, but the issue was never
15  the number of antibodies.
16      Q    Okay.  And -- and what about other
17  insurance companies?  Were other insurance
18  companies questioning the number of
19  antibodies?
20      A    Not that I'm aware of.
21      Q    All right.  So I guess I'm -- I'm
22  sort of confused because, you know, you have

Page 79

1  $26,000 overbilling.  You pay back Medicare,
2  and then you make a decision to give up going
3  forward 8 antibodies which at the time you
4  were charging $70 an antibody?
5      A    Yes.
6      Q    So for every time you tested, you
7  were going to do 26 and only charge for 18?
8      A    That's right.
9      Q    And so you were giving up eight
10  times 70.  That's $560 if I did my math,
11  right?
12      A    Yeah, whatever it is.
13      Q    So for every test you were
14  essentially giving up $560 in revenue?
15      A    Yes.
16      Q    And -- and you made that decision?
17      A    Well, I was the one who instigated.
18  Others went along with it.
19      Q    Okay.  And this was prompted simply
20  by the fact that there had been this -- this
21  overbilling?
22      A    Well, that was my motivation, yes.

Page 80

1      Q    Okay.  And what did you to convince
2  the -- what arguments did you make to Mr.
3  McDowell and Mr. Johnson to give up $560 in
4  revenue in every test?
5      A    I don't -- you know, honestly I
6  don't remember the specific discussions or
7  what arguments I made, other than what I just
8  told you.
9      Q    Which is that you wanted to have a
10  panel that nobody could argue with?
11      A    Yes.
12      Q    Now, when you talked about the
13  refund, you said that you went back to August
14  of '96.  And why did you only go back to
15  August of '96?
16      A    I wasn't involved in determining
17  what the refund was.  So I don't know
18  actually who calculated it and how they went
19  back to August of '96.
20      Q    Okay.  Who would normally determine
21  whether an overpayment -- I mean, an
22  overbilling had taken place?

Page 81

1      A    I don't know if there's one person
2  who would normally do it.  I don't know who
3  normally did it back then.  Now, if there was
4  any question of an overbilling, Tom Cassel
5  would get involved and would work with people
6  in the billing department.  Back then, I'm
7  not sure who was doing it.
8      Q    So, would it be billing or finance
9  or is billing part of finance?
10      A    Billing is part of finance.
11      Q    Okay.  So it would be somebody in
12  the finance department who would do it?
13      A    Well, not solely.  They would work
14  with people in other departments and if Tom
15  Cassel was associated with the company at
16  that time, then he would have been involved.
17      Q    Okay.  Do you know when Mr. Cassel
18  became associated with the company?
19      A    I honestly I don't recall.  I
20  believe it was '96-'97.  He wasn't full-time
21  employee of the company.  He was essentially
22  a consultant or whatever the technical term

21 (Pages 78 to 81)

Page 82

1  is, but I don't remember exactly.
2      Q    Back then was there a compliance
3  committee of any sort?
4      A    We had a compliance committee
5  started, and I don't remember the exact date
6  it started. I think it started in '97.
7  There may have been one then, but I don't
8  remember when it started.
9      Q    Okay. Is this the kind of decision
10  that you would normally run by a compliance
11  committee?
12     A    I don't know whether that would
13  have been run by the compliance committee. I
14  don't remember it coming up with the
15  compliance committee, but I don't even recall
16  honestly if there was a compliance committee
17  at that time.
18     Q    Okay. Let me have you go through
19  the -- each of the exhibits, not the
20  deposition notice for right now, but each of
21  the other exhibits and can you tell me for
22  each of the exhibits whether those are DIANON

Page 83

1  business records?   Just go through each of
2  them. For example, Exhibit 7. Is that a
3  business record of DIANON?
4          MR. PARKER: Objection. It's
5  outside the scope of the deposition.
6          THE WITNESS: I don't know what you
7  mean by a business record.
8          BY MS. DAVIS:
9      Q    Was it created by DIANON in the
10  course of business?
11     A    Yes.
12     Q    Okay. What about Exhibit 6 or was
13  that 10?
14         MR. PARKER: Objection.
15         THE WITNESS: No, that was not.
16         BY MS. DAVIS:
17     Q    Okay. This was created by Aetna?
18     A    Yes.
19     Q    Okay. What about Exhibit 9 -- 9?
20         MR. PARKER: Objection.
21         THE WITNESS: That looks like it
22  was created by DIANON.

Page 84

1          BY MS. DAVIS:
2      Q    Okay. Number 8?
3      A    Yes.
4          MR. PARKER: Objection.
5          BY MS. DAVIS:
6      Q    Business record of DIANON?
7          MR. PARKER: Objection.
8          THE WITNESS: Yes.
9          BY MS. DAVIS:
10     Q    Number 6?
11         MR. PARKER: Objection.
12         THE WITNESS: Yes.
13         BY MS. DAVIS:
14     Q    5?
15     A    Yes.
16         MR. PARKER: Objection.
17         BY MS. DAVIS:
18     Q    4?
19         MR. PARKER: Objection.
20         THE WITNESS: Yes.
21         BY MS. DAVIS:
22     Q    And 3?

Page 85

1      A    Yes.
2      Q    And 2?
3          MR. PARKER: Objection.
4          THE WITNESS: Yes.
5          BY MS. DAVIS:
6      Q    Okay. When you decided to -- to go
7  to move to 18, billing for 18 antibody, did
8  you discuss the -- the issue with anybody in
9  financing or marketing? I think you said
10  you mentioned Mr. McDowell. Anyone else?
11     A    I don't remember.
12     Q    Okay. You think the only people
13  you discussed it with were likely Mr.
14  McDowell and Mr. Johnson?
15     A    No. Those are the only people that
16  I'm sure I would have discussed it with, but
17  whoever else I discussed it with I don't
18  recall.
19     Q    Okay. So this was a decision not
20  just by you. It was a decision of the
21  company?
22     A    Yes.

Page 86

1    Q    Okay.  Did you ever get any -- any
2  legal opinions on -- on the decision to -- to
3  bill for 18 as opposed to 26?
4    A    No.
5    Q    Did you ever -- did anybody -- did
6  you or anybody else ever calculate how much
7  revenue you were giving up by moving from 26
8  to 18?
9    A    I didn't.
10    Q    Did anybody else?
11    A    I don't know.
12    Q    Did you ask anyone?
13    A    No.
14        MS. DAVIS:  Okay.  Let's go off the
15  record.
16        THE VIDEOGRAPHER:  Going off the
17  record 10:38 a.m. tape 1.
18            (Recess)
19        THE VIDEOGRAPHER:  Back on the
20  record 10:39 a.m. tape 1.
21        MS. DAVIS:  I have no more further
22  questions in the 30(b)6 deposition.  So we're

Page 87

1  going to end that now.
2        MR. PARKER:  I have no questions
3  but we do want to read and sign, please.
4        THE VIDEOGRAPHER:  Going off the
5  record at 10:39 a.m. tape 1.
6            (Whereupon, at 10:39 a.m., the
7            deposition of JAMES AMBERSON was
8            adjourned.)
9            *  *  *  *  *
10
11
12
13
14
15
16
17
18
19
20
21
22

23 (Pages 86 to 87)