# EXHIBIT 4

Marie A. Casey

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF CONNECTICUT

3

4  UNITED STATES OF AMERICA,        *

   ex rel. Dr. James J. Tiesinga,  *

5                                   *

              Plaintiffs,    * No. 3:02CV1573(MRK)

6                                   *

   vs.                             *

7                                   *

   DIANON SYSTEMS, INC.,           *

8                                   *

              Defendant.    * Pages 1 - 48

9

10

11

12       Videotaped Deposition of MARIE A. CASEY

13              Baltimore, Maryland

14           Thursday, August 3, 2006

15

16

17

18

19

20  Reported by:  Carla J. Briggs, RPR-RMR-CRR

21  Job No. 175904B

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

Marie A. Casey

Page 6

1          MR. SALCIDO:  Robert Salcido on behalf of
2  defendant Dianon.
3          MR. PIERMATTEI:  William Piermattei on
4  behalf of defendant Dianon.
5  WHEREUPON --
6              MARIE A. CASEY,
7  a Witness called for examination, having been first
8  duly sworn, was examined and testified as follows:
9              EXAMINATION
10         BY MR. SALCIDO:
11    Q    Good afternoon, Miss Casey.
12    A    Good afternoon.
13    Q    My name is Robert Salcido.  I'm here on
14  behalf of defendant Dianon.
15         MR. SALCIDO:  Do you want to remark this?
16  I'm going to use the same Exhibit 1 as I used in the
17  last one.
18         THE REPORTER:  You can just refer to that
19  one.
20         MR. SALCIDO:  Let's do that.
21    Q    I'm referring to Exhibit 1 that we had

Page 7

1  used in the prior deposition of Dr. Phurrough this
2  morning.  Could you review this, Miss Casey, and
3  tell me when your review is completed.  And what I
4  want to direct you to specifically is item 1E and
5  ask whether you're here to testify regarding that
6  item.
7    A    Yes, sir.
8         MR. MOLOT:  And 1C, Robert.  Both 1C and
9  1E.
10         MR. SALCIDO:  Thank you.
11    Q    And 1C as well?
12    A    Yes.
13         MR. MOLOT:  And No. 5 as well to the
14  extent -- about documents.
15         MR. SALCIDO:  Okay.  Thank you.
16         MR. MOLOT:  Sure.
17    Q    Miss Casey, can I ask what you did to
18  prepare to provide testimony related to item 1C?
19    A    Let me just refer to it.
20         Yes.  I don't know if you're aware of what
21  my position is, but I actually work for the Division

Page 8

1  of Medical Review and Education, and I serve as a
2  technical advisor in that division.  And in order to
3  address this particular issue, I did speak with our
4  former division director, John Warren.  I also spoke
5  with Karen Daily and -- who actually was a former
6  employee in our division who now has moved on to
7  CAG, and she had been responsible for drafting some
8  of the Program Integrity Manual instructions
9  regarding the LMRPs.  And I also talked to a former
10  employee, Misty Whitaker, who now works for a
11  pharmaceutical industry, but she had actually
12  drafted the instructions that are now in the Program
13  Integrity Manual when we transitioned from LMRP to
14  the LCD based on the BIPA regulation.  And in
15  addition, I talked briefly with Dan Schwartz who is
16  currently in my division, but has been in the
17  division for several years and had some knowledge
18  regarding LMRPs and how we developed the current
19  criteria that's in the Program Integrity Manual for
20  the LMRPs and LCDs.
21    Q    Did you review any documents?

Page 9

1    A    Yes, I did do some review of documents.
2  I -- first of all, I went through just to make sure
3  that I had a correct understanding of what was in
4  our manual instruction in terms of what our
5  guidelines are and what our parameters were, and I
6  actually was able to get a copy of some of the old
7  instructions that we had that talked about the LMRP
8  process versus the LCD process.  I also have a
9  working knowledge of the contractor that's
10  responsible.  I'm responsible actually for a
11  contractor named Fu that's responsible for the
12  Medicare coverage database that now houses all the
13  policies, so I also had some discussions with them
14  about their role in local coverage determinations.
15  And additionally, I reviewed some of the flow
16  cytometry policies.
17    Q    Do you know which ones?
18    A    NHIC I looked at, I looked at Connecticut,
19  I looked at I believe it was First Coast Service
20  Options, and I'm trying to think if there was
21  another one I looked at.  CIGNA I believe I looked

3 (Pages 6 to 9)

**Page 10**

1 at as well.

