UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DR. JAMES J. TIESINGA, <br><br> Plaintiffs, <br><br> v. <br><br> DIANON SYSTEMS, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 3:02CV1573(MRK) |

**REPLY TO THE OPPOSITION TO MOTION IN LIMINE
REGARDING DISCOVERY VIOLATIONS**

Dianon Systems, Inc., by its undersigned counsel, submits this Reply to the United States Opposition to Motion in Limine Regarding Discovery Violations ("Opposition") and in support of its Memorandum in support of Motion in Limine Regarding Discovery Violations ("Memorandum") and states as follows.

**I.   INTRODUCTION**

The government admits it failed to notify the Center for Medicare and Medicaid Services (CMS), or the Medicare carriers of this lawsuit until August 2005 – nearly three years after it was put on notice of the suit. As a result, documents concerning flow cytometry policy were lost or destroyed. The government's failure to exercise a litigation hold and protect relevant documents, as well as its conduct during the course of discovery, are evidence of bad faith. CMS instructed its carriers to produce only a limited amount of discovery despite the plain, straightforward discovery requests for all documents concerning flow cytometry. As a result, Dianon had to expend numerous

hours, thousands of dollars, and six months of discovery time to obtain that which it clearly requested at the outset. The government's conduct in prosecuting this lawsuit amounts to a wholesale refusal to recognize its discovery obligations to the detriment of Dianon and such refusal warrants dismissal.

## II. EVIDENCE OF THE GOVERNMENT'S BAD FAITH DESTRUCTION OF DOCUMENTS

The government alleges that it did not need to issue a litigation hold or take efforts to protect documents because: (1) it would be too burdensome to do so; and (2) it had document retention policies. Opposition at 19-20. The government's discovery obligations are no different than any other litigant's -- it must take affirmative steps to protect relevant documents in its custody and control, particularly when those documents could be used to defend charges of fraud. *Exhibit 1,* November 12, 2003 Department of Justice Document Freeze Update ("under no circumstances are you to destroy any information, data, or files ... relating to a current investigation or litigation/negotiation"), *Brock v. R.J. Auto Parts and Service, Inc.,* 864 F.2d 677, 679 (10th Cir. 1988), *In re Vioxx Products Liability Litigation,* 235 F.R.D. 334, 338 (E.D.La. 2006) citing *U.S. v. Procter & Gamble Co.,* 356 U.S. 677, 681 (1958); *Zubulake v. UBS Warburg, LLC,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *Bosaw v. National Treasury Employees Union,* 887 F.Supp. 1199, 1212 (S.D.Ind. 1995).

### A. The government failed to protect relevant documents in its possession, custody and control once it was on notice of this cause of action.

The government admits that it did not issue a litigation hold in this matter. Opposition at 19-20. The government claims its document retention policies are sufficient to protect all relevant documents but does not offer the retention policies it

provides local carriers as evidence of this good faith intention to protect documents. Instead, the government offers the testimony of Serena Selzer, the custodian of records for the Connecticut carrier who claims that Medicare carriers are under a "do not destroy" instruction. Opposition at 20. In addition, the government provides document retention policies from CMS that are allegedly sufficient to cover all relevant flow cytometry documents relevant to this case. *Id.* citing to Exhibits 39 and 40 (attached here as *Exhibits 2 and 3*). According to the government's own witnesses and evidence presented, CMS document retention policies are wholly inadequate to protect relevant documents for litigation purposes.

CMS designee Marie Casey[1] testified that CMS had policies concerning "contractors retaining claims documents as well as any document regarding adjudication of the claim, and basically we call it a freeze policy, that they are to freeze their destruction of any of those documents." *Exhibit 4*, Deposition of Marie Casey at 35:11 – 36:9, *Exhibit 6*, Department of Justice "freeze" on the destruction of claims adjudication documents. But this "freeze" did not cover flow cytometry utilization data (BESS data) or carrier advisory committee (CAC)[2] files for CPT code 88180 (flow cytometry) or other related documents concerning the development of Local Medical Review Policies (LMRPs) or Local Coverage Determinations (LCDs). *Id.* at 41:10 – 42:10, *Exhibit 6*.

