# EXHIBIT 9



**Clifton Gunderson LLP**
Certified Public Accountants & Consultants

February 14, 2006

Richard M. Molot, Esq.
Pat Davis, Esq.
U.S. Department of Justice
Connecticut Financial Center
157 Church Street
P.O. Box 1824
New Haven, Connecticut 06510

Re: United States ex rel. Tiesinga v. Dianon Systems, Inc., Civil No. 3:02CV1573 (MRK) (D. Conn.)

Dear Attorneys Molot and Davis:

This report (hereinafter, Report) is being offered pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

## I.      SCOPE OF ENGAGEMENT

We were engaged by the United States Department of Justice ("US DOJ") to provide services with regard to the above referenced matter.  The scope of our services included providing our opinion as to the damages suffered by the Medicare and Tricare Management Activity ("Tricare") programs as a result of the claims submitted by Dianon Systems, Inc. ("Dianon") for flow cytometry tests performed during the period from January 1, 1996 through December 31, 2003 containing antibodies that were not medically necessary.

In fulfilling these purposes, it is our opinion that we have done so in a manner that satisfies the requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals* for the establishment of the scientific validity of expert testimony.[1]   It is our opinion that, with respect to the purpose of estimating the

---

[1] *See* Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993)



00002

damages suffered by the Medicare and Tricare programs as discussed above, the statistical methods we have used to estimate the damages are scientifically valid, subject to standards governing their application, can be appropriately applied to the facts at issue, have been subjected to peer review and publication, have gained acceptance within the scientific community as proper methods, and, in this case, permit estimation of the damages within confidence limits applicable to normal standards for research in the social sciences.

## II.     QUALIFICATIONS OF THE EXPERT

It is our understanding that in providing this Report, it is necessary for us to set forth the qualifications of the undersigned, Dr. Constantin Yiannoutsos and Mr. R. James Alerding. Attached to this Report are copies of Dr. Yiannoutsos' and Mr. Alerding's curriculum vitae containing lists of publications, proceedings, appointments, and affiliations (see Appendices C and D, respectively).

Dr. Yiannoutsos is associate professor at the Indiana University School of Medicine in Indianapolis, Indiana and Director of the Indiana University Cancer Center Biostatistics Unit. He has received his doctoral degree in statistics by the University of Connecticut, Storrs, CT and has worked as a statistician for over ten years at Harvard University and Indiana University. Dr. Yiannoutsos has published over forty peer-reviewed scientific articles in the statistical, biostatistical and medical literature. He has been a consultant with Clifton Gunderson and its Valuation and Forensic Services for over a year.

Mr. Alerding has been actively engaged in the business valuation and forensic accounting area for about twenty-five years and currently spends the majority of his time on business valuation and forensic accounting issues.

Alerding is currently a partner of Clifton Gunderson LLP and the Managing Partner of its Valuation and Forensic Services Client Service Center. Clifton Gunderson is a national certified public accounting and consulting firm headquartered in Peoria, Illinois. The *Public Accounting Report* currently lists Clifton Gunderson as the 13th largest accounting firm in the United States. Prior to

his joining Clifton Gunderson, Alerding was a Tax Director and the Director in Charge of the Litigation Support and Valuation Services Division of a regional certified public accounting firm headquartered in Indianapolis, Indiana.

In addition to the above qualifications, Alerding has been actively engaged in business valuation and litigation work since 1980.  Alerding is a Certified Public Accountant, an Accredited Senior Appraiser in Business Valuation (American Society of Appraisers), Accredited in Business Valuation (American Institute of Certified Public Accountants), and a Certified Valuation Analyst (National Association of Certified Valuation Analysts).   Alerding is also a Fellow of the American College of Forensic Examiners.  In addition, Alerding is a member of the AICPA Business Valuation Standards Task Force.  Alerding also serves on the Editorial board of the *CPA Expert*.  Also attached is a summary of cases in which Alerding has testified at trial or by deposition in the past four years.

As it pertains to this Report, Alerding signs for only those sections dealing with the damages calculation, while Yiannoutsos signs for the Report in its entirety.