2      Q      And I apologize.  Earlier you referred to

3 a Medicare database?

4      A      Right.

5      Q      What was that?

6      A      They actually house all the policies

7 currently that our contractors have.

8      Q      And when you say "they," that's what I was

9 interested in, who the "they" is.

10     A      There's a contractor responsible for the

11 Medicare coverage database, and they're called the

12 Fu contractor.  And they actually upload the

13 policies that the contractors provide for them on a

14 national database that any provider out there can

15 access.

16     Q      And can you spell that for me?  You say

17 the Fu contractor?

18     A      Yeah.  It's spelled F-U.

19     Q      And it's not an acronym?

20     A      No.

21     Q      What does that database contain?

**Page 11**

1      A      It contains all the policies the carriers,

2 FIs and DMERCs have, all the local coverage -- now

3 we call them local coverage determination policies.

4 So at any time, any provider can go and say they can

5 look up a policy if they know the contractor or they

6 know the topic.  They can pull it up easily.

7      Q      So, it -- I take it, it doesn't contain

8 claims data?

9      A      No.

10     Q      Miss Casey, can you give me your

11 educational background after high school?

12     A      Yes.  I am a nurse.  I have a Bachelor's

13 degree in nursing, and I have a Master's degree in

14 public health.

15     Q      When did you get your BA in nursing?

16     A      1994.

17     Q      And your MA in public health?

18     A      2006.

19     Q      What did you do after you got your BA in

20 nursing?

21     A      I was in the Army for almost eight years.

**Page 12**

1 I was assigned to various duty assignments and then

2 because of -- I decided to transition into the

3 Public Health Corps which is a sister -- considered

4 a sister service to the Army, and then I could

5 maintain all my benefits.

6      Q      And when did you transition into the

7 Public Health Corps?

8      A      2002.

9      Q      And have you been in it since?

10     A      Yes.

11     Q      Does CMS have any type of procedure to

12 monitor a carrier's LMRPs?

13     A      The content of the LMRPs?  Is that what

14 you're looking at?

15     Q      Yes.

16     A      The content of LMRPs?  We do not have a

17 formalized process in place in which central office

18 gets involved with the content or the determinations

19 made in the LMRPs.  Basically, contractors are

20 granted the authority to use their discretion in

21 working with their local provider carrier advisory

**Page 13**

1 committee to develop the policies, and the only kind

2 of oversight feature we have is that the regional

3 offices do look at those policies to see if those

4 policies can be operationalized.

5      Q      Now, when does the regional office conduct

6 that review?

7      A      It's usually when a new or revised policy

8 is put in -- put into place by the contractor.

9      Q      And what does that review entail?

10     A      We have no specific instructions that

11 central office has provided to the regional office

12 as to how to do that review.

13     Q      Well, would the -- would one component of

14 the review be to ensure that the local medical

15 review policy conforms to CMS standards?

16     A      Generally speaking, no.  It's more to see

17 if the contractor's able to operationalize those

18 issues.  The only time that we get involved with

19 looking at a conflict, generally speaking, is if

20 there's a complaint that comes in, but we do tell

21 contractors in our manual instruction that their

4 (Pages 10 to 13)

Marie A. Casey

Page 18

1 CMS ever identify aberrancies in the statistical

2 utilization to carriers?

3    A    Yes.

4    Q    And what kind of communication would that

5 include?

6    A    I can speak to what we're doing today.  I

7 can't speak to what was done in the past, just to

8 make that point of clarification.