The government attached two record retention policies for CMS. *Exhibits 2 and 3*. The "files created by most CMS offices in the performance of their assigned

---

[1] Ms. Casey was the CMS designee who addressed "Medicare review, oversight, approval, or communications with Medicare carriers from January 1, 1996 to the present regarding Local Medical Review Policies (LMRPs) and Local Coverage Determinations (LCDs) for CPT 88180..." *Exhibit 4*, Deposition of Marie Casey at 6:21 – 7:12, *Exhibit 5*, Notice of Deposition.
[2] The carrier advisory committee (CAC) "is intended to provide a formal mechanism for physicians in the State to be informed of and participate development of an LCD in an advisory capacity; to discuss and improve administrative policies that are within discretion; and to facilitate information exchange between carriers and physicians." *Exhibit 7* at 2.

functions" including "outgoing correspondence" and "comments on draft reports, studies, and proposals prepared by other offices" are destroyed after a total retention of two years. See *Exhibit 2* at 4-5, paragraph M (Administrative Office Files), *Exhibit 4* at 12:13 – 13:8 (CMS is involved with policies created by other offices, including new and revised carrier LMRPs). According to a Department of Health and Human Services directive "(u)nder no circumstances" are CMS or its carriers "to destroy any information, data, or files CMS, (or) DOJ ...has ***identified as relating to current investigation or litigation/negotiation ... This will satisfy evidentiary needs and discovery obligations critical to the agency's litigation interests."*** *Exhibit 1,* November 12, 2003 Department of Justice Document Freeze Update (emphasis supplied). Had a litigation hold been put in place, as required pursuant to government policy in September 2002, all CMS correspondence, comments, studies, or information it received concerning any draft LMRPs from carriers from September 2000 through 2003 could have been collected and preserved. Since no litigation hold was <u>ever</u> put in place, presumably all such documents were destroyed under CMS policy. *Exhibit 2* at 4-5, paragraph M.

The government also admits in its email retention policy that:

(S)ometimes it is difficult to decide whether an email message or other material in your possession should be preserved. Here are a few questions you can apply to such material to decide if you should store the message for future retrieval. If you answered yes to any of the questions below, your material is considered a record and the record retention schedules must be applied accordingly.

   o   ***Does it have any legal value?***

*See, Exhibit 3* at 2 (emphasis supplied). Neither CMS nor its employees would know that flow cytometry email had any legal value because they were unaware of this suit from September 2002 to August 2005. This is the purpose of a litigation hold – to notify those

unaware that documents covering certain subject areas are important or have "legal value."[3]

### B. Because the government took no steps to protect relevant documents concerning this litigation, relevant documents were lost or destroyed.

#### 1. CMS Documents

The government asserts that because <u>some</u> older documents concerning flow cytometry were saved under government document retention policies, "there is no evidence that any relevant documents were lost or not produced." Opposition at 20-25. This assertion has no merit and makes no sense – evidence that some documents were saved does not mean all documents were saved, particularly when evidence shows documents were lost or destroyed. The government claims "Dianon implies that relevant emails from Jim Menas may have been lost, there is no evidence of this." Opposition at 21. Jim Menas, CMS' designee concerning its document production efforts, testified that **CMS** lost emails during its computer conversion in 2003 or 2004. Memorandum at 9, *Exhibit 9*, Deposition of Jim Menas at 7:3-7:15, 45:4-45:16. The loss of CMS documents in 2003 or 2004 occurred after this litigation began and after a litigation hold should have been issued and would have protected emails concerning flow cytometry. *Exhibit 1*. The fact that the CMS document retention policy is not sufficient is further evidenced by the fact that Mr. Menas, a CMS employee involved in the 2003 proposed rule making, failed to save electronic communications concerning the proposed and final rule. *Exhibit 9* at 45:17-46:15.