## III.    RESERVATION OF RIGHT

This Report is based upon the information that was available as of the date of this Report.  We reserve the right to supplement and/or amend this Report, as new and additional information becomes available.  We also reserve the right to supplement and/or amend this Report with charts, graphs, and other visual aids such as PowerPoint®  to assist in testimony.

CG00004

## IV.     BACKGROUND

Defendant Dianon is a clinical laboratory with its principal place of business in Stratford, CT. Dianon is a wholly owned subsidiary of Laboratory Corporation of America, Inc. In performing hematopathology flow cytometry tests, starting in 1996 and up to present time, Dianon significantly increased the number of antibodies it used to test patient specimens. At all relevant times, Dianon was reimbursed separately by Medicare and Tricare for each antibody used in the flow cytometry test. However, the United States alleges that not all of the antibodies for which Dianon billed Federal healthcare programs were medically necessary.

## V.     SUMMARY OF THE DAMAGE ANALYSIS

As stated previously, the scope of our services included providing our opinion as to the damages suffered by the Medicare and Tricare programs as a result of the claims submitted by Dianon for flow cytometry tests performed during the period from January 1, 1996 through December 31, 2003 (the "Damages Period") containing antibodies that were not medically necessary.

Our process in calculating the damages included the following steps, which will be discussed in more detail throughout the Report:

1.   We examined the databases provided by the US DOJ which contain the claims submitted by Dianon for flow cytometry tests for the Damages Period (the "Claims Databases") for both Medicare and Tricare. The Claims Databases include multiple columns for each flow cytometry test, including date of service, units billed, and amount paid.

2.   We divided the tests into two separate populations for both the Medicare and Tricare Claims Databases: Repeat Tests and Non-Repeat Tests. For each population, we analyzed Repeat and Non-Repeat Tests separately. Repeat Tests are any series of tests performed during the Damages Period for the same patient.

CG00005

3. We designed and selected a stratified random sample for the Damages Period for both the Repeat Tests and the Non-Repeat Tests from the Medicare Claims Database.

4. We provided a list of the sample tests selected from the Medicare Claims Database to the US DOJ, which in turn provided the list to an expert pathologist, Dr. Stuart D. Flynn. Dr. Flynn reviewed the patient files held by Dianon and, based upon this review, determined the number of medically necessary units for each test.

5. We examined the results of Dr. Flynn's review and used the results to estimate the damages for the total number of flow cytometry tests which Dianon performed during the Damages Period and submitted a claim to the Medicare and Tricare programs.

6. We estimated an upper and lower confidence interval based on a 95% confidence level.

A more detailed discussion of our analysis and conclusions follows.

## VI.  METHOD, DATA, AND ANALYSIS

### 1. Sample Design and Selection

#### a. Overview

The overall objective of the statistical analysis is to assess the existence of overcharging and, in the presence of possible overcharging, assess the extent of damages suffered by Medicare and Tricare as a result. We performed a sample procedure in order to estimate the damages. In the next section we describe preparatory steps taken in order to design the sample selection and the implementation and performance.

#### b. Descriptive analysis (Medicare)

Figure 1 shows frequency tables of the total number of units per test charged by Dianon to Medicare and the year or period of the test.

CG00006



CG00007





**Figure 1.** Frequency distribution of total antibodies charged per test. The small number of totals greater than 26 are multiple tests (with 26 total antibodies each) that were run on the same date.

Three main patterns of charging are evident by inspection of the frequency tables: A pattern of predominantly 26 total antibodies per test, which starts in 1996 and ends on August 31, 1997, a second period when almost exclusively 18 tests are charged, which starts on September 1, 1997 and ends on or about December 31, 2000 and a third pattern of almost exclusive charges of 26 antibodies per test, which is manifested between 2001 and 2003.