9    Q    Uh-huh.

10    A    But currently, one such strategy is that

11 we utilize GAL and OIG reports that, you know, do a

12 study on a particular procedure code or a particular

13 provider type.  And based on those, we send those

14 out to the contractors and we say, you know, utilize

15 these results, look at your own internal data as

16 well and determine if you need to look at this

17 particular item or service to do medical review.

18         Additionally, as part of the Program

19 Integrity Group, we do have a data -- new data

20 analysis component, which is a relatively recent

21 group that's been added to the Program Integrity

Page 19

1 Group, that does look at high utilization or

2 services that are -- appear to be overutilized, and

3 we have recently established a process to contact

4 the contractors and to have them also look at some

5 of those issues that are being identified by the

6 data analysis group here at central office.  And now

7 I can't really speak to exactly what systems they're

8 using.  I know that they're using multiple systems

9 because again, we're not just looking at carrier

10 data, we're looking at FI and DME data as well, so

11 they're using multiple claim systems and looking at

12 all those claim systems.

13    Q    Well, you said that you're familiar with

14 the systems in place now, but not beforehand.  Did

15 you speak to anyone else regarding systems that

16 might have been in place, say, around 1996 to the

17 year 2000 time frame?

18         MR. MOLOT:  Object to the form of the

19 question.  You can answer.

20    A    I don't recall speaking to anyone

21 specifically regarding the type of data systems that

Page 20

1 were available at that time, no.

2    Q    And what was communicated to the carriers

3 regarding utilization data?

4    A    I can tell you that to my understanding,

5 our policies did not change -- and I don't know if

6 I'm answering your question -- that our policies

7 have not changed since then regarding the need for

8 them to utilize different data sources in

9 determining which policies to develop and which

10 medical -- which, you know, claims they might want

11 to take a look at.  So, that standard has not

12 changed with the changeover to -- from LMRP to LCD

13 and our instructions have not changed, so that would

14 have been in place during the time you're asking

15 about.

16    Q    Okay.  Are you familiar with the use of

17 what's sometimes known as the STARS tool, S-T-A-R-S?

18    A    Uh-huh.

19         MR. MOLOT:  You have to answer verbally.

20    A    Oh.  Yes.  Sorry.

21    Q    And what's your understanding of that?

Page 21

1    A    Actually, it's a tool that our contractors

2 use to help locate their claims data, and I know

3 that they utilize it in development of what we call

4 the medical review strategy -- and it used to be

5 called the medical review OPEC strategy -- to

6 identify potential aberrancies.

7    Q    I have a few documents I'm going to show

8 you, Miss Casey.  I don't know if they come from

9 CMS.

10    A    Okay.

11    Q    They may not, but I just want to see if I

12 could trace down their origin.

13         MR. SALCIDO:  This will be Exhibit 2.

14         (Casey Deposition Exhibit Number 2 was

15 marked for identification.)

16         BY MR. SALCIDO:

17    Q    Are you familiar with the Comparative Data

18 Review?

19    A    (Nodding head yes.)

20    Q    What is it?

21    A    Basically, generally speaking, we have

6 (Pages 18 to 21)

**Marie A. Casey**

Page 22

1 instructed our contractors to what we now call
2 comparative billing reports, which I think this is
3 the same -- a same or similar to.  We have
4 instructed them that when they place a contractor --
5 or excuse me -- a provider on medical review, they
6 need to provide them with a comparative billing
7 report which actually looks at their utilization
8 compared to their peer's utilization.  And this
9 looks to be a similar -- similar tool that one of
10 the contractors used.
11        This might also -- this looks like they
12 looked at overall data, and this is actually what
13 they sent to the Carrier Advisory Committee to help
14 explain why.  And then that's what the CAC stands
15 for -- Carrier Advisory Committee --
16    Q    Uh-huh.
17    A    -- to explain why they might need to
18 implement a policy for this particular code.  And
19 that's a practice that our contractors continue to
20 use today to show the provider community as to why,
21 you know, we may really need to think about drafting