---

[3] The government's action stands in stark contrast to Dianon's actions in this litigation. Upon learning of the government's involvement, Dianon immediately instituted a document freeze. *See Exhibit 8,* July 25 Letter from Robert Salcido to Patricia R. Davis. The government's position ultimately is that it should be able, as here, to sue a party for more than $100 million but that it should not be held to the same standards as private companies and individuals regarding retaining documents relevant to litigation. That position should be rejected.

The official CMS policy is to maintain records for all rule makings including any "external/internal studies" or "other documents that were relied upon in developing the policies included in the rule." *Exhibit 2* at 5, paragraph N. Those documents were not kept in this case. The government admits: (1) "Dr. Rudolph and Dr. Rosen were the primary authors of the proposed rule" for flow cytometry in 2003; and (2) CMS does not have the documents Dr. Rudolph or Dr. Rosen used or relied upon for the proposed rulemaking. Opposition at 22, n.10, Memorandum at 9-10, *Exhibit 10*, Declaration of Michael S. Marquis at ¶¶ 16-20. The government asserts that the loss of these records is not prejudicial to Dianon and not worthy of an adverse jury instruction because Dianon has failed to show that the lost documents would support its defenses. This assertion has no merit.

First, Dianon need not show that the documents would have supported its defenses in this matter, only that the documents were at least negligently destroyed. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107-08 (2nd Cir. 2002). Second, the documents would likely have supported Dianon's defense in this matter. The documents would have shown that the government's definition of medical necessity as it relates to flow cytometry (i.e., a flow cytometry panel is a series of tests and each test is subject to medical necessity determination) is false. *See,* Opposition to Motion in Limine to Exclude Evidence of False Claims Act Liability at 6, 9. The proposed rule making in August 2003 notes that a flow cytometry panel is one test and is interpreted as one test, not a series of tests, thereby contradicting the government's current position in this suit which would likely have been further contradicted by documents that are now lost or destroyed. Opposition at 22, n.10.

BA2DOCS1\#318015.01

The documents Drs. Rudolph and Rosen relied upon would also have supported that numerous other providers were performing flow cytometry in a manner similar to Dianon. Documents concerning Dr. Rosen's comment "it is my <u>personal opinion</u> that what is going on with flow cytometry constitutes an <u>industry accepted</u> abuse or fraud . . ." would likely have assisted Dianon's defense. Opposition at 21, n.9 (emphasis supplied). The government has taken the position that Dianon's flow cytometry practices are outside industry standards. See Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 12-18. The documents that formed Dr. Rosen's and ultimately Dr. Rudolph's opinions concerning flow cytometry would likely have shown: (1) there is an industry-wide acceptance of comprehensive flow cytometry practices similar to Dianon's; (2) Medicare never took a position on those industry-wide, accepted practices; and (3) the beliefs of Dr. Rosen and Dr. Rudolph were "personal" and, prior to the August 2003 proposed rule making, were not made public.

In addition to the documents concerning the 2003 proposed rulemaking process, numerous additional documents pertaining to reviews, subcommittees, proposals, public meetings, and research concerning CMS regulation of flow cytometry have been lost or destroyed. *Exhibit 11,* September 22, 2006 government response to Dianon document request at ¶¶45-54.

### 2. NIH Documents

The government claims it did not need to issue a litigation hold to the NIH because "NIH documents are not relevant to this case." Opposition at 23. Second, the government claims that Dianon did not request emails from Dr. Stetler-Stevenson or the NIH. *Id.* Neither contention has any merit. Dr. Stetler-Stevenson, as world renowned

expert in flow cytometry and recent coordinator of the 2006 Flow Cytometry Consensus Conference, regularly communicated with flow cytometry practitioners around the country through electronic mail. Memorandum at 10. Evidence of this extensive correspondence are the hundreds of pages of e-mails sent to <u>one</u> flow cytometry list serve – documents the government destroyed, but a third party saved. Opposition at 23-24.