CG00009

c. Selection of the sample

In addition to the three patterns of charging that were evident by inspection of the data, there were two additional considerations in selecting the sample. The majority of patients had only a single test performed (Non-Repeat Group). These were 9,601 cases. In addition, 1,150 patients had a number of tests performed on them repeatedly (Repeat Group). This amounted to 1,553 repeated tests on these individuals. For purposes of estimation, repeated tests performed on the same individual will likely be associated in terms of the number of medically necessary units. So estimating the average number and variability of medically necessary units among repeated tests cannot proceed in the same manner as with single (non-repeated tests). In addition, the initial tests from a series performed on the same individual may not share the same number of medically necessary units as non-repeat units. For these reasons, we selected the samples of non-repeated and repeated tests separately. Further, within the repeat tests we estimated the average number of units (antibodies run) considered medically necessary.

i. Selection of non-repeat tests

In an attempt to reduce the variability of the number of medically necessary units in the sample, we used a stratified sample approach, where stratification was performed over the three time periods with the three distinct charging patterns identified.

These were:

| Stratum | Time | Total number of tests | Number selected |
|---|---|---|---|
| 1 | 1/1/1996 – 8/31/1997 | 870 | 30 |
| 2 | 9/1/1997 – 12/31/2000 | 3,019 | 60 |
| 3 | 1/1/2001 – 12/31/2003 | 5,712 | 90 |
| | Total | 9,601 | 180 |

**Table 1.** Selection of non-repeat sample.

We sampled a greater number of tests in the last two strata due to the larger number of tests performed by Dianon in those strata. We randomly selected 30 sample tests from the first stratum, 60 from the second and 90 from the third (total 180 tests) were selected.

ii.  Selection of repeated tests

Repeated tests were selected by weighing as described below. Specific individuals were selected and then all their attendant tests were included in the sample. The repeated tests were selected as follows:

1) All records that had tests performed prior to January 1, 1996 were excluded from the sample. Only cases whose earliest test was from after January 1, 1996 were included.

2) There were a total of 2,703 repeated tests sampled from.

3) We thus generated a probability for each patient record to be selected equal to $w=n_i/2,703$, where $n_i$ is the number of repeat tests for HIC $i$.

This is a proper weighting scheme since $\sum w = \sum \dfrac{n_i}{2703} = \dfrac{2703}{2703} = 1$.

CG00011

Sixty (60) patient records were selected accounting for 258 total tests (60 initial and 198 repeated tests).   A summary is shown in the Table below.

| Type of test | Total number of tests |
|---|---:|
| Initial test | 60 |
| Follow-up test | 198 |
| **Total** | 258 |

Table 2.  Selection of repeat samples (Medicare)

CG00012

2.  Analysis

    a.  **Exploratory data analysis (review sample)**

Out of the 180 non-repeated samples requested, 178 met criteria for analysis. In the remaining two, the number of medically necessary units could not be determined.  The average number of medically necessary units per test, for each stratum, along with the standard deviation is shown in the following table.

| Stratum | N | Mean Med. Nec. | Std. Deviation |
|---|---|---|---|
| 1/1/1996 – 8/31/1997 | 30 | 14.67 | 3.0887 |
| 9/1/1997 – 12/31/2000 | 59 | 15.32 | 2.7882 |
| 1/1/2001 – 12/31/2003 | 89 | 15.84 | 3.0110 |
| Total | 178 | | |

Table 3.  Descriptive statistics of the average number of units considered medically necessary upon review of the sample (Medicare – Non-Repeat).

Exploratory data analysis (shown in the histogram in the following Figure) showed that the distribution of the number of units per test considered medically necessary follow an approximate bell-shaped distribution. Thus, the number of samples collected can be analyzed via normal-approximation results.

By contrast, the number of units charged by Dianon exhibit a markedly different pattern centered around 26, 18 and 26 units in the three time periods (strata) respectively (Figure 1).

CG00013

In addition, we performed a test of equality of the variability (Levene's test of equality of the variances[2]). The result of this analysis showed that the variability of the estimates for the mean number of antibodies per test that were considered medically necessary was not significantly different in the three strata. The pooled estimate of the variance is

$$s_p = \sqrt{\frac{(30-1)(3.0887)^2 + (59-1)(3.0110)^2 + (89-1)(2.7882)^2}{178-3}} = 2.95233$$



Figure 2 Histogram of the number of medically *necessary* units per test

[2] Levene, H. (1960). In *Contributions to Probability and Statistics: Essays in Honor of Harold Hotelling*, I. Olkin et al. eds., Stanford University Press, pp. 278-292.