Page 23

1 a policy.
2    Q    Okay.  And what database does it draw
3 upon?
4    A    Usually now today, the data comes out
5 of -- well, this is a little bit confusing because I
6 don't know which contractor it was, because I think
7 in 1998, there were several different systems that
8 the contractors used.  Primarily, Part B carriers I
9 believe are on the NCS system, and it depends on
10 which region as to which type of data or data source
11 they might have used to come up with this, so I
12 can't really speak to exactly which one was utilized
13 for this.
14        MR. SALCIDO:  Mark this as Exhibit 3.
15        (Casey Deposition Exhibit Number 3 was
16 marked for identification.)
17        BY MR. SALCIDO:
18    Q    Are you familiar with this type of
19 document, Miss Casey?
20    A    This particular document, I'm not familiar
21 with.

Page 24

1    Q    It's not the type of document that's
2 communicated from CMS to carriers?
3    A    It could be, but it does not come out of
4 my area, that I'm aware of.  It may come out of OIS,
5 which is the Office of Information Systems, but to
6 my knowledge, we have not issued this type of report
7 from my office.
8        MR. SALCIDO:  Okay.  Let's mark this as
9 Exhibit 4.
10        (Casey Deposition Exhibit Number 4 was
11 marked for identification.)
12        BY MR. SALCIDO:
13    Q    How about this document?  Does it come out
14 of your office?
15    A    No, this does not come out of my office,
16 either.
17    Q    Okay.  Now, with respect to item 1C1, has
18 CMS provided any instruction to any Medicare carrier
19 that has a frequency limit with respect to flow
20 cytometry CPT 88180 that -- let me strike that and
21 then start over.

Page 25

1        Has CMS issued any -- you lost your --
2    A    Sorry.
3    Q    Has CMS issued any instruction to any
4 Medicare carrier that did not have a frequency limit
5 with respect to CPT 88180 that it must have a
6 frequency limit with respect to that LMRP?
7        MR. MOLOT:  Object to the form of the
8 question.
9    A    Not to my knowledge.
10    Q    Has CMS ever provided any instruction to
11 any Medicare carrier regarding CPT 88180 regarding
12 the list of ICD9s that could be listed on its local
13 medical review policy?
14    A    Not to my knowledge.
15    Q    Has CMS ever provided any direction to any
16 Medicare carrier regarding how many antibodies could
17 be tested based on a specimen that was used?
18    A    Not to my knowledge.
19    Q    Do you know -- and this is, I think, 1E --
20 has there been, to your knowledge, any
21 communications between CMS and the Veterans

7 (Pages 22 to 25)

Marie A. Casey

Page 30

1  documents, and it's called -- we call it a
2  certification.  And that certification was signed by
3  someone for each of the three offices, both CMM,
4  OCSQ and OFM.
5          And then in April of 2006, some additional
6  documents -- Jim Menas was able to produce some
7  additional documents from the RUC or RUC binders
8  which were then given to OGC and then transferred to
9  DOJ.  And I did speak to a couple of people
10  regarding what CMS's role was to try to get
11  documents per your request, and I had spoke briefly
12  with Jim, who I know you're going to talk to either
13  this morning or tomorrow morning, and he was one of
14  the contacts from CMM.  And he had explained that
15  his role was to help explain OGC and some others,
16  the source of the documents that were being found,
17  and he also had a role in contacting a person by the
18  name of Robin Thomas from OIS to find out about
19  perhaps conducting some data analysis on the 88180
20  code.
21          I also talked to Alice Strathy who

Page 31

1  actually was the point person in the Office of
2  Clinical Standards and Quality, and she -- it was
3  her job to get back to the OSRA person regarding
4  canvassing all OCSQ's files to find these documents,
5  and she assured that the documents were reviewed by
6  the OCSQ director and then she forwarded them on.
7  And then I spoke with Dan Schwartz and John Warren
8  who were the point of contacts at the Office of
9  Financial Management to canvass through old
10  documents and E-mails and produce the documents.
11  So, that was what we did to get information from
12  CMS.
13          And in addition, my group was -- sorry --
14  my group was responsible to contact the carriers to
15  try to get information from the carriers.  And we
16  did this -- if I'm going too fast, just let me know.
17      Q    I'll back up when -- once you're done.
18  This is helpful.
19      A    Okay.  We had sent out three what we call
20  nationwide E-mails.  We have a Medicare listserv
21  that goes out to all the carrier managers and all