First, correspondence concerning the appropriate flow cytometry panel designs, antibody utility, strategies for designing antibody panels, and evidence of flow cytometry medical practice throughout the country is relevant to this case. Second, as detailed below, Dianon clearly requested all documents in the government's custody concerning antibody panel design, the use of comprehensive panels or targeted panels, the acceptable number of antibodies to be used in flow cytometry leukemia and lymphoma diagnosis, and the number of markers used by healthcare providers.

Dr. Stetler-Stevenson testified she did not save her electronic mail communications which are regularly deleted from NIH computers. Memorandum at 10. The emails produced from a third party list serve indicate that Dr. Stetler-Stevenson regularly engaged in discussions with members of the medical community concerning antibody panel design and the use of comprehensive panels like Dianon's. *See, e.g., Exhibit 12*, April 28, 1998 e-mail from Dr. Stetler Stevenson cautioning a practitioner not to use a "restricted panel" and not to rely on the incoming diagnosis because they can be "far off the mark." Electronic mail to and from Dr. Stetler-Stevenson would also be important to show that the government's definition of "medically necessary" contradicts the term as is normally used and applied in the medical field. *See, e.g., Exhibit 13*, Deposition of Dr. Stetler-Stevenson at 96:10 – 99:2, 103:1-16 (numerous antibodies Dr.

Flynn claims are medically unnecessary Dr. Stetler-Stevenson believes are medically necessary for diagnosis of a patient). In sum, the destroyed email communications between Dr. Stetler-Stevenson and the medical community would likely have supported Dianon's defenses that the use of a large, comprehensive flow cytometry panel is common in the medical field and supported as good medical practice.

### 3. Carrier Documents

The government asserts that Dianon failed to request STARS data during the discovery period. Opposition at 25. STARS data relates to reimbursement of flow cytometry, which Dianon requested in July 2005. The government admits that: (1) STARS is a "software data management system used by some of the Medicare carriers, but not by CMS itself;" (2) the STARS system "only goes back 18 months and they can't use the STARS system for older data;" and (3) it cannot obtain data from 1996 to 2003 "because it is more than 18 months old." Opposition at 24-25. The government asserts that because some STARS data was produced, it satisfied its discovery obligations. The government misses the point.

Had the government issued a litigation hold in September 2002, the carriers who utilized the STARS data management tool could have easily preserved all data going back at least 18 months to March 2001 (Dianon produced evidence showing up to 3 years of data can be obtained – see Memorandum at 10-11 and Exhibit 23 referenced therein). This data software tool would have allowed the carriers to capture and preserve data as it existed at the time. Because the government failed to issue a litigation hold and failed to request such data from the carriers, the data is now lost as the government admits. *See Exhibit 1* (carriers instructed not to "destroy…data"). Dianon could have utilized STARS

data to support its defense that 26 antibody panels are regularly used and reimbursed. *See, e.g., Exhibits 14* and *15.*

In addition to STARS data, based upon the government response to documents, numerous documents no longer exist in carrier files. See Memorandum at 11-12. For example, the government did not produce CAC minutes or related documents concerning the development of the 1998 Connecticut LMRP. *Exhibit 16*, Deposition of Arif Toor, Connecticut carrier medical director at 17:5 – 18:13 (Connecticut had a CAC concerning the development of LMRPs).

### III. The government's conduct in responding to Dianon discovery is further evidence of bad faith.

On August 12, 2005, Dianon requested "documents" that were "in the possession, custody or control of a party or that can be obtained by a party through the exercise of a superior right to compel production from a third person." *Exhibit 17,* Dianon Document Request at 1. Specifically, Dianon requested:

- Each document that relates to how Medicare set reimbursement under former CPT Code 88180 (request 15).

- Each document that relates to any change in the reimbursement methodology for flow cytometry testing for Medicare beneficiaries (request 16).

- Each document that relates to the number of markers (antibody reagents) used or billed by providers and suppliers when performing flow cytometry . . . (request 20).

- Each document that relates to the panels or correct number of antibodies the government believes laboratories should use to perform flow cytometry (request 26).