CG00014

b. **Estimation of medically unnecessary units (population)**

The number of medically unnecessary units for each test is defined as the difference between the number of units charged and the number of units considered to be medically necessary. As the number of units that were medically necessary has been determined by the medical expert for the 178 tests that comprised the review sample, the number of unnecessary units must be estimated for the remaining 9,523 (=9,601-178) tests. To estimate the number of medically unnecessary units we subtract the mean number of units considered medically necessary from the number of units charged in each individual test.

3. **Damages Estimation (Medicare)**

   a. **Damage estimation: Non-Repeats (Medicare)**

      i. Damage estimation in the population

         An estimate of the damages incurred by charging for medically unnecessary units was calculated by determining the average per-unit charge and multiplying it by the number of unnecessary units in each test. The average per-unit charge was calculated by dividing the total amount paid by Medicare by the total number of units charged. The product (per-unit charge times the estimate of the number of medically unnecessary units) thus produce an estimate for the amount overcharged for each individual test.

      ii. Damage estimation in the review sample

         For members of the review sample, the number of unnecessary units was derived by subtracting the number of medically necessary units from the total charged to Medicare. The number of unnecessary units is then multiplied by the per-unit fee to derive the damage incurred for that individual test.

      iii. Estimation of total damages: Non-Repeats (Medicare)

         To derive the estimate of the total damage amount we added the individual-test damage estimates over all observations in the population.

CG00015

The resulting estimate of the total damages is shown in Table 4 below.

| Year | N | Damages (95% CI) | | |
|---|---|---|---|---|
| 1/1/1996 – 8/31/1997 | 870 | 189,251.72 | ( 85,175.62, | 293,503.38) |
| 9/1/1997 – 12/31/2000 | 3,019 | 212,576.15 | ( 4,928.05, | 657,544.58) |
| 1/1/2001 – 12/31/2003 | 5,712 | 2,241,580.36 | ( 977,687.18, | 3,506,761.11) |
| **Total** | **9,601** | 2,643,408.23 | (1,067,790.84, | 4,457,809.07) |

Table 4. Estimate of overcharge with 95% confidence interval: Non-Repeats (Medicare)

**b. Damage estimation: Repeats (Medicare)**

   i. Estimation of medically necessary units (review sample)

   To estimate the number of unnecessary units for each test in the population, we estimated the mean number of medically necessary units in the sample and then subtracted this from the total number of units for each test in the population. We considered the 60 initial and 198 follow-up tests separately. The reason for this is that, while the initial tests are unrelated (independent) from one individual to the other, the same is not true for repeated follow-up tests that are performed on the same individual. While the first case is similar to the non-repeat situation of Section 3 above, a modified analysis is necessary for the follow-up tests in order to account for the correlation among tests performed on the same individual.

   1) Estimation of medically necessary units (initial test)

   The mean and standard deviation for the 60 initial tests was estimated in an identical manner to the mean and standard deviation among the non-repeat tests. No stratification was performed during the selection of the sample and no stratification was performed during the analysis (particularly since the variability across strata was shown to be virtually the same). The mean number of units considered medically

CG00016

necessary among initial tests and the standard deviation are 16.92 and 4.09 tests respectively.

2) Estimation of medically necessary units (follow-up tests)

To estimate the mean number of units that were considered medically necessary among the 198 follow-up tests, we used a repeated analysis of variance model with a compound symmetry covariance structure (for details refer to Appendix A). This structure assumes that the association (statistical correlation) among the number of units in tests performed on the same individual is constant. This assumption is generally reasonable and, more importantly, is born out by the data at hand. The statistical model produced as the estimate of the mean and standard deviation of each follow-up test 12.18 and 1.7366 respectively.

ii. Estimation of medically unnecessary units (population)

The estimation of the mean number of medically unnecessary units was calculated, in all cases, by subtracting the mean number of medically necessary units, estimated in Section 4bi above.