Page 32

1  the CMDs, and that particular listserv has over a
2  hundred or so names, so it really gets out to the
3  audience that we wanted to get this information out
4  to.  So, we sent out a request back in '05 --
5  September of '05 -- and basically, we asked the
6  carriers -- we asked them to not only certify that
7  they had looked through all their documents and get
8  back to us, but we had asked them specifically to
9  look for and describe in detail any written policies
10  or standards that they had regarding a number of
11  antibodies used for the flow cytometry test, and we
12  asked them specifically for the dates '96 through
13  2004.
14          And as part of that information that we
15  sent out to help make sure that the carriers
16  understood, there was some information that we
17  provided -- we called it CMS guidance -- on exactly
18  what we were looking for with that request, and this
19  included the publication date and, you know,
20  information like where the policies were originally
21  first published and, of course, whether or not they

Page 33

1  had an LMRP, just to make sure that the carriers
2  were looking at what the question is that we wanted
3  information on.
4          And secondly, in that first inquiry, we
5  asked them to produce any documents related to
6  appeals or any information related to challenges
7  received by the contractors for Medicare policies
8  that actually limited the number of antibodies.  And
9  we gave examples of some of the things that we were
10  looking at, just their appeals information if they
11  could access it and some other information, and we
12  also as part of that request gave a deadline.
13          We received some E-mails and some
14  information back, then again in October of --
15  October 13th of 2005, we sent an additional E-mail
16  again asking them for documents.  And more documents
17  came in, and then another request was sent out in
18  May of '06, and this particular request again was
19  just asking, because we didn't get enough
20  information on appeals, so we asked again for any
21  information related to any appeals of the LMRPs

9 (Pages 30 to 33)

## Page 34

1 regarding flow cytometry. We asked for any internal
2 or external E-mails, meaning E-mails between staff
3 members within the contractor organization as well
4 as any E-mails that they had sent out to the
5 provider community or any communications they had
6 with the provider community, and then we asked them
7 for information related to determinations -- any
8 determinations that the number of antibodies were
9 not reasonable and necessary, and any information on
10 ICD9 codes and LMRPs that did not reflect medically
11 appropriate indications.
12      And then in July of '05 -- or excuse me --
13 July 5th of 2006, we sent out a joint signature memo
14 to the carriers, again asking them for the same
15 documents that I have just previously mentioned.
16 Oh. And one more requirement that we had asked them
17 for was any documents or data including BESS data
18 analysis for flow cytometry used to create change or
19 amend any of their policies, and we asked them
20 additionally for CAC notes that they had and docs in
21 their files for creation or changes to the current

## Page 35

1 policy.
2      Q    And when did that request having to do
3 with the BESS data, CAC notes, when was that made?
4      A    July 5th of 2006.
5           MR. MOLOT: Did you mention a June E-mail
6 as well?
7           THE WITNESS: I mentioned a May --
8 May 23rd of '06.
9           MR. MOLOT: Okay. I think there was a
10 June one. Anyway --
11      Q    Was there any instruction provided to the
12 carriers to retain documents in a usable form that's
13 related to flow cytometry?
14      A    What time frame are you talking about?
15 Because --
16      Q    Well, post-September 2005.
17      A    We have had long-standing policies about
18 contracts -- I don't know if I'm addressing your
19 question -- we've had long-standing policies about
20 contractors retaining claims documents as well as
21 any documents regarding adjudication of the claim,