- Each document relating to the merits or disadvantages or acceptance or rejection in the medical community of comprehensive or targeted flow cytometry panels for the diagnosis of leukemia or lymphoma (request 46).

- All documents related to the optimal, preferred or accepted number of antibodies to be used in flow cytometry panels for leukemia and lymphoma diagnosis (request 47).

- All documents relating to any appeal or challenge of any payment policy by a Medicare carrier limiting the number of antibodies reimbursed, including without limitation appeals by Impath and Genzyme to denials by Medicare carriers in California (request 50).

Dianon requested all documents in the government's control regarding reimbursement (request 15), changes in reimbursement (request 16), the number of markers billed (request 20), medical practice (request 26, 46, 47), and appeals or challenges to Medicare's reimbursement policy (request 50).

The government asserts Dianon specifically requested CMS documents, as opposed to documents in the possession of its agents, the Medicare carriers. Opposition at 10-11. The above requests do not reference CMS in any way – only documents in the custody or control of the government. Indeed, the government admits that documents in the possession of carriers are within the government custody and control as it dictates Medicare carrier document retention. Opposition at 20, *Exhibits 1 and 6.*

The government admits that CMS only instructed carriers to produce appeals and reimbursement policies. Opposition at 11. The government asserts that this disingenuous interpretation of the broad, straightforward language of the above document requests is appropriate because carriers "regularly issue" appeals and policies. *Id.* The government's excuse for not providing carrier files, CAC notes, data, comments, correspondence and other documents concerning the development and implementation of LMRPs and LCDs is without merit. The above document requests clearly requested documents concerning or relating to flow cytometry medical practice and reimbursement, not just documents that carriers "regularly issue."

-11-

The government admits that CMS: (1) has a list serve and it can contact every Medicare carrier instantly (Opposition at 12); (2) knows its carriers have carrier advisory committees (CAC), access to national data on flow cytometry, maintain "medical review files" and "medical policy files" (Opposition at 12, 14, *Exhibit 4* at 21:21 – 23:1); (3) knows both CMS and its carriers must preserve all documents related to litigation, investigation or allegations of fraud (*Exhibit 1*); (4) knows that the carriers have "thousands of pages related to flow cytometry" (Opposition at 14); and (5) requested the carrier files in May 2006 which were produced in less than two months (*Exhibit 4* at 33:13 – 35:8).

CMS, and therefore the government, are charged with knowledge of its agents, the Medicare carriers, concerning the administration of Medicare. Neither CMS nor the government can deny that they knew carriers maintained files, correspondence, and documents concerning flow cytometry yet refused to even request those documents from August 12, 2005 to May 22, 2006. Instead, it awaited Dianon's further request through "letters and phone calls." Opposition at 13. The government admits that the Connecticut Medicare carrier "had the documents most relevant to Dianon," (documents concerning the development of Connecticut's LCD) but did not produce those documents until June 2006. Opposition at 13.

Dianon presented evidence that the government had the only administrative law decision concerning the appropriate number of antibodies for more than two years yet refused to produce it. Memorandum at 4-5. The government claims this document was not produced because it "understood that (Dianon) already had" the opinion and that Dianon's document request "appeared to be seeking the underlying documents related to

the decision." How the government came to its "understanding" that Dianon had this decision is a mystery – neither Dianon nor its counsel had a copy of this decision until it was produced in June 2006.[4] Furthermore, Dianon's document request clearly requested <u>all documents</u> concerning any appeals that Impath made concerning flow cytometry – there is nothing in the "appearance" of the document request that could support the government's interpretation. *Exhibit 17* at request 20.

In response to Dianon's request for data concerning the number of markers billed by providers, the government did not disclose that it maintained 5% data samples for flow cytometry for public use. The government did not offer to produce such data or even request Dianon to pay for such data. Instead, four months after production was due and seven months after it was requested, the government offered as a "compromise" 5% data that it represented as "work product." Opposition at 5. Dianon also requested the deposition of a Medicare designee who could testify as to the number of antibodies Medicare reimbursed who was never produced.[5] *Exhibit 5* at ¶1(a).