The number of medically unnecessary units in the 258 members of the sample is equal, as in the non-repeat case, to the difference of the total units charged minus the number of units considered medically necessary by the medical expert.

iii. Estimation of total damages: Repeats (Medicare)

An estimate of the damages was calculated as the product of the number of units deemed medically unnecessary and the average per-unit fee for each test. The average per-unit fee was determined, similarly to the calculations presented in Section 3, as the ratio of the total amount charged for each test divided by the number of units.

To derive the estimate of the total damage amount we added the individual-test damage estimates over all observations in the population. The resulting estimate of the total damages is shown in Table 5 below.

| Type of test | N | Damages (95% CI) |
|---|---|---|
| Initial test | 1,150 | 230,150.47 ( 31,224.90,   503,253.33) |
| Follow-up test | 1,553 | 660,458.06 (498,072.77,   823,358.04) |
| Total | 2,703 | 890,608.53 (529.297.67, 1,326,611.37) |

**Table 5.** Estimate of overcharge with 95% confidence interval: Repeats (Medicare)

c. **Estimation of total damages: Medicare**

The total damages from the estimates based on the non-repeat and repeat tests are as follows:

| Type of test | N | Damages (95% CI) |
|---|---|---|
| Non-repeat test | 9,601 | 2,643,408.23 (1,067,790.84, 4,457,809.07) |
| Repeat test | 2,703 | 890,608.53 ( 529,297.67, 1,326,611.37) |
| Total | 12,304 | 3,534,016.76 (1,597,088.51, 5,784,420.44) |

**Table 6.** Estimate of unadjusted total damages with 95% confidence interval: Medicare Totals

Therefore, the estimate of the damages to Medicare is $3,534,016.76. We have calculated prejudgment interest on the damages through January 31, 2006 utilizing interest rates from the Federal Hospital Insurance Trust Fund.[3] The estimate of the total damages to Medicare is $4,155,331.00, including interest.

---

[3] Prejudgment interest was calculated using monthly compounding. Interest was calculated on the total damages for each year (based upon date of service) starting the first day of the following year. We understand the calculation of interest may need to be updated.

4. **Tricare**

    a. **Overview**

We performed similar analyses to those described in the previous sections in order to assess possible overcharging of tests reimbursed by Tricare. The provided data involve 939 tests performed by Dianon and paid for by Tricare. After excluding observations involving tests carried out prior to 1996 and those tests carried out after 2003, there were 612 tests that were included in the analysis. In these analyses, no sampling was performed to estimate the mean number of units per test that were considered medically necessary. The reason for this (see Section 5b) is because the prevailing charging patterns observed in Medicare accounts (Figure 1 in Section 2b) was also detected in Tricare-covered accounts. In the case of Tricare, records from individuals with single (Non-Repeat) and multiple tests (Repeat) were considered separately using estimates derived from the analysis of the Medicare data. Extrapolation to the Tricare data is performed in a manner identical to that of the Medicare population.

CG00019

b.  **Exploratory data analysis**

To establish that the same prevailing charging practices also were applied in the case of Tricare accounts we generated frequency histograms of the number of total units charged per test. These are presented in Figure 3.



CG00020



1998

1999

CG00021





2003

**Figure 3.** Frequency distribution of total antibodies charged per test. The small number of totals greater than 26 are multiple tests (with 18 or 26 total antibodies each) that were run on the same date.

There are three distinct time periods that are evident by simple inspection of the data: 1) A pattern of predominantly 26 total antibodies per test, which starts in 1996 and ends on August 31, 1997, 2) a second period when almost exclusively 18 units are charged, which starts on September 1, 1997 and ends on or about December 31, 2000 and 3) a third pattern of almost exclusive charges of 26 antibodies per test, which is manifested between 2001 and 2003. Accordingly, we applied the estimates of the mean number of units considered medically necessary in the Medicare sample, applicable to the Tricare sample.