## Page 36

1 and basically, we call it a freeze policy; that they
2 are to freeze their destruction of any of those
3 documents. Now, I don't know the time frame, but
4 recently or relatively recently, a document did go
5 out that the contractors do not have to maintain a
6 hard copy of that information, but can actually
7 image it, but in doing that, they have to certify
8 that all the information was -- you know, was kept
9 in the images.
10      Q    Yeah. With respect to policies, I guess
11 along those lines, my understanding is that the
12 STARS tool that is used on claims data is archived
13 every three years. Do you have a different
14 understanding?
15      A    I can't speak to how frequently those
16 files are archived.
17      Q    And in your presentation, you had
18 referenced September '05 as being a trigger date for
19 some communications. Are you aware of any
20 communications that predated September '05 regarding
21 compiling documents responsive to our discovery

## Page 37

1 request?
2      A    No, I'm not aware.
3           MR. MOLOT: I think she testified to an
4 August '05 communication to Jim Menas.
5           MR. SALCIDO: Okay. I see that.
6           THE WITNESS: I was speaking specifically
7 to the carriers.
8           MR. MOLOT: Yes.
9           MR. SALCIDO: Okay. Mark this as
10 Exhibit 5.
11           (Casey Deposition Exhibit Number 5 was
12 marked for identification.)
13           BY MR. SALCIDO:
14      Q    Obviously, most questions I was going to
15 ask on this document you've already answered, but in
16 terms of just setting a context for it -- and I'm
17 aware there -- you mentioned subsequent
18 communications after this one which included other
19 categories of information such as the CAC file and
20 the BESS data -- what I'm wondering is with respect
21 to -- you mentioned a communication internally with

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Marie A. Casey

**Page 38**

1 respect to CMS for responsive documents. What
2 specific categories were requested in that document
3 request?
4     A    Let me see if I -- I believe I looked over
5 some of the notes, and I think it was very similar.
6 Any internal E-mails, anything external that went
7 out from CMS; so, basically, any inner component
8 like any E-mail sent between my group and OCSQ
9 regarding flow cytometry, any E-mails that were
10 surrounding flow cytometry related to appeals, and
11 any information particularly about the
12 reimbursement. I think I had mentioned that early
13 on.
14     Q    Uh-huh.
15     A    There was specific requests for
16 information about how CMS determined reimbursement
17 policies for the particular code.
18         MR. SALCIDO: Okay. I think we could do a
19 five-minute break. Let me check with Bill, and I'll
20 see if I have any other questions.
21         MR. MOLOT: Great.

**Page 39**

1         THE VIDEOGRAPHER: We're going off the
2 record. The time is 1:01 p.m.
3         (Brief Recess.)
4         THE VIDEOGRAPHER: We're back on the
5 record in the deposition of Marie Casey. The time
6 is 1:06 p.m. You may proceed.
7         BY MR. SALCIDO:
8     Q    Yeah. I just wanted to circle back on one
9 thing. In terms of the September '05 communication
10 that went out to the carriers that you referred to,
11 is this -- Exhibit 5, is that the communication that
12 went to the carriers?
13     A    Yes.
14     Q    In terms of document retention, you'd
15 mentioned files. Was there any instructions given
16 other than claims data regarding retaining documents
17 responsive to the litigation?
18     A    To my knowledge, specifically to this
19 investigation, I'm not sure; but as I said, in
20 addition to claims data, we have a whole manual
21 instruction on retention of pertinent documents

**Page 40**

1 related to any type of claims adjudication or any
2 type of policies that our contractors are
3 developing. There are certain requirements for them
4 to maintain those documents. Now, the specifics of
5 that, I can't speak to.
6     Q    Well, what does the policy state? Because
7 I'm unclear when you say "claims adjudication"
8 whether that relates to this lawsuit or something
9 broader than that.
10     A    Well, sometimes there's -- with a
11 claims -- looking at claims, there's additional
12 documentation that might be used like a cheat sheet
13 that a nurse has to decide, you know, that she
14 might -- how to make her decision or some notes she
15 might be taking while she's actually looking at the
16 case. And basically, those things are also supposed
17 to be maintained by the contractor similar to all
18 the claims data that I told you that we're not
19 allowed to destroy unless we electronically image
20 it. So, that's what I meant by saying that we have
21 these additional records -- or documents that must