There is no good faith reason why the government delayed the production of thousands of pages of relevant documents, admittedly "the documents most relevant to Dianon" until the closing days of discovery. More than 13,000 of the 17,000 plus pages

---

[4] *See Exhibit 18,* October 11, 2006 Letter from Robert Salcido to Patricia R. Davis at 3. The government ***never*** produced during discovery the copy of the *Impath* decision that disclosed that it was ***aware*** of the *Impath* ruling authorizing a 26 antibody panel ***before*** it intervened in this action. Instead, it produced ***at the close*** of discovery a document that did not include the fax tails showing when the government received the *Impath* decision. The government did not produce the copy with the date of receipt because it would then have to explain why it did not produce the document at the start of discovery, when it was due.

[5] Dianon had a telephone conference with the Court and the government concerning reimbursement data. The government agreed to produce a witness to discuss the data which it did on August 9, 2006. After the August 9, 2006 telephone conference, Dianon reiterated its request for the deposition of a Medicare data witness pursuant to the meeting as well as Dianon's original notice of deposition. The government flatly refused to produce this witness even though he had never been named and even though the government never produced a witness to testify as to the number of antibodies Medicare regularly reimbursed. The various references in the government's Opposition that Dianon could have requested depositions of various potential fact witnesses disclosed in the government's July document productions or August designee depositions is belied by its refusal to put forward one witness noted months before the close of discovery.

BA2DOCS1\#318015.01

of documents were dumped on Dianon in the last 60 days of discovery – during a time when the parties were also conducting some 20 depositions. Dianon had to put off the depositions of the CMS (August 3 and 4, 2006 after discovery closed) and Connecticut (July 25, 2006 six days before close of discovery) designees due to the late production.

The only reason the government claims these documents were not produced was because they are not relevant. Opposition at 12, n. 4. The thousands of pages of documents the government produced in June and July 2006 all relate to the practice of flow cytometry throughout the country and the decisions CMS agents (the Medicare carriers) made in regulating flow cytometry reimbursement. These documents evidence the inconsistent position CMS took on the definition of "medical necessity" through the various LMRPs, CMS knowledge of flow cytometry practices that were consistent with Dianon practices, and the acceptance of Dianon practices through judicial review. All of these documents are relevant to both define the term "medically necessary" and to establish a government knowledge defense. This purposeful delay in producing clearly relevant, important documents prejudiced Dianon by limiting its discovery options and is further evidence of bad faith. *U.S. ex rel. Carter v. Medica-Rents, Co.*, 2006 U.S.Lexis 88931 at *9 - *11 (N.D.Tx. Dec. 7, 2006) (purposeful delay in production of key documents in qui tam action supports finding of bad faith requiring the payment of attorneys fees).

The government's production of the Wisconsin physician services documents highlights its bad faith. First, the government admits it did not produce all relevant documents in its possession. Opposition at 17. Second, the government specifically refused to produce the additional documents provided in the FOIA request. *Exhibit 11,*

-14-

Response to request no. 40. Third, after stating that it would not produce the hundreds of additional pages of documents withheld from Dianon during discovery, it produced some of them along with other documents on September 25, 2006, including several of those documents cited in Dianon's motion.[6]

The belated Wisconsin carrier document production occurred <u>after</u> the government was on notice of the FOIA request. With this knowledge, remarkably the government "found" hundreds of pages of documents never produced to Dianon during discovery, but produced to a private citizen. However, the government still failed to produce to Dianon a redline version of Wisconsin carriers' policy on flow cytometry (allowing up to 25 antibodies for lymphoma and leukemia diagnosis) as well as documents concerning the carriers' access to STARS data and ability to preserve data. Memorandum at 6, 10-11. This failure to produce relevant documents from one carrier is at least circumstantial evidence that other carriers similarly failed to produce all documents in their possession concerning flow cytometry reimbursement or policy.