CG00023

c.  **Damage estimation: Non-Repeats (Tricare)**

An estimate of the damages incurred by charging for medically unnecessary units among Tricare-covered accounts was calculated by determining the average per-unit charge and multiplying it by the number of unnecessary units in each test. The product thus produces an estimate for the amount overcharged for each individual test.

| Year | N | Damages (95% CI) |
|------|---|------------------|
| 1/1/1996 – 8/31/1997 | 30 | 7,453.13 (  3,609.62,   11,311.64) |
| 9/1/1997 – 12/31/2000 | 83 | 4,441.89 (       0.00,  14,106.64) |
| 1/1/2001 – 12/31/2003 | 381 | 60,714.19 ( 25,938.64,  95,489.74) |
| **Total** | 494 | 72,609.21 ( 29,548.26, 120,908.01) |

Table 7. Damage estimate of overcharge with 95% confidence interval: Non-Repeat Tests (Tricare)

d.  **Damage estimation: Repeats (Tricare)**

The estimation of damages for cases with repeated tests

i.  Estimation of medically unnecessary units (population)

The estimation of the mean number of medically unnecessary units was calculated, in all cases, by subtracting the mean number of medically necessary units.

ii.  Estimation of total damages: Repeats (Tricare)

An estimate of the damages was calculated as the product of the number of units deemed medically unnecessary and the average per-unit fee for each test. The average per-unit fee was determined, similarly to the calculations presented in Section 3, as the ratio of the total amount charged for each test divided by the number of units.

CG00024

To derive the estimate of the total damage amount we added the individual-test damage estimates over all observations in the population. The resulting estimate of the total damages is shown in Table 8 below.

| Type of test | N | Damages (95% CI) |
|---|---|---|
| Initial test | 49 | 5,939.49 ( 561.69, 13,482.15) |
| Follow-up test | 69 | 13,655.81 (9,351.98, 18,113.74) |
| Total | 118 | 19,595.30 (9,913.67, 31,595.89) |

Table 8. Estimate of overcharge with 95% confidence interval: Repeats (Tricare).

e.  **Estimation of total damages: Tricare**

The total damages from the estimates based on the non-repeat and repeat tests are as follows:

| Type of test | N | Damages (95% CI) |
|---|---|---|
| Non-repeat test | 494 | 72,609.21 (29,548.26, 120,908.01) |
| Repeat test | 118 | 19,595.30 ( 9,913.67,  31,595.89) |
| Total | 612 | 92,204.51 (39,461.93, 152,503.90) |

Table 9. Estimate of unadjusted total damages with 95% confidence interval: Tricare Totals.

Therefore, the estimate of the damages to Tricare is $92,204.51. We have calculated prejudgment interest on the damages through January 31, 2006 utilizing interest rates from the Federal Hospital Insurance Trust Fund. The estimate of the damages to Tricare is $109,582.42, including interest.

CG00025

**5.  Units Billed in Excess of Units Performed**

We observed several instances in the Medicare review sample during 1996 and early 1997 (Stratum 1) in which Dianon charged for more units than were performed.  The proportion of cases, in the sample, where units performed are less than units charged are 25/30 (83.33%).  The 95% confidence interval for this is (65.28%, 94.36%).  A summary of the observations is included in Exhibit VI.

**VII.    OPINION**

It is our opinion that the damages suffered by the Medicare and Tricare programs as a result of the claims submitted by Dianon for flow cytometry tests performed during the period from January 1, 1996 through December 31, 2003 containing antibodies that were not medically necessary is:

**$3,626,221.27 (Without Interest)**

**AND**

**$4,264,913.42 (With Interest)**

Further, it is our opinion that the methodology we have used to derive the damages estimated in this report is scientifically valid, subject to standards governing its application, can be appropriately applied to the facts at issue, has been subjected to peer review and publication, has gained acceptance within the scientific community as a proper methodology, and allowed the estimation of damages within confidence limits applicable to normal standards for research in the social sciences. Finally, it is our opinion that the data we analyzed were adequate to apply this statistical methodology to derive estimated damages in a reliable manner.

CG00026

## VIII.   COMPENSATION

The compensation received for this Report and the testimony of Yiannoutsos and Alerding at trial is based on hourly rates of $300 and $400, respectively, and lower rates for other staff.  No final billing has been submitted.

Very truly yours,


Constantin T. Yiannoutsos, Ph.D.          R. James Alerding, CPA/ABV, ASA, CVA
Director, Biostatistics                   Partner
Indiana University Cancer Center          Clifton Gunderson LLP
                                          Valuation and Forensic Services Group

CG00027