**Page 41**

1 be maintained by the contractor.
2     Q    Well, to be more specific then, would the
3 carrier be under instructions -- going back to let's
4 say September 2002 -- to retain BESS data?
5     A    I really can't speak to that. I can give
6 you a point of contact who could help you with that,
7 but I really don't know in terms of the actual data
8 itself if they're required to keep that archived and
9 for how long.
10     Q    How about did any instruction go back
11 let's say in September of 2002 to the carrier to
12 retain its CAC file related to CPT 88180?
13     A    Not that I'm aware of anything specific to
14 that particular file or to that particular code.
15     Q    Do you know if any instruction ever went
16 from CMS to the carrier to retain the CAC file
17 related to CPT 88180?
18     A    Not that I'm aware of.
19     Q    And how about with respect to BESS data?
20 Are you aware of any instruction CMS provided to the
21 carrier to retain its BESS data with respect to CPT

11 (Pages 38 to 41)

**Marie A. Casey**

Page 42

```
1  88180?
2      A    Not that I'm aware other than, you know,
3  when we asked for that information as part of those
4  requests, I guess the assumption would be there that
5  they wouldn't be destroying it.  They would be
6  forwarding it on and not destroying it.
7      Q    And how about before you made your
8  request?
9      A    Not that I'm aware of that I can say
10 anything specific came out of my office.
11     Q    And how about with respect to CMS?  Was
12 there any instruction given to CMS during the year
13 late 2002 to retain documents responsive to CPT
14 88180?
15     A    Not that I'm aware of.
16     Q    How about in 2003?
17     A    Not that I'm aware of.  Nothing that I
18 know that came out of my particular division
19 regarding retaining specific documents for that.
20     Q    And how about the year 2004?
21     A    Other -- not that I'm aware of that came
```

Page 44

```
1  to that, and that's one thing I did leave out.
2          MR. MOLOT:  Thank you.  Nothing further.
3                      EXAMINATION
4      BY MR. SALCIDO:
5      Q    The only follow-up question I have on
6  that, when you reference June and July, are you
7  talking '06?
8      A    Yes.
9          MR. SALCIDO:  Okay.  That's all.
10         MR. MOLOT:  Thank you.
11         THE VIDEOGRAPHER:  This concludes the
12 deposition of Marie Casey.  The time is 1:11 p.m.
13 Thank you.
14         (Reading and signing requested.)
15         (Deposition concluded at 1:11 p.m.)
16
17
18
19
20
21
```

Page 43

```
1  out of our group other than, of course, these
2  requests, you know, requesting that the contractors
3  actually send us the documents, but nothing specific
4  other than our general policies for them not to
5  destroy certain files that they have.  And like I
6  had mentioned, there's a whole instruction on that.
7          MR. SALCIDO:  Okay.  That's all I have.
8  Thank you.
9                      EXAMINATION
10     BY MR. MOLOT:
11     Q    One clarification question.  Are you aware
12 that there was also a June nationwide E-mail that
13 went out prior to the July 6th communication?
14     A    Yes.
15     Q    What did that have in there?
16     A    Basically, it had all those things that I
17 mentioned in that July JSM that went out.  It had
18 asked for the BESS data, it had asked for the CAC
19 files, it had asked for the CAC notes.  So that same
20 information actually went out in a joint signature
21 mail in July.  It was actually in an E-mail previous
```

Page 45

```
1          ACKNOWLEDGMENT OF DEPONENT
2  I hereby certify that I have read and examined the
3  foregoing transcript, and the same is a true and
4  accurate record of the testimony given by me.
5  Any additions or corrections that I feel are
6  necessary, I will attach on a separate sheet of
7  paper to the original transcript.
8
9
10
11
12
13 Date                    Marie A. Casey
14
15
16
17
18
19
20
21
```

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979