## IV.   CONCLUSION

The government did not honor its discovery obligations. Dianon clearly requested documents related to flow cytometry in the government's possession, custody or control – these included documents in the possession of CMS carriers. The government provides no reason for the delay of production of these documents until near the close (or after the close) of discovery. The government's bad faith is highlighted by the fact that, by its own admission, it failed to produce the documents "most relevant to Dianon" until June 2006 – specifically the Connecticut carrier documents related to the development of

---

[6] Since the government never labeled the source of any documents produced, undersigned counsel did not cross check the September document production, particularly after the government represented it would not produce the responsive documents.

BA2DOCS1\#318015.01

its LCD (CMS004225 – 4562). The government provides no reason for the delay in the production of hundreds of pages of "most relevant" documents. Had the government requested the carriers to produce this relevant information in September and October 2005, thousands of pages could have been produced to Dianon timely in December 2005 enabling Dianon to conduct further discovery. Instead, Dianon did not even begin the deposition process for CMS until after discovery was closed – all CMS designees were put forward in August 2006 due in large part to the late disclosure of documents.[7]

The government issued no litigation hold, and failed to establish that CMS document retention policies would cover all relevant documents. The government failed to notify CMS or its carriers of a pending fraud investigation for nearly three years, violating its own policy. The government does not deny that documents were destroyed. The government only denies that those documents that were destroyed were "irrelevant" or did not support Dianon's claims. Both assertions lack merit. Numerous documents could have been saved had the government, just as any other litigant must do, notified CMS, its carriers, and the government's premier flow cytometry laboratory at the NIH of their duties to protect relevant documents concerning flow cytometry. The notice of litigation would require nothing more than a handful of emails. The collection and protection of documents are nothing more than basic discovery requirements.

The Court has inherent powers to craft remedies for discovery violations. Given the conduct outlined in the Motion and this Reply and little or no explanation offered by the government concerning its delays and admission that it failed to protect documents, dismissal is appropriate. At the very least, the destroyed documents require an adverse

---

[7] For example, the government's September 25, 2006 production of showing the regular use of more than 20 antibodies for many different disease processes. *See Exhibit 19.* This data, not produced during discovery, could have been used for numerous depositions.

BA2DOCS1\#318015.01

inference instruction as well as the ability for Dianon to conduct a limited number of depositions, at the government's expense, to obtain discovery it was otherwise denied due to the late production of documents.

                                                  Respectfully submitted,

                                                  /s/ William Piermattei
                                        Bruce R. Parker, Admitted *Pro Hac Vice*
                                        Bar No. PHV01015
                                        William Piermattei, Admitted *Pro Hac Vice*
                                        Bar No. PHV 01585
                                        Venable LLP
                                        1800 Mercantile Bank & Trust Bldg.
                                        2 Hopkins Plaza
                                        Baltimore, Maryland  21201
                                        (410) 244-7400

                                                  /s/ Mary A. Gambardella
                                        Mary A. Gambardella (ct #05386)
                                        Epstein Becker & Green, P.C.
                                        One Landmark Square, Suite 1800
                                        Stamford, CT 06901-2601
                                        Telephone (203) 348-3737

                                        Robert Salcido, Admitted *Pro Hac Vice*
                                        Fed. Bar No. 447951
                                        Akin Gump Strauss Hauer & Feld, LLP
                                        1333 New Hampshire Avenue, NW
                                        Washington, DC 20036

                                        Attorneys for Dianon Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of May, 2007, a copy of the foregoing Reply to the Opposition to Motion in Limine Regarding Discovery Violations was sent via U.S. mail, postage prepaid, to:

> Richard M. Molot, Esq.
> Assistant United States Attorney
> U.S. Department of Justice
> Connecticut Financial Center
> 157 Church Street
> P.O. Box 1824
> New Haven CT 06510
>
> Bryan T. Carmody, Esq.
> Maya & Associates, P.C.
> 266 Post Road East
> Westport, CT 06880

_____
Dean R. Singewald II

BA2DOCS1\#318015.01